Westlaw.

377 F.3d 727                                                                                                                    Page 1
377 F.3d 727, Fed. Sec. L. Rep. P 92,903
**(Cite as: 377 F.3d 727)**

H
Briefs and Other Related Documents

United States Court of Appeals,
Seventh Circuit.

Brian ASHER, et al., Plaintiffs-Appellants,
v.
BAXTER INTERNATIONAL INCORPORATED,
et al., Defendants-Appellees.

No. 03-3189.

Argued Jan. 22, 2004.
Decided July 29, 2004.
As Amended Sept. 3, 2004.
Rehearing and Rehearing En Banc Denied Sept. 3,
2004.

**Background:** Investor brought putative class action against corporation and individual officers of corporation, alleging securities fraud via artificial inflation of stock price in advance of acquisition. The United States District Court for the Northern District of Illinois, Blanche M. Manning, J., 2003 WL 21825498, granted defendants' motion to dismiss, and investor appealed.

**Holdings:** The Court of Appeals, Easterbrook, Circuit Judge, held that:
(1) cautionary language contained in Form 10-K potentially brought allegedly misleading press releases and oral statements within safe harbor provisions of Private Securities Litigation Reform Act (PSLRA), but
(2) PSLRA safe harbor was not necessarily applicable, without discovery as to what executives knew of risks at time cautionary language was written or maintained.

Reversed and remanded.

West Headnotes

**[1] Securities Regulation** ⊕⟶60.27(7)
349Bk60.27(7) Most Cited Cases

Under fraud-on-the-market theory underlying investors' securities fraud class action against corporation and individual executives, cautionary language contained in Form 10-K and other filings potentially brought allegedly misleading press releases and executives' oral statements within safe harbor provisions of Private Securities Litigation Reform Act (PSLRA), even though language of 10-K did not "accompany" press release and oral statements. Securities Act of 1933, § 27A(c)(1)(A)(i), (c)(2)(A)(ii), (c)(2)(B), as amended, 15 U.S.C.A. § 77z-2(c)(1)(A)(i), (c)(2)(A)(ii), (c)(2)(B); Securities Exchange Act of 1934, § 21E(a), as amended, 15 U.S.C.A. § 78u-5(a).

**[2] Securities Regulation** ⊕⟶60.27(5)
349Bk60.27(5) Most Cited Cases

Private Securities Litigation Reform Act (PSLRA) safe harbor provisions do not require forward-looking statements to be accompanied by the most helpful possible cautionary language; rather, it is sufficient to point to principal contingencies that could cause actual results to depart from projection. Securities Act of 1933, § 27A(c), as amended, 15 U.S.C.A. § 77z-2(c); Securities Exchange Act of 1934, § 21E(a), as amended, 15 U.S.C.A. § 78u-(a).

**[3] Securities Regulation** ⊕⟶60.27(7)
349Bk60.27(7) Most Cited Cases

Private Securities Litigation Reform Act's (PSLRA) safe harbor provisions were not necessarily applicable in investors' securities fraud class action alleging materially false financial projections for period of several months prior to sharp stock price drop that followed lower-than-expected financial results; cautionary statements accompanying corporation's Form 10-K and other filings listed numerous possible risks but failed to mention others that executives were allegedly aware of, and there

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

377 F.3d 727 Page 2
377 F.3d 727, Fed. Sec. L. Rep. P 92,903
**(Cite as: 377 F.3d 727)**

was no way to tell at pleading stage of investors' action whether executives had known of unmentioned risks at time cautionary language was written, especially given fact that language remained fixed during months preceding price drop even as risks changed. Securities Act of 1933, § 27A(c), as amended, 15 U.S.C.A. § 77z-2(c); Securities Exchange Act of 1934, § 21E(a), as amended, 15 U.S.C.A. § 78u-(a).

*728 Barry A. Weprin (argued), Milberg, Weiss, Bershad & Schulman, New York, NY, for Plaintiffs-Appellants.

Matthew R. Kipp (argued), Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Defendants-Appellees.

Before EASTERBROOK, MANION, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

Baxter International, a manufacturer of medical products, released its second-quarter financial results for 2002 on July 18 of that year. Sales and profits did not match analysts' expectations. Shares swiftly fell from $43 to $32. This litigation followed; plaintiffs contend that the $43 price was the result of materially misleading projections on November 5, 2001, projections that Baxter reiterated until the bad news came out on July 18, 2002. Plaintiffs want to represent a class of all investors who purchased during that time either in the open market or by exchanging their shares of Fusion Medical Technologies. (Baxter acquired Fusion in a stock-for-stock transaction; plaintiffs think that Baxter juiced up the market price so that it could secure Fusion in exchange for fewer of its own shares.) Bypassing the question whether the suit could proceed as a class action, but see Fed.R.Civ.P. 23(c)(1)(A), the district court dismissed the complaint for failure to state a claim on which relief may be granted. 2003 WL 21825498, 2003 U.S. Dist. LEXIS 12905 (N.D.Ill. July 17, 2003). The court did not doubt that the allegations ordinarily would defeat a motion under Fed.R.Civ.P. 12(b)(6). Still, it held, Baxter's forecasts come within the safe harbor created by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-2(c), 78u-5(c). The PSLRA creates rules that judges must enforce at the outset of the litigation; plaintiffs do not question the statute's application before discovery but do dispute the district court's substantive decision.

Baxter's projection, repeated many times (sometimes in documents filed with the SEC, sometimes in press releases, sometimes in executives' oral statements), was that during 2002 the business would yield revenue growth in the "low teens" compared with the prior year, earnings-per-share growth in the "mid teens," and "operational cash flow of at least $500 million." Baxter often referred to these forecasts as "our 2002 full-year commitments," which is a strange locution. No firm can make "commitments" about the future--Baxter can't *compel* its customers to buy more of its products--unless it plans to engage in accounting shenanigans to make the numbers come out right no matter what happens to the business. But nothing turns on the word; the district court took these "commitments" as "forward-looking statements," see 15 U.S.C. §§ 77z-2(a), 78u-5(a), and plaintiffs do not quarrel with that understanding. What they do say is that the projections were too rosy, and that Baxter knew it. That charges the defendants with stupidity as much as with knavery, for the truth was bound to come out quickly, but the securities laws forbid foolish frauds along with clever ones.

According to the complaint, Baxter's projections were materially false because: (1) its Renal Division had not met its internal budgets in years; (2) economic instability in Latin America adversely affected Baxter's sales in that part of the world; (3) Baxter closed plants in Ronneby, Sweden, *729 and Miami Lakes, Florida, that had been its principal source of low-cost dialysis products; (4) the market for albumin (blood-plasma) products was "over-saturated," resulting in lower prices and revenue for the BioSciences Division; (5) sales of that division's IGIV immunoglobin products had fallen short of internal predictions; and (6) in March 2002 the BioScience Division had experienced a sterility failure in the manufacture of a major product, resulting in the destruction of multiple lots and a loss exceeding $10 million. The district court assumed, as shall we, that failure to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

377 F.3d 727                                                                                                                                    Page 3
377 F.3d 727, Fed. Sec. L. Rep. P 92,903
**(Cite as: 377 F.3d 727)**

disclose these facts would create problems but for the statutory safe harbor--though items (2) and (4) at least are general business matters rather than Baxter's secrets, and the securities laws do not require issuers to disclose the state of the world, as opposed to facts about the firm. See *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509 (7th Cir.1989). Item (3) also was public knowledge (Baxter issued a press release announcing the closings and a substantial charge against earnings)--though the cost of products that had been made at these plants may have been secret. Whether all firm-specific non-disclosures add up to a material non-disclosure--and whether Baxter had some non-public information about those matters that seem to be general information--are topics we need not tackle.

Section 77z-2, which deals with statements covered by the Securities Act of 1933 (here, those in the registration statement and prospectus for the stock that Baxter exchanged for Fusion's shares) and § 78u-5, which deals with statements covered by the Securities Exchange Act of 1934 (here, the statements in Baxter's press releases, press conferences, and periodic filings) are identical in all significant respects, so from now on we mention only the former statute. The statutory safe harbor forecloses liability if a forward-looking statement "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" (§ 77z-2(c)(1)(A)(i)). The fundamental problem is that the statutory requirement of "meaningful cautionary statements" is not itself meaningful. What must the firm say? Unless it is possible to give a concrete and reliable answer, the harbor is not "safe"; yet a word such as "meaningful" resists a concrete rendition and thus makes administration of the safe harbor difficult if not impossible. It rules out a caution such as: "This is a for-ward-looking statement: caveat emptor." But it does not rule *in* any particular caution, which always may be challenged as not sufficiently "meaningful" or not pinning down the "important factors that could cause actual results to differ materially"--for if it *had* identified all of those factors, it would not be possible to describe the forward-looking statement itself as materially misleading. A safe harbor matters only when the firm's disclosures (including the accompanying cautionary statements) are false or misleadingly incomplete; yet whenever that condition is satisfied, one can complain that the cautionary statement must have been inadequate. The safe harbor loses its function. Yet it would be unsound to read the statute so that the safe harbor never works; then one might as well treat § 77z-2 and § 78u-5 as defunct.

Baxter provided a number of cautionary statements throughout the class period. This one, from its 2001 Form 10-K filing--a document to which many of the firm's press releases and other statements referred--is the best illustration:

> Statements throughout this report that are not historical facts are forward-looking statements. These statements are *730 based on the company's current expectations and involve numerous risks and uncertainties. Some of these risks and uncertainties are factors that affect all international businesses, while some are specific to the company and the health care arenas in which it operates.
>
> Many factors could affect the company's actual results, causing results to differ materially, from those expressed in any such forward-looking statements. These factors include, but are not limited to, interest rates; technological advances in the medical field; economic conditions; demand and market acceptance risks for new and existing products, technologies and health care services; the impact of competitive products and pricing; manufacturing capacity; new plant start-ups; global regulatory, trade and tax policies; regulatory, legal or other developments relating to the company's Series A, AF, and AX dialyzers; continued price competition; product development risks, including technological difficulties; ability to enforce patents; actions of regulatory bodies and other government authorities; reimbursement policies of government agencies; commercialization factors; results of product testing; and other factors described elsewhere in this report or in the company's other filings with the Securities and Exchange Commission. Additionally, as discussed in Item 3--"Legal Proceedings," upon the resolution of certain legal matters, the company may incur charges in excess of presently established reserves. Any such change could have a material adverse effect on the company's

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

377 F.3d 727    Page 4
377 F.3d 727, Fed. Sec. L. Rep. P 92,903
(Cite as: 377 F.3d 727)

results of operations or cash flows in the period in which it is recorded.

Currency fluctuations are also a significant variable for global companies, especially fluctuations in local currencies where hedging opportunities are unreasonably expensive or unavailable. If the United States dollar strengthens significantly against mist foreign currencies, the company's ability to realize projected growth rates in its sales and net earnings outside the United States could be negatively impacted.

The company believes that its expectations with respect to forward-looking statements are based upon reasonable assumptions within the bounds of its knowledge of its business operations, but there can be no assurance that the actual results or performance of the company will conform to any future results or performance expressed or implied by such forward-looking statements.

The district court concluded that these are "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement". They deal with Baxter's business specifically, mentioning risks and product lines. Plaintiffs offer two responses. First they contend that the cautionary statements did not cover any of the six matters that (in plaintiffs' view) Baxter had withheld. That can't be dispositive; otherwise the statute would demand prescience. As long as the firm reveals the principal risks, the fact that some other event caused problems cannot be dispositive. Indeed, an unexpected turn of events cannot demonstrate a securities problem at all, as there cannot be "fraud by hindsight." *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978) (Friendly, J.). See also *Murray v. Abt Associates Inc.,* 18 F.3d 1376 (7th Cir.1994); *DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir.1990). The other response is that the cautionary statement did not follow the firm's fortunes: plants closed but the cautionary statement remained the *731 same; sterilization failures occurred but the cautionary statement remained the same; and bad news that (plaintiffs contend) Baxter well knew in November 2001 did not cast even a shadow in the cautionary statement.

[1] Before considering whether plaintiffs' objections defeat the safe harbor, we ask whether the cautionary statements have any bearing on Baxter's potential liability for statements in its press releases, and those its managers made orally. The press releases referred to, but did not repeat verbatim, the cautionary statements in the Form 10-K and other documents filed with the Securities and Exchange Commission. The oral statements did not do even that much. Plaintiffs say that this is fatal, because § 77z-2(c)(1)(A)(i) provides a safe harbor only if a written statement is "accompanied by" the meaningful caution; a statement published elsewhere differs from one that accompanies the press release. As for the oral statements: § 77z-2(c)(2)(A)(ii), a special rule for oral statements, provides a safe harbor only if the statement includes "that the actual results could differ materially from those projected in the forward-looking statement" and in addition:

(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to differ materially from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. § 77z-2(c)(2)(B). When speaking with analysts Baxter's executives did not provide them with all of this information, such as directions to look in the 10-K report for the full cautionary statement. It follows, plaintiffs maintain, that this suit must proceed with respect to the press releases and oral statements even if the cautionary language filed with the SEC in registration statements and other documents meets the statutory standard.

If this were a traditional securities suit--if, in other words, an investor claimed to have read or heard the statement and, not having access to the truth, relied to his detriment on the falsehood--then plaintiffs' argument would be correct. But this is not a traditional securities claim. It is a fraud-on-the-market claim. None of the plaintiffs asserts that he read any of Baxter's press releases or listened to an executive's oral statement. Instead the

377 F.3d 727                                                                                                    Page 5
377 F.3d 727, Fed. Sec. L. Rep. P 92,903
**(Cite as: 377 F.3d 727)**

theory is that other people (professional traders, mutual fund managers, securities analysts) did the reading, and that they made trades or recommendations that influenced the price. In an efficient capital market, all information known to the public affects the price and thus affects every investor. *Basic Inc. v. Levinson,* 485 U.S. 224, 241-47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), holds that reliance on the accuracy of the price can substitute for reliance on the accuracy of particular written or oral statements, when the statements affect the price--as they do for large and well-followed firms such as Baxter, for which there is a liquid public market. This works only to the extent that markets efficiently reflect (and thus convey to investors the economic equivalent **\*732** of) all public information. See Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory,* 74 Cornell L.Rev. 907, 917-22 (1989); Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory,* 42 Stan. L.Rev. 1059 (1990).

When markets are informationally efficient, it is impossible to segment information as plaintiffs propose. They ask us to say that they received (through the price) the false oral statements but not the cautionary disclosures. That can't be; only if the market is inefficient is partial transmission likely, and if the market for Baxter's stock is inefficient then this suit collapses because a fraud-on-the-market claim won't fly. An investor who invokes the fraud-on-the-market theory must acknowledge that *all* public information is reflected in the price, just as the Supreme Court said in *Basic.* See 485 U.S. at 246, 108 S.Ct. 978. See *Flamm v. Eberstadt,* 814 F.2d 1169, 1179-80 (7th Cir.1987); *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1115-16 (9th Cir.1989); *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1122-23 (10th Cir.1997). Thus if the truth or the nature of a business risk is widely known, an incorrect statement can have no deleterious effect, and if a cautionary statement has been widely disseminated, that news too affects the price just as if that statement had been handed to each investor. If the executives' oral statements came to plaintiffs through professional traders (or analysts) and hence the price, then the cautions reached plaintiffs via the same route; market professionals are savvy enough to discount projections appropriately. Then § 77z-2(c)(2)(B) has been satisfied for the oral statements (and so too § 77z-2(c)(1)(A)(i) for the press releases). And if the cautions did not affect the price, then the market must be inefficient and the suit fails for that reason. So we take the claim as the pleadings framed it: the market for Baxter's stock is efficient, which means that Baxter's cautionary language must be treated as if attached to every one of its oral and written statements. That leaves the question whether these statements satisfy the statutory requirement that they adequately "identify [ ] important factors that could cause actual results to differ materially from those in the forward-looking statement".

The parties agree on two propositions, each with support in decisions of other circuits. First, "boilerplate" warnings won't do; cautions must be tailored to the risks that accompany the particular projections. Second, the cautions need not identify what actually goes wrong and causes the projections to be inaccurate; prevision is not required. See *Halperin v. eBanker USA.COM, Inc.,* 295 F.3d 352, 359 (2d Cir.2002); *Helwig v. Vencor, Inc.,* 251 F.3d 540, 558-59 (6th Cir.2001) (en banc); *Ehlert v. Singer,* 245 F.3d 1313, 1320 (11th Cir.2001) (discussing a judicially developed defense, the bespeaks-caution doctrine, that applies to statements such as those made in tender offers to which the statutory safe harbor does not apply); *Semerenko v. Cendant Corp.,* 223 F.3d 165, 182-83 (3d Cir.2000) (same); *Harris v. Ivax Corp.,* 182 F.3d 799, 807 (11th Cir.1999) (same). Unfortunately, these principles don't decide any concrete case--for that matter, the statutory language itself does not decide any concrete case. It is the result of a compromise between legislators who did not want any safe harbor (or, indeed any new legislation), and those who wanted a safe harbor along the lines of the old Rule 175 (discussed in our *Wielgos* decision) that did not require any cautionary statements but just required the projection to have a reasonable basis. Rule 175 was limited to statements in certain documents filed with the SEC; proponents **\*733** of the PSLRA wanted to extend this to all statements, including oral declarations and press releases. As is often the situation, a compromise enabled the bill to pass but lacks much content; it does not encode a principle on which political forces agreed as much as it

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

377 F.3d 727                                                                                                                Page 6
377 F.3d 727, Fed. Sec. L. Rep. P 92,903
**(Cite as: 377 F.3d 727)**

signifies conflict about both the scope and the wisdom of the safe harbor. Compromises of this kind lack spirit. Still, the language was enacted, and we must make something of it.

Plaintiffs say that Baxter's cautions were boilerplate, but they aren't. Statements along the lines of "all businesses are risky" or "the future lies ahead" come to nothing other than caveat emptor (which isn't enough); these statements, by contrast, at least included Baxter-specific information and highlighted some parts of the business that might cause problems. For its part, Baxter says that mentioning these business segments demonstrates that the caution is sufficient; but this also is wrong, because then any issuer could list its lines of business, say "we could have problems in any of these," and avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight.

What investors would like to have is a full disclosure of the assumptions and calculations *behind* the projections; then they could apply their own discount factors. For reasons covered at length in *Wielgos*, however, this is not a sensible requirement. Many of the assumptions and calculations would be more useful to a firm's rivals than to its investors. Suppose, for example, that Baxter had revealed its sterility failure in the BioSciences Division, the steps it had taken to restore production, and the costs and prospects of each. Rivals could have used that information to avoid costs and hazards that had befallen Baxter, or to find solutions more quickly, and as Baxter could not have charged the rivals for this information they would have been able to undercut Baxter's price in future transactions. Baxter's shareholders would have been worse off. Similarly Baxter might have added verisimilitude to its projections by describing its sales policies and the lowest prices it would accept from major customers, but disclosing reservation prices would do more to help the customers than to assist the investors.

Another form a helpful caution might take would be the disclosure of confidence intervals. After saying that it expected growth in the low teens, Baxter might have added that events could deviate 5% in either direction (so the real projection was that growth would fall someplace between 8% and 18%); disclosure of the probability that growth will be under 10% (or over 16%) would have done much to avoid the hit stock prices took when the results for the first half of 2002 proved to be unexpectedly low. Baxter surely had developed internally some estimate of likely variance. Revealing the mean, median, and standard deviation of these internal estimates, and pinpointing the principal matters that could cause results to differ from the more likely outcome, could help to generate an accurate price for the stock. Knowledge that the mean is above the median, or that the standard deviation is substantial, would be particularly helpful to those professional investors whose trades determine the market price. (It might imply, for example, that as in *Wielgos* the firm was projecting what would happen if nothing unexpected happened; because some things always go wrong, investors could apply discounts.) Perhaps, *734 however, a firm's data do not permit estimates to be stated in probabilities. If, for example, a major source of uncertainty for Baxter's business was how Congress would resolve the debate about Medicare coverage for prescription drugs, or whether a rival would manage to win the FDA's approval for a product that would compete with one of Baxter's most profitable items, it would be hard to reduce these chances to probabilities. Events such as these are discrete rather than continuous variables, so standard confidence intervals would be meaningless even if probabilities could be attached to the likely outcomes.

[2] Whether or not Baxter could have made the cautions more helpful by disclosing assumptions, methods, or confidence intervals, none of these is required. The PSLRA does not require the *most* helpful caution; it is enough to "identify[ ] important factors that could cause actual results to differ materially from those in the forward-looking statement". This means that it is enough to point to the principal contingencies that could cause actual results to depart from the projection. The statute calls for issuers to reveal the "important factors" but not to attach probabilities to each potential bad outcome, or to reveal in detail what could go wrong; as we have said, that level of detail might hurt investors (by helping rivals) even as it improved the accuracy of stock prices. (Requiring cautions to contain elaborate detail also would defeat the goal of facilitating projections, by turning

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

377 F.3d 727 Page 7
377 F.3d 727, Fed. Sec. L. Rep. P 92,903
**(Cite as: 377 F.3d 727)**

each into a form of registration statement. Undue complexity would lead issuers to shut up, and stock prices could become even less accurate. Incomplete information usually is better than none, because market professionals know other tidbits that put the news in context.) Moreover, "[i]f enterprises cannot make predictions about themselves, then securities analysts, newspaper columnists, and charlatans have protected turf. There will be predictions aplenty outside the domain of the securities acts, predictions by persons whose access to information is not as good as the issuer's. When the issuer adds its information and analysis to that assembled by outsiders, the *collective* assessment will be more accurate even though a given projection will be off the mark." *Wielgos,* 892 F.2d at 514 (emphasis in original).

[3] Yet Baxter's chosen language may fall short. There is no reason to think--at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery--that the items mentioned in Baxter's cautionary language were those that at the time were the (or any of the) "important" sources of variance. The problem is not that what actually happened went unmentioned; issuers need not anticipate all sources of deviations from expectations. Rather, the problem is that there is no reason (on this record) to conclude that Baxter mentioned those sources of variance that (at the time of the projection) were the principal or important risks. For all we can tell, the major risks Baxter objectively faced when it made its forecasts were exactly those that, according to the complaint, came to pass, yet the cautionary statement mentioned none of them. Moreover, the cautionary language remained fixed even as the risks changed. When the sterility failure occurred in spring 2002, Baxter left both its forecasts and cautions as is. When Baxter closed the plants that (according to the complaint) were its least-cost sources of production, the forecasts and cautions continued without amendment. This raises the possibility--no greater confidence is possible before discovery--that Baxter omitted important variables from the cautionary language and so made projections more certain than its internal estimates at the time warranted. Thus this complaint could not be dismissed under the safe harbor, though we cannot exclude the possibility that if after discovery Baxter establishes that the cautions did reveal what were,

*ex ante,* the major risks, the safe harbor may yet carry the day.

Baxter urges us to affirm the judgment immediately, contending that the full truth had reached the market despite any shortcomings in its cautionary statements. If this is so, however, it is hard to understand the sharp drop in the price of its stock. A "truth-on-the-market" defense is available in principle, as we discussed in *Flamm,* but not at the pleading stage. Likewise one must consider the possibility that investors looked at all of the projections as fluff and responded only to the hard numbers; on this view it was a reduction in Baxter's growth rate, not the embarrassment of a projection, that caused the price decline in July 2002; again it is too early in the litigation to reach such a conclusion. It would be necessary to ask, for example, whether the price rose relative to the rest of the market when Baxter made its projections; if not, that might support an inference that the projections were so much noise.

Nor has the time arrived to evaluate Baxter's contention that its projections panned out, so there was no material error. Baxter insists that all of the projections dealt with the entire calendar year 2002, and that by year-end performance was up to snuff--close enough to the projections that any difference was immaterial. Once again, it is inappropriate to entertain such an argument at the pleading stage. The district court will need to determine whether all of the forward-looking statements referenced calendar 2002 as a whole, rather than anticipated improvements quarter-by-quarter over the preceding year. It will be necessary to evaluate whether differences between the projections and the outcome were material under the standard of *Basic.* Finally it may be necessary to explore what Baxter's full-year results actually were; plaintiffs' reply brief accuses Baxter of using gimmicks to report extra revenue in 2002 at the expense of later years. The implication is that Baxter may have overstated its 2002 results. Whether that is so cannot be determined on the pleadings, even when supplemented with the documents that Baxter has filed with the SEC.

REVERSED AND REMANDED.

377 F.3d 727, Fed. Sec. L. Rep. P 92,903

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

377 F.3d 727 Page 8
377 F.3d 727, Fed. Sec. L. Rep. P 92,903
**(Cite as: 377 F.3d 727)**

Briefs and Other Related Documents (Back to top)

- 2003 WL 23340060Original Image of this Document with Appendix (PDF)

- 2003 WL 23340059Original Image of this Document (PDF)

- 2003 WL 23340058Original Image of this Document with Appendix (PDF)

- 03-3189 (Docket) (Aug. 20, 2003)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.