Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
(Cite as: 2004 WL 992991 (S.D.N.Y.))

Page 13

SEC filings may be considered on a motion to dismiss. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002).

MSBI argues that its duty to inquire was triggered no earlier than July 18, 2002, when the first of two *Washington Post* articles was published and the SEC and DOJ began their investigations into AOLTW. MSBI Opp. at 26. Against the backdrop of this Circuit's jurisprudence on inquiry notice, and for the reasons set forth below, the Court agrees with the plaintiff. No duty to inquire was triggered prior to the publication of the July 18, 2002 *Washington Post* article.

A. The Sun, Hughes and Gateway Transactions Are Insufficient to Trigger Plaintiff's Duty to Inquire

In its motion to dismiss, AOLTW contends that a series of transactions between the Company and Sun, Hughes and Gateway (and the accompanying press releases) from November 1998 through October 1999 were sufficient to trigger the plaintiff's duty to inquire. AOLTW claims that these press releases "make clear that AOL was investing in Hughes [and Gateway] and Hughes [and Gateway] [were] agreeing to buy advertising from AOL." AOLTW Memo at 14-15. The Court agrees with AOLTW that the Sun, Hughes and Gateway transactions "make clear" that the companies were engaging in mutually beneficial contracts; however, the notion that 3 agreements to buy advertising (none of which so much as mention the Company's accounting for those transactions) "suggest to an investor of ordinary intelligence the probability that she has been defrauded" is seriously off the mark. In fact, it is hard to imagine that any reasonable investor would have read the 1998 and 1999 press releases regarding these deals as anything other than the Company doing exactly what it was supposed to be doing; *i.e.*, engaging in legitimate transactions that would ultimately create value for shareholders.

B. The Vendor Advertising and Equity Deals Are Also Insufficient to Trigger Plaintiff's Duty to Inquire

*9 The defendants argue that a series of articles from April 16, 2001 through July 12, 2001 "provided notice of all of the vendor deals alleged in the Amended Complaint to have been improper." AOLTW Memo at 15. More specifically, the defendants refer to an April 16, 2001 article in *The Wall Street Journal* titled "Amid Advertising Slowdown, AOL Parlays Partnerships Into Revenue," in which one of AOL's partners was quoted as saying, "They are getting increased revenue from us, and we're getting better rates from them ... There is money going both ways, yes." *Id.* at 15. AOLTW claims that "this article put MSBI on notice no later than April 2001 of exactly the kind of advertising deals alleged in the Amended Complaint to have resulted in overstated revenue and backlog." *Id*.

Again, AOLTW is correct: the April 16, 2001 *Wall Street Journal* article definitively put investors, including MSBI, on notice that AOLTW was entering deals and "parlay[ing] partnerships into revenue." What befuddles the Court, however, is AOLTW's extrapolation that "parlay[ing] partnerships into revenue" suggests to an investor of ordinary intelligence the probability that she has been defrauded. Indeed, throughout its motion to dismiss, AOLTW conflates notice of the existence of a transaction now alleged to be fraudulent with notice that such transactions were, *ex-ante*, being fraudulently accounted for. In addition to the April 16, 2001 *Wall Street Journal* article, none of the other articles/reports cited by the defendants (including those in *Advertising Age, Fortune, BusinessWeek Online, Thomas Weisel Partners* [FN11] and the October 23, 2001 *Wall Street Journal* ) come anywhere close to establishing the probability of fraud sufficient to trigger inquiry notice-in fact, the articles amount to little more than affirmations of AOLTW's "continued success at signing large advertising deals." *Id.* at 16. There is simply no plausible basis for holding that notice of large advertising deals, even if such deals were "unusual," constitutes "uncontroverted evidence that irrefutably demonstrates fraudulent conduct." [FN12]

FN11. Though the Thomas Weisel Partners report is closer than any of the other examples provided by the defendants to describing the internal accounting at AOL, the report specifically disclaims any

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 14

potential fraud in stating that AOL's accounting "is not a sinister thing" and that it merely reflects AOL's "muscle as a purchaser." AOLTW Memo at 19.

> FN12. It is difficult to reconcile AOLTW's position in its motion to dismiss, *i.e.,* that investors of ordinary intelligence should have been on notice of alleged accounting improprieties as early as 1998, with its course of conduct prior to the litigation, in which the Company did not even acknowledge the possibility of inflated revenue until August 2002.

MSBI's stance, that no duty to inquire was triggered prior to July 18, 2002, best comports both with this Circuit's precedent and common sense. On July 18, 2002, *The Washington Post,* a national publication with a weekly circulation of over five million, [FN13] ran the first of two articles based on statements of former Company employees and confidential documents, which reported that AOLTW and AOL artificially inflated AOL's advertising revenue. [FN14] Within two weeks of *The Washington Post's* article, the SEC and DOJ commenced civil and criminal investigations into AOLTW. MSBI Opp. at 26. Finally, on August 14, 2002, the Company, in an SEC filing, stated for the first time that it "may" have overstated A & C revenue by $49 million. *Id.*

> FN13. http://washpost.com/circulation/

> FN14. Notably, in this article, a Company attorney denied the allegations, stating that, "the accounting for all of these transactions is appropriate and in accordance with generally accepted accounting principles." AC ¶ 451. The article also quoted Defendant Ernst & Young as stating that it "stands by its original view that the accounting and disclosures were appropriate." *Id.* Because the plaintiff argues for an inquiry notice date of July 18, 2002, the Court need not reach the question of whether the statements of the Company attorney and Ernst & Young qualify as "words of comfort," though it certainly appears that they do.

Because the duty to inquire is triggered only when the wrongdoing suggested by the storm warnings is "probable, not merely possible," the Court finds that an investor of ordinary intelligence would not have been, and should not have been, aware of the probability that she had been defrauded until July 18, 2002, the date of publication of the first article in *The Washington Post.* The fact that the SEC and Justice Department did not launch investigations until 1 week and 2 weeks, respectively, after publication of this article, only bolsters this contention. [FN15] Put simply, the press releases and financial articles offered by the defendants do not satisfy its "heavy burden" and hardly qualify as storm warnings; on the contrary, a reasonable investor likely would have viewed them as sunny forecasts of a bright and profitable future for AOLTW. [FN16]

> FN15. It is worth noting that even "the service of a sweeping SEC subpoena" has been found to be an "insufficient trigger" of inquiry notice because such a subpoena "does not reveal, by itself, any particular accounting irregularity." *In Re WorldCom, No. 03 Civ. 6592,* November 21, 2003, at 34.

> FN16. Defendant AOLTW suggests that an application of Sarbanes-Oxley that expands the statute of limitations on the § 10(b) claims "may run afoul of the *ex post facto* clause of the Constitution if ... the limitations period had expired for these defendants before July 30, 2002." AOLTW Memo at 18, n 11. In addition, AOLTW argues that Sarbanes-Oxley cannot revive previously expired claims. *See* AOLTW Reply at 5. However, in light of the Court's determination that the plaintiff's duty to inquire was not triggered until July 18, 2002, both of these arguments are moot.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 15

### IX. THE CLAIMS AGAINST THE NEWLY-NAMED DEFENDANTS ARE TIMELY

*10 Defendants contend that the claims against Time Warner, Akerson, Barge, Bollenbach, Cappucio, Caufield, Gilburne, Novack, Raines, Ripp and Schuler do not relate back to the first class action filed on July 18, 2002, and thus for statute of limitations purposes, claims against these defendants were commenced on April 15, 2003, when the Amended Complaint was filed. However, having found that no plaintiff was on notice of the probability of fraud at AOLTW until July 18, 2002, the claims against the newly-named defendants, filed on April 15, 2003, are timely. [FN17] As such, the Court need not reach the question of whether the claims relate back to any earlier complaint.

> FN17. Because they were filed within one year of the date of constructive notice, these claims are timely regardless of whether Section 804 of Sarbanes-Oxley applies.

### X. BECAUSE THE AMENDED COMPLAINT IS TIMELY, ALLEGATIONS OF TOLLING ARE UNNECESSARY

Because MSBI's duty to inquire did not arise until July 18, 2002, and its complaint was filed on September 16, 2002, within the statute of limitations, MSBI was under no obligation to allege investigation that would toll the statute of limitations. As such, the argument that MSBI failed to allege any inquiry that might have tolled the statute of limitations is moot.

### XI. MSBI HAS PROPERLY PLED COMPLIANCE WITH THE STATUTE OF LIMITATIONS

Defendant AOLTW asserts that MSBI's Securities Act claims should be dismissed for failure to plead compliance with the statute of limitations. As support for this claim, the defendants rely on *In re Chaus Sec. Litig.*, No. 88 Civ. 8641, 1990 WL 188921, at *5 (S.D.N.Y. Nov. 20, 1990), which states that a Securities Act complaint must set forth (1) "the time and circumstances of the discovery" of the misstatement, (2) the reasons why the misstatement was not discovered earlier if more than a year has lapsed and (3) "the diligent efforts which the plaintiff undertook in making or seeking such discovery."

While the Court is unsure of the value of *Chaus* when a plaintiff has satisfied the statute of limitations, in the interests of thoroughness, it will apply its analysis. With respect to prong one, the Court is satisfied that MSBI has adequately plead "the time and circumstances of its discovery" of the alleged misstatements. *See generally* MSBI Opp. at 34-35. Because the Court has ruled that MSBI's complaint was filed within a year of inquiry notice, prongs two and three of *Chaus* are inapposite. Accordingly, to the extent that *Chaus* applies here, MSBI has satisfied its requirements and has properly pled compliance with the statute of limitations.

### XII. THE AMENDED COMPLAINT PLEADS ALLEGED MISSTATEMENTS WITH PARTICULARITY

AOLTW claims that because the Amended Complaint does not plead alleged misstatements with sufficient particularity, those claims should be dismissed. [FN18] Rule 9(b) of the Federal Rules of Civil Procedure states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Under Rule 9(b), "[t]he complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made." *Hollin v. Scholastic Corp., (In re Scholastic Corp. Sec. Litig.),* 252 F.3d 63, 69-70 (2d Cir.2001). Similarly, the PSLRA requires a complaint alleging violations of § 10(b) or § 14(a) of the Exchange Act to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading" and, if an allegation is made upon information and belief, "to state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see also Bond Opportunity Fund v. Unilab Corp.,* No. 99 Civ. 11074, 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003). Exchange Act claims that fail to satisfy these PSLRA pleading requirements must be dismissed. *See* 15 U.S.C. § 78u-4(b)(3)(a).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812  
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 16

> FN18. AOLTW concedes that the Amended Complaint has satisfied the particularity requirements of Rule 9(b) and the PSLRA with respect to the alleged overstated revenue associated with Bertelsmann, Veritas, Wembley and Ticketmaster.

*11 Recently, the Second Circuit held that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud. *Rombach v. Chang,* Nos. 02-7907(L), 02-7933 (XAP), 2004 WL 77928 (2d Cir. Jan. 20, 2004). In clarifying, the court stated:

> Fraud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2); at the same time, claims under those sections may be-and often are-predicated on fraud. The same course of conduct that would support a Rule 10b-5 claim may as well support a Section 11 claim or a claim under Section 12(a)(2). So while a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b).

*Rombach,* 2004 WL 77928 at *4.

As a threshold matter, and pursuant to *Rombach,* the Court must determine whether the Section 11 and Section 12(a)(2) claims asserted by MSBI are predicated on fraud; if they are, then the plaintiff is obligated to satisfy the heightened pleading standard. *Rombach* provides some guidance on this issue. In *Rombach,* the plaintiff asserted that its Section 11 claims did not "sound in fraud." *Id.* at *5. The Second Circuit nonetheless found that the claims were fraud-based because "the wording and imputations of the complaint are classically associated with fraud: that the Registration statement was 'inaccurate *and* misleading;' that it contained 'untrue statements of material facts:' and that 'materially *false* and *misleading* statements' were issued." *Id.* (emphasis in original). *Rombach* also quoted approvingly from *In re Ultrafem Secs. Litig,* 91 F.Supp.2d 678 (S.D.N.Y.2000), which applied Rule 9(b) where "plaintiffs [made] little, if any, effort to differentiate their asserted negligence claims from the fraud claims which permeate the Complaint ... [and] merely disavow[ed] any allegations that would make Rule 9(b) applicable ... without specifying the allegations that would support a negligence cause of action." *In re Ultrafem,* 91 F.Supp.2d at 690-91.

Here, MSBI asserts, first in the Amended Complaint, again in its Opposition Memorandum, and finally in a letter to the Court dated January 28, 2004 ("MSBI Letter"), that its Section 11 and Section 12(a)(2) claims are not based in fraud. MSBI argues that these claims are set forth in a separate "non-fraud based section of the Complaint and in separate non-fraud based counts." MSBI Letter at 1. MSBI also states that those sections of the Complaint "do not even mention the word fraud and the Complaint specifically disavows that any of the Section 11 claims rely on allegations of fraud." MSBI Letter at 2.

Despite its disclaimer, the Court, pursuant to *Rombach,* finds that MSBI's Section 11 and Section 12(a)(2) claims are fraud-based. There is no mention in any of the allegedly non-fraud based counts (¶¶ 631-655, 680-703) of the prongs of a negligence cause of action; *i.e.,* duty, breach, causation, and damages. Indeed, the pertinent paragraphs of the Amended Complaint contain almost all of the same fraud-based buzzwords that *Rombach* held were sufficient to trigger the heightened pleading requirements of Rule 9(b) and the PSLRA. For example, the Amended Complaint repeatedly refers to "false and misleading statements and omissions of material fact" (AC ¶ 631), and "untrue and misleading financial statements" (AC ¶ 642). As such, the Court finds that MSBI's Section 11 and Section 12(a)(2) claims are fraud-based, and Rule 9(b)'s heightened pleading standard applies to those claims. Accordingly, plaintiff's Section 11 and Section 12(a)(2) claims, because they "sound in fraud," must be pled with particularity. [FN19]

> FN19. The parties' opportunism on this issue is hard to miss. Both MSBI and AOLTW's positions on what type of claim(s) "sound in fraud" seem to be dictated not by legal principles, but rather, by legal expediency. For example, in an effort to circumvent Sarbanes-Oxley's expanded limitations period on securities

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
(Cite as: 2004 WL 992991 (S.D.N.Y.))

Page 17

claims, AOLTW argues that MSBI's Section 11 and Section 12(a)(2) claims "do not sound in fraud." AOLTW Reply at 6. However, when it comes to applying a heightened standard of pleading, AOLTW vociferously argues that Section 11 and Section 12(a)(2) "sound in fraud" and are thus subject to Rule 9(b)'s particularity requirements. MSBI's position on what constitutes "fraud," though the inverse of AOLTW's, is equally disingenuous.

*12 While it is undisputed that Rule 9(b) and the PSLRA command a higher level of pleading than non-fraud claims, it is important to note that a complaint is not, and should not be, held to the same standard as would be necessary to prevail at trial. After all, "Rule 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Acito v. IMCERA Group,* 47 F.3d 47, 52 (2d Cir.1995). By contrast, Rule 9(b) is not intended to be "a vehicle by which potentially meritorious claims are to be driven out of court because the plaintiff has failed to allege facts that he can only obtain through taking discovery that he has thus far been denied." *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1124 (S.D.N.Y.1982).

A. Allegedly Overstated A & C Revenue

MSBI alleges that AOLTW improperly accounted for a bundling arrangement with Gateway Computers by improperly booking revenue from the Gateway arrangement on a gross basis. AOLTW counters that MSBI's allegation regarding the Gateway transaction is conclusory and insufficient to satisfy the heightened pleading standard of the PSLRA. [FN20] *Id.* at 23.

FN20. In contesting the lack of particularity of the pleadings, AOLTW states that the Amended Complaint is inadequate because all it does is "describe[ ] the transaction based on publicly-available sources, cite [ ] some accounting rules that might apply to the transaction and then allege[ ], in conclusory fashion, that AOLTW's accounting for the transaction was wrong." AOLTW Memo at 23. Given the fact that MSBI is precluded from any securities-related discovery by virtue of the PSLRA discovery stay, the Court wonders what information MSBI's Complaint could be based upon, if not publicly available information. Indeed, if publicly available information were insufficient to satisfy Rule 9(b)'s particularity requirement, then, in light of the PSLRA's mandatory discovery stay, no securities case could ever survive the motion to dismiss.

In the Amended Complaint, MSBI contends that on or about late 1999 or early 2000, AOL and Gateway entered into an agreement whereby each time a Gateway computer purchaser subscribed to AOL, Gateway would receive a fee or "bounty" from AOL ("Gateway Roundtrip/Free Internet Service"). AC ¶ 176. According to an April 2, 2003 *Washington Post* article entitled "Gateway to Amend Financial Reports-SEC Had Raised Concerns Over AOL Deal," at the same time AOL paid a "bounty," Gateway in turn paid AOL for providing a free year of internet service on its computers. *Id.* The Amended Complaint alleges that "since there was no substance to this transaction other than swapping checks, AOL should have reported the transaction at its zero value instead of improperly reporting the amounts as sales and corresponding costs of sales." *Id.* According to MSBI, as a result of the transaction, AOL overstated its advertising revenue by $340 million in 2000 and $130 million in 2001. *Id.* ¶ 177.

MSBI further alleges, with the support of an article in *The Washington Post,* that Gateway was forced to restate its revenue from the AOL agreement. *Id.* ¶ 178. In sum, the Amended Complaint contains the date of the transaction at issue, the amount of the allegedly overstated revenue, preliminary details of the accounting for the transaction, and a basis for believing the accounting may have been fraudulent. The Court concludes that this is sufficient information to satisfy Rule 9(b)'s heightened pleading requirement and thus "provide[s] the defendant with fair notice of plaintiff's claim."

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
(Cite as: 2004 WL 992991 (S.D.N.Y.))

Page 18

Indeed, to hold otherwise would require securities plaintiffs to produce information at the pleading stage to which they have no access because of the PSLRA's mandatory discovery stay. [FN21]

> FN21. That one of the articles cited by MSBI contains a quote by an AOL spokesperson denying that AOL accounted for the Gateway transaction on a gross basis is immaterial for the particularity inquiry. See AOLTW Memo at 23-24. What matters for the particularity inquiry is whether the plaintiff has provided enough information to provide fair notice to the defendant and establish that the suit is not improvident--which, with respect to all of the transactions except eBay, MSBI has. Further, given the amount of revenue AOLTW has already restated, the 1999 and 2000 statements of Company spokespeople on accounting issues do not appear to be entitled to much credence.

*13 For the same reasons that the Gateway Roundtrip transaction is satisfactorily pled, i.e., it contains specific information regarding the amount of the transaction, its date and a preliminary explanation as to why the accounting was fraudulent, the transactions with the Golf Channel (AC ¶ 246), Homestore (AC ¶¶ 141-156, 192-199), [FN22] DrKoop.com (AC ¶¶ 239-240), Gateway Inc. Stock Purchase (AC ¶¶ 200-02), Hughes Electronics (AC ¶¶ 186-191), Catalina Marketing Corporation and Telefonica SA (the "jackpotting" transactions) (AC ¶¶ 212-220), Monster.com (AC ¶¶ 209-211), Oxygen Media (AC ¶¶ 203-06), PurchasePro (barter arrangements and warrants) (AC ¶¶ 207-08, 232-34), Qwest (AC ¶¶ 183-185), Sun (AC ¶¶ 157-160) and Worldcom (AC ¶¶ 180-182) are also pled with particularity. [FN23]

> FN22. Of note, the Court counts 24 paragraphs in the Amended Complaint (AC ¶¶ 141-156, 192-199) devoted exclusively to describing the transactions between AOL and Homestore that the defendants contend have not been pled with particularity.

> FN23. Though the Court will discuss the details of some of the alleged improper transactions throughout this Opinion, it will not do so here. At this point, it is adequate to indicate that the Gateway deal serves a template for numerous other deals in which AOL allegedly bartered with other companies, round-tripping money and reporting advertising revenue at greatly inflated values.

With respect to the eBay transaction that MSBI contends was fraudulently accounted for (AC ¶¶ 229-230), the Court finds that this transaction is not pled with particularity. The Amended Complaint refers only to "an agreement with the internet auction company," but makes no mention of when this agreement was consummated or what its terms were. In order to provide fair notice to the defendant, that information is required. Accordingly, the transaction between AOL and eBay is not sufficiently particularized to form the basis of any of plaintiff's claims.

B. The Sections 11 and 12(a)(2) Claims Based On the Merger Registration Statement Are Also Pled with Particularity

MSBI's Section 11 and Section 12(a)(2) claims are pled with particularity. The Amended Complaint identifies the untrue AOL financial statements and AOL Time Warner pro forma financial statements, as well as AOL representations and warranties, that were incorporated into the Merger Registration Statement. See AC ¶¶ 634-655. The Amended Complaint also provides specific reasons why plaintiff believes these statements were false or misleading, including, for example, the material overstatement of AOL advertising and commerce revenue, backlog and percentage increases in year over year comparisons (AC ¶¶ 107-140, 157-160); the material overstatement of the real value and useful life of goodwill (AC ¶¶ 413-424, 447); and the misrepresentation that the financial statements were prepared in accordance with GAAP and GAAS and fairly represented the results of AOL's operations (AC ¶ ¶ 264, 269, 275, 276,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 19

283, 605-630). In sum, with respect to the claims based on the Merger Registration Statement, the Amended Complaint adequately identifies the "statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent." See *In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 69-70.

XIII. WITH THE EXCEPTIONS NOTED BELOW, THE SECTION 10(B) CLAIMS ARE NOT DISMISSED

A private plaintiff may only bring suit under Rule 10b-5 for acts prohibited by the text of § 10(b). See *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 173 (1994). There are three principle rules promulgated under Section 10(b): Rule 10b-5(a), 10b-5(b), and 10b-5(c). Rule 10b-5(a) prohibits any person, directly or indirectly, from employing "any device, scheme or artifice to defraud" in connection with securities purchases or sales. 17 C.F.R. § 240.10b-5 . Rule 10b-5(b) prohibits misstatements and omissions in connection with securities purchases and sales. *Id.* Rule 10b-5(c) prohibits persons from engaging "in any act, practice or course of business which operates or would operate as fraud or deceit upon any person" in connection with securities purchases or sales. *Id.*

A. MSBI May Proceed Under Rules 10b-5(a) and (c) [FN24]

> FN24. Of course, MSBI may also proceed under Rule 10b-5(b), though the defendants do not appear to contest this.

*14 In its Reply, AOLTW suggests that MSBI cannot proceed under rules 10b-5(a) and 10b-5(c) because, in order to allege a claim under those subsections that is not based on misstatements or omissions, a plaintiff must allege manipulative acts, "something it has not done ." AOLTW Reply at 22. In support of this contention, the defendants rely on *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 473-74 (1977). In *Santa Fe,* the Supreme Court remarked that "manipulation," for the purposes 10b-5, "refers generally to *practices,* such as wash sales, matched orders, or rigged prices, that are *intended to mislead investors* by artificially affecting market activity." *Id.* at 476 (emphasis added). Here, according to the defendants, since the Amended Complaint does not allege that the Company defendants engaged in "wash sales, matched orders, or rigged prices," plaintiff should be precluded from proceeding under Rules 10b-5(a) and (c). AOLTW Reply at 22. Defendant's position is without merit.

First, the *Santa Fe* list of manipulative practices is clearly not exhaustive; 10b-5(a) and (c) claims need not contain the magic words "wash sales, matched orders, or rigged prices" to be valid. Second, both 10b-5 and *Santa Fe* contemplate manipulation of the securities markets to be practices, acts, misstatements or omissions designed to mislead investors. If, as the 308- page Amended Complaint alleges, the defendants in fact "engaged in a systemic scheme for more than 3 1/2 years to inflate AOL's reported advertising revenue by at least $1.7 billion based on various sham transactions and accounting improprieties," then there can be little doubt that investors have been very seriously misled by the defendants' acts. Accordingly, plaintiff is permitted to proceed under both Rules 10b-5(a) and (c).

B. It is Axiomatic that a Claim Under Section 10(b) Must Allege Facts Giving Rise to a Strong Inference of Fraudulent Intent

To establish liability under Section 10(b), a complaint must, as a threshold matter, allege sufficient scienter. See *SEC v. U.S. Envtl., Inc.,* 155 F.3d 107 (2d Cir.1998). AOLTW argues that MSBI's claims under § 10(b) of the Exchange Act should be dismissed because MSBI has, *inter alia,* not adequately pled scienter. MSBI disagrees, and contends that a strong inference of scienter is adequately pled on its Section 10(b) claims both against the Company and the individual § 10(b) defendants.

To state a claim for fraud under § 10(b) of the Exchange Act, a complaint must allege facts giving rise to a strong inference of fraudulent intent for each defendant. *See, e.g., Shields v.. Citytrust Bancorp Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). "A strong inference of scienter may be established either (a) by alleging facts showing that a defendant had both motive and opportunity to commit fraud,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 20

or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168-69 (2d Cir.2000). *See also Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000). "Although speculation and conclusory allegations will not suffice, neither [does the Second Circuit] require 'great specificity' provided the plaintiff alleges enough facts to support a 'strong inference of fraudulent intent.' " *Ganino,* 228 F.3d at 169.

1. MSBI Has Not Adequately Pled Motive and Opportunity [FN25]

> FN25. In *Novak,* the Second Circuit held that, "although litigants and lower courts need and should not employ or rely on magic words such as 'motive and opportunity,' we believe that our prior case law may be helpful in providing guidance as to how the 'strong inference' standard may be met."

*15 Of the two ways a plaintiff can plead scienter, the first is by adequately alleging motive and opportunity to commit fraud. A plaintiff properly pleads motive when she alleges that "concrete benefits could be realized by one or more of the false statements and wrongful disclosures alleged." *Shields,* 25 F.3d at 1128. To plead opportunity, a plaintiff must allege "the means and likely prospect of achieving concrete benefits by the means alleged." *Id*.

Here, MSBI contends that the Amended Complaint properly pleads that the defendants, as a group and individually, had motive and opportunity to inflate AOL advertising revenue in order to effect the Merger and thereafter make the Merger appear to be a success. MSBI Opp. at 55. In contrast, AOLTW contends that the Amended Complaint does not sufficiently allege motive and opportunity with respect to any alleged misstatement for any of the AOLTW defendants. AOLTW is correct.

While the Court recognizes that "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter," *Rothman v. Gregor,* 220 F.3d 81, 93 (2d Cir.2000) (citing *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 270 (2d Cir.1993), the series of generalized allegations offered by MSBI regarding AOL's "obsession" with consummating the Merger are simply not enough to satisfy § 10(b)'s scienter requirement. Indeed, consistent with their fiduciary obligations, it would have been quite odd if the defendants were not "obsessed" with ensuring the success of the Merger. Equally insufficient for establishing motive and opportunity is MSBI's contention that AOL was characterized by a "culture of recklessness and greed" whereby its executives were motivated to "keep their positions of power and access to corporate riches." AC ¶¶ 525-34, 516-517. As AOLTW points out, generalized allegations of greed and a desire for increased executive compensation could be made with respect to any large company. If such generalized allegations of greed were sufficient to satisfy Section 10(b)'s scienter requirement, then claims against any for-profit endeavor would survive the pleading stage simply by alleging that the defendant was in the business of making money--Section 10(b)'s scienter requirement surely commands more. [FN26]

> FN26. The Court's finding that MSBI has failed to plead motive and opportunity applies not only to the corporate defendants and individual defendants contained in the motion to dismiss filed by AOLTW, but also applies to Defendants Keller, Colburn, Rindner, Case, and Berlow.

2. MSBI Has Satisfactorily Pled Conscious Misbehavior or Recklessness With Respect to Some, But Not All, of the Defendants

Securities plaintiffs can also satisfy § 10(b)'s scienter requirement by adequately alleging strong circumstantial evidence of conscious misbehavior or recklessness. To establish strong circumstantial evidence of scienter, a plaintiff must allege facts establishing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
(Cite as: 2004 WL 992991 (S.D.N.Y.))

Page 21

it." *In re Carter Wallace, Inc. Sec. Litig.,* 220 F.3d 36, 39 (2d Cir.2000). The inference of scienter may arise where the complaint sufficiently alleges that the defendants: "... (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak,* 216 F.3d at 311.

*16 In its opposition to the motion to dismiss, MSBI argues that the Amended Complaint adequately alleges conscious misbehavior or recklessness in "one or more" of the following ways: (1) Defendants were reckless in failing to properly monitor the accounting of AOL advertising revenue, especially in light of the SEC's imposition of a Cease and Desist Order and Defendant Case's promise to the public that AOL would adopt "gold-standard" accounting practices; (2) The restatement of advertising revenue and GAAP violations support a strong inference of scienter; (3) Defendants instilled and maintained a reckless business environment; (4) Whistleblowers, internal company reports, and emergency and regular meetings regarding inflated AOL advertising revenue provided the Defendants with notice of "the true state of AOL"; (5) The Homestore and Purchase Pro transactions show "deliberate illegal behavior"; (6) Defendants' direct involvement in transactions for which AOL advertising revenue was improperly recorded reflects recklessness; (7) The ongoing SEC and DOJ investigations and the SEC's unwillingness to allow the Company to sell securities pursuant to a new securities offering; (8) Individual Defendants' continued denial of wrongdoing in light of their knowledge of improper accounting.

3. MSBI Has Adequately Alleged Scienter With Respect to Corporate Defendants AOLTW and AOL

MSBI has adequately pled scienter on its § 10(b) claims with respect to AOLTW and AOL. The plaintiff has alleged that the Company had internal financial information that showed the Company was at risk to lose $108 million in fiscal year 2001 and $140 million in 2002. AC ¶ 92. Plaintiff further alleges that regular meetings and telephone conferences were held in which issues related to advertising revenue and fraudulent deals were discussed. AC ¶¶ 90-91. Plaintiff also highlights a history of accounting problems at AOLTW by pointing specifically to SEC Cease and Desist Orders. AC ¶¶ 99-106. Finally, plaintiff alleges that no officer or director of AOLTW ever conveyed any of these concerns to the public--in fact, just the opposite--the public and analysts were presented with a picture of AOL as a company "rid[ing] above the normal market dynamics." *Id.* ¶ 364. Because plaintiff has alleged that AOLTW had access to information suggesting that the public statements of its officers were not accurate because MSBI has established, vis-à-vis SEC Cease and Desist Orders, that AOLTW was on notice of previous accounting improprieties, and because MSBI pled allegedly fraudulent transactions with sufficient particularity, the Court is satisfied that plaintiff has adequately pled scienter with respect to AOLTW.

4. MSBI Has Adequately Alleged Conscious Misbehavior or Recklessness, i.e., Scienter, with Respect to Defendants Pittman, Kelly, Pace, Keller, and Colburn, But Not With Respect To Defendants Schuler, Novack, Levin, Parsons, Ripp, Rindner, Berlow, or Case

*17 The issue of scienter with respect to the individual defendants is more complicated. As a threshold matter, the Court must determine whether plaintiff can rely on the group pleading doctrine. Under the group pleading doctrine, the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents (*e.g.,* prospectuses) that reflect the collective actions of various individuals directly involved in the day-to-day affairs of the corporation. *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999). While it is true, as MSBI contends, that this Court has previously indicated that "nothing in the PSLRA has altered the group pleading doctrine," *In re Emex Corp. Sec. Litig.,* No. 01 Civ. 4886, 2002 WL 31093612, at *7-*8 (S.D.N.Y. September 18, 2002), a closer examination of *Emex* reveals that it does not stand for the proposition that group pleading, or "clumping," in the context of Section 10(b) claims is always permissible. For example, in *Emex* this Court did permit plaintiffs to "rely on a presumption that the statements in the prospectuses, registration statements ... or other group-information are the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812  
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 22

collective works of those individuals;" however, scienter was deemed adequate only "[b]ased upon detailed pleading in the Complaint as to the Individual Defendants' roles." *Id.* There is no reason to depart from *Emex* in this case. [FN27] With respect to group-published documents such as prospectuses, plaintiffs may rely on a presumption that the group-information is the collective works of those individuals; however, with respect to the oral statements of individuals, group pleading is impermissible. As such, the scienter inquiry with respect to the individual defendants will be assessed on a case-by-case basis. [FN28]

> FN27. In addition to *Emex*, the post-PSLRA trend in this Circuit is to disallow group pleading. *See e.g., Jacobs v. Coopers & Lybrand, L.L.P.,* No. 97 Civ. 3374, 1999 WL 101772, at *17 (S.D.N.Y. Mar. 1, 1999) (quoting *ESI Montgomery Cty., Inc. v. Montenay Int'l Corp.,* No. 94 Civ. 0119, 1996 WL 22979, at *4 (S.D.N.Y. Jan. 23, 1996).

> FN28. Of the individual defendants named in the Amended Complaint, MSBI has only brought § 10(b) claims against Stephen M. Case, Robert W. Pittman, J. Michael Kelly, David M. Colburn, Myer Berlow, Barry Schuler, Kenneth J. Novack, Eric Keller, Gerald M. Levin, Wayne H. Pace, Richard D. Parsons, Joseph A. Ripp and Steven Rindner. Among these defendants, Case, Colburn, Berlow, Keller, and Rindner have filed separately, but each has raised an issue with respect to the adequacy of the scienter allegations against them.

a. Robert W. Pittman

Plaintiff alleges that Robert Pittman, as Chief Operating Officer of AOL and Co-Chief Operating Officer of AOLTW, was privy to all significant financial and operational information at the two companies. AC ¶ 475. Plaintiff alleges that Pittman admitted to being the "Account Executive" on the biggest accounts and that Pittman noted, with regard to cross-media advertising deals, "we generally do these issues at the COO or CEO level within the Company ." *Id.* ¶ 480. Further, plaintiff contends that Pittman was informed in a series of meetings by at least one employee that AOL was "living on revenue that was not of the highest quality." *Id.* ¶ 501. Plaintiff has pled that AOL tracked on a weekly basis the health of the dot-coms, how much they owed AOL, what AOL was doing to get its money, how the dot-coms were responding and how much money AOL could lose if the dot-coms did not pay their bills. *Id.* ¶ 550. In addition, the Amended Complaint alleges that internal Company documents indicated that AOL was "at risk" to lose more than $108 million in advertising revenue in fiscal 2001 (July 2000 to June 2001). *Id.* ¶ 553. The Amended Complaint specifically alleges that approximately two weeks before AOL released its first quarter results on October 18, 2000, Pittman was told that AOL faced the risk of losing more than $140 million in advertising revenue in calendar year 2001. *Id.* ¶ 554. Plaintiff has also pled the occurrence of weekly "emergency meetings" to discuss advertising arrangements with failing dot-coms. *Id.* ¶ 555.

*18 Against the backdrop of the foregoing knowledge, it is alleged that Pittman actually "touted the strength of AOL's advertising and commerce revenues," responding to a question about a slowdown in advertising by stating, "I don't see it and I don't buy it." *Id.* ¶ 557. Pittman also stated, "In the advertising world, you hear people say there's a slowdown. But it's not across the board." *Id.* ¶ 335. On January 31, 2001, Pittman claimed, "We are seeing exciting momentum in our subscription and advertising/commerce businesses across the company." *Id.* ¶ 340. On March 8, 2001, Pittman asserted, "Our businesses are doing great. I want to assure you we gave The Street our guidance and we are sticking to it. Period."

Given the allegedly stark contrast between Pittman's knowledge and Pittman's public statements, the Court is satisfied that plaintiff has adequately pled that Pittman "knew facts or had access to information suggesting that [his] public statements were not accurate; or failed to check information [he] had a duty to monitor." *Novak,* 216 F.3d at 311. [FN29] Accordingly, plaintiff has adequately pled scienter with respect to Defendant

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 23

Pittman and the Section 10(b) claim against him is not dismissed.

> FN29. When coupled with the alleged discrepancy between his knowledge and his public statements, Pittman's sales of AOL securities only add to the inference of scienter. During the Class Period, Pittman sold over 3,300,000 shares of AOL and AOLTW stock for proceeds of over $262 million. *Id.* ¶ 567. In the four months following the Merger, Pittman sold 1,500,000 shares for over $72 million in proceeds. As of January 31, 2002, Pittman owned just 13,388 shares of AOLTW stock. *Id.*

b. J. Michael Kelly

Michael Kelly served as Executive Vice President and Chief Financial Officer for AOLTW and Senior Vice President and Chief Financial Officer for AOL. According to the Amended Complaint, Kelly was the executive "most directly responsible for the adequacy of the Company's accounting." *Id.* ¶ 477. It is alleged that Kelly signed off on all of AOL and AOLTW's major advertising deals and its financial reports until December 2001. *Id.* It is further alleged that Kelly was a member of the Operating Committee ("Op Com"). According to the Amended Complaint, the Operating Committee, which consisted of nine members of senior management, met weekly. As a result of these meetings, it is alleged that members of the Operating Committee knew about the "BA Specials," the restructuring of advertising deals for failing dot-coms, and the downturn in AOL's advertising business. *Id.* ¶ 474. According to the plaintiff, despite his knowledge of AOL and AOLTW's burgeoning advertising woes, Kelly claimed, "Strong growth in subscription and advertising revenues will drive the Company's performance ... AOL Time Warner has all the financial strength necessary to back our vision for the future." *Id.* ¶ 342. Kelly, in an October 18, 2000 conference call, characterized AOL's advertising and commerce revenue growth as "very healthy ... I can't say that strongly enough." *Id.* ¶ 321.

As is the case with Defendant Pittman, Plaintiff has adequately alleged that Defendant Kelly "knew facts or had access to information suggesting that [his] public statements were not accurate." *Novak,* 216 F.3d at 311. As a member of the Operating Committee [FN30] and as the executive most responsible for the Company's accounting, it can certainly be inferred that Kelly knew of the Company's emerging advertising issues; yet, his public statements conveyed no such concern--in fact, just the opposite. In addition, by pleading Kelly's intimate involvement with the allegedly fraudulent advertising deals, MSBI has satisfied its obligations under Rule 10b-5(a) and (c). Accordingly, scienter is properly pled with respect to Kelly, [FN31] and the Section 10(b) claim against him is not dismissed.

> FN30. The Court notes that had plaintiff only alleged that Kelly was a senior executive, actively involved in Company management, such an allegation would be insufficient, on its own, to plead scienter. *See In re Health Mgmt. Sys. Inc. Sec. Litig.,* 97 Civ. 1865, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998). However, it is not simply Kelly's role as a senior executive that plaintiff has pled; instead plaintiff has alleged that as a member of the Operating Committee and a signatory of major advertising deals, Kelly was exposed to information that indicated the advertising and commerce situation at AOL and AOLTW was much bleaker than his public statements conveyed.

> FN31. Though the Court does not reach the question of whether, standing alone, Kelly's stock sales are sufficient to establish a strong inference of scienter, when considered alongside the alleged discrepancy between private knowledge and public statements, the stock sales are informative. It is alleged that during the Class Period Kelly sold over $42 million in AOL and AOLTW stock. In the three months immediately following the Merger, Kelly sold 400,000 shares for over $19 million in proceeds. *Id.* at ¶ 569.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
(Cite as: 2004 WL 992991 (S.D.N.Y.))

Page 24

i. Kelly's Statements Do Not Qualify for Protection Under Either the "Bespeaks Caution" Doctrine or the PSLRA Safe Harbor

**\*19** AOLTW argues that claims based on allegedly false and misleading oral statements by defendants Kelly and Levin are forward-looking statements accompanied by sufficient cautionary language to qualify for protection under the "safe harbor" provisions of the PSLRA, 15 U.S.C. §§ 77z-2 & 78u-5, and the "bespeaks caution" doctrine, and therefore should be dismissed. AOLTW claims that the recent decision in *Rombach* bolsters this contention. Plaintiff disagrees.

Forward-looking statements are defined as projections, plans, or statements of future economic performance. 15 U.S.C. § 78u-5(i)(1). *See also Credit Suisse First Boston v. ARM Fin. Group, Inc.*, No. 99 Civ. 12046(WHP), 2001 WL 300733, at \*5 (S.D.N.Y. March 28, 2001)(stating that "forward-looking statements are contingent statements as to future events"). "It is well recognized that even when an allegedly false statement 'has both a forward-looking aspect and an aspect that encompasses a representation of present fact,' the safe harbor provision of the PSLRA does not apply." *In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613, 629 (S.D.N.Y.2003) (quoting *In re APAC Teleservice, Inc. Sec. Litig.*, No. 97 Civ. 9145(BSJ), 1999 WL 1052004, at \*7 (S.D.N.Y. Nov. 19, 1999)). Further, "linking future success to present and past performance does not render statements immune from liability." *APAC* at \*8.

Under the PSLRA safe harbor, an oral forward-looking statement is not actionable if it is accompanied by a cautionary statement (1) identifying the particular oral statement as forward-looking, (2) stating that the actual results could differ materially from the forward-looking statement and (3) identifying a readily-available written document that identifies factors that might cause actual results to differ materially from the forward-looking statement. *See* 15 U.S.C. §§ 77z-2(c)(2) & 78u-5(c)(2). However, "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 2004 WL 77928 at \*7. *See also In re Prudential Secs. Inc. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996)("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

AOLTW contends that the statements attributed to Michael Kelly in ¶ 321 of the Amended Complaint, that AOL's advertising and commerce revenue growth was "very healthy," and "I can't say that strongly enough," are forward-looking. *Id.* ¶ 321. It is wrong. The statements are not contingent on future events, nor are they projections about AOL's financial future; rather, they are statements of the Company's existing financial condition. With respect to Kelly's prediction that AOLTW's revenue would rise 12% to 15% annually, because that statement was combined with statements of existing fact, it too falls outside the scope of the PSLRA safe harbor and the bespeaks caution doctrine. *See APAC*, 1999 WL 1052004, at \*8 (holding that "linking future success to present and past performance does not render statements immune from liability"). Furthermore, even if this Court had concluded that Kelly's statements were forward-looking, because MSBI has adequately pled that Kelly either knew or recklessly disregarded the true financial condition of AOL when he spoke publicly, *see supra* at 49-51, the statements would not be entitled to the protections of the safe harbor or the bespeaks caution doctrine. After all, "no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made." *Milman* 72 F.Supp.2d at 231. That is, the disclaimer at the beginning of the October 18, 2000 conference call that the statements that would follow were "subject to a number of factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements," is insufficient to invoke the safe harbor since MSBI has adequately alleged that such statements were made with conscious or reckless disregard for the true financial condition of the Company.

c. Barry Schuler

**\*20** Prior to the Merger, Schuler was President of Interactive Services at AOL. After AOL and Time