Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 25

Warner merged, Barry Schuler became Chairman and Chief Executive Officer of the AOL subsidiary of the Company. *Id.* ¶ 479. The Amended Complaint states that a former account manager in the account services unit of AOL's Interactive Marketing division stated that for big advertising deals, Berlow, Schuler or Pittman "signed off." *Id.* ¶ 480. It is also alleged that Schuler was a member of the Operating Committee and thus knew about the "BA Specials," the restructuring of advertising deals for failing dot-coms, and the downturn in AOL's advertising business. *Id.* ¶ 474. Further, on April 16, 2001, Schuler stated, "We're renting out the eyeballs and increasingly the fingers of our subscribers, who are primed to buy products as a result of the adjacency, context and product-information surfing the AOL service lends itself to." *Id.* ¶ 150. This is the only allegedly false and misleading statement in the Amended Complaint attributed to Schuler. Quite simply, the statement is insufficient to form the basis of a Section 10(b) claim. By all accounts, AOL was "renting out the eyeballs" of its subscribers; as such, nothing about Schuler's statement was false or misleading. Further, plaintiff's allegations that Schuler might have "signed off" on all major advertising deals and that Schuler was part of a Company-wide effort to artificially inflate AOL and AOLTW's stock price are not adequate to sustain a 10(b) claim against Defendant Schuler for alleged violations of Rules 10b-5(a) and (c). According to the Amended Complaint, it is only possible that Schuler "signed off" on the allegedly fraudulent deals. The mere possibility (in this case approximately 33%) that Barry Schuler "signed off" on a deal is insufficient to establish scienter. As a result, MSBI's Section 10(b) claim against Schuler is dismissed.

d. Kenneth J. Novack

Kenneth Novack was a Vice Chairman and Director of AOL who became Vice Chairman of AOLTW after the Merger. According to the Amended Complaint, Novack provided strategic counsel and handled special assignments for the Chairman, assumed a leading role in major corporate transactionsincluding Bertelsmann, and was a key architect of the Merger. AC ¶ 485. Notably, the Amended Complaint does not contain any specific allegations regarding Novack's knowledge of the alleged problems with AOL and AOLTW's advertising revenue. Nor does the Amended Complaint contain any statements made by Novack that are alleged to have been false or misleading. Although the Amended Complaint does allege that Novack sold 700,000 shares of AOLTW for proceeds of $33 million in the four months following the Merger, against the backdrop of the otherwise minimalist pleadings against Novack, those sales are not enough to support a strong inference of scienter. As such, the Section 10(b) claim against Defendant Novack is dismissed.

e. Gerald Levin

\*21 Gerald Levin was Chairman and Chief Executive Officer of Time Warner and Chief Executive Officer of AOL Time Warner. According to the plaintiff, Levin had access to all corporate information possessed by the two companies and overruled internal efforts to disclose the true nature of the Company's advertising revenues. *Id.* ¶ 486. There is, however, nowhere that the Court can find, any allegation of Levin's specific knowledge of the alleged deficiencies in the advertising revenue. Thus, MSBI has not adequately alleged Levin's knowledge. Alleging "access to all corporate information of both companies" is materially indistinguishable from alleging officer status, which, pursuant to *In re Health Mgmt.,* 1998 WL 283286, at \*6, is insufficient. Further, even if MSBI had established Levin's knowledge of advertising shortfalls, neither the statements attributed to Levin, nor any of the alleged acts committed by Levin, are manipulative or deceptive within the meaning of Section 10(b). Accordingly, plaintiff's allegations against Defendant Levin are inadequate to establish a strong inference of scienter and the Section 10(b) claim against Levin is therefore dismissed. [FN32]

> FN32. Having already determined that the statements of Gerald Levin are not actionable based on the allegations in the Amended Complaint, it is unnecessary to reach the question of whether Levin's statements are forward-looking and thus entitled to protection under the "bespeaks caution" doctrine and the PSLRA safe harbor.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 26

f. Wayne H. Pace

Since November 2001, Pace has served as Executive Vice President and Chief Financial Officer of AOLTW. The Amended Complaint alleges that Pace has overseen all of the Company's finance functions, including tax, financial planning, mergers and acquisitions, treasury, accounting and capital allocation and that he approved all major AOL advertising deals. *Id.* ¶ 484. Plaintiff also alleges that Defendant Pace, in Company press releases, continued to misrepresent to investors critical information relating to advertising revenue with full knowledge that investors were relying heavily on such information. *Id.* ¶ 500. Plaintiff points specifically to a July 24, 2002 conference call with market analysts in which Pace allegedly overstated advertising and commerce revenue by $126 million. *Id.* ¶¶ 405-407. Pursuant to *Novak,* and in light of allegations that Pace not only approved all of AOL's advertising deals, but personally oversaw all of the Company's finance functions, the Court concludes that plaintiff has adequately alleged that Pace "knew facts or had access to information suggesting that [his] public statements were not accurate." Accordingly, the Section 10(b) claims against Pace may proceed.

g. Richard Parsons

Richard Parsons was a Director and President of Time Warner and a Director, Chief Executive Officer and Co-Chief Operating Officer of AOL Time Warner. *Id.* ¶ 487. The Amended Complaint alleges that in that role, Parsons was privy to all information regarding the Company's operations including the Business Affairs division. The Amended Complaint then alleges that despite this "access to the truth," Parsons made misrepresentations denying the accounting improprieties of the Company. *Id.* Such conclusory allegations of knowledge are not sufficient to establish scienter with respect to Parsons; in fact, they amount to little more than alleging Parsons' officer status, which under *In re Health Mgmt.,* 1998 WL 283286, at *6, is insufficient, on its own, to plead scienter. [FN33] The Section 10(b) claim against Parsons is dismissed.

FN33. Even when the April 2001 sale of 700,000 AOLTW shares by Parsons is combined with his status as an officer, the Court does not believe that a strong inference of scienter arises, absent allegations that Parsons had specific information, or was exposed to specific information that suggested AOL's advertising revenue was not what it seemed and either made public statements that contradicted or omitted that information or engaged in manipulative or deceptive acts.

h. Joseph Ripp

*22 Joseph Ripp was Executive Vice President and Chief Financial Officer of AOL, Inc., the online subsidiary of AOL Time Warner. It is alleged he had access to and was involved with financial matters relevant to the transactions. *Id.* ¶ 482. It is specifically alleged that Ripp managed the Homestore transactions on behalf of the Company. *Id.* During mid-to late June 2001, Ripp allegedly voiced his concerns about AOLTW's ability to collect money from third parties to representatives of Homestore. According to the Amended Complaint, Ripp thus "clearly knew the details of the deals," but covered up that knowledge to allow the Company to inflate advertising revenue. *Id.* ¶¶ 148-153. The Court disagrees. The Amended Complaint does not establish that Defendant Ripp had knowledge of the nature of the allegedly fraudulent deals, but merely establishes that he participated on a telephone call where, *inter alia,* certain aspects of the deal were discussed. Conclusory allegations are not sufficient to establish that a defendant acted recklessly or with conscious misbehavior. *Ganino,* 228 F.3d at 169. As a result, the Section 10(b) claim against Ripp is dismissed.

i. Eric Keller

Eric Keller was a Senior Vice President in the Business Affairs Division at AOL and it is alleged that he was deeply involved in the creation of the Company's advertising transactions, including the Homestore and PurchasePro stock warrant deals. AC ¶ 481. In the section of the Amended Complaint devoted to pleading scienter, it is alleged that Keller was the architect of sixteen separate

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 27

sham transactions with Homestore in which the two companies generated bogus advertising revenue through the use of three-legged "round-trip" deals involving third parties. *Id.* ¶ 493. In the first leg of the deal, Homestore paid a third-party for services and products that Homestore did not need, and for which it in fact, overpaid. *Id.* ¶ 143. The second, or secret leg required the third-party to purchase advertising from AOLTW with most or all of the money Homestore paid to the third party. *Id.* The Amended Complaint alleges that Keller and Colburn agreed with Homestore executives not to document the secret leg of these transactions in order to avoid detection. *Id.* ¶ 493. [FN34] Finally, under the third leg, AOLTW purchased advertising from Homestore in the same amount that the third-party paid to AOLTW for advertising. *Id.* ¶ 143. Accordingly, AOLTW and Homestore allegedly secretly round-tripped or purchased advertising revenue from themselves in sham triangular transactions. *Id.* ¶ 143. MSBI also alleges that once these deals were in effect, Keller worked with a representative of Homestore to avoid detection by Homestore's auditing firm of these deals. *Id.* ¶ 493.

> FN34. The Amended Complaint also alleges that Keller was involved with the PurchasePro transaction in which AOL received PurchasePro stock warrants in exchange for distributing PurchasePro software. AC ¶ 496.

Certainly, if proven, MSBI's allegations regarding Keller's involvement in the Homestore transaction would establish that Keller's conduct was "highly unreasonable," and "an extreme departure from the standards of ordinary care." *In re Carter Wallace,* 220 F.3d at 39. However, Keller argues that MSBI's Section 10(b) claim cannot proceed against him because "plaintiffs do not identify any statements actually made by Mr. Keller." Defendant Eric Keller's Memorandum of Law in Support of His Motion to Dismiss Plaintiff's Consolidated Amended Class Action Complaint (Counts Six and Eighteen), dated July 14, 2003, ("Keller Memo"), at 6. The Court agrees with Keller that there are no false or misleading statements in the Amended Complaint attributable to him, and thus there is no basis for liability under Rule 10b-5(b), which prohibits misstatements and omissions in connection with securities purchases or sales. 17 C.F.R. § 240.10b-5.

**\*23** The lack of false statements notwithstanding, Keller's alleged involvement in numerous allegedly fraudulent acts is undeniable. Such acts are plainly adequate to plead a claim under Rule 10b-5(c), which the Court has already established as permissible. As stated previously, Rule 10b-5(c) prohibits persons from engaging "in any act, practice or course of business which operates or would operate as fraud or deceit upon any person" in connection with securities purchases or sales. 17 C.F.R. § 240.10b-5. If, as plaintiff alleges, Keller "agreed with Homestore executives not to document the secret leg of these transactions in order to avoid detection," then he has engaged in a prohibited act as defined by Rules 10b-5(a) and (c). Accordingly, the Court finds that MSBI has properly pled scienter with respect to Defendant Keller.

Keller also moves to dismiss the claims against him on the following grounds: (1) Keller is not subject to Section 11 liability; and (2) Plaintiff's Section 10(b) claim is time-barred by the applicable statute of limitations. Keller Memo at 6.

i. Keller is Not Subject to Section 11 Liability

Section 11 of the Securities Act imposes liability for false statements contained in a registration statement upon four classes of persons: (1) signers of the registration statement, (2) directors of the issuer, (3) professionals who prepared or certified any part of the registration statement, and (4) the underwriters of the offering. 15 U.S.C. § 77k(a). Defendant Keller, however, does not fit into any of the four § 77k(a) classes of persons; as a result, the Section 11 claim against Keller is dismissed. [FN35]

> FN35. Counsel for MSBI has also apparently conceded this point, both explicitly (through communications with counsel for Keller) and implicitly (through the omission of Keller in its listing of Registration Statement signatories in MSBI Opp. at 37, n. 28).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
(Cite as: 2004 WL 992991 (S.D.N.Y.))

Page 28

ii. The 10(b) Claim is Timely

The Court has already determined that all of MSBI's claims against AOLTW, AOL, Time Warner and the individual defendants included in the AOLTW Memo are timely since no investor of ordinary intelligence would have been aware of the probability that she had been defrauded prior to July 18, 2002. *See supra* at 18-26. Accordingly, Keller's statute of limitations arguments "adopt[ed] by reference" from the AOLTW Memo are not persuasive.

Keller also argues, however, that when AOL placed him on administrative leave on June 19, 2001, and some articles in the press "commented that Mr. Keller's suspension was made in connection with AOL's investigation into its business partnership with PurchasePro," MSBI's duty to inquire was triggered with respect to its claims against Keller. This is not a reasonable interpretation of this Circuit's inquiry notice jurisprudence. "Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct." *Warnaco*, 335 F.3d at 194. The Company's decision to place Keller on administrative leave, even when accompanied by some speculative press reports linking the suspension to PurchasePro, is simply not uncontroverted evidence that irrefutably demonstrates that Keller had committed fraud; indeed, it is nowhere close, as Keller's suspension could have been for numerous non-fraudulent reasons. As such, the Section 10(b) claims against Defendant Keller are not time-barred.

j. Steven Rindner

*24 Steven Rindner was a Senior Vice President in AOL's Business Affairs and Development division who reported directly to David Colburn. It is alleged that he "took over handling the sham transactions with Homestore on behalf of the Company." AC ¶ 482. It is also alleged that Rindner participated in a telephone call with Homestore's Chief Executive Officer, Stuart Wolff, in which Rindner confirmed that Eric Keller had left the Company and sought confirmation from Homestore that the third party vendors would make payments to AOL. AC ¶ 150. Additionally, the Amended Complaint alleges that although Rindner "clearly knew the details of the deals," he covered up that knowledge to allow the Company to inflate advertising revenue and avoid adverse publicity. AC ¶ 152. The Amended Complaint contains no allegations that Rindner was reckless or engaged in conscious misbehavior with respect to the Homestore transaction. The allegations with respect to Defendant Rindner are conclusory and thus insufficient to establish scienter. *See Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir.2001) ("A plaintiff cannot base securities fraud claims on speculation and conclusory allegations."). Accordingly, the Section 10(b) claim against Defendant Rindner (AC Count 18), the only claim in the Amended Complaint against him, is dismissed.

k. Myer Berlow

Myer Berlow was President of AOL's Worldwide Interactive Marketing Division in the Business Affairs Department. Following the Merger, in August 2001 he became President of the Global Marketing Solutions Group. In September 2002, Berlow became a Senior Advisor to the Company. AC ¶ 36(g). The Amended Complaint alleges that Berlow was a member of both the Operating Committee and the so-called "Friends of Bob [Pittman]" Group. AC ¶ 478. The Amended Complaint alleges that by at least August 2000, Berlow knew that various advertising customers of the Company were experiencing financial problems that jeopardized existing AOL advertising agreements. AC ¶ 318. Plaintiff also alleges that for big advertising deals, Berlow, Schuler, or Pittman signed off. AC ¶ 480. The Amended Complaint does not, however, indicate any one specific deal for which Berlow "signed off." The Amended Complaint also refers to a March 8, 2002 e-mail sent by Berlow to Barry Schuler. The e-mail was regarding Robert O'Connor, a former AOL employee who had allegedly warned senior executives of accounting problems at AOL. In the e-mail, Berlow wrote, "[t]he only reason you know that there is an inventory problem is that Bob [O'Connor] continued up the ladder with the inventory problem (Bobby-Ripp-Kelly-Mayo) and shot his career out the window." AC ¶ 504. According to the Amended Complaint, Berlow summed up by stating, "I have no need to be right only a desire to see my stock go up." AC ¶ 505.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
(Cite as: 2004 WL 992991 (S.D.N.Y.))

Page 29

Put simply, even when all of plaintiff's allegations against Berlow are pooled, neither conscious nor reckless misconduct is established. There are no false and misleading statements in the Amended Complaint attributed to Berlow, [FN36] nor are there any alleged manipulative and deceptive acts. [FN37] MSBI's failure to plead scienter with respect to Berlow is fatal to its Section 10(b) claim against him. Having failed to plead scienter for an underlying 10(b) claim, the plaintiff also cannot establish the requisite "culpable participation" for Section 15 and 20 claims. *See infra* at 77-82. As such, all claims in the Amended Complaint against Myer Berlow are dismissed.

> FN36. Indeed, the e-mail Berlow sent regarding the reason for Robert O'Connor's dismissal and his desire for an increased stock price appears to be true. Moreover, the statement was not made publicly, and thus could not have been relied upon by shareholders.

> FN37. The possibility that Berlow "signed off" on a hypothetical advertising deal is plainly insufficient to qualify as an alleged scheme or a deceptive act under Rules 10b-5(a) and (c).

1. David Colburn

*25 From 1995 until the Merger, David Colburn was Senior Vice President of Business Affairs for AOL. Following the Merger, Colburn became Executive Vice President and President of Business Affairs and Development for AOL Time Warner. In both roles, Colburn reported directly to Robert Pittman. The Amended Complaint alleges that Colburn was a member of the Operating Committee and that he reviewed and signed off on all deals. AC ¶ 476. The Amended Complaint also delineates Colburn's involvement in numerous advertising transactions and bases its Section 10(b) claims against Colburn, at least in part, on that involvement.

Colburn moves to dismiss the Section 10(b) claims against him for failure to plead scienter, contending that MSBI has not alleged either motive or opportunity to commit fraud or conscious misbehavior or recklessness. Memorandum of Law in Support of Defendant David M. Colburn's Motion to Dismiss the Amended Consolidated Class Action Complaint, dated July 14, 2003 ("Colb.Memo"), at 26. While the Court agrees that MSBI has failed to adequately allege that Colburn had the motive and opportunity commit fraud, the Court finds that MSBI has adequately pled that Colburn consciously misbehaved. The Court's finding is premised on Colburn's involvement with the Veritas transaction. [FN38]

> FN38. In light of the Court's determination that MSBI's allegations regarding Colburn's involvement in the Veritas transaction are sufficient to support a finding of scienter, an in-depth analysis of Colburn's alleged involvement with Homestore is unnecessary. However, a preliminary review of those transactions suggests that the Court could have just as easily based its finding of scienter with respect to Colburn on his involvement in the Homestore deals. The transactions between AOLTW and Homestore are discussed in detail *supra* at 60-61.

MSBI alleges that in September 2000, AOL negotiated a deal with Veritas Software Corporation ("Veritas") in which AOL agreed to pay Veritas $50 million in return for only $30 million worth of software. According to the Amended Complaint, the extra $20 million was then round-tripped back to AOL in a purported separate deal in which Veritas purchased online advertising from AOL. AC ¶ 161. MSBI bases this allegation on a former Senior Contract Official at AOL. *Id.* According to the Amended Complaint, it was Defendant Colburn, along with Business Affairs Director, Jeffrey Tyeryar, who instructed AOL personnel to raise the contract amount to $50 million and then structure another deal in which Veritas would spend the extra $20 million it had received for its software on AOL advertising. AC ¶ 162. This arrangement made it appear as if there were two wholly unrelated transactions. The Amended Complaint alleges that the deal, which MSBI's source alleges was a "kick-back" arrangement in violation of APB 29,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 30

was structured this way so that the extra $20 million could be booked as revenue before the end of the last quarter of calendar year 2000, the last quarter before the Merger. *Id.*

In response, Colburn contends that the allegations regarding the Veritas transaction are insufficient because there are no allegations that Colburn "either withheld the details of the deal from the Company's accountants or participated in decisions concerning the accounting for the transaction." Colb. Memo at 28. Colburn misses the point. It is the very structure of the deal, not what Colburn did or did not tell the AOL accountants, that matters. If in fact Colburn engineered a separate transaction to make it appear that AOL was receiving $20 million in advertising revenue, when in actuality it was giving itself its own money, then Colburn has acted fraudulently. In addition, the absence of a false or misleading statement attributable to Colburn does not inoculate him from Section 10(b). As the Court has previously determined, potential liability under Section 10(b) can be premised on violation of any of the rules promulgated under the section. Rule 10b-5(c) prohibits any person, directly or indirectly, from engaging "in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c). By specifically alleging Colburn's engineering of a "kick-back" arrangement with Veritas, MSBI has adequately alleged that: (1) Colburn acted with fraudulent intent; and (2) Colburn engaged in conduct prohibited by Section 10(b). Accordingly, the Court will not dismiss MSBI's Section 10(b) claims against Defendant David Colburn.

*26 In addition to its Section 10(b) claims, MSBI has also brought claims against Colburn under Section 11 (AC Count 6) and Sections 15 and 20 (AC Counts 12-13, 20). With respect to Count Six of the Amended Complaint, which alleges that Defendant Colburn is liable as a signatory of the registration statements of AOLTW in 2001 and 2002, that claim is dismissed as to Defendant Colburn. In addition to the fact that Colburn's failure to sign those registration statements precludes holding him liable, Lead Plaintiff MSBI has conceded that Count Six of the Amended Complaint mistakenly included Colburn (much like it mistakenly included Keller). Colb. Memo at 5.

Finally, for the reasons set forth *infra* at 77-82, the Court will not dismiss the Sections 15 and 20 claims against Colburn.

m. Stephen M. Case

Stephen M. Case co-founded AOL in 1985. Case served as Vice President of Marketing from September 1985 to September 1987 and as Executive Vice President from September 1987 until January 1991. Case became a Director of AOL in September 1992, Chief Executive Officer in April 1993 and Chairman of the Board in October 1995, holding all of these positions until the Merger was consummated on January 11, 2001.

According to the Amended Complaint, Case, as Chairman of AOL Time Warner, had access to all significant corporate information possessed by the two companies. AC ¶ 473. In addition, the Complaint alleges that all of the key participants in the transactions at issue reported either directly or indirectly to Case. *Id.* Plaintiffs also allege that Case had the authority to "sit in" on the Operating Committee's meetings, though notably, plaintiffs do not allege that Case ever participated in such a meeting. Despite its protestations to the contrary, MSBI has simply failed to allege that Stephen Case knew that the A & C revenue stream was considerably more imperiled than was being reported to shareholders and the public. As was true with Defendant Levin, plaintiff's allegation that Case, by virtue of his position, had "access" to all significant corporate information is insufficient; indeed, such an allegation is materially indistinguishable from alleging officer status. *See In re Health Mgmt.,* 1998 WL 283286, at *6. Further, although the Court has concluded that MSBI adequately pleaded that members of the Operating Committee were provided with information suggesting that the Company's advertising situation was precarious, Plaintiff never alleges that Case actually attended any of the Operating Committee's meetings, only that he had the authority to sit in. This is insufficient. As a result, MSBI has not adequately pled scienter with respect to Defendant Case.

Even if, however, MSBI had adequately pled that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 31

Case had knowledge of the advertising situation, none of the statements or actions attributed to Case in the Complaint are sufficient to create potential liability under any of the subsections of 10(b). For example, the Amended Complaint attributes the following allegedly fraudulent statements to Case: (1) on January 11, 2000, in response to a question regarding the Merger, Case told *The Los Angeles Times* that "one of the creative breakthroughs was in the valuation" AC ¶ 95; and (2) in early 1997, Case promised that AOL would adopt "new gold-standard accounting practices." AC ¶ 100. Finally, the Amended Complaint contains a statement by a longtime business associate of Case's, John Malone, that "Case was ready to marry anybody that would have had hard assets and liquidity." AC ¶ 537. None of these statements is false, misleading, or in any way fraudulent. In addition, unlike David Colburn and Robert Pittman, both of whom engineered deals that were allegedly fraudulent, there is no indication in the Amended Complaint that Case engaged in any manipulative or deceptive conduct. The Court refuses to indulge MSBI's invitation to infer Case's scienter from the fact that executives who reported to Case (both directly and indirectly) may have engaged in fraudulent behavior. In sum, MSBI's Section 10(b) claim against Defendant Stephen Case does not adequately plead scienter; accordingly, those claims are dismissed. The failure to plead scienter with respect to Case is also fatal to MSBI's Sections 15 and 20 control person claims (*see infra* at 77-82); as such, those claims against Case are also dismissed.

XIV. THE SECTIONS 10(B) AND 14(A) CLAIMS ADEQUATELY PLEAD LOSS CAUSATION

\*27 AOLTW argues that MSBI's claims under §§ 10(b) and 14(a) of the Exchange Act should be dismissed because MSBI has not adequately pled loss causation. To state a claim under §§ 10(b) and 14(a) of the Exchange Act, a plaintiff must plead loss causation, that is, the plaintiff must demonstrate that "the economic harm that it suffered occurred as a result of the alleged misrepresentations." *Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992). However, a plaintiff satisfies §§ 10(b) and 14(a)'s loss causation requirement by demonstrating that "defendant's misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of the transaction." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87 (2d Cir.2001). *See also Emex,* at \*8 (finding that plaintiff's allegations that "defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of Emex at the time of the transaction ... [were] sufficient to survive a motion to dismiss.").

Here, Defendant contends that Plaintiff's economic harm was not a result of the alleged misrepresentations, but rather the product of intervening external forces, such as the marketwide decline in Internet stocks and the fallout from the September 11 terrorist attacks. AOLTW Memo at 43. In response, MSBI argues that it has adequately pled loss causation by alleging that during the Class Period, defendants' actions artificially propped up the price of AOL and AOLTW securities when they were purchased, exchanged or otherwise acquired by MSBI class members, causing MSBI and the Class to lose billions of dollars. AC ¶ 16. MSBI is right. That is, in conformity with the *Suez* standard on loss causation, the Amended Complaint quite clearly alleges losses caused by a disparity between the transaction price and the true investment value of AOL and AOLTW. As such, loss causation is properly pled and the motion to dismiss on that ground is denied. [FN39]

> FN39. The Court received a letter, with numerous attachments, dated March 12, 2004, from counsel for AOLTW on the issue of loss causation. According to the defendants, a matter currently before the United States Supreme Court, *Dura Pharmaceuticals, Inc. et al. v. Broudo et al.,* No. 03-932, is directly relevant to AOLTW's motion to dismiss on the issue of loss causation. After a careful and thorough review of the entire submission, it becomes clear that the defendant's principal argument is that *Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.,* 343 F.3d 189 (2d Cir.2003), is the controlling authority on loss causation in the Second Circuit. *See* AOLTW Letter, dated March 12, 2004, at 2. According to *Emergent Capital,* "if the loss was caused

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
(Cite as: 2004 WL 992991 (S.D.N.Y.))

Page 32

by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established. *But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." Emergent Capital,* 343 F.3d at 197 (emphasis added). The Court agrees with the defendants-- *Emergent Capital* controls. Thus, defendants will have every opportunity at trial to prove that the decline in AOLTW stock was caused by September 11, 2001, its aftermath and generalized market conditions; AOLTW will not, however, have that opportunity now. At this stage, plaintiff has satisfied its obligation under *Suez* to plead loss causation.

XV. AOLTW'S ARGUMENTS IN SUPPORT OF DISMISSAL OF THE SECTION 14(A) CLAIMS ARE UNPERSUASIVE

AOLTW argues that MSBI's claims under § 14(a) of the Exchange Act against AOL and the former AOL defendants should be dismissed because the officers and directors of one party to a merger cannot, as a matter of law, be deemed to have solicited the proxies of the shareholders of the other party to the merger. *See Del Noce v. Delyar Corp.,* No. 72 Civ. 1819, 1976 WL 813, at *24 (S.D.N.Y. July 30, 1976) (holding that the CEO of one merger partner could not be deemed to have solicited the proxies of the other partner's shareholders). Plaintiff disagrees, contending that Section 14(a) imposes liability on any person who solicits or permits the use of his name to solicit a proxy. 15 U.S.C. § 78n.

The Court will not dismiss MSBI's 14(a) claims against AOL and the former AOL defendants. The only authority cited by defendants in support of dismissal, *Del Noce,* 1976 WL 813 at *24, did not involve a joint proxy statement, which this case does. In fact, the Form S-4 Registration statement at issue here, *i.e.,* the Joint Proxy Statement, contained both AOL and Time Warner's logos, contained identical information regarding the date and time for the shareholders to vote on the proposed merger (June 23, 2000 at 10:00 a.m.), and was signed by the Chairman and Chief Executive Officers of both AOL and Time Warner, Stephen Case and Gerald Levin, respectively. *See* Butler Decl. Ex. 37. Given the unmistakably cooperative nature of the Joint Proxy Statement, and given the inapplicability of *Del Noce,* the Court concludes that there is no basis upon which to dismiss the § 14(a) claims.

XVI. MSBI'S CLAIMS UNDER SECTION 12(A)(2) BASED ON THE BOND OFFERINGS ARE DISMISSED AS TO AOLTW AND THE INDIVIDUAL DEFENDANTS

*28 For the reasons set forth in pages 104-112 of this Opinion and Order, MSBI's Section 12(a)(2) claims are dismissed with prejudice.

XVII. MSBI'S SECTION 11 CLAIMS BASED ON THE BOND REGISTRATION STATEMENT (COUNTS FIVE AND SIX) ARE DISMISSED AS TO AOLTW AND THE INDIVIDUAL DEFENDANTS [FN40]

> FN40. This includes AOLTW and defendants Levin, Kelly, Barge, Caulfield, Parsons, Pittman, Novack, Akerson, Bollenbach, Gilburne, Raines, Schuler, Ripp, Cappuccio and Pace.

AOLTW contends that MSBI's claims under Section 11 of the Securities Act based on the Shelf Registration Statement should be dismissed because MSBI has not adequately alleged an injury in fact by demonstrating that it suffered a loss from its April 2001 and April 2002 bond purchases. AOLTW is correct. Because the failure to allege "injury in fact" deprives the Court of subject matter jurisdiction, AOLTW's motion to dismiss Counts Five and Six is granted. [FN41]

> FN41. For a more thorough explanation of plaintiff's failure to plead injury in fact, *see infra* at 106-108.

XVIII. MSBI'S SECTIONS 15 AND 20 CLAIMS FOR CONTROL PERSON LIABILITY ARE DISMISSED WITH RESPECT TO SOME, BUT NOT ALL OF THE INDIVIDUAL DEFENDANTS

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
**(Cite as: 2004 WL 992991 (S.D.N.Y.))**

Page 33

Defendant AOLTW argues that MSBI's claims based on control person liability under Section 15 of the Securities Act and Section 20 of the Exchange Act, (AC Counts 12-13, 20), should be dismissed. AOLTW contends that the Amended Complaint does not adequately allege primary violations by the individual defendants, as the Second Circuit requires. Additionally, the defendants claim that the Amended Complaint does not contain any particularized allegations of conscious misbehavior, recklessness or any other culpable participation by any of the individual defendants. In response, plaintiff asserts that, regardless of whether "culpable participation" is a requirement for control person claims, it has properly pled control person liability under both Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

Since Section 15 of the Securities Act and Section 20 of the Exchange Act are substantially the same, *see supra* at 10-12, the Court considers the analysis of each section interchangeable. *HB Holdings Corp. v. Scovill, Inc.* No. 88 Civ. 7983(SWK), 1990 WL 37869, *7 (S.D.N.Y. Mar. 26, 1990). See also *Index Fund, Inc. v. Hagopian*, 609 F.Supp. 499, 510 (S.D.N.Y.1985). Thus, to withstand a motion to dismiss either a § 15 or a § 20(a) claim, plaintiffs must allege: (1) an underlying primary violation by the controlled person; (2) control over the controlled person; and (3) particularized facts as to the controlling person's culpable participation in the fraud perpetrated by the controlled person. *In re Enterprise Mortgage Acceptance Co., LLC, Sec. Litig.*, MDL Doc. No. 1495, at 61 (relating to *TIAA v. EMAC*, No. 02 Civ. 2237, *ING v. EMAC*, No. 02 Civ. 2369, *Northern Life v. EMAC*, No. 02 Civ. 2941), dated November 5, 2003 (citing *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996). See also *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) ("[A] determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability.") [FN42]

> FN42. Despite some District Court opinions to the contrary, the Second Circuit has yet to eliminate the culpable participation requirement for control person claims. Until the Second Circuit does so, this Court will continue to assume that an adequately pled control person liability claim contains specific allegations of culpable participation. For a more thorough discussion of the current status of the culpable participation requirement in the Second Circuit, see *In re Enterprise Mortgage Acceptance Co., LLC, Sec. Litig.*, MDL Doc. No. 1495, at 62 fn 12 (relating to *TIAA v. EMAC*, No. 02 Civ. 2237, *ING v. EMAC*, No. 02 Civ. 2369, *Northern Life v. EMAC*, No. 02 Civ. 2941), dated November 5, 2003.

*29 Although Sections 15 and 20(a) share the similarities noted above, they differ with respect to the alleged primary violation. In this case, the Section 15 claims are premised on violations of Sections 11 and 12(a)(2), while the Section 20(a) claims are premised on violations of Section 10(b). The control person liability claims against the individual defendants, much like the scienter inquiry for the § 10(b) claims, must be assessed on a case-by-case basis.

As stated earlier, the first element for a control person claim, be it a Section 15 or a Section 20(a) claim, is a primary violation. The Court has already determined that MSBI has adequately alleged a primary violation by AOLTW of Section 10(b) and Section 11. Accordingly, MSBI has satisfied the first prong of both its Section 15 and Section 20(a) control person claims.

The second element of a § 15 or § 20(a) claim is control. Control can be demonstrated "by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." *First Jersey*, 101 F.3d at 1472-73. Stock ownership is not the only means of exercising control pursuant to Sections 15 and 20(a). Other means include business relationships, interlocking directors, family relationships, and the power to influence and control the activities of another. See *Baxter v. A.R. Baron & Co.*, 1996 WL 709624, at *6 (S.D.N.Y. Dec. 10, 1996). However, at the motion to dismiss stage, plaintiffs "need only plead facts supporting a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
(Cite as: 2004 WL 992991 (S.D.N.Y.))

Page 34

reasonable inference of control." *Cromer Fin. Ltd. v. Berger,* 137 F.Supp.2d 452, 484 (S.D.N.Y.2001). "A short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required." *In re WorldCom Sec. Litig.,* No. 02 Civ. 3288, 2003 WL 21219049, at *21 (S.D.N.Y. May 19, 2003) (citing *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 512 (2002)).

Of the individual defendants, only Berlow and Colburn contest control. [FN43] The Court finds Colburn's arguments unpersuasive. The Complaint alleges that Colburn had "direct and supervisory involvement in the day-to-day operations of AOL and AOL Time Warner." AC ¶ 818. The Complaint also alleges that because of Colburn's positions "of control and authority as a senior officer and directors of AOL and/or AOL Time Warner, Colburn was able to, and did, control the contents of the Merger Registration Statement and Bond Registration Statement and Prospectus Supplements thereto which contained materially false financial information and omitted facts." AC ¶ 752. Because MSBI has provided "a short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person," the Court finds that control is adequately pled with respect to Colburn.

> FN43. Berlow's arguments on control, however, need not be addressed given plaintiff's failure to establish scienter, *i.e.,* culpable participation, with respect to Defendant Berlow.

*30 The final element of a control person claim is culpable participation. With respect to the Section 20(a) claims (AC Count 20), although it is not entirely clear exactly what the "culpable participation" requirement commands, allegations of scienter necessarily satisfy the requirement. *Emex,* 2002 WL 31093612, at *10. Therefore, based on the Court's earlier findings, MSBI has satisfied the culpable participation requirement with respect to Defendants Pittman, Kelly, Pace, and Colburn. As such, the Section 20(a) claims against those four defendants may proceed. However, MSBI has not adequately pled scienter with respect to Defendants Case, Levin, Novack, Parsons, Schuler, Berlow, and Ripp. Accordingly, the Section 20(a) claims against Case, Levin, Novack, Parsons, Schuler, Berlow, and Ripp (AC Count 20) are dismissed.

With respect to the Section 15 claims, the Amended Complaint premises liability on violations of Section 11 (AC Count 12) and Section 12(a)(2) (AC Count 13). As a threshold matter, Count 13 is dismissed in its entirety. Having found that MSBI has not adequately pled a primary violation of 12(a)(2), it follows, that there can be no secondary liability for the same underlying conduct. Count Twelve is dismissed as against Case, Levin, Novack, Parsons, Schuler, Berlow, and Ripp. With respect to each of these individual defendants, MSBI has failed to adequately plead scienter, thereby precluding it from pleading culpable participation. The Section 15 claims against Pittman, Kelly, Colburn and Pace, given the adequacy of the scienter allegations against each of these defendants, are not dismissed.

XIX. ERNST & YOUNG'S MOTION TO DISMISS IS GRANTED IN PART AND DENIED IN PART

Ernst & Young, joined as a defendant in this action, is a firm of certified public accountants that maintains its headquarters in the Southern District of New York. AC ¶ 47. At all times relevant to this action, E & Y provided auditing and accounting services to AOL and AOLTW, including but not limited to, conducting audits of AOL and AOLTW's year-end financial statements and, beginning no later than the quarter ended March 31, 2000, reviewing AOL's and the Company's quarterly financial statements. *Id.* In connection therewith, Ernst & Young issued unqualified audit reports related to AOL and AOLTW's financial statements, for inclusion in each of AOL's annual reports for fiscal years 1999 and 2000 and transition period ended December 31, 2000 on SEC Forms 10-K, in the Merger Registration Statement and the Bond Registration Statement. *Id.* Ernst & Young also issued an unqualified audit report for inclusion in AOLTW's annual report for the years 2000 and 2001 on SEC Forms 10- K and in the Bond

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 992991 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,812
(Cite as: 2004 WL 992991 (S.D.N.Y.))

Page 35

Registration Statement. *Id.* According to the Amended Complaint, the alleged financial fraud at AOL and AOLTW could not have been accomplished without the knowing participation of Ernst & Young, who received millions of dollars in auditing, consulting and other fees from the companies. AC ¶ 25. The Complaint further alleges that as the longstanding auditor of AOL and Time Warner, and after the Merger, AOLTW, Ernst & Young had knowledge of, or recklessly disregarded the fraudulent accounting practices and schemes engaged in by AOL and AOLTW during the Class Period, and lent its considerable reputation and credibility to AOL and AOLTW's financial statements. *Id.* ¶ 26. Allegedly, those financial statements were materially misstated starting in 1998 through and including 2002, as a direct result of false advertising revenue that Ernst & Young allowed AOL and AOLTW to recognize. *Id.*

*31 Specifically, Lead Plaintiff MSBI asserts four claims against Ernst & Young: (1) Count 3 alleges that E & Y violated Section 11 of the Securities Act by making false and misleading statements in the 6/30/99 AOL opinion, included in the Merger Registration Statement; (2) Count 7 alleges that E & Y violated Section 11 of the Securities Act by making false and misleading statements in audit reports included in the Bond Registration Statement; (3) Count 16 alleges that E & Y violated Section 14(a) of the Exchange Act by making materially false and misleading statements in the 6/30/99 AOL Opinion included in the Proxy Statement; and (4) Count 19 alleges that E & Y violated Section 10(b) by making materially false and misleading statements in each of the audit reports described above. Ernst & Young moves to dismiss all four counts against it.

A. The Section 11 Claim Based on the Bond Registration Statement (Count 7) is Dismissed With Prejudice

For the reasons more thoroughly discussed *infra* at 106-108, MSBI has failed to allege injury-in-fact with respect to its claims based on the Bond Registration statement.

B. The Section 11 Claim Based on the Merger Registration Statement (Count 3) Is Timely

E & Y argues that MSBI's Merger Registration Section 11 claim must be dismissed because the claim is based on information readily available since 1999. Memorandum of Defendant Ernst & Young LLP in Support of Its Motion to Dismiss Consolidated Amended Class Action Complaint, dated July 14, 2003 ("E & Y Memo"), at 15. Before determining whether MSBI was on inquiry notice for its Section 11 claim against E & Y, the Court must first determine the potential scope of Section 11 liability. Because Section 11 imposes liability on an auditor only for material misstatements or omissions in an audit report that is included in an SEC registration statement with the auditor's consent, the 6/30/99 AOL Opinion is the only allegedly misleading E & Y report which can form the basis of Section 11 liability. Therefore, E & Y's exposure under Count Three is limited to material misstatements or omissions in the 6/30/99 AOL Opinion.

With respect to the 6/30/99 AOL Opinion, plaintiff identifies two transactions that caused the June 30, 1999 AOL Opinion to be misleading--online advertising purchases by Sun Microsystems and Hughes Electronics. [FN44] E & Y Memo at 17. Thus, if MSBI was on inquiry notice of the key facts underlying these transactions more than a year before July 14, 2002, Count Three is time-barred.

> FN44. According to the Amended Complaint, the Sun transaction, announced on November 24, 1998, involved the swap of advertisements for computer equipment. AC § 158. AOL allegedly agreed to buy $500 million in computer equipment from Sun at list price, even though companies like AOL typically buy for a 30% discount. *Id.* In turn, Sun agreed to pay AOL $350 million for advertising services. *Id.* A contemporaneous agreement provided for Sun to pay AOL more than $310 million per year as part of a three-year partnership called "iPlanet." *Id.* AOL then treated these payments from Sun as recurring revenue, despite the fact that in effect, AOL was receiving back some of its own expenditures. *Id.*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.