Westlaw.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 1

▷
Motions, Pleadings and Filings

United States District Court,
S.D. New York.

In re VIVENDI UNIVERSAL, S.A. Securities
Litigation

**No. 02 Civ. 5571(HB).**

Nov. 3, 2003.

Shareholders brought action against corporation and its officers alleging violation of federal securities laws. On defendants' motion to dismiss, the District Court, Baer, J., held that: (1) court had subject matter jurisdiction over federal securities fraud claims brought by foreign class members who acquired corporation's ordinary shares traded on foreign market; (2) shareholders stated fraud claim with sufficient particularity; (3) corporation, as foreign private issuer, was exempt from statute which prohibited any person from soliciting any shareholder proxy or consent or authorization in violation of Securities and Exchange Commission (SEC) rules and regulations; (4) shareholders stated claim that corporation violated statute governing registration statement and prospectus; (5) reasonable inference could be drawn that corporation had reasonable grounds to believe impairments of goodwill had to be reported; (6) corporate officers could be held liable for statements made to, and subsequently published by, reporters and analysts; and (7) shareholders stated sufficient basis to infer that chief executive officer had motive to promulgate falsehoods.

Motion is denied in part and granted in part.

West Headnotes

**[1] Securities Regulation ⟲67.11**

349Bk67.11 Most Cited Cases

District court had subject matter jurisdiction over federal securities fraud claims brought by foreign class members who acquired corporation's ordinary shares traded on foreign market, since alleged fraud on American stock exchange was substantial or significant contributing cause of foreign investor's decisions to purchase corporation's stock abroad; chief executive officer (CEO) and chief financial officer (CFO) decided to move to United States, allegedly to better direct corporate operations and more effectively promote misleading perceptions on Wall Street, which harbored some of the most watched securities exchanges in the world. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[2] Securities Regulation ⟲60.51**
349Bk60.51 Most Cited Cases

Shareholders stated fraud claim with sufficient particularity under federal securities laws on allegations that corporation improperly consolidated into its financials revenue from its subsidiary, failed to timely write-down impaired goodwill from previous corporate investments and acquisitions, and overstated its revenue from its environmental division on certain multi-year contracts in violation of generally accepted accounting principles (GAAP). Lanham Trade-Mark Act, § 32(a)(1), as amended, 15 U.S.C.A. § 1114(1)(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 8, 9(b), 28 U.S.C.A.

**[3] Securities Regulation ⟲49.25(1)**
349Bk49.25(1) Most Cited Cases

Corporation, as foreign private issuer, was exempt from statute which prohibited any person from soliciting any shareholder proxy or consent or authorization in violation of Securities and Exchange Commission (SEC) rules and regulations, although corporation's United States subsidiary allegedly made misstatements in its proxy statements. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. §

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 2

240.3b-4(b).

**[4] Securities Regulation ☞67.12**
349Bk67.12 Most Cited Cases

Shareholders had standing to claim violation of statute governing registration statement and prospectus only to extent that they bought foreign corporation's ordinary shares pursuant to form governing foreign deposited securities, or if shares in merger were traceable to that allegedly defective form; if shareholders bought shares under form governing registration of American Depository Shares (ADS), they did not have standing to make such claim. Securities Act of 1933, § 11(a), 12(a)(2), as amended, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); 17 C.F.R. § 239.36.

**[5] Securities Regulation ☞25.18**
349Bk25.18 Most Cited Cases

Shareholders stated claim that corporation violated statute governing registration statement and prospectus, on allegations that corporation improperly consolidated investments and reported inflated revenues in October 2000 registration statement and prospectus; no proof of fraud or deceit was required. Securities Act of 1933, § 11(a), 12(a)(2), as amended, 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A
.

**[6] Limitation of Actions ☞100(13)**
241k100(13) Most Cited Cases

Shareholders were not on constructive or inquiry notice, and, consequently, cause of action did not begin to accrue, on their cause of action for fraud, when corporation filed form stating that it held right to consolidate subsidiary's revenues by virtue of shareholder agreement, since form did not reveal that corporation's authority to consolidate subsidiary's revenue was limited. Securities Act of 1933, § 13, 15 U.S.C.A. § 77m.

**[7] Securities Regulation ☞25.18**
349Bk25.18 Most Cited Cases

**[7] Securities Regulation ☞25.30**
349Bk25.30 Most Cited Cases

Shareholders stated claim that corporation made false and misleading statements in registration statement, on allegations that corporation "failed to timely write down impaired goodwill from previous corporate investments and acquisitions . . . ," although facts relied upon by shareholders post-dated filing; post-dated evidence did not vitiate false or misleading nature of registration statement. Securities Act of 1933, § 11(a), 12(a)(2), as amended, 15 U.S.C.A. §§ 77k(a), 77l(a)(2).

**[8] Securities Regulation ☞60.45(1)**
349Bk60.45(1) Most Cited Cases

On claim of securities fraud, reasonable inference could be drawn that corporation had reasonable grounds to believe impairments of goodwill had to be reported, and that former management concluded not to do so, in view of large impairments taken immediately after departure of key figures in corporation's management. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[9] Securities Regulation ☞60.27(6)**
349Bk60.27(6) Most Cited Cases

Shareholders stated claim against corporation for fraud under federal securities laws, on allegations that corporation overstated its revenues, in reliance on revenue streams from companies that it had no right to tap. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[10] Securities Regulation ☞60.27(6)**
349Bk60.27(6) Most Cited Cases

Shareholders stated claim against corporation for fraud under federal securities laws, on allegations that it improperly consolidated financial revenues of subsidiaries into its own financial results, although corporation asserted that such consolidation did not have material effect on corporation's net income and shareholder equity; additional revenue impacted other material financial metrics that investors commonly relied upon, such as revenue growth and earnings before interest, taxes, depreciation, and amortization (EBITDA). Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 3

**[11] Securities Regulation** 📖60.27(6)
349Bk60.27(6) Most Cited Cases

Shareholders stated claim against corporation for fraud under federal securities laws, on allegations that corporation recognized revenue from subsidiary before services were rendered. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[12] Securities Regulation** 📖60.45(1)
349Bk60.45(1) Most Cited Cases

Shareholders alleged sufficient facts on its securities fraud claim to provide reasonable belief that corporation and its officers knew that corporation's statements regarding its financial health and liquidity were false, and that corporation had liquidity problem, on allegations chief executive officer (CEO) assured investors that corporation was "in a very strong position, with solid performance in virtually every business," and chief financial officer (CFO) allegedly sent desperate handwritten plea to CEO one week later, stating, "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat. All I ask is that all of this not end in shame." Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[13] Securities Regulation** 📖60.45(1)
349Bk60.45(1) Most Cited Cases

On their securities fraud claim, shareholders alleged sufficient facts to show that corporation and its officers reasonably could not have believed statements made to public, on allegations that defendants continued to represent to public that corporation was financially solid, despite being aware of financial precipice upon which it stood when its debt rating was almost downgraded, and possibility that it would need to declare bankruptcy soon. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[14] Securities Regulation** 📖60.27(5)
349Bk60.27(5) Most Cited Cases

Corporation's announcements of allegedly false financial results from prior quarters, and its purported opinion as to its cash situation, were not subject to safe harbor provision of Private Securities Litigation Reform Act (PSLRA), although announcements often included forward-looking statements and generic warning that "actual results may differ." Securities Exchange Act of 1934, § 21E(c)(1)(A)(i), as amended, 15 U.S.C.A. § 78u-5(c)(1)(A)(i).

**[15] Securities Regulation** 📖60.40
349Bk60.40 Most Cited Cases

Corporate officers could be held liable for statements made to, and subsequently published by, reporters and analysts that were pled in complaint alleging violation of federal securities laws. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[16] Securities Regulation** 📖60.51
349Bk60.51 Most Cited Cases

A plaintiff must specify the statements that were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent, to satisfy the Private Securities Litigation Reform Act (PSLRA) and the pleading rule which governs fraud claims. Securities Exchange Act of 1934, § 21D(b)(1), as amended, 15 U.S.C.A. § 78u-4(b)(1); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[17] Securities Regulation** 📖60.45(1)
349Bk60.45(1) Most Cited Cases

Under the Private Securities Litigation Reform Act (PSLRA), scienter may be imputed to a corporation and its officers when they were motivated to inflate company stock prices as a means to effectuate a specific acquisition that otherwise would not have been possible without fraudulently inflating stock prices. Securities Exchange Act of 1934, § 21D(b)(2), as amended, 15 U.S.C.A. § 78u-4(b)(2).

**[18] Securities Regulation** 📖60.45(1)
349Bk60.45(1) Most Cited Cases

Shareholders stated sufficient basis to infer that chief executive officer had motive to promulgate falsehoods in regard to corporation's financial state, in lawsuit under Private Securities Litigation Reform Act (PSLRA), on allegation that officer had

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

been given bonus worth more than $3 million, amounting to two and one half times his normal salary, for boosting corporation's earnings before interest, taxes, depreciation, and amortization (EBITDA) by more than 30% in 2001. Securities Exchange Act of 1934, § 21D(b)(2), as amended, 15 U.S.C.A. § 78u-4(b)(2).

**[19] Securities Regulation** ☞**60.53**
349Bk60.53 Most Cited Cases

Shareholders stated claim that corporation misrepresented material facts, in lawsuit under Private Securities Litigation Reform Act (PSLRA), on allegations that corporation narrowly averted downgrade of its credit and then chief executive officer (CEO) did not mention narrowly averted disaster when he urged board of directors to approve $10 billion acquisition of another business two days later. Securities Exchange Act of 1934, § 21D(b)(2), as amended, 15 U.S.C.A. § 78u-4(b)(2).

**[20] Securities Regulation** ☞**60.53**
349Bk60.53 Most Cited Cases

Shareholders stated claim that corporation misrepresented material facts, in lawsuit under Private Securities Litigation Reform Act (PSLRA), on allegations that chief executive officer (CEO) attempted to conceal from investors, board, and chief financial officer (CFO), his $6.3 billion stock buy-back to bolster corporation's share price. Securities Exchange Act of 1934, § 21D(b)(2), as amended, 15 U.S.C.A. § 78u-4(b)(2).

**[21] Securities Regulation** ☞**60.53**
349Bk60.53 Most Cited Cases

Shareholders stated claim that corporation misrepresented material facts, in lawsuit under Private Securities Litigation Reform Act (PSLRA), on allegations that corporation knew or should have known but recklessly disregarded fact that it did not take impairment charge in fiscal year 2001, resulting in corporation overstating value of its subsidiary, where chief financial officer knew from memo, which was prepared shortly after corporation acquired subsidiary, that football marketing rights of subsidiary, originally believed to be asset of subsidiary, belonged in fact to football league. Securities Exchange Act of 1934, § 21D(b)(2), as

amended, 15 U.S.C.A. § 78u-4(b)(2).

**[22] Securities Regulation** ☞**60.45(1)**
349Bk60.45(1) Most Cited Cases

Shareholders established strong circumstantial evidence that corporate officers knew, or should have known, that they were misrepresenting material facts related to corporation, or failed to review or check information that they had duty to monitor, in lawsuit under Private Securities Litigation Reform Act (PSLRA), on allegations that chief financial officer (CFO) became aware that stock buy back program, which chief executive officer (CEO) instigated, was "waste of cash" and that corporation "was running out of cash," and yet CFO continued to prepare and sign financial statements, which overstated corporation's financials. Securities Exchange Act of 1934, § 21D(b)(2), as amended, 15 U.S.C.A. § 78u-4(b)(2).

**[23] Securities Regulation** ☞**25.20(1)**
349Bk25.20(1) Most Cited Cases

Chief executive officer (CEO) of corporation was "seller," for purpose of statute governing material misstatements or omissions allegedly made by means of registration statement or prospectus, where CEO signed registration statement, and he personally took steps to solicit purchase of corporation's securities and to increase share price of those securities; CEO actively participated in preparation of misleading or false registration statement, he regularly appeared before investors and financial news agencies to tout financial vitality of corporation, and CEO stood to financially benefit from increased sale and share price of corporation's securities. Securities Act of 1933, § 12(a)(2), 15 U.S.C.A. § 77l(a)(2).

**[24] Securities Regulation** ☞**25.20(1)**
349Bk25.20(1) Most Cited Cases

Chief financial officer (CFO) of corporation was not "seller," for purpose of statute governing material misstatements or omissions allegedly made by means of registration statement or prospectus; although CFO signed false and misleading registration statement and he was close collaborator of chief financial officer who was "seller," CFO did not stand to gain financially from his actions.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 5

Securities Act of 1933, § 12(a)(2), 15 U.S.C.A. § 77l(a)(2).

**[25] Securities Regulation ☞25.20(1)**
349Bk25.20(1) Most Cited Cases

Culpable participation is not an element of a prima facie claim for control person liability for making a false statements in a registration statement, since an underlying violation is a violation of that statute in which strict liability is imposed, i.e., knowledge of misrepresentation is not required. Securities Act of 1933, §§11, 12(a)(2), 15, 15 U.S.C.A. §§ 77k, 77l(a)(2), 77o.

**[26] Securities Regulation ☞25.20(1)**
349Bk25.20(1) Most Cited Cases

Chief executive officer (CEO) had "actual control" over corporation, for purpose of control person liability for making false statements in registration statement, where he had direct or indirect business or personal relationships with other directors or major shareholders, he had ability to conceal or deflect worries about corporation's financial condition until he left while commencing new deals to acquire more assets, and ability to orchestrate, without full knowledge of board, $6.3 billion stock buy-back by corporation to help prop up its stock price. Securities Act of 1933, § 15, 15 U.S.C.A. § 77o.

**[27] Securities Regulation ☞25.20(1)**
349Bk25.20(1) Most Cited Cases

Shareholders stated claim that chief financial officer (CFO) was "controlling person," for purpose of control person liability for making false statements in registration statement, on allegations that he closely collaborated with chief executive officer (CEO), who was found to have exercised "actual control" over corporation, and CFO signed registration statement, that corporation issued to solicit approval from corporation's shareholders of 3-way merger with other corporations, which was false and misleading because corporation improperly consolidated financial revenues from various subsidiaries. Securities Act of 1933, § 15, 15 U.S.C.A. § 77o.

**[28] Securities Regulation ☞60.40**

349Bk60.40 Most Cited Cases

**[28] Securities Regulation ☞60.41**
349Bk60.41 Most Cited Cases

Shareholders stated claim that chief executive officer (CEO) violated statute governing liability of controlling persons and persons who aid and abet fraud under section 10-b, on broad allegations that CEO disseminated false and misleading statements in his capacity as CEO of corporation, when he knew of, or recklessly disregarded, non-public information, which would have shown that his statements were false and misleading. Securities Exchange Act of 1934, § 20, as amended, 15 U.S.C.A. § 78t.

**[29] Securities Regulation ☞60.40**
349Bk60.40 Most Cited Cases

**[29] Securities Regulation ☞60.41**
349Bk60.41 Most Cited Cases

Shareholders stated claim that chief financial officer (CFO) violated statute governing liability of controlling persons and persons who aid and abet fraud under section 10-b, on broad allegations that by virtue of his position as CFO, and his responsibility for approving corporation's financial statements, he knew or should have known of facts indicating that those statements were inaccurate and misleading. Securities Exchange Act of 1934, § 20, as amended, 15 U.S.C.A. § 78t.

**[30] Securities Regulation ☞60.40**
349Bk60.40 Most Cited Cases

Shareholders could rely on "group pleading doctrine" to attribute allegedly false and misleading press releases and other group-published documents produced by other corporate officers to chief financial officer (CFO) during his tenure as CFO, in lawsuit alleging securities fraud, although verbal statements made by other officers did not fall within ambit of group pleading doctrine; CFO was not a person merely affiliated with corporation, but rather he was clearly cognizable corporate insider with active daily role. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
(Cite as: 2003 WL 22489764 (S.D.N.Y.))

Page 6

*OPINION & ORDER*

BAER, J. [FN1]

> FN1. Sirimal R. Mukerjee, an intern in my
> chambers during the summer of 2003 and a
> second-year law student at Brooklyn Law
> School, provided substantial assistance in
> the research and drafting of this opinion.

## I. INTRODUCTION

*1 Plaintiffs [FN2] allege that defendants sold
them Vivendi Universal, S.A. ("Vivendi") common
stock or American Depository Shares ("ADSs") at
artificially inflated prices as a result of defendants'
[FN3] material misrepresentations and omissions
between October 30, 2000 and August 14, 2002,
inclusive, (the "class period") in violation of §§
10(b) and 20(a) of the Securities Exchange Act of
1934 (the "1934 Act"). Furthermore, plaintiffs
allege that defendants induced them to purchase or
otherwise acquire Vivendi common stock or ADSs
(the "merger subclass") pursuant to a registration
statement and prospectus dated October 30, 2000
(the "registration statement"), which was issued in
connection with the three-way merger of Vivendi,
Seagram Company Limited ("Seagram") and Canal
Plus, S.A. ("Canal Plus") on December 8, 2000 (the
"merger"), in violation of §§ 11, 12(a)(2) and 15 of
the Securities Act of 1933 (the "1933 Act"). In
addition, plaintiffs allege that they were damaged as
a result of the merger (the "proxy subclass")
between Vivendi, Seagram, and Canal Plus, in
violation of § 14(a) of the 1934 Act and SEC Rule
14a-9 promulgated thereunder. Compl. ¶¶ 1, 29,
40. Defendants in this securities class action move
to dismiss the Consolidated Class Action Complaint
(the "complaint") pursuant to 15 U.S.C. § 78u-4
(1995), and Rules 8, 9(b), 12(b)(1), 12(b)(6) and
41(b) of the Federal Rules of Civil Procedure. For
the reasons stated below, defendants' motion is
denied in part and granted in part.

> FN2. "Plaintiffs" refer to the lead plaintiffs
> (Oliver M. Gerard, Francois R. Gerard,
> Beatrice Doniger, Bruce Doniger,
> Grandchildren's Trust by Bruce Doniger

Trustee, Alison Doniger, Michael Doniger,
Edward B. Brunswick and the Ruth
Pearson Trust) representing themselves
and others similarly situated within the
putative class.

> FN3. "Defendants" refer to Vivendi
> Universal, S.A. ("Vivendi"), Jean-Marie
> Messier and Guillaume Hannezo. Messier
> and Hannezo will be referred to
> collectively as the "individual defendants."

## II. STANDARDS OF REVIEW

When construing a motion to dismiss under the
Private Securities Litigation Reform Act (the
"PSLRA"), 15 U.S.C. § 78u-4, the Court must
determine if plaintiffs pled with particularity
sufficient facts "to support a reasonable belief as to
the misleading nature of the statement or omission."
*In re Initial Public Offering Sec. Litig.*, 241
F.Supp.2d 281, 330 (S.D.N.Y.2003) (quotation
marks and citations omitted); *see Novak v. Kasaks*,
216 F.3d 300, 313-14 (2d Cir.2000); 15 U.S.C. §
78u-4(b)(1). Moreover, the Court must determine if
plaintiffs "state[d] with particularity facts giving
rise to a strong inference that ... defendant[s] acted
with the required state of mind." *In re IPO*, 241
F.Supp.2d at 330; *see* 15 U.S.C. § 78u-4(b)(2).

Under Rule 8, the complaint merely needs to
"afford [the] defendant sufficient notice of the
communications complained of to enable him to
defend himself." *Kelly v. Schmidberger*, 806 F.2d
44, 46 (2d Cir.1986) (quotation marks and citations
omitted). Furthermore, the complaint must "be so
construed as to do substantial justice." Fed.R.Civ.P.
8(f). The facts alleged must be "simple," concise,
and direct." Fed.R.Civ.P. 8(e)(1).

Rule 9(b) adds to the pleading standard of Rule 8,
but does not drastically alter it. *See In re IPO*, 241
F.Supp.2d at 326 (noting that Rules 8's and 9's
"pleading requirements only differ in degree, not in
kind"). When fraud is alleged, plaintiffs must allege
facts with particularity. Particularity "means the
who, what, when, where, and how: the first
paragraph of any newspaper story." *Id.* at 327
(quoting *DiLeo v. Ernst & Young*, 901 F.2d 624,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 7
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

627 (7th Cir.1990)).

**\*2** Defendants' motions to dismiss under Rule 12(b)(1) challenges this Court's statutory or constitutional power to adjudicate the case. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). When considering a Rule 12(b)(1) motion, the Court construes the complaint broadly and liberally in conformity with the principle set out in Rule 8(f), "but argumentative inferences favorable to the pleader will not be drawn." 5A Charles A. Wright et al., Federal Practice and Procedure 1350, at 218-219 (1990 & Supp.1991). The movant and the pleader may use affidavits and other materials beyond the pleadings themselves in support of, or in opposition to, a challenge to subject matter jurisdiction. *See Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130 (2d Cir.1976), *cert. denied sub. nom.,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Once challenged, the burden of establishing subject matter jurisdiction rests on the party asserting jurisdiction. *See Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942). Unlike a motion to dismiss under Rule 12(b)(6), however, a dismissal under Rule 12(b)(1) is not based on the claim's merits. *See Exchange Nat'l Bank,* 544 F.2d at 1130-1131.

When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to accept as true all of the facts alleged in the complaint and draw all reasonable inferences in the plaintiffs' favor. *See Krimstock v. Kelly,* 306 F.3d 40, 47-48 (2d Cir.2002). A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 63 (2d Cir.1997) (citations and internal quotations omitted). It is improper, however, " 'to assume that the [plaintiffs] can prove facts that it has not alleged." ' *Todd v. Exxon Corp.,* 275 F.3d 91, 198 (2d Cir.2001) (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

The Court has broad discretion to dismiss a complaint under Rule 41(b). *See Joseph Muller Corp. Zurich v. Societe Anonyme De Gerance Et D'Armement,* 508 F.2d 814, 815 (2d Cir.1974). "No one standard or single factor controls a court's determination under Rule 41(b); each case must be examined in its own factual circumstances." *S.E.C. v. Everest Mgmt. Corp.,* 466 F.Supp. 167, 171 (S.D.N.Y.1979) (citing *Michelsen v. Moore-McCormack Lines, Inc.,* 429 F.2d 394, 395 (2d Cir.1970)). "In reaching its conclusion, a court may balance the strong public policy in favor of deciding cases on the merits with the burden on the administration of justice and prejudice to the defendant caused by the delay." *Id.* With these standards in mind, I review defendants' motions to dismiss.

### III. FACTUAL ALLEGATIONS

Vivendi is a global conglomerate comprised primarily of two major divisions: "Media and Communications" and "Environmental Services." Compl. ¶ 30. Beginning in June 1996, Vivendi began an acquisition spree, with Messier, Vivendi's Chief Executive Officer ("CEO") and Chairman until July 3, 2002, and Hannezo, Vivendi's Chief Financial Officer ("CFO") until July 9, 2002, at the helm. This growth strategy resulted in the accumulation of a sizeable debt. After Vivendi acquired Seagram for $36 billion and Canal Plus for $12 billion, Vivendi purchased substantial equity positions in a host of other companies, including Houghton Mifflin Co., Studio Canal and USA Network Entertainment, using Vivendi stock or by borrowing against future earnings. *Id.* ¶¶ 52-53. Pursuant to this growth strategy, plaintiffs allege that "it was crucial for defendants to continue to report favorable financial results in order to keep Vivendi's stock price high and to maintain its favorable credit ratings and access to additional debt financing." *Id.* ¶ 53.

**\*3** Plaintiffs allege that throughout Messier's and Hannezo's terms at Vivendi, Vivendi and the individual defendants issued public statements indicating that Vivendi's financial results were "better than expected." For example, in a March 9, 2001 and a March 12, 2001 press release, Vivendi reported that its fiscal year 2000 results had exceeded expectations. *Id.* ¶¶ 58-59. In an April 23, 2001 press release, Vivendi stated that its first

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

quarter 2001 results were "very strong" and that its Media and Communications revenues and Telecoms revenues were up. *Id.* ¶ 61. At a shareholders' meeting held the following day, Messier stated that according to Hannezo's calculations, Vivendi had a "healthy balance sheet" and a "pro forma net debt that [was] practically non-existent." *Id.* ¶ 62. On July 2, 2001 Vivendi filed a Form 20-F for fiscal year 2000, which Hannezo signed and which contained consolidated financial statements for 1998, 1999, and 2000. *Id.* ¶ 66. Subsequently, Messier stated in a press release that Vivendi's earnings before interest, taxes, depreciation, and amortization ("EBITDA") had the "highest growth rate[ ] of the industry ... [and that its] stock is definitely an attractive investment today." *Id.* ¶¶ 67-68. Because of such statements, Vivendi's common stock and ADSs increased in price by 5%, *id.* ¶ 70, and securities analysts gave Vivendi high credit ratings, *id.* ¶ 71.

Plaintiffs further allege that in response to market rumors that Vivendi's earnings would be disappointing, defendants "categorically denied any problems." *Id.* ¶ 73. For example, in a September 25, 2001 press release, Messier maintained that "[d]espite the current environment, [Vivendi would] reach all [of its] previously stated revenue/EBITDA objectives for the 2001 year." *See id.* ¶ 74. In an October 30, 2001 press release, Messier proclaimed the strength of Vivendi's reported revenue and EBITDA growth as a testament to Vivendi's resilience during a tough economy and that he expected 10% revenue growth and 35% EBITDA growth in 2001. *Id.* ¶ 75. Once again, securities analysts responded positively to defendants' statements. *Id.* ¶ 77. During a press conference in connection with Vivendi's $10.3 billion acquisition of USA Networks Entertainment and the creation of Vivendi Universal Entertainment ("VUE"), Messier indicated that the acquisition would not put "pressure" on Vivendi but would allow it to increase its EBITDA, net income and net free cash flow. *Id.* ¶ 81. Moreover, Messier emphasized that despite its global debt ratio, "the balance sheet [was] clean." *Id.* Furthermore, as reported by *AFX News Limited* on February 6, 2002, Messier distributed a company letter noting that "[s]ome global markets, including the music market, declined during this period. But despite the difficulties, we are the only media company not to

have issued a profit warning on its operating results and there's no change to that situation ... [and that] there are no hidden risks." See *id.* ¶ 83. In a March 5, 2002 press release, Messier stated that Media and Communications, operating free cash flow was "up 2 billion euros" and that defendants "stay fully committed to conveying full transparency in [their] financial results." *See id.* ¶ 89. In response to Moody's issuance of a debt rating one notch above "junk" status, Vivendi issued a press release to mitigate the impact of the rating by claiming that it "ha[d] no impact on Vivendi Universal's cash situation." *Id.* ¶ 100. As a consequence of the press release, plaintiffs assert that defendants were able to "limit the decline in the price of Vivendi's common stock and ADSs." *Id.* On May 28, 2002, Vivendi filed its Form 20-F signed by Hannezo for the 2001 fiscal year. In response to declines in common stock and ADS prices, defendants issued a press release in May 2002 stating that Vivendi "ha[d] no reason to anticipate or fear any further deterioration in its credit rating" and that the "cash situation ... [was] comfortable." *Id.* ¶ 103. By June 26, 2002, after a series of negative market rumors, Messier tried to reassure investors in a conference call by claiming that "there [was] no hidden liability." *Id.* ¶ 105. In addition on July 2, 2002, *Bloomberg* reported that Messier sent an e-mail to his employees reiterating that, despite Vivendi's debt being downgraded again and reports that Vivendi was in danger of default, "there [were] no hidden risks in the company's accounting." *Id.* ¶ 109. On July 3, 2002, Messier resigned and Vivendi, through new management, issued a press release acknowledging that it indeed had a short-term liquidity crisis. *Id.* ¶¶ 109- 10. Later, the *Associated Press* reported on August 14, 2002 that Jean-Rene Fourtou ("Fourtou"), Vivendi's new CEO, admitted that Vivendi " 'was [then] facing a liquidity problem." ' *Id.* ¶ 114.

**\*4** In addition, plaintiffs allege that during the class period, Vivendi filed financial statements with the SEC that "were materially false and misleading because the financial statements materially inflated and distorted [Vivendi's] true financial performance during the [c]lass [p]eriod." *Id.* ¶ 122. More specifically, Vivendi allegedly failed to timely record goodwill impairments, *id.* ¶ 124, and Vivendi improperly applied generally accepted accounting principles ("GAAP") in regard to its acquisition of U.S. Filter, Seagram and Canal Plus.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 9
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
(Cite as: 2003 WL 22489764 (S.D.N.Y.))

*Id.* ¶ 128.

In regard to Canal Plus, plaintiffs allege that Vivendi valued Canal Plus at Q12.5 billion, but reported Q12.6 billion as goodwill. *Id.* ¶ 129. By June 2002, under French GAAP, Vivendi had written off approximately 78% of that Q12.5 billion acquisition cost, but did not take any write-off for impaired goodwill under U.S. GAAP in 2000 or 2001. *Id.* ¶¶ 130-31. "[B]y refusing to take any goodwill impairment write-offs under U.S. GAAP [on its 2002 Form 20-F], Vivendi effectively represented to investors that *the cash flows* Vivendi expected to receive from the assets it acquired prior to and during the [c]lass [p]eriod *equaled or exceeded* the carrying value of such assets," *id.* ¶ 132 (emphasis in original), though this allegedly was not in fact the situation, *see id.* ¶¶ 133-38 (referencing the complaint filed by Canal Plus in March 2002 alleging that NDS Group PLC's permitted the "proliferation of counterfeit smart cards that enabled users to circumvent the security measures built into the Canal [Plus's] conditional access system" and resulted in Canal Plus losing over a billion dollars). After Messier and Hannezo left Vivendi, Vivendi recorded an additional Q3.8 billion goodwill impairment for Canal Plus in the second quarter of 2002, even though Canal Plus reported revenue growth of 8%-providing "further evidence that the impairment recorded in [Canal Plus's goodwill] ... should have been taken earlier." *Id.* ¶ 141. In regard to the U.S. Filter acquisition, plaintiffs allege that Vivendi recorded approximately Q4.6 billion in goodwill when U.S. Filter's operating results were much less than reported by Vivendi. *See id.* ¶¶ 169-77. Because companies similar to U.S. Filter were sold during the class period for less than that paid by Vivendi, plaintiffs contend that defendants knew or recklessly ignored that U.S. Filter's reported goodwill was materially inflated, *id.* ¶¶ 146-47.

Plaintiffs also allege that defendants materially misrepresented Vivendi's financial statements by improperly consolidating the revenues from Cegetel and Maroc Telecom when it held less than a 50% ownership interest in those companies in 1999, 2000 and 2001. *See id.* ¶¶ 148-56. Specifically, plaintiffs allege that Vivendi's "consolidation of Cegetel's 1999-2001 operating results were false and misleading because Vivendi only owned 44%

of Cegetel shares and it did not have a sufficient controlling financial interest in Cegetel. *Id.* ¶¶ 158-61. Consequently, "Vivendi's reported revenues were overstated by Q3.9 billion, Q5.1 billion and Q6.4 billion for the years ended 1999, 2000 and 2001, respectively." *Id.* ¶ 162. Similarly, plaintiffs allege that Vivendi's consolidation of Maroc Telecom's 2001 financial results in its 2001 Form 20-F was false and misleading because it only owned 35% of Maroc Telecom. Cegetel's and Maroc Telecom's improper consolidation is purportedly evidenced by Fourtou's statements during a June 26, 2002 conference call that Vivendi, at that time, did "not have access to [cash flow from] Cegetel and Maroc Telecom," and an August 14, 2002 conference call, during which Fourtou revealed that " 'Vivendi [could not] access the cash flow generated by the companies it owns less than 50 percent of.' " *Id.* ¶ 167. Vivendi's reported revenues were thus overstated by Q1.4 billion in 2001 for Maroc Telecom. *Id.* ¶ 168.

*5 Vivendi's financial results were allegedly further distorted due to its purported improper recognition of revenue from its U.S. Filter subsidiary. *Id.* ¶¶ 169-72. In particular, "Vivendi ... [prematurely] recognized anticipated revenue from multi-year public service contracts upon signing on the contracts" in violation of GAAP and its own publicly disclosed revenue recognition policy. *Id.* ¶ 173; *see also id.* ¶¶ 174-80.

Plaintiffs additionally allege that Messier's stock buy-back program-where he clandestinely bought Vivendi stock on the market (approximately 10% of Vivendi's equity) in 2001-"caused [Vivendi] to spend approximately $6.3 *billion," id.* ¶ 183(b) (emphasis in original), thus adding even greater burden to Vivendi's already massive debt. Defendants allegedly did not initially disclose this information and later made inadequate disclosures in regards to Vivendi's sale of put options in 2000 and 2001, which obligated Vivendi to purchase approximately 2% of all of its outstanding stock at an average price of Q69, when the actual share price should have been well below this. *Id.* ¶ 183(c). Plaintiffs cite numerous newspaper reports that examined the severity of Vivendi's liquidity crisis. *See id.* ¶¶ 184-88. Notably, an October 31, 2002 *Wall Street Journal* article reported that on December 13, 2001, Hannezo wrote to Messier

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

stating: "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat.... All I ask is that all of this not end in shame." *Id.* ¶ 184. That article also reported that Messier touted the stability of Vivendi's debt-and-liquidity predicament despite being advised to the contrary by Vivendi's investment bank, Goldman Sachs & Co. ("Goldman Sachs"). *Id.* ¶ 186. At a French parliamentary hearing in September 2002, Fourtou admitted that had Messier remained CEO of Vivendi beyond July 3, 2003, Vivendi would invariably have gone bankrupt "within 10 days." *Id* . Moreover, on December 13, 2002, the *Associated Press* reported that "Hannezo admitted that 2001 was marked by a series of errors, including underestimating the debt problem." *Id.* ¶ 188.

## IV. DISCUSSION

A. Subject Matter Jurisdiction Over Claims Brought by Foreign Plaintiffs

[1] Defendants assert that this Court lacks jurisdiction over the claims brought by foreign class members who acquired Vivendi ordinary shares traded on the foreign market. Under the "conduct test," which the Second Circuit has adopted to determine when extraterritorial application of the federal securities laws is warranted, this Court has subject matter jurisdiction over the claims of foreign investors abroad (1) "if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad." *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991). Defendants contend that the principal activities complained about by investors abroad were not directly caused by activities in the United States. *Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 122 (2d Cir.1995). More specifically, defendants note that Vivendi is a French corporation that is not registered to do business in the United States. Further, defendants note that Vivendi does not make quarterly filings as is required of American corporations by the SEC and had only one corporate officer located in the United States until September 2001, when the individual defendants moved here. Thus, defendants claim that the alleged conduct at issue, namely the creation and

dissemination of allegedly fraudulent statements and financial data, was initiated, organized and approved by Vivendi corporate executives in France. Further, defendants assert that Vivendi's filing of the Forms 20-F and 6-K with the SEC and other disseminated materials to shareholders in the United States cannot confer jurisdiction upon the claims of *foreign* purchasers, and that Vivendi's vast domestic presence by virtue of its numerous acquisitions in the United States is irrelevant to evaluating the subject matter jurisdiction over the claims of investors who bought their shares in foreign markets.

*6 Plaintiffs have alleged that Vivendi undertook a scheme to acquire numerous well-known U.S. entertainment and publishing companies, such as Universal Studios, Houghton Mifflin and USA Networks, Compl. ¶ 23, and that to successfully accomplish this plan, it took on a $21 billion debt while fraudulently assuring all investors through false and misleading reports filed with the SEC and news releases that it had sufficient cash-flow to manage its debts, *id.* ¶¶ 24, 54-192. Further, plaintiffs allege that two of the alleged principal actors in this scheme, Messier, Vivendi's former CEO, and Hannezo, Vivendi's former CFO, spent half of their time in the United States from September 2001 through the end of the relevant class period of August 31, 2002, specifically to increase investments by United States investors in Vivendi. *Id.* ¶¶ 69, 77, 90-92, 105. Contrary to defendants' characterization, their conduct can hardly be deemed merely preparatory within the United States. Given Messier's and Hannezo's decision to move to the United States, allegedly to better direct corporate operations and more effectively promote misleading perceptions on Wall Street, which harbors some of the most watched securities exchanges in the world, one can reasonably infer that the alleged fraud on the American exchange was a "substantial" or 'significant contributing cause' of [foreign investor's] decision[s] to purchase [Vivendi's] stock" abroad. *Itoba Ltd.,* 54 F.3d at 122. *See, e.g.,* Compl. ¶¶ 21-25 (summarizing pervasiveness and coextensiveness of fraud in the United States and abroad to sustain Vivendi stock price and the use of instrumentalities of interstate commerce to promulgate the alleged fraud). Defendants' motion to dismiss claims brought by foreign plaintiffs for

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

lack of subject matter jurisdiction is denied. *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 130-31 (2d Cir.1998) (finding "jurisdiction over a predominantly foreign securities transaction ... when, in addition to communications with or meetings in the United States, there has also been a transaction on a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress."); *S.E.C. v. Princeton Economic Intern.,* 84 F.Supp.2d 452, 454 (S.D.N.Y.2000) (assuming subject matter jurisdiction for conduct that was "more than merely preparatory" and was "a substantial or significant contributing cause to the losses"); *In re Gaming Lottery,* 58 F.Supp.2d at 7 (same); *Leonard v. Garantia Banking Ltd.,* 1999 WL 944802, at \*4-6 (S.D.N.Y. Oct.19, 1999) ("[T]his Court finds that the trading of ADRs on the NYSE satisfies the conduct test, and any 'tipping of the scales' which might be required by [*Europe and Overseas Commodity Traders, S.A.*] is present in the use of United States banks and wire-transfer systems.").

B. Compliance with Rule 8

**\*7 [2]** Defendants contend that the complaint must be dismissed in its entirety under Rule 8 of the Federal Rules of Civil Procedure because it is an improper "puzzle pleading." In particular, defendants note that plaintiffs broadly allege that the Form F-4 that defendants filed with the SEC misstates the financial condition of Vivendi, but fails to specifically identify the pages containing the false statements in the 700-page document. Further, defendants note that plaintiffs have identified 38 separate statements that are said to be false, but do not identify with particularity what part of the document or quoted paragraph is false. Defendants contention, brought under Rule 8, in reality, seems to be nothing more than a claim under Rule 9(b). The degree of particularity that defendants seek-down to the precise sentence-simply is not mandated by the minimal pleading requirements of Rule 8. The complaint alleges that the Form F-4, signed by the individual defendants and filed by Vivendi, was misleading and improper because Vivendi presented false historical financial statements for fiscal year 1999 and the first half of fiscal year 2000. Compl. ¶ 54, 55. More specifically, the complaint alleges that Vivendi improperly consolidated into its financials revenue from its Cegetel subsidiary, failed to timely write-down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter, and overstated the Company's revenue from its environmental division on certain multi-year contracts in violation of GAAP. *Id.* Further, plaintiffs pled facts in detail to support the reasons that the enumerated categories of statements are allegedly false and misleading. *See id.* ¶¶ 119-80. These allegations suffice under the liberal pleading standard of Rule 8 to withstand a motion to dismiss.

C. Exemption from § 14(a) of the 1934 Act

**[3]** Section 14(a) prohibits any person from soliciting any shareholder proxy or consent or authorization in violation of SEC rules and regulations. 15 U.S.C. § 78n(a). Plaintiffs contend that the proxy statement included with the registration statement issued by Vivendi was materially false and misleading, and suggest that the falsity of the proxy statement should suffice to impose liability under § 14(a) of the 1934 Act. Rule 240.3a12-b(b), however, exempts "foreign private issuers" from liability under § 14(a). *Batchelder v. Kawamoto,* 147 F.3d 915, 923 (9th Cir.1998). Vivendi, undisputedly, is a corporation organized under French law, and it is therefore a "foreign issuer" under Rule 240.3b-4(b). 17 C.F.R. § 240.3b-4(b). Plaintiffs cite no authority or factual allegations that shows Vivendi fits within any exception to the definition of "foreign issuer." *See id.* § 240.3b-4(c). Further, plaintiffs fail to present any authority to support its position that liability may be imputed to Vivendi for Seagram's alleged misstatements in Seagram's proxy statements. Because Vivendi is a foreign private issuer, plaintiffs' § 14(a) claim against Vivendi must be dismissed.

D. Section 11 and 12(a)(2) Claims Under the 1933 Act

**\*8 [4]** Plaintiffs allege in counts I and II that Vivendi violated §§ 11 and 12(a)(2) of the 1933 Act when it submitted a registration statement and prospectus, filed on Form F-4 ("F-4"), dated October 30, 2000, in connection with the merger of Vivendi, Seagram and Canal Plus. Compl. ¶¶

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
(Cite as: 2003 WL 22489764 (S.D.N.Y.))

54-55, 198-215. To state a claim under § 11 of the 1933 Act, plaintiffs need only allege that a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading." 15 U.S.C. § 77k(a); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Section 12(a)(2) of the 1933 Act attaches liability to "[a]ny person who ... offers or sells a security ... by the use of any means or instruments ... in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). For the following three reasons, defendants' challenges to plaintiffs' claims on these counts must fail.

1. Named Plaintiffs Purportedly Lack Standing

Vivendi claims that none of the named plaintiffs received Vivendi shares pursuant to the allegedly fraudulent October 30, 2000 registration statement, *i.e.* Form F-4, but rather they obtained their shares pursuant to Form F-6, which plaintiffs do not allege to be false. According to plaintiffs, they purchased "Vivendi [American Depositary Shares] in exchange for Seagram stock as set forth in the [F-4] registration statement." Pl. Br. at 25-26. As background, an American Depository Share ("ADS") represents an ownership interest in a foreign deposited security, much like a share of stock represents an ownership interest in a corporation, that has been deposited with a depository, such as a United States bank or trust company. SEC, *American Depository Receipts,* May 23, 1991, *available at* 1991 WL 294145, at *2. An American Depository Receipt ("ADR") is a physical certificate, akin to a stock certificate, that evidences ownership in one or multiple fractions of an ADS. *Id.* Although the SEC formally differentiates between ADSs and ADRs, participants in the ADR market generally consider the terms to be synonymous, and use the terms interchangeably. *Id.; Definition* (visited 8/20/03) < http://www.adr.com/research/about_def.html>. For convenience, the term ADS will be used to refer to either ADSs or ADRs here. ADSs may be traded in

the United States in much the same way as equity securities issued by domestic companies. *Id.* at *5. Under the 1933 Act, ADSs and the underlying foreign deposited securities are "considered separate securities, each subject to the registration requirements unless an exemption is available." *Id.* at *10. Thus, when a foreign issuer seeks to make a public offering in the United States of securities in the form of ADSs, both the ADSs and the foreign deposited securities generally must be registered. *Id.* "In 1983, the [SEC] adopted Form F-6 specifically for the registration of ADSs under the Securities Act." *Id.; see also* American Depository Receipts, 48 Fed.Reg. 12346-02 (1983) (codified at 17 C.F.R. pts. 200, 230, 239, 240, and 249); 17 C.F.R. § 239.36. Form F-4 registers the foreign deposited securities. *See* 17 C.F.R. § 239.34; *see also American Depository Receipts,* 1991 WL 294145, at *10 n. 47.

*9 Here, Vivendi filed a Form F-4, in connection with the merger of Seagram, Vivendi, and Canal Plus into Vivendi Universal. The Form F-4 registered approximately 461 million ordinary shares, *i.e.,* foreign deposited securities, of Vivendi Universal, "represented by an equal number of Vivendi Universal ADSs." Pl. Exh. 2. Plaintiffs contend that Form F-6 "merely filed the Deposit Agreement with The Bank of New York, (which sets forth the terms by which the ADS is represented by ordinary shares or may be exchanged for ordinary shares)," and that Vivendi's argument rests on the faulty premise that Form F-6 "registered" the ADSs that the plaintiffs acquired. I disagree. Plaintiffs cite no authority to support its position that a foreign issuer may register its ADSs with Form F-4, and indeed, such argument appears to run afoul of the SEC's rules, which specifically established the Form F-6 to register ADSs. *See* American Depository Receipts, 48 Fed.Reg. 12346-02 (1983) (codified at 17 C.F.R. pts. 200, 230, 239, 240, and 249); 17 C.F.R. § 239.36. Consistent with the SEC's rules, Form F-4 filed by Vivendi states that "[t]his registration statement relates to the Vivendi Universal *ordinary shares.... A separate registration statement on Form F-6 will be filed in connection with the Vivendi Universal American Depository Shares."* Pl. Exh. 2 (emphasis added).

A claim under § 11 may be maintained only by

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
(Cite as: 2003 WL 22489764 (S.D.N.Y.))

Page 13

those who specifically received their shares pursuant to the defective registration statement pleaded in the complaint. *Fischman v. Raytheon Mfg. Co.,* 188 F.2d 783, 786 (2d Cir.1951) (Section 11 claim "may be maintained only by one who comes within a narrow class of persons *i.e.* those who purchase securities that are the *direct* subject of the prospectus and registration statement.") (emphasis added)); *Euro Trade & Forfaiting, Inc. v. Vowell,* 2002 WL 500672, at *11 (S.D.N.Y. Mar.29, 2002); *see also Lee v. Ernst & Young, LLP,* 294 F.3d 969, 976-77 (8th Cir.2002) (holding that a cause of action exists under § 11 "so long as the security was indeed issued under *that* registration statement") (emphasis in original); *Joseph v. Q.T. Wiles,* 223 F.3d 1155, 1159 (10th Cir.2000) ("[t]he buyer must have purchased a security issued under the registration statement at issue, rather than some other registration statement."). To the extent that plaintiffs bought Vivendi's ordinary shares pursuant to the allegedly defective Form F-4, *see* Compl. ¶ ¶ 1, 202, 213, 219, 222, they have standing to bring their § 11 and § 12(a)(2) claims. *See* 15 U.S.C. §§ 77k(a), 77l(a)(2). Further, plaintiffs who acquired their Vivendi ordinary shares after the merger between Vivendi, Seagram and Canal Plus may also have standing under § 11 provided the shares are traceable to the allegedly defective Form F-4. *See DeMaria v. Andersen,* 318 F.3d 170, 178 (2d Cir.2003). Because plaintiffs do not allege defects in the F-6 form, however, and thus, purchasers who bought ADSs pursuant to the F-6 form cannot claim to have standing under § 11 or § 12(a)(2) as to those shares, *id.,* their §§ 11 and 12(a)(2) claims based on the purchase of ADSs are barred.

**2. Pleading Under § 11 And § 12(a)(2) Are Too Vague To Be Cognizable**

**\*10** [5] Defendants contend that plaintiffs' allegations that Vivendi's financial statements and balance sheets in the F-4 were false and misleading are insufficient because they do not indicate what statements were false, why they were false or to what extent they were false. Defendants cite to a handful of cases that are inapposite because they all relate to the pleading requirement for violations of § 10(b) and Rule 10b-5 under the 1934 Act, which must satisfy the higher pleading standard of Rule 9(b) and the PSLRA. *See, e.g., Decker v.*

*Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982); *Weinstein v. Appelbaum,* 193 F.Supp.2d 774, 778-79 (S.D.N.Y.2002); *In re Health Mgm't Systems, Inc. Sec. Litig.,* 1998 WL 283286, at *2 (S.D.N.Y. June 1, 1998). The allegations deemed inadequate by defendants relate to the 1933 Act, which courts have long held does not have a heightened pleading requirement. *See, e.g., In re IPO,* 241 F.Supp.2d 281, 337-42 (S.D.N.Y.2003); *In re In-Store Adver. Sec. Litig.,* 878 F.Supp. 645, 650 (S.D.N.Y.1995); *Nelson v. Paramount Communications, Inc.,* 872 F.Supp. 1242, 1246 (S.D.N.Y.1994); *In re College Bound Consol. Litig.,* 1994 WL 172408, at *3 (S.D.N.Y. May 4, 1994); *In re Ann Taylor Stores Sec. Litig.,* 807 F.Supp. 990, 1003 (S.D.N.Y.1992). Because a "suit under § 11 [and § 12(a)(2) ] of the 1933 Act requires no proof of fraud or deceit," *Fischman v. Raytheon Mfg. Co.,* 188 F.2d at 786, the claims must merely meet the basic pleading standard in Rule 8(a). *In re IPO,* 241 F.Supp. 2 at 338-39; *In re BankAmerica Corp. Sec. Litig.,* 78 F.Supp.2d 976, 987 (E.D.Mo.1999). The allegations that Vivendi improperly consolidated investments and reported inflated (and therefore misrepresented) revenues in the October 2000 registration statement and prospectus satisfy the requirements of Rule 8(a) to plead claims under §§ 11 and 12(a)(2). *See* Compl. ¶¶ 54, 148-180, 208-215.

**3. Defects In Form F-4 Fail To Support Claims Under §§ 11 Or 12(a)(2)**

**a. Plaintiffs' 1933 Act Claims Are Time Barred**

[6] Defendants contend that plaintiffs' 1933 Act claims rest on an alleged "key clause" in the Cegetel shareholder agreement that was described in Vivendi's 2000 Form 20-F, filed July 2, 2001. In defendants' opinion, plaintiffs were on inquiry notice at least from July 2, 2001, and the one-year statute of limitations should start to run from that date. Plaintiffs, however, did not file their complaint until July 18, 2002. Further, defendants contend that once plaintiffs were allegedly on inquiry notice that the Form 20-F contained one misstatement or omission, they should be considered on inquiry notice for all claims based on that prospectus, and that any such claim is now time-barred.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                         Page 14
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

"[C]laims under Sections 11, 12, and 15 of the '33 Act are governed by the statute of limitations contained in Section 13 of the '33 Act." *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 349 (2d Cir.1993) (citing 15 U.S.C. § 77m (1988)). [FN4] "Broadly speaking, the statutory periods for claims under either ... [the 1933 Act or the 1934 Act] begin to run when the claim accrued or upon discovery of the facts constituting the alleged fraud. Discovery, however, includes constructive and inquiry notice as well as actual notice." *Id.* at 350. The statute of limitations may be triggered *"when,* after obtaining inquiry notice ..., the [plaintiffs], in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir.2000) (emphasis in original). "To trigger the underlying duty to inquire ... defendant[s] must establish that plaintiff[s] acquired information that suggested the *probability* and not mere *possibility* that fraud had occurred." *Lenz v. Associated Inns and Restaurants Co. of America,* 833 F.Supp. 362, 371 (S.D.N.Y.1993) (citing *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983) (emphasis in original)).

> FN4. Section 77m states in pertinent part:
> No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.
> 15 U.S.C. § 77m (1988)).

**\*11** The key clause that defendants reference, *see* Compl. ¶ 158, indicates that Vivendi's ability to access Cegetel assets could be blocked if three other minority shareholders dissented (BT, Mannesmann and Transtel). Although the key clause indicates an exception to Vivendi's authority to acquire material amounts of Cegetel's assets, it reveals nothing about whether Vivendi lacked the authority to consolidate Cegetel's revenue. Rather, according to the Form 20-F, Vivendi held the right to consolidate Cegetel's revenues by virtue of a shareholder agreement, which gave Vivendi a majority of the shareholder voting rights. Compl. ¶¶ 157-159. Plaintiffs allege that it was not until a 2002 conference call

with investors that Jean-Rene Fourtou finally revealed to the public that the agreement gave Vivendi only limited control over Cegetel, and thus Vivendi could not actually consolidate Cegetel's cash flow. *Id.* ¶ 160. Defendants cite to nothing else, other than the somewhat uninformative clause in the Form 20-F, that would suggest plaintiffs should have been on constructive or actual notice that Vivendi did not wield the authority to access Cegetel's revenue. I find inadequate basis to conclude at this time that plaintiffs were on inquiry notice of their §§ 11 or 12(a)(2) claims on and after July 2, 2001, the release date of the Form 20-F. Defendants' motion to dismiss plaintiffs' claims under § 11 and § 12(a)(2) as time-barred is denied.

b. Vivendi's Lack of Actual Knowledge

[7] Vivendi notes that plaintiffs assert that the Form F-4 was false and misleading because Vivendi had "failed to timely write down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter." Vivendi Mem. at 10; Compl. ¶ 55. Vivendi contends that all of the facts relied upon by plaintiffs to establish this allegation post-date the Form F-4 filing, and thus, Vivendi argues that plaintiffs cannot establish that Vivendi *knew* it had overstated its reported goodwill in violation of § 11 and § 12(a)(2). Vivendi's argument is without merit.

Actual knowledge is not an element of either § 11 or § 12 claims. As explained by the United States Supreme Court:

> [Section] 11 of the 1933 Act unambiguously creates a private action for damages when a registration statement includes untrue statements of material facts or fails to state material facts necessary to make the statements therein not misleading. Within the limits specified by § 11(e) [, which do not apply here], the issuer of the securities is held *absolutely liable* for any damages resulting from such misstatement or omission.

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 207-08, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("Liability against the issuer of a security is virtually absolute, even for innocent misstatements."); *In re IPO,* 241 F.Supp.2d at 396.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.