Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 15

Similarly, "[w]ith respect to ... § 12(2) claim[s] [FN5] ... there need be no showing of knowing misrepresentation or reckless disregard of the truth. Section 12(2) imposes strict liability, subject to the reasonable-care defense. The resulting standard is one of negligence." *Columbia Sav. and Loan Ass'n v. American Intern.*, 1994 WL 114828, at *4 (S.D.N.Y. Mar.31, 1994) (quoting *Odette v. Shearson, Hammill & Co.*, 394 F.Supp. 946, 956 (S.D.N.Y.1975)). Despite Vivendi's purported lack of knowledge prior to preparing the Form F-4, it may nonetheless be held absolutely liable for damages resulting from the misstatements therein. The fact that plaintiff relies on evidence that post-date the Form F-4 does not vitiate the false or misleading nature of the registration statement. Defendants' motion to dismiss the § 11 and § 12(a)(2) claims, for failure to allege facts showing Vivendi knew of the allegedly false and misleading statements at or before the time they were made, is denied.

> FN5. Section 12(a)(2) was known prior to the 1995 PSLRA amendments as Section 12(2). *In re WorldCom, Inc. Securities Litigation*, 2003 WL 21219049, at *12 (S.D.N.Y. May 19, 2003).

E. Claims Under § 10(b) and Rule 10b-5

*12 [8] In count V, plaintiffs allege that the earnings reported by Vivendi during the class period were false, in violation of § 10(b) and Rule 10b-5. To state a cause of action under § 10(b) [FN6] and Rule 10b-5, [FN7] plaintiffs must allege that "defendant[s], in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff[s'] reliance on defendant[s'] action caused injury to the plaintiff[s]." *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir.2003) (quoting *Ganino*, 228 F.3d at 161). Section 10(b) claims sound in fraud, and must satisfy the pleading requirements of Rule 9(b) and the PSLRA. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir.2001).

> FN6. Section 10(b) provides, in pertinent part, that:
>
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
> 15 U.S.C. § 78j(b).

> FN7. Rule 10b-5, the counterpart to § 10(b), describes what constitutes a manipulative or deceptive device and provides that it is unlawful for any person, directly or indirectly:
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
> 17 C.F.R. § 240.10b-5; *see also Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999).

1. Timely Recordation Of Goodwill Impairment

Defendants contend that plaintiffs "have failed to plead any facts that would support an inference that Vivendi should have determined prior to January 2002" that a recorded impairment under Statements of Financial Accounting Standards ("SFAS") No. 121 should have been made. Vivendi Mem. at 13. According to Vivendi, impairment needs to be reported only when "the sum of the undiscounted

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 16

future cash flows estimated to be generated from the use and ultimate disposal of the assets [is] less than the net carrying value of those assets." *Id.*

Plaintiffs contend that they have alleged numerous facts in the complaint to demonstrate that the cash flow from Canal Plus was impaired and should have been reported before the end of 2001. Namely, Canal Plus had filed a lawsuit in 1999 against another company for the piracy of its technology in the United States, allegedly giving rise to damages in excess of $1 billion. Compl. ¶¶ 134-36. In addition, Vivendi's new management, after Messier and Hannezo resigned, recorded an additional Q3.8 billion impairment for Canal Plus, at the end of the first half of 2002, when under French GAAP, Canal Plus revenue grew by 8%. *Id.* ¶ 141. Plaintiffs allege that the additional impairments, in view of the revenue growth and lack of explanation from Vivendi for the added impairments, evidence the fact that Canal Plus's impairment should have been recorded earlier. *Id.* Furthermore, plaintiffs note that Vivendi prepared a memo shortly after it acquired Canal Plus, detailing that marketing rights to soccer contracts at Canal Plus were not bona fide assets, as originally believed, because they belonged to the football league, and thus they should be written off in Vivendi's year-end statement for the 2000 fiscal year. *Id.* ¶¶ 142-145. Vivendi failed, however, to write off that contract as a mistaken asset in its year-end financial statement. *Id.* ¶ 145. As to U.S. Filter, the complaint alleges that its reported goodwill was inflated, as evidenced by, among other things: (1) U.S. Filter's actual operating results were much less than reported because Vivendi improperly recognized revenue from U.S. Filter, contrary to U.S. GAAP rules, *id.* ¶¶ 146, 169-177, *see also infra* Part IV.E(3), and (2) companies comparable to U.S. Filter that sold during the class period held price-to-earning ratios that were much lower in comparison to the U.S. Filter shares purchased by Vivendi, *id.* ¶ 146. In addition, Vivendi's new management, after Messier and Hannezo resigned, reported an additional goodwill impairment of Q7.2 billion on a French GAAP basis for other entities. *Id.* ¶ 147. In contrast, in the prior quarter, while under former management, Vivendi reported no charge for goodwill impairment. Plaintiffs construe the sizable reported goodwill impairments in the subsequent quarter as an indication that the goodwill impairments recorded by the prior management during the class period was clearly insufficient. *Id.* I find that the facts alleged, which I must presume to be true, support a reasonable belief that the undiscounted future cash flows of Canal Plus, U.S. Filter and other entities, were less than the carrying value of those assets, *see, e.g.,* Compl. ¶¶ 134-36, 141, 145-47, 169-77, and hence their impairments of goodwill should have been reported, but were not. In view of the large impairments taken immediately after the departure of key figures in Vivendi's management, a reasonable inference can be drawn that Vivendi had reasonable grounds to believe the impairments had to be reported and that former management concluded not to do so. *See Novak,* 216 F.3d at 314 n. 1.

2. Improper Consolidation Of Maroc Telecom And Cegetel Revenues

*13 [9] Plaintiffs claim that Vivendi had improperly consolidated the financial revenues of Maroc Telecom and Cegetel into its own financial results, Compl. ¶¶ 148-168, and that Vivendi's reported revenues were overstated by an aggregate of Q3.9 billion, Q5.1 billion and Q7.8 billion for 1999, 2000 and 2001, respectively. *Id.* ¶¶ 162, 168. Vivendi contends that it controlled a majority of the shareholder voting rights in Cegetel and Maroc Telecom. Thus, according to Vivendi, it held "exclusive control" over Cegetel and Maroc Telecom under Article L.233-16 of the French Code de commerce, and it "was therefore required to consolidate pursuant to paragraph 1000 of the Appendix to Regulation 99-02 of the French Comité de la Réglementation Comptable ("CRC"). *See* Slifkin Decl. Exh. 8.

Although Vivendi may have had the ability to control a majority of the voting rights, the CEO of Vivendi, Jean-Rene Fourtou, admitted that it did not *own* a majority of the shares of either Cegetel or Maroc, and that it could not access the cash flow from those companies, despite the shareholder voting agreement. Compl. ¶¶ 160, 167. Paragraph 101 of the CRC provides that "[a] company under control or significant influence shall be *excluded from consolidation* if: ... severe and long-lasting restrictions substantially call into question ... the possibilities of transfers of financial resources between said company and the other companies

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
(Cite as: 2003 WL 22489764 (S.D.N.Y.))

Page 17

included in the scope of consolidation." Slifkin Decl. Exh. 8 (emphasis added). In view of the exclusion provision of paragraph 101 under the CRC, I disagree with Vivendi that its inability to access the cash flow of Cegetel and Maroc Telecom is inconsequential when it comes to consolidated earnings. Contrary to Vivendi's claim, it would appear, given Fourtou's admission that certain restrictions prevented Vivendi from accessing Cegetel's and Maroc Telecom's cash flow, that under French GAAP, the restrictions arguably place the companies outside the scope of the mandatory consolidation.

Defendants further argue that reconciliation with U.S. GAAP requires that the parent company consolidate enterprises in which it has a controlling financial interest, as represented by a majority voting interest. Vivendi Mem. at 17 (citing SFAS No. 94 ¶ 13 (Slifkin Decl. Exh. 9)). Vivendi notes that the Emerging Issues Task Force (EITF) of the Financial Accounting Standards Board ("FASB") also states that the minority shareholders' ability to block "dispositions of assets greater than 20% of the fair value of the investee's total assets" does not overcome the presumption of consolidation by the majority holder of the shareholder voting interest. *See* Slifkin Decl. Exh. 10 at 4. Whether the rights of a minority shareholder may overcome the presumption of consolidation by the shareholder with a majority voting interest in a company is fact specific, *id.* at 3, and must be decided on a case-by-case basis from the totality of the circumstances. As further noted by the EITF, the rights granted the minority shareholders "may be so restrictive [on the majority shareholders] as to call into question whether control rests with the majority owner." *Id.* at 1. The facts and circumstances that may rebut the presumption of consolidation "should be based on whether the minority rights, individually or in the aggregate, provide for the minority shareholder to *effectively participate* in significant decisions that would be expected to be made in the 'ordinary course of business.' " *Id.* at 3 (emphasis added). If a minority shareholder holds "substantive participating rights," then the presumption that the majority shareholder should consolidate the investee's balance sheets is rebutted. *Id.* at 4.

*14 In regards to earnings of a corporation jointly held by majority and minority shareholders, "[t]he rights of the minority shareholder relating to dividends or other distributions may be protective, or participating and should be assessed in light of the available facts and circumstances." *Id.* at 7, ¶ 3. A minority shareholder's right to block customary or expected dividends or other distributions may represent an example of the minority shareholder's substantive participating right. *Id.* Factors that should be weighed in this determination include: the relative ownership share of the minority shareholders, corporate governance arrangements, relationship between the majority and minority shareholders, and likelihood of the event or transaction that requires minority approval. *Id.* at 5-6.

Thus far, Vivendi has not publicly disclosed the terms of the shareholders agreement. As noted above, Fourtou admitted that during the class period, Vivendi did not have access to either Cegetel's or Maroc Telecom's cash flows. Compl. ¶ ¶ 160, 167. Given the limited information available at this pre-discovery stage, and the fact-intensive inquiry required to resolve whether the minority interests in Cegetel and Maroc Telecom constitutes sufficient "substantive participating rights" to make consolidation improper under SFAS 94 and EITF 96-16, I am unconvinced that facts could not be proven to demonstrate that Vivendi's consolidation of those companies' revenues were improper under U.S. GAAP, which may give rise to liability under § 10(b) and Rule 10b-5. [FN8] Drawing all reasonable inferences in favor of plaintiffs, the complaint alleges sufficient facts to show that Vivendi overstated its revenues, in reliance on revenue streams from companies that it had no right to tap.

> FN8. Citing *Chill v. General Elec. Co.*, 101 F.3d 263 (2d Cir.1996), Vivendi contends that even if it did not comply with U.S. GAAP, this in and of itself is not sufficient to create § 10(b) liability. Vivendi is mistaken. "[A]llegations of GAAP violations or accounting irregularities ... [when] coupled with evidence of 'corresponding fraudulent intent' ... [are] sufficient." *Novak*, 216 F.3d

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 18

at 309 (quoting *Chill,* 101 F.3d at 270); *see also Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 120-21 (2d Cir.1982); 17 C.F.R. § 210.4-01(a)(1)( "Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided."). Here, "[p]laintiffs have adequately alleged that ... [d]efendants either had actual knowledge of or ready access to facts that contradicted their ... statements" *In re Nortel Networks Corp. Sec. Litig.,* 238 F.Supp.2d 613, 631 (S.D.N.Y.2003); *see* Compl. ¶¶ 134-38, 142-45, 157-68. Furthermore, plaintiffs have sufficiently alleged facts from which one may reasonably infer that defendants knew or should have known of the accounting impropriety. *See* Compl. ¶¶ 134-36, 141, 145-47, 169-77; *see also infra* Part IV.E(6).

[10] Lastly, defendants claim that even if consolidation of the subsidiaries were improper, it had no material effect on Vivendi's net income and shareholder equity. Defendants ignore the fact that the reported *Q17 billion* in additional revenue impacted other material financial metrics that investors commonly rely on, such as revenue growth and EBITDA. These metrics demonstrate that the overstated revenue may constitute a misrepresented material fact that can support claims under § 10(b) and Rule 10b-5. Accordingly, Vivendi's motion to dismiss these claims, on the basis that it properly consolidated Cegetel's and Maroc Telecom's revenue or that there have been no misrepresentations of material fact, is denied.

3. Improper Recognition Of Revenue From U.S. Filter

[11] Vivendi argues that plaintiffs do not plead sufficient facts to demonstrate the impropriety in its recognition of revenue from U.S. Filter. [FN9] Accordingly, Vivendi contends that plaintiffs cannot rely upon the revenues recognized by Vivendi from U.S. Filter to demonstrate the falsity of Vivendi's financial statements during the class period. Vivendi contends that such allegations are based on plaintiffs' misunderstanding of "booking to backlog"-a practice that Vivendi asserts is an accepted practice of managerial record-keeping. [FN10] Vivendi further asserts that plaintiffs' allegation that the reported revenue from Vivendi's Environmental Services division was overstated "by as much as 10 times" due to U.S. Filter's improper accounting is mathematically impossible.

> FN9. U.S. Filter is a subsidiary of Vivendi Environmental, which in turn, was a subsidiary of Vivendi during the class period.

> FN10. "Backlog" is the "value of unfilled orders placed with a manufacturing company. Whether the firm's backlog is rising or falling is a clue to its future sales and earnings." *Barron's Dictionary of Finance and Investment Terms* 37 (4th ed.1995).

*15 Plaintiffs contend that Vivendi violated U.S. GAAP because it "recognized and reported the entire dollar amount of long-term, fixed priced contracts as revenue upon the signing of the contract," resulting "in improperly recognized anticipated revenue from multi-year public service contracts" and yielding materially overstated operating results during the class period. Compl. ¶ 173-174. Although defendants disagree with plaintiffs' characterization, defendants do not dispute this description of how Vivendi recognized revenue from U.S. Filter. Moreover, plaintiffs contend, and defendants do not dispute, that "U.S. GAAP provides that revenue *should not be recognized* until it is realized or realizable and earned." Compl. ¶ 170 (citing FASB Concepts Statement No. 5, ¶ 83) (emphasis added). In addition, the SEC, FASB, and other accounting advisory sources advise that until services have been rendered, revenues for those services should not be recognized. *Id.* (citing SEC Staff Accounting Bulletin ("SAB") No. 101 (The SEC staff "believes that up-front fees, even if non-refundable, are earned as the products and/or services are delivered

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
(Cite as: 2003 WL 22489764 (S.D.N.Y.))

Page 19

and/or performed over the term of the arrangement or the expected period of performance."); FASB Concept Statement Nos. 2 and 5; Accounting Research Bulletin No. 43, Accounting Principles Board Opinion No. 10. The opinions expressed by the various accounting sources incorporated by reference in the complaint suffice to show that the revenues from U.S. Filter were recognized prematurely. Accordingly, I agree that plaintiffs have pled enough to provide a reasonable basis to infer that Vivendi indeed materially overstated its revenue, in part, through improperly recognizing revenue from U.S. Filter. [FN11]

> FN11. Plaintiffs allege that Vivendi Environmental's revenue was overstated by "as much as ten times" as a result of improper revenue recognition from its subsidiary, U.S. Filter. Defendants note for that allegation to be true, U.S. Filter's revenue would have to amount to about Q23.8 billion. U.S. Filter, however, earned only a reported Q1.32 billion in 2000. Plaintiffs concede that this was a misstatement on their part and represent that they meant to say that revenue from U.S. Filter, rather than Vivendi Environnement, was overstated by as much as ten times. It appears that plaintiffs' misstatement was a consequence of clerical error. Even if I disregarded plaintiffs' allegations concerning the magnitude of the overstatement, enough factual allegations have been pled to convince me that U.S. Filter's revenue may have been improperly recognized, resulting in inflated reported earnings by Vivendi. I will grant plaintiffs leave to amend their allegation in paragraph 174 of their complaint.

4. "Growing liquidity crisis"

[12] Vivendi contends that plaintiffs do not allege sufficient facts to show that it failed to disclose adequate evidence of its "growing liquidity crisis." Vivendi asserts that it timely disclosed (1) its impairments to goodwill relating to its prior acquisitions and in accordance with French and U.S. GAAP; (2) its stock repurchase program in 2001 pursuant to French regulations; and (3) the put options sold in 2000 and 2001. Accordingly, Vivendi argues plaintiffs were aware or should have been aware of the purported liquidity crisis. Further, Vivendi asserts that plaintiffs' allegations are insufficient to show that Vivendi was aware of the problem at the times it attested to its alleged financial health.

I find the complaint adequately alleges facts from which I may infer that Vivendi had a liquidity problem, of which it was aware during the class period. For instance, the complaint notes that in December 6, 2001, Messier assured investors that "Vivendi Universal is in a very strong position, with solid performance in virtually every business." Compl. ¶ 8. According to the complaint, Messier further announced that with the sales of Vivendi's $1.5 billion interest in British Sky Broadcasting Plc and $1.06 billion interest in Vivendi Environnement, Vivendi would have "room to maneuver" for additional acquisitions. Id. Contrary to the rosy picture painted by Messier, Hannezo, a long time friend of Messier and Vivendi's CFO, allegedly sent a desperate handwritten plea to Messier a week later, stating: "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat.... All I ask is that all of this not end in shame." Id. ¶¶ 9, 184. According to an investigative report by the Wall Street Journal, entitled, "How Messier Kept Cash Crises at Vivendi Hidden; Media Giant Was At Risk Well Before Investors Knew," Vivendi, unbeknownst to investors and Vivendi's board, had "narrowly averted" a downgrade by credit-rating agencies in December 2001, which would have made it difficult to borrow money and would have "plunged the company into a cash crisis." Id. In the wake of the narrowly averted downgrade, Hannezo sent his handwritten plea to Messier the same day and "implored [Messier] to take serious steps to reduce Vivendi's ballooning debt." Id. The following day, Messier, according to two directors who attended the board meeting, "made no mention of the close call with the rating agencies," and reported that the "company had no problem." Id. Accordingly, the board approved the $10 billion acquisition of USA Networks, unaware that "Vivendi was already in dire financial straits." Id.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
(Cite as: 2003 WL 22489764 (S.D.N.Y.))

Page 20

*16 The complaint further alleges that in the first half of 2002, defendants continued to deny that Vivendi had any liquidity problems. *See id.* ¶ 83 (assuring employees of Vivendi that "[t]here are no hidden risks" to warrant issue of a profit warning); ¶ 103 (stating that "the Company has *no reason* to anticipate or fear any further deterioration in its credit rating); ¶ 106 (reporting to investors in June 2002 that "the company has no hidden, off-balance sheet liabilities," and adding "We feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 12 months."). On June 24, 2002, Goldman Sachs issued a report to Vivendi's top executives and a handful of directors that indicated Vivendi could face bankruptcy as early as September or October of that year. *Id.* ¶ 186. Reportedly, a director who attended the meeting with Goldman Sachs advised Messier that he should resign, "as it was now clear Vivendi faced a severe cash crisis." *Id.* In contrast to the grim prediction by Goldman Sachs, Messier reported to the Commission des Operations de Bourse ("COB") two days later, on June 26, 2002, that "Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months." *Id.* Contrary to Messier's representation to the public and public agencies, Jean-Rene Fourtou, Vivendi's new CEO after Messier resigned in July 2002, stated that when he took over, "if Mr. Messier had stayed, the company would have gone bankrupt within 10 days." *Id.* The December 2001 handwritten note, the report from Goldman Sachs and investigative reports from other news sources, provide sufficient basis to support a reasonable belief that Vivendi had an existing liquidity problem, of which defendants were aware, during 2001 and 2002.

Defendants complain that the numerous news articles reported after the end of the class period cannot establish the fact that Vivendi was aware of its liquidity problems at the time it made the statements at issue, and that plaintiffs seek to prove fraud by hindsight. The Second Circuit has explicitly recognized that plaintiffs may "rel[y] on post-class period data to confirm what a defendant should have known during the class period." *In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 72 (citing *Rothman,* 220 F.3d at 92; *Novak,* 216 F.3d at 312-13). Defendants provide nothing to impugn the veracity of these post-dated news articles. To accept defendants' reasoning, I should reward them for their successful concealment of their wrongdoing, which for the most part did not come to light until those in control of Vivendi resigned and lost the ability to further conceal the true extent of Vivendi's financial woes. I decline to adopt defendants' reasoning. Defendants further complain that they disclosed sufficient information to allow investors to understand the extent of Vivendi's liquidity problems and true financial condition. Vivendi's purported "truth on the market" defense is "intensely fact-specific" and "rarely an appropriate basis for [dismissal]." *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 167 (2d Cir.2000). The "truth on the market" defense requires defendants to show that the "corrective information [was] conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Id.* (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1116 (9th Cir.1989)). Defendants certainly cannot meet that burden at this stage of the litigation. *In re Columbia Sec. Litig.,* 155 F.R.D. 466, 482-83 (S.D.N.Y.1993) ("defendants' burden [of establishing the truth on the market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage."). Moreover, defendants' claim that the market knew or should have known of Vivendi's liquidity crisis is belied by the precipitous drop in debt ratings and securities prices that followed immediately after Messier and Hannezo stepped down, and information of Vivendi's actual financial condition started to emerge. *See id.* ¶¶ 109, 115, 184. Indeed, as discussed above, plaintiffs have pled sufficient facts to show that Vivendi appears to have not fully disclosed impairments to goodwill in accordance with U.S. and French GAAP and moreover, reported inflated cash flow by improperly recognizing revenues from Cegetel, Maroc Telecom, and U.S. Filter. Plaintiffs have alleged sufficient facts, as reviewed above in brief, to provide a reasonable belief that defendants knew that its statements regarding Vivendi's financial health and liquidity were false, and that Vivendi did indeed have a liquidity problem.

5. False and Misleading Nature of Vivendi's Other Public Statements

a. Inactionable puffery

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 21

*17 [13] Vivendi argues that many of the statements alleged to be false either are so vague that they could not mislead a reasonable investor or are merely opinions and, hence, "soft information," which are inactionable as a matter of law. *See* Compl. ¶¶ 57-62, 67-69, 73-75, 79-81, 83, 85, 87-90, 94-96, 100, 103-106. Contrary to defendants' beliefs, they cannot escape liability merely because the opinions "on which liability [is] predicated did not express a reason in dollars and cents, but focused instead on ... "indefinite and unverifiable" term[s]." *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). "The objection ignores the fact that such conclusory terms in a commercial context [may be] reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Id.* Indeed, "[s]tatements regarding projections of future performance may be actionable ... if they are worded as guarantees or are supported by specific statements of fact, ... or if the speaker does not genuinely or reasonably believe them" at the time they were made. *In re IBM,* 163 F.3d at 107 (emphasis added); *Faulkner v. Verizon Communications, Inc.,* 156 F.Supp.2d 384, 398 (S.D.N.Y.2001); *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 141 (S.D.N.Y.1999). Moreover, "defendants may be liable for misrepresentations of existing facts" if they knew of the falsity of such statements at the time of making them. *Novak,* 216 F.3d at 315. Whether the opinion or "soft information" is indeed actionable "depends on all relevant circumstances of the particular case," *Ganino,* 228 F.3d at 162, and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action. In view of allegations that defendants, such as Messier, continued to represent to the public that Vivendi was financially solid, despite being aware of the financial precipice on which it stood when its debt rating was almost downgraded, Compl. ¶ 184, and the possibility that it would need to declare bankruptcy soon, *id.* ¶ 186, plaintiffs have alleged sufficient facts to show defendants could not have reasonably believed the statements made to the public. Plaintiffs have plead sufficient facts to show, at this stage, that defendants' statements, which defendants characterize as puffery, are indeed actionable.

b. Forward-looking statements.

[14] Vivendi contends that many of the alleged statements are forward-looking, and thus, they are inactionable, pursuant to the PSLRA "safe harbor" provision. The PSLRA safe harbor provision has two prongs.

The first prong provides in relevant part that a securities fraud defendant: "shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."

*18 *Fellman v. Electro Optical Sys. Corp.,* 2000 WL 489713, at *4 (S.D.N.Y. Apr.25, 2000) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)). By definition, the safe-harbor provision applies to protect only "forward-looking" statements, and not to misrepresentations of historical or current facts. *In re Oxford,* 187 F.R.D. at 141; *In re Complete Mgmt. Sec. Litig.,* 153 F.Supp.2d 314, 340 (S.D.N.Y.2001). "[L]inking future success to present and past performance does not render statements immune from liability." *In re APAC Teleservices, Inc.,* 1999 WL 1052004, at *8.

Vivendi contends that paragraphs 58, 61, 80, 85, 88, 89, 94, 95, 100, 103, and 104 in the complaint, for instance, may not serve as an actionable basis for liability under the PSLRA because (1) the paragraphs cite to forward-looking statements, and (2) the paragraphs cite to language that is accompanied by meaningful cautionary statements. The paragraphs cited include Vivendi's announcements of allegedly false financial results from prior quarters or purported opinion as to its cash situation, which are not subject to the safe harbor provision. Although the announcements often further include forward-looking statements and a generic warning that "actual results may differ," the "safe harbor provision ... requires that defendants identify 'important factors that could cause actual results to differ materially from those in the forward-looking statements." ' *Helwig v. Vencor, Inc.,* 251 F.3d 540, 558 (6th Cir.2001) (citing 15 U.S.C. § 78u-5(c)(1)(A)(i)). "[T]he legislative history makes clear that [such] 'boilerplate warnings will not suffice....The cautionary statements must convey substantive

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 22

information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." ' *Id.* 558-59 (quoting H.R. Conf. Rep. No. 104-369, at 43 (1995), U.S.Code Cong. & Admin. News at 742). The generic warning that "actual results may differ," which Vivendi included with its announcement, does not come close to the "cautionary language [needed] to render reliance on the misrepresentation unreasonable." *Steinberg v. PRT Group, Inc.,* 88 F.Supp.2d 294, 301 (S.D.N.Y.2000). Thus, to the extent the announcements contain forward-looking statements, the cautionary statements do not suffice to place them within the ambit of the safe-harbor provision in the PSLRA.

c. Statements From Defendants Published By Reporters And An Analyst

[15] Vivendi contends that plaintiffs have failed to plead the necessary facts that would allow them to hold defendants liable for statements reported by six reporters and one analyst. *See* Compl. ¶¶ 59, 79, 83, 87, 106, 109. The challenged paragraphs, in actuality, report *direct quotes* and statements made by Messier. Defendants provide no reason why I should believe that the reported quotes and statements were wrongly attributed. It defies common sense to argue that defendants may not be held accountable for their quotes and statements, solely because they were published by a third party. I agree that defendants may be held liable for the statements made to and subsequently published by reporters and analysts that are pled in the complaint.

d. Failure to plead with particularity under Rule 9(b) and PSLRA

*19 [16] Defendants contend that plaintiffs' § 10(b) allegations were not pled with sufficient particularity under Rule 9(b) and the PSLRA. Rule 9(b) requires that "the circumstances constituting ... fraud be stated with particularity." Fed.R.Civ.P. 9(b) . The particularity requirement of the PSLRA is largely the same as Rule 9(b), except when "plaintiffs allege, on information and belief, that defendants made material misstatements or omissions," in which case, "the complaint must 'state with particularity all facts on which that belief is formed.' " *Novak,* 216 F.3d at 312; *see also In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3d Cir.1999) (noting that § 78u-4(b)(1) "echoes precisely Fed.R.Civ.P. 9(b)"). Here, to satisfy Rule 9(b) and § 78u-4(b)(1) of the PSLRA, plaintiffs must "specify the statements that ... were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." *Novak,* 216 F.3d at 306. Section 78u-4(b)(1) requires that "the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.* at 314 n. 1; *see also See In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 72 (even under Rule 9(b) and the PSLRA, "we do not require the pleading of detailed evidentiary matter in securities litigation.").

Defendants, for the most part, do not dispute that plaintiffs adequately allege what statements were fraudulent, who made the statements, and the circumstances under which the statements were made. Vivendi Mem. at 25. Rather, defendants attack principally the adequacy of plaintiffs' explanation in their pleading of how defendants' statements were false and misleading. *Id.* Contrary to defendants' argument, I find, as discussed above at length, that plaintiffs adequately allege how defendants' improper accounting practices translated into false and misleading financial statements. *See supra,* Part IV.E(1)-(4). Section 78u-4(b)(2) of the PSLRA further requires that plaintiffs plead with particularity facts giving rise to a "strong inference" that defendants acted with scienter. As discussed below, defendants' argument that scienter has not been adequately pled is also without merit.

6. Scienter

[17] To adequately plead scienter, plaintiffs must allege facts to support a strong inference of "an intent to deceive, manipulate, or defraud." *Ernst & Ernst,* 425 U.S. at 193 n. 12; *see Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001); 15 U.S.C. § 78u-4(b)(2). "Such intent can be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *Ganino,* 228 F.3d at 168-69 (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 23

1124, 1128 (2d Cir.1994)).

a. "Motive and Opportunity"

*20 [18] Vivendi contends that plaintiffs' allegations of motive based on (1) the desire to maintain positive credit ratings, (2) the desire to inflate share prices in order to acquire other companies, (3) the use of put options sold to banks, and (4) executive compensation are all inadequate. [FN12] "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit,* 264 F.3d at 139 (internal quotations and citations omitted). Here, plaintiffs allege that defendants were motivated to commit fraud so they could acquire and continue acquiring companies, including USA Networks, MP3.com and Multithematicques, by using its artificially inflated stock and ADSs as currency. Comp. ¶ 191. Scienter may be imputed, as is the case here, to defendants when defendants' were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices. *See, e.g., Rothman,* 220 F.3d at 93-94; *Burstyn v. Worldwide Xceed Group, Inc.,* 2002 WL 31191741, at *5 (S.D.N.Y. Sept.30, 2002). Furthermore, Messier was given a "concrete and personal benefit" in the form of a bonus worth more than $3 million, amounting to two and half times his normal salary, for boosting Vivendi's EBITDA by more than 30% in 2001. *Id.* ¶ 193. He therefore had an even greater motive for inflating the appearance of Vivendi's financial performance, from which he derived a specific "concrete benefit by virtue of the false statements and wrongful nondisclosures alleged." *Novak,* 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994)). Accordingly, such allegations support a basis sufficient to infer Vivendi, Messier, and Hannezo had one or more motives to promulgate the alleged falsehoods in regard to Vivendi's financial state.

> FN12. Vivendi does not dispute opportunity.

b. "Conscious misbehavior and recklessness."

[19] Alternatively, Vivendi contends that plaintiffs failed to allege with the requisite particularity facts that evidence defendants' knowledge or recklessness as to the purported fraudulent statements, including (1) the alleged Canal Plus overstatement, (2) the alleged improper inflation of U.S. Filter goodwill, (3) the alleged improper consolidation of revenue from Cegetel and Maroc Telecom, and (4) the alleged liquidity crisis.

[20][21][22] Pleading "conscious misbehavior or recklessness" requires plaintiffs to provide factual allegations that support a strong inference that defendants knew, or had a reasonable basis to know, or recklessly disregarded, that the allegedly fraudulent statements were untrue when made. *See Novak,* 216 F.3d at 311; *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989). Here, plaintiffs allege that Vivendi narrowly averted a downgrade of its credit in December 2001, which would have plunged it into a cash crisis and made it difficult to borrow additional money for further acquisitions. Compl. ¶ 184. In the wake of the narrowly averted downgrade, Hannezo allegedly sent the now famous or infamous handwritten plea to Messier. *Id.* ¶¶ 9, 184. Messier's fraudulent intent or reckless disregard may be inferred from his alleged failure to mention the narrowly averted disaster when he was urging the board of directors to approve the $10 billion acquisition of USA Network's TV and film business two days later. *Id.* In addition to concealing the narrowly averted downgrade, Messier purportedly attempted to conceal from investors, the board, and even Hannezo, his $6.3 billion stock buy-back to bolster Vivendi's share price. As for Hannezo, he knew, for instance, from a January 29, 2001 memo, which was prepared shortly after Vivendi acquired Canal Plus, that the football marketing rights, originally believed to be an asset of Canal Plus, belonged in fact to the football league. *Id.* ¶ 143. Plaintiffs allege that Hannezo knew or should have known, but recklessly disregarded, the fact that Vivendi took no impairment charge in fiscal year 2001, resulting in Vivendi overstating the value of its subsidiary. *Id.* ¶¶ 133, 139, 144-45. Additionally, Hannezo allegedly became aware that the stock buy back program, which Messier instigated, was a "waste of cash" and that it had taken such a toll on Vivendi's cash flow that "Vivendi was running out of cash," according to a memo prepared by Hannezo. *Id.* ¶

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 24

184(b). In the face of these problems, Hannezo, as Vivendi's CFO, continued to prepare and sign financial statements, which overstated Vivendi's financials, Compl. ¶¶ 54, 62, 66, 102, and advanced the fraud on the plaintiffs by remaining silent about the fraudulent nature of the statements and press releases issued by Vivendi or his "close collaborator," Messier. Drawing all inferences in favor of plaintiffs, these allegations suffice to establish strong circumstantial evidence that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation ... [or] failed to review or check information that they had a duty to monitor." *Novak*, 216 F.3d at 308.

F. Claim Under § 12(a)(2) Against Messier And Hannezo

**\*21** [23] Messier contends plaintiffs have not adequately pled facts to show that he is a statutory "seller" under § 12(a)(2) of the 1933 Act. More specifically, Messier contends that plaintiffs' claim must fail because they have not pled that he "personally" solicited the securities purchased by plaintiffs, as allegedly required by the United States Supreme Court in *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The *Pinter* Court defined a "seller" for purposes of § 12(a)(1) to be the person who (1) passes title to the plaintiff, or (2) solicits such security purchases for his financial gain. *Id* at 642, 647. The Second Circuit extended *Pinter's* definition of "seller" to claims arising under § 12(a)(2) of the Securities Act. *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir.1988). Since *Capri*, it has become well settled in this Circuit that the seller need not have "personal" contact with the purchaser, contrary to Messier's argument, to be held liable under § 12(a)(2). *See Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir.1989) (holding that "[p]ersons who are not in privity with the plaintiff ... [are] statutory sellers within the meaning of *Pinter* if *they solicited the sales in question for a financial gain*" ) (emphasis added)); *Dorchester Investors v. Peak Trends Trust*, 2003 WL 223466, at \*2 (S.D.N.Y. Feb.3, 2003); *In re Opus360 Corp. Sec. Litig.*, 2002 WL 31190157, at \*10 (S.D.N.Y. Oct.2, 2002); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at \*7 (S.D.N.Y. Sept.20, 2001); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 761-62 (S.D.N.Y.2001); *Griffin v. Painewebber, Inc.*, 2001 WL 740764, at \*3 (S.D.N.Y. June 29, 2001); *In re APAC Teleservices, Inc. Sec. Litig.*, 1999 WL 1052004, at \*11 (S.D.N.Y. Nov.19, 1999); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1315 (S.D.N.Y.1996).

Against the prevailing weight of authority, Messier relies upon *In re Gas Reclamation, Inc. Sec. Litig.*, 733 F.Supp. 713, 724 (S.D.N.Y.1990), to show that plaintiffs' claim must still be dismissed. *Gas Reclamation*, however, is inapposite to the case-at-bar. Unlike here, the defendant's efforts in *Gas Reclamation* were largely collateral, assisting those more directly involved with solicitation. *Id.* at 723; *see also Pinter*, 486 U.S. at 650 n. 26 (rejecting liability to collateral participants). Given the scarcity of evidence in regard to defendant's direct solicitation activities, the court in *Gas Reclamation* determined that no reasonable juror could find for plaintiffs on their § 12(a)(2) claim, and granted the defendant summary judgment on that claim. *Id.* at 724.

Here, plaintiffs do not simply plead that Messier signed the registration statement, which in itself is particularly "significant for purposes of finding that a [person] is a seller," *In re Opus 360*, 2002 WL 31190157, at \*10; *see also Degulis*, 928 F.Supp. at 1315. ("signing the registration statement ... [is] a sufficient allegation to permit Plaintiffs to [withstand a motion to dismiss]")(citing *Capri v. Murphy*, 856 F.2d at 478)), but they further plead a number of other facts to show the steps taken personally by Messier to solicit the purchase of Vivendi securities and to increase the share price of those securities. Namely, the complaint alleges that Messier actively participated in the preparation of the allegedly misleading or false registration statement, Compl. ¶ 38, and regularly appeared before investors and financial news agencies to tout the financial vitality of Vivendi and thereby encourage investors to purchase Vivendi's securities, Compl. ¶¶ 58, 59, 62, 68, 87, 89, 90, 107. Furthermore, Messier stood to financially benefit from the increased sale and share price of Vivendi's securities. *See id.* ¶ 193 (alleging Messier received a $3 million bonus, or two and a half times his salary, for boosting Vivendi's EBITDA by 30%, and that he would have received

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 25

triple his salary if he boosted the EBITDA by 35%). These allegations suffice to show that Messier was a "seller" under § 12(a)(2) and to withstand a motion to dismiss here. *See In re Opus360 Corp. Sec. Litig.,* 2002 WL 31190157, at * 10; *In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d at 761-62; *Griffin,* 2001 WL 740764, at *3; *In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 93 F.Supp.2d 424, 439 (S.D.N.Y.2000), *Milman v. Box Hill Sys.,* 72 F.Supp.2d 220, 230 (S.D.N.Y.1999).

**\*22** [24] Hannezo seeks to rely on the same argument as Messier to show that he is not a statutory seller within the meaning of § 12(a)(2). Like Messier, Hannezo signed the alleged false and misleading registration statement, *id.* ¶ 54, and allegedly was a close collaborator of Messier's, *id.* ¶ 33. Although these allegations help establish that Hannezo acted with Messier to solicit the securities purchased by plaintiffs, I do not find facts alleged to show how Hannezo stood to financially gain from his actions. Accordingly, the § 12(a)(2) claim against Hannezo is dismissed.

G. Claims Under § 15 of 1933 Act Against Messier & Hannezo

1. Legal Standard To Plead A Section 15 Claim

[25] "In order to establish a *prima facie* Section 15 claim, a plaintiff need only establish (1) control, and (2) an underlying violation of Section 11 (or Section 12(a)(2))." *In re IPO,* 241 F.Supp.2d at 352. The heightened pleading standard under Rule 9(b) or the PSLRA does not apply because fraud and scienter are not necessary elements of the claim. *Id.* Thus, section 15 claims need only satisfy the minimal pleading standards of Rule 8. *Id.* While actual control and not just control status is needed to hold a person liable under § 15, "naked allegations of control ... will typically suffice" to plead an adequate § 15 claim to withstand a motion to dismiss under Rule 8. *In re IPO,* 241 F.Supp.2d at 352; *see also In re Sterling Foster & Co. Sec. Litig.,* 222 F.Supp.2d 216, 282-83 (E.D.N.Y.2002). "Because the underlying violation pursuant to section 15 is a violation of sections 11 and 12(a)(2) in which strict liability is imposed (*i.e.,* knowledge of the misrepresentation is not required), this Court agrees with those district courts that have held that [culpable participation is not an element] required to establish a *prima facie* case of control person liability pursuant to section 15." *In re Deutsche Telekom AG Sec. Litig.,* 2002 WL 244597, at *6 (S.D.N.Y. Feb.20, 2002); *see also Dorchester Investors,* 2003 WL 223466, at *3; *In re Indep. Energy Holdings PLC,* 154 F.Supp.2d at 770; *Griffin,* 2001 WL 740764, at *3; *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, at *4 (S.D.N.Y. April 19, 2001); *In re APAC Teleservices, Inc. Sec. Litig.,* 1999 WL 1052004, at *11; *Degulis,* 928 F.Supp. at 1315. Although a handful of cases hold to the contrary, *Wallace v. Buttar,* 2003 WL 103019, at *8 n. 1 (S.D.N.Y. Jan.14, 2003); *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 441 (S.D.N.Y.2001); *DeMaria v. Anderson,* 153 F.Supp.2d 300, 314 (S.D.N.Y.2001); *aff'd on other grounds* 318 F.3d 170 (2d Cir.2003), *Ellison v. American Image Motor Co.,* 36 F.Supp.2d 628, 637-38 (S.D.N.Y.1999), I concur with Judge Stein's reasoning in *Deutsche Telekom* and the apparent majority of judges in the Southern District that have determined that culpable participation is not an element of § 15. [FN13]

> FN13. The Second Circuit, as far as I am aware, has yet to render a decision on this issue.

2. Section 15 Claim Against Messier and Hannezo

**\*23** [26] Messier contends that the plaintiffs have not adequately pled facts to show that he had *actual control* over Vivendi-the primary violator-or that he was a culpable participant. As discussed above, plaintiffs do not have to plead culpable participation to sustain their § 15 claim against a motion to dismiss. Messier further argues that merely asserting the power to control by virtue of his status as CEO and chairman of the board for Vivendi is insufficient to plead actual control, as allegedly required by the Second Circuit in *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996) . *First Jersey* was concerned with the sufficiency of evidence as to control at the conclusion of trial and its holding is inapposite to the situation here, on a motion to dismiss. In any event, *First Jersey* is instructive on what "control" means--it is defined as " 'the power to direct or cause the direction of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 26

management and policies of a person, whether through the ownership of voting securities, by contact, or otherwise" ' *First Jersey,* 101 F.3d at 1472 (quoting 17 C.F.R. 240.12b-2). Messier's status as Vivendi's CEO, coupled with his "direct and/or indirect business and/or personal relationships with other directors and/or major shareholders," Compl. ¶ 218, apparent ability to conceal or deflect worries about Vivendi's financial condition until he left while commencing new deals to acquire more assets, *id.* ¶¶ 14, 15, 23, 49-52, 73, 83, 100, 184, and ability to orchestrate, without the full knowledge of the board, a $6.3 billion stock buy-back by Vivendi to help prop up its stock price, *id.* ¶ 183(b), provide sufficient underpinnings from which it may be reasonably inferred that he "had the power to control or influence, directly or indirectly, the corporation or its management." *Jacobs v. Coopers & Lybrand, LLP,* 1999 WL 101772, at *17 (S.D.N.Y. Mar.1, 1999); *see In re IPO,* 241 F.Supp.2d at 352, n. 85 (concluding "by virtue of their positions (*e.g.,* CEO, CFO) and Plaintiffs' specific allegations, ... [the defendants] very likely exercised ... control"); *In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 770 (S.D.N.Y.2001); *Gabriel Capital, L.P.,* 122 F.Supp.2d at 426-27. Having found sufficient facts pled to show that Vivendi violated §§ 11 and 12(a)(2) and that Messier allegedly exercised control over Vivendi's actions, Messier's motion to dismiss the § 15 claim against him must fail.

[27] Like Messier, Hannezo attempts to conflate the requirements of § 20(a) with the requirements of § 15. Because plaintiffs have adequately alleged a primary violation of the Securities Act, the only issue left to determine with respect to this claim is whether plaintiffs have alleged sufficient facts to establish that Hannezo was a "controlling person" within the meaning of § 15. Here, plaintiffs allege Hannezo served as Vivendi's chief financial officer ("CFO"), who closely collaborated with Messier. Compl. ¶ 33. In addition, Hannezo allegedly signed the Form F-4 that Vivendi issued to solicit approval from Vivendi's shareholders of a 3-way merger with Canal Plus and Seagram. *Id.* ¶ 54. The Form F-4 and the Form 20-F, the contents of which Hannezo apparently approved by signing it, is alleged to be false and misleading because it improperly consolidated financial revenues from various subsidiaries. *Id.* ¶¶ 55, 66, 72. Hannezo's status as CFO combined with allegations of his close collaboration with his long-time friend, Messier, and apparent approval of the allegedly misleading Form F-4 and Form 20-F, suffice to create a reasonable inference that Hannezo very likely exercised control in the actions taken by Vivendi to violate § 11 and § 12(a)(2). *See In re IPO,* 241 F.Supp.2d at 352, n. 85; *see also In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 770 (S.D.N.Y.2001); *Gabriel Capital, L.P.,* 122 F.Supp.2d at 426-27. Accordingly, defendants' motion to dismiss the § 15 claim against Hannezo is denied.

H. Claims Under § 20 of the 1934 Act Against Messier & Hannezo

1. Legal Standard To Plead A § 20 Claim

*24 [28] "In order to establish a *prima facie* case of controlling-person liability [under § 20], a plaintiff must [ (1) ] show a primary violation by the controlled person[,] ... [ (2) ] control of the primary violator by the targeted defendant, ... and [ (3) ] show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *First Jersey,* 101 F.3d at 1472 (internal quotation marks and citation omitted). Messier states that plaintiffs fail to allege his culpable participation with particularity for § 20 control liability.

Courts in this district have adopted various standards to plead culpable participation. *See, e.g., Steed Fin. LDC v. Nomura Securities Intern., Inc.,* 2001 WL 1111508, at *10 (S.D.N.Y. Sept.20, 2001) ("either conscious misbehavior or recklessness"); *Gabriel Capital, L.P. v. Natwest Fin., Inc.,* 122 F.Supp.2d 407, 426-28 (S.D.N.Y.2000) ("facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom the person had control, was engaging in fraudulent conduct"); *Mishkin v. Ageloff,* 1998 WL 651065, at *25 (S.D.N.Y. Sept.23, 1998) ("particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud"). At bottom, plaintiffs must plead facts showing either conscious misbehavior or recklessness by the defendant.

The degree of particularity that must be plead as to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 27

culpability, however, is not entirely clear. *Compare In re Deutsche Telkom,* 2002 WL 244597, at *7 (finding heightened pleading requirement of the PSLRA applies to § 20(a) claim), *with In re IPO,* 242 F.Supp.2d at 396 (holding that a § 20(a) claim in complaint must merely comport with Rule 8(a)). When faced with an appeal from a district court decision on a motion to dismiss a § 20(a) claim, the Second Circuit held that allegations of control coupled with an underlying violation sufficed to withstand such a motion. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 101 (2d Cir.2001). There, the defendant was alleged to be "an officer of the Bank and that he had primary responsibility for the dealings of that Bank and the other corporate defendants with SAM Group." *Id.* (internal references omitted). These allegations, although "somewhat broad" according to the Second Circuit, were deemed "sufficient to plead controlling-person liability" under § 20(a). *Id.* Because the plaintiffs' broad allegations were sufficient there to withstand a motion to dismiss without more particularized allegations, I conclude that a § 20(a) claim needs to be pled only in accordance with Rule 8(a). *See also In re IPO,* 242 F.Supp.2d at 396.

2. Section 20(a) Claim Against Messier and Hannezo

Here, plaintiffs allege in numerous places throughout the complaint, how Messier, disseminated false and misleading statements in his capacity as CEO of Vivendi, when he knew of or recklessly disregarded non-public information, which would have shown that his statements were false and misleading. *See* Compl. ¶¶ 38, 59-62, 68, 72, 81-82, 87-89, 93; Part IV.E(6)(b). These allegations suffice to state a claim against Messier under § 20(a). *See Ruskin v. TIG Holdings, Inc.,* 2000 WL 1154278, at *7-8 (S.D.N.Y. Aug.14, 2000); *In re Quintel Entm't Inc. Sec. Litig.,* 72 F.Supp.2d 283, 298 (S.D.N.Y.1999); *In re Leslie Fair Companies, Inc. Sec. Litig.,* 918 F.Supp. 749, 762-63 (S.D.N.Y.1996).

*25 [29] Hannezo similarly contends that plaintiffs have not adequately pled facts to establish Hannezo's control liability under § 20(a). Like the § 20(a) claim against Messier, I need to determine only whether Hannezo was a culpable participant.

Here, plaintiffs have sufficiently pled facts supporting an inference of Hannezo's culpable participation by virtue of his position as CFO and his responsibility for approving Vivendi's false financial statements, when he knew or should have known of facts indicating that these statements were inaccurate and misleading. *See* Compl. ¶¶ 9, 54-55, 66, 72, 102, 108, 141- 145, 183(b) & (c)(i), 184, 188. Accordingly, Hannezo's motion to dismiss the § 20(a) claim against him is denied.

I. Hannezo's Violation of § 10(b) of the 1934 Act and Rule 10b-5

[30] Hannezo contends that the § 10(b) and Rule 10b-5 claims against him must be dismissed because the complaint fails to allege that he made an actionable misstatement or omission. Hannezo does not dispute that he executed Forms 20-F and F-4, which plaintiffs have adequately alleged to contain false and misleading financial statements. *See supra* Part IV.D(1), Compl. ¶¶ 66, 132- 38. Accordingly, Hannezo's first ground to dismiss the § 10(b) claim and Rule 10b-5 claims must be denied. Putting aside the forms executed by Hannezo and filed with the SEC, Hannezo contends that he may not be held liable for the other statements released by other defendants. Plaintiffs assert that Hannezo may be held liable under § 10(b) and Rule 10b-5 under the "group pleading doctrine." Under this doctrine, plaintiffs may "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Polar Int'l Brokerage Corp. v. Reeve,* 2000 WL 827667, at *8 (S.D.N.Y. June 27, 2000). "The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." *Elliott Associates, L.P. v. Covance, Inc.,* 2000 WL 1752848, at * 12 (S.D.N.Y. Nov.28, 2000).

Hannezo argues that this doctrine may not be used to impose liability under § 10(b) or Rule 10b-5, in view of the decisions by the United States Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) and the Second Circuit in *Shapiro v. Cantor,* 123 F.3d 717 (2d

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 28

Cir.1997) and *Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir.1998). More specifically, defendants contend that plaintiffs, through use of the group pleading doctrine, seek to impose liability on the basis that he allegedly aided and abetted others who manipulated or committed deceptive acts in connection with the purchase or sale of Vivendi securities. The United States Supreme Court, however, held that § 10(b) liability based on aiding and abetting others is not permitted. *See Central Bank*, 511 U.S. at 166, 191. According to Hannezo, the Second Circuit adopted a bright line standard, in which the charged defendant "must actually make a false or misleading statement in order to be held liable under Section 10(b)." *See Shapiro*, 123 F.3d at 720. In *Shapiro*, the Second Circuit held that the plaintiffs' allegations in connection with the failure to disclose material information serve to support only aiding and abetting liability, because the defendant-a non-fiduciary accounting firm-did not have a duty to disclose certain material information. *Id.* at 721. Similarly, the Second Circuit in *Wright v. Ernst & Young LLP* affirmed that secondary actors, such as non-fiduciary accountants, who were merely affiliated with the defendant corporation, must actually make a false or misleading statement in order to be held liable under § 10(b). 152 F.3d at 175. Courts after *Central Bank*, *Shapiro* and *Wright*, have recognized that "primary liability under Rule 10b-5 [and section 10(b) ] may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration." ' *In re Oxford Health Plans, Inc.*, 187 F.R.D. at 142 (quoting *In re Health Management, Inc. Securities Litig.*, 970 F.Supp. 192, 208-09 (E.D.N.Y.1997)); *see also First Jersey*, 101 F.3d at 141-47 (holding that plaintiffs need not allege that a particular defendant made any fraudulent statements to be held liable under § 10(b)). Thus, a member of the upper level management, such as the CEO or CFO, who had knowledge of the fraud, and assisted in its perpetration by failing to disclose or correct the fraud when he had a duty to do so, may be held liable under § 10(b) and Rule 10b-5. *Rich v. Maidstone Fin., Inc.*, 2002 WL 31867724, at *8-9 (S.D.N.Y. Dec.20, 2002); *In re Livent, Inc. Noteholders Sec. Litig.*, 174 F.Supp.2d 144, 154 (S.D.N.Y.2001) (citing *First Jersey*, 101 F.3d at 1471 and *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994)).

*26 Although the group pleading doctrine was adopted before the PSLRA was enacted, district courts in the Second Circuit have concluded that neither the PSLRA nor *Central Bank* and its progeny affect its vitality. *In re CINAR Corp. Securities Litigation*, 186 F.Supp.2d 279, 318-19 (E.D.N.Y.2002); *In re Oxford Health Plans, Inc.*, 187 F.R.D. at 142; *In re Health Management, Inc. Securities Litig.*, 970 F.Supp. at 208-09. Unlike the accountants in *Shapiro* and *Wright*, Hannezo was not a person merely affiliated with the defendant corporation, but rather was a "clearly cognizable corporate insider[ ] with [an] active daily role[ ]" as CFO of Vivendi. *Polar Int'l Brokerage Corp.*, 108 F.Supp.2d at 237; Compl. ¶ 35. I find no reason to preclude plaintiffs from relying on the group pleading doctrine to attribute to Hannezo the allegedly false and misleading press releases and other group-published documents produced by other defendants during Hannezo's tenure as CFO. I agree, however, that oral statements made by other individual defendants do not fall within the ambit of the group pleading doctrine, and hence, oral statements made by Messier may not be attributed to Hannezo. *See Elliott Assocs.*, 2000 WL 1752848, at *12.

J. Leave to Amend The Complaint

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading 'shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991). While I find certain elements of plaintiffs' complaint insufficient, I "cannot determine that the plaintiff could not, under any circumstances, sufficiently allege his claims." *Protter v. Nathan's Famous Sys., Inc.*, 904 F.Supp. 101, 111 (E.D.N.Y.1995). Plaintiffs are granted leave, if they choose to do so, to file an amended complaint within twenty days of the date of this Order with respect to: (1) Vivendi's liability under § 14(a), (2) the clerical error made in paragraph 174 of the original complaint, and (3) the § 12(a)(2) claim against Hannezo.

V. CONCLUSION

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619
**(Cite as: 2003 WL 22489764 (S.D.N.Y.))**

Page 29

For the foregoing reasons, defendants' motion to dismiss plaintiffs' § 14(a) claim against Vivendi, and § 12(a)(2) claim against Hannezo is granted, with leave to replead within 20 days hereof, if deemed necessary. Additionally, plaintiffs' claim for damages under § 11 and § 12(a)(2) arising from the purchase of Vivendi's ADSs, pursuant to the Form F-6 is barred. Defendants' motion to dismiss plaintiffs' other claims is denied.

SO ORDERED.

\* \* \*

2003 WL 22489764 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,619

Motions, Pleadings and Filings (Back to top)

• 2004 WL 613098 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendant Vivendi Universal, S.A.'s Motion to Dismiss Count IV of the First Amended Consolidated Class Action Complaint (Feb. 04, 2004)

• 2004 WL 937915 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendant Vivendi Universal, S.A.'s Motion to Dismiss Count IV of the First Amended Consolidated Class Action Complaint (Jan. 27, 2004)

• 2004 WL 613095 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendant Vivendi Universal S.A.'s Motion to Dismiss Count IV of the First Amended Consolidated Class Action Complaint (Jan. 20, 2004)

• 2004 WL 868575 (Trial Motion, Memorandum and Affidavit) Defendant Vivendi Universal, S.A's Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Defendants' Production of Documents Previously Produced to Governmental and Regulatory Authorities, Including Deposition Transcripts (Jan. 14, 2004)

• 2004 WL 937913 (Trial Motion, Memorandum and Affidavit) Defendant Vivendi Universal, S.A's Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Defendants' Production of Documents Previously Produced to Governmental and Regulatory Authorities, Including Deposition Transcripts (Jan. 14, 2004)

• 2003 WL 23305556 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendant Jean-Marie Messier's Motion for Reconsideration Pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure and Rule 6.3 of the Local Rules for the Southern District of New York (Dec. 16, 2003)

• 2003 WL 23724668 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendant Jean-Marie Messier's Motion to Dismiss the Complaint (Oct. 10, 2003)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.