## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| IN RE: PRICELINE.COM INC. | : | **MASTER FILE NO.** |
| SECURITIES LITIGATION | : | **3:00CV01884(DJS)** |
| ─────────────────────────── | : | |
| | : | |
| **This document relates to:** | : | |
| | : | |
| **ALL ACTIONS** | : | |

### MEMORANDUM OF DECISION

Lead plaintiffs, Iliana Ilieva, Leisinger Pension Fund, Mark
Weiss and Marilyn D. Engel, and Joseph Wilenkin ("Priceline Lead
Plaintiffs Group"), bring this action on behalf of members of a
putative class of persons who purchased or otherwise acquired
securities of priceline.com Inc. ("Priceline") between January
27, 2000 and October 2, 2000, pursuant to Sections 10(b), 15
U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 78t, of the Securities
Exchange Act of 1934 ("the Exchange Act"), as amended by the
Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15
U.S.C. §§ 78a-78mm, and Rule 10b-5, 17 C.F.R. § 240.10b-5,
promulgated thereunder, against Priceline, Jay S. Walker, N.J.
Nicholas, Daniel H. Schulman, Richard S. Braddock, and Deloitte &
Touche, LLP.  Several actions have been consolidated under the
above-cited docket number.[1]  Defendants Priceline (dkt. # 70);
Walker, Nicholas, Shulman, and Braddock (hereinafter collectively

---

[1] The names and docket numbers of the individual actions are
set forth in the index to this memorandum of decision.

"individual defendants") (dkt. # 70); and defendant Deloitte &
Touche, LLP ("Deloitte") (dkt. # 67) have filed motions to
dismiss all counts of the Consolidated Amended Complaint.  For
the reasons set forth herein, Priceline's and the individual
defendants' motion to dismiss (dkt. # 70) is **GRANTED in part** and
**DENIED in part**, and Deloitte's motion to dismiss (dkt. # 67) is
**GRANTED**.  The portions of the Consolidated Amended Complaint that
are dismissed pursuant to this memorandum of decision are
**DISMISSED without prejudice** to plaintiffs re-pleading these
allegations upon curing the deficiencies set forth herein.

## I. FACTS

The following facts are alleged in the Consolidated Amended
Complaint (hereinafter "complaint" or cited as "Dkt. # 36, ¶
__"), are set forth in documents incorporated by reference into
the complaint, are set forth in Priceline's public disclosure
documents, or set forth in other materials properly considered
because plaintiffs have relied upon them in crafting their
allegations.  See Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir.
2000); In re Hunter Environmental Services, Inc. Securities
Litigation, 921 F. Supp. 914, 917-18 (D. Conn. 1996).  Defendant
Priceline is publicly-traded Delaware corporation, with its
principal place of business in Norwalk, Connecticut.  On March
30, 1999 Priceline conducted an initial public offering at a
price of $16 per share.  Shortly thereafter, Priceline's stock

-2-

traded at a high point of $145 per share.

The individual defendants were key managers of Priceline. Walker founded Priceline, and at all relevant times was Priceline's Vice Chairman of the Board of Directors. Schulman was Priceline's Chief Operating Officer from June of 1999 through June 15, 2000, when he became Priceline's President and CEO. At all relevant times, Schulman served as a director of Priceline. Braddock was Priceline's CEO from July of 1998 through June 15, 2000, when Schulman took over as CEO, and, at all relevant times, he served as Priceline's Chairman of the Board. Nichols was a director of Priceline. Deloitte & Touche, LLP is an accounting firm that audited Priceline's 1999 year-end financial statement.[2] Plaintiffs are individuals and companies who allegedly suffered damages from the defendants' actions. Plaintiffs allege that defendants' false and misleading statements inflated the value of Priceline's stock to the benefit of the defendants and other company insiders and to the detriment of the plaintiffs. Specifically, plaintiffs allege that during the period from mid-July 2000 to September 26, 2000, defendants sold, in the aggregate, millions of shares of Priceline stock, allowing them

---

[2] Deloitte's exposure to liability stems from its December 31, 1999 audit of Priceline's financial information. Plaintiffs do not allege Deloitte's involvement in events subsequent to December 31, 1999. Therefore, when the court uses the term "defendants" hereinafter in this memorandum, the court refers to Priceline and the individual defendants; it does not include Deloitte unless so indicated expressly.

to profit substantially prior to disclosing various deficiencies in Priceline's short term economic outlook.

1. PRICELINE AND WEBHOUSE

Plaintiffs allege that the defendants made false and misleading statements about Priceline's business model, financial status, and future prospects.  Priceline pioneered a "Name Your Own Price" pricing system (hereinafter "Priceline's business model" or "business model"), which is a type of demand collection system.  The "Name Your Own Price" model allows consumers to make an offer to purchase items such as airline tickets.  Having collected the consumer demand in the form of an offer, Priceline then matches the offer with a seller willing to discount the item in order to fill excess capacity, which, with respect to airline tickets, averages about 700,000 unfilled seats per day. Priceline principally applied its business model to the sale of airline tickets, hotel rooms, and car rentals.  Customers use Priceline's services through the Internet, and Priceline relies heavily on computer systems to implement its business model.

Priceline's business model is its most valuable asset, and is at the root of the events giving rise to this lawsuit. Plaintiffs allege that, in late 1999, defendants realized that in order to sustain Priceline's current stock value and become profitable, Priceline's business model must be applied to different markets beyond the travel market.  Expanded application

of the business model was allegedly important for two reasons. First, expansion would increase the value of Priceline's most important asset, which could then be licensed to provide a more predictable revenue stream.  Second, increased value and profitability would deter competition, especially from ventures and subsidiaries of airline companies, which were Priceline's core inventory suppliers.

With respect to the second reason for expansion, Priceline undertook a large financial commitment designed to encourage airline participation in Priceline's business.  In November of 1999, U.S. Airways, United, Delta, American, Continental, Northwest, TWA and American West pledged to supply inventory to Priceline in exchange for warrants to purchase 20.5 million shares of Priceline stock at the strike price of $56 per share. The agreement also provided that the airlines could demand that the warrants be adjusted to protect their value.  Thus, should the value of Priceline shares decline to a level below the strike price, Priceline would likely be forced to further dilute its stock to compensate the airline companies.

With respect to the first reason for expansion, Priceline licensed its business model to the priceline.com WebHouse Club ("WebHouse") in November of 1999.  Jay Walker founded WebHouse, and the two principal investors were Walker Digital, which owned 34% of WebHouse's stock on March 30, 2000, and Vulcan Ventures.

Walker Digital also owned 35% of Priceline stock, and Jay Walker owned 34.1% of Walker Digital stock. WebHouse applied Priceline's business model to groceries. In exchange for the license to use Priceline's business model, WebHouse was obligated to pay Priceline royalties based upon its revenue, and Priceline received warrants to purchase a majority equity stake in WebHouse (77.5%) at the price of $3.00 per share under certain conditions. On its financial statements, Priceline valued the warrants at $188.8 million.

WebHouse applied Priceline's business model to the purchase and sale of groceries. Customers would bid for items, charge the items at a discount to their credit cards, and then take delivery of the groceries at a local store. The supermarket providing the goods would receive the full retail price of the goods from WebHouse. WebHouse would be responsible for funding the difference between the full retail price and the discounted price offered to customers. As indicated several times over in statements reproduced in the complaint, Priceline and WebHouse management planned to fund the discounts available to customers through four sources of outside revenue: (1) outright subsidies from manufacturers for the amount of the discount; (2) bonuses paid to Priceline from manufacturers for introducing new customers; (3) fees paid to Priceline from third-party sponsors linking their products to certain discounts; and (4) a $3 monthly

fee paid to Priceline by customers using WebHouse for more than three months consecutively. In February of 2000, WebHouse announced that it would offer gasoline to customers, which it began to actually do on August 7, 2000. According to Priceline and WebHouse management, manufacturers would be willing to subsidize the discounts for the chance to gain new customers who would use their product for the first time because of the discount offered.

Although WebHouse was not a subsidiary of Priceline, the companies were related on several levels. Customers accessed WebHouse through Priceline's Internet site. Priceline and WebHouse also shared an information technology infrastructure, and Priceline provided WebHouse with marketing and information technology services. Plaintiffs have reproduced comments from several analysts emphasizing the importance of WebHouse's success to Priceline's continued success. Priceline, however, did not include WebHouse's financial information in its financial reports, and stated that Priceline would not do so until it exercised the warrants to purchase the WebHouse stock.

Following the introduction of WebHouse, during the beginning of the year 2000, plaintiffs allege that trouble began to befall Priceline and WebHouse. First, plaintiffs allege that the common computer support system necessary to conduct both Priceline's and WebHouse's business needed a substantial and costly overhaul.

Plaintiffs allege that WebHouse funded the overhaul, and that the overhaul contributed to delays in offering gasoline to customers and expanding WebHouse's grocery offerings nationwide. Second, on June 29, 2000, six major airline carriers launched Hotwire.com ("Hotwire"), which is an Internet-based ticket service designed to sell discounted airline tickets. Hotwire thus became Priceline's competitor, which not only impacted Priceline's customer base, but also impacted Priceline's inventory. Third, on August 1, 2000, Walker entered into a forward contract to sell 8 million of his shares of Priceline stock to two venture capital companies, Vulcan Ventures and Liberty Media, at $23.75 per share for a total price of $190 million. Walker would retain ownership of the shares until at least September 8, 2001, and he would invest $125 million of the proceeds in WebHouse. (See Compl., ¶ 138). Plaintiffs allege that, while analysts lauded this capital infusion, Priceline management knew that WebHouse was on the verge of failure. Finally, on September 14, 2000, the Better Business Bureau revoked Priceline's membership for failure to correct certain business practices that had given rise to a substantial number of consumer complaints. Plaintiffs allege that, despite the generally positive coverage from analysts during this time, Priceline faced serious challenges.

In the fall of 2000, the value of Priceline's stock plunged in the wake of certain damaging announcements. On September 27,

2000 Priceline announced that, due to weakness in the sale of airline tickets, the company would be unable to meet projections for its most recent quarter.  Further, on October 5, 2000, Priceline announced that it would be winding down WebHouse's affairs during the next ninety days because "management determined it would be unlikely to raise substantial capital next year that would be required to complete its business plan and achieve profitability."  (Dkt. # 36, ¶ 159).  Priceline also publicly stated that it would take a non-cash loss of $188.8 million in its third quarter of 2000 financial report in order to account for the cessation of WebHouse's operations.  On November 3, 2000, Priceline announced that the terms of the warrants issued to Delta had been amended; the price was reduced from $56 per share to slightly less than $5, and the numbers of shares underlying the warrant was reduced to 4.675 million from 5.5 million.  Priceline accounted for the renegotiation of the terms of the Delta warrants by taking a loss of $9 million in its fourth quarter of 2000 financial report.

## 2. FALSE AND MISLEADING STATEMENTS

Plaintiffs claim that defendants made several false or misleading statements regarding the events previously discussed. The underlying premise of plaintiffs' allegations is that Priceline held WebHouse out to be a success despite the fact that defendants had information in their possession indicating that

WebHouse would not be able to continue to operate.  Specifically, plaintiffs allege that defendants knew by the beginning of the class period that grocery manufacturers (and later major oil companies) would not offer discounts to WebHouse customers at a level that could sustain WebHouse's growth.  Because the grocery manufacturers would not provide the customer discounts, WebHouse would be forced to pay the discounts itself, which would cause its financial ruin.  Plaintiffs allege that defendants misrepresented the level of manufacturer participation and the prospects of manufacturers' deciding to participate.  If, as plaintiffs allege, defendants knew that WebHouse would not succeed, defendants' statements relating to WebHouse's, and derivatively Priceline's, success as well as statements in Priceline's financial statements valuing Priceline's warrants to purchase an interest in WebHouse are false or misleading.

## II. DISCUSSION

Plaintiffs set forth three counts in their Consolidated Amended Complaint: (1) violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 promulgated thereunder against Priceline and the individual defendants; (2) violation of 15 U.S.C. § 78t against Priceline and the individual defendants; and (3) violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 promulgated thereunder against Deloitte.  Defendants seek dismissal of each count pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure.[3]

## A. STANDARD

When considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff.  See <u>Scheur v. Rhodes</u>, 416 U.S. 232, 236 (1974); <u>Bernheim v. Litt</u>, 79 F.3d 318, 321 (2d Cir. 1996). Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted.  See <u>Hishon v. King & Spaulding</u>, 467 U.S. 69, 73 (1984); <u>Cooper v. Parsky</u>, 140 F.3d 433, 440 (2d Cir. 1998).  "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims."  <u>United States v. Yale New Haven Hosp.</u>, 727 F. Supp. 784, 786 (D. Conn. 1990) (citing <u>Scheuer</u>, 416 U.S. at 232).  In its review of a motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  <u>Samuels v. Air Transport Local 504</u>, 992 F.2d 12, 15 (2d Cir. 1993).

---

[3] Defendants' request to dismiss the complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure is denied.

## B. SECTION 10(b) CLAIM

Plaintiffs allege that defendants engaged in fraudulent conduct that affected the purchase or sale of Priceline shares of stock. Section 10 of the Securities Exchange Act of 1934 provides, in pertinent part, that

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–
>
> * * *
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b-5, which was promulgated under the authority of Section 10, provides the following:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase

-12-

or sale of any security.

17 C.F.R. § 240.10b-5.  "For a plaintiff to state a viable cause
of action for securities fraud under § 10(b), 15 U.S.C. § 78j(b),
and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), the complaint must
allege that in connection with the purchase or sale of
securities, defendant, acting with scienter, either made a false
material representation or omitted to disclose material
information so that plaintiff--acting in reliance either on
defendant's false representation or its failure to disclose
material information--suffered injury and damages."  In re
Scholastic Corp. Securities Litigation, 252 F.3d 63, 69 (2d Cir.
2001).

     In order to adequately establish the substantive elements of
a violation of Rule 10b-5, plaintiffs must meet the pleading
standard set forth in Rule 9(b) of the Federal Rules of Civil
Procedure, the PLSRA, and precedent from the Court of Appeals for
the Second Circuit.  With respect to the existence of false or
misleading statements, in order to meet Rule 9(b)'s requirement
that "[i]n all averments of fraud or mistake, the circumstances
of fraud or mistake shall be stated with particularity," Fed. R.
Civ. P. 9(b), "[t]he complaint must identify the statements
plaintiff asserts were fraudulent and why, in plaintiff's view,
they were fraudulent, specifying who made them, and where and
when they were made."   In re Scholastic Corp. Securities

Litigation, 252 F.3d at 69-70.

With respect to scienter, under the PSLRA, and prior Second Circuit precedent, a plaintiff must "state facts with particularity that give rise to a strong inference of the required state of mind." Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000); see 15 U.S.C. § 78u-4(b)(2) ("In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). The Court of Appeals for the Second Circuit has "recognized two distinct ways in which a plaintiff may plead scienter without direct knowledge of the defendant's state of mind. The first approach is to allege facts establishing a motive to commit fraud and an opportunity to do so. The second approach is to allege facts constituting circumstantial evidence of either reckless or conscious behavior." In re Time Warner Inc. Securities Litigation, 9 F.3d 259, 268-69 (2d Cir. 1993).

### 1. Limitations Period

Defendants advance two arguments with respect to the applicable limitations period. First, defendants Deloitte and Nichols argue that plaintiffs have failed to assert any claims

-14-

against them within the limitations period.  Second, Priceline
and the individual defendants claim that certain claims asserted
for the first time in the Consolidated Amended Complaint are
time-barred.  "Federal securities fraud claims must be brought
both within one year of the discovery of the facts underlying the
alleged violation, and within three years of the alleged
violation."  Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 101
(2d Cir. 2003); see Lampf, Pleva, Lipkind, Prupis & Petigrow v.
Gilbertson, 501 U.S. 350, 364 (1991) ("Litigation instituted
pursuant to § 10(b) and Rule 10b-5 therefore must be commenced
within one year after the discovery of the facts constituting the
violation and within three years after such violation.").  "The
one-year limitations period begins to run after the plaintiff
'obtains actual knowledge of the facts giving rise to the action
or notice of the facts, which in the exercise of reasonable
diligence, would have led to actual knowledge.'"  Levitt, 340 F.3d
at 101 (citing Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d
1030, 1042 (2d Cir. 1992)).

    The first action against Priceline, Braddock, Schulman, and
Walker was filed on October 2, 2000.  October 2, 2000 was the
earliest date the limitations period could have been triggered.[4]
Shortly thereafter, twenty-one other actions were filed with

---

    [4] Priceline announced that it would wind down WebHouse's
affairs and take a $188.8 million loss for the value of the
WebHouse warrants on October 5, 2000.

substantially the same claims.  On November 29, 2000, the court
consolidated nine of these cases (see Endorsement Order on Motion
to Consolidate (dkt. # 6), Howard Gunty Profit Sharing Plan v.
Priceline.com, Inc., No. 3:00CV1917(DJS) (D. Conn. Nov. 29,
2000)), and, on September 12, 2001, the court consolidated the
remainder of cases under the lead case number 3:00CV1884(DJS)
(see Memorandum Opinion & Order (dkt. # 32), Twardy v.
Priceline.com, Inc., No. 3:00CV1884(DJS) (D. Conn. Sept. 12,
2001)).  On December 1, 2000, two groups of plaintiffs filed
motions to be appointed lead plaintiffs for the putative class.
(See Dkt. #s 11 & 14).  The court granted the motion filed by
Amerindo Investment, Iliana Ilieva, Leisinger Pension Fund, Mark
Weiss and Marilyn D. Engel, and Joseph Wilenkin on September 12,
2001.  (See Memorandum Opinion & Order (dkt. # 32), Twardy v.
Priceline.com, Inc., No. 3:00CV1884(DJS) (D. Conn. Sept. 12,
2001)).  The Consolidated Amended Complaint, which was the first
pleading to name Deloitte and Nichols as defendants, was filed on
October 29, 2001.

Plaintiffs counter defendants' argument by contending that
the court should construe their moving papers requesting to be
appointed lead plaintiffs as a motion to amend the complaint and
should find that the Consolidated Amended Complaint was "filed"
on December 1, 2000, which is well within the one-year
limitations period.  Plaintiffs argue that the Amerindo

-16-

Investment group's motion, which was ultimately granted, sought
leave to file one consolidated amended complaint forty-five days
after the court ruled on the motion to appoint lead plaintiffs
and lead counsel.  (See Dkt. # 11 at 3 ("Movants respectfully
request that they be permitted to file a consolidated amended
complaint covering the entire Class Period on behalf of those
with transactions in Priceline common stock or call or put
options within forty-five (45) days after the court enters an
order appointing lead plaintiffs and approving their selection of
counsel."); Dkt. # 12 at 1 n.2 (requesting that lead plaintiffs
be permitted to file a consolidated amended complaint combining
the allegations of the complaints in each of the different
actions)).  The Tsai family's motion also set forth an identical
request.  According to plaintiffs, the court should therefore
deem the complaint amended, for the purpose of applying the
limitations period, as of the date plaintiffs requested the
court's permission to do so.  See Rothman, 220 F.3d at 96
(quoting Northwestern Nat'l Ins. Co. v. Alberts, 769 F. Supp.
498, 510 (S.D.N.Y. 1991) ("'When a plaintiff seeks to add a new
defendant in an existing action, the date of the filing of the
motion to amend constitutes the date the action was commenced for
statute of limitations purposes.'"); Derdiarian v. Futterman
Corp., 36 F.R.D. 192, 194 (S.D.N.Y. 1964) ("[F]iling of the
motion with the proposed amended complaint with this court, well

-17-

before May 1, 1964, was commencement of the action against Van
Alstyne under Rule 3, Fed. R. Civ. P., so long as there was
service without undue delay on [defendant] after the order
allowing the amended complaint to be filed was signed."); accord
Wallace v. Sherwin Williams Co., Inc., 720 F. Supp. 158, 159 (D.
Kan. 1988) ("The court holds that plaintiff's amended complaint
was effectively filed when his motion for leave to file an
amended complaint was filed on May 20, 1988. To hold otherwise
would punish plaintiff and other similarly situated plaintiffs
for the court's unavoidable delay in issuing an order granting
leave to amend a complaint."); Gloster v. Pennsylvania R. Co.,
214 F. Supp. 207, 208 (W.D. Pa. 1963) ("To give sanction to
objections to the amendment, that leave to amend must await the
actual placement of a judge's signature on an order to amend,
would be to lend impracticality and injustice to federal judicial
processes and procedure.  This case is an example.  The amended
complaint was filed on October 3, 1962, properly within the
legislative mandate.  Argument was heard November 8, 1962.  The
Court had need for researching and deliberating upon the law as
applied to the facts of the case, and this had to be done while
applying time and energy to the many other matters in a busy
court.  The necessary time so consumed . . . should not and
cannot be permitted as an obstacle to justice.").

The court finds that the Consolidated Amended Complaint was

-18-

filed, for the purpose of applying the applicable limitations period, on December 1, 2000.  Both groups of plaintiffs seeking to be appointed lead plaintiffs sought permission to file a consolidated amended complaint combining the allegations set forth in all the complaints on file with the court.  Further, Priceline, Walker, Braddock, and Schulman requested that they be excused from responding to the multiple complaints and that they be provided forty-five days from the date a consolidated amended complaint is filed to submit a response.  (See Dkt. # 8).  Thus, all parties to the action prior to the filing of the consolidated amended complaint were waiting for the court to grant plaintiffs' request to file a consolidated amended complaint as of December 1, 2000 before addressing or adjusting the pleadings.  The fact that the court did not decide this motion until September 12, 2001 and allowed plaintiffs an additional forty-five days to file the consolidated amended complaint should not prejudice plaintiffs for waiting to incorporate all amendments to the complaints rather than filing amended complaints in several actions.  Because plaintiffs sought to amend their complaints within the one-year limitations period, both their amendments adding Deloitte and Nichols and their amendments adding arguably new allegations are timely.

## 2. Unattributed Statements

Defendants allege that plaintiffs have failed to comply with the requirements of Rule 9(b) of the Federal Rules of Civil Procedure because they have not identified the speaker of several statements in the complaint for which they seek to hold defendants liable.  Rule 9(b) requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The Court of Appeals for the Second Circuit has held that, with respect to allegations that a statement violated Rule 10b-5, a plaintiff must, "at a minimum, . . . identify the speaker of the allegedly fraudulent statement[]."  <u>In re Time Warner Inc. Securities Litigation</u>, 9 F.3d at 265.  The Court of Appeals has stated that a plaintiff may identify the speaker of the allegedly fraudulent statement by pleading that the statements were part of an official press release, were spoken by a named individual, or were set forth in an analyst report upon which the defendant placed its imprimatur.  <u>See</u> <u>id.</u>

Plaintiffs have not identified the speaker of the statements set forth in several paragraphs of the complaint with the required specificity.  (<u>See</u> Dkt. # 36, ¶¶ 115b, 116a, 116b, 116c, 116g, 116h, 116r, 122b, 122e, 122h, 122k, 122p, 122s, 123a, 123c, 124a, 124f, 125a, 125b, 125c, 125e, 125f, 125g, 125h, 125k, 125*l*, 125m, 125n, 125p, 125q, 136, 139, 147a, 147c, 147e, 147f, 148d,

148e, 148f, 148g).[5]  Although plaintiffs generally allege that

the information discussed in the statements listed in the

preceding citation was provided to analysts through conference

calls and meetings initiated by Priceline, the source of the

information is not apparent from the information provided in the

complaint, and defendants' motion is granted with respect to

these statements.  Plaintiffs may amend their complaint to remedy

this deficiency in the manner prescribed by Rule 15 of the

Federal Rules of Civil Procedure.

### 3. Rule 10b-5 Violations

There are five main groups[6] of statements that plaintiffs

allege to be false or misleading: (1) statements regarding the

source of the funds subsidizing discounts offered to WebHouse

customers; (2) statements regarding WebHouse's offering gasoline

to its customers; (3) statements regarding the viability of

Priceline's business model; (4) statements regarding Priceline's

ability to attain profitability; and (5) statements in

---

[5] Defendants also claim that the certain statements attributed to particular WebHouse representatives are not actionable.  (See Dkt. # 36, ¶¶ 122c, 122f, & 122k).  At this stage of the proceedings, however, the court must presume that Priceline and WebHouse should be considered one enterprise.

[6] For the sake of simplifying this decision, the court has grouped the allegedly false and misleading statements according to their content.  The court's groupings may differ slightly from the parties' groupings and are devised for the sole purpose of deciding the pending motions.  There are individual statements that do not fit into these main groups.  The court will address these statements at a different juncture in this memorandum.

Priceline's financial reports regarding the propriety of the accounting procedures used to prepare these reports.  Defendants seek dismissal of all of plaintiffs' claims. Each group of claims is discussed herein in turn.

a. WebHouse Customer Discounts

Plaintiffs allege that, because the investing public and analysts believed that expansion into new markets was vital for Priceline's future success, defendants materially misled the public by overstating the viability of WebHouse.  Plaintiffs claim that defendants either (1) overstated the degree to which product manufacturers were subsidizing the discounts provided to WebHouse customers, or (2) altogether concealed the fact that WebHouse was ultimately responsible for funding the discount. (See Dkt. # 36, ¶¶ 98, 102, 112a, 112b, 112c, 112g, 112j, 112*l*, 112m, 116i, 116m, 116n, 116o, 116s, 118, 122a, 122d, 122g, 122i, 122*l*, 122r, 123e, 124d, 124g, 125e, 132, 146b, 146c, 146d, 146e, 146g, 148c, 148h).

Further, plaintiffs allege that various press releases and articles quoted statements notifying the public of WebHouse's expansion into new markets mislead the public because, due to certain undisclosed facts, WebHouse was ill-equipped to sustain the expansion.  (See Dkt. # 36, ¶¶ 112a, 112b, 112g, 112h, 116i, 116n, 116o, 122*l*, 123d, 124b, 133, & 144).  Plaintiffs allege that WebHouse was subsidizing approximately $.30 for every $1.00

-22-

spent by customers on each transaction, which was a rate that
could not possibly be sustained for the long haul.  Plaintiffs
also allege that defendants knew that Priceline's computer
infrastructure could not support the additional traffic generated
by WebHouse customers.  Essentially, plaintiffs claim that
WebHouse cited expansion as a measure of success when, in reality
and unbeknownst to the investing public, continued expansion
without increased manufacturer subsidies would exacerbate an
already alarming financial situation.

Defendants claim that these statements are not actionable
for two reasons.  First, defendants argue that statements
regarding the level of manufacturer participation in offering
discounts to customers were not false or misleading because "the
investment community knew that WebHouse was subsidizing customer
discounts; that WebHouse would need more capital; and that,
although WebHouse had attracted a large and growing customer
base, it faced substantial challenges attracting sponsors and
convincing grocery manufacturers to offer discounts through its
site."  (Dkt. # 71 at 14-15).  Defendants therefore assert that
any omission of information from their statements regarding
manufacturer participation was not material.  Second, defendants
characterize their statements as forward-looking statements.  As
such, defendants claim the protection of the statutory safe
harbor provision, and argue that their statements were either

-23-

immaterial or that plaintiffs cannot prove that defendants knew
the statements were false or misleading.

i. Material Omissions

With respect to defendants' first argument, the statements
regarding the viability of WebHouse could be deemed false or
misleading because defendants may have omitted materials facts.
"A statement is material only if there is a 'substantial
likelihood that the disclosure of the omitted fact would have
been viewed by the reasonable investor as having significantly
altered the "total mix" of information made available.'"  In re
International Business Machines Corporate Securities Litigation,
163 F.3d 102, 106-7 (2d Cir. 1998) (quoting Basic Inc. v.
Levinson, 485 U.S. 224, 231- 32 (1988)).  "Material facts include
those that 'affect the probable future of the company and [that]
may affect the desire of investors to buy, sell, or hold the
company's securities.'"  Castellano v. Young & Rubicam, Inc., 257
F.3d 171, 180 (2d Cir. 2001) (quoting  SEC v. Texas Gulf Sulphur
Co., 401 F.2d 833, 849 (2d Cir. 1968)).  "At the pleading stage,
a plaintiff satisfies the materiality requirement of Rule 10b-5
by alleging a statement or omission that a reasonable investor
would have considered significant in making investment
decisions."  Ganino v. Citizens Utilities Co., 228 F.3d 154, 161
(2d Cir. 2000).  Because materiality is a mixed question of law
and fact, judgment as a matter of law "may not be granted on the

ground that alleged omissions are immaterial 'unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Castellano, 257 F.3d at 180 (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)); Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission."); Ganino, 228 F.3d at 162.

The statements regarding the level of manufacturer participation in the offering of discounts are actionable because plaintiffs have alleged that defendants omitted material information. Defendants contend that the investing public was aware that WebHouse was funding customer discounts, and, therefore, any omission of this fact was not material to a reasonable investor's decision to purchase shares of Priceline stock. Plaintiffs admit that the investing public could learn that WebHouse was funding the customer discounts. Plaintiffs, however, rest their claims on a slightly different theory: defendants misled the investing public by omitting the degree and extent to which WebHouse was funding the discounts.

Plaintiffs may submit evidence in support of this theory.

-25-

The court cannot find that many of the statements set forth in
the complaint "'are so obviously unimportant to a reasonable
investor that reasonable minds could not differ on the question
of their importance.'" <u>Castellano</u>, 257 F.3d at 180 (quoting
<u>Goldman v. Belden</u>, 754 F.2d 1059, 1067 (2d Cir. 1985)).  As
plaintiffs admit, the investing public was or could have been
aware that WebHouse was ultimately responsible for funding
customer discounts.  The degree to which WebHouse was funding
these discounts, however, is vital to making an informed decision
about the company's future prospects.  For example, was WebHouse
funding 15% of the customer discounts, or 95%?  Some of
defendants' statements could give the impression that the
percentage was insignificant.  <u>See</u> <u>Elkind v. Liggett & Myers,</u>
<u>Inc.</u>, 635 F.2d 156, 164 (2d Cir. 1980) ("Liability may follow
where management intentionally fosters a mistaken belief
concerning a material fact, such as its evaluation of the
company's progress and earnings prospects in the current year.").
The percentage of the discount WebHouse was actually funding is
not trivial, especially considering the alleged magnitude of the
expenditures: "These subsidies grew from $1 million per week when
WebHouse began operations in early November 1999 to $5 million
later in the Class Period. . . . [A]s revealed after the Class
Period, WebHouse was subsidizing $4.00 of the average $13.00 per
visit discount given to its users at grocery stores."  (Compl., ¶

-26-

31, at 11).  Therefore, defendants' motion is denied with respect
to defendants' statements regarding the level of subsidies
WebHouse was actually funding.

ii. Forward-Looking Statements

Regarding defendants' second argument, the statements set
forth in the complaint concerning WebHouse' ability to sustain
nationwide expansion, even to the extent they are forward-
looking, are actionable.  "Statements that are opinions or
predictions are not per se inactionable under the securities
laws. . . .  Statements regarding projections of future
performance may be actionable under Section 10(b) or Rule 10b-5
if they are worded as guarantees or are supported by specific
statements of fact, . . . or if the speaker does not genuinely or
reasonably believe them. . . ."  In re International Business
Machines Corporate Securities Litigation, 163 F.3d at 107.  "[A]
relatively concrete representation as to a company's future
performance, if made at a time when the speaker knows that the
represented level of performance cannot be achieved, may ground a
claim of fraud."  Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir.
1994).

These general principles have been codified by the Private
Securities Litigation Reform Act ("PSLRA").  A "forward-looking
statement" is defined as follows:

The term "forward-looking statement" means--

-27-

(A) a statement containing a projection of revenues,
income (including income loss), earnings (including
earnings loss) per share, capital expenditures,
dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of
management for future operations, including plans or
objectives relating to the products or services of the
issuer;

(C) a statement of future economic performance,
including any such statement contained in a discussion
and analysis of financial condition by the management
or in the results of operations included pursuant to
the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or
relating to any statement described in subparagraph
(A), (B), or (C);

(E) any report issued by an outside reviewer retained
by an issuer, to the extent that the report assesses a
forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of
such other items as may be specified by rule or
regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).  Many of defendants' statements

regarding WebHouse's expansion are forward-looking statements as

defined by the PSLRA.

With respect to forward-looking statements, the PSLRA

provides the following:

Except as provided in subsection (b) of this section,
in any private action arising under this chapter that
is based on an untrue statement of a material fact or
omission of a material fact necessary to make the
statement not misleading, a person referred to in
subsection (a) of this section shall not be liable with
respect to any forward-looking statement, whether
written or oral, if and to the extent that--

(A) the forward-looking statement is--

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement--

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was--

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c) (footnote omitted).

Defendants have not demonstrated that the statutory safe harbor protects their forward-looking statements because plaintiffs could prove that defendants knew their statements were false or misleading.  Plaintiffs claim that defendants had access to information contrary to their statements, and therefore that defendants knew their statements were false or misleading. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  Novak, 216 F.3d at 309. Plaintiffs need not establish with precision the time when defendants became aware of the information rendering it

-29-

unreasonable to believe that WebHouse could survive, but rather
"must supply some factual basis for the allegation that the
defendants had reached this conclusion at some point during the
time period alleged.'" Rothman, 220 F.3d at 91 (quoting Posner v.
Coopers & Lybrand, 92 F.R.D. 765, 769 (S.D.N.Y. 1981)).

Plaintiffs have alleged with the requisite particularity
that defendants may have knowingly overstated WebHouse's
viability.  Plaintiffs allege that defendants had access to a
steady flow of information from intra-corporate reports
indicating that WebHouse would continue to sustain substantial
financial losses, which could only increase if WebHouse expanded
its operations.  Specifically, plaintiffs allege that defendants
had access to daily pricing reports stating the amount of revenue
generated and the profit margin, demographic analyses specifying
what products were purchased and who was purchasing these
products, network operations center reports detailing the use of
Priceline's website, and promotion reconciliation reports
updating the progress of special promotions.  Defendants also
received internal reports regarding the operational status of the
computer infrastructure sustaining Priceline and WebHouse, and
plaintiffs allege that defendants were aware of serious flaws in
the system.  In addition, defendants were in a position to know
the status of negotiations with product suppliers, which
plaintiffs claim was far less productive than defendants publicly

acknowledged.

Plaintiff's allegations could sustain a finding that defendants falsely trumpeted the success of WebHouse. Based upon the allegations set forth in the complaint, plaintiffs could prove that defendants knew that WebHouse was losing money at a staggering rate in an effort to sustain public interest long enough to entice product manufacturers to supply inventory at a discount. Plaintiffs could also prove that defendants were aware that help from the manufacturers was not forthcoming, and, further, that Priceline's computer infrastructure could not sustain the increased traffic without an expensive overhaul. The sources cited by plaintiffs could show that defendants' publicly expressed optimism was completely unfounded. See Rothman, 220 F.3d at 90-92 (holding that refusing to abide by company accounting policy requiring the listing of prepaid royalties with respect to unsuccessful software as expenses rather than assets could be deemed reckless in light of the company's possession of software sales information indicating that certain products were not successful); Novak, 216 F.3d at 312 (vacating dismissal of claims and holding that plaintiffs sufficiently alleged that defendants recklessly overstated to the public the value of outdated inventory despite being in possession of information reflecting the reduced value); Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985) (reversing dismissal of claims under Rule

10b-5 and holding that positive representations about the viability of a new product "were made with knowledge or reckless disregard of the grave uncertainties and problems concerning future sales of" the product adequately set forth a basis to conclude that the representations were reckless); cf. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal of claim and stating that "[plaintiff] does not allege that the company's disclosures were incompatible with what the most current reserve reports showed at the time the disclosures were made. . . . the pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud."). "While it is true that not all predictions are actionable and that liability probably should not be imposed on the basis of words that 'bespeak caution,' . . . the claim here is that there was no note of caution in the defendants' statements and that defendants knew caution was warranted." Goldman, 754 F.2d at 1068-69 (2d Cir. 1985). Therefore, defendants' motion is denied with respect to these statements.

### b. WebHouse Gasoline Offering

Plaintiffs contend that defendants made several false or misleading statements regarding WebHouse's offering of gasoline to customers. (See Dkt. # 36, ¶¶ 112k, 114, 115a, 115c, 115d, 115e, 115f, 115g, 115h, 116i, 116m, 123d, 123e, 124e, 124h, 124i,

124j, 131, 144, 145, 146a, 146b, 146f, 147b).  WebHouse announced
that it would offer gasoline to customers in the same manner it
offered groceries. Like its grocery offering, WebHouse would be
ultimately responsible for funding the discount passed on to the
customer. WebHouse stated that the discounts it offered would be
funded by: (1) retail owners seeking to increase traffic to their
businesses; (2) third-party sponsors seeking to link their
products to the purchase of gasoline at a discounted price; and
(3) major oil companies seeking to increase sales and to issue
proprietary credit cards to potential customers through WebHouse.
According to plaintiffs, defendants stated that WebHouse would be
able to procure the participation of major oil companies in their
offering, despite the fact that no major oil company had in fact
decided to participate.  Plaintiffs contend that the
participation of major oil companies and large sponsors was vital
to the success of WebHouse's gasoline offering because WebHouse
was unable to fund the discounts offered to customers through
fees collected from individual gasoline retailers.  As with
WebHouse's grocery business, plaintiffs contend that defendants'
statements omitted the extent of financial losses per transaction
without the support of major sponsors and oil companies.

     Defendants argue that plaintiffs' claims based upon these
statements should be dismissed for two reasons.  First,
defendants argue that their statements were not material because

-33-

the investing public was or should have been aware that WebHouse
would fund the consumer discounts on gasoline purchases.  Second,
defendants contend that the majority of statements concerning
WebHouse's gasoline business were forward-looking, and plaintiffs
cannot prove that defendants knew their statements were false or
misleading when made.

    With respect to defendants' first argument, plaintiffs have
alleged that defendants omitted material information in their
statements.  As with WebHouse's grocery subsidies, the question
is one of degree; defendants' statements could be false or
misleading because defendants knew or should have known that the
level of oil company and sponsor participation was insufficient
to meet customer demand, leaving WebHouse in a position where it
would post crippling losses in order to be able to fund the
customer discounts.  Defendants' statements could have misled the
investing public into believing that WebHouse had procured
sufficient participation from oil companies and sponsors to
sustain its gasoline offering.  Therefore, these statements are
actionable.

    To the extent defendants' statements are forward-looking,
they are also actionable because plaintiffs have set forth with
the requisite particularity that defendants should have known
that their statements were false or misleading.  Although, as
defendants point out, WebHouse's gasoline service was not

generally available until August 7, 2000, and many of the
statements set forth in the complaint precede the commencement of
this service, Webhouse did have a pilot program, (see Dkt. # 36,
¶ 123d ("This Saturday, Priceline WebHouse Club will start
mailing out one million cards for its online gasoline buying
program. . . .")), and was otherwise in a position to gauge the
effect of the consumer demand for the service on its finances and
computer infrastructure because WebHouse was operating its
grocery service at the time defendants made the statements.  It
is therefore possible that defendants were in possession of
information, from many of the same sources from which they could
have learned of contradictory information concerning WebHouse's
grocery business, contrary to their public statements such that
defendants knew their statements were false or misleading.

c. WebHouse's Repeat Customers

Plaintiffs contend that defendants, at several times
throughout the class period, misrepresented the percentage of
customers who used WebHouse's grocery service a second time.
(See Dkt. # 36, ¶¶ 122c ("'Last week, we priced our 20 millionth
grocery item,' Padgett said, adding that 85 percent of the
business is from repeat customers. . . ."), 122f (same as 122c),
125i, ("The repeat usage for the WebHouse Club was much higher

(approx. 85%). . . .”), 148m (“88% repeat usage rate”)).[7]
Plaintiffs allege that “internal analyses showed that only 10% of
those who visited the WebHouse website actually purchased
anything; only 25% of this 10% used the WebHouse service a second
time; and that only 25% of that 2.5% (i.e., .625% of all visitors
or less than 1 in 100) used the WebHouse service a third time.”
(Dkt. # 36, ¶ 40b).  Defendants argue that plaintiffs’
allegations lack the necessary specificity because plaintiffs
fail to specify a time period for their figures.

Defendants’ motion is denied with respect to these
statements.  At the pleading stage, the court must presume that
plaintiffs’ allegations are true.  Even though plaintiffs do not
state a specific time period for their calculations, the figures
they allege contradict each one of defendants’ figures cited
throughout the class period.  Therefore, plaintiffs’ allegations
are sufficient.

d. WebHouse’s Positive Gross Margins

On August 1, 2000, Walker stated that “he expects both the
grocery business and the gasoline business to be gross margin
positive by year-end 2000.”  (Dkt. # 36, ¶ 148h).  Plaintiffs
contend that Walker knew that this statement was false or

---

[7] In their memorandum of law, plaintiffs cite several
paragraphs of the complaint reproducing statements concerning
Priceline’s repeat customer rate.  The allegations, and the
arguments, however, focus upon WebHouse’s repeat customer rate.

misleading because he knew that WebHouse was losing a substantial amount of money funding discounts passed on to consumers.

Defendants motion is granted with respect to this statement, but plaintiffs may replead their allegations with more specificity in the manner prescribed by Rule 15 of the Federal Rules of Civil Procedure.  The term "gross margin" has a specific meaning: "[t]he difference between the amount of sales after returns and allowances and the cost of goods sold." Black's Law Dictionary at 703 (6th ed. 1990).  Plaintiffs have not alleged with the requisite specificity exactly how Walker's prediction with respect to this particular calculation was false or misleading.  In other words, plaintiffs must establish a firm link between their allegations that WebHouse was funding consumer discounts to its own ruin and the term "gross margin."  Without this link, plaintiffs have not alleged how Walker's statement is false or misleading.

e. Priceline's Business Model

Plaintiffs allege that defendants' statements about the viability of Priceline's business model are false or misleading. (See Dkt. # 36, ¶¶ 98, 103, 104, 105a, 105b, 107b, 108, 109, 112d, 116a, 116h, 116i, 116m, 116n, 116o, 116s, 118, 119, 122n, 122o, 124i, 125i, 131, 135, 148m, and 148o). Plaintiffs claim that defendants knew that Priceline's business model could not be successfully applied to other markets because defendants knew

-37-

that WebHouse, Priceline's first foray outside the airline ticket
and travel market, was not a viable business.  In addition to the
financial figures discussed herein relating to WebHouse's funding
of customer discounts, plaintiffs allege that defendants had to
have known that WebHouse would not succeed because there were
fundamental differences between the airline ticket market and the
grocery market.  First, airline ticket and hotel room sales were
based upon the seller's anticipated excess capacity, which would
not be used absent a discounted sale.  In contrast, brand loyalty
is the driving force behind grocery sales and marketing.
Because, according to plaintiffs, the Priceline business model
demands brand neutrality from customers seeking discounts on
certain products and relative anonymity from sellers, grocery
manufacturers and wholesalers lacked the necessary incentive to
jeopardize their formidable investment in marketing and
advertising their products.

Second, Priceline had commitments from airlines to supply
discounted tickets.  At the time WebHouse was launched,
plaintiffs claim that management knew that WebHouse did not have
sufficient manufacturer participation to offer the full range of
products necessary to pique consumer interest.  Plaintiffs allege
that WebHouse would be forced to subsidize the discounts offered
to customers itself until it had established itself as a viable
and profitable medium for grocery manufacturers despite

diminished return from the manufacturer's traditional advertising costs and perceived damage to its brand name. Thus, WebHouse had hoped to incite sufficient customer demand to force manufacturers to supply products at a discount. Plaintiffs describe this alleged plan as "a multi-hundred million dollar crap-shoot that Defendants believed was their only hope (albeit a minuscule one) of establishing the scalability of its Business Model to markets beyond online travel." (Dkt. # 36, ¶ 32).

Defendants argue that these statements are not actionable. Defendants claim that these statements are immaterial, either because they are vague statements of corporate optimism known as "puffery," or because, under the "bespeaks caution" doctrine, they are accompanied by meaningful, specific cautionary language. Further, defendants claim that plaintiffs have not alleged with the requisite specificity that defendants knew that their forward-looking statements were false or misleading.

Statements regarding the viability of Priceline's business model and the feasibility of applying the business model to different markets are material information. Plaintiffs have provided ample support for their allegation that much of Priceline's success hinged upon its ability to market its business model, which many deemed to be its most important asset. Therefore, as a general proposition, statements regarding Priceline's ability to market and apply its business model were

-39-

of great importance to investors.

At the pleading stage, the court cannot find that
defendants' statements are, as a matter of law, effectively
negated by the cautionary language set forth in Priceline's
contemporaneous public filings.  The "bespeaks caution" doctrine,
upon which defendants rely, is based upon the following premise:
"[c]ertain alleged misrepresentations in a stock offering are
immaterial as a matter of law because it cannot be said that any
reasonable investor could consider them important in light of
adequate cautionary language set out in the same offering."
Halperin, 295 F.3d at 357.  "The touchstone of the inquiry is not
whether isolated statements within a document were true, but
whether defendants' representations or omissions, considered
together and in context, would affect the total mix of
information and thereby mislead a reasonable investor regarding
the nature of the securities offered."  Id.

In Halperin, the Court of Appeals set forth a two-step
approach for applying the "bespeaks caution" doctrine.  First,
the court should identify the allegedly undisclosed risk.  Id. at
359.  Second, the court should "read the allegedly fraudulent
materials--including the cautionary language--to determine if a
reasonable investor could have been misled into thinking that the
risk that materialized and resulted in his loss did not actually
exist."  Id.; P. Stolz Family Partnership L.P. v. Daum, 355 F.3d

92, 97 (2d Cir. 2004) ("Additionally, the cautionary language must be examined in the context of the representations to determine whether the language warns of the specific contingency that lies at the heart of the alleged misrepresentation."). "In all cases, however, the court must keep in mind that a complaint fails to state a claim of securities fraud if no reasonable investor could have been misled about the nature of the risk when he invested." Id.

The cautionary language set forth in Priceline's public filings does not negate the effect of defendants' statements because plaintiffs allege that defendants were misrepresenting historical facts about WebHouse's actual performance. Plaintiffs allege that defendants heralded WebHouse as a successful application of Priceline's business model even though they were in possession of information indicating that WebHouse was certain to fail. The Court of Appeals has recently noted the limitations of the bespeaks caution doctrine:

> The cautionary language associated with the "bespeaks caution" doctrine is aimed at warning investors that bad things may come to pass--in dealing with the contingent or unforeseen future. Historical or present fact--knowledge within the grasp of the offeror--is a different matter. Such facts exist and are known; they are  not unforeseen or contingent. It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language.

P. Stolz Family Partnership L.P., 355 F.3d at 97.  Therefore, because plaintiffs allege that defendants misrepresented

historical facts, the existence of cautionary language does not affect the materiality of the statements set forth in the complaint.

Even though these statements may be forward-looking, plaintiffs have still stated a claim for which relief may be granted. As discussed herein, plaintiffs have set forth an adequate basis for the trier of fact to conclude that defendants made the statements regarding WebHouse with knowledge that these statements were false or misleading. Therefore, defendants' motion is denied with respect to the statements regarding the viability of Priceline's business model.

### f. Priceline's Profitability

Plaintiffs charge that defendants made false or misleading statements regarding Priceline's profitability and stock value. (See Dkt. # 36, ¶¶ 99, 100, 101a, 101b, 106, 107a, 116n, 119, 122m, 122o, 125o, 127, 128c, 131, 133, 134, 135, 137d, & 148b). Priceline had posted losses for each quarter from 1998 through the end of the class period, and defendants were projecting revenue increases to a target of $1 billion for the year 2000, which was over twice the revenue earned in 1999. Defendants also stated that this increase in revenue prompted them to project that Priceline would be profitable at some time during 2001, and, later in the class period, at the end of 2000. Plaintiffs claim that these statements were false because they assume that

-42-

WebHouse would justify the $188.8 million warrant valuation and would produce a steady royalty revenue stream, which, for the reasons previously set forth, they claim was unrealistic. Plaintiffs also cite Priceline's customer service difficulties, its overburdened computer infrastructure, and the emergence of competitors in Priceline's market as evidence that defendants knew that Priceline could not possibly generate a profit in late 2000 or early 2001.

Defendants deny that their statements regarding Priceline's profitability and stock value were false or misleading. Chiefly, they claim that the statements were immaterial puffery, or that their predictions were, in some ways, correct.

Defendants motion to dismiss is denied with respect to these statements. Again, plaintiffs claim that defendants knew that these statements were false or misleading because they possessed information indicating that WebHouse was doomed to fail. Further, defendants' statements are not immaterial as a matter of law.

### g. Accounting Irregularities

Plaintiffs allege that Priceline did not adhere to generally accepted accounting principles ("GAAP") when it prepared its financial statements published during the class period. In particular, plaintiffs allege that Priceline grossly overstated the value of its warrants to purchase WebHouse stock. On January

27, 2000, Priceline published its financial results for the
fiscal year 1999.  Included in these results were a nearly $1.1
billion dollar charge for the warrants issued to the airline
companies, and a $188.8 million gain from the warrants received
from WebHouse.  In this report, Priceline recorded a net loss of
$10 million.  In reports dated March 31, 2000 and June 30, 2000,
Priceline listed the warrants as an asset valued at $188.8
million.  Plaintiffs claim that, for the reasons previously set
forth herein, WebHouse could not possibly have become a viable
entity and therefore Priceline had grossly overvalued the
warrants.  Defendants argue that cautionary language accompanying
the valuation renders it immaterial, and that the valuation was a
reasonable estimate.

    Plaintiffs also claim that Priceline misrepresented, on
several occasions, that its accounting procedures were in
compliance with GAAP and other applicable guidelines.  First,
plaintiffs claim that Priceline did not comply with GAAP, as its
officers stated, because Priceline should have included
WebHouse's financial information in its own financial statements
in accordance with Accounting Research Bulletin # 51 ("ARB 51"),
which sets forth the guidelines for determining whether two
entities should prepare consolidated financial statements.
Plaintiffs allege that, because WebHouse was the alter-ego of
Priceline, ARB 51 mandates that Priceline and WebHouse file a

consolidated financial statement.  According to plaintiffs, if
Priceline and WebHouse had filed consolidated financial
statements, Priceline would not have been able to claim the
$188.8 million dollar gain from the receipt of warrants from
WebHouse because transactions between integrated companies are
eliminated.  Second, plaintiffs claim that the value of the
warrants should have been recognized over the term of the license
granted to WebHouse, and not immediately upon the grant of the
license.  Third, plaintiffs contend that Priceline could not
recognize income from the receipt of the warrants because, due to
WebHouse's lack of history and assets, the value of the warrants
was not capable of reliable estimate.  At the very least,
plaintiffs argue, Priceline should have included appropriate
warnings regarding the uncertainty of the value of the warrants.
Fourth, plaintiffs allege that Priceline should have written down
the value of the warrants as WebHouse's performance declined as a
loss that could reasonably be estimated.  Finally, plaintiffs
contend that, because WebHouse was not a marketable security, its
fair market value was not readily ascertainable, and Priceline
should have discounted the value of the warrants.  Defendants
deny that the accounting figures set forth in its public filings
were false or misleading.

     Plaintiffs have stated a claim that Priceline's valuation of
the WebHouse warrants was unreasonable.  If, as plaintiffs have

-45-

alleged, defendants had information in their possession indicating that WebHouse could not become a viable business, then valuing the warrants at $188.8 million was false or misleading. Valuation of these warrants would have had a significant impact upon Priceline's financial data, and the cautionary language accompanying the valuation does not negate its impact.

Plaintiffs have also stated a claim that Priceline violated certain provisions of GAAP and thereby intentionally misled investors. Analysis of the propriety of plaintiffs' claims depends upon the resolution of certain factual issues. For example, plaintiffs claim that Priceline should have included WebHouse's financial information in its public filings pursuant to ARB 51. At this stage of the lawsuit, plaintiffs have alleged a basis for their claim, the trier of fact will determine the facts necessary to resolve this claim. Likewise, plaintiffs' other allegations regarding Priceline's accounting practices are legally sufficient to advance beyond the pleading stage. Defendants' arguments addressing the propriety of Priceline's accounting practices are best asserted at other stages of this lawsuit. As such, defendants' motion is denied with respect to Priceline's accounting figures and practices.

h. Miscellaneous Statements

Plaintiffs allege that Walker's dismissal of Hotwire as a competitor to Priceline was false of misleading. (See Dkt. # 36,

-46-

¶¶ 128a, 128b, & 128c).  Plaintiffs contend that Walker knew this
statement was false or misleading because Hotwire would tap into
Priceline's ticket inventory and customer base.  Plaintiffs'
allegations are sufficient to survie the pleading stage, and
defendants' motion to dismiss is denied with respect to Walker's
statements about Hotwire.

Plaintiffs also allege that Walker misled the public when he
declared that he had not sold any shares of Priceline stock.
Plaintiffs contend that this statement was misleading because
Walker Digital, in which Walker owned 34.1% of the shares of
stock, did sell many shares of Priceline stock.  At this stage of
the litigation, the court cannot conclude that Walker's statement
was not misleading as a matter of law.  Therefore, defendants'
motion to dismiss is denied with respect to Walker's statement
about his stock sales.

C. LIABILITY OF DELOITTE & TOUCHE

Plaintiffs allege that "Deloitte's reckless or intentional
failure to comply with standard accounting procedures resulted in
the reporting of materially false financial statements and
results to investors."  (Dkt. # 79, at 37).  Specifically,
plaintiffs allege that

> Deloitte's actions were a complete abandonment of its
> responsibilities as an independent auditor and that, as
> a consequence, Deloitte affirmatively participated and
> perpetuated the alleged fraud.  Material portions of
> Priceline's financial statements were unsupported by
> any credible evidence while, at the same time, all the

> evidence available to Deloitte contradicted the
> treatment it publicly approved for the most material
> item in Priceline's financial statements: the WebHouse
> warrants recognized as $188.8 million in income, and
> constituting 42 percent of Priceline's reported assets.

(Id. at 1).

Deloitte issued the following statement, which was included
in Priceline's 1999 Form 10-K report to the SEC dated March 30,
2000, dated January 27, 2000:

> We have audited the accompanying balance sheets of
> priceline.com Incorporated (the "Company") as of
> December 31, 1999 and 1998, and the related statements
> of operations, changes in stockholders' equity, and
> cash flows for the years ended December 31, 1999 and
> 1998 and the period July 18, 1997 (inception) to
> December 31, 1997. These financial statements are the
> responsibility of the Company's management. Our
> responsibility is to express an opinion on these
> financial statements based on our audits.

> We conducted our audits in accordance with generally
> accepted auditing standards. Those standards require
> that we plan and perform the audit to obtain reasonable
> assurance about whether the financial statements are
> free of material misstatement. An audit includes
> examining, on a test basis, evidence supporting the
> amounts and disclosures in the financial statements.
> An audit also includes assessing the accounting
> principles used and significant estimates made by
> management, as well as evaluating the overall financial
> statement presentation. We believe that our audits
> provide a reasonable basis for our opinion.

> In our opinion, such financial statements present
> fairly, in all material respects, the financial
> position of the Company as of December 31, 1999 and
> 1998, and the results of its operations and its cash
> flows for the years ended December 31, 1999 and 1998
> and the period July 18, 1997 (inception) to December
> 31, 1997 in conformity with generally accepted
> accounting principles.

(Dkt. # 69, Ex. 1, at 42).

-48-

Plaintiffs argue that Deloitte should be liable based upon the following theory: Deloitte deliberately ignored certain "red flags" present in Priceline's financial and operational data, and, by choosing to overlook the warning signs, Deloitte was a complicit participant in Priceline's scheme to defraud the investing public.  Plaintiffs cite the following "red flags" that should have alerted Priceline to the obvious fraudulent scheme: (1) the sheer magnitude (42% of Priceline's assets) of the warrants to purchase WebHouse shares; (2) the importance of the viability of WebHouse to Priceline's financial growth; (3) the impropriety of recording royalty income from WebHouse; (4) the availability of six months of WebHouse operational data indicating the significant financial burden imposed upon Priceline; (5) management's reservations about the viability of WebHouse; (6) the weakness of Priceline's computer system; (7) the fundamental problems inherent in expanding Priceline's business model beyond the travel business; (8) the close relationship between Priceline, Walker, Walker Digital, and WebHouse; and (9) the insider sales of Priceline stock shares. Plaintiffs contend that these "red flags," and Priceline's obvious GAAP violations, would have made obvious to the reasonable accountant that Priceline was perpetrating a fraud.

" For 'recklessness on the part of a non-fiduciary accountant' to satisfy securities fraud scienter, 'such

recklessness must be "'conduct that is "highly unreasonable",
representing "an extreme departure from the standards of ordinary
care." It must, in fact, approximate an actual intent to aid in
the fraud being perpetrated by the audited company.'" Rothman,
220 F.3d at 98 (quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d
111, 120-21 (2d Cir. 1982)).  In order to meet this standard, a
plaintiff must

> prove that the accounting practices were so deficient
> that the audit amounted to no audit at all, . . . or an
> egregious refusal to see the obvious, or to investigate
> the doubtful, . . . or that the accounting judgments
> which were made were such that no reasonable accountant
> would have made the same decisions if confronted with
> the same facts.

S.E.C. v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y.
1992) (internal quotation marks, citations omitted).

Plaintiffs have not demonstrated that they could prove that
Deloitte acted with the required state of mind.  Even if the
court could infer that Deloitte was aware of the red flags set
forth herein, which is no small leap, the red flags are not so
egregious as to render Deloitte's audit a farce.  "Allegations of
a violation of GAAP provisions or SEC regulations, without
corresponding fraudulent intent, are not sufficient to state a
securities fraud claim."  Chill v. General Elec. Co., 101 F.3d
263, 270 (2d Cir. 1996); see Rothman, 220 F.3d at 98. The nature
of the GAAP violations, however, is probative of fraudulent
intent.  See In re Microstrategy, Inc. Securities Litigation, 115

F. Supp. 2d 620, 635 (E.D. Va. 2000) ("The mere *fact* that there was a restatement or a violation of GAAP, by itself, cannot give rise to a strong inference of scienter; the *nature* of such a restatement or violation, however, may ultimately do so.").

Here, the nature of the alleged accounting irregularities themselves do not give rise to a strong inference of scienter. Plaintiffs allege that it should have been obvious to Deloitte as of March of 2000 that WebHouse was worthless because it could not become a viable business. Although there may have been indications to that effect in Priceline's financial and operational data, the determination plaintiffs allege that Deloitte should have made is far too complex for the court to conclude that Deloitte's failure to do so rendered its audit a farce. Cf. In re Microstrategy, Inc., 115 F. Supp. 2d at 637 (indicating that the accounting policies violated were "not complex" and of an enormous magnitude while holding that plaintiffs could maintain a claim against an accountant). This is not a case where a company casts aside GAAP in order to inflate its own revenue stream with fictional income. See, e.g., In re Baan Co. Securities Litigation, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) ("[V]iolations [of GAAP] involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a stronger inference of scienter.").

Priceline did not simply invent an asset for the purpose of inflating its value; the alleged fraud here is that Priceline carried on the illusion that WebHouse could be a successful business entity while knowing that it would collapse under the weight of its own expansion at some point in time. There is simply nothing in the complaint to indicate that Deloitte should have been able to cast aside this illusion, and the independent valuation accompanying it, and render an opinion that the WebHouse warrants were worthless.

Plaintiffs essentially allege that, because Deloitte had access to the same information (internal pricing reports, et cetera) as Priceline and the individual defendants, Deloitte must also have been aware that the WebHouse warrants were not worth $188.8 million. Significant differences between Deloitte and the other defendants, however, mandate different conclusions. First, the other defendants are the leaders of Priceline; they formulated the business plans and had their fingers on the pulse of Priceline and WebHouse on a daily basis. For example, the individual defendants were presumably involved in negotiations with manufacturers to offer products at a discount through WebHouse, and were in a position to gauge the expected success of these negotiations. Further, the individual defendants were also privy to negotiations with the airline companies that supplied Priceline's inventory. To expect the same degree of knowledge

-52-

from an independent auditor would defy logic.  As pleaded in the
complaint, plaintiffs' alleged scheme depends not only upon hard
data, such as how much money Priceline was losing through
WebHouse on a periodic basis and repeat customer data, but also
upon events that would not necessarily be reflected in data or
other sources relevant to an audit.

Second, the other defendants' conduct extends far beyond
Deloitte's involvement in the alleged fraudulent scheme.
Deloitte's statement was published on March 30, 2000.
Plaintiffs' allegations of the other defendants' fraud extend
into the Summer of 2000.  As the court has explained elsewhere in
this memorandum, plaintiffs need not establish with precision the
time when the other defendants became aware of the information
rendering it unreasonable to believe that WebHouse could survive,
but rather "'must supply some factual basis for the allegation
that the defendants had reached this conclusion at some point
during the time period alleged.'" Rothman, 220 F.3d at 91
(quoting Posner v. Coopers & Lybrand, 92 F.R.D. 765, 769
(S.D.N.Y. 1981)).  Indeed, plaintiffs allege that WebHouse's
demise became more apparent, and thus the illusion of WebHouse's
viability more difficult to sustain, as time went on and WebHouse
expanded beyond Priceline's capacity to fund its operations.
Although the possibility exists that plaintiffs could prove that
the individual defendants and Priceline's fraudulent conduct pre-

dates March 30, 2000, the universe of relevant information that can be attributed to Deloitte is nevertheless significantly narrower.  When considered in tandem with the other difference between Deloitte and the other defendants discussed herein, the support for the inference plaintiff seeks the court to draw is stretched too thin.

Therefore, Deloitte's motion to dismiss is granted because plaintiffs have failed to allege that Deloitte acted with scienter.  Plaintiffs may amend their complaint in the manner prescribed by Rule 15 of the Federal Rules of Civil Procedure to address the deficiencies discussed herein.

### III. CONCLUSION

For the reasons set forth herein, Priceline's and the individual defendants' motion to dismiss (dkt. # 70) is **GRANTED in part** and **DENIED in part,** and Deloitte's motion to dismiss (dkt. # 67) is **GRANTED.** The allegations of the Consolidated Amended Complaint that are dismissed pursuant to this memorandum of decision are **DISMISSED without prejudice** to plaintiffs re-pleading these allegations upon curing the deficiencies set forth herein.  The parties shall submit a proposed discovery plan on or before **October 29, 2004.**  The stay of discovery shall remain in

effect until further order from this court.

So ordered this _____ day of October, 2004.


                                        **/s/DJS**
                            _____
                               **DOMINIC J. SQUATRITO**
                            **UNITED STATES DISTRICT JUDGE**

## INDEX

Randall Twardy v. Priceline.com, 3:00cv1884(DJS);
Mathis Weingarten v. Priceline.com, Inc., No. 3:00cv1901(DJS);
Natalie Berdakina v. Priceline.com, Inc., No. 3:00cv1902(DJS);
Howard Gunty Profit Sharing Plan v. Priceline.com, Inc.,
3:00cv1917(DJS);
Michael Cerelli v. Priceline.com, Inc., No. 3:00cv1918(DJS);
Samuel Mayer v. Priceline.com, Inc., No. 3:00cv1923(DJS);
Anthony Mazzo v. Priceline.com, Inc., No. 3:00cv1924(DJS);
Hyancinth S. Anish v. Priceline.com, Inc., 3:00cv1948(DJS);
Mark Fialkov v. Priceline.com, Inc., No. 3:00cv1954(DJS);
Muhammed Zia v. Priceline.com, Inc., No. 3:00cv1968(DJS);
Monica R. Mazzo v. Priceline.com, Inc., No. 3:00cv1980(DJS);
Thomas Aikin v. Priceline.com, Inc., No. 3:00cv1994(DJS);
Jeremy Licht v. Priceline.com, Inc., No. 3:00cv2049(DJS);
Jim M. Ayach & Sarah Sontag v. Priceline.com, Inc., No.
3:00cv2062(DJS);
Scott Lyon v. Priceline.com, Inc., No. 3:00cv2066(DJS);
Johnny Kwan v. Priceline.com, Inc., No. 3:00cv2069(DJS);
Jerry Krim v. Priceline.com, Inc., No. 3:00cv2083(DJS);
Rajiv Bazag v. Priceline.com, Inc., No. 3:00cv2122(DJS);
Sherman Breier v. Priceline.com, Inc., No. 3:00cv2146(DJS);
Jack A. Caswell v. Priceline.com, Inc., No. 3:00cv2169(DJS);
Dr. Ramin Farzam, et al. v. Priceline.com, Inc., No.
3:00cv2176(DJS);
Michael Karas v. Priceline.com, Inc., No. 3:00cv2232(DJS);
John Michols v. Priceline.com, Inc., et al., No. 3:00cv2280(DJS).