# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| IN RE: PRICELINE.COM, INC. | : | |
| SECURITIES LITIGATION | : | |
| _____ | : | **MASTER FILE NO.** |
| | : | **3:00CV01844(DJS)** |
| This document relates to: | : | |
| | : | **March 21, 2005** |
| ALL ACTIONS | : | |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DELOITTE & TOUCHE

**SCOTT + SCOTT, LLC**
David R. Scott
Geoffrey M. Johnson
Erin Green Comite
108 Norwich Avenue
P.O. Box 192
Colchester, CT  06415

**JOHNSON & PERKINSON**
Dennis J. Johnson
Jacob B. Perkinson
Peter J. McDougall
1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403

**STULL, STULL & BRODY**
Jules Brody
Aaron Brody
6 East 45th St.
New York, NY 10017

**Co-Lead Counsel**

**TABLE OF CONTENTS**

I.    Background Facts ........................................................................................................ 1

      A.    The Complaint ............................................................................................ 1

      B.    Procedural History ..................................................................................... 4

      C.    Plaintiff's Subpoena and Deloitte's Objections ....................................... 5

II.   Legal Standards............................................................................................................ 6

      A.    Broad Scope of Discovery Under the Federal Rules ............................... 6

      B.    The PSLRA Automatic Stay..................................................................... 8

III.  Argument ..................................................................................................................... 9

      A.    The Automatic Stay Provision of the PSLRA is not in effect and cannot Preclude

            Discovery ................................................................................................... 9

      B.    The Requested Documents Are Relevant and Should be Produced ..................... 10

            1.    Deloitte's Letter Fails to Present Adequate Objections........................... 10

            2.    The Documents Requested are Relevant to the Claims in the Complaint  12

IV.   CONCLUSION............................................................................................................ 19

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Maplan Corp. v. Heilmayr*, 2001 WL 1718366 (D. Kan. 2001) .......... 10

*Flora v. Hamilton*, 81 F.R.D. 576 (M.D.N.C. 1978) ............................................... 7

*General Electric Capital Corp. v. Lear Corp.*, 2003 WL 21239272
(D. Kan. May 20, 2003) .................................................................................. 6,7

*In re Grand  Jury Proceedings*, 219 F.3d 175 (2d Cir. 2000) .............................. 11

*Johnson & Johnston v. R.E. Service*, 2004 WL 3174428 (N.D. Cal. 2004) ......... 11

*In re Lernout & Hauspie Sec. Litigation*, 214 F. Supp. 2d 100 (D. Mass.
2002) ................................................................................................................. 8

*National Congressional for Puerto Rican Rights ex. rel. Perez v. City of New
York*, 194 F.R.D. 88 (S.D.N.Y. 2000) ............................................................... 6

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) .................................... 6

*Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540 (10th Cir.1984) ............... 12

*Quaker Chair Corp. v. Litton Business Systems, Inc.*, 71 F.R.D. 527 (S.D.N.Y.
1976) ................................................................................................................. 6

*Roesberg v. Johns-Manville Corp.*, 85 F.R.D. 292 (E.D. Pa.1980)...................... 10

*Securities & Exchange Comm. v. Dowdell*, 2002 WL 1969664
(W.D.Va. Aug. 21, 2002).................................................................................. 6

*Sherman Bank Community Association Community Association v. Wauwatosa
Realty Co.*, 486 F. Supp. 838 (E.D. Wisc. 1980) .............................................. 6

*St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508
(N.D. Iowa 2000) ............................................................................................ 11

*Thompson v. Department of Housing and Urban Development*, 199 F.R.D. 168
(D. Md. 2001) ................................................................................................... 7

*United States v. TRW, Inc.*, 211 F.R.D. 388 (C.D. Cal. 2002)........................... 8, 9

*Vacold LLC v. Cerami*, 2001 WL 167704 (S.D.N.Y. Feb. 16, 2001).................... 8

*In re Woolworth Corp. Sec. Class Action Litigation*, 166 F.R.D. 311 (S.D.N.Y. 1996) ......................................................................................................7

*In re WorldCom Sec. Litigation*, 234 F. Supp. 2d 301 (S.D.N.Y. 2002) ...............9

*Zucker v. Sable*, 72 F.R.D. 1 (S.D.N.Y. 1975) .......................................................7

## FEDERAL STATUTES

15 U.S.C.A. 78u-4(b)(3)(B) ....................................................................................8

Fed. R. Civ. P. 26(b)(1).......................................................................................6, 7

H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 748 .........................................................................8

As a result of Deloitte & Touche's ("Deloitte") refusal to provide documents pursuant to the subpoena served on it in this matter on November 23, 2004,[1] Plaintiffs are forced to file this motion. Plaintiffs' subpoena, seeks documents from Deloitte which are critical to Plaintiffs' case against the Defendants in this litigation. Nevertheless, Deloitte objects to the production of any documents on the grounds that, among other things, the automatic stay provision of the Private Securities Litigation Reform Act ("PSLRA") applies.[2] While the claims originally brought against Deloitte were dismissed, claims against the remaining Defendants have been sustained and Deloitte is in possession of documents directly relevant to the claims alleged in the Consolidated Amended Complaint (the "Complaint"). As the Court has ordered that discovery is to proceed and that the automatic stay provision of the PSLRA is no longer applicable, Deloitte should be ordered to produce the documents requested in Plaintiffs' subpoena.

## I.    Background Facts

### A.    The Complaint

The Complaint alleges that Defendants made numerous false and misleading statements about Priceline.com Inc.'s ("Priceline or the "Company") business model, financial status, and future prospects during the Class Period. ¶¶ 33-38, 97-148.[3] Priceline pioneered a "Name Your Own Price" internet pricing system, which is a type of demand collection system that allows consumers to make an offer to purchase items such as airline tickets, hotel rooms, or car rentals. ¶ 2. After collecting the consumer demand in the form of an offer, Priceline matches the offer with a seller willing to discount the item in order to fill excess capacity. Priceline's business model is one of its most valuable assets and is central to the events giving rise to this lawsuit. ¶ 2, 43.

---

[1]    A copy of Plaintiffs' subpoena is attached hereto as Exhibit A.
[2]    A copy of Deloitte's letter stating objections to the subpoena is attached hereto as Exhibit B.
[3]    Citations to paragraphs of the Consolidated Amended Complaint will be in the form of "¶ __."

In late 1999, Defendants realized that they could not sustain Priceline's current stock value and become profitable unless they expanded Priceline's business model to new markets beyond the Company's core businesses of airline travel, hotel rooms, and car rentals.  ¶ 3.  This prompted Priceline to license its business model to an affiliated company, Priceline WebHouse Club ("WebHouse"), in November 1999.  ¶ 28.  WebHouse attempted to apply Priceline's business model to the purchase and sale of groceries.  ¶ 26.  Customers would bid for items on the internet, charge the items at a discount to their credit cards, and then take delivery of the groceries at a local store.   The supermarket providing the goods would receive the full retail price of the goods from WebHouse.  Although Priceline claimed manufacturers and others were subsidizing such sales, WebHouse was actually responsible for funding the difference between the full retail price and the discounted price offered to customers.  ¶ 60.

From at least January 27, 2000 through and including October 4, 2000, (hereinafter the "Class Period") Defendants held WebHouse out as a success at a time when they knew that WebHouse could not duplicate or sustain the Priceline  business model.  ¶ 3.  In particular, Defendants knew, by the beginning of the Class Period, that grocery manufacturers would not provide discounts to WebHouse customers at a level that could sustain WebHouse, much less foster any growth.  ¶ 43.  Because grocery manufacturers were refusing to participate in WebHouse, WebHouse was forced to pay the discounts itself.  *Id.*  To hide these material facts, Defendants misrepresented the level of manufacturer participation and the prospects of future manufacturer participation.  ¶ 30, 43.

Additionally, Plaintiffs allege that, during the Class Period, the publicly reported financial statements of Priceline were false and misleading because they failed to reveal that Priceline's accounting did not comply with Generally Accepted Accounting Principles

("GAAP").  ¶¶ 35, 70, 76.  As a consequence of these misleading financial presentations, the reported financial results of Priceline were inflated, which in turn contributed to an artificial inflation in the price for Priceline stock during the Class Period.  ¶¶ 41, 116, and 233.  An important factor in causing the financial statements of Priceline to be false and misleading throughout the Class Period was a $188.8 million valuation for the warrants received by Priceline to purchase stock in WebHouse which value was reported as an asset on Priceline's financial statements throughout the Class Period.  ¶¶ 28, 35, 43, 68, 79.

The Complaint alleges that in direct violation of GAAP:  a) Priceline carried the value of the WebHouse warrants at $189 million when their actual worth was materially less than $189 million throughout the Class Period and Priceline failed to write down or write off these assets; b) Priceline improperly recognized $189 million in income in the 1999 fourth quarter as a result of its acquisition of the WebHouse warrants; c) Priceline improperly recognized revenues received from WebHouse in the three reporting periods during the Class Period; and d) Priceline inappropriately reported its and WebHouse's results and assets on a separate rather than combined or consolidated basis.  ¶¶ 76, 78, 79-84, 91, 130, 149.  These violations played an integral role in the fraud alleged by allowing Priceline to tout WebHouse's success as evidence of the supposed value of Priceline and the expandability of its business model while shielding the actual results of WebHouse from public evaluation.

The truth about WebHouse began to be disclosed on October 5, 2000, when Defendants issued a press release announcing that Priceline would be winding down WebHouse's operations over a 90-day period.  ¶ 158.  In sharp contrast to Defendants' numerous statements during the Class Period, Defendants also admitted that manufacturers had not been providing discounts for groceries to any significant extent and that WebHouse had been heavily subsidizing its

customers' purchases since the beginning of WebHouse's existence. ¶ 162. Defendants also announced that they were writing down the value of certain warrants the Company was carrying on its books representing its interest in the WebHouse business. ¶ 159. In response to these disclosures, the price of Priceline common stock dropped 38% to close at $5.81 on October 5, 2000. ¶ 160.

In essence, the Complaint alleges an egregious accounting fraud which touched on multiple aspects of Priceline's reported financials and grossly inflated the price of Priceline stock. This was accomplished, at least in part, through the necessary participation of Deloitte. The Complaint alleges that Defendants' accounting treatment represented a wholesale departure from acceptable and expected accounting practices which resulted in the artificial inflation of Priceline stock and consequent harm to Priceline investors. Unbeknownst to the public, during the Class Period, material portions of Priceline's financial statements were unsupported by any credible evidence while, at the same time, Plaintiffs allege, all the available evidence contradicted the treatment publicly asserted for the most material item in Priceline's financial statements: the WebHouse warrants recognized as $189 million in income, constituting forty-two percent (42%) of Priceline's reported assets.

**B.    Procedural History**

Shortly after the October 4, 2000 announcement that WebHouse was winding down, several plaintiffs filed complaints against Priceline and certain of its officers and directors. These cases were consolidated into the instant action on September 12, 2001. The Complaint, which added Deloitte as a Defendant, was filed on October 29, 2001, and Deloitte moved to dismiss the Complaint in on February 28, 2002. By Memorandum and Order dated October 7, 2004, the Court granted Deloitte's motion to dismiss based on a finding that Plaintiffs failed to

4

adequately allege Deloitte's scienter.  While Defendants Priceline and its named officers and

directors (Braddock, Schulman, Walker and Nichols) also moved to dismiss Plaintiffs' claims,

the Court sustained the claims brought against those Defendants under Sections 10(b) and 20(a)

of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a).  With respect to the claims

dismissed (*i.e.,* the claims for relief against Deloitte), the Court dismissed these claims without

prejudice.

### C.    Plaintiff's Subpoena and Deloitte's Objections

On November 2, 2000, the Court issued a scheduling order stating that factual discovery

in this case could begin on November 15, 2000.  Plaintiffs served their subpoena on Deloitte on

November 23, 2004.[4]  *See* Exhibit A to Declaration of Peter J. McDougall, Esq. ("McDougall

Declaration") submitted herewith.  Deloitte responded to Plaintiffs' subpoena by letter dated

December 7, 2004, and stated that it would not produce any documents pursuant to the subpoena.

*See* Exhibit B to McDougall Declaration.   Deloitte's primary objection is that the PSLRA

mandates an automatic stay of discovery as to Deloitte.  There is no authority Plaintiffs can

locate to support this novel proposition.  Deloitte also asserts additional broad and non-

particularized objections.  Plaintiffs submit that Deloitte's failure to particularize its objections

and reliance on a non-existent stay fully supports an order granting this Motion to Compel.

Since December of 2004, Deloitte and Plaintiffs' counsel have conducted three separate

meet and confer sessions in an attempt to resolve Deloitte's objections to Plaintiffs' subpoena.

McDougall Declaration ¶¶ 7, 8 and 10.  While Deloitte has offered to produce limited documents

if Plaintiffs agree to forego the pursuit of other documents called for by the subpoena, as

---

[4] Initially, Deloitte objected to the service of a subpoena on it at its Connecticut offices which was
addressed to "Deloitte Touche and Tohmanstu."  However, Plaintiffs' subpoena clearly defines Deloitte and Touche
as included within Deloitte Touche and Tohmatsu.  While Plaintiffs believe the subpoena served in Connecticut was
properly addressed, because of Deloitte's apparently shifting positions on who should be served and where,
Plaintiffs have also undergone the expense and effort of serving the same subpoena on Deloitte's main offices in
New York.  *See* McDougall Declaration at ¶ 5.

described below in Section III.B.2., each category of documents requested by the subpoena is relevant to Plaintiffs' claims against the Defendants in this case and each request is an appropriate subject of discovery.

## II.    Legal Standards

### A.    Broad Scope of Discovery Under the Federal Rules

Federal Rule of Civil Procedure 26(b)(1) defines the parameters of discovery broadly as follows:  "Parties may obtain discovery regarding any matter...which is relevant to the claim or defense of any party . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1); *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-51 (1978).

Of course, relevance, for discovery purposes, is not synonymous with admissibility. *Securities & Exchange Comm. v. Dowdell,* 2002 WL 1969664, *4 (W.D.Va. Aug. 21, 2002); *Quaker Chair Corp. v. Litton Business Systems, Inc.*, 71 F.R.D. 527, 531 (S.D.N.Y. 1976). "Relevancy is broadly construed, and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *General Electric Capital Corp. v. Lear Corp.,* 2003 WL 21239272, at *1 (D. Kan. May 20, 2003) (citations omitted); *Nat'l Cong. for Puerto Rican Rights ex. rel. Perez v. City of New York,* 194 F.R.D. 88, 92 (S.D.N.Y. 2000) ("In federal actions, discovery should be broad, and all relevant materials which are reasonably calculated to lead to the discovery of admissible evidence should be [discoverable]." ) (quotation marks and citation omitted).  Thus, there need only be a reasonable likelihood that the information sought will lead to the discovery of admissible evidence.  *See Sherman Bank Community Ass'n Community Ass'n v. Wauwatosa Realty Co.*, 486 F. Supp. 838 (E.D. Wisc. 1980).

> Examples of information relevant to the claims or defenses in a given action are: incidents of the same type, or involving the same product could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable.

*Thompson v. Department of Hous. and Urban Dev.,* 199 F.R.D. 168, 172 (D. Md. 2001) (citing Commentary to Rule Changes, Court Rules, 192 F.R.D. 340, 389). Additionally, when the discovery sought appears relevant:

> the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the scope of relevance as defined under Fed.R.Civ.P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure. Similarly, a party resisting discovery on the basis that a request is overly broad has the burden to support its objection, unless the request is overly broad on its face.

*General Electric Capital Corp.,* 2003 WL 21239272, at *1;[5] *Flora v. Hamilton*, 81 F.R.D. 576, 578 (M.D.N.C. 1978); *Zucker v. Sable*, 72 F.R.D. 1, 3 (S.D.N.Y. 1975). Because of the extremely broad standard of discovery under the Federal Rules of Civil Procedure, parties are "required to carry a heavy burden of showing why discovery [should be] denied." *Blankenship v. Hearst Corporation*, 519 F.2d 418, 429 (9th Cir. 1975); *see also Chubb Integrated Systems, LTD v. National Bank of Washington*, 103 F.R.D. 52 (D.D.C. 1984) (as a general rule, the party resisting discovery has the burden of proving that protection from discovery should be granted).

The scope of discovery is in no way limited by whether the entity from who discovery is sought is a party or a non-party. *See In re Woolworth Corp. Sec. Class Action Litig.,* 166 F.R.D. 311, 313 (S.D.N.Y. 1996). Thus, the scope of discovery under Rule 45 of the Federal Rules of

---

[5]     When a party resisting discovery argues that a discovery request presents an undue burden, "[t]his imposes an obligation to provide sufficient detail and explanation about the nature of the burden in terms of time, money and procedure required to produce the requested documents." *General Electric Capital Corp.,* 2003 WL 2123927, at *3.

Civil Procedure is the same as the scope of discovery under Rule 34.  *See United States v. TRW, Inc.,* 211 F.R.D. 388, 392 (C.D. Cal. 2002) ("The non-party witness is subject to the same scope of discovery under [Rule 45] as that person would be as a party to whom a request is addressed pursuant to Rule 34.") (citing Advisory Committee Notes to 1991 Amendment of Rule 45).

### B.    The PSLRA Automatic Stay

The PSLRA provides:

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C.A. § 78u-4(b)(3)(B).  The automatic stay provision of the PSLRA was intended to shield parties from baseless suits by preventing plaintiffs from filing frivolous lawsuits.  *See In re Lernout & Hauspie Sec. Litig.,* 214 F. Supp. 2d 100 (D. Mass. 2002).  As the Congressional Report states:

> The purpose of the [PSLRA] was to restrict abuses in securities class action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of "deep pocket" defendants;  (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.

H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 748.  Discovery, however, is permitted in securities fraud cases after the court has sustained the legal sufficiency of the complaint.  *Vacold LLC v. Cerami,* 2001 WL 167704, * 6 (S.D.N.Y. Feb. 16, 2001).  Plaintiffs have found no authority that supports Deloitte's argument that discovery may be stayed against an entity based on 15 U.S.C.A. § 78u-4(b)(3)(B) where the predicate for the application of the stay (the pendency of  a motion to dismiss) does not exist.

## III.    Argument

### A.    The Automatic Stay Provision of the PSLRA is not in effect and cannot Preclude Discovery

The Court should compel the production of documents requested by Plaintiffs from Deloitte because the prerequisite for the application of the automatic stay provision of the PSLRA no longer applies to this case.[6]  Here, the Court has already evaluated the sufficiency of the Complaint and determined that it adequately states a claim as to Defendants Priceline, Walker, Schulman, Braddock and Nichols.  The Complaint clearly explains Deloitte's involvement in the scheme allegedly perpetrated by the existing Defendants.  Thus, Plaintiffs are clearly not engaged in a "fishing expedition" in search of sustainable claims or pursuing an "otherwise frivolous class action" to force the Defendants to settle.  *In re WorldCom Sec. Litig.,* 234 F. Supp. 2d 301, 306 (S.D.N.Y. 2002).   Here, neither the letter of the law nor the policy underlying the PSLRA stay provisions is applicable to Plaintiffs' efforts to obtain discovery from Deloitte, a necessary and integral actor in the course of conduct alleged.  The current posture of this litigation precludes any objection on the ground of the application of the PSLRA stay.

Deloitte's responsive documents are relevant to the claims and defenses in this suit *regardless of whether Deloitte is a party to the suit.*  The fact that Deloitte has been dismissed as a party (thus resolving all pending motions to dismiss), simply has no bearing on whether Plaintiffs are entitled to the discovery requested in their subpoena of the exact documents that are the subject of the Plaintiffs' First Request pursuant to Rule 45.  *See TRW,* 211 F.R.D. at 392 (the scope of discovery under Rule 45 is the same as the scope of discovery under Rule 34).  Because

---

[6]  Under Local Rule 37(a)3, Plaintiffs are required to set forth "a specific verbatim listing of each of the items of discovery sought or opposed and immediately following each specification shall set forth the reason why the item should be allowed or disallowed."  This verbatim listing is contained in Section III.B.2, *infra*.  Plaintiffs' submit that such a recitation is not useful with respect to the issue of the PSLRA stay since Deloitte claims the PSLRA precludes any discovery from Deloitte at this time.

the PSLRA stay can no longer apply and the purpose of the stay is not served by a stay of

discovery as to Deloitte, documents responsive to Plaintiffs' subpoena should be produced.

Deloitte should be compelled to produce all responsive documents.

**B.    The Requested Documents Are Relevant and Should be Produced**

**1.    Deloitte's Letter Fails to Present Adequate Objections**

Deloitte's only effort to interpose objections to Plaintiffs' subpoena took the form of a

letter (*see* Exhibit B to McDougall Declaration) in which, in addition to claiming the PSLRA

stay still applied  despite the Court's order lifting the stay, listed ten separate objections.  None

of these objections were directed to any specific request sought in Plaintiffs' subpoena.  Further,

each of these objections is so generic and non-specific as to amount to no objection at all.

In Objection 1, Deloitte asserts that the entire subpoena requests "irrelevant" documents.

However, this simple assertion does not adequately address the standard for discovery.  Plaintiffs

are entitled to all evidence falling within the scope of Rule 26 which includes all documents

calculated to lead to the discovery of admissible evidence.  *See Roesberg v. Johns-Manville

Corp.*, 85 F.R.D. 292, 296 -297 (E.D. Pa.1980) (objector cannot merely assert a request is

"irrelevant" but "must show specifically how, despite the broad and liberal construction afforded

the federal discovery rules, each interrogatory is not relevant or how each question is overly

broad, burdensome or oppressive.")  As discussed below, each request in Plaintiffs' subpoena is

calculated to lead to the discovery of admissible evidence in the pending case.

Deloitte's Objection Number 2, asserts that the subpoena is "unduly burdensome and

oppressive."  This objection is inadequate.  A party cannot merely claim that a request is unduly

burdensome and oppressive, but must explain why.  *See American Maplan Corp. v. Heilmayr*,

2001 WL 1718366, *2 (D. Kan. 2001) (overruling objections to discovery where objector

"submitted no explanation to support its objections that the document requests are vague and/or ambiguous, overly broad in time and scope, unduly burdensome and neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."). Deloitte's objection fails to make any particularized showing of how the requested documents impose an undue burden and Deloitte's objection here must fail.

Deloitte's third objection is that some documents requested by the subpoena are publicly available. However, the fact that a document may be available from one source does not protect it from discovery from another. Such objections are consistently held to be frivolous. In fact, one court recently sanctioned the attorney responsible for such an objection by requiring that the attorney draft an article explaining why such objections are inappropriate. *St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508, 514-518 (N.D. Iowa 2000). In any event, Deloitte fails to identify which requests seek documents that can be obtained elsewhere or what documents these may be. Deloitte's objection here is ineffective and wholly deficient.

Deloitte's fourth objection is that the subpoena is unduly vague. Ironically, it is Deloitte's objection which must fail for vagueness. *See Johnson & Johnston v. R.E. Service*, 2004 WL 3174428, *2 (N.D. Cal. 2004) ("Given the broad scope of discovery in federal cases, a party objecting to discovery on the basis of vagueness, overbreadth, oppression or burden must state specific facts in support of its objection."). Deloitte's nondescript objection, which is not directed to any specific request in Plaintiffs' subpoena cannot withstand the demands of discovery under the Federal Rules.

Objections 5 and 7 assert various privileges based on proprietary rights, work-product, attorney-client and "accountant-client" relationship. However, Deloitte has failed to adequately support such claims of privilege and all such claims are therefore waived. *See, e.g., In re Grand*

*Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) ("It is well settled that "[t]he burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it."); *Peat, Marwick, Mitchell & Co. v. West,* 748 F.2d 540, 542 (10th Cir.1984) ("the party interposing an objection has the burden of establishing its claim of privilege or protection; a baldfaced assertion is insufficient.").

The remainder of Deloitte's objections are irrelevant to whether the documents requested should be produced (*see, e.g.*, Objection 8 demanding that Plaintiffs pre-pay Deloitte for all costs of production) or inapplicable (*see, e.g.*, Objections 5 & 10 objecting to lack of a confidentiality stipulation).[7]

### 2.    The Documents Requested are Relevant to the Claims in the Complaint

The Deloitte documents responsive to Plaintiffs' subpoena are relevant to the claims and defenses involved in this suit.  The Complaint alleges that contrary to GAAP: a) Priceline carried the value of the WebHouse warrants at $189 million when their actual worth was materially less than $189 million throughout the Class Period and Priceline failed to write down or write off these assets; b) Priceline improperly recognized $189 million in income in the 1999 fourth quarter as a result of its acquisition of the WebHouse warrants; c) Priceline improperly recognized revenues received from WebHouse in the three reporting periods during the Class Period; and d) Priceline inaccurately reported its and WebHouse's results and assets on a separate rather than combined or consolidated basis.  ¶¶ 76, 78, 79-84, 91, 130, 149.  These violations played an integral role in the fraud alleged in the Complaint by allowing Priceline to tout WebHouse's success as evidence of the supposed value of Priceline and the expandability of its business model while shielding the actual results of WebHouse from public evaluation.

---

[7]    The Court in this matter has entered a confidentiality order which provides protections for third parties wishing to avail themselves of the same.

In addition, the Complaint alleges other irregularities and misconduct which will be reflected in the documents requested from Deloitte including the inappropriate cross-over of employees between Priceline and WebHouse without appropriate accounting, ¶¶ 21, 22, 41, 77, 213; the undisclosed or misleading funding of Priceline equipment and services by WebHouse, ¶¶ 38, 41 42, 43, 85, 141, 163, 231; the sharing of facilities, ¶¶ 22, 41, 77; and the use of contractors paid for by WebHouse who worked on systems which accrued to the benefit of Priceline, ¶¶ 150, 174.

Moreover, the Complaint contains numerous allegations about the valuation and accounting for airline warrants which Priceline used as the incentive to obtain inventory for sale in its core business. ¶¶ 43, 57, 117, 130, 140. The Complaint alleges that Priceline's airline warrants were integral to the scheme at issue in this case and any documents relating to these warrants (which were adjustable based on the price of Priceline.com stock) will be relevant to Plaintiffs' claims in this litigation.

Pursuant to Local Rule of 37(a)(3), Plaintiffs here set forth the verbatim description of the documents requested followed by a brief explanation of why they should be produced.

**1.      All documents referring or relating to any audit, review, or accounting work performed by, or contemplated to be performed by, DTT for Priceline (including WebHouse) including, but not limited to:**

   **(a)     all financial statements utilized or contemplated for utilization in Priceline's filings with the SEC and/or public statements or press releases;**

   **(b)     all workpapers created during any work performed by DTT for Priceline (including WebHouse);**

   **(c)     all email, memoranda and/or correspondence;**

   **(d)     all documents provided to DTT by Priceline (including WebHouse) or given by DTT to Priceline (including WebHouse);**

   **(e)     all documents concerning any communications between Deloitte Touche Tohmatsu and Priceline (including WebHouse) or any other person or entity pertaining to Priceline's (including WebHouse) products, operations, financial results, financial statements, or its public reports, filings or public statements;**

(f)     **all documents concerning any communications among Deloitte Touche Tohmatsu's personnel relating to Priceline (including WebHouse);**

(g)     **all documents sent to, received from, filed with, or referring or relating to any communications or filings with the Securities and Exchange Commission ("SEC") or any other state or federal regulatory agency or authority of any national, regional, or local stock exchange or securities association relating to Priceline (including WebHouse);**

(h)     **all documents concerning any communications among DTT and Murray, Devine & Company regarding Priceline (including WebHouse);**

(i)     **all engagement or retention letters related to Priceline (including WebHouse), Walker Digital or any of the Individual Defendants;**

(j)     **all documents related to any invoices, fees, payments, retainers, or other such transfers of monies, to or from Priceline (including WebHouse) and/or DTT;**

(k)     **all documents related to any prior or subsequent auditors or accountants used or consulted by Priceline (including WebHouse); and**

(l)     **all communications with counsel pertaining to Priceline    (including WebHouse) or this lawsuit.**

This request seeks the audit files for Priceline.com.  The Complaint alleges that Priceline.com was engaged in violations of GAAP and GAAS and delineates several specific examples of this conduct.  ¶¶ 35, 70, 73, 75, 89, 90, 91, 92, 94, 130, 149, 225.

**2.     All documents referring or relating to any contemplated or attempted expansion of the Priceline (including WebHouse) business model by Priceline (including WebHouse) including, but not limited to: (a)  all documents regarding any actual or contemplated work relating to the expansion of the Priceline business model; (b) all communications with Priceline (including WebHouse) customers, suppliers or sponsors (or their representatives) pertaining to Priceline (including WebHouse) or its products or services; (c) all documents reflecting the amounts of money received by DTT for such work; (d) all documents referring or relating to any contracts with DTT for the provisions of such work; (e) all documents referring or relating to DTT's performance under such contracts; and (f) all documents referring or relating to the amount of and nature of, any services and/or training provided by DTT to such customers.**

This request goes to the heart of Plaintiffs' claims in this action, even under the limited view of Plaintiffs' claims taken by Deloitte. Plaintiffs' Complaint alleges that Priceline.com stock was inflated in large part due to the false impression conveyed to the investing public that

14

the Priceline.com business model was expandable beyond the travel industry.  This request seeks information which will allow Plaintiffs to test the validity of these public proclamations.

**3.**    **All documents referring or relating to any contracts or transactions between Walker Digital and Priceline (including WebHouse), including without limitation:  (a) any documents discussing or analyzing revenues and/or income related to such contracts or transactions; (b) all documents referring or relating to the performance by any parties to such relationships; and (c) all communications with any person or entity (including without limitation Walker Digital, Walker Digital's auditing or accounting firm(s) or Priceline (including WebHouse)) referring or relating to such contracts or transactions or Priceline's (including WebHouse) accounting of revenues and/or income from such contracts or transactions.**

This request seeks information which will establish the liability and control of the central actor in the pending lawsuit: Jay Walker.  The Complaint alleges that Walker was able to control, and is therefore liable for, the statements of WebHouse and Priceline which form the crux of the securities fraud alleged in this case.  These documents will allow Plaintiffs to explore the extent of Walker's involvement in WebHouse and Priceline and the interaction of these entities (which both had dealings with Walker Digital) with each other and how those relationships developed and functioned.  This information is central to the claims of the Complaint and the proof needed for Plaintiffs to establish liability for the wrongs alleged.

**4.**    **All documents discussing, analyzing, or otherwise referring or relating DTT's compliance with Generally Accepted Auditing Standards during its work for Priceline (including WebHouse).**

As noted, the Complaint alleges that, during the Class Period, Deloitte's accounting failed to comply with GAAS with respect to WebHouse and Priceline.  ¶¶ 35, 90, 91, 94, 95, 217, 219, 222, 223, 225.  Plaintiffs allege that the failure to follow these standards allowed Priceline to report financial statements which mislead the investing public and artificially inflated the price of Priceline.com stock.  Thus, these documents are directly relevant to Plaintiffs' allegations of defendants' scienter, liability and damages.

**5.    All documents discussing, analyzing or otherwise referring or relating to (a) Priceline's (including WebHouse) compliance with Generally Accepted Accounting Principles; (b) the method of revenue recognition used by Priceline (including WebHouse); or (c) the valuation of any securities received, held or issued by Priceline (including WebHouse) or Walker Digital.**

This request seeks information which is essential to Plaintiffs' case against the Defendants.  The Complaint alleges that Priceline and WebHouse failed to follow or comply with GAAP. ¶¶ 35, 70, 73, 75, 89, 91, 92, 130, 149.  In addition, the Complaint alleges that Priceline's revenue was over-reported during the class period.  ¶¶ 17, 74, 79, 80, 117, 141, 149.  Finally, Plaintiffs allege that the valuation of warrants related to both WebHouse and certain airline companies were central to the motivation and execution of the course of conduct complained of in the Complaint.  ¶¶ 35, 41, 43, 46, 57, 81-83, 87, 97, 130, 149 .  All these documents are calculated to lead to the discovery of admissible evidence and should be produced.

**6.    All documents describing or comprising Deloitte Touche Tohmatsu's document retention or destruction policies in effect during the relevant period, and any modifications thereto, and the application of those document retention or destruction policies to any documents relating to Priceline (including WebHouse).**

This request seeks to allow Plaintiffs to ascertain whether they can rely on the purported completeness of any production made by Deloitte.  The request is simple, straightforward and calculated to direct Plaintiffs to additional appropriate sources of information, if needed.

**7.    All documents referring or relating to Priceline (including WebHouse) securities and/or any actual or contemplated public or private offerings or sales of securities by Priceline (including WebHouse).**

This request goes directly to Defendants' scienter, an essential element Plaintiffs must prove in their claims against them.  To the extent that any such transactions were contemplated, they would have impacted not only the way Priceline.com managed its public disclosures and

bottom line (due to the use of warrants to attract inventory for its sales), but would also implicate the financial interests and motivations of the individual defendants in this case.

**8.    All minutes, transcripts or notes of any meeting, contact or discussion between Deloitte Touche Tohmatsu and Priceline (including WebHouse).**

This request, limited to a time period relevant to January 1, 1999 through December 31, 2001, seeks information which is calculated to lead to the discovery of admissible evidence because any conversations which were important enough to record or memorialize will indicate what issues were or were not important to Defendants and may demonstrate either actual intent (to the extent issues were discussed) or recklessness (to the extent issues were ignored). Without the full production of all such documents, Plaintiffs will be left with an incomplete picture of Defendants' conduct and scienter.

**9.    All documents referring or relating to any actual or proposed merger, acquisition, or combination of any company, partnership or entity by or with Priceline (including WebHouse).**

This request goes to the heart of Defendants' defenses. In their Motion to Dismiss and continuing to the present, the Defendants have argued that WebHouse was a completely separate entity which existed wholly apart from Priceline. In contrast, Plaintiffs contend that Priceline and WebHouse were alter egos of each other, that they functioned as a single company, that the same people controlled both entities, and that WebHouse was used as a secret source of capital for funding and enhancing Priceline's operations. ¶¶ 38, 41 42, 43, 85, 141, 163, 231. Consequently, the requested documents go directly to the heart of Plaintiffs' allegations in this case.

**10.    All documents referring or relating to any contemplated merger or other combination, affiliation or partnership of Priceline (including WebHouse) with any other company or entity.**

Again, this request seeks information on the relationship and structure of WebHouse

and/or Priceline and, for the same reasons discussed in 9 above, should be ordered produced.

**11.     All documents referring or relating to any investigation by any government or regulatory body or entity pertaining to Priceline (including WebHouse) or Walker Digital including, without limitation:  (a) all communications referring or relating to any such investigation; (b) all documents provided by DTT to or received by DTT from such entity;  (c) all memoranda discussing or pertaining to such investigation; (d) all communications with counsel pertaining to such investigation.**

This case alleges violations of the securities laws for failure to disclose full and fair

information with candor and in a timely fashion.  Clearly, investigations by regulatory agencies

of any type will be relevant to the strength of Plaintiffs' allegations about Defendants' alleged

wrongdoing.

**12.     All documents referring or relating to any communication between DTT, Priceline (including WebHouse), Walker Digital, Walker Digital's accountants, or any Individual Defendant concerning the subject matters specified in the requests above or this lawsuit.**

Similar to Request Number 3, this Request seeks information relating to the control and

interaction of various entities alleged to be involved in the scheme described in Plaintiffs'

Complaint.  The Complaint alleges that Walker was able to control, and is therefore liable for,

the statements of WebHouse and Priceline which form the crux of the securities fraud alleged in

this case.  These documents will allow Plaintiffs to explore the extent of Walker's involvement

in WebHouse and Priceline and the interaction of these entities (which both had dealings with

Walker Digital) with each other and how those relationships developed and functioned.  This

information is central to the claims of the Complaint and the proof needed for Plaintiffs to

establish liability for the wrongs alleged.

**13.     All documents referring or relating to any relationship any entity had or contemplated with Walker Digital or Priceline (including WebHouse) including, without limitation, the following:**
        **(a)     Kingdom Holding Company;**

     **(b)**     **Prince Alwaleed Bin Talal Bin Abdulaziz Al Saud;**
     **(c)**     **Allen & Company, Inc.;**
     **(d)**     **Arista Capital Partners;**
     **(e)**     **BDS Business Center, Inc.;**
     **(f)**     **Vulcan Ventures;**
     **(g)**     **General Atlantic Partners;**
     **(h)**     **Gore Creek Trust;**
     **(i)**     **Liberty, PL;**
     **(j)**     **Murray, Devine & Co.;**
     **(k)**     **Quantum Industrial Partners, LDC;**
     **(l)**     **Soros Fund Management, LP;**
     **(m)**     **Stone Street Fund 1999; and**
     **(n)**     **W.R. Berkley.**

The entities listed in this Request all had financial dealings with Priceline and/or WebHouse. In this request, Plaintiffs seek to discover information relating to any information such entities (who presumably were better informed about Priceline than the general public) might have received or disclosed with respect to Defendants and their activities during the relevant time period.

## IV.    CONCLUSION

The Deloitte documents responsive to the Plaintiffs' subpoena are central to the course of conduct set forth in the Complaint and to the potential defenses of Defendants. Thus, the requested documents are relevant to claims and defenses in this case including, but not limited to: Defendants' public statements; their knowledge of the truth of those statements; the valuation of the assets of Priceline; the validity of the earnings and income reported to the investing public; what the Defendants knew about the factors supporting the valuation of WebHouse and/or the WebHouse warrants; and the relationship between the Defendants among themselves and with WebHouse and other affiliates of Priceline. As such, documents responsive to all requests should be produced.

For all the facts, law and reasons stated above, Plaintiffs respectfully request that this honorable Court enter an order requiring Deloitte to produce all documents responsive to the Plaintiffs' subpoena served on Deloitte in this action, Deloitte's objections notwithstanding.

Respectfully submitted,

Dated: March 21, 2005

_____

SCOTT + SCOTT, LLC
David R. Scott ct16080
Erin Comite ct24886
108 Norwich Avenue
P.O. Box 192
Colchester, CT  06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432

SCOTT + SCOTT, LLC
Geoffrey M. Johnson
33 River Street
Chagrin Falls, OH 44022
Telephone:  (440) 247-8200
Facsimile:  (440) 247-8275

JOHNSON & PERKINSON
Dennis J. Johnson
Jacob B. Perkinson
Peter J. McDougall
1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403
Telephone: (802) 862-0030
Facsimile: (802) 537-4432

STULL, STULL & BRODY
Jules Brody
Aaron Brody
6 East 45th Street
New York, New York  10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

**Co-Lead Counsel**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 21, 2005, a true copy of the foregoing was served on all counsel of record on the attached service list by first-class, postage prepaid U.S. mail.

_____

Erin Green Comite

## SERVICE LIST

Dennis J. Johnson
Jacob B. Perkinson
Johnson & Perkinson
1690 Williston Road
South Burlington, VT 05403

Jules Brody
Aaron Brody
Stull, Stull & Brody
6 East 45th Street
New York, NY 10017

Andrew M. Schatz
Schatz & Nobel, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06106

J. Daniel Sagarin
Hurwitz Sagarin & Slossberg
147 North Broad St., PO Box 112
Milford, CT 06460-0112

Albert M. Myers
Carl Mullis
Paul, Hastings, Janofsky & Walker, LLP
600 Peachtree Street, N.E. 24th Floor
Atlanta, GA 30308

William R. Maguire
Sarah Loomis Cave
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004

Joseph L. Clasen
William Kelleher
Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT 06904-2305

Daniel Slifkin
James Hein
Cravath, Swaine & Moore
825 Eight Avenue
New York, NY 10019

Douglas C. Conroy
Paul, Hastings, Janofsky & Walker
1055 Washington Blvd., 9th Floor
Stamford, CT 06901