UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE: PRICELINE.COM, INC.<br>SECURITIES LITIGATION | :<br>:<br>: |
| | : MASTER FILE NO. |
| This document relates to: | : 3:00CV01884(DJS) |
| ALL ACTIONS | :<br>: |
| | : July 14, 2005 |

**PLAINTIFFS' SECOND MOTION TO COMPEL DISCOVERY
FROM PRICELINE DEFENDANTS**

Lead Plaintiffs, by and through Plaintiffs' Lead Counsel, respectfully submit this Memorandum in Support of their Second Motion to Compel Discovery from the Priceline Defendants (all current Defendants except Jay Walker). Plaintiffs request that the Court enter an order compelling the immediate production of the documents and answers to the interrogatories addressed herein.

**I.   Background Facts**

**1.   The** *Complaint*

The Consolidated Amended Complaint ("Complaint") alleges that Defendants made numerous false and misleading statements about Priceline.com Inc.'s ("Priceline or the "Company") business model, financial status, and future prospects during the Class Period. ¶¶ 33-38, 97-148.[1] Priceline pioneered a "Name Your Own Price" pricing system, which is a type of demand collection system that allows consumers to make an offer to purchase items such as airline tickets, hotel rooms, or car rentals. ¶ 2. After collecting the consumer demand in the form of an offer, Priceline matches the offer with

---
1 Citations to paragraphs of the Consolidated Amended Complaint will be in the form of ¶.

1

a seller willing to discount the item in order to fill excess capacity. Priceline's business model is one of its most valuable assets, and is central to the events giving rise to this lawsuit. ¶ 2, 43.

In late 1999, Defendants realized that they could not sustain Priceline's current stock value and become profitable unless they expanded Priceline's business model to new markets beyond the Company's core businesses of airline travel, hotel rooms, and car rentals. ¶ 3. This prompted Priceline to license its business model to the Priceline WebHouse Club ("WebHouse") in November 1999. ¶ 28. WebHouse attempted to apply Priceline's business model to the purchase and sale of groceries. ¶ 26. Customers would bid for items on the internet, charge the items at a discount to their credit cards, and then take delivery of the groceries at a local store. The supermarket providing the goods would receive the full retail price of the goods from WebHouse. WebHouse was responsible for funding the difference between the full retail price and the discounted price offered to customers. ¶ 60.

From at least January 27, 2000 through and including October 4, 2000, (hereinafter the "Class Period") Defendants held WebHouse out as a success at a time when they knew that WebHouse could not duplicate or sustain the Priceline business model. *Id.* ¶ 3. In particular, Defendants knew, by the beginning of the Class Period, that grocery manufacturers would not provide discounts to WebHouse customers at a level that could sustain WebHouse's growth. ¶ 43. Because grocery manufacturers were refusing to participate in WebHouse, WebHouse was forced to pay the discounts itself. *Id.* To hide these material facts, Defendants misrepresented the level of manufacturer participation and the prospects of future manufacturer participation. *Id.* ¶ 30, 43.

Additionally, Plaintiffs allege that, during the Class Period, the publicly reported financial statements of Priceline were false and misleading because they failed to reveal that Priceline's accounting did not comply with Generally Accepted Accounting Principles ("GAAP"). ¶¶ 35, 70, 76. As a consequence of these misleading financial presentations, the reported financial results of Priceline were inflated, which in turn contributed to an artificial inflation in the price for Priceline stock during the Class Period. ¶¶ 41, 116, and 233. An important factor in causing the financial statements of Priceline to be false and misleading throughout the Class Period was a $188.8 million valuation for the warrants received by Priceline to purchase stock in WebHouse. The $188.8 million warrant was reported as an asset on Priceline's financial statements throughout the Class Period. ¶¶ 28, 35, 43, 68, 79.

The *Complaint* alleges that in direct violation of GAAP: a) Priceline carried the value of the WebHouse warrants at $189 million when their actual worth was materially less than $189 million throughout the Class Period and Priceline failed to write down or write off these assets; b) Priceline improperly recognized $189 million in income in the fourth quarter of 1999 as a result of its acquisition of the WebHouse warrants; c) Priceline improperly recognized revenues received from WebHouse in the three reporting periods during the Class Period; and d) Priceline inappropriately reported its and WebHouse's results and assets on a separate rather than combined or consolidated basis. ¶¶ 76, 78, 79-84, 91, 130, 149. These violations played an integral role in the fraud alleged by allowing Priceline to tout WebHouse's success as evidence of the supposed value of Priceline and the expandability of its business model while shielding the actual results of WebHouse from public evaluation.

These misrepresentations caused Priceline's stock to trade at artificially high levels and enabled the Individual Defendants to sell more than a quarter billion dollars of Priceline stock. ¶ 4. During the Class Period, Individual Defendants made the following total sales: Walker sold 10,000,000 shares of Priceline for $240,000,000; Braddock sold 244,650 shares for $9,975,422; and Nicholas sold 500,000 shares for $30,838,610. ¶ 44. In addition, the Walker-controlled entities Walker Digital LLC and Walker Digital Corp. sold $45,802,000 and $52,000,000 worth of Priceline shares, respectively. ¶ 44.[2]

The truth about WebHouse began to be disclosed on October 5, 2000, when Defendants issued a press release announcing that Priceline would be winding down WebHouse's operations over a 90-day period. ¶ 158. Moreover, in sharp contrast to Defendants' numerous statements during the Class Period, Defendants also admitted that manufacturers had not been providing discounts for groceries to any significant extent and that WebHouse had been heavily subsidizing its customers' purchases since day-one of WebHouse's existence. ¶ 162. Defendants also announced that they were writing down the value of certain warrants the Company was carrying on its books representing its interest in the WebHouse business. ¶ 159. In response to these disclosures, the price of Priceline common stock dropped 38% to close at $5.81 on October 5, 2000. ¶ 160. In essence, the Complaint alleges an egregious fraud which touched on multiple aspects of Priceline's reported financials and grossly inflated the price of Priceline.

---

2    The timing of the sales is telling. For example, DefendantWalker sold $190,000,000 (8 million shares) of Priceline stock, or 12.4% of his holdings, on August 1, 2000, just days after the senior executives of Priceline reiterated that Priceline would be profitable in the third or fourth quarter of 2000. ¶ 45. Similarly, Defendant Braddock's May 17 and 18, 2000 sales closely followed Priceline's May 15 and 16, 2000 affirmative pronouncements regarding the Company's continuing progress toward profitability and expanding Business Model. ¶ 45. Nicholas' March 6, 2000 sales were on the same day Schulman touted the Company's "significant momentum" toward profitability. ¶ 45. Nicholas' August 1 and August 2, 2000 sales also followed closely Defendants' continuing assurances issued in late July of profitability in the third or fourth quarter. ¶ 45

4

### 2.    Procedural History

Shortly after the October 4, 2000 announcement that WebHouse was winding down, several plaintiffs filed complaints against Priceline and certain of its officers and directors. These cases were consolidated into the instant action on September 12, 2001. The Consolidated Amended Class Action Complaint was filed on October 29, 2001 and all Defendants moved to dismiss the Complaint on February 28, 2002. By Memorandum and Order dated October 7, 2004, the Court granted former Defendant Deloitte & Touche's ("Deloitte") motion to dismiss based on a finding the Plaintiffs failed to adequately allege Deloitte's scienter. While Defendants Priceline, Braddock, Walker and Nicholas also moved to dismiss Plaintiffs' claims, the Court sustained the claims brought against those Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a). This is Plaintiffs' second motion filed to compel relevant discovery from the Defendants. The first was resolved by the Court on June 7, 2005.

## II.    Legal Standards

Federal Rule of Civil Procedure 26(b)(1) defines the parameters of discovery broadly as follows: "Parties may obtain discovery regarding any matter...which is relevant to the claim or defense of any party . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1); *In re PE Corp. Securities Litigation*, No. 00-705, 2005 WL 806719, at *7 (D.Conn. April 8, 2005); *See also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-51 (1978) ("*Oppenheimer*").

The Supreme Court has repeatedly emphasized that the relevance clause of

26(b)(1) must be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer* at 351 (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947). *See Hickman*, 329 U.S. at 507 ("The deposition discovery rules are to be accorded a wide and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case."); *see also Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991) ("This obviously broad rule [26(b)(1)] is liberally construed"); 8 C.Wright, A. Miller, Federal Practice & Procedure §2008 at 108-09 (2d ed. 1994); ("[T]he discovery rules do not require absolute precision, and no order of production can serve as a guarantee that every document produced will be relevant. If the purposes of the Rules, and of pretrial discovery are to be effectuated, actual discovery must be expected to be somewhat of a "fishing expedition," particularly in...complex litigation.").

Importantly, relevance, for discovery purposes, is not synonymous with admissibility. *In re PE Corp. Sec. Litig.*, 2005 WL 806719, at *7; *Securities & Exchange Comm. v. Dowdell,* 2002 WL 1969664, *4 (W.D.Va. Aug. 21, 2002); *Quaker Chair Corp. v. Litton Business Systems, Inc.*, 71 F.R.D. 527, 531 (S.D.N.Y. 1976). "Relevancy is broadly construed, and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *General Electric Capital Corp.,* 2003 WL 21239272 at *1 (citations omitted); *Nat'l Cong. for Puerto Rican Rights ex. rel. Perez v. City of New York,* 194 F.R.D. 88, 92 (S.D.N.Y. 2000) ("In federal actions, discovery should be broad, and all relevant materials which are reasonably calculated to lead to the discovery of

6

admissible evidence should be [discoverable].") (quotation marks and citation omitted). Thus, there need only be a reasonable likelihood that the information sought will lead to the discovery of admissible evidence. *See In re PE Corp. Sec. Litig.*, 2005 WL 806719, at *7 ("[i]nformation that is reasonably calculated to lead to the discovery of admissible evidence is considered relevant for the purposes of discovery")(internal citations omitted). "Limitations are imposed only 'on discovery sought in bad faith, to harass or oppress the party subject to it, when it is irrelevant, or when the examination is on matters protected by a recognized privilege." *Tangorre v. Mako's, Inc.,* 2002 WL 206988, *3 (S.D.N.Y. Feb. 8, 2002) (quoting *In re Grand Jury Witnesses,* 979 F.2d 939, 943 (2d Cir. 1992) (citing *Hickman v. Taylor,* 320 U.S. at 507-08); *Gillette Co. v. Philips Oral Healthcare, Inc.,* 2001 WL 1442637 (S.D.N.Y. Nov. 15, 2001) ("[m]erely because discovery, in a large case, may be substantial does not necessarily make that discovery oppressive or unduly burdensome").

> Examples of information relevant to the claims or defenses in a given action are: incidents of the same type, or involving the same product could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable.

*Thompson v. Department of Hous. and Urban Dev.,* 199 F.R.D. 168, 172 (D.Md. 2001) (citing Commentary to Rule Changes, Court Rules, 192 F.R.D. 340, 389). Additionally, when the discovery sought appears relevant:

> the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the scope of relevance as defined under Fed.R.Civ.P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure. Similarly, a party resisting discovery on the basis that a request is overly broad has the burden to support its

objection, unless the request is overly broad on its face.

*General Electric Capital Corp.,* 2003 WL 21239272 at *1.[3] *Flora v. Hamilton*, 81 F.R.D. 576, 578 (M.D.N.C. 1978); *Zucker v. Sable*, 72 F.R.D. 1, 3 (S.D.N.Y. 1975). Because of the extremely broad standard of discovery under the Federal Rules of Civil Procedure, parties are "required to carry a heavy burden of showing why discovery [should be] denied." *Blankenship v. Hearst Corporation*, 519 F.2d 418, 429 (9th Cir. 1975); *see also Chubb Integrated Systems, LTD v. National Bank of Washington*, 103 F.R.D. 52 (D.D.C. 1984) (as a general rule, the party resisting discovery has the burden of proving that protection from discovery should be granted). "The objecting party bears the burden of demonstrating specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [question] is not relevant or how each question is overly broad, [unduly] burdensome or oppressive." *Saylavee LLC v. Hockler*, 2005 WL 1398653, *1 (D.Conn., June 14, 2005)(brackets in original).

The scope of discovery under Rule 45 of the Federal Rules of Civil Procedure is the same as the scope of discovery under Rule 34. *See United States v. TRW, Inc.,* 211 F.R.D. 388, 392 (C.D.Cal. 2002) ("The non-party witness is subject to the same scope of discovery under [Rule 45] as that person would be as a party to whom a request is addressed pursuant to Rule 34.") (citing Advisory Committee Notes to 1991 Amendment of Rule 45).

---

[3] When a party resisting discovery argues that a discovery request presents an undue burden, "[t]his imposes an obligation to provide sufficient detail and explanation about the nature of the burden in terms of time, money and procedure required to produce the requested documents." *Id.* at *3.

8

### III.    Plaintiffs' Requests and Defendants' Objections

Plaintiffs served their Second Set of Document Requests and Interrogatories on all Defendants on March 1, 2005. The Priceline Defendants responded on April 25, 2005. Plaintiffs and Defendants held a meet and confer on June 7, 2005, to discuss these matters but were unable to resolve their differences. *See* Exhibit C, Declaration of Peter J. McDougall, Esq. in Support of Plaintiffs' Second Motion to Compel Discovery from Priceline Defendants. Plaintiffs contend numerous deficiencies in Defendants' responses exist and recount them for the Court below.[4]

#### 1.    Document Request No. 3

Plaintiffs' Document Request No. 3 seeks documents relating to the investment policies and practices of the Defendants. In response, Defendants claim that their investment practices are not relevant to the claims of this action. This is clearly incorrect. Plaintiffs allege that the timing of Defendants' trades, just months before the disclosure of the close of WebHouse and the magnitude of the Defendants' trades was out of the ordinary and motivated by their knowledge of the information Plaintiffs allege was undisclosed to the investing public. Conversely, Defendants contend their trades were part of their normal investment practices and were not out of the ordinary. Clearly, Plaintiffs' request is relevant to their claim. Specifically, Plaintiffs' are entitled to investigate what constitutes Defendants' "normal" investment strategies and practices. Absent this discovery, Plaintiffs will be substantially prejudiced in their ability to prove that Defendants' trades during the period were motivated by the allege fraud instead of the result of normal trading in line with their overall investment strategies. *See, e.g.*, *In*

---

[4] Plaintiffs' Requests and Defendants' Responses are attached hereto as Exhibits A and B respectively.

*re The Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1095 (9th Cir. 2002) ("When a complaint fails to provide us with a meaningful trading history for purposes of comparison, we have been reluctant to attribute significance to the defendant's stock sales, even when the percentages of stock sold by an insider were far more suspicious" than a sale of 48% of holdings); *Ronconi v. Larkin,* 253 F.3d 423, 435-36 (9th Cir.2001) (refusing to conclude that an insider that sold 98% of her shares over the class period had engaged in suspicious trading because plaintiff provided no trading history). The Second Circuit has held that trading patterns provide evidence and inferences of fraudulent intent and there is no basis for depriving Plaintiffs of this critical evidence. *See Rothman v. Gregor,* 220 F.3d 81, 94-95 (2d Cir.2000); *See also In re Enron Corp., supra,* 258 F.Supp.2d at 593 ("Insider stock sales are suspicious "when they are 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' ") (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., No. 01-16725,* 320 F.3d 920, 937 (9th Cir.2003) (internal citations omitted). The requested information is relevant and this Court has already held that investment histories are relevant considerations in plumbing the motivations for trades in Priceline stock. *See*, June 7, 2005 Order on Defendants' Motion to Compel.

    **2.**    **Document Request No. 8**

Plaintiffs' Document Request No. 8 seeks documents reflecting testimony given by the Defendants. Defendants respond that they will produce responsive documents "only to the extent that Plaintiffs produce documents in response to Defendants'

requests."[5] Litigants are not entitled to withhold discovery based solely on perceived deficiencies in the discovery responses of their opponents. *See Bohannon v. Honda Motor Co. Ltd.*, 127 F.R.D. 536, 538 (D.Kan., 1989) (party is not entitled to withhold discovery information until they have obtained to his own satisfaction all discovery from opposing party); *see also*, *Blake v. The Prudential Insurance Company of America*, No. 02-5910, 2004 WL 784073 at *4 (N.D. Ill. Jan. 29, 2004)(sanctioning party for withholding discovery because they believed other party had not completed production). Plaintiffs' request seeks information that bears on, *inter alia*, Defendants' scienter, a central issue in this case.

### 3.     Document Request No. 11

Plaintiffs' Document Request No. 11 seeks documents concerning any agreement among the Defendants relating to this action. Defendants respond by stating they will produce documents concerning any "indemnity" agreement between or among Defendants. Defendants' response misses the mark. Request No. 11 requests "any agreement" relating to the joint defense of this action among the Defendants *in addition* to indemnity agreements. During a meet and confer, Plaintiffs' explained that they sought any agreements relating to the joint defense of this action. Nevertheless, Defendants maintained that agreements among the defendants with respect to this lawsuit are not relevant. This position is specious. The existence of and nature of any agreements for indemnification, joint defense, or similar accords is directly relevant to Plaintiffs' claims with respect to Defendants' scienter and respective liabilities to the class.

---

5      Importantly, contrary to Defendants' objections, Plaintiffs have produced documents responsive to a similar request made by Defendants.

In addition, without the revelation of such agreements, Plaintiffs will be prejudiced in their ability to challenge designations in Defendants' privilege logs and there is a serious question as to whether Defendants have withheld any disclosure of relevant information based on this objection. *See, e.g., OXY Resources California LLC v. Superior Court,* 115 Cal.App.4th 874, 893, 9 Cal.Rptr.3d 621, 638 (Cal.App. 1 Dist.,2004)(" there is a potential for abuse when parties rely on common interest agreements to protect prelawsuit communications that may be highly relevant to issues presented in a lawsuit."). In the instant suit, Jay Walker is represented by separate counsel and it is unknown what relationship exists between Walker and the remaining defendants with respect to the defense of the claims in this suit and when any agreement or relationship began. If Defendants do not reveal the existence and nature of all agreements relevant to the Defendants' response to this suit, it will be impossible for Plaintiffs to judge the proper scope of any claimed privilege with respect to the communications between Walker and the other Defendants. *See, e.g., Essex Chemical Corp. v. Hartford Acc. & Indem. Co*., 993 F.Supp. 241, 253 (D.N.J., 1998) (where joint defense agreement was not disclosed it was impossible to discern defendants' and counsel's intent, the extent and nature of counsel's interaction, or "any other considerations relevant to the implied attorney-client relationship analysis."); *Cf. For Your Ease Only, Inc. v. Calgon Carbon Corp*., 2003 WL 21920244, *1 (N.D.Ill.,2003) ("common interest" or "joint defense" doctrine exception to waiver of privilege when disclosure is made to third party applies when a third party shares a common interest with the disclosing party which is adverse to that of the party seeking discovery."). Absent the disclosure of all agreements between the Defendants relating to Defendants' defense of

this action, Plaintiffs will be severely prejudiced in their efforts to obtain relevant and potentially non-privileged information.

    **4.**    **Document Req. Nos. 12 and 13 and Interrogatories Nos. 1, 2, 3, and 34**

Plaintiffs' Document Requests Nos. 12 and 13 and Interrogatories Nos. 1, 2, 3, and 34 Plaintiffs' seek documents relating to Plaintiffs' allegations that class certification is appropriate in this case. Defendants contend they are not required to produce information concerning Plaintiffs' class-related allegations. However, the allegations of the *Complaint* concerning class certification are clearly at issue. In fact, Defendants are actively opposing class certification on the grounds that it is both legally and factually inappropriate to certify a class in this litigation. These requests clearly fall within the scope of Rule 26 and to the extent Defendants have responsive information they must produce it to Plaintiffs. *See generally*, *Oppenheimer*, *supra*.

    **5.**    **Interrogatory No. 7**

Interrogatory No. 7 asks Defendants to identify people with knowledge about the decision by Priceline to recognize $188.8 million in connection with the receipt of WebHouse warrants. In their initial response, Defendants limited their answer to the decision to recognize the WebHouse warrants as income to Priceline.com. This, however, is too narrow a response. As Plaintiffs' explained at the meet and confer, Interrogatory No. 7 also seeks information relating to *who* was involved in arriving at the valuation of these warrants and the *timing of the recognition* of the income by Priceline.com. Although Defendants expanded on their response, Defendants' response still remains deficient because it unilaterally limits disclosure to only those individuals

13

Defendants deem "primarily" familiar with the matter. *See generally*, *Oppenheimer*, *supra* and Point 6, *infra*.

### 6. Defendants' "Primarily Involved" Limitation

In response to certain Interrogatories (for example, Nos. 7, 8 and 12),[6] Defendants state that they will only list the names of people "primarily involved" in the matters as to which Plaintiffs have inquired. Defendants are obligated to reveal the identity, to the extent that they know of their identity, of *all people* involved in the matters, not just those people Defendants' unilaterally determine were "primarily involved" in matters. Importantly, Plaintiffs are not requesting that Defendants take a worldwide census, only that they reveal their own knowledge about the information requested. Defendants should be ordered to provide complete listings of *all persons,* known to them, who were involved in the matters that Plaintiffs have inquired. *See generally*, *Oppenheimer*, *supra.; see, e.g., Moore U.S.A. Inc. v. The Standard register* Company, 2000 WL 876884, *5 (W.D.N.Y. 2000)(ordering party to identify each and every person involved in the negotiation or consummation of certain agreements as "[i]n all likelihood it was not just the signatories of the agreements who were involved in the negotiation and consummation of those agreements."); *Pueblo of Sandia v. U.S.*, 50 F.3d 856, 863 (C.A.10 1995)(failure of Forest Service to make good faith effort in identifying historic properties pursuant to regulations under the National Historic Preservation Act required reversal and remand of judgment).

### 7. Interrogatory No. 21

---

[6] Interrogatory No. 7 seeks the identity of all persons with knowledge of Defendants' decision to recognize the value of the WebHouse warrants at $188.8 million; Interrogatory No. 8 seeks the identity of all persons with knowledge of Defendants' decision to write off the value of the WebHouse warrants and take a charge in the third quarter of 2000 for $188.8 million ; and Interrogatory No. 12 seeks, *inter alia*, the identity of individuals who made the decision to carry the warrants at $188.8 million on Priceline's books.

Interrogatory No. 21 asks Defendants to identify all persons with knowledge of Hotwire.[7] Defendants object because they interpret Interrogatory No. 21 as a request for the identification of an unknown number of potential witnesses. Again, as Plaintiffs' explained during the meet and confer, Plaintiffs seek only information within Defendants' possession, custody and control. Despite Defendants' objections to the contrary, Plaintiffs are entitled to a good faith response to this interrogatory. *See* Points 5 and 6, *supra*.

### 8. Interrogatories No. 22, 23 and 24

Interrogatories No. 22, 23 and 24 seek information regarding and identification of any third party who conducted an investigation of the claims asserted in this lawsuit. Again, Defendants object because they interpret these interrogatories as a request for the identification of an unknown number of potential witnesses. Again, as Plaintiffs' explained during the meet and confer, Plaintiffs only seek an answer that is based on information reasonably available to or known to Defendants. *See* Points 5 through 7, *supra*.

### 9. Interrogatories 19 and 20

In response to Plaintiffs' First Set of Interrogatories Nos. 12, 13, and 16 which sought to ascertain the identity of manufacturers and suppliers and contractors and employees who purportedly participated in Priceline's WebHouse subsidiary, Defendants provided a list of hundreds of names of entities who Defendants contend "*may have [been] included* (but may not have been limited to)" as participants with Priceline's

---

[7] Hotwire, and Defendants' awareness of its competitive threat to Priceline's core business, is of central importance to Plaintiffs' Complaint. Plaintiffs allege that Defendants were well aware of the actual and potential threats posed by Hotwire, but nevertheless downplayed these realities to investors, thus causing the price of Priceline.com stock to be artificially inflated during the class period. *See* Complaint at ¶¶ 37, 126-130, 134.

WebHouse subsidiary. In ruling on Plaintiffs' previous Motion to Compel, the Court required Defendants to provide an affidavit describing their efforts and ability to respond more completely to such requests. Plaintiffs' Second Set of Interrogatories Nos. 19 and 20, seek to have Defendants identify those entities who actually had a relationship with Priceline's subsidiary, WebHouse, and who Defendants' listed in their prior responses. Defendants have refused to do so. While it may be that the required affidavit will obviate this dispute that remains to be seen. In any event, the fact remains that in the absence of a complete response from Defendants Plaintiffs will be forced to contact each and every one of these hundreds of individual entities who "may have been included as participants" to determine if they actually have any connection at all with Priceline. Plaintiffs believe this information is within Defendants' possession and that Defendants are simply trying to overwhelm Plaintiffs' and cause them to waste time and resources. *See* Points 5 through 8, *supra*.

## IV. CONCLUSION

For all the reasons set forth above, Plaintiffs requests that this honorable Court enter an order compelling the immediate production of the requested documents and responses to the noted interrogatories by the Priceline Defendants.

Dated: July 14, 2005          Respectfully submitted,

                 ___/s/_____
                 SCOTT + SCOTT, LLC
                 David R. Scott, Fed. Bar No. CT16080
                 Erin G. Comite, Fed Bar No. CT24886
                 108 Norwich Avenue
                 P.O. Box 192
                 Colchester, CT  06415
                 Telephone: (860) 537-5537
                 Facsimile: (860) 537-4432

                 SCOTT + SCOTT, LLC
                 Geoffrey M. Johnson
                 33 River Street
                 Chagrin Falls, OH 44022
                 Telephone:  (440) 247-8200
                 Facsimile:  (440) 247-8275

                 JOHNSON & PERKINSON
                 Dennis J. Johnson
                 Jacob B. Perkinson
                 Peter J. McDougall
                 1690 Williston Road
                 P.O. Box 2305
                 South Burlington, VT 05403
                 Telephone: (802) 862-0030
                 Facsimile: (802) 537-4432

                 STULL, STULL & BRODY
                 Jules Brody
                 Aaron Brody
                 6 East 45th Street
                 New York, New York  10017
                 Telephone: (212) 687-7230
                 Facsimile: (212) 490-2022

                 **Co-Lead Counsel**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 14, 2005, a true copy of the foregoing was served on all counsel of record on the attached service list by first-class, postage prepaid U.S. mail.

    /s/_____
David R. Scott

**SERVICE LIST**

Dennis J. Johnson
Jacob B. Perkinson
Peter J. McDougall
Johnson & Perkinson
1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403

Jules Brody
Aaron Brody
Stull, Stull & Brody
6 East 45th Street
New York, NY 10017

Andrew M. Schatz
Schatz & Nobel, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06106

J. Daniel Sagarin
Hurwitz Sagarin & Slossberg
147 North Broad St., PO Box 112
Milford, CT 06460-0112

Carl Mullis, III
Paul, Hastings, Janofsky & Walker, LLP
600 Peachtree Street, N.E. 24th Floor
Atlanta, GA 30308

Joseph L. Clasen
William Kelleher
Robinson & Cole, LLP
Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT 06904-2305

Daniel Slifkin
James Hein, Jr.
Cravath, Swaine & Moore
825 Eight Avenue
New York, NY 10019

Douglas C. Conroy
Paul, Hastings, Janofsky & Walker
1055 Washington Blvd., 9Th Floor
Stamford, C T 06901