IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

In Re: Priceline.com                          :     Master File No.
Securities Litigation                          :     3:00cv1884 (DJS)
------------------------------------------------------------     :
                                                       :
This document relates to:                     :
                                                       :
        ALL PENDING ACTIONS               :
                                                       :
                                                       :     August 3, 2005

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
THE PROPOSED CLASS REPRESENTATIVES'
<u>MOTION FOR CLASS CERTIFICATION</u>**

Joseph L. Clasen (ct04090)
ROBINSON & COLE, LLP
Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT 06904-2305
Telephone: (203) 462-7500
Fax: (203) 462-7599
jclasen@stam.rc.com

Evan R. Chesler (ct03177)
Daniel Slifkin (ct21203)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
dslifkin@cravath.com

*Attorneys for Defendants
priceline.com Inc., N.J. Nicholas,
Daniel Schulman and Richard S. Braddock*

ORAL ARGUMENT REQUESTED

Douglas C. Conroy (ct11555)
Paul R. Dehmel (ct23063)
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
1055 Washington Boulevard
Stamford, CT 06901
Telephone: (203) 961-7400
Fax : (203) 359-3031
douglasconroy@paulhastings.com
pauldehmel@paulhastings.com

J. Allen Maines (phv0013)
Carl W. Mullis (phv0158)
Summer B. Joseph (phv0160)
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
600 Peachtree Street, NE
Suite 2400
Atlanta, GA 30308
Telephone:  (404) 815-2400
Fax:  (404) 815-2424
allenmaines@paulhastings.com
carlmullis@paulhastings.com
summerjoseph@paulhastings.com

*Attorneys for Defendant
Jay S. Walker*

## Citation Conventions

The following conventions will be used throughout this Memorandum:

- "Pltf. Br." for references to the Memorandum of Law in Support of the Proposed Class Representatives' Motion for Class Certification, dated January 7, 2005.

- "Kelleher Decl." for references to the Declaration of William J. Kelleher, III, dated August 3, 2005.

- "Leisinger Dep." for references to the official transcript of the deposition of Felix Leisinger, dated June 21, 2005, attached as Exhibit C to the Kelleher Decl.

- "Ross Dep." for references to the official transcript of the deposition of R. Warren Ross, dated March 7, 2005, attached as Exhibit G to the Kelleher Decl.

- "Linton Dep." for references to the official transcript of the deposition of Thomas L. Linton, dated May 12, 2005, attached as Exhibit J to the Kelleher Decl.

- "Weiss Dep." for references to the official transcript of the deposition of Mark B.Weiss, dated May 10, 2005, attached as Exhibit M to the Kelleher Decl.

- "Egel Dep." for references to the official transcript of the deposition of Marilyn D. Egel, dated May 10, 2005, attached as Exhibit N to the Kelleher Decl.

- "Anderson Dep." for references to the official transcript of the deposition of John S. Anderson, dated April 25, 2005, attached as Exhibit O to the Kelleher Decl.

### Table of Contents

Citation Conventions ................................................................................................. i

Table of Contents ..................................................................................................... ii

Table of Authorities ................................................................................................ iv

Introduction ............................................................................................................. 1

Legal Standard ........................................................................................................ 3

Argument ................................................................................................................. 4

I.      PLAINTIFFS' CLASS CERTIFICATION PAPERS FAIL, ON THEIR
        OWN TERMS, TO DEMONSTRATE TYPICALITY AND
        ADEQUACY. ................................................................................................. 4

II.     EACH OF THE PROPOSED CLASS REPRESENTATIVES IS
        UNSUITABLE PURSUANT TO THE TYPICALITY AND/OR
        ADEQUACY REQUIREMENTS OF RULE 23(a). ....................................... 7

        A.      LEISINGER PENSION FUND .......................................................... 7

                1.      Leisinger Pension Fund has no legal existence .................... 7

                2.      Leisinger Pension Fund's claims are atypical because the Fund will
                        be subject to unique defenses concerning its reliance. ....... 9

                        a.      Leisinger Pension Fund completely abdicated investment
                                authority to a third party. ......................................... 10

                        b.      Leisinger Pension Fund believes that UBS made illegal and
                                reckless investments in stocks that it knew were overvalued. .... 13

                3.      The Fund's exclusive reliance on class counsel demonstrates that it
                        will not fairly and adequately protect the proposed class from the
                        competing interests of class counsel. .................................. 14

        B.      R. WARREN ROSS ........................................................................ 17

                1.      Ross will be subject to a unique defense because he relied exclusively
                        on a third party who believed that the market price of priceline stock
                        was incorrect. ..................................................................... 17

                        a.      Ross did not rely on the allegedly misleading statements. ........ 17

                        b.      Ross did not rely on the integrity of the market ........................ 18

Page

C.    THOMAS L. LINTON ..............................................................................21

       1.    Linton is an inadequate class representative because his deposition
             testimony lacks credibility. ................................................................21

       2.    Linton's investment strategy with respect to priceline stock is
             inconsistent with reliance on the integrity of the market...................26

D.    MARK B. WEISS.....................................................................................26

       1.    Weiss's claims are atypical because he traded almost exclusively in
             priceline put options.........................................................................26

E.    MARILYN D. EGEL................................................................................30

       1.    Egel's claims are subject to the same unique defenses as Weiss's
             claims. ...............................................................................................30

       2.    Egel is an inadequate class representative because she is unfamiliar
             with and uninvolved in this litigation. ...............................................30

       3.    Egel did not participate at all in the investments of her joint
             account. ..............................................................................................34

F.    JOHN S. ANDERSON .............................................................................35

       1.    Anderson is an inadequate class representative because he is
             unfamiliar with basic aspects of the case and is not prepared to take
             an active role in the litigation.............................................................35

III.   THE PROPOSED CLASS SHOULD BE LIMITED TO PERSONS WHO
       PURCHASED PRICELINE SECURITIES DURING THE PROPOSED
       CLASS PERIOD AND HELD THOSE SECURITIES THROUGH THE
       ALLEGED CORRECTIVE DISCLOSURE ON OCTOBER 5, 2000.................37

Conclusion ..............................................................................................................38

## Table of Authorities

Page(s)

Cases

Amara v. Cigna Corp., No. Civ. 3:01CV2361 (DJS), 2002 WL 31993224
(D. Conn. 2002) ................................................................................. 10, 21

Andrada v. Atherogenics, Inc., No. 05 Civ. 00061 (RJH), 2005 WL
912359 (S.D.N.Y. Apr. 19 2005).................................................... 27, 29

Basic Inc. v. Levinson, 485 U.S. 224 (1988)...................................... 10, 18, 29

Berger v. Compaq Computer Corp., 257 F.3d 475 (5th Cir. 2001) ................................... 6

Caridad v. Metro-North Commuter R.R., 191 F.3d 283 (2d Cir. 1999) ......................... 3, 4

Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949)........................................... 21

Cohen v. Laiti, 98 F.R.D. 581 (E.D.N.Y. 1983) ..................................................... 22, 26

Darvin v. Int'l Harvester Co., 610 F. Supp. 255 (S.D.N.Y. 1985).................................... 22

Fry v. UAL Corp., 136 F.R.D. 626 (N.D. Ill. 1991).................................................. 11, 34

Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith,
Inc., 903 F.2d 176 (2d Cir. 1990)..................................................... 9, 10

Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147 (1982) .......................................... 3, 4

Greenspan v. Brassler, 78 F.R.D. 130 (S.D.N.Y. 1978)......................................... passim

In re AM Int'l Inc. Sec. Litig., 108 F.R.D. 190 (S.D.N.Y. 1985) ..................................... 17

In re American Med. Sys., Inc., 75 F.3d 1069 (6th Cir. 1996)........................................... 4

In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156 (S.D.N.Y. 1997) ......................... 28, 29

In re Lloyd's American Trust Fund Litig., No. 96 CIV. 1262 (RWS), 1998
WL 50211 (S.D.N.Y. Feb. 6, 1998)......................................................... 31

In re Razorfish Inc. Sec. Litig., No. 00CV9474 (JSR), 2001 WL 476504
(S.D.N.Y. May 4, 2001)................................................................................ 2

Isaac v. Mount Sinai Hospital, 490 A.2d 1024 (Conn. App. 1985)........................... 7, 8, 9

J.H. Cohn & Co. v. Am. Appraisal Assocs., 628 F.2d 994 (7th Cir. 1980)..................... 10

Page(s)

Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718 (11th Cir. 1987) ............................... 15

Kline v. Wolf, 702 F.2d 400 (2d Cir. 1983) ................................................................ 22, 26

Kline v. Wolf, 88 F.R.D. 696 (S.D.N.Y. 1981), aff'd, 702 F.2d 400 (2d
    Cir. 1983) ................................................................................................................. 21

Koenig v. Benson, 117 F.R.D. 330 (S.D.N.Y. 1987) ................................................ passim

Kronfeld v. Trans World Airlines, Inc., 104 F.R.D. 50 (S.D.N.Y. 1984) ........................ 19

Landry v. Price Waterhouse Chartered Accountants, 123 F.R.D. 474
    (S.D.N.Y. 1989) ....................................................................................................... 10

Levine v. Berg, 79 F.R.D. 95 (S.D.N.Y. 1978) ......................................................... 31, 32

Locaro v. Chicago Commodity Corp., Civ. A. No. 89-1206, 1990 WL
    74250 (E.D. Pa., May 31, 1990) ............................................................................... 4

Margolis v. Caterpillar, Inc., 815 F. Supp. 1150 (C.D. Ill. 1991).................................... 27

Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072 (2d Cir. 1995)......... 14, 15, 30

Noble v. Corkin, 717 A.2d 301 (Conn. Sup. 1998) ........................................................... 7

Panzirer v. Wolf, 663 F.2d 365 (2d Cir. 1981) ................................................................ 22

Prostic v. Xerox, No. Civ. B-90-113 (EBB), 1991 WL 206770 (D. Conn.
    1991) ........................................................................................................................ 19

Rossini v. Ogilvy & Mather, Inc., 798 F.2d 590 (2d Cir. 1986)........................................ 4

Sheehan v. Purolator, Inc., 839 F.2d 99 (2d Cir. 1988) .................................................... 4

Weathers v. Peters Realty Corp., 499 F.2d 1197 (6th Cir. 1974) ...................................... 4

Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377 (D. N.J. 1998)............................. 27

Weisman v. Darneille, 78 F.R.D. 669 (S.D.N.Y. 1978) ............................................. 15, 32

West v. First Penn., No. Civ. A. 89-4730, 1991 WL 17807 (E.D. Pa. Feb.
    12, 1991) ................................................................................................................ 5, 6

Zemel Family Trust v. Philips Int'l Realty Corp., 205 F.R.D. 434
    (S.D.N.Y. 2002) ..................................................................................................... 2, 22

Page(s)

**Statutes & Rules**

Fed. R. Civ. P. 17(b) ........................................................................................... 7

Fed. R. Civ. P. 23(a) .................................................................................... passim

Fed. R. Civ. P. 23(b) ........................................................................................... 3

Defendants priceline.com Inc. ("priceline"), N. J. Nicholas,

Daniel H. Schulman, Richard S. Braddock and Jay S. Walker (collectively,

"Defendants") submit this Memorandum of Law in opposition to the proposed class

representatives' motion for class certification.

### Introduction

In this securities fraud action, plaintiffs allege that the Defendants' false

and misleading statements inflated the value of priceline's stock to the benefit of the

Defendants and to the detriment of the plaintiffs.  Plaintiffs seek damages based both on a

theory of direct reliance and on the fraud-on-the-market theory of liability.

This Court appointed as lead plaintiffs a group "composed of a large

institutional investor (Amerindo Investment Advisors, Inc. [("Amerindo")]), a pension

plan (Leisinger Pension Fund), and four individual investors, Iliana Ilieva, Joseph

Wilenkin, Mark Weiss, and Marilyn E[]gel".  (Memorandum Opinion and Order,

Sept. 12, 2001, at 3.)  In choosing that group, the Court emphasized the significance of

Amerindo's involvement:  "Amerindo, its principal constituent, is a large institutional

investor with significant monetary losses—losses that far exceed those of any other

potential class member.  As other courts have recognized, there is little doubt that

Congress envisaged this type of lead plaintiff".  (Id. at 5-6)

Less than five months later, Amerindo withdrew as a lead plaintiff

(Amerindo Investment Advisors, Inc.'s Motion for Leave to Withdraw as a Lead

Plaintiff, Feb. 5, 2002; Endorsement Order, May 30, 2002).[1]  The remaining lead

---

[1] On June 1, 2005, the Securities and Exchange Commission ("SEC") applied for
emergency relief to protect investors from an ongoing fraud concerning Amerindo, and
eight days later, a grand jury indicted the president of Amerindo, Alberto Vilar, for a

plaintiffs are unusual in the post-Private Securities Litigation Reform Act of 1995 ("PSLRA") environment, as they do not include a single institutional investor. Cf. In re Razorfish Inc. Sec. Litig., 143 F. Supp. 2d 304, 307 (S.D.N.Y. 2001) ("The theory . . . [behind the PSLRA's preference for institutional investors as lead plaintiffs] was that if an investor with a large financial stake in the litigation was made lead plaintiff, such a plaintiff—frequently a large institution or otherwise sophisticated investor—would be motivated to act like a 'real' client, carefully choosing counsel and monitoring counsel's performance to make sure that adequate representation was delivered at a reasonable price."). Instead, the lead plaintiffs are now four individuals and the Leisinger Pension Fund (which, discovery has revealed, was not a pension fund and no longer exists).

The proposed class representatives are also unusual post-PSLRA, as they too do not include a large institutional investor. See Zemel Family Trust v. Philips Int'l Realty Corp., 205 F.R.D. 434, 437 (S.D.N.Y. 2002) ("plaintiff is a non-institutional investor, and therefore a less than ideal class representative under the PSLRA"). In their class certification papers, plaintiffs presented eight proposed class representatives. Since those papers were filed, three of the eight proposed class representatives have withdrawn, and plaintiffs have asked that the Court consider a new proposed class representative. (Notice of Substitution of Proposed Class Representative, April 26, 2005.) The proposed class representatives now include five individuals (R. Warren Ross, Thomas Linton, Mark Weiss, Marilyn Egel and John Anderson) and the Leisinger Pension Fund (which does not exist).

---

variety of offenses. (SEC v. Amerindo Investment Advisers Inc., 05 CV 5231 (S.D.N.Y.), Memorandum of Law, June 1, 2005; United States v. Alberto William Vilar, 05 CRIM. 621 (S.D.N.Y.), Indictment, June 9, 2005.)

-2-

Those proposed class representatives (collectively, the "Plaintiffs") seek to represent a class of purchasers of priceline securities from January 27, 2000 to October 4, 2000 ("the Class Period"). (Pltf. Br. at 2.) However, the Plaintiffs have not provided any factual basis for their assertions that they satisfy the "typicality" and "adequacy" requirements of Fed. R. Civ. P. 23(a), and accordingly, their motion and accompanying memorandum of law fail on their own terms to satisfy Plaintiffs' burden. In addition, the Plaintiffs' deposition testimony and other class-certification-related discovery demonstrate that they are, in fact, unsuitable class representatives. Further, Plaintiffs' definition of the proposed class violates settled Supreme Court and Second Circuit precedent. Therefore, their motion for class certification should be denied.

### Legal Standard

To maintain this case as a class action, the Plaintiffs bear the burden of establishing the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or facts common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class". Fed. R. Civ. P. 23(a); see Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999). Once the Rule 23(a) requirements are satisfied, the Plaintiffs must also satisfy one of the requirements of Fed. R. Civ. P. 23(b).

A trial court cannot permit an action to proceed as a class action unless it determines, "after a rigorous analysis", that each of the elements of Rule 23(a) has, in fact, been established. Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982).

-3-

**Argument**

I.    **PLAINTIFFS' CLASS CERTIFICATION PAPERS FAIL, ON THEIR**
      **OWN TERMS, TO DEMONSTRATE TYPICALITY AND ADEQUACY.**

The Supreme Court and the Second Circuit have clearly pronounced that the prerequisites to a class action under Rule 23(a) cannot be presumed and that the party seeking class certification bears the burden of establishing each of them. Falcon, 457 U.S. at 157-59; Caridad, 191 F.3d at 291; Sheehan v. Purolator, Inc., 839 F.2d 99, 103 (2d Cir. 1988); Rossini v. Ogilvy & Mather, Inc., 798 F.2d 590, 597-98 (2d Cir. 1986). Accordingly, proposed class representatives must do more than parrot back to the Court the Rule 23(a) requirements and then baldly assert that they satisfy those requirements. "Mere repetition of the language of Rule 23(a) is not sufficient. There must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled." In re American Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996) (quoting Weathers v. Peters Realty Corp., 499 F.2d 1197, 1200 (6th Cir. 1974) (citation omitted)) (emphasis added).

In In re American Med., the Sixth Circuit found class certification inappropriate where "plaintiffs' complaint and class certification motion simply allege[d] the elements of Rule 23(a) in conclusory terms". 75 F.3d at 1083. Similarly, in Locaro v. Chicago Commodity Corp., Civ. A. No. 89-1206, 1990 WL 74250 (E.D. Pa., May 31, 1990), the court denied class certification, stating "[t]here is nothing, other than conclusory statements, both in the c[o]mplaint and in the motion for class certification from which the Court can determine whether [the Rule 23(a) requirements are met]". Id. at *1.

-4-

In <u>West v. First Pa. Bank</u>, Civ. A. No. 89-4730, 1991 WL 17807
(E.D. Pa., Feb. 12, 1991), the court explained that plaintiff's "memorandum of law in
support of her motion [for class certification], in which she repeats the language of
Rule 23 . . . but provides no additional factual basis for her class claims" did not satisfy
"<u>her burden of establishing as a threshold matter</u>" the Rule 23(a) requirements. <u>Id.</u> at *2
(emphasis added). The court in <u>West</u> was "unable to subject [plaintiff's] motion for class
certification to the 'rigorous analysis' required under <u>Falcon</u>", given "the conclusory
nature of plaintiff's submission". <u>Id.</u> at *3. In fact, the court in <u>West</u> did not even
consider the substantive objections to class certification raised by the defendant because
plaintiff's memorandum of law in support of her motion was simply insufficient on its
own terms. <u>Id.</u>

   Here, the proposed class representatives' memorandum of law in support
of their motion fails, as a threshold matter, to demonstrate that they can satisfy the
adequacy and typicality prongs of Rule 23(a). In their memorandum, Plaintiffs merely
parrot back to the Court those two Rule 23(a) requirements and then state that those
requirements are satisfied. Thus, after citing various cases, the sum total of plaintiffs'
showing on typicality is as follows:

> "Here, the Proposed Class Representatives, like the absent Class members,
> purchased Priceline securities during the Class Period at prices that were
> artificially inflated due to Defendants' material misrepresentations, and
> suffered losses as a result thereof. Moreover, the Proposed Class
> Representatives' claims are based upon the same facts and legal theories
> as the rest of the Class. As stated above, so long as there is a nexus
> between the class representative's claims and the common questions of
> fact or law that unite the class, typicality is satisfied. Accordingly, the
> Proposed Class Representatives satisfy the typicality requirement."

(Pltf. Br. at 13). Those conclusory statements cannot satisfy Plaintiffs' burden of
affirmatively establishing their typicality. Indeed, those sentences are so generic that

they could easily be included in the class certification papers filed in almost any case of alleged securities fraud—making a mockery of the entire inquiry.

With respect to adequacy, the proposed class representatives state that "their interests are not antagonistic to those of the Class" because "all members of the Class allege claims arising from the same wrongful conduct and are based on the same legal theories as [their] claims". (Pltf. Br. at 14.) Plaintiffs also add that "Lead Plaintiffs have retained counsel with considerable experience in securities class actions and complex litigation". (Id.) Again, those statements are entirely generic. They cannot be enough to satisfy the adequacy requirement, which implicates the due process rights of all class members who would be bound by a judgment. See Berger v. Compaq Computer Corp., 257 F.3d 475, 480 (5th Cir. 2001).

Plaintiffs do not provide any factual basis for their conclusory assertions. Indeed, there is not a single factual statement with respect to any of the specific individuals put forward as proposed class representatives. Under those circumstances, the Court need not, and should not, go any further. See West, 1991 WL 17807, at *2-3. Nor should Plaintiffs be afforded an opportunity to provide the required factual basis in their reply brief. Following the receipt of Plaintiffs' motion for class certification, Defendants' served Plaintiffs with class-certification-related discovery requests, which sought the factual bases for the conclusory statements in their brief. Plaintiffs, however, refused to provide any factual basis in response.[2] (See, e.g., Plaintiff's [Ross's]

---

[2] In a letter to Plaintiffs' counsel dated June 3, 2005, counsel for Defendants explained:

"The reason that we served those requests on you is very simple: Plaintiffs have the burden of satisfying the prerequisites for class

Responses and Objections to Defendants' Second Set of Interrogatories and Requests for

the Production of Documents, February 17, 2005, Document Requests 1-3 and

Interrogatories 1-4, attached as Exh. B to the Kelleher Decl.)  They should not be heard

to offer one now.

## II.   EACH OF THE PROPOSED CLASS REPRESENTATIVES IS UNSUITABLE PURSUANT TO THE TYPICALITY AND/OR ADEQUACY REQUIREMENTS OF RULE 23(a).

In this section of our brief, we describe and analyze the evidence gathered

with respect to each proposed class representative.  As described below, each one has

serious—and disqualifying—problems.

### A.   LEISINGER PENSION FUND

#### 1.   Leisinger Pension Fund has no legal existence.

A plaintiff that does not have a legal existence cannot bring suit.  <u>Isaac v.

Mount Sinai Hosp.</u>, 490 A.2d 1024, 1026 (Conn. App. Ct. 1985); <u>Noble v. Corkin</u>, 717

A.2d 301, 332 (Conn. Super. Ct. 1998); <u>see</u> Fed. R. Civ. P. 17(b) ("capacity to sue or be

sued shall be determined by the law of the state in which the district court is held").

Leisinger Pension Fund (the "Fund") is a proposed class representative.

(Pltf. Br. at 2.)  Felix Leisinger, who resides in London, England, purported to testify on

---

certification, but in your memorandum of law accompanying plaintiffs'
motion for class certification, you made no effort to provide any factual
support for your assertions that plaintiffs have satisfied those prerequisites.
Accordingly, we were forced to seek through interrogatories the
evidentiary basis for the statements in your papers.  You refused to
provide any factual basis in response, which, we can only assume, is
because such a factual basis does not exist.  That is something that we will
surely bring to the Court's attention in our papers opposing class
certification."

(Letter from James G. Hein, Jr. to Jacob B. Perkinson, dated June 3, 2005, at ¶ 6,
pp. 2-3, attached as Exh. A to the Kelleher Decl.)

behalf of the Fund. (Leisinger Dep., attached as Exh. C to the Kelleher Decl., at 36:19-20, 96:12-23.) He testified, however, that the Fund no longer exists.

> "Q: Who is running The Fund today?
>
> "A: Today?
>
> "Q: Today.
>
> "A: There is no Fund today.
>
> "Q: When did The Fund get dissolved?
>
> "A: It wasn't dissolved, it was destroyed.
>
> "Q: When was it destroyed?
>
> "A: In the year 2000.
>
> "Q: Okay.
>   When you say destroyed, what do you mean?
>
> "A: The assets of The Fund were -- were -- disappeared.
>
> "Q: All of the assets disappeared?
>
> "A: 99 percent or thereabouts.
>
> "Q: Does The Fund still exist today?
>
> "A: No.
>
> "Q: Is there any money in the Fund?
>
> "A: No."

(Id. at 8:20-9:14.)

Because the Fund does not exist, it can have no legal status and, therefore, no capacity to be a plaintiff. Isaac, 490 A.2d at 1026. Indeed, the record here reveals no evidence that the Fund ever had a legal existence. The Fund is not incorporated anywhere (Leisinger Dep. at 99:3-5), and, it seems, was nothing more than a Swiss bank account. Mr. Leisinger testified that the Leisinger Pension Fund was "a fund to look after

-8-

the welfare of the Leisinger Family", created under the law of Switzerland. (Id. at 5:18-23.) However, no documentation was ever produced corroborating that. In his response to Interrogatory No. 5 (Exh. D to the Kelleher Decl. at 8), Mr. Leisinger described the Fund as a "family investment vehicle". He testified that "a family investment vehicle" is "where you pool the family savings to provide for rainy days, retirement and education, and—and unforeseen emergencies, medical, dental, that kind of thing". (Leisinger Dep. at 73:21-24.) But that is not evidence—and there is no evidence—that the Fund is or ever was an actual legal entity, with legal capacity to sue. See Isaac, 490 A.2d at 1026 ("Not having a legal existence, [an estate] can neither sue nor be sued.").

Further, even if the Fund does have a legal existence, Mr. Leisinger, who purported to testify on the Fund's behalf, cannot show that he has any authority to represent the Fund. No one on the Fund's behalf authorized Leisinger to be the Fund's representative (Leisinger Dep. at 99:18-20), and there is no record showing that Leisinger has or ever had any authority with respect to the Fund (id. at 101:7-23, 104:5-14.) He has no title at the Fund (id. at 7:7-8), "was not responsible in any way" for the management of the Fund (id. at 131:16-20), and did not participate in any of the Fund's investment decisions (id. at 32:24-35:13, 14:2-9). Mr. Leisinger is thus unequipped to represent both the Fund and the proposed class that the Fund seeks to represent.

2.    **Leisinger Pension Fund's claims are atypical because the Fund will be subject to unique defenses concerning its reliance.**

The Second Circuit has held that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation". Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner &

Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990). The concern is that "absent class members will suffer if their representative is preoccupied with defenses unique to it". Id.

Importantly, as this Court explained in Amara v. Cigna Corp., No. Civ. 3:01CV2361 (DJS), 2002 WL 31993224 (D. Conn. Dec. 20, 2002) (Squatrito, J.), "'the presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation'". Id. at *3 (quoting J.H. Cohn & Co. v. Am. Appraisal Assocs., 628 F.2d 994, 999 (7th Cir. 1980). At the class certification stage, therefore, Defendants need not demonstrate that a particular defense will succeed; the mere fact that a unique defense will be raised against a proposed representative is sufficient to make him or her an inappropriate class representative. Landry v. Price Waterhouse Chartered Accountants, 123 F.R.D. 474, 476 (S.D.N.Y. 1989).

Reliance is an essential element in a securities fraud action. Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988). Accordingly, a proposed class representative who cannot show reliance will be subject to a unique defense.

### a. Leisinger Pension Fund completely abdicated investment authority to a third party.

A securities plaintiff that has completely abdicated investment authority to a third party will be subject to unique defenses. See Fry v. UAL Corp., 136 F.R.D. 626, 636 (N.D. Ill. 1991). "[A] certain minimal level of participation by the plaintiff in the relevant stock transaction must be demonstrated" in order for the plaintiff to be a suitable class representative. Id. at 635 (citing, as an example of such minimal participation, "[o]n-going discussions with the person executing the relevant stock transactions").

-10-

In <u>Fry</u>, the court found a proposed class representative to be unsuitable where (1) another party had discretionary authority over his account, (2) he did not follow the affairs of the defendant corporation, and (3) he was not even aware that he had purchased the securities until after the fact. 136 F.R.D. at 635-636. The court explained that "[t]he cases do not support a finding that someone who abdicated complete authority over his relevant financial affairs can be found an adequate representative". <u>Id.</u> at 636.

Leisinger Pension Fund completely abdicated authority over its financial affairs to UBS. Mr. Leisinger testified that UBS managed the Fund exclusively and made all decisions concerning the Fund's investments without any input from or consultation with the Fund. (<u>See</u> Leisinger Dep. at 6:25-7:4, 7:18-8:5, 131:16-20.) He testified that neither he, nor anyone else affiliated with the Fund, was consulted by UBS regarding any of the investments made on the Fund's behalf, including the Fund's investments in priceline.

> "Q: First, it was Swiss Bank, then UBS, they are the ones that decided what to invest in for The Fund?
>
> "A: Yes.
>
> "Q: Before they made the investments, they didn't tell you what they were investing in; is that correct?
>
> "A: Yes.
>
> "Q: And -- and they didn't tell you why they were investing in any particular investment; correct?
>
> "A: Yes.
>
> "Q: And you -- and you have no idea today why they made any particular investment; right?
>
> "A: No.
>
> "Q: And that is true -- we are talking about all of the investments here including Priceline? That's your answer as to all of these; right?

-11-

"A:  Yes.

"Q:  Indeed, you didn't participate in the decision to buy the Priceline stock on behalf of The Fund; right?

"A:  No.

"Q:  You have no idea why the decision was made to buy the Priceline; right?

. . . .

"A:  No, no.

"Q:  You didn't even know that it was being bought at that time, okay, other than you might have seen something, you think; right?

"A:  That is correct.

"Q:  Indeed, you said a few minutes ago, you were not getting statements showing buys and sells; right?

"A:  Right.

. . . .

"Q:  Okay.
      Ultimately, the Priceline stock was sold.  Did you participate in the decision to sell the Priceline stock?

"A:  No.

"Q:  Do you know why?  Did UBS tell you why they were selling it?

"A:  No.

"Q:  Okay.
      It was their decision to sell it; correct?

"A.  Yes.

"Q:  Neither you, nor any member of your family participated in any of the decisions to buy or sell the Priceline stock?

"A.  Never participated in any of these decisions.

"Q:  And you don't even know why UBS actually decided what to buy or sell any of the Priceline stock at any particular points in time; right?

-12-

"A. Yes."

(Id. at 32:24-35:13; see also 18:20-20:21; 26:13-22.)

If the Fund is allowed to proceed as a class representative, its total abdication of authority over its financial affairs to UBS will become a focus of the litigation, to the prejudice of the rest of the proposed class.

> **b.      Leisinger Pension Fund believes that UBS made illegal and reckless investments in stocks that it knew were overvalued.**

In cases where a proposed class representative did participate in the decision to purchase the defendant's stock, but relied exclusively on a third party source in making that purchase decision, courts hold that the proposed class representative's claim is atypical of other fraud-on-the-market claims if the third party source did not itself rely on the integrity of the market. Koenig v. Benson, 117 F.R.D. 330, 337-38 (E.D.N.Y. 1987); Greenspan v. Brassler, 78 F.R.D. 130, 132 (S.D.N.Y. 1978).[3]

According to Mr. Leisinger, UBS knew that the investments it was making for the Fund were "illegal" and that the stocks it was buying for the Fund were overpriced. In an August 28, 2001 letter to UBS, Mr. Leisinger, on behalf of the Fund, asked UBS the following questions, among others:

> •      "Why did you carry out, execute and transact illegal stock market transactions on the United States stock exchanges - as from March 2000 - knowing that the market was grossly overvalued, overbought and on the verge of an equally long and overdue decline?" (Leisinger Exh. 2 at ¶ 17 (emphasis added), attached as Exh. E to the Kelleher Decl.)[4]

---

[3] Koenig and Greenspan are discussed in detail below in Section II.B.1.b. (pp. 18-19).

[4] Mr. Leisinger acknowledged that he was the author of the letter marked as Leisinger Exhibit 2. (Leisinger Dep. at 54:22-23.)

- "Why did you misappropriate the assets of the beneficiaries of the Leisinger Family Pension Fund . . . when predictably the stock market collapsed within three weeks of your commencing to transact and execute totally unsuitable, high risk and inappropriate US stock market transactions?" (Id. at ¶ 20.)

- "Why did you commence in March 2000 to buy and/or execute and transact US stocks at their most overvalued and overbought prices and sell the same stocks at their lowest and oversold prices." (Id. at ¶ 23.)

Mr. Leisinger testified that UBS's transactions in priceline stock on behalf of the Fund were among the transactions to which the Fund was referring in that letter. (Leisinger Dep. at 60:22-61:2).

> "Q: . . . . Is it your contention that when UBS purchased the Priceline stock for The Fund, that constituted an illegal stock market transaction?
>
> . . . .
>
> "A: I obviously believed it, yes."

(Id. at 61:3-11.)

The Fund's accusations against UBS are plainly inconsistent with its claim that it relied on the integrity of the market. If UBS believed that the market price of priceline stock was not accurate, as the Fund asserted in its letter, then the Fund cannot establish the reliance element of its claim. Accordingly, if the Fund is allowed to proceed as a class representative, it will need to devote considerable time responding to this defense.

3.    **The Fund's exclusive reliance on class counsel demonstrates that it will not fairly and adequately protect the proposed class from the competing interests of class counsel.**

The Second Circuit has held that "class certification may properly be denied 'where the class representatives ha[ve] so little knowledge of and involvement in

-14-

the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys'". <u>Maywalt v. Parker & Parsley Petroleum Co.</u>, 67 F.3d 1072, 1077-78 (2d Cir. 1995) (quoting <u>Kirkpatrick v. J.C. Bradford & Co.</u>, 827 F.2d 718, 727 (11th Cir. 1987)). In <u>Greenspan</u>, for example, the court found the proposed class representatives inadequate because, among other things, they appeared to place undue emphasis on their counsel's ability to conduct the litigation. 78 F.R.D. at 133-34; <u>see also</u> <u>Weisman v. Darneille</u>, 78 F.R.D. 669, 671 (S.D.N.Y. 1978) ("Plaintiff's evident willingness to rely on class counsel's ability to protect the interests of the class is inconsistent with the participation required of an adequate class representative.").

Mr. Leisinger testified that he understood his duties as a class representative to involve showing up for depositions and court appearances at his attorneys' request, and nothing more. (Leisinger Dep. at 90:9-91:4.) He also testified that he signed his responses to Defendants' first and second sets of interrogatories without first reading them to verify that they were correct. (<u>Id.</u> at 124:23-125:9, 131:21-132:20.) In fact, he testified that he is in the habit of signing documents even though he has not read them. (<u>Id.</u> at 126:13-15.) With respect to his responses to Defendants' first set of interrogatories, Mr. Leisinger explained: "I relied entirely on my lawyers to have represented all of the facts as should be represented". (<u>Id.</u> at 127:6-8, 128:4-5.)

As a result of the Fund's failure to supervise class counsel properly, serious errors appeared in the Fund's responses to Defendants' first and second sets of interrogatories. In the Fund's responses to the first set of interrogatories, class counsel referred to Mr. Leisinger as "the Settler and Trustee of the Leisinger Pension Fund". (<u>Id.</u>

-15-

at 76:9-13; Exh. F to the Kelleher Decl. at 5.) That was untrue. (Leisinger Dep. at 76:14-

77:9.) Then, in the Fund's responses to the second set of interrogatories, class counsel

stated that Mr. Leisinger managed the Fund. (Id. at 131:9-13; Exh. D to the Kelleher

Decl. at 8.) That too was untrue. (Leisinger Dep. at 131:16-20.) To his credit, Mr.

Leisinger apparently notified class counsel of those errors as soon as he discovered them,

which was apparently months before his deposition in June. (Id. at 76:3-77:9, 128:15-

129:5.) But class counsel did not serve Leisinger Pension Fund's amended responses to

Defendants' first and second sets of interrogatories until June 17, 2005, approximately

five and four months respectively from the service of the Fund's original sets of

responses, and just two business days prior to Mr. Leisinger's deposition.

       The Fund's exclusive reliance on class counsel thus far casts serious doubt

on its ability and willingness to supervise class counsel going forward.[5]

---

[5] Mr. Leisinger further testified that he did not have any idea what the claims against
the Defendants are and could not testify about them. (Leisinger Dep. at 90:6-8.) By
contrast, he purported to be knowledgeable, and was willing to testify, about life on the
planet Mars:

> "Q: When do you believe there were people living on Mars?
>
> "A: Millions of years ago.
>
> "Q: And what did you believe that they did to destroy Mars?
>
> "A: They did what everybody is doing now.
>
> "Q: What is that, sir? What do you believe that the Martians did millions
> of years ago to destroy Mars?
>
> "A: Overindustrialization, overurbanization, over, overpoisoning the
> planet with pesticides, algaecides . . . ."

(Id. at 129:16-130:5; see also id. at 119:7-120:7.)

B.    R. WARREN ROSS

1.    <u>Ross will be subject to a unique defense because he relied exclusively on a third party who believed that the market price of priceline stock was incorrect.</u>

A proposed class representative "who clearly did not rely upon either the allegedly misleading [statements] or on the integrity of market price or information is subject to unique defenses, and therefore may not represent the class". <u>In re AM Int'l Inc. Sec. Litig.</u>, 108 F.R.D. 190, 195 (S.D.N.Y. 1985). During his deposition, Mr. Ross made clear that he relied on neither the allegedly misleading statements nor the integrity of the market in deciding to purchase priceline stock.

a.    **Ross did not rely on the allegedly misleading statements.**

During his deposition, Mr. Ross was shown each of the press releases that this Court had previously identified as the allegedly misleading statements by Defendants. (Memorandum Opinion and Order, dated October 7, 2004, at 22, 37, 42; Ross Dep., attached as Exh. G to the Kelleher Decl., at 84:3-85:24, 88:9-91:7.) Mr. Ross admitted that he had never seen any of those press releases and had not relied upon any of them in purchasing priceline stock.

"Q:  I take it in purchasing your Priceline stock, you did not rely upon any of those press releases.

"A:  That's correct."

(Ross Dep. at 91:5-7.) In fact, Mr. Ross did not look at any of priceline's publicly-filed financial statements or press releases prior to purchasing priceline stock. (<u>Id.</u> at 59:13-19,

-17-

73:23-74:2.) (The record evidence from each of the proposed class representatives does not show direct reliance by any of them.)[6]

  Accordingly, Ross's claims cannot proceed on a theory of direct reliance and his claims would have to proceed under the fraud-on-the-market theory of reliance.

     **b. Ross did not rely on the integrity of the market.**

  Although reliance is presumed under the fraud on the market theory, the law is plain that the presumption of reliance may be rebutted by showing that the plaintiff did not rely on the market price in purchasing the securities at issue. Basic, 485 U.S. at 248. As noted above in Section II.A.2.b. (p. 13), where a plaintiff relied exclusively on a third party in making the purchase decision, the plaintiff's claim is atypical of other fraud-on-the-market claims if the third party did not rely on the integrity of the market in recommending or otherwise participating in plaintiff's purchase. Koenig, 117 F.R.D. at 337-38; Greenspan, 78 F.R.D. at 132.

  In Greenspan, for example, the court held that the plaintiffs' "possible reliance on their brother Noah's recommendation" made them "subject to defenses not applicable to other class members". Id. at 132. The court noted that the plaintiffs' brother was "a professional investor with stockholdings in several real estate investment

---

 [6] According to the Consolidated Amended Complaint, the Plaintiffs' claims are based on both direct reliance and the fraud-on-the-market theory of reliance. (Complaint ¶ 208.) In their class certification papers, Plaintiffs state that "the possibility of individualized proof of reliance is not an impediment to certification" because "the Proposed Class Representatives enjoy the benefit of the 'fraud on the market' presumption". (Pltf. Br. at 16.) Plaintiffs' class certification papers do not mention direct reliance, and as noted above, there is no record evidence from any of the proposed class representatives to support such a theory. If Plaintiffs are still maintaining the argument that this action should be certified on a direct reliance theory, then they should plainly say so and this Court should deny such a class because none of the proposed class representatives can proceed on that theory.

trusts" and had "based his [stock] recommendation [to plaintiffs] on a generalized faith in such trusts, rather than on the market's integrity". Id. at 132 n.6. The Court concluded that "[p]laintiffs' possible reliance on another's expertise is sufficient to vitiate the typicality of their claims". Id. at 132. Similarly, in Koenig, one of the proposed class representatives bought the stock at issue believing it to be a conservative stock based on the recommendation of his son. 117 F.R.D. at 338. The respective testimony of father and son indicated that the son may not have informed his father of certain publicly available information about the company's losses bearing on the risks associated with the stock. Id. "If . . . [the son] did not inform his father of these losses," the court explained, "then his father did not rely upon publicly available information, i.e., the integrity of the market, when he made his purchase." Id. The court went on to state:

> "Clearly, there is no bar to the use of secondary sources as long as those sources are based upon the financial reports of the company in making an analysis. This pertains to personal advice as well as to publications . . . . The implicit assumption . . . is that the secondary source accurately conveys the publicly available information about the company in making an analysis or summary for the prospective investor."

Id. Consistent with the approach in Koenig and Greenspan, in Prostic v. Xerox Corp., Civ. No. B-90-113 (EBB), 1991 WL 206770 (D. Conn. July 19, 1991), Chief Judge Burns explained that a proposed class representative's reliance on the advice of his investment manager would be relevant to the typicality of the proposed representative's claims if his adviser had "'relied upon factors wholly extraneous to the market'". Id. at *3 (quoting Kronfeld v. Trans World Airlines, Inc., 104 F.R.D. 50, 54 n.8 (S.D.N.Y. 1984)).

   Here, Mr. Ross testified that in making his decision to purchase priceline stock, he relied exclusively on a friend who believed that the market price of priceline

stock was incorrect. On the day he purchased priceline stock, Mr. Ross had a

conversation with William Markell, a friend of more than 50 years who had been

investing in securities for decades. (Ross Dep. at 60:15-23, 62:20-22.) Mr. Ross testified

that Markell "made the purchase [of priceline stock] from his loft on the computer and

came dashing downstairs and told me he had done it, talked at length about the

management of the company, the competency of the management of the company. . . . .

And I acceded to what he had done; i.e., the purchase, and also purchased stock in

Priceline." (Id. at 62:7-19.) Mr. Ross explained that he purchased priceline stock 15

minutes after Markell purchased it (id. at 61:23-25), and that "100 percent" of the

immediate impetus of buying the stock was his conversation with Markell (id. at 65:7-9).

> "Q: . . . . Were you aware of what Priceline's stock had been in the months prior to your purchase?
>
> "A: It had -- yes, it had reached 100 I believe, maybe more.
>
> "Q: When you bought it it was --
>
> "A: About $25 a share.
>
> "Q: So it had fallen significantly.
>
> "A: Yes.
>
> "Q: Was it your view that the market was undervaluing Priceline stock when you bought it?
>
> "A: It was clearly his view and I acceded to that.
>
> "Q: <u>His view was that the market was getting the price wrong and really it should be at a higher price?</u>
>
> "A: <u>Yes.</u>
>
> "Q: <u>And you took -- that was your understanding, too.</u>
>
> "A: <u>I acceded to that, that's correct. If I hadn't, I wouldn't have purchased it.</u>

. . . .

> "Q: And so ultimately your view was the market was undervaluing
> Priceline and you thought this was an opportunity to double your
> money, right?

. . . .

> "A: That's correct."

(Id. at 65:25-66:20, 71:5-10 (emphasis added).)  Mr. Ross further explained that his

purchase of priceline stock "was an impulse just based upon the gospel from a very

successful investor".  (Id. at 73:23-74:2.)

Because both Mr. Ross and Mr. Markell believed that the market price of

priceline stock was incorrect, Ross's claims are subject to a defense of non-reliance.  As

noted above, Defendants need not conclusively show that the presumption of reliance is

rebutted.  To establish that Ross's claim is atypical, it is enough that Ross will be subject

to a unique defense that will become a focus of the litigation and thus prejudice the class.

Amara, 2002 WL 31993224, at *3.

### C.    THOMAS L. LINTON

#### 1.    Linton is an inadequate class representative because his deposition testimony lacks credibility.

A class representative serves as a fiduciary to the proposed class.  Cohen

v. Beneficial Indus. Loan Corp., 337 U.S. 541, 549-50 (1949).  The latter's "interests are

entrusted to the fiduciary's diligence and industry and the successful protection of the

class claims depends upon his integrity".  Kline v. Wolf, 88 F.R.D. 696, 700 (S.D.N.Y.

1981), aff'd, 702 F.2d 400 (2d Cir. 1983).  As a result of this fiduciary status, a plaintiff's

credibility is an important factor in determining his or her adequacy as a class

representative.

-21-

In <u>Kline v. Wolf</u>, 702 F.2d 400 (2d Cir. 1983), the Second Circuit affirmed the district court's finding of inadequacy with respect to two plaintiffs whose credibility was called into question. <u>Id.</u> at 401-03. One of the plaintiffs in <u>Kline</u> testified that he had relied on a report that did not exist at the time he allegedly relied on it. <u>Id.</u> at 403. The other plaintiff gave testimony that conflicted with the testimony of his broker. <u>Id.</u> The Second Circuit noted that "[e]ven if this testimony was the product of an innocent mistake, it subjects [plaintiff's] credibility to serious question". <u>Id.</u> The court held that at the class certification stage, a "preliminary finding [on credibility] is sufficient". <u>Id.</u> Similarly, in <u>Panzirer v. Wolf</u>, 663 F.2d 365 (2d Cir. 1981), the Second Circuit affirmed the district court's denial of class certification on the ground that plaintiff's lack of credibility made her an inadequate class representative. <u>Id.</u> at 369. The proposed class representative in <u>Panzirer</u> "gave no less than four versions of her conversation with her broker". <u>Id.</u> at 368.

In <u>Cohen v. Laiti</u>, 98 F.R.D. 581 (E.D.N.Y. 1983), class certification was denied because the proposed class representative's testimony regarding his decision to purchase the securities at issue was directly contradicted by his broker's testimony. <u>Id.</u> at 582-83. Likewise, in <u>Darvin v. Int'l Harvester Co.</u>, 610 F. Supp. 255 (S.D.N.Y. 1985), the court held that inconsistencies in the proposed class representative's deposition testimony were sufficient to deny the motion for class certification. <u>Id.</u> at 256-57. The court explained that "inconsistent testimony could create serious problems with respect to plaintiff's credibility and could become the focus of cross examination and unique defenses at trial to the detriment of the class". <u>Id.</u> at 257; <u>see also</u> <u>Zemel</u>, 205 F.R.D. at 437 (Cederbaum, J.).

Here, Mr. Linton's testimony regarding his purchase of priceline stock contained numerous contradictions and inconsistencies that call into serious question his adequacy to serve as a fiduciary for the proposed class.

Mr. Linton's investment strategy with respect to priceline was plain from the face of the documents he produced, specifically his brokerage account statements. Mr. Linton purchased 2,000 shares of priceline on September 11, 2000 at a price of $26.875. (TL 0002-0003, attached as Exh. H to the Kelleher Decl.) Eight days later, on September 19, 2000, he placed a sell order instructing his brokerage house, Ameritrade, to sell all of those shares if and when they reached a price of $28.25 before October 31, 2000. (TL 0003, attached as Exh. H to the Kelleher Decl.) The sell price that Mr. Linton ordered was less than $1.50 more than the price at which he purchased his shares. In the ten days leading up to Mr. Linton's purchase of priceline stock, priceline's stock price fluctuated between $25.75 and $28.94. (See Exh. I to the Kelleher Decl.) Given those facts, Mr. Linton was clearly looking at the volatility of the stock price leading up to September 11, 2000 and hoping that the price would pop up slightly, allowing him to make a quick profit.

However, in direct contradiction to the evidence that he bought priceline stock in expectation of a quick profit, Mr. Linton started his deposition testimony by stating unequivocally that he purchased priceline stock to hold as a long-term investment.

"Q: What kind of return were you looking for on the stock?

"A: I don't recall setting a price.

. . . .

"Q: Did you have down a base line or some general idea of how much profit you wanted to make on your Priceline stock?

"A: Actually, it was a long-term hold, it was one that you think about that.

"Q: You planned to hold the stock over the long term?

"A: Yes.

(Linton Dep., attached as Exh. J to the Kelleher Decl., at 32:21-33-13.)

"Q: Was there a specific price at which you no longer wanted to own the stock?

"A: . . . . I don't think I had the time to figure out if I was going to sell it at a certain price. . . . . "

(Id. at 40:11-18.)

"Q: Did I hear you testify earlier that you were holding your Priceline stock for the long term?

"A: Yes."

(Id. at 141:4-7; see also id. at 141:11-13.)

"Q: So when you bought it in September, you expected stock to go up and you believed you were going to hold it for a long time?

"A: Yes.

. . . .

"Q: You didn't have any idea of what you thought the stock would go up to?

"A: When you buy stock, you don't, I mean not normally unless you're a swing trader and you're going to look for a couple of days, you don't actually set up a price to sell it. I don't anyway. Really if it's long term, you figure it's going up and you don't worry about it. You just watch it and you make your decision, at the time you make your decision."

(Id. at 142:5-24 (emphasis added); see also id. at 142:25-143:24.)

All of that testimony was given after Mr. Linton was shown the page of

his Ameritrade brokerage statement that indicated the sell order on his priceline stock.

(Id. at 16:13-17:3.) He testified that he did not know what the indicated entry was and

-24-

stated that "it doesn't mean sell" and that "I think that's just the way they set it up. It's really not a sell." (<u>Id.</u> at 17:4-23.)

Then, near the end of his deposition, Mr. Linton's testimony began to change course:

> "Q: Well, if you were holding for long term, . . . could you tell me why you had a sell order on it at 28.25? Sir, do you know what I mean by sell order 28.25?
>
> "A: Sure.
>
> "Q: You did have a sell order of 28.25?
>
> "A: I would sell it."

(<u>Id.</u> at 143:25-144:10.)

Mr. Linton next testified that he did not know whether he had a sell order or not (<u>id.</u> at 144:11-16), and that he didn't recall instructing Ameritrade to sell the priceline shares at $28.25 (<u>id.</u> at 144:17-145:5). And then, finally, he admitted: "I had a sell, looks like I had a sell for 28.25." (<u>Id.</u> at 145:18-21.)

Mr. Linton's testimony is particularly incredible given that his Ameritrade brokerage account statements reveal that he placed sell orders on many of the stocks he held, and did so with some frequency. (<u>See</u> Exh. K to the Kelleher Decl.) Mr. Linton was a sophisticated investor who monitored his investments every day (Linton Dep. at 27:4-6), had approximately two hundred thousand dollars invested in the stock market in the year 2000 (<u>id.</u> at 26:18-27:3), and has approximately the same amount invested in the stock market today (<u>id.</u> at 28:3-10). The existence, and his final admission, of the sell order undermines most of his testimony regarding his purchase of priceline stock and directly implicates his credibility. Even if the contradictions and inconsistencies contained in Linton's testimony are the product of innocent mistakes, they are still

-25-

sufficient to call his adequacy as a proposed class representative into question. <u>See</u>

<u>Kline</u>, 702 F.2d at 403. A preliminary finding that Mr. Linton has credibility issues is

sufficient to prevent him from becoming a fiduciary for the proposed class. <u>Cohen</u>, 98

F.R.D. at 582 (quoting <u>Kline</u>, 702 F.2d at 403).

> ### 2. Linton's investment strategy with respect to priceline stock is inconsistent with reliance on the integrity of the market.

In <u>Koenig</u>, Judge Bartels explained that "the Court cannot evaluate a set of

transactions alone without looking at the motives of the purchaser making them". 117

F.R.D. at 336. In Mr. Linton's case, the sell order that he placed on his priceline stock

reveals that his motive in purchasing the stock was extremely short-sighted. He bought

in expectation of a quick profit from a slight upward price fluctuation, and he planned to

get in and out of priceline stock very quickly. He did not buy priceline stock in reliance

on the long-term integrity of the stock price, as he cared only that there would be a short-

term upward change in the price. Therefore, Mr. Linton is subject to a defense of non-

reliance that renders him atypical of the proposed class.

### D. MARK B. WEISS

> ### 1. Weiss's claims are atypical because he traded almost exclusively in priceline put options.

Recently, in <u>Andrada v. Atherogenics, Inc.</u>, No. 05 Civ. 00061 (RJH),

2005 WL 912359 (S.D.N.Y. Apr. 19, 2005), a plaintiff that had only traded options was

deemed atypical and therefore an unsuitable lead plaintiff. <u>Id.</u> at *5. Judge Holwell

explained that:

> "factual issues specific to [the option trader] in determining the precise
> value of the options—e.g., the maturity, the volatility of the price of the
> [underlying] stock, the level of short term interest rates, and the
> competitive structure of the market in which the options are
> traded—would likely threaten to become the focus of the litigation."

-26-

Id. (internal quotation marks omitted). The court then concluded that an options holder "is potentially subject to unique defenses irrelevant to regular stock purchasers in the class". Id.

The most recent decisions by courts in other jurisdictions have come to the same conclusion as Andrada about the typicality of options traders. In Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377 (D. N.J. 1998), for example, the court rejected certification of a class representative who had only purchased Euro Options. Id. at 390-92. The Weikel court acknowledged that the fraud-on-the-market theory might be applicable to options traders, but explained that such a possibility did not resolve the typicality inquiry in plaintiff's favor. Id. at 391. The court noted that "the price of the underlying security is not the sole factor for determining the price of an option" and pointed to the same factors cited by the court in Andrada. Id. As a result, the court held:

> "Should [the options trader] be certified as a class representative the following issues [would] need to be addressed at trial: (1) a factual explanation of the Euro Options; (2) whether the facts demonstrate the fraud on the market theory is applicable to the Euro Options; and (3) whether the damages of [the options trader] need to be offset because of unique factors affecting the price of options contracts. The factual distinctions between [the options trader] and the . . . Ordinary Share purchasers, combined with the possibility of unique defenses being raised against [the options trader], are likely to threaten to become the focus of the litigation."

Id. Similarly, in Margolis v. Caterpillar, Inc., 815 F. Supp. 1150 (C.D. Ill. 1991), the court held that the claim of an options trader was not typical of a stock purchaser's claim and that accordingly, an options trader "can only represent a class of option holders, not stockholders". Id. at 1156.

Here, Mark Weiss's TD Waterhouse account statements reveal that his priceline trading was almost entirely in priceline put options.[7] During the alleged class period, Mr. Weiss engaged in 75 transactions in priceline put options, selling 580 put options and buying 473 put options. (See Weiss 00017, 00019, 00041, 00043, 00045, 00047, 00049, 00073, 00075, 00077, 00079, 00083, 00107, 00109, 00111, 00137, 00165, 00183, 00207, 00217, 00219, 00239, attached as Exh. L to the Kelleher Decl.) He purchased priceline stock 15 times, but 14 of those purchases were assigned to him as a result of puts that he had previously sold.[8] (See Weiss 00137, 00165, 00169, 00183, 00185, 00189, 00207, 00209, 00221, 00223, 00225, 00237, 00239, 00241, 00247, attached as Exh. L to the Kelleher Decl.; Weiss Dep., attached as Exh. M to the Kelleher Decl., at 32:20-33:1, 33:15-24, 34:6-8, 34:14-16, 34:22-24.) His only purchase of priceline stock that was not connected to put options, and thus his only voluntary purchase, was a purchase of 150 priceline shares. (Weiss Dep. at 158:12-159:7; see Weiss 00137, attached as Exh. L to the Kelleher Decl.) He traded over seven times as many put options as regular shares.[9]

---

[7] The purchase of a put option gives the buyer the right (but not the obligation) to sell 100 shares of the underlying stock at a set price (the "strike price") before the option's expiration date. Conversely, the sale of a put option obligates its seller to purchase those 100 shares at the strike price upon the exercise of the option. A trader in put options does not transact directly in terms of shares; he instead trades in contracts to buy and/or sell those shares. The Options Clearing Corporation, Understanding Stock Options, 9-11 (2003), available at http://www.888options.com/store/uso.pdf.

[8] Upon exercise, the put options that Mr. Weiss sold obligated him to buy priceline stock from the option holder at a "strike price" that was set by Mr. Weiss himself. Mr. Weiss thus had no choice but to purchase the priceline shares that were "put" to him when the market price of priceline stock fell below the strike price.

[9] There is authority that if the overwhelming proportion of a plaintiff's trading was in ordinary shares and a smaller proportion was in options, then the plaintiff is not atypical. See In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 158 (S.D.N.Y. 1997) (plaintiff that held almost six times as much common stock as it did options did not lack typicality

Mr. Weiss's extensive put option trading renders his claims atypical of the claims of the proposed class. If he were allowed to proceed as a representative of the class, the factual distinctions between an options trader and an ordinary purchaser of stock would need to be addressed at trial. In addition, Mr. Weiss would be subject to unique defenses regarding his reliance. As an options trader, he relied on the price of the put option contract, which is affected by factors extraneous to the price of the underlying stock, including "the maturity, the volatility of the price of the [underlying] stock, the level of short term interest rates, and the competitive structure of the market in which the options are traded". Andrada, 2005 WL 912359, at *5.[10]  Because an options trader does not rely directly on the market price of the underlying stock, Mr. Weiss's involvement as a class representative would trigger factual issues about whether he was relying on the integrity of priceline's stock price at all and whether (and if so how) the integrity of the stock price affects the price of a put options contract or the value of an option premium. See Basic, 485 U.S. at 248 (presumption of reliance may be rebutted by showing that the plaintiff did not rely on the market price in purchasing the securities at issue). Further, Mr. Weiss's extensive options trading would also give rise to issues regarding the calculation of damages. See Weikel, 183 F.R.D. at 391.

---

under Rule 23(a) for purposes of determining the lead plaintiff). As noted above, that is clearly not the case here, as Mr. Weiss's options trading dwarfs his trading in ordinary shares.

[10] Mr. Weiss himself acknowledged that price volatility plays a role in put option trading.

> "Q: Does the volatility of the stock have anything to do with the amount of money you get for selling a put?
>
> "A: I think it does."

(Weiss Dep. at 159:21-24.)

Because these unique factual issues and defenses associated with Mr. Weiss's claims would become a focus of the litigation to the detriment of the class, he should be denied the status of class representative. See Gary Plastic, 903 F.2d at 180.

### E.    MARILYN D. EGEL

#### 1.    Egel's claims are subject to the same unique defenses as Weiss's claims.

Marilyn Egel and Mark Weiss are husband and wife, and they held their TD Waterhouse brokerage account in joint tenancy. (Egel Dep., attached as Exh. N to the Kelleher Decl., at 8:13-17; Weiss Dep. at 124:13-17.) All of their trading, including their trading in priceline securities, was done jointly, as a legal matter. (See, e.g., Weiss 00001, attached as Exh. L to the Kelleher Decl.) Therefore, the unique defenses to which Mr. Weiss's claims will be subject also apply to Ms. Egel, and a finding that Mr. Weiss is atypical requires the same finding with respect to Ms. Egel.

#### 2.    Egel is an inadequate class representative because she is unfamiliar with and uninvolved in this litigation.

A finding that Mr. Weiss is an appropriate class representative, by contrast, does not mandate a finding that Ms. Egel is also a suitable fiduciary—she has to show that separately. The Court should deny Ms. Egel the status of class representative because she cannot independently satisfy the adequacy requirement of Rule 23(a). Ms. Egel's deposition testimony revealed that she is merely tagging along with her husband, Mr. Weiss, and has done nothing more than lend her name to this suit.

The law in the Second Circuit is that a proposed class representative is inadequate if she has "so little knowledge of and involvement in the class action that [she] would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys". Maywalt, 67 F.3d at 1077-78. Courts

-30-

consistently hold that proposed class representatives do not satisfy the adequacy

requirement of Rule 23(a) if they are (1) unfamiliar with the suit and/or (2) have not

taken an active role in the litigation and the supervision of class counsel. See, e.g., In re

Lloyd's Am. Trust Fund Litig., No. 96 CIV. 1292 (RWS), 1998 WL 50211 (S.D.N.Y.

Feb. 6, 1998); Koenig v. Benson, 117 F.R.D. 330 (S.D.N.Y. 1987); Weisman v.

Darneille, 78 F.R.D. 669 (S.D.N.Y. 1978).  At her deposition, Ms. Egel was specifically

examined on both of those topics and failed on each of them.

       First, Ms. Egel did not demonstrate a sufficient familiarity with the suit.

She testified that, prior to her meeting with class counsel the day before her deposition:

(1) she was not aware that there were any defendants other than priceline (Egel Dep. at

20:15-20); (2) she had not even heard of WebHouse (id. at 20:5-7); and (3) she had not

seen the Complaint (id. at 19:4-10).

       In very similar circumstances, courts have found proposed class

representatives inadequate.  In In re Lloyd's, for example, the court held that a proposed

class representative was inadequate because she was unfamiliar with important aspects of

the litigation, including key terms in the complaint and significant events in the case.

1998 WL 50211, at *11-12.  In Koenig, the proposed class representative was inadequate

because he "did not read his complaint before it was filed", had a weak understanding of

the basic cause of action, and admitted lack of knowledge frequently in his deposition.

117 F.R.D. at 337.  Similarly, in Levine v. Berg, 79 F.R.D. 95 (S.D.N.Y. 1978), the

plaintiff was an inadequate class representative because she was unfamiliar with matters

relating to her claim, did not consider her complaint thoroughly until the day prior to her

deposition, and even then, "was unable to articulate, with any quantum of

-31-

comprehension, the wrong purportedly practiced upon her and the proposed class". Id. at 97-98; see also Weisman, 78 F.R.D. at 671 (plaintiff who was unfamiliar with the suit and could not describe his claim or name the defendant was an inadequate class representative); Greenspan, 78 F.R.D. at 133-34 (proposed class representatives, who could only identify one of the defendants and were unaware of certain elements of the complaint, were inadequate because of their "limited personal knowledge of the facts underlying the suit").

    Second, Ms. Egel did not demonstrate the willingness and capability to participate meaningfully in the litigation and supervise class counsel. At her deposition, Ms. Egel testified that she had not had any contact with the class attorneys until the day before her deposition:

> "Q: Have you -- prior to having your deposition taken, have you spoken with Plaintiff's counsel?
>
> "A: Yes.
>
> "Q: Okay. When was the first time you spoke to them?
>
> "A: Yesterday.
>
> "Q: Prior to yesterday, had you had any discussions with anybody—prior to yesterday did you have any discussions with any of the attorneys representing the class?
>
> "A: No."

(Egel Dep. at 18:12-23.)

    Courts find such limited and belated contact with class counsel very problematic. Like Ms. Egel, the proposed class representative in Weisman did not meet with his counsel until the day preceding his deposition; there, the court denied class certification. 78 F.R.D. at 671. In Koenig, the proposed class representative "did not

-32-

meet with his lawyer until . . . well after the basic groundwork of [the] action had been laid" and was deemed inadequate. 117 F.R.D. at 337; see also Greenspan, 78 F.R.D. at 133-34 (proposed class representatives who did not meet with their attorney until well into the work on the action were inadequate).

It is not surprising that Ms. Egel has not been supervising (or even in contact with) class counsel because she is just tagging along on this suit with her husband, Mr. Weiss. Indeed, she testified that she relied entirely on her husband to ensure that her interrogatory responses were correct. (Egel Dep. at 36:18-38:15.) Her testimony further revealed that she is unaware of the responsibilities of a class representative. (Id. at 22:17-23:2.) She testified that her responsibility was "[t]o take into account [her] losses and the losses of every other person who was deceived by this situation". (Id. at 22:17-23.) Beyond that, she did not know what other responsibilities she had as a class representative. (Id. at 22:17-23:2.)

As the cases demonstrate, a proposed class representative's failure to understand and/or execute the duties of a class representative is problematic. In Weisman, class certification was denied because the plaintiff did not know the duties of a class representative. 78 F.R.D. at 671. Likewise, in Greenspan, the court found that the proposed class representatives appeared to place undue emphasis on their counsel's ability to conduct the litigation and held that they were inadequate because of "their apparently superfluous role in [the] litigation to date". 78 F.R.D. at 133-34; see also Levine, 78 F.R.D at 97-98 (proposed class representative who placed undue emphasis on her attorney's ability to investigate and prosecute the suit was inadequate).

-33-

3.    **Egel did not participate at all in the investments of her joint account.**

As discussed above in Section II.A.2.a. (pp. 10-11), "a certain minimal level of participation by the plaintiff in the relevant stock transaction must be demonstrated" in order for the plaintiff to be a suitable class representative. Fry, 136 F.R.D. at 635 (citing, as an example of such minimal participation, "[o]n-going discussions with the person executing the relevant stock transactions").

Ms. Egel, however, did not participate in any way in the investments made through the account she shared with her husband. She testified that her husband did all the investing and made all the decisions to buy and sell, without her involvement and without her knowledge. (Egel Dep. at 8:18-9:3; see also Weiss Dep. at 124:18-20.) Ms. Egel does not know how much priceline stock she owned at the beginning of the class period, or how much priceline stock she bought or sold during the class period, or even whether she ever invested in any options for priceline stock. (Egel Dep. at 9:16-10:14.) Indeed, she testified that she never so much as had a discussion with her husband about the buying or selling of priceline stock or the buying, selling or exercising of priceline options.

Ms. Egel's complete lack of participation in her priceline investments will subject her to unique defenses concerning her reliance and, in addition, reflects poorly on her ability to participate actively in this litigation on behalf of the proposed class.

F.     **JOHN S. ANDERSON**

1.     <u>**Anderson is an inadequate class representative because he is unfamiliar with basic aspects of the case and is not prepared to take an active role in the litigation.**</u>

Like Ms. Egel, John Anderson is an inadequate class representative because he is unfamiliar with this suit and with his responsibilities as a fiduciary for the class.

<u>First</u>, Mr. Anderson is not sufficiently familiar with the lawsuit. He testified that he did not know what was in the Complaint. (Anderson Dep., attached as Exh. O to the Kelleher Decl., at 46:21-47:3, 47:18-21.) When asked if he had any understanding as to what the claims are against the Defendants, Mr. Anderson replied: "I understand, possibly, they overinflated the price of their stock because of the Web Housing thing . . .". (<u>Id.</u> at 53:24-54:7.) He then added: "So I mean that's all possibly -- that's what I think I know. I don't know if it's true, obviously." (<u>Id.</u> at 54:14-16.) And when asked whether he knew anything that had happened in the litigation, he could only state: "There has been -- as I think, I recall I was supposed to come here the 12th of March or some date like that, and I was told not to because there was something -- some motion filed -- I don't understand what -- and then that's really it." (<u>Id.</u> at 64:25-65:7.)

<u>Second</u>, Mr. Anderson's testimony demonstrated that he is not prepared to play an active role in the litigation and supervise class counsel on behalf of the other members of the proposed class. He testified that the only thing he has done to monitor the case so far has been to look over the interrogatory responses and objections that class counsel prepared for him.

"Q: Other than looking at 3, 4 and 5 [discovery responses and objections], what have you done -- and that is referring to the Exhibit numbers 3, 4, 5.

"A: I understand.

"Q: What else have you done to watch over this case before --

"A: Before this?

"Q: Before this.

. . . .

"A: I would say that's really it. I mean I don't remember. I don't recall
    anything else."

(Id. at 54:25-55:12.)

Mr. Anderson also testified that he has spent very little time on the case

and, more importantly, does not expect to spend much time on the case going forward.

"Q: How much time have you spent involved with this -- in this lawsuit
    prior to coming here today?

"A: It was, I had a conference call. I've had some papers sent to me. . . .I
    looked at them, and I signed them, and that kind of stuff. . . . I
    probably looked at them at my desk during my lunchtime or
    something. So, really, my biggest time investment so far has been
    coming out -- getting on the airplane, coming here, and getting back
    on the airplane.

"Q: Excluding getting on the airplane and coming here and spending time
    here today and going back --

"A: Not much time.

"Q: -- okay, not much time at all. Right?

"A: Yes.

"Q: What do you anticipate spending time on this thing going forward?

"A: Going forward? Maybe I might have to come back to testify in court.
    That's -- other than that, I don't know. I don't think there should be
    that much time investment from this point forward."

(Id. at 73:4-25 (emphasis added).)

The members of the proposed class are entitled to a representative who will take at least enough interest in the suit to gain a general understanding of the claims, keep abreast of significant events in the litigation, and supervise class counsel. See In re Lloyd's, 1998 WL 50211, at *11; Koenig, 117 F.R.D. at 337. Mr. Anderson's limited involvement in the case thus far and his expectations of a minimal time commitment going forward are inconsistent with a class representative's fiduciary obligations to the proposed class. See Weisman, 78 F.R.D. at 671; Greenspan, 78 F.R.D. at 133-34.

III.    **THE PROPOSED CLASS SHOULD BE LIMITED TO PERSONS WHO PURCHASED PRICELINE SECURITIES DURING THE PROPOSED CLASS PERIOD AND HELD THOSE SECURITIES THROUGH THE ALLEGED CORRECTIVE DISCLOSURE ON OCTOBER 5, 2000.**

Last term, in Dura Pharm., Inc. v. Broudo, 125 S.Ct. 1627 (2005), the Supreme Court held that to establish loss causation, which is one of the elements of a private securities fraud action, a plaintiff must sufficiently allege actual economic loss. Id. at 1633-34. That approach to loss causation was already the law in the Second Circuit. Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 172-173 (2d Cir. 2005); Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc., 343 F.3d 189, 196-197 (2d Cir. 2003); Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2001). A securities fraud plaintiff who purchased the defendant's stock during the proposed class period but sold that stock before the alleged corrective disclosure cannot establish loss causation. This is because the price at which that plaintiff sold the stock was still inflated by the allegedly fraudulent statements. Dura, 125 S.Ct. at 1631 ("if . . . the purchaser sells the shares . . . before the relevant truth begins to leak out, the misrepresentations will not have led to any loss").

-37-

In the Complaint, Plaintiffs define the proposed class as "consisting of all persons who purchased the securities of Priceline between January 27, 2000 and October 4, 2000". (Complaint ¶ 46; see also Pltf. Br. at 2.) The proposed class only excludes "Defendants, members of each Individual Defendant's immediate family, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party". (Complaint ¶ 46.) That definition of the proposed class is overly broad, as it includes persons who sold priceline stock before the alleged corrective disclosure on October 5, 2000 (see id. ¶ 159) and so cannot establish loss causation. Therefore, the Court should limit the scope of the proposed class to include only persons who bought priceline stock after January 27, 2000 and still owned that stock on October 5, 2000.

### Conclusion

For the foregoing reasons, Defendants respectfully request that this Court limit the scope of the proposed class and deny the proposed class representatives' motion for class certification on the grounds that (1) they did not fulfill their burden; (2) the Leisinger Pension Fund and Messrs. Ross, Linton and Weiss are atypical of the proposed class; and (3) the Leisinger Pension Fund, Mr. Linton, Ms. Egel and Mr. Anderson are inadequate representatives of the proposed class.

August 3, 2005

-38-

DEFENDANTS PRICELINE.COM INC.,
N.J. NICHOLAS, DANIEL SCHULMAN AND
RICHARD S. BRADDOCK

Joseph L. Clasen (ct04090)
ROBINSON & COLE, LLP
Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT 06904-2305
Telephone: (203) 462-7500
Fax: (203) 462-7599
jclasen@stam.rc.com


Evan R. Chesler (ct03177)
Daniel Slifkin (ct21203)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
dslifkin@cravath.com

-39-

DEFENDANT JAY S. WALKER

Douglas C. Conroy (ct11555)
Paul R. Dehmel (ct23063)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
1055 Washington Boulevard
Stamford, CT 06901
Telephone: (203) 961-7400
Fax: (203) 359-3031
douglasconroy@paulhastings.com
pauldehmel@paulhastings.com


J. Allen Maines (phv0013)
Carl W. Mullis(phv0158)
Summer B. Joseph (phv0160)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
600 Peachtree Street, NE
Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400
Fax: (404) 815-2424
allenmaines@paulhastings.com
carlmullis@paulhastings.com
summerjoseph@paulhastings.com

-40-

## CERTIFICATION

I hereby certify that a copy of the foregoing was served this 3rd day of August, 2005 via first class mail to the following counsel of record:

| Co-Lead Counsel | Liaison Counsel |
|---|---|
| David R. Scott, Esq.<br>Scott & Scott, LLC<br>108 Norwich Avenue<br>P.O. Box 192<br>Colchester, CT 06415<br>Tel: 860-537-3818<br>Fax: 860-537-4432<br><br>Jules Brody, Esq.<br>Aaron Brody, Esq.<br>Stull Stull & Brody<br>6 East 45th Street<br>New York, NY 10017<br>Tel: 212-687-7230<br>Fax: 212-490-2022<br><br>Dennis J. Johnson, Esq.<br>Jacob B. Perkinson, Esq.<br>Johnson & Perkinson<br>1690 Williston Road<br>South Burlington, VT 05403<br>Tel: 802-862-0030<br>Fax: 802-862-0060 | Andrew M. Schatz, Esq.<br>Jeffrey S. Nobel, Esq.<br>Justin S. Kudler, Esq.<br>Schatz & Nobel, PC<br>One Corporate Center<br>20 Church Street, Suite 1700<br>Hartford, CT 06103-3202<br>Tel: 860-493-6292<br>Fax: 860-493-6290 |

STAM1-795617-1

| | |
|---|---|
| **Attorneys for Plaintiffs Twardy, Weingarten, Berdakina, Mayer, Mazzo, Fialkov, Licht, Bazag, Breirer, Farzam, Karas and Michols**<br><br>David A. Slossberg, Esq.<br>Margaret E. Haering, Esq.<br>Hurwitz & Sagarin, LLC<br>147 N. Broad Street<br>Milford, CT 06460<br>Tel: 203-877-8000<br>Fax: 203-878-9800 | **Attorneys for Defendant Jay S. Walker**<br><br>J. Allen Maines, Esq.<br>Carl Mullis, III, Esq.<br>Summer B. Joseph, Esq.<br>Laura Berg, Esq.<br>Paul, Hastings, Janofsky & Walker LLP<br>600 Peachtree Street, N.E.<br>Suite 2400<br>Atlanta, GA 30308<br>Tel: 404-815-2400<br>Fax: 404-815-2424<br><br>Douglas C. Conroy (ct11555)<br>Paul R. Dehmel (ct23063)<br>PAUL, HASTINGS, JANOFSKY & WALKER, LLP<br>1055 Washington Boulevard<br>Stamford, CT 06901<br>Telephone: 203-961-7400<br>Fax: 203-359-3031 |
| **Attorneys for priceline.com, Inc., Richard S. Braddock, Daniel H. Schulman and N.J. Nicholas, Jr.**<br><br>Evan R. Chesler, Esq.<br>Daniel Slifkin, Esq.<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019<br>Tel: 212-474-1000<br>Fax: 212-474-3700 | |

William J. Kelleher, III