UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| IN RE: PRICELINE.COM, INC. | : | |
| SECURITIES LITIGATION | : | |
| _____ | : | **MASTER FILE NO.** |
| | : | **3:00CV01884(DJS)** |
| This document relates to: | : | |
| | : | **September 22, 2005** |
| ALL ACTIONS | : | |
| | : | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL**
**<u>PRODUCTION OF ELECTRONIC DISCOVERY</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

A.    The Parties Begin Discussing Electronic Data In
      October Of 2004 .......................................................................................................4

B.    Defendants Seek To Exclude Backup Tapes From the First Motion
      To Compel ..................................................................................................................5

C.    Plaintiffs Try To Meet And Confer On Restoring The Backup Tapes ...............6

D.    Plaintiffs Try To Reach A Compromise On The Electronic Documents ...........8

E.    The Discussions With Defendant Walker About The Backup Tapes..................9

ARGUMENT ......................................................................................................................9

A.    The Priceline Defendants Should Be Compelled To Produce The
      Entire Snapshot And All Of The Ex-Employee Tapes ........................................9

B.    Defendants Should Be Compelled To Produce The WebHouse And
      Yardsale Backup Tapes In Their Native Format ...............................................13

      1.   The Backup Tapes Should Be Produced In Their "Native Format."............13

           a.   The Circumstances In This Case Warrant The Production Of The Information On
                The Backup Tapes In Their Native Format .........................................................15

           b.   Production Of Documents In Their Native Format Is The Only Way To Obtain

                Electronic Evidence That Is Critical To Plaintiffs' Claims..................................17

C.    Defendants' Concerns About Privileged Materials On The Tapes
      Are Not Valid And Can Easily Be Addressed Through Use Of A
      "Claw Back" Agreement.........................................................................................19

CONCLUSION....................................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

In re Air Disaster at Detroit Metropolitan Airport, 130 F.R.D. 634 (E.D. Mich. 1989) ...............................................................................................................18

Application of Sarrio, S.A., 119 F.3d 143 (2d Cir. 1997) ..................................................21

Daewoo Electric Co. Ltd. v. United States, 650 F. Supp. 1003 (Ct. Int'l Trade 1986) ................................................................................................................18

In re Grand Casinos, Inc. Securities, Litigation, 988 F. Supp. 1270 (D.Minn.1997) ........14

In re Grand Jury Proceedings, 604 F.2d 798 (3d Cir. 1979)..............................................21

In re Horowitz, 482 F.2d 72 (2d Cir. 1973) .......................................................................21

National Union Electric Corp. v. Matsushita Electric Industrial Co., Ltd., 494 F. Supp. 1257 (E.D. Pa. 1980) ...................................................................................18

Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340 (1978) ....................................16, 17, 18

Sattar v. Motorola, Inc., 138 F.3d 1164 (7th Cir. 1998) ...................................................20

Zubulake v. UBS Warburg, LLC, 216 F.R.D. 280 (S.D.N.Y. 2003)................................22

### STATE CASES

Long-Term Cap. Holdings v. U.S., 2002 WL. 31934139 (D. Conn. Oct. 30, 2002).........21

Schnall v. Annuity and Life RE (Holdings), Ltd., 2004 WL. 51117 (D.Conn 2004) ................................................................................................................14

In re Verisign, Inc. Sec. Litigation, 2004 WL. 2445243 (N.D. Cal. March 10, 2004) ................................................................................................................15

### DOCKETED CASES

Capital Ventures International v. Networks Commerce, Inc., No. C02-682L (W.D. Wash. May 27, 2005)...................................................................................11

In re Pemstar, Inc. Sec. Litigation, No. 02-cv-01821 (D. Minn. April 23, 2004)..............15

# FEDERAL STATUTES

Private Securities Litigation Reform Act of 1995, (the "PSLRA") 15 U.S.C. §
78u-4(b)(3)(C)(i)...........................................................................................................14

## INTRODUCTION

Over the past year, Plaintiffs have made no secret about the importance of the emails and other electronic documents to the securities fraud claims in this case.  Plaintiffs seek these documents to corroborate other evidence showing that Defendants' false and misleading statements and highly suspicious insider trading were part of a deliberate scheme to defraud the investing public.  In response, Defendants have taken every opportunity to delay production of these materials.  ***The Priceline Defendants, in particular, have engaged in the sharp practice of relying on carefully crafted documents and unexplained silences to keep Plaintiffs and the Court in the dark***.  Their strategy has worked.  Ten months have passed since Plaintiffs served their document requests and not a single electronic document has been produced.

The Priceline Defendants' statements about the "snapshot" warrant especially close scrutiny.  The snapshot is a fully accessible and searchable copy of Priceline's corporate file and email servers.  The Priceline Defendants first mentioned the snapshot on March 1, 2005.  They stated that: "a snapshot of the data on priceline's corporate file and e-mail servers was made years before you served your document requests, and *we are in the process of searching that repository for responsive documents*."  Ex. C to Declaration of Peter J. McDougall In Support of Plaintiffs' Motion to Compel ("McDougall Decl.") (emphasis added).  The Priceline Defendants' letter led Plaintiffs to believe they would soon receive documents from the snapshot.

The parties revisited the electronic document issue in late March 2005, when Plaintiffs moved to compel Defendants to produce paper and electronic documents.  Plaintiffs asked the Court to set a date certain when all paper and electronic documents would be produced.  In response, the Priceline Defendants filed papers stating that they had "computer tapes" that should be excluded from the motion to compel because these tapes needed to be restored and converted

1

"into a searchable format before the search and review of the information can even take place." Doc. 161, at 14. The Priceline Defendants did not tell the Court about the accessible and searchable snapshot or argue that it should be excluded from the motion to compel. *Id.*

Defendants' arguments about the need to restore and convert the "computer tapes" led the Court to order the parties to meet and confer to discuss "the materials stored in electronic form." Doc. 164, at 2. The Court did not address the snapshot in its Order because the Priceline Defendants' carefully drafted papers focused only on the computer tapes and never mentioned the fully accessible and searchable snapshot. *Id.*; Doc. 162, at 2 (Kelleher Decl., ¶ 7); Doc. 163, at 2 (Hein Decl., ¶ 2). These same papers led Plaintiffs to believe that the purpose of the meet and confer was to discuss restoring the computer tapes. The Priceline Defendants, meanwhile, seized on the ambiguity in the Order and held back the snapshot – *even though they focused only on the computer tapes in their papers and did not argue that the snapshot should be excluded from the motion to compel*.

Unfortunately, the Priceline Defendants did not timely reveal their expansive reading of the April 6 Order to Plaintiffs. Instead, they remained silent while Plaintiffs tried, unsuccessfully, to resolve what they thought was a dispute about restoring the computer – or "backup" – tapes. Plaintiffs first tried to facilitate the meet and confer on April 12, stating: "We would appreciate it if all Defendants would provide us with the information regarding the backup tapes referenced in the opposition papers to the Lead Plaintiffs' motion to compel . . . . *[T]his information is critical to resolving the outstanding issues concerning the backup tapes, as per the Court's instruction during last week's hearing on Plaintiffs' motion to compel*." Ex. D to McDougall Decl. (emphasis added).

When the Priceline Defendants did not respond to this letter, Plaintiffs noticed a 30(b)(6) deposition of the person at Priceline most knowledgeable about the electronic discovery issues – again, to obtain information about the backup tapes. The Priceline Defendants unilaterally canceled this deposition two days before its scheduled date and then waited a month to provide Plaintiffs with alternative dates. Ex. G to McDougall Decl. Priceline made its witness available on July 20, two months after the date when the deposition was originally scheduled to take place. Then, one day before the 30(b)(6) deposition, they sent Plaintiffs a letter that – *for the first time* – suggested that the Priceline Defendants had not and were not planning to produce responsive information on the snapshot in a timely fashion. Ex. H to McDougall Decl. In this letter, Defendants also admitted that they had ex-employee tapes, which, like the snapshot, were accessible and had not been produced. *Id.* At the deposition, Priceline's computer specialist confirmed that the snapshot is an accessible duplicate of the information on Priceline's corporate servers. Ex. I to McDougall Decl., at 215: 16-25.

The Priceline Defendants have no excuse for failing to timely produce the data on the snapshot and ex-employee tapes. This is not a situation where the Priceline Defendants need to spend money or time restoring this electronic data. Rather, *the snapshot and ex-employee tapes have been available and waiting to be searched and produced since Defendants received Plaintiffs' document requests in November 2004*. Amazingly, during a meet and confer on August 4, 2005, the Priceline Defendants stated that they were just starting to search the snapshot, contradicting the letter they sent five months earlier on March 1. McDougall Decl., ¶ 17. They also claim it will still take them several months to review and produce the snapshot and ex-employee tapes. *Id.,* ¶ 18. Plaintiffs submit that the time for delay has now ended and, accord-

ingly, request that this Court compel the Priceline Defendants to provide the entire snapshot and all the ex-employee tapes to the Plaintiffs in its searchable format by October 15, 2005.

The other area of dispute involves the 223 WebHouse and Perfect Yardsale backup tapes that Defendants currently have in their possession.[1]  These tapes, which apparently need to be restored, contain information stored on the WebHouse and Perfect Yardsale servers.  Defendant Walker claims it will cost between *$20 million and $200 million* to restore and produce the information on the 181 tapes in his possession.  Plaintiffs, however, have consulted a computer forensics specialist who can restore *all 223 tapes into their native format for $89,200*.  Declaration of Allison Griffin ("Griffin Decl."), ¶ 6.  Once the tapes are restored to their native format, Plaintiffs' computer consultant estimates that it will cost between $50,000 and $100,000 to cull down and search the tapes.  *Id.*

Despite Plaintiffs' attempts to find common ground, Defendants insist on using their wasteful and unnecessary multi-million dollar approach.  Defendants also argue vigorously that all costs under their multi-million dollar approach should be shifted to the Plaintiffs.  This appears to be an overt attempt to force monumental costs on the Plaintiffs in an effort to stymie discovery of crucial information.  By ratcheting up the costs so that they can argue in favor of cost shifting, Defendants' approach becomes cost prohibitive no matter who pays these costs, resulting in the exclusion of damaging information on the WebHouse and Yardsale tapes.  Defendants' approach defies common sense.  Accordingly, Plaintiffs request that the Court order Defendants to produce all 223 backup tapes in their native format by October 15, 2005.

---

[1] The Priceline Defendants claim to have 42 backup tapes in their possession while Defendant Walker claims to have 181.

## BACKGROUND

### A.     The Parties Begin Discussing Electronic Data In October Of 2004.

The instant dispute over the electronic documents dates back almost one year to October 2004, the date of the parties' first meet and confer following the Court's decision on the motions to dismiss.  McDougall Decl., ¶ 2.  During their initial meet and confer, the parties discussed the documents Defendants had stored in electronic form.  Plaintiffs stated these documents would be a critical component of the case.  Defendants responded that they had vast amounts of electronic data and would need to devote substantial resources to reviewing and producing this material.  *Id.*, ¶ 3.

The parties revisited the electronic discovery issue in February 2005 when discussing Defendants' responses to Plaintiffs' document requests.  In letters dated February 17 and 18, 2005, Plaintiffs once again asked Defendants to "[p]lease confirm that you will produce any electronic documents and electronically-stored data that are responsive to our document requests."  *Id.,* ¶ 4.  Plaintiffs wanted assurances that they would get the electronic documents in a timely fashion given their critical importance to the claims at issue in this case.

In response, the Priceline Defendants stated in a letter on March 1, 2005 that: "We are well aware that data stored electronically is discoverable and, as we stated during our very first meet and confer, will be searching vast amounts of electronically stored data in the course of discovery here."  Exhibit C to McDougall Decl.  The Priceline Defendants also acknowledged that: "***a snapshot of the data on priceline's corporate file and e-mail servers was made years before you served your document requests, and we are in the process of searching that repository for responsive documents.***"  *Id.* (emphasis added).

**B.**    **Defendants Seek To Exclude Backup Tapes From The First Motion To Compel.**

Plaintiffs raised the electronic document issue again in March 2005, when they moved to compel Defendants to produce responsive documents.  Plaintiffs' motion, which sought to compel production of paper and electronic documents, requested that the Court set a time frame for Defendants to complete the production of responsive documents.  McDougall Decl., ¶ 6.  In response, the Priceline Defendants filed briefs and affidavits arguing that *computer tapes in their possession should be excluded from the pending motion to compel because electronic data on these tapes had been stored on inaccessible backup tapes*.  The Priceline Defendants argued:

> *A critical consideration in determining the appropriate pace and scope of Defendants' production is the fact that a great deal of the potential production has been stored and preserved electronically by way of computer tapes*.  Recent cases both within the second circuit and elsewhere have recognized that *producing documents from tapes is very burdensome and costly because it involves restoring tapes and converting them into searchable format before the search and review of the information can even take place*.

Doc. 161, at 14 (citations omitted) (emphasis added).  The Priceline Defendants limited their discussion in their opposition solely to the backup tapes.  The Priceline Defendants did not inform the Court that electronic data had been stored on a fully accessible and searchable snapshot.  Nor did the Priceline Defendants argue that the snapshot should be excluded from the first motion to compel or cite it as a reason why the parties should meet and confer.[2]  *Id.*  Defendants' representations about the inaccessibility of the backup tapes induced this Court to order the parties to

---

[2] The Declarations that the Priceline Defendants submitted in support of their position also fail to mention the snapshot. *See, e.g.,* Doc. 163, at 2 (Declaration of James Hein, ¶ 4) (noting a conversation in which the Priceline Defendants asked Plaintiffs to exclude the "computer tapes" from the pending motion to compel).  Mr. Hein's Declaration also made it clear that the Priceline Defendants were seeking to exclude only the backup tapes, not the snapshot. *Id.*

meet and confer on the electronic document issues and file a joint motion setting forth their areas

of agreement and areas of disagreement.  Doc. 164, at 2-3.

### C.     <u>Plaintiffs Try To Meet And Confer On Restoring The Backup Tapes.</u>

Following the Court's April 6, 2005, Order, Plaintiffs sent Defendants a letter stating:

> ***We would appreciate it if all Defendants would provide us with the information regarding the backup tapes referenced in the opposition papers to the Lead Plaintiffs' motion to compel . . . This information is critical to resolving the outstanding issues concerning the backup tapes, as per the Court's instruction during last week's hearing on Plaintiffs' motion to compel.***

Ex. D to McDougall Decl., ¶ 10 (emphasis added).  Plaintiffs focused only on the backup tapes

because the Priceline Defendants cited only the "computer tapes" when requesting the meet and

confer and never mentioned the need to meet and confer on the fully accessible and searchable

snapshot or ex-employee tapes.  *See, e.g.,* Doc. 161, at 14; Doc. 163 (Hein Decl., ¶ 2).

When Plaintiffs did not hear back from the Priceline Defendants, Plaintiffs noticed a

30(b)(6) deposition of the person at Priceline most knowledgeable about the electronic docu-

ments.  McDougall Decl., ¶ 11.  Plaintiffs were forced to use one of their allotted thirty-five

depositions on the electronic discovery issues because the Priceline Defendants were not partici-

pating in the Court-ordered meet and confer process.  Plaintiffs noticed the deposition for May

13, 2005.  The Priceline Defendants responded by unilaterally rescheduling the Rule 30(b)(6)

deposition numerous times, stating as late as mid-May 2005 that they were still trying to locate

the person at Priceline who was knowledgeable about the electronic document issues.  *Id.,* ¶ 13.

Defendants eventually agreed to make Patrick Brown available for deposition on July 20, 2005.

This was three and one-half months after the Court ordered the parties to meet and confer on the

electronic document issues and over two months after the date when the deposition was initially

scheduled to take place.

Then, the day before the Rule 30(b)(6) deposition, Plaintiffs received a letter from the Priceline Defendants describing the snapshot. *Id.,* ¶ 14 (Exhibit J). In the letter, the Priceline Defendants admitted that the snapshot existed "in a usable format" – *i.e.,* unlike the backup tapes, the snapshot had been fully accessible and searchable since it was created in February 2002. *Id.,* ¶ 15. This letter also referenced several ex-employee tapes that stored electronic material from terminated employees from 2000-2001. The Priceline Defendants later admitted that, like the snapshot, the ex-employee tapes were fully accessible and searchable. *Id.,* ¶ 15. All of this was confirmed by Patrick Brown of Priceline during the Rule 30(b)(6) deposition on the electronic documents. *Id.,* ¶ 16. [3]

### D.     Plaintiffs Try To Reach A Compromise On The Electronic Documents.

Following the Rule 30(b)(6) deposition, Plaintiffs continued to try to reach a compromise with the Priceline Defendants on the electronic discovery issues. The parties held a meet and confer on August 4, 2005, four months after the Court ordered the parties to meet and confer on these issues. McDougall Decl., ¶ 16. After the meet and confer, the parties exchanged letters setting forth their respective positions. *Id.* Plaintiffs also provided the Priceline Defendants with a draft of Plaintiffs' position on September 12, 2005. *Id.*

Despite these efforts, the Plaintiffs and the Priceline Defendants still have not been able to resolve the electronic discovery issues. Most importantly, the Priceline Defendants claim that it will still take several months to review and produce the electronic information on the snapshot

---

[3] Priceline's computer specialist also testified that the information on the Priceline corporate servers is kept on backup tapes. These backup tapes should not be confused with the WebHouse and Yardsale backup tapes discussed below. The computer specialist represented that the snapshot is a fully accessible duplicate of the Priceline backup tapes. Based on these representations, Plaintiffs are not pursuing production of the apparently duplicative tapes. Plaintiffs are, however, pursing the WebHouse and Perfect Yardsale tapes because this data is not on the snapshot.

and ex-employee tapes *even though this data has been fully accessible since February 2002*. *Id.*, ¶ 18. They have also refused to tell Plaintiffs when the first electronic documents from the snapshot or ex-employee tapes will be produced or provide a time frame for completion, even though they previously represented that they had been reviewing electronic data on the snapshot since March 1, 2005. *Id.*, ¶ 5. The Priceline Defendants also stated during the August 4, 2005 meet and confer that they were just starting to search the snapshot, contradicting the statement they previously made in their March 1 letter, when they stated that the search had started. *Id.,* ¶ 18.

Moreover, the Priceline Defendants have not provided any of the information they previously agreed to provide. *Id.,* ¶ 17. For instance, in early August 2005, the Priceline Defendants agreed to provide Plaintiffs with a spreadsheet of the data contained on the snapshot, a list of the email files contained on the snapshot and ex-employee tapes and a list of possible search terms for the snapshot and ex-employee tapes. Plaintiffs have asked for this information numerous times since it was promised in early August; however, the Priceline Defendants have not provided any of this information. *Id.* Finally, the parties have not been able to agree on the production of the 42 WebHouse and Priceline backup tapes in the Priceline Defendants' possession. *Id.,* ¶ 19.

**E.    The Discussions With Defendant Walker About The Backup Tapes.**

Compared to the Priceline Defendants, Defendant Walker has been more willing to provide Plaintiffs with information on the electronic discovery issues. The parties have focused their discussions on the 181 WebHouse tapes in Defendant Walker's possession. Plaintiffs and Defendant Walker met and conferred on the backup tapes on April 21, 2005, May 26, 2005, June 15, 2005, and June 22, 2005. Several letters were also exchanged discussing the backup tapes.

*Id.,* ¶ 20. During these meet and confers, the parties tried to come up with a way to narrow the number of backup tapes that needed to be restored. *Id.,* ¶ 21. Defendant Walker provided Plaintiffs with information from the labels on the tapes, separated the tapes into various categories, and sampled the information on various tapes. Ultimately, as a result of differences over the restoration process for the backup tapes, Plaintiffs and Defendant Walker have no areas of agreement to represent to the Court. *Id.*, ¶ 23. Plaintiffs initially believed they could accept a sampling of the 181 backup tapes in Defendant Walker's possession, but after discussion with an e-discovery consultant and researching the restoration issue, Plaintiffs believe their cost-saving position of restoring all tapes to native format, discussed in detail below, is the more reasoned approach.

## ARGUMENT

### A. The Priceline Defendants Should Be Compelled To Produce The Entire Snapshot And All Of The Ex-Employee Tapes.

The Priceline Defendants have taken every opportunity to delay production of the electronic data on the snapshot and ex-employee tapes even though these materials have been fully accessible and searchable since February 2002. In March 2005, the Priceline Defendants told Plaintiffs that they were reviewing the snapshot. Then, when Plaintiffs moved to compel production of the electronic documents, the Priceline Defendants claimed that the electronic data needed to be retrieved and restored into a usable format before it could be reviewed and produced – a process that Defendants claimed would cost millions of dollars.[4] The Priceline Defen-

---

[4] *See, e.g.,* Doc. 161, at 14 ("[A] great deal of the potential production has been stored and preserved electronically by way of computer tapes . . . producing documents from tapes is very burdensome and costly because it involves restoring tapes and converting them into searchable format before the search and review of the information can even take place."); *see also* Doc. 162, at 2 (William Kelleher Decl., ¶ 7) ("Defendants have retained an electronic document ven-

dants said nothing about the snapshot (or the ex-employee tapes), did not cite these materials as a basis for the meet and confer, did not tell the Court that these materials were accessible and reviewable, and did not tell the Court that they were already reviewing these materials and had been doing so since March 1, 2005.

The circumstances surrounding the snapshot and the ex-employee tapes are virtually identical to those in *Capital Ventures Int'l v. Networks Commerce, Inc.,* No. C02-682L (W.D. Wash. May 27, 2005) (attached as Exhibit A).  There, in response to plaintiff's motion to compel, defendants submitted an affidavit stating that thirty percent of the defendants' electronic data had not yet been "processed."  Defendant suggested through omissions and carefully drafted papers that this electronic information needed to be restored before it could be used.  Based on the affidavit and the arguments defendants made in their brief, "the Court had the impression that 30% of defendants' electronic data had not been processed, that it was sitting on hard drives and servers in defendant's storage areas, and that it was not yet in a format that could be of use in the discovery process."  *Id.* at 2.

It later came to light, however, that the "unprocessed" information had been stored in an easily accessible format.  Once this fact was brought to the court's attention, the court ordered the defendants to make available within eleven days of its order a complete set of the accessible electronic files – which contained the information defendants had previously represented as being "unprocessed."  The court also ordered the defendants and their counsel "to cooperate with plaintiff to ensure that full and complete responses to discovery . . . are provided to plaintiff in the most efficient and expeditious manner."  The court explained:

_____

dor to assist them in retrieving, restoring, collecting, sorting and reviewing the electronic documents.").

> Having again reviewed the underlying memoranda regarding plain-
> tiffs' motion to compel . . . the Court finds that its understanding of
> the relevant facts was reasonable in light of defendants' statements
> and arguments . . . . ***At no point did defendants make any effort
> to clarify what they meant by "unprocessed," even though it
> should have been clear that their definition was significantly dif-
> ferent from that used by the Court and plaintiff. Defendants'
> carefully drafted documents and unexplained silences misled the
> Court regarding facts that would have aided in the efficient reso-
> lution of the underlying discovery dispute.***

As in *Capital Ventures*, the Priceline Defendants' carefully drafted papers and unex-

plained silences omitted several highly significant facts. Most significantly, Defendants said

nothing about the fully accessible snapshot of the Priceline corporate server – a snapshot that, by

Defendants' own admission, contains "every piece of electronic material created on the corporate

file servers." Doc. 161, at 14; Exhibit J to McDougall Decl. The Priceline Defendants also said

nothing about the fully accessible ex-employee tapes. Doc. 161, at 14. Instead, Defendants

claimed that a "great deal of the potential production has been stored and preserved electroni-

cally by way of computer tapes" – computer tapes that Defendants would need to restore and

convert "into searchable format before the search and review of the information can even take

place." *Id.* Defendants repeatedly talked about the need to "restore" and "retrieve" electronic

information – failing to mention the fact that vast amounts of responsive electronic data was sit-

ting around waiting to be reviewed and produced. Doc. 161, at 14, Doc. 162 at 2 (Kelleher Dec.,

¶ 7).

Had the Priceline Defendants raised issues relating to the snapshot and the ex-employee

tapes, Plaintiffs would have insisted that the Priceline Defendants produce these fully accessible

materials in the same time frame as the paper production – *i.e.,* on a rolling basis with all docu-

ments produced by July 31, 2005. As things now stand, however, the Priceline Defendants have

not produced a single electronic document from either the snapshot or the ex-employee tapes.

Moreover, when discussing the issue in late August 2005, the Priceline Defendants stated that the production of material on the snapshot and ex-employee tapes would still take several months. McDougall Decl., ¶ 18.  The Priceline Defendants also stated that they had just started to search the snapshot, contradicting the statement they previously made in their March 1, 2005 letter.  *Id.,* ¶ 17.  This is an amazing statement for the Priceline Defendants to make given that they have had complete and unfettered access to the electronic data on the snapshot and ex-employee tapes since February 2002 and have had Plaintiffs' document requests since November 2004.  This is not a situation where the Priceline Defendants had to spend money to restore the data.  The information has been available since February 2002.

There is no question that the Priceline Defendants' conduct in connection with the snapshot and ex-employee tapes has had a serious impact on the case.  Indeed, the Priceline Defendants cannot legitimately dispute that the electronic information contained on the snapshot and the ex-employee tapes will be highly probative to the claims at issue in this case.  The snapshot and ex-employee tapes include email accounts (including the accounts of Defendants Walker, Schulman, Braddock and Nicholas), spreadsheets, databases, financial information, and electronic memoranda needed to show that Defendants engaged in a carefully coordinated scheme to defraud the investing public.  The Priceline Defendants also likely recognize the value of this information and, thus, are apparently trying to keep these materials from Plaintiffs as long as possible.

Moreover, Plaintiffs cannot take the bulk of the fact depositions without the electronic documents, and thus have been unable to do so even though fact depositions were scheduled to begin April 1, 2005.  In sum, Defendants have had Plaintiffs' document requests for nearly a year and the parties are now six months away from the scheduled discovery cut-off.  During this

time, while Plaintiffs have been straining to obtain electronic discovery from Defendants, the snapshot and the ex-employee tapes have been fully accessible to the Priceline Defendants. There should be no further delay and the Priceline Defendants should be compelled to produce the electronic data on the snapshot and the ex-employee tapes in their accessible and searchable form by October 15, 2005.

**B.      Defendants Should Be Compelled To Produce The WebHouse And Perfect Yardsale Backup Tapes In Their Native Format.**

The other area of dispute involves the WebHouse and Perfect Yardsale backup tapes that the Priceline Defendants and Defendant Walker currently have in their possession. These tapes apparently contain information that was stored on the WebHouse and Perfect Yardsale servers during the relevant period. The dispute over the backup tapes turns on the cost to restore the tapes to an accessible format and the format in which the tapes will be produced.[5] Plaintiffs' e-discovery consultant can restore all 223 WebHouse and Perfect Yardsale backup tapes to their native format for $89,200. Allison Griffin Decl., ¶ 6. Defendant Walker's e-discovery expert, on the other hand, claims that it will cost his firm between $26 million and $200 million to produce the materials from the 181 back-up tapes in Walker's possession. Doc. 158 (Farley Affidavit). The Priceline Defendants have not set forth any proposal on their 42 backup tapes.

---

[5] Defendants' decision to put the WebHouse and Yardsale electronic documents on the backup tapes very well may have violated the PSLRA's automatic stay. The PSLRA stay requires parties to preserve all relevant evidence "as if they were subject to a continuing request for production of documents." Private Securities Litigation Reform Act of 1995, (the "PSLRA") 15 U.S.C. § 78u-4(b)(3)(C)(i). Furthermore, "the preservation of evidence in the possession of the parties is statutorily automatic." *Schnall v. Annuity and Life RE (Holdings), Ltd.*, 2004 WL 51117, at *2 (D.Conn 2004)(citing *In re Grand Casinos, Inc. Securities, Litigation,* 988 F.Supp. 1270, 1273 (D.Minn.1997)). Defendants have not explained how these electronic documents ended up on the tapes, or what they did to comply with the automatic stay.

1.      **The Backup Tapes Should Be Produced In Their "Native Format."**

Plaintiffs believe that the backup tapes should be produced in their native format – *e.g.,* emails should be restored back to Microsoft Outlook, word processing documents should be restored back to Microsoft Word, etc. *See, e.g.,* Griffin Decl., ¶ 5 (describing the native format approach). This approach is also most consistent with Rule 34's mandate that documents be produced *"as kept in the usual course of business"* and it is the approach adopted in two recent cases involving facts that are virtually identical to the facts at issue here. *See, e.g., In re Pemstar, Inc. Sec. Litig.,* No. 02-cv-01821 (D. Minn. April 23, 2004) ("[T]he Court is persuaded that production of electronic discovery in native format is appropriate, feasible, and important under the circumstances of this case.") (Exhibit B); *In re Verisign, Inc. Sec. Litig.,* 2004 WL 2445243, at *3 (N.D. Cal. March 10, 2004) (Exhibit C). It is also far and away the most cost-effective way to restore the electronic data to an accessible and searchable format. Griffin Decl., ¶¶ 6, 12.

Defendants, on the other hand, argue that the electronic information on the backup tapes should be converted into Tagged Image File Format (TIFF) or Portable Document Format (PDF) before it is produced. This requires an outside vendor to make an electronic "copy" of each piece of electronic data on the backup tapes and then convert it into a format that can be used by the vendor's own proprietary software. Griffin Decl., ¶¶ 11-16.

Plaintiffs' native format approach is by far the more reasonable for several reasons:

- If documents are produced in their native format, then cost-shifting is not an issue because the total *cost of restoring the backup tapes to their native format is $89,200*;

- Converting the electronic documents to TIFF or PDF files, by contrast, is cost prohibitive. Indeed, Defendant Walker has represented that it will cost between *$20 and $200 million* to restore and produce the information the 181 tapes in his

possession.  Thus, Plaintiffs' proposal would cost less than 1% of the expense De-
fendants posit would be necessary to implement their conversion proposal.

- Plaintiffs' native format approach is the only way to capture crucial embedded in-
formation and metadata about the document (such as the date and location of
creation, modifications and other identifying information) – embedded informa-
tion and metadata that is erased when the information is converted to PDF or
TIFF files;

- Plaintiffs' native format approach will allow the Defendants to produce the in-
formation on the backup tapes in a few weeks, whereas, by Defendants' own ad-
mission, it could take many months to review and produce the documents once
they are converted to TIFF or PDF files.

Plaintiffs, therefore, request that the Court order Defendants to produce on or before October 15,

2005, all electronic documents, databases, data, and email responsive to Plaintiffs' discovery re-

quests in native format as "kept in the usual course of business" with no substantive alterations to

the file format, organization, metadata, or other characteristics.  This is the only cost-effective

way for the parties to obtain the highly relevant information on the backup tapes.

### a.    The Circumstances In This Case Warrant The Production Of The In-formation On The Backup Tapes In Their Native Format.

The circumstances in this case all weigh heavily in favor of the production of the elec-

tronic documents on the backup tapes in their original native format as opposed to production in

TIFF or PDF files.  Most significantly, the native format approach is the only cost-effective way

to produce the information on the backup tapes.  Griffin Decl., ¶¶ 6, 12.  Plaintiffs' computer

consultant states that it will cost $89,200 to restore the tapes to their native format.  *Id.*  Using

Defendants' proposed approach, the costs could easily exceed $200 million.  Doc. 158 (Farley

Affidavit).[6]  The time constraints in this case also weigh in favor of the native format approach.

---

[6] Under Plaintiffs' approach, cost-shifting is not even an issue because the costs are man-
ageable and reasonable.  Furthermore, the issue of cost-shifting is properly raised only in a mo-
tion for a protective order under Rule 26(c).  *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S.
340, 358 (1978) (stating that "the responding party must bear the expense of complying with dis-

Indeed, the document requests were served on Defendants close to eleven months ago and the parties are six months away from the discovery cut-off, yet Defendants have not produced a single electronic document to date.[7]  Other factors – such as the importance of the electronic documents and the burdens on the parties under the two approaches – also cut heavily in favor of the native format approach when compelling production of the tapes.

The relevant factors were recently addressed in the *Pemstar Securities* case in the District of Minnesota.  There, as here, plaintiffs argued that electronic data in the defendants' possession should be restored to its native format.  Defendants argued that the electronic data should be produced in printed paper copy, TIFF files or PDF files.  The court sided with plaintiffs, compelling the defendants to produce electronic data in its original native format.  The court explained:

> ***The circumstances of this case make production in native format of particular importance***.  For example, in order to prevail on its section 10(b) of the Securities and Exchange Act of 1934 claim, Plaintiffs must prove scienter.  A "classic fact pattern" giving rise to a strong inference of scienter is where the "defendants published statements when they knew facts or had *access* to information suggesting that their public statements were materially inaccurate." . . . . ***[I]n attempting to prove knowledge of facts or access to information suggesting statements were materially inaccurate, it is appropriate in this case and most useful to the fact finder to view, understand, and step into the shoes of the information source that actually provided the alleged knowledge and access***.

*Id.* at 5-6 (Exhibit B) (emphasis added).  The court was also persuaded by the fact that producing electronic data in its native format would be less costly and would allow plaintiffs to access the material more easily:

---

covery requests, but he may invoke the district court's discretion under Rule 26(c) to grant orders protecting him from 'undue burden or expense' in doing so, including orders conditioning discovery on the requesting party's payment of the costs of discovery.")

[7] Due to Defendants' extensive delay, Plaintiffs likely will be seeking an extension of the fact discovery cutoff and certain other dates in the current scheduling order.

Defendants argue that TIFF files can preserve metadata and file structure and, therefore, native format is not required. That may be so, but ***it can hardly be said that linking specific metadata or file attachments with the relevant email or file is more efficient with TIFF production as opposed to native format***. The Court is persuaded by the presentation at the hearing on this matter that demonstrated, although partly a matter of common sense, the efficiency of viewing an email with an Excel file attachment in native format as opposed to the TIFF alternative. ***In addition, the record thus far demonstrates that actually producing electronic discovery in native format as opposed to TIFF would be less costly***.

*Id.* at 6 (emphasis added).

A similar result was reached in the recent *Verisign Securities* case, which is attached as Exhibit C. There, the court ordered the production of electronic documents in their original native format. Other courts have also ordered the production of electronic documents in their native format. *See, e.g., In re Air Disaster at Detroit Metro. Airport,* 130 F.R.D. 634 (E.D. Mich. 1989); *Daewoo Elec. Co. Ltd. v. United States,* 650 F. Supp. 1003 (Ct. Int'l Trade 1986); *National Union Elec. Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 494 F. Supp. 1257 (E.D. Pa. 1980). In addition, when discussing the form of production of computerized data, the Manual for Complex Litigation (4th Ed.) states: "Dynamic data may need to be produced in native format." Sec. 11.446, p. 80.

Here, the cost of restoring the documents ($89,200 to restore the tapes to their native format), the ease with which the documents can be reviewed, the importance of the documents to the case itself, and the time constraints in the case all weigh heavily in favor of the native format approach. Accordingly, this Court should order Defendant Walker to produce the 181 backup tapes in their native format and the Priceline Defendants to produce the 42 backup tapes in their possession in their native format no later than October 15, 2005.

18

    **b.**    **Production Of Documents In Their Native Format Is The Only Way To Obtain <u>Electronic Evidence That Is Critical To Plaintiffs' Claims.</u>**

As noted above, the electronic information and data on the WebHouse and Perfect Yardsale backup tapes is crucial information that Plaintiffs need to prove the claims asserted in the Amended Complaint. In this case, Plaintiffs have sought, among other things, the production of various financial and accounting documents in connection with Defendants' scheme to artificially inflate their reported revenues and earnings. It is imperative that the electronic form of these financial and accounting documents be made available to Plaintiffs so that Plaintiffs can effectively and efficiently evaluate the financial and accounting evidence.

However, as Defendants themselves are aware, the computer-based databases and spreadsheets are not as useful in printed form. Griffin Decl., ¶ 15. For example, there are often hidden columns on spreadsheets that will not appear on the printed version, but will be revealed electronically. Spreadsheets produced in electronic format also reveal how the numbers in various cells of the spreadsheets were derived, and the relationship of various cells within the spreadsheet. *Id.* By making only the printouts of electronic evidence available to Plaintiffs, Defendants are creating a situation whereby Plaintiffs are not able to fully review or analyze the evidence in the format that Defendants used it, or in the form available to Defendants' counsel. This is contrary to both the letter and the spirit of discovery under the Federal Rules. Indeed, "producing print-outs of computer data is so unnecessary that it might be considered an abusive tactic." *Computer-Based Discovery in Federal Civil Litig.,* K. Withers, 2000 Fed. Cts. L. Rev. 2 (Federal Judges Assoc. 2000).

Another key type of electronic evidence that Defendants will produce is email. As a technology company with its business principally concentrated on the internet, Priceline uses email as a main tool of communication. Additionally, email indices, which can be electronically

sorted by date, to, from, subject and other fields, would provide collective information that cannot be duplicated by any alternative sources. Griffin Decl., ¶ 8. Not only can emails easily lay out the chronology of events, but they are also extremely helpful to Plaintiffs' development of any trend, pattern or course of conduct of Defendants' fraudulent scheme. Thus, it is reasonable to ask Defendants to produce the emails in their native format. *See Sattar v. Motorola, Inc.,* 138 F.3d 1164, 1171 (7th Cir. 1998) (instructing defendants to produce emails in electronic format and provide plaintiffs with compatible equipment to access it).

Plaintiffs also need the "metadata" on the tapes in Defendants' possession. Metadata, which is not readily available when documents are produced as TIFF or PDF files, consists of information regarding who, what, when, where, why and how the data was created, documented and maintained. Mary Kay Brown and Paul D. Weiner, *Digital Dangers: A Primer on Electronic Evidence in the Wake of Enron,* 74 PA Bar Ass'n Quarterly 1 (2003) (attached as Exhibit E). Metadata reveals, among other things, when files were created, modified and deleted, and what user name was associated with those tasks. Griffin Decl., ¶ 9. Computer files often contain hidden or embedded information such as formulas and comments in spreadsheets. *Id.* By not producing electronic copies of these highly relevant documents in their native format, Defendants are precluding Plaintiffs from obtaining discoverable evidence that is critical to the claims at issue in this case. This violates both the letter and the spirit of the Federal Rules and cannot be justified given circumstances in this case.

C.    **Defendants' Concerns About Privileged Materials On The Tapes Are Not Valid <u>And Can Easily Be Addressed Through Use Of A "Claw Back" Agreement.</u>**

In connection with their efforts to shield the production of the WebHouse and Perfect Yardsale tapes from Plaintiffs, Defendants claim that the backup tapes cannot be produced in

their native format because they would be unable to review and remove privileged information from the tapes. This argument fails because the backup tapes belong to WebHouse and Perfect Yardsale – two entities that Defendants themselves argue were simply "third party licensees" that existed separate and apart from Priceline and the other Defendants. Doc. 161 at 11-13; Doc. 158 at 3-4. Indeed, Defendants argued vigorously that Priceline had simply granted WebHouse and Yardsale use of its name and intellectual property rights in exchange for royalty payments under the licensing agreement. *Id.*

After making these earlier representations, Defendants cannot turn around now and claim that these self-proclaimed "third party" materials are privileged. It is well-settled that a third party does not have standing to assert the attorney-client privilege on behalf of another. *See, e.g., Application of Sarrio, S.A.,* 119 F.3d 143, 147-48 (2d Cir. 1997) ("[I]f a client-witness waives its right to conceal matters it confided to its attorneys, a party against whom the evidence is offered has no right to insist that the privilege nevertheless be observed."); *In re Grand Jury Proceedings,* 604 F.2d 798, 801 (3d Cir. 1979) (the attorney-client privilege belongs only to the client, not to a third party who may want to assert the privilege to prevent the disclosure of documents). Moreover, the WebHouse and Perfect Yardsale privilege was waived when these entities gave the backup tapes to Defendants, who supposedly are third-party licensors who exist separate and apart from WebHouse and Perfect Yardsale. *Long-Term Cap. Holdings v. U.S.,* 2002 WL 31934139, at *3 (D. Conn. Oct. 30, 2002) ("[A]ny voluntary disclosure of an attorney-client communication to a third-party for purposes inconsistent with maintaining confidentiality waives the attorney-client privilege as to that disclosure."); *In re Horowitz,* 482 F.2d 72, 81 (2d Cir. 1973) ("We deem it clear that subsequent disclosure to a third party waives whatever privilege the communications may have possessed.").

21

More importantly, even if some of the documents on the backup tapes are privileged, Defendants' concerns can easily be addressed through the use of a "claw-back" order.  A claw-back order allows a party to produce large amounts of electronic data without waiving its right to assert the attorney-client privilege or work product doctrine with respect to any electronic document that is produced.  This approach has been used in several recent cases – particularly where, as here, it is time consuming to conduct a privilege review of all documents that have been stored in electronic format.  *See, e.g., Zubulake v. UBS Warburg, LLC,* 216 F.R.D. 280, 290 (S.D.N.Y. 2003) ("Zubulake III") ("Indeed, many parties to document-intensive litigation enter into so-called 'claw-back' agreements that allow parties to forgo privilege review altogether in favor of an agreement to return inadvertently produced privileged documents.").[8]

Defendants' extensive delay also weighs heavily in favor of a claw-back order.  Moreover, it will likely take several additional months to restore and then review the tapes in a TIFF or PDF format, whereas the tapes can be converted into their native format in a matter of weeks.  All of these factors support the production of the documents in their native format and the issuance of a claw-back order to the extent that any privilege actually exists.

---

[8] *See also* The Sedona Conference, *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production,* Comment 10a (March 2003) ("Because of the large volumes of documents and data typically at issue in cases involving production of electronic data, courts should consider entering orders protecting the parties against any waiver of privilege or protections due to the inadvertent production of documents and data . . . . Such an order should provide that the inadvertent disclosure of a privileged document does not constitute a waiver of privilege, that the privileged document should be returned (or there will be a certification that it has been deleted), and that any notes or copies will be destroyed.  Ideally, an agreement or order should be obtained prior to any production.").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs request that this Court order: (1) Defendants to pro-vide the entire snapshot and all of the ex-employee tapes to Plaintiffs in a searchable, accessible format by October 15, 2005; and (2) Defendants to restore all 223 WebHouse and Perfect Yard-sale backup tapes to their native format and produce the restored tapes to Plaintiffs by October 15, 2005.

Dated: September 22, 2005                    Respectfully submitted,

                                             SCOTT + SCOTT, LLC


                                             _____
                                             David R. Scott (ct16080)
                                             Erin Green Comite (ct24886)
                                             108 Norwich Avenue
                                             P.O. Box 192
                                             Colchester, CT  06415
                                             Telephone: (860) 537-5537
                                             Facsimile: (860) 537-4432
                                             drscott@scott-scott.com
                                             ecomite@scott-scott.com

                                             SCOTT + SCOTT, LLC
                                             Geoffrey M. Johnson
                                             33 River Street
                                             Chagrin Falls, OH 44022
                                             Telephone:  (440) 247-8200
                                             Facsimile:  (440) 247-8275

JOHNSON & PERKINSON
Dennis J. Johnson
Jacob B. Perkinson
Peter J. McDougall
1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403
Telephone: (802) 862-0030
Facsimile: (802) 862-0060

STULL, STULL & BRODY
Jules Brody
Aaron Brody
6 East 45th St.
New York, NY 10017
Telephone: (212) 687-7230
Facsimile:  (212) 490-2022

**Co-Lead Counsel**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 22, 2005, a true copy of the forego-

ing Memorandum in Support of Motion To Compel Production Of Electronic Discovery were

served on all counsel of record on the attached service list by first-class, postage prepaid U.S.

mail.

_____

Erin Green Comite

## SERVICE LIST

Dennis J. Johnson
Jacob B. Perkinson
Johnson & Perkinson
1690 Williston Road
South Burlington, VT 05403

Jules Brody
Aaron Brody
Stull, Stull & Brody
6 East 45th Street
New York, NY 10017

Andrew M. Schatz
Schatz & Nobel, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06106

J. Daniel Sagarin
Hurwitz Sagarin & Slossberg
147 North Broad St., PO Box 112
Milford, CT 06460-0112

Albert M. Myers
Carl Mullis
Paul, Hastings, Janofsky & Walker, LLP
600 Peachtree Street, N.E. 24th Floor
Atlanta, GA 30308

Martin Glenn
O'Melveny & Myers
Times Square Tower
7 Times Square
New York, NY 10036

Joseph L. Clasen
William Kelleher
Robinson & Cole, LLP
Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT 06904-2305
(Sent Via Overnight Delivery and Via
Facsimile)

Daniel Slifkin
James Hein
Cravath, Swaine & Moore
825 Eight Avenue
New York, NY 10019
(Sent Via Overnight Delivery and Via
Facsimile)

Douglas C. Conroy
Carl Mullis
Paul, Hastings, Janofsky & Walker
1055 Washington Blvd., 9th Floor
Stamford, CT 06901
(Sent Via Overnight Delivery and Via
Facsimile)