# Exhibit E



74 PABAQ 1                                                                                                        Page 1
74 Pa. B.A. Q. 1
**(Cite as: 74 Pa. B.A. Q. 1)**

Pennsylvania Bar Association Quarterly
January, 2003

**\*1** DIGITAL DANGERS: A PRIMER ON ELECTRONIC EVIDENCE IN THE WAKE OF ENRON

Mary Kay Brown, Paul D. Weiner [FNa1]
Philadelphia County Members of the Pennsylvania Bar

Copyright © 2003 by Pennsylvania Bar Association Quarterly; Mary Kay Brown,

Paul D. Weiner

TABLE OF CONTENTS

```
INTRODUCTION ................................................................ 1
THE FUNDAMENTALS OF ELECTRONIC EVIDENCE ..................................... 2
   The Proliferation of Electronic Evidence ................................. 2
   Will a Court Really Make My Client Produce Electronic Data? .............. 3
   When Does the Obligation to Preserve Electronic Evidence Attach? ......... 3
   The Paramount Role of The Lawyer In Fulfilling A Client's Duty to
      Preserve Evidence ..................................................... 5
   What Are the Ramifications for Failing to Adequately Preserve
      Electronically-Stored Information? .................................... 6
   What Must Your Client Search for and Produce? ............................ 8
   What Are the Limitations? ............................................... 11
   Who Foots the Bill? ..................................................... 12
CONCLUSION ................................................................. 17
```

INTRODUCTION

  The developing Enron scandal highlights the importance of understanding the fundamentals of preserving electronic evidence. Within days of the story breaking, a key focus of the inquiry became whether Enron, and its outside auditors, Arthur Andersen, failed to take appropriate steps to preserve relevant evidence, or permitted its intentional destruction. [FN1]

74 PABAQ 1 Page 2
74 Pa. B.A. Q. 1
**(Cite as: 74 Pa. B.A. Q. 1)**

Some of the most heated questioning during the first Congressional hearings was directed not at the conduct of Enron officials or senior accountants at Arthur Andersen, but instead at the conduct of Arthur Andersen's in-house lawyers. The issue was quite simple: once Arthur Andersen knew its client was under investigation (and even before a subpoena had been served on the company) what did **the lawyers** do to ensure that evidence--including electronically-stored evidence--was not destroyed or was preserved?

**Congressman Tauzin** [FN2]: Does it have to be raised, Ms. Temple, [FN3] when you are the counsel representing this company internally on litigation? Does anybody have to raise it? Or is [it] somebody's responsibility in the company to say, "Stop destroying documents, we're under investigation."

**\*2** Whose responsibility was it, if it was not yours? Did somebody have to raise it? Whose responsibility, Mr. Andrews?

**Mr. Andrews** [FN4]: In our policy ...

**Congressman Tauzin**: Was it your president? Was it you? Who was it?

**Mr. Andrews**: In our policy, that responsibility, a policy that we're revising and I acknowledge we're revising, in that policy that responsibility is with the engagement partner.

**Congressman Tauzin**: With an accountant, not a lawyer? You give the responsibility to an accountant to decide whether it's legally permissible to destroy documents relative to a proceeding?

Let me just tell you, I don't know what's going to happen out of all this. I really don't. I hope you're all OK, I don't know. But I'll tell you this, every accounting firm that is listening to this had better listen very carefully. If all of your policies are to let accountants decide when its legal to destroy documents in a pending investigation, an awful lot of people are going to be in trouble down the road, not just in this case.

And I hope you think seriously about what kind of policies you have on retention of documents and whether those policies are clear or vague or whether you just send memos out for somebody else to interpret or whether you eventually recognize, as you did, Ms. Temple, at some point, that they needed guidance.

They needed guidance on what not to do and what to do as you eventually gave them. And they should have gotten that guidance a long time sooner. You see, we wouldn't be here. We'd be scheduling the Enron hearing right now, but we're here discussing what happened at your company because this guidance never went out when it should have gone out and because your company did not have a clear policy on making sure the documents were not destroyed once a notice was given by the SEC that it was checking into your business.

Now that's got to change. And if you don't change it, I promise you, we will.

January 24, 2002 Transcript of the Hearings before the House Energy and Commerce Oversight and Investigations Subcommittee on the Destruction of Enron Related Documents, witnesses from the accounting firm of Arthur Andersen LLP (hereinafter "January 24, 2002 House Hearing"), 2002 WL 93115 at p. 73 (F.D.C.H.)

It is well-established that the duty to preserve evidence attaches, at the latest, when litigation commences. Indeed, the growing trend is for courts to attach the obligation to preserve relevant evidence earlier than the filing of a complaint--as soon as the party has knowledge that the information may be relevant to a potential claim. It is equally well-established that the responsibility to ensure that evidence is preserved falls first to the lawyer. Given the wide-spread use of storing information in an electronic format, the failure to take affirmative steps to preserve information will virtually ensure that it will be destroyed by otherwise innocent and routine practices.

This article outlines basic considerations regarding the preservation and production of electronic evidence that lawyers practicing in this digital age face on a daily basis.

THE FUNDAMENTALS OF ELECTRONIC EVIDENCE

The Proliferation of Electronic Evidence

Today business is conducted electronically: deals are negotiated and documented by e-mail; employee calendars are stored on desktop computers or palm pilots; electronic task lists dictate people's work day; meetings are attended by video conference; phone handsets reveal the identity of the last fifty callers; security systems create an electronic record of the identity, date and time of access to buildings; and Internet usage--for business and pleasure--is commonplace. Moreover, much of this day-to-day business data and communications are preserved on company back-up tapes on a routine basis.

"According to a University of California study, 93% of all information generated during 1999 was generated in digital form, on computers. Only 7% of information originated in other media, such as paper."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 PABAQ 1 Page 3
74 Pa. B.A. Q. 1
**(Cite as: 74 Pa. B.A. Q. 1)**

In re: Bristol-Myers Squibb Securities Litigation, 205 F.R.D. 437, 440 n. 2 (D.N.J. 2002) (citing Kenneth J. Withers, Electronic Discovery: The Challenges and Opportunities of ***3** Electronic Evidence, Address at the National Workshop for Magistrate Judges (July 2001)).

While technology certainly facilitates communication, its use leaves a distinct, digital trail. Information concerning with whom one communicated, what was discussed, when it occurred, who was privy to it, what documents were transmitted, and even attempts to erase the record of that communication, is electronically-stored and potentially discoverable.

Electronic evidence is a particularly fruitful source of evidence because it often provides data not readily apparent. One of the most common fallacies is that once an e-mail or document is deleted, it can never be recovered. In fact, deleted documents may often be recovered in whole or in fragments. Generally speaking, the more recent the deletion, the more likely a document will be successfully recovered. However, even files that have been deleted and overwritten may sometimes be found in other space on the hard drive of a computer, known as free space and slack space, and can be the source of relevant evidence.

Computer files often contain hidden or embedded information. Some programs can "undo" a deleted portion of a document or even show all prior versions of a document. There may be hidden columns on spread-sheets that will not show up on the printed version, but will be revealed electronically. Some e-mail programs have a "bcc" field that appears electronically on the sender's version, but not on the intended recipient's version. In this instance, if you only have the hard copy from the receiver's end, you will never know that others were party to the communication.

Computer files also contain what is known as "metadata." Metadata consists of information that characterizes data. In essence, metadata answers the questions of who, what, when, where, why, and how about the data being documented. With respect to electronic evidence, metadata reveals, among other things, when files were created, modified, deleted, and what user name is associated with those tasks. It is metadata that provides the blueprint of a backdated document, or reveals a party's improper attempts to delete relevant information immediately after receiving notification of a lawsuit.

In the digital world, a "paper file" tells only half (or less) of the story. The other half is contained in electronically-stored formats. This unique feature of electronic evidence combined with the proliferation of its use, has a dramatic impact on the litigation process.

Will a Court Really Make My Client Produce Electronic Data?

Yes. The Federal Rules of Civil Procedure clearly contemplate the production of electronic information. The definition of the term "documents" in Fed.R.Civ.P. 34 expressly includes "data compilations from which information can be obtained ...." The advisory committee's note to the 1970 Amendment to Fed.R.Civ.P. 34 likewise instructs:

The inclusive description of "documents" is revised to accord with changing technology. It makes clear that Rule 34 applies to electronic data compilations from which information can be obtained only with the use of detection devices, and that when the data can as a practical matter be made usable by the discovering party only through respondent's devices, respondent may be required to use his devices to translate the data into usable form. In many instances, this means that respondent will have to supply a print-out of computer data .... [I]f the discovering party needs to check the electronic source itself, the court may protect respondent with respect to preservation of his records, confidentiality of nondiscoverable matters, and cost.

Moreover, Fed.R.Civ. P. 26(a)(1)(B) mandates that even before receiving a discovery request, a party must disclose, inter alia, "a copy of, or a description by category and location of, all ... data compilations ... in the possession, custody, or control of the party that are relevant to disputed facts alleged with particularity in the pleadings."

When Does the Obligation to Preserve Electronic Evidence Attach?

As with discovery of traditional "documents," there is a point in time when a party is obligated not to destroy electronic information that may be relevant to a lawsuit. Since electronic information is continually being deleted, overwritten, or recycled, it is particularly important to know when that obligation attaches and what precautions a party must take to preserve electronic evidence before it is destroyed in the normal course of business.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 PABAQ 1                                                                                                              Page 4
74 Pa. B.A. Q. 1
**(Cite as: 74 Pa. B. A. Q. 1)**

It is generally accepted that the obligation to preserve relevant evidence attaches at the time the complaint is filed. "While a litigant is under no duty to keep or retain every document ***4** in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." Computer Assoc. Int'l, Inc. v. Am. Fundware, Inc., 133 F.R.D. 166, 169 (D. Colo. 1990) (citing Wm. T. Thompson Co. v. Gen. Nutrition Corp., 593 F.Supp. 1443, 1455 (C.D. Cal. 1984) (finding that developer's duty to preserve source code arose no later than the time it was served with complaint). See also In re St. Jude Med., Inc., Silzone Heart Valve Prod. Liab. Litig., 2002 WL 341019, at *1 (D. Minn. Mar 1, 2002) (ordering party to preserve newly-created documents during the pendency of the case, yet instructing that the duty to preserve such documents does not extend to, inter alia, "draft documents or interim versions of documents if those documents would not have been preserved in the ordinary course of business, except for those documents which contain handwritten notes by persons other than the author" or "multiple identical copies of a document, including ... electronically-stored data," if the original document remains in a party's possession, custody or control).

The growing trend, however, is for courts to attach the obligation to preserve documents earlier than the filing of a complaint--as soon as the party has knowledge that the information may be relevant to a potential claim. Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) ("Spoliation refers to the destruction or material alteration of evidence or failure to preserve property for anther's use as evidence in pending or reasonably foreseeable litigation.") (emphasis added); Kronish v. United States, 150 F.3d 112, 126 (2d Cir. 1998) (noting that that duty to preserve material evidence arises even before litigation begins--at the time when a party should know of the evidence's relevance to anticipated litigation); Mathias v. Jacobs, 197 F.R.D. 29, 37 (S.D.N.Y. 2000) ("duty to preserve arises when a party has been served with a complaint or anticipates litigation") (citations omitted); Winters v. Textron, Inc., 187 F.R.D. 518, 520 (M.D. Pa. 1999) ("[K]nowledge of a potential claim is deemed sufficient to impose a duty to preserve evidence."); Bowman v. Am. Med. Sys., Inc., 1998 WL 721079, at *3 (E.D. Pa. 1998) ("A party which reasonably anticipates litigation has an affirmative duty to preserve relevant evidence."); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 73 (S.D.N.Y. 1991) ("[N]o duty to preserve arises unless the party possessing the evidence has notice of its relevance ... [yet] the obligation to preserve evidence [can arise] prior to the filing of a complaint where a party is on notice that litigation is likely to be commenced," citing Danna v. N.Y. Tel. Co., 752 F.Supp. 594, 616 n. 9 (S.D.N.Y. 1990)); Capellupo v. FMC Corp., 126 F.R.D. 545, 550 (D. Minn. 1989) (duty to preserve evidence attaches when a party has knowledge that information in its possession is relevant to existing or future litigation); Mount Olivet Tabernacle Church v. Edwin L. Wiegand Div., 781 A.2d 1263, 1270 - 71 (Pa. Super. 2001) (the general duty to preserve evidence has been described to arise when: (1) a party knows that litigation is pending or likely, and (2) it is foreseeable that discarding the evidence would be prejudicial to the other party.)

Chairman James Greenwood [FN5] emphasized this very point at the outset of the hearings before the House Energy and Commerce Oversight and Investigations Subcommittee on the Destruction of Enron Related Documents, when he asked the following loaded question:

I'd like to read for you a quote from a Georgetown Law professor who is an expert on corporate legal ethics. Mr. Milton Regan from The Washington Post last Sunday says this--and if you look at tab 28 in your binder.

It says that as soon as an accounting firm knows that a company it audits is under government investigation, the firm's general counsel or compliance officer would typically send a notice reminding employees of the need to preserve documents related to the inquiry and that, quote, "[the] requirement of preserving documents would override any internal document retention policy."

Mr. Lynn Turner, the former top accountant for the SEC and a long-time member of the profession in accounting firms sent me a letter to the same effect, saying that an SEC inquiry into a client would normally prompt a letter from the auditor's counsel to its employees, directing them to preserve related ***5** records. I'd like to make this letter part of the record.

Finally, last Sunday on Meet the Press, your CEO and managing partner, Mr. Berardino, said essentially the same thing. Let me show you his quotes, which should be in tab 23 of your binder. He says that your policy states, quote, "exactly that," close quote, meaning that upon the SEC inquiry all shredding should have stopped. He even went further, saying that if there is a, quote, "reasonable anticipation of an investigation," close quote, all destruction should stop.

So I guess the simple question is, why didn't anyone at Andersen notify its employees that an SEC inquiry into Enron financial and accounting issues had begun and that normal document destruction policies were suspended? Why did Andersen's counsel wait nearly three weeks to do so?

January 24, 2002 House Hearing, 2002 WL 93115 at p. 8.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 PABAQ 1 Page 5
74 Pa. B.A. Q. 1
**(Cite as: 74 Pa. B.A. Q. 1)**

Some courts consider the duty to preserve evidence to have attached as soon as a party contacts an attorney or anticipates litigation. Silvestri v. General Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001) (finding that even though plaintiff did not own or control vehicle, a duty to preserve the vehicle arose when lawyers and experts examined the vehicle in anticipation of litigation); Barsoum v. NYC Housing Auth., 202 F.R.D. 396, 400 (S.D.N.Y. 2001) (instructing that that plaintiff had duty to preserve tape of key conversation between her and her supervisor because "she knew or should have known that it was reasonably foreseeable that the tape would be relevant to future litigation," and she was already receiving assistance from counsel). In fact, a court has even held that a company had a duty to preserve all evidence relating to accidents upon which the statute of limitations had not yet run. Reingold v. Wet'N Wild Nevada, Inc., 944 P.2d 800, 802 (Nev. 1997) (holding that an adverse inference instruction was an appropriate sanction because the company willfully destroyed its 1989 accident records barring plaintiff from examining them after he filed a complaint in 1991). Moreover, evidence destroyed in compliance with a company's "destruction policies" or "document retention policies" will not defeat a party's obligation to preserve relevant evidence. Id. ("If Wet'N Wild chooses such a records destruction policy, it must accept the adverse inferences of the policy.") See also Trigon Insur. Co. v. United States, 204 F.R.D. 277, 289 (E.D. Va. 2001) (finding that a document retention policy did not absolve party from responsibility when it "took no steps to preserve evidence that it knew, or was charged with knowing, must be disclosed").

Thus, it is critical to know the law in your jurisdiction, and as discussed in greater detail below, to advise your clients when material evidence must be preserved.

The Paramount Role of The Lawyer In Fulfilling A Client's Duty to Preserve Evidence

Courts have repeatedly emphasized the paramount role of the lawyer in fulfilling a client's duty to preserve evidence, instructing:
  [o]nce on notice, the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation.

Telecom Int'l. Am., Ltd. v. AT&T Corp., 189 F.R.D. 76, 81 (S.D.N.Y. 1999) (citing Kansas-Nebraska Natural Gas Co. v. Marathon Oil Co., 109 F.R.D. 12, 18 (D. Neb. 1983)). See also Donato v. Fitzgibbons, 172 F.R.D. 75, 79 (S.D.N.Y. 1997) ("The 'obligation [to preserve evidence runs] first to counsel, who ha[s] a duty to advise his [or her] client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction.'"); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 73 (S.D.N.Y. 1991) ("This obligation [to preserve records] ran first to counsel, who had a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction."); Mosel Vitelic Corp. v. Micron Tech., Inc., 162 F.Supp. 2d 307, 309 (D. Del. 2000) (in patent infringement action where alleged violator was relying on "advice of counsel" defense, the court held that initial drafts of opinion letters were discoverable, and that a lawyers' destruction of such initial drafts was "deeply troubling," and ordered that the jury be provided with an instruction which allows them to draw an adverse inference from the destruction of evidence).

Not surprisingly, this issue was underscored during the hearings before the House Energy and Commerce Oversight and Investigations Subcommittee on the Destruction of Enron Related Documents, as noted in the Introduction *6 to this article. In addition to Chairman Greenwood's admonition, another Congressional investigator likewise warned:
  **Congresswoman Degette** [FN6]: Let me just say something to you, Mr. Andrews. I was a litigator for 15 years, and I advised a lot of businesses. I didn't do SEC work and I didn't work with big five accounting firms. My clients were small businesses. But I will tell you that when I knew of threatened litigation against a client, I called them up and I said, "Don't destroy a thing." And sometimes I had to go over and physically take possession of papers.
  And that, I think, [is] the ethical obligation of every attorney who represents a client and is the ethical obligation of every accounting firm or auditor who represents a client.
  I don't think that that is so unreasonable that that should have been in your policy for all these years. And I hope to God it's in the interim policy that you have adopted.

January 24, 2002 House Hearing, 2002 WL 93115 at p. 121.

From a practical standpoint, what does this mean? It means that after you identify the issues involved in the case or potential claim it is your job as a lawyer to:
  . Interview your client's MIS personnel to understand your client's computer system and its retention/destruction procedures, as well as to identify sources of electronic evidence. For example, does e-mail reside on a user's hard drive or the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

company's e-mail server? Is there a separate server that services wireless devices? Does the company back-up information, what type, how often and where is it kept?

. Determine what relevant electronic evidence is in danger of being lost by deletion, overwriting or recycling. Are back-up tapes systematically recycled and how often? Are mass amounts of older information routinely purged from the system to create space for newer files on the system? When an employee resigns, is his/her laptop reformatted and re-distributed to another company employee? Are e-mails and other electronically-stored information automatically deleted after they reside on the system for a set period of time (e.g. 30 days)?

. Devise an action plan to preserve that information. It may range from an instruction that certain users do not delete documents or e-mails that deal with a particular subject to taking mirror images of certain computers and/or servers. Determine who needs to receive the appropriate instruction and deliver it in writing. Monitor compliance with the preservation plan in writing as the case progresses. Make sure that any user who may have relevant information, and subsequently leaves your client's employ, does not take his or her computer.

. If necessary, hire an expert in the early stages of the case who will assist you with these tasks. Indeed, it is not at all unusual to have an initial hearing, with expert testimony from both sides, regarding the issue of what electronic evidence must be preserved and produced by parties and who should bear the costs.

What Are the Ramifications for Failing to Adequately Preserve Electronically-Stored Information?

As with traditional "documents," courts have sanctioned parties for intentionally destroying electronic evidence and, in certain circumstances, for failing to prevent its destruction. Whether sanctions are warranted typically depends on two factors: whether the destruction of the evidence was accomplished in bad faith and whether the party seeking the evidence was substantially prejudiced by its loss. In those cases where the party has failed to take precautions to preclude the destruction of relevant electronic evidence in the ordinary course of business, the decisions run the gamut from imposing no sanctions because the requesting party was not prejudiced, to monetary sanctions to more severe repercussions.

In Procter & Gamble Co. v. Haugen, 179 F.R.D. 622 (D. Utah 1998), aff'd in part and rev'd in part on other grounds, 222 F.3d 1262 (10th Cir. 2000), the court considered whether to sanction Procter & Gamble for failing to preserve all of its corporate e-mail communications during the pendency of the lawsuit (which Proctor & Gamble had tenaciously insisted the defendant do) and to search or save the e-mail of five key employees. 179 F.R.D. at 631. Because no discovery ruling had been made, the court refused to impose sanctions under Rule 37(b)(2) and instead, relied on its inherent authority and the doctrine of "bad faith spoliation." Id. at 631-32. Again, because **7 no discovery order had been entered that specifically delineated the scope of the duty and provided clear evidence that Proctor & Gamble was on notice of the relevant e-mail communications, the court was unwilling to find that the company had not discharged its duties by whatever searches it had performed prior to the deletion of e-mail. Id. at 632. However, the court imposed sanctions of $10,000 for the company's failure to search or preserve the e-mail of the five key employees which Proctor & Gamble itself had identified as having relevant data. Id. See also Equal Employment Opportunity Comm'n v. Gen. Dynamics Corp., 999 F.2d 113, 116 (5th Cir. 1993) (refusing to sanction plaintiff for failing to produce computer tape in response to court's discovery order which required production of "tangible things relied on by [its expert]" where plaintiff had produced computer printout of all things relied on by its expert and did not understand Court's discovery order as calling for production of actual computer tape).

In appropriate cases, Courts have imposed severe sanctions, such as adverse inference instructions, preclusion sanctions, default judgments and instructions to the jury that they must find in favor of a particular litigant, because relevant electronic evidence was not preserved, or was intentionally destroyed. See e.g., Barsoum v. NYC Housing Auth., 202 F.R.D. 396, 401 (S.D.N.Y. 2001) (denying defendant's motion to dismiss the case, yet holding that plaintiff was precluded from introducing "any evidence" relating to a meeting between plaintiff and her supervisor, including its occurrence, because plaintiff failed to preserve a tape recording of the meeting, reasoning that this preclusion sanction "would adequately serve the purposes of punishment, deterrence, and prophylaxis."); Strasser v. Yalamanchi, 783 So. 2d 1087, 1095 (Fla. Dist. Ct. App. 2001) (affirming trial judge's instruction to the jury to find for plaintiff on his spoliation of evidence and breach of contract claims, because defendant discarded a computer that contained relevant electronic evidence after it had allegedly been hit by lightning during the pendency of the litigation); Computer Assoc. Int'l, Inc. v. Am. Fundware, Inc., 133 F.R.D. 166, 170 (D. Colo. 1990) (holding that developer's destruction of source code after receipt of complaint warranted entry of default judgment on claims of breach of computer software agreement, copyright infringement and unfair competition); Mosel Vitelic Corp. v. Micron Tech., Inc., 162 F.Supp. 2d 307, 309 (D. Del. 2000) (Court ordered that adverse inference instruction be given to the jury because counsel failed to retain initial drafts of patent infringement opinion letters that were central to the plaintiff's advice of counsel defense).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 PABAQ 1                                                                                                                    Page 7
74 Pa. B.A. Q. 1
**(Cite as: 74 Pa. B. A. Q. 1)**

The well-publicized case of Prudential Insurance Co. of America Sales Practices Litigation, 169 F.R.D. 598 (D.N.J. 1997), is instructive on the failure to prevent routine destruction practices in the face of litigation. The court in that case imposed a staggering $1 million sanction against Prudential for its senior management's failure to initiate a comprehensive document preservation plan and to distribute it to all Prudential employees in response to a Court Order to "preserve all documents and other records containing information potentially relevant to the subject matter of this litigation." Prudential, 169 F.R.D. at 600, 617. In Prudential, there was no evidence of intentional destruction of evidence. In fact, management had made some attempts to alert employees to preserve documents via an internal e-mail system. It was simply not good enough. The Court detailed specific procedures that Prudential's management needed to implement, including forwarding a copy of the Court Order to every one of Prudential's employees located throughout the country.

A party's failure to honestly apprise the court of its computer capacity and ability to retrieve electronic data can also have serious consequences. In GTFM, Inc. v. Wal-Mart Stores, Inc., 2000 WL 335558 (S.D.N.Y. Mar. 30, 2000), as a sanction for defendant's misrepresentation about its computer capacity, the court ordered an on-site inspection of defendant's computer records as follows:

Defendant shall, within thirty days after entry of this Opinion and Order, make available to an expert designated by plaintiffs' counsel, all computer records and facilities within defendant's possession, custody, or control, for the purpose of allowing plaintiffs' expert to conduct an on-site inspection of defendant's computer facilities to ascertain whether and how it is possible to extract information about the purchase of goods bearing plaintiffs' trademarks ... In addition, defendant shall make available the individual who is most familiar with defendant's computer records and facilities, and, in particular, the recording, **\*8** maintaining, back-up, purging and retrieval of ... computer data, to meet with plaintiffs' expert to explain defendants' computer facilities and to provide reasonable assistance to plaintiffs' expert in his/her efforts to retrieve data about purchases made through the Local Purchase Program ....

GTFM, 2000 WL 335558, at *1. Subsequently, the Court also imposed a monetary sanction against the defendant, and ordered it to pay all fees and expenses that plaintiff incurred as a result of defendant's failure to provide accurate discovery information, which totaled $109,753.81. GTFM v. Wal-Mart Stores, Inc., 2000 WL 1693615, at *3 (S.D.N.Y. Nov. 9, 2000). See also, Marker v. Union Fid. Life Ins. Co., 125 F.R.D. 121, 125 (M.D.N. Cal. 1989) (sanctioning defendant for producing claims director who could not answer specific questions concerning the retrieval of computerized data, where 30(b)(6) deposition notice sought "a person knowledgeable about the claims processing and claims records, and persons familiar with general file keeping, storage and retrieval systems of defendant").

Finally, it is important to note that the new Sarbanes-Oxley Act of 2002 (which was Congress's direct response to the Enron/Arthur Andersen scandal), imposes criminal penalties on anyone who knowingly destroys documents with the intent to impede a Federal investigation or a bankruptcy. In particular, the Sarbanes-Oxley Act states:

**Destruction, alteration, or falsification of records in Federal** investigations and bankruptcy**.**

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519 (2002).

What Must Your Client Search for and Produce?

While electronic data can be a fruitful source of evidence, locating and retrieving it presents a host of problems that are not present in the traditional "paper" case. For example, one court observed the following when deciding a dispute about whether it was necessary for a party that had already searched paper and electronic files, to also restore and search back-up tapes in response to a discovery request:

Using traditional search methods to locate paper records in a digital world presents unique problems. In a traditional "paper" case, the producing party searches where she thinks appropriate for the documents requested under Fed.R. Civ.P. 34. She is aided by the fact that files are traditionally organized by subject or chronology ("chron" files), such as the files of a particular person, independent of subject. Backup tapes are by their nature indiscriminate. They capture all information at a given time and from a given server but do not catalogue it by subject matter.

Unlike a labeled file cabinet or paper files organized under an index, the collection of data by the backup tapes in this case

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 PABAQ 1                                                                                                                                                                Page 8
74 Pa. B.A. Q. 1
**(Cite as: 74 Pa. B.A. Q. 1)**

[which was to permit recovery from a disaster, not archival preservation] was random ....
   It is therefore impossible to know in advance what is on these backup tapes ....

McPeek v. Ashcroft, 202 F.R.D. 31, 33 (D. D.C. 2001) (holding that before a more extensive search would be required, the defendant would first have to engage in a "test run" by restoring the e-mails attributable to one employee's computer during a one-year period).

   Generally, a client must search for responsive e-mail and documents from any source where that data may be stored. This not only includes computers, hard drives, and servers, but also back-up tapes which may contain responsive data and information. See, e.g., In re Brand Name Prescription Drugs Antitrust Litig., 1995 WL 360526, at *1 (N.D. Ill. June 15, 1995) ("First of all ... e-mail [regarding intra-corporate correspondence generated and stored within defendant's computer system] is discoverable. Rules 26(b) and 34 of the Federal Rules of Civil Procedure instruct that computer stored information is discoverable under the same rules that pertain to tangible, written materials."); Linnen v. A.H. Robins Co., Inc., 1999 WL 462015, at *4 (Mass. Super. June 16, 1999) (requiring defendant to "produce any email either sent or received by fifteen named individuals which referenced three specified topics ... which were saved on computers or in hard copy form by the specified individuals as well as any deleted messages which could **\*9** be retrieved from back-up systems," even though estimated costs to perform such searches ranged between $300,000 and $350,000 for one set of tapes, and $850,000 and $1.4 million for another set of tapes).

   Under appropriate circumstances, a court will also require a party to produce computer hard drives, mirror images of hard drives, or raw data from computers. See, e.g., Playboy Enter., Inc. v. Welles, 60 F.Supp.2d 1050, 1052 (S.D. Cal. 1999) (ordering defendant to produce hard drive of her computer to plaintiff) [FN7]; Procter & Gamble Co., 179 F.R.D. at 632 (upholding Magistrate Judge's Order which granted plaintiff "the right to search [defendant's] electronic database with 25 search terms, which [plaintiff] was to propose"); Gates Rubber Co. v. Bando Chem. Indus., Ltd., 167 F.R.D. 90 (D. Colo. 1996) (allowing plaintiff to copy hard drive to try and retrieve information regarding files that employee of defendant admitted he had deleted); Dunn v. Midwestern Indem., 88 F.R.D. 191 (S.D. Ohio 1980) (finding that discovery requests seeking "information about the defendants' computer capabilities, including information about their computer equipment, raw data, programs and data management systems ..." were relevant because "defendants' computer capabilities may foster, contribute to, or reflect the formulation or application of the defendants' underwriting standards, which are the subject matter of this action") [FN8]; Adams v. Dan River Mills, Inc., 54 F.R.D. 220, 221 (W.D. Va. 1972) (ordering production of defendant's "current computerized master payroll file and all computer print-outs for W-2 forms of the defendant's employees as far back as they were retained"); U.S. v. Microsoft Corp., 1998 WL 699028, at *2-3 (D.D.C. Oct. 2, 1998) (compelling defendant to produce copies of original databases and existing documentation that explains the use of the databases rather than the "stripped down version" [FN9] previously proffered).

   In one case, a defendant sought--and received--the database that its adversary's expert had created from the hard-copy documents that were originally produced. Williams v. E.I. du Pont de Nemours & Co., 119 F.R.D. 648, 650 (W.D. Ky. 1987). Defendant argued that it needed access to not only the database, but also to the underlying codebooks and user's manual used to analyze the raw data and arrive at the expert's final report to effectively cross-examine the expert and to establish the **\*10** accuracy of the data output. Id. at 650. The court ultimately agreed that defendant was entitled to discover, at its own expense:
   copies of the "computerized database in the form of the computer storage disc," the "code-books," the "user's manual" and "all documents used in encoding the database," with the exception of the copyrighted "Statpac" [program] which may be purchased from a vendor.

Id. at 651. Yet, the defendant was ordered to pay to plaintiff a "fair portion of the fees and expenses incurred" in the past by [plaintiff] for the work of [plaintiff's] expert in encoding the requested data and formulating the database. Id.

   It is also important to note that the production of information in "hard copy" documentary form does not preclude a party from requesting that same information in a computerized/electronic format. Anti-Monopoly, Inc. v. Hasbro, Inc., 1995 WL 649934, at *1 (S.D.N.Y. Nov. 3, 1995). [FN10] This is especially so if the hard copy documents are "unusable" in that format. See Am. Brass v. U.S., 699 F.Supp. 934, 935 (Ct. Int'l Trade 1988) (ordering defendant to produce computer tapes because the microfilm and printouts of data already supplied were "too complicated and voluminous" to be usable by plaintiffs); Timkin v. U.S., 659 F.Supp. 239, 240 (Ct. Int'l Trade 1987) (ordering defendant to produce computer tapes even though identical information was previously provided to plaintiff in roughly 15,000 pages of computer printouts, premised on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

argument that the sheer volume of data precluded plaintiff from realistically analyzing the information in hard copy format).

Yet, one court refused a request for hard copy documents because the defendant had otherwise accommodated the plaintiff's inability to read the computer tapes that were produced. Sattar v. Motorola, 138 F.3d 1164, 1171 (7th Cir. 1998). In Sattar, the Seventh Circuit upheld the denial of a motion to compel the defendant to produce some 210,000 pages of hard copy documents reflecting e-mails that were relevant to the case. Id. The defendant had produced the e-mails, but had done so in 4-inch tapes which were inaccessible to the plaintiff because he lacked the equipment and software with which to read them. Id. The trial court denied the motion, and instead decided:

> that a more reasonable accommodation was some combination of downloading the data from the tapes to conventional computer disks or a computer hard-drive, or loaning Plaintiff a copy of the necessary software, or offering [Plaintiff] on-site access to [Defendant's] own system. If all of those options failed, the court ordered that the parties would each bear half the cost of copying.

Id. The defendant ultimately provided plaintiff with a hard drive onto which it transferred the requested e-mail. Id.

Another court sanctioned a defendant for destroying underlying documents that were used to enter data into a Palm Pilot, even though the Palm Pilot was produced in discovery. Mathias v. Jacobs, 2000 WL 1041668 (S.D.N.Y. July 28, 2000). In Mathias, the defendant used a Palm Pilot. Id. at *2. He had his secretary enter addresses, phone numbers and other information from computer print outs and business cards into the Palm Pilot. Id. at *3. After inputting the information, the defendant and/or his secretary at the defendant's direction discarded the computer printouts and other documents from which she had obtained the data. Id. The defendant's Palm Pilot, yet not the underlying documents used to input information into the Palm Pilot, was produced in response to a discovery request calling for the production of:

> [a]ll diaries, appointment books, calendars, schedules, electronic organizers, and itineraries of any kind, in any form, from June 1, 1992 to the present [and] [a]ll telephone directories, Rolodex cards, diaries, organizers, electronic organizers, and documents of any kind concerning the names, addresses, or phone numbers of any people or entity plaintiff has contacted in any way from June 1, 1992 to the present.

Id. at *2.

The Mathias Court ultimately sanctioned the defendant for destroying these documents, even though much of the information was available via the Palm Pilot. Id. at *9.

**\*11** What Are the Limitations?

As with all discovery, a party can object to a discovery request seeking electronic information if the discovery request is overly broad, not reasonably calculated to lead to the discovery of admissible evidence, or if the requesting party is engaging in a fishing expedition.

In Anderson v. Cornejo, 1999 WL 543196 (N.D. Ill. July 22, 1999), the court rejected plaintiffs' demand that defendants conduct a nationwide search for responsive e-mail because the lawsuit involved alleged unlawful searches conducted at one location, O'Hare International Airport in Chicago, Illinois. Id. at *3. The court also noted that mere "speculation" that the employees at issue could have worked in other locales before being assigned to O'Hare did not justify a burdensome, nationwide search for responsive e-mail. Id. Although in a subsequent action in the same litigation, the court ordered the defendants to provide plaintiffs with passengers' identifying information from computer databases, reasoning that this request was more focused and narrower in scope than the previous request, as it only included passengers that had landed at O'Hare International. Anderson v. Cornejo, 2001 WL 219639, at *5, 6 (N.D. Ill. Mar. 6, 2001).

Similarly, in Symantec Corp. v. McAfee Associates, Inc., 1998 WL 740807 (N.D. Cal. Aug. 14, 1998), the court refused to order production of the source code for all of defendant's products dating back to 1995, as well as copies of all hard drives which had access to the server from which the information on a disc produced during discovery was copied because, "production of this magnitude would be unduly burdensome on [defendant] both in terms of volume and in terms of the proprietary nature of the information sought." Symantec, 1998 WL 740807, at *3.

In Alexander v. Federal Bureau of Investigation, 188 F.R.D. 111 (D.D.C. 1998), the court granted a Protective Order because "wholesale restoration and searches of years-old backed-up and archived e-mail, deleted and archived computer files,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 PABAQ 1                                                                                                                                    Page 10
74 Pa. B.A. Q. 1
**(Cite as: 74 Pa. B.A. Q. 1)**

or shared drive files is not part of a reasonable search ... and such an exercise is ... unlikely to lead to responsive documents." Id. at 117. The court also ordered the parties to pursue discussions regarding "targeted and appropriately worded searches of backed-up and archived e-mail and deleted hard drives for a limited number of individuals." Id.

   In In re Grand Jury Subpoena Duces Tecum, 846 F.Supp. 11 (S.D.N.Y. 1994), the court quashed a subpoena which demanded that a corporation provide a grand jury with the central processing unit (including the hard disk drive) of any computer supplied by the corporation for the use of specified officers and employees of the corporation or their assistants, as well as all computer accessible data (including floppy diskettes) created by any of the specified officers and employees or their assistants. Id. at 12. Curiously, the government's counsel conceded that the subpoena demanded irrelevant information and that a "key word" search of the information stored on the devices would reveal which of the documents are likely to be relevant to the grand jury's investigation. Id. at 13. Even so, the government's counsel insisted that the court rule on the enforceability of the subpoena "as issued" and rejected the court's suggestions that: (1) the subpoena be modified to only demand documents containing specified key words; and (2) the court appoint an expert to search the hard drives and floppy disks if the grand jury had reason to suspect that subpoenaed documents were being withheld. Id.

   The court in Lawyers Title Insurance Corp. v. United States Fidelity & Guaranty Co., 122 F.R.D. 567 (N.D. Cal. 1988), refused to order the production of information about the computer system defendant used to store, organize, and retrieve data about claims, when the sole basis for the request was "to facilitate the production" of relevant information. Id. at 569. The court reasoned, "the possibility that a lawyer could better frame his discovery requests [does not] serve as a sufficient predicate for ordering disclosure of proprietary information about a computer system .... At a minimum, counsel who seek access to opponents' information management systems should be required to show that conventional discovery methods have failed to produce the information they need to litigate their case." Id. at 570.

   In Fennell v. First Step Designs, Ltd., 83 F.3d 526 (5th Cir. 1996), the court determined that the risks and costs associated with production of a hard drive outweighed need for information, particularly because plaintiff had not demonstrated "a particularized likelihood of discovering appropriate information." Id. at 533. In doing so, the court reversed a previous **\*12** Order that required the production of the hard drive so plaintiff could attempt to determine the "last prior modification or, if there was no prior modification the date [a key document was] creat[ed]," because the disk copy of document produced to plaintiff in discovery was "autodated" August 7, 1995, the date it was produced to plaintiff. Id. at 531. The court then reviewed the parties' proposed protocols to establish a procedure by which plaintiff would have access to relevant materials on the defendant's hard drive (both of which involved neutral experts, a creation, then erasure and destruction of a mirror image of the hard drive and proposed protective orders to protect confidential and irrelevant information contained on the hard drive). Id. at 531-32. The Fennell court concluded that its initial Order to permit production of the hard drive was "ill advised" because it would involve "a 'fishing expedition' without any particularized likelihood of discovering appropriate information ..." Id. at 533.

   In Strasser v. Yalamanchi, 669 So.2d 1142 (Fla. App. 1996), a Florida appellate court quashed a trial court's Order that granted plaintiff "cart blanche" access to defendant's computer system to search for financial information that the defendant had conceded had been purged from his computer, reasoning:
   Even if plaintiff represents accurately that defendant has been thwarting the discovery process, such conduct does not necessarily invite intrusive discovery where there has been no evidence to establish any likelihood that the purged documents can be retrieved.
   If plaintiff can present evidence to demonstrate the likelihood of retrieving purged information, and if the trial court finds that there is no other less intrusive manner to obtain the information, then the computer search might be appropriate. In such an event, the order must define parameters of time and scope, and must place sufficient access restrictions to prevent compromising patient confidentiality and to prevent harm to defendant's computer and data bases.

Id. at 1145.

   However, although the Yalamanchi court quashed the trial judge's Order, it also allowed plaintiff to request a future search by demonstrating that the "purged information could successfully be retrieved without compromising patient confidentiality or damaging [plaintiff's] computer and databases." Strasser v. Yalamanchi, 783 So. 2d 1087, 1090 (Fla. Dist. Ct. App. 2001). In 1997, after the trial judge found that the plaintiff met the above test, he allowed the plaintiff to inspect the computer. Yet, as noted in the section on sanctions for failing to preserve relevant evidence, by that time the defendant had discarded the computer because it had allegedly been struck by lightning, and as a result the trial judge instructed the jury to find for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff on the spoliation of evidence and breach of contract claims, which was affirmed on appeal. Id. at 1095.

The lesson to be learned from these cases is that, just like traditional "paper" discovery, the more targeted and specific you make a discovery request for electronically stored information, the more likely it is that a court will force your adversary to produce the information.

Who Foots the Bill?

If your client employs technology that produces electronic evidence, in most instances, it will have to bear the costs associated with searching for and producing that evidence. As one court has instructed:
 It would be a dangerous development in the law if new techniques for easing the use of information became a hindrance to discovery or disclosure in litigation. The use of excessive technical distinctions is inconsistent with the guiding principle that information which is stored, used, or transmitted in new forms should be available through discovery with the same openness as traditional forms.
   * * *
 The normal and reasonable translation of electronic data into a form usable by the discovery party should be the ordinary and foreseeable burden of a respondent in the absence of a showing of extraordinary hardship.

Daewoo Elec. Co. v. U.S., 650 F.Supp 1003, 1006 (Ct. Int'l Trade 1986).

As with traditional document discovery, where the amount of time and expense incurred is relatively insignificant, the producing party will almost certainly bear that burden. Mackey v. IBP, Inc., 167 F.R.D. 186, 199 (D. Kan. 1996). In Mackey, the court found that interrogatories were not overly broad nor unduly burdensome even though obtaining information requested would require defendant to expend $1,500 for 30 hours of computer programming. Id. The court reasoned that in most **13** instances, answering interrogatories will entail some burden and that it "is of the opinion that the defendant has the capability, through its staff of computer personnel and records custodians, of performing the compilations and making the analyses which are the subject of [the] interrogatories and requests for production." Id. See also Bills v. Kennecott Corp., 108 F.R.D. 459, 460, 464 (D. Utah 1985) (denying defendant's request--which the Court considered as a Motion for Protective Order on the sole ground of cost and expense--to be reimbursed $5,411.25 for producing computer tape or a printout of computer data because: (1) the amount of money involved was not excessive or inordinate; (2) the relative expense and burden in obtaining the data would be substantially greater to the requesting party as compared with the responding party; (3) the amount of money required to obtain the data as set forth by defendant would be a substantial burden to plaintiff; and (4) the responding party is benefited in its case to some degree by producing the data in questions) [FN11]; Haworth, Inc. v. Herman Miller, Inc., 1995 WL 465838, at *1 (W.D. Mich. April, 20 1995) (requiring producing party to create and pay for computer program necessary to access information contained on an electronic filing system maintained by defendant, because: (1) the respondent/defendant had an obligation to translate the data on the electronic tape into a form usable by plaintiff; (2) the defendant had a much greater familiarity with all of the data contained on the electronic tape to be formatted; and (3) the cost and burden in the amount of eight to twelve hours of computer programming time was "miniscule" in comparison to the amount in controversy in the case).

In many instances, the time and expense associated with the production of electronic evidence can be staggering. Yet, the producing party was still required to bear the burden and expenses associated with production. Courts have reasoned that if an entity chooses to benefit from technological advances, it cannot then use that advance as a shield in litigation. Linnen v. A.H. Robins Company, Inc., 1999 WL 462015, at *6 (Mass. Super. June 16, 1999). In Linnen, the court required the defendant to shoulder the costs of restoring and searching back-up tapes which may contain responsive e-mail, estimated between $300,000 and $350,000 for one set of tapes, and $850,000 and $1.4 million for another set of tapes. Id. at 6. The court rejected the defendant's arguments that because he had already produced many documents in response to plaintiffs' requests for production, including a significant amount of e-mail correspondence, the order requiring defendants to restore and search backup tapes would prove unduly burdensome. Id. ("To permit a corporation such as [defendant] to reap the business benefits of such technology and simultaneously use that technology as a shield in litigation would lead to incongruous and unfair results."). [FN12] Id. See also In re Brand Name Prescription Drugs Antitrust Litig., 1995 WL 360526, at *2 (N.D. Ill. June 15, 1995) ("[R]elevant case law instructs that the mere fact that the production of computerized data will result in a substantial expense is not a sufficient justification for imposing the costs of production on the requesting party ... if a party chooses an electronic storage method, the necessity for a retrieval program or method is an ordinary and foreseeable risk ... [plaintiff] should not be forced to bear a burden caused by [defendant's] choice of electronic storage";

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

holding that defendant must bear $50,000 to $70,000 cost to compile, format, search and retrieve responsive e-mail from at least 30 million pages of e-mail data stored on back-up tapes).

**\*14** However, given the prevalence of electronic discovery, and the significant costs involved, the tables are beginning to turn:

Too often, discovery is not about just uncovering the truth, but also about how much of the truth the parties can afford to discover .... discovery expenses frequently escalate when information is stored in electronic form.

Rowe Entertainment, Inc. v. The William Morris Agency, Inc., 205 F.R.D. 421, 423 (S.D.N.Y. 2002), aff'd, 2002 WL 975713 (S.D.N.Y. May 9, 2002).

There are some instances in which courts have imposed the cost burden of producing electronic information on the requesting party. For example, if a party makes a unique demand for information, it may bear the burden of production. In re Air Crash Disaster at Detroit Metro. Airport, 130 F.R.D. 634, 635 (E.D. Mich. 1989) (holding that party requesting that defendant create and produce a "Nine-Track Computer Tape of the Digital Flight Guidance Computer Flight director Program Simulation Runs" must pay all reasonable and necessary costs that were associated with the manufacture of the computer-readable tape). Additionally, if there is simply no way to extract the data absent the creation of a computer program, courts have shifted costs to the requesting party. Anti-Monopoly, Inc. v. Hasbro, Inc., 1996 WL 22976, at \*2 (S.D.N.Y. Jan. 23, 1996) (requiring plaintiff to pay for creating a program to extract the requested data from defendant's computer; rejecting argument that because data could not be retrieved without special processing, defendant should be forced to "dump" their computer files including irrelevant data). Compare also, Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP, 2002 WL 992776, at \*1, 2 (N.Y. App. Div. May 16, 2002) (in a case which was "not a matter of documents demanded but not produced in discovery ... [but] about documents as property," the Court ordered the defendant law firm to search for and retrieve seven files which may be contained "in certain unindexed back-up data tapes from its earlier computer system," yet the former client had to pay the cost of any search and retrieval, because "[t]he assemblage and delivery of documents to a client is properly chargeable to the client.")

More recently, courts have responded to increasingly prevalent demands for electronic discovery by adopting new approaches to determine which party should bear the expense of such discovery. In McPeek v. Ashcroft, 202 F.R.D. 31, 33 (D. D.C. 2001), the court rejected the proposition that the defendant/responding party should automatically assume all of the costs associated with restoring and searching back-up tapes which may have contained information that was responsive to plaintiff's discovery requests. The McPeek Court reviewed the "handful of cases" (which it characterized as "idiosyncratic and provid[ing] little guidance") that addressed cost-shifting theories in cases involving the restoration of back-up tapes, including:

. The judicial rational which holds that "producing backup tapes is a cost of doing business in the computer age." Yet, according to the McPeek court, modern businesses have no choice but to use computers and back-up systems to run their business, and making the producing party bear all costs of restoration "creates a disincentive for the requesting party to demand anything less than all of the tapes."

. The "market" economic approach, which charges the requesting party for restoring and searching back-up tapes. This approach virtually guarantees that the requesting party will only demand what it needs. Yet, according to the McPeek court, there are two problems with this analysis: (1) a strict cost-based approach ignores the fact that a government agency is different than a profit-producing entity, which creates many practical problems (e.g. diverting employees to search back-up tapes is detrimental to the function of the agency and indirectly hurts taxpayers); and (2) shifting all costs to the requesting party means that the requesting party will have to pay for the producing party to search the back-up tapes even though the requesting party would not have to pay for such a search of a "paper" depository.

. The economic principle of "marginal utility." This method not only considers cost, but also the likelihood that the requested material will contain relevant information: The more likely it is that the back-up tape contains information that is relevant to a claim or defense, the fairer it is that the government agency search at its own expense. The less likely it is, the more unjust it would be to make the agency search at its own expense. The difference is "at the margin." Yet, the downside to this approach is that if the likelihood of finding something is the only criterion, there is a **\*15** risk that someone will have to spend hundreds of thousands of dollars to produce single e-mail, which is "an awfully expensive needle to justify searching a haystack," that could be used as "a gigantic club with which to beat [an] opponent into settlement."

The McPeek Court ultimately ordered the defendant to engage in a "test run" by restoring the e-mails attributable to one employee's computer during a one-year period, and that:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[t]he [defendant] will have to carefully document the time and money spent in doing the search. It will then have to search in the restored e-mails for any document responsive to any of plaintiff's requests for production of documents. Upon the completion of this search, the [defendant] will then file a comprehensive, sworn certification of the time and money spent and the results of the search. Once it does, I will permit the parties an opportunity to argue why the results and the expense do or do not justify any further search.

In Black & Veatch International Co. v. Foster Wheeler Energy Corp., 2002 WL 1071932 (D. Kan. Mar. 10, 2002), the court rejected the defendant's assertion that loading and running calculations on 2,015 original input files used to recreate interim design calculations which no longer existed at a cost of $800,000 and 1,500 man-hours was an undue burden. Yet, it required the parties to keep accurate records regarding the time and costs associated with the electronic discovery tasks, and after such tasks were accomplished, to attempt to come to an agreement regarding allocation of such costs in terms of time and money, and if they were unable to do so, to re-file appropriate motions. Id. at *4, 5.

In the recent case of Rowe Entertainment, Inc. v. The William Morris Agency, Inc., 205 F.R.D. 421 (S.D.N.Y. 2002), aff'd, 2002 WL 975713 (S.D.N.Y. May 9, 2002), the court adopted and applied a balancing approach to determine who should bear the financial burden of producing electronic evidence, and held that plaintiffs would be required to bear the costs of producing e-mails from the defendants' back-up tapes and hard drives. In response to the defendants' motion for a protective order requesting that the defendants be relieved from producing any e-mail in response to the plaintiffs' "sweeping" document demands, the Rowe Entertainment court engaged in an extensive discussion and analysis of: each defendant's computer/e-mail systems and back-up procedures, policies and programs; the costs and procedures involved for each defendant for retrieving relevant e-mail [FN13]; and the pros and cons of rationales considered by other courts faced with cost-shifting issues in the context of electronic discovery.

Ultimately, the Rowe Entertainment court held that because of the shortcomings of these "bright-line" rules, it would adopt and follow a "balancing approach taking into consideration such factors as":
  . The specificity of the discovery requests (nebulous requests warrant shifting costs to requesting party);
  . The likelihood of discovering critical information (less likelihood of discovering critical information warrants shifting cost to the requesting party);
  . The availability of such information from other sources (if already produced or available in another format, it warrants shifting cost to requesting party);
  . The purposes for which the responding party maintains the requested data (if information is not maintained for business use, but for emergency purposes or because of simple neglect to discard it, it warrants shifting cost to the producing party) [FN14];
  . The relative benefit to the parties of obtaining the information (where responding party also benefits, there is less rationale to shift cost);
  . The total cost associated with the production (if total cost not substantial, there is less rationale to shift from traditional view that responding party will bear cost);
  *16 . The relative ability of each party to control costs and its incentive to do so (cost shifts to party who decides how expansive the discovery will be); and
  . The resources available to each party (if costs outstrips resources of one party, may warrant cost-shifting).

After weighing each of these factors, the Rowe Entertainment court reasoned that the relevant factors "tip heavily in favor of shifting to the plaintiffs [the requesting party] the costs of obtaining discovery of e-mails in this case." The Court held that plaintiffs would be required to bear the costs of retrieving and producing e-mails from the defendants' back-up tapes and hard drives in accordance with the following protocol, that would operate "only as a set of guidelines" that the parties were free to add detail to and to otherwise modify by agreement:
  1. Plaintiffs shall designate one or more experts who shall be responsible for isolating each defendant's e-mails and preparing them for review. The defendants could object to the expert(s) and each expert would be subject to any confidentiality order entered in the case.
  2. With "the assistance and cooperation of defendants' technical personnel," the expert(s) shall obtain a mirror image of any hard drive containing e-mails as well as a copy of any backup tape. Plaintiffs may choose to review samples of hard drives and tapes in lieu of all of such devices.
  3. Plaintiffs' counsel shall formulate a search procedure for identifying responsive e-mails and shall notify defendants' of such procedure. Defendants' counsel may object to the search procedure.
  4. Once the search method has been established, it shall be implemented by plaintiffs' expert(s), and plaintiffs can review

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

responsive documents. Plaintiffs may choose the format for reviewing responsive documents (e.g. on computer screen or printed out in hard copy), yet after identifying e-mails which are material to the litigation, plaintiffs must provide a hard copy to defendants' counsel with bates stamps. All documents retrieved shall be reviewed on an attorneys' eyes only basis.

All steps detailed up to this point must be paid for by Plaintiffs. If the defendants wanted the responsive material produced in a specific format, e.g. converting files attached to the e-mails such as word processing documents into a "Tagged Image File Format" or "TIFF" file which can be redacted, they must pay for it.

5. Defendants' counsel shall then have the opportunity to review the documents produced in order to designate those that are confidential and assert any privilege. Defendants must pay for this review. [FN15] The fact that documents have been reviewed by counsel or by the expert(s) shall not constitute a waiver of any claim of privilege or confidentiality.

6. Any defendant, at its own expense, may review its database prior to production, and create a "redacted" hard drive or tape for the plaintiffs to review, together with a privilege log identifying the documents reviewed.

Rowe Entertainment, 205 F.R.D. at 432 - 33. See also Murphy Oil USA, Inc. v. Fluor Daniel, Inc., 2002 WL 246439, at *7 (E.D. La. Feb. 19, 2002) (following, in part, the Rowe Entertainment analysis to determine that the factors weighed in favor of shifting to the requesting party costs totaling $6.2 million, and setting forth two detailed, alternative protocols for such production, dependent on whether defendant's counsel elected to review the e-mail communications on the backup tapes prior to production); Byers v. Ill. State Police, 2002 WL 1264004, at *11-12 (N.D. Ill. June 3, 2002) (following "marginal utility" analysis discussed in McPeek to determine that shifting a portion of the cost to produce e-mail from back-up tapes and hard drives to the plaintiff/requesting party was necessary because spending $20,000 - $30,000 to comply with the request was a significant financial burden, and the search was unlikely to yield relevant information). But see In re: Bristol-Myers Squibb Securities Litigation, 205 F.R.D. 437, 440 (D.N.J. 2002) (in securities fraud, class action case against pharmaceutical company, where ***17** defendants made paper copies of documents requested by plaintiffs at the same time they were scanning the same documents into a digital database--a practice known as "blowing back" in the industry--in response to defendants' motion to compel requesting that plaintiffs be required to pay $524,618.98 in copying costs, the court ordered plaintiffs only had to pay "the nominal costs of copying the compact discs containing the digital information" and not one-half the cost of scanning, 14 cents a page, or the market blow-back rate of 8 cents a page, as requested by defendants).

These balancing tests will certainly be advanced by all responding parties and must be considered by any lawyer before he or she serves extensive discovery requests seeking electronic data.

CONCLUSION

Technological advancements in communication have changed how lawyers must think about evidence. Indeed, one Federal District Court observed:

Improvements in the technology which advantage almost everyone have become commonplace and widespread, and because we live in a society which emphasizes both computer technology and litigation, the mix of computers and lawsuits is ever increasing ...

Bills, 108 F.R.D. at 462.

Another Court likewise recognized the simple reality that businesses operating in the twenty-first century have no choice but to rely heavily on computers:

It is impossible to walk into an office of a private business or government agency without seeing a network computer, which is on a server, which in turn is being backed up on tape (or some other media) on a daily, weekly or monthly basis. What alternative is there? Quill pens?

McPeek, 202 F.R.D. 31, 33 (D. D.C. 2001).

The fact is, there is no alternative. Computers and their progeny are here to stay until communication technology advances beyond these limitations. Until then, lawyers practicing in this digital age must appreciate their obligations with respect to handling electronic evidence, including how to locate, preserve and produce such evidence, and ultimately effectively present electronic evidence at trial.

[FNa1]. Ms. Brown is a shareholder at Buchanan Ingersoll Professional Corporation, who concentrates her practice in commercial litigation, defamation, restrictive covenant and trade secret disputes. Mr. Weiner is a shareholder at Buchanan

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 PABAQ 1                                                                                                                            Page 15
74 Pa. B.A. Q. 1
**(Cite as: 74 Pa. B.A. Q. 1)**

Ingersoll Professional Corporation, who focuses his practice on complex commercial litigation matters including intellectual property disputes. Both Ms. Brown and Mr. Weiner are members of Buchanan Ingersoll's Intellectual Property and Trade Secret Litigation Group. Ms. Brown and Mr. Weiner also wish to thank Kendra Baisinger, a summer law clerk, who assisted with researching this article.

[FN1]. On March 9, 2002, in an article entitled "U.S. Said to Be Ready to Indict Audit Firm Over Enron Papers," the New York Times reported: "Lawyers have already been told by Andersen insiders that 20 to 30 trunks full of documents were destroyed at the firm's Houston office." U.S. Said to Be Ready to Indict Audit Firm Over Enron Papers, Kurt Eichenwald and Jonathan D. Glater, The New York Times, Saturday, March 9, 2002.

[FN2]. United States House Representative Billy Tauzin (R-LA).

[FN3]. Ms. Nancy Temple, Arthur Andersen's in-house legal counsel.

[FN4]. C.E. Andrews, Managing Partner for Arthur Andersen's Global Audit Practice.

[FN5]. United States House Representative James Greenwood (R-PA).

[FN6]. United States House Representative Diana Degette (D-CO).

[FN7]. In its analysis the court noted that "[t]o some degree, the burden of attempting the recovery must fall on Defendant as this process has become necessary due to Defendant's own conduct of continuously deleting incoming and outgoing e-mails, apparently without regard for this litigation." Playboy, 60 F.Supp.2d at 1054. The court also outlined an extensive protocol that had to be followed by the parties which included a court-appointed computer expert, the creation of a mirror image and a directive that "disclosure" of information protected by the attorney-client privilege to the court-appointed computer expert would not waive the attorney-client privilege. Id. at 1054 - 55.

[FN8]. Relying on Kozlowski v. Sears, Roebuck & Co., 73 F.R.D. 73 (D. Mass. 1976), the Dunn court rejected the defendants' claim that it would be difficult or impossible to locate electronically stored information that was stored on their computer system, insofar as such a claim was "grounded in the peculiar manner in which defendants maintain their computer systems." Dunn, 88 F.R.D. at 198.
  In Kozlowski, plaintiffs sought discovery concerning accidents similar to the one alleged. Defendant objected to the request, because there was "no practical way for anyone to determine whether there have been any complaints similar to those alleged ... 'other than [by] going through all of the claims ... which is the equivalent of an impossible task."' Kozlowski, 73 F.R.D. at 76. The court ordered Sears to search for the records, and rejected Sears' claims of impossibility, burdensomeness, and excessive costs which were premised on the company's decision to maintain a deficient record-keeping system, instructing:
  The defendant may not excuse itself from compliance with Rule 34, Fed.R.Civ.P. by utilizing a system of record-keeping which conceals rather than discloses relevant records, or makes it unduly difficult to identify or locate them, thus rendering the production of documents an excessively burdensome and costly expedition. To allow a defendant whose business generates massive records to frustrate discovery, by creating an inadequate filing system, and then claiming undue burden, would defeat the purpose of the discovery rules.
  It is well established that a private corporation cannot avoid producing documents by an allegation of impossibility if it can obtain the requested information from sources under its control. Kozlowski, 73 F.R.D. at 76.
  Other courts addressing electronic discovery issues have cited Kozlowski for this proposition. See, e.g., In re Brand Name Prescription Drugs Antitrust Litig., 1995 WL 360526 (N.D. Ill. June 15, 1995).

[FN9]. The court analogized the "stripped down version" as follows: "In short, it is as if Microsoft was required to produce to plaintiffs a working car, and instead it produced a box of parts and an incomplete assembly manual." Microsoft, 1998 WL 699028 * 1.

[FN10]. "In general, nearly one-third of all electronically stored data is never printed out." Rowe Entertainment, Inc. v. The William Morris Agency, Inc., 205 F.R.D. 421, 428 (S.D.N.Y. 2002), aff'd, 2002 WL 975713 (S.D.N.Y. May 9, 2002), citing Corinne L. Giacobbe, "Allocating Discovery Costs in the Computer Age: Deciding Who should Bear the Costs of Discovery of Electronically Stored Data," 57 Wash & Lee L. Rev. 257, 259 (2000).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 PABAQ 1                                                                                                              Page 16
74 Pa. B.A. Q. 1
**(Cite as: 74 Pa. B.A. Q. 1)**

[FN11]. The Bills court offered the following observations about a traditional cost-shifting technique as it pertains to electronic discovery:

  Although parties in the past have been able sometimes to shift the majority of the costs of document production to the requesting party merely by making records available for inspection, that cost-shifting tactic is less available and less necessary when the information is stored in computers. Parties are hesitant to open up their computer banks for inspection pursuant to discovery requests, and such a process currently is impracticable because of the myriad of types of computers and the lack of expertise on the part of parties and their lawyers in computer technology data processing. As a result, the requested party most often has no reasonable choice other than to produce the documentation in a comprehensible form by use of its own computer technicians. Bills, 108 F.R.D. at 462.

[FN12]. Although the Linnen court ordered defendant to restore back-up tapes to search for responsive e-mails, the court did impose restrictions designed to minimize the ultimate cost to defendant, including a procedure where defendant initially only had to restore a specified sample of back-up tapes. Linnen, 1999 WL 462015, at *6.

[FN13]. According to the parties experts' these costs ranged from a low of $10,000 for one defendant, to a high of over $9 million for another defendant.

[FN14]. The Rowe Entertainment court made the following observations about back-up tapes:

  [Back-up tapes] are not archives from which documents may easily be retrieved. The data on a backup tape are not organized for retrieval of individual documents or files, but for wholesale, emergency uploading onto a computer system. Therefore, the organization of the data mirrors the computer's structure, not the human records management structure, if there is one.
  Rowe Entertainment, 205 F.R.D. at 429, citing Kenneth J. Withers,  "Computer-Based Discovery in Federal Civil Litigation," SF97 ALI-ABA 1079, 1085 (2001).

[FN15]. Even though the Rowe Entertainment court repeatedly made distinctions between electronic files and paper files, it characterized the defendants' failure to store privileged material in a specifically designated electronic file as analogous to a situation:

  in which a company fails to shred its confidential paper documents and instead leaves them intermingled with non-confidential, discoverable papers. The expense of sorting such documents is properly borne by the responding party, and the same principle applies to electronic data.
  Rowe Entertainment, 205 F.R.D. at 432.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.