IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| In Re: Priceline.com<br>Securities Litigation<br>------------------------------------------------------------<br><br>This document relates to:<br><br>ALL PENDING ACTIONS | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

Master File No.
3:00cv1884 (DJS)


October 13, 2005

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF ELECTRONIC DISCOVERY

Joseph L. Clasen (ct04090)
ROBINSON & COLE, LLP
Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT 06904-2305
Telephone:  (203) 462-7500
Fax:  (203) 462-7599
jclasen@rc.com

Daniel Slifkin (ct21203)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Fax:  (212) 474-3700
dslifkin@cravath.com

*Attorneys for Defendants*
*priceline.com Inc., N.J. Nicholas,*
*Daniel Schulman and Richard S. Braddock*

## Table of Contents

Page(s)

Table of Authorities ......................................................................................... ii

Citation Conventions ....................................................................................... iii

Introduction.........................................................................................................1

Argument ............................................................................................................2

I.      THE SNAPSHOT AND THE DEPARTED EMPLOYEE TAPES. .......................3

     A.     Overview of Contents. .............................................................3

            1.     The Snapshot.............................................................3
            2.     The Departed Employee Tapes. ...................................4

     B.     Agreements Reached During the Meet and Confer Process. .......................4

            1.     Email Files. ..............................................................4
            2.     Non-Email Electronic Material.......................................4
            3.     Format of Production and Cost of Production. ..............................5

     C.     The One Disagreement. ...........................................................5

     D.     Problems With Plaintiffs' Proposed Approach.............................................7

     E.     Superiority of the Previously Agreed-Upon Approach. .............................9

II.    THE 42 WEBHOUSE AND PERFECT YARDSALE TAPES. ...........................12

     A.     There Is a Simple Solution to the Disagreement Over the Cost of "Restoration".............................................................................12

     B.     Format of Production. .............................................................13

     C.     Until the Restoration Process Is Complete, It Is Premature to Address the Timetable for Production and Additional Cost Issues. ..........17

Conclusion .......................................................................................................18

## Table of Authorities

Page(s)

**Cases**

Capital Ventures Int'l v. Network Commerce,
    No. C02-0682L (W.D. Wash. June 13, 2005)..........................................13, 14

Daewoo Electronics Co. v. United States, 650 F. Supp. 1003 (1986)...............................15

Douglas v. Victor Capital Group,
    No. 96 CIV. 6557, 1997 WL 716912 (S.D.N.Y. Nov. 17, 1997) ...................................8

Hagemeyer North America, Inc. v. Gateway Data Sciences Corp.,
    222 F.R.D. 594 (E.D. Wis. 2004)..................................................................................17

In re Air Crash Disaster at Detroit Metropolitan Airport,
    130 F.R.D. 634 (E.D. Mich. 1989) ...............................................................................15

In re Premstar Sec. Litig., No. 02-CV-01821 (D. Minn. Apr. 23, 2004)....................14, 15

In re Verisign, Inc. Sec. Litig.,
    No. C02-02270 JW, 2004 WL 2445243 (N.D. Cal. Mar. 10, 2004)..............................15

Nat'l Union Elec. Indus. Co. v. Matsushita Elec. Indus. Co.,
    494 F. Supp. 1257 (E.D. Pa. 1980) ..............................................................................15

Sattar v. Motorola, Inc., 138 F.3d 1164 (7th Cir. 1998) ...........................................15, 16

Wiginton v. CB Richard Ellis, Inc., 229 F.R.D. 568 (N.D. Ill. 2004) ..............................17

Zubulake v. UBS Warburg, LLC, 217 F.R.D. 309 (S.D.N.Y. 2003)................................17

Zubulake v. UBS Warburg, LLC, 216 F.R.D. 280 (S.D.N.Y. 2003)...........................8, 17

**Rules**

Fed. R. Civ. P. 26(b)(1)....................................................................................................7

Fed. R. Civ. P. 37(a)(4)(B) ........................................................................................2, 18

**<u>Citation Conventions</u>**

The following conventions will be used throughout this Memorandum:

- "Pltf. Br." for references to Plaintiffs' Memorandum in Support of Motion to Compel Production of Electronic Discovery, dated September 22, 2005.

- "McDougall Decl." for references to the Declaration of Peter J. McDougall in support of Plaintiffs' Motion to Compel Production of Electronic Discovery, dated September 22, 2005.

- "Kelleher Decl." for references to the Declaration of William J. Kelleher, III, dated October 13, 2005.

- "Griffin Decl." for references to the Declaration of Allison Griffin in Support of Plaintiffs' Motion to Compel Production of Electronic Documents, dated September 22, 2005.

Defendants priceline.com Inc. ("priceline"), N. J. Nicholas, Daniel H. Schulman and Richard S. Braddock (collectively, "Defendants") submit this Memorandum of Law in opposition to plaintiffs' motion to compel production of electronic discovery.

### Introduction

In their motion papers, plaintiffs repeatedly claim that plaintiffs and Defendants have not reached any agreement on electronic discovery issues. (Pltf. Br. at 1 n.1 ("Plaintiffs have conferred . . . with Defendants . . . but have been unable to resolve any of the electronic discovery disputes"); id. at 2 ("the parties still have not reached any areas of agreement with respect to the documents stored in electronic form"); id. at 8 ("Plaintiffs and the Priceline Defendants still have not been able to resolve the electronic discovery issues"); McDougall Decl. at ¶ 18 ("Plaintiffs and the Priceline Defendants still have not been able to resolve any of the electronic discovery issues").) The fact of the matter, however, is that plaintiffs and Defendants had reached substantial agreement on how the production of electronic material was to proceed. A series of letters exchanged between plaintiffs and Defendants documents the numerous issues about which plaintiffs and Defendants negotiated and the agreements that were reached with respect to almost all of those issues. (See Kelleher Decl., Exhs. B–H.)[1]

---

[1] In a letter dated August 15, 2005, plaintiffs' counsel stated: "Your letter was helpful and we now believe that the parties are close to resolving the issues relating to the 'snapshot' of the Priceline corporate server and the backup tapes for departed employees." (Kelleher Decl., Exh. D.) And in a letter dated August 19, plaintiffs' counsel stated: "[I]t appears that we are close to an agreement regarding the materials on the snapshot and the terminated employee back-up tapes". (Id., Exh. F.)

As of August 26, there were only two areas of disagreement:  (1) the timetable for the production of electronic material, and (2) the treatment of 42 back-up tapes.  On September 12, plaintiffs sent us their portion of what was to be the joint motion of plaintiffs and Defendants regarding the production of electronic documents. (Kelleher Decl., Exh. I.)  Plaintiffs insisted that we draft our portion of the joint motion by September 19 or else they would file their position separately.  (Id.)  We did not comply with plaintiffs' unilateral and arbitrary deadline,[2] and on September 22, plaintiffs filed their motion to compel.

Instead of seeking the Court's help in resolving the two remaining areas of disagreement, plaintiffs unilaterally abandoned all of the agreements that had been reached.  Indeed, it now appears that plaintiffs never had any intention of being bound by the agreements reached with Defendants and that they just wanted to finish the meet and confer process so that they could file yet another vexatious motion to compel.[3]

## Argument

There are two categories of electronic material at issue here.  The first category consists of the "snapshot" and the "departed employee tapes".  The second category consists of the "42 WebHouse and Perfect Yardsale tapes".  We address each category in a separate section below.

---

[2] Defendants' surreply brief in opposition to plaintiffs' motion for class certification was due on September 23, and Defendants' brief in opposition to plaintiffs' third motion to compel was due on September 30.

[3] Plaintiffs have now filed four motions to compel against Defendants.  For the reasons noted in our opposition briefs to plaintiffs' second and third motions to compel, we submit that those motions were not "substantially justified".  Fed. R. Civ. P. 37(a)(4)(B).  To the extent that this fourth motion to compel seeks relief that contravenes agreements reached during the meet and confer process, we submit that it too is not substantially justified.

## I.     THE SNAPSHOT AND THE DEPARTED EMPLOYEE TAPES.

### A.     Overview of Contents.

#### 1.     The Snapshot.

The "snapshot" is the equivalent of a full back-up of all the material that existed on priceline's corporate file servers in February 2002 (the time the snapshot was taken), reaching back to the beginning of the Company.  Promptly following the commencement of this litigation in October 2000, priceline sent an email notice to all of its employees instructing them to secure, preserve and retain relevant documents. Because of the concern that the preservation of relevant electronic material on priceline's corporate file servers might become too unwieldy as the case proceeded, and out of an abundance of caution for the preservation of relevant electronic material, priceline and its outside counsel determined to make a copy, in usable format, of all of the electronic information on priceline's corporate file servers.  The snapshot is that copy.  (Kelleher Decl., Exh. A (containing an identical description).)

A vast amount of electronic material is stored on the snapshot.  One measure of the size of the snapshot is the number of gigabytes it contains.  There are approximately 475 gigabytes of data on the snapshot.  (Id.)  A very conservative estimate, we are told, is that one gigabyte translates to approximately 50,000 pages.  (Id.)  A less conservative, and more realistic estimate, is that one gigabyte translates to approximately 100,000 pages.  (Id.)  Another measure of the size of the snapshot is the number of files it contains.  There are approximately two million files on the snapshot, and each of those files may contain multiple pages.

2.     **The Departed Employee Tapes.**

Electronic material for certain employees who left priceline in approximately 2000-2001 was moved off the corporate file servers and onto back-up tapes before the snapshot.  (Id.)  We refer to those back-up tapes as the "departed employee tapes".  Those tapes contain approximately 15 gigabytes of data.

B.     **Agreements Reached During the Meet and Confer Process.**

1.     **Email Files.**

It is possible to identify on the snapshot and the departed employee tapes the email files of specific individuals.  (Kelleher Decl., Exh. C.)  Plaintiffs and Defendants agreed that Defendants would review the email files of any of 113 identified individuals for whom an email file is located on the snapshot and/or departed employee tapes, and that Defendants would produce non-privileged, responsive documents from those files.  (Id., Exhs. C, D, E.)  Plaintiffs and Defendants agreed that Defendants would be willing to consider reasonable additions to the list of identified individuals, but that Defendants were reserving the right to oppose additions.  (Id., Exh. E.)  Defendants also agreed to provide plaintiffs with (1) a list of all the email files on the snapshot and on the departed employee back-up tapes, and (2) a spreadsheet that shows, in technical terms, the contents of the snapshot and the quantity of electronic material contained in it.  (Id.)

2.     **Non-Email Electronic Material.**

With respect to the non-email electronic material on the snapshot and departed employee tapes, plaintiffs and Defendants agreed that search terms would be agreed upon and used to search the massive amount of data, and that the documents generated by that search would then be reviewed and any non-privileged, responsive

documents produced.  (Id., Exhs. C, D.)  It was agreed that Defendants would be willing

to consider additions to the list of agreed-upon search terms, but that they were reserving

the right to oppose any additions.  (Id., Exh. E.)  Defendants suggested that plaintiffs

propose the initial list of search terms, but plaintiffs simply refused to do so and insisted

that Defendants generate the initial list.  (Id., Exhs. C, D, E.)  We were working with our

electronic vendor to generate suitable search parameters prior to the filing of plaintiffs'

motion to compel.  Despite the filing of plaintiffs' motion, we have continued to work

with our vendor on the search process, and our vendor has now nearly completed a

process referred to as "indexing", which prepares electronic material for searching.

### 3.    Format of Production and Cost of Production.

Plaintiffs and Defendants agreed that the emails and other documents from

the snapshot and departed employee tapes would be produced in TIFF format and that

Defendants would also produce corresponding text files, where applicable, so that

plaintiffs could search the production electronically.  (Id., Exhs. C, D, E, G, H.)

Defendants also agreed to preserve the snapshot and the departed employee tapes in

native format.  (Id., Exh. E.)  And Defendants further agreed not to seek cost-shifting in

connection with the agreed-upon production from the snapshot and the departed

employee tapes.  (Id., Exh. C.)

### C.    The One Disagreement.

The only area of disagreement with respect to the electronic material

stored on the snapshot and the departed employee tapes concerned the timetable for

production.  (Kelleher Decl., Exh. F.)  Defendants told plaintiffs that they would produce

responsive documents on a rolling basis, and explained that the production would take

several months given the massive amount of electronic material, the breadth of plaintiffs'

requests and the resulting burden on Defendants.[4]  (Id., Exhs. C, E.)  Defendants offered

to consent to a motion to extend by six months the applicable deadlines in the Court's

scheduling Order.  (Id., at ¶ 11; see id., Exh. J.)  That timetable, however, was

unacceptable to plaintiffs.

As a result of that one disagreement, plaintiffs apparently abandoned all of

the agreements reached with Defendants.  They now request that the Court order

Defendants to produce "the entire snapshot and all of the ex-employee tapes to Plaintiffs

in a searchable, accessible format by October 15, 2005".  (Pltf. Br. at 23.)  That is

unreasonable.[5]

Plaintiffs further request, by separate motion, that the Court extend by

nine months certain deadlines in the scheduling Order.  (Plaintiffs' Motion to Modify

Scheduling Order, dated October 6, 2005.)  That request is also unreasonable when

viewed, as it must be, in conjunction with plaintiffs' request that Defendants produce all

electronic material by October  15.  As we told plaintiffs, we are willing to agree to

extend the deadlines in the scheduling Order by six months, but only on the condition that

they withdraw their unreasonable request regarding the October 15 deadline.  (Kelleher

Decl., Exh. J.)

---

[4] Plaintiffs themselves acknowledge that Defendants told them as early as October 2004 that "their production of the electronic documents would be on a rolling basis and would span several months".  (McDougall Decl. at ¶¶ 2-3.)

[5] Plaintiffs go to great lengths in their motion papers to accuse us of misleading them and this Court.  That accusation is not true.  It has been perfectly plain in our conversations with plaintiffs throughout this litigation that we were separately discussing paper documents and documents stored in electronic form.  Moreover, during the April 6 telephone conference with the Court, counsel for priceline again made that distinction— that only paper documents were being reviewed and produced and that the material stored in electronic form needed to be dealt with separately.

**D.     Problems With Plaintiffs' Proposed Approach.**

Plaintiffs' request that we produce "the entire snapshot and all of the ex-employee tapes . . . in a searchable, accessible format by October 15, 2005" is essentially the equivalent of asking priceline to open its offices to plaintiffs' counsel to allow them to look at whatever they wish—irrespective of whether that information is relevant, responsive, or privileged. As noted above, the snapshot contains virtually all of the material that was stored on priceline's corporate file servers for a period of more than three years. It would be incredibly burdensome and time-consuming to review all of that material. That is why we have proposed searching the material using agreed-upon terms and parameters. It is perfectly clear from plaintiffs' motion papers, however, that they do not believe we are entitled to review the electronic material before producing it. Rather, they want us to hand them the hardware and give them unfettered access to more than three years of company information. There are three major problems with plaintiffs' proposed approach.

First, plaintiffs' approach does not allow Defendants' counsel to review documents for privilege before they are produced. We are entitled to do that. See Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is relevant . . . ."). Instead, plaintiffs propose that the Court enter a "claw-back order" that would "provide that the inadvertent disclosure of a privileged document does not constitute a waiver of privilege". (Pltf. Br. at 22 & n.8 (internal quotation marks omitted).) But there is nothing "inadvertent" about the disclosure that plaintiffs are proposing. The protective order governing this litigation already addresses how inadvertently-produced privileged documents are to be treated. What plaintiffs are now requesting is very different. They are asking this Court to order us to produce all of

priceline's documents, including <u>privileged documents</u>.  Plaintiffs state that claw-back orders "ha[ve] been used in several recent cases" and cite <u>Zubulake v. UBS Warburg, LLC</u>, 216 F.R.D. 280, 290 (S.D.N.Y. 2003).  (Pltf. Br. at 22.)  Despite plaintiffs' suggestion, the court in <u>Zubulake</u> did not enter a claw-back order.  Rather, the court in <u>Zubulake</u> merely stated that "many <u>parties</u>" choose to enter into "'claw-back' <u>agreements</u>".  <u>Id.</u> (emphasis added).  Plaintiffs are not entitled to see priceline's privileged documents in the first instance, and we choose not to agree otherwise.  Giving them access to privileged documents would defeat the primary purpose of asserting the privilege.

  <u>Second</u>, plaintiffs' approach makes it impossible to Bates-number or otherwise track the documents that are produced.  That invites disputes over the origin and authenticity of documents and contradicts the policy that "Bates-stamping of documents . . . should be used in <u>all</u> cases . . . . [because] [w]hen documents are number-stamped . . . disputes over whether documents were produced essentially will be eliminated".  <u>Douglas v. Victor Capital Group</u>, No. 96 CIV. 6557, 1997 WL 716912, at *3 (S.D.N.Y. Nov. 17, 1997).  Without an easy and reliable means to identify documents from the snapshot and departed employee tapes, the enormous volume of electronic material will be entirely unmanageable.  Under plaintiffs' approach, the only way to verify the origin of an electronic document would be to conduct a search for it on the snapshot and departed employee tapes.  That approach will only lead to further disputes and will make this litigation more expensive and more burdensome.

  <u>Third</u>, and relatedly, plaintiffs' approach lacks a mechanism for protecting the integrity of the electronic documents.  If we were simply to turn over to plaintiffs

-8-

copies of the entire snapshot and all of the departed employee tapes, as plaintiffs propose, there would be no way to ensure that the electronic material was not inadvertently altered during plaintiffs' review process. Under plaintiffs' approach, a document stored on the snapshot in Microsoft Word, for example, would be reviewed in Microsoft Word and so could be edited. Before such a document could be used, therefore, verification that it had not been altered would be required. And the only way to provide that verification would be to search for the document on the snapshot and the departed employee tapes and conduct a comparison. Again, that approach is likely to lead to additional disputes and make this litigation more costly and time-consuming.

### E.    Superiority of the Previously Agreed-Upon Approach.

None of the aforementioned problems exists under the approach that we suggest—the approach to which plaintiffs and Defendants had previously agreed. Under our approach, the universe of non-email documents on the snapshot and the departed employee tapes is made smaller using agreed-upon search terms and agreed-upon processes such as "de-duping".[6] That smaller universe of documents is then converted into TIFF format (with corresponding text files where applicable), reviewed for privilege, Bates-numbered, and produced. Under our approach, the "document production" is an identifiable and unalterable set of documents that can be searched electronically.

Notably, our approach is substantially supported by the declaration of Allison Griffin, a consultant with plaintiffs' own electronic vendor. In her declaration, Ms. Griffin explains that once electronic material is in "native format"—as the snapshot

---

[6] As noted above, the email files on the snapshot and the departed employee tapes can be sorted by individual, and plaintiffs and Defendants had agreed to limit the universe of emails in that way, rather than by using search terms.

is—then the appropriate next steps are to "de-dupe" the material and to select out the relevant portions of it. (See Griffin Decl. at ¶¶ 7, 8.) Ms. Griffin notes that converting electronic material to TIFF format before de-duping and culling is wasteful and problematic. (Id. at ¶ 13.) She states: "[I]n my opinion, [converting electronic data to TIFF images] is not an appropriate way to deal with large amounts of electronic data without at least culling and de-duplicating the data". (Id. at ¶ 11 (emphasis removed).) We agree. And the process that we have proposed involves de-duping and searching the electronic material prior to converting it to TIFF. With respect to the appropriate search, Ms. Griffin states: "After the duplicative material . . . is removed, other computer forensics software can then be used to search . . . using names, keyword terms, dates, etc. This software can also be used to segregate particular file types such as email, Excel spreadsheets, Word documents, etc." (Id. at ¶ 8.) Again, we agree, and our proposed approach is entirely consistent with those guidelines. Ms. Griffin also states that it is necessary to provide corresponding text files for electronic material produced in TIFF format. (Id. at ¶ 14.) We have already agreed to do that as well.

Indeed, for purposes of the non-email electronic material, the differences between our approach and the one advanced by Ms. Griffin have almost nothing to do with method and almost everything to do with counsel's respective entitlements to review information. Under our approach, our vendor performs the agreed-upon de-duping and searching so that priceline's counsel can review the production for privilege and so that plaintiffs' counsel only receives relevant, responsive, non-privileged documents. Under Ms. Griffin's approach, plaintiffs' vendor does the de-duping and searching (without agreed-upon terms and parameters) so that plaintiffs' counsel can review priceline's

privileged documents and improperly gain access to an enormous amount of priceline's information that is not even relevant to this litigation. In sum, the only benefit to plaintiffs from their approach is that they will receive information to which they are not entitled.

*    *    *

We respectfully request that the Court deny plaintiffs' motion with respect to the snapshot and the departed employee tapes and order that plaintiffs and Defendants proceed with the production of documents from those sources as previously agreed. We ask that the Court set a reasonable timetable for the completion of the production of documents from the snapshot and the departed employee tapes, and that the Court modify its November 2, 2004 scheduling Order accordingly.

Despite plaintiffs' motion, we proceeded with our review of email files, and on October 13, we produced 12,941 pages of emails to plaintiffs. We expect to produce email documents on a weekly or biweekly basis going forward, and we believe that January 31, 2006 is a reasonable deadline for the completion of the production of emails.[7]

Because plaintiffs and Defendants have not yet agreed upon search terms for the non-email material on the snapshot and the departed employee tapes, the volume of documents that will need to be reviewed and produced is not yet known. We anticipate that the production of non-email documents from the snapshot and the departed employee tapes will take several months.

---

[7] Emails existing in paper form were already produced as part of the production of paper documents that was completed on July 31, 2005. The paper production contained approximately 5,500 email documents.

If production is ordered according to the schedule above, then we submit that a six month extension of the applicable deadlines in the Court's scheduling Order is appropriate.

## II.     THE 42 WEBHOUSE AND PERFECT YARDSALE TAPES.

The "42 WebHouse and Perfect Yardsale tapes" are a set of back-up tapes in priceline's possession that we believe may contain the final archives of WebHouse and Perfect Yardsale ("Yardsale"). (Kelleher Decl., Exh. C.) Plaintiffs and Defendants have not reached any agreement with respect to those tapes. (Id., Exhs. E, F.) There are three interrelated areas of disagreement: the cost of production, the format for production, and the timetable for production.

### A.     There Is a Simple Solution to the Disagreement Over the Cost of "Restoration".

One component of the cost of production from back-up tapes is the cost of "restoration". Before the data on back-up tapes can be searched, reviewed and produced, it must first be restored. (Griffin Decl. at ¶¶ 4, 5.) Our vendor's preliminary efforts to restore the 42 back-up tapes were unsuccessful, and we have been told that restoration of the tapes will likely be very costly and difficult, if even possible at all. (Kelleher Decl., Exhs. C, E.) Plaintiffs' vendor, Navigant Consulting, Inc., claims that it "has the ability to restore the electronic data located on each of the backup tapes for $400 per tape". (Griffin Decl. at ¶ 6.)

Plaintiffs' representations in their motion papers were the first we heard of their vendor's alleged abilities with respect to the tapes. We believe that Navigant Consulting is capable and trustworthy. If Navigant Consulting and plaintiffs' counsel will (1) stipulate to a joint hiring of Navigant Consulting by plaintiffs and Defendants for

purposes of restoring the 42 back-up tapes, and (2) sign an appropriate confidentiality agreement, then we will pay exactly $16,800 to Navigant Consulting to restore the 42 tapes—provided that the Court will enter an order stating that should Navigant Consulting's attempts to restore any or all of the 42 tapes fail, or should it prove more expensive to restore the tapes than anticipated, we will not be obligated to pay a penny more.

**B.      Format of Production.**

Once the back-up tapes are restored, then we propose dealing with them in the same way that we have proposed dealing with the snapshot and the departed employee tapes. Defendants' vendor will de-dupe and search the material using agreed-upon search terms and other limiting parameters. The smaller universe of material that remains will then be converted to TIFF format by Defendants' vendor, reviewed for privilege by priceline's counsel, and produced. As we pointed out in Section I, that approach is largely consistent with the approach suggested by plaintiffs' own consultant. In addition, it is possible that some of the back-up tapes duplicate information that is available elsewhere, such as on the snapshot. There would be no reason to produce any information from those tapes.

Plaintiffs demand that we simply hand over the restored tapes—without reviewing for privilege, without culling for responsiveness and relevance, without Bates-numbering, and without any way to ensure the integrity of the electronic material. For the reasons discussed in Section I, production in native format is very problematic.[8]

---

[8] Plaintiffs claim that production in native format is necessary because they need the "metadata" associated with the electronic material. (Pltf. Br. at 20.) The production of metadata was not part of the agreement that we had reached with plaintiffs as to the

In support of their proposed approach, plaintiffs point to an order issued by the Western District of Washington in <u>Capital Ventures Int'l v. Network Commerce</u>. (<u>See</u> Pltf. Br., Exh. A ("<u>Capital Ventures</u> Order").) Plaintiffs fail to mention the extraordinary circumstances that led the court in <u>Capital Ventures</u> to issue that order, and they fail to mention that the order was a sanction against defendants for their "recalcitrant and uncooperative" conduct. (<u>Capital Ventures</u> Order at 5, 7 ("The Court expressly finds that such production is a sanction imposed by the Court . . .").) Defendants there had refused to produce electronic files in any format and, instead, insisted on producing only the actual hardware (the servers and hard drives) on which the data existed. (<u>Id.</u> at 3.) Further, defendants produced the hardware to plaintiffs in Canada (when they could have just as easily done so in the forum), and insisted that the hardware be transported from Canada. (<u>Id.</u> at 4.) In addition, defendants submitted an intentionally misleading declaration regarding whether certain data from the hardware had been recovered. (<u>Id.</u> at 3.) Those extraordinary circumstances are plainly not present here.[9]

Plaintiffs also rely on an order issued by the magistrate judge in <u>In re Premstar Sec. Litig.</u> (<u>See</u> Pltf. Br., Exh. B ("<u>Premstar</u> Order").) The <u>Premstar</u> plaintiffs argued that electronic data in defendants' possession should be restored to its native format, while defendants argued that the data should be produced as hard copies, TIFF

---

snapshot and the departed employee tapes, and there is no basis for the Court to order that metadata be produced at this time with respect to those sources or with respect to the 42 WebHouse and Perfect Yardsale back-up tapes. We believe that the wholesale production of metadata is entirely inappropriate in this case, and we reserve our right to oppose such production, depending on the Court's ruling on plaintiffs' motion.

[9] Plaintiffs attached as an exhibit to their brief only the June 13, 2005 <u>Capital Ventures</u> order. The court's two previous, related orders provide necessary background for understanding the circumstances that led to the June 13 order. All three orders are attached as Exh. K to the Kelleher Decl.

files or PDF files. (<u>Premstar</u> Order at 2.) Plaintiffs claim that the <u>Premstar</u> court "sided with plaintiffs, compelling the defendants to produce electronic data in its original format". (Pltf. Br. at 17.) That is incorrect. The court did not conclude that electronic discovery should be produced in native file format as a general matter. Rather, the court was merely persuaded that production in native file format might be appropriate "under the circumstances of this case". (<u>Premstar</u> Order at 3.) But the court did not order the wholesale production of electronic discovery in native file format. The court was "sensitive to Defendants' concerns about a native production", and ordered only a select <u>test production</u> of data in native format, reserving a final decision on the appropriateness of native format production. (<u>Id.</u> at 6-7.)

The other authorities cited by plaintiffs also do not support their contention that production in native file format is generally preferred, appropriate, or necessary. In <u>In re Verisign, Inc. Sec. Litig.</u>, No. C 02-02270 JW, 2004 WL 2445243, at *3 (N.D. Cal. Mar. 10, 2004), the court merely upheld, under the deferential "clearly erroneous" standard, a magistrate's ruling that on the facts of that case it would not be overly burdensome for defendants to produce electronic documents in native format. In <u>In re Air Crash Disaster at Detroit Metropolitan Airport</u>, 130 F.R.D. 634, 635-36 (E.D. Mich. 1989), the court held that a computer flight simulation program needed to be produced on computer-readable tape, rather than as 95 pages of single-spaced computer program lines. Similarly, in <u>Nat'l Union Elec. Indus. Co. v. Matsushita Elec. Indus. Co.</u>, 494 F. Supp. 1257 (E.D. Pa. 1980), the Court granted defendants' request that plaintiff provide data on a computer-readable tape instead of on over 1000 printed pages. In <u>Daewoo Electronics Co. v. United States</u>, 650 F. Supp. 1003 (1986), the government was

ordered to turn over the computer tapes that contained the distillation of the raw data that it had produced on other, larger tapes, because it was the distillation that had been used to make the agency decision that was the subject of judicial review in the case. In Sattar v. Motorola, Inc., 138 F.3d 1164, 1171 (7th Cir. 1998), an employment discrimination case, plaintiff requested "some 210,000 pages of hard copy" printouts of emails, but Motorola produced them on computer tapes because of cost concerns. The Seventh Circuit held that the trial court's order directing Motorola to accommodate plaintiff and his counsel by providing them with a hard drive and the necessary software to read the emails was a reasonable solution. Id.

None of those cases involved facts even remotely similar to the situation here. And the order that plaintiffs are asking this court to enter goes well-beyond the rulings in those cases. Here, Defendants have already agreed to provide plaintiffs with all responsive, non-privileged information in an appropriate, searchable format. Further, Defendants spent a great deal of time negotiating agreements with plaintiffs, which plaintiffs then needlessly abandoned. Plaintiffs are the only party being unreasonable here.

Plaintiffs also claim that Defendants are not entitled to assert any privileges at all with respect to the documents contained on the 42 WebHouse and Yardsale back-up tapes because WebHouse and Yardsale were independent companies that licensed priceline's business model. (Pltf. Br. at 21.) They claim that a third party cannot assert an attorney-client privilege that belongs to someone else, and they cite four cases on page 21 of their brief that stand for that proposition as a general matter. Plaintiffs' concern, however, is misguided, and the cases cited are inapposite. First, we

-16-

have not seen the material on the tapes because they have not been restored. All we know is that priceline happens to have possession of the tapes. It is not plain at this point who may be entitled to assert privileges with respect to their contents. <u>Second,</u> Priceline has no intention of asserting a third party's privileges. Rather, priceline would assert its own privileges. For example, a common interest privilege may exist between priceline and a third party (such as WebHouse or Yardsale) with respect to certain communications. Such a privilege might exist, for example, if priceline and one of those entities were on the same side of a commercial transaction. However, because we do not know what is on the tapes, it is inappropriate for plaintiffs to suggest that we waive whatever rights we might have ahead of time.

**C.    Until the Restoration Process Is Complete, It Is Premature to Address the Timetable for Production and Additional Cost Issues.**

At this time, it is impossible to know (1) how many of the 42 back-up tapes can be restored, (2) how much data is contained on the tapes that can be restored, and (3) how expensive and difficult it will be to search and review the material on those tapes once they are restored. Accordingly, it would be premature to make any prediction regarding how long the production of material from those tapes could take. It would also be premature to determine whether cost-shifting is warranted. <u>See</u> <u>Hagemeyer North America, Inc. v. Gateway Data Sciences Corp.</u>, 222 F.R.D. 594, 599-603 (E.D. Wis. 2004); <u>Wiginton v. CB Richard Ellis, Inc.</u>, 229 F.R.D. 568 (N.D. Ill. 2004); <u>Zubulake v. UBS Warburg, LLC</u>, 216 F.R.D. 280 (S.D.N.Y. 2003) and 217 F.R.D. 309, 317-24 (S.D.N.Y. 2003). We submit that plaintiffs and Defendants will have to revisit those issues after Navigant Consulting reports back on the success of the restoration process.

We reserve our right to seek cost-shifting in connection with the production of information from the back-up tapes once they are restored.[10]

### Conclusion

Defendants respectfully request that the Court deny plaintiffs' motion to compel production of electronic discovery from Defendants and order the production of electronic material to proceed as set forth in this memorandum and in the accompanying Proposed Order. Moreover, given that plaintiffs have needlessly reopened matters that were already agreed upon, we do not think that much of plaintiffs' motion was "substantially justified". Fed. R. Civ. P. 37(a)(4)(B). Accordingly, we also respectfully request that the Court require plaintiffs' counsel to pay Defendants the reasonable costs incurred in responding to the unnecessary aspects of this motion, including attorneys' fees. Id.

October 13, 2005

---

[10] We further reserve the right to seek cost-shifting or other appropriate relief in connection with any aspect of the production of material stored in electronic form, depending on how the court rules on plaintiffs' motion.

-18-

DEFENDANTS PRICELINE.COM INC.,
N.J. NICHOLAS,
DANIEL SCHULMAN AND
RICHARD S. BRADDOCK

Joseph L. Clasen (ct04090)
ROBINSON & COLE, LLP
Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT 06904-2305
Telephone: (203) 462-7500
Fax: (203) 462-7599
jclasen@rc.com


Daniel Slifkin (ct21203)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Fax: (212) 474-3700
dslifkin@cravath.com

-19-

## **CERTIFICATION**

I hereby certify that the foregoing was filed with the Court and served on all

counsel of record listed below via the ECF electronic court filing system and by first

class mail on this 13th day of October, 2005:

| **Co-Lead Counsel** | **Liaison Counsel** |
|---|---|
| David R. Scott, Esq.<br>Scott & Scott, LLC<br>108 Norwich Avenue<br>P.O. Box 192<br>Colchester, CT 06415<br>Tel: 860-537-3818<br>Fax: 860-537-4432<br><br>Jules Brody, Esq.<br>Aaron Brody, Esq.<br>Stull Stull & Brody<br>6 East 45th Street<br>New York, NY 10017<br>Tel: 212-687-7230<br>Fax: 212-490-2022<br><br>Dennis J. Johnson, Esq.<br>Jacob B. Perkinson, Esq.<br>Johnson & Perkinson<br>1690 Williston Road<br>South Burlington, VT 05403<br>Tel: 802-862-0030<br>Fax: 802-862-0060 | Andrew M. Schatz, Esq.<br>Jeffrey S. Nobel, Esq.<br>Justin S. Kudler, Esq.<br>Schatz & Nobel, PC<br>One Corporate Center<br>20 Church Street, Suite 1700<br>Hartford, CT 06103-3202<br>Tel: 860-493-6292<br>Fax: 860-493-6290 |

| | |
|---|---|
| **Attorneys for Plaintiffs Twardy, Weingarten, Berdakina, Mayer, Mazzo, Fialkov, Licht, Bazag, Breirer, Farzam, Karas and Michols**<br><br>David A. Slossberg, Esq.<br>Margaret E. Haering, Esq.<br>Hurwitz & Sagarin, LLC<br>147 N. Broad Street<br>Milford, CT  06460<br>Tel: 203-877-8000<br>Fax: 203-878-9800 | **Attorneys for Defendant Jay S. Walker**<br><br>J. Allen Maines, Esq.<br>Carl Mullis, III, Esq.<br>Summer B. Joseph, Esq.<br>Laura Berg, Esq.<br>Paul, Hastings, Janofsky & Walker LLP<br>600 Peachtree Street, N.E.<br>Suite 2400<br>Atlanta, GA  30308<br>Tel: 404-815-2400<br>Fax: 404-815-2424<br><br>Douglas C. Conroy (ct11555)<br>Paul R. Dehmel (ct23063)<br>PAUL, HASTINGS, JANOFSKY & WALKER, LLP<br>1055 Washington Boulevard<br>Stamford, CT 06901<br>Telephone:  203-961-7400<br>Fax:  203-359-3031 |
| **Attorneys for priceline.com, Inc., Richard S. Braddock, Daniel H. Schulman and N.J. Nicholas, Jr.**<br><br>Evan R. Chesler, Esq.<br>Daniel Slifkin, Esq.<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019<br>Tel: 212-474-1000<br>Fax: 212-474-3700 | |

William J. Kelleher, III