**EXHIBIT I**



"Erin G. Comite" <ecomite@scott-scott.com>
09/12/2005 06:00 PM

To carlmullis@paulhastings.com, summerjoseph@paulhastings.com, jhein@cravath.com, wkelleher@rc.com

cc "David R. Scott" <drscott@scott-scott.com>, "Geoff Johnson" <gjohnson@scott-scott.com>, "Peter McDougall" <pmcdougall@jpclasslaw.com>, "Jake Perkinson" <jperkinson@jpclasslaw.com>

bcc

Subject Priceline/Joint Motion on E docs

Counsel:

As you know, the Court has ordered that we file a joint motion to address the production of Defendants' electronic documents. I attach Plaintiffs' position on the production of electronic documents, which has been discussed at various meet & confers with defense counsel. Carl & Summer, you will notice that our position has shifted as a result of our continued legal research and discussions with our expert. Thus, I have not included the prior version of Defendant Walker's position in the .pdf document attached so that you are free to edit Walker's position as you deem necessary. Please be advised that this is a draft in progress.

**Please provide us with your respective positions by the close of business on Monday, Sept. 19, 2005, for filing on the following day.** If we do not receive your positions by then, we are prepared to file our position. We are particularly concerned with the Priceline Defendants' continual delay. Although the snapshot is fully accessible and searchable (and has been since discovery was served on Defendants in November 2004), not a single document from the snapshot has been produced. Although we have agreed on the email accounts to be searched and you suggested a rolling production would follow, not a single email from the snapshot has been produced. Although we agreed that you would provide us with search terms to review in order to search the remainder of the snapshot, not a single search term has been proffered.

Please contact me to discuss any issues. I will be out of the country from Wed. afternoon (9/14) through Monday (9/19).

Sincerely,

Erin Green Comite, Esq.
Scott + Scott, LLC
108 Norwich Avenue
P. O. Box 192
Colchester, CT 06415
Voice: 860-537-5537
Facsimile: 860-537-4432
e-mail: ecomite@scott-scott.com
*******************************************

This transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify us immediately by telephone at 1-800-404-7770, or e-mail at ecomite@scott-scott.com and immediately delete this message and all its attachments.

<<Joint Motion on E Docs.pdf>> Joint Motion on E Docs.pdf

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **IN RE: PRICELINE.COM, INC. SECURITIES LITIGATION** | : | |
| | : | **MASTER FILE NO. 3:00CV01884(DJS)** |
| **This document relates to:** | : | |
| **ALL ACTIONS** | : | |
| **ORAL ARGUMENT REQUESTED** | : | |

**JOINT MEMORANDUM ON DOCUMENTS**
**STORED IN ELECTRONIC FORM**

**TABLE OF CONTENTS**

[TO BE INSERTED]

## TABLE OF AUTHORITIES

[TO BE INSERTED]

Pursuant to this Court's April 6, 2005 Order on Plaintiffs' Motion to Compel, the parties hereby submit this Joint Memorandum On Documents Stored In Electronic Form. In the April 6, 2005 Order, the Court ordered the parties "to meet and confer regarding the production of documents stored in electronic form." Doc. 164 at 1-2. The April 6 Order further provided that: "If the parties are unable to reach a compromise, then the parties shall submit a joint memorandum setting forth the propositions about which the parties agree and each party's position regarding the areas of disagreement." Counsel for Plaintiffs have met with counsel for the Priceline Defendants and counsel for Defendant Walker to discuss the documents stored in electronic form on numerous occasions since the Court's April 6, 2005 order. The parties' respective positions on the documents stored in electronic form are set forth below.

**Defendants' Electronic Documents**

**I. Areas of Agreement.**

Defendants have represented that the universe of responsive documents that they have stored in electronic form falls into one of four categories:

- The first category consists of 181 WebHouse and Perfect Yardsale backup tapes that Defendant Walker has in his possession. These backup tapes contain electronic data that was stored on the WebHouse and Perfect Yardsale servers.

- The second category consists of 42 WebHouse and Perfect Yardsale backup tapes that the Priceline Defendants have in their possession. These backup tapes contain electronic data that was stored on the WebHouse and Perfect Yardsale servers.

- The third category consists of a "snapshot" that the Priceline Defendants took of Priceline's corporate and email servers. This snapshot contains all electronic data stored on the servers during the relevant period, except that data in the fourth category.

- The fourth category consists of backup tapes that Priceline maintains for its departed employees. These tapes contain all emails and attachments created by or sent to the Priceline departed employee during their tenure at Priceline.

The parties have met and conferred about these electronic documents on numerous occasions, but have been unable to reach an agreement on any of the four categories of documents.

## II. Areas of Disagreement.

### A. Plaintiffs' Position:

#### 1. The Backup Tapes Should Be Produced In Their "Native Format."

The parties in this case have been unable to agree on the ***format*** used to produce electronic data contained on the WebHouse and Perfect Yardsale backup tapes. As noted above, Defendant Walker has 181 WebHouse and Perfect Yardsale backup tapes in his possession and the Priceline Defendants have 42 WebHouse and Perfect Yardsale backup tapes in their possession. Plaintiffs believe that the most cost-effective way to restore and produce the backup tapes is to maintain the format for the documents as they were kept in the ordinary course of business (their "native format"), *e.g.*, maintaining emails in Lotus Notes or Microsoft Outlook, word processing documents in Microsoft Word, spreadsheets in Excel, etc. This approach is most consistent with Rule 34's mandate that documents be produced ***"as kept in the usual course of business"*** and it is the approach that has been adopted in two recent cases involving facts that are virtually identical to the facts at issue here. *See, e.g., In re Pemstar, Inc. Sec. Litig.*, No. 02-cv-01821 (D. Minn. April 23, 2004) ("[T]he Court is persuaded that production of electronic discovery in native format is appropriate, feasible, and important under the circumstances of this case.") (Exhibit A); *In re Verisign, Inc. Sec. Litig.*, 2004 WL 2445243, at *3 (N.D. Cal. March 10, 2004) (Exhibit B).

Defendants, on the other hand, argue that the electronic information on the backup tapes should be converted into Tagged Image File Format (TIFF) or Portable Document Format (PDF) before it is produced. This requires an outside vendor to make an electronic "copy" of each piece of electronic data on the backup tapes and then convert it into a format that can be used by

the vendor's own proprietary software.[1] Plaintiffs' proposed native format approach is by far the more reasonable for several reasons:

- If documents are produced in their native format, then cost-shifting is not an issue because the total cost of restoring the backup tapes is less than $85,000 and Plaintiffs have offered to pay for half of these costs;

- Converting the electronic documents to TIFF or PDF files, by contrast, is cost prohibitive. Indeed, Defendant Walker has represented that it will cost between ***$4.46 million and $7.13 million*** to convert the electronic evidence on 20 of the tapes into TIFF or PDF files. This figure does not include the cost of converting the 42 tapes that the Priceline Defendants have in their possession, a process that is likely to cost millions of dollars more.

- Plaintiffs' native format approach is the only way to capture crucial embedded information and metadata about the document (such as the date and location of creation, modifications and other identifying information) – embedded information and metadata that is erased when the information is converted to PDF or TIFF files; and

- Plaintiffs' native format approach will allow the Defendants to produce the information on the backup tapes in less than a month, whereas, by Defendants' own admission, it could take several years to review and produce the documents once they are converted to TIFF or PDF files.

Plaintiffs, therefore, request that the Court order Defendants to produce on or before October 15, 2005, all electronic documents, databases, data, and email responsive to Plaintiffs' discovery requests in native format as "kept in the usual course of business" with no substantive alterations to the file format, organization, metadata, or other characteristics. This is the only cost-effective way for the parties to obtain the highly relevant information on the backup tapes.

---

[1] During the meet and confer process, Plaintiffs tried to work with Defendant Walker to narrow the number of the 181 WebHouse and Perfect Yardsale tapes that needed to be restored. However, this process broke down because Defendant Walker was not able to tell what is actually on the backup tapes until he had restored the tapes to their native format. Thus, all 181 backup tapes in Walker's possession must be restored to their native format in the first instance.

      a. **The Circumstances In This Case Warrant The Production Of The Information On The Backup Tapes In Their Native Format.**

The circumstances in this case all weigh heavily in favor of the production of the electronic documents on the backup tapes in their original native format as opposed to the production in TIFF or PDF files. Most significantly, the native format approach is the only cost-effective way to produce the information on the backup tapes. Using the native format approach, the costs total less than $85,000. Using Defendants' proposed approach, the costs could easily exceed $10 million.[2] The time constraints in this case also weigh in favor of the native format approach. Indeed, the document requests themselves were served on Defendants over ten months ago and the parties are six months away from the discovery cut-off, yet Defendants have not produced a single electronic document to date. Other factors – such as the importance of the electronic documents themselves and the burdens on the parties under the two approaches – also cut heavily in favor of adopting the native format approach when compelling production of the tapes.

These factors were recently addressed in the *Pemstar Securities* case in the District of Minnesota. There, as here, plaintiffs argued that electronic data in the defendants' possession should be restored to its native format. Defendants argued that the electronic data should be produced in printed paper copy, TIFF files or PDF files. The court sided with the plaintiffs, compelling the defendants to produce electronic data in its original native format. The court explained:

---

[2] Not surprisingly, Defendants devote a large portion of their brief to cost-shifting – recognizing that, if the costs are shifted to Plaintiffs, this would keep the highly relevant information on the tapes out of the hands of the Plaintiffs altogether. Defendants raise the cost-shifting argument in order to hide relevant and damaging information. Under Plaintiffs' approach, cost-shifting is not even an issue because the costs are manageable and reasonable. Furthermore, the issue of cost shifting is properly raised only in a motion for a protective order under Rule 26(c). *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978) (stating that "the responding party must bear the expense of complying with discovery requests, but he may invoke the district court's discretion under Rule 26(c) to grant orders protecting him from 'undue burden or expense' in doing so, including orders conditioning discovery on the requesting party's payment of the costs of discovery.")

> ***The circumstances of this case make production in native format of particular importance.*** For example, in order to prevail on its section 10(b) of the Securities and Exchange Act of 1934 claim, Plaintiffs must prove scienter. A "classic fact pattern" giving rise to a strong inference of scienter is where the "defendants published statements when they knew facts or had *access* to information suggesting that their public statements were materially inaccurate." . . . ***[I]n attempting to prove knowledge of facts or access to information suggesting statements were materially inaccurate, it is appropriate in this case and most useful to the fact finder to view, understand, and step into the shoes of the information source that actually provided the alleged knowledge and access.***

*Id.* at 5-6 (Ex. A) (emphasis added). The court was also persuaded by the fact that producing electronic data in its native format would be less costly and would allow plaintiffs to access the material more easily:

> Defendants argue that TIFF files can preserve metadata and file structure and, therefore, native format is not required. That may be so, but ***it can hardly be said that linking specific metadata or file attachments with the relevant email or file is more efficient with TIFF production as opposed to native format.*** The Court is persuaded by the presentation at the hearing on this matter that demonstrated, although partly a matter of common sense the efficiency of viewing an email with an Excel file attachment in native format as opposed to the TIFF alternative. ***In addition, the record thus far demonstrates that actually producing electronic discovery in native format as opposed to TIFF would be less costly.***

*Id.* at 6 (emphasis added).

A similar result was reached in the recent *Verisign Securities* case, which is attached as Exhibit B. There, the court ordered the production of electronic documents in their original native format. Other courts have also ordered the production of electronic documents in their native format. *See, e.g., In re Air Disaster at Detroit Metro. Airport,* 130 F.R.D. 634 (E.D. Mich. 1989); *Daewoo Elec. Co. Ltd. v. United States,* 650 F. Supp. 1003 (Ct. Int'l Trade 1086); *National Union Elec. Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 494 F. Supp. 1257 (E.D. Pa. 1980). In addition, when discussing the form of production of computerized data, the Manual for Com-

plex Litigation (4th Ed.) states that: "Dynamic data may need to be produced in native format." Sec. 11.446, p. 80.

Here, the cost of restoring the documents (less than $85,000 compared to over $10 million), the ease with which the documents can be reviewed, the importance of the documents to the case itself, and the time constraints in the case all weigh heavily in favor of the native format approach. Accordingly, this Court should order Defendant Walker to produce the 181 backup tapes in their native format and the 42 backup tapes in the Priceline Defendants' possession in their native format no later than October 15, 2005.

**b. Production Of Documents In Their Native Format Is The Only Way To Obtain Electronic Evidence That Is Critical To Plaintiffs' Claims.**

As noted above, the electronic information and data on the WebHouse and Perfect Yardsale backup tapes is crucial information that Plaintiffs need to prove the claims asserted in the Amended Complaint. In this case, Plaintiffs have sought, among other things, the production of various financial and accounting documents in connection with Defendants' scheme to artificially inflate their reported revenues and earnings. It is imperative that the electronic form of these financial and accounting documents be made available to Plaintiffs so that Plaintiffs can effectively and efficiently evaluate the financial and accounting evidence.

However, as Defendants themselves are aware, the computer-based databases and spreadsheets are not as useful in printed form. There are often hidden columns on spreadsheets that will not show up on the printed version, but will be revealed electronically. Spreadsheets produced in electronic format would also reveal how the numbers in various cells of the spreadsheets were derived, and the relationship of various cells within the spreadsheet. By making only the printouts of electronic evidence available to Plaintiffs, Defendants are creating a situation whereby Plaintiffs are not able to fully review or analyze the evidence in the format that De-

fendants used them, or in the form available to Defendants' counsel. This is contrary to both the letter and the spirit of discovery. Indeed, "producing print-outs of computer data is so unnecessary that it might be considered an abusive tactic." *Computer-Based Discovery in Federal Civil Litig.*, Kenneth J. Withers, LEXSEE 2000 Fed. Cts. L. Rev. 2 (Federal Judges Assoc. 2000).

Another key type of electronic evidence that Defendants will produce is electronic mail ("email"). As a technology company with its business principally concentrated on the internet, Priceline uses email as a main tool of communication. Additionally, email indices, which can be electronically sorted by date, to, from, subject and other fields, would provide collective information that can not be duplicated by any alternative sources. Not only can emails easily lay out the chronology of events, they are extremely helpful to Plaintiffs' development of any trend, pattern or course of conduct of Defendants' fraudulent scheme. Thus, it is reasonable to ask Defendants to produce the emails in electronic form. *See Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1171 (7th Cir. 1998) (instructing defendants to produce emails in electronic format and provide plaintiffs with compatible equipment to access it).

Plaintiffs also need the "metadata" on the tapes in Defendants' possession. Metadata, which is not readily available when documents are produced as TIFF or PDF files, consists of information regarding who, what, when, where, why and how the data was created, documented and maintained. Mary Kay Brown and Paul D. Weiner, *Digital Dangers: A Primer on Electronic Evidence in the Wake of Enron,* 74 PA Bar Ass'n Quarterly 1 (2003). Metadata reveals, among other things, when files were created, modified and deleted, and what user name was associated with those tasks. Computer files often contain hidden or embedded information such as formulas and comments in spreadsheets. *Id.*

By not producing electronic copies of these highly relevant documents in their native format, Defendants are precluding Plaintiffs from obtaining discoverable evidence that is critical to the claims at issue in this case. This violates both the letter and the spirit of the Federal Rules and cannot be justified given the facts and circumstances in this case.

c. **The WebHouse And Perfect Yardsale Documents Are Not Privileged.**

In response, Defendants claim that the backup tapes cannot be produced in their native format because there is no way for them to remove privileged information from the tapes. This argument fails because the backup tapes (and any corresponding privilege) belong to WebHouse and Perfect Yardsale – to entities that Defendants themselves claim were "third party licensees" that existed separate and apart from Priceline or the other Defendants. To the extent the documents have been shared with Defendants, the privilege has been waived and, thus, no privilege exists. Certainly, Defendants have no privilege to assert with respect to these documents.

Indeed, it is well settled that a party does not have standing to assert the attorney-client privilege or work product doctrine on behalf of a third party. *See, e.g., Application of Sarrio, S.A.*, 119 F.3d 143, 147-48 (2d Cir. 1997) ("[I]f a client-witness waives its right to conceal matters it confided to its attorneys, a party against whom the evidence is offered has no right to insist that the privilege nevertheless be observed."); *In re Grand Jury Proceedings*, 604 F.2d 798, 801 (3d Cir. 1979) (the attorney-client privilege belongs only to the client, not to a third party who may want to assert the privilege to prevent the disclosure of documents and information); *Gatewood v. Stone Container Corp.*, 170 F.R.D. 455, 459-60 (S.D. Iowa 1996) (objection to subpoena overruled because defendants lacked standing to assert privilege on behalf of third party); *Hertenstein v. Kimberly Home Health Care, Inc.*, 189 F.R.D. 620, 635 (D. Kan. 1999) (same).

Moreover, even if the documents on the backup tapes were privileged, Defendants' concerns can easily be addressed through the use of a "claw-back" agreement. A claw-back agreement allows a party to produce large amounts of electronic data without waiving their right to assert the attorney-client privilege or work product doctrine with respect to any electronic document that is produced. This approach has been used in several recent cases – particularly where, as here, it is time consuming to conduct a privilege review of all documents that have been stored in electronic format. *See, e.g., Zubulake v. UBS Warburg, LLC,* 216 F.R.D. 280, 290 (S.D.N.Y. 2003) ("Zubulake III") ("Indeed, many parties to document-intensive litigation enter into so-called 'claw-back' agreements that allow parties to forgo privilege review altogether in favor of an agreement to return inadvertently produced privileged documents."). Thus, Defendants' objections concerning the disclosure of privileged documents are easily resolved.

**B. <u>Responsive Data On The Snapshot And The Ex-Employee Backup Tapes Should Be Produced No Later Than October 15, 2005.</u>**

Another major area of dispute involves the Priceline Defendants' failure to produce responsive electronic information contained on: (1) the "snapshot" that the Defendants took of the Priceline corporate and email servers; and (2) Priceline's ex-employee backup tapes. The main dispute involving the snapshot and the ex-employee tapes turns on the amount of time it will take Defendants to produce responsive information on the snapshot and the ex-employee backup tapes. Plaintiffs believe that these materials should be produced no later than October 15, 2005.

This is a reasonable time frame for producing the documents. Significantly, the snapshot and the ex-employee tapes are fully accessible and searchable and should have been treated no differently than the paper documents in Defendants' possession, custody and control. There simply is no reason why these documents could not have been produced along with the paper documents on a rolling basis for the past several months. Defendants have had Plaintiffs' docu-

ment requests since early November 2004 and have had access to the materials on the snapshot and ex-employee tapes since the discovery stay was lifted last year. Nonetheless, the Priceline Defendants have not produced a single document from the snapshot or the ex-employee tapes and now claim that producing these documents will take ***"several additional months."*** The parties are now six months away from the discovery cut off. Plaintiffs need these critical electronic documents in order to start taking depositions. Accordingly, Plaintiffs believe that if Defendants cannot produce all responsive materials on the snapshot and the ex-employee tapes by October 15, 2005, then the snapshot and the ex-employee tapes should be turned over to the Plaintiffs in their entirety.