UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE: PRICELINE.COM, INC. SECURITIES LITIGATION | : : : | |
| ——————————————— | : : | **MASTER FILE NO.** 3:00CV01884(DJS) |
| This document relates to: | : : | |
| ALL ACTIONS | : : : : | |

## DEFENDANT JAY S. WALKER'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF ELECTRONIC DISCOVERY

Plaintiffs' Motion to Compel Individual Defendant Jay S. Walker to restore 181 electronic back-up tapes to a "native file" format at his own expense and to produce to Plaintiffs everything on these tapes, regardless of their relevance, responsiveness, or privileged status, should be denied. These tapes, in their current *compressed* format – which is how they were "kept in the usual course of business" – cannot be viewed or searched without considerable processing and expense. Based on counsel for Mr. Walker's spot-checking of a sample group of these tapes that were restored to a native file format at Mr. Walker's own expense, it appears that most of the data on the tapes is neither relevant nor responsive to Plaintiff's document requests, and that at least some of the data is likely to contain privileged information. Plaintiffs are not entitled to indiscriminate, wholesale access to this data.

Production of this data would be extraordinarily over-burdensome, especially for an individual defendant. Counsel's IT vendors and advisors estimate that it will cost millions, if not tens of millions of dollars, to restore the data contained on the tapes and convert it into an accessible format that can be searched for responsive and non-privileged documents and then

**ORAL ARGUMENT REQUESTED**

produced securely, with Bates numbers. Plaintiffs' demand that Mr. Walker produce the 181 back-up tapes in a "native file" format fails to adequately address such issues as: 1) why Mr. Walker, as opposed to Plaintiffs, should pay the costs of converting the tapes to a native file format *or* to further process them into an accessible format, 2) why a number of privileged documents should be provided to Plaintiffs, 3) why tens of millions of pages of non-responsive and non-relevant documents should be provided to Plaintiffs, and 4) how the documents can be secured and Bates numbered to assure that documents are not altered or taken out of context.

If the tapes are restored only to a "native file" format, the documents will not be organized or indexed, and additional work by a vendor will be necessary before the documents can be reviewed electronically to identify and withhold non-responsive and privileged documents. Without this additional vendor expense, "native files" can be searched only manually, one page at a time.[1] Such a review would be extraordinarily over-burdensome in terms of both time and expense. In these circumstances, the burden of producing such a large volume of unorganized data clearly dwarfs any benefit to Plaintiffs, and it would not be appropriate, fair, or just to compel Mr. Walker to produce the back-up tapes in native file format.

---

[1] Plaintiffs' electronic discovery vendor concedes that once back-up tapes are restored to a native file format, "[a]dditional funds would also need to be spent culling down the material on the tapes and searching the data for relevant information." Declaration of Allison Griffin at ¶ 6. Moreover, what Ms. Griffin describes as "searching" refers only to the process of "de-duplication" and culling the restored data based on a limited number of key words. The costs to which Ms. Griffin refers and upon which Plaintiffs rely do not take into account the additional costs associated with loading the data into a review tool, which is the *only* way to organize the documents and review them efficiently for responsiveness and privilege.

## I. BACKGROUND

To date, Mr. Walker has produced 325,210 pages, comprised mostly of WebHouse documents, to Plaintiffs at considerable cost to Mr. Walker.[2] Mr. Walker's substantial document production is complete, except for 181 electronic back-up tapes that were found amongst the WebHouse documents that Mr. Walker produced. These 181 back-up tapes comprise the only electronic data in Mr. Walker's possession, custody, or control that has not been produced, determined to be privileged, or determined to be non-responsive to Plaintiffs' Document Requests.

In its April 6, 2005 Order, the Court ordered Plaintiffs and Defendants "to meet and confer regarding the production of documents stored in electronic form." Doc. 164 at 1-2. The April 6 Order further provided that: "If the parties are unable to reach a compromise, then the parties shall submit a joint memorandum setting forth the propositions about which the parties agree and each party's position regarding the areas of disagreement." Id. at 2. Counsel for Plaintiffs and Mr. Walker held numerous conference calls during April, May, June, July, and August, 2005 regarding production of the 181 tapes at issue.[3] To facilitate discussion, counsel for Mr. Walker grouped the 181 tapes into 16 groups based on their handwritten labels. At Mr.

---

[2] Some of the documents within Mr. Walker's production were stored on accessible electronic media, such as floppy disks, CDs, DVDs, and video tapes. These documents were produced in their electronic format. Therefore, Plaintiff's statement that "not a single electronic document has been produced" (Plaintiffs' Memorandum at 1) is not correct as to Mr. Walker. The 181 inaccessible back-up tapes are the only electronic materials that Mr. Walker has not produced.

[3] Plaintiffs state in their Memorandum, and Peter McDougall states in his declaration in support, that "the parties" began to meet and confer on the subject of electronic documents in October of 2004. (Plaintiffs' Memorandum at 5.) This is not correct as to Mr. Walker. Mr. Walker did not have possession, custody, or control of any of the electronic materials at issue, and did not have WebHouse's or Walker Digital's permission to produce any such materials on their behalf, until early 2005, after Plaintiffs demanded that Mr. Walker obtain the materials from these third parties. Mr. Walker's current counsel did not begin their representation of Mr. Walker until December of 2004.

Walker's own expense, counsel restored 16 of these tapes – one tape from each group – to a "native file" format. Although the data on those 16 tapes was too voluminous for a page-by-page search and could not be searched or organized electronically without further processing, counsel performed spot checks of these tapes to get a feel for the kind of files that each contained and to make informed guesses as to the contents of the remaining tapes. Based on the spot checks, counsel believes that at least 173 of the 181 tapes are likely to contain only data that is neither relevant nor responsive to Plaintiffs' document requests.

Mr. Walker provided Plaintiffs with information about how the tapes were maintained when they came into Mr. Walker's possession, produced to Plaintiffs photocopies of the handwritten labels on all of the tapes, and, following the spot-checks, provided Plaintiffs with information about the servers contained on those 16 tapes. Mr. Walker also made counsel's IT advisor available to answer Plaintiffs' questions about the tapes and prepared memoranda for Plaintiffs summarizing counsel's conclusions about the tapes based on the spot-checks. Based on this information, Plaintiffs limited their initial request to 20 tapes that Plaintiffs believed were likely to contain back-ups of email servers.[4]

Counsel for Mr. Walker attempted to work with Plaintiffs' counsel to draft a joint memorandum setting forth the parties' respective positions regarding the requested production of the 20 tapes to which Plaintiffs had narrowed their request. However, as the parties neared

---

[4] Plaintiffs stated that they were most interested in the tapes that, in their estimation, appeared most likely to contain emails. Counsel for Mr. Walker informed Plaintiffs' counsel that, based on their spot-checking of the restored sample tapes, they believed that only 8 of the 20 tapes that Plaintiffs initially requested might contain emails. Counsel for Mr. Walker also indicated to Plaintiffs that, based on the spot-checking and all of the information available to them, they believed that 12 of the 20 tapes that Plaintiffs requested were *not* likely to contain emails or any other responsive data. Nevertheless, Plaintiffs continued to request the production of all 20 tapes, and they subsequently reverted to their current position that all 181 tapes must be produced. This position is neither reasonable nor feasible.

completion of a final draft, Plaintiffs withdrew their concession to initially seek only 20 of the 181 tapes, terminated the joint effort, and instead filed a Motion to Compel production of *all* the data on *all* the tapes, forcing Mr. Walker to file this Memorandum separately in response.

Plaintiffs' suggestion that Mr. Walker is responsible for any delay in the attempted resolution of the difficult issues surrounding production of such a large amount of electronic data simply is not supported by the facts. Plaintiffs did not submit their initial draft of a joint memorandum setting forth their position to Mr. Walker until Friday, July 15, 2005. Mr. Walker reviewed Plaintiffs' position and provided revisions and a draft setting forth his position on August 15, 2005. *More than four weeks* passed before Plaintiffs circulated a revised draft of their position. Whereas the initial draft of Plaintiffs' position was 4 pages, their second draft was 10 pages. Moreover, in the second draft, Plaintiffs requested the production of all 181 tapes and raised several new arguments for the first time.

Plaintiffs insisted that Mr. Walker submit any revisions to his position by Monday, September 19 -- only one week after Plaintiffs circulated their expanded second draft. Counsel for Mr. Walker explained that Plaintiffs' proposed deadline did not give Mr. Walker a reasonable opportunity to respond to Plaintiffs' new arguments, but offered to provide his revisions to Plaintiffs by Friday, September 23 or Monday, September 26. (See email, attached hereto as Exhibit A.) Plaintiffs refused to agree to this schedule and instead filed the instant Motion to Compel on Thursday, September 22. As set forth below, Plaintiffs Motion to Compel should be denied.

## II.  ARGUMENT AND CITATION TO AUTHORITY

Plaintiffs are demanding that Mr. Walker convert, at his own expense, the 181 back-up tapes from the compressed format in which they were kept in the usual course of business into a

"native file" format, and that he produce to them *all* of the inaccessible data contained on these tapes. These 181 tapes are estimated to contain 71,834,000 to 114,935,000 pages of data. Declaration of Michael Farley at ¶ 11. Plaintiffs are demanding that all of this data be restored to and produced in a "native file" format in which, without additional processing, the data cannot be searched, redacted or produced securely with Bates numbers.

Plaintiffs make these demands despite their awareness that substantially all of the data contained on the 181 tapes is neither relevant to this litigation nor responsive to their Document Requests. Plaintiffs make these demands knowing that the data is likely to contain many privileged documents. Plaintiffs make these demands knowing that much of the data contained on the tapes may be duplicative of the data already being produced to Plaintiffs. Plaintiffs make these demands knowing that it will cost Mr. Walker a substantial amount of money just to convert the tapes from the compressed format in which they were "kept in the normal course of business" into a native file format. Plaintiffs make these demands knowing that, when simply restored to a native file format, it is impossible for Mr. Walker to search and review the tapes to identify and withhold privileged and non-responsive documents without spending millions or tens of millions of dollars. Plaintiffs make these demands knowing that it will cost Mr. Walker a substantial amount in attorney's fees to review all of the requested data. Finally, Plaintiffs make these demands knowing that Mr. Walker did not create or maintain these tapes, and that Mr. Walker obtained the tapes only after Plaintiffs demanded that Mr. Walker request them from third parties. Plaintiffs' demands should be denied.

It would not be appropriate, fair, or just to require Mr. Walker to produce *all* of the data, *including privileged and non-responsive information*, that is contained on the 181 tapes. Yet, if Mr. Walker is required to produce the 181 tapes either in their current compressed format, which

is how they were "kept in the usual course of business," *or* in their "native file" format, that is exactly what he will be required to do. Mr. Walker does not have the capability to view any of the data on the tapes in their current compressed format, nor does he have the capability to convert the compressed tapes into a "native file" format. This restoration would have to be performed by an electronic discovery vendor. Plaintiffs are not entitled to demand that Mr. Walker produce the back-up tapes in their current compressed format, because they cannot be searched to identify privileged and non-responsive data, nor are Plaintiffs entitled to demand that the tapes be produced in any format *other* than that in which the tapes were "kept in the usual course of business" at Mr. Walker's expense.

If the data contained on the tapes is restored *only* to a native file format, it will be impossible for Mr. Walker, without the aid of a vendor at considerable extra expense, to search the data electronically. Therefore, because the data in native file format is not and cannot be indexed or arranged in any manageable fashion, the hundreds of millions of pages contained on the tapes would have to be reviewed manually, page by page, to locate privileged and non-responsive materials. Such "native" data is comparable to hundreds of millions of documents stored randomly and haphazardly in thousands of file cabinets. Thus, Plaintiffs, in effect, are demanding that the *entire* contents of thousands of disorganized file cabinets be handed over, regardless of the fact that they contain a number of privileged documents, and regardless of the fact that most of the documents are non-responsive.

Because it is so voluminous and disorganized, the data on the back-up tapes is what courts deem "inaccessible," and thus the production of any responsive data would be extremely over-burdensome, particularly for an individual defendant. *See* Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 318-20 (S.D.N.Y. 2003) (noting that "whether production of documents is

unduly burdensome or expensive turns primarily on whether it is kept in an *accessible* or *inaccessible* format (a distinction that corresponds closely to the expense of production)" and identifying back-up tapes, such as the 181 back-up tapes at issue here, as the classic example of "inaccessible" data) (emphasis in original). Accordingly, if this Court requires Mr. Walker to produce any of the data on the 181 tapes, Plaintiffs should be required to pay the substantial costs to process the currently compressed data into a static, image file format in which it can be redacted, Bates numbered, and loaded into a review tool in which it can be searched electronically.

### 1. Production of the Back-Up Tapes Would be Extremely Over-Burdensome, and the Costs Associated With Any Such Production Should Be Borne By Plaintiffs.

Plaintiffs are demanding that Mr. Walker personally bear the burden of converting the 181 back-up tapes to a native file format. Plaintiffs estimate that the vendor cost to restore to a native file format is $400 per tape, for a total of $66,000 for the 165 tapes in Mr. Walker's possession that are not yet restored. Declaration of Allison Griffin at ¶ 6. Mr. Walker has estimated that the cost to restore the data to a native file format is approximately $200 to $800 per tape,[5] for a total of $33,000 to $132,000 for the 165 tapes.[6] Declaration of Michael Farley at ¶ 6. Mr. Walker should not be required to bear the substantial costs to convert these tapes to a native file format. More importantly, converting the tapes to a native file format is only the

---

[5] Mr. Walker paid Applied Discovery approximately $6,000 to restore 16 of the back-up tapes to a native file format.

[6] This estimate considers only those tapes that the vendor is able to restore. There may be some tapes that the vendor cannot restore. Declaration of Michael Farley at ¶13. In fact, Applied Discovery was unable to restore two of the tapes in Mr. Walker's original sample set. Id. at ¶ 9. It may be possible for a forensic expert to restore all or part of such problematic tapes, but the costs and time associated with such a process could be significant and are not addressed in this Memorandum. Note that it is possible that even a forensic expert will not be able to restore certain tapes. Id. at ¶ 13.

beginning. The tapes then will need to be converted to an image format and loaded into a review tool by an electronic discovery vendor so that the data can be adequately and efficiently searched for privileged and non-responsive materials and then produced securely. Due to the potentially staggering volume of data contained on the back-up tapes, this will be overwhelmingly expensive.

Based on a restoration of 16 of the 181 back-up tapes to a native file format, counsel's IT advisors estimate that all 181 tapes contain 1,436 gigabytes (Gb) of data. Declaration of Michael Farley at ¶ 10 (attached hereto as Exhibit B). Based on pages-per-Gb estimates commonly used in the electronic discovery industry,[7] the 181 tapes could contain between 71,834,000 and 114,935,000 pages of data.[8] Id. at ¶ 11. Taking into account anticipated discounts from the vendor, and *not* including the substantial attorney costs associated with review and production, the vendor cost to restore these tapes to their native file format *and then convert them to an image format, load them into a review tool, Bates number them, and produce them* could be between $14,512,000 and $23,132,000.[9] Id. at ¶ 12. The attorney's fees associated with reviewing these documents also would be in the millions of dollars.

Plaintiffs' electronic discovery vendor, Allison Griffin, also recognizes that once the tapes are restored to a native file format, *additional* vendor costs must be incurred to review the

---

[7] This estimate is based on an estimated 50,000 to 80,000 pages of data per gigabyte. The Manual for Complex Litigation (4th ed) (cited by Plaintiffs in their Memorandum at 18), at page 77, however, states that "[o]ne gigabyte is the equivalent of 500,000 typewritten pages." If this is the case, then the 181 tapes could contain as many as 718 million typewritten pages.

[8] In the unlikely event that the remaining 165 tapes are filled to their potential capacity of 80 Gb, all 181 tapes could contain up to one billion pages of data. See Doc. 158 (Declaration of Michael Farley, April 4, 2005, ¶ 11).

[9] This estimate does not include other potential costs related to set-up, filtering, de-duplicating, and hosting associated with managing the data if the volume is larger than what can be handled in-house. It is likely, however, that these processes will reduce the size of the data set that will need to be reviewed. Id. at ¶ 8.

tapes. She states: "Additional funds would also need to be spent culling down the material on the tapes and searching the data for relevant information. It is difficult to put an exact figure on these costs without knowing the volume and type of data." Declaration of Allison Griffin at ¶ 6.

Ms. Griffin estimates that "[a]ssuming only 25 – 40 tapes contain relevant data, it would cost an additional $50,000 - $100,000 to search and provide potentially responsive files on selected output media." Id. This estimate is incomplete for two reasons. First, given that Plaintiffs are demanding that all 181 tapes be produced, there is no basis for calculating costs based on the production of "only 25 – 40 tapes." Thus, even if Ms. Griffin's estimate took into account all the steps necessary to review the data for responsiveness and privilege and produce it securely, which it does not, the cost for all 181 tapes, using Ms. Griffin's estimate, would be between $350,000 and $700,000. Added to the estimated $66,000 required to restore the tapes to a native file format, Plaintiffs' actual estimate just for restoration, filtering, and de-duplication of the 181 tapes is between $416,000 and $766,000. Clearly, it would be over-burdensome to require Mr. Walker to spend nearly half a million dollars or more on this production.

Second, Plaintiffs' estimate is woefully low because it does not include all of the steps necessary for Mr. Walker to locate and withhold privileged and non-responsive materials. Plaintiffs' estimate includes *only* the estimated costs 1) to restore the data to native file format, 2) to "de-duplicate" the data, and 3) to reduce the amount of data that will be produced by marking files that contain certain key words (on which the parties would have to agree). Plantiffs' estimate does *not* include the additional costs associated with the requisite loading of the reduced data set into a vendor's review tool so that 1) responsive and privileged data can be identified, 2) privileged materials can be redacted, and 3) the documents to be produced can be Bates stamped. This final step -- loading the data into a review tool -- is necessary to enable Boolean searching,

which will allow Mr. Walker to review documents efficiently for content by searching for words in various proximities to other words, searching for documents containing some words but not others, and designing searches based on the substantive content of the data (rather than blindly filtering the data based on a limited number of words that may or may not be contained in the documents). Declaration of Michael Farley at ¶ 15. In addition, a review tool must be used to redact privileged materials and stamp the production set with Bates numbers. Id. Plaintiffs have not proposed a less-expensive method of accomplishing these goals; rather, they simply have omitted these final, critical steps from their analysis. As detailed above, the vendor cost to restore *all* 181 tapes to their native file format *and then convert the data to an image format, load it into a review tool, Bates number it, and produce it* is estimated to be between $14,512,000 and $23,132,000.

Regardless of whether one considers Plaintiffs' estimates or Mr. Walker's estimates, the costs of such a voluminous and unduly burdensome production are substantial, and Mr. Walker, *an individual defendant*, should not be required to bear them. *See, e.g.*, Medtronic Sofamor Danek, Inc. v Michelson, No. 229 F.R.D. 550, 558 (W.D. Tenn. 2003) (finding that "the cost of restoring, de-duplicating, and designing and conducting a search" of the back-up tapes at issue "reasonably could be in the range of several million," and deeming this cost to be substantial, and "therefore . . . undue."); *see also* Wright v. AmSouth BanCorporation, 320 F.3d 1198, 1205 (11th Cir. 2003) (upholding the District Court's complete denial of the plaintiff's document request because the request was overly broad and unduly burdensome). Rather, *Plaintiffs should be responsible for all of the vendor costs of producing any data from the 181 tapes*. Shifting the costs of electronic discovery to the requesting party is particularly appropriate where, as here, the data requested is "inaccessible." *See* Zubulake, 217 F.R.D. at 318. Documents stored on back-

11

up tapes are the classic example of "inaccessible" data, and voluminous, disorganized restored data is equally "inaccessible." Id. at 318-20. Thus, it is appropriate for Plaintiffs to bear the costs of restoring the data from its current compressed form to a form in which it can be electronically reviewed and securely produced.[10] *See* Wiginton v. CB Richard Ellis, Inc., 229 F.R.D. 568, 576-77 (N.D. Ill. 2004) (ordering the requesting party to pay 75% of the cost of restoring back-up tapes, *searching the data, and transferring the data to an online review tool*). If Plaintiffs are responsible for these vendor costs, then Plaintiffs will make a more reasoned determination as to whether it truly is worth the cost to obtain this data and whether the data might be obtained elsewhere in a more cost-effective manner.

In addition to the over-burdensome cost simply to convert the 181 back-up tapes from their current format to a "native file" format, production of the data in this "native file" format, as Plaintiffs are demanding, also would be over-burdensome for Mr. Walker, because electronic data, when restored only to "native file" format, remains inaccessible. *See* Zubulake, 217 F.R.D. at 318. The Zubulake court determined that even paper documents that are "kept haphazardly, with no indexing system, in quantities that make page-by-page searches impracticable" are "inaccessible." Id. Likewise, when data on back-up tapes is simply restored to a "native file" format, without being loaded into a review tool, it is "inaccessible," because it is extremely voluminous and cannot be electronically searched, indexed, or organized.[11] *See* Declaration of

---

[10] The Court in Zubulake v. UBS Warburg, LLC, 217 F.R.D. 309, 322 (S.D.N.Y. 2003) set forth a multi-factored analysis to determine when cost-shifting is required to protect the responding party from undue burden and expense. As discussed in detail in Defendant Jay S. Walker's Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Discovery From Defendants (Doc. 158) at pp. 8-12, an analysis of these factors clearly demonstrates that Plaintiffs should bear all the costs associated with the production of any data from the 181 back-up tapes.

[11] Thus, merely restoring the data on the 181 tapes to a native file format will result in potentially tens of millions of pages that are "kept haphazardly, with no indexing system, in quantities that

Michael Farley at ¶ 14. That is, the only way to search electronic documents in the "native file" format that Plaintiffs have requested, without incurring the vendor costs to load the data into a review tool, is to review each of the 71,834,000 to 114,935,000 pages manually, one page at a time.[12]   Id.   This clearly would be impracticable, and the attorney costs associated with performing such a review would be extraordinarily over-burdensome.

Plaintiffs' assertion that Mr. Walker proposes producing "print outs" of the electronic data is incorrect and misleading.  As explained above, it is production of *native files*, which, without the aid of a vendor, cannot be searched across electronically and must be reviewed page-by-page, that would be equivalent to producing "print outs," which Plaintiffs argue is "abusive." (Plaintiffs' Memorandum at 19.)  Plaintiffs gloss over the fact that restoration of the tapes to a native file format and no further will yield, even after Plaintiffs' proposed "de-duplication" and filtering, an overwhelming amount of data that can be reviewed electronically *only* by incurring the significant additional expense to load the data into a vendor's review tool.

Moreover, conversion of the data from native file format to TIFF or PDF images is necessary to provide document security and enable Bates stamping, as discussed below.  This conversion retains the data in an "electronic" format, and would allow Plaintiffs to search and review the data that is produced in a more efficient and organized manner.  It defies credulity to imagine that Plaintiffs, who requested that Mr. Walker produce paper documents in a TIFF

---

make page-by-page searches impracticable" and that therefore are inaccessible. *See* Zubulake, 217 F.R.D. at 318.

[12] Assuming that *three* attorneys can review 15,000 pages per day, a review of approximately 71,000,000 pages would take 4,733 days.  If each of those three attorneys worked five days a week for fifty weeks out of each year, this review would take nearly *nineteen years*.  A review of approximately 114,000,000 pages would take three attorneys 7,600 days.  With the three attorneys each working five days a week for fifty weeks a year, this review would take *over thirty years*.  If more pages per day can be reviewed, then the review time, of course, will be shorter.

format that can be searched in this manner, plan to review each of the 71,834,000 to 114,935,000 pages of data on the back-up tapes manually, page-by-page, rather than loading it into a review tool as they have done for the paper documents. Contrary to Plaintiffs' misinformed assertions, when converting to TIFF or PDF format, the vendor can and will be instructed to reveal all "hidden data" so that all such hidden data will be produced to Plaintiffs in a searchable electronic database. In addition, enabling electronic searching would allow Mr. Walker to review the data for privileged and non-responsive materials before producing it, as he is entitled to do.

Although the producing party usually pays the costs associated with reviewing *paper* documents for privilege, this is not the case with respect to electronic back-up tapes containing data in this quantity, because "[a]s contrasted with traditional paper discovery, e-discovery has the potential to be vastly more expensive due to the sheer volume of electronic information that can be easily and inexpensively stored on backup media." *See* Wiginton, 229 F.R.D. at 572; *see also* Byers v. Illinois State Police, No. 99C8105, 2002 WL 1264004, at *6 (N.D. Ill. June 3, 2002) ("the Court is not persuaded by the plaintiffs' attempt to equate traditional paper discovery with the discovery of e-mail files. Several commentators have noted important differences between the two. . . . Chief among these differences is the sheer volume of information. . . . Additionally, computers have the ability to capture several copies (or drafts) of the same e-mail, thus multiplying the volume of documents. All of these e-mails must be scanned for both relevance and privilege."). Because of the substantial attorney's fees that Mr. Walker will be forced to expend to search the data and identify privileged and non-responsive documents, Plaintiffs also should be required to reimburse Mr. Walker for his reasonable attorney's fees associated with the production of the data. Otherwise, the requested production would be over-burdensome based on the attorney's fees alone.

The cases that Plaintiffs cite do *not* support the position that inaccessible electronic data in the quantities at issue in the instant case should be produced in native file format at the Defendant's expense. The Court in <u>In re Pemstar, Inc. Sec. Litig.,</u> No. 02-cv-01821 (D. Minn. April 23, 2004) (attached hereto as Exhibit C) recognized the defendants' concerns about production in native format and ordered an initial *test production* of the emails of *only three individuals.* This test production was to be from only active servers and *not from back-up tapes.* The parties were to submit a proposed protocol for the test production, and after the test run was completed, the parties were to report to the Court their concerns and/or satisfaction with the test production. The Court then would determine whether to order further production, in what format, and who would pay the costs. The Court also declined to order, at that time, production in native format of three databases about which little information was known. <u>Id.</u> at 7.

In <u>In re Verisign, Inc. Sec. Litig.,</u> No. 02-02270, 2004 WL 2445243 (N.D. Cal. Mar. 2004), the Court apparently was dealing only with the requested production of "hundreds of thousands of documents" as opposed to the *tens of millions* of documents in the instant case. <u>Id.</u> at *1. The Court *was not dealing with back-up tapes* and ordered the production of documents in the format in which they were kept in the "usual course of business," which in the instant case is the current compressed format.

Similarly, in <u>In re Air Crash Disaster at Detroit Metro Airport</u>, 130 F.R.D. 634, 635 (E.D. Mich. 1989), *the Court was concerned only with <u>95</u> pages of data versus the tens of millions of pages of data in this case*; in <u>Daewoo Elecs. Co. Ltd. v. United States</u>, 650 F. Supp. 1003, 1004 (Ct. Int'l Trade 1986), the Court was concerned only with copies of computer tapes that were submitted to, or used by, the Department of Commerce in a *single* administrative review; and in

15

National Union Elec. Corp. v. Matsushita Elec. Indus. Co., Ltd., 494 F. Supp. 1257, 1262 (E.D. Pa. 1980), *the requesting party was paying all the costs* of creating a computer-readable tape.

In Computer-Based Discovery in Federal Civil Litigation, K. Withers, 2000 Fed. Cts. L. Rev. 2 (Federal Judge, Assoc. 2000), cited by Plaintiffs at page 19 of their Memorandum, the author states that the discovery of back-up tapes "has the potential to increase the volume of discovery" and that "retrieving documents from back-up tapes may be conditioned on the requesting party paying some or all of the costs." Id. at page 6. The author also states that:

> Rule 26(b)(2)(iii), which provides judges with the power to limit burdensome discovery, may also be invoked by the court to compel discovery and fashion a computer-based discovery protocol. The most recent reported computer-based discovery case to cite Rule 26(b)(2)(iii), Simon Property Group, L.P. v. MySimon, Inc. [194 F.R.D. 639 (S.D. Ind. 2000)] represents a step in the process initiated in Playboy Enterprises, Inc. v. Welles [60 F.Supp. 2d 1050 (S.D. Cal. 1999)] (which also cited Rule 26(b)(2)(iii)), and refined in Northwest Airlines, Inc. v. Local 2000 International Brotherhood of Teamsters, et al. [Civil Action No. 00-08 (D. Minn. Feb. 2, 2000) (Order on Defendant's Motion for Protective Order and Plaintiff's Motion to Compel Discovery)]. All three of these cases allowed discovery to proceed under a narrowly-crafted protocol, designed to protect the respondents' rights to object to the actual production of irrelevant or privileged material.

Id. at 10-11 [citations added].

In each of these three cases, the Court *ordered the requesting party to pay* the costs for a neutral expert vendor to convert the data into *a format that could be reviewed by the producing party for relevance and privilege.* Id. at p. 7.

The courts acknowledge that "[p]roducing electronic data requires, at minimum, several steps: (1) designing and applying a search program to identify potentially relevant electronic files; (2) reviewing the resulting files for relevance; (3) reviewing the resulting files for privilege; (4) deciding whether the files should be produced in electronic or printed form; and (5) actual production." Medtronic, 229 F.R.D. at 551; *see also* Wiginton, 229 F.R.D. at 573-574 (noting that "relevant information on CBRE's backup e-mail tapes is only available through restoring *and searching* the backup tapes") (emphasis added). Without being processed into an electronic format in which it can be organized and reviewed efficiently (which restoration only to a native file format does not allow), the data on the back-up tapes at issue is "inaccessible" – just as tens of millions of pages of unorganized, non-indexed paper documents would be inaccessible. Therefore, production in the format that Plaintiffs have requested would be extremely over-burdensome. *See* Zubulake, 217 F.R.D. at 318. Consequently, Plaintiffs' Motion should be denied, or Plaintiffs should be required to pay *all the costs* associated with producing the data.

### 2. Plaintiffs Are Not Entitled to Conduct a Carte Blanche Review of Privileged Materials, and a "No Waiver" Stipulation Does Not Protect Against This Abuse.

The serious privilege issues associated with Plaintiffs' requested production in a native file format are not solved by Plaintiffs' offer to stipulate that Mr. Walker's wholesale production of all the data on the tapes without reviewing it for privilege will not constitute a waiver of the applicable privileges. Mr. Walker's production of privileged data to Plaintiffs, even pursuant to a stipulation, nevertheless might waive privileges as to *other parties* in any future litigation. *See* Bowne, Inc. v. AmBase Corp., 150 F.R.D. 465, 478-79 (S.D.N.Y. 1993) (holding that, by agreeing to disclose privileged information to plaintiffs in a prior action pursuant to a stipulation of no waiver, a party waived its right to assert the privilege in the subsequent litigation). Mr. Walker should not be required to waive the protections of the attorney-client and work

product privileges with regard to such a large volume of documents in such a sweeping and uninformed fashion.

Mr. Walker simply should not be required to give Plaintiffs' counsel unbridled access to privileged and non-responsive data to which Plaintiffs are not entitled. Moreover, Plaintiffs should not be allowed to read and study the numerous privileged documents that are likely to be contained on the back-up tapes. Plaintiffs' demand for all of the data, including privileged documents, is tantamount to Plaintiffs going to a company's in-house attorneys and requesting access to all of their files, regardless of their privileged status, and promising to return the privileged documents *after they have read them*. In fact, given that attorneys' files very well may be included on these tapes, this sort of unrestrained access is exactly what Plaintiffs are requesting. Once Plaintiffs have read such documents, a stipulation cannot remove the privileged information from their memory.

The Federal Rules do not require that defendants unrestrictedly open their files in response to document requests, particularly without any showing that the information sought is relevant or otherwise reasonably calculated to lead to the discovery of admissible evidence. *See* Fed. R. Civ. P. 26(b); Williams v. Hernandez, 221 F.R.D. 414, 416 (S.D.N.Y. 2004) (holding that because the plaintiff "failed to justify a wholesale production of e-mails" and "failed to indicate why there would be relevant information concerning her claims in such e-mails," the request was overly broad and burdensome). Indeed, it has been recognized within this Circuit that, in the context of electronic discovery, "the reliance on broad discovery has hit a roadblock." Zubulake, 217 F.R.D. at 311. In the instant case, Plaintiffs have failed to justify their request for such a wholesale production. Plaintiffs' demand for unrestrained access to all of the data on all of the tapes at issue, regardless of its content or privileged status, is not appropriate, fair, or just.

18

Plaintiffs' argument that Mr. Walker somehow waived the attorney-client privilege by obtaining the tapes for Plaintiffs is especially troubling. Mr. Walker obtained the back-up tapes *only after Plaintiffs demanded* (and argued to this Court) that Mr. Walker should be required to *request* such materials from third parties.[13] Plaintiffs should not be allowed to demand that Mr. Walker obtain documents (including back-up tapes) from third parties and then later claim that the privilege has been waived by the third party's concession to allow Mr. Walker's attorneys to produce the documents. Clearly, such a devious argument should not be countenanced.

If Plaintiffs continue to insist that the privileges protecting WebHouse and Walker Digital's attorney-client communications and work product are waived because Plaintiffs chose to direct document requests to Mr. Walker rather than to the companies themselves, then Mr. Walker's access to the tapes and permission to produce them in this litigation certainly will be revoked by the companies, and Mr. Walker should be allowed to return the tapes to their owners, from whom Plaintiffs can seek the tapes directly.[14] Plaintiffs cannot "have their cake and eat it too" by pursing a strategy for obtaining documents that requires Mr. Walker to seek the materials from third parties and then arguing that all privileges were waived when Mr. Walker complied with Plaintiffs' demand.

### 3. Plaintiffs' Demand for all of the Metadata on the Back-Up Tapes Adds to the Over-burdensomeness of their Demands.

Plaintiffs' demand that *all* of the metadata on the 181 back-up tapes be produced significantly increases the over-burdensomeness of their request. Producing all of the metadata

---

[13] See, *e.g.*, Plaintiffs' February 18, 2005 letter to Albert Myers, attached hereto as Exhibit D, at p. 2; Plaintiffs' March 14, 2005 Memorandum in Support of their Motion to Compel (Doc. 145) at p. 14. Moreover, in its April 6, 2005 Order (Doc. 164), this Court ordered Mr. Walker to "locate and obtain" materials pertaining to WebHouse and Perfect YardSale.

[14] Neither Mr. Walker nor his counsel have viewed any of the content of the 165 back-up tapes that have yet to be restored.

on the tapes substantially will increase the number of pages of data that Mr. Walker will need to review for responsiveness and privilege.    Declaration of Michael Farley at ¶ 21.    The overwhelming majority of the metadata is not relevant to the claims or defenses of any party to this action and is not called for by Plaintiffs' Document Requests.  Significantly, Plaintiffs have not adequately explained *why* they need *all* of the metadata on *all* of the tapes.

Mr. Walker should not be required to make this large amount of non-relevant and useless data available to Plaintiffs, and certainly not at his own expense.  If, upon review of the responsive documents, Plaintiffs determine that the metadata associated with *a particular document* is needed, then Mr. Walker can produce the metadata for that particular document at Plaintiffs' expense.[15]  However, the Federal Rules do not contemplate, and Plaintiffs are not entitled to, indiscriminate production of an overwhelming volume of data, including metadata, that is neither relevant nor responsive.

### 4. Native Files Cannot Be Produced Securely, Cannot Be Bates Numbered, and Cannot be Tracked or Managed.

Even if the "native files" *could* be searched to identify privileged and non-responsive data without the aid of a vendor, there is no way to produce native files securely, or to ensure that the integrity of the documents is protected.  Declaration of Michael Farley at ¶ 16.  That is, unlike the production of hard copies or electronic documents in a PDF or TIFF format, there is no mechanism to prevent the requesting party from altering documents that are produced electronically in a native file format.  See id.  For example, a document originally created in Microsoft Word or Outlook, if produced in its native file format, would be delivered to the requesting party as a Word or Outlook file.  Id.  Hypothetically, the requesting party would be

---

[15]  When the inaccessible data on back-up tapes is converted to an image format such as TIFF or PDF, the metadata is preserved, and the vendor can provide searchable databases of both the data *and* the metadata.  Declaration of Michael Farley at ¶ 20.

able to edit that document – *even inadvertently* – using Word or Outlook, and the producing party would have no evidence of the document's alteration.  Id.  While we do not suggest that Plaintiffs in the instant case intentionally would do such a thing, it would be imprudent for counsel to produce documents in such a mutable and non-secure form.

In addition, documents in a native file format cannot be Bates numbered.  Id. at ¶ 17. Production without Bates numbers contradicts the clear policy embraced within this Circuit that "documents produced in all cases should be Bates-stamped (*i.e.*, numbered) to prevent disputes about whether documents were produced in discovery."  Douglas v. Victor Capital Group, No. 96 CIV. 6557, 1997 WL 716912, at *1 (S.D.N.Y. Nov. 17, 1997).  Moreover, if such a large-scale document production is not Bates numbered, Mr. Walker will not be able to locate any documents on which Plaintiffs rely among the tens of millions of pages produced, and Mr. Walker will not be able to search for later versions or other related documents which may affect the meaning or relevance of the document at issue.  Mr. Walker should not be required to produce documents in the inaccessible, unwieldy, and non-secure form that Plaintiffs request.

### 5. The Court Should Not Require Mr. Walker to Produce the Tapes and Should Disregard Plaintiffs' Proposed Deadline.

The *carte-blanche* production of the back-up tapes in any format would be extremely over-burdensome, especially for an individual defendant, and this Court should not require Mr. Walker to comply with Plaintiffs' request.  *See* Williams, 221 F.R.D. at 416 (denying plaintiff's request for the "wholesale production" of "any and all" electronic mail received from or sent to the defendant over a period of six months because the discovery request was overbroad and failed to state with reasonable particularity how the requested information was relevant to plaintiff's claims); *see also* In re Grand Jury Subpoena Duces Tecum, 846 F. Supp. 11, 13-14 (S.D.N.Y. 1994) (holding that, where plaintiffs refused to modify their subpoena to allow

relevant documents to be isolated through key-word searching, the subpoena, which demanded broad categories of computer-accessible data without regard for their relevance, was "unreasonably broad" and would be quashed).

Accordingly, this Court should not require production of any of the back-up tapes. If, however, the Court orders that the responsive data on certain tapes must be produced, Plaintiffs should bear all of the costs to restore the data and convert it into an accessible format in which responsive documents can be electronically located, reviewed for privilege, redacted where necessary, Bates numbered, and produced in a secure fashion. *See* Medtronic, 229 F.R.D. at 558-59 (holding that shifting "the cost of restoring, de-duplicating, and designing and conducting a search" of the back-up tapes at issue to the requesting party was warranted); *see also* OpenTV v. Liberate Techs., 219 F.R.D. 474, 477, 479 (N.D. Cal. 2003) (finding that it is "expensive and time-consuming" to make electronic material "available in a usable form for discovery," and ordering the requesting party to share the costs of converting the data to an "accessible form"); Rowe Entm't Inc. v. William Morris Agency, 205 F.R.D. 421, 428-29 (S.D.N.Y. 2002) (acknowledging that "a court may protect the responding party from 'undue burden or expense' by shifting some or all of the costs of production to the requesting party"). Plaintiffs also should be required to reimburse Mr. Walker for the attorney and paralegal fees associated with searching the back-up tapes for privileged and non-responsive documents.

Finally, Plaintiffs' suggestion that the production of the data on the tapes be completed by October 15, 2005 is patently unreasonable. It will take approximately 4 to 6 weeks just to restore the data on the 181 tapes to a native file format, provided that all 181 tapes are able to be restored without being sent to a forensic expert. Declaration of Michael Farley at ¶¶ 22; 12. In this native file format, without any additional vendor processing, we estimate that it would take

three attorneys working full time approximately 19-30 *years* to review the documents potentially contained on the 181 tapes for responsiveness and privilege.[16]  Alternatively, following the 4 to 6 weeks required to restore the data to a native file format, it would take an additional 3 to 4 months to convert the data into an accessible format in which it can be searched electronically, for a total of 4 to 5.5 months.  See id. at ¶ 23.  Following this conversion, the data would need to be searched electronically for responsive documents, redacted where necessary, Bates stamped, and then produced.  Consequently, the deadline that Plaintiffs have proposed for production in *any* format is completely unrealistic.

### III.    CONCLUSION

For all the reasons set forth above, Plaintiffs' Motion to Compel  should be denied.

We respectfully request oral argument on this matter.

Dated:  October ___, 2005

Respectfully submitted,

DEFENDANT JAY S. WALKER

J. Allen Maines (phv0013)
Carl W. Mullis (phv0158)
Summer B. Joseph (phv0160)
PAUL, HASTINGS, JANOFSKY &
WALKER, LLP
600 Peachtree Street, N.E., Suite 2400
Atlanta, GA  30308-2222
Telephone:  (404) 815-2400
Facsimile:  (404) 815-2424
allenmaines@paulhastings.com
carlmullis@paulhastings.com
summerjoseph@paulhastings.com
*Attorneys for Defendant Jay S. Walker*

---

[16] *See supra* note 12.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 12th day of October, 2005, a true copy of
Defendant Jay S. Walker's Response in Opposition to Plaintiff's Motion to Compel Production
of Electronic Discovery  was served on all counsel of record on the attached service list by first-
class, postage prepaid U.S. Mail.

Summer B. Joseph (phv0160)

## SERVICE LIST

Dennis J. Johnson
Jacob B. Perkinson
Johnson & Perkinson
1690 Williston Road
South Burlington, VT 05403
(Sent U.S. Mail and Via Facsimile)

Jules Brody
Aaron Brody
Stull, Stull & Brody
6 East 45th Street
New York, NY 10017

Andrew M. Schatz
Schatz & Nobel, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06106

Joseph L. Clasen
William Kelleher
Robinson & Cole
Financial Centre
695 East Main Street
PO Box 10305
Stamford, CT 06904-2305
(Sent U.S. Mail and Via Facsimile)

Daniel Slifkin
James Hein
Cravath, Swaine & Moore
825 Eighth Avenue
New York, NY 10019
(Sent U.S. Mail and Via Facsimile)

David R. Scott
Geoffrey M. Johnson
Erin Green Comite
Scott & Scott, LLC
108 Norwich Avenue
PO Box 192
Colchester, CT 06415
(Sent U.S. Mail and Via Facsimile)