# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 02-1821 (DWF/SRN)

In re Pemstar, Inc. Securities
Litigation

**ORDER**

---

Garrett D. Blanchfield, Esq., Reed R. Kathrein, Esq., Stanley S. Mallison, Esq., James W. Oliver, Esq., on behalf of Plaintiffs

Peter W. Carter, Esq., Mitchell W. Granberg, Esq., and Daniel J. Brown, Esq., on behalf of Defendants

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on

Plaintiffs' Motion to Compel (Doc. No. 65) and Defendants' Motion to Compel (Doc. No. 62). This

matter has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. §

636 and Local Rule 72.1.

This is a securities fraud class action. Plaintiffs allege that Pemstar, Inc. and the individual

Defendants violated sections 10(b) and 20(a) of the Securities and Exchange Act of 1934. Plaintiffs

also allege Defendants violated section 11 of the Securities and Exchange Act of 1933, individually and

as "controlling person[s] of the Company" as defined in section 15. Both parties have brought motions

to compel. The Court considers Plaintiffs' motion first.

1

## I.    PLAINTIFFS' MOTION TO COMPEL

The major issue raised by Plaintiffs' motion addresses the *form* of production of electronic data/discovery.  Plaintiffs request that all electronic data–generally consisting of relevant (1) email and file servers and (2) financial databases–should be produced in "native format," i.e., actual native Lotus Notes, Excel, and Word files and Mapics, Agile, and I2 financial databases.  Defendants argue that production of electronic data should be either in printed paper copy, in Tagged Image File Format (TIFF), or Portable Document Format (PDF).[1]  The other issues that will be addressed in turn are requests for documents concerning customers and facilities, Pemstar's acquisitions and potential acquisitions, and identification of ex-employees.[2]

### A.    TIFF vs. Native Production

Defendants do not dispute that Plaintiffs are entitled to discover electronic documents/data, including that data found only on back tapes.  (Defs.' Mem. in Opp'n to Mot. to Compel, at 6, 4).  Defendants, however, argue that the appropriate form of production is either paper copies or TIFF.  Defendants argue that the courts that have addressed the issue do not require production in native format, Federal Rule of Civil Procedure 34 does not require production in native format, and TIFF production can satisfy Plaintiffs' concerns about retaining metadata and file structure.  On the other hand, Plaintiffs argue that Rule 34 requires that electronic evidence must be produced as it is "kept in the usual course of business" and that means native format.  Plaintiffs explain that Pemstar maintained

---

[1] Defendant refers to TIFF and PDF formats interchangeably as TIFF.  The Court will as well.  The characteristics of TIFF and PDF documents are similar.

[2] The parties have resolved their dispute regarding document request numbers 58 and 59.

2

and extensively incorporated Lotus Notes as "the backbone for creating, storing, and organizing all, or almost all of the data, documents, email, and other information relating to Pemstar's business." (Pl.'s Mem. in Supp. of Mot. to Compel, at 9). Thus, Plaintiffs argue that electronic discovery will be core evidence in this case, and it is important in understanding what Defendants knew to view the electronic data in the same form as Defendants viewed it. Plaintiffs also assert that a native format of production is much less costly than producing electronic documents in paper or TIFF.

After carefully considering the parties' arguments, the Court is persuaded that production of electronic discovery in native format is appropriate, feasible, and important under the circumstances of this case.

Defendants claim that "[c]ourts that have addressed the issue require the production of emails and file server documents in paper," (Defs.' Mem. in Opp'n to Mot. to Compel, at 7), and cite a number of cases.[3] Unfortunately, not one of the cases cited by Defendants address the precise issue here: which form (native, TIFF, or paper) of electronic data/document production is appropriate when contested.[4] More importantly, the form in which electronic data/documents are to be produced is most

---

[3] Defendants cite <u>Williams v. Owens-Illinois, Inc.</u>, 665 F.2d 918 (9th Cir. 1982); <u>Antioch Co. v. Scrapbook Borders, Inc.</u>, 210 F.R.D. 645, 652 (D. Minn. 2002); <u>McNally Tunneling Corp. v. City of Evanston</u>, No. 00-6979, 2001 WL 1568879 (N.D. Ill. Dec. 10, 2001); <u>Simon Property Group L.P. v. mySimon, Inc.</u>, 194 F.R.D. 639 (S.D. Ind. 2000); <u>Playboy Enter. v. Welles</u>, 60 F.Supp.2d 1050 (S.D. Cal. 1999).

[4] <u>Williams</u> involved a situation where the defendants had already produced paper copies of wage cards, but the district court denied the request to compel production of the actual computer tapes. 665 F.2d at 932-33. The plaintiffs argued that the district court abused its discretion in denying the request and sought a order requiring the tapes on remand (the remand being for other substantive issues). <u>Id.</u> The Ninth Circuit, noting that "computer tapes are not per se non-discoverable," simply found that the district court did not abuse its discretion in denying the request for the tapes because "[a]ll information contained on the computer tapes was included in the wage cards which appellants

properly decided based on the unique factual circumstances of a particular case, not inflexible rules, especially given the intricate technology utilized by litigants.

Plaintiffs' request for native format is not unprecedented. As recently as last month, in In re Verisign, Inc. Sec. Litig., No. 02-2270 (N.D. Cal.), a federal district court ordered the production of electronic discovery in native (original) format. (Notice of Statement of Recent Decision in Supp. of Pls.' Mot. to Compel) (Doc. No. 78). Other courts have ordered the production of native computer tapes in certain circumstances. See In re Air Disaster at Detriot Metro. Airport, 130 F.R.D. 634 (E.D. Mich. 1989); Daewoo Elec. Co. Ltd v. United States, 650 F.Supp. 1003 (Ct. Int'l Trade 1986); Nat'l Union Elec. Corp. v. Matsushita Elec. Indus. Co., Ltd., 494 F.Supp. 1257 (E.D. Pa. 1980). In addition, when discussing the form of production of computerized data, the editors of the Manual for Complex Litigation (4th ed.) explain that "[d]ynamic data may need to be produced in native format." §11.446, p.80.

The circumstances of this case make production in native format of particular importance. For example, in order to prevail on its section 10(b) of the Securities and Exchange Act of 1934 claim,

---

discovered." Moreover, the Ninth Circuit did not want to limit the district court's discretion by requiring disclosure. Id. In Antioch, the issue of the form of electronic data/document production was not raised; indeed, in Antioch's proposal for electronic production they appear to have actually proposed paper production. 210 F.R.D. at 651. Rather, what was at issue was the procedure for expert restoration of electronic data and review. Id. at 652-54. The issue in McNally was simply whether the defendant, having already received paper copies, was entitled to electronic versions of certain types of plaintiff's computer files–the court, noting the "undeveloped nature" of the defendant's motion, denied the request. 2001 WL 1568879, at *4. Finally, in both Simon and Wells, the issue of the form of electronic data/document production was simply not raised, the parties apparently being satisfied with hard copies. 194 F.R.D. at 641-44; 60 F.Supp.2d at 1054-56. Rather, as in Antioch, what was at issue was the procedure for expert restoration of electronic data and review.

Plaintiffs must prove scienter. E.g., Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1534 (8th Cir.

1996). "'[S]tockholder litigation is notably difficult and notoriously uncertain' even in the best of

circumstances," In re SmithKline Beckman Corp. Sec. Litig., 751 F.Supp. 525, 529 (E.D. Pa. 1990)

(quoting Lewis v. Newman, 59 F.R.D. 525, 528 (S.D.N.Y.1973)), and proving the requisite degree of

scienter is a "notoriously difficult requirement." Goldsmith v. Technology Solutions Co., No. 92-4374,

1995 WL 17009594, at *3 (N.D. Ill. Oct. 10, 1995). A "classic fact pattern" giving rise to a strong

inference of scienter is where the "defendants published statements when they knew facts or had *access*

to information suggesting that their public statements were materially inaccurate." Florida State Bd. of

Admin. v. Gree Tree Financial Corp., 270 F.3d 645, 665 (8th Cir. 2000) (emphasis added). As

Plaintiffs persuasively explain, and Defendants do not refute, Pemstar not just maintained but extensively

utilized its computer programs, particularly Lotus Notes and its package of applications, as "the

backbone for creating, storing, and organizing all, or almost all of the data, documents, email, and other

information relating to Pemstar's business." (Pl.'s Mem. in Supp. of Mot. to Compel, at 9). Indeed,

Pemstar was awarded an Advisor Excellence Award by Lotus for its Document Control System, which

"gives Pemstar employees a creditable, single source *for all Pemstar documents*, quick *access* and

search capability for users to retrieve or reference all Pemstar documents, and *revision and audit trail*

*to document the revision life cycle for all documents*." (Mallison Aff. Ex. 12) (emphasis added).[5]

The importance of Pemstar's Lotus software is demonstrated by the fact that, as Plaintiffs explain,

---

[5] According to Pemstar's June 5, 2001 Form S-1 filed with the SEC, Pemstar was founded by
former IBM engineer Allen Berning, and almost all of the individual named defendants worked in
various management, technical, or administrative positions with IBM before joining Pemstar. (Mallison
Aff. Ex. 13). Thus, Pemstar's intricate use of IBM's Lotus software is of no surprise.

5

almost all of the substantive allegations of the complaint were derived from access to one former mid-level employee's native Lotus Notes file. Therefore, in attempting to prove knowledge of facts or access to information suggesting statements were materially inaccurate, it is appropriate in this case and most useful to the fact finder to view, understand, and step into the shoes of the information source that actually provided the alleged knowledge and access.

Defendants argue that TIFF files can preserve metadata and file structure and, therefore, native format is not required. That may be so, but it can hardly be said that linking specific metadata or file attachments with the relevant email or file is more efficient with TIFF production as opposed to native format. The Court is persuaded by the presentation at the hearing on this matter that demonstrated, although partly a matter of common sense, the efficiency of viewing an email with an Excel file attachment in native format as opposed to the TIFF alternative.

In addition, the record thus far demonstrates that actually producing electronic discovery in native format as opposed to TIFF would be less costly. As the Court understands it, restoring backup tapes and the associated cost–something this Order does not address–will need to be done regardless of the form of production.

The Court is sensitive to Defendants' concerns about a native production. In that regard, the Court orders the following. An initial, test production of Email and File Servers, (Defs.' Mem. in Opp'n in Mot. to Compel, at 2, n.2) (defining the two types of electronic files Pemstar maintains), shall occur in native format. Plaintiffs shall select three individuals, and Defendants shall produce the Email and File Server electronic files for the three individuals in native format. Email and File Server electronic files for the three individuals to be produced in native format shall be from active servers, not

6

from backup tapes. All native format production shall be considered confidential. There shall be no waiver of the attorney-client or work product privileges for inadvertent production of documents/data in native format. The parties shall prepare native format production protocol proposals, meet and confer regarding their proposals, and present a mutually agreeable or competing proposal(s) to the Court. Among other protocol issues, the Court envisions the parties selecting a neutral expert who will retain an original, "master" copy of all native format productions and requiring identification of native files to be used during depositions prior to the deposition. Only after the Court adopts or creates a protocol will the Court set a deadline for production. The parties are ordered to submit a proposed protocol within 14 days of the date of this Order. After the test production is complete, the parties shall contact the Court and express their concerns and/or satisfaction. If the Court is satisfied with the initial native format production and any concerns can be allayed, the Court will order continued production in native format.

Native production of databases–such as Mapics, Agile, and I2–is not ordered at this time. The parties shall meet and confer about what exactly is on the databases, the necessity of specific database production, and the form in which specific databases are stored (active servers/backup tapes). The Court simply lacks information about whether and how databases should be produced.

Defendants are ordered to restore the backup tapes identified in Exhibit/Tab A to the March 12, 2004 letter from Mitchell Granberg–only those backup tapes from the class period. Unfortunately, "Pemstar . . . has no way of knowing what specific, individual files are on a tape without first restoring the tape." (Letter from Mr. Granberg to the Court of 3/12/04, at 2). Defendants have also stated during a telephonic conference on April 16, 2004 that it is not possible to partially restore the tapes to a

7

status that would allow Defendants to determine what specific files are on particular tapes. Defendants do not dispute that there is likely relevant information on at least some of its backup tapes. Thus, the Court has no choice but to order Defendants to fully restore all backup tapes–from the class period–understanding that the tapes will likely be produced in native format. As part of the native format production protocol, the parties shall devise a protocol for restoration of backup tapes. Defendants need not restore the backup tapes until a native format production/backup tape restoration protocol is adopted or created by the Court.

## B.     Customers and Facilities

It appears that Defendants object to document request numbers 79 and 80 to the extent these requests reference customers not specifically mentioned in the complaint and object to the breadth of document request numbers 47, 48, 69, and 71. Request number 79 requests:

> All documents concerning Pemstar's revenue recognition, account receivables, and
> inventory with the following Pemstar customers: 3DLabs, Data General, DataPlay,
> Fluke, Fujitsu, HP, Imation, Keurig, LAM, Optical Solutions, RLX, Rockwell, RSA,
> TI, and Trimble.

Request number 80 asks for "[a]ll documents concerning any transaction about" a variety of customers and products. Request number 47 seeks documents concerning sales and returns from customers. Request number 69 seeks documents concerning purchase orders. Request number 71 seeks documents concerning "Master Agreements" with customers. Request number 48 asks for documents concerning the storage of inventory. With regard to request numbers 47, 48, 69, and 71, Plaintiffs offered to narrow those requests to documents concerning the top 15 customers of the San Jose, Taunton, and Rochester facilities and the top 5 customers of the Austin and Mexico facilities.

8

The general dispute advanced by the parties regards the fact that Defendants refuse to produce documents about customers or facilities unless those customers or facilities were specifically referenced in the complaint. The Court resolves this dispute in general terms because it appears that resolution of the general dispute will dictate the resolution of the specific requests.

Defendants may not limit their production to documents concerning customers and facilities specifically referenced in the complaint. While the Court is mindful that discovery in securities litigation can be unduly burdensome and parties are not entitled to discovery in order to develop new claims, Plaintiffs' requests are largely free from those criticisms. Plaintiffs' core allegations of fraud are that Defendants made false statements about the company's levels of inventory, accounts receivable, revenue projections, goodwill, and workforce reductions. Plaintiffs identified multiple statements in the complaint to that effect. As Plaintiffs point out, they do "not allege that defendants made any misrepresentations to the public regarding any particular transaction, customer or facility . . . . Rather, plaintiffs' allegations of fraud stem directly from Pemstar's false aggregate accounting figures." (Pl.'s Mem. in Supp. of Mot. to Compel, at 18). Plaintiffs' allegations regarding financial trouble at two particular facilities–San Jose and Taunton–and with particular customers provided the initial showing that Defendants, *inter alia*, had knowledge of the alleged general misleading statements.

Plaintiffs are entitled, after creating "a strong inference that Defendants knowingly made misrepresentations of material fact," In re Pemstar Sec. Litig., No. 02-1821, 2003 WL 21975563, at 6 (D. Minn. Aug. 15, 2003), to seek further factual support for its core allegations of fraud. For example, if Pemstar's Mexico facility lost a customer that represented eighty percent of sales, that would plainly be relevant to, among others, the issue of scienter. According to Defendants' position,

9

Plaintiffs would never know that information because Plaintiffs were not able to uncover such

information in a pre-suit investigation. That is what discovery is for, and Plaintiffs are entitled to

develop additional factual evidence to support its allegations that Defendants knew that statements

made to the public regarding inventory, accounts receivable, goodwill, work force, and revenue were

false. Accordingly, Defendants must provide information about additional facilities and customers.

The number of customers and breadth of information remains an issue. The Court finds that

Plaintiffs' proposal to limit the information sought to the top 15 customers of the San Jose, Taunton, and

Rochester facilities and the top 5 customers of the Austin and Mexico facilities is reasonable for all of

the above requests. The Court lacks enough information about the scope of the type of documents

requested in request numbers 47, 48, 69, and 71 to direct the parties, but Plaintiffs have "offered to

limit the breadth of these requests to the documents proposed by defendants." (Pl.'s Mem. in Supp. of

Mot. to Compel, at 17). Plaintiffs' offer should resolve the issue but the parties may meet and confer if

further resolution is needed.

### C.    Acquisitions

Document request number 60 seeks "[a]ll documents concerning the acquisition and integration

of MTS Systems Corporation's facility in Chaska, Minnesota." Document request number 64 asks for

documents concerning all other Pemstar acquisitions or potential acquisitions during 2001 or 2002.

Defendants' objection to these requests is similar to their objection to the requests for information about

facilities and customers not mentioned in the complaint. Specifically, Defendants argue that they need

not provide discovery "relating to Pemstar acquisitions and acquisition targets when it is clear from their

complaint that their demand for relief is based on events that occurred at the Taunton and San Jose

10

facilities, and no other." (Defs.' Mem. in Opp'n to Mot. to Compel, at 25). Plaintiffs allege that

documents concerning acquisitions are relevant to motive.

Plaintiffs are entitled to the requested discovery as limited herein. Again, Defendants take too

narrow a view of the complaint. Plaintiffs' demand for relief is based on allegations of fraud concerning

the *company's* (not specific facility's) statements about inventory, accounts receivable, revenue

projections, and goodwill. See Pemstar, 2003 WL 21975563, at *3 ("According to Plaintiffs,

Defendants knew that statements being made to the public regarding Pemstar were false, given the

problems at the San Jose and Taunton facilities."). Plaintiffs have made an initial showing of scienter by,

*inter alia*, explaining allegedly obvious problems at the Taunton and San Jose facilities, but the Court

cannot limit Plaintiffs to the evidence of scienter that it found in a pre-suit investigation. With regard to

the acquisition related requests, Plaintiffs allege in the complaint that Pemstar was motivated to make

allegedly false statements in order to finance acquisitions. Pemstar admits that it had a campaign for

growth through acquisition. Indeed, Pemstar's Registration Statement states that the company expects

to grow "by pursuing acquisitions of other companies" and the company's "future success depends on

[its] ability to obtain additional financing and capital." (Compl. ¶37). Thus, Plaintiffs have sufficiently

raised the spector of a motive to inflate stock prices and financial data to pursue acquisitions, and this

alleged motive has been particularized to Pemstar. (Compl. ¶39) ("The defendants knowingly

employed fraudulent accounting and reported inflated financial results to . . . (d) continue acquiring

additional businesses using the banks' credit facilities and Pemstar's inflated stock . . . ."); see also

(Compl. ¶¶51-52). Moreover, the facility mentioned in request number 60–MTS Systems

Corporation–is specifically mentioned in the complaint as one of the companies Pemstar acquired with

11

credit facilities or inflated stock. (Compl. ¶52). There are some circumstances where "the artificial

inflation of stock price in the acquisition context may be sufficient for securities fraud scienter."

Rothman v. Gregor, 220 F.3d 81, 93 (2d Cir. 2000); see also RMED Intern., Inc. v. Sloan's

Supermarkets, Inc., 207 F.Supp.2d 292, 298-99 (S.D.N.Y. 2002). Thus, evidence regarding

Pemstar's acquisition strategy could support a motive to commit fraud and thereby *contribute* to a

finding of scienter. Green Tree, 270 F.3d at 660 ("[M]otive and opportunity are generally relevant to a

fraud case . . . ."). Plaintiffs are entitled to discovery related to Pemstar's actual acquisitions and not

just those mentioned in the complaint.[6]

      As for "potential" acquisitions, the Court finds that such a request drifts too far from relevant

information to this case. The request is also unduly vague. Therefore, documents regarding potential

acquisitions, at this stage, need not be produced.

      **D.**    **Ex-Pemstar Employees**

      Document request number 57 seeks "[a]ll documents sufficient to identify the employees laid

off, fired, put on leave, or retired from the Company from 2001 to present." Defendants object to this

request labeling it irrelevant to any claim in the complaint. Plaintiffs argue that identification of ex-

employees is relevant to allegations in the complaint regarding Pemstar's allegedly false statements

about reductions of workforce.

_____

      [6] Plaintiffs have offered to alter the language of request number 60 to:
Documents to or from the Individual Defendants concerning PEMSTAR's acquisition
and integration of MTS Systems Corporation's facility in Chaska, Minnesota, including
analysis of the acquisition, summary documents, memoranda, and financial documents
concerning the same.
Defendants shall respond to this form of request number 60.

Federal Rule of Civil Procedure 26(b) permits discovery regarding "the identity and location of persons having knowledge of any discoverable matter." In a conference call broadcast to the public, Pemstar executives stated that "we're–you know–not laying off hundreds of permanent employees . . . no major–no major restructurings." (Compl. ¶178). Defendants do admit, however, that during the class period 355 employees were "laid off or were the subject of a reduction of force." (Letter from Mr. Granberg to the Court of 3/12/04, at 2). These ex-employees are likely to have relevant information about their specific situation and the company's workforce reduction in general–including potential information about what management told them regarding restructurings that may be contrary to the public statements made by Pemstar executives.

Defendants are concerned Plaintiffs will take the list of ex-employees and contact each one. Whatever risk that may present, it is far outweighed by the potential relevance of the evidence. If the ex-employees do not want to speak with Plaintiffs, that need only be communicated once. If the ex-employees can provide useful information (supporting Plaintiffs or Defendants), all the better. Moreover, a document detailing the name and location of ex-employees responsive to request number 57 is all that needs to be produced. Thus, the privacy concerns implicated in producing actual personnel files are not present. The time period relevant for this request is the class period. Defendants may treat their response to request number 57 as confidential under the protective order.

## II.     DEFENDANTS' MOTION TO COMPEL

The main issue in Defendants' motion to compel is whether Plaintiffs may be forced to  identify the names of persons that counsel interviewed. Plaintiffs claim that identification of those interviewed is

13

protected attorney work product. Defendants claim it is not. Defendants also move to compel

documents regarding Plaintiffs' general investment history and tax returns.

### A.    Interviewees

The general dispute between the parties is whether Plaintiffs must answer certain interrogatories

that request or tend to request identification of those persons, among a larger group that Plaintiffs have

stated have relevant information, that were interviewed by Plaintiffs' counsel/investigator. Plaintiffs

objected to the requests arguing that identifying persons interviewed would reveal mental impressions

and trial strategy. Although listing each interrogatory, Defendants present their argument in general

terms–the requested information only seeks the facts that counsel learned during the investigation. The

Court will address the issue in general terms as well.

The Court finds that Plaintiffs do not need to reveal the individuals that their counsel interviewed

during its investigation because such information is protected by the work product doctrine, but, as

explained below, the Court finds that the work product doctrine shields revelation of such information

for reasons different than those offered by Plaintiffs.

As courts have recognized, whether identification of persons interviewed in an

investigation/providing a list of interviewees is protected by the work product doctrine is not clear. See

In re Ashworth, Inc. Sec. Litig., 213 F.R.D. 385, 387 (S.D. Cal. 2002); Am. Floral Serv., Inc. v.

Florists' Transworld Delivery Ass'n, 107 F.R.D. 258, 260 (N.D. Ill. 1985) ("Though the issue is not

free from doubt, application of those principles to the present circumstances weighs against work

product protection for the identities of the interviewees."). Although Plaintiffs cite the Court to an

avalanche of cases more or less supporting their position, the courts that have considered this precise

issue or substantially similar issues are split as to whether disclosing the identity of persons interviewed would reveal counsel's mental impressions or trial strategy. Compare Castle v. Sangamo Weston, Inc., 744 F.2d 1464, 1467 (10th Cir. 1984) ("The law is clear that such information [requesting the names and addresses of the witnesses the appellants had already interviewed] is subject to discovery."); In re Theragenics Corp. Sec. Litig., 205 F.R.D. 631, 636 (N.D. Ga, 2002) (ordering disclosure of persons interviewed because it would "provide minimal, if any, disclosure of an attorney's thought processes," would "not reveal Plaintiffs' litigation strategy," and, therefore, was "not protected by the work product doctrine"); Alexander v. F.B.I., 192 F.R.D. 12, 17-19 (D.D.C. 2000) (ordering disclosure of persons interviewed because Intervenor–then President–Clinton did not meet his burden of demonstrating how it would reveal mental impressions); In re Aetna Inc. Sec. Litig., No. MDL 1219, 1999 WL 354527 (ordering disclosure of persons interviewed because no mental impressions would be revealed); Am. Floral Serv., 107 F.R.D. at 260-62 ("[T]he separation of the two interviewees from the universe of 2000 (or even 200) potential witnesses is wheat-from-chaff information of a very different kind: It gives the identity of the few people in that large group who assertedly know of Teleflora's misconduct, but as to AFS's theory of such misconduct it reveals nothing other than the tautology that information showing improper use of Membership Obligation No. 2 is relevant to this lawsuit."); Ballard v. Allegheny Airlines, Inc., 54 F.R.D. 67, 69 (E.D. Pa. 1972); Klop v. United Fruit Co., 18 F.R.D. 310, 312 (S.D.N.Y. 1955) ("[Defendants] ask for the names and whereabouts of the persons who made the statements in order that they may seek them out and procure statements from them through their own efforts. They are clearly entitled to this information under the Rules."), and cf. Duffy v. Dier, 465 F.2d 416, 418 (8th Cir. 1972) (stating, in the context of a writ of mandamus, that "[t]he court clearly had the

power to order disclosure of the names of the informants Duffy [an attorney] interviewed"); with e.g.,

Electronic Data Sys. Corp. v. Steingraber, No. 02-225, 2003 WL 21653405, at *2 (E.D. Tex. July 9,

2003) ("The Court finds that revealing the identity of witnesses interviewed would permit opposing

counsel to infer which witnesses counsel considers important, thus, revealing mental impressions and

trial strategy."); In re Ashworth, Inc. Sec. Litig., 213 F.R.D. at 389 (same); Ferruza v. MTI

Technology, No. 00-0745, 2002 WL 32344347, at *4 (C.D. Cal. June 13, 2002) (same); Laxalt v.

McClatchy, 116 F.R.D. 438, 443 (D. Nev. 1987) (same); Commonwealth of Massachusetts v. First

Nat'l Supermarkets, Inc., 112 F.R.D. 149, 151-54 (D. Mass. 1986) (same) (collecting cases); Bd. of

Educ. v. Admiral Heating and Ventilating, Inc., 104 F.R.D. 23, 32 (N.D. Ill. 1984) (same).[7]

    This Court will not follow either line of cases simply as a matter of course. The work product

doctrine should not be mechanically applied. Rather, "[t]he work product doctrine is to be applied in a

commonsense manner in light of reason and experience as determined on a case-by-case basis."

Pittman v. Frazier, 129 F.3d 983, 988 (8th Cir. 1997). The issue the parties and most of the cases

discuss is whether disclosing interviewees will reveal opinion work product–mental impressions,

conclusions, legal strategy. Persuading this Court that the work product doctrine applies, is a burden

that falls upon Plaintiffs. E.g., In re Grand Jury Proceedings (Malone), 655 F.2d 882, 887 (8th Cir.

1981).

---

    [7] Plaintiffs also repeatedly cite Baker v. Gen. Motors Corp., 209 F.3d 1051 (8th Cir. 2000)
for support of their position. Baker informs the Court's decision but it is clearly distinguishable–Baker
involved compelled production of attorney notes. 209 F.3d at 1053. Clearly, Plaintiffs do not need to
produce any "[n]otes and memoranda of [its] attorney, or [its] attorney's agent, from a witness
interview." Id. at 1054. Shelton v. Am. Motors Corp., 805 F.2d 1323 (8th Cir. 1986) is the most
analogous Eighth Circuit precedent, but it, like this case, was decided on particularized facts.

Plaintiffs have failed to meet their burden of demonstrating that identifying the persons interviewed during their investigation would reveal their counsel's mental impressions or trial strategy. Plaintiffs offer the Court no factual basis to conclude, under the facts of this particular case, *how* or *why* disclosing the identity of persons interviewed would reveal counsel's trial strategy or mental impressions. Indeed, "[i]nstead of explaining to the court *how* answering the questions [regarding interviewees] would reveal this type of protected matter, [Plaintiffs] simply claim[] that it 'clearly' would." Alexander, 192 F.R.D. at 18. It might, but it might not. Compare Am. Floral Serv., 107 F.R.D. at 261-62 (Shadur, J.), with Admiral Heating, 104 F.R.D. at 32 (Shadur, J.). For instance, Plaintiff identified 83 current or former Pemstar employees that have information about this case in the Rule 26(a) disclosures, (Baillon Aff. Ex. A), but the Court does not know how many of these people were interviewed, why they were interviewed, or what they said. All of that information would be relevant to determine if revealing the interviewees would reveal opinion work product. If the interviews focused on persons from, for example, the Taunton facility, it might be difficult to conclude that revealing the identity of those interviewees would disclose which persons Plaintiffs' counsel think are important, i.e., arguable mental impressions/trial strategy. This is so because Defendants already know that Plaintiffs think what occurred at the Taunton facility (and logically the people there) is an important part of this case given the allegations of the complaint. Plaintiffs' factual argument is largely *ipse dixit*, but their burden "is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965) (speaking of attorney

client privilege); see also Wagner v. Dryvit Systems, Inc., 208 F.R.D. 606, 611 (D. Neb. 2001)

("Blanket assertions of privilege are insufficient to satisfy this burden.").

That does not end the inquiry. There are two types of work product–ordinary/factual and

opinion. E.g., In re Murphy, 560 F.2d 326, 334, 336 (8th Cir. 1977). It seems to be undisputed that

the "raw information," Pittman, 129 F.3d at 988, regarding which persons were interviewed was

material or information collected in anticipation for litigation by Plaintiffs' counsel or investigators. This

information constitutes ordinary/fact work product. See United States v. Amerada Hess Corp., 619

F.2d 980, 987 (3d Cir. 1980); Appeal of Hughes, 633 F.2d 282, 289 (3d Cir. 1980).

In Amerada Hess, Amerada hired the law firm Milbank, Tweed, Hadley & McCloy (Milbank)

to conduct an internal investigation regarding corporate payments to foreign officials and citizens.

During its investigation, Milbank conducted interviews of 50 of Amerada's officers and employees. A

list of the names of the persons interviewed by Milbank was compiled by Milbank. As part of a civil

audit, the government sought to enforce two Internal Revenue Service summonses issued to Amerada

Hess Corporation. One of the IRS summonses sought the production of a list of names of persons

interviewed by Milbank. Amerada resisted the production of the list of interviewees on the basis that

the list was protected by the attorney-client privilege and the attorney work product doctrine.

The Third Circuit rejected the claim that revealing who was interviewed would reveal the

attorneys' mental impressions or trial strategy:

> In this case the list of interviewees is just that, a list. It does not directly or indirectly
> reveal the mental processes of the Milbank attorneys. It furnishes no information as to
> the content of any statement. There is no realistic possibility that its production will
> convert any member of the Milbank firm from advocate to witness. None of the policy

reasons for protection of work product, other than the fact of its initial compilation by Milbank, applies.

Amerada Hess Corp., 619 F.2d at 987-88.

The Third Circuit, however, did conclude that because of "its initial compilation by Milbank" the interviewee names were work product. Id. Due to the "minimal substantive content" of the interviewee list, it was only subject to qualified work product protection, or, as this Court and the Eighth Circuit frame it, qualifies as ordinary work product. Id.; see also Appeal of Hughes, 633 F.2d at 289 ("We agree with the trial court that Amerada Hess controls on the question of production of the list, not because it is not work product, but because for the production of a mere list of persons interviewed the government's showing of need to overcome the nondisclosure privilege is comparatively low.").

Fact work product can be obtained on a showing of substantial need and inability to obtain the substantial equivalent of the materials without undue hardship. Defendants have failed to meet this standard and, actually, have not even put forth an argument about need and hardship. Included among the persons disclosed in the Rule 26(a) disclosures, are those persons that were interviewed by Plaintiffs.[8] Defendants are in command over their current employees making interviews of them quite easy. As for former employees or customers/analysts that might have relevant information, Defendants will have to do the work themselves; their need is not substantial. "The effort of a party or his representative in generating information needed for trial generally does not create information that will

---

[8] Plaintiffs have also included addresses for almost all persons listed in the disclosures, and, in many cases, telephone numbers. (Baillon Aff. Ex. A).

19

not be available to others willing to invest similar effort in discovery." <u>Admiral Ins. Co. v. United States</u>
<u>Dist. Court for the Dist. of Arizona</u>, 881 F.2d 1486, 1494 (9th Cir. 1988). That is the case here.

To the extent the complaint *quotes* a particular person but does not identify the person quoted,
Plaintiffs must identify the person quoted. The Court notes that Plaintiffs conceded at the hearing on
this matter that they would eventually need to disclose the identity of any quoted persons. More
importantly, the Court finds that any work product protection afforded the identity of persons quoted in
the complaint is impliedly waived by their unidentified quotation. In this case, any unidentified quotation
in the complaint results in a party "seek[ing] a greater advantage from its control over work product
than the law must provide to maintain a healthy adversary system" and the privilege, on balance, must
give way.[9] <u>Pamida, Inc. v. E.S. Originals, Inc.</u>, 281 F.3d 726, 732 (8th Cir. 2002) (noting that the
work product doctrine can be waived in the interest of fairness, and "[t]he privilege is designed to
balance the needs of the adversary system to promote an attorney's preparation in representing a client
against society's interest in revealing all true and material facts relevant to the resolution of a dispute.").

With regard to contention interrogatories number 10, 11, and 12, Defendants' motion to
compel is denied without prejudice. Discovery has barely begun. It is preferable that the parties agree
to a time, much later in the course of discovery, when contention interrogatories must be answered, but
that time is not now.

Finally, Plaintiffs state that they have produced "all of the documents obtained from witnesses
and third parties from plaintiffs' investigation of the matter." (Pls.' Mem. in Opp'n to Mot. to Compel,

---

[9] The Court assumes that the identity of persons quoted in the complaint carries some work
product protection.

at 2). That is sufficient to satisfy Defendants' requests. Plaintiffs certainly are not required to reveal

attorney notes, descriptions of what witnesses said, or documents that tend to reveal the same.

### B.    Investment History

Defendants request documents generally concerning Plaintiffs' investment history, including

Plaintiffs' investment history in securities other than Pemstar. Defendants argue that Plaintiffs'

investment history in securities other than Pemstar is relevant to class certification and the merits of

Plaintiffs' § 10(b), rule 10b-5 claim. Plaintiffs argue that general investment history is not relevant to

class certification because an investor's level (high or low) of sophistication does not render them

atypical. Plaintiffs also argue that because they base their securities fraud claims under §10(b) on a

fraud on the market theory, as opposed to direct reliance, investment history is irrelevant.

The Court finds that investment history/sophistication are not relevant to class certification

issues absent unusual circumstances, and the burden of the broad requests here outweighs any possible

relevance to class certification. See In re Select Comfort Corp. Sec. Litig., 202 F.R.D. 598, 607 n.12

(D. Minn. 2001) ("While these varying trading strategies may create later issues as to the assessment of

individual damages, the court holds that the fact that some of the 10b-5 subclass members may have

employed distinctive trading strategies does not render them atypical."); Burstein v. Applied Extrusion

Tech., Inc., 153 F.R.D. 488, 489-91, 490 n.4 (D. Mass. 1994) (collecting cases). This is not to say

that investment history is irrelevant to the merits, but the Court seeks to avoid "turning the class

certification litigation into a full-scale litigation on the merits of plaintiffs' underlying claims." Burstein,

153 F.R.D. at 491. If a class is certified, investment history will likely be appropriate.

Lead Plaintiffs' investment history in Pemstar securities shall be produced for the period beginning 6 months prior to the class period and ending May 3, 2002 (the end of the class period).

### C.    Tax Returns

Request number 27 seeks "tax returns (including schedules and worksheets) from 1998 through 2002."

Defendants' motion to compel a response to request number 27 is denied. Tax returns and other private matters are discoverable, In re Motion to Unseal Electronic Surveillance Evidence, 965 F.2d 637, 641 (8th Cir. 1992), but "their disclosure in civil actions requires 'a balancing of the policy of liberal discovery against the policy of maintaining the confidentiality of tax returns.'" Lemanik, S.A. v. McKinley Allsopp, Inc., 125 F.R.D. 602, 609 (S.D.N.Y. 1989) (quoting SEC v. Cymaticolor Corp., 106 F.R.D. 545, 547 (S.D.N.Y. 1985)); see also United States v. Bonanno Organized Crime Family, 119 F.R.D. 625, 627 (E.D.N.Y. 1988) (collecting cases). Even assuming the tax returns are relevant, Defendants have failed to demonstrate a "compelling need for the returns because the information contained therein is not otherwise readily obtainable." Lemanik, 125 F.R.D. at 609 (internal quotations omitted). Defendants offer little argument about the tax returns but do admit that they "cannot determine whether tax returns, or at least certain schedules of tax returns, will be necessary to fully disclose plaintiff's investment history." (Defs.' Mem. in Supp. of Mot. to Compel, at 25 n.4). The Court has held that general investment history need not be produced at this time. Defendants can likely glean relevant information about Pemstar securities from the documents Plaintiffs have already produced, (Pls.' Mem. in Opp'n to Mot. to Compel, at 4), and will produce pursuant to this Order. At the very least, Defendants' request for tax returns is premature.

**THEREFORE, IT IS HEREBY ORDERED that:**

1.    Plaintiffs' Motion to Compel (Doc. No. 65) is **GRANTED IN PART** and **DENIED**

    **IN PART** consistent with the body of this Order.

2.    Defendants' Motion to Compel (Doc. No. 62) is **GRANTED IN PART** and

    **DENIED IN PART** consistent with the body of this Order.

Dated: April 23, 2004.

      _s/ Susan Richard Nelson_
      SUSAN RICHARD NELSON
      United States Magistrate Judge