## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| IN RE: PRICELINE.COM INC. | : | **MASTER FILE NO.** |
| SECURITIES LITIGATION | : | **3:00CV01884(DJS)** |
| | : | |
| **This document relates to:** | : | |
| | : | |
| **ALL ACTIONS** | : | |
| | : | |

### <u>MEMORANDUM OF DECISION</u>

Lead plaintiffs bring this action on behalf of members of a putative class of persons who purchased or otherwise acquired securities of priceline.com Inc. ("Priceline") between January 27, 2000 and October 2, 2000, pursuant to Sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 78t, of the Securities Exchange Act of 1934 ("the Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78a-78mm, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against Priceline, Jay S. Walker, N.J. Nicholas, Daniel H. Schulman, and Richard S. Braddock. Lead plaintiffs now seek certification of the proposed class, which motion is **GRANTED.**

### I. BACKGROUND

### A. CLASS CLAIMS

The following is a summary of the facts constituting the basis for plaintiffs' claims. Defendant Priceline is publicly-traded Delaware corporation, with its principal place of business

in Norwalk, Connecticut.  The individual defendants were key
managers of Priceline. Walker founded Priceline, and at all
relevant times was Priceline's Vice Chairman of the Board of
Directors.  Schulman was Priceline's Chief Operating Officer from
June of 1999 through June 15, 2000, when he became Priceline's
President and CEO.  At all relevant times, Schulman served as a
director of Priceline. Braddock was Priceline's CEO from July of
1998 through June 15, 2000, when Schulman took over as CEO, and,
at all relevant times, he served as Priceline's Chairman of the
Board.  Nichols was a director of Priceline.  Plaintiffs are
individuals and companies who allegedly suffered damages from the
defendants' actions.  Plaintiffs allege that defendants' false
and misleading statements inflated the value of Priceline's stock
to the benefit of the defendants and other company insiders and
to the detriment of the plaintiffs.

Plaintiffs allege that the defendants made false and
misleading statements about Priceline's business model, financial
status, and future prospects.  Priceline pioneered a "Name Your
Own Price" pricing system (hereinafter "Priceline's business
model" or "business model"), which is a type of demand collection
system that allows consumers to make an offer to purchase items
such as airline tickets.  Having collected the consumer demand in
the form of an offer, Priceline then matches the offer with a
seller willing to discount the item in order to fill excess

capacity, which, with respect to airline tickets, averages about 700,000 unfilled seats per day.  Priceline principally applied its business model to the sale of airline tickets, hotel rooms, and car rentals.  Customers use Priceline's services through the Internet, and Priceline relies heavily on computer systems to implement its business model.

Plaintiffs allege that, in late 1999, defendants realized that in order to sustain Priceline's current stock value and become profitable, Priceline's business model must be applied to different markets beyond the travel market.  In furtherance thereof, Priceline licensed its business model to the priceline.com WebHouse Club ("WebHouse") in November of 1999. Jay Walker founded WebHouse, and the two principal investors were Walker Digital, which owned 34% of WebHouse's stock on March 30, 2000, and Vulcan Ventures.  Walker Digital also owned 35% of Priceline stock, and Jay Walker owned 34.1% of Walker Digital stock.

WebHouse applied Priceline's business model to groceries, which allowed customers to bid for items, charge the items at a discount to their credit cards, and then take delivery of the groceries at a local store.  In exchange for the license to use Priceline's business model, WebHouse was obligated to pay Priceline royalties based upon its revenue, and Priceline received warrants to purchase a majority equity stake in WebHouse

-3-

(77.5%) at the price of $3.00 per share under certain conditions. On its financial statements, Priceline valued the warrants at $188.8 million; Priceline did not include financial information about WebHouse in its own financial statements.

Following the introduction of WebHouse, during the beginning of the year 2000, plaintiffs allege that trouble began to befall Priceline and WebHouse. In the fall of 2000, the value of Priceline's stock plunged in the wake of certain damaging announcements. On September 27, 2000, Priceline announced that, due to weakness in the sale of airline tickets, the company would be unable to meet projections for its most recent quarter. Further, on October 5, 2000, Priceline announced that it would be winding down WebHouse's affairs during the next ninety days because "management determined it would be unlikely to raise substantial capital next year that would be required to complete its business plan and achieve profitability." (Dkt. # 36, ¶ 159). Priceline also publicly stated that it would take a non-cash loss of $188.8 million in its third quarter of 2000 financial report in order to account for the cessation of WebHouse's operations. On November 3, 2000, Priceline announced that the terms of warrants it had issued to Delta, one of its principal suppliers, had been amended; Priceline accounted for the renegotiation of the terms of the Delta warrants by taking a loss of $9 million in its fourth quarter of 2000 financial

-4-

report.

Plaintiffs claim that defendants made several false or misleading statements regarding the events previously discussed. The underlying premise of plaintiffs' allegations is that Priceline held WebHouse out to be a success despite the fact that defendants had information in their possession indicating that WebHouse would not be able to continue to operate. Specifically, plaintiffs allege that defendants knew by January 27, 2000 that participating companies would not offer discounts to WebHouse customers at a level that could sustain WebHouse's growth. Because the grocery manufacturers would not provide the customer discounts, WebHouse would be forced to pay the discounts itself, which would cause its financial ruin. Plaintiffs allege that defendants misrepresented the level of manufacturer participation and the prospects of manufacturers' deciding to participate. If, as plaintiffs allege, defendants knew that WebHouse would not succeed, defendants' statements relating to WebHouse's, and derivatively Priceline's, success as well as statements in Priceline's financial statements valuing Priceline's warrants to purchase an interest in WebHouse are false or misleading.

## B. CLASS DEFINITION

Plaintiffs seek to certify a class of "all persons who purchased or otherwise acquired securities of priceline.com, Inc. ("Priceline," "PCLN" or the "Company") from January 27, 2000 to

-5-

October 4, 2000." (Dkt. # 36 ¶ 1). Defendants, citing <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 125 S. Ct. 1627 (2005), argue that the class definition should be narrowed to those persons who both purchased Priceline shares after January 27, 2000 and then sold those shares after October 5, 2000, which is the date the winding-down of WebHouse became public. In <u>Dura Pharmacueticals, Inc.,</u> the Supreme Court held that a plaintiff alleging a violation of Rule 10b-5 must allege an injury beyond simply purchasing a security at an inflated price. <u>See Dura Pharmaceuticals, Inc.,</u> 125 S. Ct. at 1634. Defendants argue that, in order to successfully prove loss causation, a class member must have purchased Priceline shares on or before October 4, 2000 and then sold those shares on or after October 5, 2000, which defendants allege is the date they fully disclosed any omissions alleged in the complaint.

Loss causation, however, "is a fact-based inquiry and the degree of difficulty in pleading will be affected by circumstances. . . ." <u>Lentell v. Merrill Lynch & Co., Inc.,</u> 396 F.3d 161, 174 (2d Cir. 2005). According to the allegations set forth in the complaint, October 4, 2000 is the date plaintiffs have chosen as the end of the class period for claims against Priceline based upon the conduct described in the complaint, but it cannot be said that the only corrective disclosure occurred on October 5, 2000; plaintiffs allege other events that could be

-6-

construed as corrective disclosures in the weeks preceding
October 5, 2000.  As such, the court cannot find that a plaintiff
who sold shares of stock before October 5, 2000 could not have
sustained any loss.   Absent a firm conceptual basis, founded in
both law and fact, this court will not narrow the proposed class
in response to an argument addressing the merits of plaintiffs'
claims.  See Heerwagen v. Clear Channel Communications, No.
04-0699-CV, 2006 WL 45859, at *10 (2d Cir. Jan. 10, 2006)  ("Some
overlap with the ultimate review on the merits is an acceptable
collateral consequence of the 'rigorous analysis' that courts
must perform when determining whether Rule 23's requirements have
been met . . . so long as it does not stem from a forbidden
preliminary inquiry into the merits. . . ."); Sirota v. Solitron
Devices, Inc., 673 F.2d 566, 572 (2d Cir. 1982) ("[I]t would be
improper for a district court to resolve substantial questions of
fact going to the merits when deciding the scope or time limits
of the class.").

        The court will not, at this stage of the litigation,
determine which plaintiffs may or may not be able to prove loss
causation; it is enough at this time that the class definition
includes all persons who may have been harmed by the fraud
alleged in the complaint – whether each person within this class
may recover is a question reserved for another day.  See In re
Oxford Health Plans, Inc., 191 F.R.D. 369, 378 (S.D.N.Y. 2000)

("Should the proof at trial limit the period during which damages can be recovered the final judgment will still bind those who are within the definition of class membership adopted by the Court in declaring a class action, but were held not entitled to recover."). The court finds that the proposed class definition incorporates the date plaintiffs have chosen as the end of the class period for claims against Priceline based upon the conduct described in the complaint and otherwise meets the applicable legal standards.

## II. DISCUSSION

Plaintiffs set forth two counts in their Consolidated Amended Complaint: (1) violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 promulgated thereunder against Priceline and the individual defendants; and (2) violation of 15 U.S.C. § 78t against Priceline and the individual defendants.

The legal standards applicable to plaintiffs' claims and pertinent to the pending motion are as follows. "For a plaintiff to state a viable cause of action for securities fraud under § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), the complaint must allege that in connection with the purchase or sale of securities, defendant, acting with scienter, either made a false material representation or omitted to disclose material information so that plaintiff – acting in reliance either on defendant's false representation or its

-8-

failure to disclose material information--suffered injury and damages." In re Scholastic Corp. Securities Litigation, 252 F.3d 63, 69 (2d Cir. 2001). With respect to reliance, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentation may be presumed for the purposes of a Rule 10b-5 action." Basic v. Levinson, 485 U.S. 224, 247 (1988).

In order to obtain class certification, plaintiffs must satisfy each of the four prerequisites set forth in Rule 23(a) of the Federal Rules of Civil Procedure. See Caridad v. Metro-North Commuter Railroad, 191 F.3d 283, 291 (2d Cir. 1999). Rule 23(a) requires satisfaction of the following four factors. First, the class must be so numerous that joinder of all members is impracticable. Second, there must exist questions of law or fact common to the class. Third, the claims or defenses of the representative parties must be typical of the claims or defenses of the class. Fourth, the representative parties must be able to protect the interests of the class fairly and adequately. These four elements are often referred to, respectively, as "numerosity," "commonality," "typicality," and "adequacy of representation." Once those prerequisites are satisfied, plaintiffs must also establish the requirements set forth in Rule

23(b).

## A. NUMEROSITY

The first prerequisite, numerosity, requires that the proposed class be so "numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs point out that, between January 27, 2000 and October 4, 2000 Priceline had at least 160 million shares of stock outstanding, and that daily trading volume regularly exceeded 3 million shares. Based upon these representations, the court finds that joinder of all persons with claims would be impracticable.

## B. COMMONALITY AND TYPICALITY

The second and third requirements of Rule 23(a) are the existence of questions of law or fact common to the class, and whether the named plaintiff's claims are typical of the claims of the class. See generally Caridad, 191 F.3d at 293 (explaining that the commonality criterion often merges with the typicality requirement and that the disputed issue of law or fact must "occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class"). "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992).

-10-

Here, there are issues of law and fact common to the claims of the entire class.  Specifically, common issues include the following:

(i)whether the federal securities laws were violated by Defendants' acts as alleged in the Complaint;

(ii) whether the Company's publicly disseminated releases and statements during the Class Period omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(iii)whether the market prices of Priceline securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of in the Complaint; and

(iv) whether the Class has sustained damages, and the measure of such damages.

(Dkt. # 135 at 11).  In order to recover, each plaintiff would have to rely upon the same facts and apply the same legal standards.  Specifically, plaintiffs must prove what defendants knew and when they knew it to prove that they omitted or misrepresented material facts with scienter, that plaintiffs relied upon defendants' material misrepresentations or omissions because the price for Priceline securities was set by a market that processes information efficiently, and that the defendants' conduct caused plaintiffs to suffer a loss.  Therefore, plaintiffs satisfy the commonality and typicality requirements.

## C. ADEQUACY

In order to certify a class, the class representative plaintiff must demonstrate that he or she will "fairly and

-11-

adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Because "absent members are to be conclusively bound by the result of an action prosecuted or defended by a party alleged to represent their interests, basic notions of fairness and justice demand that the representation they receive be adequate." 7A Wright, et al., <u>Federal Practice and Procedure</u> § 1765 at 317 (3d ed. 2005); <u>cf.</u> <u>In re Cendant Corp. Securities Litigation</u>, 404 F.3d 173, 198 (3rd Cir. 2005) ("The lead plaintiff is not the sole client in a PSLRA class action; instead, the lead plaintiff serves as a fiduciary for the entire class."). As such, "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 625 (1997).

A class representative is therefore inadequate because of characteristics unique to the representative, or the representative's ability to bring a claim, that would necessarily jeopardize the ability to effectively present and prosecute the claims of the class members. <u>See</u> <u>Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 903 F.2d 176, 180 (2d Cir. 1990) ("While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification . . . class certification is inappropriate where a putative class

representative is subject to unique defenses which threaten to become the focus of the litigation. . . .").

## 1. CLASS REPRESENTATIVES

Defendants challenge the adequacy of each proposed class representative.  These challenges are addressed in turn as follows.

### i. R. Warren Ross

Defendants claim that Ross's decision to purchase Priceline stock was solely premised upon advice from his friend, and, therefore, that his claims are atypical because he did not rely upon the efficiency of the market in setting the price of the shares he purchased.  This argument is based upon an inaccurate characterization of the whole of Ross's testimony.  In his deposition testimony, Ross describes how he became interested in Priceline before his conversation with his friend, but had decided to purchase the stock after hearing his friend's glowing endorsement of Priceline.  Ross's testimony indicates that he knew about Pricleine and WebHouse, and that he understood both the nature of investments and the kind of business Priceline engaged in at the time he purchased Priceline stock.  Ross stated that, based upon his friend's views, the market had undervalued Priceline's stock, and that he decided to purchase shares. Defendants' contention that Ross acted in blind allegiance to his

friend's advice contradicts the balance of Ross's testimony.[1]

Ross is an adequate class representative.  He knows what the factual basis for the claims are, and he has discussed the case with class counsel.  He has been involved in prosecution of the case, and he has been responsive to defendants' requests.  Most significantly, through his background as a bank compliance officer, he understands both that he is a fiduciary for the absent members and what it means to be a fiduciary. (See Dkt. # 193 Ex. G at 112:18-22 ("I represent a class because it's not possible to bring all members of that class into this room to serve in this capacity.  My interests are those of all class members equally.  It's a fiduciary responsibility, and that's why I chose to serve.") & 133:19-23 ("[M]y career as a regulator permitted me and required me to protect shareholders, employees and the public.  And I feel in that regard this position as class representative is simply an extension of that task.")). Plaintiffs have demonstrated that Ross is an adequate class representative.

### ii. Thomas Linton

Defendants argue that Linton is not an adequate

---

[1] Further, defendants' contention that Ross did not rely upon the efficiency of the market in purchasing Priceline stock because he believed that the market did not accurately value Priceline shares is meritless.  Like many other investors, it appears that Ross and his friend simply thought their analysis of the information available was superior to the prevailing market evaluation such that they were ahead of the next trend.

representative because his deposition testimony lacks credibility and because he had a short-term investment strategy atypical of the class members.  "Quality of representation embraces both the competence of the legal counsel of the representatives and the stature and interest of the named parties themselves."  7A Wright, et al., supra, § 1765 at 346 (footnote omitted).  "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff."  Savino v. Computer Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998) (affirming district court's denial of motion to certify a class because the proposed representative changed his position regarding a fact central to his claim); see Kline v. Wolf, 702 F.2d 400, 403 (2d Cir. 1981) ("Since plaintiffs' testimony on an issue critical to one of their two causes of action was subject to sharp attack, the district court reasonably concluded that their credibility in general was sufficiently in doubt to justify denying them a fiduciary role as class representatives with respect to both claims."); Panzirer v. Wolf, 663 F.2d 365, 368-69 (2d Cir. 1981) (affirming the district court's finding that plaintiff lacked credibility after offering four versions of her conversation with her broker).  As one judge from this court has persuasively stated, however:

> [t]he existence of questions about the credibility of
> named representatives will not ordinarily place the
> interests of those representatives in conflict with
> other class members.  All witnesses are potentially

> subject to attacks on their credibility. Only when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate.

In re Colonial Partnership Litigation, No. H-90-829 (JAC), 1993 WL 306526, at *5 (D. Conn. Feb. 10, 1993); see also Kaplan v. Pomerantz, 132 F.R.D. 504, 510 (N.D. Ill. 1990) ("[P]laintiff's statements go beyond minor inconsistencies. Plaintiff may be correct in asserting that the subjects of his statements are of marginal relevance to this lawsuit; nonetheless, they evince a willingness to give intentionally false and misleading testimony in an effort to further his interests in this litigation.").

Defendants' challenges to Linton's credibility do not render him unfit to represent the class.  Defendants claim that Linton purchased 2,000 shares of Priceline stock on September 11, 2000 at $26.875 per share, and that his account records indicate that Linton instructed his broker to sell the 2,000 shares if Priceline's shares reached the price of $28.25 per share before October 31, 2000.  Linton testified that he intended to keep Priceline stock for the long term.  When counsel asked Linton about the sell order, Linton stated that he did not recall placing a sell order, and he was not sure what the notation on the account statement meant.  At another point during his deposition, Linton admitted that it appeared as if he placed a sell order, but that he did not remember any details concerning

the sell order.  Defendants, without any other basis, ask this
court to find Linton's testimony incredible because he could not
recall a sell order placed on September 19, 2000 during his
deposition on May 12, 2005.  The court declines to do so;
Linton's testimony appears credible, and there is no basis to
conclude that Linton is inclined to provide false or misleading
testimony during these proceedings.  Further, even if a question
remains regarding the sell order, the fact that there was a sell
order is not an issue of such magnitude that Linton would
jeopardize the absent class members' claims should defendants
raise this issue at trial.

        Linton's claims are not atypical of the class members'
claims.  As discussed in the preceding paragraph, Linton had
apparently instructed his broker to sell Priceline shares if
Priceline's shares reached the price of $28.25 per share before
October 31, 2000.  From this, defendants extrapolate the notion
that Linton, at the time he purchased Priceline shares, had a
firm intention to make a short term profit, which is contrary to
the balance of Linton's testimony.  It does not follow that
Linton's position necessarily was a short term position because
he had ordered his broker to sell the shares when the price
reached $28.25; there are a myriad of other possible reasons for
the sell order that do not render his claims atypical of those of
the other class members.  Although the circumstances of Linton's

sell order are not clear, Linton did state that he read about
Priceline and followed the price of its stock for a substantial
period of time before purchasing Priceline stock, which indicates
that he did rely upon the efficiency of the market, and not the
short term volatility of the stock price, when he made his
purchase.  Even if Linton did instruct his broker to sell his
shares, this does not change the fact, which is supported by
Linton's testimony, that Linton relied upon the market's
efficiency in setting the purchase price for the shares he
acquired.

Linton is qualified to serve as a class representative.  He
stated that he is aware of his fiduciary responsibility, and that
he must monitor the proceedings to make sure that class counsel
is acting with the best interests of the class in mind.  He also
knows about the factual basis for the claims in this case and is
familiar with the issues presented.  Therefore, Linton is
qualified to serve as a class representative.

### iii. Mark B. Weiss

Defendants argue that Weiss traded almost exclusively in put
options for Priceline stock, and that the characteristics of this
type of security render his claim atypical of those of the class
members such that he would be an inadequate class representative.
A put option "gives the holder the right to sell an asset at a
certain price [(the strike price)] within a specific period of

time." Investopedia.com, Options Basics: What are Options?, http://www.investopedia.com/university/options/option.asp (last visited Jan. 11, 2006). Generally speaking, the value of the put option to the holder is inversely proportionate to the value of the underlying share of stock because the value of the put option increases if the price of the share falls below the strike price before the option expires. See id. Upon the sale of a put option, the seller, or writer, becomes obligated to purchase the asset at the strike price if the holder exercises the option. See id. "For this option a premium is paid, and the contract is worth more or less than the premium depending upon the direction of the market price of the underlying stock relative to the striking price." Deutschman v. Beneficial Corp., 841 F.2d 502, 504 (3rd Cir. 1988).

During the class period, Weiss engaged in 75 transactions in Priceline put options where he bought 473 put options and sold 580 put options. Of his fifteen purchases of Priceline shares during the class period, fourteen of these purchases were compelled by holders' exercise of put options assigned to Weiss. The fifteenth purchase was of 150 shares of Priceline stock. Weiss claims that his losses totaled over $750,000.

Defendants argue that, "[a]s an options trader, [Weiss] relied on the price of the put option contract, which is affected by factors extraneous to the price of the underlying stock. . .

-19-

." (Dkt. # 193 at 29). They contend that,

> [b]ecause an options trader does not rely directly on
> the market price of the underlying stock, Mr. Weiss's
> involvement as a class representative would trigger
> factual issues about whether he was relying upon the
> integrity of priceline's stock price at all and whether
> (and if so how) the integrity of the stock price
> affects the price of a put options contract or the
> value of an option premium.

(Id.).

Defendants principally rely upon two cases in support of
their contention that Weiss is an inadequate class
representative. In Andrada v. Atherogenics, Inc., No.
05CV61(RJH), 2005 WL 912359 (S.D.N.Y. Apr. 19, 2005), the court
declined to appoint an entity that had exclusively purchased
options as the lead plaintiff for a class of purchasers of common
stock and options. The court explained its holding as follows:

> [w]ere South Ferry to be appointed lead plaintiff for
> the entire class, factual issues specific to South
> Ferry in determining the precise value of the
> options-e.g., the maturity, the volatility of the price
> of the Atherogenics stock, the level of short term
> interest rates, and the competitive structure of the
> market in which the options are traded-would likely
> "threaten to become the focus of the litigation."
> Weikel v. Tower Semiconducter Ltd., 183 F.R.D. 377, 391
> (D.N.J.1998). . . . As an options holder, South Ferry
> is potentially subject to unique defenses irrelevant to
> regular stock purchasers in the class . . . as well as
> standing challenges.

Andrada, 2005 WL 912359, at *5. The court also noted that "South
Ferry has failed to identify a single instance in which an option
holder was deemed to be an appropriate lead plaintiff for an
entire securities fraud class action." Id. Second, in Weikel v.

-20-

Tower Semiconducter Ltd., 183 F.R.D. 377 (D.N.J. 1998), the court
held that a holder of "Euro Options," who was the only purchaser
of this type of security in the class, was not an adequate
representative because "[t]he factual distinctions between [the
holder of the Euro Options] and the Tower Ordinary Share
purchasers, combined with the possibility of unique defenses
being raised against [the Euro Options purchaser], are likely to
threaten to become the focus of the litigation."   Id. at 391.

Upon consideration of the nature of options trading in
general, and Weiss's explanation of his motive for his trading,
the court is satisfied that Weiss's interests, although unique in
certain respects because he traded in put options, are
sufficiently aligned with those of the class members.  Option
traders and other traders of securities aside from the shares of
stock themselves may use the fraud-on-the-market presumption of
reliance absent special circumstances compelling a different
result.  See In re Oxford Health Plans, Inc. Sec. Lit., 199
F.R.D. 119, 123-24 (S.D.N.Y. 2001) (holding that options traders
were typical and adequate class representatives); Deutschman v.
Beneficial Corp, 132 F.R.D. 359, 371 (D. Del. 1990) ("[T]he
market price of the underlying security may affect the premium at
which the option holder is able to resell the option contract and
the desirability of exercising the option by purchasing the
shares at the striking price prior to the expiration date vis-a-

vis allowing the option to expire."); <u>Moskowitz v. Lopp</u>, 128 F.R.D. 624, 631 (E.D. Pa. 1989) (holding that plaintiff who used a variety of trading strategies, including options, could rely upon the fraud-on-the-market presumption and was an adequate class representative); <u>cf.</u> <u>Weikel</u>, 183 F.R.D. at 391 ("Accordingly, it cannot be said, at this stage, the fraud on the market theory is inapplicable to the Euro Options purchases."); <u>but see</u> <u>Zlotnick v. TIE Communications</u>, 836 F.2d 818, 823 (3rd Cir. 1988) (declining to presume reliance on the part of a short seller and stating that "since Zlotnick decided that the market price was not an accurate valuation of the stock at the time of his short sale, we should not presume that it was reasonable for him to rely upon the market price at the time of his purchase.").

The cases upon which defendants rely, however, are distinguishable.  Weiss did not exclusively purchase and hold put options, where, as the holder, he would profit only if the price of Priceline shares decreased.  To the contrary, the record indicates that Weiss sold, or wrote, many put options.  By writing put options, Weiss expected to profit in either of two ways: (1) if the holder did not exercise the put option, by retaining the premium paid to him for the put option; or (2) if the holder exercised the put options and the shares were put to him, by acquiring Priceline shares at a price he deemed reasonable, which would be the strike price less the premium paid

to him for the put option.  Weiss testified that he believed
Priceline shares would increase in price after what he perceived
to be a correction in July through August of 2000, that his long-
term goal was to acquire Priceline shares to hold, and that his
writing put options was in furtherance of this goal.  Weiss
testified that, if the put options he wrote were exercised and
shares were put to him, he believed that the price of the shares
would eventually rebound so that his investment would eventually
be profitable.  (See Dkt. # 197 Ex. M at 50:23-51:5 ("I thought
the value of the stock [in March of 2000] was– was so much higher
than the put price that I was– if it was put to me, it was going
to be at a value that was just a great value.  I was getting a
premium on top of it.  I believed in the company, the stock, you
know, and thought it was a good investment.") & 91:23-92:6
("Well, I had received a premium.  So the strike price was
actually discounted to me.  My objective was to accumulate the
stock to add to my own family's estate and wealth.  In my overly
optimistic view, I thought that the stock was going to rebound
[after August of 2000] and even hit higher numbers than it hit in
'99.  So, you know, I was foolishly optimistic. . . .")).

For example, even if the market price dipped below the
strike price on a put option he wrote, if Weiss believed that the
effective purchase price of the shares (strike price minus
premium) was reasonable and that the market price would

eventually rise, writing a put option would be a win-win scenario for him. If the holder exercised the put option, Weiss would acquire Priceline stock at the effective purchase price upon the exercise of the put option. Thus, the potential for profit would be if, in the future, the market price for Priceline shares exceeded Weiss's effective purchase price of the shares. If the price of Priceline shares rose above the strike price before the option expired, he could either buy back the put options he had written at a reduced price and make a profit or wait until the options expired and retain the full premium paid to him. Thus, Weiss's profit would be the amount of the premium paid to him, or the difference between the premium paid to him and the price he paid to re-acquire the put options. According to Weiss, his long-term strategy backfired after Priceline's precipitous decline in October of 2000, which left him with many shares worth much less than the effective purchase price of the shares and many more shares put to him as a result of his sale of put options.

The courts that have found an options trader's, or a short seller's,[2] claims to be atypical have based their conclusions on the premise that the plaintiff did not rely upon the efficiency

_____

[2] A short seller, who borrows shares to sell, also turns a profit when the price of the shares he sold decreases. The short seller can replace the shares he borrowed from the lender by purchasing them at a reduced price and retain the difference between the short sale price paid to him and the price paid to replace the shares.

of the market to process information and set a price, but rather upon considerations extraneous to the price of the underlying share.  See Zlotnick, 836 F.2d at 823 ("Here, Zlotnick sold short because he believed the market price of the stock overvalued Technicom's present earnings and underestimated its potential competition."); Andrada, 2005 WL 912359, at *5; see also Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp., 315 F. Supp. 2d 666, 676 (E.D. Pa. 2004) ("In short, Zlotnick held only that a plaintiff who sells short because be believes that a stock is overvalued is not entitled to the fraud on the market presumption.").  These holdings are consistent with the Supreme Court's holding in Basic that "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."  Basic, 485 U.S. at 248.  In contrast, Weiss has testified that his practice of writing put options was founded upon the integrity of the price of the underlying shares, which, as the class alleges, was determined by an efficient market. Weiss is therefore an adequate class representative because, notwithstanding his trading in put options, because he wrote put options, his interests are aligned with those of the class and "the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to

trade at a fair market price," remains intact. Id.

              iv. Marilyn Egel & John Anderson

     Defendants claim that Anderson and Egel are inadequate class representatives because they lack knowledge of the case and the motivation to fulfill their responsibilities as class representatives.  "[C]lass certification may properly be denied 'where the class representatives ha[ve] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'"  Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995) (quoting Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 727 (11th Cir. 1987))(alterations in original).  "Although a representative plaintiff need not immerse himself in the case-small stakes imply large benefits from the division of labor, with lawyers handling details . . . -the named plaintiff must have some commitment to the case, so that the 'representative' in a class action is not a fictive concept." Rand v. Monsanto Co., 926 F.2d 596, 598-99 (7th Cir. 1991); see also Smyth v. Carter, 168 F.R.D. 28, 33 (W.D. Va. 1996) ("The named plaintiffs in a class action need not be the best representatives of the class, and to say that they are not expected to understand every detail of their case is to understate the matter.  Still, they must be able, at minimum, to

make important nondelegable decisions about the course of the litigation; also, if the named plaintiffs are evasive, untruthful, or lack credibility, this weighs heavily against them as adequate class representatives."); 7A Wright, et al., supra, § 1766 at 372 ("This inquiry into the knowledge of the representatives is to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney; the named parties must be adequate representatives in addition to having adequate counsel.") (footnote omitted).

Chiefly for the reasons set forth in plaintiffs' reply memorandum of law, the court finds that Anderson and Egel are adequate representatives. Although Egel's husband, Weiss, engaged in the trading of Priceline shares, he did so through an account owned jointly with Egel. At her deposition, Egel also demonstrated familiarity with the claims of the class and the underlying allegations in support thereof. Finally, Egel is aware of her duty to protect the interests of the absent class members. Like Egel, Anderson has demonstrated sufficient knowledge of the claims of the class and his obligations as a class representative. Therefore, Egel and Anderson are adequate class representatives.

### v. The Leisinger Pension Fund

At this juncture, the court is unable to endorse the Leisinger Pension Fund's service as a class representative. The

LPF was created under Swiss law in 1966 for the benefit of Felix Leisinger and his family and managed by Swiss Bank Corporation and later UBS.  The LPF was dissloved or, in the words of Felix Leisinger, who purports to speak on its behalf, "destroyed" in 2000 when UBS closed the account and sent Leisinger a check for $700,000.  Apparently, Leisinger later had a dispute with UBS regarding the proper management of the LBF after it sustained crippling losses, which reduced the LPF's value from in excess of $14 million to $700,000 in 2000.

The LPF is not an adequate class representative because the court cannot make an informed decision regarding the LBF's standing to sue.  Plaintiffs apparently want the court to consider the LPF to be similar to "a family trust under U.S. law," but do not make a sufficient offer of proof regarding the present or former legal status of the LPF.  Unlike some of the challenges defendants pose to other proposed class representatives, the court cannot countenance a class representative with questionable standing to bring the claims set forth in the complaint.  Further, defendants raise substantial issues regarding the conduct of the LPF's investment manager and the interaction between the LPF's investment manager and the LPF. Should plaintiffs wish to add the LPF as a class representative, they may file a motion to do so, addressing these concerns in sufficient detail, on or before May 5, 2006.

## 2. PLAINTIFFS' SHOWING OF ADEQUACY

In light of the foregoing, defendants' arguments with respect to the fitness of lead plaintiffs Ross, Linton, Weiss, Egel, and Anderson to represent the class are not persuasive. Notwithstanding this court's reservations regarding the LPF, lead plaintiffs have demonstrated that they will adequately represent the class. See 7A Wright, et al., supra, § 1765 at 336 ("[I]f there is more than one named representative, it is not necessary that all the representatives meet the Rule 23(a)(4) standard; as long as one of the representatives is adequate, the requirement will be met.").

## D. RULE 23(b)

Having found that plaintiffs have demonstrated the prerequisites to class certification set forth in Rule 23(a), the class shall be certified under Rule 23(b)(3). Rule 23(b)(3) provides, in pertinent part, the following:

> [a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
>                     * * *
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the

claims in the particular forum; (D) the difficulties
likely to be encountered in the management of a class
action.

Fed. R. Civ. P. 23(b)(3).

This is the quintessential securities fraud class action.
An enormous group of potential plaintiffs, with losses ranging
from millions of dollars to tens of dollars, seek to recover
damages arising from one entity's actions.  The focus of this
litigation is upon the propriety defendants' conduct, and any
issues pertaining to individual class members only pale in
comparison to the importance of defendants' potential liability.
As such, this class action shall be certified under Rule
23(b)(3).

### III. CONCLUSION

For the reasons set forth herein, plaintiffs' motion to
certify the class (dkt. # 134) is **GRANTED in part** and **DENIED in
part**.  The motion is **GRANTED** inasmuch as it seeks certification
of a class defined as follows: all persons who purchased or
otherwise acquired securities of priceline.com, Inc. ("Priceline"
or "PCLN") from January 27, 2000 to October 4, 2000, inclusive.
The motion is **GRANTED** inasmuch as it seeks appointment of R.
Warren Ross, Thomas Linton, John S. Anderson, Mark Weiss, Marilyn
D. Egel as class representatives; and is **DENIED without prejudice**
inasmuch as it seeks to name the Leisinger Pension Fund as a
class representative.  Plaintiffs shall submit to the court a

proposed notice and proposed means for providing notice on or before **May 5, 2006.**  Defendants may submit objections thereto or alternative proposals on or before **May 19, 2006.**

So ordered this 4th day of April, 2006.

                                        **/s/DJS**
                              _____
                                   **DOMINIC J. SQUATRITO**
                              **UNITED STATES DISTRICT JUDGE**