UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| In Re: Priceline.com Inc.<br>Securities Litigation | Master File No.<br>3:00cv1884 (CFD) |
| ------------------------------------------------ | |
| This document relates to: | |
| All Pending Actions | |
| | May 10, 2006 |

**STATUS REPORT ON THE PRODUCTION OF ELECTRONIC INFORMATION**

Defendants priceline.com Inc. ("priceline"), Richard S. Braddock, Daniel H. Schulman and N.J. Nicholas (collectively, "Defendants") submit this Status Report on the Production of Electronic Information. On December 8, 2006, the Court directed Defendants to, beginning in January 2006, file a status report on the production of electronic information on the tenth of each month. (Decision and Order, dated December 8, 2005 ("December 8th Order").)

This May 10 Status Report updates the information provided in Defendants' previous January 10, February 10, March 9 and April 10, 2006 Status Reports and Defendants incorporate those Reports by reference. For the Court's convenience, we have attached those prior Status Reports as Exhibits A-D.

1.  Emails.

In addition to several thousand pages of emails that were previously produced from hard copy files in Defendants' possession, Defendants also have produced more than 450,000 pages of emails from the snapshot and the departed employee tapes.[1] That email data

---
[1] The "snapshot" of electronic material has been described in prior documents on record in this litigation. (See, e.g., December 8th Order.) In the initial stages of this litigation priceline

was produced from the email files of a list of custodians that was agreed-upon between the parties as set forth below.

On August 11, 2005, Defendants informed plaintiffs that the snapshot and departed employee tapes allow for a search of the email files of specific individuals. (Ex. E, Letter from J. Hein to P. McDougall, dated Aug. 11, 2005.) On that same day, Defendants proposed a list of 50 individuals whose email files Defendants agreed to review. Id. That list included individuals referenced in the Consolidated Amended Complaint and in Defendants' first and second sets of interrogatory responses whose email files had been identified on the snapshot (or departed employee tapes), as well as a number of additional individuals who Defendants believed might have emails that were relevant to this litigation and for whom an email file had been located. Id. Defendants stated that we would be happy to consider reasonable additions to this initial list. Id.

On August 15, 2005, plaintiffs agreed to the approach of searching individual email files on the snapshot and departed employee tapes. (Ex. F, Letter from P. McDougall to J. Hein, dated Aug. 15, 2005.) Plaintiffs then requested that Defendants add 63 individuals to the search, making the total 113. Id. Although it was Defendants' position that the addition of that many individuals was unreasonable, Defendants ultimately agreed, on August 17, 2005, to search

---

issued a company-wide document hold notice. As the litigation progressed, priceline sought to preserve all of its electronic material in one secure location. As a result, a "snapshot" was taken of priceline's various servers. This snapshot is the equivalent of a full back-up of all the material that existed on priceline's corporate file servers as of February 2002 (the time the snapshot was taken). Included among the information on the snapshot is specific electronic information of certain employees who left priceline in approximately 2000-2001 -- the "departed employee tapes".

2

those individuals' email files as well.[2] (Ex. G, Letter from J. Hein to P. McDougall, dated Aug. 17, 2005.)

As we have reported to the Court and the plaintiffs on numerous occasions during the course of the past three months (see, e.g., Exs. C and D, Status Reports, dated, respectively, Mar. 9, 2006 and April 10, 2006.), it is Defendants' position that the review and production of responsive, non-privileged emails from the agreed-upon list of individuals' email files is substantially complete.

By letter dated April 27, 2006, plaintiffs, for the first time, contend that all individual email files contained on the snapshot and departed employee tapes should now be searched using a list of search terms. Specifically, plaintiffs contend that any agreed-upon search term that is used to search the non-email electronic data (see section 2 below), should also be used "to search the *entire* snapshot and *all* of the departed employee tapes -- not just those portions of the snapshot and departed employee tapes that contain non-email electronic data". Plaintiffs' new request would not only duplicate the completed review of email for the 113 individuals identified by the parties as potentially having relevant information, it would also unnecessarily search all of the other individuals' email files that are not likely to contain relevant information. Plaintiffs' justification for this new proposal, as stated during a May 2, 2006 meet and confer, is to "cross-check" Defendants' production of emails. Defendants' did not -- and will not -- agree to this duplicative and pointless approach.

---

[2] On February 24, 2006, Defendants informed plaintiffs that 33 of plaintiffs' requested additional individuals did not have email files on the snapshot or departed employee tapes. (Ex. H, Letter from J. Hein to G. Johnson, dated Feb. 24, 2006.) Therefore, the total of agreed-upon individuals whose email files on the snapshot or departed employee tapes were searched was 80.

3

The processes by which Defendants would search the snapshot for email and non-email electronic materials are distinct and were explicitly negotiated and agreed-upon between the parties and communicated to the Court on multiple occasions. It was agreed that emails would be searched using an agreed-upon list of custodians for the designated two-year time period of March 1, 1999 to April 1, 2001; and non-email materials would be searched using an agreed-upon search term list (see section 2 below). Those agreements are memorialized in numerous letters between the parties (see, e.g., Ex. I, Letter from P. McDougall to B. Kelleher and J. Hein, dated Aug. 8, 2005; Ex. E, Letter from J. Hein to P. McDougall, dated Aug. 11, 2005; Ex. F, Letter from P. McDougall to J. Hein, dated Aug. 15, 2005; Ex. J, Letter from R. Simonds to P. McDougall, dated May 4, 2006), and in the monthly Status Reports filed with the Court (Exs. A-D).

We believe that plaintiffs' effort to expand the review of email in disregard of the parties' previous agreements is intended only to burden the Defendants. Defendants will not unnecessarily waste resources "cross checking" our review and production of emails on the off chance that some marginal or unanticipated person that is not on the list of previously agreed-upon 113 individuals might have some relevant emails.

2. Non-email electronic material.

On August 11, 2005, Defendants informed plaintiffs that with respect to non-email electronic data contained on the snapshot or departed employee tapes, it is not possible to identify the files of particular departments or individuals. (Ex. E, Letter from J. Hein to P. McDougall, dated Aug. 11, 2005.) The Defendants informed plaintiffs that the snapshot is

searchable, however, and we proposed that plaintiffs provide a list of suggested search terms in order for the parties to "work together to craft a meaningful and reasonable search". Id.

On August 15, 2005, plaintiffs agreed to the approach of searching non-email data contained on the snapshot with a list of agreed-upon search terms. (Ex. F, Letter from P. McDougall to J. Hein, dated Aug. 15, 2005.) However, plaintiffs asked that Defendants compile the initial list of terms. Id.

On November 8, 2005, Defendants informed plaintiffs that the non-email material on the snapshot would be searched using the terms "Webhouse", "Web House" and "WHC" and that production of responsive, non-privileged documents would begin. (Ex. K, Letter from J. Hein to E. Comite, dated Nov. 8, 2005.) It was Defendants' position that these initial search terms were most likely to retrieve responsive information from the snapshot and Defendants invited plaintiffs to propose the next list of search terms. Id. Defendants also proposed that the parameters of the term search of the non-email portion of the snapshot be confined to: (i) documents "last modified" during the period beginning March 1, 1999 and ending April 1, 2001; and (ii) text files -- word processing files, spreadsheets, databases, presentations and PDF files, not program and program support files, such as ".ini", ".dll" and ".exe" files. Id. On December 19, 2005, plaintiffs agreed to those parameters and the initial search term list. (Ex. L, Letter from P. McDougall to J. Hein, dated Dec. 19, 2005.) Defendants have now produced responsive and non-privileged documents from the "Webhouse", "Web House" and "WHC" search, which total more than 120,000 pages.

By letter dated February 15, 2006, plaintiffs offered a list of proposed additional search terms. (Ex. M, Letter from P. McDougall to J. Hein, dated Feb. 15, 2006.) Plaintiffs' six-

page list contained over 637 terms -- many of which were either unrelated to the case (including several expletives), or so generic in nature (such as the term "sell") that they would have yielded an enormous volume of non-responsive material. By letter dated March 1, 2006, Defendants advised plaintiffs that a search would not be done utilizing plaintiffs' February 15th list. (Ex. N, Letter from J. Hein to E. Comite and P. McDougall, dated Mar. 1, 2006.)

During an April 7, 2006 telephone conference with Defendants' counsel, plaintiffs' indicated that they would narrow their previous list of search terms to a list of 50 terms. Plaintiffs further indicated that they believed that the number of documents generated by a shortened proposed list would help inform plaintiffs' decision whether or not to pursue additional search terms or to further narrow the list. Following that conversation, on April 7, 2006, the plaintiffs provided a revised list of proposed additional search terms. (Ex. O, Letter from G. Johnson to J. Hein and B. Kelleher, dated April 7, 2006.)

After reviewing the revised list, Defendants informed plaintiffs by letters on April 11, 2006, and April 14, 2006, that the list continued to be overly broad. (Ex. P, Letter from R. Simonds to G. Johnson, dated April 11, 2006, and Ex. Q, Letter from R. Simonds to G. Johnson, dated April 14, 2006.) Defendants agreed, however, to use the list to run a search against the non-email portion of Priceline's snapshot and departed employee tapes, and report the number of documents retrieved by those terms ("hits") and the estimated page count of those documents to the plaintiffs.[3] Id. Defendants then stated that "[w]e then will communicate to you the resultant

---

[3] Defendants informed plaintiffs that this search would be done excluding the proposed terms "AG*", "WH*" and "Scal*" since they would target a large number of generic words that begin with the stated letters. For example, running a search for WH* (a search that is unable to distinguish between capital and lowercase letters) would retrieve all the documents containing such common words as "who", "what", "where", "why" etc. In addition, Defendants told plaintiffs that the term "skadden*" would not be included in the search either. As plaintiffs are

6

number of hits and pages that would be retrieved from that search. After we both have those figures, we then can discuss the need, if any, to narrow or expand your April 7th list before any review for responsiveness and privilege begins." (Ex. Q, Letter from R. Simonds to G. Johnson, dated April 14, 2006.)

On May 1, 2006, the Defendants informed the plaintiffs by email that their April 7th search term list generated about 360,000 document hits, with an estimated page count of over 5 million pages. Those figures were computed after excluding repetitive hits and excluding the documents already reviewed as part of Defendants' search using the November 8, 2005 initial search term list.

On May 2, 2006, the parties conducted a meet and confer. Defendants told plaintiffs that after already reviewing millions of pages of documents in this litigation and producing over 750,000, Defendants were not willing to review five million additional pages retrieved by a search term list that is so overly broad and fails to target responsive materials. In an attempt to compromise, however, Defendants offered three solutions.

First, Defendants offered, with the help of an outside vendor, to specifically review the April 7th list to identify which terms were obviously overbroad in their retrieval. For example, it is Defendants' understanding from our vendor that many terms on the list are so generic in nature that they are retrieving numerous documents because they target a document's underlying formatting or set-up features. Specifically, the term "margin" is retrieving numerous documents which simply contain a margin in their underlying formatting.

---

aware (Pls.' Fourth Mot. to Compel, 7 n.3), Skadden, Arps, Slate, Meagher & Flom LLP is counsel to Priceline and the term would inappropriately target privileged documents.

Second, we suggested that the parties agree on a workable number of terms that are relevant to the case to keep the document production moving forward.

Third, we suggested that we focus the search terms on retrieving certain types of files that are most likely to contain relevant materials -- files such as Word documents or Excel spreadsheets.

Plaintiffs refused to consider any of those proposed solutions. Plaintiffs continue to maintain that Defendants must review all 5 million pages that would be retrieved using the April 7th list; and they even indicated that they intend to add additional terms to the list in the future.

In an effort to move the process forward, Defendants told plaintiffs on May 2, 2006, that Defendants plan to select ten reasonable and relevant search terms from plaintiffs' April 7th list that appropriately will target responsive information. (Ex. R, Letter from R. Simonds to G. Johnson, dated May 2, 2006.) Defendants then will produce responsive, non-privileged materials retrieved using those terms on a rolling basis. Defendants are currently preparing that list of terms and will communicate it to plaintiffs as soon as it is finalized.

3. Back-up tapes.

On July 19, 2005, Defendants told plaintiffs that "[w]e do not believe that priceline's [back up tapes] contain any information that is relevant to this litigation." (Ex. S, Letter from J. Clasen to D. Scott et al., dated July 19, 2005.) Specifically, we explained that it was Defendants' understanding that the back up tapes that contained information not already captured on the snapshot relate to: "production database servers, which contain the raw

8

transactional information of customer bids and offers; [and] development servers, which contain quality-control and other 'test' data". Id.

On August 11, 2005, Defendants provided plaintiffs with the available information about the back up tapes, including photocopies of the labels on those tapes, some of which indicated the type and manufacturer of the tape, the dates of the tapes and the server(s) backed up. (Ex. E, Letter from J. Hein to P. McDougall, dated Aug. 11, 2005.) However, Defendants informed plaintiffs that our electronic vendor's preliminary efforts to restore the back up tapes were unsuccessful and further attempts at restoration would be costly and difficult, if even possible at all. Id.

In its December 8th Order, the Court stated that full restoration of the backup tapes may well be "a colossal waste of resources." (December 8th Order, 6.) "Before the court orders defendants to restore a backup tape, there must be some indication that the files stored on the backup tape may contain relevant information." Id. at 6-7. The Court further held it would not "compel restoration of the backup tapes, regardless of which party is going to pay for restoration, unless the effort is justified." Id. at 7.

On February 8, 2006, plaintiffs proposed that we send the 43 back up tapes to an electronic media company called eMag and instruct eMag to conduct a forensic scan of the tapes which, if successful, would generate an index or catalog of their contents. Plaintiffs agreed to pay one-half the costs associated with that process. Defendants accepted that proposal:

> "We are willing to agree to plaintiffs' proposal that eMag conduct a forensic scan of the contents of the 42 back-up tapes, with plaintiffs paying one-half of the costs associated with that process. We will hire eMag to conduct the forensic scan, consistent with the Court's directive that 'Defendants shall retain possession of the original data through the restoration, data management, and document review stages'. (Dec. 8 Order at 6.) Our agreement to use eMag is limited at this time to

9

the purpose of conducting a forensic scan of the 42 back-up tapes and is not an agreement to use eMag for any other purpose." (Ex. T, Letter from J. Hein to P. McDougall, dated Feb. 8, 2006.)

After not hearing from plaintiffs on the matter, Defendants followed up with a letter on February 28, 2006 stating that we were ready to have the tapes sent to plaintiffs' proposed vendor, eMag, but needed the name(s) of plaintiffs' contact at eMag. (Ex. U, Letter from J. Hein to P. McDougall, dated Feb. 28, 2006.) We also asked plaintiffs if they wanted us to have our electronic vendor try to access the tapes one last time prior to sending them to eMag. Id. On March 15, 2006, after still not hearing from plaintiffs, we sent another letter stating that based on plaintiffs' "statement of no position" on whether our vendor should try to access the tapes, we would now have the tapes sent to eMag based upon the conditions in our February 8th letter. (Ex. V, Letter from J. Hein to P. McDougall, dated Mar. 15, 2006.)

In early April, 2006, Defendants delivered 43 back-up tapes to eMag to conduct forensic scans of the tapes. eMag was able to produce indices for 40 of the 43 tapes and Defendants provided the logs of those scans to the plaintiffs on May 5, 2006. eMag was not able to scan and provide indices for 3 of the tapes without further work and expense due to non-standard backup formatting, and the plaintiffs have been so informed.

Based on Defendants' preliminary review of the logs with our electronic document consultant, it appears that the 40 tapes that were indexed contain irrelevant priceline database material of the kind we described to the plaintiffs in our July 19, 2005 letter. (Ex. S, Letter from J. Clasen to D. Scott et al., dated July 19, 2005 ("raw transactional information of customer bids and offers; [and] . . . quality-control and other 'test' data").)

At this time, none of the back-up tapes have been selected for restoration. It is Defendants' position that, based on the preliminary results of the forensic scans and the Court's

10

statement that "there must be some indication that the files stored on the backup tape may contain relevant information" (December 8th Order, 6-7), it is not necessary to restore and review the back up tapes at this time.

4. <u>Cost-shifting.</u>

Defendants continue to reserve their right to seek cost-shifting in connection with electronic discovery, as specifically permitted by the Court's December 8, 2006 Order.

Respectfully submitted,

DEFENDANTS PRICELINE.COM INC.,
N.J. NICHOLAS,
DANIEL SCHULMAN AND
RICHARD S. BRADDOCK


/s/  William J. Kelleher III
Joseph L. Clasen (ct04090)
William J. Kelleher III (ct22140)
ROBINSON & COLE, LLP
Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT 06904-2305
Telephone:  (203) 462-7500
Fax:  (203) 462-7599
jclasen@rc.com
wkelleher@rc.com


CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Fax:  (212) 474-3700

*Attorneys for Defendants
priceline.com Inc., N.J. Nicholas,
Daniel Schulman and Richard S. Braddock*

## CERTIFICATION

I hereby certify that the foregoing was filed with the Court and served on all counsel of record listed below via the ECF electronic court filing system this 10th day of May, 2006:

| **Co-Lead Counsel** | **Liaison Counsel** |
|---|---|
| David R. Scott, Esq.<br>Erin G. Comite, Esq.<br>James E. Miller, Esq.<br>Scott & Scott, LLC<br>108 Norwich Avenue<br>P.O. Box 192<br>Colchester, CT 06415<br>Tel: 860-537-3818<br>Fax: 860-537-4432<br><br>Jules Brody, Esq.<br>Aaron Brody, Esq.<br>Stull Stull & Brody<br>6 East 45th Street<br>New York, NY 10017<br>Tel: 212-687-7230<br>Fax: 212-490-2022<br><br>Dennis J. Johnson, Esq.<br>Jacob B. Perkinson, Esq.<br>Peter McDougall, Esq.<br>Johnson & Perkinson<br>1690 Williston Road<br>South Burlington, VT 05403<br>Tel: 802-862-0030<br>Fax: 802-862-0060 | Andrew M. Schatz, Esq.<br>Jeffrey S. Nobel, Esq.<br>Justin S. Kudler, Esq.<br>Schatz & Nobel, PC<br>One Corporate Center<br>20 Church Street, Suite 1700<br>Hartford, CT 06103-3202<br>Tel: 860-493-6292<br>Fax: 860-493-6290 |

| **Attorneys for priceline.com, Inc., Richard S. Braddock, Daniel H. Schulman and N.J. Nicholas, Jr.**<br><br>Evan R. Chesler, Esq.<br>Daniel Slifkin, Esq.<br>Robert K. Simonds, Esq.<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019<br>Tel: 212-474-1000<br>Fax: 212-474-3700 | **Attorneys for Defendant Jay S. Walker**<br>Thomas D. Goldberg, Esq. (ct04386)<br>Terence J. Gallagher, Esq. (ct22415)<br>Day, Berry & Howard LLP<br>One Canterbury Green<br>Stamford, CT 06901<br>Tel: 203-977-7300<br>Fax: 203-977-7301<br><br>Jeanne E. Irving, Esq.<br>Hennigan, Bennett & Dorman LLP<br>865 South Figueroa Street, Suite 2900<br>Los Angeles, CA 90017<br>Telephone: 213-694-1200<br>Fax: 213-694-1234 |
|---|---|

/s/ William J. Kelleher III
William J. Kelleher III