Page 41

FELIX LEISINGER

Q When I am talking about your family, I am talking about your three children and your wife.

A Yes, I think my wife was here as a student, as an architect student. Yes, she was in New York.

Q Do you know if any of them have ever used Priceline services, your three children and your wife?

A I don't know.

Q Have you ever discussed Priceline with any of them?

A No.

Q How did it come about that you decided to be a class representative?

A In the sense that -- that I understand that there are so many people who have lost money, that someone has to represent them, and I have the time.

Q How did you first hear about a potential to become a class representative?

MR. JOHNSON: I instruct you not to reveal any attorney-client communications in answering the question.

Page 42

FELIX LEISINGER

MR. CLASEN: I am just asking how he first heard about it.

A I -- I can't remember.

Q Did somebody call you, did you see something on the Internet, how did it happen?

A Specifically about being a class representative?

Q Yes.

A That -- that -- that word -- that expression actually has only just been proposed to me. I don't even know what it means.

Q Let me rephrase the question.

How did you first even hear about this lawsuit?

A I did not hear about the lawsuit, I -- I -- I was about -- in 2000, I was looking for lawyers to -- to -- to help recover the enormous losses we had made, and that is how it evolved.

Q How did it more specifically evolve? How did you come to these lawyers?

A I looked up -- I -- I -- to the best of my recollection, I looked on the Internet, and -- and I saw Scott & Scott being mentioned as specialists law firm for this type of situation.

Page 43

FELIX LEISINGER

Q Okay.

After you saw this on the Internet, did you call someone from Scott & Scott?

A My wife did, yes.

Q Who did she call; do you know?

A This -- I cannot remember, but I believe it was one of the senior people at Scott & Scott.

Q Did you then make any phone calls to anybody at Scott & Scott?

A I -- I may well have done -- we also faxed to Scott & Scott what -- what we knew.

Q What did you fax to them?

A Our viewpoint, how we saw this situation.

Q How did you -- how did you see the situation?

MR. JOHNSON: Objection. You asked what he faxed to the law firm, you asked additional questions to try to get at the contents of that fax. That is attorney-client communication.

MR. CLASEN: I am trying to figure out what the situation is. He mentioned before he had lots of problems with UBS.

MR. JOHNSON: I think that is a complete

Page 44

FELIX LEISINGER

mischaracterization of his testimony.

BY MR. CLASEN:

Q Let's go back, and we will get back to this question again, okay.

You mentioned before you had serious losses with UBS?

A I am sorry?

Q Serious losses that you incurred because of UBS' conduct?

MR. JOHNSON: Objection. That mischaracterizes the testimony.

Q You can answer the question.

MR. JOHNSON: Could you read back the question.

(Requested portion read back)

MR. JOHNSON: I object to the form of the question. I think it mischaracterizes his prior testimony.

MR. CLASEN: Unless you are going to instruct him not to answer.

BY MR. CLASEN:

Q Answer the question.

A I cannot remember now what I am supposed to answer.

Page 45

FELIX LEISINGER

Q Okay.

Is it your contention you suffered serious losses because of the conduct of UBS?

A Sorry?

MR. JOHNSON: I object to that also on the basis of foundation. I think there is a foundation problem there.

BY MR. CLASEN:

Q You said The Fund was destroyed; right?

A Yes.

Q Do you blame UBS for it?

MR. JOHNSON: I object to the form of the question.

A I don't know who to blame.

Q Do you believe that UBS did anything wrong in connection with the destruction of The Fund?

MR. JOHNSON: Objection. I object on the basis of foundation, and I also object to the form of the question.

BY MR. CLASEN:

Q Go ahead.

A Yes, of course.

Q What do you believe they did wrong?

Page 46

FELIX LEISINGER

MR. JOHNSON: Same objections.

A That, I will have to --

MR. JOHNSON: Same objections, and I am also going to instruct you not to reveal any attorney-client privilege information on that topic.

BY MR. CLASEN:

Q I am not asking what you told anybody, I am just asking what you believe UBS did wrong. Tell me what you believe UBS did wrong in connection with the destruction of The Fund.

MR. JOHNSON: I will assert the same objections and instructions, and I instruct you not to answer with respect to the extent that your beliefs or your opinions are informed by communications you have had with attorneys.

MR. CLASEN: Wait a second. He has opinions.

BY MR. CLASEN:

Q I am not going to ask you did they tell you this, or did they not tell you that or what you told them. I don't want to know what you told them and they told you.

You believed that they did something

Page 47

FELIX LEISINGER

wrong. I want to know what you believe what they did wrong. If you came to that conclusion because of what you read, or heard or whatever, that is not privileged.

MR. JOHNSON: I don't think you have established a foundation that he has any independent knowledge for that. His testimony has been that he basically didn't have any contact, right. So, you are infringing on attorney-client privileged material. You are trying to find out what he may have learned based upon communications with attorneys.

MR. CLASEN: He stated that UBS did something wrong. How do have a problem --

A The simple answer is from 12 million to --

MR. CLASEN: If you want to instruct him not to answer, instruct him not to answer if you want to object to the form.

MR. JOHNSON: I object to mischaracterizing his testimony.

MR. CLASEN: Just say objection to form. Let's not coach.

BY MR. CLASEN:

Page 48

FELIX LEISINGER

Q Do you believe UBS did anything wrong in connection with the destruction of The Fund?

A Yes.

Q What do you believe they did wrong?

A Running --

MR. JOHNSON: Objection. Same objections. I instruct you not to answer to the extent that it reveals attorney-client information, to the extent that you are revealing communications you had with attorneys.

THE WITNESS: It is not about communications, this is fact.

BY MR. CLASEN:

Q Tell me about it.

A The facts are that they run it from 12 million to $700,000. Any bank who advertises worldwide that they protect its clients must be in the wrong doing such a thing in such a short time.

Q Do you know specifically what they did wrong?

A No.

MR. JOHNSON: I object. Let me -- I will object on the basis of the form of the question, and I think there is a serious

Page 49

FELIX LEISINGER

foundation problem here.

And, again, I will instruct you not to answer to the extent that it reveals attorney-client privileged information.

BY MR. CLASEN:

Q Other than -- putting aside Priceline, did UBS do anything wrong?

MR. JOHNSON: Same objections. There is a foundation problem.

A That is a question that must be answered by legal people.

Q You yourself, do you have any problems with any investment that UBS did other than Priceline?

MR. JOHNSON: Same objections.

A I could not say because I am not a financial adviser.

Q How about Priceline, do you have any problems with their investment in Priceline?

MR. JOHNSON: Same objections.

A I couldn't say.

Q Does anybody -- other than the attorneys here representing you in this case, are you represented by any other lawyers in connection

Page 50

FELIX LEISINGER

with -- in connection with any dispute you have with UBS?

A No.

Q Other than Priceline, do any of these lawyers represent you in connection with any other disputes with UBS?

MR. JOHNSON: Could you read back the question.

(Requested portion read back)

BY MR. CLASEN:

Q Other than the Priceline dispute that we are here, do any of the lawyers that are here, do they represent you in connection with anything else regarding UBS?

A No.

Q Okay.

Do you have any lawyers anywhere in the world who represent you in connection with your dispute with UBS?

MR. JOHNSON: Objection to the form of that question. I think it mischaracterizes his testimony.

A When you say you, me?

Q I mean The Fund.

Page 51

FELIX LEISINGER

Actually, are there lawyers representing The Fund anywhere in the world in connection with your dispute?

A Yes, some lawyers --

MR. JOHNSON: Let me assert my objections. I object to the form of the question, I think it mischaracterizes his testimony.

BY MR. CLASEN:

Q Who are they?

THE WITNESS: Am I supposed to answer?

MR. JOHNSON: I don't think he answered.

MR. CLASEN: He said, yes, there were some lawyers.

BY MR. CLASEN:

Q Who were the lawyers?

A Swiss lawyers.

Q What are their names?

A Dr. Hunziter.

Q You said lawyers. Are there others besides --

A It is a law firm.

Q What is the name of his law firm?

A I don't know.

Q Where is it located?

Page 52

FELIX LEISINGER

A In Zurich.

Q When did you first contact them in connection with --

A I did not.

Q How did they come about to be your lawyer?

A My -- my son -- my son was advised to -- to -- to contact these people.

VIDEOGRAPHER: I need Mr. Leisinger to pull around some more.

MR. JOHNSON: And we have been going for an hour. Can we take a break?

MR. CLASEN: Let me ask a couple of more questions so I can move on to something else afterwards.

BY MR. CLASEN:

Q Do you remember when it was your son got involved with these lawyers?

A No.

Q Was it recently, the past year or two, or was it more than that?

A I couldn't say.

Q Is there a lawsuit of some sort in Switzerland against UBS?

Page 53

FELIX LEISINGER
A I don't think so.
Q Is there a lawsuit somewhere in the world between you, or your family or The Fund against UBS?
A I don't think so.
Q Other than this case, are you a party to any lawsuit?
A I am sorry?
Q A party involved in any lawsuit?
A No.
Q Have you ever been involved in a lawsuit?
A Yes.
Q When was -- how many lawsuits were you involved?
A I have been married three times.
Q Forget about the divorce stuff, okay.
I am sorry. Other than divorce, have you been involved in any other lawsuits at any other time?
A No.
MR. CLASEN: Do you want to take a break?
MR. JOHNSON: Let's take a break.

Page 54

FELIX LEISINGER
(Brief Recess)
VIDEOGRAPHER: Returning to the record at 11:23.
MR. CLASEN: Let me mark this as Leisinger 2, please.
(Leisinger Exhibit 2, a letter, marked for identification, as of this date.)
BY MR. CLASEN:
Q Let me show you, sir, what has been marked as Leisinger 2, an 87-page document.
Have you seen this before?
A Not in this form, no.
Q Have you seen it in some other form?
A I believe so.
Q Okay.
And can you tell us what it is, not in its current form, but in the form you saw it?
A It's a letter to Luqman, Arnold.
Q Is he the CEO of UBS?
A He must have been at that time, yes.
Q Who wrote this letter; do you know?
A I believe I did.
Q You wrote it?
A I believe so. I don't know.

Page 55

FELIX LEISINGER
Q Okay.
Do you know when you wrote it?
A Well, I am looking at the date of it, so that would be -- that would be the date.
Q That date being August 28, 2001?
A I presume so, yes.
Q Okay. You should certainly reread this if you have to.
Is everything that you have said in here true, at least what you believe to be true?
A I have to read it.
Q Read it.
MR. JOHNSON: I object to the question as being overbroad.
Go a head and read it.
BY MR. CLASEN:
Q And the question so, you understand when you are reading this, is everything in there, to the best of your knowledge, accurate? Was there anything you want to change now?
A I believe it is questions, and I don't think there would be any need to change these questions.
Q Well, you state, for example, 1C, for

Page 56

FELIX LEISINGER
example, you say, "Why did you officially and internally process an act upon this invalid and legally invalid account application?" At the time you wrote this, you must have believed that the account application was -- was invalid and legally invalid; is that correct?
A I couldn't answer. I don't know what it refers to.
Q When you say it refers to, this is something you wrote; is that right?
A I believe so, but -- but I cannot see my signature.
Maybe I didn't write it. I just noticed I cannot see my signature.
Q Pardon me. Do you know if you wrote it or not, this letter?
A It's a long time ago. I -- I believe I did.
Q You believe?
A But I can't be sure.
Q Let me direct your attention to the fourth page of this document.
A Sorry, which page?
Q Page 4.

Page 57

FELIX LEISINGER

A Page 4.

Q Paragraph No. 4, which reads, "Why were the clear and obvious illegalities not uncovered and the entire illegalities and invalidity of the purported account --"

A It is not Page 4. Page 4, I can't see that.

Q The pagination may be a little different. Paragraph numbered 4.

A Page 3?

Q Page 3, sorry.

A Yes.

Q Which reads, "Why were the clear and obvious illegalities not uncovered," it starts off with that.

What were these clear and obvious illegalities that you were referring to?

A I cannot say at this stage without -- without completely opening up the whole will and -- and rethinking what it is all about.

Q Well, take your time.

Do you have any idea what you were referring to there?

MR. JOHNSON: Just for the record, we

Page 58

FELIX LEISINGER

are going to object to the entire authenticity of this document.

A It appears to be referring to previous paragraphs.

Q Which paragraphs is it referring to?

A Probably 3 and others. All of them, probably.

Q Do you have a copy of this letter that you actually did write?

A If I did write it, I would have a copy somewhere, yes.

Q Okay.

Where would that be?

A Amongst my papers.

Q Where are your papers located?

A In London.

Q Okay.

Did you look for papers that were responsive to the document requests that were served upon you?

A For today?

Q For this case?

A No.

Q Okay.

Page 59

FELIX LEISINGER

What is in your papers that you refer to?

A At the time, I requested from UBS evidence in the form of contracts as to where their authority was to -- to carry out the various machinations that had destroyed The Fund.

Q What various machinations were you referring to?

A I believe what is now described in this letter.

Q Okay.

Did any of them have to do with the purchase of the Priceline stock?

A Not to my knowledge.

MR. JOHNSON: Objection to the form of the question and to the foundation.

BY MR. CLASEN:

Q Okay.

Take a look at Paragraph 16, if you could.

MS. GREEN COMITE: 16?

MR. CLASEN: 16.

BY MR. CLASEN:

Q The question reads, "Why did you clear

Page 60

FELIX LEISINGER

out, execute and transact illegal stock market transactions on the United States stock exchanges?"

What illegal stock market transactions are you referring to?

MR. JOHNSON: Objection to the form and foundation to the question.

A You have to ask UBS this.

Q Well, you accuse them of doing this. I am just trying to figure out what you meant when you said that.

MR. JOHNSON: Objection to the form and foundation of the question, and I think that mischaracterizes his testimony.

BY MR. CLASEN:

Q Go ahead.

A Whatever transactions were executed to destroy The Fund.

Q What transactions do you know of?

A None specifically.

Q Well, were any of the Priceline transactions part of what you are accusing them, this Paragraph 16?

A Well, now I know that they would have

Page 61

FELIX LEISINGER

been part of it, yes.

Q Okay.

Is it your contention that when UBS purchased the Priceline stock for The Fund, that constituted an illegal stock market transaction?

MR. JOHNSON: Objection to the form of the question, calls for a legal conclusion.

BY MR. CLASEN:

Q Go ahead.

A I obviously believed it, yes.

Q Okay.

Why do you believe it was illegal?

MR. JOHNSON: Same objections.

A Well --

MS. GREEN COMITE: You can answer it.

A Well, I understood from the documents which UBS provided, that -- that -- that they had no authority whatsoever, in fact, that they should not carry out any stock market transactions. For -- for a pension fund, which was a retirement fund, could only be invested and safe under Swiss law, I believe, on the bricks and mortar.

Q Did you get a response to this letter?

A No.

Page 62

FELIX LEISINGER

Q No response whatsoever?

A No.

Q How did it get on the Internet?

A I have no idea.

Q Did you put it on the Internet?

A No.

Q Okay.

A This is -- this -- this -- this is on the Internet?

Q Excuse me?

A I didn't know it was on the Internet.

MR. CLASEN: Mark this as Leisinger 3, please.

(Leisinger Exhibit 3, a letter, marked for identification, as of this date.)

BY MR. CLASEN:

Q Let me show you what has been marked as Leisinger 3.

I am going to direct your attention to the second page of this document. About the middle of the page, it starts, "Felix Leisinger, for and on behalf of the Leisinger Family Pension Fund." Do you see that?

A Yes.

Page 63

FELIX LEISINGER

Q After that, there appears to be a letter that goes on for -- for -- for -- that goes on for seven pages?

A Yes.

Q Do you see that?

A Yes.

Q Is this a letter that you wrote?

A I would say so, if it is given -- if it has my name.

MR. JOHNSON: Well, he is asking you whether you -- sitting here today, whether you know it is a letter. Don't assume.

A It helps to read it first to see if it is from me. If it is genuinely unaltered, if it has my name, it would be from me, yes.

Q Just read it to yourself to confirm that it is yours; okay?

A It would take me a long time to read it all.

MR. JOHNSON: Take as much time as you need to confirm that it is, in fact, your letter.

A This could well be from me and is most likely from me.

MR. JOHNSON: For the record, the

Page 64

FELIX LEISINGER

Plaintiffs object to the authenticity of this document.

BY MR. CLASEN:

Q Is that your letter?

A I would say so, yes, not having read every word of it, but -- but I think so, yes.

Q Look at the last page of the -- it should be on the Page 19 of 22 at the top. It appears to be signed by you, too?

A Yes.

Q Do you go by another name?

A My artist name, yes.

Q What is your artist name?

A Felix Van Xilef.

Q Now, how did you come to write this letter?

A I don't know.

Q Well, why did you write it?

A I don't know.

Q Did you believe it to be true at the time you wrote it?

A Of course.

Q Do you still believe everything in there to be true?

Page 65

FELIX LEISINGER

A Probably, yes.

MR. JOHNSON: I object to the form.

BY MR. CLASEN:

Q Do you have a copy of this letter somewhere in your file?

A I have not seen this letter since it was written.

Q Was it a hard copy when you wrote it, or was it always on the Internet?

A This would be a hard copy.

Q Do you know how it came to get on the Internet?

A No, I have never heard of USAJewish.com. I have no idea.

MR. CLASEN: Okay.

Let's do this as four.

(Leisinger Exhibit 4, document captioned "Plaintiff Leisinger Pension Fund's responses to the first set of interrogatories," marked for identification, as of this date.)

(Leisinger Exhibit 5, document captioned "Plaintiffs' responses and objections to Defendant's second set of interrogatories and requests for the production of documents," marked

Page 66

FELIX LEISINGER

for identification, as of this date.)

(Leisinger Exhibit 6, document captioned "Plaintiff Leisinger Pension Fund's first amended responses to Defendant's first set of interrogatories," marked for identification, as of this date.)

(Leisinger Exhibit 7, document captioned "Plaintiffs' first amended responses to Defendant's second set of interrogatories," marked for identification, as of this date.)

BY MR. CLASEN:

Q Let me show you a couple of exhibits. Exhibit 4 is -- I will identify them -- a document captioned "Plaintiff Leisinger Pension Fund's responses to the first set of interrogatories."

Leisinger 5 is captioned, "Plaintiffs' responses and objections to Defendant's second set of interrogatories and requests for the production of documents."

Leisinger 6 is a document captioned, "Plaintiff Leisinger Pension Fund's first amended responses to Defendant's first set of interrogatories."

And Leisinger 7 is captioned,

Page 67

FELIX LEISINGER

"Plaintiffs' first amended responses to Defendant's second set of interrogatories."

Okay. I will put them in front of you. Let's put 4 through 7 in front of you.

Let's start with 4.

MR. MULLIS: Which one is Exhibit 7? I am sorry.

(Requested portion read back)

BY MR. CLASEN:

Q Let's start with 4, first.

Working from the back, take a look at the fourth from the last page. On the top right, there is a "By" line, and underneath it is typed your name?

A Yes.

Q Is that your signature?

A Yes.

Q Take a look at No. 5. Again, working from the back, the fourth to the last page -- pardon me, the fifth to the last page, Page No. 10 at the bottom, there is a "By" and then a line with the name Felix Leisinger underneath. Is that your signature?

A Yes, yes.

Page 68

FELIX LEISINGER

Q Okay.

Take a look at Exhibit 6. If we could, working from the back, it is the fourth to the last page, there is a line that says "By," and there is the name Felix Leisinger, and there is a signature. Is that your signature?

A Yes, yes.

Q Okay.

And take a look at Exhibit 7. Working from the back of that one, again the fourth to the last page, there is another "By" and a line. Is that your signature?

A Yes.

Q One of the things I did notice, your signatures seemed to have changed.

A No.

Q In at least in appearance, it changed. Compare Exhibit 4 -- compare Exhibit 4, your signature, with Exhibit 7.

A No, there is a simple explanation. If I sign in the presence of someone who knows me, then I sign this signature, which you have in front of you now, which is -- which is illegible, but --

MS. GREEN COMITE: For the record, he is

FELIX LEISINGER

pointing to Exhibit 7, the signature on Exhibit 7.
BY MR. CLASEN:
Q So, Exhibit 7 was signed when you were in front of somebody who knows who you are?
A And Exhibit 4 is the signature when -- which -- which is legible, and so people know that I signed it.
Q I see.
A Because I have been followed over on many occasions. They say did you sign this because we can't read your signature.
Q You are kidding me, people can't read the signature on No. 7?
A You can.
Q Sure. Felix Leisinger, right.
Let's go to 4, if we could. Before you signed 4, did you read it?
A Yes.
Q Did you believe everything in 4 to be true before you signed it?
A I believe so. I cannot remember at this stage what it is all about, but --
Q Take a look at -- on Exhibit 4. Let's start with Page 6, response to Interrogatory No.

FELIX LEISINGER

3.
A Page 6.
Q Exhibit 4, Page 6 --
A Yes.
Q -- the response is "Subject --" go into it a little bit, it says, "Subject to and without waiving such objections as to (A) and (B), Plaintiff responds there is a little chart here which shows the number of shares purchased, the date bought and the price per share." Do you see that?
A Yes.
Q Okay.
How did you determine those dates?
A This was determined by the lawyers.
Q Yes?
A They're whatever documents they had.
Q Other than what the lawyers told you, do you know those to be true?
A No.
Q Okay. No?
A No.
Q Did you look at any documents to verify this information?

FELIX LEISINGER

A I don't think so, no.
Q Take a look at the next page. Actually, you have to read on Page 6, the bottom, Interrogatory No. 4. Just read that to yourself, if you could.
(Witness complies)
Q I will direct your attention on Page 7 to the response to No. 4 and just read that to yourself.
(Witness complies)
Q Now, approximately, it says, "Subject to and without waiving such objections, Plaintiff responds that (A) the securities listed in 3A above --" that is the chart we just looked at -- "were purchased because the market price of Priceline.com securities at the time was attractive in light of the information known about Priceline.com at that time and because analysts' reports highly touted the stock."
Do you see that?
A (No Response)
Q Is that why the Priceline stock was bought?
MR. JOHNSON: Objection to form and

FELIX LEISINGER

foundation.
A I presume.
Q Do you know why it was bought?
A No, I don't know.
Q And other than what your lawyers told you, did anybody tell you that is why this stock was bought?
A No.
Q Okay.
You testified before that you don't know why the stock was bought; is that right?
A That is right.
Q Take a look at Exhibit 5.
I direct your attention to Page 8. Could you read Interrogatory No. 5 to yourself and then read the response to Interrogatory No. 5 to yourself.
(Witness complies)
Q You have read both of those to yourself?
A (No Response)
Q Remember?
A Yes.
Q Reading from the response to Interrogatory No. 5, skipping to the second

Page 73

FELIX LEISINGER

sentence, it says, "Subject to and without waiving such objections, Plaintiff states that Felix Leisinger is the person responsible for the management of the Leisinger Pension Fund," and it goes on.

Were you the person responsible for the management of the Leisinger Pension Fund?

A As I now understand it, no.
Q Who was?
A The bank.
Q UBS?
A Yes.
Q It refers to the Leisinger Pension Fund as a family investment vehicle. Was it a family investment vehicle?
A Yes, you could say that.
Q Okay.

What is a family investment vehicle, as you understood it?

A It is where you pool the family savings to provide for rainy days, retirement and education, and -- and unforeseen emergencies, medical, dental, that kind of thing.
Q It goes on, it says that "The Fund was

Page 74

FELIX LEISINGER

established for the benefit of Felix Leisinger's three children." Do you see that?

A Yes.
Q That is true; right?
A Yes.
Q But that is not the only people it was established for the benefit of; right?
A Yes.
Q Also you and your wife?
A Yes.
Q Let's take a look at Exhibit 6, if you could.

You have to -- you have to -- I direct your attention to go to the -- on the first page is Interrogatory No. 2 and then a response -- amended response on the first page, pardon me.

The first page of Exhibit 6, Interrogatory No. 2, and then there is the amended response to Interrogatory No. 2. Could you read those to yourself, please.

Tell me when you have done that.

(Witness complies)

A Yes, I have.
Q Okay.

Page 75

FELIX LEISINGER

The amended response to No. 2 says, "Felix Leisinger --" starting at the last four words at the first page, "Felix Leisinger had proxy over the Leisinger Pension Fund during the class period." What -- what does that mean, you had proxy over the pension fund?

A Signature.
Q You had signature authority?
A Yes.
Q For The Fund?
A Yes.
Q To sign what?
A I don't know.
Q Other than having the right to sign things, what else as proxy did you have the power to do?
A None other than sign on behalf of The Fund.
Q Sign what?
A I honestly -- I don't know.
Q Was anyone else a proxy for The Fund?
A No.
Q Were you a proxy for The Fund the whole time that The Fund was in existence?

Page 76

FELIX LEISINGER

A I believe so.
Q Go back, if you could, to Exhibit 4. Take a look at Page 5.

Just so you know, Exhibit 6 is an amended response to Exhibit 4. One of the answers that you changed was the answer to Interrogatory No. 2.

In the original answer, you have stated -- remember you signed these -- "Felix Leisinger, the Settler and Trustee of the Leisinger Pension Fund." Do you see that?

A Yes, yes.
Q First of all, were you the settler of The Fund?
A I do not know what settler means. I presume it is a legal term of no importance. Settler means nothing to me.
Q How about trustee, were you a trustee of The Fund?
A When I saw that, I immediately corrected it.
Q When you say you immediately corrected it, you signed it with the word trustee being in it?

FELIX LEISINGER

A I think it was by way of faxed communications between London and the States, and I probably signed it before I read it. But once I had read it, I corrected it and said -- I just noticed that, that it -- you wrote trustee, which I have never been, and I wouldn't even know what it is, and the reason, in any case, there are no trust funds in Switzerland.

Q If you go back to No. 6 for a second, in the amended response to Interrogatory No. 3, in C, which is on Page 2, you now state, "The securities," and that is referring to the -- to the Priceline securities -- "were purchased" -- I take it there is a typo, it should be "for investment purposes"?

A I don't know.

Q But you don't know why they were purchased; right?

A No.

Q So, the source for this information is not you; right?

A No.

Q Other than your lawyers, is the source of this information anything else?

FELIX LEISINGER

A No.

Q Let's look at Exhibit No. 7.

In this Exhibit No. 7, you have amended just the response to one question, No. 5. You have now said that the -- that the UBS managed the Leisinger Pension Fund; right?

A Yes.

Q It is now referred to as a family pension fund for The Leisinger Family for the purpose of providing retirement and education expenses funds; right?

A Yes.

Q Whose education expense funds?

A The children.

Q They still have education or --

A Not now. Now there are grandchildren.

Q Okay.

Did the grandchildren get anything out of The Fund?

A No, they -- no, they weren't born at that time.

Q The only beneficiaries were your three children, your wife and yourself?

A Yes. Yes, but it was understood that

FELIX LEISINGER

eventually there would be new family members in the form of children of children.

Q How many grandchildren do you have, by the way?

A Five.

Q Okay.

You mentioned before you saw something on the Internet, do you remember when that was, about this lawsuit from Scott & Scott?

A It would have been after the whole thing unraveled.

Q What was the first contact that you or your wife had from anyone from the law firm representing --

A It -- it -- probably at the end of 2000, early 2001.

Q Prior to today, how many times have you spoken on the telephone or in person with any of the lawyers representing you?

A Not at all.

Q Okay.

Prior to today, you have never spoken in person, face-to-face or by telephone with any of these people or any of the other members of their

FELIX LEISINGER

firms?

A Sorry, I am not clear about your question.

Q What I am asking you, I am asking a very generic question here -- I will break it up.

Have you had any telephone conversations with any of these lawyers prior to today?

A Yes.

Q Okay.

Which ones?

A Erin.

Q Right.

Anybody else?

A No.

Q Okay.

How many times have you spoken to Erin on the phone?

A A dozen times.

Q Okay.

Do you remember when?

A Over the last year or so.

Q Okay.

Other than Erin, you have spoken to none of the other lawyers on the telephone?

Page 81

FELIX LEISINGER

A Before that, yes.
Q Okay.
Which lawyers did you speak to on the telephone?
A David Scott, Jim Miller.
Q Okay.
Anybody else?
A No.
Q Have you had any face-to-face meetings with any of these lawyers prior to today?
A When you say "these lawyers," do you mean the specific --
Q Starting with the three on this side, and then we will do the other lawyers.
A Okay.
Yes, over the last couple of days.
Q Okay.
Prior to the last couple of days, had you met any of these three lawyers?
A No.
Q How about the other lawyers representing you, David Scott, Jim Miller, any of the other people, had you ever met them before?
A Yes.

Page 82

FELIX LEISINGER

Q How many times have you met them?
A Twice.
Q When were those meetings?
A Meeting in Zurich, possibly 2000 or early 2001.
Q Right?
A And a meeting in London recently.
Q Okay.
Have you provided any documents to any of the attorneys in this case, including David or any of these people?
A I believe so.
Q What documents?
A Whatever my wife found.
Q Did you look for the documents, or did your wife look?
A My wife did.
Q Did you look at what she was producing?
A No.
Q Do you know what she produced?
A I have an approximate idea.
Q What is your approximate date as to what she produced?
A Stacks of paper.

Page 83

FELIX LEISINGER

Q What were in these stacks of paper, if you know?
A All sorts of stuff which UBS had faxed.
Q What else?
A I think that is all.
Q Do you know where your wife looked to get these documents?
A I can add here that there are also stacks of envelopes which were obtained by UBS unopened envelopes which they kept in Zurich.
Q Okay.
And where are those? Are they still in your house?
A No, no. They are with lawyers.
Q Okay.
Do you know if your wife looked at those documents that were given to the lawyers in order to --
A No.
Q Okay.
So, some documents you had regarding at least UBS are with your lawyers in Zurich; is that correct?
A Since then, some of those documents have

Page 84

FELIX LEISINGER

gone to those lawyers.
Q What do you mean by "since then"? When is the since then?
A Since the early contact with Scott & Scott.
Q Did you talk to any of the Zurich lawyers and ask them if they had any documents that were responsive to the document request?
A No.
MR. JOHNSON: Objection. I think that infringes on attorney-client privilege.
MR. CLASEN: To ask him if they have documents? What is the privilege?
MR. JOHNSON: You are going into communications between him and --
MR. CLASEN: Every communication you had is not privileged. If he asked you if there is a good restaurant in New York, that is not privileged.
MR. JOHNSON: And it is confidential if it has a bearing on the case. You can ask if they searched.
BY MR. CLASEN:
Q Did you ask them if they had any

LEGALINK MANHATTAN
800-325-3376 www.legalink.com

FELIX LEISINGER

documents?

A I never spoke to them.

MR. MULLIS: I am sorry, you made this objection, so I take it it is your position that we can't make any inquiry as to what third parties he may have asked?

MR. JOHNSON: He just did. I think this issue has been --

MR. CLASEN: I am not going to ask what they said. We made the inquiry. Let me --

MR. JOHNSON: My objection is with the phrasing of the question. I think you could have asked has he inquired of third parties, not did you talk to your lawyers about X, Y and Z. Those are very different questions.

BY MR. CLASEN:

Q Did you attempt to obtain documents from your attorneys in Zurich that were responsive to the Defendant's document request in this case?

A No.

Q Do you know if your wife did?

A No.

Q Do you know what documents they have?

A No.

FELIX LEISINGER

Q You know they have some documents; right?

A Yes.

Q Some of these documents are these envelopes that you got from UBS that you never opened; right?

A Yes.

Q Obviously, since you didn't open them, you don't know what they have in them; is that right?

A That is right.

Q Okay.

And other than what you told us, you don't know what documents your wife sent to the attorneys; right?

A No.

Q You don't know where she looked; right?

A No.

Q And you yourself never looked for any of them?

A No.

Q Correct?

A Yes.

Q Correct, right.

FELIX LEISINGER

Did you obtain documents from the lawyers representing them, all of the lawyers, not just in this room?

A No.

Q You must have seen drafts of these four documents that you signed; right?

A Yes. I have seen them, yes.

Q What else have you received from them?

A I don't know.

Q Do you have a file where you keep all of this stuff?

A Yes.

Q Did your wife look at that file to decide what to produce?

A Yes, yes.

Q How do you know that?

A The file is -- is -- is -- can be seen wherever -- wherever I go.

Q Do you have a copy of the Complaint?

A Yes.

Q How many Complaints have there been in this case; do you know?

A I think one Complaint.

Q What do you know that has transpired in

FELIX LEISINGER

this case?

A That -- that the -- the -- well, that Priceline did wrong.

Q No. Procedurally, what has happened in this case; do you know?

A Procedurally, that -- that the court dismissed the dismissal, so to speak.

Q When did you learn that?

A From -- from recently from -- from the lawyers.

Q What else do you know has happened in this case?

A That Deloitte something had been granted dismissal or something like that.

Q When did you learn that?

A Also recently from the lawyers.

Q Anything else you know?

A Yes. That -- that Priceline booked 188 million of WebHouse assets when -- when -- when that -- when it wasn't -- that wasn't the right thing to do.

Q When did you learn this?

A When I looked at the Complaint at the time.