Page 89

FELIX LEISINGER

1          FELIX LEISINGER
2  Q  When did you look at the Complaint?
3  A  Whenever I got it.
4  Q  Do you remember, approximately, when
5 that was?
6  A  No.
7  Q  Was it this year?
8  A  I really couldn't say.  This year is
9 already gone so fast.
10  Q  Was it last year when you first saw the
11 Complaint?
12  A  It could well be.  I couldn't say.
13  Q  You think you looked at one Complaint;
14 right?
15  A  I think so, yes.
16  Q  What else do you know has happened in
17 this case?
18  A  That it is active.
19  Q  Who are the Defendants?  Do you know who
20 the Defendants are?
21  A  Priceline, Mr. Walker, Mr. Braddock and
22 I think some other gentlemen.
23  Q  Other than what your lawyers have told
24 you, do you have any idea who these people are?
25  A  No, no.

Page 90

1          FELIX LEISINGER
2  Q  Do you have any idea what they may have
3 done wrong other than what your lawyers have told
4 you?
5  A  No, no.
6  Q  Do you have any idea what the claims are
7 against these people and the entity?
8  A  No.
9  Q  What do you understand the obligation of
10 The Fund as one of the class reps to be?
11  A  To represent all of the victims of this.
12  Q  What do you have to do?
13  A  To be actively involved as -- as and
14 when my lawyers request it.
15  Q  What do you mean by actively involved?
16  A  Well, like coming here and making a
17 deposition.
18  Q  Anything else that you think constitutes
19 active involvement?
20  A  Yes.  It could lead ultimately to court
21 appearances as a witness, yes.
22  Q  What else do you understand, if anything
23 else?
24  A  I think is all I can say.
25  Q  Showing up for something like today and

Page 91

1          FELIX LEISINGER
2 showing up for court appearances is what you think
3 the duties of a court rep is?
4  A  Yes, on behalf of anyone.
5  Q  Do you understand that you may be liable
6 for any money in this case?
7  A  No.
8  Q  Do you have any understanding whether
9 you may have to pay for some costs --
10  A  No.
11  Q  -- incurred by the lawyers?
12  A  I believe costs will ultimately be
13 reimbursed.
14  Q  If the Plaintiff losses in this case, do
15 you have any understanding that you may have to
16 pay some costs?
17  A  Not really, no.
18  Q  Any understanding one way or another?
19  A  Not 100 percent.
20  Q  What understanding do you have as to
21 your potential liability for costs?
22  A  My understanding, that my expenses will
23 be taken care of in direct relation to the class.
24  Q  Who paid for you to come over today?
25  A  Scott & Scott.

Page 92

1          FELIX LEISINGER
2  Q  Scott & Scott, okay.
3  MR. JOHNSON:  I don't want to interrupt
4 your questioning.  We have been going for an hour
5 and 15 minutes.  Can we take another break?
6  MR. CLASEN:  Sure.
7  MR. JOHNSON:  When are you going to
8 break for lunch?
9  MR. CLASEN:  Let's just keep going,
10 maybe we can finish.  What do you think?
11  THE WITNESS:  I am fine.
12  MR. JOHNSON:  I would probably prefer to
13 take lunch.
14  MR. CLASEN:  Let's talk for a few
15 minutes, and either we will break now or decide to
16 go for lunch.
17  Does that work for you?
18  THE REPORTER:  Fine.
19  VIDEOGRAPHER:  Going off the record at
20 12:10.
21  (Brief Recess)
22  VIDEOGRAPHER:  Returning to the record
23 at 12:23, and this will mark the beginning of Tape
24 No. 2.
25 BY MR. CLASEN:

Page 93

FELIX LEISINGER

1
2    Q    Mr. Leisinger, do you know if there is
3  any other proposed class representatives?
4    A    Yes.
5    Q    Who do you know to be a proposed class
6  representative?
7    A    I -- I -- I remember Mr. Weiss,
8  W-E-I-S-S, and a Mrs. Agel, A-G-E-L, Mr. Andersen,
9  a couple of other people whose names escape me
10  just now.
11    Q    Have you ever been in any communications
12  with the other proposed class representatives?
13    A    No.
14    Q    Okay.
15         By communications, I mean you never
16  spoke to them, wrote them letters or anything
17  else?
18    A    No.
19    Q    How do you know there are other proposed
20  class representatives?
21    A    Because my lawyers have told me.
22         MR. CLASEN:  Okay. I don't have any
23  further questions at this time. Thanks a lot.
24         THE WITNESS:  Thank you.
25         MR. CLASEN:  I will turn it over to my

Page 94

FELIX LEISINGER

1
2  associate, Carl.
3         EXAMINATION BY MR. MULLIS:
4    Q    My name is Carl Mullis. I am an
5  attorney with Paul Williams, and I represent
6  Mr. Jay Walker in this litigation, sir.
7         Okay. If at any time -- I am sitting
8  back further because there are too many people.
9  If you cannot hear what I say, I am not speaking
10  loud enough or my Southern accent is a little
11  much, simply say so, and I will repeat the
12  question for you; all right?
13    A    Yes, thank you.
14    Q    Do you know Mr. Jay Walker?
15    A    No.
16    Q    You have never met Mr. Walker; have you,
17  sir?
18    A    No.
19    Q    You have never talked to Mr. Walker;
20  have you, sir?
21    A    No.
22    Q    You have never relied on any statements
23  that Mr. Walker has made to purchase Priceline
24  stock; have you?
25    A    No.

Page 95

FELIX LEISINGER

1
2    Q    In fact, you never personally have
3  purchased Priceline stock; have you, sir?
4    A    That is correct.
5    Q    Have you read any statements by
6  Mr. Walker concerning Priceline stock?
7    A    No.
8    Q    Have you read any articles or reports
9  that quoted any statements by Mr. Walker
10  concerning the Priceline stock?
11    A    No.
12    Q    Why are you here today?
13    A    Because I have been asked to make a
14  deposition.
15    Q    Who asked you to make that deposition?
16    A    My lawyers.
17    Q    Okay.
18         So, your lawyers told you to come here
19  today; didn't they?
20    A    (No Response)
21    Q    In what position are you here today for?
22    A    To represent all of the other -- all of
23  the members of -- class members.
24    Q    Okay.
25         So, are you appearing here today

Page 96

FELIX LEISINGER

1
2  personally for yourself, as a representative
3  yourself?
4    A    As well?
5    Q    As well?
6    A    As the other class members.
7    Q    Do you understand yourself to be a
8  personal class representative in this litigation?
9    A    Yes, for -- for our pension fund and for
10  all of the other class members who have lost
11  money.
12    Q    Are you appearing here today to be
13  personally a class representative?
14         MR. JOHNSON:  Objection, asked and
15  answered.
16    A    I don't really quite understand what --
17  what the question means, what -- what -- what -- I
18  don't know.
19    Q    I am sorry, go ahead and complete your
20  answer, sir.
21    A    I -- I know that I am making a
22  deposition on behalf of our pension fund and all
23  of the other class representatives, class victims.
24    Q    My understanding from your earlier
25  testimony is that the Leisinger Pension Fund

24 (Pages 93 to 96)

Page 97

FELIX LEISINGER

1
2  ceased to exist in 2001; is that correct?
3      A   As far as the bank is concerned, yes.
4      Q   Well, how did it cease to exist?
5      A   It was formulated by the bank, and it
6  was destroyed by the bank.
7      Q   So, it doesn't exist anymore; isn't that
8  correct, sir?
9      A   So, it does not exist anymore as far as
10  the bank is concerned, but as far as we are
11  concerned, it should still be existing, and it
12  should be resurrected as soon as possible.
13      Q   That means that it doesn't exist today;
14  is that correct?
15      A   I think it is a legal question which I
16  cannot really answer.  It needs counsel to answer
17  this.
18      Q   You cannot tell me today whether it
19  exists or --
20      A   As far as I am concerned, it should
21  exist, but what is the point of having a fund if
22  there is no money in it.  So, that is the problem.
23      Q   But your understanding is that the bank
24  ceased its existence?
25      A   Yes.

Page 98

FELIX LEISINGER

1
2      MR. JOHNSON:  Objection.  I object to
3  the form of the question, asked and answered.
4      A   Yes, because lack of money.
5      Q   Is there any money in The Fund right
6  now?
7      A   No.
8      Q   All of the assets of The Fund have been
9  distributed to the beneficiaries of The Fund; is
10  that correct?
11      A   Yes.
12      Q   Does The Fund file any legal reports
13  today?
14      A   No.
15      Q   Are you aware of The Fund ever filing
16  any reports to any kind of governmental authority
17  in Switzerland concerning its existence?
18      A   No.
19      Q   Can you tell me where The Fund was
20  incorporated?
21      A   No.
22      Q   As The Fund's class rep, you cannot tell
23  if The Fund exists today, where it is
24  incorporated; correct?
25      MR. JOHNSON:  Objection to the form.

Page 99

FELIX LEISINGER

1
2      A   Sorry, could you say --
3      Q   Could you tell me today where The Fund
4  is incorporated?
5      A   No where.
6      MR. JOHNSON:  Objection to the form.
7  BY MR. MULLIS:
8      Q   No where, all right.
9      Could you tell me any country that today
10  recognizes The Fund as continuing in existence?
11      A   No.
12      Q   Can you tell me any governmental
13  authority that recognizes that The Fund continues
14  to exist?
15      A   No.
16      Q   Does anyone run The Fund today?
17      A   No.
18      Q   Did anyone on The Fund's behalf say that
19  you could represent The Fund in this class action?
20      A   No.
21      Q   Do you have any authorization from The
22  Fund to be the representative for The Fund in this
23  class action?
24      MR. JOHNSON:  Objection to the form of
25  the question.

Page 100

FELIX LEISINGER

1
2      MS. GREEN COMITE:  You can answer.
3      A   There is no money, so nobody is
4  particularly interested.
5      Q   I am sorry, sir, that wasn't quite
6  responsive to my question.
7      MR. MULLIS:  Would you read back the
8  question for him, please.
9      (Requested portion read back)
10      MR. JOHNSON:  Same objection.
11      A   As I had a proxy for The Fund with the
12  bank, that kind of proxy extends into the present
13  situation, yes, in that like I am, as a class
14  representative, represent all of the victims.
15  That naturally includes The Fund.
16      Q   You are just assuming that, sir?
17      A   Yes.
18      Q   Okay.
19      Can you -- let me rephrase the question.
20      You got this proxy from the bank; is
21  that correct?
22      A   Yes.
23      Q   And just what did that proxy authorize
24  you to do?
25      A   To sign on behalf of The Fund, and in

25 (Pages 97 to 100)

Page 101

FELIX LEISINGER

1  that context, obviously represent The Fund.
3    Q   To sign what on behalf of The Fund?
4    A   Well, whatever might arise.
5    Q   I am sorry, sir?
6    A   Whatever might arise.
7    Q   Do you have any sort of paper that
8  authorizes you to have a proxy for The Fund?
9    A   No.
10    Q   So, you don't have any written record
11  that shows that you have proxy authority for The
12  Fund, whatever proxy authority means?
13    A   I -- I -- I don't know, no.
14    Q   Did the bank say that after it dissolved
15  The Fund, that you could continue to have proxy
16  for this nonexistent Fund?
17        MR. JOHNSON: Objection to the form of
18  the question, assumes facts not in evidence.
19    A   The bank said nothing.
20    Q   And -- and you don't have any kind of
21  record that shows what authority you have on
22  behalf of The Fund; is that correct?
23    A   Yes.
24    Q   When you had proxy authority for The
25  Fund, did that mean that you could tell UBS to

Page 102

FELIX LEISINGER

2  cease operating The Fund?
3    A   Sorry, I have to listen to this again.
4    Q   When you had proxy authority for The
5  Fund, did that give you authority to tell UBS to
6  cease being the trustee for The Fund?
7    A   No.
8    Q   Well, what authority did that proxy
9  authority give to you, sir, when you had it?
10    A   I believe it was a legal requirement
11  that there was someone who had a signature and who
12  was named as a proxy.
13    Q   A signature to do what, sir?
14    A   That, I do not know, but -- but there
15  was somebody who -- who had -- who had whatever
16  authority might be required at any time, for
17  whatever purpose.
18    Q   So, you don't know what authority having
19  a proxy gives to you; is that correct?
20        MR. JOHNSON: Objection to the form of
21  the question.
22    A   In principle, that is correct, yes.
23    Q   And -- and that proxy authority didn't
24  allow you to make any kind of legal agreements on
25  behalf of The Fund; did it, sir?

Page 103

FELIX LEISINGER

2        MR. JOHNSON: Objection to the form of
3  the question.
4    A   I wouldn't have thought so, no.
5    Q   All right.
6        And did that proxy authority allow you
7  to bring a lawsuit on behalf of The Fund?
8        MR. JOHNSON: Objection, form of the
9  question.
10    A   That is a legal question which counsel
11  would have to answer. I wouldn't know.
12    Q   Well, just what did you do with your
13  proxy authority? What did you sign while you had
14  the proxy authority for The Fund, sir?
15    A   I cannot remember, but -- but I don't
16  know, I don't think I ever signed anything, but I
17  may have done.
18    Q   Right now, you can't recall --
19    A   No.
20    Q   -- doing anything as proxy for The Fund;
21  is that correct?
22    A   No, no.
23        MR. JOHNSON: I object to the form of
24  the question, asked and answered.
25  BY MR. MULLIS:

Page 104

FELIX LEISINGER

2    Q   Do you have any documentation that shows
3  the existence of The Fund?
4    A   No.
5    Q   Do you have any documentation that shows
6  your authority as proxy for The Fund?
7    A   No.
8    Q   Do you have any documentation that shows
9  that you actually had a proxy for The Fund?
10    A   No.
11    Q   Do you have any documentation that shows
12  what it means to have proxy authority for The
13  Fund?
14    A   No.
15    Q   And as a class rep for The Fund here
16  today, you can't tell us what that authority was;
17  could you, sir?
18        MR. JOHNSON: Objection to the form of
19  the question.
20    A   Other than what I have said, that I --
21  that I am the -- the representative of The Fund,
22  and it was my children, so -- so it was natural
23  that I would be the proxy.
24    Q   But you don't know what being a proxy
25  is; do you?

26 (Pages 101 to 104)

Page 105

FELIX LEISINGER

1
2    A    Yes.
3         MR. JOHNSON:  Objection to the form of
4  the question.
5  BY MR. MULLIS:
6    Q    Is that correct?
7    A    I do know.  It means having a signature.
8    Q    But you don't know what all that having
9  a signature means; do you, sir?
10        MR. JOHNSON:  Objection to the form.
11   A    It does mean that you can sign something
12  on behalf of The Fund.
13   Q    Sign what on behalf of The Fund?
14        MR. JOHNSON:  Objection, asked and
15  answered.
16   A    Whatever may arise.
17   Q    But you don't have any documentation of
18  that?
19        MR. JOHNSON:  Objection, asked and
20  answered.
21   A    I think that is a specialty of the Swiss
22  banks which you do not query at the time.
23   Q    I am sorry, sir?
24   A    Which you do not query because you trust
25  them.

Page 106

FELIX LEISINGER

1
2    Q    So, you don't ask the Swiss banks what
3  authority you had; is that right?
4         MR. JOHNSON:  Objection to the form.
5    A    You just trust them, every day arrange
6  things that it will be to your -- to your benefit
7  and to your -- to your advantage as a client.
8    Q    Just like you trusted them to make all
9  of the investments on behalf of The Fund; isn't
10  that correct?
11   A    Yes.
12   Q    And just like you trusted them to
13  dissolve The Fund when the appropriate time was?
14   A    No.
15   Q    Right?
16   A    No.  No, that is when it came to -- to
17  kind of a realization that you can't trust them in
18  everything.
19   Q    After --
20        MR. JOHNSON:  I object to that last
21  question that he just asked on the form of the
22  question.
23  BY MR. MULLIS:
24   Q    You didn't trust them after they
25  dissolved The Fund; did you, sir?

Page 107

FELIX LEISINGER

1
2         MR. JOHNSON:  I object to that question.
3    A    Yes.
4    Q    You said your grandchildren are
5  beneficiaries of The Fund?
6    A    Yes.
7    Q    Do you have that in writing?  Do you
8  have any documentation that shows that your
9  grandchildren are the beneficiaries of The Fund?
10   A    No.
11   Q    You indicated you hadn't seen Leisinger
12  Exhibit 1 before; is that correct, sir?
13   A    Yes.
14   Q    So, before today, you had never seen
15  that?
16   A    Yes.
17   Q    Leisinger No. 1?
18   A    I have not, no.
19   Q    Do you know how we got Leisinger Exhibit
20  1?
21   A    No.
22   Q    Do you know how your attorneys got
23  Leisinger Exhibit 1?
24   A    No.
25   Q    You see down on Leisinger Exhibit 1, the

Page 108

FELIX LEISINGER

1
2  first page says LPF00037, and then there are Bates
3  Numbers all the way through LPF00046?  Do you see
4  that, sir?
5    A    Yes.
6    Q    Do you know what that is for?
7    A    No.
8    Q    Well, that indicates that was presented
9  to us -- produced to us by your attorneys, but you
10  don't know how they got copies of this; is that
11  correct?
12   A    I don't know.
13   Q    Do you know when copies -- I take it,
14  then, you don't know when copies of this were
15  produced to your attorneys; do you, sir?
16   A    That is right, I don't know.
17   Q    Have you given any documents to your
18  attorneys to be produced in this lawsuit?
19   A    I believe so.
20   Q    What documents have you given to your
21  attorneys?
22   A    I don't know.
23   Q    You can't recall?
24   A    No, I didn't personally give it to them.
25   Q    So, your wife is the one that gave it to

27 (Pages 105 to 108)

Page 109

FELIX LEISINGER

1
2  them?
3      A   Yes.
4      Q   Did you talk to your wife about what
5  documents she gathered up?
6      A   No.
7      Q   Did you show her where to look for
8  documents?
9      A   No.
10     Q   So, as a class rep, you didn't have any
11  involvement in getting the documents for Leisinger
12  Pension Fund to be produced; is that correct, sir?
13         MR. JOHNSON:  Objection,
14  mischaracterizes his testimony.
15     A   Not in that sense, no.
16     Q   You said you have been here twice in the
17  U.S. I may have misheard the testimony.  When was
18  the first time you were here?
19     A   In January.
20     Q   Why were you here in January?
21     A   On a private visit.
22     Q   What kind of private visit?
23     A   We went to see people in -- around
24  Chicago.
25     Q   Did it have anything to do with this

Page 110

FELIX LEISINGER

1
2  litigation?
3      A   No.
4      Q   Is that the second visit you had had
5  here in this country this year, or have you been
6  here more than just two times?
7      A   No.
8      Q   Just two times?
9      A   Two times.
10     Q   Okay.  Would you look at Leisinger
11  Exhibit No. 2, please, sir.
12         What is 46 St. Peters Crescent
13  Bexhill-on-Sea, East Sussex, TN40 2EJ England?
14  What is that address?
15     A   My wife's parents.
16     Q   Your wife's parents?
17     A   Yes.
18     Q   What is Calle Hungria 24, Urb. La
19  Cantera, 29600 Marbella, Spain?
20     A   A holiday villa in Marbella, Spain.
21     Q   What association do you have with that
22  holiday villa?
23     A   I can go there when I want to.
24     Q   You can go there, so it is a villa that
25  you frequent, then?

Page 111

FELIX LEISINGER

1
2      A   Yes.
3      Q   Do you own it, or any of your relatives
4  own it?
5      A   No.
6      Q   How are you able to go there when you
7  want to?
8      A   It is an arrangement.
9      Q   With another party?
10     A   Yes.
11     Q   Were you there at the time that you
12  wrote this questionnaire?
13         MR. JOHNSON:  Objection to the form of
14  the question.
15     A   When that was written?
16     Q   Yes.
17     A   I couldn't say.
18     Q   During the -- in August the 28th, 2001,
19  were one of these two locations would have been
20  where you would have been on that date?
21     A   I couldn't have been at both at the same
22  time.
23     Q   I understand.  Just one or the other?
24     A   And I couldn't say now, or I couldn't
25  remember where I was.

Page 112

FELIX LEISINGER

1
2      Q   Were you using at that time both of
3  those addresses as possible addresses to reach
4  you?
5      A   It would appear to be the case, yes.
6      Q   All right.
7          I want you to -- when -- when you were
8  asked earlier to look at this document, it looked
9  like you were pretty familiar with the document
10  because you didn't take very long to look at it.
11         MR. JOHNSON:  Objection.
12  BY MR. MULLIS:
13     Q   So, I will ask you to take it and read
14  it right now, and tell me any statement in here
15  that is in this particular document, Leisinger No.
16  2, that you believe that you did not write.
17         MR. JOHNSON:  Objection to the form of
18  the question.
19         And that would require the witness to
20  carefully -- if you want the witness to read
21  through the entire document, we can take a break.
22         MR. MULLIS:  The question was very
23  specific.  We can do it right now.
24         MR. JOHNSON:  It wasn't a very specific
25  question.

28 (Pages 109 to 112)

Page 113

```
 1           FELIX LEISINGER
 2       MR. MULLIS: I will make it more
 3 specific.
 4 BY MR. MULLIS:
 5    Q   I want you to please read through this
 6 document right here, right now while this is going
 7 on and tell me if there are any paragraphs or any
 8 statements in there that you believe you did not
 9 write.
10       MR. JOHNSON: Objection to the form of
11 the question. It assumes facts not in evidence.
12 I don't think you have established that he did
13 write this. He said he didn't know.
14       MR. MULLIS: Would you please not make
15 speaking objections. The question is very clear.
16 I am asking if he can read the document and tell
17 me if there are any paragraphs in here that he did
18 not write.
19       MR. CLASEN: I think he did testify that
20 he did write, just not in this form.
21    A   From whatever I can see, whoever wrote
22 it seemed to know exactly what is wrong.
23    Q   I want to see if there is anything in
24 here that you believe that you did not write.
25       MR. JOHNSON: Same objections as before.
```

Page 114

```
 1           FELIX LEISINGER
 2 Do you want us to take a break?
 3       MR. MULLIS: I want us to sit right
 4 here. I will use up part of my seven hours.
 5       MS. GREEN COMITE: Go ahead and read it.
 6       MR. JOHNSON: Could you read back the
 7 question again so we are clear. I think it was a
 8 confusing question.
 9       (Requested portion read back)
10    A   I think it is a very good letter. I
11 hope I did write it. I can't be sure now.
12    Q   Is there anything in this letter that
13 you believe that you did not write, sir?
14       MR. JOHNSON: Same objections.
15    A   I agree with all of these questions, so
16 I -- so I -- if I did write it, yes, I agree with
17 them, and I -- I am quite happy to say that if I
18 did write this, this was good.
19    Q   But the question was: Is there anything
20 in this letter that you believe that you did not
21 write?
22    A   Well, as I said, it is very difficult
23 now after so many years, but word for word -- but
24 as I say, I do agree with this letter. I think it
25 is an excellent letter. It should be widely
```

Page 115

```
 1           FELIX LEISINGER
 2 published in the New York Times and Wall Street
 3 Journal.
 4    Q   So, you believe that you did write the
 5 letter; isn't that correct, sir?
 6    A   Yes. Yes, I do.
 7    Q   Look at Leisinger No. 3, please, sir.
 8       If you look at the second page where it
 9 is numbered Page 13 up at the top, I think.
10    A   Yes.
11    Q   That is the letter that you were asked
12 earlier about.
13       Now, you believe that you wrote this
14 letter that is to the -- to Mrs. Ponte, Del Ponte?
15    A   It is well possible. I do not actually
16 recall this letter, but it could well be. It
17 could well be. From what I glance here, it looks
18 like I agree with all of this.
19    Q   I want you to read it and tell me if
20 there is anything in here that you believe that
21 you didn't write, please.
22       MR. MULLIS: I would ask that the
23 question is pending before the witness, so I would
24 ask that you not communicate with the witness,
25 please.
```

Page 116

```
 1           FELIX LEISINGER
 2       THE WITNESS: She just asked me to read
 3 it.
 4 BY MR. MULLIS:
 5    Q   I understand. I don't know what all she
 6 said to you because I can't hear from so far away.
 7 I would ask when a question is pending, that she
 8 allow you to do that.
 9       MS. GREEN COMITE: I am instructing my
10 client to read the letter line by line, please.
11       MR. JOHNSON: Objection to the form of
12 the question.
13       MR. CLASEN: He has already testified he
14 wrote it.
15       MR. JOHNSON: If you want to go back and
16 look at the transcript.
17       MR. MULLIS: Gentlemen, can you let him
18 read the letter, please.
19    A   Well, this is another excellent letter.
20 I think it is a great letter, yes.
21    Q   So, you agree with everything that is in
22 this letter?
23    A   I absolutely agree with it, yes. I
24 endorse it.
25    Q   And you also believe that you wrote the
```

29 (Pages 113 to 116)

Page 117

```
1              FELIX LEISINGER
2   letter?
3       A    Yes, probably.
4       Q    You believe that you wrote it; is that
5   correct, sir?
6       A    Yes, yes.
7       Q    And you signed it "Felix Leisinger, also
8   known as Felix Van Xilef, the artist, painter and
9   writer, on behalf of the Leisinger Family Pension
10  Fund"?
11      A    Yes.
12      Q    You have, all right.
13           What sort of writer are you, sir?
14      A    Well, this seems a good example.  On
15  issues.  I write on issues --
16      Q    You write on --
17      A    -- of global importance.
18      Q    Like what, sir?
19      A    Well, like this kind of thing.
20      Q    What else besides the Jewish Holocaust?
21      A    This wasn't so much about the Jewish
22  Holocaust, it is about the Swiss banks.
23      Q    What else do you write on?
24      A    The environment.
25      Q    What about?  I am sorry.
```

Page 118

```
1              FELIX LEISINGER
2       A    Ecology, economics.
3       Q    What about the environment and ecology
4   do you write about?
5       A    Largely that it is all connected.
6       Q    And can you just give me a brief
7   synopsis how you think it is all connected?
8       A    Yes, I could try to do that.  That --
9   that all of the money which the Swiss banks
10  accumulate is recycled into more of the same.
11      Q    And how does this affect the ecology and
12  the environment?
13      A    Well, obviously, the more you have, the
14  greater the money supply in the world.
15  Particularly with -- with vast debts, debt
16  financing, you just have even more development,
17  which means construction, industrialization,
18  and -- and commensurate pollution and global
19  warming, climate change, destruction of the ozone
20  layer.  All of that is connected directly.
21      Q    You believe that some of the funds in
22  the Swiss banks should be used to help buy up
23  forest lands, et cetera?
24      A    That would be an excellent idea.  Of
25  course, but there is no return on that; therefore,
```

Page 119

```
1              FELIX LEISINGER
2   it is not -- it is not being enacted.
3       MR. JOHNSON:  Carl, when you get to a
4   stopping point, we would like to take a break.
5       MR. MULLIS:  Sure.
6   BY MR. MULLIS:
7       Q    So, you believe that -- that -- let me
8   go back for a second and change the question.
9           I have had the pleasure reading about
10  some of your writings, and -- at least on one
11  of those comments concerning your writings, it
12  talked about your beliefs concerning Mars and the
13  fact that Mars was inhabited millions of years
14  ago.  Could you talk about that a little bit for
15  us, please?
16      MR. JOHNSON:  Objection to the form of
17  the question.
18      A    Well, it's -- it's -- it is quite
19  simple, yes.  When you think about what is
20  happening now, to the extent that by the year
21  2050, according to a professor of mathematics, the
22  average income per person in the United States
23  will be as much as the total GDP (sic) of the
24  United States in 1960, you have such a gigantic
25  money supply explosion, which translates into ever
```

Page 120

```
1              FELIX LEISINGER
2   more industrialization and urbanization, that you
3   are creating a new planet Mars, and that has
4   probably happened millions and millions of years
5   ago, that they did exactly the same up there
6   because we know now there was water up there, and,
7   therefore, there was life, but they destroyed it.
8       MR. JOHNSON:  Can we take a break?
9       MR. MULLIS:  No, I am not through, yet.
10  When it is an appropriate time.  You asked two
11  minutes ago, it will be five minutes, and we will
12  take a break at the appropriate time.
13      MR. JOHNSON:  We will take a break now.
14  I have to use the restroom.
15      MR. MULLIS:  It is over my objection.
16      VIDEOGRAPHER:  Going off the record at
17  12:57.
18      (Brief Recess)
19      VIDEOGRAPHER:  Returning to the record
20  at 1:06.
21  BY MR. MULLIS:
22      Q    Mr. Leisinger, you believe that UBS
23  basically misappropriated the assets of the
24  Leisinger Family Pension Fund; is that correct,
25  sir?
```

30 (Pages 117 to 120)

Page 121

FELIX LEISINGER

1  
2       MR. JOHNSON:  Objection to the form.
3       A    I don't know whether that is the correct
4  phraseology.  I couldn't say.  This is, again, a
5  legal question which only counsel can answer.
6       Q    Well, look at Leisinger No. 2, Paragraph
7  20.  It says, "Why did you misappropriate the
8  assets of the beneficiaries of the Leisinger
9  Family Pension Fund to first cover and then repay
10  the illegal U.S. dollar loans that you incurred on
11  the legal U.S. dollar account when predictably the
12  stock market collapsed within two weeks of your
13  commencing to transact and execute totally
14  unsuitable high risk and inappropriate U.S. stock
15  market transactions?"
16       Do you see that, sir?  That is what that
17  document says.
18       A    Yes, yes.
19       Q    Did you -- did you -- did you basically
20  think that UBS did wrong by purchasing stocks in
21  the U.S. market at that time?
22       A    Yes.
23       MR. JOHNSON:  Objection to the form of
24  the question.
25  BY MR. MULLIS:

Page 122

FELIX LEISINGER

1  
2       Q    You can go ahead and respond.  I thought
3  you said yes?
4       A    Well, in this questionnaire, yes.
5       Q    Okay.
6       Have you ever filed a lawsuit against
7  UBS?
8       A    No.
9       Q    Has any of your relatives ever filed a
10  lawsuit against UBS?
11       A    No.
12       Q    Has the Leisinger Pension Fund ever
13  filed a lawsuit against UBS?
14       A    No.
15       Q    Has UBS ever made any sort of settlement
16  payments to the Leisinger Pension Fund?
17       A    Sorry, any?
18       Q    Any sort of settlement payments to the
19  Leisinger Pension Fund?
20       A    No.
21       Q    Has UBS made any sort of settlement
22  payments to any of the beneficiaries of the
23  Leisinger Pension Fund?
24       A    Not to my knowledge.
25       Q    Are you having -- excuse me, is the

Page 123

FELIX LEISINGER

1  
2  Leisinger Pension Fund having any sort of
3  settlement negotiations with UBS?
4       A    I don't know.
5       Q    Is the Leisinger Pension Fund or any of
6  its beneficiaries having any discussions with UBS
7  concerning these allegations that are set forth in
8  Leisinger Exhibit No. 2?
9       A    I believe there have been such
10  discussions, yes.
11       Q    What is the current status of those
12  discussions?
13       A    I couldn't say.
14       Q    Who would know that?
15       A    My son.
16       Q    What is your son's name?
17       A    Andres.
18       Q    What is your son's address?
19       A    101 Silver Lane, Tunbridge Wells,
20  England.
21       Q    Which son are you referring to?
22       A    Andres.
23       Q    Where did you say he was employed?
24       A    (No Response)
25       Q    Where is he employed?  Who does he work

Page 124

FELIX LEISINGER

1  
2  for?
3       A    For the Catholic Herald.
4       Q    Where is the Catholic Herald located?
5       A    It is a newspaper in London.
6       Q    Does he work in London?
7       A    Yes.
8       Q    At the home office of the Catholic
9  Herald?
10       A    Yes.
11       Q    Is he a reporter, or editor, or what is
12  his position?
13       A    No, he is publishing manager.
14       Q    Publishing manager of the Catholic
15  Herald.
16       All right.  Which attorneys has your son
17  had conversations with concerning these
18  allegations against UBS?
19       A    I don't know.
20       MR. JOHNSON:  Objection to the form of
21  the question.
22  BY MR. MULLIS:
23       Q    If you look at Leisinger No. 4 and No.
24  6, please.
25       I believe you testified earlier that you

31 (Pages 121 to 124)

Page 125

```
                 FELIX LEISINGER
 1
 2    had not read Leisinger No. 4 before you signed it;
 3    is that correct?
 4         MR. JOHNSON: Objection,
 5    mischaracterizes his testimony.
 6         A   I believe so, yes.
 7         Q   You believe that you had not read it; is
 8    that correct?
 9         A   Yes.
10         Q   Now, you indicated that when you read
11    it, you told your attorneys about it; is that
12    correct?
13         A   Yes.
14         Q   To correct the errors?
15         A   Yes.
16         Q   In Leisinger No. 4; is that correct?
17         A   Yes.
18         Q   Just when did you read it, sir?
19         A   That, I couldn't say.
20         Q   Was it a week later that you read it?
21         A   I really -- I just couldn't remember.
22         Q   Was it two weeks later?
23         A   No idea.
24         Q   Months later?
25         A   Absolutely no idea.
```

Page 126

```
                 FELIX LEISINGER
 1
 2         Q   Well, this Leisinger No. 4 is dated
 3    December the 13th, 2004, by your signature. Is
 4    that when you would have signed it, sir?
 5         A   I couldn't say.
 6         Q   You think the date that you signed it
 7    may be false also in this document?
 8         MR. JOHNSON: Objection. Objection to
 9    the form of the question.
10         A   The date may be correct when -- 13th of
11    December where I signed, that will be correct, I
12    presume.
13         Q   Are you in the habit of signing
14    documents that you haven't read, sir?
15         A   Yes, of course.
16         Q   Okay.
17             The document is -- is dated
18    January 10th, 2005, as the date of your signature,
19    Ms. Comite and of Mr. Perkinson. Did you -- let
20    me rephrase it.
21             Did you read this document prior to
22    January 10th, 2005?
23         A   I don't know. I have no idea.
24         Q   Did you go for months not having read
25    this document?
```

Page 127

```
                 FELIX LEISINGER
 1
 2         A   That is very, very likely, yes.
 3         Q   Do you think it wasn't important what
 4    was being represented as your testimony in this
 5    litigation?
 6         A   Oh, no, not at all, but I relied
 7    entirely on my lawyers to have represented all of
 8    the facts as should be represented.
 9         Q   It turns out they didn't do that; is
10    that correct?
11         MR. JOHNSON: Objection to the form of
12    the question.
13         A   No, there was a minor kind of
14    misunderstanding on their part in respect to my
15    relationship with the bank.
16         Q   Your relationship with the bank and not
17    the Pension Fund?
18         A   Well, in connection with the Pension
19    Fund, yes. I had no other relationship with the
20    bank.
21         Q   So, you consider whether or not you were
22    trustee of the Leisinger Pension Fund to be a
23    minor matter?
24         MR. JOHNSON: Objection to the form.
25         A   No, it is not a minor matter in the
```

Page 128

```
                 FELIX LEISINGER
 1
 2    context of the bank and me, but in the context of
 3    this litigation, I didn't consider it important
 4    because I -- because I -- I relied on my lawyers
 5    to -- to write everything as it should be. And as
 6    soon as I noticed there was the word trustee
 7    there, I immediately notified them and said there
 8    is an error.
 9         Q   It was an important enough matter when
10    you finally read the document, to designate it as
11    an error; is that correct?
12         A   Yes, of course. Of course.
13         MR. JOHNSON: Objection to the form.
14    BY MR. MULLIS:
15         Q   The correction wasn't made until
16    Leisinger No. 6 was produced, which was June 17th,
17    2005. Do you have any reason why it was almost
18    six, seven months before that minor error was --
19    was corrected?
20         A   No, I have no idea, but I know that I
21    made the objection long before that.
22         Q   You made the objection to your attorneys
23    long before June 17th, 2005; is that correct, sir?
24         A   Yes.
25         Q   Months before, I assume; right?
```

32 (Pages 125 to 128)

Page 129

```
1              FELIX LEISINGER
2      A   Yes.
3      Q   So, they knew for a long period of time
4  prior to June 17th, 2005 --
5      A   Yes.
6      Q   -- that there were errors contained in
7  Leisinger Exhibit No. 4; is that correct, sir?
8      A   Not errors, it just seems like one --
9  one thing, one expression, one word.
10     Q   All right.
11         When do you believe there were people
12  living on Mars?
13         MR. JOHNSON:  Objection to the form.
14     A   When -- I don't understand your
15  question, when.
16     Q   When do you believe there were people
17  living on Mars?
18     A   Millions of years ago.
19     Q   And what did you believe that they did
20  to destroy Mars?
21     A   They did what everybody is doing now.
22     Q   What is that, sir?  What do you believe
23  that the Martians did millions of years ago to
24  destroy Mars?
25     A   Overindustrialization, overurbanization,
```

Page 130

```
1              FELIX LEISINGER
2  over, overpoisoning the planet with pesticides,
3  algaecides, herbicides, that kind of thing, and
4  pumping out thousands of millions of tons of
5  carbon dioxide.
6         7,000 million tons of carbon dioxide is
7  being pumped out every year on the planet wiping
8  out the ozone layer.  You have decentralization
9  (sic), desalination, you have all of the
10  destruction mechanisms in place that would lead
11  ultimately not within a few years, but within
12  thousands of years, it would lead to the complete
13  destruction of the planet.
14     Q   And you think the same thing happened on
15  Mars; is that correct?
16     A   Yes.  I think it is a good assumption,
17  yes.
18     Q   Give me a few minutes, please.
19         Would you look at Leisinger Exhibit 5.
20     A   Yes.
21     Q   And then Leisinger Exhibit No. 7.
22     A   Yes.
23     Q   Now, there were changes made with
24  respect to Interrogatory No. 5 on Leisinger
25  Exhibit 5 versus Leisinger Exhibit No. 7; weren't
```

Page 131

```
1              FELIX LEISINGER
2  there, sir?
3         MR. JOHNSON:  What is the question?
4         MR. MULLIS:  I asked him if there were
5  changes made, corrections made to Leisinger
6  Exhibit 5 by Leisinger Exhibit 7 with respect to
7  Interrogatory No. 5.
8      A   Yes.
9      Q   In Leisinger Exhibit No. 5, for example,
10  Interrogatory No. 5, it states that you were the
11  person responsible for the management of the
12  Leisinger Pension Fund; didn't it, sir?
13     A   Yes.
14     Q   And that was changed; was it, sir?
15     A   Absolutely.
16     Q   Because you weren't the person
17  responsible for the management of the Leisinger
18  Pension Fund; correct?
19     A   That is correct, I was not responsible
20  in any way.
21     Q   So, now, did you read No. 5 before you
22  signed it?
23     A   Evidently not.
24     Q   So, you got Leisinger Exhibit 5 and just
25  signed it without reading it; is that correct?
```

Page 132

```
1              FELIX LEISINGER
2      A   That is correct.
3      Q   Well, you signed it -- at least it shows
4  that you signed it on February 16th, 2005; is that
5  right?
6      A   Well, that must be correct, yes.
7      Q   Is that your signature on Page 10 of
8  Leisinger Exhibit 5?
9      A   Yes, absolutely.
10     Q   So, I want you to look at it to make
11  sure.
12     A   Yes.
13     Q   When you got this document from your
14  attorneys, you just signed it without reading it?
15     A   Yes.
16     Q   This wasn't back in December, this was
17  in February, not December.  This is the second
18  document that you signed a document without
19  reading it; is that correct?
20     A   Yes.
21     Q   When did you correct that to your
22  attorneys?
23     A   Again, I couldn't possibly say.  When I
24  discovered the error or errors, then I immediately
25  let them know and said here is something.
```

33 (Pages 129 to 132)

Page 133

FELIX LEISINGER

1
2    MR. JOHNSON: I am going to instruct you
3    not to divulge the content of your communications
4    with your attorneys in this matter.
5    BY MR. MULLIS:
6    Q    When did you let your attorneys know?
7    A    I can't remember, but -- but as soon as
8    I discovered it.
9    Q    I think you were asked earlier about
10   differences in signatures?
11   A    Yes.
12   Q    Between, let's say, No. 5 and -- and --
13   and 7; is that right?
14   A    Yes.
15   Q    Why did you say they are different?
16   A    It is very simple. If I sign in front
17   of someone who knows me, I can sign what -- what
18   some people have described as a scribble, and they
19   know that I am signing it because I am here and
20   there to be identifiable. But when I sign
21   something or -- which is sent by a fax where the
22   people do not know, I sign my full name in legible
23   form so that they know it's me who signed it.
24   Q    Who were you in front of for Leisinger
25   No. 7 when you signed, that it was you signing?

Page 134

FELIX LEISINGER

1
2    A    In front of Erin.
3    Q    So, was she there?
4    A    Yes, yes.
5    Q    She was there. Where did you sign this?
6    A    At a law firm in New York.
7    Q    So, you were here then?
8    A    Yes.
9    Q    So, in February -- I mean, on June 17th,
10   you were here?
11   A    Yes.
12   Q    So, you were in this country at least
13   three times, not two times?
14   A    No,I -- I -- I -- I was in this country
15   two times, and I have been here on the 17th, and I
16   am still here.
17   Q    You have been here since the 17th?
18   A    Yes.
19   Q    All right.
20   A    It's a long flight.
21   Q    I understand.
22       MR. MULLIS: Let's take a brief break,
23   and we will see whether or not we have any more
24   questions.
25       VIDEOGRAPHER: Going off the record at

Page 135

FELIX LEISINGER

1
2    1:25.
3        (Brief Recess)
4        VIDEOGRAPHER: Returning to the record
5    at 1:28.
6        MR. MULLIS: Mr. Leisinger, I don't have
7    any further questions today. I am going to
8    reserve the right, I think there are some
9    documents. I am not going to close this
10   deposition date, but I don't have any further
11   questions today.
12       I will make one correction. I was told
13   instead of saying I was an attorney with Paul
14   Hastings, I may have said I was an attorney with
15   Paul Williams, who is an attorney at the firm. He
16   has not reached the status of being a law firm
17   himself, yet, so I apologize for that.
18       Thank you, sir.
19       MR. JOHNSON: We reserve our right to
20   object to any attempt to reconvene the deposition.
21       MR. CLASEN: Everyone ends with the same
22   thing, we don't think you produced all of the
23   documents you think they did, you reserve your
24   rights and you reserve your rights, the
25   traditional ending.

Page 136

FELIX LEISINGER

1
2        MS. GREEN COMITE: The witness will read
3    and sign his deposition as well.
4        MR. CLASEN: Before any notary public,
5    though, not necessarily the one taking it?
6        MS. GREEN COMITE: Correct.
7        MR. CLASEN: Okay. Thank you very much.
8        (Time noted: 1:29 p.m.)
9
10   _____
11            FELIX LEISINGER
12   Subscribed and sworn to before me
13   this ___ day of _____, 2005.
14
15   _____
16   Notary Public
17
18
19
20
21
22
23
24
25

34 (Pages 133 to 136)