# EXHIBIT B

# ROBINSON & COLE LLP

JOSEPH L. CLASEN

Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT 06904-2305
Main (203) 462-7500
Fax (203) 462-7599
jclasen@rc.com
Direct (203) 462-7510

**Via Facsimile and First Class Mail**

July 19, 2005

Jacob B. Perkinson, Esq.
Johnson & Perkinson
1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403

David S. Scott, Esq.
Erin G. Comite, Esq.
Scott + Scott, LLC
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415

Re:    **In re Priceline.com Securities Litigation**
**Master File No. 3:00cv1884 (DJS)**

Dear David, Erin and Jake:

We appreciate the courtesy of your accommodations with respect to the scheduling of the 30(b)(6) deposition that will take place tomorrow in our Hartford office at 10:00 a.m.

In accordance with the Court's order that the parties confer about electronic material, we have prepared the following overview of what priceline did to preserve electronic material relevant to this litigation and what electronic material we believe is available.

During a number of our discussions, we have mentioned the "snapshot" of electronic material that was taken for this litigation. The snapshot warrants some explanation and provides a good starting point for this overview.

What we refer to as the "snapshot" is the equivalent of a full back-up of all the material that existed on priceline's corporate file servers in February 2002 (the time



*Law Offices*

BOSTON

HARTFORD

NEW LONDON

STAMFORD

GREENWICH

WHITE PLAINS

NEW YORK CITY

SARASOTA

*www.rc.com*

STAM1-794754-1

# ROBINSON & COLE LLP

July 19, 2005
Page 2

the snapshot was taken), reaching back to the beginning of the Company. Promptly following the commencement of this litigation in October 2000, priceline sent an e-mail notice to all of its employees instructing them to secure, preserve and retain relevant documents.[1] Because of the concern that the preservation of relevant electronic material on priceline's corporate file servers might become too unwieldy over time as the case proceeded and out of an abundance of caution for the preservation of relevant electronic material, priceline and its outside counsel determined to make a copy, in a usable format, of all of the electronic information on priceline's corporate file servers. The snapshot is that copy.

Our understanding is that it was the general Company practice that all electronic documents should be created and saved on the corporate file server and that no documents on the corporate file server should be deleted. With respect to electronic documents, therefore, our understanding is that the Company's preservation instruction did not effect any change to the status quo. Assuming that everyone at priceline created and preserved electronic materials on the corporate file servers in accordance with Company practice (and in accordance with the litigation retention policy beginning in October 2000), we believe that the snapshot contains every piece of electronic material created on the corporate file servers from priceline's inception until the date of the snapshot in February 2002.

Because WebHouse and Perfect Yardsale each utilized some of priceline's servers for a period of time following their respective launches, we believe that the snapshot also contains some WebHouse and Perfect Yardsale material.

We understand that there are approximately 475 gigabytes of material on the snapshot. A very conservative estimate, we are told, is that one gigabyte translates to approximately 50,000 pages. A less conservative, and more realistic estimate, is that one gigabyte translates to approximately 100,000 pages.

As described above, the snapshot contains the electronic material from priceline's corporate file servers. The next portion of this overview describes our understanding of what types of information are stored on priceline's various servers and how those servers are backed-up.

---

[1] Between the time of that e-mail notice and the present, additional retention notices were periodically sent to all of priceline's employees as reminders.



# ROBINSON & COLE LLP

July 19, 2005
Page 3

Priceline's electronic material is created and stored on three different types of servers: production database servers, which contain the raw transactional information of customer bids and offers; development servers, which contain quality-control and other "test" data; and corporate file servers, which contain e-mails, memoranda, letters and all other office-type documents. We do not believe that priceline's production database servers or development servers contain any information that is relevant to this litigation.

Until mid-2000, those servers were manually backed-up onto tapes at various intervals. There were daily, monthly, quarterly and yearly back-ups, though not every server was necessarily backed-up according to the same schedule. Until this litigation was commenced, some of those back-up tapes were reused (and thus overwritten) and discarded in the ordinary course.

In mid-2000, the Company moved to an automated back-up tape system. Under that system, the various servers are robotically backed-up onto tapes according to regular schedules, and sets of back-up tapes are rotated, reused and discarded according to regular schedules.

Following the commencement of this litigation, no quarterly or yearly corporate file server back-up tapes were overwritten or destroyed. The Company also collected several hundred tapes that had been used in connection with the manual back-ups. Priceline believes that any of those tapes that backed-up the corporate file servers duplicate information captured by the snapshot and by other, more comprehensive back-up tapes, such as the quarterly or yearly tapes. (This is because a later back-up of a given server contains all of the information from an earlier back-up of the same server unless information existing on the server at the time of the earlier back-up is deleted from the server before the later back-up.) With the exception of approximately 200-300 back-up tapes that were discarded by a priceline Unix administrator, priceline believes that it has secured all of the manual back-up tapes that existed as of October 2000. Priceline believes that the discarded tapes were all database production server back-ups, which do not contain any information relevant to this litigation. In addition, we believe that the information contained on those tapes is captured on other back-up tapes that the Company has collected.



# ROBINSON & COLE LLP

July 19, 2005
Page 4

Electronic material for terminated employees from 2000-2001 was moved off the corporate file servers and onto back-up tapes before the snapshot. The Company has identified and collected those back-up tapes. The Company is also in possession of some WebHouse and Perfect Yardsale back-up tapes.

Sincerely,

Joseph L. Clasen
JLC/ta

cc: Via Facsimile and First Class Mail

Daniel Slifkin, Esq.
James G. Hein, Jr., Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Carl W. Mullis, Esq.
Summer Joseph, Esq.
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, NE, 24th Floor
Atlanta, GA 30308



# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN RE: PRICELINE.COM INC.         :     MASTER FILE NO.
SECURITIES LITIGATION             :     3:00CV01884(DJS)
                                  :
_____ :
                                  :
This document relates to:         :
                                  :
     ALL ACTIONS                  :

ORDER

A telephone conference was held on April 6, 2005 regarding
plaintiffs' motion to compel (dkt. # 144).  Based upon the papers
submitted to the court and the representations made by counsel
participating in the telephone conference, the court orders the
following:

1.  All defendants shall produce documents responsive to
plaintiffs' discovery requests, on a rolling basis, on or before
July 31, 2005.

2.  Defendants shall submit a privilege log meeting the
standard set forth in Rule 37(a)1 of the Local Rules of Civil
Procedure for the District of Connecticut on or before the tenth
day of each month beginning in May of 2005.  The privilege log
shall set forth documents withheld during the preceding month.
The first privilege log, which shall be served on or before May
10, 2005, shall set forth all documents withheld prior to April
30, 2005.

3.  The parties shall meet and confer regarding the

production of material stored in electronic form. If the parties
are unable to reach a compromise, then the parties shall submit a
joint motion setting forth the propositions about which the
parties agree and each party's position regarding the areas of
disagreement.

4.    On or before July 31, 2005, defendants shall submit
affidavits from their counsel stating, with respect to materials
pertaining to WebHouse and Perfect Yard Sale, (1) that all
documents in the party's possession or control have been produced
or withheld on the basis of privilege; (2) that counsel has made
good faith efforts to locate and obtain other documents and
materials; and (3) a brief description of these good faith
efforts.

5.    Defendants shall produce all documents responsive to
plaintiffs' discovery requests for the period of March 1, 1999
through April 1, 2001. All requests for documents and
information directed to defendants shall be limited to this time
period unless otherwise specified for good cause.

6.    Overbreadth and undue burden objections shall be
specifically stated in the response to each individual discovery
request. The party asserting these objections shall provide a
brief explanation of the basis for these objections with respect
to each individual discovery request.

So ordered this 6th day of April, 2005.


                                        /s/DJS
                             _____
                                DOMINIC J. SQUATRITO
                             UNITED STATES DISTRICT JUDGE

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                                    :
                                    :
                                    :
IN RE: PRICELINE.COM INC.           :     MASTER FILE NO.
SECURITIES LITIGATION               :     3:00CV01884(DJS)
_____         :
                                    :
This document relates to:           :
                                    :
    ALL ACTIONS                     :
                                    :
```

MEMORANDUM OF DECISION AND ORDER

Now pending in the above-captioned matter is plaintiffs'
motion to compel production of electronic discovery (dkt. # 212)
from defendants.  For the reasons set forth herein, this motion
is **GRANTED in part** and **DENIED in part**.

I. BACKGROUND

Lead plaintiffs bring this action on behalf of members of a
putative class of persons who purchased or otherwise acquired
securities of priceline.com Inc. ("Priceline") between January
27, 2000 and October 2, 2000 ("Class Period"), pursuant to
Sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 78t,
of the Securities Exchange Act of 1934 ("the Exchange Act"), as
amended by the Private Securities Litigation Reform Act of 1995
("PSLRA"), 15 U.S.C. §§ 78a-78mm, and Rule 10b-5, 17 C.F.R. §
240.10b-5, promulgated thereunder, against Priceline, Jay S.
Walker, N.J. Nicholas, Daniel H. Schulman, and Richard S.
Braddock.  Plaintiffs allege that defendants' false and
misleading statements inflated the value of Priceline's stock to

the benefit of the defendants and other company insiders and to
the detriment of the plaintiffs.  Specifically, plaintiffs allege
that during the period from mid-July 2000 to September 26, 2000,
defendants sold, in the aggregate, millions of shares of
Priceline stock, allowing them to profit substantially prior to
disclosing various deficiencies in Priceline's short term
economic outlook.

The gravamen of plaintiffs' allegations is that defendants
grossly overstated the utility of Priceline's business model, and
that defendants, outside the view of the investing public, spent
exorbitant amounts of Priceline's cash to keep the doomed venture
called WebHouse afloat primarily to bolster their statements
about the utility of the business model.

## II. DISCUSSION

Plaintiffs' motion addresses defendants' production of
information stored as electronic files.  Defendants do not object
to producing responsive information at this time, but rather
there is substantial disagreement between the parties regarding
how responsive information shall be produced.

### A. SUBJECT MATTER

Plaintiffs and Walker have submitted affidavits from
computer forensic consultants that explain the necessary
terminology and methodology central to the parties' dispute,
which is summarized as follows.  The information plaintiffs seek

-2-

is found within computer files, but this information can be difficult and costly to locate for two reasons. First, many of the computer files cannot be viewed in their current format because the files have been altered for storage. Second, even if the files themselves are in the proper format for viewing, the files may be arranged in a manner designed to maximize hardware space and facilitate storage without regard to the type of file or the subject matter of the information within the file.

In order to be viewed, a file must be restored to its "native format." "Native format" is the default format of a file, and access to this file is typically provided through the software program on which it was created or through which it was viewed. For example, if the file was created in Microsoft Word and has been saved as a Microsoft Word file, it can be viewed or modified through Microsoft Word.

Files in native format can be converted in two ways relevant to the pending motion. First, the native files can be compressed to facilitate storage. In order to view the files after compression, the files must be restored to their native format. Second, the files may be converted to a Tagged Image File Format ("TIFF") or Portable Document Format ("PDF"), which is an inalterable image of the file.

The data at issue is stored in two forms. First, defendants have a "snapshot," which is "the equivalent of a full back-up of

-3-

all the material that existed on priceline's corporate file
servers in February 2002 (the time the snapshot was taken),
reaching back to the beginning of the Company." (Dkt. # 228 Ex.
A at 1-2). The data stored in the snapshot is

> created and stored on three different types of servers:
> production database servers, which contain the raw
> transactional information of customer bids and offers;
> development servers, which contain quality-control and
> other "test" data; and corporate file servers, which
> contain e-mails, memoranda, letters, and all other
> office-type documents.

(Id. at 3). The files on this snapshot are in native format and
do not need to be restored, but, because the snapshot is a
reproduction of the way files are stored on computer hardware by
the computer system, the files are arranged in an essentially
random configuration. In order to find responsive information,
the files must be searched, and the substantial number of
duplicate files must be identified and eliminated. Defendants
can generate a spreadsheet listing "the contents of the snapshot
and the quantity of electronic material contained on it." (Dkt.
# 228 Ex. C at 2). Defendants also have certain backup tapes
containing e-mail data from former employees in the same format
files are maintained on the snapshot.

Second, defendants have 223 backup tapes, 42 of which are in
Priceline's possession and 181 of which are in Walker's
possession. Data is not accessible from these backup tapes; in
order to view the files stored on the backup tapes, the files

-4-

must first be restored to their native formats.  Once the files
have been restored, as with the snapshot, the files must be
searched and culled for duplicates.

The process of viewing the files stored as computer data is
expensive and time-consuming.  The parties have estimated that
the cost of restoring a backup tape will range from $200 to $800
per tape, if it is even at all possible.  The cost of restoration
is in addition to the cost of searching the files, culling for
duplicate files, and converting responsive files for production.
These costs are exclusive of attorneys' fees associated with
reviewing and producing the amount of information that could be
responsive.  The parties disagree about several fundamental
issues relating to the production of the information stored
electronically.

## B. DIRECTIVES

The following directives are meant to provide guidance to
the parties at this stage of the proceedings.  Unfortunately, due
to the nature of this case, the production of material stored in
electronic form is going to be time consuming and expensive.  The
court's task is to ensure that discovery in this case advances
fairly and efficiently.  Based upon the parties' arguments and
the information furnished to the court, the court sets forth the
following directives.

-5-

1.  **Defendants shall retain possession of the original data through the restoration, data management, and document review stages.**

There is no reason to deviate from the well-established principle that the party producing material in response to discovery requests shall have the opportunity to review the material for responsiveness and privilege prior to producing the material to the requesting party.

2.  **Restoration of backup tapes shall proceed on a measured basis, with cost-shifting determinations made at each step of the process.**

Ordering restoration of all 223 backup tapes at this point could be a colossal waste of resources. Given the substantial amount of time and resources necessary to process the more accessible information that the parties already agree could be relevant to plaintiffs' claims, the parties' focus should be directed to processing this material as efficiently as possible.

As such, the first step in addressing the backup tapes is to determine which backup tapes will be restored. Plaintiffs now argue that all 223 tapes should be restored. Walker has indicated that eight of the 181 tapes in his possession could contain relevant information, and Priceline has not indicated that any of the forty-two backup tapes in its possession would not be relevant.

Before the court orders defendants to restore a backup tape, there must be some indication that the files stored on the backup

-6-

tape may contain relevant information.  Because of the
extraordinary expense of restoration and review, this process
should not be undertaken without justification.  Allison Griffin,
plaintiffs' computer forensics consultant, has indicated that it
may be possible to take an inventory of the data contained on
each tape at the cost of $100 per tape.  Between defendants'
knowledge of the contents of the tapes, Griffin's suggestion, or
some other cost-effective way to survey the contents, the parties
should be able to learn which backup tapes, if any, should be
restored without incurring the cost of restoration itself.  The
court is not going to compel restoration of the backup tapes,
regardless of which party is going to pay for restoration, unless
the effort is justified.

     The parties must meet and confer in an attempt to identify
which backup tapes should be restored.  If the parties are able
to agree that some backup tapes should be restored, defendants
can begin the restoration process on these tapes while the
parties discuss surveying the contents of the unrestored tapes
and identifying the next grouping of tapes to be restored.  The
court will resolve any disagreement through appropriate motion
practice.  In deciding whether to award the relief requested, the
court will focus upon two issues: (1) the justification for
restoring the tape; and (2) which party should bear the cost of
restoration.  Defendants may file a motion to shift the cost of

restoration either once the restoration has been completed or
once a firm estimate of the cost of doing so has been generated.

3.  **No party shall waive any claim that information contained on
    a computer file is privileged because that party produced an
    inventory, spreadsheet, or other survey of the contents of
    an item upon which data is stored.**

4.  **Defendants shall produce responsive information contained in
    stored data files to plaintiffs in TIFF or PDF form with
    Bates numbering and appropriate confidentiality
    designations, shall produce searchable metadata databases,
    and shall maintain the original data itself in native format
    for the duration of the litigation.**

In setting forth this directive, the court rejects two
positions advanced by plaintiffs.  First, defendants, as
custodians of the computer files, shall be responsible for
excising duplicate files, sifting through the data for responsive
information, and reviewing responsive documents for privilege in
the most efficient manner possible.  Defendants shall record and
produce a summary of their methodology so that plaintiffs can
argue for the inclusion of more data if appropriate.  Defendants
shall also seek input from plaintiffs regarding proposed search
terms.  Plaintiffs may seek a court order directing a more
inclusive search.

The court will not dictate exactly how defendants should
accomplish these tasks, but defendants' choices will be subject
to review should they elect to seek cost-shifting relief.  For
example, Griffin relates her experience in a case where a party
converted all files to TIFF format before culling the data, which

proved to be imprudent under the circumstances.  Both Griffin and

Michael Farley, Walker's computer forensic consultant, also

mention the possibility that the data be uploaded, at an

additional cost, to a vendor's software program that enables more

advanced searching.  The court leaves defendants to evaluate the

best method for culling the data but cautions defendants to be

prepared to justify any additional expense they seek to share

with plaintiffs as promoting efficiency.

Second, TIFF or PDF format is the most secure format for the

production of documents in this case.  Given the sheer volume of

information flowing from defendants to plaintiffs, the

information should be conveyed as numbered images so that no

inadvertent alterations are made, or more likely, no accusations

of alteration can be made, and so that the information can be

easily identified.  Exceptions to this directive, however, may be

applied for should production of a file in its native format be

necessary to view or comprehend the information in the file.

This directive applies to both information stored in the

snapshot, departed employee e-mail backup tapes, and restored

from backup tapes.

5.    **Defendants shall begin to produce responsive information
      from the e-mail files of the 113 individuals and the
      remainder of the snapshot in the manner consistent with the
      preceding directive.**

6.  If one party seeks relief from the court concerning the scope of information searched or produced, the party producing the information shall not delay working toward the production of information that is not in dispute.

7.  Beginning in January of 2006, defendants shall file a status report on the production of electronic information on or before the tenth day of each month, or the first business day thereafter, setting forth the following information:

    a.  What percentage of the responsive information from the 113 employee e-mail files has been produced.

    b.  The status of the review and production of the remainder of the information on the snapshot.

    c.  The status of the selection of backup tapes for restoration.

    d.  The status of the restoration of backup tapes selected for restoration.

The purpose of the status report is not to micro-manage the production process or to create a forum for the airing of disputes; rather, the court would like to observe the process and foster communication between the parties so that there is no misunderstanding about the status of the production of information.  The court is aware that this may be a burden to defendants, but the burden is justified because the court is placing primary responsibility upon defendants to properly sort through the data.  Disagreements must still be raised and resolved through motions to the court.

8.   Cost-shifting shall be applied for in the method set forth
     in the proposed revisions to Rule 26(b)(2) and the Committee
     Note attendant thereto, as detailed by the Report of the
     Civil Rules Advisory Committee, which has been approved by
     the Judicial Conference and submitted to the U.S. Supreme
     Court on September 20, 2005.  The court will apply the
     analysis set forth in the proposed revisions and Committee
     Note in determining the propriety of cost-shifting.

     The court does not make any determination with respect to

cost-shifting at this time other than to expressly state that it

will apply the proposed analysis set forth in the Report of the

Civil Rules Advisory Committee to any request properly made

thereunder.

9.   The court will revise the current scheduling order, but only
     after the parties have provided more details about the
     amount of information stored electronically that will be
     produced.

                          III. CONCLUSION

     For the reasons set forth herein, plaintiffs' motion to

compel (dkt. # 212) discovery from defendants is **GRANTED in part**

and **DENIED in part.**

     So ordered this 8th day of December, 2005.


                                        /s/DJS
                              _____
                                 DOMINIC J. SQUATRITO
                                 UNITED STATES DISTRICT JUDGE


                                -11-

# **<u>EXHIBIT E</u>**

# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1242

GEORGE J. GILLESPIE, III
THOMAS R. BROME
ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN W. WHITE
JOHN E. BEERBOWER
EVAN R. CHESLER
PATRICIA GEOGHEGAN
D. COLLIER KIRKHAM
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
NEIL P. WESTREICH
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.

JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON
JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. OREHAN
W. CLAYTON JOHNSON
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
WILLIAM B. BRANNAN
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
JOHN T. GAFFNEY
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER

JULIE A. NORTH
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN

GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO

SPECIAL COUNSEL
SAMUEL C. BUTLER
THOMAS D. BARR

OF COUNSEL
ROBERT ROSENMAN
CHRISTINE BESHAR

March 1, 2005

In re Priceline.com Securities Litigation
Master File No. 3:00cv1884 (DJS)

Dear Mr. Johnson:

I write in further response to your letter of February 17, 2005 ("2/17 Letter".) As previously stated, we do not intend to amend our discovery responses (if at all) until after we have had the opportunity to discuss our objections and narrow the scope of your requests in the meet and confer scheduled for tomorrow. To help narrow the issues for discussion on that call, however, we briefly address your "concerns" here.[1]

Document Requests

A.    General Objections

You take issue with the temporal limitation we have placed on our discovery responses. (2/17 Letter at 1-2.) As reflected in General Objection No. 3, we believe that the "Relevant Time Period" you have defined is overbroad and unduly burdensome to the extent it seeks information about conduct that occurred before or after the Alleged Class Period. But we have not, as your letter suggests, limited our responses in a way that categorically excludes all documents "created outside of the [alleged] class period". (2/17 Letter at 2.) I can confirm that our reasonable search for responsive documents will encompass documents related to the claims and defenses asserted in the lawsuit and created during a reasonable amount of time before and after the Alleged Class Period.[2]

---

[1] We address these items in the order they appear in your 2/17 Letter.

[2] Your footnote with respect to Request No. 46 is puzzling. We produced the insurance policies pertinent to this action three months ago as part of our Rule 26 initial disclosures. See PCLN 00000001-00000173.

You next ask for two clarifications with respect to our General Objection No. 4:

First, you ask us to "confirm that [we] will produce all 'documents' that fall within the scope of Rule 34(a) and Local Rule 26(a)(2)". (2/17 Letter at 2.) Of course we will comply with all applicable federal and local rules of civil procedure; nothing in General Objection No. 4 suggests otherwise. Rather, General Objection No. 4 is directed at the 17 lines of prose that follow your invocation of Rule 34(a) in your definition of "Document", which are not "synonymous" with those rules. In addition, your definition of "Document" incorporates by reference your definition of "electronic data" (which in turn incorporates other defined terms), which nowhere appears in the Federal Rules of Civil Procedure or Local Rules.

Second, you assert that we have made a "blanket objection with respect to the production of electronic data" and suggest that we are refusing to produce the same. (2/17 Letter at 2.) That is not our position. We are well aware that data stored electronically is discoverable and, as we stated during our very first meet and confer, will be searching vast amounts of electronically stored data in the course of discovery here. As described in our response to your Interrogatory No. 32, a snapshot of the data on priceline's corporate file and e-mail servers was made years before you served your document requests, and we are in the process of searching that repository for responsive documents. The first sentence of our General Objection No. 5 was intended to preserve our rights to seek cost-sharing with respect to discovery of such electronically stored materials.

You next take issue with our General Objection No. 5 and ask us to substantiate the existence of any "common defense" or "mutual interest" privilege. (2/17 Letter at 2.) This general objection was lodged prior to our review of the bulk of documents sought by your requests and was intended to anticipate any number of hypothetical privilege issues that might arise in the course of our subsequent document review. At this time, however, we are not obliged speculatively to substantiate or defend privilege calls that have not yet been made.[3]

With respect to General Objection No. 6, you assume correctly that it was included in our response because it was drafted before the Court had entered the Protective Order in this case. (2/17 Letter at 2-3.) I can confirm that we intend to proceed with production of non-privileged, responsive documents pursuant to the terms of that Protective Order.[4]

---

[3] The request in my February 14, 2005 letter that you clarify your invocation of the "investigative privilege" is entirely different. We do not believe that there is any such thing as an "investigative privilege" that would entitle you to withhold documents from production under any circumstance.

[4] In the event we identify non-privileged, responsive documents subject to third-party confidentiality obligations, we may withhold production until the appropriate

2

You next ask for two clarifications with respect to our General Objection No. 4:

First, you ask us to "confirm that [we] will produce all 'documents' that fall within the scope of Rule 34(a) and Local Rule 26(a)(2)". (2/17 Letter at 2.) Of course we will comply with all applicable federal and local rules of civil procedure; nothing in General Objection No. 4 suggests otherwise. Rather, General Objection No. 4 is directed at the 17 lines of prose that follow your invocation of Rule 34(a) in your definition of "Document", which are not "synonymous" with those rules. In addition, your definition of "Document" incorporates by reference your definition of "electronic data" (which in turn incorporates other defined terms), which nowhere appears in the Federal Rules of Civil Procedure or Local Rules.

Second, you assert that we have made a "blanket objection with respect to the production of electronic data" and suggest that we are refusing to produce the same. (2/17 Letter at 2.) That is not our position. We are well aware that data stored electronically is discoverable and, as we stated during our very first meet and confer, will be searching vast amounts of electronically stored data in the course of discovery here. As described in our response to your Interrogatory No. 32, a snapshot of the data on priceline's corporate file and e-mail servers was made years before you served your document requests, and we are in the process of searching that repository for responsive documents. The first sentence of our General Objection No. 5 was intended to preserve our rights to seek cost-sharing with respect to discovery of such electronically stored materials.

You next take issue with our General Objection No. 5 and ask us to substantiate the existence of any "common defense" or "mutual interest" privilege. (2/17 Letter at 2.) This general objection was lodged prior to our review of the bulk of documents sought by your requests and was intended to anticipate any number of hypothetical privilege issues that might arise in the course of our subsequent document review. At this time, however, we are not obliged speculatively to substantiate or defend privilege calls that have not yet been made.[3]

With respect to General Objection No. 6, you assume correctly that it was included in our response because it was drafted before the Court had entered the Protective Order in this case. (2/17 Letter at 2-3.) I can confirm that we intend to proceed with production of non-privileged, responsive documents pursuant to the terms of that Protective Order.[4]

---

[3] The request in my February 14, 2005 letter that you clarify your invocation of the "investigative privilege" is entirely different. We do not believe that there is any such thing as an "investigative privilege" that would entitle you to withhold documents from production under any circumstance.

[4] In the event we identify non-privileged, responsive documents subject to third-party confidentiality obligations, we may withhold production until the appropriate

3

Finally, you attack the basis for our General Objection No. 7 and assert that we "have an affirmative obligation under Rule 34 to provide documents and information in the possession, custody or control" of Priceline Webhouse Club, Inc. ("Webhouse") and Perfect Yard Sale, Inc. ("Yard Sale"). (2/17 Letter at 3.) Webhouse and Yard Sale were separate (and are now defunct) entities who licensed priceline's business model and had certain other arms-length contractual relationships with the company. Priceline did not hold any ownership interest in Webhouse or Yard Sale, nor did either of those two entities hold such an interest in priceline. While we are aware of the general principles set forth in the cases you cite, they do not suggest that the nature of the relationship between priceline and Webhouse or Yard Sale is sufficient to impute control over their documents to our clients. That being said, we have already committed to producing responsive documents regarding Webhouse and Yard Sale (if any) that do reside in our client's own files.

B.    Specific Responses and Objections

You observe that "almost every one" of our written responses states objections and indicates that a reasonable search will be undertaken, and responsive documents will be produced, subject thereto. You request that we also "identify the responsive documents that [we] will or will not be producing." (2/17 Letter at 3.) We are not aware of any requirement under the Federal Rules of Civil Procedure or Local Rules that we do so, and we do not intend to amend our responses in this fashion.

You again ask us to "confirm that [we] will produce documents and provide information that is in the possession, custody or control" of Webhouse and Yard Sale. (2/17 Letter at 3.) For the reasons stated previously, we are unable to do so.

You next observe that we have objected to certain requests as overly broad and unduly burdensome (including with respect to the timeframes noted), and ask us to "confirm that [we] will not withhold any responsive documents on the grounds that these documents were created outside the Class Period". (2/17 Letter at 3-4.) As stated previously, our reasonable search for responsive documents will encompass documents created during a reasonable amount of time before and after the Alleged Class Period.

You take issue with our objections that certain requests are vague and ambiguous, or seek documents not relevant to the claims or defenses of any party to this action. You suggest that we should have provided further explanation of these objections in our written responses. (2/17 Letter at 4.) We believe the appropriate forum to discuss these objections, to the extent you do not understand them, is in our meet and confer session.

---

notifications are made and/or consents obtained. See General Objection No. 5. Furthermore, as acknowledged in the Protective Order, we may seek additional protections in the event you seek production of source code.

4

By way of illustration, we draw your attention to Request No. 51, to which
we have objected on both of these grounds (among others.)[5]  It is vague and ambiguous,
for example, insofar as it fails to clearly indicate whose "interactions, meetings or
communications" it intends to capture:  those between or among "personnel" of two or
more of the listed entities?  Or those between or among two or more personnel any one of
the listed entities?  And exactly who is intended to be captured by the phrase "personnel
associated with" a given entity:  that entity's employees? those of its licensees? those of
its third party vendors?  Moreover, this request fails to limit the subject matter of the
"interactions, meetings or communications" about which it inquires to the subject matter
of the present lawsuit.  Accordingly, we believe it seeks documents that are irrelevant to
the claims or defenses of any party to this action and is not reasonably calculated to lead
to the discovery of admissible evidence.

Finally, you ask us to "confirm that [we] will not withhold documents …
on the grounds that [they] are obtainable from public sources". (2/17 Letter at 4.)  To the
extent that we identify non-privileged responsive documents maintained in our clients'
files that happen to be publicly available, we will not affirmatively withhold them on that
ground.  However, we will not seek to gather from outside sources publicly obtainable
materials that plaintiffs are capable of gathering themselves.

Interrogatories

A.    General Objections

With respect to General Objection No. 2, we refer you to the preceding
response regarding General Objection No. 5 to your document requests.

With respect to General Objection No. 3, we refer you to the preceding
response regarding General Objection No. 6 to your document requests.

With respect to General Objection No. 5, we refer you to the preceding
response regarding General Objection No. 7 to your document requests.

We believe the limitation on the Relevant Time Period set forth in General
Objection No. 6 is appropriate.  For example, Interrogatory No. 1 asks us to identify
persons "involved in making, commenting on and/or reviewing" priceline's public
statements (among others.)  The only public statements by priceline at issue in this
litigation are those made during the putative class period alleged in your Complaint.
Accordingly, we believe that limiting our response to individuals who participated with
respect to those public statements is entirely appropriate, and we do not believe that our
response excludes any "relevant information".  If you would like us to consider

---

[5] Request 51 seeks "All documents referring or relating to any interactions,
meetings or communications between personnel associated with Webhouse, priceline,
Perfect Yard Sale, Inc. and/or Walker Digital.

expanding the scope of this or any other response beyond the Alleged Class Period, please specifically articulate what you believe to be the relevance of the particular information requested.

    B.    Specific Responses

        Our response to Interrogatory No. 5 asserted a number of objections, including the two noted in your 2/17 Letter. (2/17 Letter at 5.) The Court's recent entry of a Protective Order obviously resolves the confidentiality objection. However, this interrogatory remains overly broad and unduly burdensome. As drafted, this request purports to seek a description of all pricing formulas or methodologies applicable to any product or service sold through priceline from January 1, 1999 through December 31, 2001.[6] It is our understanding that, just during the Alleged Class Period, priceline offered a substantial number of products and services, the prices for which were set by different product groups using a variety of complex algorithms and revenue management principles (among other things) and often changed on a daily basis. We do not see the relevance of much of this information and the burden of preparing a comprehensive response would be substantial. Accordingly, we do not intend to prepare a supplemental response absent significant narrowing of this Interrogatory.

        You next take issue with response to Interrogatory No. 10. (2/17 Letter at 5.) Our response describes how priceline arrived at its accounting for the Webhouse warrant at the time of its issuance. To the extent you are seeking information regarding subsequent accounting treatment, we can confirm that priceline periodically evaluated its investments (including the Webhouse warrant) in the normal course to determine whether any accounting adjustments were necessary or appropriate. When Webhouse announced on October 5, 2000 that it would begin winding down its operations, it became known that the value of the Webhouse was impaired. Accordingly, priceline wrote off the value of the warrant on its third quarter 2000 financial statements. (See 11/14/00 Form 10-Q at 8).

        Your issue regarding our responses to Interrogatories 12, 13, 16 and 21 appears to be the same: that we have not provided definitive and/or exhaustive lists of the information you have requested. (2/17 Letter at 5-6.) The tentative nature of these responses, however, was necessitated by the focus of your requests—each of which seeks information about the conduct and/or operations of Webhouse. For the reasons previously stated, we do not believe that all of the information you seek regarding Webhouse is within the possession, custody or control of our clients. Nevertheless, as indicated in General Objection No. 5, we have made a good faith attempt to gather information responsive to these requests and have answered the interrogatories regarding Webhouse upon information and belief. Our clients cannot, however, speak definitively

---

    [6] Our clients do not presently believe that they have knowledge or information sufficient to respond to this interrogatory's request for a description of Webhouse's pricing formulas and methodologies.

or exhaustively regarding the conduct or operations of this other company. Accordingly, we do not intend to supplement our responses as you have requested.

With respect to Interrogatory 14, we do not understand what you mean by the phrase "involved in soliciting members to participate in WebHouse". Please clarify what you are seeking in this interrogatory.

With respect to Interrogatories No. 17 and 20 (and General Objection No. 8), you misconstrue our objections. (2/17 Letter at 6-7.) We are not invoking Rule 33(d). Rather, we believe these requests are unduly burdensome insofar as they seek an itemization of the broad categories of document whose production you have requested elsewhere. (See Plaintiffs' First Set of Document Requests, Nos. 5 and 6.) As a general matter, we believe each party should bear the burden of analyzing the other's production for broad categories of documents they wish to use in this case.

Lastly, you ask that we amend our responses to include a response to Interrogatory No. 25. (2/17 Letter at 7.) But you ignore the objections that we have asserted. We do not intend to provide any additional information in response to this Interrogatory unless and until these objections are addressed.

Very truly yours,

Christine L. Arena

Geoffrey M. Johnson, Esq.
  Scott + Scott, LLC
    33 River Street
      Chagrin Falls, OH 44022

0125

BY FACSIMILE AND FIRST CLASS MAIL

Copies to:

Jacob B. Perkinson, Esq.
  Johnson & Perkinson
    1690 Williston Road
      P.O. Box 2305
        South Burlington, VT 05403

William J. Kelleher, III, Esq.
  Robinson & Cole LLP
    695 East Main Street
      Stamford, CT 06904-2305

FROM CRAVATH SWAINE & MOORE LLP          (TUE) 3. 1'05 15:55/ST. 15:51/NO. 4864993766 P  9

7

    J. Allen Maines, Esq.
    Carl Mullis, Esq.
        Paul, Hastings, Janofsky & Walker LLP
            600 Peachtree Street, NE
                24th Floor
                    Atlanta, GA 30308

    BY FACSIMILE