**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| **IN RE: PRICELINE.COM, INC.** | : | |
| **SECURITIES LITIGATION** | : | |
| _____ | : | **MASTER FILE NO.** |
| | : | **3:00CV01884 (AVC)** |
| **This document relates to:** | : | |
| | : | |
| **ALL ACTIONS** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DEFENDANT WALKER TO PRODUCE EMAILS AND ELECTRONIC DOCUMENTS ON THE SEVENTEEN RESTORED PRICELINE WEBHOUSE CLUB TAPES**

**SCOTT + SCOTT, LLC**
David R. Scott
Geoffrey M. Johnson
Erin Green Comite
108 Norwich Avenue
P.O. Box 192
Colchester, CT  06415

**Co-Lead Counsel**

**JOHNSON & PERKINSON**
Dennis J. Johnson
Jacob B. Perkinson
1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403

**Co-Lead Counsel**

**STULL, STULL & BRODY**
Jules Brody
Aaron Brody
6 East 45th St.
New York, NY 10017

**Co-Lead Counsel**

## <u>TABLE OF CONTENTS</u>

                                                                                                    **Page**

**INTRODUCTION**................................................................................................................1

**BACKGROUND** ...............................................................................................................5

    A.  The WebHouse Documents Are The Most Important Documents In The Case...........5

    B.  The Case History Relating The 181 WebHouse Tapes. .................................................8

**ARGUMENT** ...................................................................................................................10

    A.  Defendant Walker Has Failed To Comply With The Court's December 2005
        Order. ........................................................................................................................10

    B.  Defendant Walker Has Refused To Perform An Email-By-Email Search
        Of Certain Designated Individual Email Accounts. ....................................................11

    C.  The Court Should Order Defendant Walker To Use Search Terms To Cull
        Out The Privileged Documents And Then Produce The Remaining Emails and
        Electronic Documents On The 17 Restored WebHouse Tapes. .................................14

        1.  Defendant Walker's "Search Term" Approach Is Designated To Exclude
            The Vast Majority Of Responsive Emails And Electronic Documents.................14

        2.  The Court Should Compel Defendant Walker To Use Search Terms To
            Exclude Privileged And Work Product Documents.. .............................................15

    D.  The Court Should Set A Deadline For The Completion Of The Electronic
        Production ...................................................................................................................17

**CONCLUSION** ................................................................................................................17

## INTRODUCTION

Throughout the entire discovery period in this case, Defendant Jay Walker ("Walker") has done everything in his power to keep Plaintiffs from obtaining highly relevant emails and electronic documents that were created by and sent to the top executives and employees at the Priceline WebHouse Club ("WebHouse").[1]   This case – at its core – is about WebHouse. Defendants made numerous false statements between January 27, 2000 and October 4, 2000 that were specifically designed to give investors the misleading impression that WebHouse was well on its way to becoming a financial success.  These statements conflicted with WebHouse's own internal financial and operational reports.  ***Defendant Walker clearly recognizes that the WebHouse emails and electronic documents are the most important – and the most incriminating – documents in this entire case.  This explains why the WebHouse emails and electronic documents have not been produced***.

The WebHouse emails and electronic documents are contained on 181 WebHouse backup tapes that Defendant Walker currently has in his possession, custody and control. Plaintiffs first learned about the 181 WebHouse backup tapes after they had moved in March 2005 to compel the production of all emails and electronic documents.  When opposing this motion, Defendant Walker stated that he had certain "inaccessible" WebHouse backup tapes in his possession that needed to be restored to an accessible format before they could be reviewed and produced.  Docket No. 158-1 (Opp. To Motion To Compel, at 7-8).  Defendant Walker also

---

[1]  Defendant Jay Walker is Priceline's founder and was the CEO of the Priceline WebHouse Club.  He is the party who has the WebHouse emails and electronic documents in his possession, custody and control.  The "Priceline Defendants" – *i.e.,* Defendants Priceline, Richard Braddock, Daniel Schulman and N.J. Nichols – also have highly relevant emails and electronic documents that they have failed to produce.  The Priceline emails and electronic documents are the subject of a separate motion to compel.  Docket No. 329 (Motion to Compel).

stated that it would cost between $20 million and $200 million to restore and produce responsive documents on these backup tapes – a statement that would later prove to be untrue. *Id.* Based on Defendant Walker's representations, the Court ordered the parties to meet and confer to discuss the restoration of the WebHouse backup tapes. Exhibit A to the Declaration of Geoffrey M. Johnson ("Johnson Decl.") (April 5, 2005 Order).

The parties met several times in April, May, June, July and August 2005 to discuss the WebHouse tapes. During these meet and confers, the parties identified 8 WebHouse tapes that contained emails belonging to WebHouse executives and employees. Defendant Walker eventually agreed to restore these 8 tapes to their searchable and accessible format. However, Defendant Walker failed to produce any of the WebHouse emails and electronic documents located on the restored tapes. Defendant Walker also refused to restore any of the other 173 tapes – even though other tapes contained WebHouse emails and responsive electronic documents. As a result, Plaintiffs filed a second motion to compel in September 2005. In this motion, Plaintiffs requested that the Court order Defendant Walker to restore and then produce all 181 of the WebHouse tapes in their entirety. Docket No. 212 (Plfs' Mot. To Compel).

The Court ruled on Plaintiffs' motion in December 2005. In this order, Judge Squatrito declined to order Defendant Walker to restore all 181 of the WebHouse tapes. Exhibit B to Johnson Decl. (Dec. 8, 2005 Order). Instead, the Court set forth a three-step approach for dealing with the WebHouse tapes:

- *First*, the Court held that the parties needed to meet and confer to determine which of the 181 tapes should be restored. On this point, the Court suggested that the parties use indexes to determine which of the tapes contained responsive information. *Id.*

- *Second*, the Court made it clear that, after restoring certain designated tapes to their searchable and accessible format, Defendants were responsible for searching and producing the responsive data on the restored WebHouse tapes "in the most efficient manner possible." *Id.*

- ***Third,*** the Court held that the Defendants needed to "record and produce a summary of their methodology so that plaintiffs can argue for the inclusion of more data if appropriate." *Id.*

Following the Court's ruling on the second motion to compel, the parties held more meet and confers in December 2005 and January, February, March and April 2006. During these meet and confers, the parties agreed to create indexes that showed what types of files were located on the 181 tapes. The parties split the costs of creating these indexes. Using these indexes, the parties were able to identify 9 additional tapes that contained emails and responsive electronic documents. These additional 9 tapes were then restored to a searchable and accessible format – bringing the total number of restored tapes containing emails and electronic documents to 17.[2] As with the indexes, the parties split the costs to restore these additional tapes.

The parties also discussed ways for Defendant Walker to produce responsive emails and electronic documents on the 17 fully restored tapes. Plaintiffs proposed that Defendant Walker start by doing an email-by-email search of certain designated key email accounts. Exhibit C to Johnson Decl. (Plfs' Feb.17, 2006 Letter). This is important because many of the key individual email accounts – ***including email accounts belonging to Defendants Walker and Richard Braddock*** – are sitting on the 17 restored tapes. *See* Exhibit N to Johnson Decl. (pages from index showing that Walker and Braddock emails are on the 17 restored tapes). The parties also discussed ways to deal with the remaining responsive email and electronic documents on the 17 tapes. Just as the parties were beginning to make progress on this front, Defendant Walker replaced his attorneys with new counsel. This is the second time that Defendant Walker has

---

[2] Plaintiffs are still in the process of reviewing some of the remaining indexes to see if any of the other WebHouse tapes contain responsive emails and electronic documents. This motion, however, is not directed at any of those tapes. Instead, this motion is directed only at the 17 tapes that the parties have already fully restored.

replaced his attorneys in this case – the first time occurring after the Court denied Walker's motion to dismiss. Defendant Walker's new attorneys brought the entire WebHouse email and electronic document production to a complete halt. They have done nothing to move the process forward and have refused to produce ***any*** of the emails and electronic documents contained on the 17 fully restored WebHouse tapes in violation of the Court's December 2005 order. *See, e.g.,* Exhibits H through M to Johnson Decl. (the parties' recent letters discussing the restored WebHouse tapes). This has forced Plaintiffs to once again come before the Court.

One final issue relating to the WebHouse backup tapes must be explored. The indexes that the parties created for the WebHouse backup tapes reveal that there are electronic documents on these tapes that ***post-date*** the October 2, 2000 filing and the October 10, 2000 service date of the Complaint. *See* Exhibit O to Johnson Decl. (pages from index showing documents that post-date the filing and service date of the Complaint). ***This indicates that Defendants placed the WebHouse emails and electronic documents on the "inaccessible" backup tapes after they had been served with the Complaint.*** This would be a clear violation of the Private Securities Litigation Reform Act ("PSLRA"), which provides that: "any party to [a securities fraud] action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such persons and that are relevant to the allegations, as if they were subject to a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure." 15 U.S.C. § 77(b)(2).

The PSLRA further provides that any party aggrieved by "the willful failure of an opposing party to comply with [the document preservation requirement] may apply to the court for an order awarding appropriate sanctions." *Id.* To date, Defendants have never explained

why the WebHouse emails and electronic documents were placed on 181 "inaccessible" backup tapes in the first instance.  Defendant Walker pleads ignorance on this point, but he was the CEO at WebHouse, had his hand in virtually all aspects of WebHouse's operations, and received notice of the Complaint on October 10, 2000.  ***Defendant Walker needs to explain why the WebHouse emails and electronic documents ended up on the 181 "inaccessible" backup tapes.***

## BACKGROUND

**A.    The WebHouse Documents Are The Most Important Documents In The Case.**

This case – at its core – is about the false and misleading statements that Defendants Priceline, Jay Walker, Richard Braddock, Daniel Schulman and N.J. Nichols (collectively, the "Defendants") made to analysts and investors about WebHouse from January 27, 2000 to October 4, 2000.[3]  Defendants launched WebHouse in November 1999 to show that Priceline's "Name Your Own Price" business model – which up to that point had only been used to sell airline tickets, car rentals and hotel reservations – could also be used to successfully sell groceries and gas.[4]  At the time, Defendants were touting Priceline as "the future Wal-Mart of the web" and they wanted to show investors that Priceline's business model could be expanded beyond the travel industry.  Needless to say, analysts and investors were watching WebHouse very closely to see if it would succeed.

---

[3] Jay Walker, Richard Braddock, Daniel Schulman and N.J. Nichols were Priceline's top executives and directors.  Defendant Walker is Priceline's founder and served as the CEO of WebHouse.  Braddock served as Priceline's Chairman throughout the relevant period and was Priceline's CEO from 1998 to May 2000.  Schulman served as Chief Operating Officer from 1998 to May 2000, and then took over as CEO for the remainder of the Class Period.  Nichols served as a Priceline Director throughout the Class Period.

[4] The "Name Your Own Price" System essentially permits consumers to establish an "offer" price to purchase airline tickets, hotel rooms and rental cars and, based upon the collection of excess capacity in those markets at certain times, Priceline seeks to locate suppliers to meet that "offer" price, thereby providing an acceptable and, at times, lower price for the item(s) purchased than otherwise would be available to consumers.

Following the WebHouse launch, Defendants spent a great deal of time trying to persuade manufacturers and gas companies to offer discounted groceries and gas prices on the WebHouse website, which WebHouse shared with Priceline. Defendants did so because this was the key to WebHouse's success. Priceline's business model worked for airlines, car rental and hotel reservations because certain companies were willing to allow Priceline to sell airline tickets, car rentals and hotel reservations on the Priceline website at a deep discount. For WebHouse to succeed, Defendants needed to persuade major grocery manufacturers and gas companies to do the same. Otherwise, WebHouse would be forced to pay for the discount itself – a sure-fire way to lose a lot of money. This is where Defendants ran into trouble. Defendants could not get major manufacturers and gas companies to offer discounted groceries and gas on Priceline's website, leaving WebHouse to foot the bill.

Defendants knew that the market would not react well to news that manufacturers and gas companies were refusing to offer discounted products on the WebHouse website. Thus, Defendants made several false and misleading statements that were designed to give investors the false impressions that manufacturers and gas companies were supporting WebHouse. For instance, a Priceline spokesman stated in early 2000 that WebHouse had signed agreements with two dozen manufacturers, who had agreed to offer products for sale on the website at discounted prices. Internal board meeting documents show that the real number was six and, for these six contracts, none *required* manufacturers to offer discounted products on WebHouse.

Similarly, in July 2000, Jay Walker – who founded Priceline and was WebHouse's CEO – was asked during an interview about WebHouse: "Who is bankrolling this thing?" Walker responded: "The manufacturers and they'll do it forever." Four days before making this statement, Defendant Walker received internal financial documents showing that WebHouse was

paying for approximately 90% of the product discount out of its own pocket, whereas manufacturers were covering less than 1% of the discount. Defendant Walker also told investors during an analysts' meeting in early August 2000 that he expected the grocery and gas business at WebHouse to be "gross margin positive" by year end 2000 and that WebHouse was currently valued at over $1 billion. Contemporaneous internal documents demonstrate that these statements were patently false. These are only a few examples of the false statements that Defendants made about WebHouse – statements that were designed to give investors the false impression that WebHouse was a success.

At the same time that Defendants were making these false statements, they also were unloading hundreds of millions of dollars of their own Priceline shares. Defendant Jay Walker – in particular – was desperate to cash out some of his Priceline shares. He was grossly overextended financially due to a $120 million margin loan that he had taken out to purchase Priceline stock. Walker had overextended himself to the point where a sharp drop in Priceline stock had the potential to wipe out his entire net worth. He needed to artificially prop up Priceline's stock price long enough to unload his shares. In the spring and summer of 2000, he began aggressively selling his shares, eventually selling close to $338 million worth of Priceline stock both individually and through his holding company, Walker Digital, LLC.

WebHouse eventually buckled under the pressure of having to pay for the product discount out of its own pocket. The truth about WebHouse's financial condition began to emerge on September 15, 2000, when WebHouse announced that it was laying off 40 full time workers and 100 freelance employees. Then, on October 5, 2000, Defendants shocked the market by announcing that they were shutting WebHouse down. Investors took this as a sign that Priceline's business model was limited to the travel industry and could not be successfully

expanded to sell groceries and gas on the web.  On the day of this announcement, Priceline's stock price plummeted 38%.

Plaintiffs have pieced Defendants' scheme together from the paper documents contained in Priceline's office files.  The most incriminating documents, however, are the emails and electronic documents that belong to WebHouse's executives and employees.  Those emails and electronic documents – which tell the inside story of what went on at WebHouse – are contained on 181 WebHouse tapes that Defendant Jay Walker currently has in his possession, custody and control.  Amazingly, as of the filing of this motion, ***Defendant Walker has yet to produce a single email or electronic document contained on the WebHouse tapes – even though these emails and electronic documents are now fully searchable and accessible and are among the most important documents at issue in this case***.

**B.      The Case History Relating To The 181 WebHouse Tapes.**

The parties have a long history relating to the 181 WebHouse tapes that Defendant Walker currently has in his possession, custody and control.  This case history is summarized as follows:

- Plaintiffs first learned about the 181 WebHouse tapes when they moved to compel Defendants to produce emails and electronic documents in March 2005.  When opposing that motion, Defendant Walker stated that he had 181 "inaccessible" WebHouse tapes in his possession, custody and control.  Docket No. 158-1 (Opp. to Mot. to Compel, at 7-8).  Defendant Walker further stated that it would cost between $20 million and $200 million to restore and produce the emails and electronic documents on the tapes – a statement that would later prove to be untrue.  *Id.*

- Based on these representations, Judge Squatrito ordered the parties to meet and confer to discuss an appropriate way to restore the WebHouse tapes.  The parties then held several meet and confers in April, May, June, July and August 2005.  During these meet and confers, the parties identified 8 tapes that contained emails and responsive electronic documents.  Docket No. 260 (Def. Walker's Feb. 10, 2006 Status Rep., at 1).  These 8 tapes were eventually restored to their fully accessible and searchable format.  *Id.*

- At this point, Plaintiffs retained a computer forensics specialist to look into the restoration issue. She informed Plaintiffs that the tapes could be restored to a fully searchable and accessible format for $400 per tape. Plaintiffs' computer forensics specialist also advised that the parties could create an index of the tapes – which would allow the parties to identify those tapes that they needed to restore – for $100 per tape.

- In September 2005, when no emails and electronic documents on the restored tapes were forthcoming, Plaintiffs again moved to compel. In this motion, Plaintiffs moved the Court to order Defendant Walker to restore and produce the 181 tapes in their entirety. Docket No. 212 (Plfs' Motion to Compel). Plaintiffs stated that they were willing to take on the entire burden of searching the tapes for responsive information once the tapes were restored so long as they were given copies of the restored tapes. *Id.*

- Judge Squatrito ruled on Plaintiffs' motion in December 2005. In his order, he declined to order Defendant Walker to restore all 181 tapes. Exhibit B to Johnson Decl. (Dec. 8, 2005 Order). Instead, he set forth the following ***three-step approach*** for dealing with the 181 WebHouse tapes:

    o ***First***, the Court held that the parties needed to meet and confer to determine which of the 181 tapes should be restored. On this point, the Court strongly suggested that the parties create indexes to identify those tapes that contained the responsive documents. *Id.*

    o ***Second***, the Court made it clear that, after restoring certain designated tapes to their searchable and accessible format, the burden shifted to Defendant Walker to design a proper methodology for searching and producing the responsive information on the restored WebHouse tapes. *Id.*

    o ***Third,*** the Court held that the Defendants needed to "record and produce a summary of their methodology so that plaintiffs can argue for the inclusion of more data if appropriate" and it ordered the Defendants to file monthly status reports with the Court so that it could "observe the process." *Id.*

- Following the Court's order, the parties created indexes for the 181 tapes. Using these indexes, the parties identified 9 additional tapes that contained responsive information. The parties agreed to split the cost of restoring the tapes. By early April 2006, Defendant Walker had restored 17 WebHouse tapes to a fully searchable and accessible format.

- On April 7, 2006, Plaintiffs set up a conference call with Defendant Walker's counsel to discuss Walker's methodology for producing responsive emails and electronic documents on the 17 restored tapes. During this call, Walker's attorneys stated that they were not prepared to discuss Walker's methodology for producing responsive documents on the tapes – even though the parties had been making progress on this front.

- A few days later, Plaintiffs were told that Defendant Walker had decided to replace with new counsel the attorney who had given the go-ahead to restore the 17 tapes. *See* Exhibit

D to Johnson Decl. (April 12, 2006 email). This was the second time Defendant Walker had replaced his attorneys with new counsel – the first time occurring shortly after the Court denied Defendant Walker's motion to dismiss. Defendant Walker has now had three different sets of attorneys in this case.

- To date, Defendant Walker's new counsel has refused to search and produce the documents on the 17 tapes. Exhibit J to Johnson Decl. (Defs' May 4, 2006 Letter). Remarkably, as of the filing of this motion, Defendant Walker has yet to produce a single email or electronic document from the 17 restored tapes – *even though these emails and electronic documents are now fully accessible and reviewable and are among the most critical documents at issue in this case*.

## ARGUMENT

**A.    Defendant Walker Has Failed To Comply With The Court's December 2005 Order.**

The Court's December 2005 Order sets forth a ***three-step approach*** for dealing with the

181 WebHouse tapes:

- ***First***, the Court held that the parties needed to meet and confer to determine which of the 181 tapes should be restored. On this point, the Court suggested that the parties use indexes to determine which of the tapes contained responsive information.

- ***Second***, the Court made it clear that, after restoring certain designated tapes to their searchable and accessible format, Defendants were responsible for searching and producing the responsive data on the restored WebHouse tapes "in the most efficient manner possible." *Id.*

- ***Third,*** the Court held that the Defendants needed to "record and produce a summary of their methodology so that plaintiffs can argue for the inclusion of more data if appropriate." *Id.*

The parties moved past the first step in this process months ago when they identified and

then restored 17 WebHouse tapes containing responsive emails and electronic documents.[5]

Defendant Walker now must comply with the Court's second directive, which provides that: "the

defendants, as custodians of the computer files, shall be responsible for excising duplicate files,

sifting through data for responsive information and reviewing responsive documents for

---

[5] Plaintiffs are focusing only on the 17 restored tapes in this motion to compel. However, Plaintiffs reserve their right to seek the restoration of additional tapes should they later discover that other tapes contain responsive information.

privilege in the most efficient manner possible." Exhibit B to Johnson Dec. (Dec. 8, 2005 Order); *see also id.* ("[T]he court is placing primary responsibility upon the defendants to properly sort through the data."). Defendant Walker also must comply with the directive that requires him to: "record and produce a summary of their methodology so that plaintiffs can argue for the inclusion of more data if appropriate." *Id.* Defendant Walker has failed to comply with either of these two directives. As of the filing of this motion, Defendant Walker has failed to put forth a good faith methodology that will capture the responsive documents on the 17 restored tapes and – even more troubling – no responsive emails and electronic documents on the 17 restored tapes have been produced.

**B.    Defendant Walker Has Refused To Perform An Email-By-Email Search Of Certain Designated Individual Email Accounts.**

Defendant Walker knows what needs to be done with respect to the 17 restored WebHouse tapes. The starting point should be an email-by-email search of certain designated email accounts belonging to those executives at WebHouse whose email accounts contain documents going to the heart of the allegations in this case. Plaintiffs provided Defendant Walker with a list of these key individual email accounts in February 2006 and asked him to perform an email-by-email search of the email accounts once the tapes were fully restored. Exhibit C to Johnson Decl. (Plfs' February 17, 2006 Letter). Plaintiffs know that many of these key email accounts – ***including email accounts belonging to Defendants Walker and Richard Braddock*** – are sitting on the 17 restored tapes because the email accounts turned up on the indexes that the parties made when identifying the tapes that they needed to restore. *See* Exhibit N to Johnson Decl. (pages from index showing that Walker and Braddock emails are on the 17 restored tapes). To date, Defendant Walker has refused to perform the email-by-email search and has failed to produce a single email contained in the key email accounts.

11

Defendant Walker claims that it would be too expensive and burdensome to review the designated email accounts. In his June 12, 2006 status report, Defendant Walker states that: "Walker's counsel currently estimates the population of the email files of the individuals identified by plaintiffs to exceed 23 gigabytes, or 2,330,496 pages. It would likely cost several millions of dollars of attorney review time to perform an email-by-email review of an email population of that size."[6] Defendant Walker has made similar claims in the past – which later proved to be untrue. For instance, Defendant Walker represented to the Court in March 2005 that it would cost between $20 million and $200 million to restore and produce the emails and electronic documents on the WebHouse tapes. The parties were later able to restore the 17 most relevant tapes to a fully searchable and accessible format for approximately $7000.

Defendant Walker also continues to focus on cost-shifting. However, cost-shifting is only appropriate when dealing with ***inaccessible tapes***, which is not what the parties are dealing with here. *See, e.g., Zubalake v. UBS Warburg LLC*, 216 F.R.D. 280, 281 (S.D.N.Y. 2003) (holding that cost-shifting is "potentially appropriate ***only*** when ***inaccessible*** data is sought" and explaining that "[the responding party] must pay for any costs incurred in reviewing the restored documents") (emphasis in original); *OpenTV v. Liberate Technologies*, 219 F.R.D. 474, 476 (N.D. Cal. 2003)(explaining that the cost-shifting "inquiry necessarily turns on the accessibility of the requested data"); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1995 WL 360526, *1-2 (N.D. Ill. 1995)(Responding party bears the cost of "compiling, formatting, searching and

---

[6] Defendant Walker's July 12, 2006 status report also contains several misstatements. For instance, Defendant Walker claims that the WebHouse tapes "are old tapes." This is not true. The Court has held that the "Relevant Period" in this case spans from March 1, 1999 to April 1, 2001. Exhibit A to Johnson Decl. (April 6, 2005 Order). All of the emails and electronic documents on the WebHouse tapes fall within the heart of this "Relevant Period." Also, Defendant Walker asks the Court to set "reasonable time parameters" for the search. The Court, however, addressed this issue in its April 6, 2005 order. *Id.*

retrieving responsive email[,]"  including "search[ing] the e-mail data for names of particular individuals and … eliminate[ing] duplicate messages."). The 17 tapes at issue in this motion have now been restored and are fully accessible and searchable.[7]

Defendant Walker's cost-shifting argument is really just a last-ditch attempt to suppress the incriminating emails and electronic documents on the WebHouse tapes. Defendants lack case support for the argument and – more importantly – Plaintiffs have made it clear all along that they are perfectly willing to take on the "burden" of reviewing the emails and electronic documents on WebHouse tapes. Accordingly, this Court should order Defendant Walker to review those email accounts identified in Plaintiffs' February 17, 2006 letter on an email-by-email basis and produce all emails (including drafts, deleted emails and attachments) that are responsive to Plaintiffs' document requests. Alternatively, if it is truly "cost-prohibitive" "unreasonable" and "burdensome" to search the emails and electronic documents on the 17 restored tapes, Defendant Walker should send the 17 restored tapes to the Plaintiffs and they will review the email accounts on their own.

---

[7] As Judge Scheindlin observed in *Zubalake*:

Documents stored on backup tapes can be likened to paper records locked inside a sophisticated safe to which no one has the key or combination. The cost of accessing those documents may be onerous, and in some cases the parties should split the cost of breaking into the safe. But *once the safe is opened, the production of the documents found inside is the sole responsibility of the responding party. The point is simple: technology may increasingly permit litigants to reconstruct lost or inaccessible information, but once restored to an accessible form, the usual rules of discovery apply*. 216 F.R.D. at 291.

**C.      The Court Should Order Defendant Walker To Use Search Terms To Cull Out The Privileged Documents And Then Produce The Remaining Emails and Electronic Documents On The 17 Restored WebHouse Tapes.**

**1.      Defendant Walker's "Search Term" Approach Is Designated To Exclude The Vast Majority Of Responsive Emails And Electronic Documents.**

Defendant Walker clearly does not want to turn over the incriminating emails and electronic documents on the 17 fully restored WebHouse tapes.  However, there is very little Defendant Walker can do at this point to keep these documents from the Plaintiffs.  Defendant Walker's only option is to propose a narrow "search term" approach that will only capture a handful of the relevant documents and will result in a massive document dump.  Taking his lead from the Priceline Defendants – who used three search terms to dump hundreds of thousands of blank and irrelevant documents on the Plaintiffs (which is the subject of a separate motion to compel) – Defendant Walker proposes that the parties search only a few of the email accounts on the 17 restored tapes using narrow search terms that will undoubtedly capture few of the relevant documents in the case.  Docket No. 322 (June 12, 2006 Status Rep., at 6).

This approach will not work.  The main problem with this type of narrow "search term" approach is that it will fail to capture hundreds of thousands of relevant emails and electronic documents on the 17 restored tapes, leading to their complete exclusion from this case.  This is no doubt what Defendant Walker has in mind.  Like the Priceline Defendants, who have also proposed a narrow search term approach, Defendant Walker knows full well that it is not possible to capture many of the relevant documents with search terms – both because of difficulties in coming up with the search term list and because many relevant documents cannot be captured using search terms.  The end result is that Plaintiffs never see a majority of the responsive documents and hundreds of thousands of documents disappear entirely from the case.

**2.     The Court Should Compel Defendant Walker To Use Search Terms To Exclude Privileged And Work Product Documents.**

A far more fair and appropriate approach would be to give the Plaintiffs the opportunity to search the 17 restored tapes themselves.  As noted above, Plaintiffs have made it clear that they are willing to accept the burden of searching and reviewing the electronic materials for responsive information.  Defendant Walker has objected to this approach, claiming that this would lead to the disclosure of privileged and work-product documents contained on the WebHouse tapes.  However, these concerns can be addressed by using search terms to capture the privileged and work-product documents contained on the 17 restored tapes, which then could be removed and placed on a privilege log.  This is also a "search term" approach, but it is far more efficient and will actually capture the responsive documents.  Moreover, the Court already put a safeguard in place to protect against the possibility that certain privileged documents would not be captured by the search terms when it entered an order providing that the inadvertent production of privileged and work-product documents would not constitute a waiver of the attorney-client privilege or work-product protection.  Exhibit B to Johnson Decl. (Dec. 8, 2005 Order).

Using search terms to exclude privileged and work-product documents from the 17 restored tapes is far better than trying to use search terms to capture responsive information.  If the search terms fail to capture privileged and work-product documents, there is still a safeguard in place to ensure that these documents will not be used in the case.  Defendant Walker will still be able to assert the attorney-client privilege and work-product doctrine with respect to these documents.  However, if Defendant Walker's proposed search term approach is used to capture responsive documents, thousands of responsive documents will almost certainly fall through the cracks.  More troubling, Plaintiffs will never know that these documents exist and a majority of

the responsive documents will be excluded from this case. Plaintiffs' search term approach strikes an appropriate balance between Defendant's right to assert the attorney-client privilege and Plaintiffs' right to discover responsive documents that they need to prove the federal securities fraud claims at issue in this case.

This approach is also appropriate given the directives set forth in the Court's December 2005 Order. In that order, the Court made it clear that: "the defendants, as custodians of the computer files, shall be responsible for excising duplicate files, sifting through data for responsive information and reviewing responsive documents for privilege in the most efficient manner possible." Exhibit B to Johnson Decl. (Dec. 8, 2005 Order). The order further provides that: "the court is placing primary responsibility upon the defendants to properly sort through the data." *Id.* To date, Defendant Walker has not come up with a good faith methodology for capturing responsive documents – in direct violation of the Court's December 8, 2005 Order. Instead, he has acted strategically in hopes of preventing Plaintiffs from obtaining the vast majority of relevant documents at issue in this case.

Accordingly, this Court should order Defendant Walker to: (1) use search terms to capture those documents that may contain privileged and work-product information on the 17 restored tapes; (2) review these documents to ensure that they do in fact contain privileged or work-product information and then place the privileged and work-product documents on a privilege log that comports with Rule 26, which Defendant Walker then must provide to the Plaintiffs; (3) make a searchable electronic copy of the remaining electronic documents on the 17 restored tapes (*i.e.,* those that are not placed on the privilege log); and (4) produce this copy to the Plaintiffs so that the Plaintiffs can conduct their own search of the emails and electronic documents on the 17 restored tapes.

**D.      The Court Should Set A Deadline For The Completion Of The Electronic Production.**

Finally, this Court should set a deadline for the completion of Defendant Walker's electronic production.  This deadline is needed because Defendants have used the electronic discovery issues to delay fact discovery in the case.  The Court has already had to reset the schedule in this case due to Defendants' inability to produce the electronic documents in a timely fashion, and Plaintiffs have been forced to hold off on taking the bulk of the fact depositions until they receive the responsive electronic documents.  As things now stand, the parties are in limbo with respect to the schedule in this case.  Accordingly, this Court should set a date certain when Defendant Walker is to complete the removal of the privileged documents and to produce the 17 restored Priceline WebHouse Club tapes.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should order Defendant Walker by a date certain to:

(a)      Review those email accounts identified in Plaintiffs' February 17, 2006 letter on an email-by-email basis and produce all emails and electronic documents (including draft emails, deleted emails, emails sent to the account holder, emails sent by the account holder, and attachments) responsive to Plaintiffs' document requests contained in these individual email accounts; alternatively, Defendant Walker can provide Plaintiffs with a searchable electronic copy of the email accounts identified in Plaintiffs' February 17, 2006 letter so that Plaintiffs can review the email accounts on their own;

(b)      Use search terms to capture those documents that may contain privileged and work-product information on the 17 restored WebHouse tapes;

(c)      Review those documents captured by the privileged search term search to ensure that they do in fact contain privileged or work-product information

17

(d)     Place the privileged and work-product documents on a privilege log that fully comports with Rule 26, which they must provide to the Plaintiffs;

(e)     Make a searchable electronic copy of the remaining electronic documents on the 17 restored WebHouse tapes (*i.e.,* those that are not placed on the privilege log) and produce this copy to the Plaintiffs;[8]

(f)     Order Defendant Walker to explain in detail why the WebHouse emails and electronic documents ended up on the 181 "inaccessible" backup tapes.

(g)     Provide Plaintiffs with appropriate relief for the failure of Defendant Walker to comply with the Court's discovery orders.

Dated: July 7, 2006                              Respectfully submitted,
                                                 SCOTT + SCOTT, LLC

                                                 __/s/*Erin Green Comite* _____
                                                 David R. Scott (ct16080)
                                                 Erin Green Comite (ct24886)
                                                 108 Norwich Avenue
                                                 P.O. Box 192
                                                 Colchester, CT 06415
                                                 Telephone: (860) 537-5537
                                                 Facsimile: (860) 537-4432
                                                 drscott@scott-scott.com
                                                 ecomite@scott-scott.com

                                                 SCOTT + SCOTT, LLC
                                                 Geoffrey M. Johnson
                                                 33 River Street
                                                 Chagrin Falls, OH 44022
                                                 Telephone: (440) 247-8200
                                                 Facsimile: (440) 247-8275

                                                 JOHNSON & PERKINSON
                                                 Dennis J. Johnson
                                                 Jacob B. Perkinson
                                                 Peter J. McDougall

---

[8] As an alternative to steps (b) through (f), Defendant Walker may provide Plaintiffs with searchable copies of the 17 restored WebHouse tapes in their entirety.

1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403
Telephone: (802) 862-0030
Facsimile: (802) 862-0060

STULL, STULL & BRODY
Jules Brody
Aaron Brody
6 East 45th St.
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

**Co-Lead Counsel**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 7, 2006, a true copy of the foregoing was served on all counsel of record via either hand-delivery or overnight mail or prepaid, first-class U.S. mail, as noted below:

_____/s/*Erin Green Comite*_____
Erin Green Comite

### SERVICE VIA HAND DELIVERY

Joseph L. Clasen
William Kelleher
Alexander Pencu
ROBINSON & COLE, LLP
Financial Centre
695 East Main Street
Stamford, CT 06904-2305

Frank F. Coulom, Jr.
Bradford S. Babbitt
ROBINSON & COLE
280 Trumbull Street
Hartford, CT 06103-3597

Terence J. Gallagher, III
Thomas D. Goldberg
DAY, BERRY & HOWARD
One Canterbury Green
Stamford, CT 06901-2047

### SERVICE VIA OVERNIGHT MAIL

Bruce Bennett
Jeanne E. Irving, Esq.
J. Michael Hennigan, Esq.
Shawna Ballard
HENNIGAN, BENNETT & DORMAN
865 S. Figueroa St., Ste. 2900
Los Angeles, CA 90017

Daniel Slifkin
Robert Simonds
CRAVATH, SWAINE & MOORE
825 Eighth Avenue
Worldwide Plaza
New York, NY 10019

## **SERVICE VIA U.S. MAIL**

Dennis J. Johnson
Jacob B. Perkinson
JOHNSON & PERKINSON
1690 Williston Road
South Burlington, VT 05403

Jules Brody
Aaron Brody
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017

Andrew M. Schatz
SCHATZ & NOBEL, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06106

J. Daniel Sagarin
HURWITZ SAGARIN & SLOSSBERG
147 North Broad St., PO Box 112
Milford, CT 06460-0112