IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

In Re: Priceline.com                                  :    Master File No.
Securities Litigation                                 :    3:00cv1884 (AVC)

-----------------------------------------------------------  :

This document relates to:                            :

                                                     :

        ALL PENDING ACTIONS            :

                                                     :

                                                     :    July 27, 2006

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
EMAILS AND ELECTRONIC DOCUMENTS CONTAINED ON THE
"SNAPSHOT" AND "TERMINATED EMPLOYEE TAPES"**

Joseph L. Clasen (ct04090)
ROBINSON & COLE, LLP
Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT 06904-2305
Telephone: (203) 462-7500
Fax: (203) 462-7599
jclasen@rc.com

Daniel Slifkin (ct21203)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Fax: (212) 474-3700
dslifkin@cravath.com
*Attorneys for Defendants
priceline.com Inc., N.J. Nicholas,
Daniel Schulman and Richard S. Braddock*

## Table of Contents

Page

Introduction ................................................................................................................ 1

Argument ................................................................................................................... 3

I.  DEFENDANTS HAVE PRODUCED RESPONSIVE, NON-
   PRIVILEGED EMAILS IN ACCORDANCE WITH THE PARTIES'
   AGREEMENT ON EMAIL DATA AND THE COURT'S ORDER ..................... 3

   A.  Defendants' Production of Responsive, Non-Privileged Emails
       for Braddock, Schulman and Walker in Response to Plaintiffs'
       Document Requests was Conducted in Good Faith ................................... 3

       i.   Calendar, Diary and Meeting Status Emails were
            produced in response to plaintiffs' specific document
            requests ........................................................................................ 3

       ii.  Defendants' email production for Braddock, Schulman
            and Walker is complete ................................................................ 4

       iii. Defendants email production for Braddock, Schulman
            and Walker has been "substantive" ............................................. 7

            (a)  Braddock-specific allegation is without merit ................. 8

            (b)  Schulman-specific allegation is without merit ................ 9

            (c)  Walker-specific allegation is without merit .................. 10

       iv.  Plaintiffs' Erroneous Speculation About the Volume of
            Braddock, Schulman and Walker Emails is No Basis
            for a Motion to Compel .............................................................. 10

   B.  Defendants Continually Have Provided Plaintiffs With The
       Protocol and Methodology for Reviewing and Producing
       Electronic Material .............................................................................. 12

II. PLAINTIFFS' EFFORTS TO UNDUE THE COURT-APPROVED
   METHOD OF USING SEARCH TERMS TO SEARCH THE NON-
   EMAIL PORTIONS OF THE SNAPSHOT SHOULD BE DENIED ................. 15

   A.  Defendants' good faith efforts to review and produce electronic
       material on the snapshot have resulted in the production of
       extensive responsive material ............................................................. 15

     **B.**    Plaintiffs' proposed revision to the process of using search terms to search the snapshot directly contradicts a previous Court Order on this issue ........................................................................ 19

**III.**    PLAINTIFFS SEEK TO IGNORE A CLEAR AGREEMENT BETWEEN THE PARTIES GOVERNING THE REVIEW AND PRODUCTION OF EMAIL .............................................................................. 21

**IV.**    DEFENDANTS HAVE PRODUCED NUMEROUS "FINANCIAL DOCUMENTS" AND HAVE NOT EXCLUDED SUCH RESPONSIVE DOCUMENTS FROM OUR SEARCH AND PRODUCTION ....................................................................................... 24

**V.**    DEFENDANTS DO NOT OPPOSE A COURT-ORDERED DEADLINE FOR THE PRODUCTION OF ELECTRONIC DOCUMENTS ....................................................................................... 26

Conclusion ....................................................................................................... 27

CERTIFICATION ............................................................................................ 28

Defendants priceline.com Inc. ("priceline"), N. J. Nicholas, Daniel H. Schulman and Richard S. Braddock (collectively, "Defendants") respectfully submit this memorandum of law in opposition to plaintiffs' Motion to Compel Emails and Electronic Documents Contained on the "Snapshot" and "Terminated Employee Tapes".

## Introduction

Notwithstanding the Court's prediction that "due to the nature of this case, the production of material stored [by priceline] in electronic form is going to be time consuming and expensive" (Memorandum of Decision and Order, dated December 8, 2005, at 5 ("December 8th Order")), Defendants' efforts to review and produce emails and electronic documents have been diligent and exhaustive. That fact is irrefutable.

To date, Defendants have:

- reviewed approximately one million pages of emails from the email accounts of an agreed upon list of 80 custodians;

- produced over 450,000 pages of responsive, non-privileged emails;

- reviewed, to date, over 7.5 million pages of non-email electronic documents from the "snapshot" and "departed employee tapes"[1];

- produced over 1.1 million pages of responsive, non-privileged non-email documents from the snapshot and departed employee tapes; and

---

[1] In the initial stages of this litigation priceline issued a company-wide document hold notice. As the litigation progressed, priceline sought to preserve all of its electronic material in one secure location. As a result, a "snapshot" was taken of priceline's various servers. This snapshot is the equivalent of a full back-up of all the material that existed on priceline's corporate file servers as of February 2002 (the time the snapshot was taken). Included among the information on the snapshot is specific electronic information of certain employees who left priceline in approximately 2000-2001 -- the "departed employee tapes". For purposes of this memorandum, any reference to "snapshot" shall be meant to encompass all of the preserved electronic material, including the departed employee tapes.

- produced nine separate volumes of a privilege log.

Furthermore, as plaintiffs are aware, Defendants continue to review even more documents that are currently being retrieved from the snapshot based upon search terms that Defendants were forced to unilaterally choose after plaintiffs refused to participate meaningfully in the search term selection process.

Plaintiffs, on the other hand, have sought to obstruct the discovery process at every chance by failing to meet and confer in good faith and continuing to file discovery motions that are premature, unduly burdensome and without merit. (See, e.g., Defs.' Opp'n to Pls.' Fourth Mot. to Compel Disc. and Mem. in Supp. of Their Cross-Mot. for Protective Order ). Any delay that plaintiffs perceive in the discovery process is entirely of their own doing as they have forced Defendants to waste time and misdirect resources in response to their unnecessary motion practice -- even to the point of requiring Defendants to seek a protective order against such harassment. (Id.)

Plaintiffs' current motion is their most egregious and desperate to date. Plaintiffs, in total disregard of the record of electronic discovery:

- mischaracterize the volume of individual email and financial information that has been produced by Defendants (see infra, Sections I, IV);

- make assertions regarding search terms that they know to be false (see infra, Section II(A));

- attempt to utilize the transfer of this case to revisit and rewrite a previous Court order issued by Judge Squatrito (see infra, Section II(B));

- renege on discovery agreements reached between the parties that are clearly memorialized in correspondence and Court filings (see infra, Section III); and

- contradict themselves throughout by complaining about an alleged "document dump", while simultaneously requesting the production of "hundreds of thousands" of more documents.

Defendants have collected, reviewed and produced responsive, non-privileged documents in a thorough, transparent and appropriate fashion. All responsive, non-privileged materials located on the snapshot have been produced in accordance with the parties' agreements and the Court's directives.

It appears that plaintiffs think there is some "smoking gun" that is being deliberately withheld. There is not.

Plaintiffs' motion, therefore, should be denied for the reasons set forth below.

## Argument

### I.    DEFENDANTS HAVE PRODUCED RESPONSIVE, NON-PRIVILEGED EMAILS IN ACCORDANCE WITH THE PARTIES' AGREEMENT ON EMAIL DATA AND THE COURT'S ORDER

Defendants have produced responsive, non-privileged emails in compliance with the Court's Order and in accordance with the parties' long-standing agreement on, and protocol for, the production of email. (See infra, Section III.)

#### A.    Defendants' Production of Responsive, Non-Privileged Emails for Braddock, Schulman and Walker in Response to Plaintiffs' Document Requests was Conducted in Good Faith

##### i.    Calendar, diary and meeting status emails were produced in response to plaintiffs' specific document requests

Plaintiffs' initial complaint is that Defendants have produced many calendar, diary and meeting status emails for defendants Richard Braddock, Daniel Schulman and Jay Walker, which they unilaterally deem to be non-substantive. Plaintiffs mischaracterize those responsive emails as "blank" or "wholly irrelevant" as if plaintiffs

have no idea what they are or why they have been produced. Those emails, however, are part of each individual's email account and the plaintiffs <u>specifically</u> requested them.

In their First Request for Production of Documents, dated November 15, 2004 (Ex. A, Declaration of G. Johnson, dated July 7, 2006 ("Johnson Decl.")), the plaintiffs requested:

> All files maintained by or on behalf of the Individual Defendants [including Braddock, Schulman and Walker] which refer or relate to Priceline and/or WebHouse or Priceline's and/or WebHouse's products and/or services, including, but not limited to, <u>all diaries, calendars, or other systems maintained by or for Defendants concerning or for the purpose of their appointment scheduling.</u> (Id. Document Request No. 43 (emphasis added).)

In addition, plaintiffs defined the term "document" in their Request for Production as encompassing all electronic data, including "diaries, appointment books or calendars". (<u>Id.</u> at 2-3 (Definition 6).)

In response to that request, Defendants naturally produced numerous calendar, diary, appointment and meeting status email documents found in the respective email accounts of Braddock, Schulman and Walker for the designated relevant time period. They are hardly "blank" or "irrelevant" emails; rather they are directly responsive to plaintiffs' requests[2] and many contain substantive messages or notations.

### ii.     Defendants' email production for Braddock, Schulman and Walker is complete

Plaintiffs next allege that Defendants' production of emails for Braddock, Schulman and Walker is somehow incomplete or that Defendants have failed to conduct

---

[2] In addition to Document Request No. 43, these calendar, diary and meeting status emails are also responsive to various other document requests, including Document Request No. 5, which essentially calls for every document ever created "referring or relating to the actual or contemplated business operations of Priceline and/or WebHouse". (<u>Id.</u> at 12.)

a good faith email-by-email review of their email accounts. It is unclear exactly what documents plaintiffs were expecting to receive, but Defendants' efforts were extensive and are now complete. Plaintiffs' bald allegations are unsupported and largely, if not exclusively, based on pure speculation and disappointment that the emails of Braddock, Schulman and Walker do not support their claims.

First, plaintiffs fail to present the Court with accurate figures representing the volume of emails produced for Braddock, Schulman and Walker from their respective email accounts on the snapshot -- despite Defendants having provided plaintiffs with a Production Source Log on March 2, 2006 listing the exact Bates Number ranges for each individuals' emails. (See Ex. G, Johnson Decl.)[3]

As the chart below illustrates, plaintiffs' Opening Brief fails to account for over 400 emails for Braddock, Shulman and Walker that were produced from their email accounts on the snapshot:

| Email Custodian/Party | Correct Number of Emails Produced from Snapshot Per Defendants' Source Log | Corresponding Number of Pages | Number of Emails that Plaintiffs Have Failed to Account For |
|---|---|---|---|
| R. Braddock | 266 | 406 | 5 |
| D. Schulman | 1,756 | 3,711 | 241 |
| J. Walker | 1,158 | 2,317 | 157 |

---

[3] Braddock's emails were produced at PCLN000172786-PCLN000173186 and PCLN000647425-PCLN000647429; Schulman's emails were produced at PCLN000173187-000176878 and PCLN000647430-PCLN000647448; and Walker's emails were produced at PCLN000395129-PCLN000396732, PCLN000402801-PCLN000403512, and PCLN000648401-PCLN000648401. (See Ex. G, Johnson Decl.) In fact, most of the Braddock and Schulman emails were the very first emails that the Defendants produced from the snapshot. (Id.)

Second, plaintiffs fail to account for and consider the emails of Braddock, Schulman and Walker that were produced from other paper and electronic sources.

For example, Defendants produced many more emails for Braddock, Schulman and Walker after review of priceline's hard copy files, which was the first phase of our document production prior to dealing with the snapshot. (See Summary Chart of Emails Produced by Defendants, Declaration of W. Kelleher, dated July 27, 2006 ("Kelleher Decl."), Ex. A.) As listed in the accompanying chart of emails, those documents represent approximately 272 additional emails for Braddock, Schulman and Walker from the designated relevant time period. (Id.)

Defendants also produced additional emails for Braddock, Schulman and Walker from the email accounts of other relevant individuals who had email accounts on the snapshot and may have been carbon copied recipients of emails or had such emails in their sent or received mail folders. (Id.) This group of email represents another approximately 2,883 emails. (Id.)

In addition, emails of Braddock, Schulman and Walker were also produced in paper form by defendant Walker. That production consists of approximately 39 more emails. (See Kelleher Decl. ¶ 2 and Ex. A) In fact, there appears to be still more email data for Braddock and Walker that was found in electronic format on back up tapes possessed by defendant Walker -- albeit such data has yet to be limited by the relevant time period and reviewed for responsiveness and privilege by Walker's counsel. (See Kelleher Decl. ¶ 2.)

Accordingly, not only have the Defendants provided plaintiffs with a significant volume of emails for Braddock, Schulman and Walker, that body of email was

compiled from multiple sources across a wide spectrum of electronic media and

conventional paper records.  There can be no debate:  all reasonable steps were taken by

Defendants to collect, review and produce available responsive, non-privileged email.

### iii.    Defendants email production for Braddock, Schulman and Walker has been "substantive"

All told, the following chart represents the approximate totals of emails

produced for Braddock, Schulman and Walker:

| Email Custodian/Party | Correct Number of Emails Produced from Snapshot Per Defendants' Source Log |
|---|---|
| R. Braddock | 994 |
| D. Schulman | 3,259 |
| J. Walker | 2,061 |

And while plaintiffs fail to describe the process or criteria by which they

unilaterally deem so few of those emails to be "substantive", it is undeniable that all of

the emails are responsive to plaintiffs' own document requests and they were produced

after a review of hard copy documents and an email-by-email search of the email

accounts of an agreed-upon list of relevant document custodians.

Defendants are not withholding emails.  Nor did Defendants somehow

curtail their search of Braddock, Schulman, or Walker's email accounts.  Plaintiffs now

have all such responsive, non-privileged documents that (i) exist in Braddock, Schulman,

and Walker's email accounts on the snapshot or (ii) have been located in priceline's hard

copy files.

(a)    Plaintiffs' Braddock-specific allegation is without merit[4]

Plaintiffs allege that Braddock's email production must be incomplete because they have received a single email from non-party Goldman Sachs that was not produced by Defendants as part of Braddock's email account on the snapshot. The referenced email is an exchange between Braddock and Goldman Sachs analysts Coralie Tournier Witter and Anthony Noto.[5] However, Defendants can confirm, after double-checking Braddock's preserved email account on the snapshot, that the referenced document is not contained in his email account. (Kelleher Decl. ¶ 4.)

As a result, the fact that this document does not exist in Braddock's email account on the snapshot and therefore could not have been produced by Defendants, accompanied by the fact that Defendants have produced several other documents concerning communications with Goldman Sachs and Mr. Noto[6], demonstrates further that Defendants have engaged in a thorough email review.

---

[4] Plaintiffs incorrectly state that Richard Braddock was priceline's Chairman and CEO for most of the designated relevant time period of March 1, 1999 through April 1, 2001. Braddock served as priceline's CEO until May 15, 2000, for only a brief part of the Class Period, and he was later reappointed to that position on May 7, 2001, but only after the Class Period and after the designated relevant time period governing the production of documents. He was instead the Chairman of priceline's Board of Directors during the Class Period and the designated relevant time period. (Ex. B, Kelleher Decl.)

[5] Although the plaintiffs vaguely claim that they have obtained "several" of his emails from "third parties" (Pls.' Br. at 9), they cite only to this single email. As explained by Mr. Noto at his deposition taken by plaintiffs, it was common practice to send draft reports to companies such as priceline to confirm that it contained accurate information. (Ex. M at 81-84, Johnson Decl.) The email is by no means "substantive".

[6] See, e.g., PCLN000402210-13; PCLN000414124-26; PCLN000415133-36; PCLN000415419-21; PCLN000624417-19; PCLN000627814-15; PCLN000628686-88; PCLN000631483-505; PCLN000631560; PCLN000631561-62; PCLN000631585-86; PCLN000631696; PCLN000631697-98; PCLN000632171-210; PCLN000637889-914; PCLN000645690-92; PCLN000645789-94; PCLN000645951-54; PCLN000645955-57; PCLN000645958-60; PCLN000645961-63; PCLN000646016-40; PCLN000646081-82; PCLN000646156-59.

(b)     Plaintiffs' Schulman-specific allegation is without merit[7]

Although they badly under-account for the actual number of Schulman

emails, more than 3,200, plaintiffs contend that of the emails produced for Schulman,

only four emails are dated between May 2000 and the end of the Class Period, in October

2000.  Plaintiffs allege that such a shortage of email in this period somehow suggests that

the Defendants have not produced all relevant emails.

First, plaintiffs are wrong on their facts.  Defendants have double-checked

Schulman's emails, and of the 1,766 emails produced for Schulman that are dated within

the Class Period, there are 342 emails between May and October 2000 (Ex. A, Kelleher

Decl.) -- well more than the four alleged by plaintiffs.

Second, Defendants have produced all of Schulman's responsive, non-

privileged emails from the snapshot and priceline's relevant hard copies -- the fact that

certain time periods contain more emails than others is entirely expected and does

nothing to undermine Defendants' efforts.  In fact, plaintiffs fail to acknowledge that the

May-October 2000 time period coincided with the time when Schulman became

priceline's CEO (in May 2000).  Accordingly, Schulman's email activity during a time

period in which he was busy with high-level executive duties as both the priceline CEO

and Chief Operating Officer, as compared to earlier in 2000, may be entirely expected.

(Kelleher Decl. ¶ 6 and Ex. C.)

---

[7] Plaintiffs incorrectly state that Schulman was priceline's Chief Operating Officer and then CEO for most of the designated relevant time period of March 1, 1999 through April 1, 2001.  Schulman did not join priceline until June 1999, after the start of the designated relevant time period.  On May 15, 2000, a few months after the start of the Class Period, Schulman was appointed as priceline's CEO and served in the position of CEO until May 7, 2001.  Additionally, as of October 2000, Schulman ceased serving as priceline's Chief Operating Officer and Jeffrey Boyd assumed that position.  (Ex. C, Kelleher Decl.)

(c)     Plaintiffs' Walker-specific allegation is without merit[8]

Plaintiffs contend that of all the emails produced for Walker, only one is from the Class Period.

Again, plaintiffs are wrong on their facts: there were 492 emails produced for Walker from the Class Period.  (Ex. A, Kelleher Decl.)  And again plaintiffs insinuation is baseless:  Defendants have produced all of Walker's responsive, non-privileged emails.

Moreover, Walker has been represented throughout this case by his own counsel who has produced more than 350,000 pages of paper documents, including Walker emails.  It also appears that additional Walker email may be located on the WebHouse back up tapes.  (Ex: N, Johnson Decl.)  Therefore, Walker himself would be a substantial source, if not perhaps the primary source, of any additional email.

> iv.     **Plaintiffs' erroneous speculation about the volume of Braddock, Schulman and Walker emails is no basis for a motion to compel**

Plaintiffs' pure speculation about missing emails or their consternation at the volume of email produced for Braddock, Schulman and Walker is hardly a sound basis for a motion to compel.

Notwithstanding the fact that plaintiffs vastly understate the email produced for Braddock, Schulman and Walker, it is also not surprising that, given their duties and schedules as high-level executives at a busy company, they do not have an

---

[8] With respect to Walker, plaintiffs acknowledge that he was the CEO of a separate entity, WebHouse Club.  While he was the founder of priceline and also the Vice-Chairman of the Board of Directors of priceline, he stepped down from his position as Vice-Chairman as of December 31, 2000, and had previously assumed the role of CEO of Walker Digital LLC.  (Ex. D, Kelleher Decl.)

enormous volume of emails -- particularly in relation to other lower-level employees at priceline.[9]  The quantity of email per person may vary depending on any one of a myriad of understandable reasons, including, among others, an employee's position and responsibility, the nature of the employee's work, the day-to-day need for using email, and the employee's personal email usage habits.

Furthermore, it is well established, in this District and others, that such simple and expected realities about email data cannot be disproved through speculative motions to compel.  In <u>Wood v. Sempra Energy Trading Corp.</u>, Civil Action No. 3:03-cv-986, 2005 U.S. Dist. LEXIS 33638, at *16-17 (D. Conn. Dec. 9, 2005) (Hall, J.), the Court held:

> "The plaintiff's Motion merely speculates with regard to 'missing' emails.  Sempra has explained that, given the nature of its business and the location of employees in close proximity on a trading floor, much work is done orally, and email traffic is limited.  Further, the fact that Wood wrote a lot of emails does not necessarily mean that other people at Sempra did as well. . . .  that does not mean that the people who worked at Sempra had the same email communication habits as Wood."[10]

<u>See also</u> <u>In re CV Therapeutics, Inc., Sec. Litig.</u>, No. C 03-03709 SI, 2006 U.S. Dist. LEXIS 38909, at *16 (N.D. Cal. Apr. 3, 2006) (denying plaintiffs' motion and instead accepting defendants' explanation for any discrepancies between predicted email volumes and actual documents produced); <u>Beyond Sys., Inc. v. Kennedy W. Univ.</u>, Civil

---

[9] As illustrated by Defendants' production, the quantity of email in employees' emails account can vary, from those with a large volume of email to those with considerably less.  (<u>See</u> Ex. G, Johnson Decl. (Letter of William J. Kelleher III, March 2, 2006).)

[10] In <u>Wood</u>, the court denied the plaintiff's motion in limine that sought to preclude the use at trial of certain of the defendant's document production and emails or for the granting of an adverse inference against the defendant.  <u>Id.</u> at *24.

Action No. DKC 2005-2446, 2006 U.S. Dist. LEXIS 36054, at *33-35 (D. Md. May 31, 2006) (rejecting, as speculative and conclusory, plaintiff's assertion with respect to emails that, "based on the number of e-mails it has received, 'it is likely that similar quantities of e-mails were sent to other recipients in Maryland.'").

Simply put, the guesswork and supposition that plaintiffs engage in throughout their motion is unfounded and inappropriate justification for a motion to compel.

**B.     Defendants Continually Have Provided Plaintiffs With The Protocol and Methodology for Reviewing and Producing Electronic Material**

Plaintiffs claim that Defendants have not provided them with a summary of the steps and methods used for our review and production of electronic data in this case. Their central position is that they "do not know for sure" whether all emails have been produced from the available email accounts of 80 people because of this alleged shortcoming. Although it may be true that Defendants have not given plaintiffs a discrete piece of paper that is titled, at the top of the page, "Methodology", Defendants <u>have</u>, every step of the way, (i) consulted and agreed with plaintiffs on our methods and protocol for collecting, reviewing and producing electronic material and (ii) memorialized those agreements in correspondence and filings.

The Court stated that the Defendants should document "a summary of their methodology so that plaintiffs can argue for the inclusion of more data if appropriate." (December 8th Order at 8.) The Court further stated that it would "not dictate exactly how defendants should accomplish these tasks" and specifically left it to the Defendants "to evaluate the best method for culling the data . . .". (<u>Id.</u>)

Over a year ago, even <u>before</u> the Court directed us to do so, Defendants began advising and consulting with plaintiffs on the method by which electronic material would be reviewed.  For example, with respect to the email review and production:

- <u>On July 19, 2005</u>:  Defendants sent plaintiffs a detailed letter describing the sources of electronic data, including emails on the snapshot and departed employees tapes.  (Ex. B, Johnson Decl.)

- <u>On August 11, 2005</u>:  We informed plaintiffs:  (1) that the email files on the snapshot and departed back up tapes allowed us to search for the email files of specific individuals by name; (2) we provided a list of the 50 individuals whose emails accounts we proposed to search; (3) we explained that we would be produce emails on a rolling basis for responsive, non-privileged emails; and (4) we agreed to produce emails in TIFF format.  (<u>See</u> Ex. E, Kelleher Decl. (Letter from J. Hein to P. McDougall, dated August 11, 2006.)  The Order confirmed all of these methods and parameters.  (<u>See</u> December 8th Order.)

- <u>On August 15, 2005</u>:  Plaintiffs fully agreed with those understandings and methods with respect to email and offered a supplemental list of 63 additional people for whom they requested we review email files.  (<u>See</u> Ex. F, Kelleher Decl. (Letter from P. McDougall to J. Hein, dated August 15, 2005).)  Plaintiffs agreed to the same approach for people with email files on the departed employee tapes.  They further asked for searchable text (txt.) files for the email data and that we retain the data in native format, requests to which the Defendants agreed.  The Order likewise confirmed all of these methods and parameters.  (<u>See</u> December 8th Order.)

- <u>On September 1, 2005</u>:  Plaintiffs confirmed their understanding that Defendants were producing emails and electronic documents as TIFF files with corresponding text (txt.) files, not as native format files.  (Ex. G, Kelleher Decl.)

- <u>On January 13, 2006</u>:  Defendants advised plaintiffs that "[r]esponsive, non-privileged emails from each custodian are, in fact, being produced together, and with any non-privileged attachments."  (Ex. H, Kelleher Decl.)

- <u>On February 24, 2006</u>:  Defendants confirmed to plaintiffs, in response to their February 20, 2006 letter, that our production of responsive, non-privileged emails (including attachments) from the email accounts of the 80 requested individuals was complete and we provided the plaintiffs with

the list of 33 people for whom Defendants did not have email accounts on the snapshot or departed employee tapes. (Exs. I & J, Kelleher Decl.)

- 10th of Every Month, 2006: As required by the Order, since January 10, 2006, the Defendants have been filing periodic Status Reports on the Production of Electronic Information, in compliance with the Court's Order to do so by the 10th of every month. (See Docket Entry Nos. 255, 261, 264, 275, 301, 323, & 333.) These reports further confirm and detail, in court filings, the methods and status of our email production.

Plaintiffs' professed ignorance of the methods used by Defendants to collect, search and review the electronic material rings hollow in the face of established agreements in correspondence and court filings. All of the information on Defendants' methods for searching and producing electronic material has been in plaintiffs' hands for months. Defendants absolutely have complied with the Court's December 8th Order.[11]

---

[11] The facts of our case bear no resemblance to Wachtel v. Guardian Life Ins. Co., Case No. 03-1801, 2006 WL 1286189 (D. N.J. May 8, 2006), the lone case cited by plaintiffs in support of their argument. (Pls.' Br. at 11 n.10). Wachtel involved very specific discovery abuses that occurred over the course of three years, namely, that (i) there was a near wholesale failure to produce any emails for almost 60 relevant persons in violation of multiple court orders, and (ii) defendants never informed plaintiffs of what their intentions or plans were for producing emails, the numbers of emails to be searched, the cost of the search or how emails were stored. Wachtel, 2006 WL 1286189, at *10-12. In addition, "volumes of emails . . . which should have been produced long ago, appeared for the first time during the court's hearing" [and] "Defendants, to this day, admit that they have not reviewed for production the vast majority of thousands of e-mails contained on the company's backup tapes, with no authority for such conduct." Id. at *10. The circumstance of Wachtel do not even begin to resemble the facts our case, and plaintiffs cannot seriously contend otherwise.

II.  **PLAINTIFFS' EFFORTS TO UNDUE THE COURT-APPROVED
     METHOD OF USING SEARCH TERMS TO SEARCH THE NON-EMAIL
     PORTIONS OF THE SNAPSHOT SHOULD BE DENIED**

   A.  **Defendants' Good Faith Efforts to Review and Produce Electronic
       Material on the Snapshot have Resulted in the Production of
       Extensive Responsive Material**

   Plaintiffs contend that Defendants have not acted in good faith with

respect to utilizing search terms to search the non-email portions of the snapshot.

Specifically, plaintiffs allege that "as of the filing of this motion, the Priceline Defendants

have only proposed *three search terms*" and that, as a result, "hundreds of thousands of

relevant documents" have been "*exclud[ed] from this case*".  (Opening Brief at 12-13

(emphasis in original).)  Plaintiffs' bald allegation about "hundreds of thousands of

relevant documents" is totally unfounded[12] and their tally of the number of search terms

employed thus far by Defendants is known to be false.[13]  Plaintiffs' position is easily

refuted by a review of the record of discovery on this issue.

   • Back on August 11, 2005, Defendants informed plaintiffs that it is not
     possible to identify the files of particular departments or individuals on the
     "non-email electronic data contained on the snapshot".  (Ex. E, Kelleher
     Decl. (Letter from J. Hein to P. McDougall, dated August 11, 2005).)
     Instead, Defendants proposed that plaintiffs provide a list of suggested
     search terms in order for the parties to "work together to craft a
     meaningful and reasonable search" of the non-email portion of the
     snapshot.  (Id.)

---

   [12] Tellingly, plaintiffs complain in their brief that Defendants have engaged in a
"document dump", while at the same time requesting hundreds of thousands more
documents.  Plaintiffs' offer no insight into what documents they allege are missing from
our production and their inconsistent positions illustrate the futility of their claims.

   [13] In fact, in just a few sentences after employing bold and italics to highlight "*three
search terms*", plaintiffs acknowledge that Defendants have actually employed and
produced documents from 23 search terms.

- Plaintiffs specifically agreed to that approach, but asked that Defendants compile the initial list of search terms. (Ex. F, Kelleher Decl. (Letter from P. McDougall to J. Hein, dated August 15, 2005).)

- On November 8, 2005, Defendants proposed searching the non-email material on the snapshot with the initial terms "Webhouse", "Web House" and "WHC" and that production of responsive, non-privileged documents would begin. (Ex. K, Kelleher Decl. (Letter from J. Hein to E. Comite, dated November 8, 2005).) It was Defendants' position that these initial search terms were most likely to retrieve responsive information, but Defendants asked plaintiffs "to suggest the next set of search terms". (Id.)[14]

- Over a month later, on December 19, 2005, plaintiffs agreed to Defendants' initial search proposal (Ex. L, Kelleher Decl. (Letter from P. McDougall to J. Hein, dated December 19, 2005)), and Defendants informed them they completed production of all responsive and non-privileged documents from the "Webhouse", "Web House" and "WHC" search, which total more than 120,000 pages.

- It was not until February 15, 2006, that plaintiffs offered a proposed list of additional search terms. (Ex. M, Kelleher Decl. (Letter from P. McDougall to J. Hein, dated February 15, 2006).) Plaintiffs' six-page list contained over 637 terms -- many of which were either facially unrelated to the case (including several expletives), or so generic in nature (such as the term "sell" or "125") that they would have yielded an enormous volume of non-responsive material. (Id.)

- Defendants advised plaintiffs that we believed the February 15 list was "not sent to us in good faith" and was "not a starting point for working together to agree on additional appropriate search terms". (Ex. N, Kelleher Decl. (Letter from J. Hein to E. Comite and P. McDougall, dated March 1, 2006).)

- Faced with the absurdity of their initial proposed list, on April 7, 2006, the plaintiffs provided a revised list of proposed additional search terms. (Ex. O, Kelleher Decl. (Letter from G. Johnson to J. Hein and B. Kelleher, dated April 7, 2006).)

---

[14] Defendants also proposed that the parameters of the term search of the non-email portion of the snapshot be confined to: (i) documents "last modified" during the period beginning March 1, 1999 and ending April 1, 2001; and (ii) text files -- word processing files, spreadsheets, databases, presentations and PDF files, not program and program support files, such as ".ini", ".dll" and ".exe" files. Id.

- Defendants again informed plaintiffs that the April 7 list continued to be overly broad. (Exs. P and Q, Kelleher Decl. (Respectively: Letter from R. Simonds to G. Johnson, dated April 11, 2006; and Letter from R. Simonds to G. Johnson, dated April 14, 2006).) Defendants agreed, however, to use the list to run a search against the non-email portion of Priceline's snapshot and departed employee tapes, and report the number of documents retrieved by those terms ("hits") and the estimated page count of those documents to the plaintiffs.[15] (Id.) Defendants then stated that "[w]e then will communicate to you the resultant number of hits and pages that would be retrieved from that search. After we both have those figures, we then can discuss the need, if any, to narrow or expand your April 7th list before any review for responsiveness and privilege begins." (Id.)

- On May 1, 2006, the Defendants informed plaintiffs that their April 7th list generated <u>well over 360,000 document hits</u> with an estimated page count in excess of <u>5 million pages</u>. And those figures were computed <u>after</u> excluding repetitive hits and excluding the documents already reviewed as part of Defendants' search using the November 8, 2005 initial search term list. After already reviewing millions of pages of documents in this litigation and producing over 750,000, Defendants were not willing to review five million additional pages retrieved by a search term list that was so overly broad and failed to target responsive materials.

- In an attempt to compromise, however, Defendants offered plaintiffs three solutions during a meet and confer. First, Defendants offered, with the help of an outside vendor, to specifically review the April 7th list to identify which terms were obviously overbroad in their retrieval.[16] Second, Defendants suggested that the agree on a workable number of terms that are relevant to the case to keep the document production moving forward. Third, Defendants suggested that the parties focus the search terms on certain types of files that were most likely to contain relevant materials -- files such as Word documents or Excel spreadsheets.

---

[15] Defendants specifically informed plaintiffs that this search would be done excluding the proposed terms "AG*", "WH*" and "Scal*" since they would target a large number of generic words that begin with the stated letters. For example, running a search for WH* (a search that is unable to distinguish between capital and lowercase letters) would retrieve all the documents containing such common words as "who", "what", "where", "why", etc.

[16] For example, it is Defendants' understanding from our vendor that many terms on the list were so generic in nature that they were retrieving numerous documents because they target a document's underlying formatting or set-up features. Specifically, the term "margin" was retrieving numerous documents which simply contain a margin in their underlying formatting.

- Plaintiffs refused to consider any of those proposed solutions. Plaintiffs maintained that Defendants must utilize that April 7th list in its entirely -- and they even indicated that they intend to add additional terms in the future.

- In an effort to move the process forward in the absence of compromise, Defendants told plaintiffs that Defendants would select reasonable and relevant search terms from plaintiffs' April 7th list that appropriately would target responsive information. Thereafter, on May 23, 2006, Defendants forwarded a list of 20 such terms from plaintiffs' April 7th list that Defendants would utilize to continue the review and production from the non-email electronic material. (Ex. R (Letter from W. Kelleher to E. Comite, dated May 23, 2006).)

- Defendants now have completed the review and production applicable to the 20 additional terms, which involved the review of approximately 4-5 million additional pages and the production of approximately 980,000 additional pages.

In continuing to push the process forward unilaterally, Defendants also now have selected an additional 10 terms from plaintiffs' April 7th list. Defendants are in the process of reviewing the numerous documents retrieved with those new terms and Defendants expect to continue producing responsive, non-privileged documents from that retrieval over the next few weeks.

There can be no reasonable debate. Defendants instigated and have maintained the steady review of non-email materials contained on the snapshot. We are the only party that has participated in good faith and we have moved ahead with productions when faced with plaintiffs' failure to meet and confer. 33 search terms now have been utilized -- 30 of which also were proposed by plaintiffs. Plaintiffs' allegations that such terms are not retrieving responsive information are without support.

**B.      Plaintiffs' Proposed Revision to the Process of Using Search Terms to Search the Snapshot Directly Contradicts a Previous Court Order on this Issue**

Unable to substantiate their claim regarding Defendants' alleged "bad faith", plaintiffs then attempt to re-litigate the merits of the search term approach altogether. Specifically, plaintiffs ask the Court to allow them "the opportunity to search the 'snapshot' and 'terminated employee tapes' themselves" after search terms are used "to exclude the privileged documents rather than using search terms to try to capture the relevant documents". (Opening Brief at 13, 14.) Plaintiffs' proposed approach is totally unsupported by law and runs contrary to an Order already issued by Judge Squatrito.

The snapshot contains virtually all of the material that was stored on priceline's corporate file servers for a period of more than three years. As a result, plaintiffs' request that we allow them "the opportunity to search the 'snapshot' . . . themselves" is essentially the equivalent of asking priceline to open its offices to plaintiffs' counsel to allow them to look at whatever they wish -- irrespective of whether that information is relevant, responsive, or privileged. Not only are plaintiffs not entitled to such unfettered access, but it also would be impossible to cull out documents of a privileged nature with some hypothetical list of search terms.

First, plaintiffs' approach does not allow Defendants' counsel to review our documents for privilege before they are produced. We are entitled to do that. See Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is relevant . . .").

Second, plaintiffs' approach contravenes Judge Squatrito's December 8th Order that dealt directly with this issue. Back in September 2005, plaintiffs filed a motion to compel electronic discovery which sought the very same relief -- the

production of the priceline snapshot in a format that plaintiffs could access and search at their leisure. (See Opening Br., dated September 22, 2005; Opposition Br., dated October 13, 2005; Reply Br., filed October 21, 2005; Surreply Br., filed November 4, 2005.) The Court specifically rejected that position, stating that:

> **Defendants shall retain possession of the original data through the restoration, data management, and document review stages.**
>
> There is no reason to deviate from the well-established principle that the party producing material in response to discovery requests shall have the opportunity to review the material for responsiveness and privilege prior to producing the material to the requesting party. (December 8th Order at 16 (emphasis in original).)

Plaintiffs' indifference to this Order can only be explained as an attempt to exploit the transfer of the case to a new Judge as a chance to evade Judge Squatrito's ruling.

Plaintiffs' additional contention, that the "Federal Judicial Conference's new proposed amendments to the Federal Rules have endorsed Plaintiffs' proposed approach" (Opening Brief at 15), is absolutely not true. The proposed amendment has not been adopted, and so cannot provide the basis for the order that plaintiffs seek. In addition, contrary to plaintiffs' suggestion, there is nothing in the language of the proposed amendment or in the Committee's comments from which to infer that there are any circumstances in which a party is meant to produce its documents prior to engaging in a full review of them for privilege. Rather, the proposed amendment reflects a recognition that there are "inevitable blunders" associated with privilege reviews,

especially privilege reviews of large amounts of electronically stored information. (See

Committee on Rules of Practice and Procedure at 45 (July 25, 2005).)[17]

In sum, not only is plaintiffs' attempt to overturn the December 8th Order

improper and totally unworkable, but it would also, in effect, restart the discovery process

and force Defendants to redo many months of discovery work.

### III.    PLAINTIFFS SEEK TO IGNORE A CLEAR AGREEMENT BETWEEN THE PARTIES GOVERNING THE REVIEW AND PRODUCTION OF EMAIL

Plaintiffs contend that any agreed-upon search term that is to be used to

search the non-email electronic data (see supra, Section II(A)), should also be used to

search the remaining email accounts on the snapshot. (Opening Brief at 16-17.)

Plaintiffs' contention, however, is in direct contradiction of a previously negotiated

agreement by which the parties agreed on how priceline email files would be reviewed

and produced.

The processes by which Defendants would search the snapshot for email

and non-email electronic materials were distinct and explicitly negotiated and agreed-

upon between the parties. Specifically, it was agreed that emails would be searched using

an agreed-upon list of custodians for the designated two-year time period of March 1,

1999 to April 1, 2001; and non-email materials would be separately searched using an

agreed-upon search term list. Those agreements are memorialized in numerous letters

between the parties, for example:

---

[17] Furthermore, plaintiffs already advanced this same argument and citation in their previous motion to compel -- which was fully briefed and denied by Judge Squatrito. So rather than waste any more of the Court's time in repeating the relevant arguments, Defendants refer the Court to the following documents: Opening Br., dated September 22, 2005; Opposition Br., dated October 13, 2005; Reply Br., filed October 21, 2005; Surreply Br., filed November 4, 2005.

- On August 8, 2005, plaintiffs sent a letter to Defendants during negotiation over the methodology of searching electronic materials, which clearly delineated the two categories "**Snap-shot Electronic Mail**" and "**Snap-shot Non-Email Electronic Data**". (Ex. S, Kelleher Decl. (Letter from P. McDougall to B. Kelleher and J. Hein, dated August 8, 2005).) In that letter, under the section header "Snap-shot Electronic Mail", plaintiffs requested that Defendants provide a list of the employees whose email files Defendants planned to search. Plaintiffs separately discussed the proposed use of search terms under the section header "Snap-shot Non-Email Electronic Data". Id.

- On August 11, 2005, in response to plaintiffs August 8 letter, Defendants proposed a list of 50 individuals whose email files Defendants would review and offered further that "[w]e will be happy to consider reasonable additions to our initial list". (Ex. E, Kelleher Decl. (Letter from J. Hein to P. McDougall, dated August 11, 2005).). Separately, Defendants again discussed the use of search terms to search what plaintiffs themselves had coined, the "non-email electronic data". Id.

- On August 15, 2005, plaintiffs explicitly "agreed[ed] to [Defendants August 11] approach" of "search[ing] individual email files contained on snapshot". (Ex. F, Kelleher Decl. (Letter from P. McDougall to J. Hein, dated August 15, 2005).) Plaintiffs then requested that Defendants more than double the initial list of custodians and add 63 additional individuals to the search, making the total 113. Id. Although it was Defendants' position that the addition of that many individuals was unreasonable, Defendants ultimately agreed.[18] (Ex. T, Kelleher Decl. (Letter from J. Hein to P. McDougall, dated August 17, 2005).) Once again, plaintiffs discussed the use of search terms in a separate section of the letter dealing with the remaining non-email electronic data. Id.

- On May 2, 2006, Defendants reiterated the aforementioned agreements after a meet and confer on that same date, during which plaintiffs indicated they may now seek to expand the scope of the search term search. (Ex. U, Kelleher Decl. (Letter from R. Simonds to G. Johnson, dated May 2, 2006).)

In addition to the correspondence between the parties, Defendants, in

compliance with the December 8th Order, memorialized those agreements in monthly

---

[18] On February 24, 2006, Defendants informed plaintiffs that 33 of plaintiffs' requested additional individuals did not have email files on the snapshot. (Ex. I, Kelleher Decl. (Letter from J. Hein to G. Johnson, dated February 24, 2006).) Therefore, the total of agreed-upon individuals whose email files on the snapshot were searched was 80.

Status Reports filed with the Court. Beginning in January 2005, and continuing to the present, Defendants updated the Court and the plaintiffs on the production of materials from two separate categories: "Emails", in which the 113 agreed-upon custodians were discussed; and "Non-email electronic material", in which the search terms were discussed. (See January 10, February 10, March 9, April 10, May 10, June 12 and July 10, 2006 Status Reports.) In fact, beginning in March, Defendants represented that their review and production of emails was complete.

Plaintiffs sat silent for months and now try to overcome the clear record of agreement by reference to a single sentence in one communication between the parties: in plaintiffs' August 15, 2005 letter, which is discussed above, plaintiffs state that Defendants should "search the complete snapshot using the search terms and produce any nonprivileged, responsive materials". (Opening Brief at 17.) Plaintiffs' selective citation of the August 15 letter is disingenuous at best.

Not only do plaintiffs ignore numerous other instructive letters and filings on the issue, but they also disregard the clear context of their chosen citation -- it had nothing to do with emails. The statement cited by plaintiffs was made in the second subsection of "1. The Snapshot of the Corporate Server", titled "b. Remainder of Snapshot". (Ex. F, Kelleher Decl. (Letter from P. McDougall to J. Hein, dated August 15, 2005).) This "remainder" was created after the preceding subsection, titled "a. Emails on Snapshot", explicitly carved out the agreed-upon treatment of emails on the snapshot -- that only the email files of particular individuals would be searched.

Plaintiffs' new request would not only duplicate efforts already completed in reviewing and producing email from the agreed-upon individuals identified by the

parties as potentially having relevant information, it would also unnecessarily search all of the other individuals' email files that are <u>not</u> likely to contain relevant information.

We believe that plaintiffs' effort to expand the review of email in disregard of the parties' previous agreements is unnecessary and intended only to burden the Defendants.

## IV.  DEFENDANTS HAVE PRODUCED NUMEROUS "FINANCIAL DOCUMENTS" AND HAVE NOT EXCLUDED SUCH RESPONSIVE DOCUMENTS FROM OUR SEARCH AND PRODUCTION

Finally, plaintiffs claim that Defendants affirmatively have excluded unspecified "financial documents"[19] from our search and document production. (Opening Brief at 18.)  Plaintiffs offer no further detail as to the type of documents to which they refer.  Regardless, plaintiffs have no basis to register such a complaint: plaintiffs have already received a substantial number of responsive financial documents and reports.  <u>See</u> Ex. V, Kelleher Decl. (listing numerous examples of such documents).

Plaintiffs <u>previously</u> claimed that Defendants had withheld financial documents, including "Adaptive Marketing Daily Performance Reports", "Daily Airline Flash Reports", "Priceline Website Traffic Reports" and "Weekly Update Reports".  (Ex. W, Kelleher Decl. (Letter from E. Comite to J. Hein, W. Kelleher and C. Mullis, dated February 17, 2006).)  After double-checking our production in response to that prior claim, Defendants promptly responded on March 1, 2006, pointing out that Defendants

---

[19] Plaintiffs appear to be referring generally to periodic weekly and monthly reports concerning priceline and its business segments, and WebHouse Club, but they provide no details or specifics as to what reports they are actually referring to.  Defendants are thus unable to respond in more detail to their argument, but reserve the right to do so should the plaintiffs offer some level of specificity.

had, in fact, already produced <u>numerous</u> such reports in our production. (<u>See</u> Ex. N, Kelleher Decl.)

Plaintiffs also speculate, without any basis for doing so, that the financial documents of the type listed in their February 17 letter will not be captured either by Defendants' individual email account review and production or the search term review and production of the non-email data. This too, is wrong. Indeed, the very reports identified in plaintiffs' own February 17 letter are, in fact, from Defendants' email production. The plaintiffs' own motion demonstrates as much. (<u>See</u> Ex. K, Johnson Decl. (containing the February 17, 2006 letter from plaintiffs, which lists that plaintiffs have received Adaptive Marketing Daily Performance Reports, Bates Nos. PCLN 000176726-27; Daily Airline Flash Reports, Bates Nos. PCLN 000203872-73; and Priceline Website Traffic Reports, Bates Nos. PCLN 000182329-339 -- all of which were produced with cover letters identifying whether the production was from paper, email or non-email electronic sources).)

Moreover, we continue to refer plaintiffs to the on-going production of non-email documents from the snapshot (which at this point amounts to more than 1 million pages of additional documents) for further responsive financial documents. Kelleher Decl. ¶ 27.[20]

---

[20]  <u>See, e.g.</u>, Daily Air Web Reports at  PCLN000664767, PCLN000669975, PCLN000733752, PCLN000733763, PCLN000733780, PCLN000733786, PCLN000733792, PCLN000733799, PCLN000735072 and PCLN000735573; Priceline Website Traffic Reports at PCLN000732956, PCLN000734122, PCLN000740724, PCLN000760226, PCLN000760548, PCLN000763019, PCLN000763029, PCLN000763046, PCLN001469568, PCLN001472758 and PCLN001473539; and Weekly Status Reports at PCLN0001476890, PCLN0001478120, PCLN0001478160, PCLN0001486611, PCLN0001486627 and PCLN0001486962.). In addition, to the extent that any financial documents for WebHouse are not contained in priceline's

## V.    DEFENDANTS DO NOT OPPOSE A COURT-ORDERED DEADLINE FOR THE PRODUCTION OF ELECTRONIC DOCUMENTS

Defendants have completed the production of emails from the snapshot. (See supra, Section III.)

Defendants have completed the production of non-email electronic material retrieved by a list of 23 search terms. (See supra, Section II(A).)

At this time, none of the priceline back-up tapes have been selected for restoration and it is Defendants' position that, based on the preliminary results of the forensic scans and the Court's December 8th Order, that it is not necessary to restore and review the back up tapes. (See May 10, 2006 Status Report, 8-11.)

Therefore, the only category of documents left to be reviewed and produced are the results of Defendants' most recent use of 10 additional search terms to search the non-email portion of the snapshot. (See supra, Section II(A).) In light of the fact that (i) plaintiffs have not meaningfully participated in the selection of additional search terms and (ii) the terms already utilized have resulted in a production of over 1.1 million relevant pages, additional terms are unnecessary.

It is Defendants' position that our electronic discovery will be completed after the production generated by the 10 new search terms.

---

production, we respectfully refer the plaintiffs to Walker's production, which consists of mostly WebHouse documents. Kelleher Decl.¶ 28.

## Conclusion

For the reasons stated above, Defendants respectfully request that this Court deny plaintiffs' Motion. Moreover, given that plaintiffs have needlessly reopened matters that were already agreed upon and/or ruled upon by the Court, we do not think that plaintiffs' motion was "substantially justified". Fed. R. Civ. P. 37(a)(4)(B). Accordingly, we also respectfully request that the Court require plaintiffs' counsel to pay Defendants the reasonable costs incurred in responding to this motion, including attorneys' fees. Id.

July 27, 2006

DEFENDANTS PRICELINE.COM INC.,
N.J. NICHOLAS,
DANIEL SCHULMAN AND
RICHARD S. BRADDOCK


    /s/ Joseph L. Clasen
Joseph L. Clasen (ct04090)
ROBINSON & COLE, LLP
Financial Centre
    695 East Main Street
    P.O. Box 10305
        Stamford, CT 06904-2305
        Telephone: (203) 462-7500
        Fax: (203) 462-7599
        jclasen@rc.com


Daniel Slifkin (ct21203)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
    825 Eighth Avenue
    New York, NY 10019
        Telephone: (212) 474-1000
        Fax: (212) 474-3700
        dslifkin@cravath.com

## CERTIFICATION

I hereby certify that the foregoing was filed with the Court and served on all counsel of record listed below via the ECF electronic court filing system and by first class mail on this 27th day of July, 2006:

| Co-Lead Counsel | Liaison Counsel |
|---|---|
| David R. Scott, Esq.<br>Erin G. Comite, Esq.<br>Scott & Scott, LLC<br>108 Norwich Avenue<br>P.O. Box 192<br>Colchester, CT 06415<br>Tel: 860-537-3818<br>Fax: 860-537-4432<br><br>Jules Brody, Esq.<br>Aaron Brody, Esq.<br>Stull Stull & Brody<br>6 East 45th Street<br>New York, NY 10017<br>Tel: 212-687-7230<br>Fax: 212-490-2022<br><br>Dennis J. Johnson, Esq.<br>Jacob B. Perkinson, Esq.<br>Johnson & Perkinson<br>1690 Williston Road<br>South Burlington, VT 05403<br>Tel: 802-862-0030<br>Fax: 802-862-0060 | Andrew M. Schatz, Esq.<br>Jeffrey S. Nobel, Esq.<br>Schatz & Nobel, PC<br>One Corporate Center<br>20 Church Street, Suite 1700<br>Hartford, CT 06103-3202<br>Tel: 860-493-6292<br>Fax: 860-493-6290 |

| **Attorneys for priceline.com, Inc., Richard S. Braddock, Daniel H. Schulman and N.J. Nicholas, Jr.** | **Attorneys for Defendant Jay S. Walker** |
|---|---|
| Evan R. Chesler, Esq.<br>Daniel Slifkin, Esq.<br>Robert K. Simonds, Esq.<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019<br>Tel: 212-474-1000<br>Fax: 212-474-3700 | Thomas D. Goldberg, Esq. (ct04386)<br>Terence J. Gallagher, Esq. (ct22415)<br>Day, Berry & Howard LLP<br>One Canterbury Green<br>Stamford, CT 06901<br>Tel: 203-977-7300<br>Fax: 203-977-7301<br><br>Jeanne E. Irving, Esq.<br>Hennigan, Bennett & Dorman LLP<br>865 South Figueroa Street, Suite 2900<br>Los Angeles, CA 90017<br>Telephone: 213-694-1200<br>Fax: 213-694-1234 |

　/s/ William J. Kelleher III
William J. Kelleher, III