# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| IN RE:  PRICELINE.COM, INC. | : | MASTER FILE NO. |
| SECURITIES LITIGATION | : | 3:00-CV-01884 (AVC) |
| _____ | : |  |
|  | : |  |
| This document relates to: | : |  |
|  | : |  |
| ALL ACTIONS | : | July 28, 2006 |

**DEFENDANT JAY S. WALKER'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL DEFENDANT WALKER TO PRODUCE
EMAILS AND ELECTRONIC DOCUMENTS ON THE SEVENTEEN RESTORED
<u>PRICELINE WEBHOUSE CLUB TAPES</u>**

Thomas D. Goldberg (ct04386)
Terence J. Gallagher (ct22415)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901
Phone:  (203) 977-7300
Fax:     (203) 977-7301
tdgoldberg@dbh.com – E-mail

- and -

J. Michael Hennigan (phv01119)
Bruce Bennett (phv01105)
Jeanne E. Irving (phv01118)
Shawna Ballard (phv01117)
HENNIGAN, BENNETT & DORMAN LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone:  (213) 694-1200
Fax:  (213) 694-1234
irvingj@hbdlawyers.com – E-mail

Attorneys for Defendant, Jay S. Walker

**ORAL ARGUMENT REQUESTED**

# Table of Contents

**Page No(s).**

I.      INTRODUCTION..................................................................................1

II.     BACKGROUND INFORMATION...........................................................3

      A.      Judge Squatrito Denied Plaintiffs' Prior Request for the
           Wholesale Production of Back-up Tapes.........................................4

      B.      Mr. Walker's Counsel Has Worked Diligently to Provide
           Catalogs Containing Information to Plaintiffs in Order to Assist
           the Parties' Analyses of Which Tapes Should Be Restored and
           What Data – if Any – Should Be Loaded and Processed for
           Review. ..........................................................................................5

      C.      Mr. Walker's Counsel Has Worked Diligently to Develop a
           Reasonable Methodology for Culling Through the Voluminous
           Data Notwithstanding Plaintiffs' Failure to Cooperate in This
           Process. .........................................................................................7

III.    ARGUMENT...................................................................................10

      A.      Plaintiffs' Violation of F.R.C.P. Rule 37 and Local Rule 37
           Warrants Denial of the Motion to Compel......................................10

      B.      Plaintiffs' Failure to Identify in Their Motion Which Tapes Were
           the Subject of That Motion Deprived Mr. Walker of Adequate
           Notice of the Content of the Motion and Adequate Opportunity to
           Prepare His Opposition. ................................................................11

      C.      Plaintiffs Seek to Impose an Extreme Production Burden Upon
           Mr. Walker Without Any Evidentiary Showing as to Why This
           Burden Is Justified. ......................................................................16

           1.      The Request for the Production of All Non-Privileged
                 Data on the 17 Back-up Tapes Is Improper.......................18

           2.      The Request for an Email-by-Email Review of Mailboxes
                 for 121 "Key" Individuals Is Excessive. ...........................20

           3.      Plaintiffs Have Not Made Any Effort to Reasonably
                 Tailor Excessive Demands In a Manner That Is Likely to
                 Lead to Responsive Documents.........................................22

4.   It Is Law of This Case That Mr. Walker Is Not Required to Engage in the Wholesale Production of Data on the Tapes Plaintiffs' Motion Seeks. ........................................................23

5.   The Relief Sought by Plaintiffs' Motion Is Inconsistent With Prevailing Law. .............................................................25

D.   The Privilege Methodology Suggested by Plaintiffs Is Inappropriate and Inconsistent with Judge Squatrito's December 8 Order. .....................................................................................................27

E.   Mr. Walker Has Complied With Judge Squatrito's December 8 Order. .....................................................................................................27

F.   Plaintiffs' Objections to the Use of Search Terms Contradicts Both the December 8 Order and Plaintiffs' Prior Commitments. .................29

G.   Plaintiffs Should Be Required to Pay the Costs Associated With Their Excessive Demands. .........................................................................30

IV.   CONCLUSION. ....................................................................................................35

<u>**Table of Authorities**</u>

<u>**Page No(s).**</u>

**Cases**

*Byers v. Ilinois State Police*,
   2002 U.S. Dist. LEXIS 9861 (N.D. Ill. May 31, 2002) ........................................................ 31

*In re Dow Corning Corp.*,
   261 F.3d 280 (2d Cir. 2001) ................................................................................................ 27

*McPeek v. Ashcroft*,
   202 F.R.D. 31 (D.D.C. 2001) ............................................................................................... 30

*Medtronic Sofamor Danek, Inc. v Michelson*,
   229 F.R.D. 550 (W.D. Tenn. 2003) ................................................................................. 32, 33

*Murphy v. Barberino Bros., Inc.*,
   208 F.R.D. 483 (D. Conn. 2001) ......................................................................................... 10

*Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*,
   No. 96 CV 75901998 WL 67672 (S.D.N.Y. Feb. 19, 1998)................................................. 10

*Rowe Entertainment, Inc. v. William Morris Agency, Inc.*,
   205 F.R.D. 421 (S.D.N.Y. 2002) ......................................................................................... 31

*Tri-Star Pictures, Inc. v. Unger*,
   171 F.R.D. 94 (S.D.N.Y. 1997)............................................................................................ 10

*Wiginton v. CB Richard Ellis, Inc.*,
   229 F.R.D. 568576 77 (N.D. Ill. 2004) ............................................................................... 33

*Williams v. Hernandez*,
   221 F.R.D. 414 (S.D.N.Y. 2004) ......................................................................................... 25

*Wright v. AmSouth Bancorporation*,
   320 F.3d 1198 (11th Cir. 2003) ........................................................................................... 25

*Zubulake v. UBS Warburg LLC*,
   216 F.R.D. 280 (S.D.N.Y. 2003) ......................................................................................... 32

*Zubulake v. UBS Warburg LLC*,
   217 F.R.D. 309 (S.D.N.Y. 2003) ..................................................................................... 31, 32

**Rules**

Fed. R. Civ. P. 26(b) ............................................................................................................... 26

Fed. R. Civ. P. 37.................................................................................................................10

Local Civ. R. 37(a) 2............................................................................................................10

## I.    INTRODUCTION.

Plaintiffs' motion to compel is staggering in its breadth – it seeks the review or production of approximately 23 million pages of material – approximately 12.3 million pages of emails and 10.7 million pages of other electronic information.[1]  Plaintiffs broadly request, among other things, the production of all responsive and non-responsive, non-privileged documents on what plaintiffs' motion refers to as 17 back-up tapes, despite the fact that Judge Squatrito rejected plaintiffs' prior request for the wholesale production of back-up tapes without regard for the relevance of the voluminous data thereon.[2]  Plaintiffs' abject failure to make any showing that the results of such a blunderbuss approach to discovery could justify the enormous costs that would be entailed both violates Judge Squatrito's earlier order and is inconsistent with prevailing law.

Emblematic of the lack of reason in plaintiffs' motion to compel production from "17 restored back-up tapes" is the fact that plaintiffs' motion never identifies **which 17 out of the 29 restored tapes** plaintiffs are talking about.[3]  As a result, the motion did not advise defendant Jay Walker's counsel – nor presumably the Court – what data was the subject of the motion.  The failure to identify in the motion what tapes were the subject of the plaintiffs' motion, and the consequent failure to give Mr. Walker adequate notice of the content of the motion or an adequate opportunity to respond to it warrants denial of the motion.

---

[1]    Declaration of Celestino Santos filed concurrently herewith ("Santos Decl.") ¶6.

[2]    In his December 8, 2005 Memorandum of Decision and Order ("December 8 Order") denying plaintiffs' demand for the production of all 181 back-up tapes, Judge Squatrito ruled: "There is no reason to deviate from the well-established principle that the party producing material in response to discovery requests shall have the opportunity to review the material for responsiveness and privilege prior to producing the material to the requesting party."  (December 8 Order (Dkt. # 245) at 6.  A copy of the December 8 Order is attached as Ex. 2 to the Declaration of Jeanne E. Irving, filed concurrently herewith ("Irving Decl.").  Unless otherwise noted, all references to exhibits herein will be to exhibits attached to the Irving Decl.

[3]    As plaintiffs are aware, more than 17 tapes have been restored to native format.

Plaintiffs' failure to identify what tapes are the subject of this motion is the direct consequence of plaintiffs' failure to meet and confer with Mr. Walker's counsel about the motion before filing it.  Indeed, plaintiffs never mentioned to Mr. Walker's counsel that they were even contemplating filing this motion.  In fact, plaintiffs did not communicate with Mr. Walker's counsel at all in the two months preceding the filing of this motion to compel from May 12, 2006 until July 7, 2006.  Plaintiffs' violation of their meet and confer obligation constitutes an independent basis militating denial of the motion.

The results of plaintiffs' violation of the meet and confer rule aptly demonstrate why that rule is so important.  As plaintiffs well know, Mr. Walker's counsel has caused 29 of the WebHouse back-up tapes to be restored.  Had the plaintiffs met and conferred, Mr. Walker's counsel would certainly have inquired which 17 out of the 29 restored tapes were at issue in plaintiffs' proposed motion, and one would hope that plaintiffs' counsel would have responded.

The business day following the filing of plaintiffs' motion, Mr. Walker's counsel began a series of communications with plaintiffs' counsel in an effort to learn what tapes were the subject of the motion.  However, plaintiffs' counsel did not deign to give Mr. Walker's counsel any information in response to this request for the first 14 days of the 21-day motion response period.  When plaintiffs' counsel did finally identify the "17 restored tapes" from which plaintiffs sought to compel production, Mr. Walker's counsel learned that, actually, plaintiffs sought production of 18 tapes, and that 9 of those tapes were **not** restored tapes at all.  This fact and its implications would surely have come to light and been dealt with had plaintiffs bothered to obey the Court's rules regarding meeting and conferring.

While the botched-up condition of plaintiffs' motion and their failure to comply with the meet and confer obligation militate denial of this motion, the motion should be denied for other reasons as well.  Plaintiffs have also failed to demonstrate that any of the expansive relief they seek is appropriate.  It is law of the case that discovery of electronic data from the WebHouse back-up tapes is not to be approached in the ramshackle method proposed by the plaintiffs.  Plaintiffs' request for the blanket production order they seek should be soundly denied.

2

## II.    BACKGROUND INFORMATION.

Plaintiffs' mislead the Court about the extent of Mr. Walker's discovery productions to the plaintiffs to date.[4]  Mr. Walker has already produced to the plaintiffs approximately 350,000 pages of documents and, in addition, has produced electronic data and documents from a variety of electronic media, including CDs, DVDs, floppy discs and video tapes.  Contrary to plaintiffs' motion, those productions included in excess of 1,500 emails, which with associated and attached documents constituted over 9,500 pages of production, including email to or from the majority of the 121 individuals whom plaintiffs characterize as "key" employees.  (Irving Decl. ¶ 3.)  Presumably, plaintiffs would know that if, in fact, they had bothered to review the documents already produced.

At issue in plaintiffs' pending motion against Mr. Walker are not back-up tapes with respect to any personal computers or property of Mr. Walker.  Instead, what this motion involves the extent of Mr. Walker's obligation to search, review and produce voluminous information from WebHouse back-up tapes found in a storage facility for WebHouse, a company of which he was once the CEO but which has not been in operation for nearly six years.

Plaintiffs' motion seeks the wholesale production of documents and data found on the tapes that are the subject of the motion.  However, for the most part, there is no reason to believe that the vast majority of the data on these tapes would be relevant to this lawsuit.  Both Mr. Walker's present counsel and his prior counsel[5] have undertaken extensive efforts to assess how to deal with the tapes.  Early on in the process, in order to facilitate discussion, counsel for Mr. Walker grouped the 181 tapes into 16 groups based on their handwritten labels.  Mr. Walker's counsel engaged an electronic discovery vendor, and had 16 of these tapes – one tape from each group – restored to a "native file" format.  Although the data on those 16 tapes was too

---

[4]    Plaintiffs claim that WebHouse emails have not been produced.  (Plaintiffs' Memorandum of Law (Dkt # 330) ("Plaintiffs' Memo") at 1.)

[5]    Mr. Walker changed counsel in April, 2006.  His previous counsel was Paul, Hastings, Janofsky & Walker LLP, and his current counsel is Hennigan, Bennett & Dorman LLP.

voluminous for a page-by-page search and could not be searched or organized electronically without further processing, counsel performed spot checks of these 16 tapes to get a feel for the kind of files that each contained and to make informed guesses as to the contents of the remaining tapes.

A.     **Judge Squatrito Denied Plaintiffs' Prior Request for the Wholesale Production of Back-up Tapes.**

Subsequent to Mr. Walker's restoration of one tape from each of the 16 groups, in September, 2005, plaintiffs filed a motion to compel the wholesale production of the data on the 181 back-up tapes.  Judge Squatrito refused this request.

In an attempt to avoid what Judge Squatrito was concerned could be "a colossal waste of resources" (December 8 Order at 6), the Court held that the "[r]estoration of back-up tapes shall proceed on a **measured** basis, with cost-shifting determinations made at each step of the process."  (*Id.* at 6, heading 2, emphasis added.)  Specifically, Judge Squatrito stated that "[b]efore the Court orders defendants to restore a back-up tape, there must be some indication that the files stored on the back-up tape may contain relevant information,"[6] and ruled that "[b]ecause of the extraordinary expense of restoration and review, this process should not be undertaken without justification."[7]

Pursuant to the December 8 Order, the defendants were ensure the opportunity for "sifting through the data for **responsive** information, reviewing **responsive** information for privilege in the most efficient manner possible."  (*Id.* at 8, emphasis added.)  Judge Squatrito held that,

"[t]here is no reason to deviate from the well-established principle that the party producing material in response to discovery requests shall have the opportunity to

_____

[6]     December 8 Order at 6-7, Ex. 2.

[7]     *Id.* at 7.

4

review the material for responsiveness and privilege prior to producing the

material to the requesting party."

(December 8 Order at 6, Ex. 2.)

Judge Squatrito specifically contemplated that search terms would be used to cull potentially relevant material from the morass of electronic data, and that plaintiffs would provide input in that process.  (*Id.* at 8 ("Defendants shall also seek input from plaintiffs regarding proposed search terms.").)

Judge Squatrito found that the data on the back-up tapes "is not accessible" absent expensive and time-consuming efforts (*id.* at 4), making specific findings regarding the varied steps that were necessary to restore the data on the back-up tapes to a form capable for review and searches.  (*Id.* at 2-5.)  The December 8 Order stated that the Court would consider cost-shifting at the appropriate time and held that "Defendants may file a motion to shift the cost of restoration either once the restoration has been completed or once a firm estimate of the cost of doing so has been generated." (*Id.* at 7-8.)

**B.     Mr. Walker's Counsel Has Worked Diligently to Provide Catalogs Containing Information to Plaintiffs in Order to Assist the Parties' Analyses of Which Tapes Should Be Restored and What Data – if Any – Should Be Loaded and Processed for Review.**

Subsequent to the December 8 Order, Mr. Walker's counsel and their IT personnel devoted substantial time and resources to produce information that would enable the parties to make informed decisions about which – if any – of the tapes might contain data whose value could justify the expense of restoring, reviewing and producing it.  These extensive efforts were summarized in Mr. Walker's status report filed on June 12, 2006, a copy of which is attached as Exhibit 4 to the Irving Decl.  Rather than detailing those efforts here, we would refer the Court's attention to that status report and we incorporate it herein by reference.

In summary, however, Mr. Walker's counsel has provided plaintiffs' counsel with searchable, electronic catalogs for 164 back-up tapes – i.e., all the catalogs that Mr. Walker's

vendor has been able to generate from the 181 back-up tapes.[8]  For the files contained on each tape, the catalogs show, among other things:  the file names, the folders, and the size of the file in bytes.  Mr. Walker's counsel estimates that the pages of these catalogs alone number in excess of one hundred thousand pages.  In addition, Mr. Walker's counsel caused 29 of the 181 tapes to be restored to their native format.

The catalogs were created and provided to plaintiffs' counsel so that they could be used in evaluating whether a particular back-up tape, or part of a back-up tape, was likely to contain any information that would have any relevance to this litigation.  On April 20 and 27, 2006, plaintiffs' counsel informed Mr. Walker's counsel that they had been reviewing the catalogs in an effort to identify files on the back-up tapes that they might request to be further reviewed, and that they could provide Mr. Walker's counsel with the identified parts of the five catalogs (from group 5 and group 15) that Mr. Walker's counsel had provided to plaintiffs' counsel on March 10, 2006.  (Irving Decl. ¶¶ 9-10.)

However, plaintiffs' never did provide this information.  (Irving Decl. ¶15.)  Having devoted substantial resources to create and provide to plaintiffs more than a hundred thousand pages of catalogs of the files on the back-up tapes, for the purposes of refining plaintiffs production focus, plaintiffs have failed to refine their focus at all.  Instead, plaintiffs filed this motion to compel seeking wholesale production from 17 unidentified tapes.  In their motion, plaintiffs devote no consideration to the huge volume of data on these tapes that is totally irrelevant to this case.

Also without any apparent use of or guidance from the voluminous catalogs, plaintiffs requested that Mr. Walker's counsel review email-by-email the mailboxes for 121 so-called "key" individuals.  (Irving Decl. ¶12.)  In response to this request, Mr. Walker's counsel spent considerable time analyzing the catalogs in order to estimate the volume of data at issue with

---

[8]     Of the remaining un-catalogued 17 tapes, three tapes were either blank media or cleaning tapes, four were attempted to but were unable to be restored, and 10 were unable to be catalogued for other reasons.

respect to the email in general and with respect to the email of these 121 individuals in particular. On May 12, 2006, Mr. Walker's counsel wrote to plaintiffs' counsel and informed them that the volume of email data for those 121 custodians was too voluminous to justify an email-by-email review and suggested that the list needed to be limited to a more reasonable number of custodians and that the parties should agree to reasonable search terms, as referenced in the December 8 Order.  (Ex. 7 at 1.)  In accordance with the December 8 Order, Mr. Walker's counsel solicited plaintiffs' views on these points.

However, plaintiffs (1) never responded to Mr. Walker's counsel's letter; (2) never provided any input as to any problems associated with Mr. Walker's proposed methodology; (3) indeed, did not communicate at all with Mr. Walker's counsel over the ensuing two months; and (4) instead filed the present motion to compel seeking the production of the non-privileged contents of 17 unidentified back-up tapes without ever having met and conferred on that topic. (Irving Decl. ¶¶ 15-16.)

It is apparent that plaintiffs' strategy is to make Mr. Walker and his counsel jump through as many hoops as possible and incur as much expense as possible, while plaintiffs expend the most minimal effort and do not even bother to utilize the materials they have demanded Mr. Walker create for them.

**C.     Mr. Walker's Counsel Has Worked Diligently to Develop a Reasonable Methodology for Culling Through the Voluminous Data Notwithstanding Plaintiffs' Failure to Cooperate in This Process.**

Plaintiffs' indiscriminate and excessive motion to compel the production of all non-privileged data on these tapes without regard to file type, and including files that appear to be webpage files, systems files and database files, makes it clear that they are not interested in addressing this electronic data with any reasonable methodology for culling through the voluminous data.  However, despite plaintiffs' stonewalling in this regard, Mr. Walker's counsel has expended considerable professional time and other resources analyzing reasonable methodologies for identifying potentially relevant data in a manner –  and for a cost – that is

reasonable under the circumstances.  For example, Mr. Walker's counsel engaged in numerous discussions and written exchanges with their electronic discovery vendor on whether and how the email population on the back-up tapes could be reduced by eliminating from it emails – if any – that have already been produced by the other defendants in this case, and what the cost would be for this service. (Irving Decl. ¶¶ 33-34.)

Also, Mr. Walker's counsel reviewed prior discovery responses to cull down plaintiffs' list of 121 "key" individuals for which they seek an email-by-email review to 55 individuals who had been identified in discovery responses and the parties' initial disclosures as having information that might bear on this case.  Mr. Walker's counsel provided their vendor with instructions to load and filter such files in preparation for release to a review tool.  More specifically, Mr. Walker's counsel has, thus far, initiated the following methodology for culling through the voluminous .pst email data on the restored tapes:

1. Mr. Walker's counsel has obtained a copy set of those emails produced by other defendants;

2. Mr. Walker's counsel has instructed its electronic vendor to upload a copy set of those electronic emails produced by the other defendants;

3. Mr. Walker's counsel identified 55 of the 121 individuals for whom plaintiffs seek an email-by-email review as most likely to have responsive information based on prior discovery responses;

4. Mr. Walker's counsel has instructed the electronic vendor to upload the entire .pst mailboxes for any of these 55[9] individuals for whom mailboxes exist on the back-up tapes restored thus far and to filter those email boxes to exclude emails sent before or after the following date range:  March 1, 1999 to April 1, 2001;

---

[9]     Results of the search for emails of these 55 individuals to date have revealed that the restored back-up tapes contain .pst email files for approximately 28 of these 55 individuals.

5.  Mr. Walker's counsel has instructed the electronic vendor to filter the data for numerous attorney and law firm names so that the emails that were sent by, received by or copied to such persons or law firms can be tagged as potentially privileged and so that these particular emails can, where practical, be reviewed after the review of the remaining email population that results from the filtering described herein;

6.  Mr. Walker's counsel has instructed his electronic vendor to tag those emails from the back-up tapes that are duplicates of emails produced by other defendants or that are duplicates of other emails within the uploaded database.

(Irving Decl. ¶ 34.)

Mr. Walker's counsel intends to conduct an email-by-email review of Mr. Walker's and Mr. Braddock's .pst mailboxes, and based on the size of the email population that remains after the above filters are applied, absent duplicates, will assess whether a similar review for the remainder of the 55 individuals would be warranted.[10]

Once this review nears completion, Mr. Walker will have some factual data as to the percentage of responsive documents, the percentage of privileged documents, and the percentage of duplicate documents, from which it can derive estimates as to the degree to which the remainder of the database is likely to contain responsive or significant information, and the costs associated with extracting and reviewing such information.  With that information in hand, Mr. Walker can determine, and be able to make a presentation to the court on, what additional review steps, if any, are reasonable under the circumstances.

---

[10]     Other filters can be employed if the above steps result in a data population too voluminous to justify an email-by-email review.

III.   **ARGUMENT**

A.   **Plaintiffs' Violation of F.R.C.P. Rule 37 and Local Rule 37 Warrants Denial of the Motion to Compel.**

Before moving to compel, Rule 37 of the Federal Rules of Civil Procedure requires that a movant first confer in good faith in an effort to resolve any discovery dispute without Court action.  F.R.C.P. 37(a)(2)(A).  Similarly, Local Rule 37 prohibits a party from filing a motion to compel,

> unless counsel making the motion has conferred with opposing counsel and discussed **the discovery issues between them in detail** in a good faith effort to eliminate or reduce the area of controversy, and to arrive at a mutually satisfactory resolution.

Local Civ. R. 37(a)2. (emphasis added).

As part of the required meet and confer, the requesting party must explain what the "party is actually seeking" and "what specific genuine issues" are in dispute.  *Tri-Star Pictures, Inc. v. Unger*, 171 F.R.D. 94, 99 (S.D.N.Y. 1997) (citation omitted).  When movants fail to provide that information to their opponents, as plaintiffs did here, the appropriate response is to deny the motion to compel.  To do otherwise would encourage parties, such as the plaintiffs, to ignore their meet and confer obligations and consequently waste the time and resources of both the Court and the parties.  *See Murphy v. Barberino Bros., Inc.*, 208 F.R.D. 483, 484 (D. Conn. 2001); *see also Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96 CV 7590, 1998 WL 67672, at *3 (S.D.N.Y. Feb. 19, 1998).

Plaintiffs completely failed to comply with their meet and confer obligations here.  Plaintiffs never met and conferred with Mr. Walker's counsel about their motion to compel before filing it.  Indeed, plaintiffs never mentioned to Mr. Walker's counsel that they were contemplating this motion at all.  In fact, plaintiffs did not communicate with Mr. Walker's counsel whatsoever in the two months preceding the filing of this motion to compel – from May 12, 2006 until July 7, 2006.  (Irving Decl. ¶¶ 15-17.)

Mr. Walker's counsel's last communication with plaintiffs' counsel before the filing of the motion to compel was Mr. Walker's counsel's May 12, 2006 letter to plaintiffs' counsel, seeking plaintiffs' input in developing a reasonable methodology for refining the email population on the back-up tapes.  (Irving Decl. ¶ 16.)  Plaintiffs completely stonewalled Mr. Walker's counsel, and never responded to that letter – to this day.  Notably, plaintiffs did not reject the proposals made by Mr. Walker's counsel, nor voice any objection at all to the contents of the May 12 letter.  Instead, after remaining silent for two months, plaintiffs simply filed this motion to compel.  Plaintiffs' violation of their meet and confer obligation warrants denial of the motion on this basis alone.

**B.     Plaintiffs' Failure to Identify in Their Motion Which Tapes Were the Subject of That Motion Deprived Mr. Walker of Adequate Notice of the Content of the Motion and Adequate Opportunity to Prepare His Opposition.**

Not only did plaintiffs not identify "what specific genuine issues" were in dispute in a meet and confer, they also failed to identify" what specific genuine issues" were in dispute in their motion papers.  The motion failed to identify which "17 restored tapes" were the subject of the motion.  Moreover, plaintiffs refused to respond to Mr. Walker's numerous requests for plaintiffs to identify the tapes in issue – even after the motion was filed. The plaintiffs filed the motion to compel on Friday, July 7, 2006.  After determining that plaintiffs motion never identifies which 17 of the 29 restored tapes were the subject of that motion, the next business day, Mr. Walker's counsel emailed two of plaintiffs' lawyers, Geoff Johnson and Erin Comite, and requested that they identify by TOG ID number (the ID number given to each back-up tape) the tapes that were the subject of the motion to compel.  Neither Mr. Johnson nor Ms. Comite ever responded to Mr. Walker's counsel's email over the ensuing week and a half. (Irving Decl. ¶¶ 17,18.)  On July 19, 2006, Mr. Walker's counsel placed three telephone calls, one to each of three separate lawyers for the plaintiffs: Mr. Johnson, Ms. Comite and David Scott.  In each instance, Mr. Walker's counsel left detailed voicemail messages explaining that they were following up on the email of nine days earlier, stating that they needed to know what tapes were

the subject of plaintiffs' motion to compel and asking that plaintiffs' counsel provide that information. None of the three plaintiffs' lawyers returned any of the calls placed by Mr. Walker's counsel. (Irving Decl. ¶ 19.)

On July 20, 2006, Mr. Walker's local counsel, Terry Gallagher, called Ms. Comite again on this subject. Mr. Gallagher was finally able to speak with Ms. Comite on Friday, July 21. Ms. Comite did not identify which of the 17 tapes were the subject of plaintiffs' motion, but relayed that Mr. Johnson would be sending a letter in that regard. That letter was received near the end of the day Friday, July 21 – 14 days after the motion had been filed. (Irving Decl. Ex. 9.)

However, that letter did not relay the TOG ID numbers of the tapes that were the subject of plaintiffs' motion. Instead, it referred to groups of tapes and attached a list of those groups, which list also did not contain the TOG ID numbers of the tapes within that group. (Id.)

More importantly, however, it stated that the motion to compel was intended to encompass four groups of "restored" back-up tapes (groups 5, 15, 4 and 6), despite the fact that two of those groups – groups 4 and 6 – had never been restored, and the tapes in these four groups total 18 tapes, not 17. (Irving Decl. ¶¶ 30, 32.)

The following business day, Mr. Walker's counsel called plaintiffs' counsel, Geoff Johnson, to address the internal inconsistency in plaintiffs' position – seeking production from "17 restored" tapes, more than half of which have not been restored – and to seek clarification on which tapes were the subject of the motion. Mr. Walker's counsel explained that the groups 4 and 6 tapes had not been restored, and asked whether the motion addressed (1) the tapes that had in fact been restored or (2) the tapes listed in Mr. Johnson's July 21 letter. Mr. Johnson's only response was to ask Mr. Walker's counsel to reiterate in writing the information she had relayed on the phone. (Irving Decl. ¶¶ 23-24.)

In light of the fact that Mr. Walker's opposition to the motion to compel was due to be filed four days later, Mr. Walker's counsel asked if plaintiffs could provide an answer to the question of which tapes were the subject of the motion by the end of that day. Mr. Johnson refused that request. Mr. Walker's counsel asked Mr. Johnson to state when plaintiffs' counsel

would provide an answer to the question of what tapes were the subject of the motion, and Mr.
Johnson said that he would not make any commitment to provide that answer by any particular
date. (Irving Decl. ¶ 24.)

That same day, Mr. Walker's counsel complied with plaintiffs' request to reiterate the
contents of her conversation with plaintiffs' counsel in a letter, and again in that letter requested
that plaintiffs clarify whether the motion to compel 17 "restored" tapes addressed tapes that had
actually been restored, or the unrestored tapes in groups 4 and 6 referenced in plaintiffs' July 21
letter. (Irving Decl. ¶ 25, Ex. 10.) Continuing their stonewalling tradition, plaintiffs' counsel did
not respond to Mr. Walker's counsel's letter. (Irving Decl. ¶ 25.)

Had plaintiffs bothered to meet and confer with Mr. Walker's counsel before filing the
motion to compel, (1) Mr. Walker's counsel would have been aware from the outset exactly what
was the subject of the motion to compel; and (2) the internal inconsistency in plaintiffs' motion –
seeking production from "17 restored" tapes, many of which have not been restored – would
have been eliminated.

In the face of plaintiffs' intransigent refusal to provide any information to clarify which
tapes were the subject of their motion to compel, Mr. Walker's present counsel turned to Mr.
Walker's prior counsel at Paul Hastings to see if they could shed any light on why plaintiffs
seemed to believe that the tapes in groups 4 and 6 had been restored. After some investigation
on Paul Hasting's part, on July 26 – two days before the opposition to this motion to compel was
required to be filed – Paul Hastings informed Mr. Walker's present counsel that there had been a
mix-up involving the tapes. (Irving Decl. ¶¶ 26-27.)

The plaintiffs had originally requested that Paul Hastings restore tapes from groups 3 and
16. After discussions between Paul Hastings and plaintiffs' counsel about these tapes, plaintiffs'
counsel shifted their request to groups 4 and 6. However, a member of Paul Hastings IT

department had mistakenly sent to the vendor for restoration the tapes in groups 3 and 16 (the subject of plaintiffs' earlier request), rather than groups 4 and 6.[11]

Paul Hastings relayed this information about the tape mix-up to Mr. Walker's present counsel by telephone on July 26. During that same phone call, Paul Hastings conferenced in plaintiffs' counsel and provided plaintiffs' with the same information. (Irving Decl. ¶ 27.) Plaintiffs' response was to ask Paul Hastings to reiterate the contents of the phone call in writing, which Paul Hastings did the following morning. (Irving Decl. Ex. 28.)

As a result of the unintentional mistake of the Paul Hastings IT employee, plaintiffs had been under the mistaken impression that Paul Hastings had restored tapes in groups 4 and 6, when in fact tapes in groups 3 and 16 had been restored. This misimpression on plaintiffs' part was innocent, and we ascribe no criticism to it.

However, had plaintiffs' met and conferred with plaintiffs' present counsel before filing this motion, the confusion in this motion would never have existed. Mr. Walker's present counsel would have requested the TOG ID numbers of the tapes that plaintiffs intended to be the subject of the motion to compel – as they did immediately upon receiving the motion to compel. And one would hope that plaintiffs' would have provided that identity, which is found on the catalogs that had already been provided to plaintiffs' counsel. It was plaintiffs' obligation to provide that information in a pre-filing meet and confer, in order to apprise Mr. Walker's counsel of precisely "what specific genuine issues" were in dispute. Indeed, had plaintiffs bothered to respond to Mr. Walker's counsel's July 10 email requesting the TOG ID numbers of the tapes that were the subject of the motion to compel, this confusion would have been cleared up at least early in the response period, rather than on the eve of the deadline to file the opposition to plaintiffs' motion to compel.

---

[11]     After restoring groups 3 and 16, on May 8, 2006, Paul Hastings sent to the plaintiffs detailed catalogs of their contents, which catalogs were labeled with the TOG ID number of the tapes to which the catalogs related. (Irving Decl. Ex. 11.)

Following the joint conference call with Paul Hastings, Mr. Walker's counsel called plaintiffs' counsel and again entreated plaintiffs' to state whether plaintiffs intended their motion to concern (1) the tapes that had been restored from groups 3 and 16, or (2) the unrestored tapes in groups 4 and 6; and asked that plaintiffs' counsel agree that Mr. Walker's counsel could have an extension of time to respond to this motion to enable them to have at least one week to prepare their response after they finally learned which tapes were the subject of plaintiffs' motion.

Finally – just two days before the opposition was due – plaintiffs stated that they were maintaining that the subject of their motion to compel production from "17 restored" tapes included the tapes from groups 4 and 6 (9 of which are unrestored), as well as tapes from groups 5 and 15.[12] However, plaintiffs refused Mr. Walker's request for an extension of time to enable them to prepare a proper response in light of this new information. (Irving Decl. ¶ 29.)

Plaintiffs' failure to meet and confer, plaintiff's failure to identify which tapes were the subject of the motion to compel in the motion papers themselves, and plaintiffs' failure to identify those tapes in the first several weeks of the motion response period have deprived Mr. Walker of an adequate opportunity to respond to this motion.

In the face of a motion seeking to compel production from "17 restored," but otherwise unidentified tapes, Mr. Walker's counsel made their best guess at what plaintiffs' motion might be about, and spent the first several weeks of the motion response time preparing a response on the assumption that the motion concerned the tapes in groups 3 and 16, which had been restored.[13]  (Irving Decl. ¶ 31.)

---

[12]    Excluding any tapes that plaintiffs' July 21, 2006 letter directs be excluded from the tapes in groups 5, 15, 4 and 6 that plaintiffs say are the subject of this motion, those groups would still be left with 18 tapes.  Groups 4 and 6 contain a total of 11 tapes (excluding any blank tapes or other tapes plaintiffs requested be excluded), only 2 of which were restored in the initial restoration of 18 tapes. (Irving Decl. ¶¶ 30,32.)  After excluding one blank tape, groups 5 and 15 contain 7 tapes.

[13]    Mr. Walker's counsel also guessed – this time correctly – that plaintiffs' motion concerned groups 5 and 15, which contain seven tapes that had been restored.

Even once plaintiffs finally sent Mr. Walker's counsel a letter claiming that it was groups 4 and 6 that were the subject of their motion, this confusion was not resolved. The following business day Mr. Walker's counsel pointed out to plaintiffs that these were not restored tapes and asked plaintiffs to confirm either that they intended the motion to address (1) the unrestored groups 4 and 6 or (2) restored tapes. However, plaintiffs refused to answer that question or even commit to provide an answer on any particular date. It was not until two days before this opposition was due that plaintiffs' finally stated that they were maintaining that their motion to compel production from "17 restored" tapes actually involved 9 unrestored tapes from groups 4 and 6. So, plaintiffs' current position is that the motion they have titled as a request for documents from "17 Restored Priceline WebHouse Club Tapes," is actually a request for documents from 18 tapes, 9 of which are unrestored.

A full and complete response to this motion requires an in-depth analysis of the catalogs for the tapes at issue, in order to provide the Court with cogent information about the types of files on the tapes, the size of the data involved and other information that would enable the Court to make an informed assessment of the value of this data to this case – or the lack thereof. Just the catalogs themselves for the tapes in groups 4 and 6 number in the tens of thousands of pages. Plaintiffs' failure to meet and confer and to clearly state the subject of this motion to compel has unfairly disadvantaged Mr. Walker and deprived him of an adequate opportunity to properly respond to the motion. The motion should be denied on that basis.

**C.     Plaintiffs Seek to Impose an Extreme Production Burden Upon Mr. Walker Without Any Evidentiary Showing as to Why This Burden Is Justified.**

Plaintiffs' motion to compel asserts that the WebHouse emails and electronic documents **that they have never seen** "are not only the most important, but also the most incriminating documents in the entire case."[14] The reality is that plaintiffs have no idea what is contained in

---

[14]     In this regard, plaintiffs' assert, in bold and italics, that "Defendant Walker clearly recognizes that the WebHouse emails and electronic documents are the most important – and the most incriminating – documents in this entire case. This explains why the WebHouse emails and electronic documents have not been produced." (Plaintiffs' Mem. at 1, emphasis omitted.)

these emails and electronic documents.  For that matter, because the data has been compressed, Mr. Walker's present counsel has not yet had the opportunity to read any of the email or other documents on these tapes, and, to our knowledge, this material has not been read by anyone on the planet since these back-up tapes were created more than five years ago.  So, that is the context in which the plaintiffs baldly represent to this Court that these are the most important documents in this case.  The information that we have from the catalogs thus far – and that plaintiffs have available to them – flatly belies plaintiffs' conjecture about their value.

More importantly, although plaintiffs have had detailed catalogs of all the tapes recently identified as being the subject of this motion, plaintiffs have failed to make any showing to this Court that the documentation on these tapes is likely to provide information of sufficient value in this case to warrant the enormous costs that would be required were this data to be reviewed and produced.  Plaintiffs have failed to establish that this required balancing tips in their favor.

In fact, a review of the tens of thousands of pages of catalogs provided to plaintiffs with respect to the groups 5, 15, 4 and 6 demonstrates that substantial portions of this data are neither relevant to this litigation nor potentially responsive to the document requests propounded by plaintiffs.  For example, while plaintiffs make the unsupported proclamation that these tapes contain the most important and most incriminating evidence in the entire case, including the email of 121 "key" individuals, the reality is that these tapes contain email accounts for less than half (approximately 59) of the individuals plaintiffs have identified as "key."  In particular, these tapes do not appear to contain email accounts at all for two of the four defendants – Daniel Schulman and N.J. Nicholas.  (Santos Decl. ¶ 10.)

Furthermore, an analysis of the file extensions reflected on the catalogs provided to plaintiffs demonstrates that of the 330 gigabytes of data recorded on these tapes, 195 gigabytes (or 59%) of this data are neither .pst (email) files, nor Word file, nor Excel files.  To the contrary,

---

The tacit admission in this statement is that in the approximately 350,000 pages of hard copy and additional electronic media that Mr. Walker has produced, plaintiffs have yet to find any "incriminating" evidence.

the majority of files on these tapes are file types unlikely to contain any potentially responsive information. Additionally, even as to email, Excel and Word files, surely plaintiffs do not suggest that every email, Word document or Excel file created by every person, at any time, on any topic is important or even relevant to this litigation.

Both plaintiffs' request that Mr. Walker produce <u>all</u> non-privileged data on the 17 back-up tapes and their request that he conduct an email-by-email review of the mailboxes for 121 identified individuals are extraordinary and excessive.

> **1.      The Request for the Production of All Non-Privileged Data on the 17 Back-up Tapes Is Improper.**

If plaintiffs' requested production methodology were to be pursued, the necessary electronic vendor charges alone would be staggering. Considering that Mr. Walker's electronic vendor charges $900 per gigabyte to load data for staging and filtering, the cost of simply loading this voluminous data (estimated to be in excess of 329 gigabytes)[15] onto a system where Mr. Walker could run the privilege filters suggested by plaintiffs, exceeds $290,000.[16]

The $900 per gigabyte charge does not allow Mr. Walker's counsel to actually see the documents. That requires an additional charge $3,000 per gigabyte for releasing the filtered data into a review tool that would permit Mr. Walker's counsel to search the data; review it for, for example, privilege, confidentiality and responsiveness; redact the documents as necessary; and Bates-number the documents. Added to these vendor costs is $.04 per page to release Bates-numbered documents for production. (Irving Decl ¶ 14.)

The total vendor costs, alone, under plaintiffs' proposal cannot be precisely predicted until a filter identifying exact duplicates is run against the data[17] and until the volume of

---

[15]      *See* Irving Decl. ¶ 14 (vendor charges); Santos Decl.¶ 6 (data size).

[16]      Mr. Walker's counsel informed plaintiffs' counsel of these vendor charges in the May 12, 2006 letter. (Irving Decl. Ex. 7.)

[17]      Mr. Walker's electronic vendor excludes duplicates from the gigabyte count for releasing data into the review tool, but such duplicates are not eliminated for purposes of the initial $900 per gigabyte loading charge.

privileged data is determined.  However, based on reasonable assumptions, just the vendor costs

to implement plaintiffs' request that Mr. Walker produce the non-privileged contents of all 17

(actually, 18) tapes, regardless of relevance and exclusive of the charges associated with any

email by email review of the 121 custodians identified by plaintiffs, is likely to exceed $1

million dollars.  For example, even assuming that Mr. Walker implemented plaintiffs' inadequate

privilege review methodology (which it should **not** be required to do), assuming 20 percent of

the electronic documents on the restored tapes were exact duplicates of one another and 20

percent of the documents would be deemed privileged upon conducting privilege searches, the

estimated vendor cost, for loading, filtering, staging, releasing, Bates-stamping and producing

the entirety of the tapes at issue, under plaintiffs' proposed methodology, would be in excess of

$1.7 million.[18]

    More significantly, this cost would be dwarfed by the many millions of dollars it would

cost to conduct a privilege review and create a privilege log – even under plaintiffs' unacceptable

streamlined methodology for that review.  For example, applying the same assumptions as above

(including an assumption that 20 % of the total data was potentially privileged), the estimated

costs for the attorney review under plaintiffs' proposed procedure, assuming a charge of $237.50

per hour where an attorney is conservatively assumed to spend only one minute per page to

review, redact and log the document in question,[19] leads to over $17 million[20] in estimated

---

[18]    This estimate is calculated as follows:  (i) $900 X 316.82 gigabytes + (ii) $3,000 X 253.46 gigabytes, + (ii) .$04/page X 253.46 gigabytes X 70,0000 pages/gigabyte = $1,755,183. (*See* Santos Decl. ¶¶ 4, 6  (gigabyte and page estimates); Irving Decl. ¶ 14  (vendor charges). This estimate excludes the estimated vendor charges for the review of the estimated 13 gigabytes of emails with respect to the 121 individuals for which plaintiffs seek an email by email review.

[19]    In fact, the time to review, redact, log and produce documents is likely to take much more time than one minute per page, and at a higher blended rate than $237.50 per hour.  However, we have used these numbers by way of example because they are so unassailably conservative.  The professional fees that would be required to review and produce these documents would no doubt going be considerably higher than these estimates.

[20]    This estimate is calculated as follows: $237.50/hour X 20% of 21,799,295 pages ÷ 60 pages/hour = $17,241,942.  (*See* Santos Decl. ¶¶ 6,9.)  This estimate excludes the analysis of an estimated 13.07 gigabytes or 1,308,177 pages of .pst files with respect to the 121 custodians for which plaintiffs seek and email by email review.

attorney charges to conduct the privilege review of the tapes that plaintiffs now contend are the subject of this motion.  These estimated attorneys fees grow to in excess of $86 million, based on the above assumptions, if the entirety of the voluminous data were released subject to either a relevance review or adequate privilege review.[21]

There is no justification for Mr. Walker to produce this voluminous data in such a sweeping and uninformed fashion.

### 2.    The Request for an Email-by-Email Review of Mailboxes for 121 "Key" Individuals Is Excessive.

Plaintiffs' request for an email-by-email review of the mailbox accounts for 121 "key" individuals is likewise excessive and unwarranted.  The total database size for these .pst (email) files on the tapes from which plaintiffs seek production is estimated to be 13 gigabytes, or 1.3 million pages.  (Santos Decl. ¶ 9.)

An email-by-email review of the mailboxes for these 121 individuals would require Mr. Walker to have the data loaded, staged, filtered for duplicates, and released to a review tool where Mr. Walker's counsel would review for relevance, privilege, confidentiality, and where the documents could be Bates-numbered and stamped for confidentiality and downloaded for production.  The above-described vendor charges would apply to this process and, in addition, the vendor would charge $275 per hour to cull out the identified mailboxes for upload.  (Irving Decl. ¶ 14.)  Again, the exact vendor charges cannot be known without knowing the exact

---

[21]    This estimate is calculated as follows: $237.50/hour X 21,799,295 pages ÷ 60 pages/hour = $86,209,711.  (*See* Santos Decl. ¶¶ 6,9 for page estimates.)  This estimate excludes the analysis of an estimated 13.07 gigabytes or 1,308,177 pages of .pst files with respect to the 121 custodians for which plaintiffs seek and email by email review.

Plaintiffs are fully able to generate estimates of these charges themselves based on the electronic versions of the catalogs for the restored tapes which have been in their possession for months and based on the May 12, 2006 letter describing the vendor charges for loading, staging, filtering, releasing and producing the data in question.  (Irving Decl. Ex. 7.)  Yet, plaintiffs have failed to provide any estimate or analysis of these excessive charges and costs in their motion to compel.

number of duplicate documents, and the number of responsive or privileged documents. However, the vendor charges alone for this project are likely to exceed $67,000.[22]

Again, however, this cost would be dwarfed by the several millions of dollars it would cost to conduct a privilege review and create a privilege log even under plaintiffs' unacceptable streamlined methodology for that review. For example, applying the same assumptions as above, we presently estimate approximately $4 million[23] in attorney charges to conduct an email-by-email relevance and privilege review with respect to the emails for the identified 121 custodians located on the back-up tapes at issue in this motion.

In combination, the production of the data on the tapes that are at issue on this motion and the email-by-email review of the 121 so-called "key" individuals email accounts, even assuming plaintiffs' inadequate privilege review methodology were to be employed, would be estimated to cost over $1.8 million in vendor charges and over $21 million in attorneys fees. This burden is excessive for any defendant, including Mr. Walker who has already produced over 350,000 pages of documents and additional other media in this litigation.

---

[22]    For example, if it is assumed that, once a filter is run, 20 percent of the 13 gigabytes of emails at issue are determined to be exact duplicates of each other or of emails produced by other defendants, 50 percent of the remaining emails are responsive, and 10 percent of those documents are privileged, then the estimated electronic vendor costs with respect to the upload, filter, release, review, Bates-numbering and production of these emails is estimated to be approximately $67,138. This is estimate is calculated as follows: (i) $900 X 13 gigabytes + (ii) $3000/gigabyte X 10.4 + (iii) $.04/page X 4.68 gigabytes X 100,099 pages/gigabyte) + 20 hours X $275/hour = $67,138. Note, these vendor charges are in addition to the above projected vendor charges with respect to the production of the remainder of the voluminous data on the 17 backup tapes.

[23]    This estimate varies depending on the number of duplicate emails assumed to be in the database, a number that is not presently known. However, Mr. Walker's counsel is hoping to better estimate this charge based upon vendor reports that will be generated with respect to the duplication filters that are being run against the mailboxes that Mr. Walker's vendor is currently in the process of uploading and filtering.

**3.      Plaintiffs Have Not Made Any Effort to Reasonably Tailor Excessive Demands In a Manner That Is Likely to Lead to Responsive Documents.**

Not only are plaintiffs' demands extraordinarily burdensome, but plaintiffs have made no effort to reasonably tailor their requested relief in a manner that is likely to lead to important or even responsive or relevant evidence.  Instead, plaintiffs request the **entirety** of the non-privileged contents of the tapes in question.  Plaintiffs' request this relief without providing the Court with any meaningful assessment of the types of files contained on these tapes, despite the fact that they were provided with catalogs detailing the filenames, filetypes and data size with respect to all the restored tapes and all other tapes for which such a catalog could be generated.

Similarly, plaintiffs' demand that Mr. Walker conduct an email-by-email review of the mailboxes for 121 "key" individuals is likewise made without any meaningful assessment as to why this extremely burdensome task is reasonable under the circumstances.  For example, plaintiffs provide no analysis or evidence as to why it is that the 121 individuals in question are "key."  Instead, plaintiffs limit their discussion and evidence to comments about the .pst files for only two of the mailboxes on the entire database – that for Mr. Walker and Mr. Braddock. (Plaintiffs' Memo. at 11; Johnson Decl., Ex. N.)

Mr. Walker agrees that those two mailboxes are a priority, and is in the process of having these mailboxes loaded for filtering and review.  However, the size of **Mr. Walker's and Mr. Braddock's .pst files** on the tapes that are the subject of this motion constitute less than one-fourth of one gigabyte (less than 0.25 gigabytes) of data, which is approximately **one-fifth of one percent (0.2%) of the total estimated volume of email contained on the tapes at issue for the 121 so-called "key" individuals**.  Even more striking is the fact that the Walker and Braddock mailboxes only represent somewhere between 0.04% and 0.07% of the total estimated volume of data on the tapes that are the subject of this motion.  (Santos Decl. ¶ 10.)

In other words, **at least 99.93 % of the data plaintiffs are requesting to be produced does not involve Mr. Walker's or Mr. Braddock's email files**, which are the only files on which plaintiffs present any argument of the relevance of the documents they seek to have produced. The potential relevance of no more than 0.07 % of a data population is no justification for imposing the enormous costs associated with producing the other 99.93 %.

Plaintiffs have not provided any analysis as to why they believe that production of the emails for the remaining 99.8 % of the mailbox accounts for these so-called "key" individuals, or the 99.93% percent of data housed on the subject tapes, could be justified or reasonable. In fact, the plaintiffs did not even provide the above information about the Walker and Braddock emails in their motion, despite the fact that plaintiffs have all the electronic, searchable catalogs of the back-up tapes that Mr. Walker's counsel has, and have an equal ability to analyze that information. They just haven't bothered to do so. Instead, it would be easier for plaintiffs to have Mr. Walker's counsel devote millions, if not tens of millions, of dollars to reviewing and producing irrelevant electronic information

    **4.**    **It Is Law of This Case That Mr. Walker Is Not Required to Engage in the Wholesale Production of Data on the Tapes Plaintiffs' Motion Seeks.**

Following the reassignment of this case, the plaintiffs are trying for their second bite at the apple. In his December 8 Order, Judge Squatrito rejected plaintiffs' prior request for production of back-up tapes absent any relevancy analysis of the data subject to production. (December 8 Order at 6, Ex. 2.)[24] Plaintiffs' request for the production of all non-privileged data on 17 (or 18) tapes irrespective of relevance, and absent any staging, filtering or review to identify relevant documents, is contrary to this prior order.

---

[24]    In this regard, the order contemplates that it would be necessary for Mr. Walker to employ "<u>search terms</u>" in order "<u>sift</u>[] through the data for <u>responsive</u> information," (*id.* at 8, emphasis added), i.e., information that is responsive to document requests that plaintiffs have propounded, subject to any objections that have not be overruled by the Court.

Moreover, now that plaintiffs have insisted that, contrary to the face of their motion, they are seeking production from 9 <u>unrestored</u> tapes from groups 4 and 6, they have also failed to make the showing required by the December 8 Order that those tapes should be restored at all. Although plaintiffs' prior counsel, Paul Hastings, assented to plaintiffs' agreement to restore the tapes in groups 4 and 6, more information has been obtained since that time that indicates that many of the tapes in these groups are not restorable, and the others are not worth pursuing.

In April, 2006, catalogs were generated for several of the tapes in these groups. Of the 11 tapes in groups 4 and 6, only two were restored and the electronic discovery vendor was not able to generate catalogs for six of them and for part of one other. Moreover, the vendor has advised Mr. Walker's counsel that they will not be able to restore these tapes. So, in addition to 9 of the tapes in these groups not having been restored, **more than two-thirds of these 9 unrestored tapes in groups 4 and 6 are not restorable.**[25]

Moreover, an analysis of the catalogs that were created from the remainder of the tapes in these groups (all of which catalogs were provided to the plaintiffs in April, 2006), demonstrate, first of all, that there is very little email on these tapes whatsoever. In fact, an analysis of the catalogs generated for groups 4 and 6 reveals less than two-tenths of a gigabyte of email in these groups (approximately 0.19 of a gigabyte). (Santos Decl. ¶ 8.) Of even more significance, however, is the fact that the catalogs reveal **absolutely <u>no email</u> on these tapes relating to the 121 custodians plaintiffs characterize as the 121 key individuals**.

Although the catalogs for the group 4 and 6 tapes contain 125 gigabytes of data overall, only one gigabyte of this represents Word files and only three gigabytes consist of Excel spreadsheets. (Santos Decl. ¶ 8.) In short, the catalogs indicate that **96% of the data on the group 4 and 6 tapes are file types that are not likely to contain any information potentially relevant to this lawsuit**.

---

[25]     Of course, all of this would have been addressed if plaintiffs had bothered to meet and confer before filing this motion.

Additionally, within the four tapes and part of one other tape in these groups that were able to be cataloged, over 95% of the .pst files, Word files and Excel files reside on one tape – TOG ID number 21 – which is the tape for which the vendor could only create a partial catalog. The vendor has advised us that, while a partial restoration of this tape might be possible, there are no guarantees that the data is good and, in fact, the data may be corrupt.

Judge Squatrito stated that before the Court orders defendants to restore a back-up tape for review, there must be some indication that the files stored on the tape may contain relevant information. "Because of the extraordinary expense of restoration and review, this process should not be undertaken without justification." (December 8 Order at 7, Ex. 2.) Plaintiffs have completely failed to make the showing required by the December 8 Order to justify restoration – let alone review and production – from the tapes in groups 4 and 6.

### 5.    The Relief Sought by Plaintiffs' Motion Is Inconsistent With Prevailing Law.

While there is at least a fair amount of email, Word documents and Excel spreadsheets in groups 5 and 15, review and production from them in the fashion proposed by the plaintiffs is also unwarranted.

The Federal Rules do not require that defendants unrestrictedly open their files in response to document requests, particularly without any showing that the information sought is relevant or otherwise reasonably calculated to lead to the discovery of admissible evidence. *See* Fed. R. Civ. P. 26(b); *Williams v. Hernandez*, 221 F.R.D. 414, 416 (S.D.N.Y. 2004) (holding that because the plaintiff "failed to justify a wholesale production of e-mails" and "failed to indicate why there would be relevant information concerning her claims in such e-mails," the request was overly broad and burdensome).

Moreover, courts have recognized the extreme burden that electronic discovery can impose upon a responding party, particularly where that data is housed in a form that is not reasonably accessible. *See*, *e.g., Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1205 (11th Cir. 2003) (upholding the District Court's complete denial of the plaintiff's document request for

tape copy of all of a certain category of word processing files where plaintiff "made no attempt to narrow his request to something more meaningful and relevant" and where plaintiff failed to make a meaningful showing of relevance).

In fact, in light of these hardships imposed by electronic discovery, the proposed changes to the Federal Rules of Civil Procedure specifically address issues unique to electronic discovery. These rule changes were developed after over five years of analysis by the Rules Advisory Committee and public hearings on the topic. Under the proposed amendments to Rule 26, a party will not be required to produce electronic information that is "not reasonably accessible because of undue burden or cost," absent a court order based on the propounding party's showing of good cause.[26]  (Irving Decl. Ex. 3.)  Thus, the presumption under the proposed revisions to Federal Rule 26(b)(2)[27] is against production of the sort of electronic data at issue here.[28]  The Plaintiffs have provided nothing in their motion that would suggest that this presumption against production should be abandoned in favor of the indiscriminate production sought here.[29]

---

[26]    This Court has already determined that data "is not accessible from these back-up tapes" absent restoration to their native format. (December 8 Order at 4-5.). And the court has recognized, that once restored, there will be costs associated with searching the data and culling it for duplicates. (*Id.* at 5, 8-9.)

[27]    In the December 8 Order, Judge Squatrito held that the proposed revisions to Rule 26(b)(2) would govern cost-shifting applications in this case. (December 8 Order at 11, Ex.2.). Relevant excerpts from these proposed revisions are attached to Ms. Irving's Declaration as Exhibit 3.

[28]    This Court has already made findings as to the inaccessible nature of the data on the back-up tapes and regarding the extreme expense and time involved entailed in searching and extracting potentially relevant information from such back-up tapes. (December 8 Order at 2-5, Ex. 2.)

[29]    The filtering and review tools available to Mr. Walker's electronic vendor can assist in the process of determining the scope of review that is warranted under the circumstances. As just one example, as noted above, Mr. Walker's counsel has worked diligently with its electronic vendor to develop a cost-effective procedure for comparing the electronic emails produced by other defendants to the data on the restored back-up tapes. This comparison will not only permit Mr. Walker to eliminate from its analysis any emails already produced, but it will provide some information as to the extent to which the contents of the emails contained on the back-up tapes may overlap with those emails already reviewed by codefendants.

**D.    The Privilege Methodology Suggested by Plaintiffs Is Inappropriate and Inconsistent with Judge Squatrito's December 8 Order.**

Rule 26 does not permit the discovery of privileged information.  *See, e.g.,* Fed.R.Civ.P. 26(b)(1) ("Parties may obtain discovery regarding any matter, **not privileged**, which is relevant to the claim or defense of any party . . . ."  (Emphasis added)).  Therefore, a court cannot order the production of privileged information, even with a protective order providing that no waiver will result from such production.  *In re Dow Corning Corp.*, 261 F.3d 280, 284 (2d Cir. 2001).

Here, plaintiffs' proposed methodology for identifying privileged documents is inadequate and will, if employed, likely result in the production of privileged information. Considering that plaintiffs want **all** data produced on these tapes regardless of the subject matter or lack of relevance, any search terms for privileged documents would need to include the names of any lawyers that worked on **any** matters for WebHouse.  It would be extremely difficult, if not impossible, to create a search term list that takes into account **any** and **all** privileged matters. Thus, plaintiffs' proposal is certain to lead to the production of a large volume of both irrelevant material and privileged documents that Mr. Walker has had no opportunity to review.  Moreover, such a wholesale production has the potential of resulting in the production of irrelevant, but sensitive, consumer information (e.g., credit card numbers, addresses, phone numbers), without any opportunity for Mr. Walker's counsel to identify such documents as requiring heightened confidentiality protections in this litigation.

Finally, it is law of the case that Mr. Walker is not required to produce documents from the back-up tapes without prior review for privilege, as well as for responsiveness.  Judge Squatrito has already rejected plaintiffs' prior efforts to force Mr. Walker to produce back-up tapes without adequate privilege protections.  (December 8 Order at 6.)  There is no basis to deviate from that prior ruling here.

**E.    Mr. Walker Has Complied With Judge Squatrito's December 8 Order.**

Plaintiffs' suggestion that Mr. Walker has attempted to thwart the production of electronic data and failed to comply with Judge Squatrito's December 8 Order is belied by the

facts and plaintiffs' own prior statements.  For example, although plaintiffs' now argue that Mr. Walker has done everything in his power to keep Plaintiffs from obtaining highly relevant emails and electronic documents," (Plaintiffs' Memo. at 9-10), in its September, 2005 motion to compel the contents of all 181 back-up tapes, plaintiffs acknowledged that, "Defendant Walker has been more willing to provide Plaintiffs with information on the electronic discovery issues . . . Defendant Walker provided Plaintiffs with information from the labels on the [181] tapes, separated the tapes into various categories, and sampled the information on various tapes."  (Dkt. # 212 at 9-10, Ex. 1.)

Further, as recently as April 18, 2006, plaintiffs' counsel touted the "significant progress" that counsel for both Mr. Walker and plaintiffs had made with respect to the restoration and indexing of the 181 WebHouse back-up tapes.  (Irving Decl. Ex. 5.)   Subsequent to this April 18 letter, Mr. Walker's counsel completed the delivery to plaintiffs of the remainder of all the catalogs that were able to be generated from the 181 back-up tapes and participated in several conferences with plaintiffs' counsel regarding technological and other issues associated with reviewing and culling through electronic data.  (Irving Decl. ¶ 8.)

Moreover, despite plaintiffs' failure to identify – as their counsel had committed to do – the individual electronic files from groups 5 and 15 that they wanted loaded for staging, filtering and review, and despite their failure to assist in the identification of search terms for sifting through the data, Mr. Walker's counsel continued to expend substantial sums analyzing the tens of thousands of pages of catalogs generated for the restored tapes in order to determine the most efficient initial steps to be taken in the process of culling through the extensive data in a cost effective matter.  (Irving Decl.  ¶¶ 33-34.)  In fact, as explained above, after substantial analysis and discussions with its electronic vendor, Mr. Walker's counsel has instructed this vendor to load and filter data from any mailboxes for the 55 custodians referenced above.  As soon as the vendor has completed this processing of this data, Mr. Walker's counsel anticipates that they will begin the expensive and time-consuming task of reviewing the Walker and Braddock emails for production and privilege.  Moreover, the results of the filtering for the remainder of the 55

custodians will enable Mr. Walker's counsel to make informed judgments about how to address the email files of these custodians.

**F.     Plaintiffs' Objections to the Use of Search Terms Contradicts Both the December 8 Order and Plaintiffs' Prior Commitments.**

Plaintiffs' failure to meet and confer with Mr. Walker's counsel prior to filing this motion has resulted in misstatements in plaintiffs' papers regarding Mr. Walker's position.  For example, plaintiffs state that Mr. Walker has refused to produce any emails.  (Plaintiffs' Memo. at 1.)  This is not true.[30]

While Mr. Walker counsel's May 12, 2006 letter declined plaintiffs' suggestion that Mr. Walker's counsel conduct an email-by-email review of the mailboxes for 121 individuals, Mr. Walker never suggested that no emails should be produced.  To the contrary, the May 12 letter states that the list should be narrowed to one that is more reasonable and search terms should be identified to assist in identifying relevant emails.  Moreover, pursuant to Judge Squatrito's directive that defendants "seek input from plaintiffs regarding proposed search terms" for purposes of identifying responsive data (December 8 Order at 8), that letter invited plaintiffs to participate in the dialogue to identify search terms that would be reasonable under the circumstances.

Indeed, in an April 28, 2006 letter to Mr. Walker's counsel, plaintiffs' committed to the search term approach, stating, "Plaintiffs will also provide you with a list of search terms that you should use to search the entire database."  (Declaration of Geoffe Johnson, Ex.7.)  Like so many other commitments plaintiffs have made in this process, plaintiffs never fulfilled this commitment either and now mischaracterize the search term approach as a nefarious scheme by Mr. Walker to prevent production, rather then as the process clearly contemplated by Judge Squatrito in the December 8 Order.

---

[30]     As stated above, Mr. Walker has already produced over 1,500 emails, which with associated documents and attachments represent over 9,500 pages of material.

Plaintiffs further misstate the record by repeatedly assert that Mr. Walker's position is that the parties should impose a "narrow" search term approach for identifying relevant documents from the restored tapes. However, Mr. Walker's counsel has never proposed that the search terms to be used be "narrow," "broad," or any other dimension. Mr. Walker's counsel simply stated that search terms should be **used**, as Judge Squatrito had directed. There was no discussion of the scope of the search terms because plaintiffs failed to respond to Mr. Walker's counsel's request for their input on that subject. Instead, plaintiffs just filed this motion.[31]

G.     **Plaintiffs Should Be Required to Pay the Costs Associated With Their Excessive Demands.**

Plaintiffs' requested relief is extreme and should be denied on that basis. However, assuming arguendo that this Court were to grant some portion of the requested relief, this Court should require plaintiffs to pay the costs of the excessive production, including not only the restoration charges and other substantial vendor costs associated with loading, searching and reviewing the restored electronic data, but also the fees associated with the review of the documents.

As emphasized in *McPeek v. Ashcroft*, 202 F.R.D. 31, 33-34 (D.D.C. 2001), requiring the producing party to pay **all** costs of electronic discovery is a disincentive for the requesting party to narrow its demands. Here, where plaintiffs are for the second time seeking wholesale production of electronic data without any effort to tailor the request to relevant documents, there is a substantial need to provide plaintiffs with an incentive to reasonably tailor their demands so that they reasonably target responsive information through methodologies that are not unduly

---

[31]     Plaintiffs' motion also makes the bizarre argument that the creation of back-up tapes – which by their very nature typically involve the compression of data, making it not readily accessible – is a violation of the PSLRA. That argument is non-sensical, and plaintiffs fail to present any applicable authority for their theory that backing up or saving electronic data violates the PSLRA. Moreover, there is no suggestion that the electronic back-up tapes were the property of Mr. Walker, an individual defendant. Instead, Mr. Walker is acting as the custodian for the production of back-up tapes for WebHouse, a company that ceased its business operations years ago. Understandably, plaintiffs do not make any showing that making back-up tapes was part of Mr. Walker's job.

burdensome under the circumstances. Cost-shifting achieves this objective. *See, e.g., Byers v. Ilinois State Police*, 2002 U.S. Dist. LEXIS 9861, *37 (N.D. Ill. May 31, 2002) ("Based on the cost of the proposed search and the plaintiffs' failure to establish that the search will likely uncover relevant information, the Court concludes that the plaintiffs are entitled to the archived e-mails only if they are willing to pay for part of the cost of production. . . . shifting part of the cost of production is [also] warranted because the plaintiffs are in the best position to control the total cost of production."); *Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 429 (S.D.N.Y. 2002) (the "less specific the requesting party's discovery demands, the more appropriate it is to shift the costs of production to that party.")

Cost shifting is warranted here for other several reasons. Most obviously, despite the fact that plaintiffs have been provided with detailed catalogs of the tapes at issue on this motion, as well as all the other back-up tapes for which catalogs could be generated, they have not utilized them to focus their search to potentially relevant material. If anyone has ever needed the incentives that cost-shifting is intended to produce, it is the plaintiffs in this case.

Moreover, Mr. Walker is an individual defendant tasked with reviewing the company back-up tapes for WebHouse -- a company that is no longer operating. Because WebHouse has no ongoing operations and no operating servers to which the data can be loaded, the restoration process is particularly cumbersome and the process is necessarily dependent upon third party vendors to load the restored data into a system that permits decompression, adequate filtering and de-duplicating, and reviewing of such data.

The court in *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309 (S.D.N.Y. 2003) *(Zubulake I)*, set forth a multi-factored analysis to determine when cost-shifting is required to protect the responding party from undue burden and expense, including such factors as: the extent to which the request is specifically tailored to discover relevant information, the availability of such information from other sources, the total cost of production compared to the amount in controversy, the total cost of production compared to the resources available to each party, the relative ability of each party to control costs and its incentive to do so, the importance of the

issues at stake in the litigation, and the relative benefits to the parties of obtaining the information.  217 F.R.D. at 322.  *See also Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280 (S.D.N.Y. 2003) *(Zubulake II)* (applying seven factors, shifted 25% of the costs of restoring back-up tapes).

Here, plaintiffs have opted for wide-ranging discovery demands instead of narrowly-tailored ones, have targeted an unreasonably large document population, and have attempted to force Mr. Walker to bear unreasonably large and disproportionate costs to cull through the data in question without providing any meaningful explanation as to why such an unnecessarily broad search is warranted.  Moreover, plaintiffs are in the best position to control the costs associated with their overbearing requests by, instead, making demands reasonable under the circumstances. Thus, if any part of plaintiffs' overbroad request is granted – which it should not be – plaintiffs should bear all the costs associated with the retrieval, preparation, and management of the electronic documentation located on the subject tapes.  Indeed, shifting the costs of electronic discovery to the requesting party is particularly appropriate where, as here, the data in question is voluminous, disorganized data restored from back-up tapes.  *See, e.g., Zubulake I,* 217 F.R.D. at 318-320.

Relying on *Zubulake II,* plaintiffs argue that cost-shifting with respect to data originally housed on back-up tapes is only appropriate for the cost of restoring the tapes but not with respect to other vendor production costs.  The court in *Zubulake II*, however, also recognized that it is appropriate to shift the costs for searching the restored data.  216 at F.R.D. at 290 ( "Search costs should also be shifted because they are so intertwined with the restoration process . . .").  Here, the search costs include the $900 per gigabyte to load the data for searching and filtering and the $3,000 per gigabyte to release the data for review.

Moreover, several courts have required the propounding party to pay more than just restoration or search costs, particularly where the propounding party failed to reasonably tailor their production requests.  For example, in *Medtronic Sofamor Danek, Inc. v Michelson*, 229 F.R.D. 550, 558, 561-62 (W.D. Tenn. 2003), the court held that the plaintiff's requests "are very

broad" and that the plaintiff "has done little to limit the scope of the requests." 229 F.R.D. at 554. The court further determined that "the cost of restoring, de-duplicating, and designing and conducting a search" of the back-up tapes at issue "reasonably could be in the range of several million," and deemed this cost to be substantial, and "therefore . . . undue." *Id.* at 558. The court therefore held that the propounding party should, for example, bear 40% of the costs of extracting data of identified individuals, searching that data for keywords, and de-duplicating the data. 229 F.R.D. at 561. Moreover, the court ordered that, if the propounding party wished to have any further back-up tapes restored, it would be required to pay 100% of the costs for the restoration of any additional back-up tapes and **100% of the costs of the relevance review and 50% to 100% of the privilege review for such additionally restored tapes.** *Id.* at 562. *See also, Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568, 576 77 (N.D. Ill. 2004) (ordering the requesting party to pay 75% of the cost of restoring back-up tapes, searching the data, and transferring the data to an online review tool).

Here, as in the *Medtronic* case, considering that plaintiffs have made no effort to reasonably tailor their demand for the production of all non-privileged data on the subject tapes, if the Court grants plaintiffs' request to any degree, it should order that plaintiffs must bear all electronic vendor costs associated with this production, as well as all or a substantial portion of the attorney and professional costs associated with reviewing this excessive data for production.

This cost shifting is particularly justified in light of the proposed changes to Rule 26(b)(2) of the Federal Rules of Civil Procedure whereby the presumption with respect to data that is not readily accessible, such as that on back-up tapes, is that it need not be produced absent a showing by the propounding party that good cause exists for such production. In fact, Judge Squatrito ordered that in evaluating future cost shifting motions the Court would apply the

"analysis set forth in the proposed revisions [to Rule 26(b)(2)] and Committee Note," as detailed in the Report of the Civil Rules Advisory Committee.  (December 8 Order at 11).[32]

Here, plaintiffs' excessive requests should be soundly denied.  However, if any portion of that relief is granted,[33] this Court should order that plaintiffs bear the excessive production costs they seek to impose upon Mr. Walker.

---

[32]     These Advisory Committee comments recognize that the Court can order, as a condition to production, that the requesting party pay "part or all of the reasonable costs of obtaining information from sources that are not reasonably accessible."  (Irving Decl. Ex. 3 at 48.)

[33]     Plaintiffs should also bear the electronic vendor costs currently being incurred by Mr. Walker in association with loading, filtering, de-duplicating, releasing documents to a review tool, and Bates-numbering under the loading, filtering and production protocols that Mr. Walker has implemented thus far.  However, this request shall be the subject of a future motion that will be filed once a more firm estimate of these costs has been obtained.  (*See* December 8 Order at 8, noting that motions for cost shifting should be brought once the defendants have a firm estimate of the costs.)

## IV.    CONCLUSION.

Based on the foregoing, plaintiffs' motion should be denied in its entirety.



DATED:  July 28, 2006                           Defendant, Jay S. Walker


                                                By:      /s/  Jeanne Irving

                                                Thomas D. Goldberg (ct04386)
                                                Terence J. Gallagher (ct22415)
                                                Day, Berry & Howard LLP
                                                One Canterbury Green
                                                Stamford, CT 06901
                                                Phone:  (203) 977-7300
                                                Fax:     (203) 977-7301
                                                tdgoldberg@dbh.com – E-mail

                                                        - and -

                                                J. Michael Hennigan (phv01119)
                                                Bruce Bennett (phv01105)
                                                Jeanne E. Irving (phv01118)
                                                Shawna Ballard (phv01117)
                                                HENNIGAN, BENNETT & DORMAN LLP
                                                865 South Figueroa Street, Suite 2900
                                                Los Angeles, California 90017
                                                Telephone:  (213) 694-1200
                                                Fax:  (213) 694-1234
                                                irvingj@hbdlawyers.com – E-mail

                                                His Attorneys

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2006, a copy of the foregoing **DEFENDANT JAY S.**

**WALKER'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION**

**TO COMPEL DEFENDANT WALKER TO PRODUCE EMAILS AND ELECTRONIC**

**DOCUMENTS ON THE SEVENTEEN RESTORED PRICELINE WEBHOUSE CLUB**

**TAPES** was filed electronically and served by mail on anyone unable to accept electronic filing.

Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic

filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of

Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


_____/s/ Terence J. Gallagher_____
Terence J. Gallagher