UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE: PRICELINE.COM, INC.<br>SECURITIES LITIGATION | : <br> : <br> : | MASTER FILE NO.<br>3:00CV01884(AVC) |
| | : | |
| This document relates to: | : <br> : | July 28, 2006 |
| ALL ACTIONS | : | |

### DECLARATION OF JEANNE IRVING IN SUPPORT OF DEFENDANT JAY S. WALKER'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF EMAILS AND ELECTRONIC DOCUMENTS ON SEVENTEEN RESTORED PRICELINE WEBHOUSE CLUB TAPES

I, Jeanne Irving, do hereby declare, swear and affirm as follows:

1. I am a member of the firm Hennigan, Bennett & Dorman LLP, counsel for Jay S. Walker in this matter. I submit this declaration in support of Mr. Walker's response to "Plaintiffs' Motion to Compel Defendant Walker To Produce Emails and Electronic Documents On The Seventeen Restored Priceline WebHouse Club Tapes." Except to the extent stated otherwise herein, I make this declaration based on my own personal knowledge and experience and based on my knowledge of the file in this matter.

2. In April, 2006, Mr. Walker retained this firm to represent him in this matter. To effectuate this change in counsel, Thomas Goldberg and Terence Gallagher of Day, Berry & Howard LLP filed notices of appearance for Mr. Walker on April 27, 2006. On April 28, 2006, Paul, Hastings, Janofsky & Walker LLP, Mr. Walker's prior counsel, filed a motion to withdraw as counsel of record in this matter, which motion was granted on May 1, 2006. On May 4, 2006, a motion was filed to admit several Hennigan, Bennett & Dorman attorneys, including me, as visiting attorneys in this action. This Court granted these pro hac vice motions.

3. Based on the review of the Bates-number range of documents in Mr. Walker's previous productions, to date, Mr. Walker has already produced to the plaintiffs approximately

1

350,000 pages of documents and other evidence in the file demonstrates he has produced electronic data and documents from a variety of electronic media. Those productions included in excess of 1,500 emails, which with associated and attached documents constituted over 9,500 pages of production, including email to or from the majority of the 121 individuals whom plaintiffs characterize as "key" employees.

4.   Plaintiffs previously sought the production of all 181 backup tapes in a motion filed in September 2005. True and correct copies of certain excerpts of plaintiffs' memorandum of law with respect to this September 2005 motion (Dkt # 212) are attached hereto as Exhibit 1.

5.   On December 8, 2005, Judge Squatrito denied plaintiffs' request to compel the production of 181 backup tapes in Mr. Walker's possession, and in doing so, Judge Squatrito issued a Memorandum of Decision and Order (Dkt # 245) setting forth the procedures that govern the production of documentation from the 181 backup tapes in Mr. Walker's possession. A true and correct copy of this Memorandum of Decision and Order is attached hereto as Exhibit 2. Also, attached hereto as Exhibit 3 are relevant excerpts of the proposed revisions to Rule 26(b)(2) and the Civil Rules Advisory Committee Notes attendant thereto which are referenced in Judge Squatrito's December 8, 2006 Memorandum of Decision and Order as the basis for any request for shifting the costs of producing from the 181 backup tapes.

6.   Judge Squatrito's order requires Mr. Walker to submit monthly status reports with respect to electronic production issues relating to the backup tapes. Attached hereto as Exhibit 4 is a true and correct copy of the status report that Mr. Walker filed on June 12, 2006 regarding the production of electronic evidence, without the exhibits filed with that status report. This June status report summarizes the actions that Mr. Walker's counsel has taken to restore and catalog certain tapes in an effort to decipher the nature of the files contained on the tapes and the accessibility of the data thereon, and this report summarizes some of the preliminary results of those analyses.

7.   While this firm was first transitioning into this case, on April 18, 2006, I spoke with Peter McDougall, one of plaintiffs' attorneys in this action, about production issues,

including issues pertaining to the 181 backup tapes. Both in that call and in a follow up letter sent that same day, Mr. McDougall emphasized the progress that had been made by Mr. Walker's counsel and plaintiffs' counsel with respect to production issues relating to the backup tapes. A true and correct copy of Mr. McDougall's April 18, 2006 letter to me discussing this "substantial progress" is attached hereto as Exhibit 5.

8. Subsequent to this April 18 letter, Paul, Hastings advised me and plaintiffs' counsel confirmed that Paul Hastings completed the delivery to plaintiffs of the remainder of all the catalogs that were able to be generated from the 181 back-up tapes. Also following the April 18 letter, attorneys and/or IT persons at this firm participated in several conferences with plaintiffs' counsel regarding technological and other issues associated with reviewing and culling through electronic data.

9. In this regard, on or about April 20, 2006, I spoke with several attorneys representing the plaintiffs, including Peter McDougall, Jake Perkinson, Stacy Porter and Geoff Johnson regarding issues pertaining to the 181 backup tapes. In that conversation, Mr. McDougall informed me that they were reviewing the catalogs for the 6 backup tapes that had recently been restored in order to identify files on those catalogs that they would seek to have uploaded and reviewed. Based upon this conversation and my review of the files relating to the 181 backup tapes, I understand that Mr. McDougall was referring to the catalogs that Paul Hastings had sent to Mr. McDougall on March 10, 2006 with respect to 6 of the tapes in Groups 5 and 15 (TOG Nos. 1 through 6 of 6) that Mr. Walker's vendor attempted to restore pursuant the parties' agreement. (As plaintiffs are aware, Mr. Walker's vendor informed us that one of these 6 tapes, TOG No. 1 of 6, was blank and was not capable of being restored.) A true and correct copy of what I understand to be the March 10, 2006 letter from Paul, Hastings to Mr. McDougall attaching these catalogs is attached hereto as Exhibit 6.

10. On April 27, 2006, I had a further conversation with plaintiffs' counsel regarding issues relating to the review of information contained on the restored backup tapes. Shawna Ballard, another attorney at this firm working on this matter, also participated in this call.

3

Moreover, pursuant to plaintiffs' request that we have a person from this firm's IT department join the call, Celestino (Tino) Santos, this firm's Litigation Support Administrator, also participated in this phone call. Mr. McDougall and Mr. Johnson, as well as Ms. Griffin, an IT person working on this matter for plaintiffs, participated on the call on behalf of the plaintiffs. In this call, plaintiffs' counsel again reiterated that they were going through the catalogs that had been provided to them to identify those files that they would like to have uploaded for review. Mr. McDougall indicated in that call that he would provide the identification of the files from the catalogs that they sought to have reviewed for potential production to us shortly.

11. On April 28, 2006, Mr. Johnson wrote me a letter with respect to the call we held on April 27, 2006, a copy of which Mr. Johnson attached as Exhibit I to his Declaration. On page 2 of that letter, Mr. Johnson notes that "Plaintiffs will also provide you with a list of search terms that you should use to search the entire database."

12. On Friday, May 5, 2006, Shawna Ballard and I participated in a further meet and confer with plaintiffs' counsel. Mr. Johnson and Mr. Mc Dougall participated in that call for plaintiffs. In that call, we discussed plaintiffs' request that we conduct an email-by-email search of the .pst mailbox files for 121 individuals identified by plaintiffs and on that same day, Mr. McDougall provided me with the list of 121 individuals for whom plaintiffs sought such an email-by-email search.

13. In the meantime, beginning shortly after our retention, HBD spent a considerable amount of time analyzing the catalogs in an attempt to assess the volume of data that relates to email as well as other types of documents. We also spent a great deal of time discussing with Mr. Walker's electronic vendor the most efficient and cost-effective means of culling relevant material from the data population. These analyses and discussions revealed that the volume of the data that relates to email of the 121 individuals on the list provided to me on May 5, 2006, appears to be enormous and that the most efficient and cost-effective approach to culling from this population relevant material is to both (1) to commit to review the email of only reasonable list of identified individuals, and (2) to run a reasonable list of search and date terms against the

4

email of those identified individuals. On May 12, 2006, I wrote a letter to Mr. Johnson, a true and correct copy of which is attached hereto as Exhibit 7, explaining our position and soliciting plaintiffs' views.

14. In that letter, I also informed Mr. Johnson of the nature of charges that Mr. Walker's vendor would charge for such things as staging, filtering and de-duping data, releasing it to a review tool and releasing documents for production. In this regard, as explained in my May 12 letter, the vendor charges include $900 per gigabyte for documents that are subjected to any filtering or de-duping, and $3,000 per gigabyte for releasing the documents into a review tool where we can review the resulting population of filtered and de-duped data. As also explained in my May 12 letter, the vendor will charge $0.04 per page to release the non-privileged, responsive documents to a production set. In addition, the vendor charges $275 per hour to cull out identified data from the restored tapes for upload.

15. Plaintiffs' counsel never contacted me in response to my May 12, 2006 letter. Plaintiffs' counsel never identified those files from the catalogs that it wished to have uploaded as they had committed to do in conversations held on April 20 and 27, 2006. Plaintiffs' counsel never provided me with proposed search terms to apply to the uploaded data as they had committed to do in their April 28, 2006 letter.

16. Plaintiffs' counsel did not contact me or others representing Mr. Walker regarding their motion to compel filed on July 7, 2006. Plaintiffs' counsel never discussed with me the request for the wholesale production of non-privileged documents on the backup tapes that are the subject of their motion to compel. Plaintiffs' counsel never discussed with me or others representing Mr. Walker that they were even contemplating a motion to compel. And, in fact, the last communication that I or anyone else representing Mr. Walker had with plaintiffs' counsel prior to their filing of the motion to compel was my May 12, 2006 letter seeking plaintiffs' input in developing a reasonable methodology for refining the email population on the back-up tapes.

17. As a result of plaintiffs' failure to meet and confer, I first received and learned about plaintiffs' motion to compel on Friday, July 7, 2006, when it was filed and when I received an electronic service copy of that document. Because that motion stated that it applied to the "17 restored backup tapes," although 29 backup tapes had been restored, I and others at this firm were unable to determine which tapes were the subject of plaintiffs' motion. Therefore, on Monday July 10, 2006, the next business day following the filing of plaintiffs' motion, I began a series of communications with plaintiffs' counsel in an effort to learn what tapes were the subject of plaintiffs' motion.

18. Specifically, on Monday, July 10, 2006, I emailed two of plaintiffs' lawyers, Geoff Johnson and Erin Comite, and requested that they identify by TOG number (the ID number given to each WebHouse back-up tape) the tapes that were the subject of the motion to compel. A true and correct copy of this email is attached hereto as Exhibit 8. Neither Mr. Johnson nor Ms. Comite responded to this email over the ensuing week and a half.

19. On Wednesday, July 19, 2006, Ms. Ballard and I placed three telephone calls, one to each of three separate lawyers for the plaintiffs: Mr. Johnson, Ms. Comite and David Scott. In each instance, I left detailed voicemail messages explaining that we were following up on the email of nine days earlier, stating that we needed to know what tapes were the subject of plaintiffs' motion to compel and asking that plaintiffs' counsel provide that information. None of the three plaintiffs' lawyers returned any of these calls.

20. As reflected in my below-referenced July 24, 2006 letter, on Thursday, July 20, 2006, I understand that Mr. Walker's local counsel, Mr. Gallagher, called Ms. Comite again on this subject. I further understand that Mr. Gallagher was finally able to speak with Ms. Comite on Friday, July 21, 2006. I understand that Ms. Comite did not identify which of the 17 tapes were the subject of plaintiffs' motion, but relayed to Mr. Gallagher that Mr. Johnson would be sending a letter in that regard. That letter from Mr. Johnson, a true and correct copy of which is attached hereto as Exhibit 9, was received on the afternoon of Friday, July 21, 2006 – 14 days after plaintiffs' motion had been filed.

21. However, Mr. Johnson's letter failed to relay the TOG ID numbers of the tapes that were the subject of plaintiffs' motion. I instead that letter referred to groups of tapes, and attached a list of those groups; however, that list of groups also did not contain the TOG ID numbers of the tapes within the various groups.

22. More importantly, however, the letter stated that the motion to compel was intended to encompass four groups of "restored" back-up tapes (groups 5, 15, 4 and 6), despite the fact that the vast majority of the tapes in two of those groups – groups 4 and 6 – had never been restored. In total there are 11 tapes in groups 4 and 6 (after excluding blank tapes and another tape that plaintiffs' letter requested be excluded). Only 2 of those 11 tapes have been restored.

23. Because Mr. Johnson's July 21 letter referenced groups of tapes that had never been restored as the subject of the motion, the following business day, on Monday, July 24, 2006, I called plaintiffs' counsel, Geoff Johnson, to address the internal inconsistency in plaintiffs' position – seeking production from "17 restored tapes," many of which have not been restored – and seek clarification on which tapes were the subject of the motion. In that conversation, I explained that the group 4 and 6 tapes had not been restored, and asked whether the motion was actually intended to address the tapes that had in fact been restored or the tapes listed in Mr. Johnson's July 21 letter. Mr. Johnson's only response was to ask me to put the information I had relayed in a letter.

24. In light of the fact that my client's opposition to the motion to compel was due to be filed four days later, I asked Mr. Johnson if plaintiffs could provide an answer to the question of which tapes were the subject of the motion by the end of that day. Mr. Johnson refused that request. I then asked Mr. Johnson to state when plaintiffs' counsel would provide an answer to the question of what tapes were the subject of the motion, and Mr. Johnson said that he would not make any commitment to provide that answer by any particular date.

25. This same day, I complied with plaintiffs' request to reiterate the contents of my conversation with plaintiffs' counsel in a letter I sent that day. A true and correct copy of this

7

letter sent to Mr. Johnson on July 24, 2006 is attached hereto as Exhibit 10. In this July 24 letter, I again requested that plaintiffs clarify whether the motion to compel 17 "restored" tapes addressed tapes that had actually been restored, or the unrestored tapes in groups 4 and 6 referenced in plaintiffs' July 21 letter. Plaintiffs' counsel did not, however, respond to my letter.

26.     Mr. Walker's prior counsel, Paul Hastings, had handled the restoration of 29 of the 181 backup tapes. Thus, in the face of the lack of response from plaintiffs' counsel to clarify which tapes were the subject of their motion to compel, on Tuesday, July 25, 2006, Ms. Ballard and I contacted Carl Mullis, Mr. Walker's prior counsel at Paul Hastings to see if he could shed any light on why plaintiffs seemed to believe that the tapes in groups 4 and 6 had been restored.

27.     After some investigation on Paul Hasting's part, on Wednesday, July 26, 2006 – two days before the opposition to this motion to compel was required to be filed – Mr. Mullis telephoned me and informed Ms. Ballard and me that there had been a mix-up involving the tapes. During this phone call, Mr. Mullis conferenced in Mr. Johnson and provided plaintiffs' with the same information. Specifically, Mr. Mullis informed us and Mr. Johnson that the plaintiffs had originally requested that Paul Hastings restore tapes from groups 3 and 16. Mr. Mullis further noted that after discussions between Paul Hastings and plaintiffs' counsel about these tapes, plaintiffs' counsel shifted their request to groups 4 and 6. However, a member of Paul Hastings IT department had mistakenly sent tapes in groups 3 and 16 to be restored, rather than groups 4 and 6. Mr. Mullis further noted that after restoring tapes from groups 3 and 16, on May 8, 2006, electronic versions of the catalogs for these restored tapes were sent to Mr. McDougall, one of plaintiffs' lawyers.

28.     Mr. Johnson's response to Mr. Mullis's statements was to ask Paul Hastings to reiterate the contents of the phone call in writing, which Paul Hastings did the following morning pursuant to an email from Mr. Mullis to Mr. Johnson, which I was copied on. A true and correct copy of this July 27, 2006 email from Mr. Mullis to Mr. Johnson is attached hereto as Exhibit 11, and a true and correct copy of the May 8, 2006 letter, referenced therein, forwarding plaintiffs'

8

electronic versions of the catalogs for the tapes restored in groups 3 and 16 is attached hereto as Exhibit 12.

29. On July 26, 2006, following the joint telephone conference call including Mr. Johnson and Mr. Mullis, Ms. Ballard and I called Mr. Johnson, plaintiffs' counsel. In that call I again asked plaintiffs to state whether plaintiffs' motion concerned (1) the tapes that had been restored, or (2) the unrestored tapes in groups 4 and 6; and asked that plaintiffs' counsel agree that Mr. Walker's counsel could have an extension of time to respond to this motion to enable them to have at least one week to prepare their response after they finally learned which tapes were the subject of plaintiffs' motion. In that telephone call held on July 26, 2006, Mr. Johnson and another attorney at his firm, Mark Jakowski, informed us that that the subject of their motion to compel production from 17 "restored" tapes included the unrestored tapes from groups 4 and 6 (I confirmed this in an email that I sent to Mr. Johnson that day, a true and correct copy of which is attached hereto as Exhibit 13.) In a subsequent telephone call to us, these same lawyers refused to agree to provide us with an extension of time to respond.

30. There are a total of 7 non-blank tapes in groups 5 and 15. Therefore, together with the 11 tapes in groups 4 and 6, plaintiffs' July 21 letter asserts that the subject of this motion to compel is 18 tapes, 9 of which are not restored.

31. In the face of a motion seeking to compel production from "17 restored," but otherwise unidentified tapes, and plaintiffs' refusal to answer our requests for identification of the tapes at issue, we made our best guess at what plaintiffs' motion might be about, and spent the first several weeks of the motion response time preparing a response on the assumption that the motion concerned the tapes in groups 3 and 16, which had been restored.

32. Of the 11 tapes in groups 4 and 6, only two were restored in the initial sample restoration of a tape from each of 16 groups, and the electronic discovery vendor was not able to generate catalogs for six of them and for part of one other. Moreover, the vendor has advised us that they will not be able to restore these tapes for which no catalog was created. And, as for that tape (TOG 21) for which the vendor was only able to generate a partial catalog, the vendor has

advised us that, while a partial restoration of this tape might be possible, there are no guarantees that the data is good and, in fact, the data may be corrupt.

33. Both before and after the filing of plaintiffs' motion to compel, my colleagues and I expended considerable professional time and other resources analyzing reasonable methodologies for identifying potentially relevant data in a manner – and for a cost – that is reasonable under the circumstances. For example, Ms. Ballard and I engaged in numerous discussions and written exchanges with Mr. Walker's electronic discovery vendor on whether and how the email population on the back-up tapes could be reduced by eliminating from it emails – if any – that have already been produced by the other defendants in this case, and what the cost would be for this service.

34. Also, attorneys at our firm have reviewed prior discovery responses to cull down plaintiffs' list of 121 "key" individuals for which they seek an email-by-email review to 55 individuals who had been identified in discovery responses and parties' initial disclosures as having information that might bear on this case. In this regard, Ms. Ballard and I provided the electronic vendor with instructions to load and filter .pst files for these 55 individuals in preparation for release to a review tool. More specifically, we have, thus far, initiated the following methodology for culling through the voluminous .pst email data on the restored tapes: (a) we have obtained a copy set of those emails produced by other defendants; (b) we have instructed the electronic vendor to upload a copy set of those electronic emails produced by the other defendants; (c) we have identified 55 of the 121 individuals for whom plaintiffs seek an email-by-email review as most likely to have potentially responsive information based on prior discovery responses; (d) we have instructed the electronic vendor to upload the entire .pst mailboxes for any of these 55 individuals for whom mailboxes exist on the back-up tapes restored thus far and to filter those email boxes to exclude emails sent before or after the following date range: March 1, 1999 to April 1, 2001; (e) we have instructed the electronic vendor to filter the data for numerous attorney and law firm names so that the emails that were sent by, received by or copied to such persons or law firms can be tagged as potentially

privileged and so that these particular emails can, where practical, be reviewed after the review of remaining email population that results from the filtering described herein; and (f) we have instructed the electronic vendor to tag those emails from the back-up tapes that are duplicates of emails produced by other defendants or that are duplicates of other emails within the uploaded database.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 28, 2006.

                                                                /s/  Jeanne Irving
                                                               Jeanne Irving

CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2006, a copy of the foregoing **DECLARATION OF JEANNE IRVING IN SUPPORT OF DEFENDANT JAY S. WALKER'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF EMAILS AND ELECTRONIC DOCUMENTS ON SEVENTEEN RESTORED PRICELINE WEBHOUSE CLUB TAPES** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

      /s/ Terence J. Gallagher
      Terence J. Gallagher