# EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **IN RE: PRICELINE.COM INC. SECURITIES LITIGATION** | : | **MASTER FILE NO. 3:00CV01884(DJS)** |
| **This document relates to:** | : | |
| **ALL ACTIONS** | : | |

**MEMORANDUM OF DECISION AND ORDER**

Now pending in the above-captioned matter is plaintiffs' motion to compel production of electronic discovery (dkt. # 212) from defendants. For the reasons set forth herein, this motion is **GRANTED in part** and **DENIED in part.**

## I. BACKGROUND

Lead plaintiffs bring this action on behalf of members of a putative class of persons who purchased or otherwise acquired securities of priceline.com Inc. ("Priceline") between January 27, 2000 and October 2, 2000 ("Class Period"), pursuant to Sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 78t, of the Securities Exchange Act of 1934 ("the Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78a-78mm, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against Priceline, Jay S. Walker, N.J. Nicholas, Daniel H. Schulman, and Richard S. Braddock. Plaintiffs allege that defendants' false and misleading statements inflated the value of Priceline's stock to

the benefit of the defendants and other company insiders and to the detriment of the plaintiffs. Specifically, plaintiffs allege that during the period from mid-July 2000 to September 26, 2000, defendants sold, in the aggregate, millions of shares of Priceline stock, allowing them to profit substantially prior to disclosing various deficiencies in Priceline's short term economic outlook.

The gravamen of plaintiffs' allegations is that defendants grossly overstated the utility of Priceline's business model, and that defendants, outside the view of the investing public, spent exorbitant amounts of Priceline's cash to keep the doomed venture called WebHouse afloat primarily to bolster their statements about the utility of the business model.

## II. DISCUSSION

Plaintiffs' motion addresses defendants' production of information stored as electronic files. Defendants do not object to producing responsive information at this time, but rather there is substantial disagreement between the parties regarding how responsive information shall be produced.

### A. SUBJECT MATTER

Plaintiffs and Walker have submitted affidavits from computer forensic consultants that explain the necessary terminology and methodology central to the parties' dispute, which is summarized as follows. The information plaintiffs seek

is found within computer files, but this information can be difficult and costly to locate for two reasons. First, many of the computer files cannot be viewed in their current format because the files have been altered for storage. Second, even if the files themselves are in the proper format for viewing, the files may be arranged in a manner designed to maximize hardware space and facilitate storage without regard to the type of file or the subject matter of the information within the file.

In order to be viewed, a file must be restored to its "native format." "Native format" is the default format of a file, and access to this file is typically provided through the software program on which it was created or through which it was viewed. For example, if the file was created in Microsoft Word and has been saved as a Microsoft Word file, it can be viewed or modified through Microsoft Word.

Files in native format can be converted in two ways relevant to the pending motion. First, the native files can be compressed to facilitate storage. In order to view the files after compression, the files must be restored to their native format. Second, the files may be converted to a Tagged Image File Format ("TIFF") or Portable Document Format ("PDF"), which is an inalterable image of the file.

The data at issue is stored in two forms. First, defendants have a "snapshot," which is "the equivalent of a full back-up of

all the material that existed on priceline's corporate file servers in February 2002 (the time the snapshot was taken), reaching back to the beginning of the Company." (Dkt. # 228 Ex. A at 1-2). The data stored in the snapshot is

> created and stored on three different types of servers: production database servers, which contain the raw transactional information of customer bids and offers; development servers, which contain quality-control and other "test" data; and corporate file servers, which contain e-mails, memoranda, letters, and all other office-type documents.

(Id. at 3). The files on this snapshot are in native format and do not need to be restored, but, because the snapshot is a reproduction of the way files are stored on computer hardware by the computer system, the files are arranged in an essentially random configuration. In order to find responsive information, the files must be searched, and the substantial number of duplicate files must be identified and eliminated. Defendants can generate a spreadsheet listing "the contents of the snapshot and the quantity of electronic material contained on it." (Dkt. # 228 Ex. C at 2). Defendants also have certain backup tapes containing e-mail data from former employees in the same format files are maintained on the snapshot.

Second, defendants have 223 backup tapes, 42 of which are in Priceline's possession and 181 of which are in Walker's possession. Data is not accessible from these backup tapes; in order to view the files stored on the backup tapes, the files

must first be restored to their native formats. Once the files have been restored, as with the snapshot, the files must be searched and culled for duplicates.

The process of viewing the files stored as computer data is expensive and time-consuming. The parties have estimated that the cost of restoring a backup tape will range from $200 to $800 per tape, if it is even at all possible. The cost of restoration is in addition to the cost of searching the files, culling for duplicate files, and converting responsive files for production. These costs are exclusive of attorneys' fees associated with reviewing and producing the amount of information that could be responsive. The parties disagree about several fundamental issues relating to the production of the information stored electronically.

B. DIRECTIVES

The following directives are meant to provide guidance to the parties at this stage of the proceedings. Unfortunately, due to the nature of this case, the production of material stored in electronic form is going to be time consuming and expensive. The court's task is to ensure that discovery in this case advances fairly and efficiently. Based upon the parties' arguments and the information furnished to the court, the court sets forth the following directives.

1. **Defendants shall retain possession of the original data through the restoration, data management, and document review stages.**

There is no reason to deviate from the well-established principle that the party producing material in response to discovery requests shall have the opportunity to review the material for responsiveness and privilege prior to producing the material to the requesting party.

2. **Restoration of backup tapes shall proceed on a measured basis, with cost-shifting determinations made at each step of the process.**

Ordering restoration of all 223 backup tapes at this point could be a colossal waste of resources. Given the substantial amount of time and resources necessary to process the more accessible information that the parties already agree could be relevant to plaintiffs' claims, the parties' focus should be directed to processing this material as efficiently as possible.

As such, the first step in addressing the backup tapes is to determine which backup tapes will be restored. Plaintiffs now argue that all 223 tapes should be restored. Walker has indicated that eight of the 181 tapes in his possession could contain relevant information, and Priceline has not indicated that any of the forty-two backup tapes in its possession would not be relevant.

Before the court orders defendants to restore a backup tape, there must be some indication that the files stored on the backup

tape may contain relevant information. Because of the extraordinary expense of restoration and review, this process should not be undertaken without justification. Allison Griffin, plaintiffs' computer forensics consultant, has indicated that it may be possible to take an inventory of the data contained on each tape at the cost of $100 per tape. Between defendants' knowledge of the contents of the tapes, Griffin's suggestion, or some other cost-effective way to survey the contents, the parties should be able to learn which backup tapes, if any, should be restored without incurring the cost of restoration itself. The court is not going to compel restoration of the backup tapes, regardless of which party is going to pay for restoration, unless the effort is justified.

The parties must meet and confer in an attempt to identify which backup tapes should be restored. If the parties are able to agree that some backup tapes should be restored, defendants can begin the restoration process on these tapes while the parties discuss surveying the contents of the unrestored tapes and identifying the next grouping of tapes to be restored. The court will resolve any disagreement through appropriate motion practice. In deciding whether to award the relief requested, the court will focus upon two issues: (1) the justification for restoring the tape; and (2) which party should bear the cost of restoration. Defendants may file a motion to shift the cost of

restoration either once the restoration has been completed or once a firm estimate of the cost of doing so has been generated.

3. **No party shall waive any claim that information contained on a computer file is privileged because that party produced an inventory, spreadsheet, or other survey of the contents of an item upon which data is stored.**

4. **Defendants shall produce responsive information contained in stored data files to plaintiffs in TIFF or PDF form with Bates numbering and appropriate confidentiality designations, shall produce searchable metadata databases, and shall maintain the original data itself in native format for the duration of the litigation.**

In setting forth this directive, the court rejects two positions advanced by plaintiffs. First, defendants, as custodians of the computer files, shall be responsible for excising duplicate files, sifting through the data for responsive information, and reviewing responsive documents for privilege in the most efficient manner possible. Defendants shall record and produce a summary of their methodology so that plaintiffs can argue for the inclusion of more data if appropriate. Defendants shall also seek input from plaintiffs regarding proposed search terms. Plaintiffs may seek a court order directing a more inclusive search.

The court will not dictate exactly how defendants should accomplish these tasks, but defendants' choices will be subject to review should they elect to seek cost-shifting relief. For example, Griffin relates her experience in a case where a party converted all files to TIFF format before culling the data, which

proved to be imprudent under the circumstances. Both Griffin and Michael Farley, Walker's computer forensic consultant, also mention the possibility that the data be uploaded, at an additional cost, to a vendor's software program that enables more advanced searching. The court leaves defendants to evaluate the best method for culling the data but cautions defendants to be prepared to justify any additional expense they seek to share with plaintiffs as promoting efficiency.

Second, TIFF or PDF format is the most secure format for the production of documents in this case. Given the sheer volume of information flowing from defendants to plaintiffs, the information should be conveyed as numbered images so that no inadvertent alterations are made, or more likely, no accusations of alteration can be made, and so that the information can be easily identified. Exceptions to this directive, however, may be applied for should production of a file in its native format be necessary to view or comprehend the information in the file.

This directive applies to both information stored in the snapshot, departed employee e-mail backup tapes, and restored from backup tapes.

5. **Defendants shall begin to produce responsive information from the e-mail files of the 113 individuals and the remainder of the snapshot in the manner consistent with the preceding directive.**

Case 3:00-cv-01884-AVC Document 264 Filed 12/07/2005 Page 10 of 12

6. **If one party seeks relief from the court concerning the scope of information searched or produced, the party producing the information shall not delay working toward the production of information that is not in dispute.**

7. **Beginning in January of 2006, defendants shall file a status report on the production of electronic information on or before the tenth day of each month, or the first business day thereafter, setting forth the following information:**

   **a. What percentage of the responsive information from the 113 employee e-mail files has been produced.**

   **b. The status of the review and production of the remainder of the information on the snapshot.**

   **c. The status of the selection of backup tapes for restoration.**

   **d. The status of the restoration of backup tapes selected for restoration.**

The purpose of the status report is not to micro-manage the production process or to create a forum for the airing of disputes; rather, the court would like to observe the process and foster communication between the parties so that there is no misunderstanding about the status of the production of information. The court is aware that this may be a burden to defendants, but the burden is justified because the court is placing primary responsibility upon defendants to properly sort through the data. Disagreements must still be raised and resolved through motions to the court.

8. **Cost-shifting shall be applied for in the method set forth in the proposed revisions to Rule 26(b)(2) and the Committee Note attendant thereto, as detailed by the Report of the Civil Rules Advisory Committee, which has been approved by the Judicial Conference and submitted to the U.S. Supreme Court on September 20, 2005. The court will apply the analysis set forth in the proposed revisions and Committee Note in determining the propriety of cost-shifting.**

The court does not make any determination with respect to cost-shifting at this time other than to expressly state that it will apply the proposed analysis set forth in the Report of the Civil Rules Advisory Committee to any request properly made thereunder.

9. **The court will revise the current scheduling order, but only after the parties have provided more details about the amount of information stored electronically that will be produced.**

## III. CONCLUSION

For the reasons set forth herein, plaintiffs' motion to compel (dkt. # 212) discovery from defendants is **GRANTED in part** and **DENIED in part.**

So ordered this 8th day of December, 2005.

**/s/DJS**

______________________________

**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**