EXHIBIT N – PART 3

Westlaw.

Not Reported in F.Supp.  Page 1

Not Reported in F.Supp., 1991 WL 44843 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Thomas E. CAREY, Plaintiff,
v.
BERISFORD METALS CORPORATION,
Berisford International PLC, Howard J. Zuckerman
and William P. Karon, Defendants.
No. 90 Civ. 1045 (JMC).

March 28, 1991.

### MEMORANDUM AND ORDER

CANNELLA, District Judge.

*1 Defendant's motion for leave to file a second amended counterclaim is granted in part. Fed.R.Civ.P. 13(f), 15(a). Plaintiff's motion to dismiss defendant's first amended counterclaim is denied as moot. Plaintiff's motion for a protective order is denied. Fed.R.Civ.P. 26(c). The scope of defendant's discovery request is limited as provided herein. Fed.R.Civ.P. 26(b)(1).

### BACKGROUND

Plaintiff Thomas E. Carey was the Chief Executive Officer ["CEO"] of defendant Berisford Metals Corporation ["BMC"] from 1977 through 1988. On March 13, 1989, Carey commenced the instant action to recover vested pension benefits, deferred compensation and other benefits allegedly due him pursuant to the provisions of his written employment contract with BMC and its parent, defendant Berisford International PLC.

BMC's first amended answer asserts a counterclaim charging Carey with fraud. BMC alleges that during Carey's eleven years of employment, Carey engaged in a complex scheme to defraud the company based on the company's policy of not requiring the submission of receipts to obtain reimbursement of expenses less than $25. BMC alleges that Carey submitted false expense reports for travel expenses that he never incurred. These expenses included expenditures for business periodicals, tips, taxis, drinks, gifts and meals. Although each expense was less than $25, BMC alleges that Carey reported spending several hundred dollars each day on these expenses. Carey now moves to dismiss BMC's first amended counterclaim on the ground that it fails to satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

Discovery proceeded during the pendency of Carey's motion to dismiss. At Carey's first deposition, Carey refused to answer any questions concerning his expense reports and reimbursements. Pursuant to a May 31, 1990 stipulation and order [the "May 31 Order"], Carey's deposition was to be continued no later than August 15, 1990. The Court subsequently decided that Carey could be asked questions pertaining to BMC's first amended counterclaim. Due to several delays, Carey was not deposed until September 25, 1990 and October 4, 1990. BMC now seeks leave to file its proposed second amended counterclaim.

On December 6, 1990, BMC served deposition notices upon the custodians of records of the financial institutions where Carey maintained bank accounts, seeking the production of Carey's bank account records from 1977 to date. Carey now moves for a protective order quashing the deposition notices.

### DISCUSSION

#### I. *Motion to Amend*

BMC seeks leave to file a second amended counterclaim, which differs from its first amended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 2
Not Reported in F.Supp., 1991 WL 44843 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

counterclaim in two respects. First, the second amended counterclaim adds a fraud claim based on Carey's local expense reports and further specifies the fraud claim based on Carey's foreign expense reports. Second, it adds a claim based on section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ["RICO"], 18 U.S.C. § 1962(c) (1988). Insofar as BMC expands upon its original fraud counterclaim, BMC's motion to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure. Insofar as BMC seeks to add a RICO counterclaim, BMC's motion is governed by Rule 13(f).

*2 Rule 13(f) provides that "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment." Fed.R.Civ.P. 13(f). Amendments to assert previously omitted counterclaims are liberally granted where plaintiff will not be unduly prejudiced and defendant did not act in bad faith. *See* Index Fund, Inc. v. Hagopian, 91 F.R.D. 599, 606 (S.D.N.Y.1981).

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading by leave of court and leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a) . Similar to the liberality accorded omitted counterclaims under Rule 13(f), amendments under Rule 15(a) are generally favored. A motion to amend should be denied only if there exists "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment [or] futility." Foman v. Davis, 371 U.S. 178, 182 (1962). Carey opposes BMC's motion to file its second amended counterclaim, citing the prejudice he will suffer if the amendment is allowed, BMC's delay in asserting the counterclaim and futility of the counterclaim.[FN1]

A. *Prejudice*

The undue prejudice Carey alleges he will suffer has many causes. First, he broadly asserts that a trial on his claim will be delayed as a result of the additional motion practice necessitated by BMC's RICO claim. However, in the absence of any supporting legal argument, Carey's mere speculation that there will be extensive motion practice is insufficient to establish that an adjudication on the merits will be significantly delayed.

Carey also contends that he will be prejudiced by the need for further discovery. There are special circumstances where the reopening of discovery may be the source of undue prejudice to the opposing party. For example, in Ansam Assocs., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442 (2d Cir.1985), the Second Circuit affirmed the district court's denial of leave to amend where the amendment was based on an entirely new set of operative facts. *See id.* at 446. In the instant action, however, BMC essentially expands upon its fraud claim and adds a RICO claim based upon some of Carey's allegedly fraudulent acts. The Court finds that the proposed amendment is substantially an extension of the first counterclaim and that Carey will not be unfairly prejudiced if compelled to defend against the additional allegations. Moreover, the court's finding of prejudice in *Ansam* was also based on the fact that the motion was made after the time for discovery had run and after the opposing party had filed a motion for summary judgment. *See id.* Here, while pretrial preparation has been extensive, no trial date has been set, nor has a date been scheduled for the submission of pretrial papers. Furthermore, this is not a case where the amendment is designed to defeat a pending motion for summary judgment based on the completed discovery. *See Reisner v. General Motors Corp.*, 511 F.Supp. 1167, 1172 (S.D.N.Y.1981), *aff'd on other grounds,* 671 F.2d 91 (2d Cir.), *cert. denied,* 459 U.S. 858 (1982).

*3 Denial of a motion to amend is also warranted where the proposed amended claims will significantly increase the scope of discovery when the action is ready for trial and the moving party is using the discovery process to force a favorable settlement. *See* Barrows v. Forest Laboratories, Inc., 742 F.2d 54, 58 (2d Cir.1984). Trial in the instant action is by no means imminent nor is there

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                             Page 3
Not Reported in F.Supp., 1991 WL 44843 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

any danger that the discovery process is being used for any wrongful purpose. Thus, the Court finds that Carey will not be unduly prejudiced by the burden of further discovery. The opposing party's burden of additional discovery in and of itself does not rise to the level of prejudice required to deny leave to amend.

B. *Undue Delay*

Carey also argues that BMC's proposed counterclaim will prejudice him before the jury. This is not a reason for denying leave to amend. Rather, if the Court subsequently determines that plaintiff will be prejudiced by BMC's counterclaim, the Court may order separate trials on the claims pursuant to Rule 13(i). *See* Fed.R.Civ.P. 13(i).

Carey next argues that BMC's counterclaim should be denied because BMC unduly delayed in asserting its counterclaim. The proposed second amended counterclaim comes nine months after BMC filed its answer. However, it appears that BMC's delay in asserting its counterclaim arises from the concomitant delay in holding Carey's deposition. Although the Court ordered the parties to conduct Carey's deposition no later than August 15, 1990, he was not deposed until September 25 and October 4, 1990. Approximately one month later BMC brought the instant motion.

Clearly, BMC was entitled to depose Carey to confirm the evidence of fraud they uncovered. Carey is the only party with actual knowledge regarding his allegedly fraudulent expense reports. Delay in asserting an amended claim in order to depose an important witness may be justified where there is a need to verify information. *See* State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir.1981). Given the delay in holding Carey's deposition, the Court finds that BMC's delay in asserting its second amended counterclaim is excusable. In addition, the Court finds that BMC did not bring the counterclaim in bad faith or to purposefully delay the action.

C. *Futility*

Finally, Carey argues that BMC's fraud and RICO counterclaims should be denied because they fail to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that "[i]n all averments of fraud or mistake the circumstances constituting the fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Thus, conclusory allegations that a party's conduct was fraudulent are insufficient. *See* Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 114 (2d Cir.1982). Rather, the act or statements constituting the fraud must be alleged with specificity. *See* Ross v. A.H. Robins Co., 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946 (1980). To comply with Rule 9(b), the fraud claim must specify:

*4 "(1) precisely what statements were made in what documents or oral misrepresentations or what omissions were made, (2) the time and place of each such statement and the person responsible for making (or, in the case of not making) the same, (3) the context of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

Ruff v. Genesis Holding Corp., 728 F.Supp. 225, 227 (S.D.N.Y.1990) (quoting Posner v. Coopers & Lybrand, 92 F.R.D. 765, 769 (S.D.N.Y.1981), *aff'd,* 697 F.2d 296 (2d Cir.1982)). Rule 9(b)'s particularity requirements serve three purposes: first, they give the defendant fair notice of plaintiff's claim and the actions upon which the allegations of fraud are based, thereby enabling the defendant to prepare a defense; second, they protect defendant's reputation from harm that could result if plaintiff was permitted to broadly charge fraud; and third, they minimize the number of strike suits. *See* Stern v. Leucadia Nat'l Corp., 844 F.2d 997, 1003 (2d Cir.), *cert. denied,* 488 U.S. 852 (1988); Di Vittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir.1987); Goodman v. Shearson Lehman Bros., 698 F.Supp. 1078, 1083 (S.D.N.Y.1988).

The particularity requirements of Rule 9(b) must be read in conjunction with Rule 8(a) which requires that pleadings be "simple, concise, and direct." *See* Quaknine v. MacFarlane, 897 F.2d 75, 79 (2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 4
Not Reported in F.Supp., 1991 WL 44843 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Cir.1990). Rule 9(b) does not require the pleading of detailed evidentiary matter. *See* Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 379 (2d Cir.1974), *cert. denied,* 421 U.S. 976 (1975); 2A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 9.03 (2d ed. 1989). Thus, fraud must be pleaded with sufficient particularity to enable the adverse party to adequately frame a response. The court, however, must also be careful not to demand voluminous and unwieldy complaints.

Carey first contends that BMC's allegations are insufficient because they rest upon "information and belief." Generally, allegations of fraud cannot be based upon information and belief. *See Di Vittorio,* 822 F.2d at 1247; Segal v. Gordon, 467 F.2d 602, 608 (2d Cir.1972). However, the Second Circuit recognizes an exception to this rule with regard "to matters peculiarly within the opposing party's knowledge." *Schlick,* 507 F.2d at 379. To satisfy Rule 9(b) in this event, the allegations must be accompanied by a statement of the facts upon which the belief is based. *See Stern,* 844 F.2d at 1003; *Di Vittorio,* 822 F.2d at 1247.

BMC's allegations are necessarily based upon information and belief, since whether an item was improperly submitted for reimbursement lies peculiarly within Carey's knowledge. However, to properly assert allegations based upon information and belief, BMC must provide a basis upon which its belief is founded. The Court finds that BMC's allegations meet this requirement. For example, BMC alleges that upon information and belief Carey falsely reported spending cash for meals, business periodicals, taxis, drinks and tips on his foreign expense reports. *See* Answer and Second Amended Counterclaim, at ¶¶ 12, 16. BMC then provides a list of twenty dates in 1983 in which Carey allegedly submitted false expense reports for meals. *See id.* at ¶ 15. BMC's allegation that Carey falsely reported spending cash for meals is based on the fact that according to Carey's expense report he ate three or more meals and snacks per day, while also charging one or more meals on the same day to his company credit card. *See id.* Thus, BMC infers that Carey falsified his cash expenditures in order to obtain reimbursement from BMC. Similarly, BMC points to specific expense reports which adequately establish the basis for its remaining allegations based upon information and belief. *See id.* at ¶¶ 16-18, 20-22, 25.

*5 Carey also argues that BMC fails to particularize the fraud as required by Rule 9(b). Carey relies on the fact that BMC sets forth a few examples of allegedly fraudulent expense reports over the eleven year period, rather than list each expense it claims is fraudulent. With regard to BMC's fraud counterclaim based upon Carey's *foreign* expense reports, the Court finds that the allegations meet the particularity requirements of Rule 9(b) to the extent the allegations are limited to Carey's charges for meals, tips, drinks, business periodicals, taxis and gifts under $25. *See id.* at ¶¶ 12, 16. As to these identified items, BMC specifies how each expense was fraudulently reported. *See id.* at ¶¶ 15-18. For example, BMC alleges that the expense reports containing charges for eight or more taxi rides a day for a total in excess of $150 are false because of the magnitude of the expense. *See id.* at ¶ 17. Rule 9(b)'s particularity requirements do not mandate that BMC set forth a detailed analysis of every expense report containing fraudulent charges from 1977 through 1988. Where "the fraud allegedly involved a course of conduct over an extended period of time or a series of transactions, it is not necessary to recite in detail, the facts of each transaction of the fraudulent scheme." General Accident Ins. Co. v. Fidelity & Deposit Co., 598 F.Supp. 1223, 1232 (E.D.Pa.1984). Here, the fraudulent scheme is strictly limited to easily identifiable items appearing on Carey's foreign expense reports so as to give Carey fair notice of the claim asserted against him. Therefore, BMC's proposed fraud counterclaim based on Carey's foreign expense reports is not futile and, accordingly, leave to amend is granted.

Next, with regard to BMC's fraud counterclaim arising out of Carey's *local* expense reports, BMC alleges that the items Carey misrepresented as business related "include[ ] but are not limited to: (a) gas purchases, insurance payments and repairs for a car other than a company car, often made by Carey's wife or daughter; (b) regular purchases of alcohol for personal use; (c) charges for non-business related meals and entertainment, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1991 WL 44843 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

(d) gifts for non-business related persons." *See* Answer and Second Amended Counterclaim, at ¶ 20. BMC sets forth two examples of the fraud. In one example, BMC lists dates in 1982 through 1986 in which Carey allegedly charged personal liquor expenses to BMC as Carey was travelling outside of the United States on the dates the purchases were made. *See id.* at ¶ 21. In the second example, Carey lists dates in 1986 and 1987 in which members of Carey's family allegedly made gas purchases as Carey was working at a location other than the place where the purchase was made. *See id.* at ¶¶ 22, 33.

The allegations as to Carey's local expense reports fail to pass muster under Rule 9(b). BMC does not allege that *all* of Carey's gas, alcohol, etc. purchases were for personal use. BMC alleges that only some of these items were for personal use. The allegations fail to meet Rule 9(b)'s particularity requirements because BMC fails to give a method for distinguishing between fraudulent and legitimate charges. Rule 9(b) does not require that BMC list each gas, alcohol, meal, gift or other item for allegedly personal use charged to BMC; however, Rule 9(b) demands that sufficient particularity be given to allow Carey to frame a response to the fraud charge. Unlike the fraud counterclaim based on Carey's foreign expense reports, the fraud counterclaim based on Carey's local expense reports lacks further information identifying which items are allegedly fraudulent. Moreover, the isolated examples of fraud do not cure these deficiencies since they do not narrow the allegations in any manner that would enable Carey to determine which expenses were allegedly for personal use. Therefore, BMC's proposed fraud counterclaim based on Carey's local expense reports is futile and, accordingly, leave to amend is denied.

*6 Turning to BMC's RICO claim, BMC alleges that while Carey worked at BMC, he used BMC's employee reimbursement procedures to effectuate a scheme to defraud BMC through the submission of false foreign *and* local expense reports. *See id.* at ¶¶ 29-31. BMC alleges that Carey effectuated the scheme to defraud by using credit cards to charge personal expenses to BMC, and in doing so relied upon the United States mails in violation of the federal mail fraud statute. *See id.* at ¶¶ 31-32. Carey's sole opposition to the proposed RICO amendment is that it fails to allege the predicate act of mail fraud with the specificity required by Rule 9(b).

To adequately plead a RICO claim, BMC must allege the commission of two or more "predicate acts," 18 U.S.C. § 1961(1) (1988), constituting a "pattern of racketeering activity." 18 U.S.C. § 1962 (1988). The federal offense of mail fraud, 18 U.S.C. § 1341 (1988), constitutes such a predicate act. *See* 18 U.S.C. § 1961(1)(B) (1988). Where mail fraud violations are the "predicate acts" alleged to constitute a pattern of racketeering activity, those fraud allegations must be pleaded with the specificity required by Rule 9(b). *See* Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir.1990). Mail fraud allegations must set forth "the contents of the items mailed and specify how each of these items was false and misleading." Official Publications, Inc. v. Kable News Co., 692 F.Supp. 239, 245 (S.D.N.Y.1988), *aff'd in part and rev'd in part,* 884 F.2d 664 (2d Cir.1989). The requirement of particularity in mail fraud claims, however, "does not require a plaintiff to plead every date and place of mailing, particularly where such knowledge would be in the possession of defendants." Landy v. Mitchell Petroleum Technology Corp., 734 F.Supp. 608, 622 (S.D.N.Y.1990).

In connection with Carey's *foreign* expense reports, BMC's RICO allegation arises out of Carey's use of the company credit card in connection with his scheme to defraud BMC by submitting false claims on his foreign expense reports for reimbursement. Specifically, BMC alleges that Carey used the company credit card to charge numerous expenses to BMC "including but not limited to ... meals." *See* Answer and Second Amended Counterclaim, at ¶ 34. The Court previously held that BMC's fraud counterclaim based on Carey's foreign expense reports satisfies Rule 9(b) because it sufficiently details those charges for meals, *inter alia,* not paid for in cash. Consequently, the meal purchases made with the company credit card as part of this fraudulent scheme are also sufficiently detailed to enable Carey to adequately respond. Thus, to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                   Page 6
Not Reported in F.Supp., 1991 WL 44843 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

extent that the predicate acts of mail fraud are based on Carey's use of the company credit card to charge meals as part of his scheme to defraud BMC by falsely reporting that he expended cash for meals, the Court finds that the proposed RICO claim meets the requirements of Rule 9(b). However, to the extent that BMC alleges that Carey used the company credit card to charge other meals and other unspecified expenses while away on business travel, BMC's claim is plainly deficient. *See id.* at ¶ 34.

*7 As to the acts of mail fraud in connection with Carey's *local* expense reports BMC alleges that credit cards were used to charge personal expenses to BMC for items "including but not limited to" gasoline purchased by members of Carey's family for their personal use. *See id.* at ¶¶ 32, 33. BMC then sets forth dates in 1986 and 1987 in which gas purchases were allegedly made by a family member at a location other than where Carey was working. *See id.* at ¶ 33.

These acts of mail fraud do not meet the specificity requirements of Rule 9(b). First, the allegations are overly broad as BMC fails to identify all the items for which Carey used a credit card to make personal purchases. The counterclaim is also not sufficiently particular to the extent that the mail fraud is limited to Carey's gasoline purchases. As with the fraud counterclaim based on Carey's local expense reports, BMC fails to provide any details that would enable Carey to identify which specific gas purchases were for personal use. The specified gas purchases in 1986 and 1987 are insufficient to support the entire claim since they fail to provide additional information indicating which gas purchases in other years were allegedly made by family members.

In sum, BMC's proposed RICO counterclaim relating to the meal charges in Carey's foreign expense reports adequately pleads mail fraud and, accordingly, leave to amend is granted. However, as to the proposed RICO counterclaim relating to the local expense reports, leave to amend is denied because the counterclaim fails to adequately plead mail fraud. Carey's final contention that BMC fails to sufficiently particularize its allegation that Carey was engaged in a "pattern of racketeering activity" for over ten years is without merit. Only the predicate act of mail fraud need conform to Rule 9(b)'s particularity requirements.

II. *Discovery Dispute*

Carey seeks a protective order quashing two deposition notices that were served on December 6, 1990, upon the custodians of records at two banks where he maintains bank accounts. The notices require the production of all documents "relating to any account of the Bank held by plaintiff Thomas E. Carey, including checking, savings, money-market or investment accounts, whether held jointly with his wife or solely in his own name" and "all documents recording payments into and out of such accounts" from January 1977 to present. *See* Plaintiff's Notice of Motion, Exh. A, 90 Civ. 1045 (JMC) (S.D.N.Y. Dec. 6, 1990). Carey contends that the documents should not be produced on the grounds that (1) the request violates the May 31 Order and (2) the request is irrelevant, unduly burdensome and intrusive into Carey's personal affairs.

Rule 26(b)(1) of the Federal Rules of Civil Procedure sets forth the broad scope of permissible discovery: "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party." Fed.R.Civ.P. 26(b)(1). Relevancy is broadly construed "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). However, a party from whom discovery is sought may seek a protective order from the court to protect him from "annoyance, embarrassment, oppression or undue burden or expense." Fed.R.Civ.P. 26(c).

*8 At the outset, the Court must determine whether Carey has standing to contest the deposition notices served on his banks. A party generally lacks

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 7
Not Reported in F.Supp., 1991 WL 44843 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

standing "to quash a subpoena to one who is not a party unless the party claims some personal right or privilege with regard to the documents sought." 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2457 (1971). Here, Carey's contention that he has a privacy interest in the bank records sought by BMC is sufficient to give him standing to contest the propriety of the discovery. *See* Chazin v. Lieberman, 129 F.R.D. 97, 98 (S.D.N.Y.1990).

Carey's first objection to BMC's discovery request is that it violates the May 31 Order. Pursuant to the May 31 Order, all requests for the production of documents relating to BMC's first amended counterclaim were to be served by June 15, 1990. Here, BMC is using a deposition notice to obtain the production of documents from a non-party. However, at the time of the May 31 Order BMC had not yet moved to amend its first amended counterclaim. In fairness, the May 31 Order cannot govern discovery relevant to BMC's proposed second amended counterclaim. Indeed, Carey himself argues that he will need to conduct additional discovery which would fall outside the scope of the May 31 Order in the event that BMC is permitted to amend its first amended counterclaim. Thus, BMC's discovery request is not prohibited by the May 31 Order.

Carey also argues that the discovery request is irrelevant, unduly burdensome and personally intrusive. Despite BMC's broad claim of relevance, BMC is able to provide support only with regard to Carey's alleged submission of fraudulent foreign expense reports. BMC explains that when Carey went on business trips BMC gave him a cash advance for his anticipated out-of-pocket expenses. Carey allegedly claimed that he expended cash over and above the amount advanced. These are the allegedly fictitious charges that appear on Carey's foreign expense reports. BMC argues that if Carey had indeed expended cash beyond the amount advanced him, this would be evidenced by withdrawals or travelers check purchases made on his banks. By examining his bank records, BMC seeks to determine whether Carey made such withdrawals. BMC's contention that an absence of withdrawals is relevant because it shows that Carey did not expend his own money on foreign business trips is reasonable. Thus, the discovery request falls within the broad scope of discovery allowed under Rule 26(b)(1).

Weighing against relevance is Carey's claim of undue burden and personal intrusion. The Court finds that BMC's right to obtain relevant discovery is not outweighed by Carey's assertion of undue burden and intrusion into his privacy interests. Accordingly, Carey's motion for a protective order to quash the deposition subpoenas is denied. Fed.R.Civ.P. 26(c).

The Court finds, however, that BMC's discovery request is not limited to relevant evidence and, therefore, will restrict the scope of discovery to the material that bears on the foreign expense reports. First, BMC requests the production of all bank records, including both deposit and withdrawal information. However, only information regarding withdrawals or any other transaction whereby Carey received monies from his banks is relevant. Second, BMC's relevancy claim pertains to cash that Carey allegedly spent while away on business travel. Therefore, the discoverable information is limited to the time period when Carey was away on business travel and one week prior to making the trip. BMC may obtain this information from both Carey's individual and joint bank accounts. Third, the information may be obtained for the years Carey was employed by BMC-1977 through 1988-as the years following his employment at BMC are plainly irrelevant.

*CONCLUSION*

Defendant's motion for leave to file its second amended counterclaim is granted only to the extent that the proposed fraud and RICO counterclaims are based on Carey's foreign expense reports. Fed.R.Civ.P. 13(f), 15(a). Plaintiff's motion to dismiss defendant's first amended counterclaim is denied as moot. Plaintiff's motion for a protective order is denied. Fed.R.Civ.P. 26(c). The scope of defendant's discovery request is limited as provided herein. Fed.R.Civ.P. 26(b)(1).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 8
Not Reported in F.Supp., 1991 WL 44843 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

*9 Defendant shall file an answer and second amended counterclaim consistent with this Memorandum and Order within ten (10) days of the filing of this Memorandum and Order. Plaintiff shall file a reply within ten (10) days of the filing of the answer and second amended counterclaim.

> FN1. Carey also argues that BMC's counterclaim is permissive and, consequently, should be asserted in a separate action. This is insufficient to warrant denial of defendant's motion to amend. Indeed, Rule 13(b) "encourages the parties to assert their independent and unrelated counterclaims in order to dispose of all points of controversy between the litigants in one action, thereby avoiding the cost of multiple suits." 6C C. Wright & A. Miller, *Federal Practice & Procedure* § 1420 (1971).

S.D.N.Y.,1991.
Carey v. Berisford Metals Corp.
Not Reported in F.Supp., 1991 WL 44843 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:90cv01045 (Docket) (Feb. 16, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

--- F.Supp.2d ----  
--- F.Supp.2d ----, 2006 WL 2337244 (S.D.N.Y.)  
(Cite as: --- F.Supp.2d ----)

Page 1

**H**  
Briefs and Other Related Documents  
Only the Westlaw citation is currently available.  
United States District Court,S.D. New York.  
RESERVE SOLUTIONS, INC., Plaintiff,  
v.  
Mark VERNAGLIA, Defendant.  
**No. 05 CIV. 8622.**

Aug. 11, 2006.

**Background:** Employer brought conversion action against employee, and issued subpoenas seeking records of employee's credit card accounts. After Ronald L. Ellis, United States Magistrate Judge, quashed certain subpoenas and denied reconsideration, 2006 WL 1788299, employer filed motion requesting review.

**Holding:** The District Court, Victor Marrero, J., held that employer was entitled to obtain discovery from employee and credit card issuer with regard to credit card billing statements and other documents relating to employee's accounts and finances to the extent employer represented that the records requested pertained to items relevant to the claims at issue.

Motion denied.

**Federal Civil Procedure 170A** ⇐0

170A Federal Civil Procedure  
Employer was entitled to obtain discovery from employee and credit card issuer with regard to credit card billing statements and other documents relating to employee's accounts and finances to the extent employer represented that the records requested pertained to items relevant to the claims at issue in its conversion action against the employee; as to such documents, employee's privacy interests did not outweigh his obligation to provide or permit discovery of relevant financial information.

Melvin Arnold Brosterman, Meredith Lee Strauss, Stroock & Stroock & Lavan LLP, New York, NY, for Plaintiff.  
Brian David Spector, Spector & Ehrenworth, P.C., Florham Park, NJ, for Defendant.

DECISION AND ORDER  
MARRERO, District J.  
*1 By Order dated June 26, 2006, Magistrate Judge Ronald L. Ellis, to whom this matter had been referred for pretrial supervision, issued an Opinion and Order (the "Order") [FN*], a copy of which is attached and incorporated herein, denying reconsideration of a ruling granting a motion of defendant Mark Vernaglia ("Vernaglia") to quash certain subpoenas issued by plaintiff Reserve Solutions, Inc. ("Reserve") on American Express Company. Magistrate Judge Ellis had found that the subpoenas, which sought records of Vernaglia's American Express credit card accounts, were overbroad. Reserve filed a motion pursuant to Fed.R.Civ.P. 72 requesting this Court to: review and set aside the Order; permit the issuance of the subpoenas on American Express and other third parties without prior approval of Magistrate Judge Ellis; grant a protective order striking Vernaglia's discovery requests; and assign supervision of this case to another Magistrate Judge. Vernaglia filed a timely response in support of the Order. For the reasons stated below the Court denies the motion.

I. STANDARD OF REVIEW

A district court evaluating a Magistrate Judge's order with respect to a matter not dispositive of a claim or defense may adopt the Magistrate Judge's findings and conclusions as long as the factual and legal bases supporting the ruling are not clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a); *Thomas v. Arn,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                          Page 2

--- F.Supp.2d ----, 2006 WL 2337244 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A district judge, after considering any objections by the parties, may accept, set aside, or modify, in whole or in part, the findings and determinations of the Magistrate Judge with regard to such matters. *See* Rule 72(a).

## II. DISCUSSION

The facts relevant to this motion are set forth in the Order and are thus incorporated herein by reference. Having conducted a review of the record in connection with the instant motion, including, among other things, the parties' respective submissions as well as the Order and applicable legal authorities, the Court concludes as follows:

1. Reserve is entitled to obtain discovery from Vernaglia and American Express with regard to credit card billing statements and other documents relating to Vernaglia's accounts and finances to the extent Reserve represents that the records requested pertain to items relevant to the claims at issue in this action. As to such documents Vernaglia's privacy interests do not outweigh his obligation to provide or permit discovery of relevant financial information. Accordingly, Reserve may obtain from Vernaglia and American Express all relevant and responsive documents within reasonable limits defined by Magistrate Judge Ellis in the event of further dispute between the parties. Should such disputes arise as to particular items, the records shall be produced for in camera inspection by Magistrate Judge Ellis and determination as to relevance and discovery as appropriate.

2. The subpoena Reserve originally issued to American Express was overbroad insofar as it was not sufficiently limited as to time and content to records relevant to this litigation.

*2 3. It was not clearly erroneous or contrary to law for Magistrate judge Ellis to quash the subpoena, or to place conditions on Reserve's issuance of additional non-party subpoena's, insofar as Magistrate Judge Ellis found that the subsequent subpoena Reserve issued to American Express did not adequately comply with the limitations placed on Reserve by Magistrate Judge Ellis's previous ruling.

4. It is not clear to what extent the parties addressed and Magistrate Judge Ellis considered and expressly ruled on Reserve's detailed item-by-item objections to Vernaglia's interrogatories, pursuant to Local Rule 33.3(a), that Reserve raises in the instant motion. The Court notes, however, that by its terms Local Rule 33.3 permits enlargement of the scope of interrogatories "if ordered by the Court." Any uncertainty regarding the scope of Magistrate Judge Ellis's ruling in this regard, or specific objections to particular items, should be addressed to Magistrate Judge Ellis in the first instance.

5. If any protective order is necessary to ensure the confidentiality of any records or otherwise guard privacy interests, or to preclude inappropriate discovery, the parties should propose an order or agreement for review and approval by Magistrate Judge Ellis.

6. There is insufficient basis to reassign this case to another Magistrate Judge.

## II. ORDER

For the reasons stated above, it is hereby

ORDERED that the motion (Docket No. 37) of plaintiff Reserve Solutions in for an order to set aside the order (Docket No. 32) of Magistrate Judge Ronald L. Ellis is DENIED.

SO ORDERED.

> FN* [Editors Note: The June 26, 2006 Opinion and Order can be found at 2006 WL 1788299.]

S.D.N.Y.,2006.
Reserve Solutions, Inc. v. Vernaglia
--- F.Supp.2d ----, 2006 WL 2337244 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 738793 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Plaintiff and Third-Party Defendants' Motion to Dismiss the Counterclaim and Third-party Complaint and in Opposition to Defendant/Third-Party Plaintiff's Cross-Motion for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                      Page 3
--- F.Supp.2d ----, 2006 WL 2337244 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Leave to File and Serve Second Amended Answer, Affirmative Defenses, Counterclaim and Third Party Complaint (Feb. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 738792 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendant/Third-Party Plaintiff i) in Opposition to Motion of Plaintiff and Third-Party Defendant to Dismiss the Counterclaim and Third-Party Complaint, and ii) in Support of Motion of Defendant/Third-Party Plaintiff for Leave to File and Serve Second Amended Answer, Affirmative Defenses, Counterclaim and Third-Party Complaint (Feb. 3, 2006) Original Image of this Document (PDF)
• 2006 WL 548459 (Trial Motion, Memorandum and Affidavit) Trial Motion, Memorandum and Affidavit (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 548460 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff and Third-Party Defendants' Motion to Dismiss the Counterclaim and Third-Party Complaint (Jan. 17, 2006) Original Image of this Document (PDF)
• 2005 WL 3655610 (Trial Pleading) Answer, Affirmative Defenses, Counterclaim and Third-Party Complaint (Nov. 23, 2005)
• 1:05cv08622 (Docket) (Oct. 11, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy  Page 1

Slip Copy, 2006 WL 1788299 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
RESERVE SOLUTIONS, INC., Plaintiff,
v.
Mark VERNAGLIA, Defendant.
**No. 05 Civ. 8622 VM RLE.**

June 26, 2006.

OPINION AND ORDER
ELLIS, Magistrate J.

I. INTRODUCTION

*1 Plaintiff Reserve Solutions, Inc. ("Reserve Solutions") commenced this action on October 11, 2005, against defendant Mark Vernaglia ("Vernaglia") for conversion of funds. On May 24, 2006, and May 31, 2006, the Court quashed Reserve Solutions's subpoena to American Express, a third party. Reserve Solutions requests that the Court reconsider this decision. For the reasons which follow, Reserve Solutions's application for reconsideration is DENIED.

II. STANDARD FOR RECONSIDERATION

Reserve Solutions may move for reconsideration of the Order on the basis of "mistake, inadvertence, surprise, or excusable neglect ." Rule 60(b)(1), Federal Rules of Civil Procedure. Reserve Solutions must outline "the matters or controlling decisions which counsel believes the court has overlooked." Local Rule 6.3. Reconsideration is merited if Reserve Solutions can "demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion." *Shamis v. Ambassador Factors Corp.,* 187 F.R.D. 148, 151 (S.D.N.Y.1999). The matters must " reasonably be expected to alter the conclusion reached by the court." *Davidson v. Scully,* 172 F.Supp.2d 458, 461 (S.D.N.Y.2001). "Local Rule 6.3 is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court." *Shamis,* 187 F.R.D. at 151.

III. DISCUSSION

Vernaglia, generally, would not have standing to quash or object to a subpoena served on American Express, a third party. *Chazin v. Lieberman,* 129 F.R.D. 97, 98 (S.D.N.Y.1990); *Chemical Bank v. Dana,* 149 F.R.D. 11, 13 (D.Conn.1993). He contends, however, that the credit card records Reserve Solutions seeks are private and confidential. Since Vernaglia claims a personal privacy right in the financial records being sought, he has standing to object to the issuance of the subpoena. *Chazin,* 129 F.R.D. at 98. Vernaglia claims the subpoena is overly broad. The Court agrees.

The scope of discovery is generally limited to any matter, not privileged, which is relevant to the subject matter involved in the pending action or appears reasonably calculated to lead to the discovery of admissible evidence. Rule 26(b), Federal Rules of Civil Procedure. "Relevancy is broadly construed to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Crey v. Berisford Metals Corp.,* 1991 WL 44843, at *7 (S.D.N.Y.1991) (citation omitted). "Discovery is of broader scope than admissibility, and discovery may be had of inadmissible matters." *King v. Conde,* 121 F.R.D. 180, 194 (E.D.N.Y.1988). However, "[u]pon motion by a party or by the person from whom discovery is sought ... and for good cause shown, the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2006 WL 1788299 (S.D.N.Y.)
**(Cite as: Slip Copy)**

burden or expense...." Rule 26(c). The Court has broad discretion in managing discovery, *Wills v. Amerada Hess Corp.,* 379 F.3d 32, 41 (2d Cir.2004), and may limit discovery from the subpoenas to material that pertains to acts specified in the complaint. *Chazin,* 129 F.R.D. at 98.

*2 In its complaint, Reserve Solutions maintains that Vernaglia converted company funds. More specifically, it argues that Vernaglia used money from company accounts to pay personal expenses, and has a list of checks written by Vernaglia to American Express from company accounts. It seeks financial records from American Express to develop evidence of Vernaglia's alleged conversion. For his part, Vernaglia argues that company funds were used to pay business-related expenses.

The relevance of Reserve Solutions's subpoena to American Express was addressed by the Court on May 24, 2006, and was again considered on May 31, 2006. On May 24 the Court quashed Reserve Solutions's subpoenas to American Express as overbroad, and ordered that the subpoenas be withdrawn pending further discovery. Instead of withdrawing the subpoena as directed by the Court, Reserve Solutions served American Express with a revised subpoena. The revised subpoena, like the original subpoena, was overbroad because it was not limited to the accounts and transactions at issue in this case. On May 31 the Court quashed the revised subpoena.

Reserve Solutions's reconsideration application includes a lengthy list of exhibits. The exhibits contain, in writing, the same information Reserve Solutions orally presented to the Court on May 24. They contain no new evidence or information that would merit a reversal or modification of the Court's order. On May 24 the Court directed the parties to confer concerning the circumstances surrounding the payments to American Express before seeking discovery from a third party. Reserve Solutions has failed to confer with Vernaglia. Although this action concerns the alleged conversion of funds, discovery should not include unrelated and detailed personal financial records and credit card information. The Court finds that Reserve Solutions's 1) subpoena is overly broad; and 2) rights to subpoena the financial records is outweighed by intrusions into Vernaglia's privacy interests. It appears that recent deposition testimony from a witness has explained at least some of the payments made to American Express. Conferring will allow both parties to conduct a more focused discovery. Compliance with the subpoena will infringe on Vernaglia's privacy rights, in that Reserve Solutions would access overly broad credit card records in detail.

IV. CONCLUSION

Reserve Solutions does not point to any controlling decisions or factual matters that were presented to the Court on the underlying motion which the Court overlooked. *Shamis,* 187 F.R.D. at 151. In light of the foregoing, Reserve Solution's request for reconsideration is DENIED. The parties are directed to confer concerning the circumstances surrounding the payments to American Express by July 10, 2006.

SO ORDERED.

S.D.N.Y.,2006.
Reserve Solutions, Inc. v. Vernaglia
Slip Copy, 2006 WL 1788299 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 738793 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Plaintiff and Third-Party Defendants' Motion to Dismiss the Counterclaim and Third-party Complaint and in Opposition to Defendant/Third-Party Plaintiff's Cross-Motion for Leave to File and Serve Second Am ended Answer, Affirmative Defenses, Counterclaim and Third Party Complaint (Feb. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 738792 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendant/Third-Party Plaintiff i) in Opposition to Motion of Plaintiff and Third-Party Defendant to Dismiss the Counterclaim and Third-Party Complaint, and ii) in Support of Motion of Defendant/Third-Party Plaintiff for Leave to File

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                          Page 3
Slip Copy, 2006 WL 1788299 (S.D.N.Y.)
**(Cite as: Slip Copy)**

and Serve Second Amended Answer, Affirmative Defenses, Counterclaim and Third-Party Complaint (Feb. 3, 2006) Original Image of this Document (PDF)
• 2006 WL 548459 (Trial Motion, Memorandum and Affidavit) Trial Motion, Memorandum and Affidavit (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 548460 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff and Third-Party Defendants' Motion to Dismiss the Counterclaim and Third-Party Complaint (Jan. 17, 2006) Original Image of this Document (PDF)
• 2005 WL 3655610 (Trial Pleading) Answer, Affirmative Defenses, Counterclaim and Third-Party Complaint (Nov. 23, 2005)
• 1:05cv08622 (Docket) (Oct. 11, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Copyright 2000 The News Journal (Wilmington, DE)
All Rights Reserved
The News Journal (Wilmington, DE)

June 18, 2000 Sunday

SECTION: BUSINESS; Pg. 1F

LENGTH: 2004 words

HEADLINE: Brainstorming for a living

BYLINE: JONATHAN D. EPSTEIN, Staff

BODY:

For these 21st century entrepreneurs, the Internet is their oyster

By JONATHAN D. EPSTEIN, Staff reporter

OVER THE EASTERN SEABOARD - Just another day, and another commute to work, says Randy Christofferson as the nine-seater Westwind 1 plane crosses over the Long Island Sound and banks toward the airport in Westchester County, N.Y.

After nine months, the former president of Wilmington-based First USA Bank is accustomed to the almost daily, 160-mile trip from Delaware.

"This is just a relatively inconvenient, more expensive form of commuting," he says, peering out the window as he takes a break from reading notes and talking with his three co-workers on the plane.

It's an unusual way to travel to work, but then again, there isn't much that is traditional about the company Christofferson now heads: Walker Digital.

The Stamford-based firm, established in 1994 by 43-year-old inventor and entrepreneur Jay S. Walker, is an Internet and technology "idea factory."

It's not well-known by the public, but its successes are. It gave birth to Priceline.com, the online "name-your-own-price" source for airline tickets, hotels, rental cars, groceries, home-equity loans and more.

Under the guidance of its namesake founder and chairman, Walker Digital's 190 employees invent and patent new ways of doing business. They use the Internet to solve common problems and address consumer needs in commerce, Christofferson says. The company then finds ways to market its ideas by forming new companies, partnering with existing ones or licensing its concepts.

In the first quarter alone, executives filed 35 patent applications, and expect to produce about 100 to 150 new "inventions" a year. Christofferson says the company hopes to use those inventions to launch six to 12 new companies a year, all under the Walker Digital umbrella.

"It's very entrepreneurial. Every day is different," said Christofferson, 35, Walker Digital's CEO. "I'm learning a lot about how to launch new businesses, how to raise capital. It's very satisfying. That's why I put up with the hassle of commuting."

His new boss says Christofferson's presence has made it easier to attract new investors.

"Having Randy at the helm of Walker Digital has helped us attract an extraordinary senior management team and has sent an unmistakably positive signal to the investment community," Walker said.

Walker Digital's unusual business model also has found favor on Wall Street.

"What Jay Walker has done is try to streamline the process and make it into an idea factory," said Tomas Isakowitz, an analyst at Philadelphia brokerage firm Janney Montgomery Scott.

Isakowitz compared Walker Digital's strategy to what universities do in patenting their inventions. But, Isakowitz says, Walker has figured out how to go one step further and actually produce companies.

"It's working out very well for them," he said. "I don't think it's that easy to replicate. I haven't seen anyone else doing it."

Premier excitement

Christofferson's new job is vastly different - and, he says, more exciting - than his previous career in financial services.

Christofferson served as president of American Express Co.'s Relationship Services before joining First USA as president in October 1995. Before that, he was with Bain & Co. of Boston and Cincinnati-based Proctor & Gamble.

"People don't realize it, but Walker Digital is really a premier company when it comes to starting profitable Internet companies, and that's Randy's line of business," said Chris Keenan, director of marketing for De Novo Corp., a Hockessin-based consulting and marketing firm.

At First USA, Christofferson helped oversee the rapid growth of the bank into the world's largest credit card issuer and a major Delaware employer. His reputation as a fun-loving sports fanatic and a member of a company band helped set a relaxed, cooperative, casual style at the credit card bank. And Walker Digital employees say he's brought that philosophy with him.

"He was an important part of the company," said Jeff Unkle, spokesman for First USA, which employs more than 3,300 in Delaware, mostly in Wilmington.

Christofferson and his colleagues at Walker Digital are the second major group of former First USA executives and employees to focus on the Internet after leaving the bank.

First USA founder and former CEO Richard W. Vague last month announced the founding of Juniper Financial Corp., an online financial services company to be based on Wilmington's waterfront. He is joined by former Executive Vice President James Stewart, also former CEO of WingspanBank.com, and other former First USA executives.

In addition, Joseph J. Purzycki, former senior vice president of First USA, is now president of UltimateBid.com, a site that lets people bid on sporting, entertainment and travel experiences.

And a number of other First USA officials have gone to other Web startups or to rival banks.

Most recently, First USA co-founder John C. Tolleson, who joined Bank One's board after the purchase of First USA in 1997, resigned from his director position May 24.

The exodus occurred during a disastrous year at First USA, as pressure to grow profits led to service mistakes and problems that drove away more than a million customers and caused a precipitous drop in revenue.

"I was surprised and disappointed to see some of the things that have transpired," said Christofferson, who left First USA in May 1999. "[But] I'm pulling for them to address the opportunities and the problems, and I'm sure they will."

Christofferson, who lives with his wife, Judy, and four children in Greenville, said his departure wasn't tied to any problems. Rather, the executive says he was ready to try something new, and had even considered teaching.

Then he was approached by Walker, whom he knew from First USA's co-brand partnership with Priceline, and by August he had signed on with Walker Digital. And so began his daily commute to Connecticut.

Executive fly guys

Christofferson's day typically starts at 7 a.m. at New Castle County Airport.

On this particular day, Christofferson, sporting a white dress shirt and gray slacks, trots out of the Dawn Aero terminal toward the maroon, gray and white executive plane.

Clambering up the short ladder, he ducks his head inside and climbs into one of the nine beige leather seats. His three co-workers, two of whom worked with him at First USA, follow.

Soon he is chatting with Dan Barr, former head of human resources at the credit card bank, about an afternoon meeting in New York City. They also discuss attending a professional hockey game that night with his favorite team, the New Jersey Devils.

Minutes later, the small plane is zooming down the runway and soaring over New Castle, bound for White Plains, N.Y. Barr and Christofferson continue their talk, changing the topic to job candidates for Walker Digital.

The plane touches down an hour later, but Christofferson and crew still have a 15-minute car ride up the Merritt Parkway to their Stamford offices. They get there by 8:15 a.m. - 75 minutes after starting their day.

He and Barr, who also lives in Greenville, return with up to seven other people at the end of the day, often trying to get home in time for dinner.

Christofferson says he doesn't feel the need to move because the company is already so spread out that he has to travel quite a bit.

Besides its headquarters, the company has offices in New York City, San Diego, Atlanta and San Francisco, and executives are looking at opening an office in Europe.

"It doesn't really matter where we live," he said. "I've got to go to New York a lot, to San Diego a lot, but I like Delaware."

Walker Digital doesn't create new technology. Rather, it seeks out new ways of using existing technology or anticipates what technology will be developed. And, unlike many other Internet ventures, its goal is not to be the first to market a product, but to be unique.

"It's about putting new technology to use in a way that enriches people's lives and creates value," said the company's 38-year-old president, Vikas Kapoor.

Entrepreneurship

Jay Walker has had a long career as an entrepreneur, starting as a young child selling candy.

The Queens, N.Y., native attended college at Cornell University, and as a junior obtained a $500,000 loan from Bankers Trust Corp. The money was used to launch a weekly newspaper to compete with a Gannett Co. daily in Ithaca, N.Y. The weekly folded five months later. The News Journal also is published by the Gannett Co.

Since then, Walker has had his share of successes and failures. Among the positive highlights was persuading Federal Express to begin delivery service for catalogs.

"He's a very smart guy and very clearly understands the ability to take some unique angle on a consumer problem and put it into the marketplace, and then go out and figure out the next one," said David Cooperstein, research director for online retail firms at Forrester Research in Cambridge, Mass.

Walker's co-workers describe him as the consummate problem-solver.

"He's an amazing guy," said James Jorasch, vice president for research and development, who with Walker developed the original Priceline patent. "His creative output is unbelievable. He's like a chess player who always wants to play another game."

But Walker remains focused on coming up with inventions and developing new companies. He is not managing and marketing the new companies, his colleagues say.

That's the job for Christofferson and his team.

"We're creating value for consumers in ways that were never possible," Christofferson said.

"It's a tense, demanding thing to do, but it's extraordinarily stimulating. Some people need structure. We're not the place for that."

?Reach Jonathan Epstein at 324-2880 or jepstein£wilmingt.gannett.com

Photo Caption:

AP/ DOUGLAS HEALEY

Randy Christofferson, chief executive officer of Walker Digital, (left) and Dan Barr, senior vice president of the firm's human resources department, share a laugh in the company's Stamford, Conn., office during an interview earlier this month. "It's very entrepreneurial. Every day is different," Christofferson says.

A LOOK AT WALKER DIGITAL

Walker Digital uses the Internet to find solutions to consumer needs and business problems, and find new ways to improve commerce.

The firm has launched several new companies, including:

?Priceline.com

?WebHouse Club, the online grocery shopping spinoff from Priceline

?Perfect YardSale, an Internet service that lets buyers and sellers connect directly to sell used goods

?Synapse, a third-party magazine subscription business, also based in Connecticut

?Digital Restaurant Solutions, which has developed a computer software package that can monitor staff at fast-food restaurants. It also evaluates individual sales techniques to choose the one that works the most.

The company also has a number of projects under development that attempt to use more recent innovations. Among them:

?An online game company

?The E-Commerce Factory, which is seeking to develop new methods of payment online besides credit cards

?A venture to make museums more interactive and informative using kiosks, hand-held screens or holographic displays

?A system to store a record of telephone conversations.

?A system that lets a consumer move ahead in line on telephone customer service by pressing a button and paying 50 cents

?A tiny monitoring device in pill bottles to make sure people take their medication

Company profile

Name: Walker Digital

Headquarters: Stamford, Conn.

Founder and chairman: Jay S. Walker

CEO: Randy Christofferson

No. of employees: 190 (800 including Priceline.com)

No. of companies launched: 12

Value of companies: $10 billion

Capital raised: $600 million

Patents in hand: 45

Patents pending: 300 plus

Source: Walker Digital

Photo Caption:

Special to The News Journal/TOM NUTTER

?)Company plane prepares to take off for Connecticut.

LOAD-DATE: July 12, 2002