# EXHIBIT A, PART 2

**C.      Plaintiffs Fail to Substantiate Their Claim That Walker's Financial Records Are a Proper Subject of Discovery for the Purpose of Establishing Scienter.**

**1.      Plaintiff's Reliance on the Superseded Version of Rule 26 Cannot Support the Unprecedented Relief They Seek.**

While plaintiffs' Merrill/Morgan/Chase Opp. contains a general discussion of the scope of discovery, it provides no basis for finding that the discovery sought here, regarding non-Priceline financial transactions, falls within that scope.

Plaintiffs err by relying on authority interpreting a superseded version of Federal Rule 26. Plaintiffs cite *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978), for its discussion of the then "key phrase" in the then Rule 26 standard of relevance: "relevant to the subject matter involved in the pending action." Merrill/Morgan/Chase Opp., p. 6-7. However, Rule 26 has been amended since the *Oppenheimer* decision was issued in 1978. The current Rule 26(b)(1) provides that the permissible discovery is to be relevant to "the claim or defense of any party."

---

suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on nothing more than a company's announcement of bad news, not evidence of fraud." *S. Rep. 104-98, 1995 WL 37283* (Leg. Hist.), at 4. Smaller start-up companies with unpredictable prospects, especially those involved in high technology, are particularly vulnerable. When a number of venture-backed companies less than ten years old was surveyed, it was learned that one in six had been sued at least once and that lawsuits had consumed an average of 1,055 hours of management time and $692,000 in legal fees. *Id.* at 8. Congress also found that 93 percent of these suits are settled and that many are "settled based not on the merits but on the size of the defendant's pocketbook." Id.

Congress was particularly concerned with the high costs associated with discovery, which accounts for approximately 80 percent of total litigation costs in securities fraud actions. *Id.* at 14. Testimony before the Securities Subcommittee indicated that discovery in securities actions often "resembles a fishing expedition." Id. It was learned that "plaintiffs sometimes file frivolous lawsuits in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint." *Id.*

This admonition to curb abusive discovery is especially important to enforce, particularly where the abusive discovery at issue is designed with the aim of extorting a settlement on meritless claims.

"Although FRCP 26(b)(1) does 'not specifically explain the difference in scope between discovery relevant to "*claims and defenses*" in the litigation, and discovery relevant to the "*subject matter*," it is clear that the former is intended to be narrower then the [latter] . . . .'"

*Federal Civil Procedure Before Trial*, *supra*, p. 11-64, ¶ 11: 612 (emphasis in original).

The Consolidated Amended Complaint does not contain any allegation attempting to tie Walker's supposed scienter to any non-Priceline transactions or to Walker's finances generally, and plaintiffs do not contend otherwise. The complaint quite specifically alleges strictly Priceline-related facts with respect to Waller's purported motivation and opportunity to engage in the acts alleged. Consolidated Amended Complaint, pp. 22-30, attached as Ex. 4 to the Irving Reply Decl. The discovery plaintiffs seek is not relevant to any claim or defense alleged.

> **2.    Plaintiffs' Incantation of the "Motive and Opportunity" Phrase Does Not Establish That Walker's Non-Priceline Transactions Have Any Relation to Either a Motive or Opportunity to Engage in Acts Alleged.**

Plaintiffs' Oppositions tend to obscure what these Protective Order Motions are **not** about. These motions do not seek to inhibit the disclosure of information concerning trades in Priceline securities during the Class Period or any margin loans involving those securities. Walker's counsel has already informed plaintiffs that Walker does not object to the production of information reflecting Priceline trades or reflecting the margin loan that was secured by Priceline stock.[21]

---

[21]    Plaintiffs falsely argue that they want the documents at issue in these Protective Order Motions to discern "whether [Walker] had increasing financial demands such as margin calls . . . ." Merrill/Morgan/Chase Opp., p. 8. However, these motions do not seek to prevent disclosure of Walker's transactions in Priceline securities or the margin loan collateralized by those securities.

Also coming out of left field, plaintiffs assert that the "crux of Defendant's argument is that discovery in this case should be limited solely to the daily reported movements in Priceline.com stock during the class period." (Merrill/Morgan/Chase Opp., p. 7; Goldman Opp., p. 10.) As with the vast majority of plaintiffs' contentions, plaintiffs offer this Court and Walker no citation to any document on which plaintiffs might have based this odd assertion. Walker's Protective Order Motions say no such thing.

Plaintiffs claim that they need the bank records of Walker's **non-Priceline** financial transactions in their effort to prove scienter. Plaintiffs' theory is remarkably simplistic; they hope to find something in Walker's finances that would "motivate" him to misrepresent Priceline's business in the hopes that its stock price would rise.

The fallacy in plaintiffs' argument is two-fold, at least. First, plaintiffs assume that wanting Priceline's stock price to be higher would motivate Walker to lie. That is a Herculean leap of logic that plaintiffs do not support with any facts, argument or case law. And nothing in Walker's financial records could ever fill that gaping hole in plaintiffs' rationale for these records.

Second, plaintiffs try to lead this Court to believe that they need to invade the privacy of Walker's financial transactions – relating to matters other than the stock at issue in this case – in order to discern whether Walker had a desire during the Class Period that Priceline's stock price be higher rather than lower.[22]

This same argument would be equally applicable to any defendant in any securities fraud case in which the defendant is alleged to have made misrepresentations about a company in which he owns stock. In the Merrill/Morgan/Chase Motion, however, Walker pointed out that plaintiffs were unable to identify – and we have been unable to find – a single case that allowed an invasion into a defendant's private financial records for this purpose. Having had an additional several weeks to look for such a case, plaintiffs have again come up dry and provide no authority for this position.

---

[22]     Plaintiffs already have a plethora of information about Walker's investment in Priceline. Walker was the founder of Priceline, its Vice Chairman of the Board of Directors, and one of its largest shareholders. In plaintiffs' very brief at issue on this motion, plaintiffs state that Priceline stock was Walker's largest asset. (Merrill/Morgan/Chase Opp., p. 8.) Plaintiffs' assertion that they need records of Walker's non-Priceline finances to discern his interest in Priceline stock is disingenuous at best.

Plaintiffs begin their discussion in this regard by citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), for the proposition that one method of proving scienter is to demonstrate the motive and opportunity for a defendant to mislead the investing public for personal gain. *Hochfelder* was decided 30 years ago. In the ensuing three decades, to our knowledge (and, apparently, to plaintiffs' knowledge as well), no reported decision has ever held that a plaintiff can obtain in discovery a defendant's financial records of **transactions that are not in issue in the case** for the purpose of demonstrating a general financial desire to have the stock at issue worth more rather than less.

Accordingly, by opposing the Protective Order Motions, the plaintiffs ask this Court to issue an unprecedented ruling that would have enormous ramifications throughout the securities litigation field if applied according to plaintiffs' rationale. Plaintiffs have presented no justification – and there is no justification – for such an unprecedented order.

Moreover, such an unprecedented order would be a radical departure from the well-established line of cases that Walker presented in the Merrill/Morgan/Chase Motion, holding that courts will not allow in discovery an invasion into a defendant's financial records concerning transactions that are not the subject of the lawsuit.[23]

---

[23]    *See* Walker's Memorandum of Law in support of the Merrill/Morgan/Chase Motion, pp. 7-8, discussing *Chemical Bank v. Dana*, 149 F.R.D. 11, 13-14 (D. Conn. 1993) (court limited discovery of bank records to particular business dealings at issue because plaintiff's "right to obtain relevant discovery is outweighed by [party's] privacy interests in these documents"); *Reserve Solutions, Inc. v. Vernaglia*, No. 05 Civ 8622, 2006 WL 1788299, at *2 (S.D.N.Y. June 26, 2006) (magistrate quashed a nonparty subpoena seeking personal financial records from American Express because it infringed on privacy rights and was "not limited to the accounts and transactions at issue in this case"), motion to set aside denied, 442 F. Supp. 2d 191 (S.D.N.Y. August 11, 2006); *Chazin v. Lieberman*, 129 F.R.D. 97, 98 (S.D.N.Y. 1990) (limiting subpoena seeking documents from nonparty institutions, including banks, to exclude the time period before which plaintiff alleged acts of fraud); *Carey v. Berisford Metals Corp.*, No. 90 Civ. 1045, 1991 WL 44843 *8 (S.D.N.Y. March 28, 1991) (court limited production by nonparty banks to transactions and to a time period relevant to fraud allegations at issue).

3.    **Plaintiffs' Articulated Excuses for Wanting to Snoop Through Walker's Bank Records of Non-Priceline Transactions Are Disingenuous and Provide No Justification for an Invasion of Walker's Privacy.**

a)    **Plaintiffs' Contention That They to Want Walker's Non-Priceline Transactions to Determine Whether Walker Was "Quietly" Raising Capital for WebHouse Is Disingenuous.**

Plaintiffs attempt to justify their proposed invasion of Walker's non-Priceline financial transactions by arguing that these transactions will show "whether he was quietly raising the capital necessary to continue the WebHouse charade . . . ." (Merrill/Morgan/Chase Opp., p. 5.) This is a disingenuous and transparent pretext for snooping into Walker's personal financial records.

The patent falsehood in plaintiffs' argument is exposed by the fact that plaintiffs are seeking Walker's personal financial records and those of companies affiliated with him for a period of **15 months after WebHouse announced it was shutting down.**[24] It does not even pass the straight-face test for plaintiffs to claim they need to rifle through Walker's non-Priceline financial records for a period of 15 months after the announcement that WebHouse was shutting down under the guise of looking for evidence that Walker was raising money to invest in the already terminated enterprise.

Moreover, plaintiffs have no need to snoop through Walker's non-Priceline bank records to divine if he was "quietly" raising capital for WebHouse before WebHouse shut down either.[25] As plaintiffs well know, the fact of the matter is that Walker was very **loudly** raising money for the Priceline WebHouse Club ("WebHouse"), and the records of Walker's investments in

---

[24]    WebHouse announced it was shutting down on October 5, 2006. (Consolidated Amended Complaint, ¶ 138.)

[25]    As was public knowledge in 2000, following the burst of the tech bubble, most start-ups (particularly those in the tech sector) were having difficulty raising capital, forcing many of those start-ups to close their doors.

WebHouse (as well as those of other investors) have already been produced. As was public knowledge at the time – because it was fully disclosed and covered extensively in the media – in August, 2000, Walker entered into a contract with a two venture capital firms (one led by Paul Allen, the co-founder of Microsoft) to sell $190 million worth of Walker's Priceline stock in order to invest the after-tax proceeds of that sale in WebHouse. (Consolidated Amended Complaint, ¶ 138-140.) Earlier in 2000, Walker had personally invested another $40 million in WebHouse and Walker Digital had invested another $30 million. Additionally, Walker Digital had invested $30 million in WebHouse's original private placement. In sum, there is absolutely no reason for plaintiffs to be snooping in Walker's bank records of non-Priceline transactions to learn about Walker's investing in WebHouse.

### b) Plaintiffs' Argument About the Importance of WebHouse's Success Fails.

Faring no better is plaintiffs' argument that they need to see Walker's records of non-Priceline transactions to know "how important the success of WebHouse . . . was to Walker." (Merrill/Morgan/Chase Opp., p. 5.) Plaintiffs have Walker's public statements about WebHouse, an enterprise he founded. Plaintiffs have the documentation of Walker's investments in WebHouse. If plaintiffs are not able to deduce whether WebHouse was important to Walker from the information they already have, they surely are not going to be able to do it from records of Walker's non-Priceline financial transactions.

Plaintiffs' specious speculation about far-fetched conclusions that might be drawn from the records of transactions that are not the subject of this case cannot support the invasion of privacy that plaintiffs want to inflict on Walker.

> The mere hope that additional discovery may give rise to winning evidence does not warrant the authorization of wideranging fishing expeditions. See *Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 244 F.3d 189, 192-93 (1st Cir. 2001).*

*(Tolliver v. Federal Republic of Nigeria*, 265 F. Supp. 2d 873 (W.D. Mich. 2003).

Moreover, plaintiffs' vain attempts to draw attenuated links between Walker's private financial records and the claims in this case do not disguise plaintiffs' real motivation – which is to size up Mr. Walker's financial wherewithal for settlement purposes.

c)      **Plaintiffs Do Not Provide Any Argument Why Walker's Non-Priceline Transactions Are Relevant to His "Opportunity" to Misrepresent Information Regarding Priceline.**

Although plaintiffs' Merrill/Morgan/Chase Opp. repeatedly recites that plaintiffs want Walker's financial records of non-Priceline transactions in the hopes of finding a "motive and opportunity" to overstate Priceline's value,[26] plaintiffs do nothing to even begin to explain how those non-Priceline transactions could possibly relate to Walker's "opportunity" to engage in any act alleged in the Consolidated Amended Complaint. They don't even make a suggestion of how this could be so. And with good reason. Nothing about Walker's non-Priceline transactions is relevant to an opportunity to commit the acts alleged. Plaintiffs' contention otherwise is nonsense.[27]

d)      **Plaintiffs' Unsupported Contention That "Non-Priceline Trades by Other Entities and Officers are Relevant" Has No Apparent Tie to the Four Bank Subpoenas.**

Plaintiffs claim to want Walker's private bank records of non-Priceline transactions to discern information about "other officers," *e.g.*, "Non-Priceline Trades by Other Entities or Officers are Relevant." (Merrill/Morgan/Chase Opp., p. 7 heading II.A.) Plaintiffs claim that records of Walker's non-Priceline transactions will show whether "other officers"[28] "needed cash" or "were sophisticated and active in trading." *Id*. at p. 8. This makes no sense whatsoever,

---

[26]     *See, e.g.*, Merrill/Morgan/Chase Opp., pp. 4, 8, 9 and 11.

[27]     Similarly frivolous is plaintiffs' contention that records of Walker's non-Priceline financial transactions would be relevant to "conscious misbehavior and recklessness" by Walker. (Merrill/Morgan/Chase Opp., p. 4-5.) Understandably, plaintiffs do not even attempt to weave any argument that could support that contention.

[28]     Plaintiffs do not identify what officers they are talking about in this regard.

and plaintiffs' saying it doesn't make it so. Rightly, plaintiffs make absolutely no effort to support this bizarre assertion, and it should be rejected out of hand.[29]

**D.    Records of Walker's Non-Priceline Transactions Should Not Be Produced.**

As demonstrated by the cases discussed above, a party is entitled to have his privacy rights enforced by an order directing that records of financial transactions that are not the subject of the action are not to be produced. Plaintiffs' glib argument that Walker's personal financial information be produced under the existing protective order does not provide Walker the relief to which these cases hold he is entitled. The information has no probative value and, even if plaintiffs could fashion some argument to the contrary, any probative value is outweighed by Walker's privacy interest in this information. *See* 8 Charles Alan Wright, et al., *Federal Practice & Procedure* § 2043 (2d ed. 1994) & Supp. 2006, p. 559 ("If. . . confidential information is being sought, the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information.").

In this case, too, provision must be made to protect such personal information, which can be accomplished by not producing documents that do not reflect Priceline transactions and by simply by redacting non-Priceline information from the remainder.

**E.    Plaintiffs Fail to Justify the Overbreadth of the Subpoenas' Time Frame.**

Plaintiffs do not contend that their subpoenas comply with Judge Squatrito's orders defining the "relevant time period" for purposes of discovery in this case. Instead, plaintiffs ignore those orders. In addressing the overbreadth of the time frame dictated by the four bank subpoenas, the plaintiffs **do not even bother to acknowledge** to this Court that they are aware of

---

[29]    Similarly, whether Walker was "sophisticated and active in trading" with respect to non-Priceline transactions has absolutely nothing to do with any claim or defense in this action.

Yet another of plaintiffs' arguments in which the dots just don't connect is their contention that, since the Consolidated Amended Complaint alleges that the Walker and other defendants traded in Priceline stock, then the plaintiffs should be able to discover non-Priceline trading. Merrill/Morgan/Chase Opp., p. 9. An allegation about Priceline trades does not make non-Priceline transactions relevant to any claim or defense in the case.

the existence of the Court orders that each of the four subpoenas directly violates. Nowhere in their Merrill/Morgan/Chase Opp. do plaintiffs ever reference that Judge Squatrito established a 25-month period (March 1, 1999 and April 1, 2001) as the outer limits of the time frame that plaintiffs could use in crafting discovery requests to defendants in this case, and that Judge Squatrito also later applied this time limitation in the nonparty subpoena context as well.[30] Instead, in both that brief and in the Goldman Opp., plaintiffs pretend that Walker is "attempt[ing] to unnecessarily constrain the scope of the subpoena to an extremely cramped period" (Goldman Opp., p. 11) – as opposed to Walker's having simply pointed out that it is **law of this case** that **plaintiffs cannot seek discovery relating to any time outside the March 1, 1999 to April 1, 2001 window**.

In the Goldman Opp., plaintiffs disingenuously argue that the "time parameter set forth in the subpoena seek [sic] to recover relevant documents reflecting Walker's state of mind during the class period." (Goldman Opp., p. 11.) That statement is preposterous. Not surprisingly, plaintiffs do not attempt to explain how it could be so.

For the proposition that the time period allowed for discovery should not be too narrow, plaintiffs' again place primary reliance on *Seagate Technology*. That reliance is completely misplaced. *Seagate* did not endorse any expansive time period for discovery. To the contrary, the *Seagate* court specifically focused on how narrowly crafted the time frame was for the subpoenas at issue in that case. In *Seagate*, the discovery period that the court allowed was only 16 months long. *Seagate*, 1993 WL 293008 at *1 ("the relevant time period defined in plaintiffs' subpoenas—November 1, 1987 through February 28, 1989—appears narrowly crafted to avoid undue burden on the subpoenaed parties."). *Seagate* is certainly no support for the three-year

---

[30]      *See* n. 12 above.

18

time period sought here – a period which plaintiffs would have continue for 15 months after the Class Period has ended.

Moreover, the type of information that plaintiffs seek through the bank subpoenas is quite different from the type of information that was sought in the *Seagate* subpoenas. In *Seagate*, the plaintiffs sought analyst and research reports describing the investment community's understanding of the status of Seagate's business and its potential impact on Seagate's stock price, documents relating to meetings with Seagate and documents relating to the valuation of Seagate stock. The *Seagate* plaintiffs were not looking for non-Seagate information.

None of this discovery is in any way analogous to the personal bank and trading records sought here. While analyses of a company prepared shortly after a class period may elucidate that same company's condition during the class period, Walker's non-Priceline transactions, including those engaged in long after the class period, do not provide relevant information about Walker's Priceline-related statements during the class period.

F.      **Plaintiffs Do Not Attempt to Justify the Overbreadth of the Four Subpoenas as They Affect Persons and Entities other than Walker and Walker Digital.**

As detailed in the Merrill/Morgan/Chase Motion, through the interlocking definitions of plaintiffs' subpoenas, they actually call for production of the bank records for **hundreds of persons or entities affiliated with Walker Digital.**[31] Accordingly, Walker has sought, and Walker Digital has filed a joinder in seeking, provisions in a protective order that would prevent the production of documents for anyone other than Jay S. Walker, Walker Digital Corporation, Walker Digital LLC and Atlantis Interactive. (Memo of Law in Support of

---

[31]      In the Goldman Opp., plaintiffs actually claim that the "subpoena is not overreaching or burdensome as it relates to a single client of Goldman Sachs . . . ." (Goldman Opp., p. 11.) That statement is completely false. Even without reference to the Definitions section of the subpoenas, they seek the documents of multiple entities, in addition to Jay S. Walker. Once the Definition section is considered, the subpoenas seek documents for hundreds of entities and individuals employed by or affiliated with Walker Digital.

Merrill/Morgan/Chase Motion, p. 21, clause (2); Joinder of Nonparty Walker Digital in that motion [Docket No. 372].)[32]

In the Merrill/Morgan/Chase Opp., plaintiffs did not even attempt to frame an argument against the propriety of granting that relief, and did not present any opposition to the granting of that relief.  Walker respectfully submits that a protective order should issue that includes this uncontested relief.

## V.    THREE OF THE SUBPOENAED BANKS HAVE OBJECTED TO THE SUBPOENAS.

Plaintiffs attempt to mislead this Court into believing that the subpoenaed banks have no problem with the subpoenas, by making such statements as:  "Goldman Sachs . . . has not moved for protection" (Goldman Opp., p. 6); and "Significantly, . . . Merrill Lynch, Morgan Stanley, and Chase have not moved for a protective order."  (Merrill/Morgan/Chase Opp., p. 9.)

The **truth is that three of the four banks subpoenas have served objections to the subpoenas**, including objections to the burden imposed by the subpoenas.[33]  However, plaintiffs do not ever acknowledge the existence of the objections in their Oppositions.

To the contrary, plaintiffs oddly reiterate that the banks did not file motions for protective orders.  Of course, they didn't.  The Federal Rules provides non-parties who are served with subpoenas with an easier, less costly and less time-consuming method for addressing their objections to subpoenas.  Nonparties are allowed to simply serve their objections on the subpoenaing party.  The subpoenaing party is then prevented from inspecting or copying the

---

[32]     In addition, the Merrill/Morgan/Chase Motion sought other limitations on any documentation produced with respect to Jay S. Walker, Walker Digital Corporation, Walker Digital LLC and Atlantis Interactive.  (Merrill/Morgan/Chase Motion, p. 21-22.)

[33]     *See, e.g.*, Merrill Lynch Objections (Irving Decl. Ex. E), ("Merrill Lynch objects to the subpoena as burdensome and oppressive to the extent that it is overly broad . . . .," and "Merrill Lynch objects to this subpoena to the extent it seeks the production of documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence."); Goldman Objections (Irving Reply Decl. Ex. 2) (objecting on the same grounds just quoted from the Merrill Lynch Objections, and objecting to production of confidential documents of its clients, which would include Walker); JP Morgan Chase Objections (Irving Decl. Ex. F) (objecting on 15 separate grounds, including all of the above).

documents until the subpoenaing party has obtained an order of the Court specifically entitling him to access to the documents.[34]

This procedure is precisely the one that Merrill Lynch, Goldman and JP Morgan Chase followed in response to the subpoenas directed to them. In addition, each of the four bank subpoenaed were aware of the fact that Walker was filing the pending Protective Order Motions.

Plaintiffs' attempt to convey to the Court that the banks do not object to the subpoenas is completely contrary to the facts.

## VI.     PLAINTIFFS DO NOT ATTEMPT TO JUSTIFY THEIR FAILURE TO SERVE THE FOUR BANK SUBPOENAS WITHIN THE TIME FRAME REQUIRED BY THE FEDERAL RULES.

In light of the fact that plaintiffs failed to timely serve notice of the subpoenas on Walker and the other defendants, the Merrill/Morgan/Chase Motion seeks, among other things, an order of the Court directing that the plaintiffs serve defendants with notice of future subpoenas on the same day that plaintiffs issue the subpoenas.

In the Merrill/Morgan/Chase Opp., plaintiffs make no argument to oppose the request for that relief, and Walker respectfully submits that an order should issue including that unopposed relief.

---

[34]     F.R.C.P. Rule 45(c)(2)(B) provides, with emphasis added:

[A] person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objections to inspection or copying of any or all of the designated materials or of the premises. **If objection is made,** the party serving the subpoena **shall not be entitled to inspect and copy** the materials or inspect the premises **except pursuant to an order of the court** . . . .

## VII.    CONCLUSION.

For the foregoing reasons, the requested protective order should be granted in its entirety,

and the subpoena to Chase Manhattan Bank quashed.


DATED:  October 6, 2006                    Defendant, Jay S. Walker


                                           By:    /s/ Jeanne E. Irving

                                           Thomas D. Goldberg (ct04386)
                                           Terence J. Gallagher (ct22415)
                                           Day, Berry & Howard LLP
                                           One Canterbury Green
                                           Stamford, CT 06901
                                           Phone:  (203) 977-7300
                                           Fax:     (203) 977-7301
                                           tdgoldberg@dbh.com – E-mail

                                                   - and -

                                           J. Michael Hennigan (phv01119)
                                           Bruce Bennett (phv01105)
                                           Jeanne E. Irving (phv01118)
                                           Shawna Ballard (phv01117)
                                           HENNIGAN, BENNETT & DORMAN LLP
                                           865 South Figueroa Street, Suite 2900
                                           Los Angeles, California 90017
                                           Telephone:  (213) 694-1200
                                           Fax:  (213) 694-1234
                                           irvingj@hbdlawyers.com – E-mail

                                           His Attorneys

22