# EXHIBIT 3

result, Defendants, at that time, decided that it was necessary to install new computer systems, costing up to $200 million. Defendants also were aware that these computer problems were increasingly impacting Priceline's core businesses, resulting in numerous complaints being filed against Priceline through the Summer of 2000, and ultimately prompting the Better Business Bureau to pull Priceline's membership, an act which received extensive publicity and prompted a further decline in demand for Priceline's services.

j.   The Individual Defendants' sales of stock demonstrate that they did not believe their own contemporaneous, bullish public statements about the Company. During the Class Period, Braddock sold 244,650 shares of Priceline common stock for proceeds of $9,975,422, Walker (directly and indirectly) sold 11,975,000 shares of Priceline common stock for proceeds of $337,802,000, and Nicholas indirectly sold 500,000 shares of Priceline stock for proceeds of $30,838,610. In all, during the Class Period, **the Individual Defendants sold, directly and indirectly 12,700,000 shares of Priceline stock for proceeds of over $378,000,000.**

## VI.   DEFENDANTS' SCIENTER: MOTIVE AND OPPORTUNITY.

42.   All of the Defendants had motives to pursue the alleged fraudulent scheme. The fraudulent scheme and course of business was designed to and did: (i) deceive the investing public, including plaintiffs and other Class members; (ii) artificially inflate the price of Priceline securities during the Class Period; (iii) cause plaintiffs and other members of the Class to purchase Priceline securities at inflated prices; (iv) conceal and cover up the Individual Defendants' mismanagement of Priceline; (v) enable Priceline insiders to engage in profitable insider sales of Priceline stock; (vi) conceal that the Priceline Business Model was not scalable

and could not be extended to industries beyond Priceline's core businesses; (vii) conceal that WebHouse was not a viable entity, that the $189 million in income recognized by Priceline at the beginning of the Class Period as a result of the licensing by Priceline of its Business Model to WebHouse was inappropriate, and that the $189 million valuation of WebHouse warrants received by Priceline prior to the Class Period and reported by Priceline as assets during the Class Period was grossly inflated, thereby causing the reported financial statements of the Company to be materially false and misleading throughout the Class Period; (viii) preserve and protect Priceline's sources of inventory for its core airline ticket business, since the airlines would be less likely to make tickets available to Priceline if the price of Priceline stock declined below the $56 strike price of the airlines' warrants to acquire approximately 20 million shares of Priceline; (ix) prevent the airlines' warrants for the purchase of Priceline stock from dropping below their strike price because Defendants' knew that, if Priceline's stock dropped below the strike price, it would likely prompt the airlines to demand a revaluation of the number of shares covered by such warrants and the strike price of such warrants, which in turn, would have a detrimental effect on Priceline's financial results and stock price; (x) assist Walker and Priceline in obtaining various funds for WebHouse throughout the Class Period; and (xi) allow Priceline to obtain upgrades to its computer system by requiring WebHouse to foot the bill for all needed upgrades, avoiding any expense or debit to Priceline's balance sheet.

    43.    In particular, the following facts further demonstrate Defendants' motive for engaging in the alleged course of conduct:

    a.    Defendants knew that the Company's routes with Delta, which was Priceline's principal supplier through Summer of 1999, limited its growth potential. In fact, the

President of American Airlines ("American") had openly discouraged other airlines from making tickets avaiable to Priceline. At the time Defendants formed WebHouse, they were close to finalizing an agreement with various other airlines, including American, which would bring those airlines into the Priceline fold. These negotiations centered on the issuance of warrants by Priceline to these airlines, in exchange for their cooperation in Priceline's airline business. Defendants knew, however, these warrants would require the Company to take a massive charge against earnings upon their issuance (in the fourth quarter of 1999, the Company was forced to record a $1.1 billion charge in connection with granting the airline warrants). Defendants, through the establishment of WebHouse, and the creation of a fictitious $189 million gain recognized upon the acquisition of the WebHouse warrants in the fourth quarter of 1999, sought to offset a significant amount of the write-offs they knew would be incurred by issuing the airline warrants;

    b.  While Defendants knew that Priceline's airline business could potentially be profitable, they also knew that Priceline's stock price had a built in expectation that the Company would move beyond being a potentially profitable online travel agent and expand its business into other areas. Defendants knew that Priceline needed to demonstrate that its model could move beyond its core businesses of airlines, hotels and rental cars and move into the broader e-commerce world. In Priceline's filings with the Securities Exchange Commission ("SEC"), at the beginning of and throughout the Class Period, Priceline repeatedly acknowledged that the Company's ability to report "significant profits" depended on its ability to expand beyond its core businesses. Simply put, to give the perception, albeit misguided, that Priceline's Business Model was a valuable commodity that was extendable to other markets, Defendants

engaged in the desperate gamble of launching WebHouse even though, as Braddock secretly predicted prior to its launch, the venture would almost certainly fail;

  c.  Defendants were aware that, in early March of 2000, Priceline's sale of airline tickets had peaked at 120,000 tickets and was in decline;

  d.  As WebHouse's subsidies increased and its cash diminished, Defendants knew that they needed to raise additional capital to "prop up" WebHouse by either inducing further investment from outsiders or permitting Walker to sell Priceline shares to funnel additional monies into WebHouse. To do either, Defendants needed to create the illusion that WebHouse was an operational success;

  e.  Defendants were aware that a continuing decline in Priceline's stock price would have potentially devastating operational results. The airlines held options to acquire over 20 million shares, most with strike prices above $56 per share. Defendants knew that the airlines would have less motivation to make tickets available to Priceline if the price of Priceline's stock significantly declined below the strike price of the airlines' warrants, which would cripple Priceline's core airline business;

  f.  Moreover, the airline warrants had adjustment clauses, which allowed the airlines to demand changes in the number of shares and strike prices covered by the warrants so as to protect the value of the airline's warrants. The airline warrants also provided for a right of readjustment in the event that Priceline failed to meet certain revenue targets. Defendants knew that a stiff decline in Priceline's stock price or failure to meet revenue targets would prompt the airlines to demand a readjustment of such warrants, which would lead to dilution of PCLN stock, as Priceline would have to issue more warrants, and take additional charges against the

Company's earnings, as a result of the new issuance of warrants. One such charge is exemplified by the $8.9 million charge Priceline suffered when it was forced on October 6, 2000, two days after Defendants announced the termination of Webhouse, to adjust its warrants previously given to Delta.

       g.     WebHouse, pursuant to the WebHouse Agreements, was obligated to pay numerous fees to Priceline. Included in these fees were royalties on net revenues; compensation for marketing services; compensation for shared technology development services, pursuant to which Priceline could pass off to WebHouse a significant part, if not all, of its expenses incurred in upgrading its computer systems. These payments, which were seen as a way to push Priceline toward profitability throughout the Class Period, provided continuing motivation to deceive the investing public regarding WebHouse's operations.

       h.     As part of WebHouse Agreements, Walker Digital received a promissory note for $14,592,185 from WebHouse, payable on April 26, 2000. Walker, who controlled Walker Digital, sought to keep WebHouse alive so that WebHouse could make this payment; and

       i.     As part of Priceline's November, 1999 airline warrant deals, Walker purchased two million shares of PCLN stock from Delta at $62.50 per share for a total of $125 million. Walker did so to compensate Delta for the dilutive affect that the warrants Priceline was issuing to six other airlines would have on Delta's Priceline warrants. Walker's basis in these shares motivated him to maintain the market price of Priceline's shares.

    44.     During the Class Period, Walker, directly and through Walker Digital and Walker Digital LLC, Braddock and Nichols, sold Priceline shares at prices artificially inflated by Defendants' course of conduct. Thus, the Individual Defendants sold at a minimum the

-26-

following number of shares on the indicated dates:

DEFENDANT RICHARD S. BRADDOCK
CHAIRMAN OF THE BOARD[4]

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 8/16/00 | 28,000 | $25.52 | $ 714,560 |
| 8/15/00 | 72,000 | $25.32 | $1,823,040 |
| 6/5/00 | 48,150 | $50.28 | $2,420,982 |
| 5/18/00 | 27,000 | $50.67 | $1,368,090 |
| 5/17/00 | 69,500 | $52.50 | $3,648,750 |
| TOTAL | 244,650 | $25.32-$52.50 | $9,975,422 |

N. J. NICHOLAS, JR.
DIRECTOR[5]

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 3/9/00 | 32,600 | $91.07 | $2,968,882 |
| 3/6/00 | 97,400 | $80.72 | $7,862,128 |
| 3/6/00 | 170,000 | $87.98 | $3,648,750 |
| TOTAL | 500,000 | $25.19-$91.07 | $30,838,610 |

---

[4] Additionally, Braddock filed Form 144 on May 22, 2000, reflecting the proposed sale of 500,000 shares of Priceline stock.

[5] Not included in the above-referenced transactions is the acquisition of 200,000 shares by Gore Creek Trust on 8/1/00 at $.80 per share which were immediately sold for $5,051,000. In addition, Gore Creek Trust filed a Form 144 on March 10, 2000 reflecting the intent to sell 300,000 shares of Priceline stock.

JAY S. WALKER, DIRECTOR, FOUNDER,
AND VICE CHAIRMAN OF THE BOARD

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 9/11/00 | 2,000,000 | $25.00 | $50,000,000 |
| 8/1/00 | 8,000,000 | $23.75 | $190,000,000 |
| TOTAL | 10,000,000 | $23.75-$25.00 | $240,000,000 |

WALKER DIGITAL, LLC[6]

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 6/8/00 | 25,000 | $45.62 | $1,140,500 |
| 6/6/00 | 25,000 | $47.06 | $1,176,500 |
| 6/5/00 | 50,000 | $49.46 | $2,473,000 |
| 6/2/00 | 50,000 | $45.00 | $2,250,000 |
| 6/1/00 | 75,000 | $40.55 | $3,041,250 |
| 5/31/00 | 25,000 | $38.15 | $953,750 |
| 5/30/00 | 50,000 | $37.16 | $1,858,000 |
| 5/25/00 | 50,000 | $39.20 | $1,960,000 |
| 5/24/00 | 50,000 | $34.45 | $1,722,500 |
| 5/18/00 | 325,000 | $48.12 | $15,639,000 |
| 5/16/00 | 250,000 | $54.35 | $13,587,500 |
| TOTAL: | 975,000 | $54.35-34.45 | $45,802,000 |

---

[6]During the Class Period, Walker owned 34.1% of the stock of Walker Digital, rendering him a controlling shareholder of Walker Digital, according to Priceline's 2000 Form 14A. As revealed in this Complaint, Walker was the founder of Walker Digital and servers as its Chairman of the Board and is the Corporation's controlling shareholder. Priceline's 2000 Form 14A also reveals that Walker Digital controls Walker Digital LLC, a Delaware limited liability company. Walker is founder, chairman and the controlling shareholder of Walker Digital, LLC.

-28-

WALKER DIGITAL CORPORATION

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 5/16/00 | 1,000,000 | (Proposed) | Estimated $52,000,000 |
| TOTAL | 1,000,000 | | $52,000,000 |

COMBINED TOTAL FOR WALKER AND CONTROLLED ENTITIES

| ENTITIES | SHARES | | PROCEEDS |
|---|---|---|---|
| WALKER, WALKER DIGITAL CORPORATION, WALKER DIGITAL, LLC | 11,975,000 | | $337,802,000 |

Thus, in total, the Individual Defendants, directly or indirectly, sold 12,719,650 shares of Priceline stock at prices inflated by the alleged course of conduct for proceeds of $378,616,032.

45. Insider selling by Walker individually and through Walker Digital and Walker Digital, LLC was suspicious in timing and amount. The sales by Walker Digital and/or Walker Digital, LLC began the day after affirmative pronouncements by the Company confirming its continuing move toward profitability, and on the same day, Defendants touted the addition of nine adaptive marketing partners and the diversification of its revenues. Walker sold $190,000,000 (8 million shares) of Priceline stock, or 12.4% of his holdings, on August 1, 2000, just days after the senior executives of Priceline reiterated that Priceline would be profitable in the third or fourth quarter of 2000. Similarly, just as with Walker Digital or Walker Digital, LLC, Braddock's May 17 and 18, 2000 sales closely followed Priceline's May 15 and 16, 2000 affirmative pronouncements regarding the Company's continuing progress toward profitability and expanding Business Model. Nichols' March 6, 2000 sales were on the same day Schulman

touted the Company's "significant momentum" toward profitability. His August 1 and August 2, 2000 sale also followed closely Defendants' continuing assurances issued in late July of profitability in the third or fourth quarter. All sales conducted by the insiders grew increasingly suspicious throughout the Class Period since Defendants continued to receive daily information confirming the massive problems being encountered by Webhouse. The proximity of those sales, both in terms of good and bad news, makes these sales highly suspicious.[7]

### VII. CLASS ACTION ALLEGATIONS.

46. Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who purchased the securities of Priceline between January 27, 2000 and October 4, 2000 (i.e., the Class Period). Excluded from the Class are Defendants, members of each Individual Defendant's immediate family, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

47. Since Priceline has millions of shares of common stock outstanding, and because the Company's common stock and options were actively traded, members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members only can be determined by appropriate discovery, plaintiffs believe that Class members number at least in the thousands and that they are geographically dispersed.

---

[7] Since WebHouse also retained in excess of $70 million in cash after it ceased doing business, upon information and belief, Walker was repaid additional monies either directly or through Walker Digital, thereby further increasing his profits from the August 1, 2000 disguised insider sales.