IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE: PRICELINE.COM, INC. SECURITIES LITIGATION | : MASTER FILE NO.<br>: 3:00-CV-01884 (AVC)<br>:<br>: |
| This document relates to:<br><br>　　ALL ACTIONS | :<br>:<br>: October 10, 2006 |

**DEFENDANT JAY S. WALKER'S OCTOBER 10, 2006 STATUS REPORT
REGARDING THE PRODUCTION OF ELECTRONIC INFORMATION**

Defendant Jay S. Walker ("Walker") submits this Status Report Regarding the Production of Electronic Information pursuant to the December 8, 2005 directive of the Court that the defendants file a monthly status report on the production of electronic information.

As reflected in Mr. Walker's last several status reports, there are 181 back-up tapes. The volume of electronic data contained on the back-up tapes is enormous, and the types of files are varied, with email being just one example.

Mr. Walker's counsel and their IT personnel have devoted substantial time and resources to produce information that would enable the parties to make informed decisions about which of the tapes might contain data whose value could justify the expense of restoring, reviewing and producing them. In accord with the methodologies employed thus far, Mr. Walker's counsel is in the midst of a large scale review of electronic documents.

　A.　**Mr. Walker's Prior Counsel Restored 29 Back-Up Tapes And Caused 164 Catalogs To Be Created For The Tapes.**

As explained in Mr. Walker's January 10, 2006 status report, Mr. Walker's prior counsel, Paul, Hastings, Janofsky & Walker, divided the 181 tapes into 16 groups based on the handwritten titles on the tapes themselves. Paul Hastings supplied the plaintiffs with

1

photocopies of the handwritten labels on all of the tapes. Paul Hastings then arranged to have one sample tape from each group restored to a native file format, resulting in the restoration of 16 sample tapes. In addition, early this year, Paul Hastings caused 13 additional back-up tapes to be restored,[1] which, led to a total of 29 previously restored tapes ("29 Previously Restored Tapes").

Paul Hastings arranged to have catalogs created of each of the 16 sample tapes and provided those catalogs to the plaintiffs. Based on their review of those 16 tape catalogs, the plaintiffs were to determine if they wanted catalogs created for the remaining tapes, and eventually plaintiffs did indeed request such catalogs. Accordingly, Paul Hastings instructed Mr. Walker's electronic vendor to generate catalogs for all remaining 181 tapes.

In this regard, Mr. Walker's counsel has previously provided plaintiffs' counsel with 164 searchable, electronic catalogs or detailed directory reports for the back-up tapes – i.e., all the catalogs or reports that Mr. Walker's vendor had previously been able to generate from the 181 back-up tapes. For the files contained on each tape, the catalogs and reports show, among other things: the file names, the folders, and the size of the file in bytes. The last of these catalogs and reports were provided to plaintiffs in May, 2006.

---

[1] As for the 13 tapes restored earlier this year, the first five of these restored tapes were from Groups 5 and 15; such tapes were restored pursuant to agreement with the plaintiffs. The remaining eight restored tapes were from Groups 3 and 16. Plaintiffs had initially expressed an interest in the restoration of tapes from Groups 3 and 16. Plaintiffs and Paul Hastings subsequently agreed that Paul Hastings would instead cause tapes from Groups 4 and 6 to be restored. In accord with that agreement, a member of Paul Hastings' IT group was instructed to cause the tapes from Groups 4 and 6 to be restored. However, as Carl Mullis of Paul Hastings explained to the plaintiffs and to Mr. Walker's present counsel on July 26, 2006, against the backdrop of the plaintiffs' earlier focus on tapes in Groups 3 and 16, the IT employee from Paul Hastings mistakenly instructed the electronic vendor to restore tapes belonging to Groups 3 and 16.

### B. Mr. Walker's Counsel Has Expended Substantial Efforts To Develop A Methodology For Sifting Through The Enormous Volume of Data On The Back-Up Tapes Despite Plaintiffs' Failure To Assist In This Process.

Plaintiffs' counsel had previously committed in conversations and correspondence to review the catalogs and detail reports for the back-up tapes in order to identify for Mr. Walker's counsel those files they wanted uploaded for filtering and review and in order to eliminate data for which no review would be necessary. Plaintiffs' counsel also committed to provide Mr. Walker with search terms that they wanted to be applied to the database of uploaded data. Plaintiffs, however, never identified from the catalogs any files for review and production and have failed to identify any search terms. Instead, after months of failing to provide this promised information, on July 7, 2006, plaintiffs filed a motion seeking an email-by-email review of all emails on 17 back-up tapes and seeking the wholesale production of all other non-privileged data on such tapes.

Despite plaintiffs' failure to abide by their commitments to identify files for upload and to provide search terms, Mr. Walker's counsel has expended considerable professional time and other resources analyzing reasonable methodologies for identifying potentially relevant data on the restored back-up tapes in a manner – and for a cost – that is reasonable under the circumstances.

In this regard, Mr. Walker's counsel has, thus far, initiated the following methodology for culling through the voluminous .pst email data on the 29 Previously Restored Tapes:

1. Mr. Walker's counsel has obtained a copy set of those emails produced by other defendants, and pursuant to Mr. Walker's counsel's instructions, Mr. Walker's electronic vendor has uploaded a copy set of those electronic emails produced by the other defendants.

3

2. From the list of 121 individuals for whom plaintiffs seek an email-by-email review, based on the defendants' interrogatory responses and initial disclosures, Mr. Walker's counsel has identified 59 individuals, including the defendants, as most likely to have responsive information in their mailboxes.

3. Pursuant to Mr. Walker's counsel's instructions, Mr. Walker's electronic vendor has uploaded the entire .pst mailboxes for any of these 59 individuals for whom a mailbox existed on any of the 29 Previously Restored Tapes.[2]

4. Through this process, a total of approximately 12.7 gigabytes of data has been uploaded onto Mr. Walker's electronic vendor's systems for initial filtering.

5. Once uploaded onto Mr. Walker's electronic vendor's system, the 12.7 gigabytes of data were filtered to exclude documents that fell outside the relevant time period for production as set by Judge Squatrito. In this regard, a filter was applied to exclude those documents that predated March 1, 1999 and post-dated April 1, 2001.

6. The application of such filters left over 216,000 documents (including over 560,000 pages) that have been released to Mr. Walker's electronic vendor's review tool for further filtering, review and analysis, and attorneys are in the process of reviewing emails and attachments released to Mr. Walker's electronic vendor's review tool for responsiveness and production.

7. A number of filters have been applied to the more than 560,000 pages of documents that remained after the application of the date filters in order to

---

[2] The 29 Previously Restored Tapes do not contain .pst files for all of these 59 individuals.

identify potentially responsive documents and in order to assist with the prioritization of these documents for review and analysis.

8. For example, Mr. Walker's electronic vendor has identified those emails from the back-up tapes that are duplicates of emails produced by other defendants and such duplicates have been eliminated from the review conducted thus far to the extent feasible.

9. The data also has been filtered for numerous attorney and law firm names and for the terms: attorney(s), legal department, lawyer(s), and paralegal(s). Emails and attachments containing such search terms have been tagged as potentially privileged and have been segregated from any review to date so that the time-consuming process of analyzing potentially privileged documents can, where practical, take place after the review of the remaining email population that results from the filtering, so as to expedite the production of the bulk of the documents that do not require the more technical and time-consuming privilege analysis.

10. Further, Mr. Walker's counsel identified as the first priority the review of the contents of any of the defendants' mailboxes contained in the review tool. Such mailboxes exist in the review tool for Mr. Walker and Mr. Braddock. No mailboxes were found on the 29 Previously Restored Tapes for the remaining defendants.

11. Mr. Walker's counsel identified certain documents containing certain WebHouse terms as the subject of the second level of review. In this regard, Mr. Walker has instructed his electronic vendor to run filters against the emails

to segregate certain emails containing any of the following WebHouse terms: WebHouse, Webhouse, Web House or WHC.

12. Also, Mr. Walker's counsel instructed Mr. Walker's electronic vendor to run a filter, where possible, to exclude calendar items and contact cards from the second priority review.[3]

13. Plaintiffs' motion to compel Mr. Walker's production of electronic documents seeks both an email-by-email review, without regard to date, custodian or the content of the emails on certain of the restored back-up tapes (and some unrestored tapes) *and* the production of all other nonprivileged data, regardless of file type, content or date, from certain of the restored tapes. Given plaintiffs' apparent interest in those of the restored tapes that are the subject of plaintiffs' outstanding motion to compel,[4] in this second priority review, Mr. Walker's

---

[3] In this regard, plaintiffs contended in their briefing with respect to Priceline's production of electronic documents that the production of calendar items and meeting status emails without text in the body of such items was somehow improper, and, according to a chart in that briefing, plaintiffs labeled such documents as "Blank/Irrelevant Emails." (Memo of Law, Dkt 329 at p. 8) As a result, Mr. Walker's counsel sent plaintiffs' counsel correspondence seeking to confirm whether Mr. Walker should therefore exclude these sorts of meeting status emails and calendar items from Mr. Walker's production of electronic documents. That correspondence stated that, if plaintiffs did not respond to the correspondence by a particular date, Mr. Walker's counsel would assume that, consistent with the position plaintiffs took in their briefing on the motion to compel against Priceline, plaintiffs did not want this material produced. That specified date came and went without a response from plaintiffs.

However, notwithstanding the positions they have taken with respect to Priceline's production of blank calendar items and meeting status emails, plaintiffs' counsel belatedly informed Mr. Walker's counsel that they want Mr. Walker to produce responsive calendar emails and items, even where such items have no text in the body to be produced. This letter from plaintiffs' counsel was received after the filters for the second priority review had already been run against the bulk of the data in the review tool to exclude calendar items from that level of review.

[4] It is Mr. Walker's position that it does not make sense to prioritize the review of the data contained on the 29 Previously Restored Tapes based on which of the source tapes the data came from. Instead, the better methodology is to prioritize the restored data by file type,

6

counsel instructed Mr. Walker's electronic vendor to employ a filter to segregate, where possible, that data resulting from the above filters so that Mr. Walker's counsel can prioritize its second priority review, where practical, to focus on emails that were derived from those back-up tapes that are the subject of plaintiffs' pending motion to compel and that were part of the 29 Previously Restored Tapes.

14. In a continuation of the methodology employed in the first level review, the members of the review team have been and are reviewing email attachments at the same time they review parent emails even if that attachment does not contain one of the above-described WebHouse search terms, and the members of the review team are reviewing all emails within a conversation thread, where such emails can be readily identified, even if those emails do not contain the WebHouse search terms described above.

15. Numerous reviewers are reviewing documents filtered as part of this second level of review and thousands of documents have been reviewed in this second level review.

To date, employing the above methodology, Mr. Walker's review team has conducted at least an initial review of over 20,000 documents. Thousands of documents have been identified as responsive, and Mr. Walker's counsel intends to produce electronic documents on a rolling basis.

---

custodian, date and search terms, irrespective of which of the restored tapes the data was derived from. In this regard, Mr. Walker has uploaded and released to the review tool .pst files for any of the selected custodians, regardless of which of the 29 Previously Restored Tapes the data originally resided. And, the documents reviewed in the first phase of the review were reviewed irrespective of the source tape from which that data originated.

7

### C. Eight Additional Tapes Have Recently Been Restored From Groups 4 and 6.

On July 26, 2006, when Mr. Walker's present counsel learned that someone at Mr. Walker's prior counsel's office had mistakenly caused tapes in Groups 4 and 6, as opposed to tapes in Groups 3 and 16, to be restored (see footnote 1, *supra*), the information provided to Mr. Walker's counsel by Mr. Walker's electronic vendor reflected that most of the tapes in Groups 4 and 6 could not be successfully cataloged. Mr. Walker's counsel immediately inquired of the vendor whether the fact that the tapes were not able to be catalogued impacted whether they could be restored and was told that a tape that was unable to be catalogued was unrestorable.

Since the week of July 26, Walker's counsel has spent a considerable amount of time analyzing the information available about the Group 4 and 6 tapes and has engaged in dozens of email communications and telephone conferences with the vendor in an attempt to explore what other steps might be taken to catalog and restore the Group 4 and 6 tapes.

At Mr. Walker's counsel's suggestions, the vendor has taken some of these steps, and, as a result, Mr. Walker's electronic vendor has restored five additional tapes in Group 6.[5] Upon restoration of these tapes, Mr. Walker's electronic vendor generated tape detail reports for such tapes. Mr. Walker's counsel is in the process of making electronic copies of these voluminous tape detail reports for these recently restored tapes in Group 6 so that such reports can be provided to plaintiffs' counsel.

As for Group 4, pursuant to Mr. Walker's counsel's instructions, Mr. Walker's electronic vendor has restored three additional tapes in Group 4 (including tapes identified as TOGs 21, 23, and 24). Catalogs were previously provided to plaintiffs for these three tapes, as

---

[5] There are a total of six tapes in Group 6, one of which was restored as part of the initial restoration of 16 sample tapes. As a result of the recent restoration of the remaining 5 tapes in Group 6, all tapes in Group 6 have now been restored.

8

well as for the original sample tape in this group.[6]

Mr. Walker's counsel is in the process of reviewing the detail reports and catalogs for the recently restored tapes in Groups 4 and 6 and intends to extract and review .pst email files from those restored tapes pursuant to the same methodology described above with respect to the 29 Previously Restored Tapes.

DATED: October 10, 2006

Defendant, Jay S. Walker

By: _____
Thomas D. Goldberg (ct04386)
Terence J. Gallagher (ct22415)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901
Phone: (203) 977-7300
Fax:    (203) 977-7301
tdgoldberg@dbh.com – E-mail

- and -

J. Michael Hennigan (phv01119)
Bruce Bennett (phv01115)
Jeanne E. Irving (phv01118)
Shawna Ballard (phv01117)
HENNIGAN, BENNETT & DORMAN LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone: (213) 694-1200
Fax: (213) 694-1234
irvingj@hbdlawyers.com – E-mail

His Attorneys

---

[6] Mr. Walker's electronic vendor has not yet been able to restore two of the tapes in Group 4 but is continuing to analyze whether any further steps can be taken to restore these tapes.

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2006, a copy of defendant Jay S. Walker's October 10, 2006 Status Report Regarding the Production of Electronic Information was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/ Shawna L. Ballard