# EXHIBIT A, PART 2

Moreover, it is axiomatic that a party is only entitled in discovery of non-privileged documents and information that are "relevant to the claim or defense of any party." F.R.C.P. Rule 26(b)(1). Directly contravening this standard, plaintiffs' Motion seeks to compel the production of documents from 17 back-up tapes without any determination of whether such documents are relevant to a claim or defense, or responsive to any document request that plaintiffs have propounded. In his Opposition, Walker demonstrated that the relief plaintiffs seek is inconsistent with prevailing law.

And, in their Reply, plaintiffs do not contend otherwise. The Motion should be denied.

## IV. PLAINTIFFS' MISCHARACTERIZATION OF A STAFF-LEVEL ERROR AS A NEFARIOUS SCHEME BY WALKER IS A BLATANT ATTEMPT TO MISLEAD THIS COURT.

The Dr.-Jeckel-and-Mr.-Hyde approach plaintiffs have taken in this Motion is not limited to the relief sought. Plaintiffs also contradict themselves in their desperate attempt to put some villainous spin on the innocent mistake made by a Paul Hastings IT staffer. Plaintiffs devote a substantial portion of their Reply trying to create a brouhaha out of what the plaintiffs know full well was an innocent mix-up by one member of the IT department at Paul Hastings.[24] In their attempts to distort this benign incident, plaintiffs use such pejorative rhetoric as: "hide the ball tactics" (Reply, p. 1), "the latest and most egregious example of this litigation strategy" (*id.*), "lack of candor" (*id.*, p. 3), "'play by your own rules' litigation" (*id.*), and "Walker's highly disturbing disclosure in his Opposition brief." (*Id.*, p. 1.)

These unfounded accusations are belied by plaintiffs' own statements in letters and declarations by plaintiffs' counsel, admitting that Walker has been cooperative and reasonable in

---

[24] In an especially twisted argument, plaintiffs even go so far as to chastise Walker's present counsel for "blaming" Walker's prior counsel for the tape restoration mix-up. (Plaintiffs' Reply, p. 13.) Far from "blaming" anyone, Walker's present counsel has consistently stated that this was an innocent error, *i.e.*, an accident. It is plaintiffs who are trying to mischaracterize this event as something heinous.

15

addressing the electronic discovery issues.[25] Plaintiffs' deliberate efforts to mislead the Court into finding something nefarious about this accidental occurrence by a staff employee at Walker's prior law firm is reprehensible.

Needless to say, the mistake within the Paul Hastings IT department did not involve Jay Walker. Plaintiffs have presented no evidence (nor could they) that Walker participated in this mistake or even knew it had happened. Below is a chronology of how the error was discovered.

After review of the catalogs of the 16 sample tapes, plaintiffs requested that Paul Hastings restore six more tapes, from Groups 5 and 15, and additional tapes from Groups 3 and 16. Plaintiffs later revised that request, and opted to have tapes in Groups 4 and 6 restored, instead of tapes in Groups 3 and 16.[26] Paul Hastings agreed to restore these tapes.

In mid-April, 2006, Walker's present counsel, Hennigan, Bennett & Dorman LLP, ("Hennigan Bennett") began the transition of taking over the representation of Walker in this case from Paul Hastings. The case had then been on file for five and a half years. The Paul Hastings files arrived in Hennigan Bennett's offices in batches, beginning at the end of April and continuing though May. Altogether, those files comprised close to 300 boxes, as well as numerous CDs, DVD's and hard drives containing electronic data. Needless to say, absorbing this material did not happen overnight. Learning about the case, including but not limited to learning about the intricacies of the 181 back-up tapes, took time. (Irving Surreply Decl., ¶ 2.)

---

[25] For example, on September 22, 2005, plaintiffs acknowledged that, "Defendant Walker has been more willing to provide Plaintiffs with information on the electronic discovery issues . . . . Defendant Walker provided Plaintiffs with information from the labels on the [181] tapes, separated the tapes into various categories, and sampled the information on various tapes." (Declaration of Peter J. McDougall in Support of Plaintiffs' Motion to Compel Production of Electronic Discovery [Dkt. # 212, Ex. 1, ¶¶ 20-21.)

Further, as recently as April 18, 2006, plaintiffs' counsel touted the "significant progress" that counsel for both Mr. Walker and plaintiffs had made with respect to the restoration and indexing of the 181 WebHouse back-up tapes. (Irving Opp. Decl., Ex. 5.)

[26] Peter McDougall February 3, 2006 letter to Carl Mullis (Johnson Decl., Ex. F).

In the month that Hennigan Bennett was transitioning into the position of Walker's counsel, and in particular, between April 18 and May 5, Hennigan Bennett spent a considerable amount of time communicating, both telephonically and through correspondence, with the plaintiffs about the back-up tapes.[27] Plaintiffs advised Hennigan Bennett that Paul Hastings had restored and provided them with catalogs of "six tapes," and that Paul Hastings had committed to restoring and providing another "nine tapes." (Irving Opp. Decl., pp 7-12 and Ex. 5.) In all of plaintiffs' communications with Hennigan Bennett, plaintiffs' referred to this latter group of tapes as "the nine tapes" or "the group of nine." At no time did plaintiffs ever identify these tapes to Hennigan Bennett as belonging to any particular one or more of the 16 groups into which Paul Hastings had divided the 181 tapes.[28] Throughout plaintiffs' Reply, plaintiffs represent that they had numerous communications with Hennigan Bennett regarding the tapes in Groups 4 and 6. However, in all of these communications, plaintiffs never identified the tapes in this fashion. (Irving Surreply Decl., ¶ 5.)

On Friday, May 5, 2006, Hennigan Bennett spoke with two of plaintiffs' attorneys on the telephone, who stated that they had not yet received the catalogs for the "group of nine restored tapes." Neither had Hennigan Bennett received these catalogs. Following the call, Hennigan Bennett contacted Paul Hastings about the nine tapes. Later that same day, Hennigan Bennett emailed plaintiffs and told them that Paul Hastings had reported that their vendor was unable to restore one of the tapes, but that Paul Hastings would be able to send plaintiffs the catalogs for

---

[27] Hennigan Bennett began these communications even before becoming counsel of record in the case, and well before Hennigan Bennett had any of the files in the case. (Irving Surreply Decl., ¶ 6.)

[28] *See, e.g.*, Peter McDougall April 18, 2006 letter to Jeanne E. Irving (Irving Opp. Decl., Ex. 5) ("Walker [which is plaintiffs' way of referring to Walker's counsel, in this case, Paul Hastings] stated that their vendor was in the process of restoring the 9 additional tapes and the catalogs of these tapes will be produced soon.").

the remaining eight tapes the following Monday.[29] Paul Hastings did so, and plaintiffs received those catalogs on May 9, as did Hennigan Bennett.[30]

On May 12, 2006, Hennigan Bennett sent plaintiffs a letter describing elements of a proposed methodology for culling potentially responsive material from the back-up tapes. Plaintiffs never (including to this day) responded to that letter, and in fact, plaintiffs failed to contact Walker's counsel for the next two months.

On June 12, 2006, Hennigan Bennett filed Walker's June 12, 2006 Status Report. As stated on the cover page of the Status Report, because Hennigan Bennett was new to the case, the Status Report "relates the understanding of Mr. Walker's present counsel based on information and documents received from Mr. Walker's previous counsel, Paul, Hastings, Janofsky & Walker LLP."[31] Reflecting correspondence in the file, the Status Report relayed that,

> [p]laintiffs . . . requested, and Mr. Walker's counsel agreed, to arrange for the restoration to native format of nine other tapes (from Group 4 and Group 6) and for the creation of catalogs for all the remaining back-up tapes.

(June 12 Status Report, p. 4.) And based on Paul Hastings May 8, 2006 correspondence from Paul Hastings to plaintiffs, enclosing catalogs of those tapes that had been restored from what was referred to as the group of nine, the Status Report stated,

> [t]he vendor was able to restore eight of the nine back-up tapes from Groups 4 and 6 that plaintiffs had sought be restored to native format, and on May 8, 2006,

---

[29] Jeanne E. Irving May 5, 2006 email to Peter McDougall and Geoffrey Johnson (Irving Surreply Decl., Ex. 4).

[30] Paul Hastings May 8, 2006 letter to plaintiffs, copied to Hennigan Bennett with enclosed catalogs. (Irving Surreply Decl., Ex. 5.)

Plaintiffs' Reply complains that Hennigan Bennett should have confirmed that the tapes in Groups 4 and 6 had been restored prior to participating in the telephone discussions with plaintiffs on April 27 and May 5. (Plaintiffs' Reply, pp. 1-2.) This contention is specious. No question had ever been raised about whether the vendor was restoring the tapes the plaintiffs wanted, and we would have had no reason to question the representations that had been made to us about the restoration process. Moreover, however, we did not have the catalogs to perform any investigation of our own, even if someone had raised an issue in this regard, which had not happened.

[31] Defendant Jay S. Walker's June 12, 2006 Status Report on the Production of Electronic Discovery [Dkt. 322-1] ("June 12 Status Report"), p. 1, n. 1.

18

the searchable, electronic catalogs for these eight tapes were provided to the plaintiffs.

*Id.* That statement was the logical reflection of the information that had been provided to Hennigan Bennett, but it was incorrect because, unbeknownst to Hennigan Bennett, there had been an error made by a member of the Paul Hastings IT staff.

By July 7, 2006, the day that plaintiffs filed the Motion to compel production from "17 restored back-up tapes," Walker's counsel had restored 29 back-up tapes, but the Motion did not identify which 17 of the 29 tapes were the subject of the Motion. As a result, Walker's counsel immediately – and repeatedly – asked the plaintiffs to identify by individual TOG ID number the 17 tapes that plaintiffs intended as the subject of the Motion.

Apparently, the answer to this question was sufficiently unclear to plaintiffs that they did not manage to come up with a response to Walker's letter for the ensuing two weeks, i.e., two-thirds of the time Walker had to respond to the Motion.[32] When plaintiffs finally did deign to respond to Walker's counsel's inquiries late Friday, July 18, 2006, they still refused to identify by TOG ID number the tapes that were the subject of the Motion. Instead, plaintiffs' counsel, Geoffrey Johnson, wrote to Walker's counsel that the "17 restored tapes" that were the subject of their Motion were the tapes in Groups 5, 15, 4 and 6. (Irving Opp. Decl., Ex. 9.)

By reviewing the catalogs for the restored tapes, Walker's counsel immediately confirmed that the tapes in Groups 4 and 6 were not among the restored tapes. Instead, Walker's counsel found that, in addition to the 16 sample tapes and the additional tapes in Groups 5 and 15, the electronic discovery vendor had restored tapes in Groups 3 and 16.

As a result, Walker's counsel contacted the plaintiffs the following business day, Monday, July 21, 2006. Walker's counsel explained to plaintiffs' counsel, Mr. Johnson, that the

---

[32] Of course, the specific identity of the tapes that were the subject of the motion to compel was required to have been provided to Walker's counsel in advance of filing the motion to compel, in a meet and confer session, in addition to being provided in the moving papers themselves. Because the plaintiffs failed to provide this information, Walker's counsel was deprived of the three weeks that this Court's rules stipulate he should have had to prepare his opposition to the motion to compel.

19

Groups 4 and 6 tapes had not been restored, and asked whether the Motion addressed: (1) the tapes that had in fact been restored; or (2) the tapes listed in Mr. Johnson's July 21 letter. Apparently, the answer to this question was similarly unclear to Mr. Johnson because he could not provide an answer to that question during the telephone call. Mr. Johnson's only response was to ask Walker's counsel to reiterate in writing the information she had relayed on the phone. (Irving Opp. Decl., ¶¶ 23-24.)

In light of the fact that Walker's Opposition to the Motion was due four days later, Walker's counsel asked Mr. Johnson if plaintiffs could provide an answer to the question of which tapes were the subject of the Motion by the end of that day. Further highlighting that plaintiffs themselves were not certain of what tapes their Motion addressed, Mr. Johnson refused that request and stated, not only that he would not commit to give Walker's counsel a definitive answer on what tapes were the subject of the Motion by the end of that day, but also stated that **he would not commit to provide Walker's counsel that information by any particular date**. (Irving Opp. Decl., ¶ 24.)[33]

That same day, Walker's counsel complied with plaintiffs' request to reiterate the contents of her conversation with plaintiffs' counsel in a letter, and again in that letter requested that plaintiffs clarify whether the Motion to compel 17 "restored" tapes addressed tapes that had actually been restored, or the unrestored tapes in Groups 4 and 6 referenced in plaintiffs' July 21 letter. Continuing their stonewalling tradition, plaintiffs' counsel did not respond to Walker's counsel's letter. (Irving Opp. Decl., ¶ 25 and Ex. 10.)

---

[33] In the Reply, plaintiffs do not deny the contents of this conversation. Oddly, however, they pretend that it was always crystal clear which tapes were the subject of the motion. If that were so, then what possible reason could there be for plaintiffs:

- to fail to respond to Walker's counsel's repeated requests for that information for two weeks; and

- once plaintiffs had been informed that Groups 4 and 6 had not been restored, to refuse to confirm to Walker's counsel whether the motion was intended to address the tapes in groups 3 and 16 that had been restored, or the unrestored tapes in groups 4 and 6?

Having made no progress with plaintiffs toward solving the mystery of what tapes were the subject of the Motion, Walker's present counsel turned to Walker's former counsel to try to clarify the confusion of why plaintiffs were focused on unrestored tapes in Groups 4 and 6 when the catalogs of the restored tapes indicated that Groups 3 and 16 had been restored. Walker's prior attorney at Paul Hastings, Carl Mullis, agreed to investigate the issue with his staff and, ultimately, discovered the answer. (Irving Opp. Decl., ¶ 26.)

As Carl Mullis explained to plaintiffs and to Walker's present counsel on the telephone on July 26, 2006, a member of his firm's IT group was instructed to restore the tapes in Groups 4 and 6. However, against the backdrop of the plaintiffs' earlier focus on Groups 3 and 16, the IT employee mistakenly instructed the restoration vendor to restore the tapes in Groups 3 and 16. Pure and simple. (Irving Opp. Decl., ¶ 27.)

The error within Paul Hastings IT department was not a "tactic;" it was not part of any "strategy;" and it did not involve "hiding the ball." It is an unfortunate, but innocent, error. Nor did plaintiffs learn about the mix-up through a "highly disturbing disclosure in [Walker's] Opposition brief." To the contrary, before the Opposition was filed, the plaintiffs were apprised of the facts relating to the mix-up by Paul Hastings on the same phone call during which Paul Hastings informed Walker's present counsel of those facts.

Those facts are quite straight-forward and remarkably non-nefarious. Had plaintiffs bothered to meet and confer before filing their Motion to compel, these facts would have been identified and addressed. But plaintiffs chose to ignore that requirement.

V. **PLAINTIFFS' FAILURE TO IDENTIFY IN THEIR MOTION WHAT TAPES WERE THE SUBJECT OF THE MOTION CANNOT BE EXCUSED BY PLAINTIFF'S ARGUMENT THAT WALKER'S COUNSEL SHOULD HAVE INTUITED WHAT PLAINTIFFS INTENDED.**

The Reply argues that Walker's present counsel should somehow have been clairvoyant and known what tapes were the subject of the Motion without plaintiffs having to go to the trouble of specifically identifying – for Walker or the Court – the individual tapes by their

assigned TOG ID numbers. Plaintiff' implicit suggestion is that Walker's present counsel should somehow have known of the tape mix-up at Paul Hastings even before the attorneys at Paul Hastings did. Consistent with most of plaintiffs' arguments, plaintiffs provide no rational support for this position.

Plaintiffs' proclamation that we knew which tapes were the subject of the Motion is flat wrong. We would not have asked plaintiffs repeatedly over a two-week period to identify what tapes were the subject of the Motion if we knew the answer to that question. Not surprisingly, neither in their Motion nor their Reply were plaintiffs able to point to any writing whatsoever preceding the filing of the Motion in which they expressly referred to the tapes on Groups 4 and 6 in any communication with Walker's present counsel.

## VI.    THE STATUS OF GROUP 4 AND 6 TAPES.

On July 26, 2006, having finally received plaintiffs' confirmation that their Motion sought production form Groups 4 and 6, Walker's counsel had two days to file the Opposition to the Motion.[34] This left an inadequate amount of time for Walker's counsel to analyze the complex data concerning the Group 4 and 6 tapes that was available on the voluminous catalogs the vendor had provided and to consult with the vendor about other aspects of these tapes.

Notably, the information that the vendor had provided up to that point on the tapes in these groups indicated that attempts to catalog several of them had failed. Walker's counsel inquired of the vendor whether the fact that the tapes were not able to be catalogued impacted whether they could be restored. The answer provided in the two-day window within which Walker's counsel had to prepare the Opposition was that a tape that was unable to be catalogued was unrestorable. This information was relayed in Walker's Opposition brief.

Since the week of July 26, Walker's counsel has spent a considerable amount of time analyzing the information available about the Group 4 and 6 tapes and has engaged in dozens of

---

[34] Consistent with their practice of disadvantaging Walker at every possible opportunity with respect to this Motion, plaintiffs refused Walker's counsel's request for an extension of time to respond to the Motion.

email communications and telephone conferences with the vendor in an attempt to explore what other steps might be taken to restore the Group 4 and 6 tapes. At Walker's counsel's suggestions, the vendor has taken some of these steps which did, indeed, result in the restoration of the Group 6 tapes and in the restoration of three more tapes in Group 4.[35] Walker intends to review for production the email and email attachments on the now restored tapes in Group 4 and 6 tapes pursuant to the methodology set forth in the Opposition and in Walker's October 10 Status Report.

## VII. THE REVIEW METHODOLOGY EMPLOYED BY WALKER'S COUNSEL IS REASONABLE AND PROPER UNDER THE CIRCUMSTANCES.

As discussed in Walker's Opposition, the data on the tapes in Groups 5, 15, 4 and 16 is extremely voluminous. Indeed, the volume is even greater than earlier known, now that several of the earlier un-catalogued tapes have been restored. Focusing on the data most like to contain responsive information, the volume of data that Walker's counsel intends to upload for filtering and to review in accord with the methodologies set forth in the Opposition and in Walker's October 10 Status Report is approximately 15 gigabytes,[36] and Walker's counsel estimates that

---

[35] Consistent with plaintiff's penchant for overstated drama unsupported by facts, plaintiffs' Reply argues that, when it comes time for trial or summary judgment, the Court will need to instruct the jury to draw an adverse interest relating to spoliation of responsive documents on the WebHouse tapes. While this remark it completely misplaced in a reply brief on a motion to compel, it is also true that plaintiffs have pointed to no facts that could suggest such a result would be appropriate. The one case to which plaintiffs cite for this point, *Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co., Inc.*, 2005 WL 679071 (Fla. Cir. Ct. Mar. 1, 2005), does not support their position. In addition to failing to prove that any responsive documents are unavailable, plaintiffs do not even attempt to establish that any of the pre-requisites for such sanctions that are set forth in that case (including but not limited to the willfulness and bad faith of the responsible party) could be satisfied here. And they cannot.

Plaintiffs' also engage in considerable arm-waving about how the data came to be on "inaccessible" tapes. As plaintiffs well know, the nature of back-up tapes is that the data on them is not readily accessible without further work. *See, e.g.,* W. Schwarzer, A.W. Tashima, and J. Wagstaffe, *Federal Civil Procedure Before Trial* (The Rutter Group 2006), p. 11-225, § 11:1873 ("Most backup tapes contain undifferentiated, compressed data created for disaster recovery purposes.")

[36] Declaration of Celestino Santos, filed concurrently herewith ("Santos Surreply Decl."), ¶ 4.

23

review and production from this population will take 12 months.[37] The volume of data plaintiffs' Motion seeks – without regard to the its lack of relevance – **exceeds 480 gigabytes**, or **32 times** the amount of data that Walker anticipates will take a year to review. (Santos Surreply Decl., ¶ 3.)

The review methodology Walker has adopted with respect to these tapes is reasonable and proper under the circumstances and designed to identify potentially responsive documents. Plaintiffs' Motion and Reply presented no support whatsoever to establish any necessity to search the mailboxes of 121 custodians that plaintiffs have branded as "key." In contrast, Walker's counsel's review methodology focuses on 59 custodians who were identified in the discovery responses and disclosures of defendants as persons with knowledge relevant to this matter. Those mailboxes constitute the logical – and reasonable – group to review. No more should be required of Walker than to review the emails and the electronic documents attached to those emails for the 59 custodians.[38] Plaintiffs' overreaching approach is unwarranted and abusive.

Moreover, an enormous volume of documentation has already been produced to plaintiffs in this case. The Priceline Defendants have produced over 2,100,000 pages of non-email documents and 450,000 pages of emails.[39] Walker has individually produced more than 350,000 pages of hard copy documents, in addition to a number of discs of electronic data. Walker is producing another 40,000 pages of email and attached electronic documents this week. In sum, while the defendants are continuing to produce documents, the plaintiffs have already received approximately 3,000,000 pages of documents just from the defendants. In addition, plaintiffs

---

[37] Declaration of Shawna Ballard in Support of Defendant Jay S. Walker's Response to Plaintiffs' Motion to Modify the August 23, 2006 Scheduling Order [Dkt. 383], ¶ 7.

[38] While the data loaded onto Walker's vendor's review tool to date did not contain mailboxes for all 59 of these custodians, the vendor has yet to load the additional mailboxes resident on the recently restored tapes.

[39] Priceline Defendants' October 10, 2006 Status Report on the Production of Electronic Information [Dkt. 389], pp. 1-3.

have served over 75 subpoenas on non-parties seeking the production of documents. We are unable to report to the Court the number of pages that these third parties have produced to plaintiffs because, to date, plaintiffs have declined to provide us copies of those productions.[40]

As stated in *In re Clorox Co. Securities Litigation,* 238 F. Supp. 2d 1139 (N.D. Cal. 2002),

> The PSLRA was enacted in part to curb abusive discovery. See H.R. Conf. Rep. 104-369 at 32-33, 37. Congress concluded that Plaintiffs were using the threat of extensive discovery to force settlements on meritless claims, and sought to create a higher pleading bar in order to protect companies from the threat of pointless, expensive discovery. *Id.* at 37. This purpose would be entirely thwarted if a plaintiff could obtain discovery on a litany of meritless assertions simply by attaching them to one narrow colorable allegation.

*Id.* at 1143.

The court's comments in *Powers v. Eichen*, 961 F. Supp. 233 (S.D. Cal. 1997), are also instructive in this regard generally.

> Congress found that the federal securities laws are frequently misused by the filing of frivolous suits "alleging violations of the federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation. These suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on nothing more than a company's announcement of bad news, not evidence of fraud." *S. Rep. 104-98, 1995 WL 37283* (Leg. Hist.), at 4. Smaller start-up companies with unpredictable prospects, especially those involved in high technology, are particularly vulnerable. When a number of venture-backed companies less than ten years old was surveyed, it was learned that one in six had been sued at least once and that lawsuits had consumed an average of 1,055 hours of management time and $692,000 in legal fees. *Id.* at 8. Congress also found that 93 percent of these suits are settled and that many are "settled based not on the merits but on the size of the defendant's pocketbook." Id.
>
> Congress was particularly concerned with the high costs associated with discovery, which accounts for approximately 80 percent of total litigation costs in securities fraud actions. *Id.* at 14. Testimony before the Securities Subcommittee indicated that discovery in securities actions often "resembles a fishing expedition." Id. It was learned that "plaintiffs sometimes file frivolous lawsuits in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint." Id.

*Id.* at 235-236.

---

[40] July 28, 2005 email from plaintiffs' counsel, Peter Mc Dougall, to Walker's counsel, Summer Joseph of Paul Hastings (Irving Surreply Decl., Ex. 2).

This admonition to curb abusive discovery is especially apt here. Plaintiffs having abdicated the role they had committed to fulfill, and having presented no reasonable rationale for contravening the December 8 Order or for jettisoning the reasoned methodology developed by Walker's counsel, there is no reason to impose on this case the burdens of wholesale production of documents without regard to their relevance or responsiveness to any document request.

## VIII. CONCLUSION.

For the reasons stated here and in Walker's Opposition papers, plaintiffs' Motion should be denied in its entirety.

DATED: October 11, 2006

Defendant, Jay S. Walker

By: ___/s/ *Jeanne E. Irving*___

Thomas D. Goldberg (ct04386)
Terence J. Gallagher (ct22415)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901
Phone: (203) 977-7300
Fax:   (203) 977-7301
tdgoldberg@dbh.com – E-mail

- and -

J. Michael Hennigan (phv01119)
Bruce Bennett (phv01105)
Jeanne E. Irving (phv01118)
Shawna Ballard (phv01117)
HENNIGAN, BENNETT & DORMAN LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone: (213) 694-1200
Fax: (213) 694-1234
irvingj@hbdlawyers.com – E-mail

His Attorneys