UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE: PRICELINE.COM, INC. SECURITIES LITIGATION | : : : | MASTER FILE NO. 3:00CV01884(AVC) |
| | : | |
| This document relates to: | : : | January 17, 2007 |
| ALL ACTIONS | : | |

DECLARATION OF SHAWNA L. BALLARD IN SUPPORT OF DEFENDANT
JAY S. WALKER'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL DEFENDANT WALKER TO PRODUCE RESPONSIVE
DOCUMENTS ON THE RESTORED WEBHOUSE TAPES AND TO RESTORE
ADDITIONAL WEBHOUSE TAPES

Thomas D. Goldberg (ct04386)
Terence J. Gallagher (ct22415)
Day Pitney LLP
One Canterbury Green
Stamford, CT 06901
Telephone: (203) 977-7300
Fax: (203) 977-7301
tgoldberg@daypitney.com – E-mail

- and -

J. Michael Hennigan (phv01117)
Bruce Bennett (phv01105)
Jeanne E. Irving (phv01118)
Shawna Ballard (phv01119)
Hennigan, Bennett & Dorman LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone: (213) 694-1200
Fax: (213) 694-1234
irvingj@hbdlawyers.com – E-mail

Attorneys for Defendant, Jay S. Walker

I, Shawna L. Ballard, under penalty of perjury declare as follows:

1.      I am a member of the firm Hennigan, Bennett & Dorman LLP ("HBD"), attorneys for defendant Jay S. Walker ("Walker") in this action. I submit this declaration in support of Defendant Jay S. Walker's Memorandum of Law In Opposition To Plaintiffs' Motion To Compel Defendant Walker To Produce Responsive Documents On The Restored Webhouse Tapes And To Restore Additional Webhouse Tapes.

2.      In April, 2006, Mr. Walker retained this firm to represent him in this matter. Statements herein with respect to events that took place before April, 2006, are based upon my review of the records in this case. As for other matters, except to the extent stated otherwise herein, I make this declaration based on my own personal knowledge and experience and based on my knowledge of the file in this matter.

**A.      Plaintiffs' Prior Motion To Compel and The October 30 Ruling Thereon**

3.      The motion before this court is plaintiffs' third motion to compel with respect to the back-up tapes. Plaintiffs filed their first motion in September 2005. In that September 2005 motion, plaintiffs sought the production of all 181 back-up tapes [Docket No. 212] in Mr. Walker's possession. On December 8, 2005, Judge Squatrito denied plaintiffs' request to compel the production of 181 backup tapes in Mr. Walker's possession, and in doing so, Judge Squatrito issued a Memorandum of Decision and Order [Docket No. 245] setting forth the procedures that govern the production of documentation from the 181 backup tapes in Mr. Walker's possession.

4.      Then, on July 7, 2006, plaintiffs filed a Motion to Compel Defendant Walker to Produce Emails and Electronic Documents on the Seventeen Restored Priceline Webhouse Club Tapes ("17 Restored Tapes Motion") [Dockte No. 330 ] In the 17 Restored Tapes Motion, plaintiffs again requested, among other things, the wholesale production of documents without the use of search terms to locate potentially responsive data.

5.      On October 30, 2006, this Court  ruled on plaintiffs' 17 Restored Tapes Motion[Docket No. 404] ("October 30 Order"). Consistent with the December 8 Order, the

Court again declined to grant this unreasonable request for wholesale production of documents without the use of search terms to locate potentially responsive data. In this October 30 Order, the Court denied in part and granted in part plaintiffs' request for an email-by-email review of particular custodians' emails and the Court set a March 1, 2007 production deadline. I and others at HBD first received notice of this October 30 Order on November 2, 2006.

**B.**     **Background Regarding The Restored Back-Up Tapes And The Costs And Process For Uploading, Filtering and Releasing Such Data**

6.     There are a total of 181 tapes in what has been referred to as the "Webhouse Back-Up Tapes," although some of them are blank media or cleaning tapes. Of the 181, 169 of them were capable of being catalogued and catalogs or detail reports for these 169 tapes have been provided to plaintiffs in electronic, searchable form.

7.     These tapes are not the property of Jay Walker or any other party to this case. They are non-party materials. While plaintiffs refer to the tapes as the "Webhouse Back-Up Tapes", a review of the catalogs and the data released from the tapes suggests that the tapes reflect back-ups of servers that were apparently shared by a number of companies. In fact, the catalogs reflect that these tapes contain a substantial volume of data that is dated long before Webhouse was launched or even contemplated.

8.     The volume of electronic data contained on the back-up tapes is enormous, and the types of files are varied, with email being just one example. Mr. Walker's electronic vendor has restored a total of 37 back-up tapes. These include the restoration of 16 sample tapes and all tapes that the electronic vendor has been able to restore from Groups 3, 4, 5, 6, 15 and 16.

9.     Specifically, the records in this case reflect that Mr. Walker's prior counsel, Paul Hastings Janofsky & Walker LLP had organized the back-up tapes into 16 groups, based on the handwritten labels on the tapes. Paul Hastings then arranged for the restoration of one sample tape from each of these groups (the "Sample Tapes") for purposes of evaluating the likelihood of finding responsive information on particular groups of tapes. Then, in 2005, the parties agreed to restore additional tapes from Groups 4, 5, 6 and 15 tapes.

10.    Due to a ministerial mistake made in the IT department at Paul Hastings this past spring, the vendor had restored all the tapes in Groups 3 and 16 that the vendor was capable of restoring rather than restoring the tapes in Groups 4 and 6. Because the 17 Restored Tapes Motion had not identified specifically which tapes the motion addressed, this ministerial error was not discovered until weeks after the motion was filed and after plaintiffs identified tapes from Groups 4 and 6 as being the subject of the 17 Restored Tapes Motion.

11.    By the time the Court issued its October 30 Order on the 17 Restored Tapes Motion, HBD had already caused Mr. Walker's electronic vendor to restore all tapes from Groups 4 and 6 that the vendor was able to restore. As a result of these restoration efforts, 17 tapes from Groups 4, 5, 6 and 15 that are the subject of the 17 Restored Tapes Motion have been restored. Consequently, there are no restoration issues left to address regarding the 17 tapes that were the subject of the 17 Restored Tapes Motion and the October 30 Order.

12.    Although the tapes in Groups 3 and 16 were not part of the 17 Restored Tapes Motion, on learning that these tapes in Groups 3 and 16 had already been restored, plaintiffs demanded that Walker's counsel review and produce documents from these tapes as well. Walker's counsel acceded to this request and, as described below, has uploaded pertinent files from the 10 restored tapes in Groups 3 and 16, in addition to those in Groups 4, 5, 6 and 15.

13.    According to analyses of the catalogs and detail reports performed by HBD personnel, all 37 restored tapes contain approximately 612 gigabytes. In fact, these analyses suggest that just the 17 tapes that were the subject of the 17 Restored Tapes Motion and that the parties agreed to restore contain over 482 gigabytes of data, including an estimated 219 gigabytes of .pst data in compressed form. (Mr. Walker's electronic discovery vendor has informed us that a rule of thumb for estimating pages in pst files is 100,099 pages per gigabyte.)

14.    Mr. Walker's electronic vendor charges $900 per gigabyte to upload data for filtering and processing and $3,000 per gigabyte for release of data to an electronic review tool for review. (In addition, there are various other vendor charges associated with the document review and production.) Thus, the vendor fees, alone, associated with the upload, filtering and

release of such voluminous data would be substantial.  For example, without selecting specific files for upload, if all the estimated 482 gigabytes of data on the tapes that where the subject of the 17 Restored Tapes Motion were uploaded and all such data were released, it would cost approximately $1,880,000 in vendor charges alone, and if all the estimated 612 gigabytes of data on the restored tapes were uploaded and all such data were released, it would cost over $2,350,000 in vendor charges alone.

15.     Moreover, the time that it would take the vendor to process such data would also be substantial.  As an example, as we informed plaintiffs' counsel during the meet and confer process, Mr. Walker's electronic vendor has estimated that it would take approximately 37 days just to upload, filter, process, and prepare 482 gigabytes of data for release and that vendor has indicated that there is a possibility that it could take longer than this to process that volume of data for release.

16.     The processing of .pst data is more expensive than may other types of uncompressed data. Based on information provided by Mr. Walker's electronic vendor, it is my understanding that each .pst file on the back-up tapes consists of a compressed collection of email.  Even after a back-up tape has been restored, prior to filtering or review, Mr. Walker's electronic vendor must expand the .pst files into the individual emails.  Once expanded, this data consists of more bytes than it did in its compressed state.  It has been our experience with the data uploaded for this case that the expanded .psts are approximately 1.5 times the size of those same .psts when compressed.  The above referenced upload and release charges are applied to the expanded size of the .psts, not the compressed size that they have while residing on the tapes.

17.     After data is uploaded by the electronic vendor, filters can be applied to reduce the data that is release to the review tool.  The amount of any such reduction is unknowable for data not yet uploaded, filtered and released.  However, it has been our historical experience with data already uploaded and released that, to the extent the upload involves .pst files, any size reductions from filtering are often substantially offset by the expansion of .pst files.  As a result,

4

the upload and release of 219 gigabytes of .pst files could cost as much as $850,000 in vendor charges alone. The attorney review time would cost some multiple of that.

**C.    The Defendants Have Already Produced Voluminous Data**

18.    In the present motion, Plaintiffs seek to compel the review and production of an overwhelming volume of data prior to March 1, 2007. This enormous production is sought despite the fact that the records in this case reflect that the defendants have already produced a substantial volume of documents.

19.    In this regard, a review of the Bates Numbers for those hard copy documents produced by Mr. Walker's predecessor counsel demonstrates that Paul Hastings produced over 358,000 pages of hard copy documents on behalf of Mr. Walker. Further, since HBD became counsel, we have produced, on behalf of Mr. Walker, an additional 178,000 pages of email and attached electronic documents. Thus, Mr. Walker has already produced over 530,000 pages and, as discussed below, we estimate that we will have produced a substantial volume of additional electronic documents by the March 1, 2007 production deadline.

20.    Further, as reflected in the Priceline's January 10, 2007 Status Report On The Production Of Electronic Information [Docket No. 420], the remaining defendants have produced more than 2.65 million pages of electronic documents. Moreover, I understand that the other defendants have also produced more than 172,000 pages of hard copy documents. In addition, the records in this case reflect that there have been substantial document productions in response to more than 75 subpoenas that plaintiffs have directed to third parties.

**D.    Substantial Resources Were Being Applied To The Electronic Review Process Prior To Receiving Notice Of The October 30 Order**

21.    Beginning shortly after our retention, I and others at HBD spent a substantial amount of time analyzing data and information with respect to the back-up tapes in order to develop a methodology for review and analysis of data on these tapes that is reasonable under the circumstances. Due to the sheer magnitude of data at issue, this process has been difficult and time-consuming.

22.    Further, once plaintiffs' filed their 17 Restored Tapes Motion that sought the wholesale production of all non-privileged data on 17 tapes without regard to file type or dates, we were forced to develop a methodology for upload, filtering and review absent input from plaintiffs. In accord with that process, we uploaded data and filtered data in accord with the methodologies described in our monthly status reports to the courts.

23.    When we received notice of the October 30 Order, I was already in the midst of supervising an electronic review effort with 11 attorneys staffed on that project. And, at that time, many of these reviewers were applying a substantial portion of their professional time to the review project. In this regard, in September and October, 2006, the attorneys worked an average of 777 hours per month, at an average cost of approximately $213,200 per month. Before the issuance of the October 30 Order, we had projected that it would take until at least the end of the summer 2007 to complete the document review.

**E.    Upon Receiving Notice of the October 30 Order, We Dramatically Increased The Already Substantial Resources Being Applied To The Review Project**

24.    Because the October 30 Order directed Mr. Walker to complete its document production by March 1, 2007, we substantially increased the significant resources already being applied to the review of electronic data from the back-up tapes after receiving notice of that order. In this regard, we expanded the review team to 35 attorneys, including 19 temporary contract lawyers.[1]

25.    . The retention of this substantial group of temporary contract attorneys working out of HBD's offices represented about a 40% increase in the number of attorneys working at our firm's offices. Because the review is being conducted over the internet, HBD had to purchase new computers to provide to all of these contract lawyers, and had to find space in the law firm

---

[1]    As expected, we have had some staffing changes over the course of the review. For example, for a variety of reasons, the employment of two of these contract lawyers retained by HBD has ended and one of the Day Pitney attorneys working on the project has transitioned to a contract attorney status.

for them to work. In addition, this firm has made special arrangements to enable the contract lawyers to work overtime and weekends by having staff supervise the contract attorneys so that those of them who were willing to do so could work from 7 a.m. to 8 p.m. on weekdays and for several hours on Saturdays.

26.     Through these considerable (and expensive) efforts, we substantially increased the number of hours per month expended on the review of data from the back-up tapes. For example, in comparison to the 11 reviewers billing an average of 777 hours per month, at an average monthly cost of $213,200 in September and October, in December, a holiday month, 35 reviewers worked over 4,300 hours, at a cost of nearly $800,000.

27.     Presently, there are 34 reviewers working on the electronic document review, most of which are working at least full time on the project with several others applying substantial time to the project .

**F.     Mr. Walker's Review Team Is Conducting An Email-By-Email Review Of The .Pst (Email) Mailboxes Of All 65 Custodians (Other Than Mr. McEnroe) From The Original List Of 121 Custodians That Plaintiffs Recently Identified For Such Review**

28.     On February 17, 2006, plaintiffs' sent Mr. Walker's prior counsel a list of 121 individuals for whose mailboxes plaintiffs wanted Mr. Walker to review email-by-email. Plaintiffs resent that list to HBD in May, 2006. This is the list that plaintiffs urged upon this Court in their 17 Restored Tapes Motion. And this is the list addressed in the October 30 Order, with respect to plaintiffs' request for an order compelling Mr. Walker to conduct an email-by-email review of the mailboxes of these 121 custodians. In the October 30 Order, the Court directed that Mr. Walker conduct an email-by-email review of the mailboxes of defendants Walker and Braddock. With respect to the remainder of the 121 email accounts, the Court directed that the parties meet and confer regarding which accounts are key to this litigation, in order to identify a "narrow list of key individuals."

29.     Mr. Walker never opposed conducting an email-by-email review of Mr. Walker and Mr. Braddock's mailboxes. Indeed, with the exception of those documents designated as

potentially privileged based on search term hits and attorney designations, nearly all the responsive documents from these mailboxes had already been produced on October 13, 2006; the remainder not designated as potentially privileged (literally, a handful of documents) were produced last week.

30.    As for the remainder of the 121 email accounts for whom the court directed that the parties meet and confer regarding which accounts are key to this litigation, in order to identify a "narrow list of key individuals" for email-by-email review, on November 14, 2006, plaintiffs' counsel presented us with a new list of custodians whose email accounts plaintiffs want to be reviewed email-by-email. Plaintiffs provided some corrections to this list on November 16, 2006.

31.    Far from the "narrow" list the Court specified, the new list had 89 names. Of those 89 names, only 65 were on the list of 121 individuals that had been the subject of the 17 Restored Tapes Motion and the October 30 Order on that motion. The 24 other names were entirely new; they had never been on the list of 121 for whom plaintiffs had asked Walker to conduct an email-by-email review.

32.    With respect to the 24 new custodians on plaintiffs' list of 89, our analysis suggests that (1) only four of these 24 names appear on management level organization charts that we have been able to locate, and (2) nearly half (11 of 24) of the individuals are secretaries or administrative assistants. Moreover, the .pst mailboxes on the restored back-up tapes for these 24 new names are voluminous. They total approximately 7 gigabytes, or approximately 700,000 pages. We did not agree to do an email-by-email review for these 24 additional individuals during the meet and confer process.[2]

---

[2]    Nonetheless, as described more fully below, while not the subject of an email-by-email search, Walker is running 47 search terms against any .pst (email) files for the new 24 names requested by plaintiffs to the extent they had .pst mailboxes on the restored tapes.

33.     During the meet and confer sessions, which included exchanges of emails and correspondence and three lengthy telephone conferences held on November 16, November 29 and December 6, 2006, Ms. Irving and I repeatedly asked plaintiffs' to narrow this list of 89 custodians or to at least prioritize the list. Plaintiffs refused to do either. Further, during the meet and confer process we asked plaintiffs' counsel to explain why they thought the individuals on their list of 89 warranted email-by-email review. However, plaintiffs did not provide any explanation or any facts to support their request for such an email-by-email review of these 89 custodians.

34.     While adding 24 new names, plaintiffs dropped 56 names from the original list of 121 in acknowledgement that these custodians were not "key individuals" warranting an email-by-email search. That left 65 custodians from the list of 121 that plaintiffs were still contending were "key individuals." With respect to these 65 custodians pared from the list of 121, the review team is in the process of conducting an email-by-email review of all .pst (email) files that were located on the restored back-up tapes for these custodians with the exception of Mark McEnroe, Webhouse's former General Counsel. Moreover, Walker's counsel is also in the process of conducting and email-by-email review of one additional custodian (Tom Gerard) whose name is similar to a name of a custodian both on the list of 121 and the list of 89.[3] Of the 65 custodians remaining after eliminating Mark McEnroe and the addition of Tom Gerard, we have identified .pst files on the restored tapes for 34 of these custodians, and the review team is conducting an email-by-email review of these .pst mailboxes for these 34 custodians. A true and correct copy of this list of 34 custodians for whom we are conducting an email-by-email review is attached hereto as Exhibit A.

---

[3]     In particular, Walker's counsel is reviewing email-by-email the mailbox of Tom(masio) Gerard due to the similarity in the spelling of Tom(masio) Gerard and another custodian, Tom Gerhard(t), whose name was on both the list of 89 and the list of 121.

35.     In accord with the protocols described in status reports, when conducting this email-by-email review, in addition to reviewing the emails contained within a particular custodian's mailbox, the review team is also reviewing the attachments to such emails, all emails within the same conversation thread as the subject email to the extent such emails are readily identifiable on the review tool, and duplicates of such emails in other custodian's mailboxes to the extent such duplicates are readily identifiable on the review tool.  As with prior phases of the review, emails that Mr. Walker's vendor has identified as duplicates of emails produced by the co-defendants are being excluded from the review to the extent reasonably possible.

**G.     We Identified Appropriate Search Terms and Defined The Proper Scope of Data Against Which Search Terms Should Be Employed.**

36.     As noted below, because plaintiffs' counsel refused to identify the files that it wanted uploaded for review and the search terms it wanted applied to such files as they had previously committed to do, prior to the issuance of the October 30 Order we were forced to develop a methodology for review absent input from the plaintiffs.  In the meet and confer sessions following the issuance of the October 30 Order, we told plaintiffs we were using the search terms that the other defendants had used against the data we had uploaded to the review tool with the exception of one term ("AG") that appeared from our analysis to be unnecessary and unduly broad.  Plaintiffs objected to the use of these terms.

37.     On November 14, 2006, plaintiffs proposed their own list of search terms.  That list contained 199 terms, which plaintiffs later reduced to the 113 terms they propose in their current motion.  During the meet and confer process plaintiffs demanded that Mr. Walker apply these 113 search terms against an inordinate volume of data.

38.     At plaintiffs' request, and in hopes of facilitating the process of narrowing the list of search terms to a reasonable one, I spent a substantial amount of time testing 113 search terms proposed by plaintiffs.  I provided to plaintiffs' counsel reports reflecting, for each of the 113 search terms, the total number of pages contained in the emails (including any attachments to such emails) that contained the search term and I provided them with the total number of pages

(435,550) against which these were tested so that plaintiffs could evaluate the volume of hits on a percentage basis for each of these 113 search terms. This test was run against the data on the review tool at the time of the test from the 17 tapes that were the subject of the 17 Restored Tapes Motion.

39.     This testing revealed that many of the search terms on plaintiffs' list were overbroad. For example, this testing revealed that such overbroad terms as valu*," operat*, account*, partner*, update* and analys* (where the asterisks represent wildcards) were found **individually** in documents representing **28% to 37%** of the pages contained in the emails (including any attachments to such emails) against which these tests were run..

40.     In the meet and confer conferences, we made it clear that we were committed to reviewing as much data for production as the review team could reasonably accomplish within the four-month window allowed and that our review team would review that data according to any priorities that plaintiffs wanted to set. Alternatively, if plaintiffs did not wish to specify any priorities, we stated that we were willing to make the judgment calls to set those priorities and design the methodology most likely to identify potentially responsive data. In the context of these discussions, we urged plaintiffs to narrow or at least prioritize these search terms without prejudice to plaintiffs' apparent commitment to filing a motion to compel. Ms. Irving and I explained that if plaintiffs would present the list of their search terms in order of plaintiffs' priority, we would run the search terms in this order and review as much of the responsive data as could be reviewed and produced by the March 1 deadline. Plaintiffs refused to do this.

41.     During the last meet and confer session, we explained that the vast majority of the 113 search terms proposed by plaintiffs were overbroad and burdensome and explained that, even for those terms that were not overbroad when considered individually, it would be too burdensome for us to apply all such terms in the aggregate. Then, I specifically recited to plaintiffs the list of their terms that were not overbroad because it was a shorter list than the list of overbroad terms. Based on our analysis of information available to us on that date, we then stated that we considered to be overbroad any terms that I did not recite.

42.     Although plaintiffs never prioritized or narrowed the list of 113 search terms during the meet and confer calls, at the end of the last meet and confer session held on December 6, 2006, plaintiffs' counsel represented that in the motion to compel they intended to file, plaintiffs would shorten their search term list to less than 113 and would present the shorter list for the first time in their motion to compel.  However, plaintiffs did not do this and instead their motion to compel requests that Mr. Walker employ all of these 113 broad search terms against an inordinately large volume of data.

43.     Because plaintiffs have refused to narrow their broad list of 113 search terms, we have been left to prioritize which search terms from the list of 113 search terms should be applied to the data in question.  As part of that process, we have applied 47 of these search terms (four more than the Priceline defendants) to the data.  A true and correct copy of this list of search terms is attached hereto as Exhibit B.[4]

44.     Paul Hastings and this firm also provided plaintiffs' counsel with information that would allow them to reasonably identify the data against which search terms should be run.  In this regard, as discussed in various status reports and other filings, at plaintiffs' counsel's request, Paul Hastings and HBD collectively provided detailed catalogs for 169 of the 181 tapes so that plaintiffs' counsel could identify from the catalogs specific files for upload, filtering, staging and analysis, and could eliminate irrelevant files from the review.[5]  As discussed below, early last year, plaintiffs represented they would use the catalogs to identify particular files on them that they would request be uploaded, but never did so.

---

[4]     For two of these 47 search terms, we added a WebHouse and WHC connector due to the breadth of the terms.  Specifically, as reflected on the attached list of search terms, we added these connectors to the following broad search terms from plaintiffs' list of 113: "Goldman" and "minutes."  Also, we corrected the spelling with respect to one of plaintiffs search terms.

[5]     These represent catalogs for all tapes in which Mr. Walker's electronic vendor has been able to generate catalogs.

45.    Despite this promise and despite Mr. Walker's having expended substantial resources to provide such information to plaintiffs, plaintiffs have yet to utilize the catalogs to identify particular files or file types that they want uploaded for purposes of running search terms.  Instead, in their motion to compel, plaintiffs indiscriminately request that their excessive list of search terms be applied to all data on the restored back-up tapes without regard to the file type, the date of the data, or the significant vendor costs associated with uploading data from successive back-ups of voluminous, overlapping data.

46.    Because plaintiffs have refused to identify that data against which the search terms should be run, we have been left to prioritize the data uploaded for filtering and running search terms.  In doing so, we have caused a significant volume of data to be uploaded, filtered and released to the review tool to have search terms applied to it.

47.    Specifically, we have uploaded, or are in the process of uploading for filtering and to apply search terms, more than **65.84 gigabytes** of electronic data from the restored tapes in Groups 3, 4, 5, 6, 15 and 16, which we estimate to consist of **6.3 million pages**.  Included in this uploaded (or about to be uploaded) data are all identified (1) .doc (Word) files, (2) .xls (Excel) files, (3) .pdf (Adobe Acrobat) files; (4) .ppt (PowerPoint presentation) files; and (5) .pst (i.e., email) files for 80 custodians.

48.    As for the 80 custodians for whom .pst (email) files have been uploaded (or are in the process of being uploaded) to the extent located on the restored tapes for purposes of filtering and running search terms against such data, these 80 custodians include:  (1) those custodians contained on plaintiffs' new list of 89 that were not on the list of 121 (i.e., the new 24 names), (2) those names on the list of 121, other than Tom Gerard, that were not on the list of 89 (i.e. 55 names), and (3) Mark McEnroe.  A true and correct copy of the list of these 80 custodians is attached hereto as Exhibit C.  Of this list of 80, the restored tapes contained populated mailboxes for approximately 47 individuals.

49.    The 80 custodians for whom .pst emails were or are  in the process of being uploaded to the extent identified on the restored tapes are in addition to those 65 custodians for

whom we have uploaded files for an email-by-email review to the extent such files could be located. In other words, Mr. Walker's electronic vendor has uploaded, or is in the process of uploading, the .pst mailboxes on the restored tapes for any of the 145 individuals that plaintiffs or Walker's counsel have ever included on any list of persons with relevant knowledge, to the extent mailboxes for those individuals exist on the restored tapes.

50.     HBD, along with Mr. Walker's electronic vendor, are applying the attached list of 47 search terms to the above-described files in order to identify documents for review. When applying search terms to .pst files, an email and all of its attachments are selected for review if the email or any of its attachments contain one of the 47 search terms applied to this data.

51.     Further, as with the email-by-email review, as part of the review protocol, when conducting this review of emails in which the email or any of its attachments contain search term hits, in addition to reviewing the emails containing such hits, Mr. Walker's attorneys are also reviewing the attachments to such emails and all emails within the same conversation thread as the subject email to the extent such emails are readily identifiable. As with prior phases of the review, emails that Mr. Walker's vendor has identified as duplicates of emails produced by the co-defendants are being excluded from the review to the extent reasonably possible.

52.     Moreover, I instructed Mr. Walker's electronic vendor to forward to HBD the 105 gigabytes of .mdb (access database) files located on the restored tapes from Groups 3, 4, 5, 6, 15 and 16 for review. We estimate that there are thousands of these database files and each is getting reviewed for responsiveness and privilege.

**H.     Mr. Walker's Review Team Has Conducted A Preliminary Review Of Over One Million Pages Of Electronic Documents Thus Far**

53.     Following the methodologies outlined above, Walker's counsel has now performed a preliminary review of more than one million pages of electronic documents from the back-up tapes and are in the process of performing a quality-control review of these documents, reviewing those documents that have been designated as potentially privileged based on search term hits or attorney designations, and preparing responsive, non-privileged documents for

production.  Utilizing our historical experience in this document review to date as a basis for creating projections, we estimate that, by March 1 we will have completed the review of more than 1.5 million pages.  Further, we estimate that, from that population, Walker will have produced more than 825,000 pages of electronic documents by March 1.

### I. Plaintiffs' Belated Request To Restore An Additional Three Tapes Is Not Justified

54.      In their motion, plaintiffs seek the restoration of three additional tapes that were not the subject of the 17 Restored Tapes Motion or the October 30 Order.

55.      Plaintiffs' motion suggests that there is a connection between their belated request for additional tapes to be restored and the delivery of a handful of catalogs provided to plaintiffs in October, 2006.  However, the catalogs that were provided in October 2006 have nothing to do with the three newly requested tapes.  Instead, as reflected in my October 16, 2006 cover letter to plaintiffs' counsel conveying these catalogs, a true and correct copy of which is attached hereto as Exhibit D, the catalogs provided to plaintiffs on October 16, 2006 were for the Group 6 tapes that had been recently restored when such catalogs were sent to plaintiffs.  On the other hand, the records in this case reflect that the catalogs for tapes 17, 160 and 161 that are the subject of the plaintiffs' recent restoration request were sent to the plaintiffs in April, 2006.

56.      It is my understanding based on conversations with IT personnel that, in general, a back-up tape or a set of back-up tapes is a snapshot of the computer system or server, in part or whole, at a particular point in time.  Consequently, it is my understanding that there is generally a substantial overlap between snapshots taken close in time.

57.      Mr. Walker's vendor has already restored and uploaded back-up tapes that appear to have been created shortly before, after and in between the creation dates of the three tapes that plaintiffs have belatedly requested to be restored.  In this regard, the creation date of a back-up tape can in many instances be determined by reference to the file dates referenced on the tapes.  Based on reports generated with respect to the file dates for certain types of files reflected on the catalogs for these three tapes, these tapes appear to have been created on August 12, 15 and 29,

2000, respectively. Reports generated by our IT department, Mr. Walker's electronic vendor, and some of my searches of documents on the review tool suggest that Mr. Walker's vendor has already restored and uploaded back-up tapes that appear to have been created on August 5, August 17 and September 7, 8, 15, 27 and 28, 2000. Based on this timing, we would expect there to be significant overlap between the data on the restored tapes and the data on the three additional tapes that plaintiffs now seek to be restored.

58.     Further, analyses and reports generated from searches of the catalogs of the three new tapes that plaintiffs seek to restore reveal that they do not contain any populated mailboxes for any of custodian who is on (1) plaintiffs' wish list of 89 or their list of 121, but (2) for whom Walker has not already uploaded that custodian's mailbox(es) from one or more of the already restored tapes.[6] Further, these three tapes contain more than 7.4 gigabytes of data. This size includes only a half dozen file types found on Tapes 160 and 161, and not the full extent of the data residing on those tapes. The full size of all three of the newly requested tapes is likely considerably larger than 7.4 gigabytes.

59.     In these last weeks before the document production deadline, the review team's efforts need to be focused on finalizing the review of the enormous amounts of data that has already been uploaded or designated for upload and preparing for production of responsive, non-privileged documents.

**J.     Plaintiffs' Motion Contains Erroneous Statements About The Meet and Confer And The Review Process**

60.     Plaintiffs' motion misrepresents that Walker's counsel insisted "they would not endeavor to review more than 500,000 pages of documents." Plaintiffs' base their contention on a statement taken out of context in the meet and confer sessions.

---

[6]     At the time of the meet and confer conferences with plaintiffs', we had not yet completed the analysis of the catalogs for tapes 17, 160 and 161 and consequently did not comment on the content of these tapes one way or the other.

61.    At the outset of the meet and confer process, there was a discussion about whether the parties could agree upon a lists of search terms and custodians for email-by-email review. Before the meet and confer conferences, Walker's counsel analyzed the pace at which its review team had been able to complete review of documents to that date. Using this historical data, Walker's counsel projected the number of pages that they could reliably assure the plaintiffs they could review and produce before March 1, 2007. That number was a half million pages.

62.    However, as we repeatedly explained to the plaintiffs during the several meet and confer discussions, that number had a very limited applicability. If plaintiffs wanted us to commit at that time to review particular custodians' mailboxes email-by-email, or to a particular list of search terms, we could only **ensure** that we would be able to review mailboxes or documents responsive to hits that did not exceed half million pages. However, we emphasized in each of our three meet and confer sessions that if we determined that our review team could review more, we would not stop there. Instead, we explained that we would continue to review and produce as many documents as could be reasonably reviewed and produced by the document production deadline. We have stood by that commitment. We have already conducted a preliminary review of twice the number we guaranteed we would review, and we are continuing the review further documents. This increase can be attributed to a variety of factors, including the ramp-up time for the team of temporary contract lawyers, and their increased efficiency as they became familiar with the review tool and the case. Additionally, the data population on which the historical analysis was based had a higher concentration of emails than does the data currently residing on the review tool. Emails take more time to review than, e.g., lengthy spreadsheets.

63.    Plaintiffs' motion also suggests that we would only commit to review 21 custodians email-by-email. This is also an incomplete description of the meet and confer discussions. During the meet and confer process, we informed plaintiffs' counsel that, in the context of all the other demands of the document review process, we could ensure that we could review 21 identified custodians email-by-email by March 1, and would review more custodians

email-by-email if we were able to do so before that deadline.  As reflected above, the review

team is reviewing email-by-email 34 custodians' .pst (email) files from the restored tapes.  As

part of this review, with the exception of Mark McEnroe, the review team is reviewing email-by-

email all 65 custodians pared from the list of 121 and all 59 of the custodians identified on our

prior list of 59 persons likely to have relevant information to the extent we have identified .pst

mailboxes for these custodians on the restored tapes..

64.     In various points of its brief, plaintiffs state that Mr. Walker "delayed the onset of

his search and review of the Webhouse electronic files until this Court's October 30, 2006

Order." (Motion, pp. 1, 4.)  This statement is belied by, among other things, the simple fact that

plaintiffs were sent a 40,000 page production from these electronic tapes on October 13, 2006.

Further, status reports filed  prior to the issuance of the October 30 Order clearly reflect that Mr.

Walker had already begun the electronic review of date from the back-up tapes prior to the

issuance of the October 30 Order.

65.     Similarly, without citation to any page, section or words, plaintiffs' motion makes

the statement that Walker's December 11, 2006 status report reflects that it was not until October

30 Order issued that Walker began a legitimate review of Webhouse's electronic files.  (Motion

at 1.)  The status report makes no such statement.

66.     Plaintiffs' brief further asserts that "[f]or over two years, Defendant Walker has

led Plaintiffs on a merry chase shifting the burden to them to identify where, on Walker's 181

unrestored back-up tapes, he had deposited Webhouse's email accounts and other responsive

Webhouse documents." (Motion at 9.)  However, plaintiffs had the same catalogs as Walker had

with respect to the content of these back-up tapes.  Thus, Walker had no more ability than

plaintiffs to identify the .pst files (i.e., email files) on the catalogs.  There was nothing to stop

plaintiffs from reviewing the catalogs for files containing the .pst suffix, just as Walker's counsel

did.

18

**K.     Any Delay In The Review of the Back-Up Tapes Is Attributable To Plaintiffs**

67.     In their motion, plaintiffs accuse Mr. Walker of delaying the electronic review process with respect to data on the back-up tapes. Plaintiffs, however, ignore that any undue delays result from their own conduct.

68.     For example, the records in this case reflect that Mr. Walker's predecessor counsel and plaintiffs' counsel were making progress in 2005 regarding the scope of the electronic review when, in the midst of the ongoing meet and confer discussions, plaintiffs drastically altered their position as to the scope of the review and filed a motion in September 2005 to compel the production of all data from the 181 back-up tapes. As noted above, this Court denied that motion on December 8, 2005.

69.     Then, following the December 8, 2005 order, Paul Hastings and HBD made substantial efforts to provide information to plaintiffs that would aide in the identification of which tapes to restore and which data to review. Importantly, the records reflect that at plaintiffs' insistence and at considerable expense, Mr. Walker caused catalogs or detail reports reflecting file types and dates for the data on back-up tapes to be generated for all of those 181 back-up tapes with respect to which such catalogs could be generated. As noted above, as a result, electronic searchable catalogs were provided to plaintiffs for 169 of the 181 back-up tapes. These catalogs provide information regarding file names, file types, the dates of the files and the size of the files. From these catalogs, plaintiffs' counsel was able to perform the same analyses regarding the volume and nature of data on these back-up tapes as we have performed.

70.     According to the records in the case file, by the early part of last year, plaintiffs and Walker's previous counsel had already agreed upon the fundamentals steps that needed to be taken before the review of the electronic files could begin. Those steps included: (1) selection of the **tapes that would be restored**; and (2) the **identification of the particular files** from the tapes that would be uploaded for review and possible production.

71.     The catalogs of the tapes provided by Mr. Walker's counsel were to be the basis for both these steps.

72.    The first step was accomplished in 2006.  As stated on page 6 of the October 30 Order,

> [t]he parties identified 8 tapes containing Webhouse executive and employee emails.  . . . . [Following the Court's December 8, 2005 Order, from] December 2005 through April 2006, the parties met and conferred in an effort to determine which tapes contained responsive information.  The parties identified nine additional tapes, bringing the total number of tapes contain responsive information to 17.

73.    Plaintiffs have never performed the second step of the process.  This step is enormously important.  After restoration, to review material from the tapes, Mr. Walker's electronic discovery vendor needs to upload the data to the vendor's computer system and then release it to a review tool that Walker's counsel can access over the internet.  Indeed, as Ms. Irving described in paragraph 4 of the Surreply Declaration of Jeanne E. Irving in Opposition to Plaintiffs' Motion to Compel Defendant Walker to Produce Emails and Electronic Documents on the Seventeen Restored Priceline Webhouse Club Tapes, filed October 11, 2006 [Docket No. 392], over eight months ago, plaintiffs acknowledged that there was substantial data on the 17 Tapes that were not likely sources of responsive documents.

74.    Further, as reflected in prior filings with the Court, plaintiffs repeatedly acknowledged the importance of selecting particular files off the tapes for upload.  As one example, on April 27, 2006, in a call in which Ms. Irving and I participated, plaintiffs' counsel told us that they would begin providing to Walker's counsel the identification of those files "shortly."  And plaintiffs' counsel stated that they would perform that selection.

75.    Indeed, on April 28, 2006, Geoff Johnson wrote a letter to Jeanne Irving on behalf o f the plaintiffs, a true and correct copy of which is attached hereto as Exhibit E, reiterating plaintiffs' commitment to review the catalogs and detail reports for the back-up tapes in order to identify for us those files they wanted uploaded for filtering and review and in order to eliminate

data for which no review would be necessary. Indeed, on page 1 of the letter, under the heading
"Using The Indexes To Segregate The Data On The Backup Tapes," in this letter, Mr. Johnson
stated:

> Once we have searchable and sortable indexes, Plaintiffs will then be able to
> separate those files that likely contain responsive information from the files that
> can easily be eliminated from the search. **The goal here is to eliminate as much**
> **of the material as possible** and **focus only on the files that may contain**
> **responsive documents**.

(Emphasis added).

76.    Mr. Johnson's April 28, 2006 letter went on to state that:

> Once we have gone through the indexes, the next step will require the parties to
> segregate the materials on the tapes so that we are **only** working with **the** files that
> **Plaintiffs have designated for review**. . . . This will significantly reduce the
> volume of material.

(Emphasis added).

77.    Mr. Johnson further states on page 3 of this April 28 letter that: "The most
pressing issue right now is the production of the searchable and sortable indexes. . . . we will
then be able to segregate the data on the tapes."

78.    Plaintiffs never did do what they promised. But neither did they ever advise Mr.
Walker of their decision not to do it. Instead, they left Mr. Walker waiting for plaintiffs'
promised file selections. Then, with no notice whatsoever, plaintiffs filed the 17 Restored Tapes

Motion on July 7, 2006, seeking wholesale production of the data on the 17 tapes – essentially the opposite of what plaintiffs had agreed to in their communications with us.[7]

79.    In light of these facts, it is more than a little strange that plaintiffs' motion accuses Mr. Walker of delay. In reality, plaintiffs' conduct and failure to perform their commitments resulted in the data not being uploaded earlier than it was.

**L.    The Information Provided To Plaintiffs Contradicts Plaintiffs' Suggestion That The Back-Up Tapes Were All Created After This Action Was Filed**

80.    Plaintiffs' assertion that the back-up tapes were created after this action was filed is contradicted by information that has been in plaintiffs' possession for a substantial period of time. In this regard, according to the records in the case file, on April 18, 2005, Paul, Hastings provided plaintiffs copies of the handwritten labels on the 181 tapes. Of these 181 handwritten labels, 146 of them are dated. Of those 146 tapes with dated handwritten labels, one hundred percent of them have back-up dates that precede the filing of this case. Indeed, of the 146 handwritten dates, all but 5 are dated in 1999. A true and correct copy of these handwritten labels provided to plaintiffs are attached hereto as Exhibit F. Moreover, a review of the catalog contents for one catalog that also has a handwritten date on the label confirms that the hand-written date is the date of the latest file date for the files contained on the tape. For example, the latest file date for TOG 154 is September 16, 2000, which is also the date on the hand-written label affixed to the physical tape.

---

[7]    In the October 30 Order, the Court for the second time refused to grant a wholesale production, just as it had been denied in the December 8, 2005 order.

81.     Catalogs were also provided for most of these tapes with handwritten labels

Moreover, even for the tapes whose hand-labeling does not include a creation date, a review of

the catalogs provided to plaintiffs reveal that, for many of the tapes, the latest files reflected on

those catalogs pre-date the filing of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 17, 2007.

_____/s/ Shawna L. Ballard_____

Shawna L. Ballard