# UNITED STATES DISTRICT COURT
## THE DISTRICT OF CONNECTICUT

------------------------------------------------x

IN RE: PRICELINE.COM
SECURITIES LITIGATION,

        MASTER FILE NO.
        3:00-CV-01884(AVC)

This document relates to:

        June 20, 2007

**ALL ACTIONS**

------------------------------------------------x

## DELOITTE & TOUCHE LLP'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

Eric W. Wiechmann (CT 04331)
Thomas J. Finn (CT 20929)
McCARTER & ENGLISH, LLP
CityPlace I
Hartford, Connecticut 06103
(860) 275-6700

William R. Maguire (CT 23375)
David W. Wiltenburg
Kenneth M. Katz
David B. Shanies
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Attorneys for Deloitte & Touche LLP*

**ORAL ARGUMENT REQUESTED**

NY 1167626_1.DOC

## TABLE OF CONTENTS

Page

Preliminary Statement................................................................................................1

STATEMENT OF FACTS .........................................................................................4

Priceline, WebHouse and the WebHouse Warrant .....................................................4

  (i)  Warrant Related Accounting Issues.............................................. 5

  (ii)  WebHouse and the WebHouse Warrant .................................... 6

  (iii)  Failure of WebHouse ................................................................ 8

Year 2000 Complaints ...............................................................................................8

The December 1, 2000 Motion and "Relation Back" ..................................................9

The Consolidated Amended Complaint.....................................................................10

Deloitte's Motion to Dismiss ...................................................................................10

Discovery ................................................................................................................11

ARGUMENT ...........................................................................................................14

I.  AMENDMENT WOULD BE FUTILE BECAUSE PLAINTIFFS'
  PROPOSED CLAIM IS BARRED BY THE 3-YEAR STATUTE
  OF REPOSE APPLICABLE TO THIS CASE...............................................14

  A.  The 3-Year Statute of Repose, Measured from the Alleged
    "Violation" of the Exchange Act, Has Long Since Expired.....................15

  B.  Plaintiffs Cannot Relate Back Their CAC II
    To a Complaint that Was Dismissed Against Deloitte .............................16

II.  AMENDMENT WOULD BE FUTILE BECAUSE PLAINTIFFS'
  CLAIMS ARE ALSO BARRED BY THE 1-YEAR STATUTE
  OF LIMITATIONS.....................................................................................22

  A.  The CAC Was Time-Barred When Filed................................................22

    1.  The CAC Does Not Relate Back
      to the December 1, 2000 Motion ................................................22

    2.  The CAC Establishes that the Facts It Alleges as to
      Deloitte Were a Matter of Public Record More Than
      One Year Before It Was Filed ....................................................23

  B.  The CAC II Is Also Independently Barred by the 1-Year
    Statute of Limitations............................................................................28

**TABLE OF CONTENTS**

Page

1.  The Statute of Limitations Commenced Running
    Before Completion of Document Discovery ...................................28

2.  This Motion Was Filed More Than One Year After
    Production of Deloitte's Priceline and WebHouse
    Working Papers in October 2005...................................................29

III.  AMENDMENT WOULD BE FUTILE BECAUSE PLAINTIFFS
      DO NOT PLEAD ALLEGATIONS SUFFICIENT TO SUPPORT
      THE REQUIRED STRONG INFERENCE OF SCIENTER
      AGAINST DELOITTE...........................................................................34

  A.  The CAC II Fails to Plead that Deloitte Had Any Motive to
      Commit Securities Fraud .........................................................35

  B.  The CAC II Fails to Plead Facts That Constitute Strong
      Circumstantial Evidence of Conscious Misbehavior or
      Recklessness ............................................................................37

    1.  The Allegations Concerning the Valuation of the
        WebHouse Warrant Do Not Support a Claim of
        Scienter Against Deloitte ...............................................38

    2.  Disclosure of the Accounting for the WebHouse
        Warrant Precludes Any Inference of Scienter ..............41

    3.  The Allegations Concerning the Accounting for the
        WebHouse Warrant Do Not Support the Required
        "Strong Inference" of Scienter.......................................43

CONCLUSION.................................................................................................50

# TABLE OF AUTHORITIES

## CASES

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ..............................................21, 37

*Adams v. Intralinks, Inc.*, No. 03 Civ. 5384, 2004 WL 1627313
    (S.D.N.Y. July 20, 2004) ..............................................29

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MD 1529,
    2005 WL 1278544 (S.D.N.Y. May 31, 2005) ..............................................21, 33

*Anish v. Priceline.com, Inc.*, No. 3:00CV1948 (D. Conn. Oct. 11, 2000)..............................................26

*Barron-Baca v. Shoemaker*, No. 04-1150, 2004 WL 2730121
    (10th Cir. Dec. 1, 2004), cert. denied, 544 U.S. 951 (2005)..............................................18

*Baur v. Powerscreen USA, LLC*, No. 04-CV-890, 2005 WL 1958357
    (S.D. Ill. 2005) ..............................................19

*Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007) ..............................................21

*Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402 (2d Cir. 1975)..............................................28

*Bost v. Fed. Express Corp.*, 372 F.3d 1233 (11th Cir. 2004),
    *cert. denied*, 543 U.S. 1020 (2004)..............................................18

*Bove v. New York City*, No. 99-9181, 2000 WL 687720 (2d Cir. May 24, 2000)..............................................14

*Cerelli v. Priceline.com, Inc.*, No. 3:00CV1918 (D. Conn. Oct. 5, 2000)..............................................9, 26, 27

*Chico-Velez v. Roche Prods.*, 139 F.3d 56 (1st Cir. 1998) ..............................................18

*Chill v. Gen. Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) ..............................................34, 42

*Concerned Citizens of Belle Haven v. Belle Haven Club*, No. 3:99CV1467,
    2002 WL 32124959 (D. Conn. Oct. 25, 2002) ..............................................22

*In re Corning, Inc. Sec. Litig.*, No. 04-2845-CV, 2005 WL 714352 (2d Cir. Mar. 30,
    2005), *aff'g*, No. 01-CV-6580, 2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004) ..............................................37

*Cornwell v. Robinson*, 23 F.3d 694 (2d Cir. 1994)..............................................21

*Crystal v. Foy*, 562 F. Supp. 422 (S.D.N.Y. 1983)..............................................38

*Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111 (2d Cir. 1982) ..............................................36, 37, 38

*DiLauria v. Power Auth. of N.Y.*, 982 F.2d 73 (2d Cir. 1992)..............................................23

iii

## TABLE OF AUTHORITIES

Page

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) .................................................. 38

*Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043 (S.D.N.Y. Jan. 18, 1996) ............... 34, 36

*Elmore v. Henderson*, 227 F.3d 1009 (7th Cir. 2000) .................................................. 18, 19

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) .................................................... 33

*Feasby v. Industri-Matematik Int'l Corp.*, No. 99 CIV 8761, 2000 WL 977673
    (S.D.N.Y. July 17, 2000) ...................................................................... 38

*Fialkov v. Priceline.com, Inc.*, No. 3:00CV1954 (D. Conn. Oct. 11, 2000) ....................... 26

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249
    (S.D.N.Y. 2004) ............................................................................. 38, 42

*Friedl v. City of New York*, 210 F.3d 79 (2d Cir. 2000) ............................................ 21

*Fuqua v. Ernst & Young LLP*, No. 01-7974, 2002 WL 535085
    (2d Cir. Apr. 10, 2002) ...................................................................... 24

*Garfield v. J.C. Nichols Real Estate*, 57 F.3d 662 (8th Cir. 1995),
    *cert. denied*, 516 U.S. 944 (1995) .......................................................... 18

*In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) ................... 34

*Gouveia v. Sig Simonazzi N. Am., Inc.*, No. 3:03CV597, 2005 WL 293506
    (D. Conn. Jan. 11, 2005) ..................................................................... 21

*Green v. Robinson*, No. 01-4291, 2004 WL 2337051 (3d Cir. Oct. 13, 2004) ....................... 19

*Green v. Wolf Corp.*, 50 F.R.D. 220 (S.D.N.Y. 1970) ............................................... 22

*In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192 (E.D.N.Y. 1997) ......................... 34, 36

*Herman & MacLean v. Huddleston*, 495 U.S. 375 (1983) ............................................. 44

*Howard Gunty Profit Sharing Plan v. Priceline.com, Inc.*, No. 3:00CV1917
    (D. Conn. Oct. 5, 2000) .................................................................... 9, 26

*In re Hunter Envtl. Servs. Sec. Litig.*, 921 F. Supp. 914 (D. Conn. 1996) ....................... 38, 41

*Ingenito v. Bermec Corp.*, 441 F. Supp. 525 (S.D.N.Y. 1977) ..................................... 27

*In re Integrated Resources Real Estate Ltd. P'ships Sec. Litig.*, 815 F. Supp. 620
    (S.D.N.Y. 1993) ............................................................................. 28

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697 (2d Cir. 1994) .......... 16

# TABLE OF AUTHORITIES

<u>Page</u>

*Jewell v. County of Nassau*, 917 F.2d 738 (2d Cir. 1990) ...................................17

*Johnson v. Nyack Hosp.*, 86 F.3d 8 (2d Cir. 1996) .............................................17

*Johnson v. NYFIX*, 399 F. Supp. 2d 105 (D. Conn. 2005) ..................................43

*Jones v. Morton*, 195 F.3d 153 (3d Cir. 1999) ..................................................18

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) .................................................33

*Klein v. Bower*, 421 F.2d 338 (2d Cir. 1970) ....................................................28

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ..............................41

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148 (2d Cir. 2003) ........... *passim*

*LaRosa v. CPC Int'l, Inc.*, CIV. A. No. B-88-583, 1990 WL 128635
  (D. Conn. July 19, 1990) ...............................................................................21

*Lambert v. United States*, 44 F.3d 296 (5th Cir. 1995) .....................................18

*Lampf, Preva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991) ...................14, 15

*Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49 (D. Mass. 1995) ....................25

*In re Loral Space & Commc'ns Sec. Litig.*, No. 01 Civ. 4388, 2004 WL 376442
  (S.D.N.Y. Feb. 23, 2004) ..........................................................................36, 38

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) .................................................21

*Malhotra v. Equitable Life Assurance Soc'y of the United States*,
  364 F. Supp. 2d 299 (E.D.N.Y. 2005) ...........................................................16

*Mayer v. Priceline.com, Inc.*, No. 3:00CV1923 (D. Conn. Oct. 6, 2000) ...........26

*Mazzo v. Priceline.com, Inc.*, No. 3:00CV1924 (D. Conn. Oct. 6, 2000) ...........26

*McKenna v. City of Philadelphia*, Nos. 98-5835, 99-1163,
  2007 WL 1462229 (E.D. Pa. May 15, 2007) ................................................18, 20

*Medhekar v. U.S. Dist. Court for the N. Dist. of Cal.*, 99 F.3d 325 (9th Cir. 1996) ..................28

*Mendez v. Elliot*, 45 F.3d 75 (4th Cir. 1995) ...................................................18

*Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993) ...............................................23

*Middle Atl. Utils. Co. v. S.M.W. Dev. Corp.*, 392 F.2d 380 (2d Cir. 1968) ..................22

## TABLE OF AUTHORITIES

Page

*Miranda v. Costco Wholesale Corp.*, No. 96-35599, 1999 WL 49109
    (9th Cir. Feb 2, 1999) .......................................................................................18

*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002) ...................................27

*In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976, 2007 WL 625533
    (N.D. Ill. Feb. 23, 2007) .............................................................................18, 20

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ..................................................34, 42

*P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004) ..........................15

*Patel v. United States*, No. 02-15642, 2003 WL 245205 (9th Cir. Jan. 30, 2003),
    *cert. denied*, 540 U.S. 881 (2003) ...............................................................18

*Phoenix Four, Inc. v. Strategic Resources Corp.*, No. 05 Civ. 4837,
    2006 WL 399396 (S.D.N.Y. Feb. 21, 2006) ....................................................16

*Podany v. Robertson Stephens, Inc.*, 350 F. Supp. 2d 375 (S.D.N.Y. 2004) ...........28

*In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. 2d 232 (S.D.N.Y. 2006) .............34, 36

*Porat v. Lincoln Towers Cmty.*, 464 F.3d 274 (2d Cir. 2006) .................................21

*Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999) ........................34

*In re Priceline.com Inc. Sec. Litig.*, 342 F. Supp. 2d 33 (D. Conn. 2004) ....4, 39, 40, 43

*Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F. Supp. 658 (S.D.N.Y. 1987) ......27

*Rahr v. Grant Thornton LLP*, 142 F. Supp. 2d 793 (N.D. Tex. 2000) ........................27

*Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003 (S.D. Cal. 2000),
    *aff'd sub nom. DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385
    (9th Cir. 2002) ..............................................................................................36

*Reisman v. KPMG LLP*, 965 F. Supp. 165 (D. Mass. 1997) ..................................27

*Richardson v. U.S. News & World Report, Inc.*, 639 F. Supp. 595 (D.D.C. 1986) ......41

*Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. 386 (1869) .......................................33

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) .............................................4, 15, 23, 36

*SEC v. Price Waterhouse*, 797 F. Supp. 1217 (S.D.N.Y. 1992) ...........................36, 42

*S.S. Silverblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Hous. Dev. Fund Co., Inc.*,
    608 F.2d 28 (2d Cir. 1979) ...........................................................................22

vi

# TABLE OF AUTHORITIES

Page

*In re Salomon Analyst Winstar Litig.*, No. 02 Civ. 6171, 2006 WL 510526
(S.D.N.Y. Feb. 28, 2006)................................................................14

*Seiden v. Butcher*, 458 F. Supp. 81 (S.D.N.Y. 1978) ...............................38

*Shah v. Meeker*, 435 F.3d 244 (2d Cir. 2006)...........................................4

*Shepherd v. Wellman*, 313 F.3d 963 (6th Cir. 2002) ................................18

*Slavin v. Morgan Stanley & Co., Inc.*, 791 F. Supp. 327 (D. Mass 1992)....................27

*Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52 (D.C. Cir. 1987) .............18

*State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843 (2d Cir. 1981) .............22

*In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216
(E.D.N.Y. 2002)................................................................18, 20, 21

*Stevelman v. Alias Research, Inc.*, 174 F.3d 79 (2d Cir. 1999) ...............38, 42

*Twardy v. Priceline.com, Inc.*, No. 3:00CV1884 (D. Conn. Oct. 2, 2000)...............9, 25

*United States v. Hussein*, 178 F.3d 125 (2d Cir. 1999) ..............................23

*Wallace v. New York City Dep't of Corr.*, No. 02-0259,
2004 U.S. App. LEXIS 24077 (2d Cir. Nov. 18, 2004).......................14

*Warren v. Garvin*, 219 F.3d 111 (2d Cir. 2000) .....................................17

*In re Wellcare Mgmt. Group, Inc. Sec. Litig.*, 964 F. Supp. 632 (N.D.N.Y. 1997)................41

*Whitlock Corp. v. Deloitte & Touche, L.L.P.*, 233 F.3d 1063 (7th Cir. 2000)..............25

*Whittaker v. Northern Illinois Univ. Bd. of Trs.*, No. 00 C 50447,
2002 WL 992660 (N.D. Ill. May 14, 2002) ....................................19

*Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555 (2d Cir. 1985)..............21

*Zeigan v. Blue Cross & Blue Shield of Greater New York*, 607 F. Supp. 1434
(S.D.N.Y. 1985)................................................................22

*Zia v. Priceline.com, Inc.*, No. 3:00CV1987 (D. Conn. Oct. 13, 2000) ..............26

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001) .................41

*Zucker v. Sasaki*, 963 F. Supp. 301 (S.D.N.Y. 1997) ...........................38, 41

vii

# TABLE OF AUTHORITIES

Page

## STATUTES

15 U.S.C. § 77z-1(b)(1) ............................................................................28

15 U.S.C. § 78i(e) ....................................................................................15

15 U.S.C. § 78j(b) (2007) .........................................................................33

15 U.S.C. § 78u-4(b)(2) ............................................................................33

Section 9(e) of the Securities Exchange Act .................................................14

Section 10(b) of the Securities Exchange Act ............................................21, 33


## RULES

Fed. R. Civ. P. 9(b) ..................................................................2, 11, 33, 37, 38

Fed. R. Civ. P. 15 ...........................................................................16, 17, 20, 21

Fed. R. Civ. P. 15(c) ..............................................................................21, 22

Fed. R. Civ. P. 15(c)(2) ...........................................................................16, 17

Fed. R. Civ. P. 15(c)(3) ...........................................................................20, 21

Fed. R. Civ. P. 45 ..................................................................................12, 17

## MISCELLANEOUS

Codification of Statements on Auditing Standards § 333.01 .............................47

Codification of Statements on Auditing Standards § 333.09 .............................49

Codification of Statements on Auditing Standards § 333.16 .............................47

Codification of Statements on Auditing Standards § 336.06 ..............................7

Codification of Statements on Auditing Standards § 336.07 ..............................7

8 James WM. Moore et al., Moore's Federal Practice ¶ 41.50(7)(b) (3d ed. 2006) .....................18

Deloitte & Touche LLP ("Deloitte") respectfully submits this Opposition to plaintiffs' motion (the "Motion") for leave to file a second amended complaint (the "CAC II"), which seeks to assert a securities fraud claim against Deloitte under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), based on Deloitte's audit of the 1999 financial statements of priceline.com ("Priceline"). The 1999 financial statements were allegedly misstated with respect to the accounting for a warrant to purchase shares of Priceline WebHouse Club, Inc. ("WebHouse"). Deloitte, which served as Priceline's auditor, opposes the Motion on the grounds that the CAC II suffers from multiple time bars and other fatal defects, and the proposed amendment would, accordingly, be futile.

## Preliminary Statement

Plaintiffs here claim that a warrant issued by WebHouse to Priceline in 1999 was overvalued, because the business model of WebHouse allegedly was not working and WebHouse would never be a viable entity. Priceline and its insiders allegedly knew this, but continued to paint an unduly rosy picture of Priceline and WebHouse over several months during the year 2000.

In 2001, more than a year after suing Priceline, plaintiffs sued Deloitte based on Deloitte's report on Priceline's 1999 financial statements. Judge Squatrito dismissed the complaint as against Deloitte in 2004, finding no "strong inference" of scienter as to Deloitte, in part because plaintiffs failed to plead facts to show that Deloitte had any reason to cast aside an independent valuation of the WebHouse warrant. Judge Squatrito dismissed "*without* prejudice" under the Private Securities Litigation Reform Act (the "Reform Act") and Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). In light of the present Motion, it is particularly significant that the 2004 dismissal should have been "*with* prejudice," because the 2001 claim against Deloitte was already time-barred when it was filed – it was not dismissed on statute of limitations grounds

1

because of the erroneous application of a "relation back" theory, which had been squarely

rejected by the Second Circuit following submission of Deloitte's motion to dismiss, but prior to

Judge Squatrito's decision.

Nearly three years later, having settled with all of the Priceline defendants,

plaintiffs now propose to add Deloitte back as a party through the proposed CAC II.  This

pleading comes *too late* under settled time limitations principles, including two *additional* time

bars that have become applicable since the 2004 dismissal as to Deloitte.  It also offers *too little*

to support the "strong inference" found lacking by Judge Squatrito in 2004.

Amendment should be denied as futile because the proposed claim is deficient as

a matter of law on three independent grounds:

*First, the three-year statute of repose (Point I, pp. 14-21, infra):*

- The statute of repose cuts off claims three years from the date of an alleged
  violation.  If the plaintiff files a claim within that time and the claim is
  dismissed – *even if the dismissal is without prejudice* – the dismissed claim is
  treated as a nullity (both for purposes of the statute of repose and the statute of
  limitations), as if the dismissed claim had never been filed.  The running of
  the period is not interrupted by the filing or pendency of the dismissed action.

- Here, although plaintiffs asserted a claim against Deloitte in the CAC, once
  that claim was dismissed the effect of that filing was wiped out – as if the
  claim against Deloitte had never been filed.  Accordingly, the statute of repose
  became and remains an absolute bar to the filing of any claim against Deloitte
  in 2007.

- The Supreme Court and the Second Circuit have held that the statute of repose
  is not subject to equitable tolling of any kind.  While plaintiffs suggest in their
  memorandum that their proposed CAC II could somehow "relate back" to
  their filing of the CAC, they fail to acknowledge the controlling decisions of
  the Second Circuit, not to mention every other Circuit, that have addressed
  this issue, all of which hold that an amended pleading cannot "relate back" to
  a complaint that has been dismissed.  A dismissed claim has no more status
  for time bar purposes than a claim that was never filed.

2

*Second, the one-year statute of limitations (Point II, pp. 22-34, infra):*

- Judge Squatrito accepted an argument that plaintiffs could avoid a time bar under the one-year statute of limitations by "relating back" their CAC to a prior motion that made no mention of Deloitte or of any claim against Deloitte. In doing so, the Court overlooked *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148 (2d Cir. 2003).[1] In *LC Capital*, the Second Circuit rejected just such a "relation back" argument as "extravagant," and affirmed dismissal of a claim akin to plaintiffs' here that was similarly time-barred. Plaintiffs' Motion is silent as to *LC Capital*.

- If Judge Squatrito had applied *LC Capital*, the Court would have dismissed Deloitte out of this case on statute of limitations grounds as well as for failure to plead scienter. Plaintiffs cannot avoid the time bar because the CAC is based upon facts that it affirmatively admits were in the public domain more than a year before plaintiffs filed the CAC on October 29, 2001. Accordingly, the claim that the CAC asserted against Deloitte is time-barred under the 1-year statute of limitations.

- The proposed CAC II would be time-barred under the 1-year statute of limitations for additional and independent reasons. Because the new allegations of the CAC II are based principally on Deloitte's working papers for the Priceline and WebHouse audits, which Deloitte produced in July and October 2005, the 1-year statute of limitations ran again in October 2006, making the proposed claim doubly time-barred under the 1-year statute.

*Third, Judge Squatrito dismissed the CAC against Deloitte for the failure to plead scienter, and plaintiffs fail to plead any new facts that would support a different result for the proposed CAC II (Point III, pp. 34-50, infra):*

- *The CAC II adds nothing to show that Deloitte should have cast aside the independent valuation for the warrant:* The proposed amendment fails to plead facts to support the required "strong inference" that Deloitte committed securities fraud. As Judge Squatrito held in connection with the CAC, the CAC II pleads "nothing" to show how Deloitte was supposed to cast aside an independent valuation of the WebHouse warrant.

- *The CAC II acknowledges that the transaction was disclosed:* All the terms of the warrant transaction and Priceline's accounting for the transaction were publicly disclosed, so plaintiffs' claim is reduced to nothing more than a dispute about how to apply technical accounting principles. Disclosure contradicts any inference of fraudulent intent because disclosure is the opposite of fraud. Accordingly, as Judge Squatrito held in dismissing the

---

1. The Second Circuit issued its decision in *LC Capital* after the briefing on Deloitte's motion to dismiss, so Deloitte submitted the new authority to this Court in a supplemental submission dated February 14, 2003.

CAC against Deloitte, "the nature of the alleged accounting irregularities themselves do not give rise to an inference of scienter." *In re Priceline.com Inc. Sec. Litig.*, 342 F. Supp. 2d 33, 57, 58 (D. Conn. 2004).

- *The CAC II acknowledges that Deloitte consulted and confirmed the parties' intent*: Plaintiffs' own allegations in the CAC II, including the audit working papers to which the CAC II refers, demonstrate that Deloitte's engagement team considered the applicable accounting principles for the WebHouse warrant, cleared the proposed accounting with Deloitte's National Office accounting research group, and obtained multiple oral and written confirmations of the intent of Priceline and WebHouse in entering into the transaction. Accordingly, the documents incorporated by the CAC II contradict any claim of fraudulent intent and this pleading is just as deficient as its predecessor, which Judge Squatrito dismissed nearly three years ago.

For each of these three independent reasons, the proposed claim is deficient as a matter of law, further amendment would be futile, and the Motion should therefore be denied.

## STATEMENT OF FACTS

The following factual summary is drawn from the CAC, the CAC II, the Declaration of William R. Maguire ("Maguire Decl."), submitted herewith, and other materials from the record in this litigation of which the Court may take judicial notice on the present Motion.[2]

### Priceline, WebHouse and the WebHouse Warrant

Priceline was a pioneer in internet marketing, with its "Name Your Own Price" model allowing customers to set the price for goods and services, such as airline tickets. (CAC II ¶¶ 2, 14.) It commenced its service in April 1998 and first offered its shares to the public in April 1999. (Maguire Decl. Ex. A, Priceline 1999 Form 10-K, at Item 1, at 1.) By December 31,

---

2. *See Shah v. Meeker*, 435 F.3d 244 (2d Cir. 2006) (information reported in a single news article rendered claim time-barred); *LC Capital*, 318 F.3d at 157 (public documents considered on motion to dismiss); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference as well as public disclosure documents required by law to be, and that have been, filed with the SEC and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.").

4

1999, it had an accumulated deficit in excess of $1 billion.  (*Id.* at 14.)  As stated in its 1999 annual report, its business model was "unproven" and dependent upon a host of uncertainties, and the company would "continue to incur losses" and might "never achieve profitability." (*Id.* at 14-17.)

### (i)     Warrant Related Accounting Issues

Priceline had granted warrants to major airlines to purchase Priceline stock over a period of time in order to provide Priceline access to airline tickets which was critical to the success in the airline sector of its business.  (*Id.* at Item 7, at 26-27.)  Although these warrant agreements typically did not require any future performance on the part of the airline, they nevertheless provided an incentive for the airline to do business with Priceline, because the warrants would have value only to the extent of Priceline's business success.  (*Id.*)

Priceline had extensive discussions with the SEC regarding the appropriate accounting for such warrant arrangements in connection with its initial public offering in early 1999.  The question was whether the anticipated cost to Priceline should be reported all at once (in the year the warrant agreement was entered into) or spread over the life of the agreement.



(*See* Maguire Decl. Ex. B, at D&T 0025590.) (*Id.* at Ex. C, D&T 0025552-58 & Ex. D, D&T 25520-29.)

Later in 1999, Priceline entered into similar arrangements with other major airlines, generally granting fully vested, non-forfeitable warrants, requiring no future

5

performance. Priceline immediately recognized the full expense on these warrants. (Maguire

Decl. Ex. A, Priceline 1999 Form 10-K, Item 7, at 25.) In total, Priceline recognized over one

billion dollars in warrant expense in fiscal year 1999. (*Id.*, Statements of Cash Flows, at 46.)

The accounting considerations used by Priceline for the airline warrants

established a framework for the accounting consideration of the WebHouse warrant.

### (ii)    WebHouse and the WebHouse Warrant

In 1999, Priceline founder Jay Walker conceived WebHouse as an internet

grocery store using the Priceline business model. (*Id.* at Item 1, at 1.) Drawing on the airline

warrant experience, WebHouse granted Priceline a warrant to purchase WebHouse stock. (*Id.* at

Item 7, at 25; Ex. 10.22.4.) On October 26, 1999, at the same time that Priceline received the

WebHouse warrant, Priceline agreed to license to WebHouse certain of its technology and

business methods and provide WebHouse marketing, technical, and other services. (*Id.* at Note

11 & Exs. 10.22.2, 10.22.3, 10.22.5.) Priceline obtained the WebHouse warrant and the parties

represented to Deloitte that they intended that the warrant would require no further performance

by Priceline. (*See* Section III.B.3, *infra.*) Consistent with its discussions with the SEC regarding

the Delta warrant, Priceline recognized the entire value of the WebHouse warrant for the fiscal

year ended 1999.

The facts about the WebHouse warrant, including its value, its accounting, and

the exact financial effect on Priceline's financial statements, were fully disclosed in Priceline's

1999 Form 10-K. (*See, e.g.*, Maguire Decl. Ex. A, Priceline 1999 Form 10-K, Item 7 at 25,

Statements of Cash Flows at 46, Note 11 at 57, Exs. 10.22.2 & 10.22.4.) Priceline also disclosed

that "[u]nless and until that warrant is exercised, WebHouse Club and its financial results will

6

not be included in priceline.com's financial statements." (CAC II ¶ 108, *quoting* Priceline 1999 Form 10-K.)

The value recognized for the WebHouse warrant was supported by a valuation of an independent expert and the investment decisions of sophisticated institutional and individual investors, who, during 1999 and 2000, invested hundreds of millions of dollars in WebHouse. The valuation performed by an independent expert valuation firm, Murray Devine & Co. ("Murray Devine"), appraised the value of the WebHouse warrant at $189 million as of November 1, 1999.[3] (CAC II ¶ 109; Maguire Decl., Ex. A, Item 7, at 25; Maguire Decl. Ex. F, D&T 0000429-45.) Deloitte reviewed the Murray Devine valuation with Deloitte's Capital Markets Group personnel, who considered the qualifications of the Murray Devine firm, transactions with sophisticated investors supporting the value of WebHouse stock, the terms of the warrant agreement, and the valuation analysis that Murray Devine performed. (Maguire Decl. Ex. G, D&T 0000446.) Deloitte also considered Murray Devine's updated valuation work as of December 31, 1999, and as of March 31, 2000. (Maguire Decl. Ex. H, D&T 0000447-54 (finding no change in value at year-end); Maguire Decl. Ex. I, D&T 0000458-65 (finding that the value of the warrant had increased to $248 million at March 31, 2000).)

The value of the warrant was also supported by purchases of WebHouse stock. In October 1999, private investors purchased $69.5 million of WebHouse stock at $3.00 per share. In April 2000, private investors purchased an additional $138 million of WebHouse stock at $4.50 per share. (CAC II ¶ 186, 222, 230; Maguire Decl. Ex. J, *Wall Street Journal* article dated Oct. 16, 2000 (quoted in part at CAC II ¶ 222).) These sophisticated private investors included:

_____

3. The professional auditing standards expressly provide guidance on an auditor's reliance on a valuation by an independent specialist where the auditor encounters "complex or subjective matters potentially material to the financial statements," including the valuation of restricted securities in areas beyond the auditor's expertise. (Maguire Decl., Ex. E, Codification of Statements on Auditing Standards ("AU") § 336.06, 336.07.)

- Goldman Sachs;

- Securities lawyer Andrew Klein's Wit Capital, the first web-based investment bank;

- Microsoft founder Paul Allen's Vulcan Ventures; and

- Cable television magnate John Malone's Liberty Media Corporation.

(*Id.*) Similarly, in the first two rounds of financing, Jay Walker personally invested $135 million in WebHouse, and as late as August 2000 – more than four months after Priceline issued its 1999 year-end financial statements – Walker invested an additional $125 million in WebHouse. (*Id.*)

### (iii)    Failure of WebHouse

On September 15, 2000, WebHouse announced job cuts. (CAC II ¶ 199.) On October 5, 2000, WebHouse issued a press release announcing that it would wind-down its operations, despite its $50 million in cash reserves and an additional $20 million in working capital, because it would be unlikely to raise necessary additional capital, "[i]n light of the weakness of the current capital market environment." (CAC II ¶ 208.) The same day, Priceline announced the write-off of the WebHouse warrant. (CAC II ¶ 209.)

### Year 2000 Complaints

The first complaint in these consolidated class actions was filed on October 2, 2000. *See Twardy v. Priceline.com, Inc.*, No. 3:00CV1884 (D. Conn. Oct. 2, 2000). On October 5, 2000, plaintiffs' lead counsel, Schatz & Nobel, Stull, Stull & Brody, and Scott & Scott, filed two complaints on behalf of Priceline investors. *See Cerelli v. Priceline.com, Inc.*, No. 3:00CV1918 (D. Conn. Oct. 5, 2000); *Howard Gunty Profit Sharing Plan v. Priceline.com, Inc.*, No. 3:00CV1917 (D. Conn. Oct. 5, 2000). In total, plaintiffs would file 23 related class actions. Named as defendants were Priceline, its founder Jay S. Walker, former director N.J. Nichols, former President and CEO Daniel H. Schulman, and former Chairman of the Board

8

Richard S. Braddock (collectively, the "Priceline Defendants"). The plaintiffs alleged that,

during the Class Period, the Priceline Defendants made a "barrage" of false and misleading

statements relating to the Priceline business model, Priceline's ability to attain profitability, and

the viability of WebHouse and the WebHouse warrant.

### The December 1, 2000 Motion and "Relation Back"

Deloitte was not named as a defendant in the year 2000 complaints, and plaintiffs

made no effort to add Deloitte as a party until more than a year after they were filed. When

plaintiffs eventually sued Deloitte in 2001, they argued that they could avoid the one-year time-

bar under the statute of limitations by relating their CAC back to a motion filed on December 1,

2000 (the "December Motion").

Although plaintiffs still point to the December Motion as the centerpiece of their

"relation back" argument (*see* Pls. Mem. at 15) – this routine procedural motion cannot fulfill

any such role: it was simply a motion to consolidate the class actions, to name the Lead

Plaintiffs, and to name their counsel as lead and liaison counsel. (Mot. for Consolidation of

Related Cases, Appointment of Lead Pls., and Approval of Lead Pls.' Selection of Counsel,

dated Dec. 1, 2000, at 1; Mem. in Support at 2.) Plaintiffs also requested that they be permitted

to file a "consolidated amended complaint covering the entire class period." (December Motion

at 3.) Nowhere in the December Motion – which did not include a proposed amended complaint

– was there any mention of Deloitte or suggestion that Deloitte (or any other party) would be

added as a defendant. Nor did plaintiffs serve Deloitte with the December Motion.[4]

---

4.  On September 12, 2001, the Court issued an Order granting plaintiffs' motion, and thereby consolidated the 23
    related actions, appointed the movants lead plaintiffs, and appointed their counsel as lead and liaison counsel.
    (Order dated Sept. 12, 2001, ¶¶ 1, 12-14.) Like the December Motion, this Order makes no reference to adding
    claims against Deloitte or other parties.

**The Consolidated Amended Complaint**

The first mention of Deloitte as a defendant occurred on October 29, 2001, when plaintiffs filed the CAC. The CAC is mostly a voluminous collection of items from the public record concerning Priceline over the course of the Class Period and beyond, including a multitude of alleged misrepresentations by the Priceline Defendants – a substantial portion of which occurred after the filing of Priceline's 1999 Form 10-K. The survey of the public record contained in the CAC fills about two hundred pages of pleading, and includes: dozens of press releases; Form 8-K, 10-Q, and 10-K filings; a "barrage" of public statements made by Priceline through the news media (including television, newspapers, and other outlets); and announcements made by company spokespeople and officials at Priceline-sponsored conferences and events. (CAC ¶¶ 61, 64, 66, 68, 69, 71-75, 98-115, 118-124, 127, 128, 131-140, 143-146.) Additionally, plaintiffs allege that Priceline imposed its "imprimatur" on an array of analysts' reports and "actively utilized" such reports to disseminate false information. (CAC ¶ 238.)

As in the proposed CAC II, the only allegedly false statement attributed to Deloitte in the CAC is its report on Priceline's 1999 financial statements, which was included in Priceline's 1999 Form 10-K filed on March 30, 2000.

**Deloitte's Motion to Dismiss**

Deloitte moved to dismiss the CAC on the grounds that plaintiffs' claim against Deloitte was barred under the one-year statute of limitations applicable to this case and that the allegations were insufficient under the Reform Act and Rule 9(b) for failure to establish a "strong inference" of scienter on the part of Deloitte. The plaintiffs took the position (repeated in the present Motion) that claims against Deloitte could be deemed to "relate back" to the December Motion, even though it had no connection to Deloitte.

10

While Deloitte's Motion to Dismiss was pending, the Second Circuit decided *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148 (2d Cir. 2003), squarely holding that an amendment naming a new party defendant cannot "relate back" to a filing in which the party was not named. Accordingly, on February 14, 2003, Deloitte filed a notice of supplemental authority with the Court.

On October 7, 2004, Judge Squatrito granted Deloitte's motion to dismiss, holding that the CAC failed to plead scienter against Deloitte. Without referring to *LC Capital*, the Court stated that the CAC could be deemed to relate back to the December Motion. Accordingly, the CAC could be deemed timely despite the passage of more than one year following plaintiffs' discovery of the underlying facts. It is respectfully submitted that the ruling on the application of the statute of limitations was in conflict with *LC Capital*, and was incorrect.

**Discovery**

Realizing the extraordinary passage of time in this case, plaintiffs strive to deny that they allowed their claims against Deloitte to languish for years while they pursued the Priceline Defendants, citing selected events during the discovery process. (*See* Perkinson Decl. at ¶¶ 14-59; Pls. Mem. at 5-8.) In fact, details of the discovery process are beside the point where both the one year statute of limitations *and* the three year statute of repose expired during the long periods of inaction by plaintiffs. Moreover, as set forth in the Maguire Declaration and summarized in the following paragraphs, plaintiffs' selective account omits to mention the most important points, including that plaintiffs have had Deloitte's Priceline and WebHouse audit working papers since October 2005 at the latest.

On July 18 and October 28, 2005, following negotiated and judicially-ordered narrowing of plaintiffs' subpoena, issued pursuant to Federal Rule of Civil Procedure 45 ("Rule

11

45"), Deloitte completed production of its 1999 and 2000 audit working papers relating to Priceline, WebHouse, and another entity related to Priceline, Priceline Perfect YardSale. (Maguire Decl. ¶¶ 42, 46.) This body of material contains extensive information about the review of and accounting for the WebHouse warrant, and is used as the basis for the claim against Deloitte now asserted in the CAC II. Instead of addressing the fact that more than 18 months then passed with no action being commenced, the present Motion refers instead to disputes over trivial matters that should have been resolved without the pointless "motions to compel" filed by plaintiffs.[5]

Although plaintiffs try to portray themselves as diligent and Deloitte as recalcitrant during discovery, this is a gross distortion of what occurred. Following the ineffectual motion practice in late 2005, plaintiffs did not contact Deloitte with respect to any outstanding document issues (*id.* ¶ 50), while Deloitte prepared for production the remainder of its responsive hard copy and electronic documents, primarily relating to tax work performed for

---

5.  The motion practice did not involve any documents mentioned in the CAC II; rather, it merely involved privilege disputes between plaintiffs and the Priceline Defendants. For example, on September 15, 2005, plaintiffs moved to compel production of nine documents withheld on a fully disclosed basis from the July 18, 2005 production at the request of counsel for Priceline, which was considering the assertion of a privilege. Deloitte took no position on whether or not the documents were privileged. (Maguire Decl. ¶ 43.) Soon thereafter, Priceline withdrew any privilege claim and the documents were immediately produced. (Maguire Decl.¶ 44.) On October 11, 2005, plaintiffs withdrew their motion as "moot," a result that could have been reached through discussions among counsel.

Similarly, Deloitte withheld two documents from a production on October 28, 2005 pursuant to Priceline counsel's assertion of privilege. (Maguire Decl. ¶ 47.) Upon further review, Priceline's counsel determined that it would assert privilege with respect to only one of the two documents, and Deloitte promptly produced the non-privileged document to plaintiffs. (*Id.* ¶ 48.) On December 14, 2005, plaintiffs moved to compel production of the remaining withheld document. In its response, Deloitte advised the Court that it had no stake in the outcome of this motion, that it was taking no position as to the merits of the claim of privilege, and that it would produce or continue to withhold the document as directed by the Court. (Deloitte & Touche LLP's Mem. in Resp. to Pls. Mot. to Compel.) The Court denied plaintiffs' motion to compel on May 30, 2006. (Order denying Sealed Mot.)

Priceline, WebHouse, and Perfect YardSale.[6] On multiple occasions in July and August 2006, Deloitte attempted to contact plaintiffs' counsel with respect to the documents it had prepared for production. (*Id.* ¶ 51.) After not hearing back from plaintiffs' counsel, on August 7, 2006, Deloitte sent a letter advising plaintiffs that they may inspect the documents, and that Deloitte believed that with this production it had fulfilled its obligations under the subpoena. (*Id.*) On August 24, 2006, plaintiffs' vendor picked up the documents for scanning. (*Id.*) Again, although the present Motion mentions a relatively trivial matter relating to recovery of electronic data requiring "special technical skills" (Pls. Mem. at 8), this represents another instance where it was Deloitte rather than plaintiffs moving the process forward.[7]

Finally, while the present Motion states that the "most incriminating" documents were in the "last batch" produced in the summer of 2006 (Pls. Mem. at 8), the reality, set forth in detail in Point III below, is that there was nothing "incriminating" at all, and that the significant facts sought to be added in the CAC II (including most of the documents referenced), have been known to plaintiffs since October 2005 at the latest.

---

6. Deloitte also identified on its servers and prepared for production additional drafts of audit and audit-related documents for fiscal year 1999 relating to Priceline, WebHouse, and Perfect YardSale. (Maguire Decl. ¶ 50.)

7. Deloitte advised plaintiffs that it was unable to access and produce data from two floppy diskettes, and suggested that the parties consider the use of a third party vendor. On August 17, 2006, plaintiffs recommended eDiscovery, Inc. (Maguire Decl. ¶ 52.) When this vendor informed Deloitte that it could not perform the work, Deloitte requested that plaintiffs recommend another vendor. (*Id.*) On September 22, plaintiffs recommended eMag Solutions, and provided Deloitte with contact information for this vendor on October 5. On October 6, Deloitte advised plaintiffs that it was not familiar with this vendor's experience with recovery of data from floppy disks. (*Id.*) Plaintiffs made no response, and dropped the matter. On March 16, 2007, in light of scheduled depositions of Deloitte witnesses, Deloitte again raised the issue of the floppy disks and proposed a vendor and recovery protocol. (*Id.* ¶ 54.) On March 20, plaintiffs raised certain questions with respect to the disks and the vendor. (*Id.*) Deloitte responded on March 26, and again asked plaintiffs to confirm their agreement on the recovery protocol. (*Id.*) Plaintiffs never responded. (*Id.*)

## ARGUMENT

It is well settled that an amendment to a pleading is futile if the proposed claim would be barred by the statute of limitations or if it fails to plead scienter.[8]  As set forth below, the proposed claim against Deloitte would be subject to dismissal on no less than three independent grounds:  (i) the three-year statute of repose; (ii) the one-year statute of limitations; and (iii) continued failure to plead a "strong inference" of scienter.

**I.      AMENDMENT WOULD BE FUTILE BECAUSE
         PLAINTIFFS' PROPOSED CLAIM IS BARRED BY THE
         3-YEAR STATUTE OF REPOSE APPLICABLE TO THIS CASE**

Congress enacted both a 3-year statute of repose and a 1-year statute of limitations for securities fraud claims.  In *Lampf, Preva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991), the Supreme Court held that the applicable periods are set forth in Section 9(e) of the 1934 Act, which provides as follows:

> No action shall be maintained to enforce any liability created under
> this section, unless brought within one year after the discovery of
> the facts constituting the violation and within three years after such
> violation.

15 U.S.C. § 78i(e).  Commenting on this "1-and-3-year structure," the Court explained that the "3-year limit is a period of repose."  501 U.S. at 363; *see also Rothman v. Gregor*, 220 F.3d 81, 97 n.1 (2d Cir. 2000) (referring to the "cutoff" effect of the statute of repose).

---

8.    *See Wallace v. New York City Dep't of Corr.*, No. 02-0259, 2004 U.S. App. LEXIS 24077, *3 (2d Cir. Nov. 18,
      2004) (affirming denial of motion to amend where claim barred by statute of limitations); *Bove v. New York
      City*, No. 99-9181, 2000 WL 687720, at *1 (2d Cir. May 24, 2000) (where amended complaint did not relate
      back to original complaint and the new claims were time-barred, amendment would be futile); *In re Salomon
      Analyst Winstar Litig.*, No. 02 Civ. 6171, 2006 WL 510526, at *7 (S.D.N.Y. Feb. 28, 2006) (leave to amend
      denied where claim would be dismissed for failure to plead scienter).

14

**A.    The 3-Year Statute of Repose, Measured from the Alleged
       "Violation" of the Exchange Act, Has Long Since Expired**

Unlike a statute of limitations, a "statute of repose" runs without interruption or

"tolling" following the alleged violation and extinguishes any and all rights (not merely

remedies) upon expiration of the legislatively determined period.[9]  Thus, in *Lampf,* 501 U.S. at

364, the Supreme Court rejected any tolling of the 3-year period:

> The 3-year limit is a period of repose inconsistent with tolling.
> One commentator explains: "[T]he inclusion of the three-year
> period can have no significance in this context other than to
> impose an outside limit." *Because the purpose of the 3-year
> limitation is clearly to serve as a cutoff, we hold that tolling
> principles do not apply to that period.*

501 U.S. at 363 (emphasis added) (citations omitted).  The Second Circuit expressed the same

principle in *P. Stolz Family P'ship L.P. v. Daum,* 355 F.3d 92, 102-03 (2d Cir. 2004), stating as

follows:

> [A] statute of repose begins to run without interruption once the
> necessary triggering event has occurred, even if equitable
> considerations would warrant tolling or even if the plaintiff has not
> yet, or could not yet have, discovered that she has a cause of
> action.

*Accord Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.* 32 F.3d 697, 704 (2d Cir.1994)

("The three-year period is an absolute limitation which applies whether or not the investor could

have discovered the violation."); *Phoenix Four, Inc., v. Strategic Resources Corp.*, No. 05 Civ.

4837, 2006 WL 399396, at *6 (S.D.N.Y. Feb. 21, 2006) ("[A] statute of repose runs without

interruption once it is triggered and is not subject to equitable considerations."); *Malhotra v. The

Equitable Life Assurance Society of the United States*, 364 F. Supp. 2d 299, 305 (E.D.N.Y. 2005)

---

9.   As the Court stated in *P. Stolz Family P'ship L.P. v. Daum,* 355 F.3d 92, 102 (2d Cir. 2004):

> [S]tatutes of repose affect the availability of the underlying right:  That right is no longer available on the
> expiration of the specified period of time.  In theory, at least, the legislative bar to subsequent action is
> absolute, subject to legislatively created exceptions . . . set forth in the statute of repose.

(action commenced seven years after the alleged material omission was untimely; rejecting contention that intervening events could avoid the bar).

Here, the alleged "violation" asserted against Deloitte occurred on March 30, 2000 – the date of Priceline's 1999 Form 10-K filing, and any attempt to bring Deloitte back into this action runs afoul of the unconditional "cutoff" effect of the 3-year statute of repose. Realizing this, plaintiffs argue that the CAC II can "relate back" to the filing of the CAC under Federal Rule of Civil Procedure 15 ("Rule 15"). (Pls. Mem. at 15.) As set forth in the following paragraphs, this contention is refuted both by Rule 15 itself and by universally accepted law regarding its application to dismissals "without prejudice."

**B.      Plaintiffs Cannot Relate Back Their CAC II
          To a Complaint that Was Dismissed Against Deloitte**

Plaintiffs are incorrect in asserting that their CAC II can "relate back" to the CAC under Rule 15(c)(2). (Pls. Mem. at 15-17.) Their argument ignores the plain language of Rule 15, which does not permit the addition of new parties absent a mistake as to "identity" (which plaintiffs do not assert), and ignores the clear legal rule that precludes relation back to a dismissed complaint.

Plaintiffs cannot obtain any relief against Deloitte under Rule 15(c)(2) because, as they concede, that Rule applies to amendments "against *an existing party.*" (Pls. Mem. at 15; emphasis added.) Deloitte is not *an existing party.* Since 2004, when Judge Squatrito dismissed the CAC against Deloitte, the firm has been a non-party, as plaintiffs themselves have repeatedly acknowledged by issuing non-party subpoenas and notices seeking, in their words, "Non-Party" discovery from Deloitte and its personnel.[10] Accordingly, plaintiffs cannot avail themselves of

---

10.   Indeed, plaintiffs have taken full advantage of Deloitte's non-party status to obtain third party discovery. *See*
       Order dated June 15, 2005 (deciding plaintiffs' motion to compel "non-party" Deloitte to produce documents

relation back under Rule 15, because Deloitte is not an existing party as a result of this Court's dismissal of the CAC against Deloitte.

Plaintiffs argue that because it was "without prejudice," Judge Squatrito's dismissal "has no bearing" here. (Pls. Mem. at 15-16.)[11] In fact, it is well settled in the Second Circuit and every other Circuit that there can be no relation back to a dismissed complaint, even where dismissal was "without prejudice," and that all time-bar periods are computed as if the dismissed complaint had never been filed. Thus, in *Johnson v. Nyack Hospital*, 86 F.3d 8, 11 (2d Cir. 1996), the Second Circuit stated as follows:

> [W]here the action has been dismissed without prejudice, a plaintiff's subsequent court filing is vulnerable to a time-bar because the dismissal in and of itself does not halt the running of the limitations period, even though designated to be without prejudice.

*Accord Warren v. Garvin*, 219 F.3d 111, 114 (2d Cir. 2000) (relation back doctrine "inapplicable" following dismissal of initial claim "because there is no pleading to which to relate back"); *Jewell v. County of Nassau*, 917 F.2d 738, 740-41 (2d Cir. 1990) ("judicial stay of the pending suit, rather than dismissal . . . is the only means by which the bar of limitations may be avoided"); *In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 259-60 (E.D.N.Y. 2002) (rejecting relation back to dismissed complaint); *see also Elmore v. Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000) (dismissed action treated "as if it had never been filed"); *In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976, 2007 WL 625533, at *9 (N.D. Ill. Feb. 23, 2007); *McKenna v. City of Philadelphia*, Nos. 98-5835, 99-1163, 2007 WL 1462229, at *6 (E.D. Pa.

---

under a subpoena issued pursuant to Rule 45); Maguire Decl. Ex. K, Subpoena issued to Deloitte pursuant to Rule 45; Maguire Decl. Ex. L, Plaintiffs' "Notice of Deposition and Subpoena to Non-Party" (seeking to "take the deposition of Deloitte & Touche, LLP by [its members]").

11. Arguing that "a dismissal without prejudice has no bearing on the Rule 15(c)(2) [relation back] analysis where the defendant was named and served and the same claims were asserted in the original complaint." (*Id.* at 16.)

May 15, 2007); 8 James WM. Moore et al., Moore's Federal Practice ¶ 41.50(7)(b) (3d ed. 2006).[12]

     Plaintiffs' argument that Deloitte had obtained "notice" of the potential claims through the now-dismissed CAC is to no avail. (Pls. Mem. at 16-17.) If that were the case, *every* dismissed claim would provide such "notice." Plaintiffs' notice theory flies in the face of the decisions of the Second Circuit and the other courts, which have held that a dismissed complaint cannot support relation back.

     Equally lacking in merit is plaintiffs' apparent suggestion that their proposed claim might relate back to the December 1, 2000 Motion (Pls. Mem. at 15), despite the fact that this procedural motion had nothing to do with Deloitte and did not even provide "notice" of any claim against Deloitte. (*See* p. 9, *supra.*) Contrary to plaintiffs' contention, that motion did not "commenc[e] the action against Deloitte;" even if it had, the only action against Deloitte was dismissed in its entirety in 2004. Further, as set forth at pages 22-23, *infra*, relation back to the

---

12. All the Circuits are in accord that there can be no relation back to a dismissed action. *See Chico-Velez v. Roche Prods.*, 139 F.3d 56, 59 (1st Cir. 1998); *Jones v. Morton*, 195 F.3d 153, 160-61 (3d Cir. 1999) (where action dismissed without prejudice, complaint or petition "is treated as if it never existed"); *Mendez v. Elliot*, 45 F.3d 75, 78 (4th Cir. 1995) ("[t]he 'without prejudice' condition permits a plaintiff to refile the complaint as if it had never been filed [but does not grant] a right to refile without the consequence of time defenses, such as the statute of limitations.") (citation omitted); *Lambert v. United States*, 44 F.3d 296, 298 (5th Cir. 1995) ("the district court's order dismissing the [first] suit without prejudice left [the plaintiff] in the same position as if the first suit had never been filed."); *Shepherd v. Wellman*, 313 F.3d 963, 971 (6th Cir. 2002) ("[b]ecause plaintiffs' § 1983 claim was originally dismissed without prejudice, we treat it as though the statute of limitations continued to run."); *Elmore v. Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000); *Garfield v. J.C. Nichols Real Estate*, 57 F.3d 662, 666 (8th Cir. 1995), *cert. denied*, 516 U.S. 944 (1995) (following dismissal "it is as if no suit had ever been filed") (citation omitted); *Patel v. United States*, No. 02-15642, 2003 WL 245205 (9th Cir. Jan. 30, 2003), *cert. denied*, 540 U.S. 881 (2003); *Miranda v. Costco Wholesale Corp.*, No. 96-35599, 1999 WL 49109, at *1 (9th Cir. Feb 2, 1999) ("dismissal without prejudice leaves the plaintiff in the same position as though the action had never been brought . . ."); *Barron-Baca v. Shoemaker*, No. 04-1150, 2004 WL 2730121, at *2 (10th Cir. Dec. 1, 2004), *cert. denied*, 544 U.S. 951 (2005); *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004), *cert. denied*, 543 U.S. 1020 (2004) ("[d]ismissal of a complaint, without prejudice, does not allow a later complaint to be filed outside the statute of limitations.") (citation omitted); *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52 (D.C. Cir. 1987) ("[t]he pendency of an action involuntarily dismissed without prejudice does not operate to toll the running of the statute of limitations.") (citation and quotation marks omitted).

December Motion for any purpose is precluded by the Second Circuit's decision in *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir. 2003).

      The scant authorities cited by plaintiffs in support of relation back are plainly inapposite or incorrectly decided.  Thus, notwithstanding the Seventh Circuit's clear rejection of relation back to dismissed actions (*see Elmore v. Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000)), plaintiffs cite two unreported Illinois district court cases to try to support a contrary result.  (*See* Pls. Mem. at 16-17, citing *Whittaker v. Northern Illinois Univ. Bd. of Trustees*, No. 00 C 50447, 2002 WL 992660 (N.D. Ill. May 14, 2002) and *Baur v. Powerscreen USA, LLC*, No. 04-CV-890, 2005 WL 1958357, at *2 n.3 (S.D. Ill. 2005).)  However, *Whittaker* does not cite *any* authority, and *Baur* is inapposite because the defendant had not in fact been dismissed from the prior action.[13]

      Remarkably, *Whittaker* and *Bauer* failed to address controlling precedent to the contrary in their own Circuit.  Like the Second Circuit, the Seventh Circuit holds that, "a suit dismissed without prejudice is treated for statute of limitations purposes as if it had never been filed." *Elmore v. Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000) (citing the Second Circuit for the general rule that a defective filing is "wiped out" when the suit is dismissed).  Thus, "the statute of limitations is deemed to have continued running from whenever the cause of action accrued, without interruption by that filing." *Id.*

      Most recently, in *In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976, 2007 WL 625533 (N.D. Ill. Feb. 23, 2007), a district court in the Northern District of Illinois applied the correct relation back rule in a securities fraud action where (as in the present case) one defendant

---

13. Plaintiffs also cite *Green v. Robinson*, 112 Fed. Appx. 165, 2004 WL 2337051 (3d Cir. Oct. 13, 2004) (Pls. Mem. at 17), which actually rejected claimed relation back in the context of a "John Doe" pleading.  Read generously, the decision (designated "not precedential" by the Third Circuit) stands for the unremarkable proposition that lack of notice is fatal to a claim of relation back.

had been dismissed out while the action continued against the company. The court denied leave to add back the dismissed party, explaining that the "Seventh Circuit has squarely held" that when a suit is dismissed, the statute of limitations runs without interruption from when the claim originally accrued. *Id.* at *9. Where plaintiffs had not satisfied Rule 15(c)(3)'s requirement of a "mistake concerning the identity of the proper party," amendment to change a party was "not justifiable" under Rule 15. *Id.* at *10. This is certainly the case here, where plaintiffs do not even argue that they could satisfy the mistaken identity requirement. (Pls. Mem. at 15-16.)

Similarly, in *In re Sterling Foster*, 222 F. Supp. 2d at 259-62, Judge Spatt found no relation back where earlier securities fraud claims against the proposed defendants had been dismissed without prejudice. Where the statute of limitations had run following dismissal, Judge Spatt held that Rule 15's "mistaken identity" standard for adding new parties could not be satisfied because "plaintiffs clearly knew the identities of the [individual defendants] . . . . Indeed, they named the [individual defendants] in the First Amended Complaint." *Id.* at 261. *Accord McKenna v. City of Philadelphia*, 2007 WL 1462229, at *6 ("Because the individual defendants are no longer in this case, the effect of the proposed amendments will be to add additional parties and therefore Rule 15(c)(3) must be satisfied for those amendments to relate back.").

Plaintiffs acknowledge the special requirement of mistaken identity for relation back where, as here, an amendment would add a party to an action. (Pls. Mem. at 15 n.7.) Although plaintiffs quote the requirement, which is in Rule 15(c)(3), they do not purport to amend under Rule 15(c)(3), and do not even attempt to argue that they could satisfy its special requirement. (*Id.*, *quoting* Fed. R. Civ. P 15(c)(3).) Rule 15(c)(3) does not permit relation back of an amendment that changes the identity of a party against whom a claim is asserted unless

20

there is a showing of "mistake concerning the identity of the proper party."[14] Plaintiffs could not

make any "mistaken identity" argument here, where they have known from the beginning (it is a

matter of public record) that Deloitte was Priceline's auditor, and pleaded this fact in the CAC.[15]

     Because the 3-year statute of repose creates a fully dispositive time bar, with no

room for theories of "equitable tolling" or "relation back," amendment here would be futile.[16]

---

14. Rule 15's distinction between amendments that merely add claims against an *existing* party and amendments that assert claims against *a non-party* is fundamental, and it is uniformly held that an amendment seeking to add a party must satisfy Rule 15(c)(3). *E.g., In re Adelphia Communications Corp.*, No. 03 MD 1529, 2005 WL 1278544, at *15 (S.D.N.Y. May 31, 2005) (Rule 15(c) "sets forth two distinct standards . . . the application of which depends on whether new parties would be added to the litigation"); *Gouveia v. Sig Simonazzi N. Am., Inc.*, No. 3:03cv597, 2005 WL 293506, at *3 (D. Conn. Jan. 11, 2005) ("[W]hen an amendment seeks to add a party, . . . the proponent of the amendment must comply with the requirements of *both* Rule 15(c)(2) and Rule 15(c)(3)(A) and (B)."); *see also LC Capital*, 318 F.3d at 156 ("standards for relating back a complaint that changes the identity of the defendant" are set forth in Rule 15(c)(3)).

15. CAC ¶ 15, 217; *see, e.g., Cornwell v. Robinson*, 23 F.3d 694, 705 (2d Cir. 1994) (plaintiff's knowledge of proposed defendants at time of original suit was "obvious"); *In re Sterling Foster*, 222 F. Supp. 2d at 261-62; *LaRosa v. CPC Int'l, Inc.*, CIV. A. No. B-88-583, 1990 WL 128635, at *2 (D. Conn. July 19, 1990).

16. Where the requirements of Rule 15 governing relation back cannot be met, it is pointless for plaintiffs to cite cases regarding general liberality of amendment. The cases cited by plaintiffs at pages 9-11 are inapposite. None involves an attempt to relate back a claim to a dismissed action. *See, e.g., Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (affirming denial of motion for leave to amend where plaintiffs could not demonstrate that amended complaint would survive dismissal, thus refusing to grant plaintiffs "yet another bite at the proverbial apple.") (Pls. Mem. at 9 n.2); *Porat v. Lincoln Towers Cmty.*, 464 F.3d 274, 276 (2d Cir. 2006) (affirming denial of leave to amend) (Pls. Mem. at 9); *Friedl v. City of New York*, 210 F.3d 79, 88 (2d Cir. 2000) (no statute of limitations issue raised and Court did not consider relation back under Rule 15(c)) (Pls. Mem. at 10); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995) (affirming denial of motion for leave to amend where amendment would have been futile because 10(b) allegations, even as amended, failed to state a claim) (Pls. Mem. at 10); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (no discussion of relation back) (Pls. Mem. at 10); *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985) (no amendment sought to add new defendants or re-plead against defendants previously dismissed) (Pls. Mem. at 10); *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 846 (2d Cir. 1981) (amendment not sought to change a party) (Pls. Mem. at 11 n.3); *S.S. Silverblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Hous. Dev. Fund Co., Inc.*, 608 F.2d 28, 43 (2d Cir. 1979) (amendment sought against existing party; Rule 15(c) not discussed) (Pls. Mem. at 10 n.2); *Middle Atlantic Utils. Co. v. S.M.W. Dev. Corp.*, 392 F.2d 380, 384 (2d Cir. 1968) (same) (Pls. Mem. at 9 n.2); *Concerned Citizens of Belle Haven v. Belle Haven Club*, No. Civ. 3:99CV1467, 2002 WL 32124959, at *3 (D. Conn. Oct. 25, 2002) (same) (Pls. Mem. at 10 n.2); *Zeigan v. Blue Cross & Blue Shield of Greater New York*, 607 F. Supp. 1434, 1439 (S.D.N.Y. 1985) (same) (Pls. Mem. at 11 n.3); *Green v. Wolf Corp.*, 50 F.R.D. 220, 223 (S.D.N.Y. 1970) (same) (Pls. Mem. at 11 n.3).

**II.     AMENDMENT WOULD BE FUTILE BECAUSE
          PLAINTIFFS' CLAIMS ARE ALSO BARRED
          BY THE 1-YEAR STATUTE OF LIMITATIONS**

The statute of limitations required plaintiffs to bring any action against Deloitte "within one year after the discovery of the facts constituting the violation." (*See* Section I, at p.14, *supra*.) Plaintiffs' CAC, and their proposed CAC II, are each independently barred by this 1-year statute. The double bar merely highlights the futility of any proposed amendment.

**A.     The CAC Was Time-Barred When Filed**

Judge Squatrito's opinion that the action against Deloitte related back to the December 1, 2000, Motion, was contrary to controlling precedent. (Section 1, *infra*.) Correct application of the law disposes of plaintiffs' claim against Deloitte because their own CAC affirmatively establishes that plaintiffs discovered the facts alleged as against Deloitte in the CAC more than one year before they filed the CAC on October 29, 2001. (Section 2.)

**1.     The CAC Does Not Relate Back
          to the December 1, 2000 Motion**

In *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148 (2d Cir. 2003), the Second Circuit rejected as "extravagant" the contention that a complaint adding an accounting firm as a defendant in a securities fraud case could "relate back" to a procedural filing made before the accounting firm had been named as a party. *LC Capital*, 318 F.3d at 156-57. Plaintiffs argued that the complaint related back to a "joint stipulation" that set a schedule for filing an amended complaint and "placed no restrictions on the naming of new defendants." *Id.* at 156. The Second Circuit held that "[w]hat is required, however, is notice to a proposed defendant, . . . and the stipulation made no mention of [the accounting firm], which did not receive notice until the filing of the corrected complaint. . . ." *Id.* Accordingly, the Second

Circuit rejected plaintiffs' argument to relate back their amended complaint naming the accounting firm to the previous stipulation. *Id.*

Plaintiffs' attempt to relate their CAC back to the December 1, 2000 Motion – which made no mention of Deloitte and otherwise gave no notice of any claim against the firm – is the same argument that the Second Circuit rejected as "extravagant" in *LC Capital*, and should have been rejected by Judge Squatrito in 2004. Any suggestion that this Court should repeat the error contained in the 2004 decision (*see* Pls. Mem. at 2 n.1) should also be rejected.[17]

> ### 2.   The CAC Establishes that the Facts It Alleges as to Deloitte Were a Matter of Public Record More Than One Year Before It Was Filed

Because *LC Capital* bars relation back, plaintiffs must show that they filed the CAC against Deloitte within one year of discovering the facts alleged. *Rothman v. Gregor*, 220 F. 3d 81 (2d Cir. 2000).[18] The CAC sets out in chronological order the dates of documents from which plaintiffs discovered the facts, including Priceline's SEC filings and other published information. These documents, together with the original complaints against Priceline and its officers filed in early October 2000, demonstrate that plaintiffs knew everything of significance in their CAC more than one year before the CAC was filed on October 29, 2001.

The CAC refers to and quotes extensively from SEC filings, newspapers, press releases and other documents in the public domain. In each instance, the CAC identifies the

---

17. Even the "law of the case" doctrine does not apply to dictum or in cases of clear error. Aspects of a district court's decision that are "not necessary to" the outcome constitute dicta and are not subject to the "law of the case" doctrine. *See, e.g., United States v. Hussein*, 178 F.3d 125, 129-30 (2d Cir. 1999). Nor does the "law of the case" doctrine preclude a court from correcting a ruling that was "erroneous." *DiLauria v. Power Auth. of N.Y.*, 982 F.2d 73, 77 (2d Cir. 1992).

18. Discovery for purposes of the securities fraud statute of limitations "includes constructive or inquiry notice, as well as actual notice." *Menowitz v. Brown*, 991 F.2d 36, 41-42 (2d Cir. 1993) (*per curiam*). Thus, "[t]he one-year limitations period applicable to discovery of the violation begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" *LC Capital*, 318 F.3d at 154.

source of the fact quoted and *the date* on which the source was published. Thus, the CAC's first 173 paragraphs affirmatively allege that each of the facts set forth was publicly available *before* October 29, 2000. The next 24 paragraphs cover subsequent media and analyst reports and public filings, but these later reports simply re-hash the failure of WebHouse, or discuss Priceline's subsequent financial results and prospects for the future (CAC ¶¶ 174-197), and add nothing of significance to the first 173 paragraphs.

### SEC Filings and Media Reports

The numerous SEC filings and media reports quoted in the CAC alerted plaintiffs to the accounting for the WebHouse warrant, the Priceline-WebHouse relationship, and the closing of WebHouse:

- Priceline's 1999 Form 10-K disclosed the following facts regarding the WebHouse warrant: "As an inducement to enter into a relationship with WebHouse, priceline.com received a warrant to purchase a majority of the shares of WebHouse common stock. The warrants are non-forfeitable, fully vested upon grant, exercisable in five years or earlier upon the occurrence of certain events, and do not require the performance of any additional services. Upon receipt of the warrant in the fourth quarter, priceline.com recognized $188.8 million of income representing the amount of the estimated fair value of the warrants, based on an independent valuation." (CAC ¶ 68, *quoting* Priceline 1999 Form 10-K, Note 11, at 57; *see also* Maguire Decl. Ex. A, Priceline 1999 Form 10-K, Statements of Cash Flows (separately itemizing WebHouse warrant income) & Ex. 10.22.4 (WebHouse warrant agreement).)

- The 1999 Form 10-K also disclosed that "[u]nless and until that warrant is exercised, WebHouse Club and its financial results will not be included in priceline.com's financial statements." (CAC ¶ 69; *quoting* 1999 Form 10-K, Item 1, at 7.)

- By their own admission, plaintiffs "were informed *of the true state of WebHouse's affairs*" by the October 5, 2000 press release that WebHouse was winding down and that Priceline would write off the $189 million WebHouse warrant.[19] (CAC ¶¶ 159-60; emphasis added.) Plaintiffs plead their October

---

19. The October 5, 2000 disclosures that WebHouse would close and that Priceline had written off the value of the WebHouse warrant was a watershed event in terms of plaintiffs' alleged damage, and a clear trigger for the one-year statute of limitations. *See Fuqua v. Ernst & Young LLP*, No. 01-7974, 2002 WL 535085, at *2 (2d Cir.

5, 2000 discovery of the alleged fraud under the captions "The Truth is Disclosed/WebHouse's Demise And The Write Off Of WebHouse Warrants Is Revealed" and "The Previously Undisclosed Problems With WebHouse's Operations Surface." (CAC ¶ 159.)

- A *Wall Street Journal* article on October 16, 2000 illustrated the problems at WebHouse in great detail, including "teams of programmers working around the clock" because "the site was having serious trouble handling the legions of shoppers streaming into it." (CAC ¶ 173 (incorrectly dating the article as October 18, 2000); Maguire Decl. Ex. J (providing complete article).)

### The Original Complaints

The ten original complaints filed between October 2, 2000 and October 13, 2000

set forth the same allegations about the WebHouse warrant that plaintiffs allege in the CAC

itself. Indeed, on October 13, 2000, the complaint in *Zia v. Priceline.com, Inc.*, No. 3:00cv1987

(D. Conn. Oct. 13, 2000) (the "Zia Complaint"), alleged:

- "The representations of income and assets described in the Company's Form 8-K [dated January 31, 2000 disclosing year-end 1999 results] were false and misleading because . . . [t]he defendants had no reasonable basis for a valuation of their warrants." (*Zia* compl. ¶ 30; *compare with* CAC ¶ 81);

- "[T]he Company continued to carry the warrants granted to it by WebHouse as an asset" valued at $189 million "in its financials." (*Zia* compl. ¶ 44; *compare with* CAC ¶ 80); and

- Priceline "recorded the value of its WebHouse warrants at a value which vastly exceeded the true or fair value of these warrants and carried this inflated valuation on the financial reports of the Company initially as income and continually as an asset." (*Zia* compl. ¶ 51(f); *compare with* CAC ¶ 81).

With all the knowledge plaintiffs unquestionably had in 2000, it was their burden

to show that *something* was discovered within one year of the CAC filing. Plaintiffs attempted

without success to identify four facts that they claimed were recently discovered in their

Opposition to Deloitte's Motion to Dismiss ("Pls. Opp."). These four contentions only

---

April 10, 2002) (trigger was "radical decline in [company's] performance . . . coming on the heels of rosy predictions"); *Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 53 (D. Mass. 1995); *see also Whitlock Corp. v. Deloitte & Touche, L.L.P.*, 233 F.3d 1063, 1065-66 (7th Cir. 2000) (plaintiffs' injury triggered statute of limitations with respect to all potentially responsible persons, including auditor).

confirmed that plaintiffs had discovered all significant facts more than one year before the CAC was filed:

1.  *Internal reports (Pls. Opp. at 45-46)*:  The assertion that plaintiffs discovered at an undisclosed time various "internal daily reports" (Pls. Opp. at 45), that were "unknown to plaintiffs prior to October 29, 2000," is belied by the original complaints, all of which allege as early as October 2, 2000 the existence of negative internal reports.[20]

2.  *Management's reservations about WebHouse (Pls. Opp. at 45)*:  The assertion that plaintiffs discovered, at an undisclosed time, that certain members of Priceline management "harbored deep reservations" about WebHouse's viability (Pls. Opp. at 45), hardly counts as a later discovery since management publicly acknowledged the risks in Priceline's public filings during 2000, and on October 5, 2000, Priceline disclosed that WebHouse had failed.  (CAC ¶ 164(c) (reporting that management acknowledged WebHouse was a gamble).)[21]

3.  *The "severe impairment" of the WebHouse warrants (Pls. Opp. at 46)*:  The assertion that investigation after October 5, 2000 was required to discover the facts revealing "the severe impairment" of the WebHouse warrant (Pls. Opp. at 46), is disproved by the CAC, which establishes that plaintiffs already knew on October 5, 2000 that the warrant was not merely "severely impaired" but had been written-off completely.  (CAC ¶ 160.)  Plaintiffs also assert that investigation was required to learn that WebHouse had been subsidizing manufacturer promotions.  (Pls. Opp. at 46.)  Again, the CAC belies any late discovery of WebHouse's subsidies.

---

20. *See Twardy v. Priceline.com, Inc.*, No. 3:00CV1884 (D. Conn. Oct. 2, 2000) ¶¶ 13 (alleging that Priceline defendants had access to adverse non-public information about the business, finances and prospects in "internal corporate documents ... and/or ... reports"); 72 (alleging that Priceline defendants "had access to ... internal reports and other data and information about the Company's financial condition and performance").  These allegations are repeated in the other complaints filed in October 2000.  *See Cerelli v. Priceline.com, Inc.*, No. 3:00CV1918 (D. Conn. Oct. 5, 2000) ¶¶ 13, 72; *Howard Gunty Profit Sharing Plan v. Priceline.com, Inc.*, No. 3:00CV1917 (D. Conn. Oct. 5, 2000) ¶¶ 13, 72; *Mayer v. Priceline.com, Inc.*, No. 3:00CV1923 (D. Conn. Oct. 6, 2000) ¶¶ 13, 72; *A. Mazzo v. Priceline.com, Inc.*, No. 3:00CV1924 (D. Conn. Oct. 6, 2000) ¶¶ 13, 72; *Anish v. Priceline.com, Inc.*, No. 3:00CV1948 (D. Conn. Oct. 11, 2000) ¶¶ 13, 72; *Fialkov v. Priceline.com, Inc.*, No. 3:00CV1954 (D. Conn. Oct. 11, 2000) ¶¶ 13, 71; *Zia v. Priceline.com, Inc.*, No. 3:00CV1987 (D. Conn. Oct. 13, 2000) ¶¶ 13, 82.

21. Priceline's 1999 Form 10-K disclosed the risks of extending the Priceline model to WebHouse:  Priceline was "unlikely to make significant profits" unless it continued to make "new or complementary" products and services and "a broader range" of existing products and services available; Priceline management disclosed "Our Limited Operating History Makes Evaluating Our Business Difficult"; "We Are Not Profitable and Expect to Continue to Incur Losses"; "Our Business Model is Novel and Relatively Unproven"; "New Businesses We Are Evaluating May Not Be Successful"; "We May Be Unable to Effectively Manage Our Rapid Growth"; "We Rely on Third-Party Systems"; and "The Success of Our Business Will Depend on Continued Growth of Internet Commerce."  (Maguire Decl. Ex. A, Item 1, at 14-19.)

(*See, e.g.*, CAC ¶¶ 155(a) (in September 2000, public suspicions arose that WebHouse was "currently financing the heavy discounts on the site"); 163(b) (extent of WebHouse's subsidies of customer purchases was disclosed on October 6, 2000).)

4.   *Alleged "accounting machinations" (Pls. Opp. at 46-47)*:  The assertion that the allegedly incorrect accounting for the WebHouse warrant, "prevented Plaintiffs from discovering Deloitte's role in the fraud sooner" (Pls. Opp. at 46-47), is unsupported by any fact that plaintiffs did not already know on October 5, 2000.  On March 30, 2000, Priceline's recognition of the entire value of the WebHouse warrant was publicly disclosed.  By October 2000, the complete write-off of the warrants had been disclosed, Deloitte's role as Priceline's auditor had long been a matter of public record, and plaintiffs were already making the claim in the original complaints filed against the Priceline defendants that Priceline's accounting for the WebHouse warrants was fraudulent.[22]  (*See* Deloitte's Mem. in Support of Mot. to Dismiss at 13-14.)

The CAC establishes as a matter of law that all of the critical information about the WebHouse transactions – including Priceline's accounting for the warrants and the agreements upon which this accounting was based – was known before October 29, 2000, and that plaintiffs cannot plead a discovery after that date that added to what they already knew. Accordingly, had Judge Squatrito not overlooked the Second Circuit's decision in *LC Capital*, which bars relation back of the CAC in the circumstances here, his dismissal of the CAC as against Deloitte would have been *with* prejudice.[23]

---

22.  Plaintiffs also assert in a footnote that Priceline's public filings did not disclose that "Deloitte knew that WebHouse had no independent corporate existence and was totally dominated by Priceline." (Pls. Opp. at 47 n.26.) This is based on another allegation recycled from the October 2000 complaints. *See, e.g., Cerelli v. Priceline.com, Inc.*, No. 3:00CV1918 (D. Conn. Oct. 5, 2000) at 6 ("Defendants Use WebHouse To Operate Priceline's Internet Gas And Grocery Business Off the Books").

23.  Courts have found claims against auditors to be untimely if delayed more than one year following discovery that audited financial statements were allegedly misstated. *See Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F. Supp. 658 (S.D.N.Y. 1987) (statute of limitations began to run once plaintiff knew that the valuation in the prospectus was inaccurate); *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 554 (S.D.N.Y. 1977) (statute of limitations triggered when the plaintiff first alleged that statements in prospectus were false; that the plaintiff later acquired many additional details was "of no moment"); *Rahr v. Grant Thornton LLP*, 142 F. Supp. 2d 793, 798-99 (N.D. Tex. 2000) (decline in stock price followed by securities fraud suit against company demonstrated that plaintiff was on notice of claims against the auditor); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1329 (3d Cir. 2002) (public disclosure of asset write-offs triggered statute of limitations as against

**B.    The CAC II Is Also Independently
    Barred by the 1-Year Statute of Limitations**

Plaintiffs' discussion of the statute of limitations appears to be based upon the assumption that the statute of limitations does not begin to run until every last item theoretically available in discovery is obtained.  This assumption runs directly contrary to settled law generally, and particularly to the Reform Act, whose provisions clearly contemplate the adequacy of a securities fraud pleading before any discovery, much less completion of the massive discovery effort in this case.[24]  Moreover, while plaintiffs point to materials obtained in the discovery process less than one year prior to filing the Motion on May 14, 2007 (Pls. Mem. at 8, 9), they ignore entirely the fact that they had the Priceline and WebHouse audit files 18 months before that filing.

**1.    The Statute of Limitations Commenced
    Running Before Completion of Document Discovery**

Under the Reform Act, a plaintiff is typically required to frame its complaint in a securities fraud action without the benefit of any discovery at all.  There is no provision for pre-complaint discovery; in fact, discovery is stayed until the sufficiency of the claim is tested.  *See* 15 U.S.C. § 77z-1(b)(1); *Medhekar v. U.S. Dist. Court for the N. Dist. of Cal.*, 99 F.3d 325, 328 (9th Cir. 1996) ("Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed."); *Podany v. Robertson Stephens Inc.*, 350 F. Supp. 2d 375, 378 (S.D.N.Y. 2004) ("discovery is authorized solely for parties to develop the

---

auditor); *Reisman v. KPMG LLP*, 965 F. Supp. 165, 171-72 (D. Mass. 1997) (Form 10-K and drastic drop in stock price more than one year before filing triggered statute as against auditor); *Slavin v. Morgan Stanley & Co.*, 791 F. Supp. 327, 330 (D. Mass 1992) (same as to underwriters).

24.  *See* 15 U.S.C. § 77z-1(b)(1) ("In any private action arising under this subchapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds, upon the motion of any party, that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.").

facts in a lawsuit in which the plaintiff has stated a legally cognizable claim, not in order to permit a plaintiff to find out whether he has such a claim, *and still less to salvage a lawsuit that has already been dismissed for failure to state a claim.*") (emphasis added).

        In this case, plaintiffs obtained discovery of Deloitte as a non-party, and the statute of limitations was not tolled for their "leisurely discovery of the full details of the alleged scheme." *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir. 1975) (quoting *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970) (abrogated on other grounds)); *In re Integrated Resources Real Estate Ltd. P'ships Sec. Litig.*, 815 F. Supp. 620, 637 (S.D.N.Y. 1993) (quoting *Klein*, 421 F.2d at 343).

        In *Adams v. Intralinks, Inc.*, Judge Scheindlin dismissed a Section 10(b) securities claim as time-barred where the plaintiff had threatened a claim in 2001, thus acknowledging constructive notice of the claim, but failed to file a complaint for more than two years.  No. 03 Civ. 5384, 2004 WL 1627313, at *5-6 (S.D.N.Y. July 20, 2004).  Plaintiffs alleged that they were continuing to gather information regarding their claim, but as Judge Scheindlin explained, "[t]he fact that they were not yet aware of every detail is irrelevant." *Id.* at *6.  Similarly, plaintiffs here cannot justify delay based on the purported reasonableness of the investigation they undertook and which has taken more than five years since their prior attempt to sue Deloitte, merely because they had not collected the last document from Deloitte.

        **2.    This Motion Was Filed More Than One
            Year After Production of Deloitte's Priceline
            and WebHouse Working Papers in October 2005**

        Plaintiffs claim that they did not have the documents that "form the basis for the highly particularized allegations of scienter" until August 2006, when Deloitte produced its tax working papers and other miscellaneous electronic drafts of audit working papers.  (Pls. Mem. at

8, 9.) This claim is belied by their CAC II, which bases its new allegations on information produced by October 2005.

Plaintiffs' new allegations discuss how the Deloitte audit engagement team considered Priceline's proposed accounting for the WebHouse warrant, how they consulted with Deloitte's National Office accounting research group, and how they obtained representations from the client confirming the intent of Priceline and WebHouse in entering into the warrant transaction. (*See* CAC II ¶¶ 68-104.) These new allegations were derived from documents available to plaintiffs more than one year before the Motion was filed:

    a)    Allegation: Priceline and WebHouse intended that the warrant would be issued in exchange for the license agreement. (CAC II ¶¶ 69-73.)

- This characterization of the transactions is set forth in press releases dated September 24, November 2, November 3, and November 8, 1999. These press releases were a matter of public record seven years ago, and, were also produced to plaintiffs in July 2005 in Deloitte's audit working papers. (CAC II ¶¶ 72 (quoting D&T 0006398-400), 80 (quoting D&T 0006518-22), 81 (quoting D&T 0006509-10); 85 (quoting D&T 0006501-02); Maguire Decl. ¶ 42.)

- The September 24, 1999 term sheets of the agreements, which plaintiffs rely upon in their CAC II, were produced in October 2005. (CAC II ¶ 73 (referencing D&T 0022411-36); Maguire Decl. ¶ 46.)

    b)    Allegation: Deloitte monitored the formation of the Priceline/WebHouse transactions and reviewed drafts of the agreements. (CAC II ¶¶ 74, 78.)

- In July 2005, Deloitte produced a memo from the Priceline audit team engagement partner, Robert Bass, stating that ████████████ ████████████████ CONFIDENTIAL ████████████████ ████████ (CAC II ¶ 84 (quoting D&T 0000410); Maguire Decl. ¶ 42 & Ex. M.)

    c)    Allegation: The warrant and license agreements dated October 26, 1999 include a "whereas" clause, which states that the warrant was issued "in consideration for Grantee's execution and deliveries pursuant to the Priceline License Agreement." (CAC II ¶79)

- These agreements were a matter of public record seven years ago, filed with Priceline's Form 1999 10-K on March 30, 2000 (Priceline 1999 Form 10-K, Exs. 10.22.2 & 10.22.4); Deloitte also produced them to plaintiffs in July 2005. (Maguire Decl. ¶ 42 (agreements at D&T 0000614-57 & D&T 0000678-706).)

d)  Allegation: During the course of the Priceline and WebHouse audits, Deloitte had considered accounting guidance and had concluded that Priceline could immediately recognize all of the revenue on the warrant at year-end 1999. (CAC II ¶¶ 83, 84, 86-89, 91)

- In July 2005, plaintiffs received Deloitte's memoranda discussing the accounting literature and concluding on the appropriateness of Priceline's recognition of the warrant income in 1999. (Maguire Decl. ¶ 42; Exs. N (D&T 0000406-09), O (D&T 0002148-53), P (D&T 0000402-04).)

- In October 2005, Deloitte produced to plaintiffs a copy of a draft 2000 Form 10-K, which had a handwritten question regarding income recognition on the WebHouse warrant. (CAC II ¶ 104 (quoting D&T 0020644-724); Maguire Decl. ¶ 46.)

e)  Allegation: Deloitte's National Office accounting research group took exception to a preamble in the warrant agreement, but agreed that immediate income recognition would be appropriate if Priceline and WebHouse clarified their intent by amending the language of the warrant agreement. (CAC II ¶¶ 89, 91.)

- In July 2005, Deloitte produced to plaintiffs the memoranda documenting the audit teams' consultations with Deloitte's National Office accounting research group, including the advice to amend the agreement to conform to the intent of the parties. (Maguire Decl. ¶ 42; Exs. N (D&T 0000406-09) & O (D&T 0002148-53).)

f)  Allegation: Deloitte discussed the intent of the agreements with Priceline; Priceline documented this intent in its Form 10-K and provided Deloitte with a representation letter clarifying its intent; and Priceline and WebHouse amended the agreements after Priceline issued its Form 10-K. (CAC II ¶¶ 95-99.)

- In July and October 2005, Deloitte produced to plaintiffs: memoranda discussing the steps it took with respect to clarifying the parties' intent (Maguire Decl. Exs. N (D&T 0000406-09), O (D&T 0002148-53), P (D&T 0000402-04)); the representation letters that Deloitte obtained from Priceline and WebHouse (*Id.* Exs. Q (D&T 0005022-30) & R (D&T 0001321-27)); and the amended agreements, which were sent to

31

Deloitte after the Form 10-K was issued (D&T 0022084-111, D&T 0022169-98). (*See* Maguire Decl. ¶¶ 42, 46.)

g)  Allegation: Priceline and WebHouse signed an additional representation letter that was dated after Priceline issued its Form 10-K for fiscal year 1999. (CAC II ¶¶ 100-102.)

- In July 2005, Deloitte produced to plaintiffs the undated version of the representation letter from the Priceline audit files. (Maguire Decl. ¶ 42 (undated letter at D&T 0000456-57).) In October 2005, Deloitte produced a draft of the representation letter dated April 14, 2000 from the WebHouse audit manager's personal files.[25] (Maguire Decl. ¶ 46 & Ex. S (D&T 0020471).)

Despite everything that plaintiffs discovered in 2005, they claim that "the documents that form the basis for the highly particularized allegations of scienter" were produced in August 2006. (Pls. Mem. at 8.) In fact, the CAC II's only references to documents that Deloitte first produced in August 2006 do not support plaintiffs' inordinate delay in moving for leave to amend. The documents fall into four categories:

- First, four documents contain nothing other than notes and analysis from tax accountants analyzing the WebHouse transactions solely from a tax perspective under the Internal Revenue Code – and not for financial reporting purposes. (CAC II ¶¶ 75, 76, 94, 128; Maguire Decl. Exs. U, V, W, X, respectively.) In any event, none of them is inconsistent with the auditors' understanding that the warrant had no future performance obligations.

- Two documents reflect preliminary analysis by Deloitte's auditors *before* the agreements were executed on October 26, 1999 (CAC II ¶¶ 74, 76; Maguire Decl. Exs. Y, Z, respectively.) Plaintiffs' own allegations, in fact, show that the analysis had evolved appreciably by November 8, 1999 (less than two weeks *after* the agreements were executed) – the date by which Deloitte's audit partner had documented his discussions with Priceline's management and Priceline's counsel, his review of relevant accounting principles, and his consultations with Deloitte's National Office accounting research group. (Maguire Decl. Ex. M (D&T 0000410, quoted in part at CAC II ¶ 84); *see also* Maguire Decl. Ex. N (January 18, 2000 memorandum expanding upon

---

25.  Another draft representation letter dated May 2000, was produced in August 2006, from an electronic folder on Deloitte's server under the name of the WebHouse engagement partner, Andrew ("Drew") Wallace. (Maguire Decl. Ex. T (D&T 0069226.03).) The audit of the WebHouse financial statements was completed in May 2000. (Maguire Decl. ¶ 55.)

the analysis recorded on November 8, 1999) (D&T 0000406-09, quoted in part at CAC II ¶ 89).)

- A set of draft agreements between Priceline and WebHouse (CAC II ¶ 78; Maguire Decl. Ex. AA): Plaintiffs knew by July 2005 that Deloitte reviewed draft agreements (Maguire Decl. ¶ 42 & Ex. M (D&T 0000410, quoted in part at CAC II ¶ 84), and the executed agreements had been publicly filed with Priceline's 1999 Form 10-K in March 2000.

- A draft representation letter for the WebHouse audit dated "May , 2000" (CAC II ¶ 101; Maguire Decl. Ex. T): Plaintiffs had received another draft of this document and additional final representation letters by October 2005 (CAC II ¶ 100; Maguire Decl. ¶¶ 42, 46; Exs. S (D&T 0020471), Q (D&T 0005022-30), R (D&T 0001321-27).)

The production in August 2006 of these eight documents hardly compares to the wealth of detail that plaintiffs obtained from Deloitte's 2005 productions. Accordingly, there is no factual issue here that plaintiffs had actual knowledge by October 2005 at the latest of the information that forms the basis of Deloitte's alleged fraud – and took no action for more than 18 months.

Plaintiffs have had over six and a half years to investigate, including more than 18 months after having obtained Deloitte's audit working papers, on which they now rely to plead scienter. This leisurely approach goes directly to the policies standing behind statutes of limitations and of repose. As the Supreme Court long ago recognized:

> [Statutes of limitation] are founded upon the general experience of mankind that claims, which are valid, are not usually allowed to remain neglected. The lapse of years without any attempt to enforce a demand creates, therefore, a presumption against its original validity, or that it has ceased to subsist. This presumption is made by these statutes a positive bar; and they thus become statutes of repose, protecting parties from the prosecution of stale claims, when, by loss of evidence from death of some witnesses, and the imperfect recollection of others, or the destruction of documents, it might be impossible to establish the truth.

*Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. 386, 390 (1869); *see also In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MD 1529, 2005 WL 1278544, at *13 (S.D.N.Y. May 31, 2005) (dismissing claims as time-barred and finding "troubling the fact that the [complaint] was not filed until . . . approximately five-months after the investigation had concluded").

33

Accordingly, the 1-year statute of limitations has run not only on the CAC filed in 2001, but has also run yet again on the CAC II since plaintiffs obtained Deloitte's audit working papers more than 18 months ago.

## III.    AMENDMENT WOULD BE FUTILE BECAUSE PLAINTIFFS DO NOT PLEAD ALLEGATIONS SUFFICIENT TO SUPPORT THE REQUIRED STRONG INFERENCE OF SCIENTER AGAINST DELOITTE

Rule 9(b) requires a plaintiff to plead fraud with particularity. In the Private Securities Litigation Reform Act, Congress established a heightened pleading requirement for securities fraud claims. The Reform Act requires a plaintiff to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added); *see also Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). The scienter required to state a securities fraud claim is "a mental state embracing intent to deceive, manipulate, or defraud."[26] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). A plaintiff can plead scienter in either of two ways: (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Press v. Chemical Inv. Serv. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). Judge Squatrito found that the CAC failed to satisfy either test and the new allegations of the CAC II add nothing that would require a different conclusion.

---

26. The CAC II's proposed claim is for violation of Section 10(b) of the Exchange Act, which makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b) (2007). To state a claim under Section 10(b) of the Exchange Act, a plaintiff must plead that, in connection with the purchase or sale of securities, the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) on which the plaintiff relied, and (5) that proximately caused his injury. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 266 (2d Cir. 1996).

A.    **The CAC II Fails to Plead that Deloitte**
      **Had Any Motive to Commit Securities Fraud**

To plead motive, a plaintiff must "allege that defendants benefited in some

concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-308

(2d Cir. 2000).[27] In the proffered allegations (CAC II ¶¶ 68-104), plaintiffs make no attempt to

allege any such thing, but instead ascribe motivations to Deloitte that are contradicted outright by

the documentary evidence.

Plaintiffs' only attempt to conjure up motive is its allegation that Deloitte adopted

a fraudulent "revisionist view" of what Priceline and WebHouse intended in entering into the

warrant transaction, due to an "uncomfortable realization that the [audit team] had given

incorrect accounting advice to Priceline – which Priceline had relied upon in issuing its

January 27, 2000 earnings release." (CAC II ¶ 92.) The CAC II itself establishes just the

opposite – that the January 27th press release did not cause Deloitte to adopt any "revisionist

view." The CAC II affirmatively identifies specific Deloitte working papers which confirm that

Deloitte's understanding of the companies' intent in entering into the warrant agreement was the

same *before* January 27 as it was *after* that date. (CAC II ¶¶ 84, 89, 91.)

Both before and after January 27, Deloitte understood that the parties intended

that Priceline would own the warrant without any further obligation on its part. Thus, the

---

27.  "Generalized" and "ubiquitous" motives are insufficient to establish a defendant's scienter. *In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. 2d 232, 246 (S.D.N.Y. 2006). Absent particularized allegations of "concrete benefits," a plaintiff's motive pleading will fail. *Compare In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. at 246 (S.D.N.Y. 2006) (rejecting the desire to retain a client's business as an adequate pleading); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 202 (E.D.N.Y. 1997) ("It is unreasonable to believe that [an auditor] would willingly condone client's fraud by risking its entire reputation, not only that of its Mitchel Field office, to preserve a fee which may be a large account in the Mitchel Field office but may be minute in comparison to all its accounts."); *Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043, at *9-10 (S.D.N.Y. Jan. 18, 1996) (alleged motive based on receipt of professional fees is economically irrational) *with In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 345-46 (S.D.N.Y. 2004) (citation and quotation marks omitted) (accepting allegations of auditor's scienter where auditor benefited in a "concrete and personalized way" from the fraud, through "consulting" agreements that generated fees six times the amount of the firm's auditing fees).

document partially quoted in ¶ 84 of the CAC II, dated nearly three months *before* the January

27th release, states Deloitte's understanding, after meetings with client representatives and

"counsel to the companies" (Priceline and WebHouse), that as long as the warrant "requires no

future services," is "fully vested upon grant" and "cannot be forfeited," its benefit and expense

could be recognized immediately.  (Maguire Decl. Ex. M, D&T 0000410.)  More pointedly, a

document referenced in ¶ 89 of the CAC II, dated January 18, 2000 (nine days before the January

27th release), states in the clearest terms Deloitte's understanding that "no further performance

was required" by Priceline in order to own the warrant.  (Maguire Decl. Ex. N, at D&T

0000408.)

   These documents are incorporated by reference by plaintiffs into the CAC II and

establish that Priceline's release of unaudited financial information on January 27 did not cause

Deloitte to adopt a "revisionist view" of anything – Deloitte already knew that the parties did not

intend the ownership of the warrant to depend on license performance.  Accordingly, without any

"concrete and personal gain," it would be irrational for Deloitte to engage in a fraud from which

it had nothing to gain and everything to lose both professionally and monetarily, and the CAC II

fails to allege anything to suggest otherwise.[28]

---

28.  The underlying supposition that a desire to protect one's reputation creates a "strong inference" of fraud is
untenable.  As Judge Koeltl explained, it would be difficult to find a defendant in securities cases who did not
wish to protect his or her professional reputation.  *In re Loral Space & Commc'ns Sec. Litig.*, No. 01 Civ. 4388,
2004 WL 376442, at *7 (S.D.N.Y. Feb. 23, 2004).  In the context of a claim against an accounting firm in
*Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043, at *10 (S.D.N.Y. Jan. 18, 1996), the court stated as
follows:

> I am not prepared to assume -- as [plaintiff] would have me do -- that a Big Six (or, indeed, other)
> accounting firm like Coopers & Lybrand would knowingly condone a client's fraud in order to preserve a
> fee that, at best, is an infinitesimal percentage of its annual revenues and, by doing so, jeopardize its
> reputation and license, as well as subject itself to potential damages literally tens of thousands of times as
> large as its fee and subject the partner involved to potential professional and financial extinction. Such
> action by certified public accountants would be economically irrational.

**B.     The CAC II Fails to Plead Facts That Constitute Strong
Circumstantial Evidence of Conscious Misbehavior or Recklessness**

In the absence of motive, in order to state a securities fraud claim against an

auditor, plaintiffs must show that the auditor's "accounting practices were [1] so deficient that

the audit amounted to no audit at all, . . . or [2] 'an egregious refusal to see the obvious, or to

investigate the doubtful,' . . . or [3] that the accounting judgments which were made were such

that no reasonable accountant would have made the same decisions if confronted with the same

facts." *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992); *Zucker v. Sasaki*,

963 F. Supp. 301, 307 (S.D.N.Y. 1997) (same).  The Second Circuit has held that the facts

alleged must "approximate an actual intent to aid in the fraud being perpetrated by the audited

company." *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (quoting *Decker v. Massey-

Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982)).[29]

The new allegations of the proposed CAC II fail to provide a basis for any

inference, much less the required "strong inference" of scienter against Deloitte:  (1) the CAC II

adds nothing to the CAC – which Judge Squatrito found inadequate – to show that Deloitte

should have "cast aside the independent valuation" of the WebHouse warrant; (2) the CAC II

acknowledges that both the warrant transaction and the accounting for the transaction were

publicly disclosed, and disclosure belies any claim of fraudulent intent; and (3) the CAC II

acknowledges that the Deloitte auditors considered the accounting, consulted with the firm's

---

*Accord In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. at 246 (S.D.N.Y. 2006) (rejecting the desire to retain a
client's business as adequate to support scienter); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 202
(E.D.N.Y. 1997) ("unreasonable to believe that [an auditor] would willingly condone client's fraud by risking
its entire reputation").

29.  Because an accountant necessarily depends on its client to provide information for an audit, it is, quite properly,
"almost always more difficult to establish scienter on the part of the accountant than on the part of its client."
*Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1007-08 (S.D. Cal. 2000), *aff'd sub nom. DSAM
Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2000).

National Office accounting research group, and confirmed the intent of the parties, which is completely inconsistent with any inference of fraudulent intent and instead shows that Deloitte acted responsibly and professionally.

**1.    The Allegations Concerning the Valuation of the WebHouse Warrant Do Not Support a Claim of Scienter Against Deloitte**

Despite the extensive record supporting the valuation of the WebHouse warrant in March 2000, when Deloitte issued its report on Priceline's financial statements (pp. 7-8, *supra*), plaintiffs allege that Deloitte somehow should have decided to cast aside the independent valuation of the WebHouse warrant and also disregard the value that sophisticated private investors had placed on WebHouse stock (*id.*). (CAC ¶ 130.)

The failure of WebHouse in October 2000 does not suggest that the value of the warrant should have been written down, much less written off, at year-end 1999. The Second Circuit has made clear that hindsight cannot support a securities fraud claim.[30] Thus, courts have dismissed claims under Rule 9(b) and the Reform Act for failure to plead a strong inference of fraudulent intent where the complaint alleges nothing more than that an asset should have been written down sooner.[31]

---

30. *See, e.g., Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("lack of clairvoyance simply does not constitute securities fraud"); *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111 (2d Cir. 1982), *aff'g in relevant part*, 534 F. Supp. 873, 881 (S.D.N.Y. 1981) ("general allegations that assets were overstated [were] clearly inadequate"); *In re Corning, Inc. Sec. Litig.*, No. 04-2845-CV, 2005 WL 714352, at *1 (2d Cir. Mar. 30, 2005), *aff'g*, No. 01-CV-6580, 2004 WL 1056063, at *32 (W.D.N.Y. April 9, 2004) (even a $5 billion write-off in the same year as the assets were booked was found inadequate to serve as a basis for securities fraud).

31. *See, e.g., In re Loral Space & Comm. Ltd. Sec. Litig.*, No. 01 Civ. 4388, 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004) (dismissing complaint that failed to allege sufficient facts to show failure to take an impairment charge sooner was "so clearly required by accounting professional standards that the failure to take such a charge was fraudulent"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 265 (S.D.N.Y. 2004) (dismissing claim that charge should have been taken sooner); *Feasby v. Industri-Matematik Int'l Corp.*, No. 99 CIV 8761, 2000 WL 977673, at *4 (S.D.N.Y. July 17, 2000) ("Plaintiffs cannot prevail by using crystal balls or 20/20 hindsight any more than on conclusory generalizations or speculation."); *Zucker v. Sasaki*, 963 F. Supp. 301, 305-06 (S.D.N.Y. 1997) (company's subsequent write-off of goodwill associated with acquisition did not establish that auditor should have known the acquisition would fail; plaintiffs' allegation amounted to nothing more than "fraud by hindsight"); *Crystal v. Foy*, 562 F. Supp. 422 (S.D.N.Y. 1983) (dismissing claim

38

In *Zucker v. Sasaki*, 963 F. Supp. 301 (S.D.N.Y. 1997), the court dismissed securities fraud claims against a company's outside auditors because the plaintiff "offer[ed] no factual support for the assertion that Ernst & Young knew or should have known that there was no reasonable basis for the recorded goodwill and amortization period." *Id.* at 306. The court concluded:

> Zucker proffers no specific facts as to how or when Ernst & Young learned of or recklessly disregarded FWM's problems and the negative consequences that would ensue from the acquisition. Zucker never states what alleged information was revealed to Ernst & Young, in what form the information was provided, at what point Ernst & Young became aware of it, and from whom Ernst & Young received this information. Accordingly, the claim is insufficient under the pleading requirements of Rule 9(b).

*Id.* at 309.[32] After exhaustive discovery of Deloitte's papers, the proposed CAC II is completely bereft of any allegation of facts that came to Deloitte's attention that should have caused it to reject the independent valuations or ignore the actions of the private investors, or that would have suggested at the time of its report that WebHouse was "doomed." (CAC II ¶ 36.)

The only new allegations in the CAC II regarding the valuation of the warrant are a conclusory allegation that transactions in which sophisticated private investors paid hundreds of millions of dollars for WebHouse stock were not "arms length," and a reference to a vendor who obtained a warrant from WebHouse with a lower exercise price than the cash price paid by

---

based on conclusory allegation that certain assets were overvalued and should have been written down sooner); *Seiden v. Butcher*, 458 F. Supp. 81, 83 (S.D.N.Y. 1978) (same); *see also Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud."); *In re Hunter Envtl. Servs. Sec. Litig.*, 921 F. Supp. 914, 925 (D. Conn. 1996) ("mere fact" that defendants' predictions did not materialize was insufficient to establish a strong inference of scienter).

32. *Accord DiLeo v. Ernst & Young*, 901 F.2d 624, 626-27 (7th Cir. 1990) (affirming dismissal of complaint that failed to give examples of problem loans auditor allegedly should have detected or to explain how auditor should have detected reserve inaccuracies); *Decker*, 681 F.2d at 121 (affirming dismissal of complaint that contained only "conclusory allegations of fraudulent conduct . . . without specific allegations of fact"); *Reiger*, 117 F. Supp. 2d at 1010-11 (dismissing complaint that merely alleged publication of inaccurate accounting figures).

39

private investors.[33]  The rest of the CAC II's allegations about the valuation of the WebHouse

warrant are identical to those alleged in the CAC, which Judge Squatrito has already found

insufficient as a matter of law.  *See In re Priceline.com Inc. Sec. Litig.*, 342 F. Supp. 2d 33, 56-

59 (D. Conn. 2004); *see also* Deloitte's Mem. in Support of Mot. to Dismiss at 24-28.  Judge

Squatrito explained:

> Priceline did not simply invent an asset for the purpose of inflating
> its value; the alleged fraud here is that Priceline carried on the
> illusion that WebHouse could be a successful business entity while
> knowing that it would collapse under the weight of its own
> expansion at some point in time.  There is simply nothing in the
> complaint to indicate that Deloitte should have been able to cast
> aside this illusion, and the independent valuation accompanying it,
> and render an opinion that the WebHouse warrants were worthless.

*In re Priceline.com Inc. Sec. Litig.*, 342 F. Supp. 2d at 58.  The Court rejected allegations that

Deloitte had access to the same information as Priceline management, explaining that "[t]o

expect the same degree of knowledge from an independent auditor would defy logic." *Id.*

Because Deloitte's audit report was publicly disclosed on March 30, 2000, and plaintiffs allege

that WebHouse's demise became more apparent as time went on, the universe of information

that could be attributed to Deloitte as of March 2000 was significantly less than for the company

and individual defendants.  *Id.*  Accordingly, plaintiffs' rehashing of the valuation allegations

---

33.  The CAC II alleges that purchases of millions of dollars of WebHouse stock by private investors were not arms'
length transactions because the buyers also had investments in Priceline or Walker Digital. But plaintiffs allege
no facts to support their theory that sophisticated private investors like Goldman Sachs, Vulcan Ventures, Wit
Capital, and Liberty Media Corporation were anything other than willing purchasers who were under no
compulsion to buy, or any reason why such sophisticated investors would willingly pay millions of dollars more
for WebHouse stock than they believed it was worth.  (CAC II ¶ 129.)

Nor does the CAC II's allegation that WebHouse issued a warrant to a vendor, BDS Business Center Inc., at a
favored exercise price support plaintiffs.  (CAC II ¶ 129.)  Plaintiffs do not allege that the Priceline audit team
(composed of different members than the WebHouse engagement team) were even aware of the BDS deal, and
the CAC II significantly fails to show how a preferred deal with this vendor was of such significance as to affect
the valuations placed on WebHouse stock by private investors in transactions amounting to hundreds of
millions of dollars or, for that matter, the valuation performed by an independent appraiser.

that Judge Squatrito has already held to be insufficient should lead this Court to the same conclusion: "the inference plaintiff[s] seek[] the court to draw is stretched too thin." *Id.* at 59.

### 2. Disclosure of the Accounting for the WebHouse Warrant Precludes Any Inference of Scienter

The CAC II affirmatively alleges, as did the CAC, that Priceline's transactions with WebHouse and their accounting were disclosed. At year-end 1999, Priceline gave certain airlines with which it did business, warrants worth $1.2 billion and immediately recorded the full expense. Priceline also obtained the WebHouse warrant valued at $189 million and immediately recorded the full amount of the warrant income. The accounting for these transactions, including the terms of all of the transactions with the airlines and with WebHouse, the gross amount of the airline warrant expense ($1.2 billion), and the gross amount of the income recognized for the WebHouse warrant ($189 million), were disclosed in Priceline's Form 10-K.[34] (*See* CAC II ¶¶ 108, 109; Maguire Decl. Ex. A, 1999 Form 10-K at Statements of Cash Flows, Note 11, and Exs. 10.22.2, 10.22.4.)

Disclosure is the opposite of fraud, and courts have dismissed securities fraud claims where the key facts of a transaction were disclosed. Thus, in *Kramer v. Time Warner Inc.*, 937 F.2d 767, 778 (2d Cir. 1991), the Second Circuit affirmed dismissal of a claim that defendants had not disclosed their personal profits from a transaction, where the defendants' disclosure of the transaction, even though not ideal, did enable "any interested shareholder to calculate immediately" the amount of the individuals' profits. In light of the defendants' disclosures, the Second Circuit concluded that "there is no hint of any intent to deceive."

---

34. Plaintiffs argue that the warrant income should have been recognized over the life of the license agreement rather than all at year-end 1999, which would have changed Priceline's net loss in 1999 from about $1 billion to about $1.2 billion. In fact, if Priceline had applied to the airline warrants the accounting that plaintiffs propose for the WebHouse warrant (the airline warrants were similar in nature and comprised $1.2 billion in costs), then Priceline's net loss for the year would have been reduced by over a billion dollars.

41

Similarly, in *Zucker v. Sasaki*, 963 F. Supp. at 305, 308, the court dismissed the claim against an auditor because the client company had disclosed how it had accounted for the acquisition. Even if the company had accounted for the acquisition incorrectly, mere accounting violations would not have supported a securities fraud claim. The court explained that plaintiff's concession that the financial statements "accurately described the manner in which the goodwill from the . . . acquisition was recorded in [the Company's] books . . . undermine[]" the plaintiff's claim of fraud. *Id.* at 305. Likewise, in *In re Wellcare Management Group Inc. Securities Litigation*, 964 F. Supp. 632, 642 (N.D.N.Y. 1997), the court dismissed a claim against Deloitte where the financial statements "fully disclosed" the acquisition accounting and "there [were] no facts to suggest that Deloitte & Touche turned a blind eye." *See also In re Hunter Envtl. Servs. Sec. Litig.*, 921 F. Supp. 914, 925 (D. Conn. 1996) (defendant's "plethora of warnings about the risk involved in the investment . . . negat[ed] any general averment of fraudulent intent or knowledge"); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (11th Cir. 2001) ("the disclosures actually made by [the accounting firm] significantly undermine any hint of fraud"); *Richardson v. U.S. News & World Report, Inc.*, 639 F. Supp. 595, 603 & n.17 (D.D.C. 1986) ("a defendant cannot be held liable under the securities laws when it has in fact disclosed the relevant material facts").

Here, the disclosure of the underlying terms of the WebHouse warrant and license transactions and the accounting reduces plaintiffs' claim to disagreement about how to apply technical accounting principles and whether Priceline should have recognized the $189 million in warrant income in 1999, as it did, or over the term of the license agreement, as plaintiffs argue. In any event, disclosure of the facts and the accounting means there is "no hint of any intent to

42

deceive" with respect to the accounting for the WebHouse warrant. (CAC II ¶ 79, 109; Maguire

Decl. Ex. A, Priceline 1999 Form 10-K, Ex. 10.22.4, at § 2.01.)

### 3.    The Allegations Concerning the Accounting for the WebHouse Warrant Do Not Support the Required "Strong Inference" of Scienter

For purposes of deciding whether the CAC II fails to adequately allege scienter,

the Court does not need to determine who is right about technical issues of generally accepted

accounting principles (or GAAP) relating to income recognition, and the like.  (See, e.g., CAC II

¶¶ 83, 84, 87, 89, 92, 93.)  As the Second Circuit has stated, "GAAP violations or accounting

irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak v. Kasaks*,

216 F.3d 300, 309 (2d Cir. 2000); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.

1999); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) (alleged GAAP violations did

not satisfy scienter requirement, notwithstanding alleged recording of $350 million in false

profits); *In re Flag Telecom Holdings Sec. Litig.*, 308 F. Supp. 2d 249, 263 (S.D.N.Y. 2004)

(alleged improper application of Accounting Principles Board Opinion No. 29 could not support

inference of scienter); *SEC v. Price Waterhouse*, 797 F. Supp 1217, 1241 (S.D.N.Y. 1992) ("no

finding of fraud or recklessness can rationally be made" where the "items involved complex

issues of accounting as to which reasonable accountants could reach different conclusions").

Applying the "strong inference" standard to the claims alleged in the CAC against

Deloitte, Judge Squatrito held that "the nature of the alleged accounting irregularities themselves

do not give rise to an inference of scienter," and the allegations of GAAP violations transported

by plaintiffs from the CAC to the CAC II should no longer be at issue.[35]  *In re Priceline.com Inc.*

---

35. For example, the CAC II repeats the allegation that Priceline was required to consolidate its financial statements with WebHouse.  (*Compare* CAC ¶ 78 *with* CAC II ¶ 123.)  In *Johnson v. NYFIX*, 399 F. Supp. 2d 105, 109 (D. Conn. 2005), Judge Hall granted defendants' motion to dismiss where plaintiffs alleged that the company violated GAAP by failing to consolidate with an entity in which it owned a 50% interest (and had an option to buy an additional 30%), with which it shared expenses and made joint operational decisions, and to which it lent

*Sec. Litig.*, 342 F. Supp. 2d at 57. Plaintiffs' attempt to supplement those allegations in the CAC

II does not change the nature of their challenge to the accounting, which continues to focus upon

the WebHouse warrant, and the timing of its recognition in the financial statements of Priceline.

The CAC II's new allegations detailing Deloitte's consideration of the WebHouse

warrant, far from raising a strong inference of scienter, establish that the Deloitte auditors

devoted careful attention to the warrant and its accounting, and acted in a professional and

responsible manner, inconsistent with any notion of fraudulent intent. In particular, the

allegations of the CAC II, and the documents on which it relies, show that the Deloitte auditors

obtained an understanding of the transactions, examined relevant accounting literature, consulted

with Deloitte's National Office accounting research group and documented the consultations,

confirmed the companies' intent that the warrant agreement would not be contingent on

performance of the license agreement between Priceline and WebHouse, and exercised their

professional judgment as to the proper accounting. (CAC II ¶¶ 89, 91, 95, 97.)

Consequently, even if plaintiffs could show that despite all Deloitte's efforts and

consultations and the representations that it obtained, it should have concluded differently on

Priceline's accounting, then all that plaintiffs would have shown would, at most, amount to

negligence – not securities fraud. *See Hochfelder*, 425 U.S. at 193 & n.12; *Herman & MacLean

v. Huddleston*, 459 U.S. 375, 383 (1983) (Section 10(b) actions "require proof of scienter and do

not encompass negligent conduct").

The CAC II discussion of Deloitte's examination of the WebHouse warrant and

its accounting, drawing primarily from Deloitte's working papers, begins in September and

October 1999, when Deloitte auditors were in communication with Priceline and its attorneys

---

funds. Despite this and other alleged GAAP violations, plaintiffs' pleading failed because the complaint failed
to "state any particular facts that would suggest that defendants knew or should have known that [the company]
was using an inappropriate accounting method." *Id.* at 117.

regarding the WebHouse warrant and its accounting.  (CAC II ¶¶ 74-76.)  The Deloitte auditors

considered the relevant technical accounting literature and frequently consulted with the

accounting research group at Deloitte's National Office.  (CAC II ¶ ¶ 86, 89, 91.)  For example,

as early as November 8, 1999, Deloitte's audit partner recorded his analysis and consultations, as

follows:



(Maguire Decl. Ex. M, D&T 0000410; CAC II ¶ 84 (quoted in part).)[36]

The CAC II also cites a Deloitte working paper that documents how, on

January 18, 2000, Deloitte confirmed its initial understanding that the warrant had no future

performance obligations.

---

36. Although not an issue that needs to be decided on the present Motion, examination of the accounting literature
supports the accounting treatment.  A company recognizes the fair value of an equity instrument, such as a
warrant, at the "measurement date."  (*See* Maguire Decl. Ex. BB, Emerging Issues Task Force ("EITF") Issue
No. 96-18.)  A measurement date occurs when the instrument has no future performance obligations and it is
fully vested and non-forfeitable.  (*Id.*)  Priceline determined that a measurement date had been reached with
respect to the WebHouse warrant on October 26, 1999 – the date on which the warrant agreement was executed.
This was because the WebHouse warrant required no future performance and was "irrevocable" and "fully
vested."  (Maguire Decl. Ex. A, 1999 Form 10-K, Ex. 10.22.4, at § 2.01.)

Plaintiffs' allegation that Staff Accounting Bulletin ("SAB") 101 "clearly prohibited" Priceline's accounting is
belied by plaintiffs' own quotation of SAB 101, which states that that "registrants should consider the specific
facts and circumstances to determine the appropriate accounting for nonrefundable, up-front fees" and that
immediate recognition is appropriate for the up-front fee upon "the culmination of a separate earnings process."
(CAC II ¶ 87.)  Because there were no future performance obligations under the warrant agreement, the signing
of the agreement represented the culmination of the earnings process.  (*See* Maguire Decl. Ex. N, at D&T
0000406-09 (quoted in part in CAC II ¶ 89).)

45

**[CONFIDENTIAL]** (CAC II ¶ 89 (quoted in part); Maguire Decl. Ex. N, D&T

0000406-09.) **[CONFIDENTIAL]**



**[CONFIDENTIAL]** Deloitte considered the accounting literature,

and concluded that the full value of the warrant should be recognized on October 26, 1999.  (*Id.*)

The new allegations of the CAC II further show that the Deloitte audit team

continued its consultations with Deloitte's National Office accounting research group, sending

both the January 18, 2000 memorandum and copies of the WebHouse agreements for their

review.  (CAC II ¶ 89.)  The National Office took exception to a preamble in the warrant

agreement.  (CAC II ¶¶ 89, 91.)  The CAC II affirmatively alleges, however, that the **[CONFIDENTIAL]**

**[CONFIDENTIAL]**

**[CONFIDENTIAL]** (CAC II ¶ 91, emphasis added.)  The CAC II also cites a March 15, 2000

memorandum in which Deloitte's manager on the Priceline audit **[CONFIDENTIAL]**

**[CONFIDENTIAL]**

---

37.  The CAC II refers to four press releases from September 24, 1999 to November 8, 1999, announcing that
     Priceline received the warrant in return for a license agreement.  (CAC II ¶¶ 72, 80, 81, 85.)  The press releases
     are not inconsistent with Priceline's representations and Deloitte's understanding that the warrant was not
     intended to have any future performance obligations and thus was in the nature of "a sign-on bonus" for
     executing the license agreement.  (*Id.*)  The same is true for all of the other documents cited in the CAC II

Two Deloitte audit teams – the Priceline engagement team, and a separate engagement team which was performing the audit of WebHouse's financial statements – obtained oral and written representations confirming the parties' intent that the warrant was not contingent upon performance of the license agreement. Moreover, Priceline and WebHouse undertook to amend their agreements to remove the language that had caused the lack of clarity.[38]

The CAC II thus establishes and effectively concedes Deloitte's careful and detailed consideration of the facts and the accounting literature, with extensive input from Deloitte's National Office accounting research group, and its having obtained representations by the parties to the WebHouse transaction as to their intent, both in face-to-face meetings and in writing. Although plaintiffs point to the fact that the working papers show that Deloitte considered alternative accounting treatments (CAC II ¶¶ 89, 91), this can hardly be taken as a sign of fraud, but rather of the prudent exercise of due professional care in auditing the accounting for the warrant.[39]

---

which were prepared after the October 26, 1999 date of the agreements between Priceline and WebHouse. (CAC II ¶¶ 77 et seq.)

38. *See* CAC II ¶ 84, Maguire Decl. Ex. M, D&T 0000410 (note dated November 8, 1999); CAC II ¶ 89, Maguire Decl. Ex. N, D&T 0000406-09 (memorandum dated January 18, 2000); CAC II ¶ 91, Maguire Decl. Ex. O, D&T 0002148-53 (memorandum dated February 22, 2000); CAC II ¶ 97, Maguire Decl. Ex. Q, D&T 0005022-30 (Priceline representation letter); Maguire Decl. Ex. R, D&T 0001321-26 (WebHouse representation letter); CAC II ¶ 95, Maguire Decl. Ex. P, D&T 0000402-04 (memorandum documenting discussion with management).

39. Plaintiffs also allege that Deloitte violated generally accepted auditing standards (or GAAS) by not withdrawing its audit opinion after allegedly learning that Priceline's financial statements were materially misstated at the time of their issuance. (CAC II ¶ 277.) In support of this claim, plaintiffs apparently claim that Priceline admitted the alleged fraud in its 2000 Form 10-K, which states that Priceline "received warrants to purchase shares of its licensee, Priceline Webhouse Club, Inc. in exchange for services rendered." (Maguire Decl. Ex. CC, Priceline 2000 Form 10-K, at Note 8.) This language is in fact consistent with the accounting used in 1999. Notably, Priceline used the phrase "services rendered" – an expression signifying that Priceline's obligations had been performed – and not "services to be performed," which would have suggested further performance was required. Indeed, the remainder of this footnote makes clear that the warrant was "non-forfeitable" and "fully vested" and the grant "did not require the performance of any additional services by the Company" – all of which were considered in allowing Priceline to recognize the full value of the warrant in 1999. (*Id.*)

The contents of the working papers cited by plaintiffs in the CAC II contradict the allegation that "the Deloitte auditors joined with Priceline to generate false audit evidence." (CAC II ¶ 96.) The allegation refers to nothing more than a Priceline representation letter to Deloitte regarding the parties' intent, and to Deloitte's request that Priceline and WebHouse amend their agreements to clarify their intent, and does not in any respect support an inference of fraud by the auditors. First, a client representation letter is not "false audit evidence," but is rather an important piece of evidence that an auditor is required to obtain in performing an audit. (*See, e.g.*, Maguire Decl. Ex. DD, AU § 333.01.) Nor does it matter whether Deloitte drafted the letter because Priceline's management affirmatively represented the accuracy of its contents – indeed, it is entirely consistent with the professional standards for Deloitte to have done so.[40] Second, the substance of this representation to Deloitte was also included by Priceline in its 1999 Form 10-K, which is a formal disclosure document that was filed with the SEC. (Maguire Decl. Ex. A, at Note 11.) Finally, the parties' agreement to amend the warrant to clarify their intent was entirely consistent with the representations that they made to Deloitte, and which Deloitte had been documenting in its working papers since at least November 8, 1999. (P. 45, *supra.*)

While the CAC II alleges that the Deloitte auditors "started drafting the audit evidence of 'intent'" on April 14, 2000 (CAC II ¶ 100), the proposed CAC II and the working papers dated November 8, 1999, January 18, 2000, March 15, 2000 and March 30, 2000, to which it cites, specifically contradict this assertion by affirmatively alleging that the auditors, in fact, inquired about the parties' intent, consulted with the firm's National Office accounting research group and documented their conclusions well before April 14, 2000. (CAC ¶¶ 84, 89,

---

40. The CAC II does not even purport to claim that there is anything in the professional literature that suggests an auditor should not draft part or all of a client representation letter; to the contrary, the Codification of Statements on Auditing Standards provides illustrative samples to help the auditor draft an appropriate representation letter. (Maguire Decl. Ex. DD, AU § 333.16.)

91, 95, 97; pp. 44-47, *supra*.) As the proposed pleading concedes, the March 15, 2000

memorandum, for example, records that Deloitte had confirmed the parties' intent and that

Priceline and WebHouse had undertaken to amend the agreements to reflect the parties' intent.

(Maguire Decl. Ex. P (quoted in part at CAC II ¶ 95.) A handwritten addition to the

memorandum also recorded a follow up consultation with Deloitte's National Office accounting

research group on March 17, in which the research group confirmed that the accounting was

appropriate. (*Id.*) In July 2005, Deloitte produced to plaintiffs from the Priceline audit files all

of these documents and others confirming Priceline's written representation of the parties' intent

prior to issuance of Priceline's financial statements.[41] (Maguire Decl. ¶ 42.)

The CAC II's references to two documents dated after Priceline filed its Form 10-

K on March 30, 2000 (CAC II ¶¶ 100-101) are a tempest in a teapot. Deloitte produced both

documents from Deloitte's WebHouse (not Priceline) audit engagement files. (Maguire Decl. ¶

55.)[42] WebHouse was a non-public company on a different reporting schedule than Priceline.

(*Id.* Ex. FF.) Deloitte staffed the WebHouse audit with a separate engagement team, which

concluded the WebHouse audit in May 2000, several weeks after the Priceline audit. (*Id.* ¶ 55.)

Thus, the documents cited at paragraphs 100 and 101 of the CAC II bear April and May dates

because the WebHouse audit report and the WebHouse management representation letter were

dated April 14, 2000, and Deloitte issued its report on May 10, 2000.[43] (*Id.*)

---

41. *See also* Maguire Decl. Ex. A, 1999 Priceline Form 10-K, at Note 11.

42. For example, the April 14, 2000 unsigned draft document quoted in the CAC II at paragraph 100 was produced under a cover sheet showing that it came from the files of the engagement manager for the WebHouse audit, as follows: "ROBERT MORRIS / PRICELINE WEBHOUSE CLUB." (Maguire Decl. ¶ 57 & Ex. EE, D&T 0020356; *see also* Maguire Decl. ¶ 57 (discussing production of the document referenced at CAC II ¶ 101).)

43. The professional literature requires that management "representations should be made as of a date no earlier than the date of the auditor's report." (Maguire Decl., Ex. DD, AU § 333.09.)

Stripped of its own contradictions, the CAC II's allegations amount to nothing more than a disagreement on technical accounting issues about a transaction for which the terms and accounting were fully disclosed. Accordingly, even if the Court were to assume the correctness of plaintiffs' claim that Priceline should have accounted for the WebHouse warrant differently than it did, plaintiffs' proposed complaint against Deloitte is insufficient as a matter of law.

## CONCLUSION

For the foregoing reasons, Deloitte respectfully requests that the Court deny plaintiffs' motion for leave to file another untimely and insufficient Consolidated Amended Complaint.

Dated: June 20, 2007

Respectfully submitted,

/s/ Thomas J. Finn
Eric W. Wiechmann (CT 04331)
Thomas J. Finn (CT 20929)
McCARTER & ENGLISH, LLP
CityPlace I
Hartford, Connecticut 06103
(860) 275-6700

William R. Maguire (CT 23375)
David W. Wiltenburg
Kenneth M. Katz
David B. Shanies
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Attorneys for Deloitte & Touche LLP*

## CERTIFICATION

I hereby certify that on this 20th day of June 2007 a copy of the foregoing

Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to File a Second Amended

Compliant was filed electronically and served by mail on anyone unable to accept electronic

filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's

electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the

Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Thomas J. Finn
Eric W. Wiechmann (CT 04331)
Thomas J. Finn (CT 20929)
McCARTER & ENGLISH
CityPlace I
Hartford, Connecticut 06103
Tel:  (860) 275-6700

51