# PRICELINE COM INC

## FORM 10-K405
(Annual Report (Regulation S-K, item 405))

## Filed 3/30/2000 For Period Ending 12/31/1999

| | |
|---|---|
| Address | 800 CONNECTICUT AVE |
| | NORWALK, Connecticut 06854 |
| Telephone | 203-705-3000 |
| CIK | 0001075531 |
| Industry | Computer Services |
| Sector | Technology |
| Fiscal Year | 12/31 |

Generated by **EDGAR Online Pro**
http://pro.edgar-online.com

**EDGAR** Online®

Contact **EDGAR Online**
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the year ended December 31, 1999 Commission File No. 0-25581**

# priceline.com Incorporated

(Exact name of registrant as specified in its charter)

| Delaware | 0-25581 | 06-1528493 |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

800 Connecticut Avenue, Norwalk, Connecticut 06854
(Address of Principal Office) (Zip Code)

Registrant's telephone number, including area code:
(203) 299-8000

Securities Registered Pursuant to Section 12(b) of the Act:
Common Stock, par value $0.008 per share

Securities Registered Pursuant to Section 12(g) of the Act:
None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. Yes [X] No [ ]

Aggregate market value of voting stock held by non-affiliates of the registrant as of March 10, 2000................$5,664,836,331

Number of shares of common stock outstanding as of March 10, 2000..........................................170,115,752

**DOCUMENTS INCORPORATED BY REFERENCE**

The information required by Part III of this Annual Report on Form 10-K, to the extent not set forth herein, is incorporated herein by reference from the registrant's definitive proxy statement relating to the annual meeting of stockholders to be held on April 24, 2000, which definitive proxy statement was filed on March 27, 2000 with the Securities and Exchange Commission.

Form 10-K For the Year Ended December 31, 1999

INDEX

                                                                   PAGE
PART I
Item 1.   Business........................................................ 1
Item 2.   Properties......................................................22
Item 3.   Legal Proceedings...............................................22
Item 4.   Submission of Matters to a Vote of Security Holders. ...........23

PART II
Item 5.   Market for the Registrant's Common Stock and Related
            Stockholder Matters...........................................23
Item 6.   Selected Financial Data.........................................24
Item 7.   Management's Discussion and Analysis of Financial Condition and
            Results of Operations.........................................24
Item 7A.  Quantitative and Qualitative Disclosure About Market Risk..........35
Item 8.   Financial Statements and Supplementary Data. ......................35
Item 9.   Changes in and Disagreements With Accountants on Accounting and
            Financial Disclosure..........................................35

PART III
Item 10.  Directors and Executive Officers of the Registrant.................35
Item 11.  Executive Compensation............................................35
Item 12.  Security Ownership of Certain Beneficial Owners and Management......35
Item 13.  Certain Relationships and Related Transactions.....................35

PART IV
Item 14.  Exhibits, Financial Statement Schedules and Reports on Form 8-K.....36

Signatures..................................................................39

Financial Statements........................................................41

PART I

## Item 1. Business

### General

Priceline.com Incorporated ("priceline.com," the "Company," "we," "us" or "our") has pioneered a unique e-commerce pricing system known as a "demand collection system" that enables consumers to use the Internet to save money on a wide range of products and services while enabling sellers to generate incremental revenue. Using a simple and compelling consumer proposition - Name Your Own Price(sm) - priceline.com collects consumer demand, in the form of individual customer offers guaranteed by a credit card, for a particular product or service at a price set by the customer. Priceline.com then either communicates that demand directly to participating sellers or accesses participating sellers' private databases to determine whether priceline.com can fulfill the customer's offer. Consumers agree to hold their offers open for a specified period of time and, once fulfilled, offers cannot be canceled. Priceline.com benefits consumers by enabling them to save money, while at the same time benefitting sellers by providing them with an effective revenue management tool capable of identifying and capturing incremental revenues. By requiring consumers to be flexible with respect to brands, sellers and product features, priceline.com enables sellers to generate incremental revenue without disrupting their existing distribution channels or retail pricing structures.

Priceline.com believes that its unique business model can be applied to a broad range of products and services. The Company believes that this broad applicability of its business model, its first mover advantage, the strength of the priceline.com brand, its network of seller participants, its proprietary software systems and its intellectual property strategies provide it with significant competitive advantages. Priceline.com's strategy is to increase its revenues in existing products and services by improving product offerings, expand its Name Your Own Price(sm) service to new products and services and offer its services in international markets through investments in independent licensee companies.

Priceline.com commenced its service on April 6, 1998 with the sale of leisure airline tickets and at December 31, 1999 offered services for leisure airline tickets, hotel rooms, mortgages and new automobiles. In December 1999 and February 2000, the Company launched two different rental car offerings. In the near term, the Company intends to launch a Name Your Own Price(sm) service for international and domestic long distance service. In addition, the Company's licensee, Priceline WebHouse Club, Inc., launched a Name Your Own Price(sm) service for groceries in the fourth quarter of 1999. Another licensee, Priceline Perfect Yard Sale, Inc., launched on a test basis in the first quarter of 2000 a consumer-to-consumer based Name Your Own Price(sm) service for the sale of quality used goods over the Internet.

For the year ended December 31, 1999, priceline.com had revenues of $482.4 million. The revenues for the year ended December 31, 1999 were comprised primarily of: (1) transaction revenues representing the selling price of airline tickets and hotel rooms; (2) fee income from adaptive marketing programs offered in connection with priceline.com's product offerings; (3) ancillary revenues consisting primarily of reservation booking fees and customer processing fees; and (4) fee income from priceline.com's home financing and auto programs.

Priceline.com was formed as a Delaware limited liability company in 1997 and was converted into a Delaware corporation in July 1998. The Company completed its initial public offering in April 1999, and its comon stock is listed on the Nasdaq National Market under the symbol "PCLN." Priceline.com recently completed the relocation of its principal corporate offices from Stamford, Connecticut to Norwalk, Connecticut.

### The priceline.com Business Model

Priceline.com has developed a unique pricing system known as a "demand collection system" that uses the information sharing and communications power of the Internet to create a new way of pricing products and services. Priceline.com creates a new balance between the interests of buyers, who are willing to accept trade-offs in order to save money, and sellers, who are prepared to generate incremental revenue by selling products at below

retail prices, provided that they can do so without disrupting their existing distribution channels or retail pricing structures. Priceline.com's demand collection system allows consumers to specify the price they are prepared to pay when submitting an offer for a particular product or service within a specified range of substitutability. Priceline.com then either communicates these offers to participating sellers or accesses participating sellers' private databases to determine whether it can fulfill the customer's offer. Consumers agree to hold their offers open for a specified period of time to enable priceline.com to fulfill their offers from inventory provided by participating sellers. Once fulfilled, offers generally cannot be canceled. This system uses the flexibility of buyers to enable sellers to accept a lower price in order to sell excess inventory or capacity or increase sales velocity. Priceline.com believes that its demand collection system addresses limitations inherent in traditional seller-driven pricing mechanisms in a manner that offers substantial benefits to both buyers and sellers. The principal advantages of the priceline.com system include the following:

o Cost Savings and Preferred Method Of Purchasing For Consumers. Priceline.com's Name Your Own Price(sm) demand collection system allows consumers to save money in a simple and compelling way. Buyers effectively trade off flexibility about brands, product features and/or sellers in return for prices that are lower than those that can be obtained at that time through traditional retail distribution channels. Priceline.com believes that in many cases, such as purchasing a new car or obtaining a home mortgage, the Internet represents a preferred method to traditional retail channels.

o Incremental Revenue For Sellers. Sellers use priceline.com as a revenue management tool to generate incremental revenue without disrupting their existing distribution channels or retail pricing structures. Priceline.com requires consumers to be flexible with respect to brands and product features. As a result, sellers' brands are not revealed to customers prior to the consummation of a transaction, thereby protecting their brand integrity. This shielding of brand identity enables sellers to sell products and services at discounted prices without cannibalizing their own retail sales by publicly announcing discount prices and without competing against their own distributors.

o Proprietary Seller Networks. Priceline.com assembles proprietary networks of industry leading sellers that represent high quality brands. By establishing attractive networks of seller participants with reputations for quality, scale and national presence, priceline.com fosters increased participation by both buyers and sellers.

o Guaranteed Consumer Demand For Sellers. Each customer who makes an offer through priceline.com must guarantee his or her offer with a major credit card. The guaranteed aspect of the demand is attractive to sellers because they know that priceline.com offers them a confirmed sale.

o Broad Applications Across Multiple Markets. In contrast to many e-commerce companies that are building brands in vertical categories or groups of related categories, priceline.com believes that its e-commerce business model has horizontal application to products and services in a wide range of industries. Priceline.com further believes that the broad applicability of the priceline.com service and the strength of the priceline.com brand afford it the opportunity to obtain substantial economies of scale and offer the potential for priceline.com to become a major new channel of distribution.

The priceline.com Strategy

Priceline.com's objective is to continue to expand the priceline.com business and to operate priceline.com's demand collection system as a leading source for the purchase of products and services on the Internet. The key elements of priceline.com's strategy are as follows:

2

o Strengthen the priceline.com Brand. The Company intends to expand consumer recognition of priceline.com as the leading consumer brand for buyer-driven commerce over the Internet. To achieve this objective, priceline.com intends to continue to pursue an aggressive brand development strategy through mass market and targeted advertising and promotions, press coverage and strong word-of-mouth support. While priceline.com is already one of the most recognized e-commerce brands among adult Americans, priceline.com believes that it can expand the public's association with the priceline.com Name Your Own Price(sm) proposition to a broad range of products and services. See "- Marketing and Brand Awareness."

o Leverage the priceline.com Brand Over Numerous Products and Services. Priceline.com intends to continue to leverage the priceline.com brand across numerous products and services to achieve significant revenue scale and growth. In contrast to most e-commerce businesses that operate in one or two "vertical" markets, priceline.com is a "horizontal" commerce system that can benefit both buyers and sellers across a broad range of products and services. Priceline.com's strategy is to make available multiple product and service offerings at a single Web site under a common brand to take advantage of these market opportunities. Priceline.com intends to expand directly in certain vertical markets and license its business model and name to independent licensees in other markets. Priceline.com and its licensees have launched or expanded offerings in several new categories over the past twelve months and these efforts will continue. See "- Products and Services."

o Enhance Site Functionality and Increase Consumer Usage. Priceline.com intends to continue to frequently update and enhance the features of the priceline.com service. Priceline.com continually monitors feedback from consumers and frequently adds new features to further refine and simplify the buying process. Priceline.com also receives offers by telephone and provides customer service by telephone and e-mail to assist consumers in the offer process. By continuing to increase the functionality of the service and enhance the consumer experience, priceline.com believes that it will continue to increase customer usage and loyalty.

o Pursue International Expansion. Priceline.com believes that the international scope of the Internet and the global demand for the types of products and services available through priceline.com presents opportunities to expand its service internationally. Priceline has announced initiatives in Australia/New Zealand and Asia and intends to pursue additional overseas opportunities. See "- Products and Services - International Expansion."

## Products and Services

Priceline.com launched the priceline.com service on April 6, 1998 with the sale of leisure airline tickets. The priceline.com service now includes the sale of new automobiles, hotel room reservations, rental cars and home financing services. Priceline.com also intends to expand its product offerings to include:
other leisure travel products such as cruises; time shares and vacation packages; pre-paid long distance and other telecommunications services; credit cards; and automobile, personal insurance and other financial services products. In addition, priceline.com has announced initiatives to expand the priceline.com service internationally.

3

**Travel Services**

Leisure Airline Tickets. Priceline.com commenced its service with the sale of leisure airline tickets. The number of airlines participating in priceline.com's airline ticket service has increased to a total of 10 domestic airlines and 20 international airlines.

Consumers can make offers to purchase airline tickets through the priceline.com Web site or the 1-800-PRICELINE(sm) call center. The vast majority of all airline ticket requests are made through priceline.com's Web site. To make an offer, a customer specifies (1) the origin and destination of the trip,
(2) the dates on which the customer wishes to depart and return, (3) the price the customer is willing to pay and (4) the customer's valid credit card to guarantee the offer. When making an offer, consumers must agree to:

o fly on any major full-service airline;

o leave at any time of day between 6 a.m. and 10 p.m.on their desired dates of departure and return;

o purchase only round trip economy class tickets between the same two points of departure and return;

o accept at least one stop or connection;

o receive no frequent flier miles or upgrades; and

o accept tickets that cannot be refunded or changed.

When priceline.com receives an offer, it determines whether to fulfill the offer based upon the available fares, rules and inventory provided to priceline.com by its participating airlines. A customer is notified whether his or her offer has been accepted within one hour. If priceline.com is able to obtain an airline ticket within the parameters specified by the customer, the customer's offer is accepted and his or her credit card is charged the offer price, plus applicable taxes, surcharges and standard processing fees, and the ticket is delivered to the customer by the delivery method specified by the customer. As with pricelines.com's other travel products, once a customer's offer for airline tickets is accepted, that offer cannot be withdrawn or cancelled.

Hotels. In October 1998, priceline.com launched its Name Your Own Price(sm) travel service for hotel room reservations. Priceline.com's hotel room reservation service currently is available in substantially all major cities and metropolitan areas in the United States. Seller participants in the hotel room reservation service include several of the most significant national hotel chains as well as several important real estate investment trusts and independent property owners. Hotels participate by filing private discounted rates with related inventory control rules in priceline.com's private database in a central reservation system for hotel rooms. These rates generally are not available to the general public or to consolidators and other discount distributors who sell to the public.

Priceline.com's hotel room reservation service operates in a manner similar to its airline ticket service. Consumers are required to accept certain trade-offs with respect to brands or product features in return for saving money. For example, consumers are required to accept a reservation in any hotel within a specified geographic

4

area within a designated class of service (1, 2, 3, 4 or 5 star) and must accept limitations on change and cancellation. As with the airline ticket service, the target market for priceline.com's hotel room reservation service is the leisure travel market.

Rental Cars. Priceline.com offers two different rental car services. In December 1999, priceline.com launched its Insiders Rates(sm) service and, in February 2000, priceline.com launched its Name Your Own Price(sm) service. Priceline.com's rental car services are currently available in substantially all major United States markets. Three of the top five brand name rental car companies in the United States are seller participants in priceline.com's rental car program.

Under priceline.com's Insiders Rates(sm) service, participating car rental companies offer priceline.com customers who have successfully purchased an airline ticket from priceline.com rates on car rentals in connection with a customer's planned travel arrangements. An offer is provided to a customer by e-mail and on priceline.com's Web site when a customer checks the status of his or her request.

Priceline.com's Name Your Own Price(sm) rental car service operates in a manner similar to its airline ticket and hotel reservation services. Consumers can access priceline.com's Web site and select where and when they want to rent a car, what kind of car they want to rent (i.e., economy, compact, mid-size, SUV) and the price they want to pay per-day, excluding taxes, fees and surcharges. When priceline.com receives an offer, it determines whether to fulfill the offer based upon the available rates, rules and inventory. A customer is notified whether his or her offer has been accepted within one hour. If a customer's offer is accepted, priceline.com will immediately reserve the rental car, charge the customer's credit card and notify the customer of the car rental company and location providing the rental car.

Other Travel Services. Priceline.com intends to expand its products and services within the leisure travel industry over the next two years to encompass cruises, all-inclusive resorts, time share and vacation packages.

Home Financing Services. Priceline.com introduced its home financing service in January 1999. Under the terms of separate agreements with Alliance Partners, L.P. and LendingTree, priceline.com's financing service allows consumers to name their interest rate and points for mortgages of a specified term, including, purchase money mortgages, refinancings and home equity loans.

Alliance relationship. Under the terms of priceline.com's agreement with Alliance Partners, which was entered into on March 17, 2000, priceline.com provides advertising and marketing support and a license of certain priceline.com intellectual property to a newly formed indirect subsidiary of Alliance Partners. This Subsidiary conducts business as a broker and/or lender of residential mortgage loans under the name "pricelinemortgage." Pursuant to an intellectual property license from priceline.com, pricelinemortgage utilizes the priceline.com Name Your Own Price(sm) business model. Pricelinemortgage is controlled by First Alliance Bank, a federally chartered savings association supervised by the Office of Thrift Supervision and a wholly owned subsidiary of Alliance Partners. Pricelinemortgage has access to the management resources and expertise of Alliance Partners and its affiliates, including Alliance Mortgage Company, a residential mortgage lender since 1962. Alliance Partners provides management services to pricelinemortgage, including the procurement of personnel and office space and assistance in obtaining regulatory approvals. Pricelinemortgage is operating in all 50 states.

5

LendingTree relationship. Under priceline.com's agreement with LendingTree, priceline.com is responsible for maintaining the home financing service on the priceline.com Web site and for consumer marketing. LendingTree serves as the back-end processing system, which presents offers received through the priceline.com Web site to multiple mortgage lending institutions for consideration. There are currently more than 30 lenders participating in the home financing services through LendingTree.

To obtain a home mortgage, refinancing or home equity loan, consumers access the priceline.com Web site and specify the amount of the loan, the term, the interest rate and the points that they are willing to pay. Customers complete a simplified loan application as part of the process of making an offer. In connection with making an offer, customers are required to guarantee with a major credit card the payment of a good-faith deposit of $200 that is applied towards closing costs. Priceline.com notifies a customer within six hours whether his or her offer has been accepted by a participating lender. Participating lenders may submit counteroffers through Priceline.com for up to one business day following the customer's offer.

### Other Financial Services Products

Priceline.com intends to expand its products and services within the financial services industry over the next two years to include unsecured personal loans, automobile loans, credit cards and credit card balance consolidations and automobile and life insurance policies. As with its other products and services, priceline.com may expand its financial services products by entering into licensing transactions or strategic relationships with leading industry participants.

### New Car Sales

Priceline.com introduced its new car sales service on a test basis in the New York metropolitan area in July 1998. Since that time, priceline's new automobile service has been expanded to include 26 states and the Company intends to continue domestic expansion, subject to resolution of any regulatory issues.

6

Priceline.com's new car sales service accepts offers for every major brand of automobile. To purchase a new car through the priceline.com service, the customer identifies the exact vehicle desired to be purchased or leased, including the make, model and specified options, the geographic area in which the customer is willing to pick up the vehicle and the purchase price or lease price the customer is willing to pay. All sales are made through factory-authorized dealers.

Upon receiving an offer for a new car, priceline.com transmits the customer's offer to factory authorized dealers within the specified geographic radius, without disclosing the identity of the customer. Priceline.com directs the sale to the first dealer that notifies the Company that it is willing to accept the customer's offer. Priceline.com then notifies the customer to pick up the vehicle from that dealer and the transaction is closed directly between them.

Due to the numerous features and options on a new automobile, the range of product substitutability that consumers will accept is lower in the case of new cars than with airline tickets or hotels. As a result, a dealer that may not be able to precisely fulfill a customer's offer is permitted to make a counteroffer through priceline.com. The counteroffer may specify a different product package or price. The customer is free to accept or reject such a counteroffer. The customer also is permitted to submit an additional offer through priceline.com. Priceline.com facilitates the exchange of customer offers and dealer acceptances or counteroffers. Priceline.com does not negotiate on behalf of customers or dealers and does not represent to its customers or dealers that it is acting as an agent or broker on behalf of either party.

Once an offer for a new car is accepted by a dealer, the consumer completes the transaction directly with the dealer and receives the same standard manufacturer's warranty and other terms that are available with respect to any new car purchased from that dealer. In most states, when a sale is completed, priceline.com is paid a $50 fee from the customer and a $200 fee from the selling dealer. In other states, the Company does not currently receive compensation from the customer or dealer as a result of regulatory restrictions. If the customer fails to consummate the transaction within a specified time period after being notified that an offer is accepted, the customer is charged a cancellation fee.

The priceline.com new car sales service is differentiated from other Internet car sales services, which serve as lead generators for participating car dealers. Under such services, multiple dealers may contact the customer in response to the customer's inquiry to the Internet service. By contrast, priceline.com's new car sales service does not reveal the identity of the customer to the auto dealer until the dealer has accepted the customer's offer. Furthermore, in contrast to other Internet car sales services, dealers are not currently required to pay a participation fee to review offers from the priceline.com service.

Long Distance Service. In the near term, the Company intends to launch a Name Your Own Price(sm) service for international and domestic long distance calls. The Company intends to allow consumers to name their own price for phone-to-phone international and domestic long distance calls.

<p align="center">**Licensees**</p>

WebHouse Club. The Company has licensed its patented Name Your Own Price(sm) business model and affiliated trademarks and software systems to Priceline WebHouse Club, Inc., which operates an Internet-based service for groceries and other retail products. Walker Digital Corporation owns 34.1% of the outstanding capital stock of WebHouse Club and the balance is owned by certain institutional and individual investors. Priceline.com owns a warrant that entitles it to purchase up to 137.5 million shares of common stock of WebHouse Club, or 77.5% of the fully diluted equity of WebHouse Club, at an exercise price of $3.00 per share, upon the satisfaction of certain conditions. Unless and until that warrant is exercised, WebHouse Club and its financial results will not be included in priceline.com's financial statements. In connection with the WebHouse Club transaction, Walker Digital, granted to priceline.com an exclusive (in the field of retail commerce other than vending machines or restaurants) worldwide license to certain intellectual property, including patent and patent applications, useful in WebHouse Club's business. The Company exclusively sublicensed these intellectual property rights to WebHouse Club and granted to WebHouse Club an exclusive worldwide license to its buyer-driven commerce patent rights and other intellectual property for use in the sale of groceries, health and beauty items and household supplies by retailers, as well as a non-exclusive worldwide license to such intellectual property for use in Internet-based,

buyer-driven commerce for the sale, by retailers, of other products or services. WebHouse Club pays priceline.com a sliding scale royalty descending from 1.0% of net revenues. In addition to the patent and technology license, priceline.com and WebHouse Club share certain information technology infrastructure, and priceline.com provides WebHouse Club with marketing and information technology services.

Perfect Yard Sale. Priceline.com also has licensed its patented Name Your Own Price(sm) business model and affiliated trademarks to Priceline Perfect Yard Sale, Inc., a subsidiary of Walker Digital which operates a consumer-to-consumer service for the sale of quality used goods over the Internet. Walker Digital has agreed to grant priceline.com an exclusive, worldwide license to certain intellectual property including patents useful in Perfect Yard Sale's business. Under the terms of a preliminary agreement between priceline.com and Perfect Yard Sale, priceline.com granted to Perfect Yard Sale an exclusive royalty-free license to certain intellectual property licensed by Walker Digital to priceline.com, as well as to the priceline.com buyer-driven commerce patent rights and related intellectual property, and the Priceline name and associated trademarks for use in Perfect Yard Sale's business, and agreed to provide related services on a royalty-free basis pending execution of definitive documentation. Under the terms of the Perfect Yard Sale preliminary agreement, priceline.com has the right to receive a warrant to purchase a majority of the outstanding voting equity of Perfect Yard Sale on mutually agreed upon terms. Until that warrant is exercised, Perfect Yard Sale and its financial results will not be included in priceline.com's financial statements.

### International Expansion

On February 29, 2000, priceline.com announced that it had entered into definitive agreements, to introduce priceline.com's buyer-driven e-commerce system to the residents of Australia and New Zealand. This service will be offered by a newly formed entity, MyPrice PTY Ltd ACN. Upon consummation of the transactions contemplated by the definitive agreements, which is subject to receipt of required Australian regulatory approvals, the outstanding equity of MyPrice will be owned by a consortium of Australian and international business executives and investors. MyPrice initially will offer leisure airline tickets and intends to expand into other areas, including hotels, rental cars, financial services (including credit cards, loans and insurance), telecommunications and automotive sales. Upon consummation of the transactions, priceline.com will license its business model to MyPrice and will receive an annual licensing payment from MyPrice. Priceline.com will purchase a convertible note allowing it to take a 50% interest in MyPrice under certain conditions. Unless and until that note is converted, MyPrice and its financial results will not be included in priceline.com's financial statements. MyPrice expects to launch two web sites later this year - MyPrice.com.au and MyPrice.com.nz (both powered by priceline.com).

On January 26, 2000, the Company announced that it had entered into an agreement in principle to form an alliance with Hutchison Whampoa Limited to introduce priceline.com's buyer-driven e-commerce system to 2.6 billion consumers in China (and Hong Kong), India, Taiwan, Indonesia, Singapore, Thailand, Korea, Malaysia, the Philippines, Vietnam and certain other Asian countries. Under the terms of the agreement in principle between priceline.com and a subsidiary of Hutchison, upon execution of mutually acceptable definitive agreements, a new company will be created to launch and manage the Name Your Own Price(sm) service in Asia. The Company will license its business model to the newly created company and provide technology, marketing and operations support. Hutchison will contribute its strong brand and leverage its extensive customer base and retail network in Asia. The new company will pay priceline.com an annual licensing fee in respect of priceline.com's intellectual property and technology marketing and operation services fees. In addition, Priceline.com will purchase a convertible note allowing it to take up to a 50% interest in the new company under certain conditions. Unless and until that note is converted, the new company and its financial results will not be included in priceline.com's financial statements. Hutchison will also purchase equity securities in the new company and is also providing management services. The new company is expected to launch its first service for leisure airline tickets later this year completion of the transaction is subject to negotiation and execution of definitive agreements and certain other conditions.

Priceline.com is continuing to pursue additional opportunities to expand its service internationally.

### Adaptive Marketing Programs

Priceline.com has developed adaptive marketing programs to help bridge the gap between consumer offers and their prices, provide users of the priceline.com service with other desired products, and generate additional revenue for the Company. These programs also serve as an integral part of priceline.com's strategy of building customer loyalty.

Priceline.com's adaptive marketing programs presently include two distinct initiatives. The first, which it refers to as "adaptive promotions," allows consumers to increase the amount of their offers, and thus their likelihood of success, at no additional cost by participating in sponsor promotions during the process of making a priceline.com offer. For example, a customer making an offer to buy a round-trip airline ticket can immediately have the amount of his or her offer increased (and thereby increase his or her likelihood of success) by applying online for a credit card.

The second type of adaptive marketing program is referred to as "adaptive cross selling" and utilizes cross selling of multiple products to increase the number of successful transactions. For example, a customer whose offer for an airline ticket was marginally below acceptable levels could be offered a second related product such as a hotel room reservation or a rental car day at a combined price that provided an acceptable margin for priceline.com.

During 1999, priceline.com added adaptive marketing partners and, as a result, reduced its dependence on any one partner. Priceline.com intends to continue to add adaptive marketing programs so that consumers have a variety of programs from which to choose and priceline.com has a diversified source of adaptive marketing revenues.

Walker Digital owns the intellectual property rights underlying the technology associated with the Company's adaptive marketing programs. Walker Digital has licensed to the Company the right to use these intellectual property rights under a perpetual, exclusive, royalty-free license agreement. Walker Digital has pending several United States patent applications directed to different aspects of the processes and technology supporting the Company's adaptive marketing programs.

**Marketing and Brand Awareness**

Priceline.com has established itself as a leading e-commerce brand through an aggressive marketing and promotion campaign. During fiscal year 1999, priceline.com incurred $79.6 million for sales and marketing expense. It intends to continue to pursue an aggressive marketing strategy designed to promote brand awareness and the concept that consumers can save money on a wide range of products and services through priceline.com. Underlying priceline.com's marketing strategy is the Company's belief that its target market is all consumers, not just Internet-savvy consumers. Substantially all of such spending has been for television, radio and newspaper advertising. Priceline.com's campaign features the actor William Shatner as its spokesperson.

Priceline.com supplements its paid advertising and promotion with targeted media coverage. Priceline.com has been featured in hundreds of news stories in national publications such as The New York Times, The Wall Street Journal and USA Today, reflecting the intuitive appeal of the priceline.com business model and its strong word-of-mouth support. In addition, priceline.com engages in grass roots marketing such as promotional events on college campuses and co-promotions with popular media such as MTV.

**Competition**

Priceline.com competes with both online and traditional sellers of the products and services offered on priceline.com. The market for selling products and services over the Internet is new, rapidly evolving and intensely competitive. Current and new competitors can launch new sites at a relatively low cost. In addition, the traditional retail industry for the products and services priceline.com offers is intensely competitive.

Priceline.com currently or potentially competes with a variety of companies with respect to each product or service it offers. With respect to travel products, these competitors include:

o Internet travel agents such as Microsoft's Expedia;

o traditional travel agencies;

9

o consolidators and wholesalers of airline tickets and other travel products, including online consolidators such as CheapTickets.com;

o individual or groups of airlines, hotels, rental car companies, cruise operators and other travel service providers; and

o operators of travel industry reservation databases such as Worldspan and Sabre.

Priceline.com's current or potential competitors with respect to new automobiles include traditional and online auto dealers, including newly developing auto super stores such as AutoNation, Auto-by-Tel and Microsoft's CarPoint.

With respect to financial service products, priceline.com's competitors include:

o banks and other financial institutions;

o online and traditional mortgage and insurance brokers, including mortgage.com, Quicken Mortgage, E-Loan and iOwn, Inc.; and

o insurance companies.

Priceline.com's current or potential competitors with respect to rental cars include, among others, rental car companies and traditional and online travel agencies and travel service providers.

With respect to long distance services, priceline.com's potential competitors include long distance providers, local exchange providers that may be entering the long distance market and Internet Protocol telephone services.

Priceline.com potentially faces competition from a number of large Internet companies and services that have expertise in developing online commerce and in facilitating Internet traffic, including Amazon.com, America Online, Microsoft and Yahoo!, who could choose to compete with priceline.com either directly or indirectly through affiliations with other e-commerce or offline companies. Other large companies with strong brand recognition, technical expertise and experience in Internet commerce could also seek to compete with priceline.com. The Company also believes that a number of airlines intend to invest in and offer discount airfares and travel services through a site or sites to be established and similar steps may be under consideration by certain hotel companies and travel service providers. Competition from these and other sources could have a material adverse effect on priceline.com's business, results of operations and financial condition.

Priceline.com believes that the principal competitive factors in its markets are brand recognition, price, Web site accessibility, ability to fulfill offers, customer service, reliability of delivery, ease of use, and technical expertise and capabilities. Many of priceline.com's current and potential competitors, including Internet directories and search engines and large traditional retailers, have longer operating histories, larger customer bases, greater brand recognition and significantly greater financial, marketing, technical and other resources than priceline.com. Some of these competitors may be able to secure products and services on more favorable terms than priceline.com. In addition, many of these competitors may be able to devote significantly greater resources to: (1) marketing and promotional campaigns, (2) attracting traffic to their Web sites, (3) attracting and retaining key employees, (4) securing vendors and inventory and (5) Web site and systems development.

Increased competition could result in reduced operating margins and loss of market share and could damage priceline.com's brand. There can be no assurance that priceline.com will be able to compete successfully against current and future competitors or that competition will not have a material adverse effect on priceline.com's business, results of operations and financial condition.

10

Priceline.com's business is supported by a state of the art systems platform, which was designed with an emphasis on scalability, performance and reliability. Priceline.com's core demand collection and offer processing systems are proprietary to priceline.com. The software platform and architecture are built on server-side Java, C++, and ISO standard SQL scripts integrated with an Oracle relational database system. This internal platform was designed to include open application protocol interfaces that can provide real-time connectivity to vendors in the range of industries in which priceline.com operates. These include large global inventory systems, such as airline and hotel room reservation systems and financial service providers, as well as individual inventory suppliers, such as auto dealers, individual hotels and hard goods merchants. Priceline.com's Internet servers utilize Verisign digital certificates to help it conduct secure communications and transactions.

Priceline.com out-sources most of its call center and customer service functions, and uses a real-time interactive voice response system with transfer capabilities to its call centers and customer service centers in Norwalk, Connecticut, Boston, Massachusetts, Columbus, Ohio, and Salt Lake City, Utah.

Priceline.com's systems infrastructure, Web and database servers are hosted at Exodus Communications, Inc. in Jersey City, New Jersey, which provides communication lines from multiple providers including UUNet and AT&T, as well as 24-hour monitoring and engineering support. Exodus has its own generator and multiple back-up systems in Jersey City. Priceline.com also maintains an uninterruptible power supply system and generator and redundant servers at its Stamford, Connecticut site to provide service capability if the Exodus site fails.

Priceline.com also offers phone service through its toll-free number, 1-800-PRICELINE(sm), which allows consumers who do not have access to a computer to phone in their orders. In addition, consumers who choose not to transmit their credit card information via the Internet have the option of submitting their credit card information through the phone service. Priceline.com also uses its toll-free number to provide customer service. Because priceline.com is an Internet business, it intends to phase out its telephone ordering and credit card submission services over time and, in the future, will use its toll-free number only to provide customer service.

## Intellectual Property

Priceline.com currently holds four issued United States patents, Nos. 5,794,207, 5,797,127, 5,897,620 and 6,041,308, over 25 pending United States patent applications and corresponding pending international patent applications. Priceline.com files additional patent applications on new inventions, as appropriate.

While priceline.com believes that its issued patents and pending patent applications help to protect the priceline.com business, there can be no assurance that

o any patent can be successfully defended against challenges by third parties;

11

o the pending patent applications will result in the issuance of patents;

o competitors or potential competitors of priceline.com will not devise new methods of competing with the Company that are not covered by priceline.com's patents or patent applications;

o because of variations in the application of our business model to each of our products and services, our patents will be effective in preventing one or more third parties from utilizing a copycat business model to offer the same product or service in one or more categories;

o new prior art will not be discovered which may diminish the value of or invalidate an issued patent; or

o a third party will not have or obtain one or more patents that prevent priceline.com from practicing features of its business or will require priceline.com to pay for a license to use those features.

There has been recent discussion in the press regarding the examination and issuance of so called "business-method" patents. As a result, the United States Patent and Trademark Office has indicated that it intends to intensify the review process applicable to such patent applications. The new procedures are not expected to have a direct effect on patents already granted. Priceline.com can not anticipate what affect, if any, the new process will have on the Company's pending patent applications.

Priceline.com has been notified that a third-party patent applicant has challenged its U.S. Patent No. 5,794,207 patent by attempting to provoke an interference action in the United States Patent and Trademark Office. See "- Legal Proceedings."

Walker Digital owns certain intellectual property rights associated with the business of WebHouse Club that have been licensed exclusively to priceline.com in the field of buyer-driven commerce (other than vending machines or restaurants) which, in turn, sublicensed such rights to WebHouse Club for use in its business. Walker Digital also owns certain intellectual property rights associated with the business of Perfect Yard Sale. In a preliminary agreement, Walker Digital has agreed to license such rights exclusively to priceline.com in the field of buyer-driven commerce which, in turn, will be sublicensed to Perfect Yard Sale for use in its business. See "- Products and Services - Licensees."

Walker Digital owns the intellectual property rights underlying the technology associated with priceline.com's adaptive marketing programs. Walker Digital has licensed to priceline.com the right to use these intellectual property rights. Walker Digital has several pending United States patent applications directed to different aspects of the processes and technology supporting adaptive marketing programs.

Priceline.com seeks to protect its copyrights, service marks, trademarks, trade dress and trade secrets through a combination of laws and contractual restrictions, such as confidentiality agreements. For example, priceline.com attempts to register its trademarks and service marks in the United States and internationally. However, effective trademark, service mark, copyright and trade secret protection may not be available in every country in which priceline.com's services are made available online. See "- Additional Factors That May Affect Future Results -Our Success Depends on Our Ability to Protect Our Intellectual Property." A third party has sued priceline.com for, among other things, misappropriation of trade secrets. See "Legal Proceedings."

Priceline.com currently owns the Internet domain name "priceline.com" in the United States. Domain names are generally regulated by Internet regulatory bodies. The relationship between trademark and similar laws and domain name registration is evolving, including passage during 1999 of the Anti-Cybersquatting Consumer Protection Act, which significantly enhances the ability to prevent incorporation by third parties of trademarks into domain names. Priceline.com actively pursues infringers who improperly incorporate its trademarks into domain names, as appropriate, to maintain and enhance the strength of its trademarks. See "- Additional Factors That May Affect Future Results - Our Success Depends On Our Ability To Protect Our Intellectual Property."

12

The products and services provided by the Company are subject to various federal, state and local regulations. For example, the Company's travel service is subject to laws governing the offer and/or sale of travel services as well as laws requiring the Company to register as a "seller of travel." With respect to the Company's new car sales service, the Company is subject to regulations governing the registration and conduct of automobile dealers and brokers. In connection with the Company's plans to expand its new car sales service domestically, the Company may be required to register as an automobile dealer/broker in each applicable jurisdiction. However, the Company may be unable to expand to those jurisdictions that require dealer/brokers to maintain a dealer lot zoned for automobiles, obtain a franchise agreement with automobile manufacturers, or other related requirements. The Company will consider variations to its business model to address regulatory issues or offer its services without compensation pending resolution of any regulatory issues.

The Company is also subject to laws governing the licensing and conduct of persons providing mortgage brokerage services. Such laws typically require certain consumer protection disclosures and loan solicitation procedures. For example, the Real Estate Settlement Procedures Act prohibits the payment and receipt of mortgage loan referral fees, and permit persons to be compensated only for the fair market value of non-referral services. Accordingly, the Company has structured its home financing services such that it provides non-referral services such as Web site development and advertising to a licensed mortgage broker who, in turn, provides the back-end processing of the loan referrals. Although the mortgage broker compensates the Company only for the fair market value of its non-referral services, it is possible that governmental authorities could scrutinize the compensation agreement under the Real Estate Settlement Procedures Act or enact new legislation that might limit or prohibit the Company's present arrangement.

All of the Company's services are subject to federal and state consumer protection laws and regulations prohibiting unfair and deceptive trade practices. The Company is also subject to regulations applicable to businesses conducting online commerce. Today there are relatively few laws specifically directed toward online services. However, due to the increasing popularity and use of the Internet and online services, it is possible that laws and regulations will be adopted with respect to the Internet or online services. These laws and regulations could cover issues such as online contracts, user privacy, freedom of expression, pricing, fraud, content and quality of products and services, taxation, advertising, intellectual property rights and information security. Applicability to the Internet of existing laws governing issues such as property ownership, copyrights and other intellectual property issues, taxation, libel, obscenity and personal privacy is uncertain, but any such new legislation could have a material adverse effect on the Company's business, operating results and financial condition. In addition, some states may require the Company to qualify in that state to do business as a foreign corporation because the Company's service is available in that state over the Internet. Although the Company is qualified to do business in a number of states, failure to meet the qualifications of certain states could subject the Company to taxes and penalties.

As the Company expands its international presence, it will also be subject to various foreign regulations and governing bodies that might limit the Company's products and services. Likewise, the Company may be subject to unexpected changes in regulatory requirements and various tariffs and trade barriers in connection with online commerce. While the Company's licensees will generally be responsible for complying with applicable regulations, any failure on their part to comply may have an adverse effect on the Company.

## Employees

As of March 10, 2000, the Company employed approximately 373 full-time employees. Priceline.com also employs independent contractors to support its customer service and system support functions.

13

Priceline.com has never had a work stoppage and its employees are not represented by any collective bargaining unit. It considers its relations with its employees to be good. Priceline.com's future success will depend, in part, on its ability to continue to attract, integrate, retain and motivate highly qualified technical and managerial personnel, for whom competition is intense.

**Additional Factors That May Affect Future Results**

### Our Limited Operating History Makes Evaluating Our Business Difficult

Priceline.com was formed in July 1997 and began operations on April 6, 1998. As a result, we have only a limited operating history on which you can base an evaluation of our business and prospects. Our prospects must be considered in the light of the risks, uncertainties, expenses and difficulties frequently encountered by companies in their early stages of development, particularly companies in new and rapidly evolving markets, such as online commerce, using new and unproven business models. To address these risks and uncertainties, we must, among other things:

o attract leading sellers and consumers to the priceline.com service;

o maintain and enhance our brand, and expand our product and service offerings;

o attract, integrate, retain and motivate qualified personnel; and

o adapt to meet changes in our markets and competitive developments.

We may not be successful in accomplishing these objectives.

### We Are Not Profitable and Expect to Continue to Incur Losses

As of December 31, 1999, we had an accumulated deficit of $1.18 billion, of which $1.07 billion related to certain non-cash charges arising from equity issuances to a number of participating airlines, our chief executive officer and other parties, which was partially offset by $188.8 million of income representing the amount of estimated fair value of warrants received by us in connection with our relationship with our licensee WebHouse Club. We have not achieved profitability and expect to continue to incur losses. The principal causes of our losses are likely to continue to be significant brand development costs, marketing, personnel and promotion costs and technology and systems development costs.

Almost all of our revenues to date have been derived from airline ticket sales, hotel room reservations and related adaptive marketing programs. As our business model evolves, we have introduced and expect to continue to introduce a number of new products and services. With respect to both current and future product and service offerings, we expect to increase significantly our operating expenses in order to increase our customer base, enhance our brand image and support our growing infrastructure. For us to make a profit, our revenues and gross profit margins will need to increase sufficiently to cover these and other future costs. Otherwise, we may never achieve profitability.

### We Are Dependent on Adaptive Marketing Programs

Our adaptive marketing programs permit consumers to increase the amount of their offers at no additional cost by participating in sponsor promotions during the process of making an offer through the priceline.com service. The fees paid to us by sponsors offering the promotions generate significant revenues. Since these fees historically have involved no direct costs, they have had a disproportionately positive impact on our gross profit margins. A significant reduction in consumer acceptance of our adaptive marketing programs, significantly increased costs that we may incur in connection with adaptive marketing programs, reductions in fees paid to us

14

in connection with such programs or any material decline in such programs could result in a material reduction of our revenues and our gross profit. We may not be able to replace such revenues through other programs or through product sales.

We cannot guarantee that any of our adaptive marketing programs will continue beyond their initial terms or, even if continued, that they will be successful, or if additional adaptive marketing programs will be initiated. If such programs are not successful, our gross profit and results of operations could be adversely affected.

Potential Fluctuations in Our Financial Results Makes Financial Forecasting Difficult

We expect our revenues and operating results to vary significantly from quarter to quarter. As a result, quarter to quarter comparisons of our revenues and operating results may not be meaningful. In addition, due to our limited operating history and our new and relatively unproven business model, we cannot predict our future revenues or results of operations accurately. It is likely that in one or more future quarters our operating results will fall below the expectations of securities analysts and investors. If this happens, the trading price of our common stock would almost certainly be materially and adversely affected.

Our business has no backlog and almost all of our revenues for a particular quarter are derived from transactions that are both initiated and completed during that quarter. Our current and future expense levels are based largely on our investment plans and estimates of future revenues and are, to a large extent, fixed. Accordingly, we may be unable to adjust spending in a timely manner to compensate for any unexpected revenue shortfall, and any significant shortfall in revenues relative to our planned expenditures could have an immediate adverse effect on our business and results of operations.

Our limited operating history and rapid growth makes it difficult for us to assess the impact of seasonal factors on our business. Nevertheless, we expect our business to be subject to seasonal fluctuations, reflecting a combination of seasonality trends for the products and services offered by the priceline.com service and seasonality patterns affecting Internet use. For example, with regard to our travel products, demand for leisure travel may increase over summer vacations and holiday periods, while Internet usage may decline during the summer months. Our results also may be affected by seasonal fluctuations in the inventory made available to the priceline.com service by participating sellers. Airlines, for example, typically enjoy high demand for tickets through traditional distribution channels for travel during Thanksgiving and the year-end holiday period. As a result, during those periods, less excess airline ticket inventory would be available to priceline.com. Our business also may be subject to cyclical variations for the products and services offered; for example, leisure travel and home mortgage financing tend to decrease in economic downturns.

## We Are Dependent On the Airline Industry and Certain Airlines

Our near term, and possibly long term, prospects are significantly dependent upon our sale of leisure airline tickets. Sales of leisure airline tickets represented a substantial majority of total revenue for the year ended December 31, 1999. Leisure travel, including the sale of leisure airline tickets, is dependent on personal discretionary spending levels. As a result, sales of leisure airline tickets and other leisure travel products tend to decline during general economic downturns and recessions. Unforeseen events, such as political instability, regional hostilities, increases in fuel prices, travel-related accidents and unusual weather patterns also may adversely affect the leisure travel industry. As a result, our business also is likely to be affected by those events. Significantly reducing our dependence on the airline and travel industries is likely to take a long time and there can be no guarantee that we will succeed in reducing that dependence.

Sales of airline tickets from priceline.com's six largest airline suppliers accounted for approximately 93% of airline ticket revenue for the year ended December 31, 1999. As a result, currently we are substantially

15

dependent upon the continued participation of these airlines in the priceline.com service in order to maintain and continue to grow our total airline ticket revenues. We currently have 30 participating airlines. However, our airline participation agreements:

o do not require the airlines to make tickets available for any particular routes;

o do not require the airlines to provide any specific quantity of airline tickets;

o do not require the airlines to provide particular prices or levels of discount;

o do not require the airlines to deal exclusively with us in the public sale of discounted airline tickets; and

o generally, can be terminated upon relatively short notice.

These agreements also outline the terms and conditions under which ticket inventory provided by the airlines may be sold.

Our agreement with Delta contains certain restrictions relating to the terms of participation in our service by other carriers and the circumstances under which we may transfer or license our intellectual property to other travel providers. It is possible that, as the priceline.com service grows and becomes a significant channel of distribution for airline tickets and as other carriers seek participation in the priceline.com service, these competitively restrictive provisions of the Delta agreement could raise issues under federal and state antitrust laws. If that happened, either a federal or state government agency or private party could initiate litigation seeking to enjoin us and Delta from enforcing these provisions or seeking to collect treble damages. The outcome of any such litigation would be uncertain. If, however, such a lawsuit resulted in an injunction or subjected us to damages, our business and financial condition could suffer.

Due to our dependence on the airline industry, we could be severely affected by changes in that industry, and, in many cases, we will have no control over such changes or their timing. For example, if the Federal Aviation Administration grounded a popular aircraft model, excess seat capacity could be dramatically reduced and, as a result, our source of inventory could be significantly curtailed. In addition, given the concentration of the airline industry, particularly in the domestic market, major airlines that are not participating in the priceline.com service could exert pressure on other airlines not to supply us with tickets. Alternatively, the airlines could attempt to establish their own buyer-driven commerce service or other similar service to compete with us. We also could be materially adversely affected by the bankruptcy, insolvency or other material adverse change in the business or financial condition of one or more of our airline participants.

## Our Business Model is Novel and Relatively Unproven

The priceline.com service is based on a novel and relatively unproven business model. We will be successful only if consumers and sellers actively use the priceline.com service. Prior to the launch of the priceline.com service, consumers and sellers had never bought and sold products and services through a demand

16

collection system over the Internet. Therefore, it is impossible to predict the degree to which consumers and sellers will use the priceline.com service.

Many of the factors influencing consumers' and sellers' willingness to use the priceline.com service are outside our control. For example, a labor dispute that disrupts airline service or an airline accident could make consumers unwilling to use a service like priceline.com that does not permit the customer to designate the airline on which the customer purchases a ticket. In addition, a breach of security on the Internet, even if we were not involved, could make consumers unwilling to guarantee orders online with a credit card. Consequently, it is possible that consumers and sellers will never utilize the priceline.com service to the degree necessary for us to achieve profitability.

### We Need to Sell New Products and Services

We are unlikely to make significant profits unless we continue to make new or complementary products and services and a broader range of existing products and services available through the priceline.com service or through services provided by our licensees. We will incur substantial expenses and use significant resources in trying to continue to expand the type and range of the products and services that we offer. However, we may not be able to attract sellers, other participants and licensees to provide such products and services or consumers to purchase such products and services through the priceline.com service. In addition, if we or our licensees launch new products or services that are not favorably received by consumers, our reputation and the value of the priceline.com brand could be damaged.

The great majority of our experience to date is in the travel industry. The travel industry is characterized by "expiring" inventories. For example, if not used by a specific date, an airline ticket, hotel room reservation or rental car reservation has no value. The expiring nature of the inventory creates incentives for airlines, hotels and rental car companies to sell seats, hotel room reservations or rental car reservations at reduced rates. Because we have only limited experience in selling "non- expiring" inventories on the priceline.com service, such as new cars or financial services, we cannot predict whether the priceline.com business model can be successfully applied to such products and services.

### New Businesses We Are Evaluating May Not Be Successful

We intend to expand our current Name Your Own Price(sm) business model into other areas of e-commerce and to other regions, directly and through licensees. We recently licensed our name and business model to WebHouse Club, a privately held independent start-up company affiliated with Walker Digital for use in a business that enables consumers to use the Internet to identify the purchase terms for groceries and other retail merchandise which they would subsequently pick up from participating retailers. We also recently entered into a similar preliminary licensing arrangement with Perfect Yard Sale, another privately held independent start-up company affiliated with Walker Digital for use in a consumer-to-consumer business in which buyers would make conditional purchase offers to acquire goods from other consumers. In addition, we have licensed our name and business model to Alliance Partners in connection with our home financing services. We also have entered into, and intend to continue to enter into, similar licensing arrangements with third parties in connection with international expansion of the priceline.com service. These new businesses typically incur start-up costs and operating losses and, may not be successful. If these new businesses are not favorably received by consumers, the association of our brand name and business model with these new entities may adversely affect our business and reputation and may dilute the value of our brand name. In addition, to the extent that we need to service these licensees, our core business may suffer. Moreover, expansion of our core business model will expose us to additional risks not currently applicable to our existing operations. The additional risks associated with the expansion of our core business could have a material adverse effect on our business generally. In addition, as we expand our business model to other areas of e-commerce, these new businesses will face competition from established providers in those areas.

### We May Be Unable to Effectively Manage Our Rapid Growth

17

We have rapidly and significantly expanded our operations and anticipate that further expansion will be required to realize our growth strategy. Our rapid growth has placed significant demands on our management and other resources which, given our expected future growth rate, is likely to continue. To manage our future growth, we will need to attract, hire and retain highly skilled and motivated officers and employees and improve existing systems and/or implement new systems for: (1) transaction processing; (2) operational and financial management; and (3) training, integrating and managing our growing employee base.

**If We Lose Our Key Personnel or Cannot Recruit Additional Personnel, Our Business May Suffer**

Competition for personnel with experience in Internet commerce is intense. If we do not succeed in attracting new employees or retaining and motivating our current and future employees, our business could suffer significantly.

Since our formation in July 1997, we have expanded from 10 to 373 full-time employees as of March 10, 2000. We also have employed many key personnel since our launch in April 1998, including our Chairman and Chief Executive Officer, our President and Chief Operating Officer, our Senior Executive Vice President Stategy, Planning and Administration and Chief Financial Officer, our Executive Vice President and General Counsel, our Executive Vice President and Chief Marketing Officer, and a number of key managerial, marketing, planning, financial, technical and operations personnel. We expect to continue to add additional key personnel in the near future. We do not have "key person" life insurance policies on any of our key personnel.

We believe our performance is substantially dependent on:

o our ability to retain and motivate our senior management and other key employees; and

o our ability to identify, attract, hire, train, retain and motivate other highly skilled technical, managerial, marketing and customer service personnel.

### We Rely on Third-Party Systems

We rely on certain third-party computer systems or third-party service providers, including the computerized central reservation systems of the airline and hotel industries to satisfy demand for airline tickets and hotel room reservations. Any interruption in these third-party services, or a deterioration in their performance, could be disruptive to our business. Our agreements with third-party service providers are terminable upon short notice. In the event our arrangement with any of such third parties is terminated, we may not be able to find an alternative source of systems support on a timely basis or on commercially reasonable terms.

Intense Competition Could Reduce Our Market Share and Harm Our Financial Performance

The markets for the products and services offered on the priceline.com service are intensely competitive. We compete with both traditional distribution channels and online services. Increased competition could diminish our ability to become profitable or result in loss of market share and damage the priceline.com brand. See "- Competition."

### Our Success Depends on Our Ability to Protect Our Intellectual Property

18

We have developed what we believe is a comprehensive program for securing and protecting rights in patentable inventions, trademarks, trade secrets and copyrightable materials. If we are not successful in protecting our intellectual property, there could be a material adverse effect on our business. See "- Intellectual Property" and "Legal Proceedings."

## Legal Proceedings

We have received a copy of a Petition for Interference that requests the United States Patent and Trademark Office to declare an "interference" between a patent filed by a third party describing an electronic market for used and collectible goods and our U.S. Patent No. 5,794,207. We also are a party to other legal proceedings described in Item 3 - "Legal Proceedings." An adverse outcome in any of the actions described in Item 3 could have a material adverse effect on our business. See "Legal Proceedings."

The Success of Our Business Will Depend on Continued Growth of Internet Commerce

The market for the purchase of products and services over the Internet is a new and emerging market. As an Internet commerce business, our future revenues and profits are substantially dependent upon the widespread acceptance and use of the Internet and other online services as a medium for commerce by consumers and sellers. If widespread acceptance and growth of Internet use does not occur, our business and financial performance will suffer. Rapid growth in the use of and interest in the Internet and other online services is a recent phenomenon. This growth may not continue. A sufficiently broad base of consumers may not adopt, or continue to use, the Internet as a medium of commerce. Demand for and market acceptance of recently introduced products and services over the Internet are subject to a high level of uncertainty, and there are few proven products and services. For us to grow, consumers who historically have purchased through traditional means of commerce, such as a travel agent for airline tickets or a branch of a bank for home financings, will need to elect to purchase online products and services. Sellers of products and services will need to adopt or expand use of the Internet as a channel of distribution.

The Internet has experienced, and is expected to continue to experience, significant growth in the number of users and amount of traffic. Our success will depend upon the development and maintenance of the Internet's infrastructure to cope with this increased traffic. This will require a reliable network backbone with the necessary speed, data capacity and security, and the timely development of complementary products, such as high-speed modems, for providing reliable Internet access and services.

The Internet has experienced a variety of outages and other delays as a result of damage to portions of its infrastructure and could face such outages and delays in the future. Outages and delays are likely to affect the level of Internet usage generally, as well as the processing of transactions on the priceline.com Web site. It is unlikely that the level of orders lost in those circumstances could be made up by increased phone orders. In addition, the Internet could lose its viability due to delays in the development or adoption of new standards to handle increased levels of activity or due to increased government regulation. The adoption of new standards or government regulation may, however, require us to incur substantial compliance costs.

## Capacity Constraints and System Failures Could Harm Our Business

If our systems cannot be expanded to cope with increased demand or fail to perform, we could experience:

o unanticipated disruptions in service;

o slower response times;

o decreased customer service and customer satisfaction; or

o delays in the introduction of new products and services;

any of which could impair our reputation, damage the priceline.com brand and materially and adversely affect our revenues. Publicity about a service disruption also could cause a material decline in our stock price.

We use internally developed systems to operate the priceline.com service, including transaction processing and order management systems that were designed to be scalable. However, if the number of users of the priceline.com service increases substantially, we will need to significantly expand and upgrade our technology, transaction processing systems and network infrastructure. We do not know whether we will be able to accurately project the rate or timing of any such increases, or expand and upgrade our systems and infrastructure to accommodate such increases in a timely manner.

Our ability to facilitate transactions successfully and provide high quality customer service also depends on the efficient and uninterrupted operation of our computer and communications hardware systems. The priceline.com service has experienced periodic system interruptions, which we believe will continue to occur from time to time. Our systems and operations also are vulnerable to damage or interruption from human error, natural disasters, power loss, telecommunication failures, break-ins, sabotage, computer viruses, intentional acts of vandalism and similar events. While we currently maintain redundant servers at our Stamford, Connecticut premises to provide limited service during system disruptions at our production, we do not have fully redundant systems, a formal disaster recovery plan or alternative providers of hosting services. In addition, we do not carry sufficient business interruption insurance to compensate for losses that could occur. Any system failure

that causes an interruption in service or decrease the responsiveness of the priceline.com service could impair our reputation, damage our brand name and materially adversely affect our revenues.

**We May Not Be Able to Keep Up with Rapid Technological and Other Changes**

The markets in which we compete are characterized by rapidly changing technology, evolving industry standards, frequent new service and product announcements, introductions and enhancements and changing consumer demands. We may not be able to keep up with these rapid changes. In addition, these market characteristics are heightened by the emerging nature of the Internet and the apparent need of companies from many industries to offer Internet-based products and services. As a result, our future success will depend on our ability to adapt to rapidly changing technologies, to adapt our services to evolving industry standards and to continually improve the performance, features and reliability of our service in response to competitive service and product offerings and the evolving demands of the marketplace. In addition, the widespread adoption of new Internet,

19

networking or telecommunications technologies or other technological changes could require us to incur substantial expenditures to modify or adapt our services or infrastructure.

### Online Security Breaches Could Harm Our Business

The secure transmission of confidential information over the Internet is essential in maintaining consumer and supplier confidence in the priceline.com service. Substantial or ongoing security breaches on our system or other Internet-based systems could significantly harm our business. We currently require buyers to guarantee their offers with their credit card, either online or through our toll-free telephone service. We rely on licensed encryption and authentication technology to effect secure transmission of confidential information, including credit card numbers. It is possible that advances in computer capabilities, new discoveries or other developments could result in a compromise or breach of the technology used by us to protect customer transaction data.

We incur substantial expense to protect against and remedy security breaches and their consequences. However, we cannot guarantee that our security measures will prevent security breaches. A party that is able to circumvent our security systems could steal proprietary information or cause significant interruptions in our operations. For instance, several major Web sites recently experienced significant interruptions as a result of improper direction of excess traffic to those sites. Security breaches also could damage our reputation and expose us to a risk of loss or litigation and possible liability. Our insurance policies carry low coverage limits, which may not be adequate to reimburse us for losses caused by security breaches.

We also face risks associated with security breaches affecting third parties conducting business over the Internet. Consumers generally are concerned with security and privacy on the Internet and any publicized security problems could inhibit the growth of the Internet and, therefore, the priceline.com service as a means of conducting commercial transactions.

### Our Stock Price is Highly Volatile

The market price of our common stock is highly volatile and is likely to continue to be subject to wide fluctuations in response to factors such as the following, some of which are beyond our control:

o quarterly variations in our operating results;

o operating results that vary from the expectations of securities analysis and investors;

o changes in expectations as to our future financial performance, including financial estimates by securities analysts and investors;

o changes in market valuations of other Internet or online service companies;

o announcements of technological innovations or new services by us or our competitors;

o announcements by us or our competitors of significant contracts, acquisitions, strategic partnerships, joint ventures or capital commitments;

o loss of a major seller participant, such as an airline or hotel chain;

o changes in the status of our intellectual property rights;

o lack of success in the expansion of our business model horizontally or geographically;

o announcements by third parties of significant claims or proceedings against us or adverse developments in pending proceedings;

o additions or departures of key personnel; and

o stock market price and volume fluctuations.

Sales of a substantial number of shares of our common stock could adversely affect the market price of our common stock by introducing a large number of sellers to the market. Given the volatility that exists for our shares, such sales could cause the market price of our common stock to decline.

In addition, the trading prices of Internet stocks in general, including ours, have experienced extreme price and volume fluctuations. These fluctuations often have been unrelated or disproportionate to the operating performance of these companies. The valuations of many Internet stocks, including ours, are extremely high based on conventional valuation standards, such as price to earnings and price to sales ratios. The trading price of our common stock has increased significantly from the initial public offering price. These trading prices and valuations may not be sustained. Any negative change in the public's perception of the prospects of Internet or e-commerce companies could depress our stock price regardless of our results. Other broad market and industry factors may decrease the market price of our common stock, regardless of our operating performance. Market fluctuations, as well as general political and economic conditions, such as a recession or interest rate or currency rate fluctuations, also may decrease the market price of our common stock.

In the past, securities class action litigation often has been brought against a company following periods of volatility in the market price of their securities. We may in the future be the target of similar litigation. Securities litigation could result in substantial costs and divert management's attention and resources.

### Our Business is Subject to Tax Uncertainties

Potential Federal Air Transportation Tax on Airline Ticket Sales. A Federal transportation tax is imposed upon the sale of airline tickets. The tax is based on a percentage of the cost of transportation, which was 9% for periods prior to October 1, 1998, 8% for the period October 1, 1998 through September 30, 1999 and 7.5% thereafter. The Company has historically interpreted the tax regulations as requiring that the tax be computed based on the amount charged by the airline for the airline ticket and the Company's participating airlines have collected and remitted the tax based on this amount. The Company applied for a ruling from the Internal Revenue Service confirming this interpretation. In December 1999, the Internal Revenue Service indicated to the Company that it was unlikely that a favorable ruling would be issued. The Company subsequently withdrew its ruling request because of the uncertainty of the outcome. Because the Company anticipated the possibility of an adverse ruling on this issue, the Company accrued approximately $1.9 million relating to the balance of the tax liability for tickets sold prior to that date. The Company believes this accrual to be adequate, but there can be no assurance as to the final outcome because a formal ruling has not been issued by the Internal Revenue Service.

State Taxes. We file tax returns in such states as required by law based on principles applicable to traditional businesses. In addition, we do not collect sales or other similar taxes in respect of transactions conducted through the priceline.com service (other than the federal air transportation tax referred to above). However, one or more states could seek to impose additional income tax obligations or sales tax collection obligations on out-of-state companies, such as ours, which engage in or facilitate online commerce. A number of proposals have been made at state and local levels that could impose such taxes on the sale of products and services through the Internet or the income derived from such sales. Such proposals, if adopted, could substantially impair the growth of e-commerce and adversely affect our opportunity to become profitable.

Legislation limiting the ability of the states to impose taxes on Internet-based transactions has been enacted by the United States Congress. However, this legislation, known as the Internet Tax Freedom Act, imposes only a three-year moratorium, which commenced October 1, 1998 and ends on October 21, 2001, on state and local taxes on (1) electronic commerce where such taxes are discriminatory and (2) Internet access unless such taxes were generally imposed and actually enforced prior to October 1, 1998. It is possible that the tax moratorium could fail to be renewed prior to October 21, 2001. Failure to renew this legislation would allow various states to impose

21

taxes on Internet-based commerce. The imposition of such taxes could adversely affect our ability to become profitable.

Case 3:00-cv-01884-AVC    Document 460-2    Filed 06/20/2007    Page 37 of 149

## Regulatory and Legal Uncertainties Could Harm Our Business

The products and services we offer through the priceline.com service are regulated by federal and state governments. Our ability to provide such products and services is and will continue to be affected by such regulations. The implementation of unfavorable regulations or unfavorable interpretations of existing regulations by courts or regulatory bodies, could require us to incur significant compliance costs, cause the development of the affected markets to become impractical and otherwise adversely affect our financial performance. See "-Government Regulation."

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Sections of this Annual Report on Form 10-K, including the "Management's Discussion and Analysis of Financial Condition and Results of Operations", and the descriptions of the Company's business, contain forward- looking statements. In some cases, readers can identify forward-looking statements by terminology such as "may," "will," "should," "could," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential," or "continue," or the negative of such terms or other comparable terminology. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by such forward-looking statements. Such factors include, among other things, the factors described in "- Additional Factors That May Affect Future Results." We undertake no duty to update any of the forward-looking statements, whether as a result of new information, future events or otherwise.

## Item 2. Properties

Priceline.com's executive, administrative and operating offices are located in approximately 140,510 square feet of leased office space located in Norwalk, Connecticut and 10,000 square feet of leased office space located in Stamford, Connecticut. Priceline.com is subleasing the Stamford office space from Walker Digital on a month-to-month basis. Priceline.com also has guaranteed Walker Digital's obligations under a lease of office space in New York City that is used by both companies. Priceline.com anticipates that it will require additional space within the next 12 months to accommodate its anticipated growth.

The Company did not own any real estate as of March 31, 2000.

## Item 3. Legal Proceedings

### Legal Proceedings

On January 6, 1999, priceline.com received notice that a third-party patent applicant and patent attorney, Thomas G. Woolston, purportedly had filed in December 1998 with the United States Patent and Trademark Office a request to declare an interference between a patent application filed by Woolston and priceline.com's U.S. Patent No. 5,794,207. Priceline.com currently is awaiting information from the Patent Office regarding whether it will initiate an interference proceeding.

On January 19, 1999, Marketel International Inc., a California corporation, filed a lawsuit against priceline.com, among others. On February 22, 1999, Marketel filed an amended and supplemental complaint. The amended complaint filed by Marketel alleges causes of action for, among other things, misappropriation of trade secrets, breach of contract, conversion, breach of confidential relationship, copyright infringement, fraud, unfair competition and false advertising, and seeks injunctive relief and damages in an unspecified amount. In its amended complaint, Marketel alleges, among other things, that the defendants conspired to misappropriate Marketel's business model, which allegedly was provided in confidence approximately ten years ago. The amended complaint also alleges that four former Marketel employees are the actual sole inventors or co-inventors of U.S. Patent No. 5,794,207 which was issued on August 11, 1998 and has been assigned to priceline.com. Marketel asks that the patent's inventorship be corrected accordingly.

On February 5 and February 16, 1999, the Company filed its answer and amended answer, respectively, to the amended complaint, in which it denied the material allegations of liability in the complaint. The cause of action is currently pending against priceline.com and Priceline Travel, Inc. under the caption Marketel International, Inc. v. Priceline.com, et al., No. C-99-1061 (N.D. Cal. 1999). Priceline.com and all other defendants strongly dispute the material legal and factual allegations contained in Marketel's amended complaint and believe that the amended complaint is without merit. Priceline.com intends to defend vigorously against the action. Pursuant to the indemnification obligations contained in the Purchase and Intercompany Services Agreement with Walker Digital, Walker Digital has agreed to indemnify, defend and hold harmless priceline.com for damages, liabilities and legal expenses incurred in connection with the Marketel litigation.

On October 13, 1999, priceline.com filed a complaint in the United States District Court for the District of Connecticut under the caption Priceline.com Incorporated v. Microsoft Corporation and Expedia, Inc., No. 399CV1991 (AWT) alleging that Microsoft Corporation and Expedia, Inc., a subsidiary of Microsoft Corporation, infringe priceline.com's U.S. Patent No. 5,794,207 by operating the defendants' "Hotel Price Matcher" service, and that the defendants' conduct toward priceline.com violated the Connecticut Unfair Trade Practices Act. On December 20, 1999, defendants moved the Court to dismiss the complaint for failure to name a necessary party, Marketel. On March 21, 2000, the presiding judge stated that he intends to deny defendants' motion to dismiss, and that a decision will be forthcoming. On December 23, 1999, the Court granted priceline.com's motion to supplement the complaint to expressly include defendants' "Flight Price Matcher" service. In the lawsuit, priceline.com is seeking declaratory relief, permanent injunctive relief and actual and punitive damages.

From time to time the Company has been and expects to continue to be subject to legal proceedings and claims in the ordinary course of business, including claims of alleged infringement of third-party intellectual property rights by the Company. Such claims, even if not meritorious, could result in the expenditure of significant financial and managerial resources.

The Company is unable to predict the outcome of the legal proceedings referred to above.

### Item 4. Submission of Matters to a Vote of Security Holders

No matters were submitted for a vote of stockholders of the Company during the fourth quarter of the year ended December 31, 1999.

<p style="text-align:center">PART II</p>

### Item 5. Market for the Registrant's Common Stock and Related Stockholder Matters

### Price Range of Common Stock

Priceline.com's common stock has been quoted on the Nasdaq National Market under the symbol "PCLN" since priceline.com's initial public offering on March 29, 1999. Prior to such time, there was no public market for the common stock of priceline.com. The following table sets forth, for the periods indicated, the high and low closing sales prices per share of the common stock as reported on the Nasdaq National Market:

| 1999 | High | Low |
|------|------|-----|
| First Quarter (from March 29, 1999) ................... | $ 82.875 | $ 69.00 |
| Second Quarter ...................................... | 162.375 | 59.875 |
| Third Quarter ....................................... | 112.00 | 55.625 |

<p style="text-align:center">23</p>

## Dividend Policy

Priceline.com has not declared or paid any cash dividends on its capital stock since its inception and does not expect to pay any cash dividends for the foreseeable future. Priceline.com currently intends to retain future earnings, if any, to finance the expansion of its business.

## Holders

As of March 17, 2000, there were approximately 476 stockholders of record of priceline.com's common stock, although the Company believes that there is a significantly larger number of beneficial owners.

## Use of Proceeds of Initial Public Offering

On April 1, 1999, priceline.com completed an initial public offering in which it sold 10,000,000 shares of its common stock. The managing underwriters in the offering were Morgan Stanley & Co., Incorporated, Merrill Lynch, Pierce, Fenner & Smith Incorporated, BancBoston Stephens Inc. and Donaldson Lufkin & Jenrette Securities Corporation. The shares of common stock sold in the offering were registered under the Securities Act of 1933, as amended, on a Registration Statement on Form S-1 (the "Registration Statement") (Reg. No. 333-69657) that was declared effective by the Securities and Exchange Commission on March 29, 1999. All 10,000,000 shares of common stock registered under the Registration Statement were sold at a price of $16.00 per share for gross proceeds of $160.0 million. Offering proceeds to priceline.com, net of approximately $11.2 million in aggregate underwriter discounts and commissions and $4.5 million in other related expenses, were approximately $144.3 million.

Net offering proceeds received on April 1, 1999 from the initial public offering were used for general corporate purposes, including working capital to fund anticipated operating losses, expenses associated with its advertising campaigns, brand-name promotions and other marketing efforts and capital expenditures. Priceline.com also may use a portion of the net proceeds, currently intended for general corporate purposes, to acquire or invest in businesses, technologies, products or services, although no specific acquisitions are planned and no portion of the net proceeds has been allocated for any acquisition. None of the net offering proceeds of priceline.com have been paid directly or indirectly to any director, officer, general partner of priceline.com or their associates, persons owning 10% or more of any class of priceline.com's equity securities, or an affiliate of priceline.com other than compensation to and other related arrangements with officers of priceline.com in the ordinary course of business and payments that were made in the ordinary course of business to Walker Digital Corporation pursuant to a reciprocal services arrangement.

## Item 6. Selected Financial Data

### SELECTED FINANCIAL DATA

The selected financial data presented below are derived from the financial statements of the Company, and should be read in connection with those statements, which are included herein. All share and per share amounts have been retroactively adjusted to reflect the 1.25:1 stock split during 1999.

| | Year Ended December 31, | | July 18, (inception) to December 31, |
|---|---|---|---|
| | 1999 | 1998 | 1997 |
| | (In thousands, except per share amounts) | | |
| Statement of Operations Data: | | | |
| Revenues .................................. | $   482,410 | $    35,237 | |
| Cost of revenues: | | | |
| Product costs ............................ | 423,056 | 33,496 | |
| Supplier warrant costs ................... | 1,523 | 3,029 | |
| Total cost of revenues .................. | 424,579 | 36,525 | |
| Gross profit .............................. | 57,831 | (1,288) | |
| Operating expenses: | | | |
| Warrant costs, net ....................... | 998,832 | 57,979 | |
| Sales and marketing ...................... | 79,577 | 24,388 | $     441 |
| General and administrative (including $1,812 of option payroll taxes in 1999) ............ | 27,609 | 18,004 | 1,012 |
| Systems and business development ......... | 14,023 | 11,132 | 1,060 |
| Total operating expenses ................ | 1,120,041 | 111,503 | 2,513 |
| Operating loss ........................... | (1,062,210) | (112,791) | (2,513) |
| Other income (expense) ................... | 7,120 | 548 | |
| Net loss ................................. | (1,055,090) | (112,243) | (2,513) |
| Accretion on preferred stock ............. | (8,354) | (2,183) | |
| Net loss applicable to common shareholders ........ | $(1,063,444) | $ (114,426) | $  (2,513) |

```
Net loss applicable to common stockholders per
   basic and diluted common share ...........................    $    (7.90)    $    (1.41)    $    (.05)
                                                                  ===========    ===========    ===========

Weighted average number of basic and diluted
   common shares outstanding ................................        134,622         81,231        50,834
                                                                  ===========    ===========    ===========
```

```
                                                                              As of December 31,
                                                                  -----------------------------------------
                                                                    1999           1998           1997
                                                                  -----------    -----------    -----------
                                                                              (In thousands)
Cash and cash equivalents and short-term
   investments ............................................    $   171,943    $    53,593    $        16
Working capital ...........................................        172,489         49,922         (2,389)
Total assets ..............................................        441,886         66,572          1,449
Long-term obligations .....................................             --          1,015             51
Total liabilities .........................................         39,250         11,296          2,706
Total stockholders' equity ................................        402,636         55,276         (1,257)
```

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Overview

Priceline.com has pioneered a unique e-commerce pricing system known as a "demand collection system" that enables consumers to use the Internet to save money on a wide range of products and services while enabling sellers to generate incremental revenue. Using a simple and compelling consumer proposition--Name Your Own Price(SM)--we collect consumer demand, in the form of individual customer offers guaranteed by a credit card, for a particular product or service at a price set by the customer. We then either communicate that demand directly to participating sellers or access participating sellers' private databases to determine whether we can fulfill the customer's offer. Consumers agree to hold their offers open for a specified period of time and, once fulfilled, offers cannot be canceled. We benefit consumers by enabling them to save money, while at the same time benefiting sellers by providing them with an effective revenue management tool capable of identifying and capturing incremental revenues. By requiring consumers to be flexible with respect to brands, sellers and product features, we enable sellers to generate incremental revenue without disrupting their existing distribution channels or retail pricing structures.

Priceline.com was formed in July 1997 and our primary activities during the period prior to launch consisted of recruiting and training employees, developing our business model, implementing systems to support our business model, developing relationships with seller participants and developing the priceline.com brand. We commenced operations in April 1998 with the sale of leisure airline tickets. Since that time, our business has grown significantly and the priceline.com service includes the following products and services:

o leisure airline tickets, provided by ten domestic and 20 international airline participants;

o hotel rooms, which was launched in October 1998, in substantially all major United States markets with more than 15 leading national hotel chains as participants;

o rental cars, which was launched in December 1999, in substantially all major United States markets with three leading rental car chains as participants;

o new automobiles, which was launched on a test basis in the New York Metropolitan Area in July 1998 and is now offered in 26 states;

o home financing services, which was launched in January 1999 with home mortgage services and now also includes home equity loans and refinancing services.

Priceline.com also is currently planning an expansion of its core Name Your Own Price(SM) business model to other areas of e-commerce, including long distance telephone service, cruises and vacation packages.

Through the innovative use of "adaptive marketing programs," priceline.com also markets customer acquisition programs for third parties. These programs facilitate the completion of a higher percentage of successful transactions through the priceline.com service, while generating fee income for the Company. During 1999, the Company increased its number of adaptive marketing partners from one to ten, thus reducing its dependence on any one partner. Priceline.com intends to continue to add adaptive marketing programs so that consumers have a variety of programs from which to choose and priceline.com has a diversified source of adaptive marketing revenues.

Priceline.com has announced several transactions pursuant to which third parties ("Licensees") license the priceline.com name and demand collection system for offering a particular product or service or for offering a number of products or services in a distinct international region. Pursuant to the Licensee transactions, priceline.com generally receives a royalty under the license and may also receive fees for services and reimbursement of certain

expenses. Priceline.com also holds convertible debt or warrants entitling it to acquire a significant percentage of such Licensee's equity securities upon the occurrence of certain events. Unless such equity securities are converted, the results of Licensees will not be included in priceline.com's financial results.

In 1999, priceline.com licensed its name and demand collection system to Priceline WebHouse Club, Inc. and agreed to provide certain services to WebHouse Club. WebHouse Club offers a Name Your Own Price(SM) service for groceries and has announced the planned offering of a service for gasoline. Under the negotiated agreements, priceline.com receives a royalty based on a percentage of WebHouse Club revenues and compensation at fair value for certain services rendered. As an inducement to enter into a relationship with WebHouse Club, priceline.com received a warrant to purchase a majority of the shares of WebHouse Club common stock. The warrants are non-forfeitable, fully vested upon grant, exercisable in five years or earlier upon the occurrence of certain events, and do not require the performance of any additional services. Upon receipt of the warrant in the fourth quarter, priceline.com recognized $188.8 million of income representing the amount of the estimated fair value of the warrants, based on an independent valuation.

In March 2000, the Company entered into an agreement with Alliance Partners, LP, pursuant to which Alliance has formed an operating subsidiary, Priceline Mortgage, for the primary purpose of acting as a broker and/or lender of residential mortgage loans in connection with the priceline.com mortgage service. Priceline.com has agreed to provide $3.62 million of financing to an affiliate of Alliance in the form of a convertible secured note and has agreed to license the "priceline" name and business model for use by Priceline Mortgage. Alliance has agreed to provide management services to Priceline Mortgage, including the procurement of personnel and office space and assistance in obtaining regulatory approvals. A pilot program was launched in early October 1999 and currently is operating in all 50 states.

Because the priceline.com system does not set minimum offer thresholds, and consumers are not charged to make offers for its products, it is expected that we will receive a significant number of unreasonable or "fantasy offers". Accordingly, in addition to analyzing our actual fulfillment rates, we also analyze the percentage of "reasonable" offers that we are able to fill. We consider an offer for an airline ticket, hotel room or rental car to be "reasonable" when it is no more than 30% lower than the lowest generally available advance-purchase fare for the same product. Using this standard, the overall percentage of offers considered reasonable for the year ended December 31, 1999 was approximately 57.0%. The Company measures its "bind" rate as the percentage of reasonable offers that the Company ultimately fulfills. The Company's bind rate for 1999 was 43.6% for all reasonable airline ticket, hotel room and rental car offers.

When making offers for airline tickets through the priceline.com service, consumers are permitted to make only one offer within a seven day period unless they change some feature of their itinerary, such as the date on which or the airport from which they are willing to fly. As a result of the Company's "checkstatus" feature, introduced in April 1999, consumers whose initial requests are not satisfied are permitted to resubmit revised offers that reflect at least one change to their itinerary. Effective with this change, each initial offer and any resubmitted offers are treated as a single offer for purposes of measuring our total offer volume and our offer fulfillment rates. Previously, each had been counted as a separate offer. Therefore, comparisons with prior periods may not be meaningful.

As of December 31, 1999, the Company had an accumulated deficit of $1.18 billion, of which $1.07 billion related to certain non-cash charges arising from equity issuances to a number of participating airlines, its chief executive officer and other parties, as more fully described below, partially offset by the WebHouse Club warrant income described above. Priceline.com believes that its continued growth will depend in large part on its ability to continue to promote the priceline.com brand and to apply the priceline.com business model to a wide range of products and services.

Priceline.com intends to continue to invest heavily in marketing and promotion, technology and personnel. As a result it expects to incur additional losses. However, the Company's plans call for reduction of operating losses and improvement in its gross margins in an effort to achieve profitability. Priceline.com's limited operating history makes the prediction of future results of operations difficult, and accordingly, there can be no assurance that it will achieve or sustain revenue growth or profitability.

As of December 31, 1999, the Company had outstanding non-qualified stock options to purchase 27,024,740 shares issued to various employees, consultants and directors pursuant to the Company's 1997 Omnibus Plan and 1999 Omnibus Plan. The options entitle the holders to purchase common stock at a weighted average exercise price of approximately $13.93 per share, subject to adjustment in accordance with the 1997 Omnibus Plan and the 1999 Omnibus Plan. Upon exercise of an option, priceline.com will be required to make payments on behalf of the option holders for certain payroll taxes such as Social Security and Medicare. These payroll taxes will appear as a general and administrative expense on priceline.com's statement of operations and will amount to approximately 1.5% to 2.0% of the difference between the exercise price and the then fair market value of the common stock at the time of exercise. However, upon exercise of outstanding options, priceline.com will be paid the exercise price of the options that are exercised. The total exercise price of the options outstanding at December 31, 1999 is $376.5 million. Priceline.com also will be entitled to an income tax deduction equal to the sum of (1) the difference between the exercise price of the option and the then fair market value of the common stock at the time of exercise and (2) the total amount of payroll tax payments. Such deduction would be utilized to the extent that the Company generates taxable income. The calculation of the payroll tax expense and income tax deduction, and the timing of those events and the receipt of the related cash inflow, is directly dependent upon the exercise of options and the value of shares of priceline.com Common Stock at the time of exercise. As the decision to exercise options is at the sole discretion of the holder of the options, the timing and amount of the expense, income tax deduction and timing of the cash inflows cannot be estimated.

During July 1999, priceline.com issued to Continental Airlines a warrant to purchase common stock that will become exercisable upon the earlier of July 2004 or upon the achievement of certain performance thresholds. However, the agreement does not require Continental to make any performance commitments. Accordingly, priceline.com incurred a non-cash charge of approximately $88.4 million during the third quarter of 1999 representing the fair value of the warrant on the grant date. In November 1999, the Company amended the Continental warrant to allow the exercise price to fall within the range of the warrants issued to other airlines discussed below. Priceline.com incurred a non-cash charge of approximately $3.5 million during the fourth quarter as a result of the warrant amendment.

In August 1998, priceline.com entered into a warrant agreement granting Delta Airlines ("Delta") the right to purchase up to 18,892,603 shares of common stock at an exercise price of approximately $0.93 per share. Vesting was contingent upon achievement of certain predetermined performance thresholds. However, there was no penalty for failure to provide ticket inventory to satisfy these performance thresholds. Accordingly, no expense was recorded when the warrant was issued. On December 31, 1998, priceline.com amended its agreement with Delta to eliminate the vesting contingencies and fix the number of shares subject to the warrant at 18,619,402. The amended warrant issued to Delta became exercisable at the earlier of seven years or upon the achievement of certain performance thresholds. However, the agreement did not require Delta to make any performance commitments, is non-exclusive and allows Delta to participate in other programs similar to the priceline.com service. Therefore, the Company recorded a non-cash charge of approximately $58.7 million, reflecting the fair value of the Delta warrant on December 31, 1998.

In November 1999, the Company further amended the Delta warrant to provide Delta with a cashless exercise right. Upon the exercise of the warrant, Delta acquired a total of 16,525,834 shares of

Common Stock of priceline.com. In conjunction with that transaction, Delta sold 2,063,700 shares of priceline.com Common Stock to priceline.com's founder and Vice Chairman Jay S. Walker for an aggregate purchase price of $125 million. The Company further gave Delta the right to exchange six million shares of priceline.com Common Stock for six million shares of newly issued convertible preferred stock that may be converted into priceline.com Common Stock on a one-for-one basis. To date, Delta has not elected to exercise the conversion right.

In November 1999, the Company entered into separate Participation Warrant Agreements with each of eight major domestic airlines relating to their inclusion in the Company's leisure airline ticket service. Under the Participation Warrant Agreements, the airlines were granted warrants to purchase a total of 20 million shares of priceline.com Common Stock at exercise prices ranging from $52.625 to $59.933 per share. All warrants were fully vested on the date of grant, but generally are not exercisable until November 2005, subject to acceleration under certain circumstances. Priceline.com incurred additional warrant costs of approximately $1.1 billion during the fourth quarter as a result of the issuance of the warrants.

## Results of Operations

Priceline.com did not commence operations until April 1998. Accordingly, discussion of comparisons with the prior year is not meaningful.

Year Ended December 31, 1999

    Revenues

|  | Year Ended December 31, ($000) | | % Change |
|---|---|---|---|
|  | 1999 | 1998 |  |
| Revenues...................................... | $482,410 | $35,237 | 1,269% |

Revenues for the year ended December 31, 1999 were comprised primarily of:
(1) transaction revenues representing the selling price of airline tickets, hotel rooms and rental cars; (2) fee income from adaptive marketing programs offered in connection with our product offerings; (3) ancillary revenues consisting primarily of Worldspan reservation booking fees and customer processing fees; and (4) fee income from our home financing and auto programs.

Revenues increased during 1999 as a result of the substantial development of our unique customer base, repeat purchases by existing customers and the inclusion of the hotel room, rental car, automobile, and home financing services and adaptive marketing programs. The Company has launched certain of its services in select geographic markets and then expanded to other regions. During 1999, the Company's hotel room reservation service expanded from 25 cities to nationwide coverage. The Company's auto program was launched in the New York City area and expanded to cover 26 states at December 31, 1999. The Company's rental car service was launched nationally during the fourth quarter. The Company currently plans to launch its products for long distance telephone services, cruises and vacation packages during 2000. The Company believes each of these products has the potential to increase revenues in 2000.

As of December 31, 1999 priceline.com had a base of approximately 3.8 million unique customers. A unique customer is defined as someone who has made a guaranteed offer for at least one of priceline.com's products. Of the total unique customer base, approximately 3.0 million made their first offer on priceline.com during 1999. During 1999, priceline.com customers made approximately 4.3 million offers for services.

27

Ancillary revenues for the year ended December 31, 1999 increased as a result of volume-driven increases in Worldspan reservation booking fees and the introduction of a customer processing fee in the airline and hotel services. Fee-based income and ancillary revenues represented 8.4% of total revenues for the year ended December 31, 1999.

### Product Costs and Gross Profit

| | Year Ended December 31, ($000) | | |
|---|---|---|---|
| | 1999 | 1998 | % Change |
| Product Costs.................................. | $424,579 | $36,525 | 1,062% |
| % of Revenues................................. | 88% | 104% | |
| Gross Profit.................................. | $57,831 | $(1,288) | 4,590% |
| Gross Margin.................................. | 12.0% | (4.0)% | |

For the year ended December 31, 1999, product costs were comprised of (1) the cost of airline tickets from our suppliers, net of the federal air transportation tax, segment fees and passenger facility charges imposed in connection with the sale of airline tickets; (2) the cost of hotel rooms from our suppliers, net of hotel tax; and (3) supplier warrant costs that represent a non-cash expense related to the issuance of common stock warrants to one of our airline program participants in January 1999. We anticipate that we will recognize additional non-cash supplier warrant costs in the amount of approximately $381,000 in each of the next four fiscal quarters.

Gross profit is comprised of revenues less cost of revenues. Excluding the effect of non-cash supplier warrant costs for the year ended December 31, 1999, the Company had gross profit of $59.4 million. During 1999, gross profit was positive as a result of the transactional sales volumes that were sold at positive margins, and the launch of products generating fee-based revenues. Because fee-based and ancillary revenues generally do not involve separate costs, these revenues had a disproportionately positive impact on total gross profit and made a substantial contribution to gross profit for the year ended December 31, 1999.

For the year ended December 31, 1999, gross margin increased each quarter as a result of increased sales volume, increased fee-based revenue and decreased sales of tickets that were sold below cost. Fee-based revenues, such as adaptive marketing revenues, ancillary revenues and revenues from financial services and automobiles generate higher margins than transaction revenues, on which the gross margin generated is derived from the spread between customer payments and product costs.

The Company expects that gross profit and gross margin will improve in the first quarter of 2000 as a result of anticipated consumer demand sufficient to allow the Company to increase revenues while selling its products at increasing positive margins. As a result of this anticipated growth, the Company expects the proportion of its gross profit and gross margin attributable to adaptive marketing revenues to decline.

### Operating Expenses

#### Warrant Costs, Net

| | Year Ended December 31, ($000) | | |
|---|---|---|---|
| | 1999 | 1998 | % Change |
| Warrant Costs, Net............................ | $998,832 | $57,979 | 1,623% |

Warrant costs, net consist of the fair value of warrants issued to online suppliers during 1999 as discussed above. Such costs were partially offset by warrant income of $188.8 million recognized in the fourth quarter as a result of the receipt of warrants to purchase common stock of WebHouse.

### Sales and Marketing

| | Year Ended December 31, ($000) | | |
|---|---|---|---|
| | 1999 | 1998 | % Change |
| Sales & Marketing | $79,577 | $24,388 | 226.3% |
| % of Revenues | 16.5% | 69.2% | |

Sales and marketing expenses for the year ended December 31, 1999 consisted primarily of: (1) advertising and promotions; (2) credit card processing fees; (3) fees payable to a third party service provider that operates priceline.com's call center; (4) compensation for priceline.com's sales and marketing personnel; and (5) provisions for customer charge-backs (based upon a percentage reflecting priceline.com's historical experience). The Company plans to continue to invest heavily in advertising and other marketing programs and expects that all marketing costs will increase. However, with the exception of processing fees and provisions for customer accommodations and charge-backs, which the Company anticipates will grow proportionately with transaction based revenue, the Company anticipates that the other marketing costs will decrease as a percentage of revenues as the result of anticipated revenue growth.

### General and Administrative

| | Year Ended December 31, ($000) | | |
|---|---|---|---|
| | 1999 | 1998 | % Change |
| General & Administrative | $27,609 | $18,004 | 53.3% |
| % of Revenues | 5.7% | 51.1% | |

General and administrative expenses for the year ended December 31, 1999 were comprised primarily of compensation for personnel, fees for outside professionals, telecommunications and other overhead costs, including occupancy expense. The year ended December 31, 1999 included a charge of $1,812 relating to option payroll taxes resulting from the exercise of employee stock options. Excluding this expense, general and administrative expense was 5.3% of sales for the year ended December 31, 1999. Excluding this charge, general and administrative expenses increased as a result of increased payroll and overhead costs associated with the expansion of our product offerings and increases in our revenue base.

### Systems and Business Development

| | Year Ended December 31, ($000) | | |
|---|---|---|---|
| | 1999 | 1998 | % Change |
| Systems & Business Development | $14,023 | $11,132 | 26.0% |
| % of Revenues | 2.9% | 31.6% | |

Systems and business development expenses for the year ended December 31, 1999 were comprised primarily of: (1) compensation to our information technology and product development staff; (2) payments to outside contractors; (3) data communications and other expenses associated with operating priceline.com's Web site; and (4) depreciation and amortization on computer hardware and software. During 1999, systems and business development expenses increased due to increased payroll costs, increased depreciation and amortization resulting from increased capital expenditures and

29

increased development cost associated with the expansion of priceline.com's product offering and technological infrastructure. As the Company depends on its web site and internal systems to operate, it expects to continue to invest significantly on the systems and business development area.

In March 1998, the American Institute of Certified Public Accountants issued Statement of Position ("SOP") 98-1, "Accounting for Costs of Computer Software Developed or Obtained for Internal Use." This SOP requires capitalization of certain costs of computer software developed or obtained for internal use. Priceline.com adopted this SOP on January 1, 1999 and, during the year ended December 31, 1999, priceline.com capitalized approximately $13.9 million of computer software developed or obtained for internal use. Amortization of such costs aggregated approximately $1.1 million during the year ended December 31, 1999.

Other Income, Net

|  | Year Ended December 31, ($000) | | |
| --- | --- | --- | --- |
|  | 1999 | 1998 | % Change |
| Other Income (Net)......................... | $7,120 | $548 | 1,199% |

Other income, net, for the year ended December 31, 1999 was primarily comprised of interest income. Interest income on cash and marketable securities increased due to higher cash and cash equivalent balances resulting from our initial public offering of common stock in April of 1999 and our secondary public offering of common stock in August of 1999.

**Year Ended December 31, 1998**

Priceline.com was formed in July 1997, but did not commence operations until April 1998. Accordingly, comparisons with prior periods are not meaningful.

## Revenues

Total revenues for the year ended December 31, 1998 were $35.2 million. Since commencement of operations in April 1998, essentially all revenues consisted of airline ticket sales, hotel room reservations and related adaptive marketing programs. Priceline.com's automobile sales service, which was launched on a test basis in the New York metropolitan area in July 1998, did not contribute materially to revenues during the period.

### Product Costs and Gross Profit (Loss)

Cost of revenues for the year ended December 31, 1998 totaled $36.5 million, consisting of product costs of $33.5 million and supplier warrant costs of $3.0 million. Product costs represent the cost of airline tickets from priceline.com's suppliers, net of the federal air transportation tax, segment fees and passenger facility charges imposed in connection with the sale of airline tickets. Supplier warrant costs represent a non-cash expense related to the pro-rata amount of the Delta warrant earned prior to December 31, 1998, the date on which the Delta warrant was amended.

Gross profit (loss), which is comprised of revenues less cost of revenues, was $(1.3) million for the year ended December 31, 1998. Excluding the effect of the non-cash supplier warrant costs, priceline.com would have had gross profit of $1.7 million for the year ended December 31, 1998. In 1998, priceline.com sold a substantial number of tickets below its cost in order to increase airline and adaptive marketing revenues, build a record of successful transactions, and enhance the priceline.com brand. Because the fees generated by adaptive marketing programs have historically involved no separate costs, adaptive marketing revenues had a disproportionately positive impact on priceline.com's total gross margin. The Capital One adaptive marketing program accounted for all of priceline.com's adaptive marketing revenues in 1998.

**Operating Expenses**

Warrant Cost, net. Warrant costs, net for the year ended December 31, 1998 totaled $58.0 million, or 164.5% of revenues. Supplier start up warrant costs consist of a non-cash charge representing the fair value of warrants issued to certain participating airlines in the priceline.com service in connection with securing the airline's participation in the priceline.com service.

Sales and Marketing. Sales and marketing expenses for the year ended December 31, 1998 totaled $24.4 million, or 69.2% of revenues. The expenses were comprised of: (1) advertising and promotional items; (2) fees payable to a third party service provider, which operates priceline.com's call center; (3) credit card processing fees; (4) provisions for customer credit card charge-backs (based upon a percentage reflecting priceline.com's historical experience); and
(5) compensation for priceline.com's sales and marketing personnel.

General and Administrative. General and administrative expenses for the year ended December 31, 1998 totaled $18.0 million or 51.1% of revenues. General and administrative expenses consist primarily of compensation for personnel, fees for outside professionals, telecommunications and other overhead costs, including occupancy expense. In July 1998, priceline.com issued 8,125,000 shares of Common Stock, to the Chairman and Chief Executive Officer that resulted in the recognition of a charge of $6.5 million with respect to these shares. The shares were issued as compensation for agreeing to accept the position.

Systems and Business Development. Systems and business development expenses for the year ended December 31, 1998 totaled $11.1 million, or 31.6% of revenues. Systems and business development expenses are comprised primarily of compensation to priceline.com's information technology and product development staff and payments to outside contractors, data communications and other expenses associated with operating priceline.com's Web site and, to a lesser extent, depreciation on computer hardware and licensing fees for computer software.

### Other Income, Net

Other income, net for the year ended December 31, 1998 totaled $548,374, reflecting approximately $633,000 of interest income earned by priceline.com on its cash balances, net of interest expense for the period.

### Period Ended December 31, 1997

During the period from its formation in July 1997 through December 31, 1997, priceline.com was engaged in start-up activities and incurred $2.5 million of operating expenses. These operating expenses primarily consisted of investments in technology and personnel related expenses. No revenues were earned during the period.

### Liquidity and Capital Resources

At December 31, 1999, the Company had approximately $171.9 million in cash and cash equivalants, and short-term investments.

Net cash used in operating activities was $63.0 million, $40.9 million and $774,000 for the years ended December 31, 1999 and 1998 and for the period July
18 (inception) through December 31, 1997, respectively. Net cash used in operating activities was primarily attributable to net losses.

Net cash used in investing activities was $68.2 million, $6.6 million and $1.3 million for the years ended December 31, 1999 and 1998 and for the period July 18 (inception) through December 31, 1997, respectively. Net cash used in investing activities was primarily related to purchases of property and equipment, and in 1999 for investments in marketable securities.

Priceline.com has certain commitments for capital expenditures as part of its ongoing business. None of these commitments are material to the financial statements either individually or in the aggregate. Capital expenditures, primarily for computer equipment and software, were $27.4 million for the year ended December 31, 1999. As a result of its rapid growth, priceline.com expects to increase capital expenditures for purchased computer hardware, internally developed software, other equipment and leasehold improvements.

Net cash provided by financing activities was $210.8 million, $101.1 million and $2.1 million for the years ended December 31, 1999 and 1998 and for the period July 18 (inception) through December 31, 1997, respectively. Net cash provided by financing activities resulted primarily from the issuance of equity securities referred to below.

In April 1999, priceline.com completed its initial public offering in which it sold 10,000,000 shares of its Common Stock at a price of $16.00 per share. Offering proceeds to priceline.com, net of approximately $11.2 million in aggregate underwriters' discounts and commissions and $4.5 million in related expenses, were approximately $144.3 million. In August 1999, priceline.com completed a public offering in which it sold 1,000,000 shares of its Common Stock at a price of $67.00 per share. Offering proceeds to priceline.com, net of approximately $2.5 million in aggregate underwriters' discounts and commissions and $2.0 million in related expenses, were approximately $62.5 million.

During 1997, priceline.com's initial equity capital of approximately $27.0 million was provided by Mr. Jay S. Walker, other high net worth individuals and a partnership affiliated with General Atlantic Partners, LLC, a private equity firm that invests worldwide in software and information technology companies. An additional $20.0 million was invested by two partnerships affiliated with General Atlantic in July 1998. In December 1998, priceline.com sold equity securities in a private offering to a group of corporate and institutional investors and high net worth individuals for approximately $54.4 million. Included in that group were two partnerships affiliated with General Atlantic; Vulcan Ventures, Incorporated; Liberty PL, Inc., a wholly owned subsidiary of Liberty Media Corporation; Quantum Industrial Partners LDC, a fund managed by Soros Fund Management, LLC and Allen & Company Incorporated. Allen & Company Incorporated also has served as priceline.com's financial advisor.

In April 1999, priceline.com made a $3.3 million loan to Mr. Richard S. Braddock for the payment of taxes related to the issuance to Mr. Braddock of 8,125,000 shares of common stock in August 1998. The loan bears interest at 5.28% per annum. Interest is payable annually and principal is payable in January 2004.

In July 1999, priceline.com made a $6.0 million loan to an executive of the Company, pursuant to the terms of his employment agreement dated June 14, 1999. The loan bears interest annually at 5.82% per annum. In the first quarter of 2000, priceline.com made loans to two executives aggregating $5.0 million, which bear interest at 6.56%. Subject to certain prepayment obligations and to forgiveness in the event of certain changes of control, death, or termination without cause, pursuant to the terms of these loans, accrued interest and principal are payable after five years, but are forgiven under certain circumstances if the executive remains employed by the Company at that time. Upon any forgiveness of the loans, the Company would recognize as compensation expense an amount up to the amount of principal and interest forgiven.

Priceline.com believes that its existing cash balances and liquid resources will be sufficient to fund its operating activities, capital expenditures and other obligations through at least the next twelve months. However, if during that period or thereafter, priceline.com is not successful in generating sufficient cash flow from operations or in raising additional capital when required in sufficient amounts and on terms acceptable to priceline.com, these failures could have a material adverse effect on priceline.com's business, results of operations and financial condition. If additional funds were raised

32

through the issuance of equity securities, the percentage ownership of its then-current stockholders would be diluted.

## Market-related Risks

Priceline.com currently has no floating rate indebtedness, holds no derivative instruments other than through investments in licensees discussed above, and does not earn significant foreign-sourced income. Accordingly, changes in interest rates or currency exchange rates do not generally have a direct effect on priceline.com's financial position. However, changes in currency exchange rates may affect the cost of international airline tickets and international hotel room reservations offered through the priceline.com service, and so indirectly affect consumer demand for such products and priceline.com's revenue. In addition, to the extent that changes in interest rates and currency exchange rates affect general economic conditions, priceline.com would also be affected by such changes.

## Recent Accounting Pronouncements

In July 1999, the FASB issued Statement No. 137, "Accounting for Derivative Instruments and Hedging Activities-Deferral of Effective Date of FASB No. 133". The Statement defers for one year the effective date of FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities". The rule now will apply to fiscal quarters of fiscal years beginning after June 15, 2000. In June 1998, SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" was issued. The statement will require the recognition of all derivatives as either assets or liabilities in the balance sheet and the measurement of those instruments at fair value. Derivatives that are not hedges must be adjusted to fair value through income. If the derivative is a hedge, depending on the nature of the hedge, changes in the fair value of derivatives will either be offset against the change in fair value of the hedged assets, liabilities, or firm commitments through earnings or recognized in other comprehensive income until the hedged item is recognized in earnings. The ineffective portion of the derivative's change in fair value will be immediately recognized in earnings. The Company has not yet determined the effect of SFAS No. 133 will have on the earnings and financial position of the Company.

In 1999, the Company adopted Statement of Position (SOP) 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use." This standard requires certain direct development costs associated with internal-use software to be capitalized including external direct costs of material and services and payroll costs for employees devoting time to the software projects. These costs are included in software and are amortized over a period not to exceed three years beginning when the asset is substantially ready for use. Costs incurred during the preliminary project stage, as well as maintenance and training costs, are expensed as incurred.

## Tax Matters

## Federal Air Transportation Tax on Airline Ticket Sales

A Federal transportation tax is imposed upon the sale of airline tickets. The tax is based on a percentage of the cost of transportation, which was 9% for periods prior to October 1, 1998, 8% for the period October 1, 1998 through September 30, 1999 and 7.5% thereafter. The Company has historically interpreted the tax regulations as requiring that the tax be computed based on the amount charged by the airline to priceline.com for the airline ticket and the Company's participating airlines have collected and remitted the tax based on this amounts. The Company applied for a ruling from the Internal Revenue Service (the "Service") confirming this interpretation. In December 1999, the Service indicated to the Company that it was unlikely that a favorable ruling would be issued. The Company subsequently withdrew its ruling request because of the uncertainty of the outcome. Because the Company anticipated the possibility of an adverse ruling on this issue, the Company accrued

33

approximately $1.3 million relating to the balance of the tax liability for tickets sold prior to that date. The Company believes this accrual to be adequate but there can be no assurance as to the final outcome because a formal ruling has not been issued by the service.

**Non-Qualified Stock Options**

As of December 31, 1999, we had outstanding non-qualified stock options to purchase 27,024,740 shares issued to various employees, consultants and directors pursuant to the 1997 Omnibus Plan and the 1999 Omnibus Plan. The options entitle holders to purchase common stock at a weighted average exercise price of approximately $13.93 per share, subject to adjustment in accordance with the 1997 Omnibus Plan and the 1999 Omnibus Plan.

**Year 2000 Readiness Disclosure**

The following disclosure may be deemed "Year 2000 Readiness Disclosure" pursuant to the Year 2000 Information and Readiness Disclosure Act.

Since inception, the Company has dedicated substantial resources to address the potential issues related to Year 2000 programming and related concerns. As a result of these efforts, the Company has not experienced to date any material disruption in its operations in connection with, or following, the transition of Year 2000.

Since the Company was cognizant of Year 2000 issues during the development of its systems and products since inception, specific costs related to Year 2000 issues can not be quantified. There were no material additional costs incurred to make any previously existing product or services Year 2000 compliant.

**Information Regarding Forward Looking Statements**

See "Special Note Regarding Forward Looking Statements."

34

Priceline.com currently has no floating rate indebtedness, holds no derivative instruments other than through investments in licensees described in this Annual Report on Form 10-K and does not earn significant foreign-sourced income. Accordingly, changes in interest rates or currency exchange rates do not generally have a direct effect on priceline.com's financial position. However, changes in currency exchange rates may affect the cost of international airline tickets and international hotel reservations offered through the priceline.com service, and so indirectly affect consumer demand for such products and priceline.com's revenue. In addition, to the extent that changes in interest rates and currency exchange rates affect general economic conditions, priceline.com would also be affected by such changes.

## Item 8. Financial Statements and Supplementary Data

The following financial statements of the Company and the independent auditors' report are filed as part of this Annual Report on Form 10-K (See Item 14):

Balance Sheets as of December 31, 1999 and December 31, 1998; Statements of Operations , Changes in Stockholders' Equity and Cash Flows for the years ended December 31, 1999, December 31, 1998 and the period July 18, 1997 (inception) to December 31, 1997; Notes to Financial Statements; Independent Auditors' Report.

## Item 9. Changes and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## PART III

## Item 10. Directors and Executive Officers of the Registrant

Information regarding the Company's directors and executive officers and compliance with Section 16(a) of the Securities Exchange Act of 1934, as amended, required by Part III, Item 10, is included in the Company's Proxy Statement relating to the Company's annual meeting of stockholders to be held on April 24, 2000, and is incorporated herein by reference.

## Item 11. Executive Compensation

Information required by Part III, Item 11, is included in the Company's Proxy Statement relating to the Company's annual meeting of stockholders to be held on April 24, 2000, and is incorporated herein by reference.

## Item 12. Security Ownership of Certain Beneficial Owners and Management

Information required by Part III, Item 12, is included in the Company's Proxy Statement relating to the Company's annual meeting of stockholders to be held on April 24, 2000, and is incorporated herein by reference.

## Item 13. Certain Relationships and Related Transactions

35

Information regarding certain of the Company's relationships and related transactions is included in the Company's Proxy Statement relating to the Company's annual meeting of stockholders to be held on April 24, 2000, and is incorporated herein by reference.

PART IV

**Item 14. Exhibits, Financial Statement Schedules and Reports on Form 8-K**

(a) List of Documents Filed as a Part of this Annual Report on Form 10-K:

The following financial statements of the Company and the independent auditors' report are filed as part of this Annual Report on Form 10-K.

Balance Sheets as of December 31, 1999 and December 31, 1998; and the related Statements of Operations , Changes in Stockholders' Equity and Cash Flows for the years ended December 31, 1999, December 31, 1998 and the period July 18, 1997 (inception) to December 31, 1997; Notes to Financial Statements; Independent Auditors' Report.

(b) Reports on Form 8-K:

On October 14, 1999, the Company filed a report on Form 8-K announcing that the Company filed a suit in U.S. District Court against Microsoft Corporation and its Expedia Inc. subsidiary, claiming that Expedia.com's hotel service infringes on the Company's U.S. Patent No. 5,794,207. The suit also charges that Microsoft's conduct is in violation of the Connecticut Unfair Trade Practices Act.

On November 18, 1999, the Company filed a report on Form 8-K announcing that United Airlines, American Airlines and US Airways had agreed to become participating carriers in the priceline.com Name Your Own Price(sm) airline ticket service.

(c) Exhibits

The exhibits listed below are filed as a part of this Annual Report on Form 10-K.

```
     Exhibit Number                      Description
     --------------                      -----------
     2.1*               Agreement of Merger, dated as of July 31, 1998, between
                        priceline.com LLC and the Registrant.
     3.1*               Form of Amended and Restated Certificate of Incorporation of
                        the Registrant.
     3.2*               Form of By-Laws of the Registrant.
     4.1                Reference is hereby made to Exhibits 3.1 and 3.2.
     4.2*               Specimen Certificate for Registrant's Common Stock.
     4.3*               Amended and Restated Registration Rights Agreement, dated as
                        of December 8, 1998, among the Registrant and certain
                        stockholders of the Registrant.
     10.1.1*            1997 Omnibus Plan of the Registrant.
     10.1.2*            1999 Omnibus Plan of the Registrant.
     10.2*              Stock Purchase Agreement, dated July 31, 1998, among the
                        Registrant and the investors named therein, as amended.
     10.3*              Stock Purchase Agreement, dated as of December 8, 1998, among
                        the Registrant and the investors named therein, as amended.
     10.4               Reference is hereby made to Exhibit 4.3.
     10.5*              Purchase and Intercompany Services Agreement, dated April 6,
                        1998, among the Registrant, Walker Asset Management Limited
                        Partnership, Walker Digital
```

36

```
Exhibit Number                Description
--------------                -----------
                    Corporation and Priceline Travel, Inc.
10.6.1*             Employment Agreement, dated as of January 1, 1998, between Jay
                    S. Walker, Walker Digital Corporation, the Registrant and
                    Jesse M. Fink.
10.6.2*             Amendment No. 1 to Employment Agreement, dated November 16,
                    1998 between the Registrant and Jesse M. Fink.
10.7.1*             Employment Agreement, dated as of July 23, 1998, between the
                    Registrant and Timothy G. Brier.
10.7.2*             Amendment No. 1 to Employment Agreement, dated November 16,
                    1998, between the Registrant and Timothy G. Brier.
10.8*               Amended and Restated Employment Agreement, dated as of August
                    15, 1998, by and between the Registrant and Richard S.
                    Braddock.
10.9*               Airline Participation Agreement, dated April 1998, by and
                    among the Registrant, Priceline Travel, Inc. and Trans World
                    Airlines, Inc.
10.10*+             Airline Participation Agreement, dated October 2, 1998, by and
                    among the Registrant, Priceline Travel, Inc. and Northwest
                    Airlines, Inc.
10.11.1*+           General Agreement, dated August 31, 1998, by and among the
                    Registrant, Priceline Travel, Inc. and Delta Air Lines, Inc.
10.11.2*+           Airline Participation Agreement, dated August 31, 1998, by and
                    among the Registrant, Priceline Travel, Inc. and Delta Air
                    Lines, Inc.
10.11.3*+           Amendment to the Airline Participation Agreement and the
                    General Agreement, dated December 31, 1998, between and among
                    the Registrant, Priceline Travel, Inc. and Delta Air Lines,
                    Inc.
10.11.4***          Letter Agreement, dated July 16, 1999, between the Registrant
                    and Delta Air Lines, Inc.
10.11.5             Master Agreement, dated November 17, 1999, between the
                    Registrant and Delta Air Lines, Inc.
10.11.6             Amendment to the Airline Participation Agreement and the
                    General Agreement, dated November 17, 1999, by and among the
                    Registrant, Priceline Travel, Inc. and Delta Air Lines, Inc.
10.11.7+            Participation Warrant Agreement, dated as of November 17,
                    1999, between the Registrant and Delta Air Lines, Inc.
10.12*+             Airline Participation Agreement, dated December 31, 1998, by
                    and among the Registrant, Priceline Travel, Inc. and America
                    West Airlines.
10.13*+             Internet Marketing and Licensing Agreement, as of August 1,
                    1998, between the Registrant and LendingTree, Inc.
10.14*              Systems Access Agreement, dated as of August 4, 1997, between
                    the Registrant and WORLDPAN, L.P.
10.15*              Master Agreement for Outsourcing Call Center Support, dated as
                    of April 6, 1998, between the Registrant and CALLTECH
                    Communications, Incorporated.
10.16*              Form of Participation Warrant Agreement.
10.17.1*+           Participation Warrant Agreement, dated as of December 31,
                    1998.
10.17.2*+           Amendment No. 1, dated as of February 4, 1999, to Warrant
                    Participation Agreement, dated as of December 31, 1999.
10.17.3*+           Amendment No. 2, dated as of March 3, 1999, to Participation
                    Warrant Agreement, dated as of December 31, 1998, as
                    previously amended to Amendment No. 1 to Warrant Participation
                    Agreement, dated as of February 4, 1999.
10.18***            Employment Agreement, dated as of June 14, 1999, between the
                    Registrant and Daniel H. Schulman.
10.19.1***          Airline Participation Agreement, dated July 16, 1999, between
                    the Registrant and Continental Airlines, Inc.
10.19.2***          Participation Warrant Agreement, dated July 16, 1999, between
                    the Registrant and Continental Airlines, Inc.
10.19.3             First Amendment to Participation Warrant Agreement, dated as
                    of November 17, 1999, by and between the Registrant and
                    Continental Airlines, Inc.
10.19.4+            Participation Warrant Agreement, dated November 17, 1999,
                    between the Registrant and Continental Airlines, Inc.
10.20****           License Agreement, dated July 20, 1999 between Walker Digital
                    Corporation and the Registrant.
10.21               Sublease, dated October 1999, between Oxford Health Plans,
                    Inc., as Sub-Landlord and the
```

| Exhibit Number | Description |
|---|---|
| | Registrant, as Sub-Tenant, and Agreement of Lease, dated June 16, 1993, as amended, between Prudential Insurance Company of America, as Landlord, and Oxford Health Plans, Inc., as Tenant. |
| 10.22.1 | Securityholders' Agreement, dated as of October 26, 1999, among the Registrant, Priceline WebHouse Club, Inc., Walker Digital, LLC and the Investors signatory thereto. |
| 10.22.2+ | Intellectual Property License Agreement, dated as of October 26, 1999, between the Registrant and Priceline WebHouse Club, Inc. |
| 10.22.3+ | Marketing and Technical Services Agreement, dated as of October 26, 1999, between the Registrant and Priceline WebHouse Club, Inc. |
| 10.22.4+ | Warrant Agreement, dated as of October 26, 1999, between the Registrant and Priceline WebHouse Club, Inc. |
| 10.22.5+ | Services Agreement, dated as of October 26, 1999, between the Registrant and Priceline WebHouse Club, Inc. |
| 10.23.1+ | Airline Participation Agreement, dated as of November 15, 1999, by and between the Registrant and United Air Lines, Inc. |
| 10.23.2+ | Participation Warrant Agreement, dated as of November 15, 1999, by and between the Registrant and United Air Lines, Inc. |
| 10.24.1+ | Airline Participation Agreement, dated as of November 17, 1999, by and between the Registrant and US Airways, Inc. |
| 10.24.2+ | Participation Warrant Agreement, dated as of November 17, 1999, by and between the Registrant and US Airways, Inc. |
| 10.25.1+ | Airline Participation Agreement, dated as of November 17, 1999, by and between the Registrant and American Airlines, Inc. |
| 10.25.2+ | Participation Warrant Agreement, dated as of November 17, 1999, by and between the Registrant and American Airlines, Inc. |
| 10.26+ | Participation Warrant Agreement, dated as of November 17, 1999, by and between the Registrant and Trans World Airlines, Inc. |
| 10.27+ | Participation Warrant Agreement, dated as of November 17, 1999, by and between the Registrant and Northwest Airlines, Inc. |
| 10.28+ | Participation Warrant Agreement, dated as of November 17, 1999, by and between the Registrant and America West Airlines |
| 10.29 | Continuing Employment Agreement, dated as of December 16, 1999, between the Registrant and Melissa M. Taub. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 27.1 | Financial Data Schedule. |

* Previously filed as an exhibit to the Form S-1 (Registration No. 333-69657) filed in connection with priceline.com's initial public offering and incorporated herein by reference.

** Previously filed as an exhibit to the Form 10-Q filed on May 17, 1999 and incorporated herein by reference.

*** Previously filed as an exhibit to the Form S-1 (Registration No.
333-83513) filed in connection with priceline.com's secondary public offering and incorporated herein by reference.

**** Previously filed as an exhibit to the Form 10-Q filed on November 15, 1999

+ Certain portions of this document have been omitted pursuant to a confidential treatment request.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**PRICELINE.COM INCORPORATED**

                                                        **Date**

```
By: /s/ Richard S. Braddock                    March 30, 2000
    -----------------------
    Richard S. Braddock
    Chairman of the Board
    Chief Executive Officer
```

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

```
By: /s/ Richard S. Braddock                    March 30, 2000
    -----------------------------
    Richard S. Braddock
    Chairman of the Board
    Chief Executive Officer

By: /s/ Thomas P. D'Angelo                      March 30, 2000
    -----------------------------
    Thomas P. D'Angelo
    Principal Financial Officer
    Principal Accounting Officer

By: /s/ Paul A. Allaire                         March 30, 2000
    -----------------------------
    Paul A. Allaire
    Director

By: /s/ Ralph M. Bahna                          March 30, 2000
    -----------------------------
    Ralph M. Bahna
    Director
```

39

By: /s/ Paul J. Blackney                          March 30, 2000
    ------------------------------
Paul J. Blackney
Director


By: /s/ William E. Ford                           March 30, 2000
    ------------------------------
William E. Ford
Director


By: /s/ Marshall Loeb                             March 30, 2000
    ------------------------------
Marshall Loeb
Director


By: /s/ Nicholas J. Nicholas, Jr.                 March 30, 2000
    ------------------------------
Nicholas J. Nicholas, Jr.
Director


By: /s/ Nancy B. Peretsman                        March 30, 2000
    ----------------------                        --------
Nancy B. Peretsman
Director

By: /s/Daniel H. Schulman                         March 30, 2000
    ----------------------                        --------
Daniel H. Schulman
President and Chief Operating Officer
Director

By: /s/Jay S. Walker                              March 30, 2000
    ----------------                              --------
Jay S. Walker
Vice Chairman, Director

                              40

**PRICELINE.COM INCORPORATED**
**INDEX TO FINANCIAL STATEMENTS**

Page No.
--------

Independent Auditor's Report.......................................  42

Balance Sheets for the fiscal years ended December 31, 1999 and
    December 31, 1998..............................................  43

Statements of Operations for the fiscal years ended December 31,
    1999 and December 31, 1998 and for the period July 18, 1997
    (Inception) to December 31, 1997..............................  44

Statements of Changes in Stockholders' Equity for the fiscal
    years ended December 31, 1999 and December 31, 1998
    and for the period July 18, 1997 (Inception) to
    December 31, 1997.............................................  45

Statements of Cash Flows for the fiscal years ended December 31,
    1999 and December 31, 1998 and for the period July 18, 1997
    (Inception) to December 31, 1997..............................  46

Notes to Financial Statements......................................  47

**INDEPENDENT AUDITORS' REPORT**

To the Board of Directors and Stockholders of priceline.com Incorporated

We have audited the accompanying balance sheets of priceline.com Incorporated (the "Company") as of December 31, 1999 and 1998, and the related statements of operations, changes in stockholders' equity, and cash flows for the years ended December 31, 1999 and 1998 and the period July 18, 1997 (inception) to December 31, 1997. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 1999 and 1998, and the results of its operations and its cash flows for the years ended December 31, 1999 and 1998 and the period July 18, 1997 (inception) to December 31, 1997 in conformity with generally accepted accounting principles.

Stamford, Connecticut
January 27, 2000
(March 17, 2000 as to Note 15)

42

**BALANCE SHEETS**

(In thousands)

|  | December 31, | |
|---|---|---|
|  | 1999 | 1998 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents ........................................................ | $ 133,172 | $ 53,593 |
| Short-term investments ........................................................... | 38,771 | |
| Accounts receivable, net of allowance for doubtful accounts of | | |
| $1,961 and $291 ............................................................... | 21,289 | 4,177 |
| Related party receivables ........................................................ | 508 | |
| Prepaid expenses and other current assets ........................................ | 17,999 | 2,433 |
|  | ---------- | ---------- |
| Total current assets ......................................................... | 211,739 | 60,203 |
| Property and equipment, net ...................................................... | 28,006 | 5,927 |
| Related party receivable ......................................................... | 8,838 | |
| Warrants to purchase common stock of Priceline WebHouse Club, Inc. ............... | 189,000 | |
| Other assets ..................................................................... | 4,303 | 442 |
|  | ---------- | ---------- |
| Total assets ................................................................. | $ 441,886 | $ 66,572 |
|  | ========== | ========== |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable ................................................................. | $ 24,302 | $ 5,268 |
| Related party payable ............................................................ | | 32 |
| Accrued expenses ................................................................. | 13,695 | 4,259 |
| Other current liabilities ........................................................ | 1,253 | 722 |
|  | ---------- | ---------- |
| Total current liabilities ................................................... | 39,250 | 10,281 |
| Long term obligations ............................................................ | | 1,015 |
|  | ---------- | ---------- |
| Total liabilities ........................................................... | 39,250 | 11,296 |
|  | ---------- | ---------- |
| Stockholders' equity: | | |
| Common stock, $0.008 par value authorized 1,000,000 and 300,000 shares, | | |
| respectively; issued and outstanding, 163,867 and | | |
| 93,225 shares, respectively ................................................... | 1,311 | 746 |
| Convertible preferred stock, $0.01 par value; authorized 150,000 shares: | | |
| Series A $1.16 liquidation value per share; issued and | | |
| outstanding 17,289 shares at December 31, 1998 ............................... | | 173 |
| Series B $4.00 liquidation value per share; issued and | | |
| outstanding, 13,837 shares at December 31, 1998 ............................. | | 138 |
| Additional paid-in capital ....................................................... | 1,581,708 | 171,158 |
| Accumulated deficit .............................................................. | (1,180,383) | (116,939) |
|  | ---------- | ---------- |
| Total stockholders' equity ....................................................... | 402,636 | 55,276 |
|  | ---------- | ---------- |
| Total liabilities and stockholders' equity ...................................... | $ 441,886 | $ 66,572 |
|  | ========== | ========== |

See notes to financial statements.

43

**STATEMENTS OF OPERATIONS**

(In thousands, except per share data)

| | Year Ended December 31, | | July 18, 1997 (Inception) to December 31, 1997 |
|---|---|---|---|
| | 1999 | 1998 | |
| Revenues ............................................ | $ 482,410 | $ 35,237 | |
| Cost of revenues: | | | |
| Product costs ..................................... | 423,056 | 33,496 | |
| Supplier warrant costs ............................ | 1,523 | 3,029 | |
| Total costs of revenues ........................ | 424,579 | 36,525 | |
| Gross profit (loss) ................................. | 57,831 | (1,288) | |
| Operating expenses: | | | |
| Warrant costs, net ................................ | 998,832 | 57,979 | |
| Sales and marketing ............................... | 79,577 | 24,388 | $ 441 |
| General and administrative (including $1,812 of option payroll taxes in 1999) ..................... | 27,609 | 18,004 | 1,012 |
| Systems and business development ................... | 14,023 | 11,132 | 1,060 |
| Total operating expenses ....................... | 1,120,041 | 111,503 | 2,513 |
| Operating loss ...................................... | (1,062,210) | (112,791) | (2,513) |
| Interest income .................................... | 7,501 | 548 | |
| Other expense ...................................... | (381) | | |
| Total other income (expense) ................... | 7,120 | 548 | |
| Net loss ............................................ | (1,055,090) | (112,243) | (2,513) |
| Accretion on preferred stock ....................... | (8,354) | (2,183) | |
| Net loss applicable to common stockholders .......... | $(1,063,444) | $ (114,426) | $ (2,513) |
| Net loss applicable to common stockholders per basic and diluted common share ................... | $ (7.90) | $ (1.41) | $ (.05) |
| Weighted average number of basic and diluted common shares outstanding ....................... | 134,622 | 81,231 | 50,834 |

See notes to financial statements.

44

STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY
FOR THE YEARS ENDED DECEMBER 31, 1999 AND 1998 AND FOR THE PERIOD JULY 18, 1997 (INCEPTION) TO DECEMBER 31, 1997

(In thousands)

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| Issuance of common stock and common stock subscriptions ..... | | | 51,670 | $ 413 | $ 843 | | $ 1,256 |
| Net loss ......................... | | | | | | $ (2,513) | (2,513) |
| Balance, December 31, 1997 ....... | | | 51,670 | 413 | 843 | (2,513) | (1,257) |
| Issuance of common stock and common stock subscriptions ..... | | | 41,555 | 333 | 32,663 | | 32,996 |
| Issuance of Series A convertible preferred stock ............... | 17,289 | $ 173 | | | 19,827 | | 20,000 |
| Issuance of Series B convertible preferred stock ............... | 13,837 | 138 | | | 54,276 | | 54,414 |
| Accretion on preferred stock ..... | | | | | 2,183 | (2,183) | |
| Issuance of options to purchase common stock ................... | | | | | 245 | | 245 |
| Issuance of warrants to purchase common stock ................... | | | | | 61,121 | | 61,121 |
| Net loss ......................... | | | | | | (112,243) | (112,243) |
| Balance, December 31, 1998 ....... | 31,126 | $ 311 | 93,225 | $ 746 | $ 171,158 | $ (116,939) | $ 55,276 |
| Conversion of Series A convertible preferred stock ............... | (17,289) | (173) | 21,611 | 173 | | | |
| Conversion of Series B convertible preferred stock ............... | (13,837) | (138) | 17,297 | 138 | | | |
| Accretion on preferred stock ..... | | | | | 8,354 | (8,354) | |
| Issuance of common stock ......... | | | 11,000 | 88 | 208,329 | | 208,417 |
| Exercise of warrants to purchase common stock ................... | | | 19,121 | 153 | 1,579 | | 1,732 |
| Exercise of options to purchase common stock ................... | | | 1,613 | 13 | 1,654 | | 1,667 |
| Issuance of warrants to purchase common stock ................... | | | | | 1,190,634 | | 1,190,634 |
| Net loss ......................... | | | | | | (1,055,090) | (1,055,090) |
| Balance, December 31, 1999 ....... | | | 163,867 | $ 1,311 | $ 1,581,708 | $(1,180,383) | $ 402,636 |

See notes to financial statements.

**STATEMENTS OF CASH FLOWS**

(In thousands)

|  | Year Ended December 31, 1999 | Year Ended December 31, 1998 | July 18, 1997 (Inception) to December 31, 1997 |
|---|---|---|---|
| OPERATING ACTIVITIES: |  |  |  |
| Net loss | $(1,055,090) | $ (112,243) | $ (2,513) |
| Adjustments to reconcile net loss to net cash used in operating activities: |  |  |  |
| Depreciation and amortization | 5,348 | 1,860 | 212 |
| Provision for uncollectible accounts | 3,127 | 581 |  |
| Warrant costs, net | 1,189,111 |  |  |
| Warrant income | (189,000) |  |  |
| Equity based compensation |  | 67,866 |  |
| Changes in assets and liabilities: |  |  |  |
| Accounts receivable | (29,617) | (4,757) |  |
| Prepaid expenses and other current assets | (12,043) | (1,922) |  |
| Restricted bank deposit and bank certificate of deposit |  | (680) |  |
| Accounts payable and accrued expenses | 28,470 | 8,300 | 1,227 |
| Other | (3,331) | 112 | 300 |
| Net cash used in operating activities | (63,025) | (40,883) | (774) |
| INVESTING ACTIVITIES: |  |  |  |
| Additions to property and equipment | (27,416) | (6,607) | (1,317) |
| Minority equity investment | (2,000) |  |  |
| Investment in marketable securities | (38,771) |  |  |
| Net cash used in investing activities | (68,187) | (6,607) | (1,317) |
| FINANCING ACTIVITIES: |  |  |  |
| Related party payable |  | (1,072) | 1,104 |
| Issuance of long-term debt |  | 1,000 |  |
| Payment of long-term debt | (1,000) |  |  |
| Principal payments under capital lease obligations | (25) | (22) | (2) |
| Issuance of common stock and subscription units | 211,816 | 26,495 | 1,006 |
| Payment received on stockholder note |  | 250 |  |
| Issuance of Series A convertible preferred stock |  | 20,000 |  |
| Issuance of Series B convertible preferred stock |  | 54,415 |  |
| Net cash provided by financing activities | 210,791 | 101,066 | 2,108 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 79,579 | 53,576 | 17 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 53,593 | 17 |  |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 133,172 | $ 53,593 | $ 17 |
| SUPPLEMENTAL CASH FLOW INFORMATION: |  |  |  |
| Cash paid during the period for interest | $ 37 | $ 61 | $ 1 |

See notes to financial statements.

46

NOTES TO FINANCIAL STATEMENTS

## 1. BUSINESS DESCRIPTION

Priceline.com Incorporated ("priceline.com", or the "Company") has pioneered a unique e-commerce pricing system known as a "demand collection system" that enables consumers to use the Internet to save money on a wide range of products and services while enabling sellers to generate incremental revenue. Using a simple and compelling consumer proposition-Name Your Own Price(SM)-priceline.com collects consumer demand, in the form of individual customer offers guaranteed by a credit card, for a particular product or service at a price set by the customer. The Company then accesses a database of inventory available to the Company for purchase to determine whether priceline.com can fulfill the customer's offer. Consumers agree to hold their offers open for a specified period of time and, once fulfilled, offers generally cannot be canceled. The Company benefits consumers by enabling them to save money, while at the same time benefiting sellers by providing them with an effective revenue management tool capable of identifying and capturing incremental revenues. By requiring consumers to be flexible with respect to brands, sellers and product features, priceline.com enables sellers to generate incremental revenue without disrupting their existing distribution channels or retail pricing structures.

Walker Digital Corporation ("Walker Digital"), a research and development company, developed the priceline.com service and the business model and related intellectual property rights underlying the priceline.com service, the rights for which were transferred to the Company. Walker Digital had no operations and no revenues related to the assets transferred to priceline.com. Walker Digital was founded and is controlled by the founding stockholder and Vice Chairman of priceline.com. During the years ended December 31, 1999 and 1998, Walker Digital provided the Company with a variety of services including subleasing office facilities to the Company. Charges to the Company for such services aggregated approximately $1,411,000 and $706,000, respectively. In addition, the Company charged Walker Digital $1,800,000 and $384,831 for the years ended December 31, 1999 and 1998, respectively, for certain services, including legal and accounting services and IT infrastructure. Such amounts have been offset against general and administrative expenses in the accompanying statements of operations.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Presentation--The financial statements for all periods presented include the financial statements of priceline.com and Priceline Travel. On March 24, 1999, priceline.com exercised its call option to purchase Priceline Travel for nominal consideration and Priceline Travel was merged into priceline.com. All significant inter-company transactions have been eliminated.

Use of Estimates--The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities at the date of the financial statements and reported amount of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Fair Value of Financial Instruments--The Company's financial instruments, including cash and cash equivalents, accounts receivable-net and accounts payable, are carried at cost which approximates their fair value because of the short-term maturity of these financial instruments. The Company's investment in Lending Tree, Inc. was valued at cost as there was no market for its securities at December 31, 1999. The Company recognized income for the warrant to purchase common stock of Priceline WebHouse Club, Inc. at estimated fair market value, as determined by an independent valuation firm. The carrying value of the capital lease obligations and long-term debt approximates fair value because the interest

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

rates on these obligations are comparable to the interest rates that could have been obtained at the dates of the respective balance sheets.

Cash and Cash Equivalents, and Short-term Investments--The Company invests excess cash primarily in money market accounts, certificates of deposits, and short-term commercial paper. All highly liquid instruments with an original maturity of three months or less are considered cash equivalents. Marketable securities are considered "trading securities" and valued at fair value.

Property and Equipment--Property and equipment are stated at historical cost. Depreciation and amortization of property and equipment is computed on a straight-line basis, generally over the estimated useful lives of the assets or, when applicable, the life of the lease, whichever is shorter.

Impairment of Long-Lived Assets--The Company evaluates the recoverability of its long-lived assets in accordance with Statement of Financial Accounting Standards "SFAS" No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of." SFAS No. 121 requires recognition of impairment of long-lived assets in the event the net book value of such assets exceeds the future undiscounted cash flows attributable to such assets.

Software Capitalization--In 1999, the Company adopted Statement of Position (SOP) 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use." This standard requires certain direct development costs associated with internal-use software to be capitalized including external direct costs of material and services and payroll costs for employees devoting time to the software projects. These costs are included in software and are amortized over a period not to exceed three years beginning when the asset is substantially ready for use. Costs incurred during the preliminary project stage, as well as maintenance and training costs, are expensed as incurred.

Revenues and Cost of Revenues--The Company recognizes and records revenues in a variety of ways depending on the product or service sold. With respect to airline ticket, hotel room and rental car services, the Company recognizes as revenue the amount received from the customer, net of taxes, and records as the cost of revenue the amount that the Company pays the respective airline or hotel. With respect to its automobile service, the Company earns a fixed fee from both the customer and the seller after the transaction is consummated. With respect to its home financing service, during 1999 the Company received a percentage of the fees earned by third parties in connection with the closing of mortgage loans. Going forward, the mortgage product will be offered through National Mortgage Center LLC (doing business as pricelinemortgage ( "pricelinemortgage"), a Company that has been licensed to use the priceline.com demand collection system. The Company also generates revenues through adaptive marketing programs with third parties that pay the Company fees for marketing their customer acquisition programs. Additionally, the Company generates revenues from third party sources, including a customer processing fee for airline, hotel and rental car services, and ancillary reservation booking fees from the Worldspan reservation system for booking of airline flight segments and hotel reservations through the Worldspan system. Consumer processing fees are payable to the Company and recognized as revenue only upon completion of successful transactions.

The manner in which and time at which revenues are recognized differs depending on the product or service sold through the priceline.com service. With respect to airline ticket, hotel room and rental car services, revenues are generated by transactions with customers who make offers to purchase airline tickets and reserve hotel rooms and rental cars supplied to priceline.com by participating sellers. Revenues and related costs are recognized if, and when, the Company accepts and fulfills the

48

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

customer's offer. Because priceline.com is the merchant of record in these transactions, revenue for these services includes the offer price paid by the customer, net of certain taxes and fees. Airline, hotel and rental car revenues also may include fees from third parties for adaptive marketing programs. With respect to automobile services, fees or other payments payable by the seller and /or the customer are recognized as revenue. With respect to home financing services, the Company receives no fees from consumers. The Company recognizes revenue from fees paid directly by its strategic partner through the operation of its home financing services. Because the Company acts as an intermediary between the customer and the seller in auto and home financing transactions, revenues for these products and services are recorded at the amount of the fee received, and not on the value of the underlying transaction, when the transaction is completed. Automobile and home financing services revenues also may include fees from third parties for adaptive marketing programs.

Priceline.com expressly permits only credit cards as an acceptable form of payment from its consumers. On rare occasions, the Company provides refunds and makes certain customer accommodations to individual customers to satisfy disputes and complaints. The Company accrues for such expected losses and classifies the resulting expense as an addition to the allowance for doubtful accounts. The Company extends customary payment terms to corporate customers such as automobile dealers and adaptive marketing sponsors.

Sales and Marketing--Sales and marketing expenses are comprised primarily of costs of radio and newspaper advertising, costs of the third-party offer-taking call center, credit card processing fees, provisions for customer accommodations and charge-backs, and compensation for the Company's sales and marketing personnel. All sales and marketing costs are expensed as incurred.

Systems and Business Development--Systems and business development expenses are comprised primarily of compensation to the Company's information systems and product development staff and payments to outside contractors, data communications and other expenses associated with operating the Company's Web site, depreciation on computer hardware and licensing fees for computer software. Such costs are expensed as incurred.

Equity-Based Compensation--The Company accounts for stock-based employee compensation arrangements in accordance with provisions of Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees," and complies with the disclosure provisions of SFAS No. 123, "Accounting for Stock-Based Compensation." Under APB Opinion No. 25, compensation expense is based on the difference, if any, on the date of grant, between the fair value of priceline.com's stock and the exercise price of the option.

The Company accounts for equity instruments issued to non-employees in accordance with the provisions of SFAS No. 123 and Emerging Issues Task Force ("EITF") Issue No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services." All transactions in which goods or services are the consideration received for the issuance of equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date of the fair value of the equity instrument issued is the earlier of the date on which the counterparty's performance is complete or the date on which it is probable that performance will occur.

Income Taxes--The Company accounts for income taxes in accordance with SFAS No. 109, "Accounting for Income Taxes," which requires recognition of deferred tax liabilities and assets for the

49

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

expected future tax consequences of events that have been included in the financial statements or tax returns. Under this method, deferred tax liabilities and assets are determined based on the temporary difference between the financial statement and tax basis of assets and liabilities using presently enacted tax rates in effect. Valuation allowances are established when necessary to reduce deferred tax assets to the amounts expected to be realized.

During the period that priceline.com operated as an LLC, it was treated substantially as a partnership for tax purposes and, accordingly, the tax effect of its activities accrued to its members through July 1998.

Net Loss Per Share--The Company computes basic and diluted earnings per share in accordance with Statement of Financial Accounting Standards No. 128 ("SFAS 128"), "Earnings per Share". SFAS 128 requires the Company to report both basic earnings per share, which is based on the weighted average number of common shares outstanding, and diluted earnings per share, which is based on the weighted average number of common shares outstanding and all dilutive potential common shares outstanding. Since the Company incurred losses for all periods presented, the inclusion of options in the calculation of weighted average common shares is anti-dilutive; and therefore there is no difference between basic and diluted earnings per share.

Business Risk--Business risks include the following:

Competition--The markets for the products and services offered on the priceline.com service are intensely competitive. The Company competes with both traditional distribution channels and online services. The Company currently or potentially competes with a variety of companies with respect to each product or services offered. The Company potentially faces competition from a number of large online services that have expertise in developing online commerce and in facilitating Internet traffic. Many competitors have significant competitive advantages. For example, airlines, hotels and other suppliers also sell their products and services directly to consumers and have established Web sites. Internet directories, search engines and large traditional retailers have significantly greater operating histories, customer bases, technical expertise, brand recognition and/or online commerce experience than the Company. In addition, certain competitors may be able to devote significantly greater resources to furthering their business.

Dependence on Airline Industry and Certain Carriers--The Company's near term, and possibly long term, prospects are significantly dependent upon the sale of leisure airline tickets. Sales of leisure airline tickets represented approximately 85% and 86% of total revenues for the years ended December 31, 1999 and 1998, respectively. As a result, currently the Company is substantially dependent upon the continued participation of the airlines in the priceline.com service in order to maintain and continue to grow its total revenues. Significantly reducing the Company's dependence on the airlines is likely to take a long period of time and there can be no guarantee that the Company will succeed in reducing that dependence.

Concentration of Credit Risk--Financial instruments, which potentially subject the Company to concentrations of credit risk, are principally bank deposits and accounts receivable. Cash and cash equivalents and marketable securities are deposited with high credit quality financial institutions. Accounts receivable are derived from the revenues earned from customers in the U.S. and are denominated in U.S. dollars. The Company maintains an allowance for uncollectible accounts based upon the expected collectibility of accounts receivable.

50

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Barter Transaction--In 1999, the Company entered into one barter transaction to exchange services for advertising. The transaction was recorded at the estimated fair value of the services expected to be received. Revenue of $375,000 from this transaction was recognized in 1999, when the service was provided and will be expensed during 2000, when the advertising is provided to priceline.com.

Segment Reporting--The Company operates as a single segment and will evaluate additional segment disclosure requirements as it expands its operations. All of the operations and identifiable assets are in the United States.

Reclassification--Certain amounts in prior years' financial statements have been reclassified to conform to the current year presentation.

### Recent Accounting Pronouncements

In July 1999, the FASB issued Statement No. 137, "Accounting for Derivative Instruments and Hedging Activities-Deferral of Effective Date of FASB No. 133". The Statement defers for one year the effective date of FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities". The rule now will apply to fiscal quarters of fiscal years beginning after June 15, 2000. In June 1998, SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" was issued. The statement will require the recognition of all derivatives as either assets or liabilities in the balance sheet and the measurement of those instruments at fair value. Derivatives that are not hedges must be adjusted to fair value through income. If the derivative is a hedge, depending on the nature of the hedge, changes in the fair value of derivatives will either be offset against the change in fair value of the hedged assets, liabilities, or firm commitments through earnings or recognized in other comprehensive income until the hedged item is recognized in earnings. The ineffective portion of the derivative's change in fair value will be immediately recognized in earnings. The Company has not yet determined the effect of SFAS No. 133 will have on the earnings and financial position of the Company.

## 3. SHORT-TERM INVESTMENTS

At December 31, 1999, the Company held short term instruments which were classified as trading securities; accordingly, they are carried at fair value on the balance sheet. Net unrealized gains (losses) of $13,000 have been recognized in the financial statements. Marketable securities at December 31, 1999 include the following (in thousands):

|  | December 31, 1999 |
| --- | --- |
|  | Fair Value |
| Discounted commercial paper............................ | $22,578 |
| Asset backed securities................................ | 3,443 |
| Municipal bonds and notes.............................. | 12,750 |
|  | $38,771 |

Included in other assets is a $2.0 million equity investment in Lending Tree, Inc., an internet-based home financing service provider. Since the Company owns less than 20% of Lending Tree and does not exert significant influence over the investee, the Company accounts for the investment on the cost basis. In accordance with SFAS No. 115, the Company deems these securities as available for sale. Because there was no readily determinable value for shares of Lending Tree at December 31, 1999, the Company has valued its investment at cost. The Company's home financing service is offered through a joint marketing arrangement with Lending Tree.

51

**NOTES TO FINANCIAL STATEMENTS (Continued)**

## 4. ACCOUNTS RECEIVABLE

A summary of the activity in the allowance for uncollectible accounts for the years ended December 31, 1999 and 1998 is as follows (in thousands):

|  | 1999 | 1998 |
|---|---|---|
| Balance, beginning of year | $ 291 | $ -- |
| Provision charged to expense | 3,127 | 581 |
| Charge-offs | (1,457) | (290) |
| Balance, end of year | $1,961 | $291 |

## 5. PROPERTY AND EQUIPMENT

Property and equipment at December 31, 1999 and 1998 consists of the following (in thousands):

|  | Estimated Useful Lives (years) | 1999 | 1998 |
|---|---|---|---|
| Computer equipment and software | 3 | $33,242 | $7,034 |
| Office equipment, furniture & fixtures and leasehold improvements | 3 to 7 | 2,173 | 965 |
| Total | | 35,415 | 7,999 |
| Less accumulated depreciation and amortization | | (7,409) | (2,072) |
| Property and equipment, net | | $28,006 | $5,927 |

Depreciation and amortization expense was approximately $5,337,000, $1,860,000 and $212,000 for the years ended December 31, 1999 and 1998, and for the period July 18, 1997 to December 31, 1997, respectively.

## 6. LONG TERM DEBT

In April 1998, priceline.com issued a promissory note to an investor for $1,000,000. The promissory note bore interest at a rate of 6% per annum. In connection with the promissory note, priceline.com issued detachable warrants to purchase 62,500 shares of common stock at $0.80 per share. The note was repaid in 1999.

## 7. STOCKHOLDERS' EQUITY

In March 1999, the Company effected a 1.25:1 stock split. All share and per share amounts have been retroactively adjusted to reflect the stock split.

On July 18, 1997, priceline.com issued 42,990,211 shares of Common Stock for the initial contributed services of the founders. No compensation expense was recognized for the contributed services as priceline.com was in the earliest phases of development. Such services included conceiving the priceline.com business model, developing business strategies and operating plans, initiating contact with airline suppliers and raising capital. There were no employment agreements related to the services initially contributed and/or the shares issued in respect of such shares.

Also, on July 18, 1997, priceline.com issued 6,895,833 shares of Common Stock to Walker Digital in exchange for the transfer by Walker Digital to priceline.com of all the rights, title, and interest in certain patents and patent applications relating to buyer driven commerce.

52

## 7. STOCKHOLDERS' EQUITY (Continued)

In April 1998, priceline.com issued warrants to purchase 125,000 shares of Common Stock, at a zero exercise price, to a non-employee in exchange for services rendered to the Company. The estimated fair value of the warrants at the date of grant of $100,000 was based on the value of the equivalent shares as of the grant date, that is 125,000 shares at $0.80 per share, and has been reflected as sales and marketing expense and additional paid-in-capital.

In July 1998, priceline.com issued 8,125,000 shares of Common Stock, to the Chairman and Chief Executive Officer that resulted in the recognition of a charge of $6,500,000 with respect to these shares. The shares were issued as compensation for agreeing to accept the position.

In April 1999, the Company completed an initial public offering in which it sold 10,000,000 shares of its Common Stock, $0.008 par value. Offering proceeds to the Company, net of underwriter discounts and commissions and other related expenses, were approximately $144.3 million. At the time of the offering, shares of the Series A and Series B Preferred Stock were automatically converted, subject to anti-dilution adjustment, into an equal number of shares of Common Stock.

In August 1999, the Company completed a public offering in which it sold 1,000,000 shares of its Common Stock and certain stockholders of the Company sold 3,500,000 shares of common stock at a price of $67.00 per share. Offering proceeds to priceline.com, net of underwriters discounts and commissions and related expenses, were approximately $62.5 million.

## 8. WARRANTS TO PURCHASE COMMON STOCK

In August 1998, priceline.com entered into a warrant agreement with Delta Air Lines ("Delta") to purchase up to 18,892,603 shares of Common Stock at an exercise price of approximately $0.93 per share (the "Delta Warrant") for agreeing to participate in the priceline.com service. Vesting was contingent upon achievement of certain predetermined performance thresholds. However, there was no penalty for failure to provide ticket inventory to satisfy these performance thresholds. Accordingly, no expense was recorded when the warrant was issued. On December 31, 1998, the Company amended its agreement with Delta to eliminate the vesting contingencies and fix the number of shares subject to the warrant at 18,619,402. The warrants were immediately vested on the date of grant, in that they are not subject to any forfeiture for any reason. The amended Delta Warrant was to become exercisable at the earlier of seven years or over three years upon the achievement of certain performance thresholds. The agreement does not require Delta to make any performance commitments, is non-exclusive and allows Delta to participate in other programs similar to the priceline.com service. Accordingly, the Company recognized approximately $58.7 million of expense based upon the fair value of the warrant on December 31, 1998, of which $3.0 million is included in cost of revenues-supplier warrant costs and $55.7 million is included in expenses-warrant costs, net in the accompanying statements of operations.

In November 1999, the Company further amended the Delta warrant to provide Delta with a cashless exercise right. Upon the exercise of the warrant, Delta acquired a total of 16,525,834 shares of Common Stock of priceline.com. In conjunction with that transaction, Delta sold 2,085,767 shares of priceline.com Common Stock to priceline.com's founder and Vice Chairman Jay S. Walker for an aggregate purchase price of $125 million. The Company further gave Delta the right to exchange six million shares of priceline.com common stock for six million shares of newly issued convertible preferred stock that may be converted into priceline.com stock on a one-for-one basis. To date, Delta has not elected to exercise the conversion right.

8. WARRANTS TO PURCHASE COMMON STOCK (Continued)

On December 31, 1998, priceline.com issued warrants to purchase 937,500 shares of Common Stock, at an exercise price of $3.20 per share, to three airlines in recognition of their being among the original participants in the priceline.com service. Because there are no requirements as to the nature or length of that participation, and the warrants are not subject to forfeiture for any reason, the Company recognized approximately $2.3 million of expense based upon the fair value of the warrants at December 31, 1998. That amount is included in expenses- warrant costs, net in the accompanying statements of operations.

On January 29, 1999, priceline.com issued warrants to an airline to purchase 1,250,000 shares of Common Stock at an exercise price of $6.40 per share. The warrants become exercisable as follows, 50% on January 29, 2000 and 50% on January 29, 2001. The agreement requires the airline to make available to priceline.com airline ticket inventory on certain specified terms and conditions for two years. If the airline does not provide the specified airline ticket inventory, the unexercised warrants are returnable and a substantial penalty will be imposed. The fair value of the warrant of $3.1 million at the grant date was capitalized and will be amortized over the two year period during which services are expected to be provided to the Company.

During July 1999, priceline.com issued to Continental Airlines a warrant to purchase common stock that will become exercisable upon the earlier of July 2004 or upon the achievement of certain performance thresholds. However, the agreement does not require Continental to make any performance commitments. Accordingly, priceline.com incurred a non-cash charge of approximately $88.4 million during the third quarter of 1999 representing the fair value of the warrant on the grant date. In November 1999, the Company amended the Continental warrant to allow the exercise price to fall within the range of the warrants issued to other airlines discussed below. Priceline.com incurred a non-cash charge of approximately $3.5 million during the fourth quarter as a result of the warrant amendment.

In November 1999, the Company entered into separate Participation Warrant Agreements with each of eight major domestic airlines relating to their inclusion in the Company's leisure airline ticket service. Under the Participation Warrant Agreements, the airlines were granted warrants to purchase a total of 20 million shares of priceline.com Common Stock at exercise prices ranging from $52.625 to $59.933 per share. All warrants were fully vested on the date of grant, but generally are not exercisable until November 2005, subject to acceleration under certain circumstances. Priceline.com incurred additional warrant costs of approximately $1.1 billion during the fourth quarter of 1999 as a result of the issuance of these warrants.

9. STOCK OPTION PLANS

In February 1999, the Company adopted the 1999 Omnibus Plan (the "1999 Plan"), which provides for grants of options as incentives and rewards to encourage employees, officers, consultants and directors in the long term success of the Company. In addition, the Company had previously adopted the 1997 Omnibus Plan (the "1997 Plan"). The 1999 Plan and 1997 Plan provide for grants of options to purchase up to 9,375,000 and 23,875,000 shares of Common Stock, respectively, at a purchase price equal to the fair market value on the date of grant. Generally, options from both plans vest over three years from the date of grant. Compensation expense for options granted to non-employees, included in

54

## 9. STOCK OPTION PLANS (Continued)

general and administrative, aggregated $0 and $245,063, during the years ended December 31, 1999 and 1998, respectively.

The following summarizes the transactions pursuant to the Plan:

|  | Shares | Weighted Average Option Price | Option Price Range |
|---|---|---|---|
| Granted during 1998................................ | 23,449,219 | $0.93 | $0.80-3.20 |
| Forfeited.......................................... | (189,374) | 0.80 | 0.80 |
| Cancelled.......................................... | (815,625) | 0.80 | 0.80 |
| Balance at December 31, 1998...................... | 22,444,220 | $0.94 | $0.80-3.20 |
| Granted during 1999............................... | 6,481,833 | 55.99 | 3.20-139.25 |
| Exercised......................................... | (1,614,697) | 1.02 | 0.80-8.00 |
| Forfeited.......................................... | (286,616) | 20.74 | 0.80-139.25 |
| Balance at December 31, 1999...................... | 27,024,740 | $13.93 | $0.80-139.25 |
| Exercisable at December 31, 1999................. | 16,708,585 | | |
| Exercisable at December 31, 1998................. | None | | |
| Available for grant at December 31, 1999......... | 4,610,563 | | |
| Available for grant at December 31, 1998......... | 1,430,780 | | |

No options were granted during 1997.

The following table summarizes information about stock options outstanding at December 31, 1999:

| RANGE OF EXERCISE PRICES | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| | NUMBER OUTSTANDING AS OF 12/31/99 | WEIGHTED AVERAGE REMAINING LIFE | WEIGHTED AVERAGE EXERCISE PRICE | NUMBER EXERCISABLE AS OF 12/31/99 | WEIGHTED AVERAGE EXERCISE PRICE |
| $ .80-$ .93 | 19,532,282 | 8.53 | $ .81 | 16,171,502 | $0.80 |
| 3.20- 13.00 | 2,835,458 | 9.12 | 5.99 | 537,083 | 3.42 |
| 46.75- 139.25 | 4,657,000 | 9.68 | 73.83 | -- | -- |
| $ .80-$139.25 | 27,024,740 | 9.07 | $13.93 | 16,708,585 | $0.88 |

Had compensation costs been determined based upon the fair value at grant date, the Company's pro forma net loss and pro forma net loss per share for the years ended December 31, 1999 and 1998 would have been reported as follows (in thousands, except per share amounts):

| 1999: | Reported | Pro Forma |
|---|---|---|
| Net loss.......................................... | $1,055,090 | $1,295,758 |
| Net loss applicable to common shareholders........ | 1,063,444 | 1,304,112 |
| Basic and diluted loss per common share........... | 7.90 | 9.69 |

## 9. STOCK OPTION PLANS (Continued)

| 1998: | Reported | Pro Forma |
| ---- | ---------- | ---------- |
| Net loss............................................ | $112,243 | $114,613 |
| Net loss applicable to common shareholders......... | 114,426 | 116,797 |
| Basic and diluted loss per common share............ | 1.41 | 1.44 |

The fair value of options granted during 1999 was determined on the date of grant using the Black-Scholes method. The weighted average fair value of options granted during 1999 was estimated to be approximately $52.45, based on the following assumptions: volatility of 107%, risk free interest rate of 5.9%, an expected life of 3 years, and no dividends.

The fair value of options granted during 1998 was determined on the date of grant using the minimum value method. The weighted average fair value of options granted during 1998 was estimated to be approximately $0.15, based on the following assumptions: volatility of 0%, risk free interest rate of 6.0%, an expected life of 3 years, and no dividends.

## 10. TAXES

Income Taxes Through July 31, 1998, priceline.com operated as a limited liability company and income taxes (benefits) accrued to the members. Accordingly, no income taxes (benefits) were reflected in the accompanying financial statements as of December 31, 1997 and for the period then ended. Since converting from an LLC to a corporation in July 1998, the Company has incurred net operating losses of approximately $1.1 billion, and accordingly, no provision for income taxes is reflected in the accompanying statements of operations.

The tax effects of temporary differences that give rise to significant portions of deferred tax assets at December 31, 1999 and 1998 are as follows (in thousands):

| | 1999 | 1998 |
| | --------- | --------- |
| Warrant costs ................................ | $ 488,989 | $ 25,267 |
| Net operating loss carryforwards ............. | 459,455 | 9,348 |
| Start-up costs ............................... | 2,300 | 2,988 |
| Other ........................................ | (2,801) | 382 |
| Less valuation allowance ..................... | (947,943) | (37,985) |
| | --------- | --------- |
| Deferred tax asset, net ...................... | $    -- | $    -- |
| | ========= | ========= |

A valuation allowance for the full amount of the net deferred tax asset was recorded at December 31, 1999 and 1998 and represents the portion of tax operating loss carryforwards and other items for which it is more likely than not that the benefit of such items will not be realized. The

56

## 10. TAXES (Continued)

income tax benefit is different from the amount computed using applicable statutory federal rates for the following reasons (in thousands):

|  | 1999 | 1998 |
|---|---|---|
| Income tax benefit at federal statutory rate ..... | $ 369,281 | $ 39,285 |
| Adjustment due to: |  |  |
| LLC status through July 31, 1998 ............... |  | (7,090) |
| State taxes and other ......................... | 64,605 | 5,790 |
| Increase in valuation allowance ................ | (433,886) | (37,985) |
| Income tax benefit .............................. | $    -- | $    -- |

Federal Air Transportation Tax--A Federal transportation tax is imposed upon the sale of airline tickets. The tax is based on a percentage of the cost of transportation, which was 9% for periods prior to October 1, 1998, 8% for the period October 1, 1998 through September 30, 1999 and 7.5% thereafter. The Company has historically interpreted the tax regulations as requiring that the tax be computed based on the amount charged by the airline to priceline.com for the airline ticket and the Company's participating airlines have collected and remitted the tax based on this amount. The Company applied for a ruling from the Internal Revenue Service (the "Service") confirming this interpretation. In December 1999, the Service indicated to the Company that it was unlikely that a favorable ruling would be issued. The Company subsequently withdrew its ruling request because of the uncertainty of the outcome. Because the Company anticipated the possibility of an adverse ruling on this issue, the Company accrued approximately $1.9 million relating to the balance of the tax liability for tickets sold prior to that date. The Company believes this accrual to be adequate, but there can be no assurance as to the final outcome because a formal ruling has not been issued by the service.

## 11. LICENSING, MARKETING and TECHNOLOGY AGREEMENTS

In 1999, priceline.com licensed its name and demand collection system to Priceline WebHouse Club, Inc. ("WebHouse") and agreed to provide certain services to WebHouse. WebHouse is an independent company. Under the negotiated agreements, priceline.com receives a royalty based on a percentage of WebHouse revenues and payments for services at estimated fair value. The Company realized $33,777 of royalty revenue in 1999. As an inducement to enter into a relationship with WebHouse, priceline.com received a warrant to purchase a majority of the shares of WebHouse common stock. The warrants are non-forfeitable, fully vested upon grant, exercisable in five years or earlier upon the occurrence of certain events, and do not require the performance of any additional services. Upon receipt of the warrant in the fourth quarter, priceline.com recognized $188.8 million of income representing the amount of the estimated fair value of the warrants, based on an independent valuation. Priceline.com is negotiating a similar arrangement with another independent Licensee, Priceline Perfect Yardsale, Inc. ("Yardsale").

Additionally, priceline.com and WebHouse entered into an Intellectual Property License Agreement, Marketing and Technical Services Agreement and a Services Agreement pursuant to which priceline.com provides certain marketing, technology and other services to WebHouse and receives compensation at fair value for services rendered. Accordingly, WebHouse paid the Company $1.65 million during 1999 under these agreements.

57

11. LICENSING, MARKETING and TECHNOLOGY AGREEMENTS (Continued)

Priceline.com and Yardsale also entered into a preliminary agreement pursuant to which priceline.com licenses its name and demand collection system and provides certain marketing, technology and other services to Yardsale and receives compensation at fair value for services rendered. The agreements with Yardsale were not in effect until after January 1, 2000.

12. COMMITMENTS AND CONTINGENCIES

Legal Proceedings On January 6, 1999, priceline.com received notice that a third party patent applicant and patent attorney, Thomas G. Woolston, purportedly had filed in December 1998 with the United States Patent and Trademark Office a request to declare an interference between a patent application filed by Woolston and priceline.com's U.S. Patent 5,794,207. Priceline.com currently is awaiting information from the Patent Office regarding whether it will initiate an interference proceeding.

On January 19, 1999, Marketel International Inc. (Marketel), a California corporation, filed a lawsuit against priceline.com, among others. On February 22, 1999, Marketel filed an amended and supplemental complaint. The amended complaint filed by Marketel alleges causes of action for, among other things, misappropriation of trade secrets, breach of contract, conversion, breach of confidential relationship, copyright infringement, fraud, unfair competition and false advertising, and seeks injunctive relief and damages in an unspecified amount. In its amended complaint, Marketel alleges, among other things, that the defendants conspired to misappropriate Marketel's business model, which allegedly was provided in confidence approximately ten years ago. The amended complaint also alleges that four former Marketel employees are the actual sole inventors or co-inventors of U.S. Patent 5,794,207, which was issued on August 11, 1998 and has been assigned to priceline.com. Marketel asks that the patent's inventorship be corrected accordingly.

On February 5, and February 10, 1999, the Company filed their answer and amended answer, respectively, to the amended complaint, in which they denied the material allegations of liability in the complaint. Priceline.com strongly dispute the material legal and factual allegations contained in Marketel's amended complaint and believes that the amended complaint is without merit. Priceline.com intends to defend vigorously against the action. Pursuant to the indemnification obligations contained in the Purchase and Intercompany Services Agreement with Walker Digital, Walker Digital has agreed to indemnify, defend and hold harmless priceline.com for damages, liabilities and legal expenses incurred in connection with the Marketel litigation.

On October 13, 1999, priceline.com filed a complaint in the United States District Court for the District of Connecticut under the caption Priceline.com Incorporated v. Microsoft Corporation and Expedia, Inc., No. 399CV1991 (AWT) alleging that Microsoft Corporation and Expedia, Inc., a subsidiary of Microsoft Corporation, infringe priceline.com's U.S. Patent 5,794,207 by operating the defendants' "Hotel Price Matcher" service, and that the defendants' conduct toward priceline.com violated the Connecticut Unfair Trade Practices Act. On December 20, 1999 defendants moved the Court to dismiss the complaint for failure to name a necessary party, Marketel. On March 21, 2000, the presiding judge stated that he intends to deny defendant's motion to dismiss, and that a decision will be forthcoming. On December 23, 1999 the Court granted priceline.com's motion to supplement the complaint to expressly include defendant's "Flight Price Matcher" service. In the lawsuit, priceline.com is seeking declaratory relief, permanent injunctive relief and actual and punitive damages.

From time to time the Company has been and expects to continue to be subject to legal proceedings and claims in the ordinary course of business, and including claims of alleged infringement

58

## 12. COMMITMENTS AND CONTINGENCIES (Continued)

of third party intellectual property rights by the Company. Such claims, even if not meritorious, could result in the expenditure of significant financial and managerial resources.

The Company is unable to predict the outcome of the legal proceedings referred to above.

Airline Alliances and Relationships Priceline.com has entered into Airline Participation Agreements with twenty-eight airlines for the supply of airline tickets. The Airline Participation Agreements do not commit the airlines to provide tickets for any particular routes or at a discount to their retail prices, but outline the terms and conditions under which tickets may be sold pursuant to fares, rules and availability that the airlines may provide from time to time. The Airline Participation Agreements are generally subject to termination upon 30 days notice by priceline.com or the airline.

Employment Contracts At December 31, 1999, priceline.com had entered into employment agreements with certain members of senior management that provide for minimum annual compensation of approximately $2.4 million in the aggregate. The agreements provide for periods of employment of up to five years. Generally, the agreements provide for the grant of stock options under the 1999 and 1997 Omnibus Plans.

## 13. BENEFIT PLAN

Priceline.com adopted a defined contribution 401(k) savings plan (the Plan) during 1998 covering all employees who are at least 21 years old and have completed 6 months of service. The Plan allows eligible employees to contribute up to 20% of their eligible earnings, subject to a statutorily prescribed annual limit. The Company may make matching contributions on a discretionary basis to the Plan. All participants are fully vested in their contributions and investment earnings. During the years ended December 31, 1999 and 1998, the Company did not make any matching contributions to the Plan.

## 14. OTHER RELATED PARTY TRANSACTIONS

The Founder and Vice Chairman of priceline.com also serves as non-executive Chairman of NewSub Services, Inc. ("NewSub"), a direct marketing company co-founded by him. The Company participates in certain adaptive marketing programs with NewSub. During the years ended December 31, 1999 and 1998, the Company recognized revenue of $202,322 and $0, respectively, and sales and marketing expense of $579,338 and $80,799, respectively, related to these programs.

In June 1998, priceline.com issued a promissory note to a Walker Digital for $1,000,000. The promissory note bore interest at a rate of 6% per annum and was due June 30, 1999. The note has been repaid.

In December 1998, priceline.com completed a private placement of Series B Convertible Preferred Stock with several investors, including GAP and Vulcan Ventures Incorporated. Fees of $850,000 have been paid to a company, in which a director a priceline.com is a director and stockholder, in connection with this transaction.

In April 1999, priceline.com made a $3.3 million loan to Mr. Richard S. Braddock for the payment of taxes related to the issuance to Mr. Braddock of 8,125,000 shares of common stock in August 1998. The loan bears interest at 5.28% per annum. Interest is payable annually and principal is payable in January 2004.

14. OTHER RELATED PARTY TRANSACTIONS (Continued)

In July 1999, priceline.com made a $6.0 million loan to an executive of the Company, pursuant to the terms of his employment agreement dated June 14, 1999. The loan bears interest annually at 5.82% per annum. Subject to certain prepayment obligations and to forgiveness in the event of certain changes of control, death, or termination without cause, pursuant to the terms of this loan, accrued interest and principal are payable after five years, but are forgiven under certain circumstances if the executive remains employed by the Company at that time. Upon any forgiveness of the loan, the Company would recognize as compensation expense an amount up to the amount of principal and interest forgiven.

15. SUBSEQUENT EVENTS

In March 2000, the Company entered into an agreement with Alliance Capital Partners, pursuant to which Alliance has formed an operating subsidiary, pricelinemortgage, for the primary purpose of acting as a broker and/or lender of residential mortgage loans in connection with the priceline.com mortgage service. Priceline.com has agreed to provide $3.62 million of financing to an affiliate of Alliance in the form of a convertible secured note and has agreed to license the "priceline" name and business model for use by pricelinemortgage. Alliance has agreed to provide management services to pricelinemortgage, including the procurement of personnel and office space and assistance in obtaining regulatory approvals.

In February 2000, the Company announced the resignation of Paul Francis, Executive Vice President and Chief Financial Officer and the hiring of Heidi Miller as Senior Executive Vice President, Chief Financial Officer, Strategy, Planning and Administration.

In the first quarter 2000, priceline.com made loans to two executives aggregating $5.0 million, which bear interest at 6.56%. Subject to certain prepayment obligations and to forgiveness in the event of certain changes of control, death, or termination without cause, pursuant to the terms of these loans, accrued interest and principal are payable after five years, but are forgiven under certain circumstances if the executive remains employed by the Company at that time. Upon any forgiveness of the loans, the Company would recognize as compensation expense an amount up to the amount of principal and interest forgiven.

NOTES TO FINANCIAL STATEMENTS (Continued)

## 16. SELECTED QUARTERLY FINANCIAL DATA (Unaudited)

The follow table sets forth certain key interim financial information for the years ended December 31, 1999 and 1998.

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| | (In thousands, except per share amounts) | | | |
| **1999:** | | | | |
| Revenues ............................... | $ 49,411 | $ 111,564 | $ 152,222 | $ 169,213 |
| Cost of revenue: | | | | |
|   Product costs ............................... | 43,659 | 100,664 | 133,628 | 145,104 |
|   Supplier warrant costs ............................... | 381 | 381 | 381 | 381 |
| Total cost of revenues ............................... | 44,040 | 101,045 | 134,009 | 145,485 |
| Gross profit ............................... | 5,371 | 10,519 | 18,213 | 23,728 |
| Operating expenses: | | | | |
|   Warrant costs, net ............................... | | | 88,389 | 910,443 |
|   Sales and marketing ............................... | 17,138 | 17,733 | 21,413 | 23,293 |
|   General and administrative ............................... | 3,667 | 5,503 | 8,390 | 10,049 |
|   Systems and business development ............................... | 2,184 | 3,469 | 4,593 | 3,777 |
| Total expenses ............................... | 22,989 | 26,705 | 122,785 | 947,562 |
| Operating loss ............................... | (17,618) | (16,186) | (104,572) | (923,834) |
| Other income (expense) ............................... | 458 | 1,929 | 2,356 | 2,377 |
| Net loss ............................... | (17,160) | (14,257) | (102,216) | (921,457) |
| Accretion on preferred stock ............................... | (8,354) | | | |
| Net loss applicable to common stockholders ............... | $ (25,514) | $ (14,257) | $(102,216) | $(921,457) |
| Net loss per basic and diluted common share ............. | $ (0.27) | $ (0.10) | $ (0.71) | $ (5.91) |
| Weighted average common shares outstanding ............... | 94,939 | 142,320 | 144,501 | 156,032 |
| **1998:** | | | | |
| Revenues ............................... | | $ 7,022 | $ 9,222 | $ 18,993 |
| Cost of revenue: | | | | |
|   Product costs ............................... | | 7,943 | 8,851 | 16,702 |
|   Supplier warrant costs ............................... | | | | 3,029 |
| Total cost of revenues ............................... | | 7,943 | 8,851 | 19,731 |
| Gross profit ............................... | | (921) | 371 | (738) |
| Operating expenses: | | | | |
|   Warrant costs, net ............................... | | | | 57,979 |
|   Sales and marketing ............................... | $ 1,130 | 6,635 | 8,160 | 8,463 |
|   General and administrative ............................... | 1,697 | 3,102 | 9,400 | 3,806 |
|   Systems and business development ............................... | 1,926 | 3,442 | 2,801 | 2,962 |
| Total expenses ............................... | 4,753 | 13,179 | 20,361 | 73,210 |
| Operating loss ............................... | (4,753) | (14,100) | (19,990) | (73,948) |
| Other income (expense) ............................... | 50 | 113 | 142 | 244 |
| Net loss ............................... | (4,703) | (13,987) | (19,848) | (73,704) |
| Accretion on preferred stock ............................... | | | | (2,183) |
| Net loss applicable to common stockholders ............... | $ (4,703) | $ (13,987) | $ (19,848) | $ (75,887) |
| Net loss per basic and diluted common share ............. | $ (0.08) | $ (0.17) | $ (0.19) | $ (0.81) |
| Weighted average common shares outstanding ............... | 55,487 | 81,297 | 105,411 | 93,168 |

INDEX TO EXHIBITS

| Exhibit Number | Description |
| --- | --- |
| 2.1* | Agreement of Merger, dated as of July 31, 1998, between priceline.com LLC and the Registrant. |
| 3.1* | Form of Amended and Restated Certificate of Incorporation of the Registrant. |
| 3.2* | Form of By-Laws of the Registrant. |
| 4.1 | Reference is hereby made to Exhibits 3.1 and 3.2. |
| 4.2* | Specimen Certificate for Registrant's Common Stock. |
| 4.3* | Amended and Restated Registration Rights Agreement, dated as of December 8, 1998, among the Registrant and certain stockholders of the Registrant. |
| 10.1.1* | 1997 Omnibus Plan of the Registrant. |
| 10.1.2* | 1999 Omnibus Plan of the Registrant. |
| 10.2* | Stock Purchase Agreement, dated July 31, 1998, among the Registrant and the investors named therein, as amended. |
| 10.3* | Stock Purchase Agreement, dated as of December 8, 1998, among the Registrant and the investors named therein, as amended. |
| 10.4 | Reference is hereby made to Exhibit 4.3. |
| 10.5* | Purchase and Intercompany Services Agreement, dated April 6, 1998, among the Registrant, Walker Asset Management Limited Partnership, Walker Digital Corporation and Priceline Travel, Inc. |
| 10.6.1* | Employment Agreement, dated as of January 1, 1998, between Jay S. Walker, Walker Digital Corporation, the Registrant and Jesse M. Fink. |
| 10.6.2* | Amendment No. 1 to Employment Agreement, dated November 16, 1998 between the Registrant and Jesse M. Fink. |
| 10.7.1* | Employment Agreement, dated as of July 23, 1998, between the Registrant and Timothy G. Brier. |
| 10.7.2* | Amendment No. 1 to Employment Agreement, dated November 16, 1998, between the Registrant and Timothy G. Brier. |
| 10.8* | Amended and Restated Employment Agreement, dated as of August 15, 1998, by and between the Registrant and Richard S. Braddock. |
| 10.9* | Airline Participation Agreement, dated April 1998, by and among the Registrant, Priceline Travel, Inc. and Trans World Airlines, Inc. |
| 10.10*+ | Airline Participation Agreement, dated October 2, 1998, by and among the Registrant, Priceline Travel, Inc. and Northwest Airlines, Inc. |
| 10.11.1*+ | General Agreement, dated August 31, 1998, by and among the Registrant, Priceline Travel, Inc. and Delta Air Lines, Inc. |
| 10.11.2*+ | Airline Participation Agreement, dated August 31, 1998, by and among the Registrant, Priceline Travel, Inc. and Delta Air Lines, Inc. |
| 10.11.3*+ | Amendment to the Airline Participation Agreement and the General Agreement, dated December 31, 1998, between and among the Registrant, Priceline Travel, Inc. and Delta Air Lines, Inc. |
| 10.11.4*** | Letter Agreement, dated July 16, 1999, between the Registrant and Delta Air Lines, Inc. |
| 10.11.5 | Master Agreement, dated November 17, 1999, between the Registrant and Delta Air Lines, Inc. |
| 10.11.6 | Amendment to the Airline Participation Agreement and the General Agreement, dated November 17, 1999, by and among the Registrant, Priceline Travel, Inc. and Delta Air Lines, Inc. |
| 10.11.7+ | Participation Warrant Agreement, dated as of November 17, 1999, between the Registrant and Delta Air Lines, Inc. |
| 10.12*+ | Airline Participation Agreement, dated December 31, 1998, by and among the Registrant, Priceline Travel, Inc. and America West Airlines. |
| 10.13*+ | Internet Marketing and Licensing Agreement, as of August 1, 1998, between the Registrant and LendingTree, Inc. |
| 10.14* | Systems Access Agreement, dated as of August 4, 1997, between the Registrant and WORLDPAN, L.P. |

```
Exhibit Number                  Description
--------------                  -----------
10.15*          Master Agreement for Outsourcing Call Center Support, dated as
                of April 6, 1998, between the Registrant and CALLTECH
                Communications, Incorporated.
10.16*          Form of Participation Warrant Agreement.
10.17.1*+       Participation Warrant Agreement, dated as of December 31,
                1998.
10.17.2*+       Amendment No. 1, dated as of February 4, 1999, to Warrant
                Participation Agreement, dated as of December 31, 1999.
10.17.3*+       Amendment No. 2, dated as of March 3, 1999, to Participation
                Warrant Agreement, dated as of December 31, 1998, as
                previously amended to Amendment No. 1 to Warrant Participation
                Agreement, dated as of February 4, 1999.
10.18***        Employment Agreement, dated as of June 14, 1999, between the
                Registrant and Daniel H. Schulman.
10.19.1***      Airline Participation Agreement, dated July 16, 1999, between
                the Registrant and Continental Airlines, Inc.
10.19.2***      Participation Warrant Agreement, dated July 16, 1999, between
                the Registrant and Continental Airlines, Inc.
10.19.3         First Amendment to Participation Warrant Agreement, dated as
                of November 17, 1999, by and between the Registrant and
                Continental Airlines, Inc.
10.19.4+        Participation Warrant Agreement, dated November 17, 1999,
                between the Registrant and Continental Airlines, Inc.
10.20****       License Agreement, dated July 20, 1999 between Walker Digital
                Corporation and the Registrant.
10.21           Sublease, dated October 1999, between Oxford Health Plans,
                Inc., as Sub-Landlord and the Registrant, and Sub-Tenant, and
                Agreement of Lease, dated June 16, 1993, as amended, between
                Prudential Insurance Company of America, as Landlord, and
                Oxford Health Plans, Inc., as Tenant.
10.22.1         Securityholders' Agreement, dated as of October 26, 1999,
                among the Registrant, Priceline WebHouse Club, Inc., Walker
                Digital, LLC and the Investors signatory thereto.
10.22.2+        Intellectual Property License Agreement, dated as of October
                26, 1999, between the Registrant and Priceline WebHouse Club,
                Inc.
10.22.3+        Marketing and Technical Services Agreement, dated as of
                October 26, 1999, between the Registrant and Priceline
                WebHouse Club, Inc.
10.22.4+        Warrant Agreement, dated as of October 26, 1999, between the
                Registrant and Priceline WebHouse Club, Inc.
10.22.5+        Services Agreement, dated as of October 26, 1999, between the
                Registrant and Priceline WebHouse Club, Inc.
10.23.1+        Airline Participation Agreement, dated as of November 15,
                1999, by and between the Registrant and United Air Lines, Inc.
10.23.2+        Participation Warrant Agreement, dated as of November 15,
                1999, by and between the Registrant and United Air Lines, Inc.
10.24.1+        Airline Participation Agreement, dated as of November 17,
                1999, by and between the Registrant and US Airways, Inc.
10.24.2+        Participation Warrant Agreement, dated as of November 17,
                1999, by and between the Registrant and US Airways, Inc.
10.25.1+        Airline Participation Agreement, dated as of November 17,
                1999, by and between the Registrant and American Airlines,
                Inc.
10.25.2+        Participation Warrant Agreement, dated as of November 17,
                1999, by and between the Registrant and American Airlines,
                Inc.
10.26+          Participation Warrant Agreement, dated as of November 17,
                1999, by and between the Registrant and Trans World Airlines,
                Inc.
10.27+          Participation Warrant Agreement, dated as of November 17,
                1999, by and between the Registrant and Northwest Airlines,
                Inc.
10.28+          Participation Warrant Agreement, dated as of November 17,
                1999, by and between the Registrant and America West Airlines
10.29           Continuing Employment Agreement, dated as of December 16,
                1999, between the Registrant and Melissa M. Taub.
12.1            Computation of Ratio of Earnings to Fixed Charges.
23.1            Consent of Deloitte & Touche LLP.
27.1            Financial Data Schedule.
```

* Previously filed as an exhibit to the Form S-1 (Registration No. 333-69657) filed in connection with priceline.com's initial public offering and incorporated herein by reference.

** Previously filed as an exhibit to the Form 10-Q filed on May 17, 1999 and incorporated herein by reference.

*** Previously filed as an exhibit to the Form S-1 (Registration No. 333-83513) filed in connection with priceline.com's secondary public offering and incorporated herein by reference.

**** Previously filed as an exhibit to the Form 10-Q filed on November 15, 1999

+ Certain portions of this document have been omitted pursuant to a confidential treatment request.

Exhibit 10.22.2

**CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR CERTAIN
PORTIONS OF THIS DOCUMENT. CONFIDENTIAL PORTIONS HAVE BEEN
FILED WITH THE SECURITIES AND EXCHANGE COMMISSION.**

**INTELLECTUAL PROPERTY
LICENSE AGREEMENT**

This INTELLECTUAL PROPERTY LICENSE AGREEMENT (this "Agreement"), made and entered into this 26th day of October, 1999 (the "Effective Date"), by and between PRICELINE.COM INCORPORATED, a Delaware corporation ("Priceline"), and PRICELINE WEBHOUSE CLUB, INC., a Delaware corporation ("WebHouse") (each, a "Party", and collectively the "Parties"),

**W I T N E S S E T H :**

WHEREAS, Priceline is an Internet-based company with significant name recognition of its trademarked "priceline" name and patented "demand collection system" for selling products over the Internet,

WHEREAS, Walker Digital, LLC ("Walker Digital") is a research and development company containing certain trade secrets, know-how and other intellectual property;

WHEREAS, in connection with the establishment of WebHouse's business of the sale of retail products in a "name your price" format over the Internet,
(i) Walker Digital is (A) contributing certain know-how and other assets and liabilities used in or incurred during the initial development of WebHouse's business, pursuant to an asset contribution agreement dated as of the date hereof between Walker Digital and WebHouse (the "Asset Contribution Agreement") and (B) licensing certain intellectual property pursuant to a license agreement between Walker Digital and Priceline dated as of the date hereof, which intellectual property shall in turn be sublicensed by Priceline to WebHouse,
(ii) Walker Digital Corporation, a research and development company, is contributing certain employees to WebHouse under the Asset Contribution Agreement, and (iii) Priceline is (A) licensing and sublicensing, as applicable, the use of the "priceline" name, certain patent rights and other intellectual property rights for use in connection with WebHouse's business, pursuant to this Agreement, (B) providing professional services, including accounting and legal services to WebHouse pursuant to a services agreement between Priceline and WebHouse dated as of the date hereof (the "Services Agreement"), and (C) providing certain marketing and technical services to WebHouse pursuant to a marketing and technical services agreement between Priceline and WebHouse dated as of the date hereof (the "Marketing and Technical Services Agreement");

WHEREAS, in consideration for the cash and the assets it has contributed pursuant to the Asset Contribution Agreement, Walker Digital is receiving a promissory note in the amount of $14,592,185.60, payable on April 26, 2000 (the "Walker Digital Note");

[**]=Confidential Treatment requested for redacted portion

WHEREAS, in consideration of their cash contributions, Walker Digital and certain other Investors (the "Investors") are receiving a total of 23,500,000 shares of WebHouse's common stock, par value $.01 per share (the "Common Stock"), pursuant to the subscription agreement (the "Subscription Agreement") dated as of the date hereof between WebHouse and the Investors;

WHEREAS, in consideration for its execution and deliveries pursuant to this Agreement, Priceline is receiving a warrant to purchase under certain circumstances up to 137.5 million shares of Common Stock pursuant to an agreement between Priceline and WebHouse dated as of the date hereof (the "Priceline Warrant") and has certain rights to participate in WebHouse's corporate governance;

WHEREAS, in connection with the establishment of WebHouse, Priceline is agreeing, pursuant to the Services Agreement and the Marketing and Technical Services Agreement, to provide services to and to coordinate marketing activities with WebHouse in exchange for arm's-length consideration;

WHEREAS, Priceline is the owner or licensee of certain intellectual property related to Buyer-Driven Commerce; and

WHEREAS, WebHouse desires to obtain a license to use such intellectual property in certain licensed fields and Priceline desires to grant to WebHouse such a license under the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01. General. As used herein, the following terms shall have the following meanings:

"Affiliate" shall mean, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with, such specified Person.

"Agreement" shall have the meaning set forth in the preamble.

[**]=Confidential Treatment requested for redacted portion

"Asset Contributions Agreement" shall have the meaning set forth in the recitals.

"Buyer-Driven Commerce" shall mean any commerce system or process that permits a prospective buyer to fix the terms and conditions, including price, on which such buyer is willing to purchase a particular product or service, with such offer being guaranteed or otherwise secured by the buyer should a seller of the product or service accept the terms of the buyer's offer, as such process may evolve, expand or develop from time to time.

"Change of Control" shall mean and shall be deemed occur if: (a) upon the exercise of the Warrant in full, Priceline would not beneficially own or retain, directly or indirectly, more than 50% of the WebHouse Voting Interests; (b) WebHouse shall sell, assign, or otherwise transfer all or substantially all of its assets to any Person other than Priceline or an Affiliate thereof; or (c) during any consecutive two (2) year period, individuals who at the beginning of such period constituted the Board of Directors of WebHouse (together with any new directors whose election by the Board of Directors of WebHouse or whose nomination for election by the stockholders of WebHouse was approved by a vote of the majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason (other than by action of Priceline) to constitute a majority of the Board of Directors of WebHouse then in office.

"Common Stock" shall have the meaning set forth in the recitals.

"Confidential Information" shall have the meaning set forth in
Section 9.01.

"Control" (including the terms "Controlled by" and "under common Control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"Core Merchandise Field" shall mean the field of Internet-based Buyer-Driven Commerce related to the sale of groceries, health and beauty items and household supplies by Retailers. The Core Merchandise Field shall specifically exclude the field of Buyer-Driven-Commerce related to re-sales of goods or services between consumers where both of such consumers would normally be ultimate consumers of such goods or services.

"Effective Date" shall have the meaning set forth in the preamble.

"Exclusive Hosting Term" shall have the meaning set forth in Section 6.02.

[**]=Confidential Treatment requested for redacted portion

3

"Expiration Event" shall mean the event of Priceline not controlling a majority of the WebHouse Voting Interest upon the expiration of the Warrant.

"Indemnified Party" shall have the meaning set forth in Section 11.03.

"Indemnifying Party" shall have the meaning set forth in Section 11.03

"Intellectual Property" shall mean all intellectual property rights, including United States and foreign patents and patent applications, divisions, continuations, continuations-in-part, reissues, or extensions thereof, trade secrets, know-how and copyrights, trademarks and trademark related rights.

"Investors" shall have the meaning set forth in the recitals.

"Joint Intellectual Property" shall mean all Intellectual Property to the extent covering inventions, improvements, modifications, alterations, or enhancements that are made jointly by WebHouse and Priceline during the Term of this Agreement.

"Licensed Patents" shall mean (a) the patents and patent applications listed on Schedule A hereto, together with any continuations, continuations-in-part, reissues, reexaminations, and foreign counterparts thereof, and (b) any other patents or patent applications that are now owned or controlled by, or licensed to (with the right to grant sublicenses), Priceline, or that become owned or controlled by or licensed to (with the right to grant sublicenses) Priceline prior to the Expiration Event, in each case relating to the Core Merchandise Field or the New Merchandise Field.

"Licensed Trademarks" shall mean (a) the trademarks and service marks set forth on Schedule B, all registrations and applications thereof, including, without limitation, the registrations and applications set forth on Schedule B, and any foreign counterparts thereof and (b) any other trademarks and service marks, domain names, trade dress, logos and other source identifiers, including registrations thereof, that are now owned or controlled by, or licensed to (with the right to grant sublicenses), Priceline, or that become owned or controlled by or licensed to (with the right to grant sublicenses) Priceline prior to the Expiration Event, in each case relating to the Core Merchandise Field or the New Merchandise Field.

"Net Revenue" shall mean the net revenue of WebHouse as disclosed on the annual audited financial statements for any fiscal year and the interim unaudited quarterly financial statements for any fiscal quarter, in each case in the Core Merchandise Field and the New Merchandise Field.

[**]=Confidential Treatment requested for redacted portion

Case 3:00-cv-01884-AVC    Document 460-2    Filed 06/20/2007    Page 77 of 149

"New Merchandise Field" shall mean the field of Internet-based Buyer-Driven Commerce related to the sale of products or services other than groceries, health and beauty items and household supplies by Retailers. The New Merchandise Field shall specifically exclude the fields of (a) Buyer-Driven-Commerce related to re-sales of goods or services between consumers where both of such consumers would normally be ultimate consumers of such goods or services and (b) Buyer-Driven-Commerce related to the sales of (i) automobiles, (ii) home financing products and services, (iii) hotel room reservations, (iv) airline tickets and (v) other travel related services.

"Other Licensed Intellectual Property" shall mean all patents, know-how, trade secrets, copyrights and other intellectual property that is now owned or controlled by, or licensed to (with the right to grant sublicenses), Priceline, or that becomes owned or controlled by or licensed to (with the right to grant sublicenses) Priceline prior to the Expiration Event, in each case relating to the Core Merchandise Field or the New Merchandise Field. Other Licensed Intellectual Property shall include all Priceline engineering components, including but not limited to Priceline's (a) offer pricing system software, (b) Dcommapper software for load balancing, (c) Psession software for load balancing, and (d) DBPolicy Manager software for load balancing.

"Party" shall have the meaning set forth in the preamble.

"Person" shall mean an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock company, joint venture, pool, syndicate, sole proprietorship, incorporated organization, governmental authority or any other form of entity.

"Priceline" shall have the meaning set forth in the preamble.

"Priceline Field" shall mean the field of Internet-based Buyer-Driven Commerce outside of the Core Merchandise Field and the New Merchandise Field.

"Priceline Home Page" shall mean the home page of the Priceline web site, currently located at the URL www.priceline.com, or any successor site thereto.

"Priceline Warrant" shall have the meaning set forth in the recitals.

"Representative" shall have the meaning set forth in Section 9.01(a).

"Retailers" shall mean Persons that sell goods or services directly to ultimate consumers; provided, however, Retailers shall not include any business wherein the buyer picks up the goods at a vending machine or a restaurant.

"Service Standards" shall have the meaning set forth in Section 5.01.

[**]=Confidential Treatment requested for redacted portion

5

"Subscription Agreement" shall have the meaning set forth in Recitals.

"Term" shall have the meaning set forth in Section 12.01.

"Third Party Claim" shall have the meaning set forth in Section 11.03.

"Voting Interest" of WebHouse means one Share of Common Stock and any other share or unit of Capital Stock issued by WebHouse, the holders of which are ordinarily, in the absence of contingencies, entitled to one vote in the election of WebHouse's directors (or Persons performing similar functions), or the approval of its management and policies, even if the right to vote has been suspended by the occurrence of a contingency.

"Warrant" shall mean Priceline's warrant to purchase shares of WebHouse under the Priceline Warrant.

"WebHouse" shall have the meaning set forth in the preamble.

"WebHouse Field" shall mean the Core Merchandise Field and the New Merchandise Field.

"WebHouse Home Page" shall mean the home page of the WebHouse web site, which the Parties currently contemplate will be located at the URL www.webhouseclub.com, or any successor site thereto.

<div align="center">

**ARTICLE II**

**LICENSE GRANT**

</div>

SECTION 2.01. Patent License. (a) Core Merchandise Field. Subject to the terms and conditions of this Agreement, Priceline hereby grants to WebHouse a worldwide exclusive license under the Licensed Patents to make, have made, offer for sale, sell, use, import and export products and services in the Core Merchandise Field; provided that the license granted under this Section 2.01(a) shall become non-exclusive upon the Expiration Event.

(b) New Merchandise Field. Subject to the terms and conditions of this Agreement, Priceline hereby grants to WebHouse a worldwide non-exclusive license under the Licensed Patents to make, have made, offer for sale, sell, use, import and export products and services in the New Merchandise Field.

SECTION 2.02. Trademark License. (a) Core Merchandise Field. Subject to the terms and conditions of this Agreement, Priceline hereby grants to WebHouse a worldwide

[**]=Confidential Treatment requested for redacted portion

exclusive license to use the Licensed Trademarks on or in connection with goods and services in the Core Merchandise Field.

(b) New Merchandise Field. Subject to the terms and conditions of this Agreement, Priceline hereby grants to WebHouse a non-exclusive license to use the Licensed Trademarks on or in connection with goods and services in the New Merchandise Field.

SECTION 2.03. Other Intellectual Property License. (a) Core Merchandise Field. Subject to the terms and conditions of this Agreement, Priceline hereby grants to WebHouse a worldwide exclusive license to use the Other Licensed Intellectual Property, including but not limited to the right to reproduce, distribute, offer for sale, sell, display and prepare derivative works of copyrights in the Other Licensed Intellectual Property, on or in connection with the manufacture, marketing, distribution and sale of products and services in the Core Merchandise Field; provided that the license granted under this Section 2.03(a) shall become non-exclusive upon the Expiration Event.

(b) New Merchandise Field. Subject to the terms and conditions of this Agreement, Priceline hereby grants to WebHouse a non-exclusive license to use the Other Licensed Intellectual Property, including but not limited to the right to reproduce, distribute, offer for sale, sell, display and prepare derivative works of copyrights in the Other Licensed Intellectual Property, on or in connection with the manufacture, marketing, distribution and sale of products and services in the New Merchandise Field.

SECTION 2.04. WebHouse Intellectual Property. In the event that WebHouse creates, acquires or develops any intellectual property, including Joint Intellectual Property, relating to or useful in the Priceline Field prior to the earlier of (a) the Expiration Event and (b) the termination of this Agreement in accordance with Article XII, WebHouse hereby grants Priceline, during the Term (x) a worldwide, royalty-free, fully paid, and exclusive right and license, including the right to grant sublicenses to Affiliates, to such intellectual property in the Priceline Field and (y) a worldwide, royalty-free, fully paid and co-exclusive (with WebHouse and its Affiliates) right and license, including the right to grant sublicenses to Affiliates, to such intellectual property in the New Merchandise Field; provided that the licenses granted under this Section 2.04 shall become non-exclusive upon the Expiration Event.

SECTION 2.05. Customer Lists. Each Party shall have access to the customer lists of the other Party; provided that, with the exception of strictly internal business purposes, neither Party may use the other Party's customer lists without prior written approval of such other Party which shall not be unreasonably withheld.

SECTION 2.06. Reservation of Rights. All rights not expressly granted to a Party hereunder shall remain the exclusive property of the other Party. Without limiting the foregoing, and subject to the rights granted to WebHouse under this Agreement, Priceline shall

[**]=Confidential Treatment requested for redacted portion

retain the exclusive right to (a) sell, assign or otherwise transfer the Licensed Patents, Licensed Trademarks and Other Licensed Intellectual Property to any third party, or (b) to license others to use the Licensed Patents, Licensed Trademarks (either alone or with other brand names, trademarks, service marks, trade names, characters or designs) or Other Licensed Intellectual Property in fields outside of the Core Merchandise Field.

## ARTICLE III

## ROYALTIES

SECTION 3.01. Royalties. (a) During the Term of this Agreement, and except as set forth in Sections 3.01(b) and 3.01(c) hereof, WebHouse shall pay Priceline a royalty equal to [**]% of quarterly Net Revenues less than $[**],
[**]% of quarterly Net Revenues between $[**] and $[**], [**]% of quarterly Net Revenues between $[**] and $[**], [**] of quarterly Net Revenues between $[**] and $[**], and [**]% of quarterly Net Revenues greater than $[**].

(b) The royalty payable by WebHouse under Section 3.01(a) shall be reduced as follows: WebHouse shall pay Priceline a royalty equal to [**]% of quarterly Net Revenues less than $[**], [**]% of quarterly Net Revenues between $[**] and $[**], [**]% of quarterly Net Revenues between $[**] and $[**], [**]% of quarterly Net Revenues between $[**] and $[**], and [**]% of quarterly Net Revenues greater than $[**] during the Term, in the event that all of the licenses granted under Section 2.02 hereof shall be terminated for any reason.

(c) The royalty payable by WebHouse under Section 3.01(a) shall be reduced as follows: WebHouse shall pay Priceline a royalty equal to [**]% of quarterly Net Revenues less than $[**], [**]% of quarterly Net Revenues between $[**] and $[**], [**]% of quarterly Net Revenues between $[**] and $[**], [**]% of quarterly Net Revenues between $[**] and $[**], and [**]% of quarterly Net Revenues greater than $[**] during the Term, in the event that all of the licenses granted under Section 2.01 hereof shall be terminated for any reason.

SECTION 3.02. Currency. All royalties due hereunder shall be paid in United States dollars without deductions of any kind. Any and all taxes due on or in connection with the royalties payable to Priceline hereunder (other than taxes based upon the income of Priceline) shall be borne by WebHouse and shall not be deducted from the royalties payable hereunder.

SECTION 3.03. Reports and Payments. WebHouse shall furnish to Priceline a written report by the end of January, April, July and October of each year setting forth the quarterly Net Revenues of WebHouse during the preceding calendar quarter and the royalties

[**]=Confidential Treatment requested for redacted portion

8

payable to Priceline with respect thereto, which report shall be accompanied by the royalties then due.

SECTION 3.04. Overdue Payments. Any payments that are not timely paid as provided hereunder shall bear interest at the annual rate of the lower of ten percent (10%) or the maximum rate allowed by law, accruing as of the first day such payment became overdue. Any failure of WebHouse to make timely payment to Priceline of royalties due hereunder shall be deemed to constitute a breach of this Agreement.

SECTION 3.05. Records. WebHouse shall maintain accurate records and books of account showing all revenue of WebHouse in sufficient detail to enable the royalties payable by WebHouse hereunder to be accurately determined. Upon reasonable notice to WebHouse, Priceline shall have the right to conduct an audit (not more than twice per calendar year), either itself or through an independent accounting firm, of any royalties payable hereunder at any time up to three (3) years after payment of such royalties, and to examine the records and books of account of WebHouse in connection therewith to verify the accuracy of reports and payments required to be delivered to Priceline hereunder. Priceline shall bear the full cost and expense of such audit, unless a discrepancy in excess of twenty percent (20%) in favor of Priceline is discovered, in which event WebHouse shall bear the full cost and expense of such audit. Regardless of the amount of discrepancy, all discrepancies shall be immediately due and payable. Any discrepancy due shall bear interest at the annual rate of the lower of ten percent (10%) or the maximum rate allowed by law, accruing as of the first day such payment became overdue.

<div align="center">

**ARTICLE IV**

**OWNERSHIP OF TRADEMARKS AND
JOINT INTELLECTUAL PROPERTY**

</div>

SECTION 4.01. Ownership. WebHouse acknowledges that Priceline owns all right, title and interest in and to the Licensed Patents, Licensed Trademarks and Other Licensed Intellectual Property. WebHouse shall not take any action that is inconsistent with the ownership of the Licensed Trademarks by Priceline. WebHouse agrees that nothing in this Agreement, and no use of the Licensed Trademarks by WebHouse pursuant to this Agreement, shall vest in WebHouse, or shall be construed to vest in WebHouse, any right of ownership in or to the Licensed Trademarks other than the right to use the Licensed Trademarks in accordance with this Agreement.

SECTION 4.02. Goodwill. All goodwill and improved reputation in respect of the Licensed Trademarks generated by WebHouse's use of the Licensed Trademarks shall inure to the benefit of Priceline. WebHouse shall not by any act or omission use the Licensed Trademarks in any manner that tarnishes, degrades, disparages or reflects adversely on Priceline

[**]=Confidential Treatment requested for redacted portion

<div align="center">9</div>

or its business or reputation. Nothing in this Agreement shall be deemed to a) give Priceline any right, title or interest in or to WebHouse's trade names, trademarks, or service marks with which WebHouse uses the Licensed Trademarks,
(b) give WebHouse any right, title or interest in or to Priceline's trade names, trademarks, or service marks with which Priceline uses the Licensed Trademarks outside of the Core Merchandise Field and the New Merchandise Field, or (c) give either Party the right to use any trademarks or service marks of the other Party other than the Licensed Trademarks.

SECTION 4.03. Joint Intellectual Property. As between Priceline and WebHouse, WebHouse shall be the exclusive owner of the entire right, title and interest in and to Joint Intellectual Property, and Priceline hereby assigns all right title and interest to Joint Intellectual Property to WebHouse; provided, however, such Joint Intellectual Property shall be licensed to Priceline pursuant to Section 2.04.

## ARTICLE V

## MAINTENANCE OF SERVICE STANDARDS AND INSPECTION

SECTION 5.01. Service Standards. In order to preserve the inherent value of the Licensed Trademarks, WebHouse shall ensure that all Buyer-Driven Commerce related services provided by WebHouse under the Licensed Trademarks shall be of at least the same quality as Buyer-Driven Commerce related services provided by Priceline under the Licensed Trademarks outside of the Core Merchandise Field and the New Merchandise Field and shall conform to the image, reputation, branding and positioning standards promulgated by Priceline from time to time (the "Service Standards"). WebHouse shall use and display the Licensed Trademarks only in such form and manner as shall be approved by Priceline, which approval shall not be unreasonably withheld or delayed.

SECTION 5.02. Exact Usage. WebHouse shall not use any Licensed Trademark without the prior written approval of Priceline, which approval shall not be unreasonably withheld or delayed.

SECTION 5.03. Legal Compliance. WebHouse agrees that the business operated by it in connection with the Licensed Trademarks shall, in all material respects, comply with all laws, rules, regulations and requirements of any governmental body as may be applicable to the operation, advertising and promotion of such business.

SECTION 5.04. Right to Inspect. Priceline shall have the right to inspect, upon reasonable notice and during normal business hours, the premises of WebHouse to the extent reasonably necessary in order to ensure that the quality of goods and services distributed, marketed, or sold under the Licensed Trademarks meet the Service Standards, and solely to the

[**]=Confidential Treatment requested for redacted portion

extent that such inspection cannot reasonably be made using information or materials publicly available. Should Priceline notify WebHouse that any of its business activities do not comply with the Service Standards, WebHouse shall promptly make commercially reasonable efforts to correct such defects.

## ARTICLE VI

## ADVERTISING AND PROMOTIONAL MATERIALS

SECTION 6.01. Advertising and Promotional Materials. WebHouse shall submit all sales, promotional and advertising materials to be used by WebHouse in connection with products or services bearing Licensed Trademarks, including, but not limited to, web site content (including web site advertising), newspaper, and radio and television advertising, to Priceline for prior approval thereof, which approval shall not be unreasonably withheld. In the event Priceline's approval or rejection of such sales, promotional, or advertising materials is not received by WebHouse within fifteen (15) days of submission of such materials to Priceline for approval, such materials shall be deemed approved by Priceline; provided, however, that Priceline may, at its discretion and upon written notice to WebHouse, terminate this provision pursuant to which such materials are deemed approved if approval or rejection is not received by WebHouse within fifteen (15) days of submission.

SECTION 6.02. Hosting Website Home Page. Priceline shall provide the exclusive link to the WebHouse Home Page by hosting a link on the Priceline Home Page until the earlier of (i) the Expiration Event or (ii) termination of the license granted under Section 2.02 hereof (the "Exclusive Hosting Term"). During the Exclusive Hosting Term, WebHouse shall be the sole and exclusive provider of products and services in the Core Merchandise Field to which Priceline provides a link on the Priceline Home Page. WebHouse shall not establish an access route to the WebHouse Home Page independent of Priceline's Home Page, without the prior express written consent of Priceline, during the Exclusive Hosting Term. Priceline shall use commercially reasonable efforts to ensure that such link to the WebHouse Home Page is operational at all times. In the event Priceline is unable to provide a link to the WebHouse Home Page for a commercially unreasonable period of time, Priceline shall allow WebHouse to establish an access route to the WebHouse Home Page independent of Priceline's Home Page. Priceline shall, at the request of WebHouse, continue to provide a link to WebHouse's Home Page for a transition period of six (6) months upon termination of the Exclusive Hosting Term. Priceline shall control the placement of the link to the WebHouse Home Page on the Priceline Home Page; provided, however, that the size and type of such link shall be at least comparable to the size of and similar in type to the links to other comparable products and services offered by Priceline on the Priceline Home Page. Exhibit 1 hereto contains an example of the size and type of a link to the WebHouse Home Page in comparison to the size and type of links to other comparable products and services.

[**]=Confidential Treatment requested for redacted portion

11

SECTION 6.03. No Other Control. The submission of rates, advertising and promotional materials to Priceline for approval thereof under the terms of
Section 6.01 shall be solely for the purpose of ensuring compliance with the Service Standards, and Priceline shall have no right with respect to approval of pricing, selection of specific products and services, or any other aspect of the business of WebHouse.

## ARTICLE VII

## PROTECTION OF LICENSED INTELLECTUAL PROPERTY

SECTION 7.01. Notification of Infringement. Each Party shall immediately notify the other Party and provide to the other Party all relevant background facts upon becoming aware of (i) any registrations of, or applications for registration of, marks that do or may conflict with any Licensed Trademark in the Core Merchandise Field or the New Merchandise Field, and (ii) any infringement, misappropriation, imitation, dilution, illegal use or misuse of the Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property in the Core Merchandise Field or the New Merchandise Field.

SECTION 7.02. Action Against Infringer. Priceline shall have the first right, but not the obligation, to take action against others in the courts, administrative agencies or otherwise, at Priceline's cost and expense, to prevent or terminate infringement, misappropriation, imitation, illegal use or misuse of the Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property in the Core Merchandise Field or the New Merchandise Field, and to oppose or cancel applications or registrations of trademarks, service marks, trade dress, characters and designs that do or may conflict with any of the Licensed Trademarks in the Core Merchandise Field or the New Merchandise Field. WebHouse agrees to cooperate with Priceline in any litigation or other enforcement action that Priceline may undertake to enforce or protect the Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property in the Core Merchandise Field or the New Merchandise Field and, upon Priceline's request, to execute, file and deliver all documents and proof necessary for such purpose, including being named as a party to such litigation as required by law. All reasonable out-of-pocket expenses incurred by WebHouse in connection therewith shall be reimbursed by Priceline. WebHouse shall have the right to participate and be represented in any such action, suit or proceeding by its own counsel at its own expense. WebHouse shall have no claim of any kind against Priceline based on or arising out of Priceline's handling of or decisions concerning any such action, suit, proceeding, settlement, or compromise, and WebHouse hereby irrevocably releases Priceline from any such claim, provided, however, that Priceline shall not enter into any settlement or compromise of such action, suit or proceeding that affects or concerns the validity, enforceability, or ownership of any Licensed Trademarks, Licensed Patents, or the Other Licensed Intellectual Property in the Core Merchandise Field or the New Merchandise Field

[**]=Confidential Treatment requested for redacted portion

12

without the prior written consent of WebHouse, which consent shall not be unreasonably withheld.

Case 3:00-cv-01884-AVC   Document 460-2   Filed 06/20/2007   Page 85 of 149

SECTION 7.03. Enforcement by WebHouse. Priceline shall promptly notify WebHouse in the event it elects not to take action under the terms of
Section 7.02. WebHouse shall thereafter have the option to commence any such action against others in the Core Merchandise Field or the New Merchandise Field under its own direction and control, and at its cost and expense. Priceline shall reasonably assist WebHouse in such action if so requested, and shall be named a party to such action if requested by WebHouse or required by law. Priceline shall have the right to participate and be represented in any such action, suit or proceeding by its own counsel at its own expense. Priceline shall have no claim of any kind against WebHouse based on or arising out of WebHouse's handling of or decisions concerning any such action, suit, proceeding, settlement, or compromise, and Priceline hereby irrevocably releases WebHouse from any such claim, provided that WebHouse shall not enter into any settlement or compromise of such action, suit or proceeding that affects or concerns the validity, enforceability (except in respect of granting immunity from suit in connection with such settlement or compromise) or ownership of any Licensed Trademarks, Licensed Patents or Other Licensed Property in the Priceline Field or the New Merchandise Field without the prior written consent of Priceline, which consent shall be at Priceline's sole discretion. WebHouse may discontinue such action, suit or proceeding if in its sole discretion it determines that such action, suit or proceeding is not advantageous to WebHouse.

SECTION 7.04. Withdrawal of Enforcement. If either Party brings an action under this Article VII and subsequently ceases to pursue or withdraws from such action, it shall promptly notify the other Party and the other Party may substitute itself for the withdrawing Party under the terms of this Article VII.

SECTION 7.05. Recoveries. All damages or other compensation of any kind recovered in such action, suit, or proceeding or from any settlement or compromise brought under this Article VII shall be for the benefit of the Party that brought such action, suit, or proceeding, or in the event of a withdrawal by a Party under Section 7.04 hereof, shall be apportioned between the Parties in an amount proportional to the amount paid by each such Party with respect to its costs and expenses in bringing such action, suit, or proceeding; provided, however, that to the extent that damages or compensation recovered by one Party are based on revenues or profits lost by the other Party, such other Party shall be entitled to its pro rata share of such damages or compensation.

[**]=Confidential Treatment requested for redacted portion

13

# ARTICLE VIII

## MAINTENANCE OF LICENSED INTELLECTUAL PROPERTY

SECTION 8.01. Priceline to Control. Except as otherwise provided in this Article VIII, Priceline shall prosecute and maintain all Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property in the name of Priceline at the cost and expense of Priceline. WebHouse shall provide reasonable cooperation to Priceline in connection with such prosecution or maintenance, and shall make available to Priceline or its authorized attorneys, agents or representatives such of its employees as WebHouse in its reasonable judgment deems necessary in order to assist Priceline with the prosecution or maintenance of registrations and applications.

SECTION 8.02. New Trademarks. Upon the reasonable request of WebHouse, Priceline shall file and obtain, at its own expense, additional applications for registration of Licensed Trademarks as used or intended to be used by WebHouse in the Core Merchandise Field or the New Merchandise Field. Any trademark applications filed and registrations obtained under the terms of this Section 8.02 shall be in the name of Priceline and shall be included in the Licensed Trademarks. Nothing in this Section 8.02 shall restrict WebHouse's right to obtain trademark registrations in its own name and for its own benefit.

SECTION 8.03. Priceline Abandonment. Without the prior written consent of WebHouse, Priceline shall not abandon or allow to lapse any registration or application of the Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property. In the event Priceline desires to abandon any such registration or application and upon the request of WebHouse, Priceline shall assign such registration or application to WebHouse.

[**]=Confidential Treatment requested for redacted portion

14

# ARTICLE IX

## CONFIDENTIALITY

SECTION 9.01. Confidentiality. WebHouse will receive or learn from Priceline, and Priceline's subsidiaries and affiliates, and Priceline will learn from WebHouse, information, both orally and in writing, concerning the business of Priceline or WebHouse, respectively, including, without limitation, financial, technical and marketing information, and data and information related to the development of technology and services, trade secrets, technology, plans, methods, processes, specifications, models, protocols, techniques, research projects, information management systems and software, whether protectable by patent, copyright or other statutory means, relating to WebHouse's and Priceline's business, as the case may be, and which information is deemed, in the case of WebHouse, proprietary to WebHouse and, in the case of Priceline, proprietary to Priceline. Both Parties hereby agree, as set forth below, to protect such information, whether furnished before, on or after the date of this Agreement, as it protects its own similar confidential information, but never less than commercially reasonable efforts and not to disclose such information to anyone except as otherwise provided for in this Agreement. Such information, in whole or in part, together with analyses, compilations, programs, reports, proposals, studies or any other documentation prepared by the Parties, as the case may be, that contain or otherwise reflect or make reference to such information, is hereinafter referred to as "Confidential Information". Both Parties hereby agree that the Confidential Information will be used solely for the purpose of this Agreement and not for any other purpose. Both Parties further agree that any Confidential Information pertaining to the other Party is the sole and exclusive property of such other Party, and that the receiving Party shall not have any right, title, or interest in or to such Confidential Information except as expressly provided in this Agreement. Both Parties further agree to hold in the strictest confidence and not to disclose to anyone for any reason Confidential Information pertaining to the other Party; provided that

(a) such Confidential Information may be disclosed to the receiving Party's respective officers, directors, employees, agents, or representatives (collectively, "Representatives") on a "need to know" basis for the purpose of this Agreement on the condition that

(i) each such Representative will be informed by the receiving Party of the confidential nature of such Confidential Information and will agree to be bound by the terms of this Agreement and not to disclose the Confidential Information to any other person, and

(ii) both Parties agree to accept full responsibility for any breach of this Section 9.01 by its respective Representatives; and

[**]=Confidential Treatment requested for redacted portion

15

(b) Confidential Information pertaining to the other Party may be disclosed upon the prior written consent of the other Party.

Both Parties hereby agree, upon the request of the other Party, to promptly deliver to the other Party the Confidential Information pertaining to such other Party, without retaining any copies thereof.

SECTION 9.02. Exceptions. The term "Confidential Information" shall not include any information: (a) that at the time of disclosure or thereafter is generally available to or known by the public (other than as a result of a disclosure directly or indirectly by the receiving Party); (b) is independently developed by the receiving Party, without reference to or use of, the Confidential Information of the other Party; (c) was known by the receiving Party as of the time of disclosure without breach of confidentiality; (d) is lawfully learned from a third party not under obligation to the disclosing Party. In the event that the receiving Party is requested pursuant to, or required by, applicable law or regulation or by legal process to disclose Confidential Information, the receiving Party shall (i) provide prompt written notice to the other Party prior to such disclosure in order for such Party to seek an appropriate protective order or other remedy, (ii) consult with the other Party to resist or narrow the scope of such request or legal process and

(iii) in the event disclosure is required, use its best efforts to disclose only that portion of Confidential Information that is legally required to be disclosed and to ensure that all Confidential Information disclosed will be accorded confidential treatment.

SECTION 9.03. Unauthorized Disclosure. Each Party acknowledges and confirms that the Confidential Information of each Party constitutes proprietary information and trade secrets valuable to such Party, and that the unauthorized use, loss or outside disclosure of such Confidential Information shall cause irreparable injury to such Party. Each Party shall notify the other Party immediately upon discovery of any unauthorized use or disclosure of Confidential Information of the other Party, and will cooperate with the other Party in every reasonable way to help regain possession of such Confidential Information and to prevent its further unauthorized use. Each Party acknowledges that monetary damages may not be a sufficient remedy for unauthorized disclosure of Confidential Information and that the other Party shall be entitled, without waiving other rights or remedies, to such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction. Each Party shall be entitled to recover reasonable attorney's fees for any action arising out of or relating to a disclosure of its Confidential Information by the other Party.

[**]=Confidential Treatment requested for redacted portion

16

ARTICLE X

## REPRESENTATIONS AND WARRANTIES

SECTION 10.01. Representations and Warranties of Priceline. Priceline represents and warrants that as of the date hereof:

(a) Organization and Authority. Priceline is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. Priceline is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed or qualified would not materially and adversely affect Priceline's assets, liabilities or results of operations or prevent or materially delay the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Priceline, the performance by it of its obligations hereunder and the consummation by it of the transactions contemplated hereby have been duly authorized by all requisite action on its part. This Agreement has been duly executed and delivered by Priceline, and (assuming due authorization, execution and delivery by the other Person signatory hereto) this Agreement constitutes a legal, valid and binding obligation of Priceline enforceable against it in accordance with its terms.

(b) No Conflict. The execution, delivery and performance of this Agreement by Priceline do not and will not (i) violate, conflict with or result in the breach of any provision of its Certificate of Incorporation or By-laws,
(ii) conflict with or violate any law, governmental regulation or governmental order applicable to Priceline or any of its assets, properties or businesses or
(iii) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights pursuant to, any contract, agreement or arrangement by which Priceline is bound; except to the extent that any conflict under (ii) or (iii) above would not prevent or materially delay the consummation of the transactions contemplated by this Agreement.

(c) Ownership. To the knowledge of Priceline, Priceline is either
(i) the owner of the entire right, title and interest in and to the Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property or (ii) has been granted a license thereunder and has the right to grant to WebHouse the rights granted herein.

(d) Enforceability. To the knowledge of Priceline, the Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property have not been adjudged invalid or unenforceable in whole or part.

[**]=Confidential Treatment requested for redacted portion

17

(e) Actions. Except as listed on Schedule 4 hereto, no action has been asserted or is pending, nor, to the knowledge of Priceline, has any such action been threatened, against Priceline either (i) challenging or seeking to deny or restrict the use by Priceline of any of the Licensed Trademarks, Licensed Patents, or Other Licensed Intellectual Property, or (ii) alleging that the use of the Licensed Trademarks, Licensed Patents, or Other Licensed Intellectual Property by Priceline does or may conflict with, misappropriate or infringe the intellectual property rights of any third party.

(f) No Infringement. To Priceline's knowledge, the use of the Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property in connection with the business of WebHouse as contemplated herein does not conflict with, misappropriate, or infringe the intellectual property rights of any third party.

(g) Conduct of Business. To Priceline's knowledge, the rights licensed hereunder are sufficient for WebHouse to operate its business as currently anticipated.

(h) Exclusive Rights. To Priceline's knowledge, none of the rights licensed hereunder conflict with any license or covenant not to sue granted by Priceline to any third party.

SECTION 10.02. Representations and Warranties of WebHouse. WebHouse represents and warrants that as of the date hereof:

(a) Organization and Authority. WebHouse is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. WebHouse is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed or qualified would not materially and adversely affect WebHouse's assets, liabilities or results of operations or prevent or materially delay the transactions contemplated by this Agreement. The execution and delivery of this Agreement by WebHouse, the performance by it of its obligations hereunder and the consummation by it of the transactions contemplated hereby have been duly authorized by all requisite action on its part. This Agreement has been duly executed and delivered by WebHouse, and (assuming due authorization, execution and delivery by the other Person signatory hereto) this Agreement constitutes a legal, valid and binding obligation of WebHouse enforceable against it in accordance with its terms.

(b) No Conflict. The execution, delivery and performance of this Agreement by WebHouse do not and will not (i) violate, conflict with or result in the breach of any provision of its Certificate of Incorporation or By-laws,
(ii) conflict with or violate any law, governmental

[**]=Confidential Treatment requested for redacted portion

18

regulation or governmental order applicable to WebHouse or any of its assets, properties or businesses, or (iii) together with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights pursuant to, any contract, agreement or arrangement by which Priceline is bound; except to the extent that any conflict under (ii) or (iii) above would not prevent or materially delay the consummation of the transactions contemplated by this Agreement.

## ARTICLE XI

## INDEMNIFICATION

SECTION 11.01. Indemnification by WebHouse. WebHouse agrees to defend, indemnify, and hold Priceline and its Affiliates and the respective directors, officers, employees, and agents of Priceline harmless from and against any and all losses, debts, liabilities, claims, demands, causes of action and expenses (including attorney's fees and deposition and discovery expenses) arising out of or resulting from (a) the breach by WebHouse of any of its representations, warranties, covenants and agreements contained within this Agreement, or (b) the carrying on of WebHouse's business other than those losses that would constitute a breach of Priceline's representations and warranties set forth herein.

SECTION 11.02. Indemnification by Priceline. Priceline agrees to defend, indemnify, and hold WebHouse and its Affiliates and the respective directors, officers, employees, and agents of WebHouse harmless from and against any and all losses arising out of or resulting from (a) the breach by Priceline of any of its representations, warranties, covenants and agreements contained within this Agreement, (b) the carrying on of Priceline's business and (c) actions brought against WebHouse by third parties to the extent that Priceline is indemnified by others for such third-party liabilities.

SECTION 11.03. Indemnification Process. In respect of any claim, suit or demand by any third party ("Third Party Claim") arising from or relating to unauthorized acts or breaches of the terms of this Agreement, WebHouse and Priceline (each, an "Indemnified Party") shall give the Party hereto from whom indemnification is sought (the "Indemnifying Party") prompt written notice of any Third Party Claim of which such Indemnified Party has knowledge concerning any losses as to which such Indemnified Party may request indemnification hereunder. If the Indemnifying Party acknowledges in writing its obligation to indemnify the Indemnified Party hereunder against any losses that may result from such Third Party Claim, then the Indemnifying Party shall be entitled to assume and control the defense of such Third Party Claim at its expense and through counsel of its choice if it gives notice of its intention to do so to the Indemnified Party within five (5) days of the receipt of such notice from the Indemnified Party; provided that if there exists or is reasonably likely to exist a conflict or interest that would

[**]=Confidential Treatment requested for redacted portion

19

make it inappropriate in the judgment of the Indemnified Party, in its sole and absolute discretion, for the same counsel to represent both the Indemnified Party and the Indemnifying Party, then the Indemnified Party shall be entitled to retain its own counsel, at the expense of the Indemnifying Party. In the event the Indemnifying Party exercises the right to undertake any such defense against any such Third Party Claim as provided above, the Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party. Similarly, in the event the Indemnified Party is, directly or indirectly, conducting the defense against any such Third Party Claim, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party, at the Indemnified Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably required by the Indemnified Party. No such Third Party Claim may be settled by the Indemnifying Party without the prior written consent of the Indemnified Party.

## ARTICLE XII

## TERM AND TERMINATION

SECTION 12.01. Term of Agreement. This Agreement shall remain in force until the later of (i) the termination of the patent license granted under
Section 2.01 or (ii) the termination of the trademark license granted under
Section 2.02, unless earlier terminated in accordance with the provisions of this Article 12 (the "Term").

SECTION 12.02. Term of Licenses. (a) Unless earlier terminated under the terms of this Article 12, the patent licenses granted under Section 2.01 and the Other Intellectual Property license granted under Section 2.03 shall terminate on October 26, 2019; provided, however, in the event that the patent licenses granted under Section 2.01 and the Other Intellectual Property License granted under Section 2.03 terminate on October 26, 2019, the Parties shall in good faith negotiate the terms of and the Parties shall enter into a royalty bearing patent and Other Intellectual Property license of equivalent scope to the licenses granted under Sections 2.01 and 2.03 with such royalties based on the fair market value of such license.

(b) Unless earlier terminated under the terms of this Article 12, the trademark licenses granted under Section 2.02 shall terminate on the earlier of (i) the date six (6) months after the Expiration Event or (ii) October 26, 2019; provided, however, in the event that the trademark licenses granted under
Section 2.02 terminate on October 26, 2019, the Parties shall in good faith negotiate the terms of and the Parties shall enter into a royalty bearing trademark

[**]=Confidential Treatment requested for redacted portion

20

license of equivalent scope to the licenses granted under Section 2.02 with such royalties based on the fair market value of such license.

SECTION 12.03. Termination of Trademark Licenses by Priceline. (a) Priceline may terminate the trademark licenses granted under Section 2.02 on six
(6) months written notice to WebHouse in the event that WebHouse fails to achieve annual Net Revenues of $100 million in the fiscal year ending December 31, 2001.

(b) Priceline may terminate the trademark licenses granted under
Section 2.02 on six (6) months written notice following a Change of Control.

SECTION 12.04. Termination by WebHouse. WebHouse may terminate this Agreement, or any of the licenses granted hereunder (a) at any time upon ninety
(90) days written notice to Priceline or (b) upon any willful material breach by Priceline of its obligations under Section 6.02.

SECTION 12.05. Termination for Breach. In addition to any other rights of termination provided for in this Agreement, if either Party commits a material breach of any of the material provisions of this Agreement, and such breach is not cured within ninety (90) days after the date on which notice of breach is sent by the non-breaching Party to the breaching Party, the breaching Party shall have the right to terminate the Agreement upon a further thirty (30) days written notice to the breaching Party.

SECTION 12.06. Upon Termination of Trademark Licenses. Upon termination of this Agreement or the trademark licenses granted under Section 2.02, WebHouse shall immediately cease and desist all uses of the Licensed Trademarks, and will promptly, at its option, either destroy all materials and signage bearing any Licensed Trademarks or will deliver to Priceline all such materials and signage. WebHouse shall thereafter make no reference in its advertising or promotional materials as having been formerly associated with or licensed by Priceline. WebHouse will not subsequently adopt or use any trademark, service mark, trade name, domain name, trade dress, logo or other source identifier which is derived from or confusingly similar to any Licensed Trademark. Priceline shall thereafter make no reference in its advertising or promotional materials as having been formerly associated with or licensed by WebHouse. Priceline will not subsequently adopt or use any trademark, service mark, trade name, domain name, trade dress, logo or other source identifier which is derived from or confusingly similar to any trademark, service mark, domain name, trade dress, logos or other source identifier owned or controlled by WebHouse.

SECTION 12.07. Upon Termination of Agreement. Except as provided in
Section 12.09, upon termination of this Agreement (i) all licenses granted hereunder pursuant to Article 2 shall immediately terminate, and (ii) WebHouse shall within fifteen (15) days thereafter

[**]=Confidential Treatment requested for redacted portion

21

generate a final written report of the revenues of WebHouse through the termination date, and pay Priceline the royalties due through the termination date.

SECTION 12.08. Payment of Royalties upon Termination. Termination of this Agreement for any reason shall not affect any obligation of WebHouse to pay Priceline any royalties accrued as of the date of termination.

SECTION 12.09. Survival. The provisions of Articles 9, 11, 12 and 13 and Section 3.05 shall survive termination of this Agreement in accordance with their terms. In the event of termination of this Agreement by WebHouse under
Section 12.05 for a breach of this Agreement by Priceline, the provisions of
Section 2.01 and 2.03 shall additionally survive termination of this Agreement.

## ARTICLE XIII

## GENERAL

SECTION 13.01. Expenses. Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

SECTION 13.02. Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by courier service, by telecopy or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 13.02):

(a) if to WebHouse:

Priceline WebHouse Club, Inc. Five High Ridge Park
Stamford, CT 06905
Telecopy No.: (203) 595-8305 Attention: Anne Maffei

(b) if to Priceline:

priceline.com Incorporated One High Ridge Park

[**]=Confidential Treatment requested for redacted portion

22

Telecopy No.: (203) 595-8345 Attention: Melissa Taub

SECTION 13.03. Public Announcements. Except as required by law, by governmental regulation or by the requirements of any securities exchange on which the securities of a Party hereto are listed, no Party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or otherwise communicate with any news media without the prior written consent of the other Party, and the Parties shall cooperate as to the timing and contents of any such press release or public announcement.

SECTION 13.04. Headings. The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 13.05. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

SECTION 13.06. Entire Agreement. This Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, with respect to the subject matter hereof.

SECTION 13.07. Assignment and Sublicense. This Agreement may not be assigned nor any license granted hereunder sublicensed by either Party without the express written consent of the other Party (which consent may be granted or withheld in the sole discretion of any Party), except that (i) this Agreement may be assigned, without consent, in connection with the sale of a Party's business whether such is a sale of all or substantially all of such Party's assets, a merger or a stock sale and (ii) Priceline may assign or sublicense its rights hereunder to an Affiliate thereof; provided that any such assignment shall not relieve Priceline of its obligations hereunder. This Agreement shall inure to the benefit of, and be binding upon, the successors of the Parties hereto, provided such assignment was in compliance with the terms hereof.

[**]=Confidential Treatment requested for redacted portion

SECTION 13.08. No Third-Party Beneficiaries. This Agreement shall be binding upon and inure solely to the benefit of the Parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 13.09. Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, each of the Parties.

SECTION 13.10. Governing Law. This Agreement shall be governed by the laws of the State of New York. All actions and proceedings arising out of or relating to this Agreement may be heard and determined in any New York State or federal court sitting in the City of New York, County of Manhattan, and the Parties hereto hereby irrevocably submit to the nonexclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive any defense of an inconvenient forum to the maintenance of any such action or proceeding.

SECTION 13.11. Counterparts. This Agreement may be executed in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Copies of executed counterparts transmitted by telecopy, telefax or other electronic transmission service shall be considered original executed counterparts for purposes of this Section 13.11; provided that receipt of copies of such counterparts is confirmed.

SECTION 13.12. Specific Performance. The Parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

SECTION 13.13. Waiver of Jury Trial. Each of the Parties hereto irrevocably and unconditionally waives trial by jury in any legal action or proceeding relating to this Agreement or the transactions contemplated hereby and for any counterclaim therein.

SECTION 13.14. Execution of Documents. Consistent with the terms of this Agreement, each Party shall perform all lawful acts and execute such instruments as the other Party may reasonably request to confirm, evidence, maintain or protect such Party's rights to or under any of the intellectual property licensed hereunder. If a Party refuses or fails to perform such acts or execute such instruments, the other Party may do so as attorney-in-fact for such purpose.

[**]=Confidential Treatment requested for redacted portion

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized signatories thereunto duly authorized as of the date first above written.

**PRICELINE.COM INCORPORATED**

By: _____
Name:
Title:

**PRICELINE WEBHOUSE CLUB, INC.**

By: _____
Name:
Title:

[**]=Confidential Treatment requested for redacted portion

Exhibit 10.22.3

**CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR CERTAIN
PORTIONS OF THIS DOCUMENT. CONFIDENTIAL PORTIONS HAVE BEEN
FILED WITH THE SECURITIES AND EXCHANGE COMMISSION.**

### MARKETING AND TECHNICAL SERVICES AGREEMENT

This MARKETING AND TECHNICAL SERVICES AGREEMENT (this "Agreement"), made and entered into this 26th day of October, 1999 (the "Effective Date"), by and between PRICELINE.COM INCORPORATED, a Delaware corporation ("Priceline"), and PRICELINE WEBHOUSE CLUB, INC., a Delaware corporation ("WebHouse") (each, a "Party," and collectively, the "Parties"),

### W I T N E S S E T H :

WHEREAS, Priceline is an Internet-based company with significant name recognition of its trademarked "priceline" name and patented "demand collection system" for selling products over the Internet;

WHEREAS, Walker Digital, LLC ("Walker Digital") is a research and development company containing certain trade secrets, know-how and other intellectual property;

WHEREAS, in connection with the establishment of WebHouse's business of the sale of retail products in a "name your price" format over the Internet,
(i) Walker Digital is (A) contributing certain know-how and other assets and liabilities used in or incurred during the initial development of WebHouse's business, pursuant to an asset contribution agreement dated as of the date hereof between Walker Digital and WebHouse (the "Asset Contribution Agreement") and (B) licensing certain intellectual property pursuant to a license agreement between Walker Digital and Priceline dated as of the date hereof, which intellectual property shall in turn be sublicensed by Priceline to WebHouse,
(ii) Walker Digital Corporation, a research and development company, is contributing certain employees to WebHouse under the Asset Contribution Agreement, and (iii) Priceline is (A) licensing and sublicensing, as applicable, the use of the "priceline" name, certain patent rights and other intellectual property rights for use in connection with WebHouse's business, pursuant to an intellectual property license agreement between Priceline and WebHouse dated as of the date hereof (the "Priceline License Agreement"), (B) providing professional services, including accounting and legal services to WebHouse pursuant to a services agreement between Priceline and WebHouse dated as of the date hereof (the "Services Agreement"), and (C) providing certain marketing and technical services to WebHouse pursuant to this Agreement;

[**]=Confidential Treatment requested for redacted portion

WHEREAS, in consideration for the cash and the assets it has contributed pursuant to the Asset Contribution Agreement, Walker Digital is receiving a promissory note in the amount of $14,592,185.60, payable on April 26, 2000;

WHEREAS, in consideration of their cash contributions, Walker Digital and certain other investors (the "Investors") are receiving a total of 23,500,000 shares of WebHouse's common stock, par value $.01 per share (the "Common Stock"), pursuant to the subscription agreement (the "Subscription Agreement") dated as of the date hereof between WebHouse and the Investors;

WHEREAS, in consideration for its execution and deliveries pursuant to the Priceline License Agreement, Priceline is receiving a warrant to purchase under certain circumstances up to 137.5 million shares of Common Stock pursuant to an agreement between Priceline and WebHouse dated as of the date hereof (the "Priceline Warrant") and has certain rights to participate in WebHouse's corporate governance;

WHEREAS, in connection with the establishment of WebHouse, Priceline is agreeing, pursuant to the Services Agreement and this Agreement, to provide services to and to coordinate marketing activities with WebHouse in exchange for arm's-length consideration; and

WHEREAS, subsequent to the date of this Agreement, Priceline shall, for a period of time, provide or cause to be provided to WebHouse certain marketing and technical services with respect to WebHouse's business.

NOW THEREFORE, in consideration of the mutual promises and covenants hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01. General. As used herein, the following terms shall have the following meanings:

"Affiliate" shall mean, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with, such specified Person.

"Agreement" shall have the meaning set forth in the preamble.

[**]=Confidential Treatment requested for redacted portion

"Asset Contribution Agreement" shall have the meaning set forth in the recitals.

"Buyer-Driven Commerce" shall mean any commerce system or process that permits a prospective buyer to fix the terms and conditions, including price, on which such buyer is willing to purchase a particular product or service, with such offer being guaranteed or otherwise secured by the buyer should a seller of the product or service accept the terms of the buyer's offer.

"Change of Control" shall mean and shall be deemed to occur if: (a) upon the exercise of the Warrant in full, Priceline would not beneficially own or retain, directly or indirectly, more than 50% of the WebHouse Voting Interests; (b) WebHouse shall sell, assign, or otherwise transfer all or substantially all of its assets to any Person other than Priceline or an Affiliate thereof; or (c) during any consecutive two (2) year period, individuals who at the beginning of such period constituted the Board of Directors of WebHouse (together with any new directors whose election by the Board of Directors of WebHouse or whose nomination for election by the stockholders of WebHouse was approved by a vote of the majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason (other than by action of Priceline) to constitute a majority of the Board of Directors of WebHouse then in office.

"Common Stock" shall have the meaning set forth in the recitals.

"Confidential Information" shall have the meaning set forth in Section 6.01.

"Control" (including the terms "Controlled by" and "under common Control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"Cooperative Marketing Services" shall have the meaning set forth in Section 2.03.

"Effective Date" shall have the meaning set forth in the preamble.

"Investors" shall have the meaning set forth in the recitals.

"Party" or "Parties" shall have the meaning set forth in the preamble.

[**]=Confidential Treatment requested for redacted portion

3

"Person" shall mean an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock company, joint venture, pool, syndicate, sole proprietorship, incorporated organization, governmental authority or any other form of entity.

"Priceline" shall have the meaning set forth in the preamble.

"Priceline License Agreement" shall have the meaning set forth in the recitals.

"Priceline Warrant" shall have the meaning set forth in the Recitals.

"Primary Marketing Services" shall mean services related to the promotion and advertisement of WebHouse's business independent of Priceline's business.

"Services" shall mean Shared Technology Infrastructure Services, Technology Development Services, Cooperative Marketing Services and Primary Marketing Services.

"Shared Technology Infrastructure Services" shall have the meaning set forth in Section 2.01.

"Subscription Agreement" shall have the meaning set forth in the recitals.

"Technology Development Services" shall mean services related to the design and development of hardware and software related to WebHouse's business.

"Term" shall have the meaning set forth in Section 4.01.

"Voting Interest" of WebHouse means one Share of Common Stock and any other share or unit of Capital Stock issued by WebHouse, the holders of which are ordinarily, in the absence of contingencies, entitled to one vote in the election of WebHouse's directors (or Persons performing similar functions), or the approval of its management and policies, even if the right to vote has been suspended by the occurrence of a contingency.

"Warrant" shall mean Priceline's warrant to purchase shares of WebHouse under the Priceline Warrant.

"WebHouse" shall have the meaning set forth in the preamble.

## ARTICLE II

[**]=Confidential Treatment requested for redacted portion

4

**THE SERVICES**

SECTION 2.01 Provision of Technical Services. Subject to the terms and conditions of this Agreement and in accordance with the standards of performance set forth in Section 2.02, Priceline shall provide to WebHouse the Shared Technology Infrastructure Services specified in Schedule 1 hereto (the "Shared Technology Infrastructure Services") during the Term. During the Term, the Parties agree to share certain hardware and software systems and cooperate regarding the purchase of other hardware and software systems in connection with the provision of Shared Technology Infrastructure Services by Priceline to WebHouse.

(b) Subject to the terms and conditions of this Agreement and in accordance with the standards of performance set forth in Section 2.02, Priceline shall provide to WebHouse Technology Development Services during the period beginning on the Effective date and ending on March 31, 2000. Upon mutual agreement between the Parties, the Parties may agree to extend the period within which Priceline shall provide Technology Development Services beyond March 31, 2000, pursuant to Section 2.04.

SECTION 2.02. Standard of Performance. Priceline agrees to provide or cause to be provided to WebHouse the Shared Technology Infrastructure Services and the Technology Development Services in substantially the same manner and at substantially the same levels as such activities are conducted for Priceline's own benefit (including, without limitation, by performing all necessary maintenance of systems and infrastructure used in providing the Shared Technology Infrastructure Services and the Technology Development Services).

SECTION 2.03. Marketing Services. Subject to the terms and conditions of this Agreement, Priceline and WebHouse shall cooperate in good faith to conduct marketing activities in respect of co-branding and co-positioning of the Parties' respective services, during the Term (the "Cooperative Marketing Services"). The companies shall develop and implement brand recognition and awareness strategies and campaigns which integrate and associate the Priceline name with WebHouse and its business. In furtherance of these objectives, Priceline shall, inter alia, list or name WebHouse and the goods and services offered by WebHouse in any advertising media wherein other Priceline services or affiliates are listed or named.

(b) Subject to the terms and conditions of this Agreement, Priceline shall provide to WebHouse Primary Marketing Services during the period beginning on the Effective date and ending on March 31, 2000. Upon mutual agreement between the Parties, the Parties may agree to extend the period within which Priceline shall provide Primary Marketing Services beyond March 31, 2000, pursuant to Section 2.04.

[**]=Confidential Treatment requested for redacted portion

5

SECTION 2.04. Changes. WebHouse may request the provision of additional Shared Technology Infrastructure Services, Technology Development Services, Cooperative Marketing Services, Primary Marketing Services or new services which were not previously requested and may request the cessation of specific Services then being provided. In such case, the parties shall negotiate in good faith whether and on what terms Priceline shall provide (if at all) any additional Services.

SECTION 2.05. Cooperation and Access. (a) Each of the Parties hereto agrees to fully cooperate in good faith with the other in connection with the Services provided under this Agreement and matters related to or arising hereunder, including, without limitation, Priceline's cooperation with WebHouse to enable WebHouse to establish its own infrastructure to perform the Technical Services itself, independently of Priceline.

(b) WebHouse shall permit Priceline and its employees and agents access during regular business hours (or otherwise upon reasonable prior notice) to such data and personnel designated by WebHouse as involved in receiving or overseeing the Technical Services as reasonably requested by Priceline to facilitate Priceline's performance of this Agreement. Priceline shall permit WebHouse and its employees and agents access during regular business hours (or otherwise upon reasonable prior notice) to individuals responsible for the Technical Services and shall provide WebHouse with such data and records as WebHouse may reasonably request for the purposes of allowing WebHouse to exercise general oversight and to monitor the performance of the Technical Services.

(c) WebHouse shall be entitled to have access at all reasonable times and on reasonable notice to the premises and records of Priceline (insofar as such records relate to the business of WebHouse) and any agent or Affiliate providing the Technical Services hereunder (including any individual responsible for providing the Services) for purposes of verifying the accuracy of charges for Services rendered hereunder and to verify the proper performance of Services by Priceline.

(d) Each party agrees to make available any of its employees whose assistance, testimony or presence is necessary to assist the other party in evaluating or defending any claims, including the presence of such persons as witnesses in hearings or trials for such purpose; provided that the party requiring such assistance shall reimburse the party providing such assistance (or the employee) for any direct out-of-pocket costs in connection with such employee's assistance, testimony or presence, promptly following receipt of appropriate documentation of such out-of-pocket costs.

(e) Each party shall cooperate with and assist the other party in obtaining any third-party consents necessary for the performance of the Technical Services hereunder, including, without limitation, any required consent under any software license or real property

[**]=Confidential Treatment requested for redacted portion

6

lease. The costs and expenses of obtaining any such consents shall be borne equally by the parties. In the event that the parties are unable to obtain any required consent they shall negotiate in good faith reasonable modifications of the Services such that such consents are not required.

## ARTICLE III

## FEES

SECTION 3.01 Fees. (a) Cooperative Marketing Services Fees: As of the Effective Date, the amount of compensation and specific Cooperative Marketing Services to be provided shall be negotiated in good faith quarterly in advance of such succeeding quarter. The amount of compensation shall be based on the fair market value of such Cooperative Marketing Services. In the event the parties are unable to agree on the amount of compensation or the specific Cooperative Marketing Services to be provided for any given quarter, the compensation shall equal the amount agreed in the immediately preceding quarter plus [**]% and the Cooperative Marketing Services provided shall be the same Cooperative Marketing Services provided the previous quarter. The compensation paid by WebHouse for Cooperative Marketing Services shall not exceed [**]% of Priceline's total quarterly advertising and marketing related expenditures.

(b) Primary Marketing Services Fees. On or before December 31, 1999, WebHouse shall pay Priceline $[**] as compensation for past Primary Marketing Services and for Primary Marketing Services to be performed through December 31, 1999. On or before March 31, 2000, WebHouse shall pay Priceline $[**] as compensation for Primary Marketing Services to be performed through March 31, 1999. Thereafter, WebHouse shall not be obligated to pay Priceline any compensation for Primary Marketing Services unless the Parties agree upon the provision of additional Primary Marketing Services pursuant to Sections 2.03(b) and 2.04. In the event that the Parties agree that Priceline shall provide such additional Primary Marketing Services, the Parties shall negotiate in good faith quarterly in advance of such succeeding quarter the amount of compensation to be paid by WebHouse to Priceline as compensation for such additional Primary Marketing Services. Such compensation shall be based on the fair market value of such additional Primary Marketing Services.

(c) Shared Technology Infrastructure Services Fees: On or before December 31, 1999, WebHouse shall pay Priceline $[**] as compensation for past Shared Technology Infrastructure Services and for Shared Technology Infrastructure Services to be performed through December 31, 1999. Thereafter, the amount of compensation and specific Shared Technology Infrastructure Services to be provided shall be negotiated in good faith quarterly in advance of such succeeding quarter. The amount of compensation shall be based on the fair market value of such Shared Technology Infrastructure Services and the unamortized value of

[**]=Confidential Treatment requested for redacted portion

any capitalized asset (as determined in accordance with generally accepted accounting principles consistently applied by Priceline) acquired by Priceline that are directly related to and required for Priceline's provision of Shared Technology Infrastructure Services. In the event the parties are unable to agree on the amount of compensation or the specific Technical Services to be provided for any given quarter, the compensation shall equal the amount agreed in the immediately preceding quarter plus [**]% and the Shared Technology Infrastructure Services provided shall be the same Shared Technology Infrastructure Services provided the previous quarter. In the event the parties are unable to agree on the amount of compensation or Shared Technology Infrastructure Services for the first quarter of the year 2000, the compensation shall be $[**] and the Shared Technology Infrastructure Services shall be the same Shared Technology Infrastructure Services provided during 1999. Any hardware or software purchased or developed by Priceline for the exclusive use of WebHouse shall be billed to WebHouse at Priceline's cost and shall be owned exclusively by WebHouse.

(d) Technical Development Services Fees. On or before December 31, 1999, WebHouse shall pay Priceline $[**] as compensation for past Technical Development Services and for Technical Development Services to be performed through December 31, 1999. On or before March 31, 2000, WebHouse shall pay Priceline $[**] as compensation for Technical Development Services to be performed through March 31, 2000. Thereafter, WebHouse shall not be obligated to pay Priceline any compensation for Technical Development Services unless the Parties agree upon the provision of additional Technical Development Services pursuant to Sections 2.01(b) and 2.04. In the event that the Parties agree that Priceline shall provide such additional Technical Development Services, the Parties shall negotiate in good faith quarterly in advance of such succeeding quarter the amount of compensation to be paid by WebHouse to Priceline as compensation for such additional Technical Development Services. Such compensation shall be based on the fair market value of such additional Technical Development Services.

[**]=Confidential Treatment requested for redacted portion

ARTICLE IV

## TERM AND TERMINATION

SECTION 4.01. Term. Unless earlier terminated under the terms of this Agreement, the Term of this Agreement (the "Term") shall commence on the Effective Date and continue for a period of 12 months and shall automatically continue for successive one-year terms thereafter until terminated by either party effective at the end of such initial 12-month term or the then current one-year term, in each case on written notice given at least 18 months prior to the end of such initial 12-month term or the then current one-year term; provided that, unless the parties otherwise agree in writing, the term of this Agreement shall not extend beyond the termination of the trademark license granted under Section 2.02 of the Priceline License Agreement.

SECTION 4.02. Termination. Priceline shall continue to make each Service available through the end of the Term or, if earlier, until canceled by WebHouse by written notice to Priceline. Notwithstanding the foregoing, this Agreement (and the obligation to provide any Services) may be terminated:

(a) by WebHouse, at any time upon ninety (90) days written notice to Priceline;

(b) by mutual agreement of Priceline and WebHouse;

(c) by Priceline, at any time, not less than 90 days after delivery of notice to WebHouse, in the event that WebHouse shall have defaulted on or breached any material term of this Agreement and shall not have cured such breach within 60 days after receiving notice from Priceline specifying the nature of such default or breach;

(d) by WebHouse, at any time, not less than 90 days after delivery of notice to Priceline, in the event that Priceline shall have defaulted on or breached any material term of this Agreement and shall not have cured such breach within 60 days after receiving notice from WebHouse specifying the nature of such default or breach;

(e) by either party, immediately upon delivery of notice to the other party, in the event that such other party (i) requires a composition or other similar arrangement with creditors, files for bankruptcy or is declared bankrupt or (ii) shall have assigned or transferred to any third party any of its rights or obligations hereunder except in accordance with
Section 7.07; or

(f) by Priceline, at any time, following the expiration of the Warrant.

[**]=Confidential Treatment requested for redacted portion

9

SECTION 4.03. Payments Upon Termination. In the event that upon termination of this Agreement, any capitalized assets acquired by Priceline that were directly related to and required for Priceline's provision of Shared Technology Infrastructure Services retain any unamortized value (as determined in accordance with generally accepted accounting principles consistently applied by Priceline), WebHouse shall continue to pay Priceline compensation for Shared Technology Infrastructure Services quarterly until the value of such capitalized assets has been completely amortized.

## ARTICLE V

## RESPONSIBILITY

SECTION 5.01. Relationship of the Parties. Nothing in this Agreement shall be construed as (a) an assumption by Priceline of any obligation to maintain or increase the sales or profits of WebHouse or otherwise to assume responsibility for WebHouse's operations; (b) an assumption by Priceline of any financial obligation of WebHouse; (c) the creation of any relationship of employment or agency between WebHouse and employees or consultants of Priceline, its subsidiaries or associated companies; (d) an assumption by Priceline of any responsibility for the work performed by outside suppliers employed by WebHouse at the suggestion or recommendation of Priceline; or (e) the delegation of any function or authority of WebHouse to Priceline. In all matters relating to this Agreement, each Party hereto shall be solely responsible for the acts of its own employees, and employees of one Party shall not be considered employees of the other Party. Except as specifically permitted by this Agreement, no Party hereto or any of its employees shall have any authority to negotiate, enter into any contract or incur any obligation, on behalf of the other Party. The Parties hereto are independent contractors and neither Party is an employee, partner or joint venturer of the other.

SECTION 5.02. Limitation of Liability. Priceline MAKES NO WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES PROVIDED HEREUNDER. Priceline shall have no liability for any losses or damages that WebHouse may incur as a result of the provision or non-provision of Services except to the extent caused by the gross negligence or wilful misconduct of such person. In no event shall Priceline, its officers, directors, employees, agents, independent contractors, affiliates and stockholders be liable for any consequential or special damages suffered by WebHouse as a result of any representations, actions or inactions by any person or entity in respect of its obligations hereunder.

## ARTICLE VI

## CONFIDENTIALITY

[**]=Confidential Treatment requested for redacted portion

SECTION 6.01—Confidentiality. WebHouse will receive data from Priceline, and Priceline's patents, subsidiaries and affiliates, and Priceline will learn from WebHouse, information, both orally and in writing, concerning the business of Priceline or WebHouse, respectively, including, without limitation, financial, technical and marketing information, data, information related to the development of technology and services, trade secrets, technology, plans, methods, processes, specifications, models, protocols, techniques, research projects, information management systems and software, whether protectable by patent, copyright or other statutory means, relating to WebHouse's and Priceline's business, as the case may be, and which information is deemed, in the case of WebHouse, proprietary to WebHouse and, in the case of Priceline, proprietary to Priceline. Both Parties hereby agree, as set forth below, to protect such information, whether furnished before, on or after the date of this Agreement, as it protects its own similar confidential information, but never less than commercially reasonable efforts, and not to disclose such information to anyone except as otherwise provided for in this Agreement. Such information, in whole or in part, together with analyses, compilations, programs, reports, proposals, studies or any other documentation prepared by the Parties, as the case may be, which contains or otherwise reflects or makes reference to such information, is hereinafter referred to as "Confidential Information". Both Parties hereby agree that the Confidential Information will be used solely for the purpose of this Agreement and not for any other purpose. Both Parties further agree that any Confidential Information pertaining to the other Party is the sole and exclusive property of such other Party, and that the receiving Party shall not have any right, title, or interest in or to such Confidential Information except as expressly provided in this Agreement. Both Parties further agree to hold in the strictest confidence and not to disclose to anyone for any reason Confidential Information pertaining to the other Party; provided that

(a) such Confidential Information may be disclosed to the receiving Party's respective officers, directors, employees, agents, or representatives (collectively, "Representatives") on a "need to know" basis for the purpose of this Agreement on the condition that

(i) each such Representative will be informed by the receiving Party of the confidential nature of such Confidential Information and will agree to be bound by the terms of this Agreement and not to disclose the Confidential Information to any other person and

(ii) both Parties agree to accept full responsibility for any breach of this Section 6.01 by their respective Representatives; and

(b) Confidential Information pertaining to the other Party may be disclosed upon the prior written consent of the other Party.

[**]=Confidential Treatment requested for redacted portion

11

Both Parties hereby agree, upon the request of the other Party, to promptly deliver to the other Party, at its own cost, the Confidential Information pertaining to such other Party, without retaining any copies thereof.

SECTION 6.02. Non-Confidential Information. The term "Confidential Information" shall not include any information: (a) which at the time of disclosure or thereafter is generally available to or known by the public (other than as a result of a disclosure directly or indirectly by the receiving Party);

(b) is independently developed by the receiving Party, without reference to or use of, the Confidential Information of the other Party; (c) was known by the receiving Party as of the time of disclosure without breach of confidentiality;

(d) is lawfully learned from a third party not under obligation to the disclosing Party; or (e) is required to be disclosed pursuant to a subpoena, court order or other legal process, whereupon the receiving Party shall provide prompt written notice to the other Party prior to such disclosure.

## ARTICLE VII

### MISCELLANEOUS

SECTION 7.01. Expenses. Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

SECTION 7.02. Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by courier service, by telecopy or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 7.02):

(a) if to Priceline:

priceline.com Incorporated Five High Ridge Park
Stamford, CT 06905
Telecopy No.: (203) 595-8345 Attention: Melissa Taub

(b) if to WebHouse:

[**]=Confidential Treatment requested for redacted portion

12

Priceline WebHouse Club, Inc. One High Ridge Park
Stanford, CT 06905
Telecopy No.: (203) 595-8305 Attention: Anne Maffei

SECTION 7.03. Public Announcements. Except as required by law, governmental regulation or by the requirements of any securities exchange on which the securities of a Party hereto are listed, no Party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or otherwise communicate with any news media without the prior written consent of the other Party, and the Parties shall cooperate as to the timing and contents of any such press release or public announcement.

SECTION 7.04. Headings. The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 7.05. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

SECTION 7.06. Entire Agreement. This Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, with respect to the subject matter hereof.

SECTION 7.07. Assignment. This Agreement shall not be assigned without the express written consent of the Parties (which consent may be granted or withheld in the sole discretion of any Party) except that this Agreement may be assigned, without consent, in connection with the sale of a Party's entire business whether such is a sale of all or substantially all of such Party's assets, a merger or a stock sale. This Agreement shall inure to the benefit of, and be binding upon, the successors of the Parties hereto and the assignees of the Parties hereto, provided such assignment was in compliance with the terms hereof.

SECTION 7.08. No Third Party Beneficiaries. This Agreement shall be binding upon and inure solely to the benefit of the Parties hereto and their permitted assigns and nothing

[**]=Confidential Treatment requested for redacted portion

13

herein, express or implied, is intended or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 7.09. Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, each of the Parties.

SECTION 7.10. Governing Law. This Agreement shall be governed by the laws of the State of New York. All actions and proceedings arising out of or relating to this Agreement may be heard and determined in any New York State or federal court sitting in the City of New York, County of Manhattan, and the Parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive any defense of an inconvenient forum to the maintenance of any such action or proceeding.

SECTION 7.11. Counterparts. This Agreement may be executed in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Copies of executed counterparts transmitted by telecopy, telefax or other electronic transmission service shall be considered original executed counterparts for purposes of this
Section 7.11; provided that receipt of copies of such counterparts is confirmed.

SECTION 7.12. Specific Performance. The Parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

SECTION 7.13. Waiver of Jury Trial. Each of the Parties hereto irrevocably and unconditionally waives trial by jury in any legal action or proceeding relating to this Agreement or the transactions contemplated hereby and for any counterclaim therein.

[**]=Confidential Treatment requested for redacted portion

14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized signatories thereunto duly authorized as of the date first above written.

**PRICELINE.COM INCORPORATED**

By: _____
Name:
Title:

**PRICELINE WEBHOUSE CLUB, INC.**

By: _____
Name:
Title:

[**]=Confidential Treatment requested for redacted portion

**SCHEDULE 1**

**TECHNICAL SERVICES**

1. Clarus Accounting System: A system that provides accounts payable, accounts receivable, general ledger processing, budgeting and reporting, including shared network connections.

2. MIS Data Warehousing: Shared database server and database environment. Priceline WebHouse Club will have separate database layouts for its operational database and data warehouse on the shared server, including shared network connections.

3. Brio Reporting Software: Shared BRIO software engine, server, and network. Priceline WebHouse will have separate BRIO reports specific to its business on the server, including shared network connections.

4. Informatica ETL: Shared tool used to transform data from operational MIS database to data warehouse.

5. Oracle Database Servers: Three production database servers, each with a shared Oracle database engine, will be shared, including shared network connections.

6. Shareplex Software: Software that copies data between the primary and secondary production databases, including shared network connections.

7. Silknet Software: Software and servers that provide application for call center operations, including shared network connections.

8. Kana Software: Software and servers that provide e-mail management for call center operations, including shared network connections.

9. Paylinx: Software and servers that provide interface to Paymentech for credit card authorization, including shared network connections.

10. Networking Infrastructure: Networking hardware and software including servers routers and related service fees.

[**]=Confidential Treatment requested for redacted portion

**CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR CERTAIN
PORTIONS OF THIS DOCUMENT. CONFIDENTIAL PORTIONS HAVE BEEN
FILED WITH THE SECURITIES AND EXCHANGE COMMISSION.**

### WARRANT AGREEMENT

WARRANT AGREEMENT, dated as of October 26, 1999 (this "Agreement"), between PRICELINE.COM INCORPORATED, a Delaware corporation ("Grantee"), and PRICELINE WEBHOUSE CLUB, INC., a Delaware corporation ("Issuer"),

### W I T N E S S E T H :

WHEREAS, Grantee is an Internet-based company with significant name recognition of its trademarked "priceline" name and patented "demand collection system" for selling products over the Internet;

WHEREAS, Walker Digital, LLC ("Walker Digital") is a research and development company containing certain trade secrets, know-how and other intellectual property;

WHEREAS, in connection with the establishment of Issuer's business of the sale of retail products in a "name your price" format over the Internet,
(i) Walker Digital is (A) contributing certain know-how, and other assets and liabilities used in or incurred during the initial development of the Company's business, pursuant to an asset contribution agreement dated as of the date hereof between Walker Digital and Issuer (the "Asset Contribution Agreement") and (B) licensing certain intellectual property pursuant to a license agreement between Walker Digital and Priceline dated as of the date hereof, which intellectual property shall in turn be sublicensed by Priceline to Issuer, (ii) Walker Digital Corporation, a research and development company, is contributing certain employees to Issuer under the Asset Contribution Agreement, and (iii) Grantee is (A) licensing and sublicensing, as applicable, the use of the "priceline" name, certain patent rights and other intellectual property rights for use in connection with the Issuer's business, pursuant to an intellectual property license agreement between Grantee and Issuer dated as of the date hereof, (the "Priceline License Agreement") (B) providing professional services, including accounting and legal services to Issuer pursuant to a services agreement between the Grantee and Issuer dated as of the date hereof (the "Services Agreement"), and (C) providing certain marketing and technical services to Issuer pursuant to a marketing and technical services agreement between Grantee and Issuer dated as of the date hereof (the "Marketing and Technical Services Agreement");

WHEREAS, in consideration for the cash and the assets it has contributed pursuant to the Asset Contribution Agreement, Walker Digital is receiving a promissory note in the amount of $14,592,185.60, payable on April 26, 2000;

[**]=Confidential Treatment requested for redacted portion

WHEREAS, in consideration of their cash contributions, Walker Digital and certain other investors (the "Investors") are receiving a total of 23,500,000 shares of common stock of Issuer, par value $.01 per share (the "Common Stock"), pursuant to the subscription agreement dated as of the date hereof (the "Subscription Agreement") between Issuer and the Investors;

WHEREAS, in consideration for Grantee's execution and deliveries pursuant to the Priceline License Agreement, Issuer desires to issue, and Grantee desires to accept, a warrant to purchase up to 137.5 million shares of Common Stock and furthermore has certain rights to participate in Issuer's corporate governance;

WHEREAS, Issuer, Walker Digital, Grantee and the Investors will enter into an agreement providing certain rights to the parties and subjecting them to certain restrictions (the "Securityholders' Agreement"); and

WHEREAS, in connection with the establishment of Issuer, Grantee is agreeing, pursuant to the Services Agreement and Marketing and Technical Services Agreement, to provide services to and to coordinate marketing activities with the Company in exchange for arm's-length consideration.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth herein, and intending to be legally bound hereby, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01. Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"Agreement" or "this Agreement" means this Warrant Agreement, dated as of October 26, 1999, between the Issuer and the Grantor, and all amendments hereto made in accordance with the provisions of Section 8.09.

"Asset Contribution Agreement" shall have the meaning assigned in the recitals.

"Board of Directors" means the board of directors of the Issuer.

[**]=Confidential Treatment requested for redacted portion

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"Capital Stock" means, with respect to any Person at any time, any and all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of capital stock, partnership interests (whether general or limited), limited liability company interests or equivalent ownership interests in or issued by such Person.

"Change of Control" means the occurrence of any of the following:

(1) the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one transaction or a series of related transactions, of all or substantially all of the properties or assets of Issuer to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act) other than Grantee or an affiliate of Grantee;

(2) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as defined above) other than Grantee or an affiliate of Grantee, becomes the Beneficial Owner, directly or indirectly, of voting stock of Issuer with the power to vote 50% or more of the total votes entitled to be cast on any matter submitted to a vote of shareholders of Issuer;

(3) during any consecutive two year period, individuals who at the beginning of such period constituted the Board of Directors (together with any new directors whose election to the Board of Directors, or whose nomination for election by the shareholders of Issuer, was approved by the vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors then in office; or

(4) Issuer consolidates with, or merges with or into, any Person, or any Person consolidates with, or merges with or into, Issuer, in any such event pursuant to a transaction in which any of the outstanding voting stock of Issuer or such other Person is converted into or exchanged for cash, securities or other property, other than any such transaction where the voting stock of Issuer outstanding immediately prior to such transaction is converted into or exchanged for voting stock of the surviving or transferee Person constituting a majority of the outstanding shares of such voting stock of such surviving or transferee Person (immediately after giving effect to such issuance) and no Person other than Grantee or an affiliate of Grantee becomes the Beneficial Owner, directly or indirectly, of voting stock of such Person with the power to vote 50% or more of the total votes entitled to be cast on any matter submitted to a vote of shareholders.

[**]=Confidential Treatment requested for redacted portion

3

"Closing" shall have the meaning assigned in Section 3.01.

"Common Stock" shall have the meaning assigned in the recitals.

"Control" (including the terms "Controlled by" and "under common Control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"Convertible Securities" shall have the meaning assigned in Section 2.04(b)(i).

"Employee Options" shall mean the options to acquire 17.3 million Shares that may be granted to employees, consultants, directors and officers of Issuer pursuant to the Issuer's 1999 Omnibus Employee Equity Plan, as amended from time to time, or any successor plan.

"Encumbrance" means any security interest, pledge, mortgage, lien (including, without limitation, environmental and tax liens), charge, encumbrance, adverse claim, preferential arrangement or restriction of any kind, including, without limitation, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Exercise Event" shall have the meaning assigned in Section 2.02(b).

"Exercise Notice" shall have the meaning assigned in Section 2.02(c).

"Exercise Price" shall have the meaning assigned in Section 2.01.

"Expiration Date" shall have the meaning assigned in Section 2.02(a).

"Governmental Entities" means any domestic or foreign governmental, administrative or regulatory authority or agency.

"Grantee" shall have the meaning assigned in the preamble.

"Grantee Common Stock" shall have the meaning assigned in Section 2.02(c).

[**]=Confidential Treatment requested for redacted portion

4

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Initial Public Offering" means the first underwritten public offering of the Common Stock resulting in aggregate net proceeds (after expenses and underwriting commissions and discounts) to Issuer and any selling stockholders of at least $50 million; provided that, following such offering the Common Stock is listed on a United States or foreign national securities exchange or quoted on any United States or foreign automated securities quotation system.

"Insolvency Event" means, in respect of a Person, that time when the sum of the Company's debts exceeds the sum of its assets, valued at fair market value; or that such Person shall not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by it or against it seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain undismissed or unstayed for a period of 30 days or any of the actions sought in proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of it property) shall occur; or Issuer shall take any corporate action to authorize any of the actions set forth above.

"Investors" shall have the meaning assigned in the recitals.

"Issuer" shall have the meaning assigned in the preamble.

"Marketing and Technical Services Agreement" shall have the meaning assigned in the recitals.

"NASD" shall mean the National Association of Securities Dealers, Inc.

"Net Revenue" means the net revenue of Issuer as disclosed on the annual audited financial statements for any fiscal year and the unaudited quarterly financial statements for any fiscal quarter.

"New Securities" means any Capital Stock of Issuer, whether now authorized or not, and rights, options or warrants to purchase such Capital Stock, and securities of any

[**]=Confidential Treatment requested for redacted portion

5

type whatsoever and are, or may become, convertible into or exchangeable or exercisable for Capital Stock of such; provided that the term "New Securities" does not include (i) securities of Issuer issued to employees, consultants, officers or directors of Issuer, or which have been reserved for issuance, pursuant to any employee stock option, stock purchase, stock bonus plan, or other similar stock agreement or arrangement approved by the Board of Directors, including the Priceline designee to the Board,

(ii) securities of Issuer issued in connection with any stock split, stock dividend or recapitalization of Issuer, (iii) securities of Issuer issued in an Initial Public Offering, (iv) securities of Issuer issued upon the conversion or exchange of convertible or exchangeable securities of Issuer that are outstanding as of the date of this Agreement, (v) Warrant Shares or (vi) any right, option or warrant to acquire any security convertible into or exchangeable or exercisable for the securities excluded from the definition of New Securities pursuant to subclause (i) above if issued pursuant to any employee stock option, stock purchase, stock bonus plan or other similar stock agreement or arrangement approved by the Board of Directors, including the Priceline designee to the Board of Directors.

"Notice of Issuance" shall have the meaning assigned in Section 2.05(b).

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Exchange Act.

"Priceline License Agreement" shall have the meaning assigned in the recitals.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Services Agreement" shall have the meaning assigned in the recitals.

"Share" means any share of Common Stock.

"Stock Payment Amount" shall have the meaning assigned in Section 2.03(a).

"Stockholder" means each Person (other than the Issuer) who shall own, beneficially or of record, any Shares and be listed in the share registry of the Issuer as the owner thereof.

"Subscription Agreement" shall have the meaning assigned in the recitals.

"Subsidiary" or "Subsidiaries" of any Person means any corporation, partnership, joint venture, association or other entity, all of the Capital Stock or other similar equity

[**]=Confidential Treatment requested for redacted portion

interests of which are owned beneficially and of record by such Person directly or indirectly through one or more intermediaries.

"Third Party" means, with respect to Grantee, any Person, other than
(i) Issuer, (ii) any Subsidiary of Issuer or (iii) any Subsidiary of Grantee.

"Walker Digital" shall have the meaning assigned in the recitals.

"Warrant" shall have the meaning assigned in Section 2.01.

"Warrant Shares" shall have the meaning assigned in Section 2.01.

<div align="center">

**ARTICLE II**

**THE WARRANT**

</div>

SECTION 2.01. Grant of Warrant. Issuer hereby grants to Grantee an irrevocable, fully vested warrant (the "Warrant") to purchase 137,500,000 Shares (the "Warrant Shares"), at a purchase price per Warrant Share initially equal to $3.00 (the "Exercise Price"), subject to the terms and conditions set forth herein. The number of shares constituting the Warrant Shares and the Exercise Price are both subject to adjustment as set forth in Section 2.04 hereof.

SECTION 2.02. Exercise of Warrant. (a) Subject to the conditions set forth in Article VI, the Warrant may be exercised by Grantee, in whole or in part, at any time after the fifth anniversary of the date of this Agreement or, if earlier, the occurrence of an Exercise Event; provided that the Warrant shall terminate and be of no further force and effect upon the earlier to occur of (i) Closing of the final exercise of the Warrant, (ii) sixty (60) days after the Issuer notifies Grantee of a willful and material breach by Grantee of Section 6.02 of the License Agreement, if such breach is not cured prior to the expiration of such sixty (60) day period, and (iii) thirty days following the fifth anniversary of the date hereof (the "Expiration Date"). Notwithstanding the termination of the Warrant, Grantee shall be entitled to purchase those Warrant Shares with respect to which it has issued an Exercise Notice (as defined below) prior to the termination of the Warrant. The termination of the Warrant shall not affect any rights hereunder which by their terms extend beyond the date of such termination.

(b) An "Exercise Event" shall occur for purposes of this Agreement upon the occurrence of any of the following events:

[**]=Confidential Treatment requested for redacted portion

(i) Issuer achieves a Net Revenue of $[**] for any four-quarter period immediately preceding the date of measurement or any shorter period in which Issuer achieves Net Revenue of $[**];

(ii) the occurrence of an Insolvency Event in respect of Issuer;

(iii) the adoption of a plan relating to the liquidation or dissolution of the Company;

(iv) the occurrence of a Change of Control, or Board approval of a transaction that would result in a Change of Control; or

(v) Board approval of an Initial Public Offering.

Promptly upon the occurrence of any event described in clauses (i) and (ii) above, and no later than fifteen (15) days prior to an event described in clauses (iii) through (v) above, Issuer shall provide Grantee with notice of such event together with the consolidated financial statements of Issuer, and Grantee may exercise the Warrant until the Expiration Date.

(c) The Warrant shall be exercised by written notice from Grantee to Issuer (an "Exercise Notice") stating that the Warrant is being exercised and setting forth: (i) a proposed closing date, which (subject to the earlier satisfaction or waiver of the conditions set forth in Article VI) shall be:

(A) in the case of an exercise upon the fifth anniversary hereof or pursuant to clause (b)(i) or (b)(ii) above, no earlier than fifteen (15) days after, and no later than thirty (30) days after, the date of delivery of such notice, and

(B) in the case of an exercise pursuant to clause (b)(iii) through
(b)(v) above, shall be the closing date of the transaction giving rise to the Exercise Event or such earlier date as shall be specified in the Exercise Notice,

on which date the Warrant Shares shall be issued; (ii) the number of Warrant Shares to be purchased; and (iii) whether Grantee will purchase the Warrant Shares with cash, shares of Grantee's common stock, par value $.01 per share ("Grantee Common Stock") or a combination thereof (including the relative percentage of any combination). The Warrant shall be deemed to be exercised on the date of delivery of the Exercise Notice, at which time the decision to exercise the Warrant shall be irrevocable; provided that, in the case of an exercise pursuant to clause (b)(iv) or (b)(v) above, the Warrant's exercise shall be conditional upon the closing of the transaction giving rise to the Exercise Event.

[**]=Confidential Treatment requested for redacted portion

8

(d) In the event that Grantee exercises the Warrant in part only, upon such exercise Issuer shall execute and deliver to Grantee, at Issuer's expense, a new Warrant exercisable for the number of Shares representing the unexercised portion of the Warrant so exercised in part.

SECTION 2.03. Form of Payment. (a) The Exercise Price may be paid in cash, in shares of Grantee Common Stock or in any combination thereof at the sole discretion of the Grantee. The number of shares of Grantee Common Stock to be delivered in payment of all or a portion of the aggregate Exercise Price (the "Stock Payment Amount") shall be determined by dividing the portion of the aggregate Exercise Price to be paid in Grantee Common Stock by the average of the closing prices of Grantee Common Stock quoted on the Nasdaq Stock Market (or, if then traded on a national securities exchange, the average of the closing prices of Grantee Common Stock on the principal national securities exchange on which listed or, if quoted on the NASD OTC Bulletin Board, the average of the means of the closing bid and asked price of Grantee Common Stock) on each of the ten (10) trading days immediately preceding the date the Exercise Notice is delivered.

(b) In the event of any change in Grantee Common Stock or in the number of outstanding shares of Grantee Common Stock between the date of an Exercise Notice and the Closing by reason of a stock dividend, split-up, recapitalization, combination, exchange of shares or similar transaction or any other extraordinary change in the corporate or capital structure of Grantee (including, without limitation, the declaration or payment of an extraordinary dividend of cash, securities or other property), the type and number of shares or securities to be delivered by Grantee in payment of the Stock Payment Amount shall be adjusted appropriately so that Issuer shall receive upon payment of the Stock Payment Amount the number and class of shares or other securities or property that Issuer would have received in respect of Grantee Common Stock if Grantee had paid the Stock Payment Amount immediately prior to such change.

SECTION 2.04. Adjustments upon Share Issuances, Changes in Capitalization, Etc. (a) In the event that Issuer shall issue or sell, prior to the exercise in full or expiration of the Warrant, any Shares (except as provided in paragraph (f) below) or Convertible Securities (as hereinafter defined) or any rights or options to purchase Shares or Convertible Securities for a consideration per share less than the Exercise Price in effect immediately prior to such issue or sale, then forthwith upon such issue or sale the Exercise Price shall be reduced to a price (calculated to the nearest $.0001) determined by dividing (i) an amount equal to the sum of (A) the number of Shares outstanding immediately prior to such issue or sale multiplied by the Exercise Price then in effect, and (B) the consideration, if any, received by the Issuer upon such issue or sale, by (ii) the total number of Shares outstanding immediately after such issue or sale.

(b) For the purposes of calculating any adjustment to the Exercise Price pursuant to paragraph (a) above, the following provisions shall apply:

[**]=Confidential Treatment requested for redacted portion

(i) In case at any time Issuer shall grant any rights to subscribe for, or any rights or options to purchase, Common Stock or any stock or other securities convertible into or exchangeable for Common Stock (such convertible or exchangeable stock or securities being herein called "Convertible Securities"), whether or not such rights or options or the right to convert or exchange any such Convertible Securities are immediately exercisable, and the price per Share for which Common Stock is issuable upon the exercise of such rights or options or upon conversion or exchange of such Convertible Securities

(determined by dividing (A) the total amount, if any, received or receivable by Issuer as consideration for the granting of such rights or options, plus the minimum aggregate amount of additional consideration payable to Issuer upon the exercise of such rights or options, plus, in the case of any such rights or options which relate to such Convertible Securities, the minimum aggregate amount of additional consideration, if any, payable upon the issue or sale of such Convertible Securities and upon the conversion or exchange thereof, by (B) the total maximum number of Shares issuable upon the exercise of such rights or options or upon the conversion or exchange of all such Convertible Securities issuable upon the exercise of such rights or options)

shall be less than the Exercise Price in effect immediately prior to the time of the granting of such rights or options, then the total maximum number of Shares issuable upon the exercise of such rights or options or upon conversion or exchange of the total maximum amount of such Convertible Securities issuable upon the exercise of such rights or options shall (as of the date of granting of such rights or options) be deemed to be outstanding and to have been issued for such price per Share. Except as provided in paragraph (e) of this Section 2.04, no further adjustments of the Exercise Price shall be made upon the actual issue of such Common Stock or of such Convertible Securities upon exercise of such rights or options or upon the actual issue of such Common Stock upon conversion or exchange of such Convertible Securities.

(ii) In case at any time Issuer shall issue or sell any Convertible Securities, whether or not the rights to exchange or convert thereunder are immediately exercisable, and the price per Share for which Common Stock is issuable upon such conversion or exchange

(determined by dividing (A) the total amount received or receivable by Issuer as consideration for the issue or sale of such Convertible Securities, plus the minimum aggregate amount of additional consideration, if any, payable to Issuer upon the

[**]=Confidential Treatment requested for redacted portion

10

conversion or exchange thereof by (B) the total maximum number of Shares issuable upon the conversion or exchange of all such Convertible Securities)

shall be less than the Exercise Price in effect immediately prior to the time of such issue or sale, then the total maximum number of Shares issuable upon conversion or exchange of all such Convertible Securities shall (as of the date of the issue or sale of such Convertible Securities) be deemed to be outstanding and to have been issued for such price per Share, provided that (i) except as provided in paragraph (e) of this Section 2.04, no further adjustments of the Exercise Price shall be made upon the actual issue of such Common Stock upon conversion or exchange of such Convertible Securities, and (ii) if any such issue or sale of such Convertible Securities is made upon exercise of any rights to subscribe for or to purchase or of any option to purchase any such Convertible Securities for which adjustments of the Exercise Price have been or are to be made pursuant to other provisions of this paragraph (b), no further adjustment of the Exercise Price shall be made by reason of such issue or sale.

(iii) In case at any time Issuer shall declare a dividend or make any other distribution upon any stock of the Company payable in Common Stock or Convertible Securities, any Common Stock or Convertible Securities, as the case may be, issuable in payment of such dividend or distribution shall be deemed to have been issued or sold without consideration.

(iv) In case at any time any Share or Convertible Securities or any rights or options to purchase any Common Stock or Convertible Securities shall be issued or sold for cash, the consideration received therefor shall be deemed to be the amount received by Issuer therefor, without deduction therefrom of any expenses incurred or any underwriting commissions or concessions or discounts paid or allowed by Issuer in connection therewith. In case any Shares or Convertible Securities or any rights or options to purchase any Common Stock or Convertible Securities shall be issued or sold for a consideration other than cash, the amount of the consideration other than cash received by Issuer shall be deemed to be the fair value of such consideration as determined by the Board of Directors, without deduction therefrom of any expenses incurred or any underwriting commissions or concessions or discounts paid or allowed by Issuer in connection therewith. In case any Shares or Convertible Securities or any rights or options to purchase any Common Stock or Convertible Securities shall be issued in connection with any merger of another corporation into Issuer, the amount of consideration therefor shall be deemed to be the fair value of the assets of such merged corporation as determined by the Board of Directors after deducting therefrom all cash and other consideration (if any) paid by Issuer in connection with such merger.

[**]=Confidential Treatment requested for redacted portion

11

(v) In case at any time Issuer shall take a record of the holders of Common Stock for the purpose of entitling them (i) to receive a dividend or other distribution payable in Common Stock or Convertible Securities, or (ii) to subscribe for or purchase Common Stock or Convertible Securities, then such record date shall be deemed to be the date of the issue or sale of the Shares deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

(c) In the event that Issuer shall make any distribution of its assets upon or with respect to its Common Stock, as a liquidating or partial liquidating dividend or otherwise, Grantee shall, upon any exercise of the Warrant subsequent to the record date for such distribution or, in the absence of a record date, subsequent to the date of such distribution, receive, in addition to the Shares subscribed for, the amount of such assets (or, at the option of Issuer, a sum equal to the value thereof at the time of distribution as determined by the Board of Directors in its sole discretion) which would have been distributed to Grantee if it had exercised the Warrant for that number of Shares immediately prior to the record date for such distribution or, in the absence of a record date, immediately prior to the date of such distribution.

(d) In case at any time Issuer shall subdivide its outstanding Shares into a greater number of Shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced and conversely, in case the outstanding Shares of the Issuer shall be combined into a smaller number of Shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased.

(e) (i) If the purchase price provided for in any right or option referred to in subparagraph (i) of paragraph (b) above, or the rate at which any Convertible Securities referred to in subparagraph (i) or (ii) of said paragraph
(b) are convertible into or exchangeable for Common Stock, shall change or a different purchase price or rate shall become effective at any time or from time to time (other than under or by reason of provisions designed to protect against dilution), then, upon such change becoming effective, the Exercise Price then in effect hereunder shall forthwith be increased or decreased to such Exercise Price as would have obtained had the adjustments made upon the granting or issuance of such rights or options or Convertible Securities been made upon the basis of (1) the issuance of the number of Shares theretofore actually delivered upon the exercise of such options or rights or upon the conversion or exchange of such Convertible Securities, and the total consideration received therefor, and (2) the granting or issuance at the time of such change of any such options, rights, or Convertible Securities then still outstanding for the consideration, if any, received by the Company therefor and to be received on the basis of such changed price.

(ii) On the expiration of any right or option referred to in subparagraph (i) of paragraph (b) above, or on the termination of any right to convert or exchange any Convertible Securities referred to in subparagraph (i) or (ii) of said paragraph (b), the Exercise Price shall

[**]=Confidential Treatment requested for redacted portion

12

forthwith be readjusted to such amount as would have obtained had the adjustment made upon the granting or issuance of such rights or options or Convertible Securities been made upon the basis of the issuance or sale of only the Shares actually issued upon the exercise of such options or rights or upon the conversion or exchange of such Convertible Securities.

(iii) If the purchase price provided for in any right or option referred to in subparagraph (i) of paragraph (b) above, or the rate at which any Convertible Securities referred to in subparagraph (i) or (ii) of said paragraph
(b) are convertible into or exchangeable for Common Stock, shall change at any time under or by reason of provisions with respect thereto designed to protect against dilution, then in case of the delivery of Common Stock upon the exercise of any such right or option or upon conversion or exchange of any such Convertible Security, the Exercise Price then in effect hereunder shall forthwith be decreased to such Exercise Price as would have obtained had the adjustments made upon the issuance of such right or option or Convertible Security been made upon the basis of the issuance of (and the total consideration received for) the Shares so delivered.

(f) Issuer shall not be required to make any adjustment of the Exercise Price in the case of:

(i) the granting by Issuer of Employee Options,

(ii) the issuance of Shares pursuant to the exercise of Employee Options, whether granted prior to or subsequent to the date hereof, or

(iii) the issuance of such additional Shares as may be issuable upon the exercise of such options as a result of adjustment in the number of Shares covered by such options for stock dividends, stock splits or other changes in the capitalization of Issuer.

(g) If any capital reorganization or reclassification of the Capital Stock of Issuer, or consolidation or merger of Issuer with another corporation, or the sale of all or substantially all of its assets to another corporation, shall be effected in such a way that holders of Common Stock shall be entitled to receive stock, securities or assets with respect to or in exchange for Common Stock, then, as a condition of such reorganization, reclassification, consolidation, merger or sale, Issuer or such successor or purchasing corporation, as the case may be, shall execute with Grantee an agreement providing that Grantee shall have the right thereafter and until the Expiration Date to exercise the Warrant for the kind and amount of stock, securities or assets receivable upon such reorganization, reclassification, consolidation, merger or sale by a holder of the number of Shares for which the Warrant might have been exercised immediately prior to such reorganization, reclassification, consolidation, merger or sale, subject to adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 2.04.

[**]=Confidential Treatment requested for redacted portion

13

(h) (i) Whenever the Exercise Price is adjusted pursuant to the provisions of this Section 2.04, the number of Warrant Shares for which the Warrant is exercisable shall be adjusted so that it shall equal the number determined by multiplying the number of Warrant Shares for which the Warrant was exercisable immediately prior to such adjustment by a fraction, the numerator of which shall be the Exercise Price in effect immediately prior to such adjustment, and the denominator of which shall be the Exercise Price in effect immediately thereafter.

(ii) Issuer shall not be required to issue fractional Shares upon any exercise of the Warrant following any adjustment in the number of Warrant Shares for which the Warrant is exercisable pursuant to subparagraph (i) above. If any fraction of a Share would, except for the provisions of this sentence, be issuable on the exercise of the Warrant (or specified portion thereof), Issuer shall pay an amount in cash calculated by it to be equal to the then current market value per Share multiplied by such fraction, rounded to the nearest whole cent.

(i) The provisions of this Agreement, including, without limitation, Sections 2.01, 2.02, 2.04, 2.05 and 5.04, shall apply with appropriate adjustments to any securities for which the Warrant becomes exercisable pursuant to this Section 2.04.

SECTION 2.05. Right to Purchase New Securities. (a) In the event that Issuer proposes to issue New Securities (prior to, and other than in connection with, an Initial Public Offering), Grantee shall have the right to purchase in lieu of the Person to whom Issuer proposed to issue such New Securities, in accordance with paragraph (b) below, a number of Shares or other New Securities which Issuer proposes to issue equal to the product of (i) the total number or amount of Shares or other New Securities which Issuer proposes to issue at such time and (ii) a fraction, the numerator of which shall be the total number of Shares which Grantee owns or is entitled to purchase on the fifth anniversary of the date of this Agreement or, if earlier, upon the occurrence of an Exercise Event, pursuant to this Warrant, and the denominator of which shall be the total number of Shares then outstanding plus the total number of Shares which Grantee is entitled to purchase on the fifth anniversary of the date of this Agreement or, if earlier upon the occurrence of an Exercise Event, pursuant to this Warrant. The rights given by Issuer under this Section 2.05 shall terminate if unexercised within 30 days after receipt of the Notice of Issuance referred to in paragraph (b) below.

(b) In the event that Issuer proposes to undertake an issuance of New Securities (prior to an Initial Public Offering), it shall give written notice (a "Notice of Issuance") of its intention to Grantee, describing all material terms of the New Securities, the price and all material terms upon which Issuer proposes to issue such New Securities. The Grantee shall have 30 days from the date of the Notice of Issuance to agree to purchase all or any portion of its pro rata share of such New Securities (as determined pursuant to paragraph (a) above) for the same consideration, if such consideration shall consist solely of cash, or for cash, cash equivalents or

[**]=Confidential Treatment requested for redacted portion

14

marketable securities having an equivalent value to the consideration payable by the Person to whom Issuer proposes to issue such New Securities at the time of payment, and otherwise upon the terms specified in the Notice of Issuance by giving written notice to Issuer, and stating therein the quantity of New Securities to be purchase by Grantee.

SECTION 2.06. Further Assurances. Issuer and Grantee shall use reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws to consummate and make effective the transactions contemplated hereunder, including, without limitation, using reasonable efforts to obtain all required licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Entities. Without limiting the generality of the foregoing, the parties hereto shall, when required in order to effect the transactions contemplated hereunder, make all necessary filings, and thereafter make any other required or appropriate submissions, under the HSR Act and shall supply as promptly as practicable to the appropriate Governmental Entity any additional information and documentary material that may be requested pursuant to the HSR Act. Each of the parties hereto shall cooperate with the other when required in order to effect the transactions contemplated hereunder. In case at any time after the date hereof, any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and directors of each of the parties hereto shall use their reasonable best efforts to take all such action.

[**]=Confidential Treatment requested for redacted portion

15

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF ISSUER

Issuer hereby represents and warrants to Grantee as follows:

SECTION 3.01. Due Organization and Authority. Issuer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. Issuer is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed or qualified would not materially and adversely affect the assets, liabilities or results of operations of Issuer or prevent or materially delay the consummation of the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Issuer, the performance of Issuer's obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Issuer. This Agreement has been duly executed and delivered by Issuer, and (assuming due authorization, execution and delivery by the other party hereto) this Agreement constitutes legal, valid and binding obligations of Issuer enforceable against Issuer in accordance with its terms.

SECTION 3.02. Capital Stock of Company. The authorized capital stock of Issuer consists of 300,000,000 shares of Common Stock, of which 23,500,000 shares will be issued and outstanding following the closing of the Subscription Agreement, and 50,000,000 shares of preferred stock, of which none has been designated or issued by Issuer. Issuer has reserved Common Stock for issuance in the amounts and for the purposes that follow:

(i) 137.5 million shares of Common Stock have been reserved for issuance upon exercise of the Warrant;

(ii) 666,667 shares of Common Stock have been reserved for issuance upon exercise of the warrant held by BDS Business Center, Inc.;

(iii) 65,000 shares of Common Stock have been reserved for issuance upon exercise of the warrant held by William Shatner; and

(iv) 17,333,333 shares of Common Stock have been reserved for issuance upon the exercise of certain employee options to be granted pursuant to the Company's Omnibus Employee Equity Plan, of which 12,911,749 shares relate to options that have been granted as of the date hereof.

[**]=Confidential Treatment requested for redacted portion

16

Except as set forth above, (i) no shares of Capital Stock of Issuer have been reserved for issuance for any reason, (ii) no subscription, warrant, option, convertible security, or other right (contingent or other) to purchase or otherwise acquire Capital Stock of Issuer is authorized or outstanding; and

(iii) Issuer has made no commitment to issue shares, subscription, warrants, options, convertible securities or other such rights or to distribute to holders of any of its Capital Stock any evidence of indebtedness or asset.

SECTION 3.03. Authority to Issue Shares. Issuer has taken all necessary corporate action to authorize and reserve and permit it to issue, and at all times from the date hereof until its obligation to deliver shares of Common Stock upon the exercise of the Warrant terminates, shall have reserved, all the Warrant Shares issuable pursuant to this Agreement, and Issuer shall take all necessary corporate action to authorize and reserve and permit it to issue all additional shares of Common Stock or other securities which may be issued pursuant to Section 2.04 or 2.05, all of which, upon their issuance and delivery in accordance with the terms of this Agreement, shall be duly authorized, validly issued, fully paid and nonassessable and free of preemptive rights.

SECTION 3.04. No Conflict. Assuming that all consents, approvals, authorizations and other actions described in Section 3.05 have been obtained, the execution, delivery and performance of this Agreement by Issuer does not and will not (a) violate, conflict with or result in the breach of any provision of Issuer's Certificate of Incorporation or By-laws, (b) conflict with or violate any law, governmental regulation or governmental order applicable to Issuer or any of its respective assets, properties or businesses, or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrance on any of the assets or properties of Issuer pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which Issuer is a party or by which any of such assets or properties are bound or affected; except to the extent that any conflict under (b) or (c) above would not materially and adversely affect Issuer's assets, liabilities or results of operations or prevent or materially delay the consummation of the transactions contemplated by this Agreement.

SECTION 3.05. Governmental Consents and Approvals. The execution, delivery and performance of this Agreement by Issuer does not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Entities, except such as are required by the HSR Act.

[**]=Confidential Treatment requested for redacted portion

17

ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF GRANTEE

Grantee hereby represents and warrants to Issuer as follows:

SECTION 4.01. Due Organization and Authority. Grantee is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. Grantee is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed or qualified would not prevent or materially delay the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Grantee, the performance of Grantee's obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Grantee. This Agreement has been duly executed and delivered by Grantee, and (assuming due authorization, execution and delivery by the other party hereto) this Agreement constitutes legal, valid and binding obligations of Grantee enforceable against Grantee in accordance with its terms.

SECTION 4.02. No Conflict. Assuming that all consents, approvals, authorizations and other actions described in Section 4.03 have been obtained, the execution, delivery and performance of this Agreement by Grantee does not and will not (a) violate, conflict with or result in the breach of any provision of Grantee's Certificate of Incorporation or By-laws, (b) conflict with or violate any law, governmental regulation or governmental order applicable to Grantee or any of its assets, properties or businesses, or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights pursuant to, any contract, agreement or arrangement by which Grantee is bound; except to the extent that any conflict under (b) or (c) above would not prevent or materially delay the consummation of the transactions contemplated by this Agreement.

SECTION 4.03. Governmental Consents and Approvals. The execution, delivery and performance of this Agreement by Grantee does not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Entities, except such as are required by the HSR Act.

SECTION 4.04. Private Placement. Grantee understands that the offering and sale of the Warrant Shares hereunder are intended to be exempt from registration under the Securities Act pursuant to Section 4(2) of the Securities Act and represents the following:

[**]=Confidential Treatment requested for redacted portion

18

(a) The Warrant Shares are being acquired for Grantee's own account and without a view to the public distribution thereof or any interest therein;

(b) Grantee is an "accredited investor" as such term is defined in Regulation D, as amended, under the Securities Act; and

(c) Grantee has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Warrant Shares, and is capable of bearing the economic risks of such investment, including a complete loss of its investment in the Warrant Shares.

<div align="center">

**ARTICLE V**

**CLOSING**

</div>

SECTION 5.01. Closing. Upon the terms and subject to the conditions set forth in this Agreement, the transactions provided for in Article II shall take place at one or more closings (each a "Closing") to be held at the offices of the Issuer at One High Ridge Park, Stamford, Connecticut, at 10:00 a.m. Eastern Standard Time on the later of the proposed closing date specified in the Exercise Notice or the Business Day immediately following the satisfaction or waiver of all conditions to the obligations of the parties as set forth in Article VI, or at such other place or at such other time or on such other date as the parties may mutually agree.

SECTION 5.02. Closing Deliveries by Issuer. At each Closing, Issuer shall deliver to Grantee:

(a) a certificate or certificates evidencing the number of Warrant Shares registered in Grantee's name and in such denominations as Grantee shall request;

(b) a certificate from Issuer, signed by a duly authorized officer, to the effect that the representations and warranties of Issuer contained in this Agreement are true and correct as of the Closing, with the same force and effect as if made on the date of the Closing, and that all covenants and agreements of Issuer contained in this Agreement to be complied with on or prior to the Closing have been complied with;

(c) a true and complete copy, certified by the Secretary of Issuer, of the resolutions duly and validly adopted by the Board, evidencing their authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, together with a certified copy of the Certificate of Incorporation and By-laws of Issuer; and

[**]=Confidential Treatment requested for redacted portion

(d) a legal opinion of Shearman & Sterling, counsel to Issuer, in form and substance satisfactory to Grantee.

SECTION 5.03. Closing Deliveries by Grantee. At each Closing, Grantee shall deliver:

(a) a certificate, signed by a duly authorized officer, to the effect that the representations and warranties of such party contained in this Agreement are true and correct as of the Closing, with the same force and effect as if made on the date of the Closing, and that all covenants and agreements of Grantee contained in this Agreement to be complied with on or prior to the Closing have been complied with; and

(b) the Exercise Price for the Warrant Shares by wire transfer of immediately available funds and delivery of a certificate or certificates evidencing Grantee Common Stock equal to the Stock Payment Amount, if any, accompanied by such legal opinions, officer's certificates and other supporting documentation as Issuer shall reasonably require.

SECTION 5.04. Legends on Certificates. (a) Certificates evidencing Warrant Shares delivered hereunder may, at Issuer's election, contain the following legend:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933 OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

Such certificates shall not bear such legend if in the opinion of counsel satisfactory to Issuer (it being agreed that Shearman & Sterling shall be satisfactory) the securities being sold thereby may be publicly sold without registration under the Securities Act.

(b) Certificates evidencing Grantee Common Stock delivered hereunder as the Stock Payment amount may, at Grantee's election, contain the following legend:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT

[**]=Confidential Treatment requested for redacted portion

**OF 1933 OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.**

Such certificates shall not bear such legend if in the opinion of counsel satisfactory to Grantee (it being agreed that Skadden, Arps, Slate, Meagher & Flom shall be satisfactory) the securities being sold thereby may be publicly sold without registration under the Securities Act.

## ARTICLE VI

## CONDITIONS TO CLOSING

The obligations of each party to this Agreement to consummate the transactions contemplated hereby shall be subject to the fulfillment, at or prior to each Closing, of each of the following conditions:

SECTION 6.01. Representations, Warranties and Covenants. The representations and warranties of each other party contained in this Agreement shall have been true and correct when made and shall be true and correct as of the Closing, with the same force and effect as if made on the date of the Closing, and all covenants and agreements contained in this Agreement to be complied with on or prior to Closing shall have been complied with in all material respects.

SECTION 6.02. No Prohibition. None of the transactions contemplated hereby shall have been prohibited by any applicable law, court order or governmental regulation.

SECTION 6.03. HSR Act. Any waiting period (and any extension thereof) under the HSR Act applicable to the transactions contemplated hereby shall have expired or shall have been terminated.

## ARTICLE VII

## AFFIRMATIVE COVENANTS

SECTION 7.01. Preservation of Existence. Issuer shall use its reasonable commercial efforts to:

(a) preserve and maintain in full force and effect its existence and good standing under the laws of the State of Delaware;

[**]=Confidential Treatment requested for redacted portion

21

(b) preserve and maintain in full force and effect all material rights, privileges, qualifications, applications, licenses and franchises necessary in the normal conduct of its business;

(c) preserve its business organization; and

(d) file or cause to be filed in a timely manner all reports, applications, estimates and licenses that shall be required by any governmental authority and that, if not timely filed, would have a material adverse effect on Issuer's financial condition or results of operation.

SECTION 7.02. Financial Statements and Other Information. Issuer shall deliver to Grantee, in form and substance satisfactory to Grantee:

(a) as soon as available, but not later than ninety (90) days after the end of each fiscal year of Issuer, a copy of the audited balance sheet of Issuer as of the end of such fiscal year and the related statements of operations and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous year, all in reasonable detail and accompanied by a management summary and analysis of the operations of Issuer for such fiscal year accompanied by the report of a nationally recognized independent certified public accounting firm, which report shall state that such financial statements present fairly, in all material respects, the financial condition as of such date and results of operations and cash flows for the period indicated in conformity with GAAP applied on a consistent basis; and

(b) commencing with the fiscal period ending on March 31, 2000, as soon as available, but in any event not later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year, the unaudited balance sheet of Issuer, and the related statements of operations and cash flows for such quarter and for the period commencing on the first day of the fiscal year and ending on the last day of such quarter, all certified by an appropriate officer of Issuer as presenting fairly the financial condition as of such date and results of operations and cash flows for the periods indicated in conformity with GAAP applied on a consistent basis, subject to normal year-end adjustments, the absence of a management's discussion and analysis of financial condition section and the absence of footnotes required by GAAP.

SECTION 7.03. Annual Budget. Not less than thirty (30) days prior to the end of each fiscal year, or at such later date as may be determined by Issuer's Board of Directors, Issuer shall prepare and submit to its Board of Directors for its approval an operating budget of Issuer for the next fiscal year.

[**]=Confidential Treatment requested for redacted portion

## ARTICLE VIII

## MISCELLANEOUS

SECTION 8.01. Expenses. Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

SECTION 8.02. Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by courier service, by telecopy or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

(a) if to Issuer:

Priceline WebHouse Club, Inc. One High Ridge Park
Stamford, CT 06905
Telecopy No.: (203) 595-8305 Attention: Anne Maffei, Vice President -- Corporate Finance

(b) if to Grantee:

priceline.com Incorporated Five High Ridge Park
Stamford, CT 06905
Telecopy No.: (203) 595-8345 Attention: Melissa Taub, General Counsel

SECTION 8.03. Public Announcements. Except as required by law, governmental regulation or by the requirements of any securities exchange on which the securities of a party hereto are listed, no party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or otherwise communicate with any news media without the prior written consent of the other party, and the parties shall cooperate as to the timing and contents of any such press release or public announcement.

[**]=Confidential Treatment requested for redacted portion

23

SECTION 8.04. Headings. The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 8.05. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

SECTION 8.06. Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, with respect to the subject matter hereof.

SECTION 8.07. Assignment. This Agreement shall not be assigned without the express written consent of the parties hereto (which consent may be granted or withheld in the sole discretion of any party) except that Grantee may assign its rights hereunder to a Subsidiary thereof; provided that any such assignment shall not relieve the assigning party of its obligations hereunder. This Agreement shall inure to the benefit of, and be binding upon, the successors of the parties hereto and the assignees of the parties hereto, provided such assignment was in compliance with the terms hereof.

SECTION 8.08. No Third Party Beneficiaries. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 8.09. Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, each of the parties hereto.

SECTION 8.10. Governing Law. This Agreement shall be governed by the laws of the State of New York. All actions and proceedings arising out of or relating to this Agreement may be heard and determined in any New York State or federal court sitting in the City of New York, County of New York, and the parties hereto hereby irrevocably submit to the nonexclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive any defense of an inconvenient forum to the maintenance of any such action or proceeding.

[**]=Confidential Treatment requested for redacted portion

24

SECTION 8.11. Counterparts. This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Copies of executed counterparts transmitted by telecopy, telefax or other electronic transmission service shall be considered original executed counterparts for purposes of this Section 8.11; provided that receipt of copies of such counterparts is confirmed.

SECTION 8.12. Specific Performance. The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

SECTION 8.13. Waiver of Jury Trial. Each of the parties hereto irrevocably and unconditionally waives trial by jury in any legal action or proceeding relating to this Agreement or the transactions contemplated hereby and for any counterclaim therein.

[**]=Confidential Treatment requested for redacted portion

25

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**PRICELINE.COM INCORPORATED**

By: _____
                     Name:
                     Title:

**PRICELINE WEBHOUSE CLUB, INC.**

By: _____
                     Name:
                     Title:

[**]=Confidential Treatment requested for redacted portion

Exhibit 16.22.5

**CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR CERTAIN
PORTIONS OF THIS DOCUMENT. CONFIDENTIAL PORTIONS HAVE BEEN
FILED WITH THE SECURITIES AND EXCHANGE COMMISSION.**

**SERVICES AGREEMENT**

This SERVICES AGREEMENT, dated as of October 26, 1999 (this "Agreement"), between PRICELINE.COM INCORPORATED., a Delaware corporation ("Priceline"), and PRICELINE WEBHOUSE CLUB, INC., a Delaware corporation (the "Company"),

**W I T N E S S E T H :**

WHEREAS, Priceline is an Internet-based company with significant name recognition of its trademarked "priceline" name and patented "demand collection system" for selling products over the internet;

WHEREAS, Walker Digital, LLC ("Walker Digital") is a research and development company containing certain trade secrets, know-how and other intellectual property;

WHEREAS, in connection with the establishment of the Company's business of the sale of retail products in a "name your price" format over the Internet for the sale of products by businesses to consumers (the "Business")
(i) Walker Digital is (A) contributing certain know-how and other assets and liabilities used in or incurred during the initial development of the Business pursuant to an asset contribution agreement dated as of the date hereof (the "Asset Contribution Agreement") between Walker Digital and the Company, and (B) licensing certain intellectual property pursuant to a license agreement between Walker Digital and Priceline, dated as of the date hereof, which intellectual property shall in turn be sublicensed by Priceline to the Company, (ii) Walker Digital Corporation, a research and development company, is contributing certain employees to the Company under the Asset Contribution Agreement, and (iii) Priceline is (A) licensing and sublicensing, as applicable, the use of the "priceline" name, certain patent rights and other intellectual property rights for use in connection with the Business, pursuant to an intellectual property license agreement between Priceline and the Company, dated as of the date hereof (the "Priceline License Agreement"), (B) providing professional services, including accounting and legal services to the Company pursuant to this Agreement, and (C) providing certain marketing and technical services to the Company pursuant to a marketing and technical services agreement between Priceline and the Company, dated as of the date hereof (the "Marketing and Technical Services Agreement");

WHEREAS, in consideration for the cash and the assets it has contributed pursuant to the Asset Contribution Agreement, Walker Digital is receiving from the Company a Promissory Note in the amount of $14,592,185.60 payable on April 26, 2000;

[**]=Confidential Treatment requested for redacted portion

WHEREAS, in consideration of their cash contributions, Walmart Digital and certain other investors (the "Investors") are receiving a total of 23,500,000 shares of the Company's common stock, par value $.01 per share (the "Common Stock"), pursuant to the subscription agreement (the "Subscription Agreement") dated as of the date hereof between WebHouse and the Investors;

WHEREAS, in consideration for its execution and deliveries pursuant to the Priceline License Agreement, Priceline is receiving a warrant (the "Priceline Warrant") to purchase, under certain circumstances, up to 137.5 million shares of Common Stock and has certain rights to participate in the Company's corporate governance;

WHEREAS, in connection with the establishment of the Company, Priceline is agreeing, pursuant to this Agreement and the Marketing and Technical Services Agreement, to provide services to, and to coordinate marketing activities with, the Company in exchange for arm's-length consideration; and

WHEREAS, subsequent to the date of this Agreement, Priceline is willing to provide or cause to be provided to the Company for a limited period of time certain professional, operating and administrative services with respect to the Business.

NOW THEREFORE, in consideration of the mutual promises and covenants hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I

## THE SERVICES

SECTION 1.01. Provision of Services. Subject to the terms and conditions set forth in this Agreement, Priceline shall provide or cause to be provided the professional services, including, but not limited to, accounting and legal to the Company currently provided by Priceline to the Business (the "Services"); provided, however, that Priceline shall only be required to provide such Services to the extent that it has the internal resources available at the time to provide such Services and Priceline shall have no obligation to engage any third party to provide such Services.

SECTION 1.02. Covered Services. Priceline shall be obligated to make available and provide the Services at the time of execution and throughout the Term as reasonably requested from time to time, in writing, by the Company.

[**]=Confidential Treatment requested for redacted portion

2

SECTION 1.03. Standard of Performance. Priceline agrees to provide or cause to be provided to the Company the Services in substantially the same manner and at substantially the same quality levels as such Services are currently provided to the Company by Priceline; provided that the Company may request the provision of a lower volume of any Services.

SECTION 1.04. Term. Unless earlier terminated pursuant to Section 1.05, this Agreement shall terminate on October 26, 2000 (the "Term") and thereafter shall be of no further force and effect, except nothing herein shall relieve either party hereto from liability for any willful breach hereof; provided that the parties by mutual written agreement may extend the term of the Agreement.

SECTION 1.05. Termination. Priceline shall continue to make the Services available through the end of the Term or, if earlier, until canceled by the Company by written notice to Priceline. Notwithstanding the foregoing, this Agreement (and the obligation to provide any Services) may be terminated:

(a) by mutual agreement of Priceline and the Company;

(b) by Priceline, at any time, not less than 60 days after delivery of notice to the Company, in the event that the Company shall have defaulted on or breached any material term of this Agreement and shall not have cured such breach within 30 days after receiving notice from Priceline specifying the nature of such default or breach;

(c) by the Company, at any time, not less than 60 days after delivery of notice to Priceline, in the event that Priceline shall have defaulted on or breached any material term of this Agreement and shall not have cured such breach within 30 days after receiving notice from the Company specifying the nature of such default or breach;

(d) by either party, immediately upon delivery of notice to the other party, in the event that such other party (x) requires a composition or other similar arrangement with creditors, files for bankruptcy or is declared bankrupt or (y) shall have assigned or transferred to any third party any of its rights or obligations hereunder except in accordance with Section 4.07; or

(e) by Priceline, at any time, following the expiration, in accordance with its terms, of Priceline's warrant to purchase 137.5 million shares of Common Stock pursuant to the Warrant Agreement.

SECTION 1.06. Compensation for Services. The amount of compensation and Services to be provided shall be $[**] for all Services provided from the date of this Agreement through to December 31, 1999, and, after such time, specific Services and compensation therefor shall be negotiated in good faith in advance of the provision of such

[**]=Confidential Treatment requested for redacted portion

3

Services; provided that compensation for such Services shall be provided at their fair market value.

SECTION 1.07. Changes. The Company may request the provision of additional Services or new services which were not previously requested and which are acceptable to Priceline, in its sole discretion, to provide, and may request the cessation of specific Services then being provided. In such case, the parties shall negotiate in good faith on any additional compensation to be paid for additional Services or new services or for a rebate of the compensation paid or to be paid in respect of Services no longer rendered. In the event the parties are unable to agree on the amount of compensation or the specific Services to be provided for any given quarter, the compensation shall equal the amount agreed upon in the immediately preceding quarter plus [**]% (on an annual basis) and the Services provided shall be the same Services provided the previous quarter. In the event the parties are unable to agree on the amount of compensation or Services for the first quarter of the year 2000, the compensation shall equal one-quarter of the annualized amount of the compensation agreed upon for the partial 1999 year plus [**]% of such quarterly amount and the Services shall be the same Services provided during 1999.

## ARTICLE II

## RESPONSIBILITY

SECTION 2.01. Relationship of the Parties. Nothing in this Agreement shall be construed as (a) an assumption by Priceline of any obligation to maintain or increase the sales or profits of the Company or otherwise to assume responsibility for the Company's operations; (b) an assumption by Priceline of any financial obligation of the Company; (c) the creation of any relationship of employment or agency between the Company and employees or consultants of Priceline, its subsidiaries or associated companies; (d) an assumption by Priceline of any responsibility for the work performed by outside suppliers employed by the Company at the suggestion or recommendation of Priceline; or (e) the delegation of any function or authority of the Company to Priceline. In all matters relating to this Agreement, each party hereto shall be solely responsible for the acts of its own employees, and employees of one party shall not be considered employees of the other party. Except as specifically permitted by this Agreement, no party hereto nor any of its employees shall have any authority to negotiate, enter into any contract or incur any obligation, on behalf of the other party. The parties hereto are independent contractors and neither party is an employee, partner or joint venturer of the other.

SECTION 2.02. Limitation of Liability. Priceline MAKES NO WARRANTY,
EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES PROVIDED HEREUNDER. Priceline shall have no liability for any losses or damages that the Company may incur as a result of the provision or non-provision of Services except to the extent caused by the gross negligence

[**]=Confidential Treatment requested for redacted portion

4

or wilful misconduct of such person. In no event shall Priceline, its officers, directors, employees, agents, independent contractors, affiliates and stockholders be liable for any consequential or special damages suffered by the Company as a result of any representations, actions or inactions by any person or entity in respect of its obligations hereunder.

[**]=Confidential Treatment requested for redacted portion

# ARTICLE III

## CONFIDENTIALITY

SECTION 3.01. Confidentiality. The Company will receive or learn from Priceline, and Priceline's parents, subsidiaries and affiliates, and Priceline will learn from the Company, information, both orally and in writing, concerning the business of Priceline or the Company, respectively, including, without limitation, financial, technical and marketing information, data, information related to the development of technology and services, trade secrets, technology, plans, methods, processes, specifications, models, protocols, techniques, research projects, information management systems and software, whether protectable by patent, copyright or other statutory means, relating to the Company's and Priceline's business, as the case may be, and which information is deemed, in the case of the Company, proprietary to the Company and, in the case of Priceline, proprietary to Priceline. Both parties hereby agree, as set forth below, to protect such information, whether furnished before, on or after the date of this Agreement, as it protects its own similar confidential information, but never less than commercially reasonable efforts, and not to disclose such information to anyone except as otherwise provided for in this Agreement. Such information, in whole or in part, together with analyses, compilations, programs, reports, proposals, studies or any other documentation prepared by the parties, as the case may be, which contains or otherwise reflects or makes reference to such information, is hereinafter referred to as "Confidential Information". Both parties hereby agree that the Confidential Information will be used solely for the purpose of this Agreement and not for any other purpose. Both parties further agree that any Confidential Information pertaining to the other party is the sole and exclusive property of such other party, and that the receiving party shall not have any right, title, or interest in or to such Confidential Information except as expressly provided in this Agreement. Both parties further agree to hold in the strictest confidence and not to disclose to anyone for any reason Confidential Information pertaining to the other party; provided that

(a) such Confidential Information may be disclosed to the receiving party's respective officers, directors, employees, agents, or representatives (collectively, "Representatives") on a "need to know" basis for the purpose of this Agreement on the condition that

(i) each such Representative will be informed by the receiving party of the confidential nature of such Confidential Information and will agree to be bound by the terms of this Agreement and not to disclose the Confidential Information to any other person and

[**]=Confidential Treatment requested for redacted portion

6

(ii) both parties agree to accept full responsibility for any breach of this Section 3.01 by its respective Representatives; and

(b) Confidential Information pertaining to the other party may be disclosed upon the prior written consent of the other party.

Both parties hereby agree, upon the request of the other party, to promptly deliver to the other party, at its own cost, the Confidential Information pertaining to such other party, without retaining any copies thereof.

SECTION 3.02. Nonconfidential Information. The term "Confidential Information" shall not include any information which: (a) at the time of disclosure or thereafter is generally available to or known by the public (other than as a result of a disclosure directly or indirectly by the receiving party);
(b) is independently developed by the receiving party, without reference to or use of the Confidential Information of the other party; (c) was known by the receiving party as of the time of disclosure without breach of confidentiality;
(d) is lawfully learned from a third party not under obligation to the disclosing party; or (e) is required to be disclosed pursuant to a subpoena, court order or other legal process, whereupon the receiving party shall provide prompt written notice to the other party prior to such disclosure.

## ARTICLE IV

## MISCELLANEOUS

SECTION 4.01. Expenses. Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

SECTION 4.02. Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by courier service, by telecopy or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 4.02):

(a) if to Priceline:

priceline.com Incorporated Five High Ridge Park
Stamford, CT 06905

[**]=Confidential Treatment requested for redacted portion

7

(b) if to the Company:

Priceline WebHouse Club, Inc. One High Ridge Park
Stanford, CT 06905
Telecopy No.: (203) 595-8305 Attention: Anne Maffei

SECTION 4.03. Public Announcements. Except as required by law, by governmental regulation or by the requirements of any securities exchange on which the securities of a party hereto are listed, no party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or otherwise communicate with any news media without the prior written consent of the other party, and the parties shall cooperate as to the timing and contents of any such press release or public announcement.

SECTION 4.04. Headings. The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 4.05. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

SECTION 4.06. Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, with respect to the subject matter hereof.

SECTION 4.07. Assignment and Sublicense. This Agreement may not be assigned by either party without the express written consent of the other party (which consent may be granted or withheld in the sole discretion of any party), except that (i) this Agreement may be assigned, without consent, in connection with the sale of a party's business whether such is a sale of all or substantially all of such party's assets, a merger or a stock sale and (ii) Priceline

[**]=Confidential Treatment requested for redacted portion

8

may assign or sublicense its rights hereunder to an affiliate thereof; provided that any such assignment shall not relieve Priceline of its obligations hereunder. This Agreement shall inure to the benefit of, and be binding upon, the successors of the parties hereto, provided such assignment was in compliance with the terms hereof.

SECTION 4.08. No Third Party Beneficiaries. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 4.09. Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, each of the parties.

SECTION 4.10. Governing Law. This Agreement shall be governed by the laws of the State of New York. All actions and proceedings arising out of or relating to this Agreement may be heard and determined in any New York State or federal court sitting in the City of New York, County of Manhattan, and the parties hereto hereby irrevocably submit to the nonexclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive any defense of an inconvenient forum to the maintenance of any such action or proceeding.

SECTION 4.11. Counterparts. This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Copies of executed counterparts transmitted by telecopy, telefax or other electronic transmission service shall be considered original executed counterparts for purposes of this
Section 4.11; provided that receipt of copies of such counterparts is confirmed.

SECTION 4.12. Specific Performance. The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

SECTION 4.13. Waiver of Jury Trial. Each of the parties hereto irrevocably and unconditionally waives trial by jury in any legal action or proceeding relating to this Agreement or the transactions contemplated hereby and for any counterclaim therein.

SECTION 4.14. Relationship of the Parties. The parties hereto are independent contractors and neither party is an employee, partner or joint venturer of the other. Under no circumstances shall any of the employees of a party hereto be deemed to be employees of the other party for any purpose. Neither party shall have the right to bind the other to any agreement with a third party nor to represent itself as a partner or joint venturer of the other.

[**]=Confidential Treatment requested for redacted portion

9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized signatories thereunto duly authorized as of the date first above written.

**PRICELINE.COM INCORPORATED**

By: _____
　　　　　Name:
　　　　　Title:

**PRICELINE WEBHOUSE CLUB, INC.**

By: _____
　　　　　Name:
　　　　　Title:

[**]=Confidential Treatment requested for redacted portion