# EXHIBIT BB


a Wolters Kluwer business

## Accounting Research Manager ® - Audit Public

EITF - Emerging Issues Task Force
  1996\Issue 96-18: Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services
    Abstract

# EITF ABSTRACTS

**Issue No. 96-18**

| | |
|---|---|
| **Title:** | Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services |
| **Dates Discussed:** | September 18-19, 1996; November 14, 1996; January 23, 1997; March 13, 1997; May 21-22, 1997; July 23-24, 1997; September 18, 1997; November 20, 1997; July 23, 1998; April 18–19, 2001; July 19, 2001 |
| **References:** | FASB Statement No. 123, *Accounting for Stock-Based Compensation* ◻<br>FASB Statement No. 123 (revised 2004), *Share-Based Payment* ◻<br>FASB Interpretation No. 28, *Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans* ◻<br>SEC Staff Accounting Bulletin No. 57, *Contingent Stock Purchase Warrants* ◻<br>SEC Staff Accounting Bulletin No. 95 ◻ (untitled, which deletes SAB 57) |

**ISSUE**

Statement 123 establishes the measurement principles for transactions in which equity instruments are issued in exchange for the receipt of goods or services. Paragraph 8 of Statement 123 states that those transactions should be measured at the fair value of the consideration received or the fair value of the equity instruments issued, whichever is more reliably measurable. Statement 123 does not, however, prescribe the measurement date or provide guidance on recognition of the cost of those transactions. Also, it does not address the accounting for equity instruments issued in conjunction with selling goods or services, such as a sales incentive. The FASB staff observes, however, that sales incentives in the form of equity instruments should be measured at the fair value of the sales incentive or the fair value of the equity instruments issued, whichever is more reliably measurable.

Transactions in which equity instruments are issued in exchange for the receipt of goods or services may involve a contemporaneous exchange of the equity instruments for goods or services or may involve an exchange that spans several financial reporting periods. Furthermore, by virtue of the terms of the exchange with the counterparty, the quantity and terms of the equity instruments to be issued may be known or only known within a range when the transaction arrangement is established. This Issue addresses the measurement date and recognition approach for any of these

transactions if the counterparty to the transaction is other than an employee. This Issue supersedes Issue No. 96-3, "Accounting for Equity Instruments That Are Issued for Consideration Other Than Employee Services under FASB Statement No. 123 ◊," which addressed certain of those transactions. This Issue does not, however, address the accounting for equity instruments either issued to a lender or investor who provides financing to the issuer or issued in a business combination.

This Issue addresses the transactions described above in which (1) the fair value of the equity instruments is more reliably measurable than the fair value of the goods or services received and (2) the counterparty receives shares of stock, stock options, or other equity instruments in settlement of the entire transaction or, if the transaction is part cash and part equity instruments, in settlement of the portion of the transaction for which the equity instruments constitute the consideration.

The issues are:

1. For all transactions, what date the issuer should use to measure the fair value of the equity instruments (the measurement date)

2. For all transactions, what period(s) and manner (that is, capitalize versus expense) the issuer should use to recognize the fair value of the equity instruments

3. For transactions in which the quantity and terms of the equity instruments are all known up front (that is, the quantity and terms are not based on counterparty performance or market conditions), how the equity instruments should be accounted for *prior to the measurement date* for purposes of recognizing, as appropriate, the cost of the transaction

4. For transactions in which the quantity or any of the terms of the equity instruments are not all known up front (that is, the quantity or terms are based on counterparty performance or market conditions):

   (a) How the equity instruments should be measured *at the measurement date*

   (b) How the equity instruments should be accounted for *prior to the measurement date* for purposes of recognizing, as appropriate, the cost of the transaction

   (c) How the equity instruments should be accounted for *after the measurement date* when the resolution of the counterparty performance or market conditions results in changes in the quantity or terms of the equity instruments.

## EITF DISCUSSION

### Issue 1 — For All Transactions, the Measurement Date

The Task Force reached a consensus that the issuer should measure the fair value[1] of the equity instruments[2] using the stock price and other measurement assumptions as of the earlier of either of the following:

[object]                                                                                                                              6/18/2007

[1] An FASB staff representative stated that when applying the consensuses in this Issue, the minimum value method specified in paragraph 20 of Statement 123 is not an acceptable method for determining the fair value of nonemployee awards by nonpublic companies.

[2] Throughout this Issue, the term *equity instruments* is meant to include both the equity instruments that are provided for in the arrangement with the counterparty and any embedded or freestanding issuer commitments to change the quantity or terms thereof based on counterparty performance conditions or market conditions.

1. The date at which a commitment for performance by the counterparty to earn the equity instruments is reached (a "performance commitment")[3]; or

[3] A performance commitment is a commitment under which performance by the counterparty to earn the equity instruments is probable because of sufficiently large disincentives for nonperformance. The disincentives must result from the relationship between the issuer and the counterparty. Forfeiture of the equity instruments as the sole remedy in the event of the counterparty's nonperformance is not considered a sufficiently large disincentive for purposes of applying this guidance. In addition, the ability to sue for nonperformance, in and of itself, does not represent a sufficiently large disincentive to ensure that performance is probable. (The Task Force observed that an entity can always sue for nonperformance but that it is not always clear whether any significant damages would result.)

2. The date at which the counterparty's performance is complete.[4]

[4] The counterparty's performance is complete when the counterparty has delivered or purchased, as the case may be, the goods or services, despite the fact that at that date the quantity or all the terms of the equity instruments may yet depend on other events (this would occur, for example, if a target stock price requirement has not been met when the counterparty has delivered the goods or services).

This date is hereafter referred to as the *measurement date*.[5] [Note: See STATUS section.]

[5] The Task Force subsequently discussed situations in which counterparty performance may be required over a period of time (for example, three years) but the equity award granted to the party performing the services is fully vested and nonforfeitable on the date the parties enter into the contract. Although Task Force members believe that this type of arrangement would be rare, because, typically, vesting provisions do exist, there was general agreement that a reasonable interpretation of the consensus is that the measurement date for an award that is nonforfeitable and that vests immediately could be the date the parties enter into the contract, even though services have not yet been performed.

In Exhibit 96-18A, Examples 1-3 describe transactions in which a performance commitment exists prior to the time that the counterparty's performance is complete and Examples 10 and 11 contain numerical examples involving such transactions. Examples 4-7 describe transactions in which a performance commitment does not exist prior to the time the counterparty's performance is complete, and Examples 12-14 contain numerical examples involving such transactions.

### Issue 2 — For All Transactions, the Period(s) and the Manner to Recognize

The Task Force did not address the period(s) or the manner (that is, capitalize versus expense) in which an enterprise should recognize the fair value of the equity instruments that will be issued, other than to reach a consensus that an asset, expense, or sales discount would be recognized (or previous recognition reversed) in the same period(s) and in the same manner (that is, capitalize versus expense) as if the enterprise had paid cash for the goods or services or used cash rebates as a sales discount instead of paying with or using the equity instruments.

The Task Force reached a consensus that a recognized asset, expense, or sales discount should not be reversed if a stock option that the counterparty has the right to exercise expires unexercised.

### Issue 3 — For Transactions in Which the Quantity and Terms Are Known Up Front, the Accounting Prior to the Measurement Date

The Task Force reached a consensus that when it is appropriate under generally accepted accounting principles for the issuer to recognize any cost of the transaction during financial reporting periods prior to the measurement date, for purposes of recognition of costs during those periods the equity instruments should be measured at their then-current fair values at each of those interim financial reporting dates. Changes in those fair values between those interim reporting dates should be attributed in accordance with the methods illustrated in Interpretation 28. Example 12 in Exhibit 96-18A illustrates application of this consensus. [Note: See STATUS section.]

### Issue 4(a) — For Transactions in Which the Quantity or Any of the Terms Are Not Known Up Front, How to Measure at the Measurement Date

**Transactions That Involve Only Market Conditions**[6]

> [6] Market conditions are those conditions that relate to achievement of a specified market target, for example, attaining a specified stock price or specified amount of intrinsic value of a stock option.

The Task Force reached a consensus that if, on the measurement date, the quantity or any of the terms of the equity instruments are dependent on the achievement of market conditions, then the issuer should use the fair value of the equity instruments for recognition purposes. That fair value would be calculated as the fair value of the equity instruments without regard to the market condition plus the fair value of the issuer's commitment to change the quantity or terms of the equity instruments based on whether the market condition is met. Example 8 in Exhibit 96-18A illustrates application of this consensus.

**Transactions That Involve Only Counterparty Performance Conditions[7]**

> [7] Counterparty performance conditions are those conditions that relate to the achievement of a specified performance target, for example, attaining a specified increase in market share for a specified product. A counterparty performance condition might pertain either to the performance of the enterprise as a whole or to some part of the enterprise, such as a division.

The Task Force reached a consensus that if, on the measurement date, the quantity or any of the terms of the equity instruments are dependent on the achievement of counterparty performance conditions that, based on the different possible outcomes, result in a range of aggregate fair values for the equity instruments as of that date, then the issuer should utilize the lowest aggregate (that is, the variable terms times the applicable number of equity instruments) amount within that range for recognition purposes. This amount may be zero. Examples 11, 13, and 14 in Exhibit 96-18A illustrate application of this consensus.

**Transactions That Involve Both Market Conditions and Counterparty Performance Conditions**

The Task Force reached a consensus that the guidance in the preceding paragraph (that is, lowest aggregate fair value) also applies in this situation.

**Issue 4(b) — For Transactions in Which the Quantity or Any of the Terms Are Not Known Up Front, the Accounting Prior to the Measurement Date**

**Transactions That Involve Only Market Conditions**

The Task Force reached a consensus that the guidance described above for Issue 3 (that is, the then-current fair value) also applies in this situation. [Note: See STATUS section.]

**Transactions That Involve Only Counterparty Performance Conditions**

The Task Force reached a consensus that when it is appropriate under generally accepted accounting principles for the issuer to recognize any cost of the transaction in reporting periods prior to the measurement date, the equity instruments should be measured at their then-current lowest aggregate fair value at each of those interim reporting dates. Changes in those lowest aggregate fair values between those interim reporting dates should be attributed in accordance with the methods illustrated in Interpretation 28. Examples 13 and 14 in Exhibit 96-18A illustrate application of this consensus. [Note: See STATUS section.]

**Transactions That Involve Both Market Conditions and Counterparty Performance Conditions**

The Task Force reached a consensus that the guidance in the preceding paragraph (that is, the then-current lowest aggregate fair value) also applies in this situation. [Note: See STATUS section.]

**Issue 4(c) — For Transactions in Which the Quantity or Any of the Terms Are Not Known Up Front, the Accounting after the Measurement Date**

**Transactions That Involve Only Market Conditions**

The Task Force observed that after the issuer measures the then-current fair value of the issuer's commitment related to the market condition as described in the "Only Market Conditions" section of Issue 4(a), the issuer should, to the extent necessary, recognize and classify future changes in the fair value of this commitment in accordance with any relevant accounting literature on financial instruments, such as Issue No. 96-13, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock ⌂." [Note: See STATUS section.]

**Transactions That Involve Only Counterparty Performance Conditions**

The Task Force reached a consensus that as each quantity and term become known and until all the quantities and terms that stem from the counterparty's performance become known, the "lowest aggregate" fair value measured pursuant to the consensus on Issue 4(a) should be adjusted, to reflect additional cost of the transaction, using the "modification accounting" methodology described in paragraph 35 of Statement 123. That is, the adjustment should be measured at the date of the revision of the quantity or terms of the equity instruments as the difference between (1) the then-current fair value of the revised instruments utilizing the then-known quantity or term and (2) the then-current fair value of the old equity instruments immediately before the quantity or term becomes known. The "then-current fair value" is calculated using the assumptions that result in the lowest aggregate fair value if the quantity or any other terms remain unknown. Examples 11, 13, and 14 in Exhibit 96-18A illustrate application of this consensus. [Note: See STATUS section.]

**Transactions That Involve Both Market Conditions and Counterparty Performance Conditions**

The Task Force reached a consensus that through the date the last performance-related condition is resolved, the issuer should apply "modification accounting" for the resolution of both counterparty performance conditions and market conditions. If, at the time the last counterparty performance-related condition is resolved, one or more market conditions remain, then the issuer should measure the then-current fair value of the issuer's commitment to issue additional equity instruments or change the terms of the equity instruments based on whether the market condition is met. This measured amount is an additional cost of the transaction. Example 9 in Exhibit 96-18A illustrates application of this consensus.

The Task Force observed that after the issuer measures the then-current fair value of the issuer's commitment related to the market condition, the issuer should, to the extent necessary, recognize and classify future changes in the fair value of this commitment in accordance with any relevant accounting literature on financial instruments, such as Issue 96-13. [Note: See STATUS section.]

**Transition**

At the November 14, 1996 meeting, the SEC Observer stated that until the Task Force reaches a consensus the SEC staff will expect registrants to apply the tentative conclusions reached at the November 14, 1996 meeting (that is, measurement at the commitment date)[8] to all nonemployee transactions having a commitment date after November 14, 1996.

[8] At the November 14, 1996 meeting, the Task Force tentatively defined *commitment date* as the date on which *both* parties (1) come to a mutual understanding of the terms of the arrangement and (2) commit to perform under the terms of the binding arrangement. The Task Force did not, however, reach a consensus on this definition.

At the January 23, 1997 meeting, the SEC Observer modified its comment made at the November 14, 1996 meeting on transition and stated that the SEC staff expected registrants to apply prospectively the tentative conclusions reached at the November 14, 1996 meeting to all transactions entered into after November 14, 1996, as well as to any earlier nonemployee transactions in which the measurement date,[9] as defined in Issue 96-3, was not met by November 14, 1996.

[9] In Issue 96-3 the Task Force reached a consensus that the *measurement date* was the date on which the parties come to a mutual understanding of the terms of the arrangement and agree to a binding contract.

At the May 21-22, 1997 meeting, the SEC Observer stated that until the Task Force reaches a final consensus on this Issue, the SEC staff will expect registrants to apply the tentative conclusion reached at the May 21-22, 1997 meeting (that is, measurement at the vesting date)[10] to all equity instruments issued to nonemployees after May 22, 1997.

[10] At the May 21-22, 1997 meeting, the Task Force tentatively defined *vesting date* as the date on which the quantity or terms of the equity instruments are no longer contingent on satisfaction of the terms of the exchange transaction. The Task Force did not, however, reach a consensus on this definition.

The Task Force reached a consensus that both SEC registrants and other entities are permitted to apply the consensuses either (1) prospectively to new arrangements and to modifications of existing arrangements that occur after November 20, 1997, or (2) prospectively to new arrangements and to modifications of existing arrangements that occur after November 20, 1997 and retroactively to all arrangements that were entered into or modified from December 15, 1995 through November 20, 1997. (December 15, 1995 is the date on which the SEC staff rescinded SAB 57.) Retroactive application to arrangements that were entered into or modified prior to December 15, 1995 is precluded. Retroactive application may be effected either through restatement or in a manner similar to the cumulative effect of a change in accounting principle. "Modifications of existing arrangements" does not include changes to the quantity or terms of an equity instrument that occur when any originally unknown quantity or term becomes known pursuant to the terms of the original instruments.

## STATUS

A related issue was discussed in Issue No. 00-8, "Accounting by a Grantee for an Equity Instrument to Be Received in Conjunction with Providing Goods or Services ." Issue 00-8 provides guidance on the measurement from the standpoint of the grantee (provider of goods or services) in those transactions. The measurement guidance in Issue 00-8 is consistent with the measurement guidance in Issue 96-18 for the grantor. (See Issue 00-8 for details of the consensuses reached.)

At the September 20-21, 2000 meeting, the Task Force reached a consensus supporting the codification of the consensuses in Issues No. 96-13 ⬚, No. 99-3, "Application of Issue No. 96-13 to Derivative Instruments with Multiple Settlement Alternatives ⬚," and No. 00-7, "Application of Issue No. 96-13 to Equity Derivative Instruments That Contain Certain Provisions That Require Net Cash Settlement If Certain Events outside the Control of the Issuer Occur ⬚," as presented in Issue No. 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock ⬚."

Statement 123(R) was issued in December 2004. It replaces Statement 123 and supersedes Interpretation 28. Statement 123(R) does not change the consensuses reached in this Issue.

No further EITF discussion is planned.

**Exhibit 96-18A**

## EXAMPLES OF THE APPLICATION OF
## THE EITF CONSENSUSES ON ISSUE 96-18

The following arrangements describe situations in which a performance commitment exists before the counterparty's performance is complete. These arrangements contain performance commitments before performance is complete despite the fact that in some cases the quantity or some of the terms of the equity instruments are not known when the arrangement is entered into and for that matter may not be known until some time after the counterparty has provided or, in the case of sales incentives, purchased the requisite goods or services. Each case assumes that the fair value of the equity instruments to be issued is more reliably measurable than the fair value of the corresponding goods or services.

> **Example 1**
> A telecommunications company agrees to issue shares of its stock in exchange for the construction services of a manufacturer to build a new version of a satellite, with a contract delivery date not to exceed four years. The manufacturer is subject to a significant penalty if it does not complete construction of the satellite. This penalty is considered to be of a magnitude that is a "sufficiently large disincentive for nonperformance"; thus, the arrangement contains a performance commitment.
>
> **Example 2**
> An enterprise agrees to issue stock options in exchange for the services of a lawyer to defend it in a product liability case. The quantity, exercise price, and exercise period of the stock options are dependent on whether the lawyer wins or loses the case. If the lawyer quits the case, the lawyer is subject to damages. The damages are considered to be a "sufficiently large disincentive for nonperformance"; thus, this arrangement contains a performance commitment. This arrangement contains a performance commitment regardless of the fact that both the quantity and some of the terms of the stock options are unknown when the arrangement is established.

**Example 3**
A retailer agrees to issue stock options to an advertising freelancer in exchange for designing a marketing campaign for a particular chain of its stores. The exercise price of the stock options is based on a formula that ties the exercise price to the cumulative percentage increase in sales from the date the new marketing campaign is rolled out until a particular stock options' exercise date. If the freelancer quits, then the freelancer is subject to specified monetary damages that, in the circumstances, constitute a "sufficiently large disincentive for nonperformance." This transaction thus contains a performance commitment regardless of the fact that the exercise price of a particular stock option is not known until the date it is exercised.

The following arrangements do not contain performance commitments before the counterparty's performance is complete, for the reasons specified.

**Example 4**
A telecommunications company agrees to pay cash in exchange for a manufacturer to build a new kind of satellite, with a contract delivery date not to exceed four years. However, the terms of the arrangement also provide that if the manufacturer completes the satellite within three years, the issuer agrees to also compensate the manufacturer with stock options. This transaction does not contain a performance commitment with respect to the stock options (although it may contain a performance commitment with respect to the cash) because there is no penalty if the satellite is not finished within three years. If the satellite is completed within three years, the stock options will be measured on the date the satellite is completed.

**Example 5**
A clothing manufacturer commits to issue 100 shares of stock in exchange for clothing of historical significance if its bid at an auction is accepted. The transfer of the stock for the auctioned goods occurs 30 days after the date of the auction. The auctioning party has the 30 days in which to either accept the bid received at the auction or, if it believes the winning bid is too low, decide not to accept it. Even after the auctioning party accepts a bid it may change its mind up until the time the auctioned goods are delivered without incurring a penalty that constitutes a significant disincentive for nonperformance. This transaction does not contain a performance commitment on the date the clothing manufacturer commits to issue 100 shares nor thereafter, because there is no disincentive for nonperformance *on the part of the auctioning party* other than loss of the shares of stock that were to be received for the auctioned clothing. Accordingly, if the auctioned goods are received, the shares of stock will be measured on the date they are received.

**Example 6**
A retailer agrees to issue a combination of cash and stock options to a freelancer in exchange for the design of a new advertising campaign. If the freelancer decides not to complete the entire campaign, the freelancer earns only the cash and stock options attributable to the components of the campaign, if any, that were completed. This transaction does not contain a performance commitment because the freelancer has no disincentive for nonperformance other than loss of the cash and stock options attributable to the work not performed. Accordingly,

the stock options related to a particular completed component of the campaign will be measured at their then-current fair value when the component of the campaign to which they relate is completed.

### Example 7

A manufacturer invents a new kind of plastic piping that can withstand the cold at record temperatures. To stimulate sales, the manufacturer sends letters to all its existing plastic piping customers offering them stock options if they will purchase a minimum amount of the new plastic piping within a five-year period. If a customer purchases more than the minimum amount of plastic piping, the exercise period of the options increases based on a sliding scale relative to the quantity purchased. This transaction does not contain a performance commitment because a potential customer can, but is not required to, purchase the plastic piping. Accordingly, the stock options earned by buying the minimum amount will be measured as of the date purchases of the minimum amount of plastic piping have been made. This measured amount will be adjusted (using "modification accounting") as the length of the exercise period is modified as a result of subsequent purchases.

The following examples illustrate how to apply the guidance regarding the date the equity instruments are to be measured to a transaction that contains a market condition.

### Example 8

An enterprise agrees to pay cash and issue 1,000 stock options in exchange for an architectural design firm to design for the enterprise a new research laboratory and to deliver the plans within a year. The design firm is subject to a significant penalty if it does not complete the design of the research laboratory within one year. This penalty is considered to be of a magnitude that is a "sufficiently large disincentive for nonperformance"; thus, the arrangement contains a performance commitment. The quantity and terms of the stock options are known at the performance commitment date, except that if 2 years after the design firm has received the 1,000 stock options the enterprise's stock price is below $35 per share, the enterprise will issue to the design firm, based on a sliding scale, up to 250 additional stock options.

The enterprise would measure the 1,000 stock options on the performance commitment date pursuant to the requirements of this Issue. Assume this fair value is $10,000. At the performance commitment date the enterprise would also measure the fair value of the issuer's commitment to potentially issue another 250 stock options, regardless of whether this commitment is in-the-money at that date. Assume this fair value is $2,000. The total cost of the transaction to be recognized is thus $12,000. After the performance commitment date, the enterprise would account for the commitment to potentially issue the 250 additional stock options in accordance with the relevant accounting literature on financial instruments, including Issue 96-13.

### Example 9

Assume the same facts as in Example 8 except that the exercise price of the 1,000 stock options was not known at the performance commitment date because it would ultimately be determined based on a matter stemming from the design firm's performance in designing the

[object]                                                                                                    6/18/2007

research laboratory. The enterprise would measure the 1,000 stock options on the performance commitment date pursuant to the requirements of this Issue. (Assume the lowest aggregate fair value of the stock options is $8,000.) Thereafter, the enterprise would account for the arrangement in accordance with this Issue through the time that the exercise price became known. If the exercise price becomes known prior to the time that the 2-year, $35 stock price guarantee elapses, then, at the time the exercise price becomes known, the issuer would (a) apply this Issue's "modification accounting" to the change in exercise price (assume this results in an additional cost of $1,500) and (b) determine the then-current fair value of the stock price commitment and recognize that fair value as additional cost of the transaction (assume the then-current fair value was $1,000). Thereafter, that is, from the time the exercise price becomes known, the enterprise would account for the commitment to potentially issue 250 additional stock options in accordance with the relevant accounting literature on financial instruments, including Issue 96-13. The total cost of the exchange transaction with the counterparty would be $10,500.

If, however, the exercise price had become known after the 2-year, $35 stock price guarantee had lapsed, then the enterprise would account for the actual issuance of any of the 250 additional stock options in accordance with the "modification accounting" provisions of this Issue.

The following examples apply the consensuses to a transaction that has a performance commitment before counterparty performance is complete. In Example 10, both the quantity and all the terms of the equity instruments are known up front, whereas in Example 11 they are not.

**Example 10**
On December 31, 20X1, Company A enters into an arrangement with an attorney to defend it in a lawsuit. On December 31, 20X1, the attorney commits to perform the services in exchange for 1,000 stock options with an exercise price of $10 and an exercise period of 10 years. If the attorney quits, then the attorney is subject to specified monetary damages that, in the circumstances, constitute a "sufficiently large disincentive for nonperformance." The attorney commences work on the case on January 1, 20X2, and finishes work on the case on December 31, 20X3. The judge decides the case in Company A's favor on January 31, 20X4.

December 31, 20X1 is the performance commitment date and, thus, the date at which Company A will measure the fair value of the 1,000 stock options with an exercise price of $10. Assume this aggregate fair value is $22,000. Company A will recognize $22,000 during the course of 20X2 – 20X3 in the same period(s) and in the same manner as if it had agreed to pay $22,000 in cash for the lawyer's services.

**Example 11**
Same as Example 10, except that the attorney will receive 1,000 stock options with an exercise price of $10 that are exercisable for 10 years if the case is won, whereas the attorney will receive 500 stock options with an exercise price of $15 that are exercisable for 5 years if the case is lost. As in Example 10, the judge also decides the case in Company A's favor on January 31, 20X4.

December 31, 20X1 is the performance commitment date, and thus the date at which Company A will measure the fair value of the 1,000 stock options with an exercise price of $10 and the 500 stock options with an exercise price of $15. Company A will select whichever fair value is lower, in the aggregate, and recognize that cost during the course of 20X2 – 20X3 in the same period(s) and in the same manner as if it had agreed to pay cash for the services.

Assume the aggregate fair values at December 31, 20X1 are $22,000 and $16,000 for the $10 and $15 options, respectively. Company A will select the lower fair value, $16,000, and recognize it during the course of 20X2 – 20X3 in the same period(s) and in the same manner as if it had agreed to pay cash for the lawyer's services. At January 31, 20X4 when the case is won, Company A will measure, using current assumptions as of that date, both the $10 and the $15 stock options and recognize additional cost equal to the difference between those two fair values. Assume that on January 31, 20X4, the $10 stock options are worth, in the aggregate, $54,000 and the $15 stock options are worth, in the aggregate, $43,000. Company A will recognize an additional $11,000 (that is, $54,000 – $43,000) of transaction cost on January 31, 20X4 to reflect the fact that the case was won and thus the terms of the options have been revised from that assumed to calculate the $16,000 cost that Company A previously recognized.

The following examples apply the consensuses to transactions that do not have a performance commitment before counterparty performance is complete. In Example 12, both the quantity and all the terms of the equity instruments are known up front, whereas in Examples 13 and 14 they are not.

### Example 12

Company B enters into an arrangement with a freelancer to create a new advertising campaign. The freelancer will be compensated with a combination of cash and stock options. The freelancer earns the cash and stock options attributable to each component of the five-component campaign, if any, that she designs. The only ramification for the freelancer of quitting the assignment before she has completed all its components is the lost opportunity to earn the cash and stock options associated with any unfinished components. The freelancer commences work on the campaign on January 1, 20X2, delivers the first component on March 31, 20X2, and delivers the second component on November 30, 20X2, then quits the assignment. For every component of the advertising campaign that the freelancer completes, she will earn $50,000 in cash and 600 stock options. The stock options have an exercise price of $10 and are exercisable for 10 years from the date the related component of the campaign is completed. The following paragraph contains the calculations.

There is no performance commitment date prior to the completion of performance; thus, the appropriate quantity of stock options is measured at its then-current fair value as of the financial reporting dates, if any, at which the cost of the freelancer's work on the component of the advertising campaign in question needs to be recognized. This continues until the freelancer completes the component of the advertising campaign in question, at which time the set of 600 stock options is adjusted for the last time to its then-current fair value. If the fair value of the first set of 600 stock options is $25,000 on March 31, 20X2, then $25,000 is the cost recognized for the first set of 600 stock options. If the fair value of the second set of 600 stock

options is $27,000 on June 30, 20X2, $28,000 on September 30, 20X2, and $24,000 on November 30, 20X2, then $24,000 is the cost ultimately recognized for the second set of 600 stock options. Interim measurements that Company B would make, if any, to recognize the appropriate portion of the cost of the freelancer's services during each period the work is performed would be based on the $27,000 and the $28,000 for the quarters ended June 30, 20X2, and September 30, 20X2, respectively. The change in the fair value would be attributed in accordance with the provisions of Interpretation 28.

**Example 13**
Same as Example 12, except that the exercise price of a particular stock option is based on the percentage increase in store revenue from the time the freelancer earns the option until the time the stock option is exercised, but in no case will it exceed $15.

There is no performance commitment date prior to the completion of performance; thus, each set of 600 stock options is measured at its then-current fair value as of the financial reporting dates, if any, at which Company B would make interim measurements of the cost of the freelancer's work on the component of the advertising campaign in question. This continues until the freelancer completes the component of the advertising campaign in question, at which time the set of 600 stock options is adjusted for the last time to its then-current fair value. The following paragraphs contain the calculations.

At March 31, 20X2, the freelancer has earned the first set of 600 stock options. The fair value of those stock options is $15,000 at an exercise price of $15. Because $15,000 is the lowest possible fair value (because $15 is the highest possible exercise price), the stock options earned on March 31, 20X2 are measured at $15,000. The $15,000 is recognized in the same period(s) as would a payment by Company B to the freelancer of $15,000 in cash in addition to the first $50,000 in cash.

At November 30, 20X2, the freelancer has earned the second set of 600 stock options. The fair value of those stock options at November 30, 20X2 is $21,000 at an exercise price of $15. Because $21,000 is the lowest possible fair value (because $15 is the highest possible exercise price), the stock options earned on November 30, 20X2 are measured at $21,000. The $21,000 is recognized in the same period(s) as would a payment by Company B to the freelancer of $21,000 in cash in addition to the second $50,000 in cash. Interim measurements that Company B would make, if any, to recognize the appropriate portion of the cost of the freelancer's services during each period the work is performed, such as during the quarters ended June 30, 20X2 and September 30, 20X2, would be based on the lowest possible fair value of the stock options as of those dates.

On July 10, 20X6, the freelancer exercises all of the stock options earned on March 31, 20X2 and on November 30, 20X2. Based on the exercise price sliding scale, on July 10, 20X6 the options earned on March 31, 20X2 have an exercise price of $9 and the options earned on November 30, 20X2 have an exercise price of $12. The aggregate fair value on July 10, 20X6, of the 600 stock options earned on March 31, 20X2, is $60,000 assuming an exercise price of $9 and $45,000 assuming an exercise price of $15. Similarly, the aggregate fair value of the 600 stock

options earned on November 30, 20X2, is $33,000 assuming an exercise price of $12 and $21,000 assuming an exercise price of $15. On July 10, 20X6, Company B will thus recognize an additional cost of $27,000 (that is, [$60,000 – $45,000] + [$33,000 – $21,000]) to reflect the fact that the growth in sales fostered revisions in the exercise price from the $15 used to calculate the cost that Company B previously recognized.

**Example 14**
Company C enters into an outsourcing contract with a large data processing firm. Company C's employees currently working in the management information systems department are to be terminated by Company C and hired by the data processing firm. As part of its arrangement with the data processing firm, management of Company C elects to grant these individuals stock options that will also contain performance provisions. Based on the hiring status of these individuals and the terms of the arrangement, Company C considers the accounting for the stock options granted to these individuals to be within the scope of this Issue.

The terms of the options provide for an increase in the number of options to be granted if an enterprise-wide software package is installed by June 30, 20X7. On June 30, 20X5, software engineer A is granted options to purchase 5,000 common shares at an exercise price of $5 per share which vest over 2 years. In the event the software described above is installed timely, the award increases to 7,500 shares. On June 30, 20X7, the fair value of the options to purchase 5,000 shares is $20,000; the fair value of the options to purchase 7,500 shares is $30,000.

There is no performance commitment prior to completion of performance because the software engineer may quit prior to completion of the software implementation with no penalty other than the loss of the options that he would have earned. The 5,000 stock options are thus ultimately measured when performance is complete, or on June 30, 20X7, at the then-current fair value of $20,000. During the 2 years ended June 30, 20X7, Company C would recognize (as appropriate relative to the periods and manner that Company C would recognize cash payments under the same arrangement) the cost of the appropriate number of the 5,000 stock options at their then-current fair value as of each financial reporting date within that period. Upon the completion of installation of the software, assuming it is on June 30, 20X7, an additional $10,000 (that is, $30,000 – $20,000) would be recognized to reflect the fact that the timely completion fostered a revision in the quantity from the 5,000 stock options used to calculate the cost that Company C previously recognized.

↑ Top

© 1996 Financial Accounting Standards Board
© 2007 CCH. All Rights Reserved.