**Exhibit B**

NERA
Economic Consulting

February 2005

# Recent Trends in Shareholder Class Action Litigation: Bear Market Cases Bring Big Settlements



Elaine Buckberg, Ph.D.
Todd Foster
Ronald Miller, Ph.D.
Stephanie Plancich, Ph.D.

How Markets Work℠

The bursting of the stock market bubble is now dominating trends in shareholder class action settlements and driving up the value of settlements.

# Recent Trends in Shareholder Class Action Litigation: Bear Market Cases Bring Big Settlements

Elaine Buckberg, Todd Foster, Ronald Miller, Stephanie Plancich[1]

**Top Ten Securities Class Action Settlements**

| Ranking | Company | Year | Settlement Value ($MM) |
|---|---|---|---|
| 1 | Cendant Corp.★ | 2000 | $3,528 |
| 2 | WorldCom, Inc.★★ | 2004 | 2,575 |
| 3 | Lucent Technologies, Inc. | 2003 | 517 |
| 4 | BankAmerica Corp.; NationsBank Corp. | 2002 | 490 |
| 5 | Raytheon Company | 2004 | 460 |
| 6 | Waste Management Inc. II | 2002 | 457 |
| 7 | Rite Aid Corporation | 2003 | 320 |
| 8 | Bristol-Myers Squibb Co. | 2004 | 300 |
| 9 | DaimlerChrysler AG | 2003 | 300 |
| 10 | Oxford Health Plans, Inc. | 2003 | 300 |

★ This settlement value incorporates a $341 million settlement in the "Cendant Prides" case.

★★ This is a partial settlement involving Citigroup, Inc.

The bursting of the stock market bubble is now dominating trends in shareholder class action settlements and driving up the value of settlements. In 2004, securities fraud settlements again made headlines with three of the eight largest shareholder class action settlements of all time: WorldCom, Raytheon and Bristol-Myers Squibb. But the jump in settlements is not limited to a few huge cases. More broadly, 2004 was characterized by a 33% increase in mean settlement, to $27.1 million[2] from $20.3 million in 2003, although the median settlement actually fell 4% to $5.3 million from $5.5 million. We find that these higher settlements can be explained by higher investor losses, the single most powerful publicly-available predictor of settlement value.[3] Increasing numbers of cases with class periods ending during the bear market of 2000–2002 are reaching settlement and the average case with a class period ending during the bear market has investor losses at least two-thirds higher than cases with class periods ending in prior years.[4] As a result, several more years of high average settlements are likely.

Although only Citigroup has yet settled in the WorldCom suit, its $2.575 billion settlement ranks WorldCom second among shareholder class action settlements, after the $3.528 billion Cendant settlement and far ahead of the third-ranked $517 million Lucent Technologies settlement.

The WorldCom, Raytheon and Bristol-Myers Squibb settlements have a combined value of over $3.3 billion, more than twice the combined value of the Lucent Technologies, Rite Aid, DaimlerChrysler and Oxford Health Plan settlements in 2003, which at the time were four of the seven largest shareholder class action settlements in history.

Behind the extraordinary settlements are extraordinary investor losses, the single most powerful predictor of settlement size: WorldCom, Raytheon and Bristol-Myers Squibb ranked first, twenty-third and third in investor losses, respectively, among settled cases. Considering the amount of investor losses, the size of these settlements is less surprising.

## Federal Filings
January 1991–December 2004



Case Types:
- Standard Filings
- Laddering Cases
- Analyst Cases
- Mutual Fund Cases

## 2004 Filings Consistent with Historical Levels

Federal filings were essentially flat in 2004 at 238, compared to 234 in 2003. This year-to-year stability in filings is itself notable. Total federal filings peaked in 2001 at their all-time high of 505, dropped 45% to 281 in 2002, then fell 17% to 234 in 2003. However, filing rates in 2001–2003 were affected by the laddering and analyst cases, both of which are likely to be one-time phenomena. The laddering cases alleged that newly-public companies and their underwriters engaged in unfair IPO allocation practices and manipulation of the early aftermarket; the analyst cases alleged that analyst recommendations were influenced by the investment banks' interest in winning business from the recommended companies. There were only 197 standard filings in 2001, excluding 303 laddering cases and five analyst cases. The analyst cases accounted for another 40 filings in 2002 and 14 in 2003. Another new group of filings arrived in 2003 and 2004: mutual fund cases. These cases, which allege that mutual fund companies concealed market timing and late trading in their funds, accounted for 18 filings in 2003 and 21 filings in 2004.

### Firms Face a 2% Chance of Suit, Each Year

|  | 1995 | 2004 | Change |
|---|---|---|---|
| No. of Publicly Traded Companies | 11,688 | 11,875 | 1.6% |
| Annual Filings | 190 | 238 | 25.3% |
| Probability of Securities Class Action | 1.6% | 2.0% | 22.6% |

If the laddering, analyst and mutual fund cases are excluded from each year's filings, the remaining 202 filings in 2003 and 217 filings in 2004 are broadly in line with the post-PSLRA average of 212 filings each year.[5]

Consistent with long-term trends, filings continue to concentrate in the Second and Ninth Circuits.

Over a five-year period, the average public corporation faces a 10% probability that it will face at least one shareholder class action lawsuit, if the 2004 filing rate continues.[6] The annual likelihood of a suit has risen 23% since 1995, from 1.6% to 2.0%.



### Federal Filings in 2004 Were Concentrated in the Second and Ninth Circuits

Total: 238 Cases

| D.C. Circuit | 1st Circuit | 2nd Circuit | 3rd Circuit | 4th Circuit | 5th Circuit | 6th Circuit | 7th Circuit | 8th Circuit | 9th Circuit | 10th Circuit | 11th Circuit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 10 | 56 | 24 | 11 | 20 | 6 | 12 | 9 | 68 | 5 | 15 |



### Cases Filed Post-SOX with Class Periods Ending Prior to July 25, 2001 Were Concentrated in the Second Circuit

Total: 45 Cases

| D.C. Circuit | 1st Circuit | 2nd Circuit | 3rd Circuit | 4th Circuit | 5th Circuit | 6th Circuit | 7th Circuit | 8th Circuit | 9th Circuit | 10th Circuit | 11th Circuit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 6 | 24 | 3 | 0 | 1 | 1 | 0 | 2 | 4 | 0 | 3 |

## Filings Are Unaffected By the Passage of Sarbanes-Oxley

More than two years after Sarbanes-Oxley ("SOX") passed in July 2002, any short-term effects of the legislation on shareholder class action filings would likely now be evident in the data. NERA's research finds that while securities litigation continues to increase as a long-term trend, there is no statistically significant change in the number of filings or the size of settlements since the passage of SOX.[7] Theoretically, SOX could have led to either an increase or a decrease in filings. The Act extended the statute of limitations to two years after the disclosure of fraud and five years after its occurrence, from one and three years, respectively. As such, plaintiffs' attorneys could have responded to the passage of SOX by filing additional suits for cases on which the pre-SOX statute of limitations had expired—perhaps cases with weaker merits that had not ranked as high on their priority lists as the heavy load of laddering and analyst cases.

Although it was not initially clear whether SOX extended the statute of limitations for cases on which the previous limit had run out, the courts received 45 filings for cases with class periods ending before July 25, 2001, mostly in the Second Circuit. In December 2004, the Second Circuit joined a number of district courts in deciding that such claims remain time-barred. The Seventh Circuit subsequently agreed. Other circuits have not yet weighed in on the issue. At the same time, the plaintiffs' bar could have been more leisurely about filing cases involving disclosures within the year before or since SOX's passage. On net, however, we find no statistically significant change in the level of filings.

The limited short-term impact of SOX contrasts with the powerful but short-lived effect of the Private Securities Litigation Reform Act of 1995 (PSLRA). Filings dropped sharply in 1996 to 127, from a five-year average of 190, then rebounded to 193 in 1997 and continued to rise thereafter. From 1991 to 2004, there is a statistically significant positive trend in filings.

**Settlements Slowed Post-PSLRA**
Cases Settled



**Average Settlements Have Been Rising**
Mean Settlement Value ($MM)



### Time to Settlement: Post-PSLRA Slower Pace Continues

A marked effect of PSLRA has been a slowing of time to settlement. This effect is striking in that it is the sole statistically significant long-term impact of PSLRA, which did not have a lasting effect on the level of filings nor any effect on the level or size of settlements. Prior to PSLRA, 48% of cases settled within three years and 63% within five; since, only 31% have settled within three years and 48% within five.

### Mean Settlement Up by 33% in 2004, Although the Median Settlement Fell Again

Trends in settlement values bifurcated in 2004: while typical settlements fell, numerous large settlements drove up the year's average settlement value by fully one-third. The median settlement fell 4% to $5.3 million, from $5.5 million in 2003 and $6.0 million in 2002. That's a 12% drop in just two years. Mean settlements jumped by 33% to $27.1 million from $20.3 million in 2003. If Cendant is excluded in computing the 2000 average, mean settlements hit an all-time high in 2004.[8] If settlements with the SEC are included, the 2004 mean rises to $32.0 million.[9]

The increase in mean settlements cannot be explained by a handful of extraordinary settlements; it is a broader trend. Of 119 settlements in 2004, nine settlements were valued at $100 million or more (five private and four SEC); 16 settlements exceeded $50 million (11 private and five SEC). Yet over 70% of settlements were valued at $10 million or less and over 44% of settlements fell under $5 million. Many of the largest settlements of 2004 were reached in the fourth quarter, a typical pattern. Mid-year statistics suggested that settlements would fall in 2004 in both average and median terms. The mean private settlement for January-September 2004 was only $16.8 million, as compared to $38.3 million in October-December.

4

### Median Investor Losses
By End-of-Class Period Year ($MM)



### Settlements May Have Further to Fall, But It May Take a Few Years

Settlements in 2002–2004 have been substantially higher than in the prior post-PSLRA years of 1996–2001, averaging $23.6 million versus $13.5 million for the earlier years. Our analysis indicates that this is due to higher investor losses in suits settled in 2002–2004, including a number of lawsuits with class periods ending during the collapse of the stock market bubble in 2000–2002.

We expect this trend of high settlements to continue for several more years as other cases with class periods covering the 2000–2002 bubble deflation period reach settlement. Our projection rests on our analysis of median investor losses by end-of-class-period year for settled cases. For settled cases, median investor losses for cases with class periods in 2000–2002 are $381 million—more than 175% of the maximum for any prior end-of-class-period year, $214 million for 1997. If we assume that cases settle at a uniform pace regardless of the size of investor losses, we can further assume that investor losses for unsettled cases with class periods ending in 2000–2002 are similarly high to settled cases with class periods ending in those years.

As just under 50% of cases settle within five years of the filing date, it will be several more years before all these cases with class periods ending in 2000–2002 are settled. If cases continue to progress at their historical rates, approximately half of cases with class periods ending in 2000 will have settled by the end of 2005. Approximately half of those cases with class periods ending in 2001 will have settled by the end of 2006 and half of those with class periods ending in 2002 will have settled by the end of 2007.[10]

We find no statistically significant change in settlement values since the passage of Sarbanes-Oxley, once we control for other factors including investor losses. Higher investor losses explain the rise in settlements, as we will discuss further below.

Case 3:02-cv-01846-AVC    Document 46-3    Filed 06/21/2007    Page 9 of 17

## Settlements of Securities Class Actions
1991–2004 ($MM)

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000★ incl. Cendant | 2000★ excl. Cendant | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Cases Settled | 92 | 115 | 128 | 130 | 141 | 134 | 125 | 114 | 97 | 144 | 143 | 133 | 122 | 160 | 119 |
| **Nominal Dollars** | | | | | | | | | | | | | | | |
| Median Settlement | 3.8 | 5.1 | 4.1 | 3.8 | 4.6 | 3.9 | 4.4 | 5.4 | 4.8 | 5.0 | — | 5.0 | 6.0 | 5.5 | 5.3 |
| Average Settlement | 12.3 | 19.2 | 8.4 | 8.0 | 13.0 | 8.6 | 8.7 | 19.6 | 14.7 | 37.6 | 15.4 | 13.9 | 23.5 | 20.3 | 27.1 |
| Total of Settlements | 1,129 | 2,203 | 1,078 | 1,042 | 1,828 | 1,153 | 1,083 | 2,236 | 1,429 | 5,408 | — | 1,848 | 2,867 | 3,251 | 3,223 |
| **Constant 2004 Dollars** | | | | | | | | | | | | | | | |
| Median Settlement | 5.3 | 6.8 | 5.3 | 4.8 | 5.7 | 4.6 | 5.1 | 6.2 | 5.4 | 5.4 | — | 5.3 | 6.3 | 5.6 | 5.3 |
| Average Settlement | 16.9 | 25.6 | 10.9 | 10.1 | 16.0 | 10.3 | 10.1 | 22.6 | 16.6 | 40.9 | 16.8 | 14.7 | 24.5 | 20.7 | 27.1 |
| Total of Settlements | 1,554 | 2,946 | 1,399 | 1,319 | 2,250 | 1,379 | 1,266 | 2,573 | 1,609 | 5,891 | — | 1,957 | 2,989 | 3,314 | 3,223 |

★ In May 2000, Cendant Corp. settled its class action lawsuit for approximately $3.2 billion

## Explaining Settlements

NERA has estimated a settlement prediction model that explains over 60% of the variation in settlements, using data on cases filed from January 1996 to December 2004. This section discusses the sensitivity of settlement values to various lawsuit characteristics, based on that model; all the sensitivity measures described are calculated controlling for other characteristics of the suit and changes in the consumer price index.

Trends in investor losses explain both the top settlements of 2003 and the downward trend in the median. On average, a 1.0% increase in investor losses results in a 0.4% increase in the size of the expected settlement, meaning that settlements tend to increase far less than one-for-one with investor losses. Investor losses, an estimate of what investors lost over a class period relative to an investment in the S&P, are the single most powerful publicly available determinant of settlements, explaining approximately 50% of the variation.

We use investor losses as a proxy for the damage estimates presented by the plaintiffs' side prior to settlement, because we generally do not have access to the plaintiffs' actual figures.

Following the bursting of the 1990s stock market bubble, average investor losses ballooned from $140 million in the average suit settling in 1996 to $1.0 billion in 2002 and $2.5 billion in 2003, before dropping to $1.7 billion in 2004. Median investor losses for cases settling in 2004, however, rose, returning to the 2002 level of $340 million after dipping to $215 million in 2003. Taking a the longer-term perspective, 2004 median investor losses were five times the 1996 median of $65 million. Although there were six settlements over $100 million in 2004, two-thirds of settlements were under $10 million.[11]

The inclusion of securities other than common stock in a class action suit results in dramatically higher settlements.

Effectively, the claims of the holders of these other securities represent losses above and beyond—and not captured by our measure of—investor losses on common stock. The inclusion of bonds in a suit more than doubles settlement value on average. The inclusion of options adds one-third on average.

Settlements increase with the depth of the defendants' pockets. For each 1.0% increase in the company's market capitalization on the day after the end of the class period, the typical settlement will increase 0.1%. But this effect may be offset if the company's fortunes change on the way to settlement. If the defendant firm is in bankruptcy or has a stock price of less than $1.00 per share on the settlement date, the settlement will typically be approximately one-third lower. The involvement of company co-defendants can lead to larger settlements. In cases with an accounting firm co-defendant, settlements increase by more than two-thirds, controlling for all other characteristics of the case.

Cases with accounting allegations result in higher settlements for several additional reasons. The presence of any one of three accounting factors—accounting issues, accounting irregularities or restatements—will raise average settlement values by approximately 20%. More often, two or more of these accounting variables will apply to the same case, further increasing the likely settlement. The naming of an accounting co-defendant, which occurs in only a subset of accounting cases, has the most powerful impact on settlement value.

Among Congress's major goals for the PSLRA was to involve institutional investors as lead plaintiffs, with the intention that institutional investor plaintiffs play a more active role in litigation and generate better outcomes for plaintiffs. Controlling for other case characteristics, cases with an institutional investor plaintiff settle for a statistically significant one-third more on average. Possible reasons for higher settlements in cases with institutional investors as lead plaintiffs include the retention of more effective plaintiffs' counsel in those cases, the lead plaintiff's more effective supervision of counsel and own contribution to strategy or both. Alternatively, it may reflect a tendency for institutional investors to get involved in cases where the allegations have greater merit or the defendants' capacity to pay in relation to potential damages is greater.

Our model also indicates that settlements increase by approximately 25% if Section 11 claims are involved.

While defendants' resources and the characteristics of a case affect settlements, only the health-services sector pays markedly different settlements than other industries. Settlements involving companies in the health-services sector are typically one-third higher than settlements involving all other industries, controlling for other case characteristics.

> *If the defendant firm is in bankruptcy or has a stock price of less than $1.00 per share on the settlement date, the settlement will typically be approximately one-third lower.*

7

## Investor Losses Have Risen More Rapidly than Settlements
1991–2004



## Actual Recovery Rates May Be Higher than They Appear

Investor recoveries are frequently—but inaccurately—assessed by comparing settlement values to investor losses. While investor losses provide a comparable measure of plaintiffs' claims, it is a misleading and exaggerated measure of damages—leading to substantial underestimation of investor recoveries. In 2004, the median percentage of investor losses paid in settlement reached a new low of 2.3%, compared to 2.9% in 2002 and a high of 7.2% in 1996. These statistics have led plaintiffs to ask whether they are "leaving money on the table." However, a pre-trial settlement equal to little more than 2% of investor losses does not mean that plaintiffs are leaving nearly 98% of the damages that could potentially be awarded to them in a trial on the table.[12] Recovery rates are understated because the legally compensable loss is typically substantially less than the investor losses relative to the S&P 500.[13] Moreover, because many shareholders eligible to claim under the class settlement agreement do not do so, those investors who file claims typically get twice their *pro rata* share of the settlement amount.

It is important to recognize that investor losses do not measure loss due to the alleged fraud, only loss compared to an alternative investment in the S&P 500. This is the equivalent of asking how much better off investors in a company would be had they instead invested the same amount over the same period in an S&P 500 index fund. As a result, plaintiffs could not present an investor loss calculation to a judge or jury as alleged damages: this measure of loss would fall short of the scientific standards set by previous judicial decisions, which require the use of event studies or similar techniques to measure the loss *attributable* to the alleged fraud.[14] Other factors may have caused the defendant company's stock price to fall, including developments at the company unrelated to the fraud and trends in the company's sector, and thus may drive a wedge between investor losses and losses due to the fraud. For example, dispersion of performance between the S&P 500 and the Nasdaq during the 2000–2002 bear market contributes to high investor losses in cases involving tech stocks. But an estimate of investor losses for other tech companies with no alleged fraud would also yield high investor losses for the 2000–2002 period.

> *Claiming rates around 50% imply that claiming shareholders will receive roughly twice the per-share compensation implied by the aggregate settlement figure.*

Moreover, the investor loss calculation treats all shares outstanding as allegedly damaged shares. It does not adjust for the number of factors that reduce the number of allegedly damaged shares and thereby reduce aggregate damages, including institutional holdings, insider holdings or transactions, shareholders with 5% ownership of the company or short interest. As a result, calculations of the loss attributable to the fraud typically generate numbers substantially lower than investor losses.

Additionally, those shareholders who file a claim typically receive twice as much compensation per share as the aggregate settlement figure would suggest. Because many shareholders do not file claims, those investors who do so often recover substantially more per share than the ratio of settlement value to eligible shares. Most settlements are fixed in value and distributed *pro rata* to shareholders filing claims. Recent research has revealed a median filing rate of only 22.1% among institutional investors.[15]

Combined with findings that institutional investors account for over 57.5% of the total allowed loss, this suggests that as much as 45% of eligible claims, in dollar terms, are not filed solely due to the behavior of institutions.[16] Separate research done by NERA has similarly found that claims are made for only 51% of estimated losses, in dollar terms. Claiming rates around 50% imply that claiming shareholders will receive roughly twice the per-share compensation implied by the aggregate settlement figure, in *pro rata* distributions. In response to low claiming rates, some settlements are agreed in per-share terms, and each claimant receives the predetermined per-share amount; any unclaimed funds are returned to the parties contributing to the settlement.

Any settlement amount, however, is reduced by payment to plaintiffs' counsel. While the fee percentages requested by plaintiffs' counsel have fallen in recent years, 33% is still the most frequent percentage, requested in over 40% of cases.

## Attorney Fees as a Percentage of Settlement Have Declined
Attorney Fees Requested by Plaintiffs' Counsel (as a Percentage of Settled Cases)



■ 1996–2001
■ 2002–2004

### Settlements Are Mixed Benefits for Current Shareholders

Shareholders who both have a damage claim and are current shareholders when the settlement is paid will experience offsetting gains and losses. Those shareholders will gain from the settlement payment they receive but be harmed because the company's contribution to the settlement will reduce the value of their existing shareholding in the company. The value of their existing shareholding also may be negatively impacted by the company's payment of legal fees, any side effects of the litigation on management and company performance, and increased rates for D&O insurance.[17] Such shareholders may be more interested in the deterrent effect of shareholder class actions in preventing future frauds than in receiving financial compensation through a settlement.

### Settling for Corporate Governance Reforms

Because recovery rates have been perceived to be low, shareholder class actions have been viewed by some as a corporate governance tool designed to deter future fraud as much as a mechanism of investor compensation. SOX sought to strengthen corporate governance by supplementing shareholder class actions with stronger criminal penalties for corporate fraud. At the same time, some shareholder class action settlements are tackling corporate governance more directly, including specific corporate governance reforms in the settlement terms. Since the passage of SOX, at least nine settlements have included changes in corporate governance procedures, including settlements involving Sprint and Mattel. All but one of the nine also involved cash payments.

## Federal Court Securities Class Action Settlements Involving Corporate Governance Changes★

| Company | Approx. Settlement Date | Settlement Description | Corporate Governance Reforms | |
|---|---|---|---|---|
| AON Corporation | 06/04 | $7.25 million | • Certain corporate governance procedures were agreed to, but not disclosed | |
| Enterasys Networks, Inc. | 12/03 | $17 million plus $33 million of stock | • Requires disclosure of membership of board of directors<br>• Limits terms of directors to one year | • Shareholders may recommend two directors annually<br>• Expands proxy statement disclosures |
| Hanover Compressor Co. | 01/04 | $80 million (partial settlement) | • Requires rotation of outside audit firm | • Places restrictions on insider stock sales |
| HCA Inc. | 01/04 | $50 million | • Requires independence of two-thirds of HCA's board<br>• Calls for two audit committee members to have accounting/financial experience | • Requires rotation of outside audit firm (every seven years) |
| Homestore.com, Inc. | 12/03 | $13 million plus $59 million of stock | • Adds requirements for independent directors and special committees<br>• Requires disclosure of membership of board of directors<br>• Limits terms of directors to two years | • Shareholders may appoint new director<br>• Prohibits future use of stock options for director compensation<br>• Requires minimum stock retention by officers after options exercise |
| Honeywell Inc. | 06/04 | $100 million | • Ensures independence of outside auditors and board of directors | • Adopts provisions relating to compensation of officers and directors, and the performance of internal audits |
| Ingersoll-Rand Company | 12/02 | No financial payment (reorganization/reforms only) | • Must show employees/directors receive no grant of benefits in the reorganization plan | • Shareholders may revoke voting agreement<br>• Restricts certain corporate transactions |
| Mattel Inc.★★ | 12/02 | $122 million | • Certain corporate governance procedures were agreed to, but not disclosed | |
| Sprint Corporation | 12/03 | $50 million | • Establishes role of lead independent director<br>• Caps all payments to board members and their families at $45,000<br>• Sets $200,000 limit on payments to organizations linked to directors | • Prohibits executives from selling shares while the company is buying its own stock<br>• Shortens directors' terms to one year from three years |

★ Data obtained from NERA's proprietary database of class action lawsuits, in conjunction with Securities Class Action Alert and Factiva News Searches.
★★ See Associated Press Newswire article published December 5, 2002.

The fact that most settlements involving reforms also involved cash might suggest that plaintiffs who sought corporate governance reforms view them as a supplement rather than as an alternative to a cash settlement. But a closer look suggests that trade-offs were made between cash payments and reforms in most, if not all, cases. Of the seven settlements that involved both cash payments and corporate governance reforms, five settled for cash payments that fell below the value predicted by our settlement model by 40% or more. Only two involved higher cash payments than our model predicted *and* corporate governance reforms: Honeywell Inc. and Mattel Inc. We do not have enough information to determine whether plaintiffs voluntarily traded off cash for reforms or whether, in these cases, defendants' assets were limited and plaintiffs negotiated for reforms only after defendants' financial resources were exhausted.

## Conclusion

Shareholder class action settlements are now reflecting the bursting of the stock market bubble. The large investor loss cases with class periods ending during the bear market of 2000–2002 are now reaching large settlements, consistent with those losses. However, we do not find a statistically significant change in the relationship between investor losses and settlement size. Large settlements are likely to continue for several years as these bear market cases progress toward settlement.

Beyond the numbers, shareholder class actions are being used in new ways to improve corporate governance. Although the threat of a suit—with its reputational and financial costs—has always served as an incentive to good corporate governance, shareholders are beginning to use shareholder class action lawsuits to obtain specific corporate governance reforms.

## End Notes

1. This edition of NERA's research on recent trends in securities class action litigation expands on previous work by our colleagues Lucy Allen, Frederick C. Dunbar, Vinita M. Juneja, Denise Neumann Martin and David I. Tabak. We gratefully acknowledge their contribution to previous editions as well as this current version. In addition, the authors thank Patrick E. Conroy, Louis A. Guth, and Marcia Kramer Mayer for valuable input and insightful comments, and Christopher Enright and D.J. Percella for supervising the research effort. These individuals receive only credit for improving this paper; all errors and omissions are ours.

2. The 2004 mean settlement excludes the partial WorldCom settlement.

3. Claimed damages, which we have for a smaller sample of cases, are a more powerful predictor of settlement size.

4. Among settled cases.

5. The post-PSLRA average is calculated for 1996-2003, excluding all laddering, analyst or mutual fund cases. Excluding 1996, the 1997-2004 average is 223 standard filings per year.

6. The probability of not facing a suit is 98.0% per year. Assuming that the probability of facing a suit in each year is independent and compounding over five years yields a 90.4% chance of no suit in five years, or a 9.6% chance of at least one suit.

7. We refer to the size of settlements reached since SOX, including suits filed prior to SOX. Were there a statistically significant change, this would be an indirect effect of the legislation and an effect of the changes in attitudes that led to its passage.

8. 2004 is the all-time high for aggregate settlements if the $3.2 billion Cendant settlement is excluded from the 2000 average.

9. Statistics for other years exclude SEC settlements.

10. This approximation assumes that most suits are filed in the same year as the class period end, although the statute of limitations allowed one year from disclosure to filing prior to the passage of Sarbanes-Oxley on July 25, 2002 and two years since the passage of Sarbanes-Oxley.

11. Worldcom Inc., Raytheon Company, Bristol Myers Squibb, Bank of America, MFS Mutual Funds, FleetBoston Financial Corporation.

12. Bear in mind that plaintiffs' counsel typically receives one-third of any settlement or sum awarded at judgment as compensation for their services.

13. D&O insurance policies typically include a fraud exclusion such that if a jury returns a verdict of fraud and rewards damages, the D&O insurance policy will be voided and cannot be used to pay damages. This may reduce the pool of funds available to pay damages and therefore result in lower damage judgments or a heavier burden on the company to pay damages.

14. See, for example, In Re Executive Telecard Ltd. Securities Litigation or In Re Zonagen, Inc. Securities Litigation.

15. James D. Cox and Randall S. Thomas, "Leaving Money on the Table: Do Institutional Investors Fail to File Claims in Securities Class Actions?" Washington University Law Quarterly 80, no. 3 (2002).

16. Elliot J. Weiss and John S. Beckerman, "Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions," Yale Law Journal 104 (1995): 2053, 2089.

17. The company's D&O insurance providers contribute to many settlements. This contribution may result in a subsequent increase in the company's D&O insurance premia. It is relatively uncommon for individual defendants to contribute to a settlement.

## About NERA

NERA Economic Consulting is an international firm of economists who understand how markets work. We provide economic analysis and advice to corporations, governments, law firms, regulatory agencies, trade associations and international agencies. Our global team of more than 500 professionals operates in 18 offices across North and South America, Europe, Asia and Australia.

NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance and litigation. Our more than 40 years of experience creating strategies, studies, reports, expert testimony and policy recommendations reflects our specialization in industrial and financial economics. Because of our commitment to deliver unbiased findings, we are widely recognized for our independence. Our clients come to us expecting integrity; they understand this sometimes calls for their willingness to listen to unexpected or even unwelcome news.

NERA Economic Consulting (**www.nera.com**), founded in 1961 as National Economic Research Associates, is a subsidiary of Mercer Inc., a Marsh & McLennan company.

# NERA
Economic Consulting

| | | |
|---|---|---|
| Boston | New York City | |
| Brussels | Philadelphia | |
| Chicago | Rome | |
| Denver | San Francisco | |
| Frankfurt | São Paulo | |
| Ithaca | Sydney | |
| London | Tokyo | |
| Los Angeles | Washington D.C. | |
| Madrid | White Plains | For further information, please visit our global website at: |
| | | **www.nera.com** |

**NERA Economic Consulting**
1166 Avenue of the Americas
34th Floor
New York, NY 10036
Tel: 212.345.5326
Fax: 212.345.4650
www.nera.com

© Copyright 2005
National Economic Research
Associates, Inc.

All rights reserved.
Printed in the U.S.A.

 Marsh & McLennan Companies