**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | **:** | |
| **IN RE: PRICELINE.COM, INC.** | **:** | |
| **SECURITIES LITIGATION** | **:** | |
| _____ | **:** | **MASTER FILE NO.** |
| | **:** | **3:00CV01884 (AVC)** |
| **This document relates to:** | **:** | |
| | **:** | |
| **ALL ACTIONS** | **:** | |

MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF PROPOSED CLASS ACTION
SETTLEMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......................................................................2

HISTORY OF THE LITIGATION ...............................................................3

    A.    Background ...........................................................................3
    B.    Procedural History of the Litigation...........................................6

SUMMARY OF THE SETTLEMENT ..........................................................8

    A.    The Settlement .......................................................................8
    B    Plaintiffs' Recovery Under The Settlement and Plan of Allocation ...........8

CLASS NOTICE AND CERTIFICATION......................................................9

    A.    Adequacy of the Notice.........................................................10
    B.    Content of the Notice ...........................................................11

THE PROPOSED SETTLEMENT SHOULD BE
GRANTED FINAL APPROVAL...................................................................13

    A.    The Proposed Settlement Is Fair, Reasonable and Adequate......................14

        1.    The complexity, expense and likely duration of the litigation.............16
        2.    The Reaction of the Class to the Settlement ........................................17
        3.    The Stage of Proceedings and the Amount of Discovery Completed .17
        4.    Risks of Establishing Liability............................................................19
        5.    The Risks of Establishing Damages ...................................................20
        6.    Risks of Maintaining Class Action Through Trial..............................21
        7.    The Ability of Defendants to Withstand a Greater Judgment .............21
        8.    The Range of Reasonableness of the Settlement Funds
            in Light of the Best Possible Recovery and Litigation Risks ............22

    B.    The Settlement Negotiations Were Procedurally Fair.................................. 23

THE PROPOSED PLAN OF ALLOCATION IS FAIR, REASONABLE
AND ADEQUATE ........................................................................................24

CONCLUSION.............................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Agent Orange Prod. Liab. Litig.*,
  818 F.2d 145 (2d Cir. 1987)................................................................................. 11

*Am. Bank Note Holographics, Inc. Sec. Litig.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001).......................................................... 17, 24

*AOL Time Warner, Inc. Securities*,
  *2006 WL 903236 *10 (S.D.N.Y. April 6, 2006)* ............................................ 18

*Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000)................................................................ 18

*Banyai v. Mazur*,
  *2007 WL 927583 *7 (S.D.N.Y. March 27, 2007)* ........................................ 14

*Chatelain v. Prudential-Bache Secs., Inc.*,
  805 F. Supp. 209 (S.D.N.Y. 1992)................................................................... 14

*Corrugated Container Antitrust Litig.*,
  643 F.2d 195 (5th Cir. 1981 ............................................................................. 17

*Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)............................................................. 15, 20, 22, 23

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974).......................................................................................... 10

*Global Crossing Sec. and ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y 2004) .......................................................... 17, 18, 23

*Gulf Oil Cities Serv. Tender Offer Litig.*,
  142 F.R.D. 588 (S.D.N.Y.1992) ...................................................................... 22

*Indep. Energy Holdings PLC Sec. Litig.*,
  302 F.Supp. 2d 180 (S.D.N.Y. 2003)...................................................... 11, 12, 13

*Iomega Sec. Litig.*,
  Civ Nos. B-86-257 (JAC), (D. Conn. Oct. 1, 1987) .................................. 14, 15, 21

*Ivan F. Boesky Sec. Litig.*,
  948 F.2d 1358 (2d Cir. 1991)........................................................................... 14

*Lloyd's Am. Trust Fund Litig.*,
  No. 96 Civ. 1262 (RWS), (S.D.N.Y. Nov. 26, 2002) ....................................................... 18, 20

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)................................................................... 14, 17, 20, 24

*Merrill Lynch & Co., Inc. Research*,
  2007 WL 313474 *8 (S.D.N.Y. Feb. 1, 2007) ......................................................... 10

*Michael Milken & Assocs.*,
  150 F.R.D. 57 (S.D.N.Y. 1993) ....................................................................... 22

*NASDAQ Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ...................................................................... 21

*New York & Maryland v. Nintendo of Am ., Inc.*,
  775 F. Supp. 676 (S.D.N.Y. 1991)..................................................................... 14

*Nissan Motor Corp. Antitrust Litig.*,
  552 F.2d 1088 (5th Cir. 1977) ......................................................................... 10

*PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y.1997) .......................................................... 13, 14, 15, 17, 18, 24

*Plummer v. Chem. Bank*,
  608 F.2d 654 (2d Cir. 1982 ............................................................................ 17

*Prudential Sec. Inc. Ltd. P'ships Litig.*,
  164 F.R.D. 362 (S.D.N.Y. 1996) ...................................................................... 11

*Rite Aid Corp. Sec. Litig.*,
  146 F. Supp. 2d 706 (E. D. Pa.2001) ................................................................. 22

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)........................................................................... 20

*Sterling Foster & Co. Sec. Litig.*,
  238 F. Supp. 2d 480 (E.D.N.Y. 2002) ............................................................... 23

*Thompson v. Metropolitan Life Ins. Co.*,
  216 F.R.D. 55 (S.D.N.Y. 2003) ....................................................................... 15

*Trief v. Dun & Bradstreet Corp.*,
  840 F. Supp. 277 (S.D.N.Y. 1993)..................................................................... 14

*Warner Communications Sec. Litig.*,
  618 F. Supp. 735 (S.D.N.Y. 1985)...................................................................... 14, 20

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982)................................................................................ 15, 23

**Other Authorities**

15 U.S.C. §§ 78u-4(a)(7), 77z-1(a)(7) ...................................................................... 12
15 U.S.C. §78u-5 ...................................................................................................... 24

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ....................................................................................... 10

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs in this action (the "Action") respectfully request that this Court grant final approval of the proposed settlement of $80 million (the "Settlement") with Defendant Priceline.com Incorporated ("Priceline.com" or "Priceline") and Individual Defendants Jay Walker ("Walker"), Dan Schulman ("Schulman"), Richard Braddock ("Braddock") and N. J. Nicholas ("Nicholas") (Walker, Schulman, Braddock and Nicholas are collectively referred to as the "Individual Defendants") (Priceline.com and the Individual Defendants are collectively referred to as the "Settling Defendants" or "Defendants"). The Settlement partially resolves a class action lawsuit brought under the federal securities laws involving whether Defendants misled investors by issuing false and misleading press releases and other statements regarding Priceline.com's financial performance and business prospects in a scheme to artificially inflate the value of Priceline.com's securities. The Settlement will benefit all persons and entities that purchased securities, including common stock and options between January 27, 2000 and October 4, 2000, inclusive (the "Class Period"), and who were damaged when the truth was disclosed (the "Class").[1]  As set forth in Plaintiffs' Motion For Leave To Serve And File A Second Amended Complaint, Plaintiffs are continuing this lawsuit with respect to claims asserted against Deloitte.

For the reasons set forth below and in the accompanying Joint Declaration of David R. Scott and Jacob B. Perkinson in Support of Final Approval of Class Action Settlement and Award of Attorneys' Fees and Expenses (the "Joint Declaration"), Plaintiffs submit that the Settlement is an outstanding recovery for the Class and respectfully request that the Court approve the Settlement and Plan of Allocation, and enter the proposed Order and Final Judgment accordingly.  A separate Memorandum is being submitted in support of Plaintiffs' petition for an award of attorneys' fees and costs.

---

[1]     Excluded from the Class are Defendants and defined affiliates.  Also excluded from the Class is Priceline.com's independent auditor Deloitte & Touche, LLP ("Deloitte").

## PRELIMINARY STATEMENT

The proposed Settlement represents an extraordinary recovery for the Class. The Settlement partially resolves a lawsuit over whether Priceline misled investors about the problems and risks associated with, *inter alia*, Priceline's financial reporting and business operations, including WebHouse and its highly touted "Business Model." The Settlement was entered into after over six years of extensive discovery, retention of and consultation with teams of accounting, economic and business experts to ascertain Priceline's financial reporting deficiencies and their relationship to Plaintiffs' losses and to assess damages to the Class, and four separate rounds of mediation sessions with a retired United States District Court judge, the Hon. Nicholas Politan, and then Robert A. Meyer, Esq., who recommended the proposed settlement terms. There remained serious risks on the merits and to establishing damages in prosecuting the action further, including establishing:

- Whether and to what extent Defendant's Class Period statements were actionably false or misleading;

- What Generally Accepted Accounting Principles ("GAAP") were applicable to this case;

- That Defendants misstated their financial statements in violation of these GAAP standards;

- That each of the Defendants sued under §10b and Rule 10b-5 acted with scienter;

- That the alleged false statements caused Plaintiffs' losses; and

- The amount of damage to the Class.

Each of these issues was vigorously disputed. For example, Defendants would be expected to argue that Plaintiffs' losses resulted from the bursting of the internet bubble rather than from any wrongdoing on the part of the Defendants. With respect to the accounting issues, Priceline has never restated its financial statements and Defendants will undoubtedly argue that the Securities and Exchange Commission ("SEC") reviewed and approved Priceline's accounting for certain airline stock warrants. Many of these issues would have been the subject of a "battle of experts" – adding to and compounding the uncertainties, expense and delay of post-trial

motions and likely appeals.  At the end of the day, if Plaintiffs prevailed on all theories, the Defendants would likely be unable to pay the full amount of a judgment.  The Settlement has far exceeded Defendants' insurance coverage and constitutes a significant portion of Priceline's available assets.  Under these circumstances, the $80 million recovery for the Class represents an outstanding result.  Indeed, not a single Class member has objected to the substantive terms of the Settlement or the substantial recovery obtained.

Additionally, Plaintiffs' proposed Plan of Allocation is a fair and appropriate method for distributing the recovered funds to Class Members.  The Plan of Allocation takes into account the relative risks of recovery based upon when Class Members purchased and sold their stock and the alleged fraud was revealed.  The Plan of Allocation, which is set forth fully in the Notice of Pendency of Class Action and Proposed Settlement, Motion For Attorneys' Fees and Settlement Fairness Hearing (the "Notice") that has been mailed to members of the Class, provides for the distribution of the Net Settlement Fund on a *pro rata* basis, based on a formula tied to liability and damages.  There is likewise no objection to the Plan of Allocation.

Plaintiffs respectfully submit that the Settlement is worthy of immediate approval, and that the proposed Plan of Allocation is equitable and just, and that each should be approved by the Court.

## HISTORY OF THE LITIGATION[2]

### A.    Background

This Action is brought on behalf of a Class of all persons who purchased the securities of Priceline.com during the Class Period of January 27, 2000 and October 4, 2000, inclusive. Plaintiffs brought this action after Priceline.com, a publicly traded Delaware corporation with its executive offices and principal place of business located in Fairfield County, Connecticut, announced it would be closing its "Name Your Own Price" grocery and gasoline business which

---

[2]    The lengthy history of this case is only summarized herein. Plaintiffs respectfully refer the Court to the Joint Declaration for a fuller description of the litigation and the settlement negotiations.

was operated through a purportedly separate and privately owned entity, WebHouse Club
("WebHouse"). Priceline.com had made several allegedly false and misleading public
statements about the ongoing success of WebHouse, and its implications for Priceline,
particularly with respect to establishing the viability of Priceline's business model which had
been licensed to WebHouse. At WebHouse's inception, Priceline was granted stock options for
75% of WebHouse, and Priceline reported revenues of $189 million for these stock options on its
1999 financial statements published at the beginning of the Class Period. Priceline's investment
in WebHouse was first written down when WebHouse announced it was going out of business at
the end of the Class Period. Plaintiffs contend that the Defendants violated GAAP when
Priceline recognized revenues which it had not yet earned, and when Priceline failed to write
down its investment as impaired since WebHouse was consistently losing large sums of money
throughout the Class Period and had no prospects of profitability, a fact that was concealed from
investors because WebHouse was a purportedly "private" company. WebHouse's' undisclosed
losses also demonstrated that Priceline's "Business Model" could not be expanded into other
markets, a fact which directly contradicted Defendants' optimistic statements made throughout
the Class Period.

Plaintiffs also alleged that Defendants misled the market about the business prospects and
profitability of Priceline's main business, selling discounted airline tickets on the internet.
According to the Complaint, throughout the Class Period, Defendants misled the market through
assertions that the uniqueness of Priceline's "name your own price" model set Priceline apart and
protected it from competition by other internet airline ticket discounters. Plaintiffs contended
that Priceline had obtained its ticket inventory only by issuing stock warrants whose true costs
were then under-reported and incorrectly described on Priceline's financial statements. As
Priceline's airline ticket business floundered (and Priceline was forced to issue ever-increasing
amounts of its equity to the airlines to obtain airline tickets), Priceline's stock price dropped
precipitously.

Thus, the Complaint alleges that the Settling Defendants and Deloitte[3] issued false and misleading press releases and other statements regarding Priceline's financial performance and business prospects during the Class Period in a scheme to artificially inflate the value of Priceline's securities. The Complaint further alleges that members of the Class purchased the securities of Priceline during the Class Period at prices artificially inflated as a result of the Defendants' and Deloitte's dissemination of allegedly materially false and misleading statements regarding Priceline in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

Specifically, the Complaint alleges, *inter alia*, that Priceline's publicly reported financial statements, and Deloitte's audit opinion included within Priceline's 1999 Form 10-K constituted false statements, because the amounts of income and assets included in Priceline's financial statements were misstated, Deloitte's audit opinion falsely represented that Priceline's 1999 annual financial statements were fairly presented in accordance with GAAP, and that Deloitte had conducted its audit in accordance with GAAS. Among other things, the Complaint alleges that Priceline.com and Deloitte violated FASB Statement of Concepts #5, by improperly recognizing $189 million in revenue upon receiving the WebHouse warrants, and thereby artificially inflating Priceline.com's earnings and the value of its securities.

For Plaintiffs' claims relating to WebHouse, Defendants were expected to offer experts to testify that Priceline's accounting treatment was within the range of appropriate accounting judgment. Defendants would have offered evidence that Priceline had used an independent appraiser to value the WebHouse stock warrants and to establish that the original issuance of the warrants was made on an "arms-length" basis. Defendants have also argued that the fact that private investors, including several of the Individual Defendants themselves, invested in WebHouse throughout the Class Period negates any showing of scienter. With respect to

---

[3]     By its decision dated October 7, 2004, this Court dismissed Deloitte as a party, permitting Plaintiffs to apply for leave to amend if and when they were able to cure the complaint's failure to adequately allege Deloitte's scienter. Plaintiffs have filed such a motion and a proposed complaint which is currently pending. Deloitte is not a party in this Settlement.

Priceline's accounting, Defendants would no doubt point to the fact that neither the SEC nor Priceline's independent auditors ever required Priceline to restate its financial statements. Finally, Defendants have argued that the disclosures relating to WebHouse did not cause the major part of the stock losses experienced by Plaintiffs in the Class.

For Plaintiffs' claims relating to Priceline's airline ticket business, Defendants argued that Priceline's written agreements with the airlines were all publicly filed with the SEC, and that officials at the SEC questioned, reviewed and then finally agreed to Priceline's method of valuation and accounting treatment for the issuance of its stock warrants to airlines before the Class Period when Priceline first filed its original Registration Statement. Again, Priceline has never restated its results, including with respect to the accounting for these warrants. Defendants have also argued that the major decline in Priceline's stock at the end of the Class Period resulted from the bursting of the internet bubble – not from any wrongdoing on Defendants' part.

## B.     Procedural History of the Litigation

Beginning on October 2, 2000, twenty-two (22) related putative securities class actions – including, *Twardy, et al v. Priceline.com, Inc, et al.,* No. 3:00-cv-01884-AVC; *Weingarten v. Priceline.com, Inc., et al.,* No. 3:00-cv-01901-DJS; *Berdakina v. Priceline.com, Inc, et al.,* No. 3:00-cv-01902-DJS; *Howard Gunty Plan v. Priceline.com, Inc, et al.,* No. 3:00-cv-01917-DJS; *Cerelli v. Priceline.com Inc, et al.,* No. 3:00-cv-01918-DJS; *Mayer v. Priceline.com, Inc, et al.,* No. 3:00-cv-01923-DJS; *Mazzo v. Priceline.com, Inc, et al.,* No. 3:00-cv-01924-DJS; *Anish v. Priceline.com, Inc, et al.,* No. 3:00-cv-01948-DJS; *Fialkov v. Priceline.com, Inc, et al.,* No. 3:00-cv-01954-DJS; *Zia v. Priceline. com, Inc, et al.,* No. 3:00-cv-01968-DJS; *Mazzo v. Priceline. com, Inc, et al.,* No. 3:00-cv-01980-DJS; *Atkin v. Priceline.com, Inc, et al.,* No. 3:00-cv-01994-DJS; *Licht v. Priceline.com, Inc, et al.,* No. 3:00-cv-02049-DJS; *Ayach, et al v. Priceline.com, Inc, et al.,* No. 3:00-cv-02062-DJS; *Lyon v. Priceline.com, Inc, et al.,* No. 3:00-cv-02066-DJS; *Kwan v. Priceline.com, Inc, et al.,* No. 3:00-cv-02069-DJS; *Krim v. Priceline.com, Inc, et al.,* No. 3:00-cv-02083-DJS; *Bazag v. Priceline. com, Inc, et al.,* No. 3:00-cv-02122-DJS; *Breier v. Priceline.com, Inc, et al.,* No. 3:00-cv-02146-DJS; *Caswell v. Priceline.com, Inc, et al.,* No.

3:00-cv-02169-DJS; *Farzam, et al v. Priceline. com, Inc, et al.*, No. 3:00-cv-02176-DJS; *Karas v. Priceline.com Inc, et al.*, No. 3:00-cv-02232-DJS – were filed in this Court and were subsequently consolidated under the above caption on September 12, 2001, and are hereinafter referred to as the "Action."  Additionally, on September 12, 2001, the Court appointed lead plaintiffs and appointed Scott + Scott, LLP, Johnson & Perkinson and Stull, Stull & Brody as Plaintiffs' lead counsel.  A Consolidated Amended Complaint was thereafter filed on October 29, 2001.

In February 2002, Defendants, including Deloitte, moved in separate motions to dismiss the Complaint.  On October 7, 2004, the Court denied in part and granted in part the Settling Defendants' motion to dismiss, and granted Deloitte's motion to dismiss without prejudice. Judge Squatrito held that the Plaintiffs alleged with the requisite particularity that Settling Defendants knowingly made false and misleading statements with regard to Priceline.com's profitability and stock value, as well as WebHouse's viability and the viability of Priceline.com's business model.  *See* Docket No. 101 at 30, 31, 42, 43.  The Settling Defendants filed their respective Answers to the Complaint on December 23, 2004, and December 28, 2004, respectively, denying any liability to the Class.

The Court certified the case as a class action on April 4, 2006, and appointed Thomas Linton, Mark B. Weiss, Marilyn Egel, R. Warren Ross and John Anderson as the Class Plaintiffs and Scott + Scott, LLP and Johnson & Perkinson as Class Plaintiffs' Counsel.

As is more fully described in the Joint Declaration of Co-Lead Counsel, this was a hard-fought case.  This case has settled over six years after it was begun, after extensive discovery, including several depositions and motions to compel, and the review of in excess of 5.29 million pages of internal Priceline and WebHouse documents, as well as Deloitte workpapers and other files, and with the input or multiple teams of experts.  The parties engaged in four rounds of mediation conducted with the assistance of retired United States District Judge Nicholas H. Politan and Robert A. Meyer, Esq., acting as mediators.  For the reasons described herein and in the Joint Declaration, the $80 million settlement of this case is an outstanding result and should

be approved.

<div align="center">

**SUMMARY OF THE SETTLEMENT**
</div>

**A.**     **The Settlement**

The Settling Defendants have agreed to pay $80 million in cash in full settlement of Plaintiffs' claims against them.  The settlement fund, less any attorneys' fees and expenses and notice, administrative and tax expenses (the "Net Settlement Fund") will be distributed among those injured Class members who have not requested exclusion from the Class and who submit a timely and valid Proof of Claim under the procedures set forth in the Settlement Notice.  The Settlement partially resolves the claims concerning whether Priceline and the Individual Defendants misled investors about the financial reporting and risks associated with, *inter alia*, Priceline's business model and WebHouse.  Plaintiffs have filed a proposed complaint to continue the lawsuit with respect to claims asserted against Deloitte.

**B.**     **Plaintiffs' Recovery Under The Settlement and Plan of Allocation**

The claims administrator will determine each "Authorized Claimant's" *pro rata* share of the Net Settlement Fund based on his or her "recognized Claim" from transactions during the Class Period based on the Plan of Allocation.  The claim for damages by any claimant is not to exceed the net losses realized by the claimant on all acquisitions or sales of common shares or options during the Class Period.

For purposes of the Settlement, "Recognized Claims" are calculated as follows:

- Priceline.com common stock:

Damage claims are available for all persons and entities that acquired their shares on or after January 27, 2000, and on or before October 4, 2000, and sold their shares on or after September 27, 2000, or have continued to hold their shares. Damages per share are weighted as described above and are determined based on the inflation in the share price at the date of purchase minus the inflation in share price at the date of sale, as more specifically set forth in the Plan of Allocation.

- Call Options to purchase Priceline.com common shares:

With respect to purchases and sales (covers) of Call Options, the Artificial Inflation per Option on a given day is the percentage reduction in the value of Call Options on that day as a result of the inflation in Priceline.com's closing common share price times the price paid (if purchased) or received (if sold).  The

<div align="center">-8-</div>

percentage reduction in the value of Call Options will be calculated using the Black-Scholes option pricing formula (using the implied volatility for an at-the-money option on that day and one year risk-free US Treasury interest rate) and the closing share price of Priceline.com's common stock on the transaction date compared with the Black-Scholes pricing formula using the uninflated share price of Priceline.com's common stock on that same date. The uninflated share price of Priceline.com's common stock will be determined by reducing the closing share price by the inflation per share for the transaction day as also set forth in the Plan of Allocation.

The Plan of Allocation and the "Recognized Claim" formulae are prepared in in order to fairly allocate the recovery among Class members. Thus, investors who purchased Priceline stock after Priceline first announced its 1999 financial results or throughout the Class Period and held their stock until at least September 27, 2000 (when the first corrective disclosure relating to the fraud alleged in this case was published) qualify for recovery under the Settlement.  As detailed in the Plan of Allocation with respect to common stock purchases, a Claimant's Recognized Claim is based on Plaintiffs' contention of the estimated artificial inflation in the price paid for shares of Priceline common stock as calculated by Plaintiffs' damages expert. This estimated inflation is the excess amount that class members allegedly paid, over fair market value, for their stock.  The alleged amount of artificial inflation for Priceline common stock and for each day during the Class Period is set forth in Table 1 of the Plan of Allocation.  The formulae and the inflation table takes into account the limitations on damages imposed under the PSLRA and other limitations tied to net losses and  gains during the Class Period.

Under the Plan of Allocation, checks will be distributed to Authorized Claimants after the Court has finally approved the Settlement and after all claims have been processed.  If any funds remain in the Net Settlement Fund after the checks are distributed by reason of un-cashed distributions the balance will be distributed as ordered by the Court on motion of the Class Plaintiffs.

## CLASS NOTICE AND CERTIFICATION

The Court's April 4, 2006, Order certified this action as a class action.  The certified Class includes all persons and entities whom purchased or otherwise acquired securities of Priceline.com securities during the Class Period of January 27, 2000 through October 4, 2000,

and were damaged thereby.  Excluded from the Class are (i) the Settling Defendants, (ii) the officers and directors of Priceline.com at all relevant times, (iii) members of Settling Defendants' immediate families and their legal representatives, heirs, successors or assigns, (iv) any entity in which Settling Defendants have or at any time had a Controlling Interest and (v) Deloitte & Touche LLP, or any of Deloitte's partners, officers and directors.

The Court's May 11, 2007, Order repeated the description of the Class as set forth above, approved the procedures for notifying the Class about the Settlement, as well as the content of the notice materials, and set the dates for filing requests for exclusion, objections, and proofs of claim and for the hearing on the fairness of the Settlement.  On May 16, 2007, the Court revised the date for filing proofs of claim.  For the reasons set forth below, the Court should confirm its prior conclusions and find that notice to the Class was adequate.

A.     <u>Adequacy of the Notice</u>

Federal Rule of Civil Procedure 23(c) and (e) describe the form of notice to Class Members applicable here.  *See, e.g., In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088 (5th Cir. 1977).  Conformity with the requirements of Rule 23(c)(2) fulfills the due process mandate. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173 (1974).  Thus, for opt-out class actions like this one, due process and the Federal Rules require individual notice to "all class members whose names and addresses may be ascertained through reasonable effort."  *Id.; accord* Fed. R. Civ. P. 23(c)(2)(B); *In re Merrill Lynch & Co., Inc. Research,* 2007 WL 313474 *8 (S.D.N.Y. Feb. 1, 2007) ("Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members." (citation omitted)).

Strategic Claims Services ("Strategic Claims"), the Claims Administrator for the Settlement, administered the mailing of individual notice by first-class mail to all reasonably locatable Class Members at their last-known addresses.  Strategic Claims obtained the most recent addresses for all Priceline.com shareholders of record.  *See* Affidavit of Paul Mulholland,

CPA, CVA Concerning Mailing of Notice of Pendency of Class Action and Proposed Settlement Motion for Attorneys' Fees and Settlement Fairness Hearing and Proof of Claim ("Mulholland") ¶4 (attached to Joint Declaration as Exhibit A). Strategic Claims has mailed a total of 88,893 packets of individual notice materials directly to entities identified in Priceline's transfer records and to nominees and institutions at their request. *Id.*, ¶8.

In addition to the mailing of individual notice, the Summary Notice of Pendency Of Class Action and Proposed Settlement Motion for Attorneys' Fees and Settlement Fairness Hearing ("Summary Notice") was published in all of the editions of the *Wall Street Journal* and *USA Today* on or before May 28, 2007. *Id.*, ¶6. Additionally, a press release announcing the Settlement in the same form as the publication notice was issued over the PR Newswire for national distribution on or before May 28, 2007. *Id.*, ¶6. The Notice, Settlement Agreement and Proof of Claim are also posted and available publicly on the claims Administrator's website. *Id.*, ¶4. Finally, Priceline described the Settlement in its First Quarter 2007 Form 10-Q filed on May 10, 2007.

These procedures collectively satisfy Rule 23(c)(2)(B)'s requirement that individual notice be sent to all potential Class members identifiable through reasonable effort. *See, e.g., In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F.Supp. 2d 180, 185-86 (S.D.N.Y. 2003) (due process satisfied by mailing approximately 30,000 notice packets to all reasonably identifiable persons who purchased securities during Class Period and by publishing summary notice in The New York Times); *see also, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 168-69 (2d Cir. 1987) (approving letter notice to reasonably identifiable class members, supplemented by "various forms of substitute notice," including publication in various media); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y. 1996) (approving individual notice to class members "whose address could reasonably be located" and summary notice published twice in national editions of the *Wall Street Journal*, *New York Times*, and *USA Today*), aff'd mem., MDL No. 1005, 107 F.3d 3, 1996 WL 739258 (2d Cir. 1996).

B.     **Content of the Notice**

The content of the notice – whether mailed directly to class members or communicated by publication – also satisfied Rule 23, due-process norms and the PSLRA.  Rule 23(c)(2)(B) specifies certain information that a class notice in a Rule 23(b)(3) action must contain, including (i) the nature of the case, the class definition, and the claims, issues, or defenses in the action, (ii) class members' right to exclude themselves from the class, (iii) the binding effect of a class judgment on all class members who do not request exclusion, and (iv) class members' right to object to the partial settlement and appear through counsel.  The PSLRA contains additional requirements applicable to this securities action, including 15 U.S.C. §§ 78u-4(a)(7), 77z-1(a)(7), as follows:

(A)     Statement of recovery – the amount of the settlement determined in the aggregate and on an average per share basis;

(B)     Statement of potential outcome of case – the amount of damages per share recoverable if Plaintiffs were to prevail on every claim. If the parties are unable to agree on damages, a statement concerning the issues on which the parties disagree;

(C)     Statement of attorneys' fees – statement of fees and costs to be applied for in the aggregate and on a per share basis;

(D)     Identification of lawyers' representatives – the name, telephone number, and address of counsel available to answer questions; and

(E)     Reasons for settlement – a brief statement explaining the reasons why the parties are proposing the settlement.

15 U.S.C. §§ 78u-4(a)(7), 77z-1(a)(7); *Indep. Energy Holdings*, 302 F. Supp. 2d at 184.  The notice also must include a cover page summarizing the required information. 15 U.S.C. §§ 78u-4(a)(7), 77z-1(a)(7)(A).

The notice provided to the Class in this case satisfies all the foregoing requirements. The Notice informed the Class of the relevant aspects of the Action and the partial settlement, including:

• The nature of the case, a statement of the parties' respective claims and defenses, the background of the settlement, and how the settlement funds will be allocated if the settlement is approved;

- Class members' right to exclude themselves from the securities settlement class, to object to any aspect of the settlement, and to appear at the fairness hearing--and the processes and deadlines for doing so; and

- The binding effect of any judgment on all persons who do not exclude themselves from a class, and the impact on class members if the settlement is approved.

Consistent with the PSLRA's requirements, the Notice also:

- set out the amount of the settlement and the aggregate recovery per share, and provided the Plan of Allocation;

- stated that the parties disagree on the amount of damages to which class members would be entitled, and summarized the bases for that disagreement;

- stated the outside limits of the amount of attorneys' fees sought;

- provided the name, address, and telephone number of lead counsel for the Class; and

- explained why the parties have proposed a settlement, including the risk that depletion and potential unavailability of insurance funds could defeat Plaintiffs' ability to collect a judgment.

The notices provided sufficient information for the Class to understand the proposed partial settlement and their options. *See, e.g., In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y.1997) *aff'd*, 117 F.3d 721 (2d Cir. 1997) (settlement notice adequate where "level of detail apprises the class members of the salient terms of the settlement and affords them a reasonable opportunity to present any objections."); *Indep. Energy Holdings*, 302 F. Supp. 2d at 184 (approving notice where information required by PSLRA was found partly in individual notice and partly in summary notice).

Accordingly, the Court should find the form and substance of the notices disseminated to the Class proper and adequate.

## THE PROPOSED SETTLEMENT SHOULD BE
## GRANTED FINAL APPROVAL

The substantive terms of the Settlement and the method used to arrive at the Settlement, as well as the proposed Plan of Allocation are fair, reasonable and adequate and should be approved by the Court.[4]

### A.   The Proposed Settlement Is Fair, Reasonable and Adequate

In determining whether final approval should be given to a class action settlement, the Court must determine whether a proposed settlement, taken as a whole, is fair, reasonable and adequate. *In re Iomega Sec. Litig.*, Civ Nos. B-86-257 (JAC), B-86-273 (JAC), 1987 WL 43391, at *9 (D. Conn. Oct. 1, 1987); *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1368 (2d Cir. 1991); *Banyai v. Mazur, 2007 WL 927583 *7 (S.D.N.Y. March 27, 2007).* A proposed class action settlement enjoys a strong presumption that it is fair, reasonable, and adequate if, as here, it was the product of arm's length negotiations conducted by capable counsel experienced in class action litigation arising under the federal securities laws, and if it occurred after meaningful discovery. *See, e.g., Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358, 366-67 (S.D.N.Y. 2002); PaineWebber,* 171 F.R.D. at 124; *New York & Maryland v. Nintendo of Am ., Inc.*, 775 F. Supp. 676, 680-81 (S.D.N.Y. 1991); *Chatelain v. Prudential-Bache Secs., Inc*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992) ("A strong initial presumption of fairness attaches to the proposed settlement when it is shown to be the result of this type of a negotiating process and when the number of objectors is small."); *see also Manual for Complex Litigation, Fourth § 21.612* (2004) ("Extended litigation between or among adversaries might bolster confidence that the settlement negotiations were at arm's length."). Indeed, "absent evidence of fraud or overreaching, [courts] consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel." *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 281 (S.D.N.Y. 1993) (citation omitted).

---

[4]    The factors supporting final approval of the Settlement and the Plan of Allocation are only summarized herein.  Plaintiffs respectfully refer the Court to the Joint Declaration for a detailed discussion of the litigation risks and other factors supporting final approval of the Settlement and Plan of Allocation.

In making this determination, the Court compares "the terms of the compromise with the likely rewards of litigation." *Iomega*, 1987 WL 43391, at *9; *In re Warner Communications Sec. Litig*., 618 F. Supp. 735, 740 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *see also Detroit v. Grinnell Corp*., 495 F.2d 448, 462 (2d Cir. 1974) ("[t]he court is only called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable" (citations omitted)).

The Court must ascertain sufficient facts about the settlement in order to render "an intelligent and objective opinion" about the likelihood of success if a claim is litigated, but in doing so, the Court cannot conduct a trial on the settlement's merits.  *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (citations omitted); *Grinnell*, 495 F.2d at 462 ("[t]he Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case"); *Paine Webber*, 171 F.R.D. at 124 (approval of a settlement is within the Court's discretion).

The factors in this Circuit to be considered in evaluating the Settlement are:

1.      the complexity, expense and likely duration of the litigation;

2.      the reaction of the class to the settlement;

3.      the stage of the proceedings and the amount of discovery completed;

4.      the risks of establishing liability;

5.      the risks of establishing damages;

6.      the risk of maintaining the class action through trial;

7.      the ability of the Defendants to withstand a greater judgment;

8.      the range of reasonableness of the settlement funds in light of the best possible recovery; and

9.    the range of reasonableness of the settlement funds to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463; *Iomega*, 1987 WL 43391, at *9; *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003).  When assessed in light of the applicable criteria, the Settlement is fair, reasonable and adequate and should be granted final approval.

### 1.    The complexity, expense and likely duration of the litigation

As described in more detail in the Joint Declaration, this Action is replete with complexity both in establishing liability and in proving damages.  Already the litigation has proceeded for over six years and Plaintiffs have incurred expert fees, document processing and other costs exceeding $1.394 million as well as over $12 million of lodestar.  To prevail, Plaintiffs would have to prove that Priceline.com and the Individual Defendants knowingly and/or recklessly violated the relevant accounting standards; that Priceline's revenues, stock option expenses and income, as well as its assets, were fraudulently misstated and not just a product of corporate mismanagement, erroneous business judgment, or good faith misapplication of relevant accounting standards; that the market was deceived by the false press releases and/or by the misstated financial statements and that the false statements and omissions, rather than unrelated market forces caused Plaintiffs' losses.  Each of these elements of proof was hotly contested.  Thus, for example, the parties did not even agree as to which accounting guidances and requirements controlled the initial accounting for the WebHouse financing, stock options, licensing and related agreements or indeed whether they should be accounted for as single "transaction" or a series of independent agreements.  The parties also disagreed over the valuation of the WebHouse warrants and when during the Class Period the stock options that had been recorded on Priceline's balance sheet as an asset became impaired.  The timing of the recognition of expense, the type of expense and the valuation of the stock warrants issued and reissued to the various airlines providing Priceline with their ticket inventory involved even greater accounting complexities.

Moreover, whatever the outcome of any eventual trial, inevitable appeals would have been taken to the Second Circuit and perhaps even to the U.S. Supreme Court. All of the foregoing would have delayed, for years, the ability of the Class to recover. Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk of delay of continued litigation through the remainder of the discovery periods, summary judgment, trial and post-trial proceedings.

2.      The Reaction of the Class to the Settlement

The reaction of the Class to the Settlement is often the most significant factor to be weighed in considering its adequacy. *See Maley*, 186 F. Supp. 2d at 362; *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001); *Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 457-58 (S.D.N.Y 2004). The fact that no objections to the substantive terms of the Settlement have been made as of this date is evidence of the fairness of the Settlement. *PaineWebber*, 171 F.R.D. at 126.

Over 88,893 Settlement Notices were sent to Class Members or their nominees. To date, no objections to the substantive terms of the Settlement or the Plan of Allocation have been received. The deadline for submitting objections was June 8, 2007. The favorable reaction of the Class is further evidence that the Settlement is fair, reasonable and adequate.

3.      The Stage of Proceedings and the Amount of Discovery
          Completed

The original complaints were filed in October 2000. Since that time, the Court denied Settling Defendants' motion to dismiss, the Class was certified, and Plaintiffs took and defended numerous depositions and reviewed million of pages of documents produced by Priceline, WebHouse, Deloitte and third parties. Additional insights into the relative strengths and weaknesses of the case were obtained through the series of mediations conducted before a settlement was finally reached. In addition, Plaintiffs used teams of investigators, forensic accountants and economists to investigate, analyze and quantify their claims. The stage of proceedings and the amount of discovery completed at the time of settlement is relevant to "the

-17-

parties' knowledge of the strengths and weaknesses of the various claims in the case, and consequently affects the determination of the settlement's fairness." *PaineWebber*, 171 F.R.D. at 126. To approve a proposed settlement "the Court need not find that the parties have engaged in extensive discovery." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) (citing *Plummer v. Chem. Bank*, 608 F.2d 654 (2d Cir. 1982)). "Formal discovery is not a prerequisite." *Global Crossing*, 225 F.R.D. at 458-59 (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981)). "Instead, it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make ... an appraisal' of the Settlement." *Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 176; *accord Global Crossing*, 225 F.R.D. at 458-59; *In re AOL Time Warner, Inc. Securities, 2006 WL 903236 *10 (S.D.N.Y. April 6, 2006)* ("Courts have approved settlements at all stages of the proceedings. The relevant inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement.")

Here, there is no doubt that at this stage of these proceedings, the parties have gained a thorough understanding of their own strengths and weaknesses. Prior to executing the Stipulation, Co-Lead Counsel, their investigators and forensic accountants, investigated the events and transactions alleged in the Action, and reviewed and analyzed millions of pages of documents produced by Priceline and others. Plaintiffs' understanding of the facts and evidence was then put to the test as they presented their case to two separate mediators, highly regarded defense counsel and Priceline's insurers, and their experts.

This process adds credibility to Co-Lead Counsel's careful assessment that the Settlement is fair. *PaineWebber*, 171 F.R.D. at 126 ("Class Counsel has had sufficient information to act intelligently on behalf of the class") (internal quotations and citations omitted); *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 WL 31663577, at *15 (S.D.N.Y. Nov. 26, 2002) ("[g]iven the stage of this case and the extensive discovery conducted. . . Plaintiffs' counsel is well-positioned to assess the fairness of the proposed settlement"); *Global Crossing*,

225 F.R.D. at 459 (where plaintiffs obtained documents from the company through informal discovery during settlement negotiations, the court determined that "Plaintiffs' counsel appear to have scrutinized the facts of the Actions from the earliest stages of the litigation and developed an informed basis from which to negotiate a reasonable compromise"). Accordingly, this factor also supports approval of the Settlement.

<div align="center">4.     Risks of Establishing Liability</div>

As the preceding paragraphs have shown, this Action is replete with complexity both in establishing liability and in proving damages. Despite all that has occurred, Plaintiffs would still have to overcome likely motions for summary judgment and a "battle of the experts" at trial of this case. Each would have proven to be complex, expensive and time-consuming. There were enormous risks in proceeding with a trial of Plaintiffs' claims, requiring complex, fact-intensive analyses of the accounting as described above, and all of this would need to be absorbed and understood by a lay jury.

For instance, Plaintiffs would have to show that Priceline.com's accounting treatment of the WebHouse warrants was not a product of reasonable choices among accounting alternatives or, indeed, not merely negligent but reckless or knowingly false. Priceline's accounting for and valuation of the WebHouse warrants was supported by independent appraisals and private investments by sophisticated purchasers. The Settling Defendants have pointed to Deloitte's sign-off on its accounting and the fact that neither Deloitte nor the SEC has required Priceline to restate its financial statements. Plaintiffs would have a heavy burden of persuading a jury that Priceline.com's misstated financial results were fraudulently rather than merely erroneously issued. Defendants also would claim that any flaws in their accounting were the result of reasonable reliance on their auditor, Deloitte. Audit workpapers and other documents produced by Deloitte reflect that Priceline.com collaborated with Deloitte in reaching its conclusions and consulted with them in reporting their financial results. Indeed, recently produced documents suggest that Deloitte was the architect for the original structure of the WebHouse transaction and its accounting treatment. Deloitte was similarly deeply involved in structuring the relationship

between Priceline and the airlines in order to obtain preferred accounting and tax treatment for the airline's stock warrants. The jury could find the argument that Priceline and the Individual Defendants merely deferred to Deloitte particularly persuasive because Deloitte held itself out to be the expert in this area. At a minimum, to understand Plaintiffs' claims, the jury would have to consider varying approaches to interpreting interrelated agreements among affiliated companies and technical testimony concerning the valuation of stock options in start-up companies. With respect to Plaintiffs' claims regarding the accounting treatment for the airline warrants, Defendants would also argue that the SEC itself approved Priceline's accounting methods by permitting Priceline to file its initial registration statement for its pre-Class Period Initial Public Offering, which included expenses for warrants issued to Delta.

Plaintiffs also would have to show that Priceline.com's publicly-announced projected future results were not sheltered by the special legal protections for issuers who make predictions of future corporate performance, including the PSLRA's "safe harbor" for forward-looking statements, 15 U.S.C. §78u-5, and the judicially-created "bespeaks caution" doctrine, *see Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

Plaintiffs would also have to demonstrate that the Class's losses were actually caused by Priceline's fraudulent accounting and related false and misleading statements, rather than other factors influencing Priceline's stock price. Because the internet bubble burst in early 2000, Plaintiffs' risk of establishing loss causation was particularly high in this case.

     5.    The Risks of Establishing Damages

Plaintiffs also confronted significant obstacles in demonstrating damages. "Calculation of damages is a complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the stock's 'true' value absent the alleged fraud." *Global Crossing*, 225 F.R.D. at 459 (citations and internal quotations omitted). The jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction which at best is uncertain. *See Lloyd's*, 2002 WL 31663577, at *21 ("The determination of damages. . . is a complicated and uncertain process, typically involving

conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable."); *Maley*, 186 F. Supp. 2d at 365 (same); *Warner*, 618 F. Supp. at 744-45 ("[i]n this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions"). Again, because stock prices in the industry as a whole declined in early 2000, isolating the amount of Plaintiffs' stock losses that was attributable to Defendants' fraud versus market forces would be a particularly daunting task.

The risk of establishing damages and the amount thereof also supports approval of the Settlement.

        6.        <u>Risks of Maintaining Class Action Through Trial</u>

The Court has certified the Class in this Action. Of course, there could be a risk of decertification at a later stage. See *In re NASDAQ Market-Makers Antitrust Litig*., 187 F.R.D. 465, 476-77 (S.D.N.Y. 1998) (decertification can occur if management problems arise during litigation; decertification or reversal of certification would deprive class of any recovery). While unlikely, this risk could not be ruled out. Defendants vigorously opposed class certification and, in fact, successfully precluded one Lead Plaintiff from being appointed as a class representative. Defendants could be expected to continue their efforts to defeat class certification, especially as trial drew closer and thereafter on appeal.

        7.        <u>The Ability of Defendants to Withstand a Greater Judgment</u>

While no one can predict whether a much larger judgment entered several years from now would be collectible, the inability of Defendants to withstand a greater judgment was a significant consideration relied upon by Plaintiffs' counsel in determining to settle this case. *See Iomega,* 1987 WL 43391, at *10. As Priceline reported in its first quarter 2007 Form 10-Q, only $30 million of the $80 million cash settlement is being funded through its insurance policies. The balance sheet identified in this Form 10-Q also reflects that Priceline could not have paid a much larger judgment than that negotiated in this case. Priceline's current liabilities ($752

-21-

million) exceed its current assets ($556 million). Indeed, according to this financial report, apart from its intangible assets, goodwill and deferred taxes, Priceline's total assets are less than its total liabilities and Priceline has an accumulated deficit of $1.278 billion dollars. For this same quarter (which includes the charge for the settlement), Priceline reported an operating loss of $31.7 million. Nor is it likely that the Individual Defendants could sustain a judgment in the amounts sought on this case. Thus, this factor strongly supports approval of the Settlement.

8.     The Range of Reasonableness of the Settlement Funds in Light of the Best Possible Recovery and Litigation Risks

The last two substantive factors courts consider are the range of reasonableness of the settlement funds in light of (i) the best possible recovery and (ii) litigation risks. In analyzing these last factors, the issue for the Court is not whether the Settlement represents the "best possible recovery," but how the Settlement relates to the strengths and weaknesses of the case. The Court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462.

Given the history and posture of this case, as well as the litigation risks discussed above, the Settlement provides an extraordinary recovery. In fact, the Settlement amount far exceeds the maximum recoverable amount of Priceline.com's insurance policies, both as originally written and with the reductions for litigation expenses already funded by the policies.

According to the court in *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 715 (E. D. Pa.2001), since 1995, class action settlements have typically recovered "between 5.5% and 6.2% of the class members' estimated losses." While here, Plaintiffs' economist had preliminarily estimated "dollar drop" damages relating to the WebHouse transaction to be $300 to $400 million, with damages relating to losses in Priceline's airline ticket business exceeding $1 billion,[5] Defendants' damages estimate relating to WebHouse was less than half of Plaintiffs' estimate, and Defendants did not even attempt to value Plaintiffs' airline business claims. Thus,

---

[5]     Estimated damages using a "percentage" method would be higher.

for Plaintiffs' stronger WebHouse claims, the $80 million recovery reflects a 20-60% recovery. Nor, given Priceline's current financial condition, could Plaintiffs hope to recover anywhere near its damages estimate for the airline business claims even if they prevailed on those claims at trial. A settlement can be approved even when it amounts to only a small percentage of the recovery sought. *In re Michael Milken & Assocs.*, 150 F.R.D. 57, 64-65 (S.D.N.Y. 1993); *In re Gulf Oil Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 590-91 (S.D.N.Y.1992); *Grinnell,* 495 F.2d at 455 n. 2 ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."). Here, Plaintiffs are recovering a significant portion of its strongest claims relating to the WebHouse transaction and, even if Plaintiffs obtained, after long and costly litigation, a dramatically larger judgment, there is a significant issue as to whether such a judgment could be collected.

> In cases like these actions--where the risks and costs of litigation are great, where little if any additional recovery might be gained through litigation, and where the remaining insurance could be depleted or lost entirely, thereby potentially reducing the recovery available through litigation--the amount of "potential damages" does not preclude approval of a lesser settlement amount. The prompt, guaranteed payment of the settlement money increases the settlement's value in comparison to "some speculative payment of a hypothetically larger amount years down the road." Teachers' Retirement Sys., 2004 WL 1087261, at *5.

*Global Crossing*, 2004 WL 2724076, at *25.

In light of all the risks, the Settlement represents an outstanding recovery for the Class.

**B.      The Settlement Negotiations Were Procedurally Fair**

In assessing whether a settlement is fair, reasonable and adequate, courts often examine the "negotiating process by which the settlement was reached" to determine whether the settlement was the result of "arms-length negotiations" between counsel with "the experience and ability . . . necessary to effective representation of the class's interests." *Weinberger*, 698 F.2d at 74; *In re Sterling Foster & Co. Sec. Litig.*, 238 F. Supp. 2d 480, 484 (E.D.N.Y. 2002) ("[a] strong presumption of fairness attaches to proposed settlements that have been negotiated at arms-length").

Few settlement negotiations were more hard-fought than those which occurred in this case, where two sets of face-to-face mediations conducted over a period of months before the Hon. Retired U.S. District Judge Politan broke down with no agreement reached. During a third mediation attempt conducted with the assistance of Robert Meyer, Esq., acting as mediator, the parties agreed that continued discussions were warranted, and a settlement was reached only with yet another full day mediation. Collusion is simply not an issue with respect to this Settlement. As explained in the Joint Declaration, in settling this case, the parties approached the mediation with the same diligence which they practiced throughout the course of the litigation. The settlement negotiations themselves were undeniably conducted at arm's length between highly experienced and skilled attorneys specializing in securities fraud litigation and with the able mediation expertise of retired District Judge Nicholas H. Politan and Robert A. Meyer, Esq. The Settlement is therefore clearly entitled to a presumption of fairness from the settlement negotiations.

<div align="center">

**THE PROPOSED PLAN OF ALLOCATION**
**IS FAIR, REASONABLE AND ADEQUATE**

</div>

A Plan of Allocation is fair, reasonable and adequate as long as it has a "reasonable, rational basis." *Maley*, 186 F. Supp. 2d at 367. Because it is impossible in a large class to calculate each member's claim with mathematical precision, courts recognize that "the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *PaineWebber*, 171 F.R.D. at 133.

Here, the Plan of Allocation provides for the distribution of the Net Settlement Fund on a *pro rata* basis, based on a formula tied to liability and damages. "Allocation formulas, including certain discounts for certain securities, are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim." *American Bank Note*, 127 F. Supp. 2d at 429. An allocation formula only need have a reasonable and rational basis, particularly if recommended by experienced and competent class counsel. *Id*. at 429-30.

<div align="center">

-24-

</div>

Counsel's conclusion that the Plan of Allocation is fair and reasonable is therefore entitled to great weight.  *Id.* at 430 (approving allocation plan and according counsel's opinion "considerable weight" because there were "lengthy negotiations" among lead counsel and "detailed assessments of the strengths and weaknesses of the claims asserted, the applicable damages, and the likelihood of recovery").

For these reasons, the Plan of Allocation is fair, reasonable and adequate and should be approved.  Moreover, here no Class Member has objected to the Plan of Allocation.

## CONCLUSION

This Settlement is the result of over six years of aggressively prosecuted and defended complex securities litigation.  The $80 million recovery was obtained only after four (4) mediation attempts and represents a tremendous result in settlement of the Class's claims against Defendants who likely could pay little more than the settlement amount.  For all the foregoing reasons, Plaintiffs respectfully request that the Court approve the Settlement as fair, reasonable and adequate.

Dated:  June 21, 2007

Respectfully submitted,

**SCOTT & SCOTT, LLP**

/s/ David R. Scott
David R. Scott (ct16080)
drscott@scott-scott.com
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432

**JOHNSON & PERKINSON**

**/s/** Jacob B. Perkinson
Jacob B. Perkinson
1690 Williston Road

-25-

South Burlington, VT 05403
Telephone: (802) 862-0030
Facsimile: (802) 862-0060

**Attorneys for Class Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2007, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing. The parties may access this filing through the court's CM/ECF System.

<div style="margin-left:40%">

*/s/ David R. Scott*
_____

**SCOTT + SCOTT, LLP**
David R. Scott (CT16080)
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
Fax: (860) 537-4432

**Co-Lead Counsel for Plaintiffs**

</div>