UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| IN RE: PRICELINE.COM, INC. SECURITIES LITIGATION | : : : | |
| ———————————————— | : : | MASTER FILE NO. 3:00CV01884 (AVC) |
| This document relates to: | : : | |
| ALL ACTIONS | : : : : : | |

JOINT DECLARATION OF DAVID R. SCOTT AND JACOB B. PERKINSON IN
SUPPORT OF FINAL APPROVAL OF THE PROPOSED SETTLEMENT, PLAN OF
ALLOCATION AND AWARD OF ATTORNEYS' FEES AND EXPENSES

**SCOTT + SCOTT, LLP**
David R. Scott
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
Fax: (860) 537-4432

**SCOTT + SCOTT, LLP**
Beth A. Kaswan
19th Floor, Suite 1915
75 Rockefeller Plaza
New York, NY 10019
Tel: (212) 710-1040
Fax: (212) 710-1041

**SCOTT + SCOTT, LLP**
Geoffrey M. Johnson
33 River Street
Chagrin Falls, OH 44022
Tel: (440) 247-8200
Fax: (440) 247-8275

**Co-Lead Counsel**

**JOHNSON & PERKINSON**
Dennis J. Johnson
Jacob B. Perkinson
Eben Duval
1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403
Tel: (802) 862-0030
Fax: (802) 862-0060

**Co-Lead Counsel**

## DECLARATION

Pursuant to 28 U.S.C. § 1746, David R. Scott and Jacob B. Perkinson, under penalty of perjury, declare that the following is true and correct to the best of their knowledge and belief:

1.     David R. Scott is the managing partner of the law firm of Scott + Scott, LLP. Jacob B. Perkinson is a partner and senior practitioner in the law firm of Johnson & Perkinson. Our two firms are Court-appointed Lead Counsel and Class Counsel for Plaintiffs and Class Representatives R. Warren Ross, Thomas Linton, John S. Anderson, Mark Weiss and Marilyn D. Engel (collectively, "Plaintiffs"). We have personal knowledge of the matters set forth herein based on our active participation in all material aspects of the prosecution and settlement of this action.

2.     This declaration is submitted in support of Plaintiffs' application for (a) final approval of the proposed Settlement for $80,000,000 plus accrued interest (the "Settlement"); (b) the Plan of Allocation; and (c) an award of attorneys' fees equal to 30% of the $80,000,000 fund (the "Settlement Fund") plus interest accrued on the Settlement Fund, and reimbursement of expenses of $1,394,422.57 (the "Fee Application"). The purpose of this declaration is to set forth the background of the action and its procedural history, the factual investigation and prosecution, the negotiations that led to the Settlement, the notice process and the proposed Plan of Allocation.

## PRELIMINARY STATEMENT

3.     After nearly seven years of aggressive and hard-fought litigation, Plaintiffs have reached a settlement with Defendants Priceline.com, Inc., Jay Walker, Daniel Schulman, Richard Braddock and N.J. Nichols (collectively, the "Defendants") in which the Defendants have agreed to pay a total of $80 million for the benefit of the Class. Of this amount, approximately $50

1

million will come directly from Priceline, and the remaining $30 million will come from Priceline's insurers, thereby exhausting all of Priceline's available insurance.[1]

4.      The proposed Settlement represents an extraordinary recovery for the Class. The Settlement partially resolves a lawsuit over whether Priceline.com misled investors about Priceline's financial performance and risks associated with Priceline.com's business operations, including WebHouse and its business model. The Settlement was entered into after years of extensive discovery, retention of and consultation with teams of accounting and economic experts to ascertain Priceline's financial reporting deficiencies and their relationship to Plaintiffs' losses, and four separate mediation sessions with a retired United States District Court Judge Nicholas Politan and Robert A. Meyer, Esq., who recommended the proposed settlement terms.

5.      The overall Settlement is especially strong given that there remained serious risks – both with respect to the merits of the lawsuit and in establishing damages. These included:

- Whether and to what extent Defendants' Class period statements were actionably false or misleading;

- What Generally Accepted Accounting Principles ("GAAP") were applicable to this case;

- Whether Defendants misstated their financial statements in violation of these GAAP standards;

- That each of the Defendants sued under Section 10b and Rule 10b-5 acted with scienter;

- That the alleged false statements caused Plaintiffs' losses; and

- The amount of damage to the Class.

---

[1]      Plaintiffs have not settled their claims against Priceline's auditor, Deloitte & Touche ("Deloitte"). Plaintiffs recently filed a motion to amend the Consolidated Class Action Complaint to re-assert claims against Deloitte, and, with the Court's permission, Plaintiffs will continue to vigorously litigate these additional claims.

6.    Each of these issues was vigorously disputed. For example, Defendants would be expected to argue that Plaintiffs losses resulted from the bursting of the internet bubble rather than from any wrongdoing on the part of the Defendants. With respect to the accounting issues, Priceline has never restated its financial statements and Defendants would undoubtedly have argued that the Securities and Exchange Commissions ("SEC") reviewed and approved of Priceline's accounting making proof of liability on these claims very difficult.

7.    Many of these issues would have been subject to a "battle of experts" – added to and compounding the uncertainties, expense and delay of inevitable post-trial motions and appeals. And at the end of the day, if Plaintiffs prevailed on all theories, the Defendants would likely be unable to pay the full amount of a judgment. The Settlement here far exceeds Defendants' insurance coverage, and constitutes a significant portion of Priceline's available assets. Under these circumstances, the $80 million recovery for the Class represents an outstanding result. Indeed, not a single Class member has objected to the substantive terms of the Settlement or the substantial recovery obtained.

8.    Turning to the key terms of the Settlement Agreement itself, the entire Settlement Amount of $80 million (after deduction of Court-approved expenses and attorneys' fees), plus interest accruing from the date when the amount is fully paid into escrow, will be distributed to damaged members of the Class who timely submit valid proofs of claim. Assuming the Settlement is approved, there will not be any right of reversion to the Settling Defendants or their insurers.

9.    Plaintiffs also seek approval of the proposed Plan of Allocation as fair and reasonable. The Plan of Allocation, which is set forth fully in the Notice of Pendency of Class action and Proposed Settlement With Defendants, Motion for Attorneys' Fees and Settlement

3

Fairness Hearing (the "Notice") that has been mailed to members of the Class, provides for the distribution of the Net Settlement Fund on a *pro rata* basis, based on a formula tied to liability and damages. As this is a reasonable and rational distribution, the Court should approve the proposed Plan of Allocation.

10.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is also applying to the Court for a collective award of attorneys' fees and payment of costs and expenses. Specifically, Class Counsel is applying for a fee of 30% of the Settlement Amount, which is $24 million, and requesting reimbursement of incurred expenses totaling $1,394,422.57. Respectfully, Class Counsel submit that the Fee Application should be awarded because: (a) the fee sought is supported by the amount of time expended by counsel in prosecuting the case, *i.e.*, it represents a multiple of less than two times the value of counsels' time while typical awards in similar cases grant multipliers well above this request; (b) the action was extremely risky and was prosecuted on a contingent basis; (c) the Settling Defendants put on a vigorous defense; and (d) counsels' efforts resulted in a substantial settlement favorable to the Class.

## THE MERITS OF PLAINTIFFS' CLAIMS

11.     Plaintiffs in this case alleged that Priceline and the other Defendants made false statements and misleading omissions to convince the market that Priceline's "Name Your Own Price" business model was unique, profitable and could be expanded into new markets.[2] The case involves two broad theories of recovery:

---

[2]     The "Name Your Own Price" System essentially permits consumers to establish an "offer" price to purchase airline tickets, hotel rooms and rental cars and, based upon the collection of excess capacity in those markets at certain times, Priceline seeks to locate suppliers to meet that "offer" price, thereby providing an acceptable and, at times, lower price for the item(s) purchased than otherwise would be available to consumers.

- **First**, Plaintiffs contend that Defendants misrepresented the extent to which Priceline's business model could be used to sell an infinite array of products. To do this, Defendants created separate "off-the-books" companies, whose financial performance was concealed from the public, one of which was called WebHouse. Defendants made numerous false and misleading statements about WebHouse's financial success and business model.

  Plaintiffs contend that Priceline misstated its financial statements, by recognizing as revenue the purported value of stock warrants for a 75% interest in WebHouse, and then failing to write-down this investment as the evidence of WebHouse's failure grew.

- **Second**, Plaintiffs contend that Defendants misrepresented Priceline's relationship with the airlines, and the extent to which Priceline had access to cheap tickets. Priceline granted huge amounts of Priceline stock warrants to various airlines in order to obtain its airline ticket inventory and mis-reported their costs on its financial statements.

  Defendants vigorously disputed each of these contentions.

**A.     False Statements About WebHouse.**

12.     A significant portion of this case involved Plaintiffs' allegations that Defendants knowingly and/or recklessly made false statements about WebHouse. Defendants launched WebHouse, purportedly a separate and private company having private investors, in late October 1999 to demonstrate that Priceline's "Name Your Own Price" business model – which up to that point had only been used to sell airline tickets, car rentals and hotel reservations – could also be successfully applied to any number of additional goods and services. At the time, Defendants were touting Priceline as the "future Wal-Mart of the Web," and they wanted to show investors that Priceline's business model could be expanded beyond the travel industry.

13.     In late October 1999 Priceline executed a series of agreements by which it licensed its business model to WebHouse, agreed to provide management, marketing and other support to WebHouse and obtained stock warrants, with a $3 exercise price to obtain a 75% interest in WebHouse.  In late October 1999, several of the individual Defendants and other

5

investors with sizeable investments in Priceline or in Defendant Jay Walker's other companies, also purchased WebHouse stock at $3 per share. Based on these WebHouse stock purchases, Priceline obtained an appraisal valuing its stock warrants in WebHouse at $189 million, which it then immediately (and improperly) booked as income on its 1999 financial statements – thereby further demonstrating to the market the value of its "business model" for applications beyond the travel industry.

14.    Following the WebHouse launch, Defendants spent a great deal of time trying to persuade grocery manufacturers and gasoline suppliers to offer discounts for the groceries and gas purchased on the WebHouse website, which WebHouse shared with Priceline. Otherwise, WebHouse itself would be forced to fund the discounts provided to its customers – which is precisely what occurred. While Defendants regularly announced WebHouse's successful growth and expansion into new markets throughout the Country, with each grocery purchase, WebHouse lost money because the manufacturers had refused to fund the discounts WebHouse was granting to its customers. Because WebHouse was a purportedly "private" company, WebHouse financial statements reflecting these enormous and growing losses were withheld from the market. Nor did Priceline or the other Defendants reveal the financial debacle that grew throughout the Class Period.

15.    Only when Defendants announced at the end of the Class Period that WebHouse was ceasing business did Priceline disclose on its financial statements that its purported $189 million  investment in WebHouse was "impaired," and reversed the income it had prematurely reported.

16.    Plaintiffs were prepared to show that, at the same time that Defendants were making the false statements about WebHouse's success and concealing its financial losses and

the widespread refusal by manufacturers to fund the discounts, Defendants were unloading hundreds of millions of dollars of their own Priceline shares. By the summer of 2000, Defendant Jay Walker, the person who had founded both Priceline and WebHouse, and who held major investments in both, was desperate to cash out some of his Priceline shares because he was grossly overextended financially due to a $120 million margin loan that he had taken out to purchase Priceline stock. Walker had overextended himself to the point where a sharp drop in Priceline stock had the potential to wipe out his entire net worth. In the spring and summer of 2000, as WebHouse secretly floundered despite glowing reports from Defendants regarding its success, Walker began aggressively selling his Priceline shares.

17.    On September 27, 2000 Priceline reported sharply lower financial results, attributing the decline to problems in its core airline ticket business. Certain analysts, however, began to speculate about possible problems at WebHouse and its impact on Priceline. Then, on October 5, 2000, Defendants shocked the market by announcing that they were shutting WebHouse down. Investors took this as a sign that Priceline's business model was limited to the travel industry and could not be successfully expanded to sell groceries and gasoline on the web. On the day of this announcement, Priceline's stock price plummeted 38%.

18.    Plaintiffs' counsel pieced together the WebHouse fraud from massive amounts of documents obtained through extraordinary efforts, as further described below. In addition, millions of pages of hard-copy and electronic documents were obtained from the Defendants only after Plaintiffs filed repeated motions with the Court to compel their production. Similar efforts were required to obtain audit workpapers and other documents from Deloitte to support these claims.

7

19.    While Plaintiffs believe that they have developed a strong case of fraud relating to the WebHouse transaction, and in fact this evidence is the primary reason that Defendants ultimately agreed to settle this case, if the claims were to go to trial, Defendants would offer a vigorous defense.    First, Defendants have argued, with some documentary support, that WebHouse was set up as a private company, not for the purpose of defrauding Priceline's public investors but rather to permit private investors to bear the extraordinary financial risks that this new venture entailed.    Second, Defendants cite to the fact that several of the individual Defendants, including Jay Walker, individually and through his companies, as well as other sophisticated private investors, invested hundreds of millions of dollars of cash in WebHouse evidencing a belief that, with enough customer growth and acceptance by retailers, manufacturers would ultimately participate and fund the discounts.    Defendants have further argued that during the Class period, the market knew that WebHouse was having difficulty signing up manufacturers, and that many of the statements Plaintiffs contend were false were either immaterial, obvious puffery or protected forward-looking statements.

20.    With respect to Plaintiffs' WebHouse accounting allegations, to negate their scienter, Defendants will no doubt rely heavily on Deloitte's audit sign-off on their 1999 financial statements.    Documents produced by Deloitte reflect that Deloitte auditors not only knew about the parties' original intent and nature of the WebHouse transaction which precluded immediate revenue recognition, but that Deloitte auditors and tax consultants actively participated in structuring the transaction and commenting on the language in the implementing agreements.    Plaintiffs' strongest evidence in this case, that the accounting treatment for the issuance of the WebHouse warrants knowingly violated GAAP, comes from Deloitte's own audit workpapers and notes – which reflect that Deloitte's national experts advised Deloitte's auditors

that Priceline's upfront revenue recognition for the WebHouse warrants violated GAAP and was improper under the existing transaction agreements (so that Deloitte and Defendants then attempted to retroactively change the language in the agreements to justify the published accounting treatment). Defendants have also relied heavily on the "independent" appraisals obtained by Priceline to justify its failure to write-down and recognize an expense for the impairment of the WebHouse stock options asset during the Class Period. Finally Defendants can be expected to point to the fact that neither Deloitte nor the SEC ever required Priceline to restate its Class Period financial statements for errors in the accounting for the WebHouse transaction.

21.     Finally, Defendants have argued that even if Plaintiffs were to prevail on their claims that false statements were knowingly made by Defendants about WebHouse and in connection with its accounting, these statements were responsible for little, if any, of Plaintiffs' losses on their Priceline stock, which Defendants largely attributed to the bursting of the internet bubble. Thus, Defendants' assessments of potential damages relating to WebHouse were less than half of Plaintiffs' preliminary $300-400 million damages estimate(using a "dollar drop" method; damages using a "percentage" method would be higher).

**B.     False Statements About Priceline's Airline Ticket Business.**

22.     In this case, Plaintiffs have also alleged that Defendants made numerous false statements during the Class Period about Priceline's relationship with the major airlines and Priceline's ability to obtain deeply discounted airline tickets for sale on the Priceline website, while denying the competitive threat of other online travel services. Plaintiffs contend that Defendants misled the market into believing that Delta and the other airlines were beating down Priceline's door to sell their excess inventory using its business model, when in fact the airlines

were being induced to deliver up their discounted tickets in exchange for the right to obtain and then exercise warrants for huge amounts of Priceline's stock. Defendants manipulated the way they accounted for the warrants they gave to Delta and the other airlines, by under-reporting their cost and treating them as non-recurring extraordinary items rather than as part of Priceline's inventory which would have impacted its on-going profit margins.

23.    As noted above, Priceline needed access to reduced fare airline tickets to operate its core business. Accordingly, Priceline's relationship with the airline carriers was essential to the market's assessment of Priceline's prospects. Since Priceline's agreements with airlines imposed no legal obligation to provide Priceline with any tickets, and, in fact, Priceline's "business model" did not set it apart from the growing number of internet airline ticket discounters, Defendants' strategy for obtaining ticket inventory was based upon convincing the airlines that they could profit by Priceline's success through the exercise of their warrants in Priceline stock.  This strategy necessitated maintaining a high price for Priceline's stock by touting Priceline's growing profitability.  In reality, the true costs of obtaining the airline tickets by issuing stock options, far exceeded any profits earned on the sale of the tickets – so that Priceline's on-going statements that it was approaching profitability were an illusion fostered by failing to treat the regularly issued and reissued stock options as an on-going inventory cost.

24.    In August 1998, Priceline entered an agreement with Delta that reflected the reality of their relationship – when Delta provided an agreed upon amount of discounted airline tickets, its Priceline stock options would vest, and Priceline would then be required to recognize the expense for obtaining the tickets.  In December 1998, the agreement with Delta was revised, purely for accounting purposes – so that the expense for Delta's warrants could be "fixed" at a *de minimus* amount and recognized on Priceline's financial statements, before the Priceline IPO. By

10

late 1999, when Delta had earned the right to exercise the warrants, Delta's warrants in Priceline were worth more than the remainder of the Company. In order to protect Priceline from a growing competitive threat from Microsoft's Expedia internet provider, Delta agreed to waive restrictions in its contracts with Priceline and permit other major airlines to participate in Priceline. Delta then received even more warrants and cash for this agreement. While almost $1 billion of expense was reported on Priceline's 1999 financial statements for the new stock options issued to the other major airlines, the significance of this cost was down-played by treating it as an extraordinary "non-cash" item that was not reflected in Priceline's on-going operating margins.

25.     Defendants deceived investors throughout the Class Period regarding Priceline's supposedly improving financial condition and prospects for profitability, both of which hinged on the reported success of Priceline's airline ticket business. But, as Priceline's stock prices dropped in 2000, the stock warrants issued to the major airlines no longer provided any incentive for the airlines to provide their discounted tickets to Priceline versus its competitors. Priceline shocked the market on September 27, 2000 with the announcement of the sharp drop in its airline ticket business which stood in stark contrast to prior statements touting the growth and success of that business.

26.     Defendants vigorously denied any liability on this theory. First, Defendants noted that all the written agreements with the airlines were publicly filed with the SEC and thus known to the market. Defendants also argued that Priceline's accounting methodology for the Delta warrants was questioned, reviewed and then finally accepted by the SEC, when the SEC permitted the filing of Priceline's original Registration Statement for its IPO. Defendants attributed no damages to investors for this claim.

## HISTORY OF THIS ACTION

27.    The litigation began in October 2000, when twenty-two (22) related putative

securities class actions were filed alleging violations of the Securities Exchange Act of 1934

(the "Exchange Act") and the Securities Act of 1933 (the "Securities Act") in connection

with investors' purchases of Priceline securities – including, *Twardy, et al v. Priceline.com,*

*Inc, et al*., No. 3:00-cv-01884-AVC; *Weingarten v. Priceline.com, Inc, et al*., No. 3:00-cv-

01901-DJS; *Berdakina v. Priceline.com, Inc, et al*., No. 3:00-cv-01902-DJS; *Howard Gunty Plan*

*v. Priceline.com, Inc, et al*., No. 3:00-cv-01917-DJS; *Cerelli v. Priceline.com Inc, et al*., No.

3:00-cv-01918-DJS; *Mayer v. Priceline.com, Inc, et al*., No. 3:00-cv-01923-DJS; *Mazzo v.*

*Priceline.com, Inc, et al*., No. 3:00-cv-01924-DJS; *Anish v. Priceline.com, Inc, et al*., No. 3:00-

cv-01948-DJS; *Fialkov v. Priceline.com, Inc, et al*., No. 3:00-cv-01954-DJS; *Zia v.*

*Priceline.com, Inc, et al*., No. 3:00-cv-01968-DJS; *Mazzo v. Priceline.com, Inc, et al*., No. 3:00-

cv-01980-DJS; *Atkin v. Priceline.com, Inc, et al*., No. 3:00-cv-01994-DJS; *Licht v.*

*Priceline.com, Inc, et al*., No. 3:00-cv-02049-DJS; *Ayach, et al v. Priceline.com, Inc, et al*., No.

3:00-cv-02062-DJS; *Lyon v. Priceline.com, Inc, et al*., No. 3:00-cv-02066-DJS; *Kwan v.*

*Priceline.com, Inc, et al*., No. 3:00-cv-02069-DJS; *Krim v. Priceline.com, Inc, et al*., No. 3:00-

cv-02083-DJS; *Bazag v. Priceline.com, Inc, et al*., No. 3:00-cv-02122-DJS; *Breier v.*

*Priceline.com, Inc, et al*., No. 3:00-cv-02146-DJS; *Caswell v. Priceline.com, Inc, et al*., No.

3:00-cv-02169-DJS; *Farzam, et al v. Priceline.com, Inc, et al*., No. 3:00-cv-02176-DJS; *Karas*

*v. Priceline.com Inc, et al*., No. 3:00-cv-02232-DJS.

28.    On September 12, 2001, this Court (Judge Dominic J. Squatrito) entered orders

that: (a) consolidated the underlying actions under the caption *In re Priceline.com, Inc. Securities*

*Litigation*; (b) appointed Lliana Llieva, Mark Weiss, Marilyn D. Egel, Joseph Wilenkin, Randall Twardy, John Anderson and the Leisinger Pension Fund as Lead Plaintiffs; and (c) approved Lead Plaintiffs choice of Lead Counsel.

29.     Once appointed as such, Lead Counsel embarked upon a hard-fought and aggressive prosecution of this action. Indeed, for the past almost seven years, as described more fully below, Plaintiffs and Lead Counsel vigorously litigated this action by, among other things, conducting an extensive investigation into Defendants' wrongful conduct through both formal and informal discovery; drafting a detailed, particularized amended complaint; extensively briefing Defendants' motions to dismiss; engaging in comprehensive discovery, including taking depositions and conducting a voluminous document review; engaging in rigorous motion practice; and preparing for and participating in four different mediations leading up to the settlement in this action.

**A.     The Investigation**

30.     In preparation for filing the Consolidated Class Action Complaint, Lead Counsel conducted a thorough and extensive investigation into the matter. The investigation included, among other things:

- Interviewing numerous former Priceline and WebHouse employees at all levels of the Company;

- Consulting with outside forensic accountants;

- Consulting with economists;

- Consulting with outside investigators;

- Reviewing statements made by Defendants, including those made in SEC filings, press releases, conference calls, news articles and analysts' reports comprising over fifteen boxes and 40,000 pages of paper.

13

31.     Lead Counsels' in-depth investigation uncovered substantial information about the Company, its business practices and Priceline's business model that formed the basis of Plaintiffs' detailed and particularized amended complaint. It also provided Plaintiffs with a road-map for the discovery phase of the case, and it proved to be of critical importance during the mediation and settlement phases of the case.

32.     Plaintiffs investigated customer complaints to better understand Priceline's technological and customer service issues. This investigation included reviewing documents from the Better Business Bureau, the Federal Trade Commission, and the Attorney General's Offices from the states of Pennsylvania, Connecticut, and Washington and comparing the customer experiences with public statements to the contrary.

33.     Lead Counsel's use of the forensic accountants, in particular, proved to be of critical importance.    Among other things, in the course of discovery, Plaintiffs' forensic accountants reviewed more than 15 boxes of Deloitte workpapers, productions of documents from airlines, and publicly filed financial reports. They researched, analyzed and discussed with counsel applicable accounting standards, guidance, and SEC releases on the accounting for non-employee stock warrants, revenue recognitions requirements, and accounting for contingencies and asset impairments.

34.     These evidentiary materials and experts analyses were used to assist counsel in preparing a second amended complaint, to prepare for depositions, and to further develop Plaintiffs' positions at the numerous mediations that took place. These analyses were also used in counsels' presentations to defense counsel and the insurers to break through earlier negotiation logjams and to arrive at the $80 million settlement.

35.     Similarly, Plaintiffs utilized the services of expert economists to develop detailed event studies and economic analyses which were presented and argued at the mediations to illustrate concerted loss causation and damages approaches and to tie them to the analyses that had been developed with the assistance of Plaintiffs' forensic accountants.

**B.     The Consolidated Amended Complaint**

36.     After assimilating a vast amount of information obtained without the benefit of formal discovery, Plaintiffs filed a 249-page Consolidated Amended Class Action Complaint (the "Complaint") on October 29, 2001.  Plaintiffs alleged that the Defendants and Priceline's auditor, Deloitte & Touche, violated Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, by issuing false and misleading statements during the period January 27, 2000 through October 4, 2000, in an effort to artificially inflate the value of Priceline's stock.  Generally, Plaintiffs alleged that Priceline's financial results were materially overstated, that Defendants had made false representations that their business model was expandable beyond travel services, and that Defendants falsely described the profitability of Priceline.  The Complaint also alleged claims under Sections 10-b and 20(a) of the Exchange Act of 1934.

37.     On February 28, 2002, Defendants filed a Motion to Dismiss Plaintiffs' Consolidated Amended Complaint.  Defendants' memorandum filed in support of their Motion was premised on their assertions that Plaintiffs' Complaint was deficient because it:  (a) did not comply with Fed R. Civ. P. 8; (b) failed to plead fraud with particularity as required by Fed. R. Civ. P. 9(b) and the PSLRA; (c) failed to plead any actionable statements which were false when made; (d) failed to adequately allege each of the Defendants' scienter; (e) identified no

15

statements which were material; and (f) was barred by the Statute of Limitations since most of the conduct alleged occurred prior to the filing of the Consolidated Amended Complaint.

38.     On the same day, February 28, 2002, Deloitte filed a separate Motion to Dismiss Plaintiffs' Complaint. In its memorandum in support of that Motion, Deloitte asserted that Plaintiffs' Complaint was deficient because it: (a) was barred by the Statue of Limitations; (b) failed to plead fraud with particularity as required by Fed.R.Civ.P. 9(b) and the Reform Act.

39.     On May 28, 2002, Lead Plaintiffs filed an Opposition to the Priceline Defendants' Motion to Dismiss. In their Opposition, Lead Plaintiffs demonstrated how Defendants' false statements with respect to the lateral expandability of the Priceline business model was the basis for Priceline's inflated stock price. Additionally, Lead Plaintiffs documented how the Complaint adequately pled Defendants' false and misleading statements with particularity; how Defendants violated their duty to speak completely and truthfully; and how under the PSLRA Defendants' allegedly false or misleading statements were not immunized by their simultaneously issued cautionary statements. Lead Plaintiffs' Memorandum also contained an extensive analysis of the WebHouse venture and how this manifestation of expansion beyond perishable travel inventory was destined to fail.

40.     Additionally, on May 28, 2002, Plaintiffs filed a Memorandum in Opposition to Deloitte's Motion to Dismiss. Plaintiffs' Memorandum set forth that Deloitte participated in the fraud, and how the financial statements provided to investors did not follow Generally Accepted Accounting Principals (hereafter, "GAAP"). Further, Lead Plaintiffs laid out the extensive list of "red flags" available to Deloitte, demonstrating it's scienter.

41.     On June 28, 2002, Deloitte filed its reply brief in support of its Motion. In its memorandum Deloitte argued that: WebHouse was a separate entity; and that the misleading

statements regarding expandability of the business model, repeat customers, gross margin forecasts, the success of the gasoline and grocery businesses, and valuation statements in the financial disclosures were not actionable.  Deloitte also continued to argue that Plaintiffs' Complaint was time barred under Rule 15(c)(3).

42.     On June 28, 2002 the Priceline Defendants filed their reply brief in support of their Motion to Dismiss.  The Priceline Defendants again argued that Lead Plaintiffs' Complaint was barred by the Statute of Limitations; that Plaintiffs had failed to meet the pleading requirements of Rule 8; and that Lead Plaintiffs failed to state a claim upon which relief may be granted.

**C.      The Court Rules On Defendants' Motions to Dismiss**

43.     On October 7, 2004 Judge Squatrito issued a memorandum of decision granting in part and denying in part the Priceline Defendants' Motions to Dismiss.  The Court found that: the Amended Complaint was filed in a timely manner; the Priceline Defendants' statements omitted material information; the Defendants' statements were not entitled to protection as a matter of law in the first instance as forward-looking statements under the PSLRA safe harbor; and Plaintiffs' claims were alleged with the requisite particularity.

44.     On October 7, 2004 the Court granted Deloitte's Motion to Dismiss, holding that the Complaint was timely filed, but that Plaintiffs did not adequately allege that Deloitte had acted with scienter.

45.     On December 28, 2004 Defendant Jay S. Walker answered the Plaintiffs' Amended Complaint.

17

## DISCOVERY

46.    Immediately after being appointed, Lead Counsel began actively pursuing informal discovery.    After the motions to dismiss were resolved, Lead Counsel requested documents from defendants, served non-parties with subpoenas, propounded written discovery requests, conducted depositions, and moved the Court to compel production when the Defendants and non-parties refused to voluntarily comply.

**A.    Document Discovery, Written Discovery and Depositions.**

47.    Plaintiffs served on Defendants three separate requests for production of documents and things.    In response, Defendants produced millions of pages of documents. Specifically, Plaintiffs served the following:

- Plaintiffs' First Request in March 2004;

- Plaintiffs' Second Request in November 2005;

48.    Plaintiffs also obtained over 85,000 pages of documents from Deloitte.    On 11/22/04, Plaintiffs issued a subpoena *duces tecum* on Deloitte.    Thereafter, on 12/3/04, Plaintiffs served Deloitte with second subpoena *duces tecum*.

49.    In connection with Plaintiffs' discovery of Deloitte's documents, on July 18, 2005, after repeatedly requesting to do so, Plaintiffs reviewed Deloitte's original work papers, which Deloitte had initially refused to make available for review.    Similarly, Plaintiffs secured, through persistent discovery requests, and motions filed with the court, the production of Deloitte's electronic audit work papers, which Deloitte initially withheld from production.

50.     Plaintiffs also issued and served subpoenas on numerous non-parties, including, among others:

| DATE | ENTITY | RELATIONSHIP |
|------|--------|--------------|
| 11/30/04 | Vulcan Ventures, Inc. | Investor/Affiliate |
| 11/30/04 | Liberty Media | Investor |
| 12/3/04 | Deloitte & Touche, LLP | Auditor |
| 12/3/04 | Gristede's Foods, Inc. | Retailer |
| 12/3/04 | King Kullen Grocery, Inc. | Retailer |
| 12/3/04 | Thrifty Stores of Washington | Retailer |
| 12/3/04 | Meijer, Inc. | Retailer |
| 12/3/04 | Pathmark Stores, Inc. | Retailer |
| 12/3/04 | Weis Markets, Inc. | Retailer |
| 12/3/04 | Safeway, Inc. | Retailer |
| 12/3/04 | Super Fresh Food Markets, Inc. | Retailer |
| 12/3/04 | The Kroger Co. | Retailer |
| 12/3/04 | Albertson's Inc. | Retailer |
| 12/3/04 | Wegmans Food Markets | Retailer |
| 12/3/04 | D'Agostino Supermarkets, Inc. | Retailer |
| 12/3/04 | Key Food Stores Co-Op, Inc. | Retailer |
| 12/3/04 | Farm Fresh Markets | Retailer |
| 12/3/04 | Foods Co. | Retailer |
| 12/6/04 | Jewel-Osco | Retailer |
| 12/6/04 | Cala Foods | Retailer |
| 12/6/04 | Waldbaums | Retailer |
| 12/6/04 | Bi Lo, LLC | Retailer |
| 12/6/04 | Bell Markets | Retailer |
| 12/6/04 | Food Town | Retailer |
| 12/6/04 | Stop & Shop | Retailer |
| 12/6/04 | Friendly Markets | Retailer |
| 12/6/04 | Great Atlantic & Pacific Co. | Retailer |
| 12/6/04 | Food Emporium | Retailer |
| 12/6/04 | Ralph's Grocery Corp. | Retailer |
| 12/6/04 | Food Giant Supermarkets, Inc. | Retailer |
| 12/6/04 | Tops Markets, | Retailer |
| 12/6/04 | C&S Wholesale Grocers | Retailer |
| 12/6/04 | Winn-Dixie | Retailer |
| 12/6/04 | Ahold-USA | Retailer |

| DATE | ENTITY | RELATIONSHIP |
|---|---|---|
| 12/6/04 | ShopRite | Retailer |
| 12/9/04 | Kellogg Company | Manufacturer |
| 12/9/04 | General Mills | Manufacturer |
| 12/9/04 | H.J. Heinz Co. | Manufacturer |
| 12/9/04 | Nestle USA, Inc. | Manufacturer |
| 12/9/04 | Hershey Foods Corp. | Manufacturer |
| 12/9/04 | Pepsico, Inc. | Manufacturer |
| 12/9/04 | Super Fresh Food Markets, Inc. | Manufacturer |
| 1/05/05 | Giant Food, Inc. | Retailer |
| 1/07/05 | Thriftyway Stores, Inc. | Retailer |
| 04/13/05 | Better Business Bureau, Inc. | Consumer Advocate |
| 05/09/05 | Utz Quality Foods, Inc. | Manufacturer |
| 05/10/05 | The Gillette Company | Manufacturer |
| 05/10/05 | The J.M. Smucker Company | Manufacturer |
| 05/24/05 | The Dannon Company | Manufacturer |
| 06/06/05 | Ameritrade Inc. | Brokerage House |
| 06/09/05 | Herbert Mines Associates, Inc. | Recruiter and Investor |
| 06/09/05 | Kindred Partners, LLC | Recruiter |
| 06/09/05 | Delta Airlines | Supplier |
| 06/09/05 | American Airlines | Supplier |
| 06/09/05 | Continental Airlines | Supplier |
| 06/09/05 | Northwest Airlines | Supplier |
| 06/09/05 | U.S. Airways | Supplier |
| 06/09/05 | America West Airlines | Supplier |
| 06/09/05 | United Airlines | Supplier |
| 07/14/05 | Murray, Devine & Company | Valuation Consultant |
| 03/06/06 | Allen & Co. | Investor |
| 03/06/06 | General Atlantic Partners | Investor/Affiliate |
| 08/11/06 | Morgan Stanley | Financial Service Provider |
| 08/11/06 | Goldman Sachs | Financial Service Provider |
| 08/11/06 | Chase Manhattan | Financial Service Provider |
| 08/11/06 | Merrill Lynch | Financial Service Provider |
| 2/13/06 | Houlihan Lokey | Valuation Consultant |
| 2/16/06 | BDS, dba Tallon Inc. | Investor |
| 3/26/06 | Warner-Lambert *dba* Pfizer Inc. | Manufacturer |
| 3/26/06 | Schewbel Baking Co. | Manufacturer |

51.     In response to the document requests and subpoenas, Lead Counsel received and, thereafter, reviewed and analyzed approximately 5,294,120 million pages of documents, including, among others:

- Documents relating to Priceline and WebHouse's internal financial records, including individual segment results, consolidated financial results, and draft financial statements;

- Internal correspondence including e-mails and letters among the Individual Defendants and other senior management and Priceline employees;

- Minutes of the meetings of Priceline's Board of Directors and the Board's Audit Committee;

- Documents relating to Deloitte's audits of Priceline's financial statements, including audit work papers, management letters and engagement letters;

- Deloitte's audit and accounting manuals as they related to the allegations in this Action.

- Documents relating to Priceline's relationships with the airlines and with manufacturers and retailers.

52.     In addition to propounding document requests and reviewing documents, Lead Counsel also responded to multiple document requests served on Plaintiffs by Defendants.

53.     Plaintiffs propounded and responded to numerous written discovery requests over the court of the litigation.    Specifically, Plaintiffs served Defendants with three sets of interrogatories, including:

- Plaintiffs' First Set of Interrogatories in November 2005;

- Plaintiffs' Second Set of Interrogatories in March 2005;

- Plaintiffs' Third Set of Interrogatories in February 2007.

54.     Lead Counsel also responded to multiple sets of interrogatories that Defendants had served on Plaintiffs on November 15, 2004 and January 19, 2005.

55. Lead Counsel has also taken several depositions in this case, including the depositions of several of Priceline's analysts, depositions of the individuals at the valuation firm that valued the WebHouse warrants, depositions of the third-party investors who invested in the WebHouse business, and a Rule 30(b)(6) deposition of a Priceline designee.

**B.    Motion Practice**

56. Throughout the discovery process, upon Defendants' refusal to produce, voluntarily, Plaintiffs engaged in vigorous motion practice to compel Defendants to produce documents and respond to discovery requests. As described below, Defendants refused or failed to produce documents and answer Plaintiffs' discovery requests on numerous occasions. Where Defendants' positions were unjustified, Plaintiffs sought the Court's intervention through formal motions to compel. Plaintiffs diligently and thoroughly briefed each issue and advanced compelling legal arguments so that, in almost every instance, the Court granted Plaintiffs' requests.

57. Specifically, Plaintiffs have filed the following motions against the Priceline Defendants:

**1.    Plaintiffs' March 14, 2005 Motion to Compel:**

- Relief Sought: In this motion to compel, Plaintiffs:

    1) moved to compel all Defendants to produce a privilege log when Defendants refused to provide one;

    2) moved to compel all Defendants to provide unambiguous responses to Plaintiffs' document requests when Defendants refused to do so;

    3) moved the Court to set a definitive date when all Defendants would complete their document production when they refused to provide one;

    4) moved to compel all Defendants to tell Plaintiffs whether Defendants planned to search for WebHouse documents when Defendants refused to

do so – documents that, as detailed in Plaintiffs' July 7, 2006 motion to compel, are among the most relevant documents at issue in this case;

- The Court's Order:  On April 6, 2005, Judge Squatrito:

1) ordered that: "Defendants shall submit a privilege log meeting the standard set forth in Rule 37(a)(1) of the Local Rules of Civil Procedure for the District of Connecticut on orbef ore the tenth day of each month. The privilege log shall set forth documents withheld during the preceding month."

2) ordered that: "Overbreath and undue burden objections shall be specifically stated in response to each individual discovery request" and requiring the party asserting these objections to "provide a brief explanation of the basis for the objections with respect to each individual discovery request."

3) ordered Defendants to "produce documents responsive to plaintiffs' requests, on a rolling basis, on or before July 31, 2005."

4) ordered that: "Defendants shall submit affidavits from their counsel stating, with respect to materials pertaining to WebHouse . . . (1) that all documents in the party's possession or control have been produced or withheld on the basis of privilege; (2) that counsel  has made good faith efforts to locate and obtain other documents and materials; and (3) a brief description of these efforts."

2.    **Plaintiffs' July 14, 2005 Motion to Compel:**

- Relief Sought:  In this motion, Plaintiffs moved the Court to:

1) compel all Defendants to provide supplemental responses to challenged interrogatories after Defendants had refused to do so; and

2) to provide documents responsive to Plaintiffs' document requests;

- The Court's Orders:

1) On June 7, 2005, Judge Squatrito ordered Defendants to provide supplemental responses to 6 of the 8 challenged interrogatories at issue.

23

2) On November 23, 2005, Judge Squatrito ordered the Priceline Defendants to produce documents responsive to all but 3 of the challenged document requests.[3]

**3.     Plaintiffs' August 11, 2005 Motion to Compel:**

▪ Relief Sought:  In this motion, Plaintiffs moved to compel the Priceline Defendants to provide additional information about the "privileged" documents on their log when they refused to do so and to produce non-privileged documents they had placed on their privilege log;

▪ The Court's Order:  On December 8, 2005, Judge Squatrito held that: "defendants have not adequately demonstrated that their objections should be sustained with respect to all entries.  Defendants should bear the burden of demonstrating that information is protected by the attorney-client privilege or the work product immunity doctrine, and must therefore supplement their privilege log to provide information necessary to make an informed determination of the validity of their objections."

**4.     Plaintiffs' September 22, 2005 Motion to Compel:**

▪ Relief Sought:  In this motion, Plaintiffs moved to compel the Priceline Defendants to produce emails and electronic documents from Priceline's email and corporate file servers when Defendants refused to so do;

▪ The Court's Order:  On December 8, 2005, Judge Squatrito ordered the Priceline Defendants to:

1) produce the emails and electronic documents on the corporate file servers;

2) file monthly status reports with the Court so the Court can "observe the process"; and

3) "produce a summary of their methodology so that plaintiffs can argue for the inclusion of more data if appropriate."

**5.     Plaintiffs' March 30, 2006 Motion to Compel:**

▪ Relief Sought:  In this motion, Plaintiffs moved to compel the Priceline Defendants to produce responsive, non-privileged documents that they had improperly placed on their privilege log;

---

[3] The Court denied Plaintiffs' motion to compel with respect to three of the challenged document requests because the Priceline Defendants represented to the Court in their opposition papers that they had no documents in their possession, custody or control that were responsive to those challenged requests.

- The Court's Order:    On June 9, 2006, this Court ordered the Priceline Defendants to submit to the Court no later than July 26, 2006 "the underlying documents that are still in dispute for an in camera inspection." This prompted the Priceline Defendants to remove 277 non-privileged documents from their log.

58.    Plaintiffs prevailed on virtually every issue in every motion to compel they have filed against the Priceline Defendants in this case.  Moreover, as a direct result of these efforts, Lead Counsel was able to gain access to the key documents supporting the securities fraud claims alleged in the Complaint.  These documents later would prove to be of crucial importance to the case, as they allowed Plaintiffs to put on a convincing case to the mediator,  the Defendants and their insurers when the parties met in February and April of 2007 for their final successful mediation of the securities fraud claims at issue in the suit.

**C.    Electronic Discovery**

59.    Lead Counsel also engaged in extensive motion practice with Defendants in order to obtain highly relevant emails and electronic documents that were in the Defendants' possession, custody and control.  The emails and electronic discovery battle involved two parts: (1) Plaintiffs' attempts to obtain relevant emails and electronic documents located on Priceline's corporate file servers; and (2) Plaintiffs' attempts to obtain relevant emails and electronic documents stored on 181 WebHouse "backup" tapes that were in Defendant Jay Walker's possession, custody and control.

**1.    The Priceline Corporate Server.**

60.    The parties have a long history with respect to the emails and electronic documents that are located on Priceline's corporate server.  Plaintiffs spent close to two years

trying to obtain relevant emails and electronic documents on the "snapshot" and "terminated employee tapes." Plaintiffs have taken the following steps to obtain these electronic materials:

- In late 2004 and throughout the first half of 2005, Plaintiffs participated in numerous meet and confers with the Priceline Defendants on the electronic document issues. At first, the Priceline Defendants assured the Plaintiffs that "[A] snapshot of the data on priceline's corporate file and e-mail servers was made years before you served your document requests and *we are in the process of searching that repository for responsive documents*."

- In late March 2005, when no electronic documents were forthcoming, Plaintiffs moved to compel the Priceline Defendants to produce all responsive materials, including emails and electronic documents. In response, the Priceline Defendants told the Court that the emails and electronic documents should be excluded from Plaintiffs' motion to compel *because the electronic materials needed to be restored before they could be searched and reviewed*. This led Judge Squatrito to order the parties to hold additional meet and confers on the restoration of the electronic materials.

- In late July 2005, Plaintiffs learned that the emails and electronic documents on the Priceline "snapshot" did not need to be restored, but were accessible and searchable in their current electronic form. The Priceline Defendants disclosed this fact in a letter that they sent Plaintiffs the day before Plaintiffs were to take a Rule 30(b)(6) deposition on the electronic documents. The accessibility of both the "snapshot" and "terminated employee tapes" was confirmed the next day at the 30(b)(6) deposition – *a fact that directly contradicted the representations that the Priceline Defendants made to the Court months before when opposing Plaintiffs' motion to compel*.

- Following the 30(b)(6) deposition, the parties held several more meet and confers. Then, when no electronic documents were forthcoming, Plaintiffs moved in September 2005 to compel the production of the entire "snapshot" and "terminated employee tapes." In their motion, Plaintiffs stated that they were willing to take on the burden of searching the entire "snapshot" and "terminated employee tapes," but in order to do so they needed complete and unfettered access to these electronic materials.

- On December 8, 2005, Judge Squatrito ruled on Plaintiffs' motion to compel. The Court declined to order the Priceline Defendants to turn over the entire "snapshot" and "terminated employee tapes." Instead, the Court placed the burden on the Priceline Defendants to design a proper methodology for searching and producing the responsive information on the "snapshot" and "terminated employee tapes."

- The Court also held that the Defendants needed to "record and produce a summary of their methodology so that plaintiffs can argue for the inclusion of

26

more data if appropriate" and it ordered the Priceline Defendants to file monthly status reports with the Court so that it could "observe the process."

- Following the Court's ruling on the motion to compel, the Priceline Defendants informed Plaintiffs that they are adopting the two-pronged approach to deal with the "snapshot" and "terminated employee tapes" they had previously set forth in an August 11, 2005 letter. First, Defendants proposed doing an email-by-email review of certain individual email accounts. Second, Defendants proposed using search terms to capture responsive documents on the "nonemail portion of the snapshot." *Id.*

61.    As result of these efforts, Plaintiffs were able to obtain the emails and electronic documents located on Priceline's corporate servers, including emails and electronic documents belonging to Defendants Walker, Schulman and Braddock.

## 2.    The WebHouse Backup Tapes.

62.    The parties also have a long history relating to the 181 WebHouse tapes that Defendant Walker had in his possession, custody and control. This history is summarized as follows:

- Plaintiffs first learned about the 181 WebHouse tapes when they moved to compel Defendants to produce emails and electronic documents in March 2005. When opposing that motion, Defendant Walker stated that he had 181 WebHouse tapes in his possession, custody and control. He also stated that these tapes needed to be restored before they could be produced and he represented that *it would cost between $26 million and $200 million to restore and produce the emails and electronic documents on the tapes*.

- Based on these representations, Judge Squatrito ordered the parties to meet and confer to discuss an appropriate way to restore WebHouse tapes. The parties then held several meet and confers in the spring and summer of 2005, but were not able to make any progress on the tapes.

- At this point, Plaintiffs retained a computer forensics specialist to look into the restoration issue. She informed Plaintiffs that *the tapes could be restored to a fully searchable and accessible format for $400 per tape*. Plaintiffs' computer forensics specialist also advised that the parties could create an index of the tapes – which would allow the parties to identify those tapes that they needed to restore – for $100 per tape.

- In August 2005, Plaintiffs again moved to compel Defendant Walker to restore and produce the 181 tapes. In that motion, Plaintiffs offered to split the costs of restoring the 181 tapes. Plaintiffs also stated that they were willing to take on the entire burden of searching the tapes for responsive information once the tapes were restored so long as they were given copies of the restored tapes.

- Judge Squatrito ruled on Plaintiffs' motion in December 2005. In his order, he declined to order Defendant Walker to restore all 181 tapes. Instead, he set forth the following **three step approach** for dealing with the 181 Priceline WebHouse Club tapes:

    - **First**, the Court held that the parties needed to meet and confer to determine which of the 181 tapes contained responsive information and needed to be restored. On this point, the Court strongly suggested that the parties create indexes to identify those tapes that should be restored.

    - **Second**, the Court made it clear that, after restoring certain designated tapes to their searchable and accessible format, the burden shifted to Defendant Walker to design a proper methodology for searching and producing the responsive information on the restored WebHouse tapes.

    - **Third,** the Court held that the Defendants needed to "record and produce a summary of their methodology so that plaintiffs can argue for the inclusion of more data if appropriate" and it ordered the Defendants to file monthly status reports with the Court so that it could "observe the process."

63.    Following the Court's order on this motion to compel, the parties held several meet and confers to discuss the restoration and production of the emails and electronic documents on the backup tapes. Due to the amount of material contained on the Walker backup tapes, Defendants initially produced catalogs describing the file's name and type. This partial production method required Plaintiffs to review the catalogs to narrow the scope of production to only those tapes likely to be responsive to Plaintiffs document requests. In reviewing the catalogs, Plaintiffs were able to target the tapes most likely to contain email, office documents, and presentations efficiently while eliminating non-responsive system files and data. Out of the 181 backup tapes, Plaintiffs requested seventeen for restoration. Even with this targeted

28