approach, eventually, Plaintiffs were forced to file another motion to compel. As a result of that motion, Defendant Walker eventually capitulated, and agreed to begin producing the emails and electronic documents on the backup tapes.

## CLASS CERTIFICATION

64.    Plaintiffs moved to certify this action as a class action under Fed.R.Civ.P. 23(b)(3) on January 7, 2005. Following the filing of Plaintiffs' class certification motion, Defendants proceeded to take extensive discovery on the class certification issue. Among other things, Defendants:

- Served each of the proposed class representatives with two separate sets of document requests seeking a long list of documents that purportedly related to each of the proposed class representatives' adequacy to serve as a class representative;

- Served each of the proposed class representatives with two separate sets of interrogatories;

- Subjected each of the proposed class representatives to a deposition in which the class representatives were asked about, among other things, their knowledge about this lawsuit, their contact with counsel, and their willingness to serve as a class representative in the case; and

- Filed an opposition brief and a surreply in which Defendants argued that none of the class representatives were adequate representatives for the proposed class.

65.    This Court (Judge Squatrito) ruled on Plaintiffs' class certification motion on April 4, 2006. In its Order, the Court rejected virtually every one of Defendants arguments, and held that Class Representatives Thomas Linton, R. Warren Ross, John S. Anderson, Mark Weiss and Marilyn Engel were adequate representatives of the Class, and Scott + Scott and Johnson & Perkinson were appointed Class Plaintiffs' Counsel.

66.    Specifically, the Court held:

[Plaintiffs' class certification motion] is **GRANTED** inasmuch as it seeks certification of a class defined as follows: all persons who purchased or otherwise acquired securities of priceline.com, Inc. ("Priceline" or the "PCLN") from

29

January 27, 2000 to October 4, 2000, inclusive. The motion is **GRANTED** inasmuch as it seeks the appointment of R. Warren Ross, Thomas Linton, John S. Anderson, Mark Weiss and Marilyn D. Engle as Class Representatives.

## SETTLEMENT NEGOTIATIONS

67.     The Settlement is the result of intensive, arm's-length negotiations between Plaintiffs and Defendants that extended over a three-year period, and involved four substantive mediation sessions and several follow-up communications with retired United States District Judge Nicholas H. Politan and Mediator Robert Meyer of the law firm of Loeb & Loeb. All settlement negotiations occurred while discovery was ongoing and, as described above, Plaintiffs were in the process of reviewing millions of pages of documents and conducting depositions.

68.     The mediation sessions with Judge Politan occurred in August 2004 and January 2006. Lead Counsel prepared extensive confidential mediation statements prior to both of these mediation sessions. The mediation statements were shared with Judge Politan, but not with the Defendants. Lead Counsel also consulted with damages and valuation experts prior to these mediation sessions to: (i) quantify the damages suffered by the Class; (ii) analyze Priceline's financial wherewithal; and (iii) advise Lead Counsel and Plaintiffs concerning Priceline's business condition. Lead Counsel consulted closely with these experts to ensure that the negotiated settlement would confer a substantial benefit to the Class.

69.     Discussions between Lead Counsel and the Defendants reached an impasse during both the August 2004 and January 2006 mediation sessions because of serious differences in the parties' views concerning the merits, the likelihood of success at trial, and the value of the case. Specifically, the parties disagreed on the following critical issues, among others: (i) whether the Priceline Defendants' accounting policies and practices were in violation of GAAP; (ii) whether the Defendants had made false and misleading statements about the WebHouse business model;

30

(iii) whether Plaintiffs would prevail on the motion seeking class certification (which had not yet been granted as of the August 2004 and January 2006 mediations); (iv) whether Plaintiffs would be able to prove that the Defendants acted with the requisite fraudulent intent; and (v) the damages. Indeed, at that time, Priceline contended that, to the extent that there were any damages, they were less than $20 million.

70.     Following the unsuccessful January 2006 mediation, Lead Counsel returned to the fact discovery in the case. Then, in January 2007, Defendants indicated that they were once again interested in mediating the securities fraud claims in the case. Defendants also proposed using Robert Meyer of the law firm of Loeb & Loeb as the mediator. Plaintiffs agreed.

71.     The mediation sessions before Mr. Meyer occurred in February and April 2007. Prior to these mediations, Lead Counsel prepared extensive confidential mediation statements and consulted with their forensic accountants and damages and valuation experts. Lead Counsel also attached several documents and cited to specific deposition testimony in their mediation statement. In addition, Mr. Meyer asked Plaintiffs for follow-up documentation on certain points, which Plaintiffs provided from the documents that had reviewed and analyzed in the case. On more than one occasion the mediation almost again broke down. Only at the last few moments did the parties agree that enough progress had been made to warrant another mediation session. Detailed discussions were had on Deloitte's workpapers, Priceline's financial reports and the accounting issues in the case. The differing theories and analyses of damages were also hotly debated. After a full day of meetings the parties finally reached an agreement to resolve this Action against Defendants Priceline, Jay Walker, Richard Braddock, Daniel Schulman and N.J. Nichols for a total of $80 million in cash. Over the next several weeks, negotiations

concerning the detailed terms of a settlement stipulation ensued.  Ultimately, on May 4, 2007, Plaintiffs and the Defendants entered into a Stipulation and Agreement of Settlement.

## DEPOSITION PROGRAM

72.    In addition to defending the deposition of each class representative, Plaintiffs conducted substantive depositions of Defendants and third parties in order to prepare the case for trial.   These depositions required counsel to expend many hours in preparation to become conversant with the subject matter explored at each deposition.

73.    Plaintiffs conducted the following depositions:

- Dennis Murray.  Mr. Murray was deposed in Philadelphia on 7/26/05 and is a principle at the firm that provided Priceline with a valuation opinion which Defendants claimed provided an absolute defense to their accounting for the Webhouse warrants.  His testimony was essential to establishing Plaintiffs' theory that the valuation Defendants' ascribed to WebHouse was unfounded.

- Christopher  Hannson. Mr. Hannson was deposed in Philadephia on 11/30/05 and was the analyst at Murray Devine who was primarily responsible for drafting the valuation opinion which Defendants claimed provided an absolute defense to their accounting for the Webhouse warrants.

- Andrew Frisch.  Mr. Frisch was deposed in New York City on 9/21/06 and was an analyst at Murray Devine who took over the responsibilities of Mr. Frisch.

- Anthony Noto. Plaintiffs deposed Anthony Noto of Goldman Sachs in NewYork City because he was one of the main analysts that covered Priceline securities for investors during the Class Period.  His deposition testimony was critical to establishing that the investment community was closely watching Priceline's

WebHouse venture to see if Priceline could successfully expand its "Name Your Own Price" business model into new business areas.

- 30(b)(6) deposition of Priceline.  Plaintiffs conducted a deposition of Patrick Brown, a Priceline designee, as part of their two year dispute over the electronic documents.  As a result of the 30(b)(6) deposition, Plaintiffs were able to target the emails and electronic documents that were most relevant to the securities fraud claims at issue in the case.

- Diane Daggett – Ms. Daggett worked for one of the original major private investors in WebHouse.  Her testimony was important to understanding the original intent of the agreements for the WebHouse transaction.  Ms. Daggett also was a director in WebHouse and received reports of its progress during the Class Period.

74.     In addition, Plaintiffs conducted numerous informal interviews of people with knowledge about the allegations of the Complaint and dedicated significant resources to investigating the claims of this case outside formal discovery efforts.

## EVALUATION OF THE PROPOSED SETTLEMENT

75.     Co-Lead Counsel respectfully submit that the substantive terms of the Settlement and the method used to arrive at the Settlement, as well as the proposed Plan of Allocation are fair, reasonable and adequate and should be approved by the Court.

76.     The factors in this Circuit to be considered in evaluating the Settlement are: (i) the complexity, expense and likely duration of the litigation; (ii) the reaction of the class to the settlement; (iii) the stage of the proceedings and the amount of discovery completed; (iv) the risks of establishing liability; (v) the risks of establishing damages; (vi) the risk of maintaining

the class action through trial; (vii) the ability of the defendants to withstand a greater judgment; (viii) the range of reasonableness of the settlement funds in light of the best possible recovery; and (ix) the range of reasonableness of the settlement funds to a possible recover in light of all the attendant risks of litigation. When assessed in light of the applicable criteria, the Settlement is fair, reasonable and adequate and should be granted final approval.

## A.     The Risks of Continued Litigation

77.     Plaintiffs still had to overcome likely motions for summary judgment. Moreover, trial of this case would have proven to be complex, expensive and time consuming. As described earlier, there were significant risks in proceeding with a trial of Plaintiffs' claims, requiring complex, fact-intensive analyses of such issues as the accounting treatment by Priceline of its WebHouse warrants and for Priceline warrants issued to the various airlines to obtain discounted tickets.

78.     Plaintiffs also had the heavy burden of persuading a jury that Priceline's misstated financial results were fraudulently, rather than merely erroneously, issued. Defendants argued that they had properly accounted for the airline and WebHouse warrants and that therefore no fraud had occurred. Defendants also claimed that any flaws in their accounting were the result of reasonable reliance on their auditor, Deloitte. Documents produced by Priceline reflect that Priceline collaborated with Deloitte in reaching its accounting conclusions and consulted with it in reporting its financial results. The jury could well find that argument persuasive, particularly because Deloitte held itself out to be the expert in this area and in order to understand Plaintiffs' claims, the jury would have to consider complex testimony concerning actuarial standards of practice and calculations.

79.    In addition, for Plaintiffs' claims relating to WebHouse, had this case not settled, Defendants were expected to offer experts to testify that Priceline's accounting treatment was within the range of appropriate accounting judgment.  Defendants would have offered evidence that Priceline had used an independent appraiser to value the WebHouse stock warrants and to establish that the original issuance of the warrants was made on an "arms-length" basis. Defendants have also argued that the fact that private investors, including several of the Individual Defendants themselves, invested in WebHouse throughout the class period negates any showing of scienter with respect to Priceline's accounting.  Defendants would no doubt point to the fact that neither the SEC, nor Priceline's independent auditors, ever required Priceline to restate its financial statements.  Finally, Defendants have argued that the disclosures relating to WebHouse did not cause the major part of the stock losses experienced by the class.

80.    As for Plaintiffs' claim relating to Priceline's airline ticket business, Defendants first argued that Priceline's written agreements with the airlines were all publicly filed with the SEC, and that the reviewing officials at the SEC questioned and then finally agreed to Priceline's method of valuation and accounting treatment for the issuance of its stock warrants to airlines, before the class period.  Again, with respect to the stock warrants to the airlines, Priceline has never restated its original accounting treatment for these warrants.

81.    Plaintiffs would also have to demonstrate that the Class's losses were caused by Priceline's fraudulent accounting for the airline and WebHouse warrants, rather than the implosion of the "internet bubble," which also occurred in 2000.  Because Priceline experienced other problems during the Class Period beyond its difficulties with the WebHouse business, Plaintiffs' risks in this regard were significant.

82.    The issue of damages would also likely be vigorously disputed.  Moreover, there was considerable uncertainty as to how much of any damages awarded Plaintiffs might have been able to recover in the event of a successful trial.  Even if a judgment were obtained, post-judgment appeals would have significantly delayed any recovery and collecting any judgment for United States statutory violations against Priceline's assets in other countries, including Europe, likely would have been difficult and added to that delay.  Many countries recognize only judgments for common law violations and will not give effect to those entered on statutory grounds that do not comport with their own policies.

**B.**    **The Complexity, Expense and Likely Duration Of The Litigation**

83.    As the preceding paragraphs have shown, this Action is replete with complexity both in establishing liability and in proving damages.  Plaintiffs would have to prove that the market was deceived by the misstated financial statements and that Priceline violated the relevant accounting standards.  Additionally, the jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction which at best is uncertain.

84.    Moreover, whatever the outcome of any eventual trial, inevitably appeals would have been taken to the Second Circuit and perhaps even to the U.S. Supreme Court.  All of the foregoing would have delayed, for years, the ability of the Class to recover.  Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk of delay of continued litigation through the summary judgment, trial and post-trial proceedings.

85.    Delay was a factor strongly considered by Plaintiffs' counsel in negotiating the proposed Settlement.  Priceline is relying on its D&O carriers, which collectively issued Priceline a total of $50 million in D&O insurance policies, to fund a major piece of its share of the Settlement.  As Priceline reported in its most recently filed Form 10-Q, only $30 million of

insurance was available to contribute towards the Settlement. If the litigation proceeds, Priceline attorneys' fees, expert expenses, and other litigation costs are likely to exhaust most, if not all, of the D&O insurance proceeds, and, without resolution of this litigation, Priceline is unlikely to rehabilitate itself with its other creditors, so that a litigated judgment against Priceline would be unlikely to be fully collectible, if it was collectible at all. Moreover, delay in recovery would increase Plaintiffs' expense in pursuing the case thereby reducing the availability of class funds.

**C.      Stage Of The Proceedings And The Amount Of Discovery Completed**

        86.    As described above, this Action was settled only after Co-Lead Counsel had conducted extensive investigation into the Class's potential claims, thoroughly researched the applicable law of the Class's claims and Defendants' defenses, prepared and filed a detailed Complaint specifying Defendants' alleged violations of federal securities laws, successfully opposed Defendants' motions to dismiss, worked with expert accounting and damage consultants, engaged in informal discovery with Priceline, analyzed the risks of continued litigation in light of the poor financial condition of Priceline and the resulting collectibility issues, and engaged in extensive settlement negotiations with defense counsel. Therefore, Plaintiffs and Co-Lead Counsel had sufficient information to permit them to carefully consider the adequacy of the Settlement.

**D.      The Ability Of The Defendants To Withstand Greater Judgments**

        87.    As Priceline reported in its first quarter 2007 Form 10-K, only $30 million of the $80 million cash settlement is being funded through its insurance policies. The balance sheet identified in this Form 10-K also reflects that Priceline could not have paid a much larger judgment than that negotiated in this case. Priceline's current liabilities ($752 million) exceed its current assets ($556 million). Indeed, according to this financial report, apart from its intangible

assets, goodwill and deferred taxes, Priceline's total assets are less than its total liabilities and Priceline has an accumulated deficit of $1.278 billion dollars.  For this same quarter (which includes the charge for the settlement), Priceline reported an operating loss of $31.7 million.  Nor is it likely that the Individual Defendants could sustain a judgment in the amounts sought on this case.  Thus, this factor strongly supports approval of the Settlement.

E.    **The Range of Reasonable Of The Settlement Funds In Light Of The Best Possible Recovery And Litigation Risks**

88.    In analyzing these last factors, the issue for the Court is not whether the Settlement represents the "best possible recovery," but how the Settlement relates to the strengths and weaknesses of the case.  Given the history and posture of this case, as well as the litigation risks discussed above, the Settlement provides an extraordinary recovery.

**CLASS NOTICE**

89.    By Order dated May 11, 2007 (the "Preliminary Approval Order"), this Court granted preliminary approval of the Settlement, ordered that notice be disseminated to the Class, and set the June 8, 2007 deadline for Class members to submit objections to the Settlements, Plan of Allocation and the request for attorneys' fees and reimbursement of expenses, or request exclusion from the Class.  The Court set a final approval hearing date of July 2, 2007.

90.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed Strategic Claims Services (SCS), the claims administrator for the Settlement, to begin disseminating copies of the Notice.[4]  The Notice contains a thorough description of each of the Settlements, the Plan of Allocation and Class members' rights to participate in and object to the Settlements, or exclude themselves from the Class. *See* SCS Aff., Exh. C. To do so, SCS obtained the names and

---

[4]    SCS's Affidavit Concerning Mailing of Notice of Pendency of Class Action and Proposed Settlement Motion forAt torney Fees and Settlement Fairness Hearing and Proof of Claim ("SCS Aff.") is attached hereto as Exhibit A.

addresses of potential Class members from listings provided by Priceline's transfer agent, as well as names provided by banks, brokers and nominees pursuant to the Preliminary Approval Order. *Id.*, ¶¶3-5.

91.     In order to provide immediate notice to all brokerage companies, bank and trust companies which are contained on SCS's master list, a letter was sent notifying them of the Settlement on May 15, 2007. *Id.*, ¶3. This master list consists of the 848 largest banks and brokerage companies ("Nominee Account Holders"), as well as 1,042 mutual funds, insurance companies, pension funds, and money managers ("Institutional Groups") which may have traded Priceline.com, Inc.'s ("Priceline") securities in their clients' or their accounts. *Id.*

92.     To provide actual notice to all persons and entities who purchased or otherwise acquired Priceline between January 27, 2000 and October 4, 2000, inclusive ("Class Period"), SCS mailed, by first class mail, the Notice/Claim Form approved by the Court to all individuals and organizations identified on the records of Priceline's transfer agent. *Id.,* ¶4. These records reflect persons and entities that may have purchased or otherwise acquired securities of Priceline for their own account or for the account(s) of others during the Class Period. *Id.* In addition, SCS mailed Notice/Claim Forms to Nominee Account Holders and Institutional Groups. *Id.* The Notice/Claim Forms were mailed on or before May 18, 2007 as required by the Preliminary Order Re: Notice and Hearing on Settlement Pursuant to Rule 23 of the Federal Rules of Civil Procedure, dated May 11, 2007 (the "Court's May 11, 2007 Order"). *Id.*

93.     In addition, the Summary Notice of Pendency of Class Action, Hearing on Proposed Settlements and Attorneys' Fee Petition and Right to Share in Net Settlement Fund was published in all editions of *USA Today* and the *Wall Street Journal* and over the *PR newswire* for national distribution on or before May 28, 2007. *Id.,* ¶6. Information regarding the Settlements,

including downloadable copies of the Notice and Claim Form, was posted on SCS's website. *Id.*, ¶4.

94.    The deadline for Class members to file objections to the Settlements, Plan of Allocation or request for attorneys' fees and reimbursement of expenses was June 8, 2007.

## PLAN OF ALLOCATION

95.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Class members who wish to participate in the distribution of the Settlement Fund must submit a valid Claim Form and all required information postmarked no later than August 31, 2007.  As provided in the Notice, after deducting all appropriate taxes, administrative costs, attorneys' fees, and reimbursement of expenses, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the Plan of Allocation.

96.    If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class members who submit appropriate Claim Forms. The Plan of Allocation is designed to achieve an equitable distribution of the Net Settlement Fund.

97.    The Plan of Allocation is the product of Lead Counsel's investigation and discovery in this Action, as well as its consultation with Lead Plaintiff's damages experts. Indeed, Lead Counsel worked closely with the damages experts in establishing the Plan of Allocation, and believe the Plan of Allocation is a fair, adequate, and reasonable method to allocate the Net Settlement Fund among Class members.

98.    The analysis performed by Plaintiffs' damages expert entailed studying the market reaction to public disclosures that revealed or described the alleged misrepresentations or their effects, and calculating the reasonable percentage of artificial inflation present in the daily

closing market prices for Priceline common stock for each day in the Class Period that, in its opinion, was attributable to the alleged wrongdoing. Plaintiffs' damages expert also measured the percentage price decline associated with each particular disclosure, adjusted that price reaction to eliminate the effects, if any, attributable to general market or industry conditions, and then used standard statistical techniques to ensure that the price reaction was statistically significant. To isolate the price effect reasonably believed to be caused by inflationary statements, Plaintiffs' expert also analyzed the market reaction to Priceline's quarterly announcements during the Class Period to determine if any were associated with statistically significant price increases. Under the Plan of Allocation, all Class Members who purchased during the Class Period and continued to hold their stock through at least September 27, 2000, and suffered losses, are entitled to payment from the Net Settlement Fund.

99.     SCS, as the Claims Administrator for the Settlement, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's "Loss Amount," calculated in accordance with the Plan of Allocation. Calculation of the Loss Amount will depend upon several factors, including when the stock was purchased or acquired.

100.    In sum, the Plan of Allocation, developed in consultation with Lead Plaintiffs' damages expert, was designed to fairly and rationally allocate the proceeds of the Settlement among Class members. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is adequate, fair, and reasonable and should be approved.

## THE FEE APPLICATION

101.    The Notice informed Class members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount *not to exceed* 33.3% of the Settlement Fund, and for

41

reimbursement of Plaintiffs' Counsel's Litigation Expenses in an amount not to exceed $2.25 million.

102.    Lead Counsel achieved an extraordinary result for the Class at great risk and expense to themselves.  Throughout this litigation, Lead Counsel were committed to the interests of the Class, and invested the time and resources and paid the ongoing out-of-pocket costs, necessary to resolve the Class' claims.  Moreover, Lead Counsel took this case on a contingency basis, with no assurance of success, and litigated this case for almost seven years without any compensation at all.

A.    **Plaintiffs' Counsels' Work and Expertise**

103.    A Compendium of Declarations of Plaintiffs' Counsel in support of an Award of Attorneys' Fees and Reimbursement of Expenses (the "Compendium of Plaintiffs' Counsel Declarations") is filed herewith.  The schedules attached as Exhibit B to each respective declaration indicate the amount of time spent by each attorney and paralegal employed by each firm, and the lodestar calculations based on counsel's current billing rates.  The schedules were prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel, which are available at the request of the Court.  The hourly rates for attorneys and paralegals included in these schedules are the same as the regular current rates charged for their services in non-contingent matters.  In addition, these rates are commensurate with the hourly rates charged by lawyers performing similar services in Connecticut, Vermont, California, New York, New York and Cleveland, Ohio.  For attorneys or paralegals who are no longer employed, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment by Lead Counsel.

104.    In the Compendium of Plaintiffs' Counsel Declarations, Plaintiffs' Counsel Declarations outline the experience and qualifications of the attorneys and their respective firms who worked on the Action at the request and under the direction of Lead Counsel, the services rendered and time expended in rendering those services, and the attorneys' normal, current hourly rates in non-contingent matters.    Class Plaintiffs' Counsel will divide fees among Plaintiffs' Counsel based on Class Plaintiffs' Counsel's assessment of each firm's contribution to the prosecution of the Action.

105.    As set forth in the Plaintiffs' Counsel Declarations, Lead Counsel and other Plaintiffs' Counsel have expended over 31,768 hours in the prosecution and investigation of this litigation.    The resulting lodestar is over $12.1 Million.    Under the lodestar approach, the requested fee yields a multiple of approximately 1.98 times Plaintiffs' Counsels' lodestar.

**B.    Standing and Caliber of Opposing Counsel**

106.    The quality of work performed by Plaintiffs' Counsel, under the leadership of Lead Counsel, in attaining the Settlements should also be evaluated in light of the quality of the opposition.    The defendants were represented by some of the country's most prestigious law firms.    These firms spared no effort in the defense of their clients.    In the face of this knowledgeable, formidable, and well-financed opposition, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade the Defendants to settle the case on terms that were highly favorable to the Class.

**C.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases**

107.    This prosecution was undertaken by Plaintiffs' Counsel entirely on a contingent-fee basis.    The risks assumed by Plaintiffs' Counsel in bringing these claims to a successful conclusion are described above and in the Settlement Memorandum.    Those risks are also

relevant to an award of attorneys' fees. Here, the risks assumed by Plaintiffs' Counsel, and the time and expenses incurred without any payment, were extensive, and are described in detail above and in the accompanying Attorneys' Fees and Expenses Memorandum.

108.    From the outset, Lead Counsel understood they were embarking on a complex, expensive and probably lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. Plaintiffs faced Defendants represented by large firms who spared no expense in opposing Plaintiffs' efforts to obtain discovery from their clients. In undertaking their responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of this litigation, and that funds were available to compensate staff and to cover the considerable out-of-pocket costs that a case such as this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel have received no compensation during the course of this litigation and have incurred $1,394,422.57 in out-of-pocket expenses in prosecuting this Action for the benefit of the Class.

109.    Lead Counsel also bore the risk that no recovery would be achieved. As discussed herein and in the Settlement Memorandum, from the outset, this case presented a number of risks and uncertainties that could have prevented any recovery whatsoever. As discussed in detail in the Attorneys' Fees and Expenses Memorandum, despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured. Moreover, in this case, Plaintiffs did not have the benefit of an earlier or concurrent government investigation to guide their litigation efforts. Plaintiffs developed their accounting allegations, from scratch and without the benefit of a prior restatement of earnings.

110.    Lead Counsel firmly believe that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Indeed, in this case, only in the final hours of the fourth attempt at mediation, did the parties finally agree to settle this case.

111.    As a result of Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties, Lead Counsel achieved a significant recovery for the benefit of the Class.  In circumstances such as these, and in consideration of Plaintiffs' Counsels' hard work and the extraordinary result achieved, the requested fee is reasonable and should be approved.

## REIMBURSEMENT OF THE REQUESTED EXPENSES AND COSTS IS FAIR AND REASONABLE

112.    Lead Counsel seek reimbursement of litigation expenses reasonably and actually incurred by Plaintiffs' Counsel in connection with commencing and prosecuting the claims against the defendants.  Plaintiffs' Counsel advanced all of the incurred litigation expenses.

113.    From the beginning of the case, Plaintiffs' Counsel were aware they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute this Action.  Thus, Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

45

114.    As set forth in the Plaintiffs' Counsel Schedule, Plaintiffs' Counsel have incurred in excess of $1.394 million in unreimbursed litigation expenses in connection with the prosecution of this Action. These expenses are reflected on the books and records maintained by Plaintiffs' Counsel. These books and records are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred. Plaintiffs' Counsels' expenses are set forth in detail in each firm's Declaration in the Compendium of Plaintiffs' Counsel Declarations, each of which identifies the specific category of expense, *e.g.*, experts' fees, transcripts, travel costs, photocopying, telephone, fax and postage expenses and other costs actually incurred for which Plaintiffs' Counsel seek reimbursement. These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in the respective firms' billing rates.

115.    Lead Counsel maintained strict control over the litigation expenses incurred by Plaintiffs' Counsel. Indeed, many of the litigation expenses were paid out of a litigation fund funded by Plaintiffs' Counsel and jointly maintained by Scott + Scott, LLP and Johnson & Perkinson (the "Litigation Fund").

116.    Lead Counsel retained forensic accounting and auditing experts to analyze the allegations that Priceline's financial statements filed with the SEC were false and misleading. These experts provided substantial assistance to Lead Counsel in the prosecution of this action by, among other things, assisting Lead Counsel in drafting the Complaint; responding to numerous accounting issues raised by defendants in their motions to dismiss; understanding the complex accounting and auditing issues raised in many of the documents produced by defendants and in Priceline's financial results; preparing for and questioning at the depositions of

the defendants and other witnesses in the case; and, finally, assisting in developing Plaintiffs' positions and relevant evidence for use at the mediations.

117.    Plaintiffs also employed an expert to opine on the validity of the method and conclusions of the valuation opinion for the WebHouse warrants which formed an integral piece of Plaintiffs' case.

118.    Similarly, Plaintiffs' retained damages and valuation experts to provide substantial assistance to Lead Counsel in the prosecution and resolution of this Action.  These experts consulted with Lead Counsel and analyzed the market impact and efficiency of the market issues in connection with Lead Plaintiffs' motions for class certification.  These experts performed preliminary events studies to assist in the evaluation of loss causation and to estimate damages suffered by the Class, and provide consultation on the Plan of Allocation.

119.    The litigation expenses for which Plaintiffs' Counsel seek reimbursement also include costs paid for the creation, maintenance and management of the electronic database used in connection with the necessary document discovery.  Each document was inputted into a searchable database for use at deposition and trial. Lead Plaintiffs received over 5.294 million pages of documents from the defendants and non-parties.  In order to access and review this voluminous production in an organized, efficient and effective manner, Lead Plaintiffs relied on the electronic database.  In addition, the large volume of documents required copying for review and other litigation related purposes.  Lead Plaintiffs negotiated discounted rates for these services.

120.    The other expenses for which Plaintiffs' Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, long distance telephone and facsimile

charges, postage and delivery expenses, computerized research, court reporters for depositions, overtime expenses, filing fees and photocopying.

121. Plaintiffs' Counsel also seek reimbursement for travel expenses, which are also the type of expense that is necessarily incurred in litigation and routinely charged to clients billed by the hour. This Action involved a significant amount of travel for depositions as well as travel for document review. As set forth above, the depositions in this Action occurred throughout the United States, including in, among other locations, Chicago, New York and Seattle. In addition, Plaintiffs' Counsel traveled to review the original Deloitte audit workpapers and to attend certain mediation sessions in New York and Los Angeles.

122. All of the litigation expenses incurred, which were necessary to the successful prosecution and resolution of the claims against the defendants.

123. In view of the complex nature of the Action, the litigation expenses incurred were reasonable and necessary to pursue the interests of the Class. Accordingly, Lead Counsel respectfully submit that the expenses incurred by Plaintiffs' Counsel are reasonable in amount and should be reimbursed in full.

## CONCLUSION

124. In the view of the very substantial recovery to the Class, the risks of this litigation, the enormous efforts of Lead Counsel, the quality of work performed, the contingent nature of the fee, the complexity of the case and the standing and experience of Plaintiffs' Counsel, Lead Counsel respectfully submit that the Priceline settlement of $80 million should be approved as fair, reasonable and adequate, that the Plan of Allocation should be approved; that a fee in the amount of 30% of the Settlement Fund (with interest) should be awarded to Lead

Counsel, and that the Plaintiffs' Counsel's litigation expenses in the amount of $1,394,422.57 and the Lead Plaintiffs' expense requests should be reimbursed in full (with interest).

We declare under penalty of perjury that the foregoing is true and correct.

Executed on June 21, 2007

/s/ David R. Scott                        /s/ Jacob B. Perkinson
David R. Scott                            Jacob B. Perkinson

49