UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN RE: PRICELINE.COM, INC.            :
SECURITIES LITIGATION                  :
                                                      :
                                                      :        MASTER FILE NO.
‎_____      :        3:00-CV-01884 (AVC)
                                                      :
This document relates to:              :
                                                      :        July 18, 2007
      ALL ACTIONS                       :
                                                      :

**PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR
MOTION FOR LEAVE TO SERVE AND FILE A SECOND AMENDED
COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.   SUMMARY OF THE ARGUMENT ...................................................................... 1

II.  PLAINTIFFS HAVE ADEQUATELY PLED DELOITTE'S SCIENTER FOR
     THE ACCOUNTING FRAUD THEORY ALLEGED IN THE PROPOSED
     COMPLAINT ........................................................................................................ 7

III. THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS
     AGAINST DELOITTE............................................................................................ 11

     A.   The CAC Dated October 29, 2001 Was Timely Filed ................................. 11

          1.   The Law of the Case Doctrine Precludes Revisiting Deloitte's
               Rejected Statute of Limitations Argument ............................................11

          2.   The One Year Discovery Rule Does Not Bar Plaintiffs' Claims
               Even If The CAC Does Not Relate Back To The Lead Plaintiff Motion................13

     B.   The Earlier Dismissal of Deloitte Did Not Restart the Statute of Limitations................ 15

# TABLE OF AUTHORITIES

Page

## CASES

*AUSA Life Ins. Co. v. Ernst & Young*,
206 F. 3d 202 (2d Cir. 2000)..................................................................................... 7

*AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*,
104 F. 3d 601 (1997)................................................................................................ 12

*In re Blech Sec. Litig.*,
No. 94 Civ. 7696, 1997 WL 20833 (S.D.N.Y. Jan. 21, 1997)................................. 18

*Cavic v. Grand Bahama Dev. Co., Ltd.*,
701 F. 2d 879 (11th Cir. 1983) ............................................................................... 14

*Chico-Velez v. Roche Products, Inc.*,
139 F. 3d 56 (1st Cir. 1998)..................................................................................... 16

*Competitive Associates, Inc. v. Fantastic Fudge, Inc.*,
58 F.R.D. 121 (S.D.N.Y. 1973) ............................................................................... 14

*In re Complete Management Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001)....................................................................... 8

*DiLaura v. Power Auth. of N.Y.*,
982 F. 2d 73 (2d Cir. 2002)..................................................................................... 12

*In re Dreyfus Aggressive Growth Mutual Fund Litig.*,
No 98 Civ. 4318 (HB), 2000 WL 10211. ............................................................... 14

*Elmore v. Henderson*,
227 F. 3d 1009 (7th Cir. 2000) ............................................................................... 16

*Fellman v. Electro Optical Systems Corp.*,
2000 WL 489713 (S.D.N.Y. 2000)......................................................................... 17

*In re Global Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004)................................................................... 8, 9

*Green v. Wolf Corp.*,
50 F.R.D. 220 (S.D.N.Y. 1970) .............................................................................. 17

*Henderson v. United States*,
517 U.S. 654 (1996).................................................................................................. 15

*Jewell v. County of Nassau,*
  917 F. 2d 738 (2d Cir. 1990)................................................................................................ 16

*Johnson v. Nyack Hosp.,*
  86 F. 3d 8 (2d Cir. 1996)..................................................................................................... 16

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,*
  501 U.S. 350 (1991)............................................................................................................ 11

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.,*
  318 F. 3d 148 (2d Cir. 2003)........................................................................................ 11, 13

*Lentell v. Merrill Lynch & Co. Inc.,*
  396 F. 3d 161 (2d Cir. 2005)........................................................................................ 13, 15

*Levitt v. Bear Stearns & Co., Inc.,*
  340 F.3d 94 (2d Cir. 2003)........................................................................................... 13, 15

*Liberty Mut. Ins. Co. v. Wetzel,*
  424 U.S. 737 (1976)............................................................................................................ 17

*Luce v. Edelstein,*
  802 F.2d 49 (2d Cir. 1986).................................................................................................. 16

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
  547 U.S. 71, 126 S.Ct. 1503 (2006)..................................................................................... 4

*In re Neopharm, Inc. Sec. Litig.,*
  No. 02C2976, 2007 WL 625533 (N.D. Ill. Feb. 23, 2007)................................................ 16

*Oneida Indian Nation of New York v. City of Sherrill, New York*
  337 F. 3d 139 (2d Cir. 2003), *vacated on other grounds,* 544 U.S. 197 (2005).................. 5

*Reisman v. KPMG Peat Marwick LLP,*
  965 F. Supp. 165 (D. Mass 1997). ..................................................................................... 14

*Rothman v. Gregor,*
  220 F. 3d 81 (2d Cir. 2000)................................................................................... 11, 13, 15

*S.E.C. v. KPMG LLP,*
  412 F. Supp. 2d 349 (S.D.N.Y. 2006)................................................................................... 8

*Shah v. Meeker,*
  435 F. 3d 244 (2d Cir. 2006)............................................................................................... 13

*Slayton v. American Exp. Co.,*
   460 F.3d 215 (2d Cir. 2006)...................................................................................17

*State Teachers Retirement Bd. v. Fluor Corp.,*
   654 F. 2d 843 (2d Cir. 1981)..................................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   127 S.Ct. 2499 (2007).......................................................................3, 4, 7, 8, 9

*Traer v. Clews,*
   115 U.S. 528, 6 S. Ct. 155 (1885)...........................................................................15

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
   99 F. 3d 538 (2d Cir. 1996)....................................................................................17

*United States v. Arthur Young & Co.,*
   465 U.S. 805 (1984)................................................................................................9

*United States v. Simon,*
   425 F. 2d 796 (2d Cir. 1969)...................................................................................8

*Warren v. Garvin,*
   219 F. 3d 111 (2d Cir. 2000)..................................................................................16

*White v. Murtha,*
   377 F. 2d 428  (5th Cir. 1967) ..............................................................................12

*Virgin Atl. Airways v. Nat'l Mediation Bd.,*
   956 F. 2d 1245 (2d Cir. 1992)................................................................................12

## STATUTES

15 U.S.C. §78i(e) .......................................................................................................11

## RULES

Fed. R. Civ. P. 3 ........................................................................................................15

Fed. R. Civ. P. 15(c)(2)...........................................................................................6, 19

Fed. R. Civ. P. 54(b) .................................................................................................17

Fed. R. Evid. 201 .......................................................................................................5

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 3763 (July 25, 2002) .................................................................. 10

S. Conf. Rep. No. 3763 (July 25, 2002) ..................................................................... 10

**MISCELLANEOUS**

18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* §4478 (1981) ............... 12

18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* §44478.1 (2002) .......... 12

## I.    SUMMARY OF THE ARGUMENT

Plaintiffs have moved for leave to file a Second Amended Complaint (the "SAC"), using information Plaintiffs learned from the 89,000 pages of Deloitte audit work papers and other Deloitte internal files provided to Plaintiffs in July through October 2005 (29,000 pages), and August 2006 (60,000 pages). This information was produced pursuant to a subpoena served on Deloitte in December 2004, within weeks of the time that Judge Squatrito lifted the discovery stay following the October 7, 2004 decision on Defendants' motion to dismiss. Declaration of Jacob B. Perkinson ("Perkinson Decl.") at ¶¶ 32-33, 42 and 54.

In the October 7, 2004 decision, Docket No. 101, Judge Squatrito sustained most of Plaintiffs' claims against Priceline and the Individual Defendants. He also ruled that Plaintiffs' claims against Deloitte were not time-barred, but that Plaintiffs had not adequately alleged scienter on the part of Deloitte. Thus, Plaintiffs' claims against Deloitte were dismissed, "without prejudice to Plaintiffs repleading their allegations upon curing the deficiencies set forth herein." Docket No. 101 at 54.

The proposed amendments in the SAC at Section IV-F, "The Evolving Intent and Accounting for the Webhouse Transaction," ¶¶68-104 expand on the allegations of scienter in the Consolidated Amended Complaint (the "CAC"). The SAC sets forth several new and highly particularized facts showing that Deloitte acted with scienter when, following Priceline's receipt of stock warrants from its affiliate company, Priceline Webhouse Club, LLC ("Webhouse"), Deloitte helped Priceline to prematurely and fraudulently recognize $189 million in revenue that Priceline had yet to earn. Indeed, Deloitte's own audit work papers and files show that Deloitte knew Priceline was violating Generally Accepted Accounting Principles ("GAAP"), specifically, FAS Statement of Concepts #5 (FAS Con #5) (Ex. 1).[1] As the 1999 audit was on-going, the SEC issued SAB 101 (Ex. 2) which was directed to precisely the type of fraudulent revenue

---

[1]    The documents identified in this memorandum and which are described in the allegations in the SAC, are attached to the Declaration of Beth A. Kaswan ("Kaswan Decl.") and are cited herein as "Ex. __".

recognition scheme engaged in by Priceline in immediately recognizing revenue for the Webhouse warrants. (SAC ¶ 87, 126) Documents produced by Deloitte demonstrate that Priceline's auditors were well aware of SAB 101 and its significance to Priceline's accounting. SAC ¶ 86-88, 92-93; Exs. 3-5.

The SAC alleges (and documents produced in this case show) that immediate revenue recognition was improper because the Webhouse warrants were issued to Priceline as part of a single integrated transaction (the "Webhouse Transaction"), in which Priceline had agreed to provide Webhouse with the use of its intellectual property, including its website and business model, and to provide management, marketing, technology and other services to Webhouse in consideration for receipt of the warrants. (SAC ¶¶ 69-70, 127; Exs. 6, 7 )[2] Thus, as the warrants were issued for services to be performed in the future, and for the future use of Priceline's intellectual property, Priceline could not immediately report revenue for the warrants.

As Deloitte's records show, to effectuate the Webhouse Transaction, Deloitte accountants, including its auditors and tax consultants, worked closely with Priceline's lawyers to structure and carefully craft the language of six separate contracts, (SAC ¶¶ 73-78; Exs. 8-14), so that the contracts reflected that the warrants were issued as consideration for the licensing of Priceline's "property", but not for services. (SAC ¶ 75; Ex. 15). On October 20, 1999, six days before the final Webhouse Transaction agreements were dated, the Priceline audit manager provided Priceline with journal entries to recognize revenue for the Webhouse warrants over time. (SAC ¶ 76; Ex. 16). An October 20, 1999 memorandum of the Deloitte tax consultants also reflects the "fact" that the Webhouse warrant was being issued "in exchange for Priceline's intellectual property." (SAC ¶ 76; Ex. 17). Then, however, on November 8, 1999, the Priceline audit partner approved *immediate* revenue recognition for the Webhouse warrants. (SAC ¶ 84;

---

[2]    This allegation was included in the CAC at ¶ 80, and Judge Squatrito in his October 7, 2004 decision referred to this theory as Plaintiffs' second claim of Priceline's accounting irregularities. Docket No. 101 at 45 ("Second, Plaintiffs claim that the value of the warrants should have been recognized over the term of the license granted to Webhouse, and not immediately upon the grant of the license.").

Ex. 18). On January 27, 2000 Priceline issued a press release for its fourth quarter 1999 financial performance which reported $189 million of income for the immediate recognition of the Webhouse warrants. (SAC ¶ 90; Ex. 19). Before Deloitte could issue its final formal audit opinion,[3] however, Deloitte's national accounting experts advised the auditors that the language in the Webhouse Transaction contracts referring to the license of Priceline's intellectual property as the consideration for the warrants, barred immediate revenue recognition. (SAC ¶ 91; Ex. 21).

Rather than issue an adverse audit opinion, the Deloitte auditors and Priceline managers agreed that Priceline would retroactively change the language in the six transaction contracts to reflect that Priceline had no obligation to license its property in order to obtain the warrants, and that, instead, the contracts would represent that the warrants were issued merely to "induce" Priceline to enter into a business relationship with WebHouse – *i.e.,* similar to a "sign on" bonus. (SAC ¶¶ 89, 91-92; Exs. 22 at D+T 0000455, 23 and 24). With the promise from Priceline managers to change the contracts, and various written "management representations," (SAC ¶ 97; Ex. 25), that Deloitte itself drafted (SAC ¶ 96; Exs. 26, 27), Deloitte issued a clean audit opinion certifying that Priceline's financial statements were fairly presented in compliance with GAAP, and that Deloitte had conducted its audit in accordance with GAAS. (SAC ¶ 114; Ex. 20).

In fact, Priceline never did modify its Webhouse transaction contracts (not that it would have been acceptable to alter business contracts in order to justify an erroneous and historical accounting treatment), though a draft "restated and amended" agreement was prepared. (SAC ¶ 99; Ex. 28). And in its 2000 Form 10-K, Priceline admitted that the Webhouse warrants had been issued for "services rendered." (SAC ¶ 104; Ex. 29). Because these allegations (and the evidence produced from Deloitte's files) reflect that Deloitte issued its clean audit opinion

---

[3]    The date appearing on an audit opinion, here January 27, 2000, is generally the date that the auditor finishes its audit fieldwork. Here, the text of Deloitte's audit opinion shows it was issued on or after March 7, 2000. (Ex. 20).

knowing that Priceline's financial statements violated GAAP, and that Deloitte itself had created false audit evidence to rationalize the falsity of its opinion in violation of GAAS, these allegations more than satisfy Plaintiffs' duty under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (2007), to allege facts demonstrating a "strong inference" of scienter.

Deloitte's principal argument in opposing Plaintiffs' motion is that Plaintiffs' motion is "futile" and Plaintiffs cannot show scienter because Deloitte relied upon independent valuations of the Webhouse warrants. Def. Mem. at 1, 37-41 ("Plaintiffs here claim that a warrant issued by Webhouse to Priceline in 1999 was overvalued") But this has absolutely nothing to do with Plaintiffs' new allegations in the SAC relating to scienter. Deloitte has simply set up a straw man to knock down by addressing a wholly different issue than the one alleged in the SAC. Nor, as Deloitte contends (Def. Mem. at 3, 42-43), does this lawsuit involve a minor (and disclosed) technical dispute about complex accounting doctrines -- following the Treadway Commission report on fraudulent revenue recognition, the SEC, in late 1999, issued SAB 101 to prohibit precisely this type of contract manipulation used to accelerate revenue recognition for upfront fees that were, in substance, paid as part of an overall ongoing business arrangement. (SAC ¶126, Exs. 2, 3 at D+T 0005137). Moreover, the "disclosure" in Priceline's footnote to its financial statements that described the Webhouse Transaction was itself false and misleading. This "disclosure" in the Form 10-K, drafted by Deloitte auditors, contrary to Deloitte's argument, did not save the improper accounting from constituting a fraud. Def. Mem. at 41. Finally, the admissions included in Priceline's 2000 Form 10-K -- that the Webhouse warrants were issued for "services rendered" -- cannot be explained away (as Deloitte tries to do here, Def. Mem. at 47, fn.39) by the contention that this statement refers to services performed only in 1999; the handwritten notes in Deloitte's 2000 audit work papers reflect that even the Deloitte auditors did not ascribe such an innocent interpretation to Priceline's statement in the 2000 Form 10-K. (SAC ¶ 64; Ex. 29). Thus, Plaintiffs' proposed inferences are "at least" as "cogent" and "compelling" as those offered by Deloitte. *Tellabs*, 127 S.Ct. at 2510. If they were not, Priceline and the individual Defendants would not have just agreed to pay $80 million to settle

4

these same claims against them. This is patently not the type of "nuisance filing" that Congress sought to curb through the PSLRA by imposing stricter pleading requirements. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 126 S.Ct. 1503, 1510-11 (2006).

Deloitte also argues that Plaintiffs' SAC is "futile" because the statute of limitations to file a securities fraud case expired, while Plaintiffs were in the process of litigating this lawsuit. Here, again, Deloitte misses the boat by incorrectly describing the issue.[4] As Judge Squatrito already ruled, this lawsuit was timely commenced against Deloitte and once an action is commenced, it stops the statute of limitations from running *for that case*. Deloitte's argument to the contrary (Def. Mem. at 16-21) is predicated upon a long list of decisions holding that suing a Defendant in one lawsuit, does not equitably toll the statute of limitations for purposes of suing the Defendant in a *different* lawsuit -- hardly a novel concept, but one that does not apply to the circumstances of this case. Thus, the long recitation by Deloitte (Def. Mem. at 29-33) regarding which incriminating documents were produced by Deloitte in its 2005 document productions versus its 2006 production has absolutely nothing to do with the question of whether the statute of limitations has run against Deloitte in *this* case.

---

[4]    Deloitte, in making its various statute of limitations arguments, also contends that it has acted reasonably in providing discovery, and that plaintiffs have caused the delays in presenting their claims against Deloitte. While for the reasons described in this memoranda, it does not matter when during the lawsuit the documents needed to allege Deloitte's scienter were produced (because the statute of limitations stopped running when Deloitte was sued), in fact, Deloitte did not produce the bulk of its files -- 60,000 pages -- until August 2006, 18 months after plaintiffs served its subpoena dated December 3, 2004 (Ex. 30), for these records. As described in the Kaswan Decl., and the attached exhibits, many of these later produced records were used to connect the dots in making out the "strong inference" of scienter required by the PSLRA. Moreover, as recently as March 2007, Deloitte still had refused to produce its 1998 restatement files (Ex. 31) -- even though Deloitte has argued in its opposition papers here that the 1998 accounting for the Delta warrant (which was restated between February and March of 1999, apparently as a result of discussions with the SEC) (Ex. 32) established the legitimacy of Priceline's accounting for the Webhouse warrants. (Def. Mem. at 41; Maguire Decl. Ex. B, C and D). These exhibits were not referred to in the Proposed Complaint and do not reflect the type of "facts" that are subject to judicial notice. Fed. R. Evid. 201. Thus, they cannot properly be considered on a motion to dismiss, which is the governing standard for evaluating Deloitte's futility arguments. *See Oneida Indian Nation of New York v. City of Sherrill, New York*, 337 F. 3d 139, 168 (2d Cir. 2003) ("A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."), *vacated on other grounds*, 544 U.S. 197 (2005). Deloitte has effectively moved for summary judgment on an issue for which it has selectively produced only part of Priceline's communications with the SEC, while withholding the remainder of related documents claiming them to be outside their discovery obligations. These documents thus may not be relied upon in determining whether amendment of the CAC would be "futile."

Both a dismissal with leave to replead, and a dismissal of a defendant in a multi-defendant case, unless the dismissal is certified under Fed. R. Civ. P. 54(b), are non-final or interlocutory and do not end the litigation against the defendant because the decisions are subject to "revision" or "reconsideration" by the district court, at any time, including on the grounds of newly discovered evidence (as is the case here).  Thus, the SAC "relates back" under Fed. R. Civ. P. 15(c)(2) to the earlier pleading joining Deloitte.  Judge Squatrito, on October 7, 2004, correctly decided that the Complaint filed October 29, 2001, which named Deloitte as a Defendant, was timely, and his decision should not be disturbed under the "law of the case" doctrine.  But even if this Court were to revisit Judge Squatrito's decision, and even if this Court concluded that Judge Squatrito had erred in relating back the October 29, 2001 pleading to the filing of the lead plaintiff motion (as Deloitte contends), the October 2001 complaint would still be timely -- because as the original complaints show, Plaintiffs immediately made "some inquiry" into the facts of this case, (the first part of the one year of "discovery" statute test); and the CAC which joined Deloitte was filed *before* the expiration of one year following the time that Plaintiffs, in exercising due diligence, *could have* obtained the facts needed to plead a securities fraud claim against Deloitte (the second part of the one year of statute test).  At a minimum, this issue involves disputed questions of fact that are not properly resolved on the pleadings, or on a motion to amend.

As the Second Circuit has held on multiple occasions, in evaluating whether the one year of discovery limitations bar applies, merely because Plaintiffs have sufficient notice and access to evidence to plead a securities fraud case against an issuer, does not mean that Plaintiffs also have sufficient access to information to plead a case against a secondary actor, such as an independent accountant -- which is precisely what occurred here (since Judge Squatrito upheld Plaintiffs' Webhouse accounting fraud claims against Priceline, and its officers and dismissed them against Deloitte).  Because of the PSLRA discovery stay (and because there was no government investigation or restatement to assist Plaintiffs), the one year of discovery statute does not apply to bar Plaintiffs' claims against Deloitte. As evidenced by the Court's prior

dismissal of the Plaintiffs claims, Deloitte was sued *before* Plaintiffs could have obtained the Deloitte workpapers and internal files containing sufficient information to plead Deloitte's knowledge with particularity. The CAC was also filed before the three year statute of limitations that serves as an absolute cut-off had run.

## II. PLAINTIFFS HAVE ADEQUATELY PLED DELOITTE'S SCIENTER FOR THE ACCOUNTING FRAUD THEORY ALLEGED IN THE PROPOSED COMPLAINT.

Plaintiffs allege that Deloitte's audit opinion, which represented that Priceline's 1999 financial statements were "fairly presented" in accordance with GAAP, and that Deloitte had performed its audit in accordance with GAAS, was fraudulently issued, because Deloitte's auditors knew that (1) Priceline had misstated its revenues by prematurely recognizing revenue upon the receipt of the Webhouse warrants; and (2) that footnote #11 to the 1999 financial statements (drafted by Deloitte) falsely described the consideration for the Webhouse warrants. SAC ¶¶ 91-92, 96-98, 109, 129, 138, 273. Plaintiffs further claim that Deloitte failed to comply with GAAS, by acting as Priceline's advocate and apologist, rather than its "independent" auditor. SAC ¶¶ 103, 139, 144, 275.

Pleading a "strong inference" of scienter under the PSLRA means that, based upon an assessment of all the allegations in the complaint, *Tellabs*, 127 S.Ct. at 2509-10, the inference of scienter is at least as "cogent" and "compelling" as the competing inference proposed by Defendants of non-fraudulent intent. *Id.* at 2510. Under the PSLRA's "strong inference" requirement, "a Plaintiff is not forced to plead more than she would be required to prove at trial," *Id.* at 2513, and, fraudulent intent for purposes of the federal securities laws, means an "intent to deceive, manipulate, or defraud." *Id.* at 2507.

The intent to "deceive manipulate or defraud" exists when a "scheme, viewed broadly, is necessarily going to injure." *AUSA Life Ins. Co. v. Ernst & Young*, 206 F. 3d 202, 220-21 (2d Cir. 2000) (citations omitted). In the context of a securities fraud case against an auditor, because the major accounting firms "well know" that public investors rely heavily on the

integrity of certifications by independent auditors of the company's financial statements, this standard is met where, as Plaintiffs allege occurred in this case, a firm first identifies and "protests" an accounting abuse, and then acquiesces to it. *Id.* at 221, 229. Indeed, "scienter" may be proven against an auditor, even for criminal purposes, merely by demonstrating that it certified financial statements knowing them to be false. *United States v. Simon,* 425 F. 2d 796, 809 (2d Cir. 1969). (rejecting the auditor's argument that a finding of scienter was precluded by the lack of his financial benefit from his client's wrong-doing).[5] *Id.* at 808-09. The government in *Simon* argued (like Plaintiffs have done in this case) that Defendant's motive in knowingly certifying the false statements was to preserve its reputation, "and conceal the alleged dereliction of their predecessors and themselves in former years." *Id.* at 808; SAC ¶ 92. When Defendants countered that had they wanted to "cover up" their deficiencies, they could have more effectively done so (again as Deloitte has done here), the Court was not persuaded, observing that "men who find themselves in a bad situation of their own making do not always act with full rationality." *Id.* at 808-809. *See also, S.E.C. v. KPMG LLP,* 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006) (scienter is proven when Plaintiff shows that an auditor lacked a genuine belief that its clients' financial statements were accurate in all material respects*); In re Complete Management Inc. Sec. Litig.,* 153 F. Supp. 2d at 333-35 ("willful blindness" satisfies the scienter requirement).

As Plaintiffs allege, and Deloitte's workpapers show, because Deloitte's national experts advised the Priceline auditors that Priceline's accounting was improper, each of the above decisions applies to this case. Indeed, Plaintiffs allegations go further: Plaintiffs have also alleged (1) that Deloitte counseled Priceline to alter its records, (SAC ¶ 91); (2) that Deloitte

---

[5]    Here Deloitte also argues that Plaintiffs failed to plead "motive" based upon a purported lack of financial benefit (Def. Mem. at 35), but Deloitte did in fact earn substantial consulting fees as well as audit fees in connection with its review of the Webhouse Transaction. *See, e.g.,* Exs. 9-12. As Deloitte grudgingly acknowledges, (Def. Mem. 35, fn.27), consulting fees may constitute the financial benefit that satisfies one alternative way of establishing an inference of scienter in the Second Circuit. *In re Complete Management,* 153 F. Supp. 2d 314, 315 (S.D.N.Y. 2001) (holding that "motive" was sufficiently alleged by investors suing an auditor who also performed consulting work); *In re Global Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d at 345-46. The payment of these fees strengthens but is not critical to Plaintiffs' claims of scienter. *See Tellabs,* 127 S.Ct. at 2511 ("[W]hile…personal financial gain may weigh heavily in favor of a scienter inference, we agree with the Seventh Circuit that the absence of a motive allegation is not fatal.")

drafted the misleading "management representations" for Priceline managers to sign, (SAC ¶ 96) (3) and that Deloitte's handiwork was included, verbatim, in Fn. #11 to Priceline's 1999 financial statements, (SAC ¶ 98); (4) that Deloitte "covered up" its wrongdoing by (a) including in its Priceline audit workpapers as "audit evidence", the post-audit statement by Priceline and Webhouse managers that the Webhouse warrants were (a) "issued solely as an inducement for Priceline to enter into a relationship with Webhouse"; (b) which promised to modify the Priceline agreements that described a different consideration for the warrants (SAC ¶ 102); and (c) omitting from the "audit evidence" the intent expressed by the Priceline Board of Directors resolution approving the Webhouse Transaction (which described the Priceline license and related services agreements as the consideration for the Webhouse warrant) (SAC ¶¶ 275-76); and, (5) that Deloitte did not require Priceline to restate the 1999 financial statements when (a) Priceline failed to modify its Webhouse contracts; and (b) the Priceline admitted in its 2000 Form 10-K that Webhouse warrants were issued for services. (SAC ¶ 277).

Deloitte does not and can not contest Plaintiffs' factual allegations as they are predicated upon Deloitte's own files, as the exhibits submitted with this reply show. Instead, Deloitte argues that Plaintiffs' new allegations merely demonstrate "Deloitte auditors' careful attention to the warrant and its accounting, and [that they] acted in a professional and responsible manner" Def. Mem. at 44. Given that the Priceline Defendants have just paid $80 million to settle claims that they published false financial statements that knowingly violated GAAP based on these same Deloitte records, this argument is untenable. To put it mildly, Deloitte's position clearly does not reflect the "most plausible of competing inferences." *Tellabs*, 127 S.Ct. at 2506, 2510 (citations omitted).

Moreover, auditors who "specifically counsel" their clients to adopt risky and misleading accounting practices (as Deloitte did here) may be found to have acted with scienter. *In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d at 345-46. Under the federal securities laws, an auditor certifying a public company's financial statements performs a "public watchdog" function which demands the accountant to maintain total "independence" from the client. *United*

*States v. Arthur Young & Co.*, 465 U.S. 805, 817-19 (1984). While Deloitte cites to older cases expressing skepticism about an auditor's willingness to condone accounting fraud and risk its reputation, Enron and its ilk have put this questionable reasoning to rest. The legislative history for the Sarbanes-Oxley legislation prohibiting public auditors from performing certain types of consulting work, attributes the corporate securities scandals, in part, to auditors' conflicts of interest, particularly where auditors issue audit opinions approving their own work.[6] That is precisely what occurred here -- Deloitte acted as one of the architects of the multiple agreements that were structured to avoid the accounting and tax ramifications of the substance of the Webhouse Transaction, and then, as Priceline's auditors, Deloitte publicly approved the false and misleading accounting for the structure it had created. In doing so, Deloitte failed to act "independently" and conduct its audit in accordance with GAAS.[7]

Under GAAS, which Deloitte represented in its audit opinion it had followed in reaching its conclusion that Priceline's 1999 financial statements were fairly stated, "independence" means more than whether an auditor lacks a financial conflict with its audit client; it requires an auditor to be "intellectually honest." AU Section 220 (Ex. 34). Deloitte's involvement in structuring the Webhouse Transaction to avoid accounting for its substance and then falsely describing the "intent" of the Webhouse Transaction to avoid issuing the required adverse opinion is not "intellectually honest". The GAAS requirement that an auditor exercise "due professional care" means that he must perform his audit with "professional skepticism," which is

---

[6]     *See*, S. Conf. Rep. No. 3763, at S7351 (July 25, 2002) (statement of Sen. Sarbanes) ("This legislation prohibits accounting firms from providing certain specified consulting services if they are also the auditors of the company. In our considered judgment, there are certain consulting services which inherently carry with them significant conflicts of interest. Auditors, in effect, find themselves in the position of auditing their own work."); *see also* H.R. Conf. Rep. No. 3763, at H5463 (July 25, 2002) (statement of Rep. LaFalce) ("[A]uditors will no longer be permitted to perform consulting services that create conflict between their duties to shareholders and their self-interests.").

[7]     Deloitte's 1999 "Client Service Satisfaction Assessment" prepared for the Webhouse audit aptly demonstrates how fully Deloitte's auditors ignored their role as "independent" auditors. There, Webhouse's Chief Financial Officer ("CFO") praised Deloitte because it had helped, "the Company meet their objectives through creative solutions to their accounting, internal control, and tax issues," and because Priceline had received "value for its money." (Ex. 33).

"an attitude that includes a questioning mind and a critical assessment of audit evidence. AU Section 230 (Ex. 35). "An auditor must also use the knowledge, skill and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence." *Id*. Here, Deloitte collaborated in preparing obviously suspect audit evidence which it included in its workpapers while ignoring the Priceline Board resolution that contemporaneously authorized the Webhouse Transaction.

These facts give rise to a cogent and compelling inference that Deloitte deliberately acted to cover-up and illegitimately rationalize an audit opinion it knew to be false.

## III.  THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS AGAINST DELOITTE.

For federal securities fraud cases filed before the effective date of Sarbanes-Oxley (which this case is), the complaint must be filed, "within one year of the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. §78i(e); *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991). The Proposed Complaint is timely under both provisions.

### A.  The CAC Dated October 29, 2001 Was Timely Filed

Deloitte's challenge to the timeliness of the CAC was rejected by Judge Squatrito in his October 7, 2004 decision, which should be upheld by this Court.

#### 1.  The Law of the Case Doctrine Precludes Revisiting Deloitte's Rejected Statute of Limitations Argument

By his decision dated October 7, 2004, Judge Squatrito rejected Deloitte's argument that the October 29, 2001 complaint was barred by the one year of discovery statute of limitations. He did so by finding that the October 29, 2001 CAC relates back to the December 1, 2000 motion for appointment of lead plaintiff (the "Lead Plaintiff Motion"), finding that the motion was the equivalent of a motion to amend, which tolls the statute under *Rothman v. Gregor*, 220 F. 3d 81 (2d Cir. 2000). Deloitte argues that Judge Squatrito was wrong under *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F. 3d 148 (2d Cir. 2003). Def. Mem. at 23.

11

In issuing his October 7, 2004 decision, Judge Squatrito was aware of *LC Capital* because Deloitte presented this case to Judge Squatrito in a filing of supplemental authority. DKT Nos. 86, 87.   Nonetheless, the court specifically held that relation back in this case was proper and timely:   "The court finds that the CAC was filed, for the purpose of applying the applicable limitations period, on December 1, 2000…both their amendments adding Deloitte and Nichols and their amendments adding arguably new allegations are timely."   Docket No. 101 at 18-19.   Even in situations where a court's decision is not the holding of the case, the "law of the case applies both to matters expressly decided and to those decided by necessary implication." *AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*, 104 F. 3d 601, 605 (1997).   Here, the relation back argument was central to Deloitte's Motion to Dismiss and was directly ruled on by the Court at Deloitte's request.   Deloitte, citing *DiLaura v. Power Auth. of N.Y.*, 982 F. 2d 73 (2d Cir. 2002), (Def. Mem. at 23 n. 17), argues that the law of the case doctrine does not preclude a court from revisiting a decision that is *dicta* or clearly erroneous.   In *DiLauria*, however, the court found that the district court "did not have the benefit, at that time, of [the] decision" demonstrating its error.   982 F. 2d at 77.   Here the court considered Deloitte's arguments, and rejected them.   "All too often, requests…would reflect only the loser's misplaced attachment to a properly rejected argument…A presumption against reconsideration makes sense."   18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* §4478.1 at 692 (2002).

The law of the case "must be followed in all subsequent proceedings in the same case in the trial court unless…controlling authority has since made a contrary decision or the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice."   *White v. Murtha*, 377 F. 2d 428, 431-32 (5th Cir. 1967).   "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."   *Virgin Atl. Airways v. Nat'l Mediation Bd.*, 956 F. 2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* §4478 at 790 (1981)).   Deloitte has not articulated

any new evidence, any case decided after the October 2004 Order, or a combination of clear error or manifest injustice in support of diverging from the law of the case doctrine. *LC Capital* is not controlling on the issue of relation back because the relation back issue was not before the Second Circuit and was not applied at the district court level in that case. Thus, Judge Squatrito's October 7, 2004 decision that the complaint against Deloitte relates back to December 1, 2000 should be left undisturbed or upheld for the very same reasons stated in that decision.

**2.     The One Year Discovery Rule Does Not Bar Plaintiffs' Claims Even If The CAC Does Not Relate Back To The Lead Plaintiff Motion**

The imputation of knowledge under the one year "discovery" statute of limitations may occur in one of two ways: "(i) 'if the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose'; and (ii) if some inquiry is made, 'we will impute knowledge of what an investor in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud.'" *Lentell v. Merrill Lynch & Co. Inc.*, 396 F. 3d 161, 168 (2d Cir. 2005), *citing LC Capital Partners, LP v. Frontier Ins. Group, Inc.* 318 F.3d 148, 154 (2d Cir. 2003); *see also Levitt v. Bear Stearns & Co., Inc.*, 340 F.3d 94, 101 (2d Cir. 2003) ("[W]hether the securities fraud claim of a plaintiff who receives 'storm warnings' is time barred 'turns on *when*, after obtaining inquiry notice,' the plaintiff 'in the exercise of reasonable diligence, should have discovered the facts underlying the [defendant's] alleged fraud.'") (citation omitted) (emphasis original); *cf. Shah v. Meeker*, 435 F. 3d 244, 249 (2d Cir. 2006) (Plaintiff failed the first part of the two-part test because it undertook no inquiry).

Because of the difficulty of obtaining information relating to the scienter of "secondary" wrongdoers (such as Deloitte), courts in the Second Circuit are particularly reluctant to find that the one year statute has run against them even when a plaintiff is otherwise able to plead a case against the company and its officers. *See Rothman v. Gregor*, 220 F.3d at 97 (where the Second Circuit reversed the District Court's dismissal of an auditor, because the District Court had

erroneously assumed that the statute of limitations barred the action against the auditor because plaintiffs had been able to allege a securities fraud complaint against the issuer), *see also Lentell,* 396 F.3d at 169; *Levitt,* 340 F.3d at 102-04..

Deloitte ignores the controlling two-part test repeatedly articulated by the Second Circuit in *Lentell, LC Capital Partners, Levitt* and *Rothman,* for determining whether a Section 10(b) claim is barred by the one year statute of limitations. These cases squarely hold that the one-year limitations period initiated by "discovery" of the facts supporting a claim runs not from any "inquiry notice," as Deloitte assumes, but from the date on which a plaintiff should have *actually* discovered the facts underlying the alleged fraud by Deloitte. Because here there was no restatement or government investigation, that date was delayed until the time Plaintiffs were able to obtain and evaluate Deloitte's workpapers and internal files. Thus, for the statute to begin to run, Plaintiffs must have both 1) a reason to investigate, and if "some inquiry" is made, 2) the ability to access information sufficient to allow the filing of a sustainable complaint. Critically, this standard is intensely factual and clearly inappropriate for resolution at a preliminary stage such as on a motion for leave to amend.[8]

Importantly, Plaintiffs in this case did act and made "some inquiry" within a year of having a reason to begin their investigation -- as the "basis" sections of various original complaints filed with this Court demonstrate. *See, e.g.* Exs. 36, 37.[9]  As such, the issue before

---

[8]     *See Competitive Associates, Inc. v. Fantastic Fudge, Inc.* 58 F.R.D. 121, 123 (S.D.N.Y. 1973) (if there is a question of fact as to when the statute of limitations began to run, motion to dismiss based on this defense should be denied); *In re Dreyfus Aggressive Growth Mutual Fund Litig.,* No 98 Civ. 4318 (HB), 2000 WL 10211 at *3 (S.D.N.Y. Jan. 6, 2000) (although plaintiff "could conceivably have anticipated trouble" more than a year prior to filing the lawsuit, "the issue of constructive knowledge and inquiry notice should more properly be resolved by the trier of fact at a later stage in this litigation."); *Cavic v. Grand Bahama Dev. Co., Ltd.,* 701 F. 2d 879, 888 n.6 (11th Cir. 1983) (whether, under statute of limitations, fraud should have been discovered earlier is generally considered a question of fact, particularly where the conduct of the alleged fraudulent party was calculated to mislead, deceive or dissuade inquiry by the victim); *c.f Reisman v. KPMG Peat Marwick LLP*, 965 F. Supp. 165 (D. Mass 1997) (where a company's restatement was considered sufficient to cause the statute to run.). Here, of course, Priceline did not restate the accounting for the Webhouse warrant and Priceline and Deloitte never publicly admitted that Priceline's accounting was deficient.

[9]     The CAC also includes a section on Plaintiffs' investigation of the facts of this case. *See* CAC ¶ 237. An explanation of the comprehensive investigation performed by Plaintiffs' counsel  between October 2000 and the filing of the CAC, with particular dates ascribed to the investigative steps, can be set forth in an *ex parte* declaration by counsel should the Court choose to revisit Judge Squatrito's October 2004 decision on the statute of limitations, and deems such detail necessary.

this Court is not whether Plaintiffs were on "inquiry notice" of claims against Deloitte within the year preceding October 29, 2001, but rather, under the second branch of the discovery rule, whether Plaintiffs had or should have had the information to plead Deloitte's scienter during that time period as the Second Circuit cases cited above explain. Under the second part of the one-year discovery test, even having information to fully plead a securities fraud case against the company is not enough to cause the statute to run against an auditor or other "secondary" or "tertiary" wrongdoer, because of the difficulty of acquiring proof of that wrongdoer's own scienter. *Lentell*, 396 F. 3d at 169; *Levitt*, 340 F. 3d at 102-04; *Rothman*, 220 F. 3d at 97.

Nowhere is this heightened pleading difficulty for a "secondary" wrongdoer more apparent than in this case, where Judge Squatrito sustained Plaintiffs' complaint against Priceline and its officers for the accounting irregularities, but not as against Deloitte. Even now, Deloitte argues that Plaintiffs still have failed in their efforts to adequately plead its scienter -- even with the 89,000 pages of internal files that Plaintiffs used to augment the scienter allegations in the SAC. Deloitte's argument that Plaintiffs' scienter allegations remain insufficient is fundamentally at odds with its argument that Plaintiffs had the information to plead its scienter one year before the CAC was filed on October 29, 2001. Because, here, Plaintiffs were only able to plead Deloitte's scienter with the particularity this Court demands, by referring to Deloitte's internal files which were produced pursuant to a subpoena issued as soon as the discovery stay was lifted, years after Deloitte was joined to this case, the one year discovery rule does not bar the claims made against Deloitte in the CAC filed October 29, 2001.

**B.**     **The Earlier Dismissal of Deloitte Did Not Restart the Statute of Limitations**

"A civil action is commenced by filing a complaint with the court." Fed. R. Civ. P. 3. As early as 1883, the Supreme Court held that "where an action has been commenced on a claim, however defective, it stops the running of the statute of limitations." *Traer v. Clews*, 115 U.S. 528, 6 S. Ct. 155, 168 (1885) (citations omitted); *see also Henderson v. United States*, 517 U.S. 654, 657 n.2 (1996) ("In a suit on a right created by federal law, filing a complaint suffices to satisfy the statute of limitations.").

By his decision dated October 7, 2004, Judge Squatrito sustained various securities fraud claims against Priceline and its officers, held that Plaintiffs had not adequately pled scienter against Deloitte, and granted leave to replead:

> For the reasons set forth herein, Priceline's and the individual Defendants' motion (DKT #70) is GRANTED in part and DENIED in part, and Deloitte's motion to dismiss (DKT #67) is GRANTED. The allegations of the Consolidated Amended Complaint that are dismissed pursuant to this memoranda of decision are *DISMISSED without prejudice to Plaintiffs repleading their allegations upon curing the deficiencies set forth herein.*

DKT # 101 at 54 (emphasis added). The Court imposed no deadline for repleading these claims. If, however, Deloitte's analysis of the law is correct -- that the dismissal caused the one-year/three year statute of limitations to pop back up as though the CAC had never been filed, then Judge Squatrito's grant of the right to replead would have been meaningless as of the day the decision was entered because Judge Squatrito issued his decision four years after the Plaintiffs had purchased their Priceline securities. Not surprisingly, this is simply not the law.

Because of the cumbersome and time-consuming process by which securities fraud lawsuits are consolidated, one or more lead Plaintiffs are appointed, and the adequacy of the consolidated complaint is tested through complex and intensely briefed motions. The one-year/three-year limitations would often run out before the Court had issued its decision on Defendants' first motion to dismiss if the original filing of the lawsuit did not continue to prevent it from running. Courts finding that Plaintiffs have failed in their attempt to plead an adequately detailed consolidated complaint commonly grant leave to Plaintiffs to try again. *See, e.g. Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir. 1986) (securities complaints dismissed for a lack of particularity are "almost always" dismissed with leave to amend). Despite this everyday occurrence, there is no plethora of decisions holding that the right to amend has been mooted out by a resurrected statute of limitations.[10] Indeed, the general absence of caselaw even discussing

---

[10]     The only case cited by Deloitte involving a situation where the statute of limitations was held to bar a claim in the same lawsuit against a defendant who had been named in the complaint and served with the complaint is *In re Neopharm, Inc. Sec. Litig.*, No. 02-C-2976, 2007 WL 625533 (N.D. Ill. Feb. 23, 2007). This case erroneously relied upon decisions, such as those cited by Deloitte here, that hold that the joinder of a party in one lawsuit, did not toll the statute of limitations for a second lawsuit. *See e.g. Johnson v. Nyack Hosp.,* 86 F. 3d 8 (2d Cir. 1996) (first complaint dismissed without prejudice followed by a new action that was time-barred); *Warren v. Garvin,* 219 F. 3d

this argument suggests that it is so "creative" that virtually no other defendant has even thought it might be a defense to Plaintiffs' securities fraud claims. *See e.g.,* examples of cases dismissing complaints with leave to replead more than one year after the original complaint was filed, *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F. 2d 843, 856 (2d Cir. 1981) (amendment allowed after three-year interval); *Green v. Wolf Corp.*, 50 F.R.D. 220, 223 (S.D.N.Y. 1970) (amendment allowed after four years); *see also Fellman v. Electro Optical Systems Corp.*, 2000 WL 489713 (S.D.N.Y. 2000) (where upon dismissing the complaint for a lack of particularity, with leave to replead, plaintiffs joined new defendants). In *Fellman*, the Court analyzed whether the statute of limitations ran against the newly added defendants under Fed. R. Civ. P. 15(c)(3), but for the dismissed defendants who had earlier been timely joined to the case, no such inquiry was made.

The reason that the statute of limitations does not become resurrected is because a dismissal with a right to replead contemplates that the dismissal, as a non-final order, will be "revised" if the pleading deficiencies are cured by a subsequently filed complaint. *See, e.g. Slayton v. American Exp. Co.* 460 F.3d 215, 224 (2d Cir. 2006) (A dismissal with leave to replead a defendant's scienter is a non-final order). A dismissal of fewer than all the defendants, absent a certification under Fed. R. Civ. P. 54(b), is also non-final. That means the dismissal is subject to revision and does not end the lawsuit against any defendant. *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 743-44, fn.2 (1976) (Absent a Rule 54(b) certification, "any order or other form of decision however designated which adjudicates fewer than all claims or rights and liabilities of fewer than all the parties *shall not terminate the action as to any of the claims or parties* and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and rights and liabilities of all the parties.") (emphasis added). Nor do the requirements included in the Federal Rules for reconsidering final judgments apply to a District Court's interlocutory decisions. "[A] district court is vested with the power to

111 (2d Cir. 2000) (Plaintiff requested his petition for habeas corpus to be dismissed to pursue state claim; his second petition was deemed to be a separate action and untimely); *Elmore v. Henderson,* 227 F. 3d 1009, 1011 (7th Cir. 2000) (action dismissed for misjoinder without leave to amend); *Jewell v. County of Nassau,* 917 F. 2d 738 (2d Cir. 1990) (no leave to amend granted); *Chico-Velez v. Roche Products, Inc.,* 139 F. 3d 56, 59 (1st Cir. 1998) (same).

revisit its decisions before the entry of final judgment and is free from the constraints of Rule 60 in so doing." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 99 F. 3d 538, 541 (2d Cir. 1996).

Indeed, one of the reasons a Court may decide not to certify a dismissal of fewer than all defendants as final under Rule 54(b), is to permit the dismissed defendants to be brought back into the lawsuit as new evidence is discovered. *See, e.g., In re Blech Sec. Litig.*, No. 94 Civ. 7696, 1997 WL 20833 at *2 (S.D.N.Y. Jan. 21, 1997), where the district court refused to certify the dismissal of some of defendants, whose claims were intertwined with the remaining defendants, because the evidence which might be subsequently acquired in the course of discovery in the on-going action, could lead the court "to modify its dismissal to permit repleading against the [dismissed] defendants; such modification of an order is expressly permitted by Rule 54(b)".

Clearly the language of Judge Squatrito's October 7, 2004 decision reflects the Court's intention to permit Plaintiffs to replead their case against Deloitte "upon curing the deficiencies" in the CAC. Deloitte's reasoning negates this intent, and the authorities that Deloitte cites to argue that an amendment does not "relate back", even "where a dismissal was 'without prejudice,'" (Def. Mem. at 17), wholly miss the point. Plaintiffs do not contend that the statute of limitations was tolled because the dismissal was "without prejudice." Plaintiffs claim that the statute *stopped running* for this case when Deloitte was sued. Because the decision dismissing the claims against Deloitte was non-final, the decision did not terminate the action against Deloitte and Deloitte's dismissal may be "revised" or "reconsidered" upon Plaintiffs' "curing the deficiencies" in its complaint -- based upon new evidence discovered in the course of this lawsuit. As a result, the CAC was timely filed and the SAC "relates back" under Fed. R. Civ. P. 15(c)(2), because it involves the same "conduct, transactions or occurrences", and thus Plaintiffs' claims against Deloitte are timely.

Dated: July 18, 2007                    Respectfully submitted,

                                      */s/ David R. Scott*

                                      SCOTT + SCOTT, LLP
David R. Scott, Fed. Bar No. CT16080
Erin G. Comite, Fed Bar No. CT24886
Mark V. Jackowski
108 Norwich Avenue
P.O. Box 192
Colchester, CT  06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432

SCOTT + SCOTT, LLP
Beth A. Kaswan
75 Rockefeller Plaza
19th Floor, Suite 1915
New York, NY 10019
Telephone:  (212) 710-1040
Facsimile:  (212) 710-1041

SCOTT + SCOTT, LLP
Geoffrey M. Johnson
33 River Street
Chagrin Falls, OH 44022
Telephone:  (440) 247-8200
Facsimile:  (440) 247-8275

**Co-Lead Counsel**

JOHNSON & PERKINSON
Dennis J. Johnson
Jacob B. Perkinson
Eben F. Duval (phv01237)
1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403
Telephone: (802) 862-0030
Facsimile: (802) 862-0060