UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| IN RE: PRICELINE.COM, INC. SECURITIES LITIGATION | : : : : : | MASTER FILE NO. 3:00-CV-01884 (AVC) |
| This document relates to: | : : | July 18, 2007 |
| ALL ACTIONS | : : : | |

DECLARATION OF BETH A. KASWAN

I, Beth A. Kaswan, pursuant to 28 U.S.C. § 1746 declare, under penalty of perjury, that the following is true, to the best of my knowledge and belief.

1.      I am Of Counsel to Scott + Scott LLP, one of the lead counsel in this case. I make this declaration in further support of Plaintiffs' motion for leave to serve and file a second amended complaint.

2.      I have been actively involved in reviewing the workpapers and other files produced in discovery by Deloitte and Touche LLP ("Deloitte") in this case, and am familiar with the documents used to plead Deloitte's scienter in the proposed Second Amended Complaint (the "SAC"). I am also familiar with the various accounting guidances and auditing standards cited in the SAC.

3.      Attached as Exhibit 1 is a true copy of the Statement of Financial Accounting Concepts ("SFAC") No. 5, a highly authoritative accounting requirement in the hierarchy of accounting literature. Paragraphs 83 and 84 address "Revenues and Gains" and require, *inter alia*, that, "Revenues are not recognized until earned," and that, "If services are rendered or rights to use assets extend continuously over time . . . revenues may be recognized as earned as time passes."

4.      Attached as Exhibit 2, is a true copy of SEC Staff Accounting Bulletin ("SAB") 101, on "Revenue Reconition in Financial Statements." SAB 101 provides guidance on the application of SFAC No. 5, and on page 8, in response to question #5, addresses situations where "nonrefundable fees" are paid "upon entering into arrangements," that "may ostensibly be received for conveyance of a license or other intangible right." The SEC then describes examples where, the "initial fees may, in substance, be wholly or partly an advance payment for future products or services," such that "the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package." According to the SEC, under SAB 101, when this occurs, the up-front fees, "generally should be defined and recognized systematically over the periods that the fees are

earned." This is the accounting theory the Plaintiffs have relied upon in drafting the new section in the SAC, Section IV-F, "The Evolving Intent and Accounting for the Webhouse Transaction," ¶¶68-104, relating to Deloitte's scienter.

5.     Exhibit 3 is a true copy of a document produced by Deloitte in response to a subpoena served by Plaintiffs on Deloitte in December 2004. All documents with a Bates number beginning "D&T" were produced by Deloitte. This document, which purports to be a January 27, 2000 letter from Deloitte to Priceline's Board of Directors (the "Board") issued in connection with Deloitte's audit of Priceline's 1999 financial statements, in Appendix A, describes the history and significance of SAB 101:

> The SEC issued Staff Accounting Bulletin No. 101 in December of 1999. SAB101 summarizes certain SEC staff views on the accounting for the recognition of revenue. The SEC provided this guidance due, in part, to the large number of revenue recognition issues that registrants encounter. For example, a March 1999 report entitled *Fraudulent Financial Reporting:  1987-1997 An Analysis of U.S. Public Companies*, sponsored by the Committee of Sponsoring Organizations (COSO) of the Treasury Commission, indicated that over half of financial reporting frauds in the study involved overstating revenue.

Deloitte's letter to the Board further reports that Deloitte has "reviewed the guidance provided by SAB 101 with [Priceline] managers and have incorporated this guidance in performing our audit procedures."

6.     Exhibit 4, produced by Deloitte, purports to be a schedule outlining certain SAB issuances, including SAB 101. It notes that SAB 101, "[A]ddresses SEC's concerns regarding completion of the earnings process for purposes of revenue recognition," and that "[O]verstatement of revenues has been a major factor in SEC enforcement cases." The term "SEC enforcement" generally refers to fraud rather than compliance matters.

7.     Exhibit 5 purports to be a December 6, 1999, memoranda prepared by Thomas Restivo, the audit manager for Deloitte's 1999 audit of Priceline.   The document reflects that Restivo consulted with Phil Callif in Deloitte's National Office regarding "newly released SAB 101." According to other documents produced by

Deloitte, Callif is one of the two National Office experts who advised Deloitte's auditors, including Restivo, for the 1999 Priceline and Webhouse audits, and particularly for the accounting treatment for the Webhouse warrants.

8.    Exhibit 6 is a true copy of a memorandum dated September 19, 1999, from Paul Francis, then Priceline's Chief Financial Officer ("CFO"), that was produced to Plaintiffs by Priceline after Judge Squatrito lifted the discovery stay.    The memorandum is addressed to Priceline's Board and outlines a proposed structure for a transaction for Priceline to expand into the groceries business.    As the memorandum states:

> *Priceline.com ("priceline") is proposing to enter into a licensing agreement* with an affiliated company called Priceline Web House Club ("WHC") *pursuant to which Priceline will license its name and intellectual property* related to the priceline business model *in return for a warrant* to acquire approximately 75% of the fully diluted capitalization of WHC (the "priceline warrant")… [Emphasis added.]

Francis, in this memoranda, stated that the consideration for the issuance of the Webhouse warrants also included agreements for marketing and technology sharing, and reported that he had discussed the accounting ramifications of issuing the warrant with Deloitte.

9.    Exhibit 7 is a true copy of a document produced by Priceline dated September 19, 1999 and purporting to be Resolutions of the Priceline Board approving the Webhouse Transaction. Board approval of the Webhouse Transaction, as the transaction was described in Francis' September 19, 1999 memorandum, Exhibit 6, was memorialized in the Resolutions, (which specifically cross-referenced Francis' September 19, 1999 memorandum).

10.    According to documents produced by Deloitte, after the September 1999 Board approval, Priceline's lawyers and Deloitte accountants, including the Priceline auditors and tax consultants, worked closely to draft language for the six contracts, all

eventually dated October 26, 1999, to effectuate the transaction described in Francis' memo.

11.    Exhibit 8, produced from Deloitte, reflects that in September 1999, Restivo received Sherman & Sterling draft term sheets dated September 24, 1999 for the various contracts for the Webhouse Transaction. According to Exhibit 9, Restivo and the 1999 Priceline audit partner, Robert Bass, billed Priceline $63,500 for "consultation on various accounting issues through October 16, 1999." According to Exhibit 10, the Webhouse audit partner, Andrew Wallace, billed $25,000 for time spent before October 15, 1999 on "various reviews of the term sheets for Priceline Webhouse Club, the Priceline Webhouse Club 1999 Omnibus Plan, and initial discussions relating to revenue recognition issues." And, according to Exhibit 11, Deloitte tax consultants billed $35,000 for tax services provided from September 19, 1999 through October 16, 1999 in connection with, "research, analysis and preparation for meetings related to the potential income and loss recognition for" the airline and Webhouse Club warrants. According to Exhibit 12, by the time of the completion of the 1999 audit, the Priceline auditors billed $129,946 for "professional services" relating to, *inter alia*, the "Priceline Webhouse Club warrant, contract and accounting," which was over and above the $190,000 charged for the Priceline 1999 audit.

12.    Deloitte produced lined drafts of the various Webhouse transaction agreements, prepared by the law firm, Sherman and Sterling, that all had dates of October 26, 1999. Exhibit 13 and 14 purport to be drafts of the Webhouse warrant agreement and services agreement, respectively.

13.    Exhibit 15 purports to be notes with a date of October 18, 1999, memorializing conversations with Bob Mylod and Paul Francis about the language of the "intent" to be inserted into the Webhouse warrant agreements -- that the warrants were for "*property* (not services)."

14.    Exhibit 16 purports to be an October 20, 1999 memorandum prepared by Restivo to Jodi Dottori of Priceline advising her of the language which needed to be included in the Webhouse warrant agreement and in the Webhouse license agreement. By this memoranda, Restivo also provided to Priceline proposed journal entries for Priceline's accounting for the Webhouse warrants. These journal entries reflect that revenue for the Webhouse warrants would be recognized over the period of the Webhouse license, rather than being immediately recognized (as ultimately occurred).

15.    Exhibit 17 purports to be a memorandum dated October 20, 1999 prepared by Deloitte's tax consultants reporting as the "Facts," that Webhouse, "will issue to Priceline.com ("Priceline") *a warrant in exchange for* an intellectual property patent and trademark license. (Emphasis added).

16.    Exhibit 18 purports to be a November 8, 1999 memorandum to the file by Robert Bass, the audit partner for Priceline's 1999 audit. Bass describes that, among other things, he, and the audit partner for Webhouse's 1999 audit, reviewed all the drafts of the Webhouse agreements, and that they concluded that, "as to the [Webhouse] warrant we believe as long as the warrant meets the guidelines of [ETIF] 96-18 and requires no future services to be rendered, is fully vested upon grant, cannot be forfeited and is exercisable in a reasonable period of time, *then Priceline can recognize income when the warrant is received* . . . (Emphasis added).

17.    Exhibit 19 is a copy of a document produced by Deloitte purporting to be Priceline's January 27, 2000 press release announcing its fourth quarter 1999 earnings. The press release includes an income statement that reflects that Priceline recognized $189 million of income for the Webhouse warrants during fourth quarter 1999. The income statement reflects that Priceline offset the costs of the stock warrants Priceline issued to airlines with the revenues from the Webhouse warrant it recognized. In Def. Mem. at 41, fn. 34, Deloitte contends that Priceline's accounting for the airline warrants was more conservative than that suggested by Plaintiffs. In fact, however, Priceline took

a far more aggressive position in interpreting the facts to recognize the costs on its financial statements than it did for income tax purposes -- for 1999 federal tax purposes, Priceline reported (and Deloitte's tax accountants approved) that the airline warrants had a cost of $2 billion.

18.    Exhibit 20 is a true copy of Deloitte's audit opinion that was included within Priceline's 1999 Form 10-K.  The opinion is dated January 27, 2000 (which generally means that that is the date that the audit fieldwork was completed), and March 17, 2000 as to the matters described in footnote 15 to Priceline's financial statements -- so that the audit opinion was necessarily issued to Priceline on or after March 17, 2000.

19.    Exhibit 21 is a true copy of a document produced by Deloitte from its Webhouse audit files dated February 22, 2000 and purporting to be prepared by the audit managers for both the 1999 Webhouse and Priceline audits.  The memorandum contains a "note" that Phil Callif and Greg Tomlinson of Deloitte's national office disagreed with the auditors' analysis for the immediate revenue recognition by Priceline (and expense by Webhouse) for the Webhouse warrants.  According to the national office, the language in the agreements whereby the warrant was tied to the licensing agreement did not support up-front accounting treatment.  According to the memoranda, the National Office would, however, approve Priceline's accounting if the transaction agreements were retroactively altered:

> National Office agreed immediate revenue/expense accounting treatment of the warrant in 1999 would be appropriate if the agreements were subsequently changed to remove the above language [tying the warrants to the licensing agreement] from the agreements.  PL and WHC are in the process of removing such language and we obtained a representation from both Company's [sic] noting such intent (A/2351) which is acceptable to National Office.

20.    The February 22, 2000 memorandum was not included in the audit workpapers for the 1999 Priceline audit workpapers produced to Plaintiffs.

21.     A file was produced to Plaintiffs by Deloitte labeled "7180 Webhouse Warrant," which, from its context, appears to be audit workpapers for the 1999 audit of Priceline.  Excerpts of this file are attached as Exhibit 22.  The page, D&T0000455, bears the handwritten notation, "WH-Intent"; immediately following this page is an executed statement entitled "Webhouse Warrant-Documentation of Intent."  No date appears on this statement, which represents that, "[T]he 'Priceline Warrant' . . . was issued solely as an inducement for Priceline to enter into a relationship with Webhouse . . .," and "We are in the process of amending certain agreements that were entered into by the undersigned as of October 26, 1999 so that they accurately reflect the original intent and substance underlying the issuance of the Priceline Warrant."

22.     Exhibits 23 and 24 dated April 14, 2000 and May 2000, respectively, purport to be unsigned drafts of the statement described above.  Thus, the final signed statement included in the Priceline 1999 audit workpapers as the audit evidence of the "Intent" for the Webhouse Transaction, may be inferred to have been prepared long after the conclusion of the 1999 Priceline audit and the issuance of Priceline's audit opinion for the 1999 audit.  Based upon the attachments to the Declaration of William MaGuire, the April and May *drafts* of the statement were not included in Priceline's audit work papers.  That drafts were included in the Webhouse audit files, but not in Priceline's, merely reinforces the inference that the Priceline auditors sought to cover-up that the audit evidence used to justify the unqualified Priceline audit opinion was first prepared *after* the Priceline opinion was issued.  So that Plaintiffs are not making a "tempest in a teacup" (Def. Mem. at 49) about the suspect nature of this audit evidence.

23.     Exhibit 25 is a document purporting to be the management "Representation Letter" for the 1999 audit that is signed by Priceline managers and directed to Deloitte.  It includes, at ¶ 39, the representation that,

> "*as an inducement to enter into a relationship with Webhouse, priceline received a warrant* to purchase a majority of the shares of Webhouse common stock. The warrants are non-forfeitable, fully vested upon grant, exercisable in five years or earlier upon the occurrence of certain events, and do not require the performance of any additional services.

24.    Exhibit 26 is a memorandum purporting to be prepared by Restivo to Greg Tomlinson and Phil Callif. At the end of the memorandum are two "Updates". The last update states that, "we will include a representation as to the intent of the agreement in the management representation letter and request that such intent be incorporated and reflected into the underlying agreements."

25.    Exhibit 27 is a memorandum dated March 15, 2000 purporting to be prepared by Restivo that includes a summary of Deloitte's audit procedures and results. Paragraph 9 reflects that Deloitte, "include[d] a representation in the management representation letter mirroring the language contained in Note 11 regarding the [Webhouse] transaction." Footnote 11 to the Priceline financial statements included in its 1999 Form 10-K includes language which is identical to the above-quoted language in the management representation letter (Ex. 25). Thus, according to exhibits 25, 26 and 27, Deloitte drafted the language that represented that "as an inducement to enter into a relationship with Webhouse," Priceline had received the Webhouse warrant, that was included in Priceline's published financial statements that Deloitte audited.

26.    Exhibit 28, are excerpts of what purports to be an unsigned copy of a Webhouse warrant agreement, that had been "amended and restated" as of December 31, 1999, which was produced in discovery by Priceline; no such document was produced by Deloitte. No executed copies have been produced by Priceline, Webhouse or Deloitte, and Plaintiffs have not located any Board minutes or resolutions of either

Priceline or Webhouse authorizing this back-dated and "restated" warrant agreement. The unsigned agreement includes the following language relating to the supposed consideration for the Webhouse warrant (at PCLN 000100330):

> *WHEREAS, as an inducement to Grantee to enter into this Agreement*, Issuer hereby desires to grant, and Grantee desires to accept, upon execution of this Agreement, a warrant to purchase up to 137.5 million shares of Common Stock and certain rights to participate in Issuer's corporate governance: *Issuer acknowledges and agrees that the inducement is non-forfeitable and non-refundable* by Grantee, is fully vested upon grant, *does not require Grantee to perform any acts or services other than to enter into discussions with Issuer for Grantees potential participation with Issuer in Issuer's business; and is not contingent upon the successful negotiation of any business relationship* or agreement between the parties hereto, including without limitation, the negotiation and/or execution of an agreement for Issuer's participation in the Grantee's services.

This language reflects the strained nature of the theory that Deloitte had devised for justifying Priceline's accounting treatment for the Webhouse warrants.

27.    Exhibit 29 is an excerpt from the draft of Priceline's Form 10-K for the year ended December 31, 2000 that was produced by Deloitte. Apart from the handwriting on the second page (apparently added by a Deloitte auditor), the language under the heading "Write-off of Webhouse Club Warrant" is the same as in the final filed version of the 2000 Form 10-K. Apparently, the auditor, for the 2000 audit, by his note, is noting the impropriety of the 1999 accounting treatment, based upon the following statement Priceline included in the 2000 Form 10-K:

> "On October 5, 2000, the Priceline Webhouse Club, Inc., a privately-held licensee of ours announced that it would be ceasing operations. In the *fourth quarter 1999, we received a warrant in Webhouse in exchange for services rendered and, upon receipt of the warrant, recognized approximately $189 million of income...*"

(Emphasis added).

Next to this statement, the handwritten notes ask, "Why did the Company recognize income in 1999?  Is the accounting treatment correct?"  No follow up response to this question was included in the year 2000 audit workpapers produced by Deloitte to Plaintiffs.

28.      With respect to Deloitte's statute of limitations defense, Plaintiffs dispute that Deloitte has timely produced its files since being served with a subpoena in December 2004.  (Exhibit 30).  As described in the Declaration of Jacob B. Perkinson, two-thirds of the documents produced by Deloitte were produced 18 months after the December 3, 2004 subpoena to Deloitte to produce its documents.  And Deloitte continues to withhold the audit workpapers it relies upon for its defense that the accounting treatment for the Webhouse warrants was based on the earlier accounting for the Delta warrant.  (Def. Mem. at 5).

29.      Upon my review of certain loose letters produced by Deloitte that reflect part of the communications between Priceline and its counsel and the SEC in February and March 1999, about the accounting for the Priceline stock warrants issued to Delta Airlines in December 1998, I made a request to Deloitte's counsel to produce Deloitte's files relating to Priceline's restatement of its 1998 financial statements.  As reflected in the letter dated March 26, 2007 (Exhibit 31), Deloitte refused on the grounds that, "The restatement relates to periods prior to 1999, and outside the applicable discovery period."  In fact, the restatement occurred in 1999 and the restatement documents are called for by the subpoena issued to Deloitte, see Request No. 1(a), (b), (e), (f), (g) and (l).  As Priceline's Registration Statement for its Initial Public Offering ("IPO") filed

March 31, 1999 reflects, the 1998 restatement covered changes to the 1998 accounting for the Delta airline warrant (Exhibit 32).   In footnote no. 32 to the 1998 financial statements included in the March 1999 Registration Statement, under the heading "Restatement", Priceline reported that it had restated its 1998 income for, *inter alia*,  its accounting for the Delta warrants -- which presumably occurred at some point in 1999 after Priceline first reported its earnings for the year ended December 31, 1998.

30.     Deloitte has submitted selected portions of communications with the SEC as proof of the legitimacy of its accounting for the Webhouse warrant, while withholding the remainder of these communications as relating to periods "prior to 1999".   See Exhibits B, C and D to the Declaration of William R. McGuire.   Thus, despite Deloitte's protestations that it has been forthcoming in discovery, to this day Deloitte is withholding audit files which it contends are critical to the evaluation of the accounting for the Webhouse warrants.

31.     Exhibit 33 purports to be a "Client Service Satisfaction Assessment" prepared for the audit of the 1999 financial statements of Webhouse (which includes the accounting for the Webhouse warrant).   This document strongly suggests that Deloitte's independence as an auditor was compromised, as it reports the views of Webhouse's controller that Deloitte, "helped the Company meet their objectives through creative solutions to their accounting, internal control and tax issues," and that the Company "is receiving value for its money."

32.     The American Institute of Certified Public Accountants ("AICPA") publishes United States Auditing Standards that are considered part of GAAS.   Exhibit 34 is a true copy of the AICPA publication on AU Section 220 on auditor independence,

and Exhibit 35 is a true copy of the AICPA publication on AU 230A on the requirement for Professional Care in the Performance of Work by an auditor.

33.     Exhibits 36 and 37 are excerpts of original complaints filed in this case which show that Plaintiffs performed "some inquiry" of the facts of this case as early as October 2000. The Consolidated Amended Complaint ("CAC"), at ¶237, also describes, in summary fashion, the investigation Plaintiffs undertook between October 2000 and October 2001 for pleading this case.

Dated:  New York, New York
        July /6, 2007

Beth A. Kaswan
Scott + Scott, LLP
75 Rockefeller Plaza
19th Floor, Suite 1915
New York, NY 10019
Telephone:  (212) 710-1040
Facsimile:  (212) 710-1041

- 12 -