# EXHIBIT 6

00000376253

Memorandum

To: Priceline.com Board of Directors

From: Paul E. Francis

Re: Proposed Structure of Priceline Web House Club, Inc.

Date: September 19, 1999

    Priceline.com ("priceline") is proposing to enter into a licensing arrangement with an affiliated company called Priceline Web House Club ("WHC") pursuant to which priceline will license its name and intellectual property related to the priceline business model in return for a warrant to acquire approximately 75% of the fully diluted capitalization of WHC (the "priceline Warrant") after giving effect to anticipated future financing rounds. WHC is presently owned by Walker Digital Corporation, which has developed the WHC business and will be an investor in WHC's initial round of financing. The priceline Warrant, and the relationship between priceline and WHC, will be structured in a manner that will not require priceline to include the results of WHC in its financial statement unless and until it exercises the Warrant.

    This memorandum provides background on the WHC business plan, priceline's reasons for electing this ownership structure and business development model, the anticipated capital structure of WHC and certain key terms of various agreements between priceline and WHC.

Summary Description of the Priceline Web House Club Business

    The priceline Web House Club extends the priceline business model to the sale of groceries and health and beauty products typically sold in supermarkets and pharmacies. Although the exclusive field of use in the initial license between priceline and WHC is limited to these product categories, WHC will have a nonexclusive license to expand WHC's scope to cover other retail products such as hard goods, white goods and other retail products.

    WHC initially will offer consumers the ability to name their own price for approximately 150 categories of products, which are listed on Exhibit A. These categories account for well over half of the average total purchase in a supermarket. If the customer's offer is accepted by WHC, the customer will pick up the goods at a participating retailer. Nearly every major supermarket chain in the New York metropolitan area, where WHC will be launched in late October, has agreed to participate in the WHC program. WHC transactions will be settled at the supermarket with a "priceline Web House Club" card, which will act like a credit card from the standpoint of the retailer.

WHC customers will be offered multiple brands within each category, and must be willing to accept at least two brands (i.e., the customer may veto certain brand options). Customers will be allowed to have 50% of each offer comprised of WHC "Bonus Dollars". Customers will receive ten free Bonus Dollars for activating their Web House Club payment card and will earn additional Bonus Dollars by agreeing to accept adaptive marketing or "Sponsor Program" offers. The Web House Club site will provide customers with the estimated price of the target item. On average, customers are expected to offer approximately 71% of the shelf price in cash, plus Bonus Dollars in many cases.

WHC will pay the retailer the full amount of the shelf price. WHC expects to make up the difference between the amount of the customer's offer and the shelf price and realize a profit from four revenue sources: (i) payments from manufacturers, (ii) payments from Sponsor, (iii) membership fees (after a free introductory period) and (iv) credit card interchange fees.

Attached as Exhibit B is a summary financial model showing the expected revenue contribution from each of these sources. For the year 2000, the percentage of *cost of revenues* (i.e., shelf price) accounted for by each revenue source is as follows: customer offer: 66.2%, manufacturer payments: 15.0%, sponsor payments: 28.4%, membership fees: 0% (in year one), and interchange payments: 0% (in year one). This results in year 2000 gross margin of 8.7%.

WHC will launch in the New York metropolitan area in late October 1999. The business will extended to other parts of the country starting in early 2000. The pace of the roll-out will be dictated by the pace of adoption of the WHC business model in the New York area and the degree of logistical support at the retailer level as indicated by the New York launch.

The proposed financing plans and capital structure for WHC are described below.

Benefits to Priceline of the Affiliate Licensee Structure

The organizational and capital structure of WHC evolved from three interrelated ideas:

- *First, a conviction that WHC could only be rapidly and effectively developed in an entrepreneurial environment without hindering the expansion of priceline's existing business lines.* The entrepreneurial structure of the WHC development model required it to recruit its own management team with equity incentives typical of a start-up company. WHC has been rapidly developed without many of the organizational structures and disciplines that are now necessary within priceline. Although WHC coordinated its development efforts with priceline in anticipation of receiving a priceline license, WHC had significant freedom to make technology, marketing and financial decisions unconstrained by previous choices made by priceline.

00000376253

- *Second, a belief that shifting development risks to third parties while retaining an option to buy gives priceline the opportunity of a substantial return for a low financial risk and permits the most aggressive exploitation of the WHC market opportunity.* WHC is a revolutionary application of the priceline business model. While there is substantial upside opportunity, there are significant risks as well. Priceline management believes that the risk of loss in these businesses is more suitably borne by outside investors. Nevertheless, the value of the priceline brand and business model are such that priceline can retain for its shareholders the right to acquire approximately 75% of the equity of WHC in the future in return for allowing WHC to license the priceline name and business model.

- *Third, a point of view that the development of these businesses could best be maximized outside of a public company.* Priceline believes that financial discipline and visible financial progress are part of the responsibility of being a public company. The nature of entrepreneurial enterprises that have large opportunities, but which also must incur enormous costs before achieving financial stability, are incompatible with the needs of public stock market investors. Moreover, the disclosure requirements that WHC would face as part of a public company would require it to reveal too much proprietary information before it had consolidated its market position.

Based on these perspectives, WHC was incubated within Walker Digital with a plan to organize and capitalize it as an independent company when it was ready to be launched as an operating business. Walker Digital is currently developing one other business, called "Perfect Yard Sale", that it expects will seek a license from priceline prior to launch early next year. Perfect Yard Sale is a consumer-to-consumer business based on the name your price model. It is expected that the capital and corporate structure of Perfect Yard Sale will be similar to that of WHC. While some administrative support services have been provided to PYS and WHC pursuant to the Walker Digital and Priceline Intercompany Agreement, priceline has not directed their development activities or yet agreed to the use of the priceline name or "name your price" business model. Jay Walker, in his role as Chairman of Walker Digital, has been the driving force in the strategic development of both PYS and WHC and has funded their development through Walker Digital Corporation.

## Proposed Financing and Capital Structure

WHC has received verbal commitments from several investors to invest in WHC at approximately a $500 million pre-money valuation, or $3.00 per share. These investors and the amount of their commitment include: Walker Digital Corporation--$30 million, Vulcan Investments--$30 million, Goldman Sachs & Co.--$5 million, Jon Otto (the CEO of WHC)--$2 million and Wit Capital--$1 million.

Confidential

PCLN000093008

00000376253

The initial and fully diluted capitalization of WHC are expected to be as follows (shares and $ in thousands except per share amounts):

| Investor | Initial Ownership | | | |
|---|---|---|---|---|
| | $ per Share | Shares | Total $ | % Owned |
| Walker Digital | $3.00 | 10,000 | $30,000 | 44.1% |
| Vulcan Investments | $3.00 | 10,000 | $30,000 | 44.1% |
| Other First Round Investors | $3.00 | 2,667 | $8,000 | 11.8% |
| Management Options | $3.00 | 0 | $0 | 0.0% |
| Priceline Warrant | $3.00 | 0 | $0 | 0.0% |
| Second/Third Round Investors | $16.00 | 0 | 0 | 0.0% |
| **Total** | | 22,667 | $68,000 | 100.0% |

| Investor | Subsequent Ownership | | | |
|---|---|---|---|---|
| | $ per Share | Shares | Total $ | % Owned |
| Walker Digital | $3.00 | 10,000 | $30,000 | 5.45% |
| Vulcan Investments | $3.00 | 10,000 | $30,000 | 5.45% |
| Other First Round Investors | $3.00 | 2,667 | $8,000 | 1.45% |
| Management Options | $3.00 | 17,333 | $52,000 | 9.45% |
| Priceline Option | $3.00 | 137,500 | $412,500 | 75.0% |
| Second/Third Round Investors | $16.00 | 6,250 | $100,000 | 3.4% |
| **Total** | | 183,750 | $632,500 | 100.0% |

4425.1 10/28/99 10:05:17 AM

00000376253

WHC anticipates closing its first round of financing in approximately 30 days. The funds from the first round financing are expected to provide sufficient funding through approximately April 2000. WHC's plan is to complete the stage two financing in January, based on the preliminary results of the New York roll-out. The capitalization shown above assumes that these results would support an increase of the stage one valuation to $12.00 per share. WHC is planning to raise $50 million in the second stage financing by issuing 4.167 million shares.

The third stage financing would occur by the fourth quarter of 2000. The capitalization shown above assumes that by then the WHC the business model will be demonstrating significant traction to justify a valuation of approximately $4 billion, which was the valuation of Webvan's last private equity round. The capitalization shown above assumes that WHC would raise $50 million by issuing 2.083 million shares at $24.00 per share. We anticipate that the third stage financing would provide sufficient capital to support the business until approximately mid-2001, by which time the business is projected to be operating at a break-even level.

If more capital is needed, or if the valuations are lower than shown above, priceline's fully diluted ownership upon exercise of the Priceline Warrant would be less than the amount shown above. Priceline Warrant, once exercisable, can be exercised in whole or in part, for either priceline stock at fair market value or for cash. To the extent priceline elected to exercise its warrant before the subsequent financings, its fully diluted ownership could be greater than that shown above.

Terms and Conditions of the Priceline Warrant

In consideration of entering into the Trademark and Intellectual Property License and the other agreements described below, priceline will receive a warrant to acquire 137.5 million shares of common stock at a price of $3.00 per share. The priceline warrant will be exercisable only upon the occurrence of one of the following events: (i) WHC achieves net revenue of an agreed upon threshold (currently expected to be between $300 million and $500 million) for any trailing four quarter period or such shorter period of time needed to reach such minimum threshold in revenue; (ii) WHC files a registration statement for an initial public offering or approves a business combination; or (iii) WHC files for bankruptcy or undergoes a reorganization or similar event. The exercise price of the warrant will be payable in cash or priceline.com stock at fair market value at the time of exercise. The warrant will expire on the fifth anniversary of the date of issue unless previously exercised.

We have been informed by our auditors, Deloitte & Touche, that the existence of the warrant will not result in consolidation by priceline.com provided that exercise of the warrant is not within priceline's sole discretion or otherwise certain of exercise. The existence of performance thresholds to exercise and the substantial exercise price validate the contingent nature of the warrant. We do not expect priceline.com to recognize income for tax or GAAP reporting purposes upon receiving the WHC warrant due to its

4425.1 10/28/99 10:05:17 AM

Confidential

PCLN000093010

contingent nature. At the time of exercise, priceline.com will have income equal to the difference between the fair market value of WHC and the exercise price.

Corporate Structure and Governance

Priceline Web House Club, Inc. has been established as a Delaware corporation. Walker Digital Corporation will contribute the assets that it has acquired or developed relating to the WHC business to this corporation upon signing a Subscription Agreement and related documents. The Board of Directors of WHC will be comprised initially of one director nominated by Walker Digital, Jon Otto, the CEO of WHC, one director nominated by priceline, and two outside directors who are approved by the financial investors.

In the absence of legal control of a majority of shares, the test for consolidation under GAAP is whether the reporting entity has "effective control" over another entity. A FASB Exposure Draft dated October 16, 1995 titled "Consolidated Financial Statements: Policy and Procedures" provides guidelines for the determination of whether consolidation is required. The Draft states:

> "The existence of control generally is apparent when it results from legal means, but in other circumstances determining whether effective control exists usually requires a careful consideration of the relevant facts and circumstances." (Paragraph 14)

The factors cited as evidence of control include a large minority voting interest where no other party has a significant interest, an ability to nominate a majority of the Board of Directors, the ability to convert securities with a majority of voting interest *at the option of the holder* (i.e., this test would not be applicable to the priceline warrant due to its contingent nature) and other subjective factors. Among these subjective factors are "[e]stablishing the controlled entity's policies as well as its capital and operating budgets" or "[s]electing, determining the compensation of, and terminating personnel responsible for implementing its policies and decisions."

The corporate structure and governance of WHC would not trigger any of these tests. The proposed corporate structure would not give priceline effective legal control. WHC's corporate governance structure similarly would not result in consolidation by priceline. WHC would have its policies and budgets established by its own Board of Directors, who would also be ultimately responsible for WHC's personnel decisions.

**In order to achieve priceline's objective that the results of WHC not be consolidated in priceline's financial statement prior to the exercise of the priceline Warrant, priceline needs to accept that it will not have "effective control" over WHC, which will operate as an independent company managed by its own Board of Directors and officers.** Although priceline will not have control over WHC, it will have the customary protections of a licensor in connection with the use of the priceline name and business model. It will also have certain "supermajority" protections, including a

4425.1  10/28/99 10:05:17 AM

Confidential

PCLN000093011

00000376253

requirement that priceline's approval be obtained for a sale or initial public offering of WHC within three years of formation.

Licensing, Marketing and Technology Sharing Agreements

Priceline.com and WHC will enter into a Trademark and Intellectual Property Licensing Agreement pursuant to which priceline.com will grant WHC a license to use the priceline core patent and related intellectual property, as well as license the use of the priceline trademark. The terms of the license have not been finalized and are subject to review by the financial investors. It currently is contemplated that a royalty fee will be paid by WHC to priceline in the amount of 0.5% on the first $500 million in annualized revenues, increasing to 1.0% on revenues in excess of $1 billion on an annualized basis.

The Trademark Licensing Agreement will contain customary provisions limiting the use of priceline intellectual property by WHC. These restrictions are required for priceline.com to preserve its legal rights with respect to intellectual property. Such controls will not be deemed to give priceline "effective control" over WHC.

The Marketing Agreement will also contain provisions customary in a franchising or licensing relationship giving priceline control over the use of its name. However, the marketing plans will remain within the control of WHC. It is possible that the Marketing Agreement will require WHC to pay a fixed amount or a sliding scale of revenues to priceline.com to support brand advertising that includes the WHC Web House Club. Commitments for product advertising, however, will be managed by WHC.

Attached as Exhibit C are terms sheets describing the proposed terms of these Agreements and other legal agreements related to the priceline warrant and the formation and governance of WHC. **These term sheets have not been finalized and are subject to change pending further negotiations between priceline and WHC and pending input from WHC's financial investors.**

Priceline Merchandise Financial Projections

Financial Projections for WHC are attached as Exhibit D. The current business plan contemplates the launch of WHC in the New York metropolitan area in November. By January, if the early reads on the New York launch are encouraging, the business will gradually be rolled out to adjacent markets such as Philadelphia and Boston. The business could be rolled out more aggressively if results in the New York market warrant it or if the Board of Directors of WHC believes it advisable for other strategic reasons. The current base case contemplates year 2000 revenues of $506 million, with gross profit of $42 million and an operating loss of $47 million.

4425.1 10/28/99 10:05:17 AM