# EXHIBIT 8

*PbL*    *New Agreements*    — *these acq*

*3-01*

— *option*    *TR 9/88.*

S&S DRAFT: 9/24/99

# TERM SHEETS OF
# AGREEMENTS FOR
# PRICELINE WEBHOUSE CLUB, INC.

**TERMINOLOGY:**

The following terms are used herein with the meanings set forth below:

- "*Board*": The Company's board of directors.

- "*Common Stock*": The Company's common stock, par value $.01 per share.

- "*Company*" or "*Webhouse*": Priceline Webhouse Club, Inc.

- "*Goldman Sachs*": Goldman Sachs [      ], L.L.P.

- "*Investors*": Vulcan Ventures, Goldman Sachs, WIT Capital, Walker Digital, Jon Otto, the private investors and any subsequent purchasers of Common Stock, other than employees.

- "*Priceline*": priceline.com Incorporated.

- "*Priceline Warrant*": The warrant to be issued by the Company to Priceline pursuant to the Warrant Agreement.

- "*Securityholders*": The Investors and Priceline.

- "*Shares*": Shares of Common Stock.

- "*Outside Investors*": Vulcan Ventures, Goldman Sachs, WIT Capital, the private investors and any subsequent purchasers of Common Stock not affiliated with Priceline or Walker Digital.

- "*Vulcan Capital*": Vulcan Ventures, Inc.

- "*WIT Capital*": WIT Capital [Corporation].

NYDOCS02 474163 11

CONFIDENTIAL

D&T 0022411

CAPITALIZATION:

- *Authorized Capital:* The Company's authorized capital stock will be 300 Shares.

- *Common Stock:* The Company currently contemplates reserving for issuance up to 300 million Shares: 10 million to be issued to Walker Digital, 10 million to Vulcan Ventures, 1.67 million to Goldman Sachs, 0.67 million to Jon Otto, 0.67 million to private investors and 0.33 million to WIT Capital, all pursuant to the Subscription Agreement described below; 137.5 million to be reserved for issuance upon exercise of the Priceline Warrant described below; 122.5 million to be reserved for issuance in subsequent rounds of investment; and 17.33 million to be reserved for employee options.

- *Priceline Warrant:* The Company will issue a warrant to Priceline. The Priceline Warrant will be exercisable for 137.5 million Shares and will be issued pursuant to the Priceline Warrant Agreement described below.

- *Employee Options:* The Company may issue options on up to 17.33 million additional shares of Common Stock to employees. The employee options will be issued pursuant to the Omnibus Employee Equity Plan described below.



NYDOCS02 474163 11

2

CONFIDENTIAL

D&T 0022412

SUBSCRIPTION
AGREEMENT:

- *Parties:* The Company and the Investors.

- *Capital to Be Raised:* Walker Digital will subscribe for 10 million Shares, Vulcan Ventures for 10 million Shares, Goldman Sachs for 1.67 million Shares, Jon Otto for 0.67 million Shares, certain private investors for 0.67 million and WIT Capital for 0.33 million Shares. Consideration will be $3.00 per share. The amount payable in cash by Walker Digital at the closing will be the selling price for 10 million shares of $30 million less (i) the amount it contributed to the Company in cash prior to the date of the Subscription Agreement and (ii) the book value of the other assets it contributed pursuant to the Asset Contribution Agreement. The other Investors will pay the consideration for their shares in full in cash at closing. Thus, the Company's initial capitalization will be $68.67 million.

- *Conditions:* Consummation of the purchases of Common Stock contemplated in the Subscription Agreement will be subject to customary conditions, including the expiration of any applicable HSR waiting periods.

- *Representations and Warranties:* Each party will make representations and warranties to the other parties with respect to:

  – such party's due organization and authorization to enter into the Subscription Agreement

  – necessary consents and approvals and any conflicts caused by the consummation of the contemplated transactions

  Each Investor will make representations and warranties with respect to such Investor's qualification as an accredited investor or other person to whom the Common Stock can be sold without registration under the Securities Act.

- *Governing Law:* The State of New York.

NYDOCS02 474163 11

3

D&T 0022413

CONFIDENTIAL

**SECURITYHOLDERS'
AGREEMENT:**

- *Parties*: The Securityholders and the Company. Subsequent Investors will sign the Securityholders' Agreement at the time they buy Common Stock.

- *Board of Directors*: The Company's By-laws will provide that the total number of directors may not exceed 9.

Initially, the Board will have 7 members. The Securityholders will agree to vote their shares to elect 1 director designated by Priceline, 1 director designated by Walker Digital, 1 director designated by Jon Otto, 1 director designated by Vulcan Ventures and 1 director designated by Goldman Sachs, all until the expiration of the Priceline Warrant unexercised. The remaining 2 directors will be elected by Vulcan Ventures, Goldman Sachs, WIT Capital and Jon Otto (voting on an equal basis without reference to proportionate share ownership); provided that both such directors must qualify as "independent directors," as defined in NASD Rule 4200(a)(14), but substituting the word "affiliate" for "subsidiaries."

If Priceline exercises any portion of the Priceline Warrant such that it shall thereafter hold a majority of the outstanding Shares, the Board will be expanded to 9 members: Priceline will have the right to designate up to 5 directors; Walker Digital 1 director; Jon Otto 1 director; the Outside Investors (voting cumulatively in proportion to share ownership) 2 directors.

The Securityholders will also agree to vote, in the event of any vacancy, to elect a substitute director designated by the same person(s) as designated the director vacating office.

All voting agreements with respect to representation on the Board will expire upon the termination of the Priceline Warrant unexercised.

NYDOCS02.474165.11

4

**CONFIDENTIAL**

D&T 0022414

*Management of the Company:* The Company's by-laws will provide that the affirmative vote of the director(s) designated by Priceline is required to approve any of the following actions:



— any business combination or sale of the Company;

— any amendment to the Company's charter or by-laws, including any increase in the number of directors on the Board;

— prior to the third anniversary of the Subscription Agreement, the commencement of an IPO;

— any affiliate transactions other than at fair market value in the ordinary course of business;

— dissolution and winding-up of the Company; or

— the voluntary initiation of bankruptcy, liquidation or other insolvency proceedings.

*Registration Rights:* The Outside Investors and Jon Otto (but not Priceline or Walker Digital) will be entitled to compel the Company to launch its IPO only after the third anniversary of the date of the Subscription Agreement, and only if the Shares held by the Outside Investors demanding an IPO (together with the Shares held by Jon Otto, if he elects to join their demand) represent not less than 25% of the Company's outstanding Common Stock, excluding any shares held by Priceline. All of the Securityholders will be barred from selling Shares in an IPO.

Following an IPO, in addition to piggyback registration rights, Priceline will be entitled to 2 demand registrations and each Investor will be entitled to 1 demand registration. All registration demands will be subject to customary cut-back and black-out period provisions. Priceline may exercise

CONFIDENTIAL

D&T 0022415

its demand registration rights at any time, provided it holds at least 25% of Company's outstanding Common Stock. Each other Securityholder or group of Securityholders, to exercise its demand registration right, must hold 25% or more of the outstanding Common Stock, not counting any Shares held by Priceline.

- *Transfer Restrictions:* The Common Stock will be subject to a lock-up period during which any and all transfers and encumbrances (except for transfers to certain affiliates, trusts, etc.) are prohibited. This lock-up period will run from the date of issuance until the earlier of (i) the third anniversary of the date of the agreement and (ii) 180 days after the completion of an IPO. Between the third anniversary of the agreement and the filing of a registration statement or other public disclosure in connection with an IPO, any sale of Common Stock will be subject to a right of first refusal. Any Shares a Securityholder proposes to sell must be offered first to the Company, then to the Investors *pro rata*, then to Priceline. If less than all offered Shares are purchased by the Company, Priceline and the other Securityholders, the remainder may be sold to a third party.

  All transfer restrictions imposed by the Securityholders' Agreement will terminate 180 days after the Company's IPO, except that the Common Stock will be subject to a 180-day lock-up period following any public offering.

- *Representations and Warranties*: Each party will make representations and warranties to the other parties with respect to:

  – such party's due organization and authorization to enter into the Securityholders' Agreement

  – necessary consents and approvals and any conflicts caused by the performance of the contemplated agreements

NYDOCS02 474163 11

6

**D&T 0022416**

**CONFIDENTIAL**

- *Termination:* The Securityholders' Agreement will remain in effect until:

    – all rights granted thereunder have been used or extinguished;

    – subsequent to the exercise in full of the Priceline Warrant or expiration of the Priceline Warrant unexercised, Securityholders holding more than 50% of the Company's outstanding Common Stock, excluding the Shares held by Priceline, vote in favor of terminating the Securityholders' Agreement at an earlier date; or

    – Priceline obtains control of 100% of the Common Stock;

    provided that no such termination will affect the right of any party to recover damages or collect indemnification for any breach of the representations, warranties or covenants in the Securityholders' Agreement that occurred prior to such termination.

- *Indemnification:* Each of the parties will provide a standard indemnification to the others (i) for breaches of representations, warranties and covenants contained in the Securityholders' Agreement and (ii) for misstatements by such party in connection with a public offering.

- *Governing Law:* The State of New York.

NYDOCS02 474163 11

D&T 0022417

CONFIDENTIAL

**PRICELINE
WARRANT
AGREEMENT:**

- *Parties:* The Company and Priceline.

- *Warrant:* Priceline will have a warrant to purchase from the Company 137.5 million Shares (subject to adjustment as described in "Anti-dilution" below). The warrant may be exercised in whole or in part. In the event of a partial exercise, the warrant will remain exercisable for the number of Shares not previously called.

- *Expiration Date:* The warrant will expire on the earliest to occur of (i) the exercise of the warrant in whole and (ii) the fifth anniversary of the date of the warrant's issuance.

- *Exercise Events:* The warrant will be exercisable only upon the occurrence of one of the following events:

  - the Company achieves net revenues of $300 million for any trailing four-quarter period or such shorter period as is required to reach $300 million;

  - the Company undertakes an IPO or approves a business combination in which more than 50% of the Company's voting stock is transferred;

  - the Company authorizes the liquidation and winding-up of its assets;

  - the Company files for bankruptcy or undergoes a reorganization or other similar event;

- *Exercise Price:* The exercise price of the warrant will be equal to $3.00 per share (subject to adjustment as described in "Anti-dilution" below).

- *Consideration:* The exercise price of the warrant will be payable in cash, Common Stock of Priceline (valued at the weighted average of the closing prices

8

NYDOCS02 474165 11

**D&T 0022418**

**CONFIDENTIAL**

on the 10 business days immediately preceding the exchange). or any combination thereof.

- *Anti-dilution:* To the extent it remains exercisable, the warrant will be modified to neutralize the dilution or concentration of the Company's equity as a result of

  - any stock dividend, stock split, reverse stock split, merger or other recapitalization; or

  - the issuance of Common Stock (or other equity interests, including Common Stock derivatives and convertible or exchangeable securities) by the Company for less than $3.00 per share (or the equivalent thereof, taking into account any recapitalization).

- *Pre-emptive Rights:* If the Company proposes a new issuance of capital stock, Priceline will have the right to buy any or all of such Shares (or other equity interests in the Company) issued by the Company before they are offered to any other person.

- *Transferability:* The warrant may not be transferred without the Company's consent except to an affiliate of Priceline.

- *Governing Law:* The State of New York.

D&T 0022419

**CONFIDENTIAL**

ASSET
CONTRIBUTION
AGREEMENT:

- *Parties:* The Company and Walker Digital
  (Priceline may execute a similar agreement).

- *Assets Transferred:* Walker Digital will sell,
  assign, transfer, convey and deliver to the Company
  the assets set forth on a schedule to this agreement,
  which will include assets from the following
  categories:

  – [list any specific contracts to be transferred;]

  – cash (in the form of expenses incurred to
    date);

  – furniture fixtures, equipment, machinery and
    other tangible personal property owned or
    leased by Walker Digital and used in or
    relating principally to the business of the
    Company;

  – all books of account, general, financial, tax
    records, invoices, shipping records, supplier
    lists, correspondence and other documents,
    records and files owned, associated with or
    employed by Walker Digital and used in or
    relating principally to the business of the
    Company;

  – all of Walker Digital's right, title and
    interest in, to and under the intellectual
    property, including domain names, listed on
    a schedule to the agreement;

  – leasehold interests in certain real property
    and buildings used in the Company's
    business; and

  – certain computer hardware and infrastructure
    used in the Company's business

D&T  0022420

CONFIDENTIAL

The assets to be transferred shall exclude the rights to the priceline.com software, patent and copyrights and other intellectual property licensed to the Company under the license agreement.

- *Employees:* Walker Digital will transfer an agreed list of employees to the Company.

- *Assumption of Liabilities:* The Company will assume and agree to pay, perform and discharge when due, any and all debts and liabilities related to the assets and employees transferred in connection with this agreement.

- *Indemnification:* The Company will indemnify Walker Digital against any losses incurred from claims from third parties arising after the contribution and related to the business of the Company. Walker Digital will indemnify the Company against all losses incurred from claims by third parties for incidents prior to the contribution and related to the business of the Company.

- *Governing Law:* The State of New York.

D&T 0022421

CONFIDENTIAL

INTELLECTUAL PROPERTY
LICENSE AGREEMENT:

- *Licensor:* Priceline.

- *Licensee:* The Company. W⊦

- *Licensed Field:* Internet based "Buyer Driven Commerce" in which consumers willing to purchase groceries, health and beauty items and household supplies (the "Core Merchandise") and other retail products (the "New Merchandise") at less than full price are matched with retailers willing to sell such products.

- *License Grants:* The license grant with respect to Core Merchandise will be exclusive until the Priceline Warrant expires unexercised (the "Exclusivity Period"). This includes "grant back" licenses from the Company to Priceline. The license grant with respect to New Merchandise will be non-exclusive. All license grants that survive the expiration of the Priceline Warrant unexercised will become non-exclusive.

- *Royalties:* The Company will pay Priceline royalties in an amount that decreases as the Company's annual revenues increase, as follows: 1% of revenues less than $500 million; 0.75% of revenues between $500 million and $1 billion; 0.5% of revenues between $1 billion and $5 billion; 0.25% of revenues between $5 billion and $10 billion and 0% of revenues greater than $10 billion.

  - Royalties will be reduced by 60% in the event the Trademark License terminates prior to the Patent License.

- *Patents:* Patents will be scheduled. These patents will include those of Schedule A of the Intercompany Agreement between Priceline and WD as well as others owned or controlled by Priceline.

  All IP will be licensed through Priceline.

D&T 0022422

CONFIDENTIAL

- *Trademarks:* Trademarks will be scheduled. These trademarks will include those of Schedule B of the Intercompany Agreement between Priceline and WD as well as others owned or controlled by Priceline.

- *Copyrights:* All relevant copyrights owned or controlled by Priceline will be licensed under the General Intellectual Property Grant.

- *General Intellectual Property Grant:* Priceline will license to the Company all know-how, trade secrets, patents, copyrights and other intellectual property now owned or controlled by, or licensed to (with the right to grant sublicenses), Priceline or that is independently developed by Priceline prior to the unexercised expiration of the Warrant. General grant will include license to create derivative works in order to resolve web page "look and feel" issues as well as IP related to adaptive marketing.

- *Intellectual Property Acquired by Priceline from Third Parties:* The Company shall have the option to license intellectual property that Priceline acquires or licenses from third parties prior to the unexercised expiration of the Priceline Warrant, in each case relating to the Licensed Field.



  — If the intellectual property is acquired or licensed from a related third party (e.g., Walker Digital) the parties shall negotiate a license fee based upon Priceline's cost. ↖ *TRANSFER Pricing*

  — If the intellectual property is acquired or licensed from an unrelated third party the parties shall negotiate a license fee based upon Priceline's cost.

- *The Company's Intellectual Property:* In the event that the Company creates, acquires or develops any intellectual property excluding Company Trademarks relating to or useful in the Priceline Field prior to (i) the expiration of the Priceline Warrant unexercised, or (ii) termination of the

CONFIDENTIAL

D&T 0022423

Trademark License, the Company shall grant to Priceline a royalty-free, fully paid, irrevocable and perpetual right and license, including the right to grant sublicenses to affiliates, to such intellectual property. "Priceline Field" shall mean the field of Internet-based Buyer-Driven Commerce, excluding the Licensed Field in respect of the Company. These "grant back" licenses granted by the Company to Priceline will become non-exclusive upon the expiration of the Priceline Warrant unexercised

- *Customer Lists:* Each party shall have access to the customer list[s] of the other party; provided that a party may not use the other party's customer list in any manner that results in a material adverse effect on the business of the other party.

- *Term:* The rights granted under the licenses will terminate and expire as follows:

  – The term of the patent license will commence on the date executed and end on the expiry date of the last licensed patent to expire, subject to earlier termination in accordance with the termination provisions of the license.

  – The term of the trademark license shall commence on the date executed and shall continue in full force until a date one year after the unexercised expiration of the Priceline Warrant, subject to earlier termination in accordance with the termination provisions of the license.

- *Termination:* The license agreement will terminate under the following conditions:

  – Priceline may terminate the Trademark License if the Company fails to achieve revenues of $500 million in the fiscal year ending December 31, 2001.

CONFIDENTIAL

D&T 0022424

– If either party commits a material breach of any of the material provisions of the license agreement, and such breach is not cured within 90 days after the date on which notice of breach is sent by the non-breaching party to the breaching party, the non-breaching party shall have the right to terminate the license agreement upon a further 30 days' written notice.

– The Company may terminate at any time upon 90 days' notice.

– Priceline may terminate the Trademark License upon a change of control of the Company. Change of control shall be defined in respect of equity ownership and composition of the Board of Directors. There will be a six (6) month transition period during which the new controlling stockholders may continue using the licensed trademarks after a change of control.

– Upon termination or expiration, the Company shall destroy all uses of trademarks and deliver materials and signage to Priceline.

• *Trademark/Advertising Control:* The Company shall ensure that Company marketing, promotional and advertising materials, as well as the Company's site content (including web page advertising), displaying the Licensed Trademarks are consistent with Priceline's image, reputation, branding and positioning. In order to ensure compliance with these requirements, the Company shall submit all sales, promotional, advertising and (including web pages and web page advertising) site content to be used by the Company in connection with products or services bearing Licensed Trademarks, including, but not limited to, newspaper, radio and television advertising, to Priceline for prior approval thereof, which approval shall not be unreasonably withheld.

D&T 0022425

**CONFIDENTIAL**

– In the event Priceline's approval of such sales, promotional, or advertising materials is not received by the Company within fifteen (15) days of submission of such materials to Priceline for approval, such materials shall be deemed approved by Priceline.

● *Hosting Website Frontpage:* Priceline will provide the exclusive link to the Company's home page by hosting a link on the Priceline homepage until the earlier of (i) termination of the trademark license, or (ii) change of control. During the Exclusivity Period, the Company may not establish an access route to its home page independent of Priceline's homepage, without the prior express written consent of Priceline. Upon termination of exclusivity, Priceline shall, at the request of the Company, continue to provide a link to the Company's home page for a transition period of six (6) months.

● *No Other Control:* The submission of sales, advertising and promotional materials to Priceline for approval thereof shall be solely for the purpose of ensuring compliance with the Priceline quality standards, and Priceline shall have no right in respect of approval of pricing, selection of specific products and services, or any other aspect of the business of WebHouse.

● *Assignment:* The Company may not assign the license agreement without the prior written consent of Priceline.

● *Ownership:* The Company acknowledges that Priceline owns all rights to the licensed intellectual property. The Company shall not disclose any of Priceline's confidential or proprietary information to any third party without Priceline's consent.

– Priceline acknowledges that the Company owns all rights in (i) Company Trademarks and (ii) other Company intellectual property subject to the "license back" provision above.

**D&T 0022426**

CONFIDENTIAL

* *Warranties:* Priceline will make the following warranties to the Company:

    – Ownership. Priceline is either (i) the owner of the Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property, or (ii) has been granted a license thereunder and has the right to grant to the Company the rights granted in the License Agreement.

    – No Conflict. Priceline has the right to enter into the License Agreement and there are no outstanding agreements that are inconsistent with the Agreement.

    – Enforceability. The Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property have not been adjudged invalid or unenforceable in whole or part.

    – Actions. Except as Scheduled, no actions have been asserted, are pending, or threatened, against Priceline (i) challenging the use by Priceline of any of the Licensed Trademarks, Licensed Patents, or Other Licensed Intellectual Property, or (ii) alleging that the use of the Licensed Trademarks, Licensed Patents, or Other Licensed Intellectual Property misappropriates or infringes the intellectual property rights of any third party. [Schedule to include Marketel litigation and Patent Interference]

    – No Infringement. To Priceline's knowledge, the use of the Licensed Trademarks, Licensed Patents, and Other Licensed Intellectual Property in connection with the business of the Company as contemplated, does not misappropriate or infringe the intellectual property rights of any third party.

    – Other standard representations and warranties

17

Draft September 24, 1999

D&T 0022427

CONFIDENTIAL

- *Indemnification:*

  – Indemnification by the Company. The Company agrees to defend, indemnify, and hold Priceline and its Affiliates and the respective directors, officers, employees, and agents of Priceline harmless from and against any and all losses arising out of or resulting from (i) the breach by the Company of any of its representations, warranties, covenants and agreements contained in the License Agreement, or (ii) arising out of the Company's use of any Licensed Trademark or the carrying on of the Company's business other than those losses that would constitute a breach of Priceline's representations and warranties.

  – Indemnification by Priceline. Priceline agrees to defend, indemnify, and hold the Company and its Affiliates and the respective directors, officers, employees, and agents of the Company harmless from and against any and all losses arising out of or resulting from (i) the breach by Priceline of any of its representations, warranties, covenants and agreements contained in the License Agreement, (ii) or arising out of Priceline's use of any Licensed Trademark or the carrying on of Priceline's business; (iii) actions brought by third parties to the extent that Priceline is indemnified by others for such third-party liabilities.

- *Maintenance and Protection of Trademarks and Patents:* The Company agrees to assist Priceline in suits relating to marks and patents. The Company shall notify Priceline of unauthorized use, infringements, imitations or dilutions of which it is or becomes aware. Priceline will agree to maintain its patents. WebHouse shall not be responsible for any costs related to the maintenance or protection of the licensed patents, licensed trademarks or other licensed intellectual property.

D&T 0022428

CONFIDENTIAL

• *Governing Law:* The State of New York.

CONFIDENTIAL

D&T 0022429

**MARKETING AND
TECHNOLOGY SERVICES
AGREEMENT:**

- *Parties:* The Company and Priceline.

- *Marketing Responsibilities of Each Party:* During the Marketing Cooperation Term, Priceline and the Company shall coordinate certain marketing activities in respect of co-branding and co-positioning of the Parties' respective services. The companies shall develop and implement brand recognition and awareness strategies and campaigns which integrate and associate the Priceline name with the Company and its business. The parties shall use reasonable efforts to coordinate their adaptive marketing activities.

  Each party shall list the other in any advertising media wherein other Priceline services or affiliates are listed.

- *Compensation for Marketing Services:*

  – The Company will pay Priceline compensation based on the Company's usage of the marketing services provided.

  – Priceline and the Company will negotiate in good faith to agree to compensation for marketing services provided by Priceline under the Agreement, prior to the commencement of such marketing services.

- *Technology Services:* The Company may engage Priceline to provide the following services on a regular basis:

  - Clarus Accounting System

  - Data warehousing

  - Brio software used to provide user access to data warehouse and reporting

  - Informatica ETL software used to support moving data from one area to another

NYDOCS02 474163 11                    20                    *Draft September 24, 1999*

**CONFIDENTIAL**

D&T 0022430

- Parasoft code checking software

- Oracle

- Shareplex software for replications/backing up

- Kana E-mail system

- Prime Response direct marketing software

- SilkNet customer service software

- Sun Servers

- *Compensation for Technology Services:*

  – Priceline and WebHouse shall negotiate in good faith to agree to compensation (based on Webhouse's usage of Priceline services) for the technology services provided by Priceline under the Agreement.

- *Termination:*

  – The Agreement shall terminate either 5 years from the date of the Agreement or on the expiration date of the Trademark License, whichever is earlier.

  – The marketing agreement may also be terminated by the Company provided the IP License is terminated simultaneously or upon material breach by either party.

- *Governing Law:* The State of New York.

**D&T 0022431**

**CONFIDENTIAL**

SERVICES
AGREEMENT:

- *Parties:* The Company and Priceline.

- *Services:* The Company may engage Priceline to provide the following services on a transitional basis until the Company is able to provide such services for itself or by contract but in any event no later than December 31, 2000:

  - management;

  - accounting;

  - payroll;

  - office lease and maintenance; and

  - human resources.

- *Compensation:* The Company shall pay to Priceline an amount equal to the fair market value of the services provided. Initially, the Company shall pay Priceline an amount equal to $[_____] for the remainder of 1999. Thereafter, the compensation shall be renegotiated in good faith semi-annually. In the event that the parties are unable to agree on the amount for any given period, the amount shall be equal to the amount agreed to be payable for the immediately preceding six-month period plus [10]% (any partial period shall be annualized for purposes of determining this figure). Such compensation will be paid on a quarterly basis in arrears.

- *Governing Law:* The State of New York.

CONFIDENTIAL

D&T 0022432

OMNIBUS EMPLOYEE
EQUITY PLAN:

- *Plan Sponsor:* The Company.

- *Nature of Plan:* The Company 1999 Omnibus Plan (the "Plan") will be substantially similar to the Priceline 1999 Omnibus Plan (the "Priceline Plan"). The Plan will be based on Common Stock and will provide for the grant of qualified and non-qualified stock options ("Options") and may also provide for the grant of stock subject to certain restrictions ("Restricted Stock") and other stock-based awards. The initial grants to be made in 1999 will be in the form of Options ("Initial Grant Options").

- *Administration:* The Plan will be administered by a committee (the "Committee") established by the Company's board.

- *Participation:* Key employees of the Company, including certain members of management, officers of Priceline, members of the Company's board who are also employees of the Company and consultants, will be eligible to participate in the Plan.

- *Number of Shares Subject to the Plan:* The maximum number of shares of Common Stock reserved for the grant of awards under the Plan will be 17.33 million shares.

- *Duration of the Plan:* The Plan will be effective from the date it is established (the "Effective Date") until the tenth anniversary of the Effective Date, or until such earlier time as the Committee determines, at which time no additional grants may be made pursuant to the Plan. Awards made prior to the expiration of the Plan will continue to be valid in accordance with their terms after the expiration of the Plan.

- *Term of Options:* The Options will expire 10 years from the date of grant or at an earlier time determined by the Committee.

- *Vesting and Exercisability of Options:* All Options will vest and (subject to the proviso in clause (a)

CONFIDENTIAL

D&T 0022433

below) become exercisable over four years, with 25% of the Options granted to a Participant on a given date of grant vesting on the first anniversary of such date of grant, and 25% becoming vested annually thereafter; provided, however, that (a) no Option will become exercisable earlier than the earlier of 180 days following an IPO by the Company and 5 years from the date of grant (the "Exercisability Date") and (b) with respect to the Initial Grant Options only, the first anniversary of grant will be deemed to be December 31, 1999, and the remaining three installments will vest on the first three anniversaries of such date.

However, the Committee may otherwise determine and set forth vesting terms in any applicable Option agreement and vesting may be accelerated in accordance with the terms of the Plan.

[•    *Put Rights:*  If no IPO has occurred by the fifth anniversary of grant of the Initial Grant Options, participants will thereafter, until an IPO, have the right to put their vested Options (or shares of Common Stock issued upon the exercise of Options) to the Company for cash in an amount equal to the Appraised Value (less the relevant exercise price in the case of Options). For this purpose, "Appraised Value" means, as of any relevant date of determination, the value of a share of Common Stock as of the then most recent December 31 (beginning with December 31, 2004) as determined by an investment banking or appraisal firm selected by management of the Company from a list of firms to be agreed upon prior to the Effective Date; such firm will perform such appraisal by taking into account all relevant information, but in any event considering (a) trading values of comparable public companies, (b) acquisitions of comparable companies and (c) a discounted cash flow analysis.]

•    *Exercise Price of Options:*  Each agreement with respect to an Option will set forth the exercise price per share payable by the grantee upon exercise of the Option. Under the Initial Grant Options, the

D&T 0022434

CONFIDENTIAL

exercise price will be $3.00 per share. Generally, the exercise price per share will be determined by the Committee; provided, however, that the exercise price per share may not be less than the fair market value of a share of Common Stock as determined in good faith by the Board.

*Effect of Termination of Employment:* Except as may otherwise be provided in an applicable Option agreement, upon termination of a Participant's employment for any reason other than death or disability, all vested Options will remain outstanding and be exercisable for a period of 90 days following the later of the date of termination and the Exercisability Date (or one year in the event of death of Participant during this 90 day period). To the extent that the Options were not vested at the time of such termination, they will be immediately forfeited.

In the event that a Participant is terminated for disability or death, the Participant (or the Participant's estate) will have one year from the later of the termination date and the Exercisability Date to exercise all unexercised vested stock Options. To the extent that the Options were not vested at the time of such termination, they will be immediately forfeited.

*Acceleration of Vesting, Waiver of Conditions and Amendments:* The Committee, in its sole discretion, may (a) accelerate the vesting of any Options granted under the Plan, waive or amend the operation of Plan provisions respecting exercise after termination of employment, or otherwise adjust any of the other terms of such Option; (b) accelerate the vesting or waive any condition imposed hereunder with respect to any Restricted Stock and (c) otherwise adjust any of the terms applicable to any award; provided, however, that all Options and Restricted Stock will vest upon a Change in Control. For this purpose, "Change in Control" will be defined in the same manner as under the Priceline Plan, except that it will not include the exercise of the Priceline Warrant or any

D&T 0022435

CONFIDENTIAL

other transaction in which Priceline acquires control of the Company.

- *Transfers Among Priceline, Walker Digital, Perfect Yard Sale and WebHouse*: The Committee will provide for continued vesting of Options and Restricted Stock based on post-termination service by a participant with Priceline, Walker Digital, Perfect Yard Sale, WebHouse or any other affiliate of Priceline.

- *Change in Capitalization:* The Plan may be amended by the Committee and outstanding awards will be subject to equitable adjustments in the event of a dividend or other distribution, stock split, reverse split, reorganization, merger, consolidation, spin-off, combination, repurchase, share exchange or any other similar corporate transaction or event affecting the Common Stock in order to preserve, but not increase, the benefits or potential benefits intended to be made available under the Plan. Such adjustments may include, without limitation, the assumption of Options by a successor to or parent of the Company. [Upon the exercise in whole or in part of the Priceline Warrant, participants will be provided the same put rights described above under "Put Rights". If Priceline acquires 100% of the Company, it will be required to substitute Priceline options and shares for the Options and shares of Common Stock held by participants, based on the then Appraised Value.]

- *Governing Law:* The State of New York.

D&T 0022436

CONFIDENTIAL