# EXHIBIT 13

OCT-26-1999  11:17        DELOITTE & TOUCHE LLP           212 436  5000   P.48

## WARRANT AGREEMENT

WARRANT AGREEMENT, dated as of October 26, 1999 (this "Agreement"), between PRICELINE.COM INCORPORATED, a Delaware corporation ("Grantee"), and PRICELINE WEBHOUSE CLUB, INC., a Delaware corporation ("Issuer").

### WITNESSETH:

WHEREAS, Grantee is an internet-based company with significant name recognition of its trademarked "priceline" name and patented "demand collection system" for selling products over the Internet;

WHEREAS, Walker Digital, LLC ("Walker Digital") is a research and development company containing certain trade secrets, know-how and other intellectual property;

WHEREAS, in connection with the establishment of Issuer's business of the sale of retail products in a "name your price" format over the Internet, Walker Digital is (A) contributing the employees and certain related know-how, and other assets and liabilities used in or incurred during the initial development of the Company's business, pursuant to an asset contribution agreement dated as of [—] October 26, 1999 between Walker Digital and Issuer and (B) licensing certain intellectual property pursuant to a license agreement between Walker Digital and Priceline dated as of the date hereof, which intellectual property shall in turn be sublicensed to Issuer and (ii) Grantee is (A) licensing and sublicensing, as applicable, the use of the "priceline" name, certain patent rights and other intellectual property rights for use in connection with the Issuer's business, pursuant to an intellectual property license agreement between Grantee and Issuer dated as of the date hereof, (B) providing certain management, accounting, legal and systems operations other services to the Issuer pursuant to a services agreement between the Grantee and Issuer dated as of the date hereof, and (C) providing certain marketing and technical services to Issuer pursuant to a marketing and technical services agreement between Grantee and Issuer dated as of the date hereof;

WHEREAS, in consideration for cash and the assets it has contributed to Issuer pursuant to the asset contribution agreement, Walker Digital is receiving a promissory note in the amount of $11,172,920.61 $14,592,185.60, payable on April 26, 2000;

WHEREAS, in consideration of their cash contributions, Walker Digital and certain other investors (the "Investors") are receiving a total of 27,500,000 shares of common stock of Issuer, par value $.01 per share (the "Common Stock"), pursuant to an agreement between Issuer and the Investors dated as of October 26, 1999 (the "Subscription Agreement");

NYDOCS02/Comparic 475637 8 v. 9

48

CONFIDENTIAL

D&T 0034085

WHEREAS, Issuer, Walker Digital, Grantee and the Investors will enter into an agreement providing certain rights to the parties and subjecting them to certain restrictions (the "Securityholders' Agreement");

WHEREAS, in consideration for Grantee's execution and deliveries pursuant to the license agreement described above, Issuer desires to issue, and Grantee desires to accept, a warrant to purchase up to 137.5 million shares of Common Stock and furthermore has certain rights to participate in Issuer's corporate governance pursuant to the Securityholders' Agreement; and

WHEREAS, in connection with the establishment of Issuer, Grantee is agreeing, pursuant to the services agreement and marketing and technical services agreement described above, to provide services to and to coordinate marketing activities with the Company in exchange for arm's-length consideration; and

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth herein, and intending to be legally bound hereby, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01. Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"Agreement" or "this Agreement" means this Warrant Agreement, dated as of [————] October 26, 1999, between the Issuer and the Grantor, and all amendments hereto made in accordance with the provisions of Section 8.09.

"Board of Directors" means the board of directors of the Issuer.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"Capital Stock" means, with respect to any Person at any time, any and all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of capital stock, partnership interests (whether general or limited), limited liability company interests or equivalent ownership interests in or issued by such Person.

"Change of Control" means the occurrence of any of the following:

NYDOCS02/Companie 475637 8 v. 9                    2

CONFIDENTIAL

D&T 0034086

(1)    the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one transaction or a series of related transactions, of all or substantially all of the properties or assets of Issuer, ~~taken as a whole,~~ to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act) other than Grantee or an affiliate of Grantee;

(2)    the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as defined above) other than Grantee or an affiliate of Grantee, becomes the Beneficial Owner, directly or indirectly, of voting stock of Issuer with the power to vote 50% or more of the total votes entitled to be cast on any matter submitted to a vote of shareholders _of Issuer_;

(3)    during any consecutive two year period, individuals who at the beginning of such period constituted the Board of Directors (together with any new directors whose election to the Board of Directors, or whose nomination for election by the shareholders of Issuer, was approved by the vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors then in office; or

(4)    Issuer consolidates with, or merges with or into, any Person, or any Person consolidates with, or merges with or into, Issuer, in any such event pursuant to a transaction in which any of the outstanding voting stock of Issuer or such other Person is converted into or exchanged for cash, securities or other property, other than any such transaction where the voting stock of Issuer outstanding immediately prior to such transaction is converted into or exchanged for voting stock of the surviving or transferee Person constituting a majority of the outstanding shares of such voting stock of such surviving or transferee Person (immediately after giving effect to such issuance) and no Person other than Grantee or an affiliate of Grantee becomes the Beneficial Owner, directly or indirectly, of voting stock of such Person with the power to vote 50% or more of the total votes entitled to be cast on any matter submitted to a vote of shareholders.

"Closing" shall have the meaning assigned in Section 5.01.

"Common Stock" shall have the meaning assigned in the recitals.

"Control" (including the terms "Controlled by" and "under common Control with"), ~~with respect to the relationship between or among two or more Persons,~~ means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect

CONFIDENTIAL                                                      D&T 0034087

a majority of the board of directors or similar body governing the affairs of such Person.

"Convertible Securities" shall have the meaning assigned in Section 2.04(b)(i).

"Employee Options" shall mean the options to acquire 17.3 million Shares that may be granted to employees, consultants, directors and officers of Issuer pursuant to the Issuer's 1999 Omnibus Employee Equity Plan, as amended from time to time, or any successor plan.

"Encumbrance" means any security interest, pledge, mortgage, lien (including, without limitation, environmental and tax liens), charge, encumbrance, adverse claim, preferential arrangement or restriction of any kind, including, without limitation, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Exercise Event" shall have the meaning assigned in Section 2.02(b).

"Exercise Notice" shall have the meaning assigned in Section 2.02(c).

"Exercise Price" shall have the meaning assigned in Section 2.01.

"Expiration Date" shall have the meaning assigned in Section 2.02(a).

"Governmental Entities" means any domestic or foreign governmental, administrative or regulatory authority or agency.

"Grantee" shall have the meaning assigned in the preamble.

"Grantee Common Stock" shall have the meaning assigned in Section 2.02(c).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Initial Public Offering" means the first underwritten public offering of the Common Stock resulting in aggregate net proceeds (after expenses and underwriting commissions and discounts) to Issuer and any selling stockholders of at least $50 million; provided that, following such offering the Common Stock is listed on a United States or foreign national securities exchange or quoted on any U.S. United States or foreign automated securities quotation system.

NYDOCS02/Comparic 475637 8 v. 9                    4

CONFIDENTIAL

51

D&T 0034088

"Insolvency Event" means, in respect of a Person, that time when the sum of the Company's debts exceeds the sum of its assets, valued at fair market value; or that such Person shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by it or against it seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain undismissed or unstayed for a period of 30 days or any of the actions sought in proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of it property) shall occur; or Issuer shall take any corporate action to authorize any of the actions set forth above.

"Investors" shall have the meaning assigned in the recitals.

"Issuer" shall have the meaning assigned in the preamble.

"NASD" shall mean the National Association of Securities Dealers, Inc.

"Net Revenue" means the net revenue of Issuer as disclosed on the annual audited financial statements for any fiscal year and the unaudited quarterly financial statements for any fiscal quarter.

"New Securities" means any Capital Stock of Issuer, whether now authorized or not, and rights, options or warrants to purchase such Capital Stock, and securities of any type whatsoever that are, or may become, convertible into or exchangeable or exercisable for Capital Stock of Issuer; provided that the term "New Securities" does not include (i) securities of Issuer issued to employees, consultants, officers or directors of Issuer, or which have been reserved for issuance, pursuant to any employee stock option, stock purchase, stock bonus plan, or other similar stock agreement or arrangement approved by the Board of Directors, including the Priceline designee to the Board, (ii) securities of Issuer issued in connection with any stock split, stock dividend or recapitalization of Issuer, (iii) securities of Issuer issued in an Initial Public Offering, (iv) securities of Issuer issued upon the conversion or exchange of convertible or exchangeable securities of Issuer that are outstanding as of the date of this Agreement, (v) Warrant Shares or (vi) any right, option or warrant to acquire any security convertible into or exchangeable or exercisable for the securities excluded from the definition of New Securities pursuant to subclause (i) above if issued pursuant to

52

CONFIDENTIAL

D&T 0034089

any employee stock option, stock purchase, stock bonus plan or other similar stock agreement or arrangement approved by the Board of Directors, including the Priceline designee to the Board of Directors.

"Notice of Issuance" shall have the meaning assigned in Section 2.05(b).

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Share" means any share of Common Stock.

"Stock Payment Amount" shall have the meaning assigned in Section 2.03(a).

"Stockholder" means each Person (other than the Issuer) who shall own, beneficially or of record, any Shares and be listed in the share registry of the Issuer as the owner thereof.

"Subscription Agreement" shall have the meaning assigned in the recitals.

"Subsidiary" or "Subsidiaries" of any Person means any corporation, partnership, joint venture, association or other entity, all of the Capital Stock or other similar equity interests of which, are owned beneficially and of record by such Person directly or indirectly through one or more intermediaries.

"Third Party" means, with respect to Grantee, any Person, other than (i) Issuer, (ii) any Subsidiary of Issuer or (iii) any Subsidiary of Grantee.

"Walker Digital" shall have the meaning assigned in the recitals.

"Warrant" shall have the meaning assigned in Section 2.01.

"Warrant Shares" shall have the meaning assigned in Section 2.01.

S-3

CONFIDENTIAL

D&T 0034090

OCT-26-1999 11:19    DELOITTE 2 TOUCHE LLP    212 436 5000    P.54

## ARTICLE II

## THE WARRANT

SECTION 2.01. Grant of Warrant. Issuer hereby grants to Grantee an irrevocable, fully vested warrant (the "Warrant") to purchase 137,500,000 Shares (the "Warrant Shares"), at a purchase price per Warrant Share initially equal to $3.00 (the "Exercise Price"), subject to the terms and conditions set forth herein. The number of shares constituting the Warrant Shares and the Exercise Price are both subject to adjustment as set forth in Section 2.04 hereof.

SECTION 2.02. Exercise of Warrant. (a) Subject to the conditions set forth in Article VI, the Warrant may be exercised by Grantee, in whole or in part, at any time after the fifth anniversary of the date of this Agreement or, if earlier, the occurrence of an Exercise Event; provided that the Warrant shall terminate and be of no further force and effect upon the earlier to occur of (i) Closing of the final exercise of the Warrant, (ii) sixty (60) days after the Issuer notifies Grantee of a willful and material breach by Grantee of Section 6.02 of the License Agreement, if such breach is not cured prior to the expiration of such sixty (60) day period, and (iii) thirty days following the fifth anniversary of the date hereof (the "Expiration Date"). Notwithstanding the termination of the Warrant, Grantee shall be entitled to purchase those Warrant Shares with respect to which it has issued an Exercise Notice (as defined below) prior to the termination of the Warrant. The termination of the Warrant shall not affect any rights hereunder which by their terms extend beyond the date of such termination.

(b)    An "Exercise Event" shall occur for purposes of this Agreement upon the occurrence of any of the following events:

(i)    Issuer achieves Net Revenue of $300 million for any four-quarter period immediately preceding the date of measurement, or any shorter period in which Issuer achieves Net Revenue of $300 million;

(ii)    the occurrence of an Insolvency Event in respect of Issuer;

(iii)    the adoption of a plan relating to the liquidation or dissolution of the Company;

(iv)    the occurrence of a Change of Control, or Board approval of a transaction that would result in a Change of Control; or

(v)    Board approval of an Initial Public Offering.

Upon Promptly upon the occurrence of any event described in clauses (i) and (ii) above, and no later than fifteen (15) days prior to an event described in clauses (iii) through (v) above,

CONFIDENTIAL    D&T 0034091

Issuer shall ~~promptly~~ provide Grantee with notice of such event together with the consolidated financial statements of Issuer, and Grantee may exercise the Warrant until the Expiration Date.

    (c)    The Warrant shall be exercised by written notice from Grantee to Issuer (an "Exercise Notice") stating that the Warrant is being exercised and setting forth: (i) a proposed closing date, which (subject to the earlier satisfaction or waiver of the conditions set forth in Article VI) shall be:

    (A)    in the case of an exercise upon the fifth anniversary hereof or pursuant to clause (b)(i) or (b)(ii) above, no earlier than fifteen (15) days after, and no later than thirty (30) days after, the date of delivery of such notice, and

    (B)    in the case of an exercise pursuant to clause (b)(iii) ~~or (b)(iv)~~ through (b)(v) above, shall be the closing date of the transaction giving rise to the Exercise Event or such earlier date as shall be specified in the Exercise Notice,

on which date the Warrant Shares shall be issued; (ii) the number of Warrant Shares to be purchased; and (iii) whether Grantee will purchase the Warrant Shares with cash, shares of Grantee's common stock, par value $.01 per share ("Grantee Common Stock") or a combination thereof (including the relative percentage of any combination). The Warrant shall be deemed to be exercised on the date of delivery of the Exercise Notice, at which time the decision to exercise the Warrant shall be irrevocable; provided that, in the case of an exercise pursuant to clause (b)(iv) or (b)(v) above, the Warrant's exercise shall be conditional upon the closing of the transaction giving rise to the Exercise Event.

    (d)    In the event that Grantee exercises the Warrant in part only, upon such exercise Issuer shall execute and deliver to Grantee, at Issuer's expense, a new Warrant exercisable for the number of Shares representing the unexercised portion of the Warrant so exercised in part.

    SECTION 2.03.  Form of Payment. (a)  The Exercise Price may be paid in cash, in shares of Grantee Common Stock or in any combination thereof at the sole discretion of the Grantee. The number of shares of Grantee Common Stock to be delivered in payment of all or a portion of the aggregate Exercise Price (the "Stock Payment Amount") shall be determined by dividing the portion of the aggregate Exercise Price to be paid in Grantee Common Stock by the average of the closing prices of Grantee Common Stock quoted on the Nasdaq Stock Market (or, if then traded on a national securities exchange, the average of the closing prices of Grantee Common Stock on the principal national securities exchange on which listed or, if quoted on the NASD OTC Bulletin Board, the average of the means of the closing bid and asked price of Grantee Common Stock) on each of the ten (10) trading days immediately preceding the date the Exercise Notice is delivered.

CONFIDENTIAL                    D&T 0034092

(b)    In the event of any change in Grantee Common Stock or in the number of outstanding shares of Grantee Common Stock between the date of an Exercise Notice and the Closing by reason of a stock dividend, split-up, recapitalization, combination, exchange of shares or similar transaction or any other extraordinary change in the corporate or capital structure of Grantee (including, without limitation, the declaration or payment of an extraordinary dividend of cash, securities or other property), the type and number of shares or securities to be delivered by Grantee in payment of the Stock Payment Amount shall be adjusted appropriately so that Issuer shall receive upon payment of the Stock Payment Amount the number and class of shares or other securities or property that Issuer would have received in respect of Grantee Common Stock if Grantee had paid the Stock Payment Amount immediately prior to such change.

SECTION 2.04.  Adjustments upon Share Issuances, Changes in Capitalization, Etc.  (a) In the event that Issuer shall issue or sell, prior to the exercise in full or expiration of the Warrant, any Shares (except as provided in paragraph (f) below) or Convertible Securities (as hereinafter defined) or any rights or options to purchase Shares or Convertible Securities for a consideration per share less than the Exercise Price in effect immediately prior to such issue or sale, then forthwith upon such issue or sale the Exercise Price shall be reduced to a price (calculated to the nearest $.0001) determined by dividing (i) an amount equal to the sum of (A) the number of Shares outstanding immediately prior to such issue or sale multiplied by the Exercise Price then in effect, and (B) the consideration, if any, received by the Issuer upon such issue or sale, by (ii) the total number of Shares outstanding immediately after such issue or sale.

(b)    For the purposes of calculating any adjustment to the Exercise Price pursuant to paragraph (a) above, the following provisions shall apply:

(i)    In case at any time Issuer shall grant any rights to subscribe for, or any rights or options to purchase, Common Stock or any stock or other securities convertible into or exchangeable for Common Stock (such convertible or exchangeable stock or securities being herein called "Convertible Securities"), whether or not such rights or options or the right to convert or exchange any such Convertible Securities are immediately exercisable, and the price per Share for which Common Stock is issuable upon the exercise of such rights or options or upon conversion or exchange of such Convertible Securities

(determined by dividing (A) the total amount, if any, received or receivable by Issuer as consideration for the granting of such rights or options, plus the minimum aggregate amount of additional consideration payable to Issuer upon the exercise of such rights or options, plus, in the case of any such rights or options which relate to such Convertible Securities, the minimum aggregate amount of additional consideration, if any, payable

NYDOCS02/Comparix 475637 8 v. 9              9

CONFIDENTIAL

D&T 0034093

(iii)    In case at any time Issuer shall declare a dividend or make any other distribution upon any stock of the Company payable in Common Stock or Convertible Securities, any Common Stock or Convertible Securities, as the case may be, issuable in payment of such dividend or distribution shall be deemed to have been issued or sold without consideration.

(iv)    In case at any time any Share or Convertible Securities or any rights or options to purchase any Common Stock or Convertible Securities shall be issued or sold for cash, the consideration received therefor shall be deemed to be the amount received by Issuer therefor, without deduction therefrom of any expenses incurred or any underwriting commissions or concessions or discounts paid or allowed by Issuer in connection therewith. In case any Shares or Convertible Securities or any rights or options to purchase any Common Stock or Convertible Securities shall be issued or sold for a consideration other than cash, the amount of the consideration other than cash received by Issuer shall be deemed to be the fair value of such consideration as determined by the Board of Directors, without deduction therefrom of any expenses incurred or any underwriting commissions or concessions or discounts paid or allowed by Issuer in connection therewith. In case any Shares or Convertible Securities or any rights or options to purchase any Common Stock or Convertible Securities shall be issued in connection with any merger of another corporation into Issuer, the amount of consideration therefor shall be deemed to be the fair value of the assets of such merged corporation as determined by the Board of Directors after deducting therefrom all cash and other consideration (if any) paid by Issuer in connection with such merger.

(v)    In case at any time Issuer shall take a record of the holders of Common Stock for the purpose of entitling them (i) to receive a dividend or other distribution payable in Common Stock or Convertible Securities, or (ii) to subscribe for or purchase Common Stock or Convertible Securities, then such record date shall be deemed to be the date of the issue or sale of the Shares deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

~~(vi) The number of Shares outstanding at any given time shall include Shares owned or held by or for the account of Issuer, and the disposition of any such Shares shall not be considered an issue or sale of Common Stock for the purposes of paragraph (a) above.~~

(c)    In the event that Issuer shall make any distribution of its assets upon or with respect to its Common Stock, as a liquidating or partial liquidating dividend or otherwise, Grantee shall, upon any exercise of the Warrant subsequent to the record date for such distribution or, in the absence of a record date, subsequent to the date of such distribution, receive, in addition to the Shares subscribed for, the amount of such assets (or, at the option of Issuer, a sum equal to the value thereof at the time of distribution as determined by the Board of Directors in its sole discretion) which would have been distributed to Grantee if it had

NYDOCS02/Composite 475637 8 v 9                11

CONFIDENTIAL

D&T 0034094

     (i)    The provisions of this Agreement, including, without limitation, Sections 2.01, 2.02, 2.04, 2.05 and 5.04, shall apply with appropriate adjustments to any securities for which the Warrant becomes exercisable pursuant to this Section 2.04.

     SECTION 2.05.  Right to Purchase New Securities.  (a)  In the event that Issuer proposes to issue New Securities (prior to, and other than in connection with, an Initial Public Offering), Grantee shall have the right to purchase in lieu of the Person to whom Issuer proposed to issue such New Securities, in accordance with paragraph (b) below, a number of Shares or other New Securities which Issuer proposes to issue equal to the product of (i) the total number or amount of Shares or other New Securities which Issuer proposes to issue at such time and (ii) a fraction, the numerator of which shall be the total number of Shares which Grantee owns or is entitled to purchase, assuming on the fifth anniversary of the date of this Agreement or, if earlier, upon the occurrence of an Exercise Event, pursuant to this Warrant, and the denominator of which shall be the total number of Shares then outstanding plus the total number of Shares which Grantee is entitled to purchase, assuming on the fifth anniversary of the date of this Agreement or, if earlier upon the occurrence of an Exercise Event, pursuant to this Warrant.  The rights given by Issuer under this Section 2.05 shall terminate if unexercised within 30 days after receipt of the Notice of Issuance referred to in paragraph (b) below.

     (b)    In the event that Issuer proposes to undertake an issuance of New Securities (prior to, and other than in connection with, an Initial Public Offering), it shall give written notice (a "Notice of Issuance") of its intention to Grantee, describing all material terms of the New Securities, the price and all material terms upon which Issuer proposes to issue such New Securities.  The Grantee shall have 30 days from the date of the Notice of Issuance to agree to purchase all or any portion of its pro rata share of such New Securities (as determined pursuant to paragraph (a) above) for the same consideration, if such consideration shall consist solely of cash, or for cash, cash equivalents or marketable securities having an equivalent value to the consideration payable by the Person to whom Issuer proposes to issue such New Securities at the time of payment, and otherwise upon the terms specified in the Notice of Issuance by giving written notice to Issuer, and stating therein the quantity of New Securities to be purchase by Grantee.

     SECTION 2.06.  Further Assurances.  Issuer and Grantee shall use reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws to consummate and make effective the transactions contemplated hereunder, including, without limitation, using reasonable efforts to obtain all required licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Entities.  Without limiting the generality of the foregoing, the parties hereto shall, when required in order to effect the transactions contemplated hereunder, make all necessary filings, and thereafter make any other required or appropriate submissions, under the HSR Act and shall supply as promptly as practicable to the appropriate Governmental Entity any additional information and documentary material that may be requested pursuant to

NYDOCS02/Companies 415637 8 v. 9          14

58

CONFIDENTIAL

D&T 0034095

the HSR Act. Each of the parties hereto shall cooperate with the other when required in order to effect the transactions contemplated hereunder. In case at any time after the date hereof, any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and directors of each of the parties hereto shall use their reasonable best efforts to take all such action.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF ISSUER

Issuer hereby represents and warrants to Grantee as follows:

SECTION 3.01. Due Organization and Authority. Issuer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. Issuer is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed or qualified would not materially and adversely affect the assets, liabilities or results of operations of Issuer or prevent or materially delay the consummation of the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Issuer, the performance of Issuer's obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Issuer. This Agreement has been duly executed and delivered by Issuer, and (assuming due authorization, execution and delivery by the other party hereto) this Agreement constitutes legal, valid and binding obligations of Issuer enforceable against Issuer in accordance with its terms.

SECTION 3.02. Capital Stock of Company. The authorized capital stock of Issuer consists of 300,000,000 shares of Common Stock, of which ~~27,500,000~~ 23,500,000 shares will be issued and outstanding following the closing of the Subscription Agreement, and 50,000,000 shares of preferred stock, of which none has been designated or issued by Issuer. Issuer has reserved Common Stock for issuance in the amounts and for the purposes that follow:

(i)      137.5 million shares of Common Stock have been reserved for issuance upon exercise of the Warrant;

(ii)     666,667 shares of Common Stock have been reserved for issuance upon exercise of the warrant held by **BDS** Business ~~Data Services Incorporated~~ **Center, Inc.**;

(iii)    65,000 shares of Common Stock have been reserved for issuance upon exercise of the warrant held by William Shatner; and

59

CONFIDENTIAL

D&T 0034096

(iv)    17,333,333 shares of Common Stock have been reserved for issuance upon the exercise of certain employee options to be granted pursuant to the Company's Omnibus Employee Equity Plan, of which [~~8,552,916~~ 12,911,749] shares relate to options that have been granted as of the date hereof.

Except as set forth above, (i) no shares of Capital Stock of Issuer have been reserved for issuance for any reason; (ii) no subscription, warrant, option, convertible security, or other right (contingent or other) to purchase or otherwise acquire Capital Stock of Issuer is authorized or outstanding; and (iii) Issuer has made no commitment to issue shares, subscription, warrants, options, convertible securities, or other such rights or to distribute to holders of any of its Capital Stock any evidence of indebtedness or asset.

SECTION 3.03.  Authority to Issue Shares.  Issuer has taken all necessary corporate action to authorize and reserve and permit it to issue, and at all times from the date hereof until its obligation to deliver shares of Common Stock upon the exercise of the Warrant terminates, shall have reserved, all the Warrant Shares issuable pursuant to this Agreement, and Issuer shall take all necessary corporate action to authorize and reserve and permit it to issue all additional shares of Common Stock or other securities which may be issued pursuant to Section 2.04 or 2.05, all of which, upon their issuance and delivery in accordance with the terms of this Agreement, shall be duly authorized, validly issued, fully paid and nonassessable and free of preemptive rights.

SECTION 3.04.  No Conflict.  Assuming that all consents, approvals, authorizations and other actions described in Section 3.05 have been obtained, the execution, delivery and performance of this Agreement by Issuer does not and will not (a) violate, conflict with or result in the breach of any provision of Issuer's Certificate of Incorporation or By-laws, (b) conflict with or violate any law, governmental regulation or governmental order applicable to Issuer or any of its respective assets, properties or businesses, or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrance on any of the assets or properties of Issuer pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which Issuer is a party or by which any of such assets or properties is bound or affected; except to the extent that any conflict under (b) or (c) above would not materially and adversely affect Issuer's assets, liabilities or results of operations or prevent or materially delay the consummation of the transactions contemplated by this Agreement.

SECTION 3.05.  Governmental Consents and Approvals.  The execution, delivery and performance of this Agreement by Issuer does not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Entities, except such as are required by the HSR Act.

NYDOCS02/Compsrisc 475637 8 v. 9                        16

CONFIDENTIAL

D&T 0034097