UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|   |   |
|---|---|
| IN RE: PRICELINE.COM, INC. SECURITIES LITIGATION | : : : : : : : |
| This document relates to: | |
| ALL ACTIONS | |

: MASTER FILE NO.
: 3:00-CV-1884(AVC)

**RULING ON MOTION FOR LEAVE TO FILE
A SECOND  AMENDED COMPLAINT**

This is an action for damages brought on behalf of a class of all persons and entities who purchased or acquired Priceline.com securities during the class period of January 27, 2000 through October 4, 2000, and were damaged thereby.[1] It is brought pursuant to sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 78t, of the Securities and Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78a-78mm, and Rule 10b-5, 17 C.F.R. § 240.10b-5.  The complaint alleges that the defendants made certain misleading statements with respect to the profitability of Priceline.com ("Priceline") and WebHouse Club ("Webhouse"), causing the plaintiff class to suffer losses on

---

[1] Excluded from the class are the following: (1) the settling defendants; (2) the officers and directors of Priceline.com, at all relevant times; (3) members of the settling defendants' immediate families and their legal representatives, heirs, successors or assigns; (4) any entity in which the settling defendants have or at any time had a controlling interest; and (5) Deloitte & Touche LLP, or any of Deloitte's partners, officers and directors.

their investments in Priceline securities.  On May 4, 2007, the plaintiffs reached a settlement with the defendants Priceline, Jay Walker, Dan Schulman, Richard Braddock and N.J. Nichols.  On July 2, 2007, the court held a hearing to address the fairness of the proposed settlement in accordance with Federal Rule of Civil Procedure 23(e),[2] and on July 20, 2007, approved the parties proposed settlement and the plaintiffs' requested attorneys' fees and expenses.

On May 14, 2007, the plaintiffs filed the within motion for leave to file a second amended complaint against DeLoitte and Touche LLP ("Deloitte").  The proposed second amended complaint makes a claim against Deloitte for violation of section 10(b) of the Securities and Exchange Act.  The second amended complaint alleges unlawful conduct on the part of Deloitte with respect to the so-called "WebHouse warrants" and their accounting treatment.  For the reasons that follow, the motion is denied.

**FACTS**

Examination of the complaint and the papers filed in connection with the motion for leave to file a second amended complaint reveal the following facts:

On October 2, 2000, the plaintiffs filed the complaint in

---

[2] Federal Rule of Civil Procedure 23(e) provides, in relevant part, that "the court may approve a settlement . . . that would bind class members only after a hearing and on finding that the settlement . . . is fair, reasonable, and adequate."  Fed.R.Civ.P. 23(e)(1)(C).

this case, alleging that the defendants made certain misleading statements with respect to the profitability of Priceline and WebHouse, causing the plaintiff class to suffer losses on their investments in Priceline securities. On November 29, 2000, the court consolidated nine of the within cases. On September 12, 2001, the court consolidated the remaining 21 cases under the above-titled case number. On September 12, 2001, the court appointed lead plaintiff for the putative class. On October 29, 2001, the plaintiff filed a consolidated amended complaint. On February 28, 2002, the defendant, Deloitte and Touche ("Deloitte"), and the defendants Priceline, Walker, Schulman, Braddock and Nichols ("Priceline Defendants"), filed motions to dismiss the consolidated amended complaint. On October 7, 2004, the court, the honorable Dominic J. Squatrito, granted in part and denied in part the defendants' motions to dismiss and dismissed a portion of the allegations against the Priceline defendants and all of the allegations against Deloitte. Specifically, with respect to Deloitte, the court concluded that "the plaintiffs have not demonstrated that they could prove that Deloitte acted with the required state of mind." See In re: Priceline.com, Inc. Securities Litigation, 342 F. Supp.2d 33, 50 (D. Conn. 2004). The court concluded that "the nature of the alleged accounting irregularities themselves do not give rise to a strong inference of scienter." Id.

On January 7, 2005, the plaintiffs filed a motion to certify the class. On April 4, 2006, the court certified the plaintiff class to include all persons and entities who purchased or acquired Priceline.com securities during the class period of January 27, 2000 through October 4, 2000, and were damaged thereby. During the pendency of this case, the parties filed numerous discovery motions and have produced and reviewed 5.29 million pages of WebHouse and Priceline documents.

On May 4, 2007, the plaintiffs reached agreement with the Priceline defendants for a cash settlement of $80 million.[3]

On May 14, 2007, three years after the court dismissed Deloitte from this case, seven years after the plaintiffs filed the original complaint in this case, and ten days after the plaintiffs filed their notice of settlement with the Priceline defendants, the plaintiffs filed the within motion file a second amended complaint against Deloitte. In their proposed second amended complaint, the plaintiffs allege facts with respect to Deloitte's alleged scienter in section VIII(F). In general, section VIII(F) recounts various communications with respect to the WebHouse warrant transaction. Specifically, the second amended complaint alleges the following facts with respect to

---

[3] On July 2, 2007, the court held a hearing to address the fairness of the proposed settlement in accordance with Federal Rule of Civil Procedure 23(e). On July 20, 2007, the court approved the parties proposed settlement and the plaintiffs' requested attorneys' fees and expenses.

that warrant transaction:

> In 1999, the founder of Priceline, Jay Walker, conceived the concept for WebHouse as an internet grocery store using the Priceline, "name your own price" business model. On October 26, 1999, WebHouse granted to Priceline warrants to purchase shares of WebHouse stock and Priceline agreed to license certain of its business methods to WebHouse. Priceline disclosed facts surrounding the WebHouse warrants in its 1999 Form 10-K, filed on March 30, 2000. Priceline realized immediate gain for the warrants in the amount of approximately $189 million in income for the 1999 tax year.
>
> In September 1999, Priceline described the transaction as an exchange of Priceline's trademark license for a warrant to purchase WebHouse stock that was exercisable upon certain events. At that time, the transaction also included WebHouse's payment of royalties to Priceline under certain circumstances. On September 30, 1999, Priceline executive, Jay Walker met with Priceline auditors Robert Bass and Tom Restivo and Priceline tax consultant at Deloitte, David Acampora, to discuss tax treatment for the WebHouse transaction. On October 18, 1999, there was discussion with Skadden Arps attorneys that Robert Mylod, Priceline Vice President and Paul Francis would call the law firm drafting the WebHouse transaction to change the language of the warrant to communicate an intent to exchange the warrants for property and

not services.  Deloitte tax consultants prepared a memo reflecting this fact.  Priceline audit manager, Tom Restivo, noted in a memo dated October 20, 1999, that revenue from the warrant would be deferred.

On October 26, 1999, Priceline and WebHouse entered into various agreements regarding the WebHouse warrants.  On November 2, 1999, Priceline issued a press release stating that it licensed its business to WebHouse and WebHouse would make royalty payments once it achieved a certain threshold and WebHouse issued the warrants to Priceline entitling Priceline to purchase a majority equity stake in WebHouse under certain conditions.  On November 3, 1999, Priceline issued a second press release in which it stated that "Priceline.com has licensed its patented business system, brand and certain technology to the WebHouse Club.  In return, priceline.com has received warrants to purchase a majority stake in WebHouse Club."  Thus, the November 3, 1999 press release removed any reference to royalty payments and stated that the warrants were exchanged for Priceline's intellectual property.

On November 8, 1999, Robert Bass concluded in a memorandum that, after review of the various agreements and attending several meetings, if the warrants were fully vested upon grant and required no further services to be rendered, Priceline could recognize them as income when received.  On November 8, 1999,

6

Priceline issued another press release in which it stated that the warrant was issued in change for Priceline's intellectual property.

In December 1999, the SEC issued Staff Accounting Bulletin ("SAC") 101, which addressed revenue recognition under certain circumstances. In that document, the SEC stated that "[u]nless the up-front fee is in exchange for products delivered or services performed that represent the culmination of a separate earnings process, the deferral of revenue is appropriate." SAC 101 also states that "the registrants should consider the specific facts and circumstances to determine the appropriate accounting for non-refundable, up-front fees." Deloitte's audit files contain an outline of SAB 101. The complaint further alleges that Restivo and Deloitte auditors were aware of the GAAP prohibition of up-front revenue recognition on fees for signing a license agreement.

On January 18, 2000, Restivo drafted a memorandum in which he requested that experts in Deloitte's national office approve up-front revenue recognition for the WebHouse warrants. In a January 27, 2000 letter, Deloitte auditors advised Priceline about SAB 101.[4] On January 27, 2000, Priceline issued a press release announcing its fourth quarter earnings in which it

---

[4] The letter was presented to Priceline's audit committee on February 29, 2000.

recognized revenue of $189 million for the WebHouse warrant.

In a February 22, 2000 memorandum, Restivo reported that Deloitte's national office had rejected up-front revenue recognition for the WebHouse warrants unless the language in the agreement was changed to represent an intent that the warrant was in exchange for Priceline doing business with WebHouse and not in consideration for Priceline's execution and delivery of the license agreement.  Restivo represented that Priceline and WebHouse were in the process of making this change.  Priceline created a new warrant agreement to replace the language addressing consideration for the warrant.

After two preliminary versions of its audit evidence of intent, the final version was included in Deloitte's 1999 audit work papers.  It reflected the fact that the warrant agreement was entered into solely for the purpose of inducing Priceline to do business with WebHouse and stated that certain agreements with respect to the warrants were being amended.

In its 2000 form 10-K, Priceline reported an intent that the warrant was exchanged "for services rendered" and reported that upon receipt of the warrant, Priceline recognized its value.  The second amended complaint states that a copy of this document, in Deloitte's files, contains handwritten notes questioning whether Priceline should have recognized this income in 1999.

**STANDARD**

Federal Rule of Civil Procedure 15(a) provides, in relevant part, as follows: "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a).  In Foman v. Davis, 371 U.S. 178 (1962), the Supreme Court recognized that "[i]n the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, by virtue of the allowance of the amendment, futility of amendment, etc.- the leave sought should, as the rules require, be 'freely given.'" Id. at 182.  "Although the decision of whether to allow plaintiffs to amend their complaint is left to the sound discretion of the district court, there must be good reason to deny the motion." Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir. 1995).  The Acito court recognized that "[o]ne good reason to deny leave to amend is when such leave would be futile." Id.

**DISCUSSION**

The plaintiffs argue that the allegations against Deloitte contained in the proposed second amended complaint are based upon documents that Deloitte produced in August 2006.  The plaintiffs allege that the documents contain evidence of scienter sufficient

9

to maintain a securities fraud claim against Deloitte. Specifically, the plaintiffs state that there is evidence that Deloitte auditors and tax consultants were intimately involved in the fraudulent structuring of the Webhouse transaction. The amended complaint further alleges that Deloitte auditors and Priceline officials thereafter created false audit evidence in order to conceal the improper accounting.

Deloitte responds that two limitations periods have expired and, in any event, the second amended complaint fails to allege facts sufficient to create the requisite "strong inference" that Deloitte committed securities fraud. Deloitte states that its auditors acted responsibly and professionally and any error was, at most, negligent conduct and did not rise to the level of scienter necessary to maintain an action for securities fraud.

With respect to allegations against Deloitte, the original consolidated complaint alleged that "Deloitte's reckless or intentional failure to comply with standard accounting procedures resulted in the reporting of materially false financial statements and results to investors." Complaint at ¶ 37. Specifically, the complaint alleged that

> Deloitte's actions were a complete abandonment of its responsibilities as an independent auditor and that, as a consequence, Deloitte affirmatively participated and perpetuated the alleged fraud. Material portions of Priceline's financial statements were unsupported by any credible evidence while, at the same time, all the evidence available to Deloitte contradicted the treatment it publicly approved for the most material item in Priceline's financial statements: the WebHouse

warrants recognized as $188.8 million in income, and constituting 42 percent of Priceline's reported assets.

The plaintiffs alleged, in their original consolidated amended complaint, that Deloitte was liable based upon the existence of certain "red flags" in Priceline's data which should have alerted Deloitte to Priceline's scheme to defraud investors. These so-called "red flags" were, (1) the magnitude of the WebHouse warrants (42% of Priceline's assets); (2) the fact that WebHouse's viability was important to Priceline's financial growth; (3) the impropriety of recording WebHouse royalty income; (4) the WebHouse operational data indicating its burden on Priceline; (5) management's reservations concerning Webhouse's viability; (6) Priceline's weak computer system; (7) the problems inherent in expanding Priceline beyond the travel business; (8) Priceline, Walker, Walker Digital and WebHouse's close relationship; and (9) Priceline stock insider sales.

In an opinion dated October 7, 2004, Judge Squatrito concluded that these allegations failed to allege sufficient scienter on the part of Deloitte in order to maintain a securities fraud claim against them. Specifically, the court stated that the "[p]laintiffs have not demonstrated that they could prove that Deloitte acted with the requisite state of mind. Even if the court could infer that Deloitte was aware of the red flags set forth herein, which is no small leap, the red flags are not so egregious as to render Deloitte's audit a farce." <u>In re:</u>

11

Priceline.co, Inc. Securities Litigation, 342 F. Supp.2d 33, 57 (D. Conn. 2004). The court further stated that "the nature of the alleged accounting irregularities themselves do not give rise to a strong inference of scienter." Id. at 57. The court recognized that

> "the alleged fraud here is that Priceline carried on the illusion that WebHouse could be a successful business entity while knowing that it would collapse under the weight of its own expansion at some point in time. There is simply nothing in the complaint to indicate that Deloitte should have been able to cast aside this illusion, and the independent valuation accompanying it, and render an opinion that the WebHouse warrants were worthless."

Id. at 58.

For the reasons that follow, the court concludes that the plaintiffs proposed second amended complaint fails to allege sufficient additional facts to overcome the concerns expressed in this court's prior opinion.

The second circuit has recognized that "[s]ecurities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." ATSI Communication, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). In order to properly plead scienter, "a plaintiff must either (a) allege facts to show that 'defendants had both motive and opportunity to commit fraud' or (b) allege facts that 'constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Press v. Chemical Investment Services Corp., 166 F.3d 529, 538 (2d Cir. 1999) (citing Shields

12

v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)). Specifically, the Private Securities Litigation Reform Act requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see also Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000). The Supreme Court recently stated that the phrase "strong inference" requires the court "to engage in a comparative evaluation; it must consider not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged. . . . To qualify as 'strong' within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. V. Makor Issues & Rights Ltd., 127 S. Ct. 2499, 2504-05 (2007); see also ATSI Communications, Inc. V. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) (dismissing securities fraud complaint for failure to properly plead scienter and applying the Tellabs standard).

In order to state a cause of action for securities fraud against an auditor, the second circuit has recognized that "[f]or 'recklessness on the part of a non-fiduciary accountant' to satisfy securities fraud scienter, 'such recklessness must be conduct that is 'highly unreasonable,' representing 'an extreme

departure from the standards of ordinary care.' It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.'" Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000)(holding that "[a]lthough the Complaint alleged that Andersen had violated various GAAP provisions, those allegations, 'without corresponding fraudulent intent,' do not suffice 'to state a securities fraud claim.'")(quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120-21 (2d Cir 1982)).[5] The facts alleged in the second amended complaint fail to rise this level of scienter.

In their second amended complaint, the plaintiffs again point to several circumstances that, they argue, should have alerted Deloitte to a problem with Priceline's up-front revenue recognition of the WebHouse warrants and that indicate Deloitte's intent to defraud investors. The plaintiffs argue that Restivo's view was revisionist in that, once he realized his mistaken

---

[5] This court, in ruling on the defendants' earlier motions to dismiss, recognized that in order to meet the stringent standard for scienter of a non-fiduciary accountant, in the securities fraud context, a plaintiff must

> prove that the accounting practices were so deficient that the audit amounted to no audit at all, . . . or an egregious refusal to see the obvious, or to investigate the doubtful, . . . or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

In re: Priceline.com, Inc. Securities Litigation, 342 F. Supp.2d 33, 57 (D. Conn. 2004)(quoting S.E.C. v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)).

14

advice regarding the language in the warrants and their accounting treatment, he attempted to retroactively change that language to be at odds with the original intent of the WebHouse transaction. The plaintiffs argue that Restivo created "false audit evidence" in order to cure the defect in the language of the warrant agreement with respect to Priceline's up-front revenue recognition of the warrants.[6] The plaintiffs allege that Deloitte auditors and tax consultants were involved in structuring the WebHouse transaction.

Deloitte responds that the facts of this case do not involve the requisite level of intent to make out a securities fraud claim. Specifically, Deloitte states that its auditors never took a revisionist view but instead consistently stated that the warrant was not for future services. Deloitte also states that it had no concrete personal gain from any fraudulent action with respect to the warrant transaction and, therefore, had no motive to act with intent to defraud. Deloitte argues that the facts

---

[6] For example, the second amended complaint cites a memorandum dated March 15, 2000, in which Tom Restivo reports that he had spoken to Robert Mylod who "indicated that the purpose of the warrant grant was purely an inducement to get [Priceline] to participate in discussion with the [WebHouse] service and was in the nature of a good faith 'sign-on bonus.'" Second Amended complaint, ¶ 95. The complaint also cites Priceline's March 2000 representation letter, footnote 11 to Priceline's financial statements contained in its 1999 Form 10-K, and Deloitte's audit evidence of intent which contain similar language regarding the purpose of the warrant that the plaintiffs allege Deloitte caused to be inserted. Id. at ¶¶ 97-98.

here do not show conscious misbehavior because there was an independent valuation of the Webhouse warrant, the warrant transaction and its accounting were publically disclosed, which belies any underlying fraudulent intent, and Deloitte auditors carefully considered the appropriate accounting treatment for the warrants.

Based upon review of the arguments and the additional facts alleged in the second amended complaint, the court concludes that the allegations remain, as they were in 2004,[7] deficient with respect to Deloitte's scienter. Any inference of scienter on the facts presented in the amended complaint is not "at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. V. Makor Issues & Rights Ltd., 127 S. Ct. 2499, 2504-05 (2007). The facts demonstrate that Deloitte auditors publically disclosed their accounting treatment and sought advice concerning the proper treatment of the warrants. The allegations further demonstrate several instances in which Deloitte carefully

---

[7] The court recognizes the continued applicability of its analysis in its prior decision that,
> the alleged fraud here is that Priceline carried on the illusion that WebHouse could be a successful business entity while knowing that it would collapse under the weight of its own expansion at some point in time. There is simply nothing in the complaint to indicate that Deloitte should have been able to cast aside this illusion, and the independent valuation accompanying it, and render an opinion that the WebHouse warrants were worthless.

Id. at 58.

considered the facts surrounding the warrant transaction in order to determine the proper accounting treatment for the warrants. The inference that Deloitte acted appropriately under the circumstances outweighs any alleged inference of intentional fraud. Further, any mistaken accounting decisions were, at most, negligent and the second amended complaint has failed to allege facts to support a sufficient inference of scienter. Deloitte's decisions were not 'highly unreasonable,' representing 'an extreme departure from the standards of ordinary care.'" Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000). Because amendment would be futile,[8] the motion to file a second amended complaint is denied.

---

[8] In Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir. 1995), the second circuit recognized that "[o]ne good reason to deny leave to amend is when such leave would be futile." Id. In that case, the court held that the proposed amended complaint did not sufficiently plead scienter to support a securities fraud claim where the defendant failed to disclose certain information to investors.

**CONCLUSION**

For the foregoing reasons, the plaintiffs' motion to file a second amended complaint (document no. **449**) is **DENIED**.  In addition, the motions to seal portions of certain documents (document no.s **481** and **490**) are **GRANTED**.

It is so ordered this           day of November, 2007, at Hartford, Connecticut.

                                   _____
                                   Alfred V. Covello,
                                   United States District Judge